U.S. Department of Justice

~~Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

# Report On The Investigation Into Russian Interference In The 2016 Presidential Election

## Volume II of II

### Special Counsel Robert S. Mueller, III

*Submitted Pursuant to 28 C.F.R. § 600.8(c)*

Washington, D.C.

March 2019

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

## TABLE OF CONTENTS – VOLUME II

INTRODUCTION TO VOLUME II ........................................................................................... 1

EXECUTIVE SUMMARY TO VOLUME II .............................................................................. 3

I. BACKGROUND LEGAL AND EVIDENTIARY PRINCIPLES .................................................. 9

    A. Legal Framework of Obstruction of Justice................................................................ 9

    B. Investigative and Evidentiary Considerations............................................................ 12

II. FACTUAL RESULTS OF THE OBSTRUCTION INVESTIGATION ...................................... 15

    A. The Campaign's Response to Reports About Russian Support for Trump ................. 15

        1.   Press Reports Allege Links Between the Trump Campaign and Russia ............. 16

        2.   The Trump Campaign Reacts to WikiLeaks's Release of Hacked Emails........... 17

        3.   The Trump Campaign Reacts to Allegations That Russia was Seeking to
            Aid Candidate Trump ...................................................................................... 18

        4.   After the Election, Trump Continues to Deny Any Contacts or
            Connections with Russia or That Russia Aided his Election............................... 21

    B. The President's Conduct Concerning the Investigation of Michael Flynn ................. 24

        1.   Incoming National Security Advisor Flynn Discusses Sanctions on Russia
            with Russian Ambassador Sergey Kislyak ........................................................ 24

        2.   President-Elect Trump is Briefed on the Intelligence Community's
            Assessment of Russian Interference in the Election and Congress Opens
            Election-Interference Investigations ................................................................. 27

        3.   Flynn Makes False Statements About his Communications with Kislyak to
            Incoming Administration Officials, the Media, and the FBI .............................. 29

        4.   DOJ Officials Notify the White House of Their Concerns About Flynn ............. 31

        5.   McGahn has a Follow-Up Meeting About Flynn with Yates; President
            Trump has Dinner with FBI Director Comey ..................................................... 32

        6.   Flynn's Resignation ......................................................................................... 36

        7.   The President Discusses Flynn with FBI Director Comey .................................. 38

        8.   The Media Raises Questions About the President's Delay in Terminating
            Flynn....... ........................................................................................................ 41

        9.   The President Attempts to Have K.T. McFarland Create a Witness
            Statement Denying that he Directed Flynn's Discussions with Kislyak ............. 42

    C. The President's Reaction to Public Confirmation of the FBI's Russia
    Investigation................................................................................................................ 48

        1.   Attorney General Sessions Recuses From the Russia Investigation.................... 48

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

2. FBI Director Comey Publicly Confirms the Existence of the Russia Investigation in Testimony Before HPSCI ................................................................. 52

3. The President Asks Intelligence Community Leaders to Make Public Statements that he had No Connection to Russia ................................................. 55

4. The President Asks Comey to "Lift the Cloud" Created by the Russia Investigation.......................................................................................................... 57

D. Events Leading Up To and Surrounding the Termination of FBI Director Comey ............................................................................................................................. 62

1. Comey Testifies Before the Senate Judiciary Committee and Declines to Answer Questions About Whether the President is Under Investigation ............ 62

2. The President Makes the Decision to Terminate Comey....................................... 64

E. The President's Efforts to Remove the Special Counsel ............................................. 77

1. The Appointment of the Special Counsel and the President's Reaction ............. 78

2. The President Asserts that the Special Counsel has Conflicts of Interest............. 80

3. The Press Reports that the President is Being Investigated for Obstruction of Justice and the President Directs the White House Counsel to Have the Special Counsel Removed ................................................................................... 84

F. The President's Efforts to Curtail the Special Counsel Investigation......................... 90

1. The President Asks Corey Lewandowski to Deliver a Message to Sessions to Curtail the Special Counsel Investigation......................................................... 90

2. The President Follows Up with Lewandowski ..................................................... 92

3. The President Publicly Criticizes Sessions in a New York Times Interview ....... 93

4. The President Orders Priebus to Demand Sessions's Resignation ...................... 94

G. The President's Efforts to Prevent Disclosure of Emails About the June 9, 2016 Meeting Between Russians and Senior Campaign Officials............................... 98

1. The President Learns About the Existence of Emails Concerning the June 9, 2016 Trump Tower Meeting.......................................................................... 98

2. The President Directs Communications Staff Not to Publicly Disclose Information About the June 9 Meeting.............................................................. 100

3. The President Directs Trump Jr.'s Response to Press Inquiries About the June 9 Meeting................................................................................................. 101

4. The Media Reports on the June 9, 2016 Meeting .............................................. 103

H. The President's Further Efforts to Have the Attorney General Take Over the Investigation ........................................................................................................ 107

1. The President Again Seeks to Have Sessions Reverse his Recusal................... 107

2. Additional Efforts to Have Sessions Unrecuse or Direct Investigations Covered by his Recusal................................................................................... 109

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

I. The President Orders McGahn to Deny that the President Tried to Fire the
   Special Counsel ........................................................................................... 113

   1. The Press Reports that the President Tried to Fire the Special Counsel ............ 113

   2. The President Seeks to Have McGahn Dispute the Press Reports .................... 114

J. The President's Conduct Towards Flynn, Manafort, ▆HOM▆ ............................. 120

   1. Conduct Directed at Michael Flynn .................................................. 120

   2. Conduct Directed at Paul Manafort .................................................. 122

   3. ▆Harm to Ongoing Matter▆ ........................................................... 128

K. The President's Conduct Involving Michael Cohen .................................... 134

   1. Candidate Trump's Awareness of and Involvement in the Trump Tower
      Moscow Project ......................................................................... 134

   2. Cohen Determines to Adhere to a "Party Line" Distancing Candidate
      Trump From Russia ..................................................................... 138

   3. Cohen Submits False Statements to Congress Minimizing the Trump
      Tower Moscow Project in Accordance with the Party Line .............................. 139

   4. The President Sends Messages of Support to Cohen .................................. 144

   5. The President's Conduct After Cohen Began Cooperating with the
      Government............................................................................. 148

L. Overarching Factual Issues ............................................................ 156

III. LEGAL DEFENSES TO THE APPLICATION OF OBSTRUCTION-OF-JUSTICE STATUTES TO THE
   PRESIDENT................................................................................ 159

   A. Statutory Defenses to the Application of Obstruction-Of-Justice Provisions
      to the Conduct Under Investigation ................................................. 160

      1. The Text of Section 1512(c)(2) Prohibits a Broad Range of Obstructive
         Acts......... ...................................................................... 160

      2. Judicial Decisions Support a Broad Reading of Section 1512(c)(2) ................ 162

      3. The Legislative History of Section 1512(c)(2) Does Not Justify Narrowing
         Its Text.... ...................................................................... 164

      4. General Principles of Statutory Construction Do Not Suggest That Section
         1512(c)(2) is Inapplicable to the Conduct in this Investigation.................. 165

      5. Other Obstruction Statutes Might Apply to the Conduct in this
         Investigation.................................................................... 167

   B. Constitutional Defenses to Applying Obstruction-Of-Justice Statutes to
      Presidential Conduct ............................................................... 168

      1. The Requirement of a Clear Statement to Apply Statutes to Presidential
         Conduct Does Not Limit the Obstruction Statutes ................................. 169

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

    2.  Separation-of-Powers Principles Support the Conclusion that Congress May Validly Prohibit Corrupt Obstructive Acts Carried Out Through the President's Official Powers.............................................................................. 171

        a.  The Supreme Court's Separation-of-Powers Balancing Test Applies In This Context.................................................................................................. 172

        b.  The Effect of Obstruction-of-Justice Statutes on the President's Capacity to Perform His Article II Responsibilities is Limited .................... 173

        c.  Congress Has Power to Protect Congressional, Grand Jury, and Judicial Proceedings Against Corrupt Acts from Any Source .................................... 176

    3.  Ascertaining Whether the President Violated the Obstruction Statutes Would Not Chill his Performance of his Article II Duties ................................ 178

IV.  CONCLUSION...................................................................................................................... 182

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

### INTRODUCTION TO VOLUME II

This report is submitted to the Attorney General pursuant to 28 C.F.R. § 600.8(c), which states that, "[a]t the conclusion of the Special Counsel's work, he . . . shall provide the Attorney General a confidential report explaining the prosecution or declination decisions [the Special Counsel] reached."

Beginning in 2017, the President of the United States took a variety of actions towards the ongoing FBI investigation into Russia's interference in the 2016 presidential election and related matters that raised questions about whether he had obstructed justice. The Order appointing the Special Counsel gave this Office jurisdiction to investigate matters that arose directly from the FBI's Russia investigation, including whether the President had obstructed justice in connection with Russia-related investigations. The Special Counsel's jurisdiction also covered potentially obstructive acts related to the Special Counsel's investigation itself. This Volume of our report summarizes our obstruction-of-justice investigation of the President.

We first describe the considerations that guided our obstruction-of-justice investigation, and then provide an overview of this Volume:

*First*, a traditional prosecution or declination decision entails a binary determination to initiate or decline a prosecution, but we determined not to make a traditional prosecutorial judgment. The Office of Legal Counsel (OLC) has issued an opinion finding that "the indictment or criminal prosecution of a sitting President would impermissibly undermine the capacity of the executive branch to perform its constitutionally assigned functions" in violation of "the constitutional separation of powers."[1] Given the role of the Special Counsel as an attorney in the Department of Justice and the framework of the Special Counsel regulations, *see* 28 U.S.C. § 515; 28 C.F.R. § 600.7(a), this Office accepted OLC's legal conclusion for the purpose of exercising prosecutorial jurisdiction. And apart from OLC's constitutional view, we recognized that a federal criminal accusation against a sitting President would place burdens on the President's capacity to govern and potentially preempt constitutional processes for addressing presidential misconduct.[2]

*Second*, while the OLC opinion concludes that a sitting President may not be prosecuted, it recognizes that a criminal investigation during the President's term is permissible.[3] The OLC opinion also recognizes that a President does not have immunity after he leaves office.[4] And if individuals other than the President committed an obstruction offense, they may be prosecuted at this time. Given those considerations, the facts known to us, and the strong public interest in

---

[1] *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 222, 260 (2000) (OLC Op.).

[2] *See* U.S. CONST. Art. I § 2, cl. 5; § 3, cl. 6; *cf.* OLC Op. at 257-258 (discussing relationship between impeachment and criminal prosecution of a sitting President).

[3] OLC Op. at 257 n.36 ("A grand jury could continue to gather evidence throughout the period of immunity").

[4] OLC Op. at 255 ("Recognizing an immunity from prosecution for a sitting President would not preclude such prosecution once the President's term is over or he is otherwise removed from office by resignation or impeachment").

U.S. Department of Justice
Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

safeguarding the integrity of the criminal justice system, we conducted a thorough factual investigation in order to preserve the evidence when memories were fresh and documentary materials were available.

*Third*, we considered whether to evaluate the conduct we investigated under the Justice Manual standards governing prosecution and declination decisions, but we determined not to apply an approach that could potentially result in a judgment that the President committed crimes. The threshold step under the Justice Manual standards is to assess whether a person's conduct "constitutes a federal offense." U.S. Dep't of Justice, Justice Manual § 9-27.220 (2018) (Justice Manual). Fairness concerns counseled against potentially reaching that judgment when no charges can be brought. The ordinary means for an individual to respond to an accusation is through a speedy and public trial, with all the procedural protections that surround a criminal case. An individual who believes he was wrongly accused can use that process to seek to clear his name. In contrast, a prosecutor's judgment that crimes were committed, but that no charges will be brought, affords no such adversarial opportunity for public name-clearing before an impartial adjudicator.[5]

The concerns about the fairness of such a determination would be heightened in the case of a sitting President, where a federal prosecutor's accusation of a crime, even in an internal report, could carry consequences that extend beyond the realm of criminal justice. OLC noted similar concerns about sealed indictments. Even if an indictment were sealed during the President's term, OLC reasoned, "it would be very difficult to preserve [an indictment's] secrecy," and if an indictment became public, "[t]he stigma and opprobrium" could imperil the President's ability to govern."[6] Although a prosecutor's internal report would not represent a formal public accusation akin to an indictment, the possibility of the report's public disclosure and the absence of a neutral adjudicatory forum to review its findings counseled against potentially determining "that the person's conduct constitutes a federal offense." Justice Manual § 9-27.220.

*Fourth*, if we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state. Based on the facts and the applicable legal standards, however, we are unable to reach that judgment. The evidence we obtained about the President's actions and intent presents difficult issues that prevent us from conclusively determining that no criminal conduct occurred. Accordingly, while this report does not conclude that the President committed a crime, it also does not exonerate him.

*       *       *

This report on our investigation consists of four parts. Section I provides an overview of obstruction-of-justice principles and summarizes certain investigatory and evidentiary considerations. Section II sets forth the factual results of our obstruction investigation and analyzes the evidence. Section III addresses statutory and constitutional defenses. Section IV states our conclusion.

---

[5] For that reason, criticisms have been lodged against the practice of naming unindicted co-conspirators in an indictment. *See United States v. Briggs*, 514 F.2d 794, 802 (5th Cir. 1975) ("The courts have struck down with strong language efforts by grand juries to accuse persons of crime while affording them no forum in which to vindicate themselves."); *see also* Justice Manual § 9-11.130.

[6] OLC Op. at 259 & n.38 (citation omitted).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

### EXECUTIVE SUMMARY TO VOLUME II

Our obstruction-of-justice inquiry focused on a series of actions by the President that related to the Russian-interference investigations, including the President's conduct towards the law enforcement officials overseeing the investigations and the witnesses to relevant events.

#### FACTUAL RESULTS OF THE OBSTRUCTION INVESTIGATION

The key issues and events we examined include the following:

*The Campaign's response to reports about Russian support for Trump.* During the 2016 presidential campaign, questions arose about the Russian government's apparent support for candidate Trump. After WikiLeaks released politically damaging Democratic Party emails that were reported to have been hacked by Russia, Trump publicly expressed skepticism that Russia was responsible for the hacks at the same time that he and other Campaign officials privately sought information ██Harm to Ongoing Matter████████ about any further planned WikiLeaks releases. Trump also denied having any business in or connections to Russia, even though as late as June 2016 the Trump Organization had been pursuing a licensing deal for a skyscraper to be built in Russia called Trump Tower Moscow. After the election, the President expressed concerns to advisors that reports of Russia's election interference might lead the public to question the legitimacy of his election.

*Conduct involving FBI Director Comey and Michael Flynn.* In mid-January 2017, incoming National Security Advisor Michael Flynn falsely denied to the Vice President, other administration officials, and FBI agents that he had talked to Russian Ambassador Sergey Kislyak about Russia's response to U.S. sanctions on Russia for its election interference. On January 27, the day after the President was told that Flynn had lied to the Vice President and had made similar statements to the FBI, the President invited FBI Director Comey to a private dinner at the White House and told Comey that he needed loyalty. On February 14, the day after the President requested Flynn's resignation, the President told an outside advisor, "Now that we fired Flynn, the Russia thing is over." The advisor disagreed and said the investigations would continue.

Later that afternoon, the President cleared the Oval Office to have a one-on-one meeting with Comey. Referring to the FBI's investigation of Flynn, the President said, "I hope you can see your way clear to letting this go, to letting Flynn go. He is a good guy. I hope you can let this go." Shortly after requesting Flynn's resignation and speaking privately to Comey, the President sought to have Deputy National Security Advisor K.T. McFarland draft an internal letter stating that the President had not directed Flynn to discuss sanctions with Kislyak. McFarland declined because she did not know whether that was true, and a White House Counsel's Office attorney thought that the request would look like a quid pro quo for an ambassadorship she had been offered.

*The President's reaction to the continuing Russia investigation.* In February 2017, Attorney General Jeff Sessions began to assess whether he had to recuse himself from campaign-related investigations because of his role in the Trump Campaign. In early March, the President told White House Counsel Donald McGahn to stop Sessions from recusing. And after Sessions announced his recusal on March 2, the President expressed anger at the decision and told advisors that he should have an Attorney General who would protect him. That weekend, the President took Sessions aside at an event and urged him to "unrecuse." Later in March, Comey publicly

U.S. Department of Justice
Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

disclosed at a congressional hearing that the FBI was investigating "the Russian government's efforts to interfere in the 2016 presidential election," including any links or coordination between the Russian government and the Trump Campaign. In the following days, the President reached out to the Director of National Intelligence and the leaders of the Central Intelligence Agency (CIA) and the National Security Agency (NSA) to ask them what they could do to publicly dispel the suggestion that the President had any connection to the Russian election-interference effort. The President also twice called Comey directly, notwithstanding guidance from McGahn to avoid direct contacts with the Department of Justice. Comey had previously assured the President that the FBI was not investigating him personally, and the President asked Comey to "lift the cloud" of the Russia investigation by saying that publicly.

***The President's termination of Comey.*** On May 3, 2017, Comey testified in a congressional hearing, but declined to answer questions about whether the President was personally under investigation. Within days, the President decided to terminate Comey. The President insisted that the termination letter, which was written for public release, state that Comey had informed the President that he was not under investigation. The day of the firing, the White House maintained that Comey's termination resulted from independent recommendations from the Attorney General and Deputy Attorney General that Comey should be discharged for mishandling the Hillary Clinton email investigation. But the President had decided to fire Comey before hearing from the Department of Justice. The day after firing Comey, the President told Russian officials that he had "faced great pressure because of Russia," which had been "taken off" by Comey's firing. The next day, the President acknowledged in a television interview that he was going to fire Comey regardless of the Department of Justice's recommendation and that when he "decided to just do it," he was thinking that "this thing with Trump and Russia is a made-up story." In response to a question about whether he was angry with Comey about the Russia investigation, the President said, "As far as I'm concerned, I want that thing to be absolutely done properly," adding that firing Comey "might even lengthen out the investigation."

***The appointment of a Special Counsel and efforts to remove him.*** On May 17, 2017, the Acting Attorney General for the Russia investigation appointed a Special Counsel to conduct the investigation and related matters. The President reacted to news that a Special Counsel had been appointed by telling advisors that it was "the end of his presidency" and demanding that Sessions resign. Sessions submitted his resignation, but the President ultimately did not accept it. The President told aides that the Special Counsel had conflicts of interest and suggested that the Special Counsel therefore could not serve. The President's advisors told him the asserted conflicts were meritless and had already been considered by the Department of Justice.

On June 14, 2017, the media reported that the Special Counsel's Office was investigating whether the President had obstructed justice. Press reports called this "a major turning point" in the investigation: while Comey had told the President he was not under investigation, following Comey's firing, the President now was under investigation. The President reacted to this news with a series of tweets criticizing the Department of Justice and the Special Counsel's investigation. On June 17, 2017, the President called McGahn at home and directed him to call the Acting Attorney General and say that the Special Counsel had conflicts of interest and must be removed. McGahn did not carry out the direction, however, deciding that he would resign rather than trigger what he regarded as a potential Saturday Night Massacre.

4

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

*Efforts to curtail the Special Counsel's investigation*.  Two days after directing McGahn to have the Special Counsel removed, the President made another attempt to affect the course of the Russia investigation.  On June 19, 2017, the President met one-on-one in the Oval Office with his former campaign manager Corey Lewandowski, a trusted advisor outside the government, and dictated a message for Lewandowski to deliver to Sessions.  The message said that Sessions should publicly announce that, notwithstanding his recusal from the Russia investigation, the investigation was "very unfair" to the President, the President had done nothing wrong, and Sessions planned to meet with the Special Counsel and "let [him] move forward with investigating election meddling for future elections."  Lewandowski said he understood what the President wanted Sessions to do.

One month later, in another private meeting with Lewandowski on July 19, 2017, the President asked about the status of his message for Sessions to limit the Special Counsel investigation to future election interference.  Lewandowski told the President that the message would be delivered soon.  Hours after that meeting, the President publicly criticized Sessions in an interview with the New York Times, and then issued a series of tweets making it clear that Sessions's job was in jeopardy.  Lewandowski did not want to deliver the President's message personally, so he asked senior White House official Rick Dearborn to deliver it to Sessions.  Dearborn was uncomfortable with the task and did not follow through.

*Efforts to prevent public disclosure of evidence.*  In the summer of 2017, the President learned that media outlets were asking questions about the June 9, 2016 meeting at Trump Tower between senior campaign officials, including Donald Trump Jr., and a Russian lawyer who was said to be offering damaging information about Hillary Clinton as "part of Russia and its government's support for Mr. Trump."  On several occasions, the President directed aides not to publicly disclose the emails setting up the June 9 meeting, suggesting that the emails would not leak and that the number of lawyers with access to them should be limited.  Before the emails became public, the President edited a press statement for Trump Jr. by deleting a line that acknowledged that the meeting was with "an individual who [Trump Jr.] was told might have information helpful to the campaign" and instead said only that the meeting was about adoptions of Russian children.  When the press asked questions about the President's involvement in Trump Jr.'s statement, the President's personal lawyer repeatedly denied the President had played any role.

*Further efforts to have the Attorney General take control of the investigation.*  In early summer 2017, the President called Sessions at home and again asked him to reverse his recusal from the Russia investigation.  Sessions did not reverse his recusal.  In October 2017, the President met privately with Sessions in the Oval Office and asked him to "take [a] look" at investigating Clinton.  In December 2017, shortly after Flynn pleaded guilty pursuant to a cooperation agreement, the President met with Sessions in the Oval Office and suggested, according to notes taken by a senior advisor, that if Sessions unrecused and took back supervision of the Russia investigation, he would be a "hero."  The President told Sessions, "I'm not going to do anything or direct you to do anything.  I just want to be treated fairly."  In response, Sessions volunteered that he had never seen anything "improper" on the campaign and told the President there was a "whole new leadership team" in place.  He did not unrecuse.

*Efforts to have McGahn deny that the President had ordered him to have the Special Counsel removed*.  In early 2018, the press reported that the President had directed McGahn to

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

have the Special Counsel removed in June 2017 and that McGahn had threatened to resign rather than carry out the order. The President reacted to the news stories by directing White House officials to tell McGahn to dispute the story and create a record stating he had not been ordered to have the Special Counsel removed. McGahn told those officials that the media reports were accurate in stating that the President had directed McGahn to have the Special Counsel removed. The President then met with McGahn in the Oval Office and again pressured him to deny the reports. In the same meeting, the President also asked McGahn why he had told the Special Counsel about the President's effort to remove the Special Counsel and why McGahn took notes of his conversations with the President. McGahn refused to back away from what he remembered happening and perceived the President to be testing his mettle.

**Conduct towards Flynn, Manafort, HOM** ███. After Flynn withdrew from a joint defense agreement with the President and began cooperating with the government, the President's personal counsel left a message for Flynn's attorneys reminding them of the President's warm feelings towards Flynn, which he said "still remains," and asking for a "heads up" if Flynn knew "information that implicates the President." When Flynn's counsel reiterated that Flynn could no longer share information pursuant to a joint defense agreement, the President's personal counsel said he would make sure that the President knew that Flynn's actions reflected "hostility" towards the President. During Manafort's prosecution and when the jury in his criminal trial was deliberating, the President praised Manafort in public, said that Manafort was being treated unfairly, and declined to rule out a pardon. After Manafort was convicted, the President called Manafort "a brave man" for refusing to "break" and said that "flipping" "almost ought to be outlawed." **Harm to Ongoing Matter**
███████████

**Conduct involving Michael Cohen.** The President's conduct towards Michael Cohen, a former Trump Organization executive, changed from praise for Cohen when he falsely minimized the President's involvement in the Trump Tower Moscow project, to castigation of Cohen when he became a cooperating witness. From September 2015 to June 2016, Cohen had pursued the Trump Tower Moscow project on behalf of the Trump Organization and had briefed candidate Trump on the project numerous times, including discussing whether Trump should travel to Russia to advance the deal. In 2017, Cohen provided false testimony to Congress about the project, including stating that he had only briefed Trump on the project three times and never discussed travel to Russia with him, in an effort to adhere to a "party line" that Cohen said was developed to minimize the President's connections to Russia. While preparing for his congressional testimony, Cohen had extensive discussions with the President's personal counsel, who, according to Cohen, said that Cohen should "stay on message" and not contradict the President. After the FBI searched Cohen's home and office in April 2018, the President publicly asserted that Cohen would not "flip," contacted him directly to tell him to "stay strong," and privately passed messages of support to him. Cohen also discussed pardons with the President's personal counsel and believed that if he stayed on message he would be taken care of. But after Cohen began cooperating with the government in the summer of 2018, the President publicly criticized him, called him a "rat," and suggested that his family members had committed crimes.

U.S. Department of Justice
Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

***Overarching factual issues***.  We did not make a traditional prosecution decision about these facts, but the evidence we obtained supports several general statements about the President's conduct.

Several features of the conduct we investigated distinguish it from typical obstruction-of-justice cases.  First, the investigation concerned the President, and some of his actions, such as firing the FBI director, involved facially lawful acts within his Article II authority, which raises constitutional issues discussed below.  At the same time, the President's position as the head of the Executive Branch provided him with unique and powerful means of influencing official proceedings, subordinate officers, and potential witnesses—all of which is relevant to a potential obstruction-of-justice analysis.  Second, unlike cases in which a subject engages in obstruction of justice to cover up a crime, the evidence we obtained did not establish that the President was involved in an underlying crime related to Russian election interference.  Although the obstruction statutes do not require proof of such a crime, the absence of that evidence affects the analysis of the President's intent and requires consideration of other possible motives for his conduct.  Third, many of the President's acts directed at witnesses, including discouragement of cooperation with the government and suggestions of possible future pardons, took place in public view.  That circumstance is unusual, but no principle of law excludes public acts from the reach of the obstruction laws.  If the likely effect of public acts is to influence witnesses or alter their testimony, the harm to the justice system's integrity is the same.

Although the series of events we investigated involved discrete acts, the overall pattern of the President's conduct towards the investigations can shed light on the nature of the President's acts and the inferences that can be drawn about his intent.  In particular, the actions we investigated can be divided into two phases, reflecting a possible shift in the President's motives.  The first phase covered the period from the President's first interactions with Comey through the President's firing of Comey.  During that time, the President had been repeatedly told he was not personally under investigation.  Soon after the firing of Comey and the appointment of the Special Counsel, however, the President became aware that his own conduct was being investigated in an obstruction-of-justice inquiry.  At that point, the President engaged in a second phase of conduct, involving public attacks on the investigation, non-public efforts to control it, and efforts in both public and private to encourage witnesses not to cooperate with the investigation.  Judgments about the nature of the President's motives during each phase would be informed by the totality of the evidence.

## STATUTORY AND CONSTITUTIONAL DEFENSES

The President's counsel raised statutory and constitutional defenses to a possible obstruction-of-justice analysis of the conduct we investigated.  We concluded that none of those legal defenses provided a basis for declining to investigate the facts.

***Statutory defenses.***  Consistent with precedent and the Department of Justice's general approach to interpreting obstruction statutes, we concluded that several statutes could apply here. *See* 18 U.S.C. §§ 1503, 1505, 1512(b)(3), 1512(c)(2).  Section 1512(c)(2) is an omnibus obstruction-of-justice provision that covers a range of obstructive acts directed at pending or contemplated official proceedings.  No principle of statutory construction justifies narrowing the provision to cover only conduct that impairs the integrity or availability of evidence.  Sections 1503 and 1505 also offer broad protection against obstructive acts directed at pending grand jury,

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

judicial, administrative, and congressional proceedings, and they are supplemented by a provision in Section 1512(b) aimed specifically at conduct intended to prevent or hinder the communication to law enforcement of information related to a federal crime.

***Constitutional defenses***.  As for constitutional defenses arising from the President's status as the head of the Executive Branch, we recognized that the Department of Justice and the courts have not definitively resolved these issues.  We therefore examined those issues through the framework established by Supreme Court precedent governing separation-of-powers issues.  The Department of Justice and the President's personal counsel have recognized that the President is subject to statutes that prohibit obstruction of justice by bribing a witness or suborning perjury because that conduct does not implicate his constitutional authority.  With respect to whether the President can be found to have obstructed justice by exercising his powers under Article II of the Constitution, we concluded that Congress has authority to prohibit a President's corrupt use of his authority in order to protect the integrity of the administration of justice.

Under applicable Supreme Court precedent, the Constitution does not categorically and permanently immunize a President for obstructing justice through the use of his Article II powers.  The separation-of-powers doctrine authorizes Congress to protect official proceedings, including those of courts and grand juries, from corrupt, obstructive acts regardless of their source.  We also concluded that any inroad on presidential authority that would occur from prohibiting corrupt acts does not undermine the President's ability to fulfill his constitutional mission.  The term "corruptly" sets a demanding standard.  It requires a concrete showing that a person acted with an intent to obtain an improper advantage for himself or someone else, inconsistent with official duty and the rights of others.  A preclusion of "corrupt" official action does not diminish the President's ability to exercise Article II powers.  For example, the proper supervision of criminal law does not demand freedom for the President to act with a corrupt intention of shielding himself from criminal punishment, avoiding financial liability, or preventing personal embarrassment.  To the contrary, a statute that prohibits official action undertaken for such corrupt purposes furthers, rather than hinders, the impartial and evenhanded administration of the law.  It also aligns with the President's constitutional duty to faithfully execute the laws.  Finally, we concluded that in the rare case in which a criminal investigation of the President's conduct is justified, inquiries to determine whether the President acted for a corrupt motive should not impermissibly chill his performance of his constitutionally assigned duties.  The conclusion that Congress may apply the obstruction laws to the President's corrupt exercise of the powers of office accords with our constitutional system of checks and balances and the principle that no person is above the law.

CONCLUSION

Because we determined not to make a traditional prosecutorial judgment, we did not draw ultimate conclusions about the President's conduct.  The evidence we obtained about the President's actions and intent presents difficult issues that would need to be resolved if we were making a traditional prosecutorial judgment.  At the same time, if we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state.  Based on the facts and the applicable legal standards, we are unable to reach that judgment.  Accordingly, while this report does not conclude that the President committed a crime, it also does not exonerate him.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

## I. BACKGROUND LEGAL AND EVIDENTIARY PRINCIPLES

### A.    Legal Framework of Obstruction of Justice

The May 17, 2017 Appointment Order and the Special Counsel regulations provide this Office with jurisdiction to investigate "federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation, such as perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses." 28 C.F.R. § 600.4(a). Because of that description of our jurisdiction, we sought evidence for our obstruction-of-justice investigation with the elements of obstruction offenses in mind. Our evidentiary analysis is similarly focused on the elements of such offenses, although we do not draw conclusions on the ultimate questions that govern a prosecutorial decision under the Principles of Federal Prosecution. *See* Justice Manual § 9-27.000 *et seq.* (2018).

Here, we summarize the law interpreting the elements of potentially relevant obstruction statutes in an ordinary case. This discussion does not address the unique constitutional issues that arise in an inquiry into official acts by the President. Those issues are discussed in a later section of this report addressing constitutional defenses that the President's counsel have raised. *See* Volume II, Section III.B, *infra*.

Three basic elements are common to most of the relevant obstruction statutes: (1) an obstructive act; (2) a nexus between the obstructive act and an official proceeding; and (3) a corrupt intent. *See*, *e.g.*, 18 U.S.C. §§ 1503, 1505, 1512(c)(2). We describe those elements as they have been interpreted by the courts. We then discuss a more specific statute aimed at witness tampering, *see* 18 U.S.C. § 1512(b), and describe the requirements for attempted offenses and endeavors to obstruct justice, *see* 18 U.S.C. §§ 1503, 1512(c)(2).

***Obstructive act***. Obstruction-of-justice law "reaches all corrupt conduct capable of producing an effect that prevents justice from being duly administered, regardless of the means employed." *United States v. Silverman*, 745 F.2d 1386, 1393 (11th Cir. 1984) (interpreting 18 U.S.C. § 1503). An "effort to influence" a proceeding can qualify as an endeavor to obstruct justice even if the effort was "subtle or circuitous" and "however cleverly or with whatever cloaking of purpose" it was made. *United States v. Roe*, 529 F.2d 629, 632 (4th Cir. 1975); *see also United States v. Quattrone*, 441 F.3d 153, 173 (2d Cir. 2006). The verbs "'obstruct or impede' are broad" and "can refer to anything that blocks, makes difficult, or hinders." *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (internal brackets and quotation marks omitted).

An improper motive can render an actor's conduct criminal even when the conduct would otherwise be lawful and within the actor's authority. *See United States v. Cueto*, 151 F.3d 620, 631 (7th Cir. 1998) (affirming obstruction conviction of a criminal defense attorney for "litigation-related conduct"); *United States v. Cintolo*, 818 F.2d 980, 992 (1st Cir. 1987) ("any act by any party—whether lawful or unlawful on its face—may abridge § 1503 if performed with a corrupt motive").

***Nexus to a pending or contemplated official proceeding***. Obstruction-of-justice law generally requires a nexus, or connection, to an official proceeding. In Section 1503, the nexus must be to pending "judicial or grand jury proceedings." *United States v. Aguilar*, 515 U.S. 593,

U.S. Department of Justice
Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

599 (1995). In Section 1505, the nexus can include a connection to a "pending" federal agency proceeding or a congressional inquiry or investigation. Under both statutes, the government must demonstrate "a relationship in time, causation, or logic" between the obstructive act and the proceeding or inquiry to be obstructed. *Id.* at 599; *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 707-708 (2005). Section 1512(c) prohibits obstructive efforts aimed at official proceedings including judicial or grand jury proceedings. 18 U.S.C. § 1515(a)(1)(A). "For purposes of" Section 1512, "an official proceeding need not be pending or about to be instituted at the time of the offense." 18 U.S.C. § 1512(f)(1). Although a proceeding need not already be in progress to trigger liability under Section 1512(c), a nexus to a contemplated proceeding still must be shown. *United States v. Young*, 916 F.3d 368, 386 (4th Cir. 2019); *United States v. Petruk*, 781 F.3d 438, 445 (8th Cir. 2015); *United States v. Phillips*, 583 F.3d 1261, 1264 (10th Cir. 2009); *United States v. Reich*, 479 F.3d 179, 186 (2d Cir. 2007). The nexus requirement narrows the scope of obstruction statutes to ensure that individuals have "fair warning" of what the law proscribes. *Aguilar*, 515 U.S. at 600 (internal quotation marks omitted).

The nexus showing has subjective and objective components. As an objective matter, a defendant must act "in a manner that is *likely* to obstruct justice," such that the statute "excludes defendants who have an evil purpose but use means that would only unnaturally and improbably be successful." *Aguilar*, 515 U.S. at 601-602 (emphasis added; internal quotation marks omitted). "[T]he endeavor must have the natural and probable effect of interfering with the due administration of justice." *Id.* at 599 (citation and internal quotation marks omitted). As a subjective matter, the actor must have "contemplated a particular, foreseeable proceeding." *Petruk*, 781 F.3d at 445-446. A defendant need not directly impede the proceeding. Rather, a nexus exists if "discretionary actions of a third person would be required to obstruct the judicial proceeding if it was foreseeable to the defendant that the third party would act on the [defendant's] communication in such a way as to obstruct the judicial proceeding." *United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (brackets, ellipses, and internal quotation marks omitted).

***Corruptly***. The word "corruptly" provides the intent element for obstruction of justice and means acting "knowingly and dishonestly" or "with an improper motive." *United States v. Richardson*, 676 F.3d 491, 508 (5th Cir. 2012); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (to act corruptly means to "act[] with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct" the relevant proceeding) (some quotation marks omitted); *see* 18 U.S.C. § 1515(b) ("As used in section 1505, the term 'corruptly' means acting with an improper purpose, personally or by influencing another."); *see also Arthur Andersen*, 544 U.S. at 705-706 (interpreting "corruptly" to mean "wrongful, immoral, depraved, or evil" and holding that acting "knowingly . . . corruptly" in 18 U.S.C. § 1512(b) requires "consciousness of wrongdoing"). The requisite showing is made when a person acted with an intent to obtain an "improper advantage for [him]self or someone else, inconsistent with official duty and the rights of others." BALLENTINE'S LAW DICTIONARY 276 (3d ed. 1969); *see United States v. Pasha*, 797 F.3d 1122, 1132 (D.C. Cir. 2015); *Aguilar*, 515 U.S. at 616 (Scalia, J., concurring in part and dissenting in part) (characterizing this definition as the "longstanding and well-accepted meaning" of "corruptly").

***Witness tampering***. A more specific provision in Section 1512 prohibits tampering with a witness. *See* 18 U.S.C. § 1512(b)(1), (3) (making it a crime to "knowingly use[] intimidation . . . or corruptly persuade[] another person," or "engage[] in misleading conduct towards another

U.S. Department of Justice
~~Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

person," with the intent to "influence, delay, or prevent the testimony of any person in an official proceeding" or to "hinder, delay, or prevent the communication to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense"). To establish corrupt persuasion, it is sufficient that the defendant asked a potential witness to lie to investigators in contemplation of a likely federal investigation into his conduct. *United States v. Edlind*, 887 F.3d 166, 174 (4th Cir. 2018); *United States v. Sparks*, 791 F.3d 1188, 1191-1192 (10th Cir. 2015); *United States v. Byrne*, 435 F.3d 16, 23-26 (1st Cir. 2006); *United States v. LaShay*, 417 F.3d 715, 718-719 (7th Cir. 2005); *United States v. Burns*, 298 F.3d 523, 539-540 (6th Cir. 2002); *United States v. Pennington*, 168 F.3d 1060, 1066 (8th Cir. 1999). The "persuasion" need not be coercive, intimidating, or explicit; it is sufficient to "urge," "induce," "ask[]," "argu[e]," "giv[e] reasons," *Sparks*, 791 F.3d at 1192, or "coach[] or remind[] witnesses by planting misleading facts," *Edlind*, 887 F.3d at 174. Corrupt persuasion is shown "where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it." *United States v. Rodolitz*, 786 F.2d 77, 82 (2d Cir. 1986); *see United States v. Gabriel*, 125 F.3d 89, 102 (2d Cir. 1997). It also covers urging a witness to recall a fact that the witness did not know, even if the fact was actually true. *See LaShay*, 417 F.3d at 719. Corrupt persuasion also can be shown in certain circumstances when a person, with an improper motive, urges a witness not to cooperate with law enforcement. *See United States v. Shotts*, 145 F.3d 1289, 1301 (11th Cr. 1998) (telling Secretary "not to [say] anything [to the FBI] and [she] would not be bothered").

When the charge is acting with the intent to hinder, delay, or prevent the communication of information to law enforcement under Section 1512(b)(3), the "nexus" to a proceeding inquiry articulated in *Aguilar*—that an individual have "knowledge that his actions are likely to affect the judicial proceeding," 515 U.S. at 599—does not apply because the obstructive act is aimed at the communication of information to investigators, not at impeding an official proceeding.

Acting "knowingly . . . corruptly" requires proof that the individual was "conscious of wrongdoing." *Arthur Andersen*, 544 U.S. at 705-706 (declining to explore "[t]he outer limits of this element" but indicating that an instruction was infirm where it permitted conviction even if the defendant "honestly and sincerely believed that [the] conduct was lawful"). It is an affirmative defense that "the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully." 18 U.S.C. § 1512(e).

*Attempts and endeavors*. Section 1512(c)(2) covers both substantive obstruction offenses and attempts to obstruct justice. Under general principles of attempt law, a person is guilty of an attempt when he has the intent to commit a substantive offense and takes an overt act that constitutes a substantial step towards that goal. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 106-107 (2007). "[T]he act [must be] substantial, in that it was strongly corroborative of the defendant's criminal purpose." *United States v. Pratt*, 351 F.3d 131, 135 (4th Cir. 2003). While "mere abstract talk" does not suffice, any "concrete and specific" acts that corroborate the defendant's intent can constitute a "substantial step." *United States v. Irving*, 665 F.3d 1184, 1198-1205 (10th Cir. 2011). Thus, "soliciting an innocent agent to engage in conduct constituting an element of the crime" may qualify as a substantial step. Model Penal Code § 5.01(2)(g); *see United States v. Lucas*, 499 F.3d 769, 781 (8th Cir. 2007).

11

U.S. Department of Justice
Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

The omnibus clause of 18 U.S.C. § 1503 prohibits an "endeavor" to obstruct justice, which sweeps more broadly than Section 1512's attempt provision. *See United States v. Sampson*, 898 F.3d 287, 302 (2d Cir. 2018); *United States v. Leisure*, 844 F.2d 1347, 1366-1367 (8th Cir. 1988) (collecting cases). "It is well established that a[n] [obstruction-of-justice] offense is complete when one corruptly endeavors to obstruct or impede the due administration of justice; the prosecution need not prove that the due administration of justice was actually obstructed or impeded." *United States v. Davis*, 854 F.3d 1276, 1292 (11th Cir. 2017) (internal quotation marks omitted).

## B.   Investigative and Evidentiary Considerations

After the appointment of the Special Counsel, this Office obtained evidence about the following events relating to potential issues of obstruction of justice involving the President:

(a) The President's January 27, 2017 dinner with former FBI Director James Comey in which the President reportedly asked for Comey's loyalty, one day after the White House had been briefed by the Department of Justice on contacts between former National Security Advisor Michael Flynn and the Russian Ambassador;

(b) The President's February 14, 2017 meeting with Comey in which the President reportedly asked Comey not to pursue an investigation of Flynn;

(c) The President's private requests to Comey to make public the fact that the President was not the subject of an FBI investigation and to lift what the President regarded as a cloud;

(d) The President's outreach to the Director of National Intelligence and the Directors of the National Security Agency and the Central Intelligence Agency about the FBI's Russia investigation;

(e) The President's stated rationales for terminating Comey on May 9, 2017, including statements that could reasonably be understood as acknowledging that the FBI's Russia investigation was a factor in Comey's termination; and

(f) The President's reported involvement in issuing a statement about the June 9, 2016 Trump Tower meeting between Russians and senior Trump Campaign officials that said the meeting was about adoption and omitted that the Russians had offered to provide the Trump Campaign with derogatory information about Hillary Clinton.

Taking into account that information and our analysis of applicable statutory and constitutional principles (discussed below in Volume II, Section III, *infra*), we determined that there was a sufficient factual and legal basis to further investigate potential obstruction-of-justice issues involving the President.

Many of the core issues in an obstruction-of-justice investigation turn on an individual's actions and intent. We therefore requested that the White House provide us with documentary evidence in its possession on the relevant events. We also sought and obtained the White House's concurrence in our conducting interviews of White House personnel who had relevant information. And we interviewed other witnesses who had pertinent knowledge, obtained documents on a

U.S. Department of Justice
~~Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

voluntary basis when possible, and used legal process where appropriate. These investigative steps allowed us to gather a substantial amount of evidence.

We also sought a voluntary interview with the President. After more than a year of discussion, the President declined to be interviewed. Grand Jury ██████████████████████████████████████████████████████████████████████████████████ During the course of our discussions, the President did agree to answer written questions on certain Russia-related topics, and he provided us with answers. He did not similarly agree to provide written answers to questions on obstruction topics or questions on events during the transition. Ultimately, while we believed that we had the authority and legal justification to issue a grand jury subpoena to obtain the President's testimony, we chose not to do so. We made that decision in view of the substantial delay that such an investigative step would likely produce at a late stage in our investigation. We also assessed that based on the significant body of evidence we had already obtained of the President's actions and his public and private statements describing or explaining those actions, we had sufficient evidence to understand relevant events and to make certain assessments without the President's testimony. The Office's decision-making process on this issue is described in more detail in Appendix C, *infra*, in a note that precedes the President's written responses.

In assessing the evidence we obtained, we relied on common principles that apply in any investigation. The issue of criminal intent is often inferred from circumstantial evidence. *See, e.g., United States v. Croteau*, 819 F.3d 1293, 1305 (11th Cir. 2016) ("[G]uilty knowledge can rarely be established by direct evidence. . . . Therefore, mens rea elements such as knowledge or intent may be proved by circumstantial evidence.") (internal quotation marks omitted); *United States v. Robinson*, 702 F.3d 22, 36 (2d Cir. 2012) ("The government's case rested on circumstantial evidence, but the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom.") (internal quotation marks omitted). The principle that intent can be inferred from circumstantial evidence is a necessity in criminal cases, given the right of a subject to assert his privilege against compelled self-incrimination under the Fifth Amendment and therefore decline to testify. Accordingly, determinations on intent are frequently reached without the opportunity to interview an investigatory subject.

Obstruction-of-justice cases are consistent with this rule. *See, e.g., Edlind*, 887 F.3d at 174, 176 (relying on "significant circumstantial evidence that [the defendant] was conscious of her wrongdoing" in an obstruction case; "[b]ecause evidence of intent will almost always be circumstantial, a defendant may be found culpable where the reasonable and foreseeable consequences of her acts are the obstruction of justice") (internal quotation marks, ellipses, and punctuation omitted); *Quattrone*, 441 F.3d at 173-174. Circumstantial evidence that illuminates intent may include a pattern of potentially obstructive acts. Fed. R. Evid. 404(b) ("Evidence of a crime, wrong, or other act . . . may be admissible . . . [to] prov[e] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."); *see, e.g., United States v. Frankhauser*, 80 F.3d 641, 648-650 (1st Cir. 1996); *United States v. Arnold*, 773 F.2d 823, 832-834 (7th Cir. 1985); *Cintolo*, 818 F.2d at 1000.

Credibility judgments may also be made based on objective facts and circumstantial evidence. Standard jury instructions highlight a variety of factors that are often relevant in

13

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

assessing credibility. These include whether a witness had a reason not to tell the truth; whether the witness had a good memory; whether the witness had the opportunity to observe the events about which he testified; whether the witness's testimony was corroborated by other witnesses; and whether anything the witness said or wrote previously contradicts his testimony. *See, e.g., First Circuit Pattern Jury Instructions* § 1.06 (2018); *Fifth Circuit Pattern Jury Instructions (Criminal Cases)* § 1.08 (2012); *Seventh Circuit Pattern Jury Instruction* § 3.01 (2012).

In addition to those general factors, we took into account more specific factors in assessing the credibility of conflicting accounts of the facts. For example, contemporaneous written notes can provide strong corroborating evidence. *See United States v. Nobles*, 422 U.S. 225, 232 (1975) (the fact that a "statement appeared in the contemporaneously recorded report . . . would tend strongly to corroborate the investigator's version of the interview"). Similarly, a witness's recitation of his account before he had any motive to fabricate also supports the witness's credibility. *See Tome v. United States*, 513 U.S. 150, 158 (1995) ("A consistent statement that predates the motive is a square rebuttal of the charge that the testimony was contrived as a consequence of that motive."). Finally, a witness's false description of an encounter can imply consciousness of wrongdoing. *See Al-Adahi v. Obama*, 613 F.3d 1102, 1107 (D.C. Cir. 2010) (noting the "well-settled principle that false exculpatory statements are evidence—often strong evidence—of guilt"). We applied those settled legal principles in evaluating the factual results of our investigation.