U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

## II. FACTUAL RESULTS OF THE OBSTRUCTION INVESTIGATION

This section of the report details the evidence we obtained. We first provide an overview of how Russia became an issue in the 2016 presidential campaign, and how candidate Trump responded. We then turn to the key events that we investigated: the President's conduct concerning the FBI investigation of Michael Flynn; the President's reaction to public confirmation of the FBI's Russia investigation; events leading up to and surrounding the termination of FBI Director Comey; efforts to terminate the Special Counsel; efforts to curtail the scope of the Special Counsel's investigation; efforts to prevent disclosure of information about the June 9, 2016 Trump Tower meeting between Russians and senior campaign officials; efforts to have the Attorney General unrecuse; and conduct towards McGahn, Cohen, and other witnesses.

We summarize the evidence we found and then analyze it by reference to the three statutory obstruction-of-justice elements: obstructive act, nexus to a proceeding, and intent. We focus on elements because, by regulation, the Special Counsel has "jurisdiction . . . to investigate . . . federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation, such as perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses." 28 C.F.R. § 600.4(a). Consistent with our jurisdiction to investigate federal obstruction crimes, we gathered evidence that is relevant to the elements of those crimes and analyzed them within an elements framework—while refraining from reaching ultimate conclusions about whether crimes were committed, for the reasons explained above. This section also does not address legal and constitutional defenses raised by counsel for the President; those defenses are analyzed in Volume II, Section III, *infra*.

### A.   The Campaign's Response to Reports About Russian Support for Trump

During the 2016 campaign, the media raised questions about a possible connection between the Trump Campaign and Russia.[7] The questions intensified after WikiLeaks released politically damaging Democratic Party emails that were reported to have been hacked by Russia. Trump responded to questions about possible connections to Russia by denying any business involvement in Russia—even though the Trump Organization had pursued a business project in Russia as late as June 2016. Trump also expressed skepticism that Russia had hacked the emails at the same time as he and other Campaign advisors privately sought information HOM██████ about any further planned WikiLeaks releases. After the election, when questions persisted about possible links between Russia and the Trump Campaign, the President-Elect continued to deny any connections to Russia and privately expressed concerns that reports of Russian election interference might lead the public to question the legitimacy of his election.[8]

---

[7] This section summarizes and cites various news stories not for the truth of the information contained in the stories, but rather to place candidate Trump's response to those stories in context. Volume I of this report analyzes the underlying facts of several relevant events that were reported on by the media during the campaign.

[8] As discussed in Volume I, while the investigation identified numerous links between individuals with ties to the Russian government and individuals associated with the Trump Campaign, the evidence was not sufficient to charge that any member of the Trump Campaign conspired or coordinated with representatives of the Russian government to interfere in the 2016 election.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

1. <u>Press Reports Allege Links Between the Trump Campaign and Russia</u>

On June 16, 2015, Donald J. Trump declared his intent to seek nomination as the Republican candidate for President.[9] By early 2016, he distinguished himself among Republican candidates by speaking of closer ties with Russia,[10] saying he would get along well with Russian President Vladimir Putin,[11] questioning whether the NATO alliance was obsolete,[12] and praising Putin as a "strong leader."[13] The press reported that Russian political analysts and commentators perceived Trump as favorable to Russia.[14]

Beginning in February 2016 and continuing through the summer, the media reported that several Trump campaign advisors appeared to have ties to Russia. For example, the press reported that campaign advisor Michael Flynn was seated next to Vladimir Putin at an RT gala in Moscow in December 2015 and that Flynn had appeared regularly on RT as an analyst.[15] The press also reported that foreign policy advisor Carter Page had ties to a Russian state-run gas company,[16] and that campaign chairman Paul Manafort had done work for the "Russian-backed former Ukrainian president Viktor Yanukovych."[17] In addition, the press raised questions during the Republican

---

[9] @realDonaldTrump 6/16/15 (11:57 a.m. ET) Tweet.

[10] *See, e.g.*, Meet the Press Interview with Donald J. Trump, NBC (Dec. 20, 2015) (Trump: "I think it would be a positive thing if Russia and the United States actually got along"); *Presidential Candidate Donald Trump News Conference, Hanahan, South Carolina*, C-SPAN (Feb. 15, 2016) ("You want to make a good deal for the country, you want to deal with Russia.").

[11] *See, e.g.*, *Anderson Cooper 360 Degrees*, CNN (July 8, 2015) ("I think I get along with [Putin] fine."); Andrew Rafferty, *Trump Says He Would "Get Along Very Well" With Putin*, NBC (July 30, 2015) (quoting Trump as saying, "I think I would get along very well with Vladimir Putin.").

[12] *See, e.g.*, @realDonaldTrump Tweet 3/24/16 (7:47 a.m. ET); @realDonaldTrump Tweet 3/24/16 (7:59 a.m. ET).

[13] *See, e.g.*, Meet the Press Interview with Donald J. Trump, NBC (Dec. 20, 2015) ("[Putin] is a strong leader. What am I gonna say, he's a weak leader? He's making mincemeat out of our President."); *Donald Trump Campaign Rally in Vandalia, Ohio*, C-SPAN (Mar. 12, 2016) ("I said [Putin] was a strong leader, which he is. I mean, he might be bad, he might be good. But he's a strong leader.").

[14] *See, e.g.*, Andrew Osborn, *From Russia with love: why the Kremlin backs Trump*, Reuters (Mar. 24, 2016); Robert Zubrin, *Trump: The Kremlin's Candidate*, National Review (Apr. 4, 2016).

[15] *See, e.g.*, Mark Hosenball & Steve Holland, *Trump being advised by ex-U.S. Lieutenant General who favors closer Russia ties*, Reuters (Feb. 26, 2016); Tom Hamburger et al., *Inside Trump's financial ties to Russia and his unusual flattery of Vladimir Putin*, Washington Post (June 17, 2016). Certain matters pertaining to Flynn are described in Volume I, Section IV.B.7, *supra*.

[16] *See, e.g.*, Zachary Mider, *Trump's New Russia Advisor Has Deep Ties to Kremlin's Gazprom*, Bloomberg (Mar. 30, 2016); Julia Iofee, *Who is Carter Page?*, Politico (Sep. 23, 2016). Certain matters pertaining to Page are described in Volume I, Section IV.A.3, *supra*.

[17] Tracy Wilkinson, *In a shift, Republican platform doesn't call for arming Ukraine against Russia, spurring outrage*, Los Angeles Times (July 21, 2016); Josh Rogin, *Trump campaign guts GOP's anti-Russia stance on Ukraine*, Washington Post (July 18, 2016).

U.S. Department of Justice
~~Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

National Convention about the Trump Campaign's involvement in changing the Republican platform's stance on giving "weapons to Ukraine to fight Russian and rebel forces."[18]

### 2. The Trump Campaign Reacts to WikiLeaks's Release of Hacked Emails

On June 14, 2016, a cybersecurity firm that had conducted in-house analysis for the Democratic National Committee (DNC) posted an announcement that Russian government hackers had infiltrated the DNC's computer and obtained access to documents.[19]

On July 22, 2016, the day before the Democratic National Convention, WikiLeaks posted thousands of hacked DNC documents revealing sensitive internal deliberations.[20]   Soon thereafter, Hillary Clinton's campaign manager publicly contended that Russia had hacked the DNC emails and arranged their release in order to help candidate Trump.[21]   On July 26, 2016, the New York Times reported that U.S. "intelligence agencies ha[d] told the White House they now have 'high confidence' that the Russian government was behind the theft of emails and documents from the Democratic National Committee."[22]

Within the Trump Campaign, aides reacted with enthusiasm to reports of the hacks.[23] **Harm to Ongoing Matter** discussed with Campaign officials that WikiLeaks would release the hacked material.[24]   Some witnesses said that Trump himself discussed the possibility of upcoming releases **HOM**.   Michael Cohen, then-executive vice president of the Trump Organization and special counsel to Trump, recalled hearing **Harm to Ongoing Matter** .[25]   Cohen recalled that Trump responded, "oh good, alright,"

---

[18] Josh Rogin, *Trump campaign guts GOP's anti-Russia stance on Ukraine,* Washington Post, Opinions (July 18, 2016).   The Republican Platform events are described in Volume I, Section IV.A.6, *supra.*

[19] *Bears in the Midst: Intrusion into the Democratic National Committee,* CrowdStrike (June 15, 2016) (post originally appearing on June 14, 2016, according to records of the timing provided by CrowdStrike); Ellen Nakashima, *Russian government hackers penetrated DNC, stole opposition research on Trump,* Washington Post (June 14, 2016).

[20] Tom Hamburger and Karen Tumulty, *WikiLeaks releases thousands of documents about Clinton and internal deliberations,* Washington Post (July 22, 2016).

[21] Amber Phillips, *Clinton campaign manager: Russians leaked Democrats' emails to help Donald Trump,* Washington Post (July 24, 2016).

[22] David E. Sanger and Eric Schmitt, *Spy Agency Consensus Grows That Russia Hacked D.N.C.,* New York Times (July 26, 2016).

[23] Gates 4/10/18 302, at 5; Newman 8/23/18 302, at 1.

[24] Gates 4/11/18 302, at 2-3 (SM-2180998); Gates 10/25/18 302, at 2; *see also* Volume I, Section III.D.1, *supra.*

[25] Cohen 8/7/18 302, at 8; *see also* Volume I, Section III.D.1, *supra.*   According to Cohen, after WikiLeaks's subsequent release of stolen DNC emails on July 22, 2016, Trump said to Cohen words to the effect of, **HOM**   Cohen 9/18/18 302, at 10.   Cohen's role in the candidate's and later

U.S. Department of Justice
~~Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

and **Harm to Ongoing Matter**.[26]   Manafort said that shortly after WikiLeaks's July 22, 2016 release of hacked documents, he spoke to Trump **Harm to Ongoing Matter** ; Manafort recalled that Trump responded that Manafort should **HOM** keep Trump updated.[27]   Deputy campaign manager Rick Gates said that Manafort was getting pressure about **HOM** information and that Manafort instructed Gates **HOM** status updates on upcoming releases.[28]   Around the same time, Gates was with Trump on a trip to an airport **HOM** , and shortly after the call ended, Trump told Gates that more releases of damaging information would be coming.[29]   **Harm to Ongoing Matter** were discussed within the Campaign,[30] and in the summer of 2016, the Campaign was planning a communications strategy based on the possible release of Clinton emails by WikiLeaks.[31]

3. The Trump Campaign Reacts to Allegations That Russia was Seeking to Aid Candidate Trump

In the days that followed WikiLeaks's July 22, 2016 release of hacked DNC emails, the Trump Campaign publicly rejected suggestions that Russia was seeking to aid candidate Trump. On July 26, 2016, Trump tweeted that it was "[c]razy" to suggest that Russia was "dealing with Trump"[32] and that "[f]or the record," he had "ZERO investments in Russia."[33]

In a press conference the next day, July 27, 2016, Trump characterized "this whole thing with Russia" as "a total deflection" and stated that it was "farfetched" and "ridiculous."[34]  Trump said that the assertion that Russia had hacked the emails was unproven, but stated that it would give him "no pause" if Russia had Clinton's emails.[35]  Trump added, "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing.  I think you will probably be rewarded

---

President's activities, and his own criminal conduct, is described in Volume II, Section II.K, *infra*, and in Volume I, Section IV.A.1, *supra*.

[26] Cohen 8/7/18 302, at 8.

[27] **Grand Jury** .  As explained in footnote 197 of Volume I, Section III.D.1.b, *supra*, this Office has included Manafort's account of these events because it aligns with those of other witnesses and is corroborated to that extent.

[28] Gates 10/25/18 302, at 4.

[29] Gates 10/25/18 302, at 4.

[30] Bannon 1/18/19 302, at 3.

[31] Gates 4/11/18 302, at 1-2 (SM-2180998); Gates 10/25/18 302, at 2 (messaging strategy was being formed in June/July timeframe based on claims by Assange on June 12, 2016, **Harm to Ongoing Matter** ).

[32] @realDonaldTrump 7/26/16 (6:47 p.m. ET) Tweet.

[33] @realDonaldTrump 7/26/16 (6:50 p.m. ET) Tweet.

[34] *Donald Trump News Conference, Doral, Florida*, C-SPAN (July 27, 2016).

[35] *Donald Trump News Conference, Doral, Florida*, C-SPAN (July 27, 2016).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

mightily by our press."[36]  Trump also said that "there's nothing that I can think of that I'd rather do than have Russia friendly as opposed to the way they are right now," and in response to a question about whether he would recognize Crimea as Russian territory and consider lifting sanctions, Trump replied, "We'll be looking at that.  Yeah, we'll be looking."[37]

During the press conference, Trump repeated "I have nothing to do with Russia" five times.[38]  He stated that "the closest [he] came to Russia" was that Russians may have purchased a home or condos from him.[39]  He said that after he held the Miss Universe pageant in Moscow in 2013 he had been interested in working with Russian companies that "wanted to put a lot of money into developments in Russia" but "it never worked out."[40]  He explained, "[f]rankly, I didn't want to do it for a couple of different reasons.  But we had a major developer . . . that wanted to develop property in Moscow and other places.  But we decided not to do it."[41]  The Trump Organization, however, had been pursuing a building project in Moscow—the Trump Tower Moscow project— from approximately September 2015 through June 2016, and the candidate was regularly updated on developments, including possible trips by Michael Cohen to Moscow to promote the deal and by Trump himself to finalize it.[42]

Cohen recalled speaking with Trump after the press conference about Trump's denial of any business dealings in Russia, which Cohen regarded as untrue.[43]  Trump told Cohen that Trump Tower Moscow was not a deal yet and said, "Why mention it if it is not a deal?"[44]  According to Cohen, at around this time, in response to Trump's disavowal of connections to Russia, campaign

---

[36] *Donald Trump News Conference, Doral, Florida*, C-SPAN (July 27, 2016).  Within five hours of Trump's remark, a Russian intelligence service began targeting email accounts associated with Hillary Clinton for possible hacks.  *See* Volume I, Section III, *supra*.  In written answers submitted in this investigation, the President stated that he made the "Russia, if you're listening" statement "in jest and sarcastically, as was apparent to any objective observer."  Written Responses of Donald J. Trump (Nov. 20, 2018), at 13 (Response to Question II, Part (d)).

[37] *Donald Trump News Conference, Doral, Florida*, C-SPAN (July 27, 2016).  In his written answers submitted in this investigation, the President said that his statement that "we'll be looking" at Crimea and sanctions "did not communicate any position."  Written Responses of Donald J. Trump (Nov. 20, 2018), at 17 (Response to Question IV, Part (g)).

[38] *Donald Trump News Conference, Doral, Florida*, C-SPAN (July 27, 2016).

[39] *Donald Trump News Conference, Doral, Florida*, C-SPAN (July 27, 2016).

[40] *Donald Trump News Conference, Doral, Florida*, C-SPAN (July 27, 2016).

[41] *Donald Trump News Conference, Doral, Florida*, C-SPAN (July 27, 2016).

[42] The Trump Tower Moscow project and Trump's involvement in it is discussed in detail in Volume I, Section IV.A.1, *supra*, and Volume II, Section II.K, *infra*.

[43] Cohen 9/18/18 302, at 4.

[44] Cohen 9/18/18 302, at 4-5.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

advisors had developed a "party line" that Trump had no business with Russia and no connections to Russia.[45]

In addition to denying any connections with Russia, the Trump Campaign reacted to reports of Russian election interference in aid of the Campaign by seeking to distance itself from Russian contacts. For example, in August 2016, foreign policy advisor J.D. Gordon declined an invitation to Russian Ambassador Sergey Kislyak's residence because the timing was "not optimal" in view of media reports about Russian interference.[46] On August 19, 2016, Manafort was asked to resign amid media coverage scrutinizing his ties to a pro-Russian political party in Ukraine and links to Russian business.[47] And when the media published stories about Page's connections to Russia in September 2016, Trump Campaign officials terminated Page's association with the Campaign and told the press that he had played "no role" in the Campaign.[48]

On October 7, 2016, WikiLeaks released the first set of emails stolen by a Russian intelligence agency from Clinton Campaign chairman John Podesta.[49] The same day, the federal government announced that "the Russian Government directed the recent compromises of e-mails from US persons and institutions, including from US political organizations."[50] The government statement directly linked Russian hacking to the releases on WikiLeaks, with the goal of interfering with the presidential election, and concluded "that only Russia's senior-most officials could have authorized these activities" based on their "scope and sensitivity."[51]

On October 11, 2016, Podesta stated publicly that the FBI was investigating Russia's hacking and said that candidate Trump might have known in advance that the hacked emails were going to be released.[52] Vice Presidential Candidate Mike Pence was asked whether the Trump

---

[45] Cohen 11/20/18 302, at 1; Cohen 9/18/18 302, at 3-5. The formation of the "party line" is described in greater detail in Volume II, Section II.K, *infra*.

[46] DJTFP00004953 (8/8/16 Email, Gordon to Pchelyakov) (stating that "[t]hese days are not optimal for us, as we are busily knocking down a stream of false media stories"). The invitation and Gordon's response are discussed in Volume I, Section IV.A.7.a, *supra*.

[47] *See, e.g.*, Amber Phillips, *Paul Manafort's complicated ties to Ukraine, explained*, Washington Post (Aug. 19, 2016) ("There was also a wave of fresh headlines dealing with investigations into [Manafort's] ties to a pro-Russian political party in Ukraine."); Tom Winter & Ken Dilanian, *Donald Trump Aide Paul Manafort Scrutinized for Russian Business Ties*, NBC (Aug. 18, 2016). Relevant events involving Manafort are discussed in Volume I, Section IV.A.8, *supra*.

[48] Michael Isikoff, *U.S. intel officials probe ties between Trump adviser and Kremlin*, Yahoo News (Sep. 23, 2016); *see, e.g.*, 9/25/16 Email, Hicks to Conway & Bannon; 9/23/16 Email, J. Miller to Bannon & S. Miller; Page 3/16/17 302, at 2.

[49] @WikiLeaks 10/7/16 (4:32 p.m. ET) Tweet.

[50] Joint Statement from the Department Of Homeland Security and Office of the Director of National Intelligence on Election Security, DHS (Oct. 7, 2016).

[51] Joint Statement from the Department Of Homeland Security and Office of the Director of National Intelligence on Election Security, DHS (Oct. 7, 2016).

[52] John Wagner & Anne Gearan, *Clinton campaign chairman ties email hack to Russians, suggests Trump had early warning*, Washington Post (Oct. 11, 2016).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Campaign was "in cahoots" with WikiLeaks in releasing damaging Clinton-related information and responded, "Nothing could be further from the truth."[53]

####    4.   After the Election, Trump Continues to Deny Any Contacts or Connections with Russia or That Russia Aided his Election

On November 8, 2016, Trump was elected President.  Two days later, Russian officials told the press that the Russian government had maintained contacts with Trump's "immediate entourage" during the campaign.[54]  In response, Hope Hicks, who had been the Trump Campaign spokesperson, said, "We are not aware of any campaign representatives that were in touch with any foreign entities before yesterday, when Mr. Trump spoke with many world leaders."[55]  Hicks gave an additional statement denying any contacts between the Campaign and Russia: "It never happened.  There was no communication between the campaign and any foreign entity during the campaign."[56]

On December 10, 2016, the press reported that U.S. intelligence agencies had "concluded that Russia interfered in last month's presidential election to boost Donald Trump's bid for the White House."[57]  Reacting to the story the next day, President-Elect Trump stated, "I think it's ridiculous.  I think it's just another excuse."[58]  He continued that no one really knew who was responsible for the hacking, suggesting that the intelligence community had "no idea if it's Russia or China or somebody.  It could be somebody sitting in a bed some place."[59]  The President-Elect

---

[53] Louis Nelson, *Pence denies Trump camp in cahoots with WikiLeaks*, Politico (Oct. 14, 2016).

[54] Ivan Nechepurenko, *Russian Officials Were in Contact With Trump Allies, Diplomat Says*, New York Times (Nov. 10, 2016) (quoting Russian Deputy Foreign Minister Sergey Ryabkov saying, "[t]here were contacts" and "I cannot say that all, but a number of them maintained contacts with Russian representatives"); Jim Heintz & Matthew Lee, *Russia eyes better ties with Trump; says contacts underway*, Associated Press (Nov. 11, 2016) (quoting Ryabkov saying, "I don't say that all of them, but a whole array of them supported contacts with Russian representatives").

[55] Ivan Nechepurenko, *Russian Officials Were in Contact With Trump Allies, Diplomat Says*, New York Times (Nov. 11, 2016) (quoting Hicks).

[56] Jim Heintz & Matthew Lee, *Russia eyes better ties with Trump; says contacts underway*, Associated Press (Nov. 10, 2016) (quoting Hicks).  Hicks recalled that after she made that statement, she spoke with Campaign advisors Kellyanne Conway, Stephen Miller, Jason Miller, and probably Kushner and Bannon to ensure it was accurate, and there was no hesitation or pushback from any of them.  Hicks 12/8/17 302, at 4.

[57] Damien Gayle, *CIA concludes Russia interfered to help Trump win election, say reports*, Guardian (Dec. 10, 2016).

[58] *Chris Wallace Hosts "Fox News Sunday," Interview with President-Elect Donald Trump*, CQ Newsmaker Transcripts (Dec. 11, 2016).

[59] *Chris Wallace Hosts "Fox News Sunday," Interview with President-Elect Donald Trump*, CQ Newsmaker Transcripts (Dec. 11, 2016).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

also said that Democrats were "putting [] out" the story of Russian interference "because they suffered one of the greatest defeats in the history of politics."[60]

On December 18, 2016, Podesta told the press that the election was "distorted by the Russian intervention" and questioned whether Trump Campaign officials had been "in touch with the Russians."[61]   The same day, incoming Chief of Staff Reince Priebus appeared on Fox News Sunday and declined to say whether the President-Elect accepted the intelligence community's determination that Russia intervened in the election.[62]   When asked about any contact or coordination between the Campaign and Russia, Priebus said, "Even this question is insane.  Of course we didn't interface with the Russians."[63]  Priebus added that "this whole thing is a spin job" and said, "the real question is, why the Democrats . . . are doing everything they can to delegitimize the outcome of the election?"[64]

On December 29, 2016, the Obama Administration announced that in response to Russian cyber operations aimed at the U.S. election, it was imposing sanctions and other measures on several Russian individuals and entities.[65]  When first asked about the sanctions, President-Elect Trump said, "I think we ought to get on with our lives."[66]  He then put out a statement that said "It's time for our country to move on to bigger and better things," but indicated that he would meet with intelligence community leaders the following week for a briefing on Russian interference.[67]  The briefing occurred on January 6, 2017.[68]  Following the briefing, the intelligence community released the public version of its assessment, which concluded with high confidence that Russia had intervened in the election through a variety of means with the goal of harming Clinton's

---

[60] *Chris Wallace Hosts "Fox News Sunday," Interview with President-Elect Donald Trump,* CQ Newsmaker Transcripts (Dec. 11, 2016).

[61] David Morgan, *Clinton campaign:  It's an 'open question' if Trump team colluded with Russia,* Reuters Business Insider (Dec. 18, 2016).

[62] *Chris Wallace Hosts "Fox News Sunday," Interview with Incoming White House Chief of Staff Reince Priebus,* Fox News (Dec. 18, 2016).

[63] *Chris Wallace Hosts "Fox News Sunday," Interview with Incoming White House Chief of Staff Reince Priebus,* Fox News (Dec. 18, 2016).

[64] *Chris Wallace Hosts "Fox News Sunday," Interview with Incoming White House Chief of Staff Reince Priebus,* Fox News (Dec. 18, 2016).

[65] *Statement by the President on Actions in Response to Russian Malicious Cyber Activity and Harassment*, White House (Dec. 29, 2016); *see also* Missy Ryan et al., *Obama administration announces measures to punish Russia for 2016 election interference*, Washington Post (Dec. 29, 2016).

[66] John Wagner, *Trump on alleged election interference by Russia: 'Get on with our lives,'* Washington Post (Dec. 29, 2016).

[67] Missy Ryan et al., *Obama administration announces measures to punish Russia for 2016 election interference*, Washington Post (Dec. 29, 2016).

[68] Comey 11/15/17 302, at 3.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

electability.[69]   The assessment further concluded with high confidence that Putin and the Russian government had developed a clear preference for Trump.[70]

Several days later, BuzzFeed published unverified allegations compiled by former British intelligence officer Christopher Steele during the campaign about candidate Trump's Russia connections under the headline "These Reports Allege Trump Has Deep Ties To Russia."[71]   In a press conference the next day, the President-Elect called the release "an absolute disgrace" and said, "I have no dealings with Russia.  I have no deals that could happen in Russia, because we've stayed away. . . .  So I have no deals, I have no loans and I have no dealings.  We could make deals in Russia very easily if we wanted to, I just don't want to because I think that would be a conflict."[72]

Several advisors recalled that the President-Elect viewed stories about his Russian connections, the Russia investigations, and the intelligence community assessment of Russian interference as a threat to the legitimacy of his electoral victory.[73]   Hicks, for example, said that the President-Elect viewed the intelligence community assessment as his "Achilles heel" because, even if Russia had no impact on the election, people would think Russia helped him win, taking away from what he had accomplished.[74]   Sean Spicer, the first White House communications director, recalled that the President thought the Russia story was developed to undermine the legitimacy of his election.[75]   Gates said the President viewed the Russia investigation as an attack on the legitimacy of his win.[76]   And Priebus recalled that when the intelligence assessment came out, the President-Elect was concerned people would question the legitimacy of his win.[77]

---

[69] Office of the Director of National Intelligence, *Russia's Influence Campaign Targeting the 2016 US Presidential Election*, at 1 (Jan. 6, 2017).

[70] Office of the Director of National Intelligence, *Russia's Influence Campaign Targeting the 2016 US Presidential Election,* at 1 (Jan. 6, 2017).

[71] Ken Bensinger et al., *These Reports Allege Trump Has Deep Ties To Russia*, BuzzFeed (Jan. 10, 2017).

[72] *Donald Trump's News Conference: Full Transcript and Video*, New York Times (Jan. 11, 2017), *available at* https://www.nytimes.com/2017/01/11/us/politics/trump-press-conference-transcript.html.

[73] Priebus 10/13/17 302, at 7; Hicks 3/13/18 302, at 18; Spicer 10/16/17 302, at 6; Bannon 2/14/18 302, at 2; Gates 4/18/18 302, at 3; *see* Pompeo 6/28/17 302, at 2 (the President believed that the purpose of the Russia investigation was to delegitimize his presidency).

[74] Hicks 3/13/18 302, at 18.

[75] Spicer 10/17/17 302, at 6.

[76] Gates 4/18/18 302, at 3.

[77] Priebus 10/13/17 302, at 7.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

**B.      The President's Conduct Concerning the Investigation of Michael Flynn**

*Overview*

During the presidential transition, incoming National Security Advisor Michael Flynn had two phone calls with the Russian Ambassador to the United States about the Russian response to U.S. sanctions imposed because of Russia's election interference. After the press reported on Flynn's contacts with the Russian Ambassador, Flynn lied to incoming Administration officials by saying he had not discussed sanctions on the calls. The officials publicly repeated those lies in press interviews. The FBI, which previously was investigating Flynn for other matters, interviewed him about the calls in the first week after the inauguration, and Flynn told similar lies to the FBI. On January 26, 2017, Department of Justice (DOJ) officials notified the White House that Flynn and the Russian Ambassador had discussed sanctions and that Flynn had been interviewed by the FBI. The next night, the President had a private dinner with FBI Director James Comey in which he asked for Comey's loyalty. On February 13, 2017, the President asked Flynn to resign. The following day, the President had a one-on-one conversation with Comey in which he said, "I hope you can see your way clear to letting this go, to letting Flynn go."

*Evidence*

   1.  Incoming National Security Advisor Flynn Discusses Sanctions on Russia with Russian Ambassador Sergey Kislyak

Shortly after the election, President-Elect Trump announced he would appoint Michael Flynn as his National Security Advisor.[78] For the next two months, Flynn played an active role on the Presidential Transition Team (PTT) coordinating policy positions and communicating with foreign government officials, including Russian Ambassador to the United States Sergey Kislyak.[79]

On December 29, 2016, as noted in Volume II, Section II.A.4, *supra*, the Obama Administration announced that it was imposing sanctions and other measures on several Russian individuals and entities.[80] That day, multiple members of the PTT exchanged emails about the sanctions and the impact they would have on the incoming Administration, and Flynn informed members of the PTT that he would be speaking to the Russian Ambassador later in the day.[81]

---

[78] Flynn 11/16/17 302, at 7; *President-Elect Donald J. Trump Selects U.S. Senator Jeff Sessions for Attorney General, Lt. Gen. Michael Flynn as Assistant to the President for National Security Affairs and U.S. Rep. Mike Pompeo as Director of the Central Intelligence Agency*, President-Elect Donald J. Trump Press Release (Nov. 18, 2016); *see also, e.g.*, Bryan Bender, *Trump names Mike Flynn national security adviser*, Politico, (Nov. 17, 2016).

[79] Flynn 11/16/17 302, at 8-14; Priebus 10/13/17 302, at 3-5.

[80] *Statement by the President on Actions in Response to Russian Malicious Cyber Activity and Harassment*, The White House, Office of the Press Secretary (Dec. 29, 2016).

[81] 12/29/16 Email, O'Brien to McFarland et al.; 12/29/16 Email, Bossert to Flynn et al.; 12/29/16 Email, McFarland to Flynn et al.; SF000001 (12/29/16 Text Message, Flynn to Flaherty) ("Tit for tat w Russia not good. Russian AMBO reaching out to me today."); Flynn 1/19/18 302, at 2.

U.S. Department of Justice
Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

Flynn, who was in the Dominican Republic at the time, and K.T. McFarland, who was slated to become the Deputy National Security Advisor and was at the Mar-a-Lago resort in Florida with the President-Elect and other senior staff, talked by phone about what, if anything, Flynn should communicate to Kislyak about the sanctions.[82]   McFarland had spoken with incoming Administration officials about the sanctions and Russia's possible responses and thought she had mentioned in those conversations that Flynn was scheduled to speak with Kislyak.[83]   Based on those conversations, McFarland informed Flynn that incoming Administration officials at Mar-a-Lago did not want Russia to escalate the situation.[84]   At 4:43 p.m. that afternoon, McFarland sent an email to several officials about the sanctions and informed the group that "Gen [F]lynn is talking to russian ambassador this evening."[85]

Approximately one hour later, McFarland met with the President-Elect and senior officials and briefed them on the sanctions and Russia's possible responses.[86]   Incoming Chief of Staff Reince Priebus recalled that McFarland may have mentioned at the meeting that the sanctions situation could be "cooled down" and not escalated.[87]   McFarland recalled that at the end of the meeting, someone may have mentioned to the President-Elect that Flynn was speaking to the Russian Ambassador that evening.[88]   McFarland did not recall any response by the President-Elect.[89]   Priebus recalled that the President-Elect viewed the sanctions as an attempt by the Obama Administration to embarrass him by delegitimizing his election.[90]

Immediately after discussing the sanctions with McFarland on December 29, 2016, Flynn called Kislyak and requested that Russia respond to the sanctions only in a reciprocal manner, without escalating the situation.[91]   After the call, Flynn briefed McFarland on its substance.[92]   Flynn told McFarland that the Russian response to the sanctions was not going to be escalatory because Russia wanted a good relationship with the Trump Administration.[93]   On December 30, 2016, Russian President Vladimir Putin announced that Russia would not take retaliatory measures

---

[82] Statement of Offense at 2-3, *United States v. Michael T. Flynn*, 1:17-cr-232 (D.D.C. Dec. 1, 2017), Doc. 4 (*Flynn* Statement of Offense); Flynn 11/17/17 302, at 3-4; Flynn 11/20/17 302, at 3; McFarland 12/22/17 302, at 6-7.

[83] McFarland 12/22/17 302, at 4-7 (recalling discussions about this issue with Bannon and Priebus).

[84] *Flynn* Statement of Offense, at 3; Flynn 11/17/17 302, at 3-4; McFarland 12/22/17 302, at 6-7.

[85] 12/29/16 Email, McFarland to Flynn et al.

[86] McFarland 12/22/17 302, at 7.

[87] Priebus 1/18/18 302, at 3.

[88] McFarland 12/22/17 302, at 7.  Priebus thought it was possible that McFarland had mentioned Flynn's scheduled call with Kislyak at this meeting, although he was not certain.  Priebus 1/18/18 302, at 3.

[89] McFarland 12/22/17 302, at 7.

[90] Priebus 1/18/18 302, at 3.

[91] *Flynn* Statement of Offense, at 3; Flynn 11/17/17 302, at 3-4.

[92] *Flynn* Statement of Offense, at 3; McFarland 12/22/17 302, at 7-8; Flynn 11/17/17 302, at 4.

[93] McFarland 12/22/17 302, at 8.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

in response to the sanctions at that time and would instead "plan . . . further steps to restore Russian-US relations based on the policies of the Trump Administration."[94] Following that announcement, the President-Elect tweeted, "Great move on delay (by V. Putin) - I always knew he was very smart!"[95]

On December 31, 2016, Kislyak called Flynn and told him that Flynn's request had been received at the highest levels and Russia had chosen not to retaliate in response to the request.[96] Later that day, Flynn told McFarland about this follow-up conversation with Kislyak and Russia's decision not to escalate the sanctions situation based on Flynn's request.[97] McFarland recalled that Flynn thought his phone call had made a difference.[98] Flynn spoke with other incoming Administration officials that day, but does not recall whether they discussed the sanctions.[99]

Flynn recalled discussing the sanctions issue with incoming Administration official Stephen Bannon the next day.[100] Flynn said that Bannon appeared to know about Flynn's conversations with Kislyak, and he and Bannon agreed that they had "stopped the train on Russia's response" to the sanctions.[101] On January 3, 2017, Flynn saw the President-Elect in person and thought they discussed the Russian reaction to the sanctions, but Flynn did not have a specific recollection of telling the President-Elect about the substance of his calls with Kislyak.[102]

Members of the intelligence community were surprised by Russia's decision not to retaliate in response to the sanctions.[103] When analyzing Russia's response, they became aware of Flynn's discussion of sanctions with Kislyak.[104] Previously, the FBI had opened an investigation of Flynn based on his relationship with the Russian government.[105] Flynn's contacts with Kislyak became a key component of that investigation.[106]

---

[94] *Statement by the President of Russia*, President of Russia (Dec. 30, 2016) 12/30/16.

[95] @realDonaldTrump 12/30/16 (2:41 p.m. ET) Tweet.

[96] Flynn 1/19/18 302, at 3; *Flynn* Statement of Offense, at 3.

[97] Flynn 1/19/18 302, at 3; Flynn 11/17/17 302, at 6; McFarland 12/22/17 302, at 10; *Flynn* Statement of Offense, at 3.

[98] McFarland 12/22/17 302, at 10; *see* Flynn 1/19/18 302, at 4.

[99] Flynn 11/17/17 302, at 5-6.

[100] Flynn 1/19/18 302, at 4-5. Bannon recalled meeting with Flynn that day, but said he did not remember discussing sanctions with him. Bannon 2/12/18 302, at 9.

[101] Flynn 11/21/17 302, at 1; Flynn 1/19/18 302, at 5.

[102] Flynn 1/19/18 302, at 6; Flynn 11/17/17 302, at 6.

[103] McCord 7/17/17 302, at 2.

[104] McCord 7/17/17 302, at 2.

[105] McCord 7/17/17 302, at 2-3; Comey 11/15/17 302, at 5.

[106] McCord 7/17/17 302, at 2-3.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

    2.   <u>President-Elect Trump is Briefed on the Intelligence Community's Assessment of Russian Interference in the Election and Congress Opens Election-Interference Investigations</u>

On January 6, 2017, as noted in Volume II, Section II.A.4, *supra*, intelligence officials briefed President-Elect Trump and the incoming Administration on the intelligence community's assessment that Russia had interfered in the 2016 presidential election.[107]  When the briefing concluded, Comey spoke with the President-Elect privately to brief him on unverified, personally sensitive allegations compiled by Steele.[108]  According to a memorandum Comey drafted immediately after their private discussion, the President-Elect began the meeting by telling Comey he had conducted himself honorably over the prior year and had a great reputation.[109]  The President-Elect stated that he thought highly of Comey, looked forward to working with him, and hoped that he planned to stay on as FBI director.[110]  Comey responded that he intended to continue serving in that role.[111]  Comey then briefed the President-Elect on the sensitive material in the Steele reporting.[112]  Comey recalled that the President-Elect seemed defensive, so Comey decided

---

[107] *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 1-2).

[108] Comey 11/15/17 302, at 3; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 1-2).

[109] Comey 1/7/17 Memorandum, at 1.  Comey began drafting the memorandum summarizing the meeting immediately after it occurred.  Comey 11/15/17 302, at 4.  He finished the memorandum that evening and finalized it the following morning.  Comey 11/15/17 302, at 4.

[110] Comey 1/7/17 Memorandum, at 1; Comey 11/15/17 302, at 3.  Comey identified several other occasions in January 2017 when the President reiterated that he hoped Comey would stay on as FBI director.  On January 11, President-Elect Trump called Comey to discuss the Steele reports and stated that he thought Comey was doing great and the President-Elect hoped he would remain in his position as FBI director.  Comey 11/15/17 302, at 4; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (testimony of James B. Comey, former Director of the FBI), CQ Cong. Transcripts, at 90. ("[D]uring that call, he asked me again, 'Hope you're going to stay, you're doing a great job.'  And I told him that I intended to.").  On January 22, at a White House reception honoring law enforcement, the President greeted Comey and said he looked forward to working with him.  *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee,* 115th Cong. (June 8, 2017) (testimony of James B. Comey, former Director of the FBI), CQ Cong. Transcripts, at 22.  And as discussed in greater detail in Volume II, Section II.D, *infra*, on January 27, the President invited Comey to dinner at the White House and said he was glad Comey wanted to stay on as FBI Director.

[111] Comey 1/7/17 Memorandum, at 1; Comey 11/15/17 302, at 3.

[112] Comey 1/7/17 Memorandum, at 1-2; Comey 11/15/17 302, at 3.  Comey's briefing included the Steele reporting's unverified allegation that the Russians had compromising tapes of the President involving conduct when he was a private citizen during a 2013 trip to Moscow for the Miss Universe Pageant.  During the 2016 presidential campaign, a similar claim may have reached candidate Trump.  On October 30, 2016, Michael Cohen received a text from Russian businessman Giorgi Rtskhiladze that said, "Stopped flow of tapes from Russia but not sure if there's anything else.  Just so you know . . . ."  10/30/16 Text Message, Rtskhiladze to Cohen.  Rtskhiladze said "tapes" referred to compromising tapes of Trump rumored to be held by persons associated with the Russian real estate conglomerate Crocus Group, which had helped host

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

to assure him that the FBI was not investigating him personally.[113]  Comey recalled he did not want the President-Elect to think of the conversation as a "J. Edgar Hoover move."[114]

On January 10, 2017, the media reported that Comey had briefed the President-Elect on the Steele reporting,[115] and BuzzFeed News published information compiled by Steele online, stating that the information included "specific, unverified, and potentially unverifiable allegations of contact between Trump aides and Russian operatives."[116]  The next day, the President-Elect expressed concern to intelligence community leaders about the fact that the information had leaked and asked whether they could make public statements refuting the allegations in the Steele reports.[117]

In the following weeks, three Congressional committees opened investigations to examine Russia's interference in the election and whether the Trump Campaign had colluded with Russia.[118]  On January 13, 2017, the Senate Select Committee on Intelligence (SSCI) announced that it would conduct a bipartisan inquiry into Russian interference in the election, including any "links between Russia and individuals associated with political campaigns."[119]  On January 25, 2017, the House Permanent Select Committee on Intelligence (HPSCI) announced that it had been conducting an investigation into Russian election interference and possible coordination with the political campaigns.[120]  And on February 2, 2017, the Senate Judiciary Committee announced that it too would investigate Russian efforts to intervene in the election.[121]

---

the 2013 Miss Universe Pageant in Russia.  Rtskhiladze 4/4/18 302, at 12.  Cohen said he spoke to Trump about the issue after receiving the texts from Rtskhiladze.  Cohen 9/12/18 302, at 13.  Rtskhiladze said he was told the tapes were fake, but he did not communicate that to Cohen.  Rtskhiladze 5/10/18 302, at 7.

[113] Comey 11/15/17 302, at 3-4; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 2).

[114] Comey 11/15/17 302, at 3.

[115] *See, e.g.*, Evan Perez et al., *Intel chiefs presented Trump with claims of Russian efforts to compromise him*, CNN (Jan. 10, 2017; updated Jan. 12, 2017).

[116] Ken Bensinger et al., *These Reports Allege Trump Has Deep Ties To Russia*, BuzzFeed News (Jan. 10, 2017).

[117] *See* 1/11/17 Email, Clapper to Comey ("He asked if I could put out a statement. He would prefer of course that I say the documents are bogus, which, of course, I can't do."); 1/12/17 Email, Comey to Clapper ("He called me at 5 yesterday and we had a very similar conversation."); Comey 11/15/17 302, at 4-5.

[118] *See 2016 Presidential Election Investigation Fast Facts*, CNN (first published Oct. 12, 2017; updated Mar. 1, 2019) (summarizing starting dates of Russia-related investigations).

[119] *Joint Statement on Committee Inquiry into Russian Intelligence Activities*, SSCI (Jan. 13, 2017).

[120] *Joint Statement on Progress of Bipartisan HPSCI Inquiry into Russian Active Measures*, HPSCI (Jan. 25, 2017).

[121] *Joint Statement from Senators Graham and Whitehouse on Investigation into Russian Influence on Democratic Nations' Elections* (Feb. 2, 2017).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

### 3. Flynn Makes False Statements About his Communications with Kislyak to Incoming Administration Officials, the Media, and the FBI

On January 12, 2017, a Washington Post columnist reported that Flynn and Kislyak communicated on the day the Obama Administration announced the Russia sanctions.[122]  The column questioned whether Flynn had said something to "undercut the U.S. sanctions" and whether Flynn's communications had violated the letter or spirit of the Logan Act.[123]

President-Elect Trump called Priebus after the story was published and expressed anger about it.[124]  Priebus recalled that the President-Elect asked, "What the hell is this all about?"[125]  Priebus called Flynn and told him that the President-Elect was angry about the reporting on Flynn's conversations with Kislyak.[126]  Flynn recalled that he felt a lot of pressure because Priebus had spoken to the "boss" and said Flynn needed to "kill the story."[127]  Flynn directed McFarland to call the Washington Post columnist and inform him that no discussion of sanctions had occurred.[128]  McFarland recalled that Flynn said words to the effect of, "I want to kill the story."[129]  McFarland made the call as Flynn had requested although she knew she was providing false information, and the Washington Post updated the column to reflect that a "Trump official" had denied that Flynn and Kislyak discussed sanctions.[130]

When Priebus and other incoming Administration officials questioned Flynn internally about the Washington Post column, Flynn maintained that he had not discussed sanctions with Kislyak.[131]  Flynn repeated that claim to Vice President-Elect Michael Pence and to incoming press secretary Sean Spicer.[132]  In subsequent media interviews in mid-January, Pence, Priebus, and

---

[122] David Ignatius, *Why did Obama dawdle on Russia's hacking?*, Washington Post (Jan. 12, 2017).

[123] David Ignatius, *Why did Obama dawdle on Russia's hacking?*, Washington Post (Jan. 12, 2017). The Logan Act makes it a crime for "[a]ny citizen of the United States, wherever he may be" to "without authority of the United States, directly or indirectly commence[] or carr[y] on any correspondence or intercourse with any foreign government or any officer or agent thereof, in relation to any disputes or controversies with the United States, or to defeat the measures of the United States." 18 U.S.C. § 953.

[124] Priebus 1/18/18 302, at 6.

[125] Priebus 1/18/18 302, at 6.

[126] Priebus 1/18/18 302, at 6.

[127] Flynn 11/21/17 302, at 1; Flynn 11/20/17 302, at 6.

[128] McFarland 12/22/17 302, at 12-13.

[129] McFarland 12/22/17 302, at 12.

[130] McFarland 12/22/17 302, at 12-13; McFarland 8/29/17 302, at 8; *see* David Ignatius, *Why did Obama dawdle on Russia's hacking?*, Washington Post (Jan. 12, 2017).

[131] Flynn 11/17/17 302, at 1, 8; Flynn 1/19/18 302, at 7; Priebus 10/13/17 302, at 7-8; S. Miller 8/31/17 302, at 8-11.

[132] Flynn 11/17/17 302, at 1, 8; Flynn 1/19/18 302, at 7; S. Miller 8/31/17 302, at 10-11.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Spicer denied that Flynn and Kislyak had discussed sanctions, basing those denials on their conversations with Flynn.[133]

The public statements of incoming Administration officials denying that Flynn and Kislyak had discussed sanctions alarmed senior DOJ officials, who were aware that the statements were not true.[134] Those officials were concerned that Flynn had lied to his colleagues—who in turn had unwittingly misled the American public—creating a compromise situation for Flynn because the Department of Justice assessed that the Russian government could prove Flynn lied.[135] The FBI investigative team also believed that Flynn's calls with Kislyak and subsequent denials about discussing sanctions raised potential Logan Act issues and were relevant to the FBI's broader Russia investigation.[136]

On January 20, 2017, President Trump was inaugurated and Flynn was sworn in as National Security Advisor. On January 23, 2017, Spicer delivered his first press briefing and stated that he had spoken with Flynn the night before, who confirmed that the calls with Kislyak were about topics unrelated to sanctions.[137] Spicer's statements added to the Department of Justice's concerns that Russia had leverage over Flynn based on his lies and could use that derogatory information to compromise him.[138]

On January 24, 2017, Flynn agreed to be interviewed by agents from the FBI.[139] During the interview, which took place at the White House, Flynn falsely stated that he did not ask Kislyak to refrain from escalating the situation in response to the sanctions on Russia imposed by the Obama Administration.[140] Flynn also falsely stated that he did not remember a follow-up conversation in which Kislyak stated that Russia had chosen to moderate its response to those sanctions as a result of Flynn's request.[141]

---

[133] *Face the Nation Interview with Vice President-Elect Pence*, CBS (Jan. 15, 2017); Julie Hirschfield Davis et al., *Trump National Security Advisor Called Russian Envoy Day Before Sanctions Were Imposed*, Washington Post (Jan. 13, 2017); *Meet the Press Interview with Reince Priebus*, NBC (Jan. 15, 2017).

[134] Yates 8/15/17 302, at 2-3; McCord 7/17/17 302, at 3-4; McCabe 8/17/17 302, at 5 (DOJ officials were "really freaked out about it").

[135] Yates 8/15/17 302, at 3; McCord 7/17/17 302, at 4.

[136] McCord 7/17/17 302, at 4; McCabe 8/17/17 302, at 5-6.

[137] Sean Spicer, *White House Daily Briefing*, C-SPAN (Jan. 23, 2017).

[138] Yates 8/15/17 302, at 4; Axelrod 7/20/17 302, at 5.

[139] *Flynn* Statement of Offense, at 2.

[140] *Flynn* Statement of Offense, at 2.

[141] *Flynn* Statement of Offense, at 2. On December 1, 2017, Flynn admitted to making these false statements and pleaded guilty to violating 18 U.S.C. § 1001, which makes it a crime to knowingly and willfully "make[] any materially false, fictitious, or fraudulent statement or representation" to federal law enforcement officials. *See* Volume I, Section IV.A.7, *supra*.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

### 4.   DOJ Officials Notify the White House of Their Concerns About Flynn

On January 26, 2017, Acting Attorney General Sally Yates contacted White House Counsel Donald McGahn and informed him that she needed to discuss a sensitive matter with him in person.[142]   Later that day, Yates and Mary McCord, a senior national security official at the Department of Justice, met at the White House with McGahn and White House Counsel's Office attorney James Burnham.[143]   Yates said that the public statements made by the Vice President denying that Flynn and Kislyak discussed sanctions were not true and put Flynn in a potentially compromised position because the Russians would know he had lied.[144]   Yates disclosed that Flynn had been interviewed by the FBI.[145]   She declined to answer a specific question about how Flynn had performed during that interview,[146] but she indicated that Flynn's statements to the FBI were similar to the statements he had made to Pence and Spicer denying that he had discussed sanctions.[147]   McGahn came away from the meeting with the impression that the FBI had not pinned Flynn down in lies,[148] but he asked John Eisenberg, who served as legal advisor to the National Security Council, to examine potential legal issues raised by Flynn's FBI interview and his contacts with Kislyak.[149]

That afternoon, McGahn notified the President that Yates had come to the White House to discuss concerns about Flynn.[150]   McGahn described what Yates had told him, and the President asked him to repeat it, so he did.[151]   McGahn recalled that when he described the FBI interview of Flynn, he said that Flynn did not disclose having discussed sanctions with Kislyak, but that there may not have been a clear violation of 18 U.S.C. § 1001.[152]   The President asked about Section 1001, and McGahn explained the law to him, and also explained the Logan Act.[153]   The President

---

[142]   Yates 8/15/17 302, at 6.

[143]   Yates 8/15/17 302, at 6; McCord 7/17/17 302, at 6; SCR015_000198 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President).

[144]   Yates 8/15/17 302, at 6-8; McCord 7/17/17 302, at 6-7; Burnham 11/3/17 302, at 4; SCR015_000198 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President).

[145]   McGahn 11/30/17 302, at 5; Yates 8/15/17 302, at 7; McCord 7/17/17 302, at 7; Burnham 11/3/17 302, at 4.

[146]   Yates 8/15/17 302, at 7; McCord 7/17/17 302, at 7.

[147]   SCR015_000198 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President); Burnham 11/3/17 302, at 4.

[148]   McGahn 11/30/17 302, at 5.

[149]   SCR015_000198 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President); McGahn 11/30/17 302, at 6, 8.

[150]   McGahn 11/30/17 302, at 6; SCR015_000278 (White House Counsel's Office Memorandum re: "Flynn Tick Tock") (on January 26, "McGahn IMMEDIATELY advises POTUS"); SCR015_000198 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President).

[151]   McGahn 11/30/17 302, at 6.

[152]   McGahn 11/30/17 302, at 7.

[153]   McGahn 11/30/17 302, at 7.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

instructed McGahn to work with Priebus and Bannon to look into the matter further and directed that they not discuss it with any other officials.[154]  Priebus recalled that the President was angry with Flynn in light of what Yates had told the White House and said, "not again, this guy, this stuff."[155]

That evening, the President dined with several senior advisors and asked the group what they thought about FBI Director Comey.[156]  According to Director of National Intelligence Dan Coats, who was at the dinner, no one openly advocated terminating Comey but the consensus on him was not positive.[157]  Coats told the group that he thought Comey was a good director.[158]  Coats encouraged the President to meet Comey face-to-face and spend time with him before making a decision about whether to retain him.[159]

5.  McGahn has a Follow-Up Meeting About Flynn with Yates; President Trump has Dinner with FBI Director Comey

The next day, January 27, 2017, McGahn and Eisenberg discussed the results of Eisenberg's initial legal research into Flynn's conduct, and specifically whether Flynn may have violated the Espionage Act, the Logan Act, or 18 U.S.C. § 1001.[160]  Based on his preliminary research, Eisenberg informed McGahn that there was a possibility that Flynn had violated 18 U.S.C. § 1001 and the Logan Act.[161]  Eisenberg noted that the United States had never successfully prosecuted an individual under the Logan Act and that Flynn could have possible defenses, and

---

[154] McGahn 11/30/17 302, at 7; SCR015_000198-99 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President).

[155] Priebus 10/13/17 302, at 8.  Several witnesses said that the President was unhappy with Flynn for other reasons at this time.  Bannon said that Flynn's standing with the President was not good by December 2016. Bannon 2/12/18 302, at 12.  The President-Elect had concerns because President Obama had warned him about Flynn shortly after the election. Bannon 2/12/18 302, at 4-5; Hicks 12/8/17 302, at 7 (President Obama's comment sat with President-Elect Trump more than Hicks expected).  Priebus said that the President had become unhappy with Flynn even before the story of his calls with Kislyak broke and had become so upset with Flynn that he would not look at him during intelligence briefings.  Priebus 1/18/18 302, at 8.  Hicks said that the President thought Flynn had bad judgment and was angered by tweets sent by Flynn and his son, and she described Flynn as "being on thin ice" by early February 2017.  Hicks 12/8/17 302, at 7, 10.

[156] Coats 6/14/17 302, at 2.

[157] Coats 6/14/17 302, at 2.

[158] Coats 6/14/17 302, at 2.

[159] Coats 6/14/17 302, at 2.

[160] SCR015_000199 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President); McGahn 11/30/17 302, at 8.

[161] SCR015_000199 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President); Eisenberg 11/29/17 302, at 9.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

told McGahn that he believed it was unlikely that a prosecutor would pursue a Logan Act charge under the circumstances.[162]

That same morning, McGahn asked Yates to return to the White House to discuss Flynn again.[163] In that second meeting, McGahn expressed doubts that the Department of Justice would bring a Logan Act prosecution against Flynn, but stated that the White House did not want to take action that would interfere with an ongoing FBI investigation of Flynn.[164] Yates responded that Department of Justice had notified the White House so that it could take action in response to the information provided.[165] McGahn ended the meeting by asking Yates for access to the underlying information the Department of Justice possessed pertaining to Flynn's discussions with Kislyak.[166]

Also on January 27, the President called FBI Director Comey and invited him to dinner that evening.[167] Priebus recalled that before the dinner, he told the President something like, "don't talk about Russia, whatever you do," and the President promised he would not talk about Russia at the dinner.[168] McGahn had previously advised the President that he should not communicate directly with the Department of Justice to avoid the perception or reality of political interference in law enforcement.[169] When Bannon learned about the President's planned dinner with Comey, he suggested that he or Priebus also attend, but the President stated that he wanted to dine with Comey alone.[170] Comey said that when he arrived for the dinner that evening, he was surprised and concerned to see that no one else had been invited.[171]

---

[162] SCR015_000199 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President); Eisenberg 11/29/17 302, at 9.

[163] SCR015_000199 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President); McGahn 11/30/17 302, at 8; Yates 8/15/17 302, at 8.

[164] Yates 8/15/17 302, at 9; McGahn 11/30/17 302, at 8.

[165] Yates 8/15/17 302, at 9; Burnham 11/3/17 302, at 5; see SCR015_00199 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President) ("Yates was unwilling to confirm or deny that there was an ongoing investigation but did indicate that the Department of Justice would not object to the White House taking action against Flynn.").

[166] Yates 9/15/17 302, at 9; Burnham 11/3/17 302, at 5. In accordance with McGahn's request, the Department of Justice made the underlying information available and Eisenberg viewed the information in early February. Eisenberg 11/29/17 302, at 5; FBI 2/7/17 Electronic Communication, at 1 (documenting 2/2/17 meeting with Eisenberg).

[167] Comey 11/15/17 302, at 6; SCR012b_000001 (President's Daily Diary, 1/27/17); Hearing on Russian Election Interference Before the Senate Select Intelligence Committee, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 2-3).

[168] Priebus 10/13/17 302, at 17.

[169] See McGahn 11/30/17 302, at 9; Dhillon 11/21/17 302, at 2; Bannon 2/12/18 302, at 17.

[170] Bannon 2/12/18 302, at 17.

[171] Hearing on Russian Election Interference Before the Senate Select Intelligence Committee, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 3); see Comey 11/15/17 302, at 6.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Comey provided an account of the dinner in a contemporaneous memo, an interview with this Office, and congressional testimony. According to Comey's account of the dinner, the President repeatedly brought up Comey's future, asking whether he wanted to stay on as FBI director.[172] Because the President had previously said he wanted Comey to stay on as FBI director, Comey interpreted the President's comments as an effort to create a patronage relationship by having Comey ask for his job.[173] The President also brought up the Steele reporting that Comey had raised in the January 6, 2017 briefing and stated that he was thinking about ordering the FBI to investigate the allegations to prove they were false.[174] Comey responded that the President should think carefully about issuing such an order because it could create a narrative that the FBI was investigating him personally, which was incorrect.[175] Later in the dinner, the President brought up Flynn and said, "the guy has serious judgment issues."[176] Comey did not comment on Flynn and the President did not acknowledge any FBI interest in or contact with Flynn.[177]

According to Comey's account, at one point during the dinner the President stated, "I need loyalty, I expect loyalty."[178] Comey did not respond and the conversation moved on to other topics, but the President returned to the subject of Comey's job at the end of the dinner and repeated, "I need loyalty."[179] Comey responded, "You will always get honesty from me."[180] The

---

[172] Comey 11/15/17 302, at 7; Comey 1/28/17 Memorandum, at 1, 3; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 3).

[173] Comey 11/15/17 302, at 7; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 3).

[174] Comey 1/28/17 Memorandum, at 3; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 4).

[175] Comey 1/28/17 Memorandum, at 3; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 4).

[176] Comey 1/28/17 Memorandum, at 4; Comey 11/15/17 302, at 7.

[177] Comey 1/28/17 Memorandum, at 4; Comey 11/15/17 302, at 7.

[178] Comey 1/28/18 Memorandum, at 2; Comey 11/15/17 302, at 7; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 3).

[179] Comey 1/28/17 Memorandum, at 3; Comey 11/15/17 302, at 7; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 3-4).

[180] Comey 1/28/17 Memorandum, at 3; Comey 11/15/17 302, at 7; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 4).

U.S. Department of Justice
~~Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

President said, "That's what I want, honest loyalty."[181]   Comey said, "You will get that from me."[182]

After Comey's account of the dinner became public, the President and his advisors disputed that he had asked for Comey's loyalty.[183]   The President also indicated that he had not invited Comey to dinner, telling a reporter that he thought Comey had "asked for the dinner" because "he wanted to stay on."[184]   But substantial evidence corroborates Comey's account of the dinner invitation and the request for loyalty. The President's Daily Diary confirms that the President "extend[ed] a dinner invitation" to Comey on January 27.[185]   With respect to the substance of the dinner conversation, Comey documented the President's request for loyalty in a memorandum he began drafting the night of the dinner;[186] senior FBI officials recall that Comey told them about the loyalty request shortly after the dinner occurred;[187] and Comey described the request while

[181] Comey 1/28/17 Memorandum, at 3; Comey 11/15/17 302, at 7; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 4).

[182] Comey 1/28/17 Memorandum, at 3; Comey 11/15/17 302, at 7; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 4).

[183] *See, e.g.*, Michael S. Schmidt, *In a Private Dinner, Trump Demanded Loyalty. Comey Demurred.*, New York Times (May 11, 2017) (quoting Sarah Sanders as saying, "[The President] would never even suggest the expectation of personal loyalty"); Ali Vitali, *Trump Never Asked for Comey's Loyalty, President's Personal Lawyer Says*, NBC (June 8, 2017) (quoting the President's personal counsel as saying, "The president also never told Mr. Comey, 'I need loyalty, I expect loyalty,' in form or substance."); Remarks by President Trump in Press Conference, White House (June 9, 2017) ("I hardly know the man. I'm not going to say 'I want you to pledge allegiance.' Who would do that? Who would ask a man to pledge allegiance under oath?"). In a private conversation with Spicer, the President stated that he had never asked for Comey's loyalty, but added that if he had asked for loyalty, "Who cares?" Spicer 10/16/17 302, at 4. The President also told McGahn that he never said what Comey said he had. McGahn 12/12/17 302, at 17.

[184] *Interview of Donald J. Trump*, NBC (May 11, 2017).

[185] SCR012b_000001 (President's Daily Diary, 1/27/17) (reflecting that the President called Comey in the morning on January 27 and "[t]he purpose of the call was to extend a dinner invitation"). In addition, two witnesses corroborate Comey's account that the President reached out to schedule the dinner, without Comey having asked for it. Priebus 10/13/17 302, at 17 (the President asked to schedule the January 27 dinner because he did not know much about Comey and intended to ask him whether he wanted to stay on as FBI Director); Rybicki 11/21/18 302, at 3 (recalling that Comey told him about the President's dinner invitation on the day of the dinner).

[186] Comey 11/15/17 302, at 8; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 4).

[187] McCabe 8/17/17 302, at 9-10; Rybicki 11/21/18 302, at 3. After leaving the White House, Comey called Deputy Director of the FBI Andrew McCabe, summarized what he and the President had discussed, including the President's request for loyalty, and expressed shock over the President's request. McCabe 8/17/17 302, at 9. Comey also convened a meeting with his senior leadership team to discuss what the President had asked of him during the dinner and whether he had handled the request for loyalty properly. McCabe 8/17/17 302, at 10; Rybicki 11/21/18 302, at 3. In addition, Comey distributed his

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

under oath in congressional proceedings and in a subsequent interview with investigators subject to penalties for lying under 18 U.S.C. § 1001.  Comey's memory of the details of the dinner, including that the President requested loyalty, has remained consistent throughout.[188]

### 6. Flynn's Resignation

On February 2, 2017, Eisenberg reviewed the underlying information relating to Flynn's calls with Kislyak.[189]  Eisenberg recalled that he prepared a memorandum about criminal statutes that could apply to Flynn's conduct, but he did not believe the White House had enough information to make a definitive recommendation to the President.[190]  Eisenberg and McGahn discussed that Eisenberg's review of the underlying information confirmed his preliminary conclusion that Flynn was unlikely to be prosecuted for violating the Logan Act.[191]  Because White House officials were uncertain what Flynn had told the FBI, however, they could not assess his exposure to prosecution for violating 18 U.S.C. § 1001.[192]

The week of February 6, Flynn had a one-on-one conversation with the President in the Oval Office about the negative media coverage of his contacts with Kislyak.[193]  Flynn recalled that the President was upset and asked him for information on the conversations.[194]  Flynn listed the specific dates on which he remembered speaking with Kislyak, but the President corrected one of the dates he listed.[195]  The President asked Flynn what he and Kislyak discussed and Flynn responded that he might have talked about sanctions.[196]

---

memorandum documenting the dinner to his senior leadership team, and McCabe confirmed that the memorandum captured what Comey said on the telephone call immediately following the dinner.  McCabe 8/17/17 302, at 9-10.

[188] There also is evidence that corroborates other aspects of the memoranda Comey wrote documenting his interactions with the President.  For example, Comey recalled, and his memoranda reflect, that he told the President in his January 6, 2017 meeting, and on phone calls on March 30 and April 11, 2017, that the FBI was not investigating the President personally.  On May 8, 2017, during White House discussions about firing Comey, the President told Rosenstein and others that Comey had told him three times that he was not under investigation, including once in person and twice on the phone.  Gauhar-000058 (Gauhar 5/16/17 Notes).

[189] Eisenberg 11/29/17 302, at 5; FBI 2/7/17 Electronic Communication, at 1 (documenting 2/2/17 meeting with Eisenberg).

[190] Eisenberg 11/29/17 302, at 6.

[191] Eisenberg 11/29/17 302, at 9; SCR015_000200 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President).

[192] Eisenberg 11/29/17 302, at 9.

[193] Flynn 11/21/17 302, at 2.

[194] Flynn 11/21/17 302, at 2.

[195] Flynn 11/21/17 302, at 2.

[196] Flynn 11/21/17 302, at 2-3.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

On February 9, 2017, the Washington Post reported that Flynn discussed sanctions with Kislyak the month before the President took office.[197]   After the publication of that story, Vice President Pence learned of the Department of Justice's notification to the White House about the content of Flynn's calls.[198]   He and other advisors then sought access to and reviewed the underlying information about Flynn's contacts with Kislyak.[199]   FBI Deputy Director Andrew McCabe, who provided the White House officials access to the information and was present when they reviewed it, recalled the officials asking him whether Flynn's conduct violated the Logan Act.[200]   McCabe responded that he did not know, but the FBI was investigating the matter because it was a possibility.[201]   Based on the evidence of Flynn's contacts with Kislyak, McGahn and Priebus concluded that Flynn could not have forgotten the details of the discussions of sanctions and had instead been lying about what he discussed with Kislyak.[202]   Flynn had also told White House officials that the FBI had told him that the FBI was closing out its investigation of him,[203] but Eisenberg did not believe him.[204]   After reviewing the materials and speaking with Flynn, McGahn and Priebus concluded that Flynn should be terminated and recommended that course of action to the President.[205]

That weekend, Flynn accompanied the President to Mar-a-Lago.[206]   Flynn recalled that on February 12, 2017, on the return flight to D.C. on Air Force One, the President asked him whether he had lied to the Vice President.[207]   Flynn responded that he may have forgotten details of his calls, but he did not think he lied.[208]   The President responded, "Okay. That's fine. I got it."[209]

---

[197]  Greg Miller et al., *National security adviser Flynn discussed sanctions with Russian ambassador, despite denials, officials say*, Washington Post (Feb. 9, 2017).

[198]  SCR015_000202 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President); McGahn 11/30/17 302, at 12.

[199]  SCR015_000202 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President); McCabe 8/17/17 302, at 11-13; Priebus 10/13/17 302, at 10; McGahn 11/30/17 302, at 12.

[200]  McCabe 8/17/17 302, at 13.

[201]  McCabe 8/17/17 302, at 13.

[202]  McGahn 11/30/17 302, at 12; Priebus 1/18/18 302, at 8; Priebus 10/13/17 302, at 10; SCR015_000202 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President).

[203]  McGahn 11/30/17 302, at 11; Eisenberg 11/29/17 302, at 9; Priebus 10/13/17 302, at 11.

[204]  Eisenberg 11/29/17 302, at 9.

[205]  SCR015_000202 (2/15/17 Draft Memorandum to file from the Office of the Counsel to the President); Priebus 10/13/17 302, at 10; McGahn 11/30/17 302, at 12.

[206]  Flynn 11/17/17 302, at 8.

[207]  Flynn 1/19/18 302, at 9; Flynn 11/17/17 302, at 8.

[208]  Flynn 11/17/17 302, at 8; Flynn 1/19/18 302, at 9.

[209]  Flynn 1/19/18 302, at 9.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

On February 13, 2017, Priebus told Flynn he had to resign.[210]  Flynn said he wanted to say goodbye to the President, so Priebus brought him to the Oval Office.[211]  Priebus recalled that the President hugged Flynn, shook his hand, and said, "We'll give you a good recommendation. You're a good guy.  We'll take care of you."[212]

Talking points on the resignation prepared by the White House Counsel's Office and distributed to the White House communications team stated that McGahn had advised the President that Flynn was unlikely to be prosecuted, and the President had determined that the issue with Flynn was one of trust.[213]  Spicer told the press the next day that Flynn was forced to resign "not based on a legal issue, but based on a trust issue, [where] a level of trust between the President and General Flynn had eroded to the point where [the President] felt he had to make a change."[214]

### 7.  The President Discusses Flynn with FBI Director Comey

On February 14, 2017, the day after Flynn's resignation, the President had lunch at the White House with New Jersey Governor Chris Christie.[215]  According to Christie, at one point during the lunch the President said, "Now that we fired Flynn, the Russia thing is over."[216]  Christie laughed and responded, "No way."[217]  He said, "this Russia thing is far from over" and "[w]e'll be here on Valentine's Day 2018 talking about this."[218]  The President said, "[w]hat do you mean? Flynn met with the Russians.  That was the problem.  I fired Flynn.  It's over."[219]  Christie recalled responding that based on his experience both as a prosecutor and as someone who had been investigated, firing Flynn would not end the investigation.[220]  Christie said there was no way to make an investigation shorter, but a lot of ways to make it longer.[221]  The President asked Christie what he meant, and Christie told the President not to talk about the investigation even if he was

[210] Priebus 1/18/18 302, at 9.

[211] Priebus 1/18/18 302, at 9; Flynn 11/17/17 302, at 10.

[212] Priebus 1/18/18 302, at 9; Flynn 11/17/17 302, at 10.

[213] SCR004_00600 (2/16/17 Email, Burnham to Donaldson).

[214] Sean Spicer, *White House Daily Briefing*, C-SPAN (Feb. 14, 2017).  After Flynn pleaded guilty to violating 18 U.S.C. § 1001 in December 2017, the President tweeted, "I had to fire General Flynn because he lied to the Vice President and the FBI."  @realDonaldTrump 12/2/17 (12:14 p.m. ET) Tweet.  The next day, the President's personal counsel told the press that he had drafted the tweet.  Maegan Vazquez et al., *Trump's lawyer says he was behind President's tweet about firing Flynn*, CNN (Dec. 3, 2017).

[215] Christie 2/13/19 302, at 2-3; SCR012b_000022 (President's Daily Diary, 2/14/17).

[216] Christie 2/13/19 302, at 3.

[217] Christie 2/13/19 302, at 3.

[218] Christie 2/13/19 302, at 3.  Christie said he thought when the President said "the Russia thing" he was referring to not just the investigations but also press coverage about Russia.  Christie thought the more important thing was that there was an investigation.  Christie 2/13/19 302, at 4.

[219] Christie 2/13/19 302, at 3.

[220] Christie 2/13/19 302, at 3.

[221] Christie 2/13/19 302, at 3.

38

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

frustrated at times.[222]  Christie also told the President that he would never be able to get rid of Flynn, "like gum on the bottom of your shoe."[223]

Towards the end of the lunch, the President brought up Comey and asked if Christie was still friendly with him.[224]  Christie said he was.[225]  The President told Christie to call Comey and tell him that the President "really like[s] him.  Tell him he's part of the team."[226]  At the end of the lunch, the President repeated his request that Christie reach out to Comey.[227]  Christie had no intention of complying with the President's request that he contact Comey.[228]  He thought the President's request was "nonsensical" and Christie did not want to put Comey in the position of having to receive such a phone call.[229]  Christie thought it would have been uncomfortable to pass on that message.[230]

At 4 p.m. that afternoon, the President met with Comey, Sessions, and other officials for a homeland security briefing.[231]  At the end of the briefing, the President dismissed the other attendees and stated that he wanted to speak to Comey alone.[232]  Sessions and senior advisor to the President Jared Kushner remained in the Oval Office as other participants left, but the President

---

[222] Christie 2/13/19 302, at 3-4.

[223] Christie 2/13/19 302, at 3.  Christie also recalled that during the lunch, Flynn called Kushner, who was at the lunch, and complained about what Spicer had said about Flynn in his press briefing that day.  Kushner told Flynn words to the effect of, "You know the President respects you.  The President cares about you.  I'll get the President to send out a positive tweet about you later."  Kushner looked at the President when he mentioned the tweet, and the President nodded his assent.  Christie 2/13/19 302, at 3.  Flynn recalled getting upset at Spicer's comments in the press conference and calling Kushner to say he did not appreciate the comments.  Flynn 1/19/18 302, at 9.

[224] Christie 2/13/19 302, at 4.

[225] Christie 2/13/19 302, at 4.

[226] Christie 2/13/19 302, at 4-5.

[227] Christie 2/13/19 302, at 5.

[228] Christie 2/13/19 302, at 5.

[229] Christie 2/13/19 302, at 5.

[230] Christie 2/13/19 302, at 5.

[231] SCR012b_000022 (President's Daily Diary, 2/14/17); Comey 11/15/17 302, at 9.

[232] Comey 11/15/17 302, at 10; 2/14/17 Comey Memorandum, at 1; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 4); Priebus 10/13/17 302, at 18 (confirming that everyone was shooed out "like Comey said" in his June testimony).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

excused them, repeating that he wanted to speak only with Comey.[233]  At some point after others had left the Oval Office, Priebus opened the door, but the President sent him away.[234]

According to Comey's account of the meeting, once they were alone, the President began the conversation by saying, "I want to talk about Mike Flynn."[235]  The President stated that Flynn had not done anything wrong in speaking with the Russians, but had to be terminated because he had misled the Vice President.[236]  The conversation turned to the topic of leaks of classified information, but the President returned to Flynn, saying "he is a good guy and has been through a lot."[237]  The President stated, "I hope you can see your way clear to letting this go, to letting Flynn go.  He is a good guy.  I hope you can let this go."[238]  Comey agreed that Flynn "is a good guy," but did not commit to ending the investigation of Flynn.[239]  Comey testified under oath that he took the President's statement "as a direction" because of the President's position and the circumstances of the one-on-one meeting.[240]

---

[233] Comey 11/15/17 302, at 10; Comey 2/14/17 Memorandum, at 1; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 4).  Sessions recalled that the President asked to speak to Comey alone and that Sessions was one of the last to leave the room; he described Comey's testimony about the events leading up to the private meeting with the President as "pretty accurate."  Sessions 1/17/18 302, at 6.  Kushner had no recollection of whether the President asked to stay behind.  Kushner 4/11/18 302, at 24.

[234] Comey 2/14/17 Memorandum, at 2; Priebus 10/13/17 302, at 18.

[235] Comey 11/15/17 302, at 10; Comey 2/14/17 Memorandum, at 1; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 4).

[236] Comey 2/14/17 Memorandum, at 1; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 5).

[237] Comey 11/15/17 302, at 10; Comey 2/14/17 Memorandum, at 2; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 5).

[238] *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 5); Comey 2/14/17 Memorandum, at 2.  Comey said he was highly confident that the words in quotations in his Memorandum documenting this meeting were the exact words used by the President.  He said he knew from the outset of the meeting that he was about to have a conversation of consequence, and he remembered the words used by the President and wrote them down soon after the meeting.  Comey 11/15/17 302, at 10-11.

[239] Comey 11/15/17 302, at 10; Comey 2/14/17 Memorandum, at 2.

[240] *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (CQ Cong. Transcripts, at 31) (testimony of James B. Comey, former Director of the FBI).  Comey further stated, "I mean, this is the president of the United States, with me alone, saying, 'I hope' this.  I took it as, this is what he wants me to do."  *Id.*; *see also* Comey 11/15/17 302, at 10 (Comey took the statement as an order to shut down the Flynn investigation).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Shortly after meeting with the President, Comey began drafting a memorandum documenting their conversation.[241] Comey also met with his senior leadership team to discuss the President's request, and they agreed not to inform FBI officials working on the Flynn case of the President's statements so the officials would not be influenced by the request.[242] Comey also asked for a meeting with Sessions and requested that Sessions not leave Comey alone with the President again.[243]

### 8. The Media Raises Questions About the President's Delay in Terminating Flynn

After Flynn was forced to resign, the press raised questions about why the President waited more than two weeks after the DOJ notification to remove Flynn and whether the President had known about Flynn's contacts with Kislyak before the DOJ notification.[244] The press also continued to raise questions about connections between Russia and the President's campaign.[245] On February 15, 2017, the President told reporters, "General Flynn is a wonderful man. I think he's been treated very, very unfairly by the media."[246] On February 16, 2017, the President held

---

[241] Comey 11/15/17 302, at 11; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the record of James B. Comey, former Director of the FBI, at 5).

[242] Comey 11/15/17 302, at 11; Rybicki 6/9/17 302, at 4; Rybicki 6/22/17 302, at 1; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the record of James B. Comey, former Director of the FBI, at 5-6).

[243] Comey 11/15/17 302, at 11; Rybicki 6/9/17 302, at 4-5; Rybicki 6/22/17 302, at 1-2; Sessions 1/17/18 302, at 6 (confirming that later in the week following Comey's one-on-one meeting with the President in the Oval Office, Comey told the Attorney General that he did not want to be alone with the President); Hunt 2/1/18 302, at 6 (within days of the February 14 Oval Office meeting, Comey told Sessions he did not think it was appropriate for the FBI Director to meet alone with the President); Rybicki 11/21/18 302, at 4 (Rybicki helped to schedule the meeting with Sessions because Comey wanted to talk about his concerns about meeting with the President alone); *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the record of James B. Comey, former Director of the FBI, at 6).

[244] *See, e.g.*, Sean Spicer, *White House Daily Briefing*, C-SPAN (Feb. 14, 2017) (questions from the press included, "if [the President] was notified 17 days ago that Flynn had misled the Vice President, other officials here, and that he was a potential threat to blackmail by the Russians, why would he be kept on for almost three weeks?" and "Did the President instruct [Flynn] to talk about sanctions with the [Russian ambassador]?"). Priebus recalled that the President initially equivocated on whether to fire Flynn because it would generate negative press to lose his National Security Advisor so early in his term. Priebus 1/18/18 302, at 8.

[245] *E.g.*, Sean Sullivan et al., *Senators from both parties pledge to deepen probe of Russia and the 2016 election*, Washington Post (Feb. 14, 2017); Aaron Blake, *5 times Donald Trump's team denied contact with Russia*, Washington Post (Feb. 15, 2017); Oren Dorell, *Donald Trump's ties to Russia go back 30 years*, USA Today (Feb. 15, 2017); Pamela Brown et al., *Trump aides were in constant touch with senior Russian officials during campaign*, CNN (Feb. 15, 2017); Austin Wright, *Comey briefs senators amid furor over Trump-Russia ties*, Politico (Feb. 17, 2017); Megan Twohey & Scott Shane, *A Back-Channel Plan for Ukraine and Russia, Courtesy of Trump Associates*, New York Times (Feb. 19, 2017).

[246] Remarks by President Trump and Prime Minister Netanyahu of Israel in Joint Press Conference, White House (Feb. 15, 2017).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

a press conference and said that he removed Flynn because Flynn "didn't tell the Vice President of the United States the facts, and then he didn't remember. And that just wasn't acceptable to me."[247] The President said he did not direct Flynn to discuss sanctions with Kislyak, but "it certainly would have been okay with me if he did. I would have directed him to do it if I thought he wasn't doing it. I didn't direct him, but I would have directed him because that's his job."[248] In listing the reasons for terminating Flynn, the President did not say that Flynn had lied to him.[249] The President also denied having any connection to Russia, stating, "I have nothing to do with Russia. I told you, I have no deals there. I have no anything."[250] The President also said he "had nothing to do with" WikiLeaks's publication of information hacked from the Clinton campaign.[251]

> ### 9.  The President Attempts to Have K.T. McFarland Create a Witness Statement Denying that he Directed Flynn's Discussions with Kislyak

On February 22, 2017, Priebus and Bannon told McFarland that the President wanted her to resign as Deputy National Security Advisor, but they suggested to her that the Administration could make her the ambassador to Singapore.[252] The next day, the President asked Priebus to have McFarland draft an internal email that would confirm that the President did not direct Flynn to call the Russian Ambassador about sanctions.[253] Priebus said he told the President he would only direct McFarland to write such a letter if she were comfortable with it.[254] Priebus called McFarland into his office to convey the President's request that she memorialize in writing that the President did not direct Flynn to talk to Kislyak.[255] McFarland told Priebus she did not know whether the President had directed Flynn to talk to Kislyak about sanctions, and she declined to say yes or no

---

[247] Remarks by President Trump in Press Conference, White House (Feb. 16, 2017).

[248] Remarks by President Trump in Press Conference, White House (Feb. 16, 2017). The President also said that Flynn's conduct "wasn't wrong – what he did in terms of the information he saw." The President said that Flynn was just "doing the job," and "if anything, he did something right."

[249] Remarks by President Trump in Press Conference, White House (Feb. 16, 2017); Priebus 1/18/18 302, at 9.

[250] Remarks by President Trump in Press Conference, White House (Feb. 16, 2017).

[251] Remarks by President Trump in Press Conference, White House (Feb. 16, 2017).

[252] KTMF_00000047 (McFarland 2/26/17 Memorandum for the Record); McFarland 12/22/17 302, at 16-17.

[253] See Priebus 1/18/18 302, at 11; see also KTMF_00000048 (McFarland 2/26/17 Memorandum for the Record); McFarland 12/22/17 302, at 17.

[254] Priebus 1/18/18 302, at 11.

[255] KTMF_00000048 (McFarland 2/26/17 Memorandum for the Record); McFarland 12/22/17 302, at 17.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

to the request.[256]  Priebus understood that McFarland was not comfortable with the President's request, and he recommended that she talk to attorneys in the White House Counsel's Office.[257]

McFarland then reached out to Eisenberg.[258]  McFarland told him that she had been fired from her job as Deputy National Security Advisor and offered the ambassadorship in Singapore but that the President and Priebus wanted a letter from her denying that the President directed Flynn to discuss sanctions with Kislyak.[259]  Eisenberg advised McFarland not to write the requested letter.[260]  As documented by McFarland in a contemporaneous "Memorandum for the Record" that she wrote because she was concerned by the President's request: "Eisenberg . . . thought the requested email and letter would be a bad idea – from my side because the email would be awkward.  Why would I be emailing Priebus to make a statement for the record?  But it would also be a bad idea for the President because it looked as if my ambassadorial appointment was in some way a quid pro quo."[261]  Later that evening, Priebus stopped by McFarland's office and told her not to write the email and to forget he even mentioned it.[262]

Around the same time, the President asked Priebus to reach out to Flynn and let him know that the President still cared about him.[263]  Priebus called Flynn and said that he was checking in and that Flynn was an American hero.[264]  Priebus thought the President did not want Flynn saying bad things about him.[265]

On March 31, 2017, following news that Flynn had offered to testify before the FBI and congressional investigators in exchange for immunity, the President tweeted, "Mike Flynn should ask for immunity in that this is a witch hunt (excuse for big election loss), by media & Dems, of

---

[256] KTMF_00000047 (McFarland 2/26/17 Memorandum for the Record) ("I said I did not know whether he did or didn't, but was in Maralago the week between Christmas and New Year's (while Flynn was on vacation in Carribean) and I was not aware of any Flynn-Trump, or Trump-Russian phone calls"); McFarland 12/22/17 302, at 17.

[257] Priebus 1/18/18 302, at 11.

[258] McFarland 12/22/17 302, at 17.

[259] McFarland 12/22/17 302, at 17.

[260] KTMF_00000048 (McFarland 2/26/17 Memorandum for the Record); McFarland 12/22/17 302, at 17.

[261] KTMF_00000048 (McFarland 2/26/17 Memorandum for the Record); *see* McFarland 12/22/17 302, at 17.

[262] McFarland 12/22/17 302, at 17; KTMF_00000048 (McFarland 2/26/17 Memorandum for the Record).

[263] Priebus 1/18/18 302, at 9.

[264] Priebus 1/18/18 302, at 9; Flynn 1/19/18 302, at 9.

[265] Priebus 1/18/18 302, at 9-10.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

historic proportion!"[266]  In late March or early April, the President asked McFarland to pass a message to Flynn telling him the President felt bad for him and that he should stay strong.[267]

### *Analysis*

In analyzing the President's conduct related to the Flynn investigation, the following evidence is relevant to the elements of obstruction of justice:

a.      Obstructive act.  According to Comey's account of his February 14, 2017 meeting in the Oval Office, the President told him, "I hope you can see your way clear to letting this go, to letting Flynn go. . . . I hope you can let this go."  In analyzing whether these statements constitute an obstructive act, a threshold question is whether Comey's account of the interaction is accurate, and, if so, whether the President's statements had the tendency to impede the administration of justice by shutting down an inquiry that could result in a grand jury investigation and a criminal charge.

After Comey's account of the President's request to "let[] Flynn go" became public, the President publicly disputed several aspects of the story.  The President told the New York Times that he did not "shoo other people out of the room" when he talked to Comey and that he did not remember having a one-on-one conversation with Comey.[268]  The President also publicly denied that he had asked Comey to "let[] Flynn go" or otherwise communicated that Comey should drop the investigation of Flynn.[269]  In private, the President denied aspects of Comey's account to White House advisors, but acknowledged to Priebus that he brought Flynn up in the meeting with Comey and stated that Flynn was a good guy.[270]  Despite those denials, substantial evidence corroborates Comey's account.

---

[266] @realDonaldTrump 3/31/17 (7:04 a.m. ET) Tweet; *see* Shane Harris at al., *Mike Flynn Offers to Testify in Exchange for Immunity*, Wall Street Journal (Mar. 30, 2017).

[267] McFarland 12/22/17 302, at 18.

[268] *Excerpts From The Times's Interview With Trump*, New York Times (July 19, 2017).  Hicks recalled that the President told her he had never asked Comey to stay behind in his office.  Hicks 12/8/17 302, at 12.

[269] In a statement on May 16, 2017, the White House said: "While the President has repeatedly expressed his view that General Flynn is a decent man who served and protected our country, the President has never asked Mr. Comey or anyone else to end any investigation, including any investigation involving General Flynn. . . .  This is not a truthful or accurate portrayal of the conversation between the President and Mr. Comey."  *See* Michael S. Schmidt, *Comey Memorandum Says Trump Asked Him to End Flynn Investigation*, New York Times (May 16, 2017) (quoting White House statement); @realDonaldTrump 12/3/17 (6:15 a.m. ET) Tweet ("I never asked Comey to stop investigating Flynn. Just more Fake News covering another Comey lie!").

[270] Priebus recalled that the President acknowledged telling Comey that Flynn was a good guy and he hoped "everything worked out for him."  Priebus 10/13/17 302, at 19.  McGahn recalled that the President denied saying to Comey that he hoped Comey would let Flynn go, but added that he was "allowed to hope."  The President told McGahn he did not think he had crossed any lines.  McGahn 12/14/17 302, at 8.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

First, Comey wrote a detailed memorandum of his encounter with the President on the same day it occurred. Comey also told senior FBI officials about the meeting with the President that day, and their recollections of what Comey told them at the time are consistent with Comey's account.[271]

Second, Comey provided testimony about the President's request that he "let[] Flynn go" under oath in congressional proceedings and in interviews with federal investigators subject to penalties for lying under 18 U.S.C. § 1001. Comey's recollections of the encounter have remained consistent over time.

Third, the objective, corroborated circumstances of how the one-on-one meeting came to occur support Comey's description of the event. Comey recalled that the President cleared the room to speak with Comey alone after a homeland security briefing in the Oval Office, that Kushner and Sessions lingered and had to be shooed out by the President, and that Priebus briefly opened the door during the meeting, prompting the President to wave him away. While the President has publicly denied those details, other Administration officials who were present have confirmed Comey's account of how he ended up in a one-on-one meeting with the President.[272] And the President acknowledged to Priebus and McGahn that he in fact spoke to Comey about Flynn in their one-on-one meeting.

Fourth, the President's decision to clear the room and, in particular, to exclude the Attorney General from the meeting signals that the President wanted to be alone with Comey, which is consistent with the delivery of a message of the type that Comey recalls, rather than a more innocuous conversation that could have occurred in the presence of the Attorney General.

Finally, Comey's reaction to the President's statements is consistent with the President having asked him to "let[] Flynn go." Comey met with the FBI leadership team, which agreed to keep the President's statements closely held and not to inform the team working on the Flynn investigation so that they would not be influenced by the President's request. Comey also promptly met with the Attorney General to ask him not to be left alone with the President again, an account verified by Sessions, FBI Chief of Staff James Rybicki, and Jody Hunt, who was then the Attorney General's chief of staff.

A second question is whether the President's statements, which were not phrased as a direct order to Comey, could impede or interfere with the FBI's investigation of Flynn. While the President said he "hope[d]" Comey could "let[] Flynn go," rather than affirmatively directing him to do so, the circumstances of the conversation show that the President was asking Comey to close the FBI's investigation into Flynn. First, the President arranged the meeting with Comey so that they would be alone and purposely excluded the Attorney General, which suggests that the President meant to make a request to Comey that he did not want anyone else to hear. Second, because the President is the head of the Executive Branch, when he says that he "hopes" a subordinate will do something, it is reasonable to expect that the subordinate will do what the President wants. Indeed, the President repeated a version of "let this go" three times, and Comey

---

[271] Rybicki 11/21/18 302, at 4; McCabe 8/17/17 302, at 13-14.

[272] *See* Priebus 10/13/17 302, at 18; Sessions 1/17/18 302, at 6.

U.S. Department of Justice
Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

testified that he understood the President's statements as a directive, which is corroborated by the way Comey reacted at the time.

b.    Nexus to a proceeding.  To establish a nexus to a proceeding, it would be necessary to show that the President could reasonably foresee and actually contemplated that the investigation of Flynn was likely to lead to a grand jury investigation or prosecution.

At the time of the President's one-on-one meeting with Comey, no grand jury subpoenas had been issued as part of the FBI's investigation into Flynn.  But Flynn's lies to the FBI violated federal criminal law, Grand Jury ████████████████████, and resulted in Flynn's prosecution for violating 18 U.S.C. § 1001.  By the time the President spoke to Comey about Flynn, DOJ officials had informed the President, that Flynn's statements to senior White House officials about his contacts with Kislyak were not true and that Flynn had told the same version of events to the FBI.  McGahn also informed the President that Flynn's conduct could violate 18 U.S.C. § 1001.  After the Vice President and senior White House officials reviewed the underlying information about Flynn's calls on February 10, 2017, they believed that Flynn could not have forgotten his conversations with Kislyak and concluded that he had been lying.  In addition, the President's instruction to the FBI Director to "let[] Flynn go" suggests his awareness that Flynn could face criminal exposure for his conduct and was at risk of prosecution.

c.    Intent.  As part of our investigation, we examined whether the President had a personal stake in the outcome of an investigation into Flynn—for example, whether the President was aware of Flynn's communications with Kislyak close in time to when they occurred, such that the President knew that Flynn had lied to senior White House officials and that those lies had been passed on to the public.  Some evidence suggests that the President knew about the existence and content of Flynn's calls when they occurred, but the evidence is inconclusive and could not be relied upon to establish the President's knowledge.  In advance of Flynn's initial call with Kislyak, the President attended a meeting where the sanctions were discussed and an advisor may have mentioned that Flynn was scheduled to talk to Kislyak.  Flynn told McFarland about the substance of his calls with Kislyak and said they may have made a difference in Russia's response, and Flynn recalled talking to Bannon in early January 2017 about how they had successfully "stopped the train on Russia's response" to the sanctions.  It would have been reasonable for Flynn to have wanted the President to know of his communications with Kislyak because Kislyak told Flynn his request had been received at the highest levels in Russia and that Russia had chosen not to retaliate in response to the request, and the President was pleased by the Russian response, calling it a "[g]reat move."  And the President never said publicly or internally that Flynn had lied to him about the calls with Kislyak.

But McFarland did not recall providing the President-Elect with Flynn's read-out of his calls with Kislyak, and Flynn does not have a specific recollection of telling the President-Elect directly about the calls.  Bannon also said he did not recall hearing about the calls from Flynn.  And in February 2017, the President asked Flynn what was discussed on the calls and whether he had lied to the Vice President, suggesting that he did not already know.  Our investigation accordingly did not produce evidence that established that the President knew about Flynn's discussions of sanctions before the Department of Justice notified the White House of those discussions in late January 2017.  The evidence also does not establish that Flynn otherwise

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

possessed information damaging to the President that would give the President a personal incentive to end the FBI's inquiry into Flynn's conduct.

Evidence does establish that the President connected the Flynn investigation to the FBI's broader Russia investigation and that he believed, as he told Christie, that terminating Flynn would end "the whole Russia thing." Flynn's firing occurred at a time when the media and Congress were raising questions about Russia's interference in the election and whether members of the President's campaign had colluded with Russia. Multiple witnesses recalled that the President viewed the Russia investigations as a challenge to the legitimacy of his election. The President paid careful attention to negative coverage of Flynn and reacted with annoyance and anger when the story broke disclosing that Flynn had discussed sanctions with Kislyak. Just hours before meeting one-on-one with Comey, the President told Christie that firing Flynn would put an end to the Russia inquiries. And after Christie pushed back, telling the President that firing Flynn would not end the Russia investigation, the President asked Christie to reach out to Comey and convey that the President liked him and he was part of "the team." That afternoon, the President cleared the room and asked Comey to "let[] Flynn go."

We also sought evidence relevant to assessing whether the President's direction to Comey was motivated by sympathy towards Flynn. In public statements the President repeatedly described Flynn as a good person who had been harmed by the Russia investigation, and the President directed advisors to reach out to Flynn to tell him the President "care[d]" about him and felt bad for him. At the same time, multiple senior advisors, including Bannon, Priebus, and Hicks, said that the President had become unhappy with Flynn well before Flynn was forced to resign and that the President was frequently irritated with Flynn. Priebus said he believed the President's initial reluctance to fire Flynn stemmed not from personal regard, but from concern about the negative press that would be generated by firing the National Security Advisor so early in the Administration. And Priebus indicated that the President's post-firing expressions of support for Flynn were motivated by the President's desire to keep Flynn from saying negative things about him.

The way in which the President communicated the request to Comey also is relevant to understanding the President's intent. When the President first learned about the FBI investigation into Flynn, he told McGahn, Bannon, and Priebus not to discuss the matter with anyone else in the White House. The next day, the President invited Comey for a one-on-one dinner against the advice of an aide who recommended that other White House officials also attend. At the dinner, the President asked Comey for "loyalty" and, at a different point in the conversation, mentioned that Flynn had judgment issues. When the President met with Comey the day after Flynn's termination—shortly after being told by Christie that firing Flynn would not end the Russia investigation—the President cleared the room, even excluding the Attorney General, so that he could again speak to Comey alone. The President's decision to meet one-on-one with Comey contravened the advice of the White House Counsel that the President should not communicate directly with the Department of Justice to avoid any appearance of interfering in law enforcement activities. And the President later denied that he cleared the room and asked Comey to "let[] Flynn go"—a denial that would have been unnecessary if he believed his request was a proper exercise of prosecutorial discretion.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Finally, the President's effort to have McFarland write an internal email denying that the President had directed Flynn to discuss sanctions with Kislyak highlights the President's concern about being associated with Flynn's conduct. The evidence does not establish that the President was trying to have McFarland lie. The President's request, however, was sufficiently irregular that McFarland—who did not know the full extent of Flynn's communications with the President and thus could not make the representation the President wanted—felt the need to draft an internal memorandum documenting the President's request, and Eisenberg was concerned that the request would look like a quid pro quo in exchange for an ambassadorship.

### C.   The President's Reaction to Public Confirmation of the FBI's Russia Investigation

#### Overview

In early March 2017, the President learned that Sessions was considering recusing from the Russia investigation and tried to prevent the recusal. After Sessions announced his recusal on March 2, the President expressed anger at Sessions for the decision and then privately asked Sessions to "unrecuse." On March 20, 2017, Comey publicly disclosed the existence of the FBI's Russia investigation. In the days that followed, the President contacted Comey and other intelligence agency leaders and asked them to push back publicly on the suggestion that the President had any connection to the Russian election-interference effort in order to "lift the cloud" of the ongoing investigation.

#### Evidence

#### 1.   Attorney General Sessions Recuses From the Russia Investigation

In late February 2017, the Department of Justice began an internal analysis of whether Sessions should recuse from the Russia investigation based on his role in the 2016 Trump Campaign.[273] On March 1, 2017, the press reported that, in his January confirmation hearing to become Attorney General, Senator Sessions had not disclosed two meetings he had with Russian Ambassador Kislyak before the presidential election, leading to congressional calls for Sessions to recuse or for a special counsel to investigate Russia's interference in the presidential election.[274]

Also on March 1, the President called Comey and said he wanted to check in and see how Comey was doing.[275] According to an email Comey sent to his chief of staff after the call, the President "talked about Sessions a bit," said that he had heard Comey was "doing great," and said that he hoped Comey would come by to say hello when he was at the White House.[276] Comey

---

[273] Sessions 1/17/18 302, at 1; Hunt 2/1/18 302, at 3.

[274] *E.g.*, Adam Entous et al., *Sessions met with Russian envoy twice last year, encounters he later did not disclose*, Washington Post (Mar. 1, 2017).

[275] 3/1/17 Email, Comey to Rybicki; SCR012b_000030 (President's Daily Diary, 3/1/17, reflecting call with Comey at 11:55 am.)

[276] 3/1/17 Email, Comey to Rybicki; *see Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (CQ Cong. Transcripts, at 86) (testimony

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

interpreted the call as an effort by the President to "pull [him] in," but he did not perceive the call as an attempt by the President to find out what Comey was doing with the Flynn investigation.[277]

The next morning, the President called McGahn and urged him to contact Sessions to tell him not to recuse himself from the Russia investigation.[278] McGahn understood the President to be concerned that a recusal would make Sessions look guilty for omitting details in his confirmation hearing; leave the President unprotected from an investigation that could hobble the presidency and derail his policy objectives; and detract from favorable press coverage of a Presidential Address to Congress the President had delivered earlier in the week.[279] McGahn reached out to Sessions and reported that the President was not happy about the possibility of recusal.[280] Sessions replied that he intended to follow the rules on recusal.[281] McGahn reported back to the President about the call with Sessions, and the President reiterated that he did not want Sessions to recuse.[282] Throughout the day, McGahn continued trying on behalf of the President to avert Sessions's recusal by speaking to Sessions's personal counsel, Sessions's chief of staff, and Senate Majority Leader Mitch McConnell, and by contacting Sessions himself two more times.[283] Sessions recalled that other White House advisors also called him that day to argue against his recusal.[284]

That afternoon, Sessions announced his decision to recuse "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States."[285] Sessions believed the decision to recuse was not a close call, given the applicable

---

of James B. Comey, former Director of the FBI) ("[H]e called me one day. . . . [H]e just called to check in and tell me I was doing an awesome job, and wanted to see how I was doing.").

[277] Comey 11/15/17 302, at 17-18.

[278] McGahn 11/30/17 302, at 16.

[279] McGahn 11/30/17 302, at 16-17; *see* SC_AD_00123 (Donaldson 3/2/17 Notes) ("Just in the middle of another Russia Fiasco.").

[280] Sessions 1/17/18 302, at 3.

[281] McGahn 11/30/17 302, at 17.

[282] McGahn 11/30/17 302, at 17.

[283] McGahn 11/30/17 302, at 18-19; Sessions 1/17/18 302, at 3; Hunt 2/1/18 302, at 4; Donaldson 11/6/17 302, at 8-10; *see* Hunt-000017; SC_AD_00121 (Donaldson 3/2/17 Notes).

[284] Sessions 1/17/18 302, at 3.

[285] Attorney General Sessions Statement on Recusal, Department of Justice Press Release (Mar. 2, 2017) ("During the course of the last several weeks, I have met with the relevant senior career Department officials to discuss whether I should recuse myself from any matters arising from the campaigns for President of the United States. Having concluded those meetings today, I have decided to recuse myself from any existing or future investigations of any matters related in any way to the campaigns for President of the United States."). At the time of Sessions's recusal, Dana Boente, then the Acting Deputy Attorney General and U.S. Attorney for the Eastern District of Virginia, became the Acting Attorney General for campaign-related matters pursuant to an executive order specifying the order of succession at the Department of Justice. *Id.* ("Consistent with the succession order for the Department of Justice, . . . Dana Boente shall act as and perform the functions of the Attorney General with respect to any matters from

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

language in the Code of Federal Regulations (CFR), which Sessions considered to be clear and decisive.[286]  Sessions thought that any argument that the CFR did not apply to him was "very thin."[287]  Sessions got the impression, based on calls he received from White House officials, that the President was very upset with him and did not think he had done his duty as Attorney General.[288]

Shortly after Sessions announced his recusal, the White House Counsel's Office directed that Sessions should not be contacted about the matter.[289]  Internal White House Counsel's Office notes from March 2, 2017, state "No contact w/Sessions" and "No comms / Serious concerns about obstruction."[290]

On March 3, the day after Sessions's recusal, McGahn was called into the Oval Office.[291]  Other advisors were there, including Priebus and Bannon.[292]   The President opened the conversation by saying, "I don't have a lawyer."[293]  The President expressed anger at McGahn about the recusal and brought up Roy Cohn, stating that he wished Cohn was his attorney.[294]  McGahn interpreted this comment as directed at him, suggesting that Cohn would fight for the

---

which I have recused myself to the extent they exist."); *see* Exec. Order No. 13775, 82 Fed. Reg. 10697 (Feb. 14, 2017).

[286] Sessions 1/17/18 302, at 1-2.  28 C.F.R. § 45.2 provides that "no employee shall participate in a criminal investigation or prosecution if he has a personal or political relationship with . . . [a]ny person or organization substantially involved in the conduct that is the subject of the investigation or prosecution," and defines "political relationship" as "a close identification with an elected official, a candidate (whether or not successful) for elective, public office, a political party, or a campaign organization, arising from service as a principal adviser thereto or a principal official thereof."

[287] Sessions 1/17/18 302, at 2.

[288] Sessions 1/17/18 302, at 3.

[289] Donaldson 11/6/17 302, at 11; SC_AD_00123 (Donaldson 3/2/17 Notes).  It is not clear whether the President was aware of the White House Counsel's Office direction not to contact Sessions about his recusal.

[290] SC_AD_00123 (Donaldson 3/2/17 Notes).  McGahn said he believed the note "No comms / Serious concerns about obstruction" may have referred to concerns McGahn had about the press team saying "crazy things" and trying to spin Sessions's recusal in a way that would raise concerns about obstruction.  McGahn 11/30/17 302, at 19.  Donaldson recalled that "No comms" referred to the order that no one should contact Sessions.  Donaldson 11/6/17 302, at 11.

[291] McGahn 12/12/17 302, at 2.

[292] McGahn 12/12/17 302, at 2.

[293] McGahn 12/12/17 302, at 2.

[294] McGahn 12/12/17 302, at 2.  Cohn had previously served as a lawyer for the President during his career as a private businessman.  Priebus recalled that when the President talked about Cohn, he said Cohn would win cases for him that had no chance, and that Cohn had done incredible things for him.  Priebus 4/3/18 302, at 5.  Bannon recalled the President describing Cohn as a winner and a fixer, someone who got things done.  Bannon 2/14/18 302, at 6.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

President whereas McGahn would not.[295]  The President wanted McGahn to talk to Sessions about the recusal, but McGahn told the President that DOJ ethics officials had weighed in on Sessions's decision to recuse.[296]  The President then brought up former Attorneys General Robert Kennedy and Eric Holder and said that they had protected their presidents.[297]  The President also pushed back on the DOJ contacts policy, and said words to the effect of, "You're telling me that Bobby and Jack didn't talk about investigations? Or Obama didn't tell Eric Holder who to investigate?"[298]  Bannon recalled that the President was as mad as Bannon had ever seen him and that he screamed at McGahn about how weak Sessions was.[299]  Bannon recalled telling the President that Sessions's recusal was not a surprise and that before the inauguration they had discussed that Sessions would have to recuse from campaign-related investigations because of his work on the Trump Campaign.[300]

That weekend, Sessions and McGahn flew to Mar-a-Lago to meet with the President.[301]  Sessions recalled that the President pulled him aside to speak to him alone and suggested that Sessions should "unrecuse" from the Russia investigation.[302]  The President contrasted Sessions with Attorneys General Holder and Kennedy, who had developed a strategy to help their presidents where Sessions had not.[303]  Sessions said he had the impression that the President feared that the investigation could spin out of control and disrupt his ability to govern, which Sessions could have helped avert if he were still overseeing it.[304]

On March 5, 2017, the White House Counsel's Office was informed that the FBI was asking for transition-period records relating to Flynn—indicating that the FBI was still actively investigating him.[305]  On March 6, the President told advisors he wanted to call the Acting Attorney

---

[295] McGahn 12/12/17 302, at 2.

[296] McGahn 12/12/17 302, at 2.

[297] McGahn 12/12/17 302, at 3.  Bannon said the President saw Robert Kennedy and Eric Holder as Attorneys General who protected the presidents they served.  The President thought Holder always stood up for President Obama and even took a contempt charge for him, and Robert Kennedy always had his brother's back.  Bannon 2/14/18 302, at 5.  Priebus recalled that the President said he had been told his entire life he needed to have a great lawyer, a "bulldog," and added that Holder had been willing to take a contempt-of-Congress charge for President Obama.  Priebus 4/3/18 302, at 5.

[298] McGahn 12/12/17 302, at 3.

[299] Bannon 2/14/18 302, at 5.

[300] Bannon 2/14/18 302, at 5.

[301] Sessions 1/17/18 302, at 3; Hunt 2/1/18 302, at 5; McGahn 12/12/17 302, at 3.

[302] Sessions 1/17/18 302, at 3-4.

[303] Sessions 1/17/18 302, at 3-4

[304] Sessions 1/17/18 302, at 3-4.  Hicks recalled that after Sessions recused, the President was angry and scolded Sessions in her presence, but she could not remember exactly when that conversation occurred.  Hicks 12/8/17 302, at 13.

[305] SC_AD_000137 (Donaldson 3/5/17 Notes); *see* Donaldson 11/6/17 302, at 13.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

General to find out whether the White House or the President was being investigated, although it is not clear whether the President knew at that time of the FBI's recent request concerning Flynn.[306]

### 2. FBI Director Comey Publicly Confirms the Existence of the Russia Investigation in Testimony Before HPSCI

On March 9, 2017, Comey briefed the "Gang of Eight" congressional leaders about the FBI's investigation of Russian interference, including an identification of the principal U.S. subjects of the investigation.[307]  Although it is unclear whether the President knew of that briefing at the time, notes taken by Annie Donaldson, then McGahn's chief of staff, on March 12, 2017, state, "POTUS in panic/chaos . . . Need binders to put in front of POTUS.  (1) All things related to Russia."[308]  The week after Comey's briefing, the White House Counsel's Office was in contact with SSCI Chairman Senator Richard Burr about the Russia investigations and appears to have received information about the status of the FBI investigation.[309]

On March 20, 2017, Comey was scheduled to testify before HPSCI.[310]  In advance of Comey's testimony, congressional officials made clear that they wanted Comey to provide information about the ongoing FBI investigation.[311]  Dana Boente, who at that time was the Acting Attorney General for the Russia investigation, authorized Comey to confirm the existence of the Russia investigation and agreed that Comey should decline to comment on whether any particular individuals, including the President, were being investigated.[312]

---

[306] Donaldson 11/6/17 302, at 14; *see* SC_AD_000168 (Donaldson 3/6/17 Notes) ("POTUS wants to call Dana [then the Acting Attorney General for campaign-related investigations] / Is investigation / No / We know something on Flynn / GSA got contacted by FBI / There's something hot").

[307] Comey 11/15/17 302, at 13-14; SNS-Classified-0000140-44 (3/8/17 Email, Gauhar to Page et al.).

[308] SC_AD_00188 (Donaldson 3/12/18 Notes).  Donaldson said she was not part of the conversation that led to these notes, and must have been told about it from others.  Donaldson 11/6/17 302, at 13.

[309] Donaldson 11/6/17 302, at 14-15.  On March 16, 2017, the White House Counsel's Office was briefed by Senator Burr on the existence of "4-5 targets."  Donaldson 11/6/17 302, at 15.  The "targets" were identified in notes taken by Donaldson as "Flynn (FBI was in—wrapping up)→DOJ looking for phone records"; "Comey→Manafort (Ukr + Russia, not campaign)"; ████████ "Carter Page ($ game)"; and "Greek Guy" (potentially referring to George Papadopoulos, later charged with violating 18 U.S.C. § 1001 for lying to the FBI).  SC_AD_00198 (Donaldson 3/16/17 Notes).  Donaldson and McGahn both said they believed these were targets of SSCI.  Donaldson 11/6/17 302, at 15; McGahn 12/12/17 302, at 4.  But SSCI does not formally investigate individuals as "targets"; the notes on their face reference the FBI, the Department of Justice, and Comey; and the notes track the background materials prepared by the FBI for Comey's briefing to the Gang of 8 on March 9.  *See* SNS-Classified-0000140-44 (3/8/17 Email, Gauhar to Page et al.); *see also* Donaldson 11/6/17 302, at 15 (Donaldson could not rule out that Burr had told McGahn those individuals were the FBI's targets).

[310] *Hearing on Russian Election Tampering Before the House Permanent Select Intelligence Committee*, 115th Cong. (Mar. 20, 2017).

[311] Comey 11/15/17 302, at 16; McCabe 8/17/17, at 15; McGahn 12/14/17 302, at 1.

[312] Boente 1/31/18 302, at 5; Comey 11/15/17 302, at 16-17.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

In his opening remarks at the HPSCI hearing, which were drafted in consultation with the Department of Justice, Comey stated that he had "been authorized by the Department of Justice to confirm that the FBI, as part of [its] counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts. As with any counterintelligence investigation, this will also include an assessment of whether any crimes were committed."[313]   Comey added that he would not comment further on what the FBI was "doing and whose conduct [it] [was] examining" because the investigation was ongoing and classified—but he observed that he had "taken the extraordinary step in consultation with the Department of Justice of briefing this Congress's leaders . . . in a classified setting in detail about the investigation."[314]   Comey was specifically asked whether President Trump was "under investigation during the campaign" or "under investigation now."[315]   Comey declined to answer, stating, "Please don't over interpret what I've said as—as the chair and ranking know, we have briefed him in great detail on the subjects of the investigation and what we're doing, but I'm not gonna answer about anybody in this forum."[316]   Comey was also asked whether the FBI was investigating the information contained in the Steele reporting, and he declined to answer.[317]

According to McGahn and Donaldson, the President had expressed frustration with Comey before his March 20 testimony, and the testimony made matters worse.[318]   The President had previously criticized Comey for too frequently making headlines and for not attending intelligence briefings at the White House, and the President suspected Comey of leaking certain information to the media.[319]   McGahn said the President thought Comey was acting like "his own branch of government."[320]

---

[313] *Hearing on Russian Election Tampering Before the House Permanent Select Intelligence Committee*, 115th Cong. (Mar. 20, 2017) (CQ Cong. Transcripts, at 11) (testimony by FBI Director James B. Comey); Comey 11/15/17 302, at 17; Boente 1/31/18 302, at 5 (confirming that the Department of Justice authorized Comey's remarks).

[314] *Hearing on Russian Election Tampering Before the House Permanent Select Intelligence Committee*, 115th Cong. (Mar. 20, 2017) (CQ Cong. Transcripts, at 11) (testimony by FBI Director James B. Comey ).

[315] *Hearing on Russian Election Tampering Before the House Permanent Select Intelligence Committee*, 115th Cong. (Mar. 20, 2017) (CQ Cong. Transcripts, at 130) (question by Rep. Swalwell).

[316] *Hearing on Russian Election Tampering Before the House Permanent Select Intelligence Committee*, 115th Cong. (Mar. 20, 2017) (CQ Cong. Transcripts, at 130) (testimony by FBI Director James B. Comey).

[317] *Hearing on Russian Election Tampering Before the House Permanent Select Intelligence Committee*, 115th Cong. (Mar. 20, 2017) (CQ Cong. Transcripts, at 143) (testimony by FBI Director James B. Comey).

[318] Donaldson 11/6/17 302, at 21; McGahn 12/12/17 302, at 7.

[319] Donaldson 11/6/17 302, at 21; McGahn 12/12/17 302, at 6-9.

[320] McGahn 12/12/17 302, at 7.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Press reports following Comey's March 20 testimony suggested that the FBI was investigating the President, contrary to what Comey had told the President at the end of the January 6, 2017 intelligence assessment briefing.[321]   McGahn, Donaldson, and senior advisor Stephen Miller recalled that the President was upset with Comey's testimony and the press coverage that followed because of the suggestion that the President was under investigation.[322]   Notes from the White House Counsel's Office dated March 21, 2017, indicate that the President was "beside himself" over Comey's testimony.[323]   The President called McGahn repeatedly that day to ask him to intervene with the Department of Justice, and, according to the notes, the President was "getting hotter and hotter, get rid?"[324]   Officials in the White House Counsel's Office became so concerned that the President would fire Comey that they began drafting a memorandum that examined whether the President needed cause to terminate the FBI director.[325]

At the President's urging, McGahn contacted Boente several times on March 21, 2017, to seek Boente's assistance in having Comey or the Department of Justice correct the misperception that the President was under investigation.[326]   Boente did not specifically recall the conversations, although he did remember one conversation with McGahn around this time where McGahn asked if there was a way to speed up or end the Russia investigation as quickly as possible.[327]   Boente said McGahn told him the President was under a cloud and it made it hard for him to govern.[328]   Boente recalled telling McGahn that there was no good way to shorten the investigation and attempting to do so could erode confidence in the investigation's conclusions.[329]   Boente said McGahn agreed and dropped the issue.[330]   The President also sought to speak with Boente directly, but McGahn told the President that Boente did not want to talk to the President about the request

---

[321] *E.g.*, Matt Apuzzo et al., *F.B.I. Is Investigating Trump's Russia Ties, Comey Confirms*, New York Times (Mar. 20, 2017); Andy Greenberg. *The FBI Has Been Investigating Trump's Russia Ties Since July*, Wired (Mar. 20, 2017); Julie Borger & Spencer Ackerman, *Trump-Russia collusion is being investigated by FBI, Comey confirms*, Guardian (Mar. 20, 2017); *see* Comey 1/6/17 Memorandum, at 2.

[322] Donaldson 11/6/17 302, at 16-17; S. Miller 10/31/17 302, at 4; McGahn 12/12/17 302, at 5-7.

[323] SC_AD_00213 (Donaldson 3/21/17 Notes).   The notes from that day also indicate that the President referred to the "Comey bombshell" which "made [him] look like a fool."   SC_AD_00206 (Donaldson 3/21/17 Notes).

[324] SC_AD_00210 (Donaldson 3/21/17 Notes).

[325] SCR016_000002-05 (White House Counsel's Office Memorandum). White House Counsel's Office attorney Uttam Dhillon did not recall a triggering event causing the White House Counsel's Office to begin this research.   Dhillon 11/21/17 302, at 5.   Metadata from the document, which was provided by the White House, establishes that it was created on March 21, 2017.

[326] Donaldson 11/6/17 302, at 16-21; McGahn 12/12/17 302, at 5-7.

[327] Boente 1/31/18 302, at 5.

[328] Boente 1/31/18 302, at 5.

[329] Boente 1/31/18 302, at 5.

[330] Boente 1/31/18 302, at 5.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

to intervene with Comey.[331]  McGahn recalled Boente telling him in calls that day that he did not think it was sustainable for Comey to stay on as FBI director for the next four years, which McGahn said he conveyed to the President.[332]  Boente did not recall discussing with McGahn or anyone else the idea that Comey should not continue as FBI director.[333]

3.  The President Asks Intelligence Community Leaders to Make Public Statements that he had No Connection to Russia

In the weeks following Comey's March 20, 2017 testimony, the President repeatedly asked intelligence community officials to push back publicly on any suggestion that the President had a connection to the Russian election-interference effort.

On March 22, 2017, the President asked Director of National Intelligence Daniel Coats and CIA Director Michael Pompeo to stay behind in the Oval Office after a Presidential Daily Briefing.[334]  According to Coats, the President asked them whether they could say publicly that no link existed between him and Russia.[335]  Coats responded that the Office of the Director of National Intelligence (ODNI) has nothing to do with investigations and it was not his role to make a public statement on the Russia investigation.[336]  Pompeo had no recollection of being asked to stay behind after the March 22 briefing, but he recalled that the President regularly urged officials to get the word out that he had not done anything wrong related to Russia.[337]

Coats told this Office that the President never asked him to speak to Comey about the FBI investigation.[338]  Some ODNI staffers, however, had a different recollection of how Coats described the meeting immediately after it occurred.  According to senior ODNI official Michael Dempsey, Coats said after the meeting that the President had brought up the Russia investigation and asked him to contact Comey to see if there was a way to get past the investigation, get it over with, end it, or words to that effect.[339]  Dempsey said that Coats described the President's comments as falling "somewhere between musing about hating the investigation" and wanting Coats to "do something to stop it."[340]  Dempsey said Coats made it clear that he would not get involved with an ongoing FBI investigation.[341]  Edward Gistaro, another ODNI official, recalled

---

[331] SC_AD_00210 (Donaldson 3/21/17 Notes); McGahn 12/12/17 302, at 7; Donaldson 11/6/17 302, at 19.

[332] McGahn 12/12/17 302, at 7; Burnham 11/03/17 302, at 11.

[333] Boente 1/31/18 302, at 3.

[334] Coats 6/14/17 302, at 3; Culver 6/14/17 302, at 2.

[335] Coats 6/14/17 302, at 3.

[336] Coats 6/14/17 302, at 3.

[337] Pompeo 6/28/17 302, at 1-3.

[338] Coats 6/14/17 302, at 3.

[339] Dempsey 6/14/17 302, at 2.

[340] Dempsey 6/14/17 302, at 2-3.

[341] Dempsey 6/14/17 302, at 3.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

that right after Coats's meeting with the President, on the walk from the Oval Office back to the Eisenhower Executive Office Building, Coats said that the President had kept him behind to ask him what he could do to "help with the investigation."[342]   Another ODNI staffer who had been waiting for Coats outside the Oval Office talked to Gistaro a few minutes later and recalled Gistaro reporting that Coats was upset because the President had asked him to contact Comey to convince him there was nothing to the Russia investigation.[343]

On Saturday, March 25, 2017, three days after the meeting in the Oval Office, the President called Coats and again complained about the Russia investigations, saying words to the effect of, "I can't do anything with Russia, there's things I'd like to do with Russia, with trade, with ISIS, they're all over me with this."[344]   Coats told the President that the investigations were going to go on and the best thing to do was to let them run their course.[345]   Coats later testified in a congressional hearing that he had "never felt pressure to intervene or interfere in any way and shape—with shaping intelligence in a political way, or in relationship . . . to an ongoing investigation."[346]

On March 26, 2017, the day after the President called Coats, the President called NSA Director Admiral Michael Rogers.[347]   The President expressed frustration with the Russia investigation, saying that it made relations with the Russians difficult.[348]   The President told Rogers "the thing with the Russians [wa]s messing up" his ability to get things done with Russia.[349] The President also said that the news stories linking him with Russia were not true and asked Rogers if he could do anything to refute the stories.[350]   Deputy Director of the NSA Richard Ledgett, who was present for the call, said it was the most unusual thing he had experienced in 40 years of government service.[351]   After the call concluded, Ledgett prepared a memorandum that he and Rogers both signed documenting the content of the conversation and the President's request, and they placed the memorandum in a safe.[352]   But Rogers did not perceive the President's request to be an order, and the President did not ask Rogers to push back on the Russia

---

[342] Gistaro 6/14/17 302, at 2.

[343] Culver 6/14/17 302, at 2-3.

[344] Coats 6/14/17 302, at 4.

[345] Coats 6/14/17 302, at 4; Dempsey 6/14/17 302, at 3 (Coats relayed that the President had asked several times what Coats could do to help "get [the investigation] done," and Coats had repeatedly told the President that fastest way to "get it done" was to let it run its course).

[346] *Hearing on Foreign Intelligence Surveillance Act Before the Senate Select Intelligence Committee*, 115th Cong. (June 7, 2017) (CQ Cong. Transcripts, at 25) (testimony by Daniel Coats, Director of National Intelligence).

[347] Rogers 6/12/17 302, at 3-4.

[348] Rogers 6/12/17 302, at 4.

[349] Ledgett 6/13/17 302, at 1-2; *see* Rogers 6/12/17 302, at 4.

[350] Rogers 6/12/17 302, at 4-5; Ledgett 6/13/17 302, at 2.

[351] Ledgett 6/13/17 302, at 2.

[352] Ledgett 6/13/17 302, at 2-3; Rogers 6/12/17 302, at 4.

U.S. Department of Justice
~~Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

investigation itself.[353]  Rogers later testified in a congressional hearing that as NSA Director he had "never been directed to do anything [he] believe[d] to be illegal, immoral, unethical or inappropriate" and did "not recall ever feeling pressured to do so."[354]

In addition to the specific comments made to Coats, Pompeo, and Rogers, the President spoke on other occasions in the presence of intelligence community officials about the Russia investigation and stated that it interfered with his ability to conduct foreign relations.[355]  On at least two occasions, the President began Presidential Daily Briefings by stating that there was no collusion with Russia and he hoped a press statement to that effect could be issued.[356]  Pompeo recalled that the President vented about the investigation on multiple occasions, complaining that there was no evidence against him and that nobody would publicly defend him.[357]  Rogers recalled a private conversation with the President in which he "vent[ed]" about the investigation, said he had done nothing wrong, and said something like the "Russia thing has got to go away."[358]  Coats recalled the President bringing up the Russia investigation several times, and Coats said he finally told the President that Coats's job was to provide intelligence and not get involved in investigations.[359]

4.  The President Asks Comey to "Lift the Cloud" Created by the Russia Investigation

On the morning of March 30, 2017, the President reached out to Comey directly about the Russia investigation.[360]  According to Comey's contemporaneous record of the conversation, the President said "he was trying to run the country and the cloud of this Russia business was making

---

[353] Rogers 6/12/17 302, at 5; Ledgett 6/13/17 302, at 2.

[354] *Hearing on Foreign Intelligence Surveillance Act Before the Senate Select Intelligence Committee*, 115th Cong. (June 7, 2017) (CQ Cong. Transcripts, at 20) (testimony by Admiral Michael Rogers, Director of the National Security Agency).

[355] Gistaro 6/14/17 302, at 1, 3; Pompeo 6/28/17 302, at 2-3.

[356] Gistaro 6/14/17 302, at 1.

[357] Pompeo 6/28/17 302, at 2.

[358] Rogers 6/12/17 302, at 6.

[359] Coats 6/14/17 302, at 3-4.

[360] SCR012b_000044 (President's Daily Diary, 3/30/17, reflecting call to Comey from 8:14 - 8:24 a.m.); Comey 3/30/17 Memorandum, at 1 ("The President called me on my CMS phone at 8:13 am today . . . . The call lasted 11 minutes (about 10 minutes when he was connected)."; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 6).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

that difficult."[361]  The President asked Comey what could be done to "lift the cloud."[362]  Comey explained "that we were running it down as quickly as possible and that there would be great benefit, if we didn't find anything, to our Good Housekeeping seal of approval, but we had to do our work."[363]  Comey also told the President that congressional leaders were aware that the FBI was not investigating the President personally.[364]  The President said several times, "We need to get that fact out."[365]  The President commented that if there was "some satellite" (which Comey took to mean an associate of the President's or the campaign) that did something, "it would be good to find that out" but that he himself had not done anything wrong and he hoped Comey "would find a way to get out that we weren't investigating him."[366]  After the call ended, Comey called Boente and told him about the conversation, asked for guidance on how to respond, and said he was uncomfortable with direct contact from the President about the investigation.[367]

On the morning of April 11, 2017, the President called Comey again.[368]  According to Comey's contemporaneous record of the conversation, the President said he was "following up to see if [Comey] did what [the President] had asked last time—getting out that he personally is not under investigation."[369]  Comey responded that he had passed the request to Boente but not heard back, and he informed the President that the traditional channel for such a request would be to

---

[361] Comey 3/30/17 Memorandum, at 1.  Comey subsequently testified before Congress about this conversation and described it to our Office; his recollections were consistent with his memorandum. *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 6); Comey 11/15/17 302, at 18.

[362] Comey 3/30/17 Memorandum, at 1; Comey 11/15/17 302, at 18.

[363] Comey 3/30/17 Memorandum, at 1; Comey 11/15/17 302, at 18.

[364] Comey 3/30/17 Memorandum, at 1; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 6).

[365] Comey 3/30/17 Memorandum, at 1; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 6).

[366] Comey 3/30/17 Memorandum, at 1; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 6-7).

[367] Comey 3/30/17 Memorandum, at 2; Boente 1/31/18 302, at 6-7; *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 7).

[368] SCR012b_000053 (President's Daily Diary, 4/11/17, reflecting call to Comey from 8:27 – 8:31 a.m.); Comey 4/11/17 Memorandum, at 1 ("I returned the president's call this morning at 8:26 am EDT. We spoke for about four minutes.").

[369] Comey 4/11/17 Memorandum, at 1.  Comey subsequently testified before Congress about this conversation and his recollections were consistent with his memo.  *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee,* 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 7).

U.S. Department of Justice

Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

have the White House Counsel contact DOJ leadership.[370] The President said he would take that step.[371] The President then added, "Because I have been very loyal to you, very loyal, we had that thing, you know."[372] In a televised interview that was taped early that afternoon, the President was asked if it was too late for him to ask Comey to step down; the President responded, "No, it's not too late, but you know, I have confidence in him. We'll see what happens. You know, it's going to be interesting."[373] After the interview, Hicks told the President she thought the President's comment about Comey should be removed from the broadcast of the interview, but the President wanted to keep it in, which Hicks thought was unusual.[374]

Later that day, the President told senior advisors, including McGahn and Priebus, that he had reached out to Comey twice in recent weeks.[375] The President acknowledged that McGahn would not approve of the outreach to Comey because McGahn had previously cautioned the President that he should not talk to Comey directly to prevent any perception that the White House was interfering with investigations.[376] The President told McGahn that Comey had indicated the FBI could make a public statement that the President was not under investigation if the Department of Justice approved that action.[377] After speaking with the President, McGahn followed up with Boente to relay the President's understanding that the FBI could make a public announcement if the Department of Justice cleared it.[378] McGahn recalled that Boente said Comey had told him there was nothing obstructive about the calls from the President, but they made Comey uncomfortable.[379] According to McGahn, Boente responded that he did not want to issue a statement about the President not being under investigation because of the potential political ramifications and did not want to order Comey to do it because that action could prompt the

---

[370] Comey 4/11/17 Memorandum, at 1.

[371] Comey 4/11/17 Memorandum, at 1.

[372] Comey 4/11/17 Memorandum, at 1. In a footnote to this statement in his memorandum, Comey wrote, "His use of these words did not fit with the flow of the call, which at that point had moved away from any request of me, but I have recorded it here as it happened."

[373] Maria Bartiromo, *Interview with President Trump*, Fox Business Network (Apr. 12, 2017); SCR012b_000054 (President's Daily Diary, 4/11/17, reflecting Bartiromo interview from 12:30 - 12:55 p.m.).

[374] Hicks 12/8/17 302, at 13.

[375] Priebus 10/13/17 302, at 23; McGahn 12/12/17 302, at 9.

[376] Priebus 10/13/17 302, at 23; McGahn 12/12/17 302, at 9; *see* McGahn 11/30/17 302, at 9; Dhillon 11/21/17 302, at 2 (stating that White House Counsel attorneys had advised the President not to contact the FBI Director directly because it could create a perception he was interfering with investigations). Later in April, the President told other attorneys in the White House Counsel's Office that he had called Comey even though he knew they had advised against direct contact. Dhillon 11/21/17 302, at 2 (recalling that the President said, "I know you told me not to, but I called Comey anyway.").

[377] McGahn 12/12/17 302, at 9.

[378] McGahn 12/12/17 302, at 9.

[379] McGahn 12/12/17 302, at 9; *see* Boente 1/31/18 302, at 6 (recalling that Comey told him after the March 30, 2017 call that it was not obstructive).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

appointment of a Special Counsel.[380]  Boente did not recall that aspect of his conversation with McGahn, but did recall telling McGahn that the direct outreaches from the President to Comey were a problem.[381]  Boente recalled that McGahn agreed and said he would do what he could to address that issue.[382]

### *Analysis*

In analyzing the President's reaction to Sessions's recusal and the requests he made to Coats, Pompeo, Rogers, and Comey, the following evidence is relevant to the elements of obstruction of justice:

  a. <u>Obstructive act</u>.  The evidence shows that, after Comey's March 20, 2017 testimony, the President repeatedly reached out to intelligence agency leaders to discuss the FBI's investigation.  But witnesses had different recollections of the precise content of those outreaches.  Some ODNI officials recalled that Coats told them immediately after the March 22 Oval Office meeting that the President asked Coats to intervene with Comey and "stop" the investigation.  But the first-hand witnesses to the encounter remember the conversation differently.  Pompeo had no memory of the specific meeting, but generally recalled the President urging officials to get the word out that the President had not done anything wrong related to Russia.  Coats recalled that the President asked that Coats state publicly that no link existed between the President and Russia, but did not ask him to speak with Comey or to help end the investigation.  The other outreaches by the President during this period were similar in nature.  The President asked Rogers if he could do anything to refute the stories linking the President to Russia, and the President asked Comey to make a public statement that would "lift the cloud" of the ongoing investigation by making clear that the President was not personally under investigation.  These requests, while significant enough that Rogers thought it important to document the encounter in a written memorandum, were not interpreted by the officials who received them as directives to improperly interfere with the investigation.

  b. <u>Nexus to a proceeding</u>.  At the time of the President's outreaches to leaders of the intelligence agencies in late March and early April 2017, the FBI's Russia investigation did not yet involve grand jury proceedings.  The outreaches, however, came after and were in response to Comey's March 20, 2017 announcement that the FBI, as a part of its counterintelligence mission, was conducting an investigation into Russian interference in the 2016 presidential election.  Comey testified that the investigation included any links or coordination with Trump campaign officials and would "include an assessment of whether any crimes were committed."

  c. <u>Intent</u>.  As described above, the evidence does not establish that the President asked or directed intelligence agency leaders to stop or interfere with the FBI's Russia investigation— and the President affirmatively told Comey that if "some satellite" was involved in Russian election interference "it would be good to find that out."  But the President's intent in trying to prevent Sessions's recusal, and in reaching out to Coats, Pompeo, Rogers, and Comey following

---

[380] McGahn 12/12/17 302, at 9-10.

[381] Boente 1/31/18 302, at 7; McGahn 12/12/17 302, at 9.

[382] Boente 1/31/18 302, at 7.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Comey's public announcement of the FBI's Russia investigation, is nevertheless relevant to understanding what motivated the President's other actions towards the investigation.

The evidence shows that the President was focused on the Russia investigation's implications for his presidency—and, specifically, on dispelling any suggestion that he was under investigation or had links to Russia. In early March, the President attempted to prevent Sessions's recusal, even after being told that Sessions was following DOJ conflict-of-interest rules. After Sessions recused, the White House Counsel's Office tried to cut off further contact with Sessions about the matter, although it is not clear whether that direction was conveyed to the President. The President continued to raise the issue of Sessions's recusal and, when he had the opportunity, he pulled Sessions aside and urged him to unrecuse. The President also told advisors that he wanted an Attorney General who would protect him, the way he perceived Robert Kennedy and Eric Holder to have protected their presidents. The President made statements about being able to direct the course of criminal investigations, saying words to the effect of, "You're telling me that Bobby and Jack didn't talk about investigations? Or Obama didn't tell Eric Holder who to investigate?"

After Comey publicly confirmed the existence of the FBI's Russia investigation on March 20, 2017, the President was "beside himself" and expressed anger that Comey did not issue a statement correcting any misperception that the President himself was under investigation. The President sought to speak with Acting Attorney General Boente directly and told McGahn to contact Boente to request that Comey make a clarifying statement. The President then asked other intelligence community leaders to make public statements to refute the suggestion that the President had links to Russia, but the leaders told him they could not publicly comment on the investigation. On March 30 and April 11, against the advice of White House advisors who had informed him that any direct contact with the FBI could be perceived as improper interference in an ongoing investigation, the President made personal outreaches to Comey asking him to "lift the cloud" of the Russia investigation by making public the fact that the President was not personally under investigation.

Evidence indicates that the President was angered by both the existence of the Russia investigation and the public reporting that he was under investigation, which he knew was not true based on Comey's representations. The President complained to advisors that if people thought Russia helped him with the election, it would detract from what he had accomplished.

Other evidence indicates that the President was concerned about the impact of the Russia investigation on his ability to govern. The President complained that the perception that he was under investigation was hurting his ability to conduct foreign relations, particularly with Russia. The President told Coats he "can't do anything with Russia," he told Rogers that "the thing with the Russians" was interfering with his ability to conduct foreign affairs, and he told Comey that "he was trying to run the country and the cloud of this Russia business was making that difficult."

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

### D.     Events Leading Up To and Surrounding the Termination of FBI Director Comey

#### *Overview*

Comey was scheduled to testify before Congress on May 3, 2017.  Leading up to that testimony, the President continued to tell advisors that he wanted Comey to make public that the President was not under investigation.  At the hearing, Comey declined to answer questions about the scope or subjects of the Russia investigation and did not state publicly that the President was not under investigation.  Two days later, on May 5, 2017, the President told close aides he was going to fire Comey, and on May 9, he did so, using his official termination letter to make public that Comey had on three occasions informed the President that he was not under investigation.  The President decided to fire Comey before receiving advice or a recommendation from the Department of Justice, but he approved an initial public account of the termination that attributed it to a recommendation from the Department of Justice based on Comey's handling of the Clinton email investigation.  After Deputy Attorney General Rod Rosenstein resisted attributing the firing to his recommendation, the President acknowledged that he intended to fire Comey regardless of the DOJ recommendation and was thinking of the Russia investigation when he made the decision.  The President also told the Russian Foreign Minister, "I just fired the head of the F.B.I.  He was crazy, a real nut job.  I faced great pressure because of Russia.  That's taken off. . . . .  I'm not under investigation."

#### *Evidence*

1.  <u>Comey Testifies Before the Senate Judiciary Committee and Declines to Answer Questions About Whether the President is Under Investigation</u>

On May 3, 2017, Comey was scheduled to testify at an FBI oversight hearing before the Senate Judiciary Committee.[383]  McGahn recalled that in the week leading up to the hearing, the President said that it would be the last straw if Comey did not take the opportunity to set the record straight by publicly announcing that the President was not under investigation.[384]  The President had previously told McGahn that the perception that the President was under investigation was hurting his ability to carry out his presidential duties and deal with foreign leaders.[385]  At the hearing, Comey declined to answer questions about the status of the Russia investigation, stating "[t]he Department of Justice ha[d] authorized [him] to confirm that [the Russia investigation] exists," but that he was "not going to say another word about it" until the investigation was completed.[386]  Comey also declined to answer questions about whether investigators had "ruled

---

[383] *Hearing on Oversight of the FBI before the Senate Judiciary Committee*, 115th Cong. (May 3, 2017).

[384] McGahn 12/12/17 302, at 10-11.

[385] McGahn 12/12/17 302, at 7, 10-11 (McGahn believed that two foreign leaders had expressed sympathy to the President for being under investigation); SC_AD_00265 (Donaldson 4/11/17 Notes) ("P Called Comey – Day we told him not to?  'You are not under investigation' NK/China/Sapping Credibility").

[386] *Hearing on FBI Oversight Before the Senate Judiciary Committee*, 115th Cong. (CQ Cong. Transcripts, at 70) (May 3, 2017) (testimony by FBI Director James Comey).  Comey repeated this point

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

out anyone in the Trump campaign as potentially a target of th[e] criminal investigation," including whether the FBI had "ruled out the president of the United States."[387]

Comey was also asked at the hearing about his decision to announce 11 days before the presidential election that the FBI was reopening the Clinton email investigation.[388]  Comey stated that it made him "mildly nauseous to think that we might have had some impact on the election," but added that "even in hindsight" he "would make the same decision."[389]  He later repeated that he had no regrets about how he had handled the email investigation and believed he had "done the right thing at each turn."[390]

In the afternoon following Comey's testimony, the President met with McGahn, Sessions, and Sessions's Chief of Staff Jody Hunt.[391]  At that meeting, the President asked McGahn how Comey had done in his testimony and McGahn relayed that Comey had declined to answer questions about whether the President was under investigation.[392]  The President became very upset and directed his anger at Sessions.[393]  According to notes written by Hunt, the President said, "This is terrible Jeff.  It's all because you recused.  AG is supposed to be most important appointment.  Kennedy appointed his brother.  Obama appointed Holder.  I appointed you and you recused yourself.  You left me on an island.  I can't do anything."[394]  The President said that the recusal was unfair and that it was interfering with his ability to govern and undermining his authority with foreign leaders.[395]  Sessions responded that he had had no choice but to recuse, and it was a mandatory rather than discretionary decision.[396]  Hunt recalled that Sessions also stated at

---

several times during his testimony. *See id.* at 26 (explaining that he was "not going to say another peep about [the investigation] until we're done"); *id.* at 90 (stating that he would not provide any updates about the status of investigation "before the matter is concluded").

[387] *Hearing on FBI Oversight Before the Senate Judiciary Committee*, 115th Cong. (May 3, 2017) (CQ Cong. Transcripts, at 87-88) (questions by Sen. Blumenthal and testimony by FBI Director James B. Comey).

[388] *Hearing on FBI Oversight Before the Senate Judiciary Committee*, 115th Cong. (May 3, 2017) (CQ Cong. Transcripts, at 15) (question by Sen. Feinstein).

[389] *Hearing on FBI Oversight Before the Senate Judiciary Committee*, 115th Cong. (May 3, 2017) (CQ Cong. Transcripts, at 17) (testimony by FBI Director James B. Comey).

[390] *Hearing on FBI Oversight Before the Senate Judiciary Committee*, 115th Cong. (May 3, 2017) (CQ Cong. Transcripts, at 92) (testimony by FBI Director James B. Comey).

[391] Sessions 1/17/18 302, at 8; Hunt 2/1/18 302, at 8.

[392] Sessions 1/17/18 302, at 8; Hunt-000021 (Hunt 5/3/17 Notes); McGahn 3/8/18 302, at 6.

[393] Sessions 1/17/18 302, at 8-9.

[394] Hunt-000021 (Hunt 5/3/17 Notes).  Hunt said that he wrote down notes describing this meeting and others with the President after the events occurred. Hunt 2/1/17 302, at 2.

[395] Hunt-000021-22 (Hunt 5/3/17 Notes) ("I have foreign leaders saying they are sorry I am being investigated."); Sessions 1/17/18 302, at 8 (Sessions recalled that a Chinese leader had said to the President that he was sorry the President was under investigation, which the President interpreted as undermining his authority); Hunt 2/1/18 302, at 8.

[396] Sessions 1/17/18 302, at 8; Hunt-000022 (Hunt 5/3/17 Notes).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

some point during the conversation that a new start at the FBI would be appropriate and the President should consider replacing Comey as FBI director.[397]   According to Sessions, when the meeting concluded, it was clear that the President was unhappy with Comey, but Sessions did not think the President had made the decision to terminate Comey.[398]

Bannon recalled that the President brought Comey up with him at least eight times on May 3 and May 4, 2017.[399]   According to Bannon, the President said the same thing each time: "He told me three times I'm not under investigation. He's a showboater. He's a grandstander. I don't know any Russians. There was no collusion."[400]   Bannon told the President that he could not fire Comey because "that ship had sailed."[401]   Bannon also told the President that firing Comey was not going to stop the investigation, cautioning him that he could fire the FBI director but could not fire the FBI.[402]

### 2.   The President Makes the Decision to Terminate Comey

The weekend following Comey's May 3, 2017 testimony, the President traveled to his resort in Bedminster, New Jersey.[403]   At a dinner on Friday, May 5, attended by the President and various advisors and family members, including Jared Kushner and senior advisor Stephen Miller, the President stated that he wanted to remove Comey and had ideas for a letter that would be used to make the announcement.[404]   The President dictated arguments and specific language for the letter, and Miller took notes.[405]   As reflected in the notes, the President told Miller that the letter should start, "While I greatly appreciate you informing me that I am not under investigation concerning what I have often stated is a fabricated story on a Trump-Russia relationship – pertaining to the 2016 presidential election, please be informed that I, and I believe the American public – including Ds and Rs – have lost faith in you as Director of the FBI."[406]   Following the dinner, Miller prepared a termination letter based on those notes and research he conducted to support the President's arguments.[407]   Over the weekend, the President provided several rounds of

---

[397] Hunt-000022 (Hunt 5/3/17 Notes).

[398] Sessions 1/17/18 302, at 9.

[399] Bannon 2/12/18 302, at 20.

[400] Bannon 2/12/18 302, at 20.

[401] Bannon 2/12/18 302, at 20.

[402] Bannon 2/12/18 302, at 20-21; *see* Priebus 10/13/17 302, at 28.

[403] S. Miller 10/31/17 302, at 4-5; SCR025_000019 (President's Daily Diary, 5/4/17).

[404] S. Miller 10/31/17 302, at 5.

[405] S. Miller 10/31/17 302, at 5-6.

[406] S. Miller 5/5/17 Notes, at 1; *see* S. Miller 10/31/17 302, at 8.

[407] S. Miller 10/31/17 302, at 6.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

edits on the draft letter.[408]  Miller said the President was adamant that he not tell anyone at the White House what they were preparing because the President was worried about leaks.[409]

In his discussions with Miller, the President made clear that he wanted the letter to open with a reference to him not being under investigation.[410]  Miller said he believed that fact was important to the President to show that Comey was not being terminated based on any such investigation.[411]  According to Miller, the President wanted to establish as a factual matter that Comey had been under a "review period" and did not have assurance from the President that he would be permitted to keep his job.[412]

The final version of the termination letter prepared by Miller and the President began in a way that closely tracked what the President had dictated to Miller at the May 5 dinner: "Dear Director Comey, While I greatly appreciate your informing me, on three separate occasions, that I am not under investigation concerning the fabricated and politically-motivated allegations of a Trump-Russia relationship with respect to the 2016 Presidential Election, please be informed that I, along with members of both political parties and, most importantly, the American Public, have lost faith in you as the Director of the FBI and you are hereby terminated."[413]  The four-page letter went on to critique Comey's judgment and conduct, including his May 3 testimony before the Senate Judiciary Committee, his handling of the Clinton email investigation, and his failure to hold leakers accountable.[414]  The letter stated that Comey had "asked [the President] at dinner shortly after inauguration to let [Comey] stay on in the Director's role, and [the President] said that [he] would consider it," but the President had "concluded that [he] ha[d] no alternative but to find new leadership for the Bureau – a leader that restores confidence and trust."[415]

In the morning of Monday, May 8, 2017, the President met in the Oval Office with senior advisors, including McGahn, Priebus, and Miller, and informed them he had decided to terminate Comey.[416]  The President read aloud the first paragraphs of the termination letter he wrote with

---

[408] S. Miller 10/31/17 302, at 6-8.

[409] S. Miller 10/31/17 302, at 7.  Miller said he did not want Priebus to be blindsided, so on Sunday night he called Priebus to tell him that the President had been thinking about the "Comey situation" and there would be an important discussion on Monday.  S. Miller 10/31/17 302, at 7.

[410] S. Miller 10/31/17 302, at 8.

[411] S. Miller 10/31/17 302, at 8.

[412] S. Miller 10/31/17 302, at 10.

[413] SCR013c_000003-06 (Draft Termination Letter to FBI Director Comey).

[414] SCR013c_000003-06 (Draft Termination Letter to FBI Director Comey).  Kushner said that the termination letter reflected the reasons the President wanted to fire Comey and was the truest representation of what the President had said during the May 5 dinner.  Kushner 4/11/18 302, at 25.

[415] SCR013c_000003 (Draft Termination Letter to FBI Director Comey).

[416] McGahn 12/12/17 302, at 11; Priebus 10/13/17 302, at 24; S. Miller 10/31/17 302, at 11; Dhillon 11/21/17 302, at 6; Eisenberg 11/29/17 302, at 13.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Miller and conveyed that the decision had been made and was not up for discussion.[417]   The President told the group that Miller had researched the issue and determined the President had the authority to terminate Comey without cause.[418]   In an effort to slow down the decision-making process, McGahn told the President that DOJ leadership was currently discussing Comey's status and suggested that White House Counsel's Office attorneys should talk with Sessions and Rod Rosenstein, who had recently been confirmed as the Deputy Attorney General.[419]   McGahn said that previously scheduled meetings with Sessions and Rosenstein that day would be an opportunity to find out what they thought about firing Comey.[420]

At noon, Sessions, Rosenstein, and Hunt met with McGahn and White House Counsel's Office attorney Uttam Dhillon at the White House.[421]   McGahn said that the President had decided to fire Comey and asked for Sessions's and Rosenstein's views.[422]   Sessions and Rosenstein criticized Comey and did not raise concerns about replacing him.[423]   McGahn and Dhillon said the fact that neither Sessions nor Rosenstein objected to replacing Comey gave them peace of mind that the President's decision to fire Comey was not an attempt to obstruct justice.[424]   An Oval Office meeting was scheduled later that day so that Sessions and Rosenstein could discuss the issue with the President.[425]

At around 5 p.m., the President and several White House officials met with Sessions and Rosenstein to discuss Comey.[426]   The President told the group that he had watched Comey's May

---

[417] S. Miller 10/31/17 302, at 11 (observing that the President started the meeting by saying, "I'm going to read you a letter. Don't talk me out of this. I've made my decision."); Dhillon 11/21/17 302, at 6 (the President announced in an irreversible way that he was firing Comey); Eisenberg 11/29/17 302, at 13 (the President did not leave whether or not to fire Comey up for discussion); Priebus 10/13/17 302, at 25; McGahn 12/12/17 302, at 11-12.

[418] Dhillon 302 11/21/17, at 6; Eisenberg 11/29/17 302, at 13; McGahn 12/12/17 302, at 11.

[419] McGahn 12/12/17 302, at 12, 13; S. Miller 10/31/17 302, at 11; Dhillon 11/21/17 302, at 7. Because of the Attorney General's recusal, Rosenstein became the Acting Attorney General for the Russia investigation upon his confirmation as Deputy Attorney General. *See* 28 U.S.C. § 508(a) ("In case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office").

[420] McGahn 12/12/17 302, at 12.

[421] Dhillon 11/21/17 302, at 7; McGahn 12/12/17 302, at 13; Gauhar-000056 (Gauhar 5/16/17 Notes); *see* Gauhar-000056-72 (2/11/19 Memorandum to File attaching Gauhar handwritten notes) ("Ms. Gauhar determined that she likely recorded all these notes during one or more meetings on Tuesday, May 16, 2017.").

[422] McGahn 12/12/17 302, at 13; *see* Gauhar-000056 (Gauhar 5/16/17 Notes).

[423] Dhillon 11/21/17 302, at 7-9; Sessions 1/17/18 302, at 9; McGahn 12/12/17 302, at 13.

[424] McGahn 12/12/17 302, at 13; Dhillon 11/21/17 302, at 9.

[425] Hunt-000026 (Hunt 5/8/17 Notes); *see* Gauhar-000057 (Gauhar 5/16/17 Notes).

[426] Rosenstein 5/23/17 302, at 2; McGahn 12/12/17 302, at 14; *see* Gauhar-000057 (Gauhar 5/16/17 Notes).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

3 testimony over the weekend and thought that something was "not right" with Comey.[427]   The President said that Comey should be removed and asked Sessions and Rosenstein for their views.[428]   Hunt, who was in the room, recalled that Sessions responded that he had previously recommended that Comey be replaced.[429]   McGahn and Dhillon said Rosenstein described his concerns about Comey's handling of the Clinton email investigation.[430]

The President then distributed copies of the termination letter he had drafted with Miller, and the discussion turned to the mechanics of how to fire Comey and whether the President's letter should be used.[431]   McGahn and Dhillon urged the President to permit Comey to resign, but the President was adamant that he be fired.[432]   The group discussed the possibility that Rosenstein and Sessions could provide a recommendation in writing that Comey should be removed.[433]   The President agreed and told Rosenstein to draft a memorandum, but said he wanted to receive it first thing the next morning.[434]   Hunt's notes reflect that the President told Rosenstein to include in his recommendation the fact that Comey had refused to confirm that the President was not personally under investigation.[435]   According to notes taken by a senior DOJ official of Rosenstein's description of his meeting with the President, the President said, "Put the Russia stuff in the memo."[436]   Rosenstein responded that the Russia investigation was not the basis of his recommendation, so he did not think Russia should be mentioned.[437]   The President told Rosenstein he would appreciate it if Rosenstein put it in his letter anyway.[438]   When Rosenstein

---

[427] Hunt-000026-27 (Hunt 5/8/17 Notes).

[428] Sessions 1/17/18 302, at 10; *see* Gauhar-000058 (Gauhar 5/16/17 Notes) ("POTUS to AG: What is your rec?").

[429] Hunt-000027 (Hunt 5/8/17 Notes).

[430] McGahn 12/12/17 302, at 14; Dhillon 11/21/17 302, at 7.

[431] Hunt-000028 (Hunt 5/8/17 Notes).

[432] McGahn 12/12/17 302, at 13.

[433] Hunt-000028-29 (Hunt 5/8/17 Notes).

[434] McCabe 9/26/17 302, at 13; Rosenstein 5/23/17 302, at 2; *see* Gauhar-000059 (Gauhar 5/16/17 Notes) ("POTUS tells DAG to write a memo").

[435] Hunt-000028-29 (Hunt 5/8/17 Notes) ("POTUS asked if Rod's recommendation would include the fact that although Comey talks about the investigation he refuses to say that the President is not under investigation. . . . So it would be good if your recommendation would make mention of the fact that Comey refuses to say public[ly] what he said privately 3 times.").

[436] Gauhar-000059 (Gauhar 5/16/17 Notes).

[437] Sessions 1/17/18 302 at 10; McCabe 9/26/17 302, at 13; *see* Gauhar-000059 (Gauhar 5/16/17 Notes).

[438] Gauhar-000059 (Gauhar 5/16/17 Notes); McCabe 5/16/17 Memorandum 1; McCabe 9/26/17 302, at 13.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

left the meeting, he knew that Comey would be terminated, and he told DOJ colleagues that his own reasons for replacing Comey were "not [the President's] reasons."[439]

On May 9, Hunt delivered to the White House a letter from Sessions recommending Comey's removal and a memorandum from Rosenstein, addressed to the Attorney General, titled "Restoring Public Confidence in the FBI."[440] McGahn recalled that the President liked the DOJ letters and agreed that they should provide the foundation for a new cover letter from the President accepting the recommendation to terminate Comey.[441] Notes taken by Donaldson on May 9 reflected the view of the White House Counsel's Office that the President's original termination letter should "[n]ot [see the] light of day" and that it would be better to offer "[n]o other rationales" for the firing than what was in Rosenstein's and Sessions's memoranda.[442] The President asked Miller to draft a new termination letter and directed Miller to say in the letter that Comey had informed the President three times that he was not under investigation.[443] McGahn, Priebus, and Dhillon objected to including that language, but the President insisted that it be included.[444] McGahn, Priebus, and others perceived that language to be the most important part of the letter to

---

[439] Rosenstein 5/23/17 302, at 2; Gauhar-000059 (Gauhar 5/16/17 Notes) ("DAG reasons not their reasons [POTUS]"); Gauhar-000060 (Gauhar 5/16/17 Notes) ("1st draft had a recommendation. Took it out b/c knew decision had already been made.").

[440] Rosenstein 5/23/17 302, at 4; McGahn 12/12/17 302, at 15; 5/9/17 Letter, Sessions to President Trump ("Based on my evaluation, and for the reasons expressed by the Deputy Attorney General in the attached memorandum, I have concluded that a fresh start is needed at the leadership of the FBI."); 5/9/17 Memorandum, Rosenstein to Sessions (concluding with, "The way the Director handled the conclusion of the email investigation was wrong. As a result, the FBI is unlikely to regain public and congressional trust until it has a Director who understands the gravity of the mistakes and pledges never to repeat them. Having refused to admit his errors, the Director cannot be expected to implement the necessary corrective actions.").

[441] S. Miller 10/31/17 302, at 12; McGahn 12/12/17 302, at 15; Hunt-000031 (Hunt 5/9/17 Notes).

[442] SC_AD_00342 (Donaldson 5/9/17 Notes). Donaldson also wrote "[i]s this the beginning of the end?" because she was worried that the decision to terminate Comey and the manner in which it was carried out would be the end of the presidency. Donaldson 11/6/17 302, at 25.

[443] S. Miller 10/31/17 302, at 12; McGahn 12/12/17 302, at 15; Hunt-000032 (Hunt 5/9/17 Notes).

[444] McGahn 12/12/17 302, at 15; S. Miller 10/31/17 302, at 12; Dhillon 11/21/17 302, at 8, 10; Priebus 10/13/17 302, at 27; Hunt 2/1/18 302, at 14-15; Hunt-000032 (Hunt 5/9/17 Notes).

U.S. Department of Justice
Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

the President.[445]  Dhillon made a final pitch to the President that Comey should be permitted to resign, but the President refused.[446]

Around the time the President's letter was finalized, Priebus summoned Spicer and the press team to the Oval Office, where they were told that Comey had been terminated for the reasons stated in the letters by Rosenstein and Sessions.[447]  To announce Comey's termination, the White House released a statement, which Priebus thought had been dictated by the President.[448]  In full, the statement read: "Today, President Donald J. Trump informed FBI Director James Comey that he has been terminated and removed from office.  President Trump acted based on the clear recommendations of both Deputy Attorney General Rod Rosenstein and Attorney General Jeff Sessions."[449]

That evening, FBI Deputy Director Andrew McCabe was summoned to meet with the President at the White House.[450]  The President told McCabe that he had fired Comey because of the decisions Comey had made in the Clinton email investigation and for many other reasons.[451]  The President asked McCabe if he was aware that Comey had told the President three times that he was not under investigation.[452]  The President also asked McCabe whether many people in the FBI disliked Comey and whether McCabe was part of the "resistance" that had disagreed with Comey's decisions in the Clinton investigation.[453]  McCabe told the President that he knew Comey had told the President he was not under investigation, that most people in the FBI felt positively about Comey, and that McCabe worked "very closely" with Comey and was part of all the decisions that had been made in the Clinton investigation.[454]

---

[445] Dhillon 11/21/17 302, at 10; Eisenberg 11/29/17 302, at 15 (providing the view that the President's desire to include the language about not being under investigation was the "driving animus of the whole thing"); Burnham 11/3/17 302, at 16 (Burnham knew the only line the President cared about was the line that said Comey advised the President on three separate occasions that the President was not under investigation).  According to Hunt's notes, the reference to Comey's statement would indicate that "notwithstanding" Comey's having informed the President that he was not under investigation, the President was terminating Comey.  Hunt-000032 (Hunt 5/9/17 Notes).  McGahn said he believed the President wanted the language included so that people would not think that the President had terminated Comey because the President was under investigation.  McGahn 12/12/17 302, at 15.

[446] McGahn 12/12/17 302, at 15; Donaldson 11/6/17 302, at 25; *see* SC_AD_00342 (Donaldson 5/9/17 Notes) ("Resign vs. Removal. – POTUS/removal.").

[447] Spicer 10/16/17 302, at 9; McGahn 12/12/17 302, at 16.

[448] Priebus 10/13/17 302, at 28.

[449] *Statement of the Press Secretary,* The White House, Office of the Press Secretary (May 9, 2017).

[450] McCabe 9/26/17 302, at 4; SCR025_000044 (President's Daily Diary, 5/9/17); McCabe 5/10/17 Memorandum, at 1.

[451] McCabe 9/26/17 302, at 5; McCabe 5/10/17 Memorandum, at 1.

[452] McCabe 9/26/17 302, at 5; McCabe 5/10/17 Memorandum, at 1-2.

[453] McCabe 9/26/17 302, at 5; McCabe 5/10/17 Memorandum, at 1-2.

[454] McCabe 9/26/17 302, at 5; McCabe 5/10/17 Memorandum, at 1-2.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Later that evening, the President told his communications team he was unhappy with the press coverage of Comey's termination and ordered them to go out and defend him.[455]   The President also called Chris Christie and, according to Christie, said he was getting "killed" in the press over Comey's termination.[456]   The President asked what he should do.[457]   Christie asked, "Did you fire [Comey] because of what Rod wrote in the memo?", and the President responded, "Yes."[458]   Christie said that the President should "get Rod out there" and have him defend the decision.[459]   The President told Christie that this was a "good idea" and said he was going to call Rosenstein right away.[460]

That night, the White House Press Office called the Department of Justice and said the White House wanted to put out a statement saying that it was Rosenstein's idea to fire Comey.[461]   Rosenstein told other DOJ officials that he would not participate in putting out a "false story."[462]   The President then called Rosenstein directly and said he was watching Fox News, that the coverage had been great, and that he wanted Rosenstein to do a press conference.[463]   Rosenstein responded that this was not a good idea because if the press asked him, he would tell the truth that Comey's firing was not his idea.[464]   Sessions also informed the White House Counsel's Office that evening that Rosenstein was upset that his memorandum was being portrayed as the reason for Comey's termination.[465]

In an unplanned press conference late in the evening of May 9, 2017, Spicer told reporters, "It was all [Rosenstein]. No one from the White House. It was a DOJ decision."[466]   That evening and the next morning, White House officials and spokespeople continued to maintain that the

---

[455] Spicer 10/16/17 302, at 11; Hicks 12/8/17, at 18; Sanders 7/3/18 302, at 2.

[456] Christie 2/13/19 302, at 6.

[457] Christie 2/13/19 302, at 6.

[458] Christie 2/13/19 302, at 6.

[459] Christie 2/13/19 302, at 6.

[460] Christie 2/13/19 302, at 6.

[461] Gauhar-000071 (Gauhar 5/16/17 Notes); Page Memorandum, at 3 (recording events of 5/16/17); McCabe 9/26/17 302, at 14.

[462] Rosenstein 5/23/17 302, at 4-5; Gauhar-000059 (Gauhar 5/16/17 Notes).

[463] Rosenstein 5/23/17 302, at 4-5; Gauhar-000071 (Gauhar 5/16/17 Notes).

[464] Gauhar-000071 (Gauhar 5/16/17 Notes). DOJ notes from the week of Comey's firing indicate that Priebus was "screaming" at the DOJ public affairs office trying to get Rosenstein to do a press conference, and the DOJ public affairs office told Priebus that Rosenstein had told the President he was not doing it. Gauhar-000071-72 (Gauhar 5/16/17 Notes).

[465] McGahn 12/12/17 302, at 16-17; Donaldson 11/6/17 302, at 26-27; Dhillon 11/21/17 302, at 11.

[466] Jenna Johnson, *After Trump fired Comey, White House staff scrambled to explain why*, Washington Post (May 10, 2017) (quoting Spicer).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

President's decision to terminate Comey was driven by the recommendations the President received from Rosenstein and Sessions.[467]

In the morning on May 10, 2017, President Trump met with Russian Foreign Minister Sergey Lavrov and Russian Ambassador Sergey Kislyak in the Oval Office.[468] The media subsequently reported that during the May 10 meeting the President brought up his decision the prior day to terminate Comey, telling Lavrov and Kislyak: "I just fired the head of the F.B.I. He was crazy, a real nut job. I faced great pressure because of Russia. That's taken off. . . . I'm not under investigation."[469] The President never denied making those statements, and the White House did not dispute the account, instead issuing a statement that said: "By grandstanding and politicizing the investigation into Russia's actions, James Comey created unnecessary pressure on our ability to engage and negotiate with Russia. The investigation would have always continued, and obviously, the termination of Comey would not have ended it. Once again, the real story is that our national security has been undermined by the leaking of private and highly classified information."[470] Hicks said that when she told the President about the reports on his meeting with Lavrov, he did not look concerned and said of Comey, "he *is* crazy."[471] When McGahn asked the President about his comments to Lavrov, the President said it was good that Comey was fired because that took the pressure off by making it clear that he was not under investigation so he could get more work done.[472]

That same morning, on May 10, 2017, the President called McCabe.[473] According to a memorandum McCabe wrote following the call, the President asked McCabe to come over to the White House to discuss whether the President should visit FBI headquarters and make a speech to

---

[467] *See, e.g.*, Sarah Sanders, *White House Daily Briefing*, C-SPAN (May 10, 2017); SCR013_001088 (5/10/17 Email, Hemming to Cheung et al.) (internal White House email describing comments on the Comey termination by Vice President Pence).

[468] SCR08_000353 (5/9/17 White House Document, "Working Visit with Foreign Minister Sergey Lavrov of Russia"); SCR08_001274 (5/10/17 Email, Ciaramella to Kelly et al.). The meeting had been planned on May 2, 2017, during a telephone call between the President and Russian President Vladimir Putin, and the meeting date was confirmed on May 5, 2017, the same day the President dictated ideas for the Comey termination letter to Stephen Miller. SCR08_001274 (5/10/17 Email, Ciaramella to Kelly et al.).

[469] Matt Apuzzo et al., *Trump Told Russians That Firing "Nut Job" Comey Eased Pressure From Investigation*, New York Times (May 19, 2017).

[470] SCR08_002117 (5/19/17 Email, Walters to Farhi (CBS News)); *see* Spicer 10/16/17 302, at 13 (noting he would have been told to "clean it up" if the reporting on the meeting with the Russian Foreign Minister was inaccurate, but he was never told to correct the reporting); Hicks 12/8/17 302, at 19 (recalling that the President never denied making the statements attributed to him in the Lavrov meeting and that the President had said similar things about Comey in an off-the-record meeting with reporters on May 18, 2017, calling Comey a "nut job" and "crazy").

[471] Hicks 12/8/17 302, at 19.

[472] McGahn 12/12/17 302, at 18.

[473] SCR025_000046 (President's Daily Diary, 5/10/17); McCabe 5/10/17 Memorandum, at 1.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

employees.[474]   The President said he had received "hundreds" of messages from FBI employees indicating their support for terminating Comey.[475]   The President also told McCabe that Comey should not have been permitted to travel back to Washington, D.C. on the FBI's airplane after he had been terminated and that he did not want Comey "in the building again," even to collect his belongings.[476]   When McCabe met with the President that afternoon, the President, without prompting, told McCabe that people in the FBI loved the President, estimated that at least 80% of the FBI had voted for him, and asked McCabe who he had voted for in the 2016 presidential election.[477]

In the afternoon of May 10, 2017, deputy press secretary Sarah Sanders spoke to the President about his decision to fire Comey and then spoke to reporters in a televised press conference.[478]   Sanders told reporters that the President, the Department of Justice, and bipartisan members of Congress had lost confidence in Comey, "[a]nd most importantly, the rank and file of the FBI had lost confidence in their director.   Accordingly, the President accepted the recommendation of his Deputy Attorney General to remove James Comey from his position."[479]   In response to questions from reporters, Sanders said that Rosenstein decided "on his own" to review Comey's performance and that Rosenstein decided "on his own" to come to the President on Monday, May 8 to express his concerns about Comey.   When a reporter indicated that the "vast majority" of FBI agents supported Comey, Sanders said, "Look, we've heard from countless members of the FBI that say very different things."[480]   Following the press conference, Sanders spoke to the President, who told her she did a good job and did not point out any inaccuracies in her comments.[481]   Sanders told this Office that her reference to hearing from "countless members of the FBI" was a "slip of the tongue."[482]   She also recalled that her statement in a separate press interview that rank-and-file FBI agents had lost confidence in Comey was a comment she made "in the heat of the moment" that was not founded on anything.[483]

Also on May 10, 2017, Sessions and Rosenstein each spoke to McGahn and expressed concern that the White House was creating a narrative that Rosenstein had initiated the decision to

---

[474] McCabe 5/10/17 Memorandum, at 1.

[475] McCabe 5/10/17 Memorandum, at 1.

[476] McCabe 5/10/17 Memorandum, at 1; Rybicki 6/13/17 302, at 2. Comey had been visiting the FBI's Los Angeles office when he found out he had been terminated. Comey 11/15/17 302, at 22.

[477] McCabe 5/10/17 Memorandum, at 1-2. McCabe's memorandum documenting his meeting with the President is consistent with notes taken by the White House Counsel's Office. *See* SC_AD_00347 (Donaldson 5/10/17 Notes).

[478] Sanders 7/3/18 302, at 4; Sarah Sanders, *White House Daily Briefing*, C-SPAN (May 10, 2017).

[479] Sarah Sanders, *White House Daily Briefing*, C-SPAN (May 10, 2017); Sanders 7/3/18 302, at 4.

[480] Sarah Sanders, *White House Daily Briefing*, C-SPAN (May 10, 2017).

[481] Sanders 7/3/18 302, at 4.

[482] Sanders 7/3/18 302, at 4.

[483] Sanders 7/3/18 302, at 3.

U.S. Department of Justice

~~Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

fire Comey.[484]  The White House Counsel's Office agreed that it was factually wrong to say that the Department of Justice had initiated Comey's termination,[485] and McGahn asked attorneys in the White House Counsel's Office to work with the press office to correct the narrative.[486]

The next day, on May 11, 2017, the President participated in an interview with Lester Holt. The President told White House Counsel's Office attorneys in advance of the interview that the communications team could not get the story right, so he was going on Lester Holt to say what really happened.[487]  During the interview, the President stated that he had made the decision to fire Comey before the President met with Rosenstein and Sessions.  The President told Holt, "I was going to fire regardless of recommendation . . . . [Rosenstein] made a recommendation.  But regardless of recommendation, I was going to fire Comey knowing there was no good time to do it."[488]  The President continued, "And in fact, when I decided to just do it, I said to myself—I said, you know, this Russia thing with Trump and Russia is a made-up story.  It's an excuse by the Democrats for having lost an election that they should've won."[489]

In response to a question about whether he was angry with Comey about the Russia investigation, the President said, "As far as I'm concerned, I want that thing to be absolutely done properly."[490]  The President added that he realized his termination of Comey "probably maybe will confuse people" with the result that it "might even lengthen out the investigation," but he "ha[d] to do the right thing for the American people" and Comey was "the wrong man for that position."[491] The President described Comey as "a showboat" and "a grandstander," said that "[t]he FBI has been in turmoil," and said he wanted "to have a really competent, capable director."[492]  The President affirmed that he expected the new FBI director to continue the Russia investigation.[493]

On the evening of May 11, 2017, following the Lester Holt interview, the President tweeted, "Russia must be laughing up their sleeves watching as the U.S. tears itself apart over a Democrat EXCUSE for losing the election."[494]  The same day, the media reported that the President had demanded that Comey pledge his loyalty to the President in a private dinner shortly

---

[484] McGahn 12/12/17 302, at 16-17; Donaldson 11/6/17 302, at 26; *see* Dhillon 11/21/17 302, at 11.

[485] Donaldson 11/6/17 302, at 27.

[486] McGahn 12/12/17 302, at 17.

[487] Dhillon 11/21/17 302, at 11.

[488] *Interview with President Donald Trump*, NBC (May 11, 2017) Transcript, at 2.

[489] *Interview with President Donald Trump*, NBC (May 11, 2017) Transcript, at 2.

[490] *Interview with President Donald Trump*, NBC (May 11, 2017) Transcript, at 3.

[491] *Interview with President Donald Trump*, NBC (May 11, 2017) Transcript, at 3.

[492] *Interview with President Donald Trump*, NBC (May 11, 2017) Transcript, at 1, 5.

[493] *Interview with President Donald Trump*, NBC (May 11, 2017) Transcript, at 7.

[494] @realDonaldTrump 5/11/17 (4:34 p.m. ET) Tweet.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

after being sworn in.[495]  Late in the morning of May 12, 2017, the President tweeted, "Again, the story that there was collusion between the Russians & Trump campaign was fabricated by Dems as an excuse for losing the election."[496]  The President also tweeted, "James Comey better hope that there are no 'tapes' of our conversations before he starts leaking to the press!" and "When James Clapper himself, and virtually everyone else with knowledge of the witch hunt, says there is no collusion, when does it end?"[497]

### Analysis

In analyzing the President's decision to fire Comey, the following evidence is relevant to the elements of obstruction of justice:

a.  <u>Obstructive act</u>.  The act of firing Comey removed the individual overseeing the FBI's Russia investigation.  The President knew that Comey was personally involved in the investigation based on Comey's briefing of the Gang of Eight, Comey's March 20, 2017 public testimony about the investigation, and the President's one-on-one conversations with Comey.

Firing Comey would qualify as an obstructive act if it had the natural and probable effect of interfering with or impeding the investigation—for example, if the termination would have the effect of delaying or disrupting the investigation or providing the President with the opportunity to appoint a director who would take a different approach to the investigation that the President perceived as more protective of his personal interests.  Relevant circumstances bearing on that issue include whether the President's actions had the potential to discourage a successor director or other law enforcement officials in their conduct of the Russia investigation.  The President fired Comey abruptly without offering him an opportunity to resign, banned him from the FBI building, and criticized him publicly, calling him a "showboat" and claiming that the FBI was "in turmoil" under his leadership.  And the President followed the termination with public statements that were highly critical of the investigation; for example, three days after firing Comey, the President referred to the investigation as a "witch hunt" and asked, "when does it end?"  Those actions had the potential to affect a successor director's conduct of the investigation.

The anticipated effect of removing the FBI director, however, would not necessarily be to prevent or impede the FBI from continuing its investigation.  As a general matter, FBI investigations run under the operational direction of FBI personnel levels below the FBI director.  Bannon made a similar point when he told the President that he could fire the FBI director, but could not fire the FBI.  The White House issued a press statement the day after Comey was fired that said, "The investigation would have always continued, and obviously, the termination of Comey would not have ended it."  In addition, in his May 11 interview with Lester Holt, the President stated that he understood when he made the decision to fire Comey that the action might prolong the investigation.  And the President chose McCabe to serve as interim director, even

---

[495] Michael S. Schmidt, *In a Private Dinner, Trump Demanded Loyalty.  Comey Demurred.*, New York Times (May 11, 2017).

[496] @realDonaldTrump 5/12/17 (7:51 a.m. ET) Tweet.

[497] @realDonaldTrump 5/12/17 (8:26 a.m. ET) Tweet; @realDonaldTrump 5/12/17 (8:54 a.m. ET) Tweet.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

though McCabe told the President he had worked "very closely" with Comey and was part of all the decisions made in the Clinton investigation.

b.     Nexus to a proceeding.  The nexus element would be satisfied by evidence showing that a grand jury proceeding or criminal prosecution arising from an FBI investigation was objectively foreseeable and actually contemplated by the President when he terminated Comey.

Several facts would be relevant to such a showing.  At the time the President fired Comey, a grand jury had not begun to hear evidence related to the Russia investigation and no grand jury subpoenas had been issued.  On March 20, 2017, however, Comey had announced that the FBI was investigating Russia's interference in the election, including "an assessment of whether any crimes were committed."  It was widely known that the FBI, as part of the Russia investigation, was investigating the hacking of the DNC's computers—a clear criminal offense.

In addition, at the time the President fired Comey, evidence indicates the President knew that Flynn was still under criminal investigation and could potentially be prosecuted, despite the President's February 14, 2017 request that Comey "let[] Flynn go."  On March 5, 2017, the White House Counsel's Office was informed that the FBI was asking for transition-period records relating to Flynn—indicating that the FBI was still actively investigating him.  The same day, the President told advisors he wanted to call Dana Boente, then the Acting Attorney General for the Russia investigation, to find out whether the White House or the President was being investigated.  On March 31, 2017, the President signaled his awareness that Flynn remained in legal jeopardy by tweeting that "Mike Flynn should ask for immunity" before he agreed to provide testimony to the FBI or Congress.  And in late March or early April, the President asked McFarland to pass a message to Flynn telling him that the President felt bad for him and that he should stay strong, further demonstrating the President's awareness of Flynn's criminal exposure.

c.     Intent.  Substantial evidence indicates that the catalyst for the President's decision to fire Comey was Comey's unwillingness to publicly state that the President was not personally under investigation, despite the President's repeated requests that Comey make such an announcement.  In the week leading up to Comey's May 3, 2017 Senate Judiciary Committee testimony, the President told McGahn that it would be the last straw if Comey did not set the record straight and publicly announce that the President was not under investigation.  But during his May 3 testimony, Comey refused to answer questions about whether the President was being investigated.  Comey's refusal angered the President, who criticized Sessions for leaving him isolated and exposed, saying "You left me on an island."  Two days later, the President told advisors he had decided to fire Comey and dictated a letter to Stephen Miller that began with a reference to the fact that the President was not being investigated: "While I greatly appreciate you informing me that I am not under investigation concerning what I have often stated is a fabricated story on a Trump-Russia relationship . . . ."  The President later asked Rosenstein to include "Russia" in his memorandum and to say that Comey had told the President that he was not under investigation.  And the President's final termination letter included a sentence, at the President's insistence and against McGahn's advice, stating that Comey had told the President on three separate occasions that he was not under investigation.

The President's other stated rationales for why he fired Comey are not similarly supported by the evidence.  The termination letter the President and Stephen Miller prepared in Bedminster

U.S. Department of Justice

~~Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

cited Comey's handling of the Clinton email investigation, and the President told McCabe he fired Comey for that reason. But the facts surrounding Comey's handling of the Clinton email investigation were well known to the President at the time he assumed office, and the President had made it clear to both Comey and the President's senior staff in early 2017 that he wanted Comey to stay on as director. And Rosenstein articulated his criticism of Comey's handling of the Clinton investigation after the President had already decided to fire Comey. The President's draft termination letter also stated that morale in the FBI was at an all-time low and Sanders told the press after Comey's termination that the White House had heard from "countless" FBI agents who had lost confidence in Comey. But the evidence does not support those claims. The President told Comey at their January 27 dinner that "the people of the FBI really like [him]," no evidence suggests that the President heard otherwise before deciding to terminate Comey, and Sanders acknowledged to investigators that her comments were not founded on anything.

We also considered why it was important to the President that Comey announce publicly that he was not under investigation. Some evidence indicates that the President believed that the erroneous perception he was under investigation harmed his ability to manage domestic and foreign affairs, particularly in dealings with Russia. The President told Comey that the "cloud" of "this Russia business" was making it difficult to run the country. The President told Sessions and McGahn that foreign leaders had expressed sympathy to him for being under investigation and that the perception he was under investigation was hurting his ability to address foreign relations issues. The President complained to Rogers that "the thing with the Russians [was] messing up" his ability to get things done with Russia, and told Coats, "I can't do anything with Russia, there's things I'd like to do with Russia, with trade, with ISIS, they're all over me with this." The President also may have viewed Comey as insubordinate for his failure to make clear in the May 3 testimony that the President was not under investigation.

Other evidence, however, indicates that the President wanted to protect himself from an investigation into his campaign. The day after learning about the FBI's interview of Flynn, the President had a one-on-one dinner with Comey, against the advice of senior aides, and told Comey he needed Comey's "loyalty." When the President later asked Comey for a second time to make public that he was not under investigation, he brought up loyalty again, saying "Because I have been very loyal to you, very loyal, we had that thing, you know." After the President learned of Sessions's recusal from the Russia investigation, the President was furious and said he wanted an Attorney General who would protect him the way he perceived Robert Kennedy and Eric Holder to have protected their presidents. The President also said he wanted to be able to tell his Attorney General "who to investigate."

In addition, the President had a motive to put the FBI's Russia investigation behind him. The evidence does not establish that the termination of Comey was designed to cover up a conspiracy between the Trump Campaign and Russia: As described in Volume I, the evidence uncovered in the investigation did not establish that the President or those close to him were involved in the charged Russian computer-hacking or active-measure conspiracies, or that the President otherwise had an unlawful relationship with any Russian official. But the evidence does indicate that a thorough FBI investigation would uncover facts about the campaign and the President personally that the President could have understood to be crimes or that would give rise to personal and political concerns. Although the President publicly stated during and after the election that he had no connection to Russia, the Trump Organization, through Michael Cohen,

U.S. Department of Justice
~~Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

was pursuing the proposed Trump Tower Moscow project through June 2016 and candidate Trump was repeatedly briefed on the progress of those efforts.[498]  In addition, some witnesses said that Trump was aware that ▮Harm to Ongoing Matter▮ ▮▮▮▮▮ at a time when public reports stated that Russian intelligence officials were behind the hacks, and that Trump privately sought information about future WikiLeaks releases.[499]  More broadly, multiple witnesses described the President's preoccupation with press coverage of the Russia investigation and his persistent concern that it raised questions about the legitimacy of his election.[500]

Finally, the President and White House aides initially advanced a pretextual reason to the press and the public for Comey's termination.  In the immediate aftermath of the firing, the President dictated a press statement suggesting that he had acted based on the DOJ recommendations, and White House press officials repeated that story.  But the President had decided to fire Comey before the White House solicited those recommendations.  Although the President ultimately acknowledged that he was going to fire Comey regardless of the Department of Justice's recommendations, he did so only after DOJ officials made clear to him that they would resist the White House's suggestion that they had prompted the process that led to Comey's termination.  The initial reliance on a pretextual justification could support an inference that the President had concerns about providing the real reason for the firing, although the evidence does not resolve whether those concerns were personal, political, or both.

E.    **The President's Efforts to Remove the Special Counsel**

*Overview*

The Acting Attorney General appointed a Special Counsel on May 17, 2017, prompting the President to state that it was the end of his presidency and that Attorney General Sessions had failed to protect him and should resign.  Sessions submitted his resignation, which the President ultimately did not accept.  The President told senior advisors that the Special Counsel had conflicts of interest, but they responded that those claims were "ridiculous" and posed no obstacle to the Special Counsel's service.  Department of Justice ethics officials similarly cleared the Special Counsel's service.  On June 14, 2017, the press reported that the President was being personally investigated for obstruction of justice and the President responded with a series of tweets

---

[498] *See* Volume II, Section II.K.1, *infra.*

[499] *See* Volume I, Section III.D.1, *supra.*

[500] In addition to whether the President had a motive related to Russia-related matters that an FBI investigation could uncover, we considered whether the President's intent in firing Comey was connected to other conduct that could come to light as a result of the FBI's Russian-interference investigation.  In particular, Michael Cohen was a potential subject of investigation because of his pursuit of the Trump Tower Moscow project and involvement in other activities.  And facts uncovered in the Russia investigation, which our Office referred to the U.S. Attorney's Office for the Southern District of New York, ultimately led to the conviction of Cohen in the Southern District of New York for campaign-finance offenses related to payments he said he made at the direction of the President. *See* Volume II, Section II.K.5, *infra.*  The investigation, however, did not establish that when the President fired Comey, he was considering the possibility that the FBI's investigation would uncover these payments or that the President's intent in firing Comey was otherwise connected to a concern about these matters coming to light.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

criticizing the Special Counsel's investigation. That weekend, the President called McGahn and directed him to have the Special Counsel removed because of asserted conflicts of interest. McGahn did not carry out the instruction for fear of being seen as triggering another Saturday Night Massacre and instead prepared to resign. McGahn ultimately did not quit and the President did not follow up with McGahn on his request to have the Special Counsel removed.

### *Evidence*

1. The Appointment of the Special Counsel and the President's Reaction

On May 17, 2017, Acting Attorney General Rosenstein appointed Robert S. Mueller, III as Special Counsel and authorized him to conduct the Russia investigation and matters that arose from the investigation.[501]  The President learned of the Special Counsel's appointment from Sessions, who was with the President, Hunt, and McGahn conducting interviews for a new FBI Director.[502]  Sessions stepped out of the Oval Office to take a call from Rosenstein, who told him about the Special Counsel appointment, and Sessions then returned to inform the President of the news.[503]  According to notes written by Hunt, when Sessions told the President that a Special Counsel had been appointed, the President slumped back in his chair and said, "Oh my God. This is terrible. This is the end of my Presidency. I'm fucked."[504]  The President became angry and lambasted the Attorney General for his decision to recuse from the investigation, stating, "How could you let this happen, Jeff?"[505]  The President said the position of Attorney General was his most important appointment and that Sessions had "let [him] down," contrasting him to Eric Holder and Robert Kennedy.[506]  Sessions recalled that the President said to him, "you were supposed to protect me," or words to that effect.[507]  The President returned to the consequences of the appointment and said, "Everyone tells me if you get one of these independent counsels it ruins your presidency. It takes years and years and I won't be able to do anything. This is the worst thing that ever happened to me."[508]

---

[501] Office of the Deputy Attorney General, Order No. 3915-2017, *Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters* (May 17, 2017).

[502] Sessions 1/17/18 302, at 13; Hunt 2/1/18 302, at 18; McGahn 12/14/17 302, at 4; Hunt-000039 (Hunt 5/17/17 Notes).

[503] Sessions 1/17/18 302, at 13; Hunt 2/1/18 302, at 18; McGahn 12/14/17 302, at 4; Hunt-000039 (Hunt 5/17/17 Notes).

[504] Hunt-000039 (Hunt 5/17/17 Notes).

[505] Hunt-000039 (Hunt 5/17/17 Notes); Sessions 1/17/18 302, at 13-14.

[506] Hunt-000040; *see* Sessions 1/17/18 302, at 14.

[507] Sessions 1/17/18 302, at 14.

[508] Hunt-000040 (Hunt 5/17/17 Notes); *see* Sessions 1/17/18 302, at 14. Early the next morning, the President tweeted, "This is the single greatest witch hunt of a politician in American history!" @realDonaldTrump 5/18/17 (7:52 a.m. ET) Tweet.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

The President then told Sessions he should resign as Attorney General.[509]  Sessions agreed to submit his resignation and left the Oval Office.[510]  Hicks saw the President shortly after Sessions departed and described the President as being extremely upset by the Special Counsel's appointment.[511]  Hicks said that she had only seen the President like that one other time, when the Access Hollywood tape came out during the campaign.[512]

The next day, May 18, 2017, FBI agents delivered to McGahn a preservation notice that discussed an investigation related to Comey's termination and directed the White House to preserve all relevant documents.[513]  When he received the letter, McGahn issued a document hold to White House staff and instructed them not to send out any burn bags over the weekend while he sorted things out.[514]

Also on May 18, Sessions finalized a resignation letter that stated, "Pursuant to our conversation of yesterday, and at your request, I hereby offer my resignation."[515]  Sessions, accompanied by Hunt, brought the letter to the White House and handed it to the President.[516]  The President put the resignation letter in his pocket and asked Sessions several times whether he wanted to continue serving as Attorney General.[517]  Sessions ultimately told the President he wanted to stay, but it was up to the President.[518]  The President said he wanted Sessions to stay.[519]  At the conclusion of the meeting, the President shook Sessions's hand but did not return the resignation letter.[520]

When Priebus and Bannon learned that the President was holding onto Sessions's resignation letter, they became concerned that it could be used to influence the Department of Justice.[521]  Priebus told Sessions it was not good for the President to have the letter because it

---

[509] Hunt-000041 (Hunt 5/17/17 Notes); Sessions 1/17/18 302, at 14.

[510] Hunt-000041 (Hunt 5/17/17 Notes); Sessions 1/17/18 302, at 14.

[511] Hicks 12/8/17 302, at 21.

[512] Hicks 12/8/17 302, at 21.  The Access Hollywood tape was released on October 7, 2016, as discussed in Volume I, Section III.D.1, *supra.*

[513] McGahn 12/14/17 302, at 9; SCR015_000175-82 (Undated Draft Memoranda to White House Staff).

[514] McGahn 12/14/17 302, at 9; SCR015_000175-82 (Undated Draft Memoranda to White House Staff).  The White House Counsel's Office had previously issued a document hold on February 27, 2017. SCR015_000171 (2/17/17 Memorandum from McGahn to Executive Office of the President Staff).

[515] Hunt-000047 (Hunt 5/18/17 Notes); 5/18/17 Letter, Sessions to President Trump (resigning as Attorney General).

[516] Hunt-000047-49 (Hunt 5/18/17 Notes); Sessions 1/17/18 302, at 14.

[517] Hunt-000047-49 (Hunt 5/18/17 Notes); Sessions 1/17/18 302, at 14.

[518] Hunt-000048-49 (Hunt 5/18/17 Notes); Sessions 1/17/18 302, at 14.

[519] Sessions 1/17/18 302, at 14.

[520] Hunt-000049 (Hunt 5/18/17 Notes).

[521] Hunt-000050-51 (Hunt 5/18/17 Notes).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

would function as a kind of "shock collar" that the President could use any time he wanted; Priebus said the President had "DOJ by the throat."[522]   Priebus and Bannon told Sessions they would attempt to get the letter back from the President with a notation that he was not accepting Sessions's resignation.[523]

On May 19, 2017, the President left for a trip to the Middle East.[524]   Hicks recalled that on the President's flight from Saudi Arabia to Tel Aviv, the President pulled Sessions's resignation letter from his pocket, showed it to a group of senior advisors, and asked them what he should do about it.[525]   During the trip, Priebus asked about the resignation letter so he could return it to Sessions, but the President told him that the letter was back at the White House, somewhere in the residence.[526]   It was not until May 30, three days after the President returned from the trip, that the President returned the letter to Sessions with a notation saying, "Not accepted."[527]

### 2.   The President Asserts that the Special Counsel has Conflicts of Interest

In the days following the Special Counsel's appointment, the President repeatedly told advisors, including Priebus, Bannon, and McGahn, that Special Counsel Mueller had conflicts of interest.[528]   The President cited as conflicts that Mueller had interviewed for the FBI Director position shortly before being appointed as Special Counsel, that he had worked for a law firm that represented people affiliated with the President, and that Mueller had disputed certain fees relating to his membership in a Trump golf course in Northern Virginia.[529]   The President's advisors pushed

---

[522] Hunt-000050 (Hunt 5/18/17 Notes); Priebus 10/13/17 302, at 21; Hunt 2/1/18 302, at 21.

[523] Hunt-000051 (Hunt 5/18/17 Notes).

[524] SCR026_000110 (President's Daily Diary, 5/19/17).

[525] Hicks 12/8/17 302, at 22.

[526] Priebus 10/13/17 302, at 21.   Hunt's notes state that when Priebus returned from the trip, Priebus told Hunt that the President was supposed to have given him the letter, but when he asked for it, the President "slapped the desk" and said he had forgotten it back at the hotel.   Hunt-000052 (Hunt Notes, undated).

[527] Hunt-000052-53 (Hunt 5/30/17 Notes); 5/18/17 Letter, Sessions to President Trump (resignation letter).   Robert Porter, who was the White House Staff Secretary at the time, said that in the days after the President returned from the Middle East trip, the President took Sessions's letter out of a drawer in the Oval Office and showed it to Porter.   Porter 4/13/18 302, at 8. Personal Privacy

[528] Priebus 1/18/18 302, at 12; Bannon 2/14/18 302, at 10; McGahn 3/8/18 302, at 1; McGahn 12/14/17 302, at 10; Bannon 10/26/17 302, at 12.

[529] Priebus 1/18/18 302, at 12; Bannon 2/14/18 302, at 10.   In October 2011, Mueller resigned his family's membership from Trump National Golf Club in Sterling, Virginia, in a letter that noted that "we live in the District and find that we are unable to make full use of the Club" and that inquired "whether we would be entitled to a refund of a portion of our initial membership fee," which was paid in 1994.   10/12/11 Letter, Muellers to Trump National Golf Club.   About two weeks later, the controller of the club responded that the Muellers' resignation would be effective October 31, 2011, and that they would be "placed on a waitlist to be refunded on a first resigned / first refunded basis" in accordance with the club's legal

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

back on his assertion of conflicts, telling the President they did not count as true conflicts.[530] Bannon recalled telling the President that the purported conflicts were "ridiculous" and that none of them was real or could come close to justifying precluding Mueller from serving as Special Counsel.[531] As for Mueller's interview for FBI Director, Bannon recalled that the White House had invited Mueller to speak to the President to offer a perspective on the institution of the FBI.[532] Bannon said that, although the White House thought about beseeching Mueller to become Director again, he did not come in looking for the job.[533] Bannon also told the President that the law firm position did not amount to a conflict in the legal community.[534] And Bannon told the President that the golf course dispute did not rise to the level of a conflict and claiming one was "ridiculous and petty."[535] The President did not respond when Bannon pushed back on the stated conflicts of interest.[536]

On May 23, 2017, the Department of Justice announced that ethics officials had determined that the Special Counsel's prior law firm position did not bar his service, generating media reports that Mueller had been cleared to serve.[537] McGahn recalled that around the same time, the President complained about the asserted conflicts and prodded McGahn to reach out to Rosenstein about the issue.[538] McGahn said he responded that he could not make such a call and that the President should instead consult his personal lawyer because it was not a White House issue.[539] Contemporaneous notes of a May 23, 2017 conversation between McGahn and the President reflect that McGahn told the President that he would not call Rosenstein and that he would suggest that the President not make such a call either.[540] McGahn advised that the President could discuss the issue with his personal attorney but it would "look like still trying to meddle in [the] investigation" and "knocking out Mueller" would be "[a]nother fact used to claim obst[ruction] of

---

documents. 10/27/11 Letter, Muellers to Trump National Golf Club. The Muellers have not had further contact with the club.

[530] Priebus 4/3/18 302, at 3; Bannon 10/26/18 302, at 13 (confirming that he, Priebus, and McGahn pushed back on the asserted conflicts).

[531] Bannon 10/26/18 302, at 12-13.

[532] Bannon 10/26/18 302, at 12.

[533] Bannon 10/26/18 302, at 12.

[534] Bannon 10/26/18 302, at 12.

[535] Bannon 10/26/18 302, at 13.

[536] Bannon 10/26/18 302, at 12.

[537] Matt Zapotosky & Matea Gold, *Justice Department ethics experts clear Mueller to lead Russia probe*, Washington Post (May 23, 2017).

[538] McGahn 3/8/18 302, at 1; McGahn 12/14/17 302, at 10; Priebus 1/18/18 302, at 12.

[539] McGahn 3/8/18 302, at 1. McGahn and Donaldson said that after the appointment of the Special Counsel, they considered themselves potential fact witnesses and accordingly told the President that inquiries related to the investigation should be brought to his personal counsel. McGahn 12/14/17 302, at 7; Donaldson 4/2/18 302, at 5.

[540] SC_AD_00361 (Donaldson 5/31/17 Notes).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

just[ice]."[541]   McGahn told the President that his "biggest exposure" was not his act of firing Comey but his "other contacts" and "calls," and his "ask re: Flynn."[542]   By the time McGahn provided this advice to the President, there had been widespread reporting on the President's request for Comey's loyalty, which the President publicly denied; his request that Comey "let[] Flynn go," which the President also denied; and the President's statement to the Russian Foreign Minister that the termination of Comey had relieved "great pressure" related to Russia, which the President did not deny.[543]

On June 8, 2017, Comey testified before Congress about his interactions with the President before his termination, including the request for loyalty, the request that Comey "let[] Flynn go," and the request that Comey "lift the cloud" over the presidency caused by the ongoing investigation.[544]   Comey's testimony led to a series of news reports about whether the President had obstructed justice.[545]   On June 9, 2017, the Special Counsel's Office informed the White House Counsel's Office that investigators intended to interview intelligence community officials who had allegedly been asked by the President to push back against the Russia investigation.[546]

On Monday, June 12, 2017, Christopher Ruddy, the chief executive of Newsmax Media and a longtime friend of the President's, met at the White House with Priebus and Bannon.[547]   Ruddy recalled that they told him the President was strongly considering firing the Special Counsel

---

[541] SC_AD_00361 (Donaldson 5/31/17 Notes).

[542] SC_AD_00361 (Donaldson 5/31/17 Notes).

[543] *See, e.g.*, Michael S. Schmidt, *In a Private Dinner, Trump Demanded Loyalty. Comey Demurred.*, New York Times (May 11, 2017); Michael S. Schmidt, *Comey Memorandum Says Trump Asked Him to End Flynn Investigation*, New York Times (May 16, 2017); Matt Apuzzo et al., *Trump Told Russians That Firing 'Nut Job' Comey Eased Pressure From Investigation*, New York Times (May 19, 2017).

[544] *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (Statement for the Record of James B. Comey, former Director of the FBI, at 5-6). Comey testified that he deliberately caused his memorandum documenting the February 14, 2017 meeting to be leaked to the New York Times in response to a tweet from the President, sent on May 12, 2017, that stated "James Comey better hope that there are no 'tapes' of our conversations before he starts leaking to the press!," and because he thought sharing the memorandum with a reporter "might prompt the appointment of a special counsel." *Hearing on Russian Election Interference Before the Senate Select Intelligence Committee*, 115th Cong. (June 8, 2017) (CQ Cong. Transcripts, at 55) (testimony by James B. Comey, former Director of the FBI).

[545] *See, e.g.*, Matt Zapotosky, *Comey lays out the case that Trump obstructed justice*, Washington Post (June 8, 2017) ("Legal analysts said Comey's testimony clarified and bolstered the case that the president obstructed justice.").

[546] 6/9/17 Email, Special Counsel's Office to the White House Counsel's Office. This Office made the notification to give the White House an opportunity to invoke executive privilege in advance of the interviews. On June 12, 2017, the Special Counsel's Office interviewed Admiral Rogers in the presence of agency counsel. Rogers 6/12/17 302, at 1. On June 13, the Special Counsel's Office interviewed Ledgett. Ledgett 6/13/17 302, at 1. On June 14, the Office interviewed Coats and other personnel from his office. Coats 6/14/17 302, at 1; Gistaro 6/14/17 302, at 1; Culver 6/14/17 302, at 1.

[547] Ruddy 6/6/18 302, at 5.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

and that he would do so precipitously, without vetting the decision through Administration officials.[548] Ruddy asked Priebus if Ruddy could talk publicly about the discussion they had about the Special Counsel, and Priebus said he could.[549]  Priebus told Ruddy he hoped another blow up like the one that followed the termination of Comey did not happen.[550]  Later that day, Ruddy stated in a televised interview that the President was "considering perhaps terminating the Special Counsel" based on purported conflicts of interest.[551]  Ruddy later told another news outlet that "Trump is definitely considering" terminating the Special Counsel and "it's not something that's being dismissed."[552]  Ruddy's comments led to extensive coverage in the media that the President was considering firing the Special Counsel.[553]

White House officials were unhappy with that press coverage and Ruddy heard from friends that the President was upset with him.[554]  On June 13, 2017, Sanders asked the President for guidance on how to respond to press inquiries about the possible firing of the Special Counsel.[555]  The President dictated an answer, which Sanders delivered, saying that "[w]hile the president has every right to" fire the Special Counsel, "he has no intention to do so."[556]

Also on June 13, 2017, the President's personal counsel contacted the Special Counsel's Office and raised concerns about possible conflicts.[557]  The President's counsel cited Mueller's previous partnership in his law firm, his interview for the FBI Director position, and an asserted personal relationship he had with Comey.[558]  That same day, Rosenstein had testified publicly before Congress and said he saw no evidence of good cause to terminate the Special Counsel, including for conflicts of interest.[559]  Two days later, on June 15, 2017, the Special Counsel's

---

[548] Ruddy 6/6/18 302, at 5-6.

[549] Ruddy 6/6/18 302, at 6.

[550] Ruddy 6/6/18 302, at 6.

[551] *Trump Confidant Christopher Ruddy says Mueller has "real conflicts" as special counsel*, PBS (June 12, 2017); Michael D. Shear & Maggie Haberman, *Friend Says Trump Is Considering Firing Mueller as Special Counsel*, New York Times (June 12, 2017).

[552] Katherine Faulders & Veronica Stracqualursi, *Trump friend Chris Ruddy says Spicer's 'bizarre' statement doesn't deny claim Trump seeking Mueller firing*, ABC (June 13, 2017).

[553] *See, e.g.*, Michael D. Shear & Maggie Haberman, *Friend Says Trump Is Considering Firing Mueller as Special Counsel*, New York Times (June 12, 2017).

[554] Ruddy 6/6/18 302, at 6-7.

[555] Sanders 7/3/18 302, at 6-7.

[556] Glenn Thrush et al., *Trump Stews, Staff Steps In, and Mueller Is Safe for Now*, New York Times (June 13, 2017); *see* Sanders 7/3/18 302, at 6 (Sanders spoke with the President directly before speaking to the press on Air Force One and the answer she gave is the answer the President told her to give).

[557] Special Counsel's Office Attorney 6/13/17 Notes.

[558] Special Counsel's Office Attorney 6/13/17 Notes.

[559] *Hearing on Fiscal 2018 Justice Department Budget before the Senate Appropriations Subcommittee on Commerce, Justice, and Science*, 115th Cong. (June 13, 2017) (CQ Cong. Transcripts, at 14) (testimony by Rod Rosenstein, Deputy Attorney General).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Office informed the Acting Attorney General's office about the areas of concern raised by the President's counsel and told the President's counsel that their concerns had been communicated to Rosenstein so that the Department of Justice could take any appropriate action.[560]

> 3. The Press Reports that the President is Being Investigated for Obstruction of Justice and the President Directs the White House Counsel to Have the Special Counsel Removed

On the evening of June 14, 2017, the Washington Post published an article stating that the Special Counsel was investigating whether the President had attempted to obstruct justice.[561] This was the first public report that the President himself was under investigation by the Special Counsel's Office, and cable news networks quickly picked up on the report.[562] The Post story stated that the Special Counsel was interviewing intelligence community leaders, including Coats and Rogers, about what the President had asked them to do in response to Comey's March 20, 2017 testimony; that the inquiry into obstruction marked "a major turning point" in the investigation; and that while "Trump had received private assurances from then-FBI Director James B. Comey starting in January that he was not personally under investigation," "[o]fficials say that changed shortly after Comey's firing."[563] That evening, at approximately 10:31 p.m., the President called McGahn on McGahn's personal cell phone and they spoke for about 15 minutes.[564] McGahn did not have a clear memory of the call but thought they might have discussed the stories reporting that the President was under investigation.[565]

Beginning early the next day, June 15, 2017, the President issued a series of tweets acknowledging the existence of the obstruction investigation and criticizing it. He wrote: "They made up a phony collusion with the Russians story, found zero proof, so now they go for obstruction of justice on the phony story. Nice";[566] "You are witnessing the single greatest WITCH HUNT in American political history—led by some very bad and conflicted people!";[567] and "Crooked H destroyed phones w/ hammer, 'bleached' emails, & had husband meet w/AG days

---

[560] Special Counsel's Office Attorney 6/15/17 Notes.

[561] Devlin Barrett et al., *Special counsel is investigating Trump for possible obstruction of justice, officials say*, Washington Post (June 14, 2017).

[562] CNN, for example, began running a chyron at 6:55 p.m. that stated: "WASH POST: MUELLER INVESTIGATING TRUMP FOR OBSTRUCTION OF JUSTICE." CNN, (June 14, 2017, published online at 7:15 p.m. ET).

[563] Devlin Barrett et al., *Special counsel is investigating Trump for possible obstruction of justice, officials say*, Washington Post (June 14, 2017).

[564] SCR026_000183 (President's Daily Diary, 6/14/17) (reflecting call from the President to McGahn on 6/14/17 with start time 10:31 p.m. and end time 10:46 p.m.); Call Records of Don McGahn.

[565] McGahn 2/28/19 302, at 1-2. McGahn thought he and the President also probably talked about the investiture ceremony for Supreme Court Justice Neil Gorsuch, which was scheduled for the following day. McGahn 2/28/18 302, at 2.

[566] @realDonaldTrump 6/15/17 (6:55 a.m. ET) Tweet.

[567] @realDonaldTrump 6/15/17 (7:57 a.m. ET) Tweet.

U.S. Department of Justice
Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

before she was cleared—& they talk about obstruction?"[568]  The next day, June 16, 2017, the President wrote additional tweets criticizing the investigation: "After 7 months of investigations & committee hearings about my 'collusion with the Russians,' nobody has been able to show any proof. Sad!";[569] and "I am being investigated for firing the FBI Director by the man who told me to fire the FBI Director! Witch Hunt."[570]

On Saturday, June 17, 2017, the President called McGahn and directed him to have the Special Counsel removed.[571]  McGahn was at home and the President was at Camp David.[572]  In interviews with this Office, McGahn recalled that the President called him at home twice and on both occasions directed him to call Rosenstein and say that Mueller had conflicts that precluded him from serving as Special Counsel.[573]

On the first call, McGahn recalled that the President said something like, "You gotta do this. You gotta call Rod."[574]  McGahn said he told the President that he would see what he could do.[575]  McGahn was perturbed by the call and did not intend to act on the request.[576]  He and other advisors believed the asserted conflicts were "silly" and "not real," and they had previously communicated that view to the President.[577]  McGahn also had made clear to the President that the White House Counsel's Office should not be involved in any effort to press the issue of conflicts.[578]  McGahn was concerned about having any role in asking the Acting Attorney General to fire the Special Counsel because he had grown up in the Reagan era and wanted to be more like Judge

[568] @realDonaldTrump 6/15/17 (3:56 p.m. ET) Tweet.

[569] @realDonaldTrump 6/16/17 (7:53 a.m. ET) Tweet.

[570] @realDonaldTrump 6/16/17 (9:07 a.m. ET) Tweet.

[571] McGahn 3/8/18 302, at 1-2; McGahn 12/14/17 302, at 10.

[572] McGahn 3/8/18 302, at 1, 3; SCR026_000196 (President's Daily Diary, 6/17/17) (records showing President departed the White House at 11:07 a.m. on June 17, 2017, and arrived at Camp David at 11:37 a.m.).

[573] McGahn 3/8/18 302, at 1-2; McGahn 12/14/17 302, at 10.  Phone records show that the President called McGahn in the afternoon on June 17, 2017, and they spoke for approximately 23 minutes. SCR026_000196 (President's Daily Diary, 6/17/17) (reflecting call from the President to McGahn on 6/17/17 with start time 2:23 p.m. and end time 2:46 p.m.); (Call Records of Don McGahn).  Phone records do not show another call between McGahn and the President that day.  Although McGahn recalled receiving multiple calls from the President on the same day, in light of the phone records he thought it was possible that the first call instead occurred on June 14, 2017, shortly after the press reported that the President was under investigation for obstruction of justice.  McGahn 2/28/19 302, at 1-3.  While McGahn was not certain of the specific dates of the calls, McGahn was confident that he had at least two phone conversations with the President in which the President directed him to call the Acting Attorney General to have the Special Counsel removed.  McGahn 2/28/19 302, at 1-3.

[574] McGahn 3/8/18 302, at 1.

[575] McGahn 3/8/18 302, at 1.

[576] McGahn 3/8/18 302, at 1.

[577] McGahn 3/8/18 302, at 1-2.

[578] McGahn 3/8/18 302, at 1-2.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Robert Bork and not "Saturday Night Massacre Bork."[579]  McGahn considered the President's request to be an inflection point and he wanted to hit the brakes.[580]

When the President called McGahn a second time to follow up on the order to call the Department of Justice, McGahn recalled that the President was more direct, saying something like, "Call Rod, tell Rod that Mueller has conflicts and can't be the Special Counsel."[581]  McGahn recalled the President telling him "Mueller has to go" and "Call me back when you do it."[582]  McGahn understood the President to be saying that the Special Counsel had to be removed by Rosenstein.[583]  To end the conversation with the President, McGahn left the President with the impression that McGahn would call Rosenstein.[584]  McGahn recalled that he had already said no to the President's request and he was worn down, so he just wanted to get off the phone.[585]

McGahn recalled feeling trapped because he did not plan to follow the President's directive but did not know what he would say the next time the President called.[586]  McGahn decided he had to resign.[587]  He called his personal lawyer and then called his chief of staff, Annie Donaldson, to inform her of his decision.[588]  He then drove to the office to pack his belongings and submit his resignation letter.[589]  Donaldson recalled that McGahn told her the President had called and demanded he contact the Department of Justice and that the President wanted him to do something that McGahn did not want to do.[590]  McGahn told Donaldson that the President had called at least twice and in one of the calls asked "have you done it?"[591]  McGahn did not tell Donaldson the specifics of the President's request because he was consciously trying not to involve her in the

_____

[579] McGahn 3/8/18 302, at 2.

[580] McGahn 3/8/18 302, at 2.

[581] McGahn 3/8/18 302, at 5.

[582] McGahn 3/8/18 302, at 2, 5; McGahn 2/28/19 302, at 3.

[583] McGahn 3/8/18 302, at 1-2, 5.

[584] McGahn 3/8/18 302, at 2.

[585] McGahn 2/28/19 302, at 3; McGahn 3/8/18 302, at 2.

[586] McGahn 3/8/18 302, at 2.

[587] McGahn 3/8/18 302, at 2.

[588] McGahn 3/8/18 302, at 2-3; McGahn 2/28/19 302, at 3; Donaldson 4/2/18 302, at 4; Call Records of Don McGahn.

[589] McGahn 3/8/18 302, at 2; Donaldson 4/2/18 302, at 4.

[590] Donaldson 4/2/18 302, at 4.

[591] Donaldson 4/2/18 302, at 4.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

investigation, but Donaldson inferred that the President's directive was related to the Russia investigation.[592] Donaldson prepared to resign along with McGahn.[593]

That evening, McGahn called both Priebus and Bannon and told them that he intended to resign.[594] McGahn recalled that, after speaking with his attorney and given the nature of the President's request, he decided not to share details of the President's request with other White House staff.[595] Priebus recalled that McGahn said that the President had asked him to "do crazy shit," but he thought McGahn did not tell him the specifics of the President's request because McGahn was trying to protect Priebus from what he did not need to know.[596] Priebus and Bannon both urged McGahn not to quit, and McGahn ultimately returned to work that Monday and remained in his position.[597] He had not told the President directly that he planned to resign, and when they next saw each other the President did not ask McGahn whether he had followed through with calling Rosenstein.[598]

Around the same time, Chris Christie recalled a telephone call with the President in which the President asked what Christie thought about the President firing the Special Counsel.[599] Christie advised against doing so because there was no substantive basis for the President to fire the Special Counsel, and because the President would lose support from Republicans in Congress if he did so.[600]

### Analysis

In analyzing the President's direction to McGahn to have the Special Counsel removed, the following evidence is relevant to the elements of obstruction of justice:

a.   <u>Obstructive act</u>. As with the President's firing of Comey, the attempt to remove the Special Counsel would qualify as an obstructive act if it would naturally obstruct the

---

[592] McGahn 2/28/19 302, at 3-4; Donaldson 4/2/18 302, at 4-5. Donaldson said she believed McGahn consciously did not share details with her because he did not want to drag her into the investigation. Donaldson 4/2/18 302, at 5; *see* McGahn 2/28/19 302, at 3.

[593] Donaldson 4/2/18 302, at 5.

[594] McGahn 12/14/17 302, at 10; Call Records of Don McGahn; McGahn 2/28/19 302, at 3-4; Priebus 4/3/18 302, at 6-7.

[595] McGahn 2/28/19 302, at 4. Priebus and Bannon confirmed that McGahn did not tell them the specific details of the President's request. Priebus 4/3/18 302, at 7; Bannon 2/14/18 302, at 10.

[596] Priebus 4/3/18 302, at 7.

[597] McGahn 3/8/18 302, at 3; McGahn 2/28/19 302, at 3-4.

[598] McGahn 3/8/18 302, at 3.

[599] Christie 2/13/19 302, at 7. Christie did not recall the precise date of this call, but believed it was after Christopher Wray was announced as the nominee to be the new FBI director, which was on June 7, 2017. Christie 2/13/19 302, at 7. Telephone records show that the President called Christie twice after that time period, on July 4, 2017, and July 14, 2017. Call Records of Chris Christie.

[600] Christie 2/13/19 302, at 7.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

investigation and any grand jury proceedings that might flow from the inquiry. Even if the removal of the lead prosecutor would not prevent the investigation from continuing under a new appointee, a factfinder would need to consider whether the act had the potential to delay further action in the investigation, chill the actions of any replacement Special Counsel, or otherwise impede the investigation.

A threshold question is whether the President in fact directed McGahn to have the Special Counsel removed. After news organizations reported that in June 2017 the President had ordered McGahn to have the Special Counsel removed, the President publicly disputed these accounts, and privately told McGahn that he had simply wanted McGahn to bring conflicts of interest to the Department of Justice's attention. *See* Volume II, Section II.I, *infra*. Some of the President's specific language that McGahn recalled from the calls is consistent with that explanation. Substantial evidence, however, supports the conclusion that the President went further and in fact directed McGahn to call Rosenstein to have the Special Counsel removed.

First, McGahn's clear recollection was that the President directed him to tell Rosenstein not only that conflicts existed but also that "Mueller has to go." McGahn is a credible witness with no motive to lie or exaggerate given the position he held in the White House.[601] McGahn spoke with the President twice and understood the directive the same way both times, making it unlikely that he misheard or misinterpreted the President's request. In response to that request, McGahn decided to quit because he did not want to participate in events that he described as akin to the Saturday Night Massacre. He called his lawyer, drove to the White House, packed up his office, prepared to submit a resignation letter with his chief of staff, told Priebus that the President had asked him to "do crazy shit," and informed Priebus and Bannon that he was leaving. Those acts would be a highly unusual reaction to a request to convey information to the Department of Justice.

Second, in the days before the calls to McGahn, the President, through his counsel, had already brought the asserted conflicts to the attention of the Department of Justice. Accordingly, the President had no reason to have McGahn call Rosenstein that weekend to raise conflicts issues that already had been raised.

Third, the President's sense of urgency and repeated requests to McGahn to take immediate action on a weekend—"You gotta do this. You gotta call Rod."—support McGahn's recollection that the President wanted the Department of Justice to take action to remove the Special Counsel. Had the President instead sought only to have the Department of Justice re-examine asserted conflicts to evaluate whether they posed an ethical bar, it would have been unnecessary to set the process in motion on a Saturday and to make repeated calls to McGahn.

Finally, the President had discussed "knocking out Mueller" and raised conflicts of interest in a May 23, 2017 call with McGahn, reflecting that the President connected the conflicts to a plan to remove the Special Counsel. And in the days leading up to June 17, 2017, the President made clear to Priebus and Bannon, who then told Ruddy, that the President was considering terminating

---

[601] When this Office first interviewed McGahn about this topic, he was reluctant to share detailed information about what had occurred and only did so after continued questioning. *See* McGahn 12/14/17 302 (agent notes).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

the Special Counsel. Also during this time period, the President reached out to Christie to get his thoughts on firing the Special Counsel. This evidence shows that the President was not just seeking an examination of whether conflicts existed but instead was looking to use asserted conflicts as a way to terminate the Special Counsel.

   b.   Nexus to an official proceeding. To satisfy the proceeding requirement, it would be necessary to establish a nexus between the President's act of seeking to terminate the Special Counsel and a pending or foreseeable grand jury proceeding.

   Substantial evidence indicates that by June 17, 2017, the President knew his conduct was under investigation by a federal prosecutor who could present any evidence of federal crimes to a grand jury. On May 23, 2017, McGahn explicitly warned the President that his "biggest exposure" was not his act of firing Comey but his "other contacts" and "calls," and his "ask re: Flynn." By early June, it was widely reported in the media that federal prosecutors had issued grand jury subpoenas in the Flynn inquiry and that the Special Counsel had taken over the Flynn investigation.[602] On June 9, 2017, the Special Counsel's Office informed the White House that investigators would be interviewing intelligence agency officials who allegedly had been asked by the President to push back against the Russia investigation. On June 14, 2017, news outlets began reporting that the President was himself being investigated for obstruction of justice. Based on widespread reporting, the President knew that such an investigation could include his request for Comey's loyalty; his request that Comey "let[] Flynn go"; his outreach to Coats and Rogers; and his termination of Comey and statement to the Russian Foreign Minister that the termination had relieved "great pressure" related to Russia. And on June 16, 2017, the day before he directed McGahn to have the Special Counsel removed, the President publicly acknowledged that his conduct was under investigation by a federal prosecutor, tweeting, "I am being investigated for firing the FBI Director by the man who told me to fire the FBI Director!"

   c.   Intent. Substantial evidence indicates that the President's attempts to remove the Special Counsel were linked to the Special Counsel's oversight of investigations that involved the President's conduct—and, most immediately, to reports that the President was being investigated for potential obstruction of justice.

   Before the President terminated Comey, the President considered it critically important that he was not under investigation and that the public not erroneously think he was being investigated. As described in Volume II, Section II.D, *supra*, advisors perceived the President, while he was drafting the Comey termination letter, to be concerned more than anything else about getting out that he was not personally under investigation. When the President learned of the appointment of the Special Counsel on May 17, 2017, he expressed further concern about the investigation, saying "[t]his is the end of my Presidency." The President also faulted Sessions for recusing, saying "you were supposed to protect me."

   On June 14, 2017, when the Washington Post reported that the Special Counsel was investigating the President for obstruction of justice, the President was facing what he had wanted

---

[602]  *See, e.g.*, Evan Perez et al., *CNN exclusive: Grand jury subpoenas issued in FBI's Russia investigation*, CNN (May 9, 2017); Matt Ford, *Why Mueller Is Taking Over the Michael Flynn Grand Jury*, The Atlantic (June 2, 2017).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

to avoid: a criminal investigation into his own conduct that was the subject of widespread media attention. The evidence indicates that news of the obstruction investigation prompted the President to call McGahn and seek to have the Special Counsel removed. By mid-June, the Department of Justice had already cleared the Special Counsel's service and the President's advisors had told him that the claimed conflicts of interest were "silly" and did not provide a basis to remove the Special Counsel. On June 13, 2017, the Acting Attorney General testified before Congress that no good cause for removing the Special Counsel existed, and the President dictated a press statement to Sanders saying he had no intention of firing the Special Counsel. But the next day, the media reported that the President was under investigation for obstruction of justice and the Special Counsel was interviewing witnesses about events related to possible obstruction—spurring the President to write critical tweets about the Special Counsel's investigation. The President called McGahn at home that night and then called him on Saturday from Camp David. The evidence accordingly indicates that news that an obstruction investigation had been opened is what led the President to call McGahn to have the Special Counsel terminated.

There also is evidence that the President knew that he should not have made those calls to McGahn. The President made the calls to McGahn after McGahn had specifically told the President that the White House Counsel's Office—and McGahn himself—could not be involved in pressing conflicts claims and that the President should consult with his personal counsel if he wished to raise conflicts. Instead of relying on his personal counsel to submit the conflicts claims, the President sought to use his official powers to remove the Special Counsel. And after the media reported on the President's actions, he denied that he ever ordered McGahn to have the Special Counsel terminated and made repeated efforts to have McGahn deny the story, as discussed in Volume II, Section II.I, *infra*. Those denials are contrary to the evidence and suggest the President's awareness that the direction to McGahn could be seen as improper.

## F.     The President's Efforts to Curtail the Special Counsel Investigation

### *Overview*

Two days after the President directed McGahn to have the Special Counsel removed, the President made another attempt to affect the course of the Russia investigation. On June 19, 2017, the President met one-on-one with Corey Lewandowski in the Oval Office and dictated a message to be delivered to Attorney General Sessions that would have had the effect of limiting the Russia investigation to future election interference only. One month later, the President met again with Lewandowski and followed up on the request to have Sessions limit the scope of the Russia investigation. Lewandowski told the President the message would be delivered soon. Hours later, the President publicly criticized Sessions in an unplanned press interview, raising questions about Sessions's job security.

### 1.   The President Asks Corey Lewandowski to Deliver a Message to Sessions to Curtail the Special Counsel Investigation

On June 19, 2017, two days after the President directed McGahn to have the Special Counsel removed, the President met one-on-one in the Oval Office with his former campaign

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

manager Corey Lewandowski.[603]   Senior White House advisors described Lewandowski as a "devotee" of the President and said the relationship between the President and Lewandowski was "close."[604]

During the June 19 meeting, Lewandowski recalled that, after some small talk, the President brought up Sessions and criticized his recusal from the Russia investigation.[605]   The President told Lewandowski that Sessions was weak and that if the President had known about the likelihood of recusal in advance, he would not have appointed Sessions.[606]   The President then asked Lewandowski to deliver a message to Sessions and said "write this down."[607]   This was the first time the President had asked Lewandowski to take dictation, and Lewandowski wrote as fast as possible to make sure he captured the content correctly.[608]

The President directed that Sessions should give a speech publicly announcing:

I know that I recused myself from certain things having to do with specific areas.  But our POTUS . . . is being treated very unfairly.  He shouldn't have a Special Prosecutor/Counsel b/c he hasn't done anything wrong.  I was on the campaign w/ him for nine months, there were no Russians involved with him.  I know it for a fact b/c I was there.  He didn't do anything wrong except he ran the greatest campaign in American history.[609]

The dictated message went on to state that Sessions would meet with the Special Counsel to limit his jurisdiction to future election interference:

Now a group of people want to subvert the Constitution of the United States.  I am going to meet with the Special Prosecutor to explain this is very unfair and let the Special Prosecutor move forward with investigating election meddling for future elections so that nothing can happen in future elections.[610]

---

[603] Lewandowski 4/6/18 302, at 2; SCR026_000201 (President's Daily Diary, 6/19/17). ████████

████ Personal Privacy ████

[604] Kelly 8/2/18 302, at 7; Dearborn 6/20/18 302, at 1 (describing Lewandowski as a "comfort to the President" whose loyalty was appreciated).  Kelly said that when he was Chief of Staff and the President had meetings with friends like Lewandowski, Kelly tried not to be there and to push the meetings to the residence to create distance from the West Wing.  Kelly 8/2/18 302, at 7.

[605] Lewandowski 4/6/18 302, at 2.

[606] Lewandowski 4/6/18 302, at 2.

[607] Lewandowski 4/6/18 302, at 2.

[608] Lewandowski 4/6/18 302, at 3.

[609] Lewandowski 4/6/18 302, at 2-3; Lewandowski 6/19/17 Notes, at 1-2.

[610] Lewandowski 4/6/18 302, at 3; Lewandowski 6/19/17 Notes, at 3.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

The President said that if Sessions delivered that statement he would be the "most popular guy in the country."[611] Lewandowski told the President he understood what the President wanted Sessions to do.[612]

Lewandowski wanted to pass the message to Sessions in person rather than over the phone.[613] He did not want to meet at the Department of Justice because he did not want a public log of his visit and did not want Sessions to have an advantage over him by meeting on what Lewandowski described as Sessions's turf.[614] Lewandowski called Sessions and arranged a meeting for the following evening at Lewandowski's office, but Sessions had to cancel due to a last minute conflict.[615] Shortly thereafter, Lewandowski left Washington, D.C., without having had an opportunity to meet with Sessions to convey the President's message.[616] Lewandowski stored the notes in a safe at his home, which he stated was his standard procedure with sensitive items.[617]

### 2.   The President Follows Up with Lewandowski

Following his June meeting with the President, Lewandowski contacted Rick Dearborn, then a senior White House official, and asked if Dearborn could pass a message to Sessions.[618] Dearborn agreed without knowing what the message was, and Lewandowski later confirmed that Dearborn would meet with Sessions for dinner in late July and could deliver the message then.[619] Lewandowski recalled thinking that the President had asked him to pass the message because the President knew Lewandowski could be trusted, but Lewandowski believed Dearborn would be a better messenger because he had a longstanding relationship with Sessions and because Dearborn was in the government while Lewandowski was not.[620]

On July 19, 2017, the President again met with Lewandowski alone in the Oval Office.[621] In the preceding days, as described in Volume II, Section II.G, *infra*, emails and other information about the June 9, 2016 meeting between several Russians and Donald Trump Jr., Jared Kushner, and Paul Manafort had been publicly disclosed. In the July 19 meeting with Lewandowski, the

---

[611] Lewandowski 4/6/18 302, at 3; Lewandowski 6/19/17 Notes, at 4.

[612] Lewandowski 4/6/18 302, at 3.

[613] Lewandowski 4/6/18 302, at 3-4.

[614] Lewandowski 4/6/18 302, at 4.

[615] Lewandowski 4/6/18 302, at 4.

[616] Lewandowski 4/6/18 302, at 4.

[617] Lewandowski 4/6/18 302, at 4.

[618] Lewandowski 4/6/18 302, at 4; *see* Dearborn 6/20/18 302, at 3.

[619] Lewandowski 4/6/18 302, at 4-5.

[620] Lewandowski 4/6/18 302, at 4, 6.

[621] Lewandowski 4/6/18 302, at 5; SCR029b_000002-03 (6/5/18 Additional Response to Special Counsel Request for Certain Visitor Log Information).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

President raised his previous request and asked if Lewandowski had talked to Sessions.[622] Lewandowski told the President that the message would be delivered soon.[623] Lewandowski recalled that the President told him that if Sessions did not meet with him, Lewandowski should tell Sessions he was fired.[624]

Immediately following the meeting with the President, Lewandowski saw Dearborn in the anteroom outside the Oval Office and gave him a typewritten version of the message the President had dictated to be delivered to Sessions.[625] Lewandowski told Dearborn that the notes were the message they had discussed, but Dearborn did not recall whether Lewandowski said the message was from the President.[626] The message "definitely raised an eyebrow" for Dearborn, and he recalled not wanting to ask where it came from or think further about doing anything with it.[627] Dearborn also said that being asked to serve as a messenger to Sessions made him uncomfortable.[628] He recalled later telling Lewandowski that he had handled the situation, but he did not actually follow through with delivering the message to Sessions, and he did not keep a copy of the typewritten notes Lewandowski had given him.[629]

### 3. The President Publicly Criticizes Sessions in a New York Times Interview

Within hours of the President's meeting with Lewandowski on July 19, 2017, the President gave an unplanned interview to the New York Times in which he criticized Sessions's decision to recuse from the Russia investigation.[630] The President said that "Sessions should have never recused himself, and if he was going to recuse himself, he should have told me before he took the job, and I would have picked somebody else."[631] Sessions's recusal, the President said, was "very unfair to the president. How do you take a job and then recuse yourself? If he would have recused himself before the job, I would have said, 'Thanks, Jeff, but I can't, you know, I'm not going to

---

[622] Lewandowski 4/6/18 302, at 5.

[623] Lewandowski 4/6/18 302, at 5.

[624] Lewandowski 4/6/18 302, at 6. Priebus vaguely recalled Lewandowski telling him that in approximately May or June 2017 the President had asked Lewandowski to get Sessions's resignation. Priebus recalled that Lewandowski described his reaction as something like, "What can I do? I'm not an employee of the administration. I'm a nobody." Priebus 4/3/18 302, at 6.

[625] Lewandowski 4/6/18 302, at 5. Lewandowski said he asked Hope Hicks to type the notes when he went in to the Oval Office, and he then retrieved the notes from her partway through his meeting with the President. Lewandowski 4/6/18 302, at 5.

[626] Lewandowski 4/6/18 302, at 5; Dearborn 6/20/18 302, at 3.

[627] Dearborn 6/20/18 302, at 3.

[628] Dearborn 6/20/18 302, at 3.

[629] Dearborn 6/20/18 302, at 3-4.

[630] Peter Baker et al., *Excerpts From The Times's Interview With Trump*, New York Times (July 19, 2017).

[631] Peter Baker et al., *Excerpts From The Times's Interview With Trump*, New York Times (July 19, 2017).

take you.' It's extremely unfair, and that's a mild word, to the president."[632] Hicks, who was present for the interview, recalled trying to "throw [herself] between the reporters and [the President]" to stop parts of the interview, but the President "loved the interview."[633]

Later that day, Lewandowski met with Hicks and they discussed the President's New York Times interview.[634] Lewandowski recalled telling Hicks about the President's request that he meet with Sessions and joking with her about the idea of firing Sessions as a private citizen if Sessions would not meet with him.[635] As Hicks remembered the conversation, Lewandowski told her the President had recently asked him to meet with Sessions and deliver a message that he needed to do the "right thing" and resign.[636] While Hicks and Lewandowski were together, the President called Hicks and told her he was happy with how coverage of his New York Times interview criticizing Sessions was playing out.[637]

### 4. The President Orders Priebus to Demand Sessions's Resignation

Three days later, on July 21, 2017, the Washington Post reported that U.S. intelligence intercepts showed that Sessions had discussed campaign-related matters with the Russian ambassador, contrary to what Sessions had said publicly.[638] That evening, Priebus called Hunt to talk about whether Sessions might be fired or might resign.[639] Priebus had previously talked to Hunt when the media had reported on tensions between Sessions and the President, and, after speaking to Sessions, Hunt had told Priebus that the President would have to fire Sessions if he wanted to remove Sessions because Sessions was not going to quit.[640] According to Hunt, who took contemporaneous notes of the July 21 call, Hunt told Priebus that, as they had previously discussed, Sessions had no intention of resigning.[641] Hunt asked Priebus what the President would

---

[632] Peter Baker et al., *Excerpts From The Times's Interview With Trump*, New York Times (July 19, 2017).

[633] Hicks 12/8/17 302, at 23.

[634] Hicks 3/13/18 302, at 10; Lewandowski 4/6/18 302, at 6.

[635] Lewandowski 4/6/18 302, at 6.

[636] Hicks 3/13/18 302, at 10. Hicks thought that the President might be able to make a recess appointment of a new Attorney General because the Senate was about to go on recess. Hicks 3/13/18 302, at 10. Lewandowski recalled that in the afternoon of July 19, 2017, following his meeting with the President, he conducted research on recess appointments but did not share his research with the President. Lewandowski 4/6/18 302, at 7.

[637] Lewandowski 4/6/18 302, at 6.

[638] Adam Entous et al., *Sessions discussed Trump campaign-related matters with Russian ambassador, U.S. intelligence intercepts show*, Washington Post (July 21, 2017). The underlying events concerning the Sessions-Kislyak contacts are discussed in Volume I, Section IV.A.4.c, *supra*.

[639] Hunt 2/1/18 302, at 23.

[640] Hunt 2/1/18 302, at 23.

[641] Hunt 2/1/18 302, at 23-24; Hunt 7/21/17 Notes, at 1.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

accomplish by firing Sessions, pointing out there was an investigation before and there would be an investigation after.[642]

Early the following morning, July 22, 2017, the President tweeted, "A new INTELLIGENCE LEAK from the Amazon Washington Post, this time against A.G. Jeff Sessions. These illegal leaks, like Comey's, must stop!"[643]   Approximately one hour later, the President tweeted, "So many people are asking why isn't the A.G. or Special Council looking at the many Hillary Clinton or Comey crimes. 33,000 e-mails deleted?"[644]   Later that morning, while aboard Marine One on the way to Norfolk, Virginia, the President told Priebus that he had to get Sessions to resign immediately.[645]   The President said that the country had lost confidence in Sessions and the negative publicity was not tolerable.[646]   According to contemporaneous notes taken by Priebus, the President told Priebus to say that he "need[ed] a letter of resignation on [his] desk immediately" and that Sessions had "no choice" but "must immediately resign."[647]   Priebus replied that if they fired Sessions, they would never get a new Attorney General confirmed and that the Department of Justice and Congress would turn their backs on the President, but the President suggested he could make a recess appointment to replace Sessions.[648]

Priebus believed that the President's request was a problem, so he called McGahn and asked for advice, explaining that he did not want to pull the trigger on something that was "all wrong."[649]   Although the President tied his desire for Sessions to resign to Sessions's negative press and poor performance in congressional testimony, Priebus believed that the President's desire to replace Sessions was driven by the President's hatred of Sessions's recusal from the Russia investigation.[650]   McGahn told Priebus not to follow the President's order and said they should consult their personal counsel, with whom they had attorney-client privilege.[651]   McGahn

---

[642] Hunt 2/1/18 302, at 23-24; Hunt 7/21/17 Notes, at 1-2.

[643] @realDonaldTrump 7/22/17 (6:33 a.m. ET) Tweet.

[644] @realDonaldTrump 7/22/17 (7:44 a.m. ET) Tweet.  Three minutes later, the President tweeted, "What about all of the Clinton ties to Russia, including Podesta Company, Uranium deal, Russian Reset, big dollar speeches etc." @realDonaldTrump 7/22/17 (7:47 a.m. ET) Tweet.

[645] Priebus 1/18/18 302, at 13-14.

[646] Priebus 1/18/18 302, at 14; Priebus 4/3/18 302, at 4-5; *see* RP_000073 (Priebus 7/22/17 Notes).

[647] RP_000073 (Priebus 7/22/17 Notes).

[648] Priebus 4/3/18 302, at 5.

[649] Priebus 1/18/18 302, at 14; Priebus 4/3/18 302, at 4-5.

[650] Priebus 4/3/18 302, at 5.

[651] RP_000074 (Priebus 7/22/17 Notes); McGahn 12/14/17 302, at 11; Priebus 1/18/18 302, at 14. Priebus followed McGahn's advice and called his personal attorney to discuss the President's request because he thought it was the type of thing about which one would need to consult an attorney.  Priebus 1/18/18 302, at 14.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

and Priebus discussed the possibility that they would both have to resign rather than carry out the President's order to fire Sessions.[652]

That afternoon, the President followed up with Priebus about demanding Sessions's resignation, using words to the effect of, "Did you get it?  Are you working on it?"[653]  Priebus said that he believed that his job depended on whether he followed the order to remove Sessions, although the President did not directly say so.[654]  Even though Priebus did not intend to carry out the President's directive, he told the President he would get Sessions to resign.[655]  Later in the day, Priebus called the President and explained that it would be a calamity if Sessions resigned because Priebus expected that Rosenstein and Associate Attorney General Rachel Brand would also resign and the President would be unable to get anyone else confirmed.[656]  The President agreed to hold off on demanding Sessions's resignation until after the Sunday shows the next day, to prevent the shows from focusing on the firing.[657]

By the end of that weekend, Priebus recalled that the President relented and agreed not to ask Sessions to resign.[658]  Over the next several days, the President tweeted about Sessions.  On the morning of Monday, July 24, 2017, the President criticized Sessions for neglecting to investigate Clinton and called him "beleaguered."[659]  On July 25, the President tweeted, "Attorney General Jeff Sessions has taken a VERY weak position on Hillary Clinton crimes (where are E-mails & DNC server) & Intel leakers!"[660]  The following day, July 26, the President tweeted, "Why didn't A.G. Sessions replace Acting FBI Director Andrew McCabe, a Comey friend who was in charge of Clinton investigation."[661]  According to Hunt, in light of the President's frequent public attacks, Sessions prepared another resignation letter and for the rest of the year carried it with him in his pocket every time he went to the White House.[662]

---

[652]  McGahn 12/14/17 302, at 11; RP_000074 (Priebus 7/22/17 Notes) ("discuss resigning together").

[653]  Priebus 1/18/18 302, at 14; Priebus 4/3/18 302, at 4.

[654]  Priebus 4/3/18 302, at 4.

[655]  Priebus 1/18/18 302, at 15.

[656]  Priebus 1/18/18 302, at 15.

[657]  Priebus 1/18/18 302, at 15.

[658]  Priebus 1/18/18 302, at 15.

[659]  @realDonaldTrump 7/24/17 (8:49 a.m. ET) Tweet ("So why aren't the Committees and investigators, and of course our beleaguered A.G., looking into Crooked Hillarys crimes & Russia relations?").

[660]  @realDonaldTrump 7/25/17 (6:12 a.m. ET) Tweet.  The President sent another tweet shortly before this one asking "where is the investigation A.G." @realDonaldTrump 7/25/17 (6:03 a.m. ET) Tweet.

[661]  @realDonaldTrump 7/26/17 (9:48 a.m. ET) Tweet.

[662]  Hunt 2/1/18 302, at 24-25.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

### *Analysis*

In analyzing the President's efforts to have Lewandowski deliver a message directing Sessions to publicly announce that the Special Counsel investigation would be confined to future election interference, the following evidence is relevant to the elements of obstruction of justice:

a.   <u>Obstructive act</u>.   The President's effort to send Sessions a message through Lewandowski would qualify as an obstructive act if it would naturally obstruct the investigation and any grand jury proceedings that might flow from the inquiry.

The President sought to have Sessions announce that the President "shouldn't have a Special Prosecutor/Counsel" and that Sessions was going to "meet with the Special Prosecutor to explain this is very unfair and let the Special Prosecutor move forward with investigating election meddling for future elections so that nothing can happen in future elections." The President wanted Sessions to disregard his recusal from the investigation, which had followed from a formal DOJ ethics review, and have Sessions declare that he knew "for a fact" that "there were no Russians involved with the campaign" because he "was there." The President further directed that Sessions should explain that the President should not be subject to an investigation "because he hasn't done anything wrong." Taken together, the President's directives indicate that Sessions was being instructed to tell the Special Counsel to end the existing investigation into the President and his campaign, with the Special Counsel being permitted to "move forward with investigating election meddling for future elections."

b.   <u>Nexus to an official proceeding</u>.   As described above, by the time of the President's initial one-on-one meeting with Lewandowski on June 19, 2017, the existence of a grand jury investigation supervised by the Special Counsel was public knowledge. By the time of the President's follow-up meeting with Lewandowski, **Grand Jury**
                              *See* Volume II, Section II.G, *infra*. To satisfy the nexus requirement, it would be necessary to show that limiting the Special Counsel's investigation would have the natural and probable effect of impeding that grand jury proceeding.

c.   <u>Intent</u>.   Substantial evidence indicates that the President's effort to have Sessions limit the scope of the Special Counsel's investigation to future election interference was intended to prevent further investigative scrutiny of the President's and his campaign's conduct.

As previously described, *see* Volume II, Section II.B, *supra*, the President knew that the Russia investigation was focused in part on his campaign, and he perceived allegations of Russian interference to cast doubt on the legitimacy of his election. The President further knew that the investigation had broadened to include his own conduct and whether he had obstructed justice. Those investigations would not proceed if the Special Counsel's jurisdiction were limited to future election interference only.

The timing and circumstances of the President's actions support the conclusion that he sought that result. The President's initial direction that Sessions should limit the Special Counsel's investigation came just two days after the President had ordered McGahn to have the Special Counsel removed, which itself followed public reports that the President was personally under

97

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

investigation for obstruction of justice. The sequence of those events raises an inference that after seeking to terminate the Special Counsel, the President sought to exclude his and his campaign's conduct from the investigation's scope. The President raised the matter with Lewandowski again on July 19, 2017, just days after emails and information about the June 9, 2016 meeting between Russians and senior campaign officials had been publicly disclosed, generating substantial media coverage and investigative interest.

The manner in which the President acted provides additional evidence of his intent. Rather than rely on official channels, the President met with Lewandowski alone in the Oval Office. The President selected a loyal "devotee" outside the White House to deliver the message, supporting an inference that he was working outside White House channels, including McGahn, who had previously resisted contacting the Department of Justice about the Special Counsel. The President also did not contact the Acting Attorney General, who had just testified publicly that there was no cause to remove the Special Counsel. Instead, the President tried to use Sessions to restrict and redirect the Special Counsel's investigation when Sessions was recused and could not properly take any action on it.

The July 19, 2017 events provide further evidence of the President's intent. The President followed up with Lewandowski in a separate one-on-one meeting one month after he first dictated the message for Sessions, demonstrating he still sought to pursue the request. And just hours after Lewandowski assured the President that the message would soon be delivered to Sessions, the President gave an unplanned interview to the New York Times in which he publicly attacked Sessions and raised questions about his job security. Four days later, on July 22, 2017, the President directed Priebus to obtain Sessions's resignation. That evidence could raise an inference that the President wanted Sessions to realize that his job might be on the line as he evaluated whether to comply with the President's direction that Sessions publicly announce that, notwithstanding his recusal, he was going to confine the Special Counsel's investigation to future election interference.

### G. The President's Efforts to Prevent Disclosure of Emails About the June 9, 2016 Meeting Between Russians and Senior Campaign Officials

*Overview*

By June 2017, the President became aware of emails setting up the June 9, 2016 meeting between senior campaign officials and Russians who offered derogatory information on Hillary Clinton as "part of Russia and its government's support for Mr. Trump." On multiple occasions in late June and early July 2017, the President directed aides not to publicly disclose the emails, and he then dictated a statement about the meeting to be issued by Donald Trump Jr. describing the meeting as about adoption.

*Evidence*

1. The President Learns About the Existence of Emails Concerning the June 9, 2016 Trump Tower Meeting

In mid-June 2017—the same week that the President first asked Lewandowski to pass a message to Sessions—senior Administration officials became aware of emails exchanged during