U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

investigation for obstruction of justice.  The sequence of those events raises an inference that after seeking to terminate the Special Counsel, the President sought to exclude his and his campaign's conduct from the investigation's scope.  The President raised the matter with Lewandowski again on July 19, 2017, just days after emails and information about the June 9, 2016 meeting between Russians and senior campaign officials had been publicly disclosed, generating substantial media coverage and investigative interest.

The manner in which the President acted provides additional evidence of his intent.  Rather than rely on official channels, the President met with Lewandowski alone in the Oval Office.  The President selected a loyal "devotee" outside the White House to deliver the message, supporting an inference that he was working outside White House channels, including McGahn, who had previously resisted contacting the Department of Justice about the Special Counsel.  The President also did not contact the Acting Attorney General, who had just testified publicly that there was no cause to remove the Special Counsel.  Instead, the President tried to use Sessions to restrict and redirect the Special Counsel's investigation when Sessions was recused and could not properly take any action on it.

The July 19, 2017 events provide further evidence of the President's intent.  The President followed up with Lewandowski in a separate one-on-one meeting one month after he first dictated the message for Sessions, demonstrating he still sought to pursue the request.  And just hours after Lewandowski assured the President that the message would soon be delivered to Sessions, the President gave an unplanned interview to the New York Times in which he publicly attacked Sessions and raised questions about his job security.  Four days later, on July 22, 2017, the President directed Priebus to obtain Sessions's resignation.  That evidence could raise an inference that the President wanted Sessions to realize that his job might be on the line as he evaluated whether to comply with the President's direction that Sessions publicly announce that, notwithstanding his recusal, he was going to confine the Special Counsel's investigation to future election interference.

**G.      The President's Efforts to Prevent Disclosure of Emails About the June 9, 2016 Meeting Between Russians and Senior Campaign Officials**

*Overview*

By June 2017, the President became aware of emails setting up the June 9, 2016 meeting between senior campaign officials and Russians who offered derogatory information on Hillary Clinton as "part of Russia and its government's support for Mr. Trump."  On multiple occasions in late June and early July 2017, the President directed aides not to publicly disclose the emails, and he then dictated a statement about the meeting to be issued by Donald Trump Jr. describing the meeting as about adoption.

*Evidence*

1.   The President Learns About the Existence of Emails Concerning the June 9, 2016 Trump Tower Meeting

In mid-June 2017—the same week that the President first asked Lewandowski to pass a message to Sessions—senior Administration officials became aware of emails exchanged during

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

the campaign arranging a meeting between Donald Trump Jr., Paul Manafort, Jared Kushner, and a Russian attorney.[663] As described in Volume I, Section IV.A.5, *supra*, the emails stated that the "Crown [P]rosecutor of Russia" had offered "to provide the Trump campaign with some official documents and information that would incriminate Hillary and her dealings with Russia" as part of "Russia and its government's support for Mr. Trump."[664] Trump Jr. responded, "[I]f it's what you say I love it,"[665] and he, Kushner, and Manafort met with the Russian attorney and several other Russian individuals at Trump Tower on June 9, 2016.[666] At the meeting, the Russian attorney claimed that funds derived from illegal activities in Russia were provided to Hillary Clinton and other Democrats, and the Russian attorney then spoke about the Magnitsky Act, a 2012 U.S. statute that imposed financial and travel sanctions on Russian officials and that had resulted in a retaliatory ban in Russia on U.S. adoptions of Russian children.[667]

According to written answers submitted by the President in response to questions from this Office, the President had no recollection of learning of the meeting or the emails setting it up at the time the meeting occurred or at any other time before the election.[668]

The Trump Campaign had previously received a document request from SSCI that called for the production of various information, including, "[a] list and a description of all meetings" between any "individual affiliated with the Trump campaign" and "any individual formally or informally affiliated with the Russian government or Russian business interests which took place between June 16, 2015, and 12 pm on January 20, 2017," and associated records.[669] Trump Organization attorneys became aware of the June 9 meeting no later than the first week of June 2017, when they began interviewing the meeting participants, and the Trump Organization attorneys provided the emails setting up the meeting to the President's personal counsel.[670] Mark Corallo, who had been hired as a spokesman for the President's personal legal team, recalled that he learned about the June 9 meeting around June 21 or 22, 2017.[671] Priebus recalled learning about the June 9 meeting from Fox News host Sean Hannity in late June 2017.[672] Priebus notified one

---

[663] Hicks 3/13/18 302, at 1; Raffel 2/8/18 302, at 2.

[664] RG000061 (6/3/16 Email, Goldstone to Trump Jr.); @DonaldJTrumpJR 7/11/17 (11:01 a.m. ET) Tweet.

[665] RG000061 (6/3/16 Email, Trump Jr. to Goldstone); @DonaldJTrumpJR 7/11/17 (11:01 a.m. ET) Tweet.

[666] Samochornov 7/12/17 302, at 4.

[667] *See* Volume I, Section IV.A.5, *supra* (describing meeting in detail).

[668] Written Responses of Donald J. Trump (Nov. 20, 2018), at 8 (Response to Question I, Parts (a) through (c)). The President declined to answer questions about his knowledge of the June 9 meeting or other events after the election.

[669] DJTFP_SCO_PDF_00000001-02 (5/17/17 Letter, SSCI to Donald J. Trump for President, Inc.).

[670] Goldstone 2/8/18 302, at 12; 6/2/17 and 6/5/17 Emails, Goldstone & Garten; Raffel 2/8/18 302, at 3; Hicks 3/13/18 302, at 2.

[671] Corallo 2/15/18 302, at 3.

[672] Priebus 4/3/18 302, at 7.

U.S. Department of Justice

Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

of the President's personal attorneys, who told Priebus he was already working on it.[673]  By late June, several advisors recalled receiving media inquiries that could relate to the June 9 meeting.[674]

2. The President Directs Communications Staff Not to Publicly Disclose Information About the June 9 Meeting

Communications advisors Hope Hicks and Josh Raffel recalled discussing with Jared Kushner and Ivanka Trump that the emails were damaging and would inevitably be leaked.[675] Hicks and Raffel advised that the best strategy was to proactively release the emails to the press.[676] On or about June 22, 2017, Hicks attended a meeting in the White House residence with the President, Kushner, and Ivanka Trump.[677]  According to Hicks, Kushner said that he wanted to fill the President in on something that had been discovered in the documents he was to provide to the congressional committees involving a meeting with him, Manafort, and Trump Jr.[678]  Kushner brought a folder of documents to the meeting and tried to show them to the President, but the President stopped Kushner and said he did not want to know about it, shutting the conversation down.[679]

On June 28, 2017, Hicks viewed the emails at Kushner's attorney's office.[680]  She recalled being shocked by the emails because they looked "really bad."[681]  The next day, Hicks spoke privately with the President to mention her concern about the emails, which she understood were soon going to be shared with Congress.[682]  The President seemed upset because too many people knew about the emails and he told Hicks that just one lawyer should deal with the matter.[683]  The President indicated that he did not think the emails would leak, but said they would leak if everyone had access to them.[684]

---

[673] Priebus 4/3/18 302, at 7.

[674] Corallo 2/15/18 302, at 3; Hicks 12/7/17 302, at 8; Raffel 2/8/18 302, at 3.

[675] Raffel 2/8/18 302, at 2-3; Hicks 3/13/18 302, at 2.

[676] Raffel 2/8/18 302, at 2-3, 5; Hicks 3/13/18 302, at 2; Hicks 12/7/17 302, at 8.

[677] Hicks 12/7/17 302, at 6-7; Hicks 3/13/18 302, at 1.

[678] Hicks 12/7/17 302, at 7; Hicks 3/13/18 302, at 1.

[679] Hicks 12/7/17 302, at 7; Hicks 3/13/18 302, at 1.  Counsel for Ivanka Trump provided an attorney proffer that is consistent with Hicks's account and with the other events involving Ivanka Trump set forth in this section of the report.  Kushner said that he did not recall talking to the President at this time about the June 9 meeting or the underlying emails.  Kushner 4/11/18 302, at 30.

[680] Hicks 3/13/18 302, at 1-2.

[681] Hicks 3/13/18 302, at 2.

[682] Hicks 12/7/17 302, at 8.

[683] Hicks 3/13/18 302, at 2-3; Hicks 12/7/17 302, at 8.

[684] Hicks 12/7/17 302, at 8.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Later that day, Hicks, Kushner, and Ivanka Trump went together to talk to the President.[685] Hicks recalled that Kushner told the President the June 9 meeting was not a big deal and was about Russian adoption, but that emails existed setting up the meeting.[686] Hicks said she wanted to get in front of the story and have Trump Jr. release the emails as part of an interview with "softball questions."[687] The President said he did not want to know about it and they should not go to the press.[688] Hicks warned the President that the emails were "really bad" and the story would be "massive" when it broke, but the President was insistent that he did not want to talk about it and said he did not want details.[689] Hicks recalled that the President asked Kushner when his document production was due.[690] Kushner responded that it would be a couple of weeks and the President said, "then leave it alone."[691] Hicks also recalled that the President said Kushner's attorney should give the emails to whomever he needed to give them to, but the President did not think they would be leaked to the press.[692] Raffel later heard from Hicks that the President had directed the group not to be proactive in disclosing the emails because the President believed they would not leak.[693]

3. The President Directs Trump Jr.'s Response to Press Inquiries About the June 9 Meeting

The following week, the President departed on an overseas trip for the G20 summit in Hamburg, Germany, accompanied by Hicks, Raffel, Kushner, and Ivanka Trump, among others.[694] On July 7, 2017, while the President was overseas, Hicks and Raffel learned that the New York Times was working on a story about the June 9 meeting.[695] The next day, Hicks told the President about the story and he directed her not to comment.[696] Hicks thought the President's reaction was odd because he usually considered not responding to the press to be the ultimate sin.[697] Later that day, Hicks and the President again spoke about the story.[698] Hicks recalled that the President asked

---

[685] Hicks 12/7/17 302, at 8; Hicks 3/13/18 302, at 2.

[686] Hicks 3/13/18 302, at 2; Hicks 12/7/17 302, at 9.

[687] Hicks 3/13/18 302, at 2-3.

[688] Hicks 3/13/18 302, at 2-3; Hicks 12/7/17 302, at 9.

[689] Hicks 3/13/18 302, at 3; Hicks 12/7/17 302, at 9.

[690] Hicks 3/13/18 302, at 3.

[691] Hicks 3/13/18 302, at 3.

[692] Hicks 12/7/17 302, at 9.

[693] Raffel 2/8/18 302, at 5.

[694] Raffel 2/8/18 302, at 6.

[695] Raffel 2/8/18 302, at 6-7; Hicks 3/13/18 302, at 3.

[696] Hicks 12/7/17 302, at 10; Hicks 3/13/18 302, at 3.

[697] Hicks 12/7/17 302, at 10.

[698] Hicks 3/13/18 302, at 3.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

her what the meeting had been about, and she said that she had been told the meeting was about Russian adoption.[699]   The President responded, "then just say that."[700]

On the flight home from the G20 on July 8, 2017, Hicks obtained a draft statement about the meeting to be released by Trump Jr. and brought it to the President.[701]   The draft statement began with a reference to the information that was offered by the Russians in setting up the meeting: "I was asked to have a meeting by an acquaintance I knew from the 2013 Miss Universe pageant with an individual who I was told might have information helpful to the campaign."[702] Hicks again wanted to disclose the entire story, but the President directed that the statement not be issued because it said too much.[703]   The President told Hicks to say only that Trump Jr. took a brief meeting and it was about Russian adoption.[704]   After speaking with the President, Hicks texted Trump Jr. a revised statement on the June 9 meeting that read:

> It was a short meeting. I asked Jared and Paul to stop by. We discussed a program about the adoption of Russian children that was active and popular with American families years ago and was since ended by the Russian government, but it was not a campaign issue at that time and there was no follow up.[705]

Hicks's text concluded, "Are you ok with this? Attributed to you."[706]   Trump Jr. responded by text message that he wanted to add the word "primarily" before "discussed" so that the statement would read, "We primarily discussed a program about the adoption of Russian children."[707]   Trump Jr. texted that he wanted the change because "[t]hey started with some Hillary thing which was bs and some other nonsense which we shot down fast."[708]   Hicks texted back, "I think that's right too but boss man worried it invites a lot of questions[.]   [U]ltimately [d]efer to you and [your attorney] on that word Bc I know it's important and I think the mention of a campaign issue adds something to it in case we have to go further."[709]   Trump Jr. responded, "If I don't have it in there it appears as though I'm lying later when they inevitably leak something."[710]   Trump Jr.'s statement—adding

---

[699] Hicks 3/13/18 302, at 3; Hicks 12/7/17 302, at 10.

[700] Hicks 3/13/18 302, at 3; *see* Hicks 12/7/17 302, at 10.

[701] Hicks 3/13/18 302, at 4.

[702] Hicks 7/8/17 Notes.

[703] Hicks 3/13/18 302, at 4-5; Hicks 12/7/17 302, at 11.

[704] Hicks 12/7/17 302, at 11.

[705] SCR011a_000004 (7/8/17 Text Message, Hicks to Trump Jr.).

[706] SCR011a_000004 (7/8/17 Text Message, Hicks to Trump Jr.).

[707] SCR011a_000005 (7/8/17 Text Message, Trump Jr. to Hicks).

[708] SCR011a_000005 (7/8/17 Text Message, Trump Jr. to Hicks).

[709] SCR011a_000005 (7/8/17 Text Message, Hicks to Trump Jr.).

[710] SCR011a_000006 (7/8/17 Text Message, Trump Jr. to Hicks).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

the word "primarily" and making other minor additions—was then provided to the New York Times.[711]  The full statement provided to the *Times* stated:

> It was a short introductory meeting.  I asked Jared and Paul to stop by.  We primarily discussed a program about the adoption of Russian children that was active and popular with American families years ago and was since ended by the Russian government, but it was not a campaign issue at the time and there was no follow up.  I was asked to attend the meeting by an acquaintance, but was not told the name of the person I would be meeting with beforehand.[712]

The statement did not mention the offer of derogatory information about Clinton or any discussion of the Magnitsky Act or U.S. sanctions, which were the principal subjects of the meeting, as described in Volume I, Section IV.A.5, *supra*.

A short while later, while still on Air Force One, Hicks learned that Priebus knew about the emails, which further convinced her that additional information about the June 9 meeting would leak and the White House should be proactive and get in front of the story.[713]  Hicks recalled again going to the President to urge him that they should be fully transparent about the June 9 meeting, but he again said no, telling Hicks, "You've given a statement.  We're done."[714]

Later on the flight home, Hicks went to the President's cabin, where the President was on the phone with one of his personal attorneys.[715]  At one point the President handed the phone to Hicks, and the attorney told Hicks that he had been working with Circa News on a separate story, and that she should not talk to the New York Times.[716]

### 4.   The Media Reports on the June 9, 2016 Meeting

Before the President's flight home from the G20 landed, the New York Times published its story about the June 9, 2016 meeting.[717]  In addition to the statement from Trump Jr., the Times story also quoted a statement from Corallo on behalf of the President's legal team suggesting that the meeting might have been a setup by individuals working with the firm that produced the Steele reporting.[718]  Corallo also worked with Circa News on a story published an hour later that

---

[711] Hicks 3/13/18 302, at 6; *see* Jo Becker et al., *Trump Team Met With Lawyer Linked to Kremlin During Campaign*, New York Times (July 8, 2017).

[712] *See* Jo Becker et al., *Trump Team Met With Lawyer Linked to Kremlin During Campaign*, New York Times (July 8, 2017).

[713] Hicks 3/13/18 302, at 6; Raffel 2/8/18 302, at 9-10.

[714] Hicks 12/7/17 302, at 12; Raffel 2/8/18 302, at 10.

[715] Hicks 3/13/18 302, at 7.

[716] Hicks 3/13/18 302, at 7.

[717] *See* Jo Becker et al., *Trump Team Met With Lawyer Linked to Kremlin During Campaign*, New York Times (July 8, 2017); Raffel 2/8/18 302, at 10.

[718] *See* Jo Becker et al., *Trump Team Met With Lawyer Linked to Kremlin During Campaign*, New York Times (July 8, 2017).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

questioned whether Democratic operatives had arranged the June 9 meeting to create the appearance of improper connections between Russia and Trump family members.[719]  Hicks was upset about Corallo's public statement and called him that evening to say the President had not approved the statement.[720]

The next day, July 9, 2017, Hicks and the President called Corallo together and the President criticized Corallo for the statement he had released.[721]  Corallo told the President the statement had been authorized and further observed that Trump Jr.'s statement was inaccurate and that a document existed that would contradict it.[722]  Corallo said that he purposely used the term "document" to refer to the emails setting up the June 9 meeting because he did not know what the President knew about the emails.[723]  Corallo recalled that when he referred to the "document" on the call with the President, Hicks responded that only a few people had access to it and said "it will never get out."[724]  Corallo took contemporaneous notes of the call that say: "Also mention existence of doc.  Hope says 'only a few people have it.  It will never get out.'"[725]  Hicks later told investigators that she had no memory of making that comment and had always believed the emails would eventually be leaked, but she might have been channeling the President on the phone call because it was clear to her throughout her conversations with the President that he did not think the emails would leak.[726]

On July 11, 2017, Trump Jr. posted redacted images of the emails setting up the June 9 meeting on Twitter; the New York Times reported that he did so "[a]fter being told that The Times was about to publish the content of the emails."[727]  Later that day, the media reported that the President had been personally involved in preparing Trump Jr.'s initial statement to the New York Times that had claimed the meeting "primarily" concerned "a program about the adoption of Russian children."[728]  Over the next several days, the President's personal counsel repeatedly and

---

[719] *See Donald Trump Jr. gathered members of campaign for meeting with Russian lawyer before election*, Circa News (July 8, 2017).

[720] Hicks 3/13/18 302, at 8; Corallo 2/15/18 302, at 6-7.

[721] Corallo 2/15/18 302, at 7.

[722] Corallo 2/15/18 302, at 7.

[723] Corallo 2/15/18 302, at 7-9.

[724] Corallo 2/15/18 302, at 8.

[725] Corallo 2/15/18 302, at 8; Corallo 7/9/17 Notes ("Sunday 9th – Hope calls w/ POTUS on line"). Corallo said he is "100% confident" that Hicks said "It will never get out" on the call.  Corallo 2/15/18 302, at 9.

[726] Hicks 3/13/18 302, at 9.

[727] @DonaldJTrumpJR 7/11/17 (11:01 a.m. ET) Tweet; Jo Becker et al., *Russian Dirt on Clinton? 'I Love It,' Donald Trump Jr. Said*, New York Times (July 11, 2017).

[728] *See, e.g.*, Peter Baker & Maggie Haberman, *Rancor at White House as Russia Story Refuses to Let the Page Turn*, New York Times (July 11, 2017) (reporting that the President "signed off" on Trump Jr.'s statement).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

inaccurately denied that the President played any role in drafting Trump Jr.'s statement.[729]  After consulting with the President on the issue, White House Press Secretary Sarah Sanders told the media that the President "certainly didn't dictate" the statement, but that "he weighed in, offered suggestions like any father would do."[730]  Several months later, the President's personal counsel stated in a private communication to the Special Counsel's Office that "the President dictated a short but accurate response to the New York Times article on behalf of his son, Donald Trump, Jr."[731]  The President later told the press that it was "irrelevant" whether he dictated the statement and said, "It's a statement to the New York Times. . . . That's not a statement to a high tribunal of judges."[732]

On July 12, 2017, the Special Counsel's Office ███Grand Jury███            ███ Trump Jr. ███Grand Jury███                    related to the June 9 meeting and those who attended the June 9 meeting.[733]

On July 19, 2017, the President had his follow-up meeting with Lewandowski and then met with reporters for the New York Times.  In addition to criticizing Sessions in his Times interview, the President addressed the June 9, 2016 meeting and said he "didn't know anything about the meeting" at the time.[734]  The President added, "As I've said—most other people, you know, when they call up and say, 'By the way, we have information on your opponent,' I think most politicians — I was just with a lot of people, they said . . . , 'Who wouldn't have taken a meeting like that?'"[735]

### *Analysis*

In analyzing the President's actions regarding the disclosure of information about the June 9 meeting, the following evidence is relevant to the elements of obstruction of justice:

a.      <u>Obstructive act</u>.  On at least three occasions between June 29, 2017, and July 9, 2017, the President directed Hicks and others not to publicly disclose information about the June

---

[729] *See, e.g.*, David Wright, *Trump lawyer: President was aware of "nothing"*, CNN (July 12, 2017) (quoting the President's personal attorney as saying, "I wasn't involved in the statement drafting at all nor was the President."); *see also* Good Morning America, ABC (July 12, 2017) ("The President didn't sign off on anything. . . . The President wasn't involved in that."); Meet the Press, NBC (July 16, 2017) ("I do want to be clear—the President was not involved in the drafting of the statement.").

[730] Sarah Sanders, *White House Daily Briefing*, C-SPAN (Aug. 1, 2017); Sanders 7/3/18 302, at 9 (the President told Sanders he "weighed in, as any father would" and knew she intended to tell the press what he said).

[731] 1/29/18 Letter, President's Personal Counsel to Special Counsel's Office, at 18.

[732] Remarks by President Trump in Press Gaggle (June 15, 2018).

[733] ███Grand Jury███ .

[734] Peter Baker et al., *Excerpts From The Times's Interview With Trump*, New York Times (July 19, 2017).

[735] Peter Baker et al., *Excerpts From The Times's Interview With Trump*, New York Times (July 19, 2017).

U.S. Department of Justice
Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

9, 2016 meeting between senior campaign officials and a Russian attorney. On June 29, Hicks warned the President that the emails setting up the June 9 meeting were "really bad" and the story would be "massive" when it broke, but the President told her and Kushner to "leave it alone." Early on July 8, after Hicks told the President the New York Times was working on a story about the June 9 meeting, the President directed her not to comment, even though Hicks said that the President usually considered not responding to the press to be the ultimate sin. Later that day, the President rejected Trump Jr.'s draft statement that would have acknowledged that the meeting was with "an individual who I was told might have information helpful to the campaign." The President then dictated a statement to Hicks that said the meeting was about Russian adoption (which the President had twice been told was discussed at the meeting). The statement dictated by the President did not mention the offer of derogatory information about Clinton.

Each of these efforts by the President involved his communications team and was directed at the press. They would amount to obstructive acts only if the President, by taking these actions, sought to withhold information from or mislead congressional investigators or the Special Counsel. On May 17, 2017, the President's campaign received a document request from SSCI that clearly covered the June 9 meeting and underlying emails, and those documents also plainly would have been relevant to the Special Counsel's investigation.

But the evidence does not establish that the President took steps to prevent the emails or other information about the June 9 meeting from being provided to Congress or the Special Counsel. The series of discussions in which the President sought to limit access to the emails and prevent their public release occurred in the context of developing a press strategy. The only evidence we have of the President discussing the production of documents to Congress or the Special Counsel is the conversation on June 29, 2017, when Hicks recalled the President acknowledging that Kushner's attorney should provide emails related to the June 9 meeting to whomever he needed to give them to. We do not have evidence of what the President discussed with his own lawyers at that time.

      b.    <u>Nexus to an official proceeding</u>. As described above, by the time of the President's attempts to prevent the public release of the emails regarding the June 9 meeting, the existence of a grand jury investigation supervised by the Special Counsel was public knowledge, and the President had been told that the emails were responsive to congressional inquiries. To satisfy the nexus requirement, however, it would be necessary to show that preventing the release of the emails to the public would have the natural and probable effect of impeding the grand jury proceeding or congressional inquiries. As noted above, the evidence does not establish that the President sought to prevent disclosure of the emails in those official proceedings.

      c.    <u>Intent</u>. The evidence establishes the President's substantial involvement in the communications strategy related to information about his campaign's connections to Russia and his desire to minimize public disclosures about those connections. The President became aware of the emails no later than June 29, 2017, when he discussed them with Hicks and Kushner, and he could have been aware of them as early as June 2, 2017, when lawyers for the Trump Organization began interviewing witnesses who participated in the June 9 meeting. The President thereafter repeatedly rejected the advice of Hicks and other staffers to publicly release information about the June 9 meeting. The President expressed concern that multiple people had access to the emails and instructed Hicks that only one lawyer should deal with the matter. And the President

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

dictated a statement to be released by Trump Jr. in response to the first press accounts of the June 9 meeting that said the meeting was about adoption.

But as described above, the evidence does not establish that the President intended to prevent the Special Counsel's Office or Congress from obtaining the emails setting up the June 9 meeting or other information about that meeting. The statement recorded by Corallo—that the emails "will never get out"—can be explained as reflecting a belief that the emails would not be made public if the President's press strategy were followed, even if the emails were provided to Congress and the Special Counsel.

### H.  The President's Further Efforts to Have the Attorney General Take Over the Investigation

#### *Overview*

From summer 2017 through 2018, the President attempted to have Attorney General Sessions reverse his recusal, take control of the Special Counsel's investigation, and order an investigation of Hillary Clinton.

#### *Evidence*

##### 1.  The President Again Seeks to Have Sessions Reverse his Recusal

After returning Sessions's resignation letter at the end of May 2017, but before the President's July 19, 2017 New York Times interview in which he publicly criticized Sessions for recusing from the Russia investigation, the President took additional steps to have Sessions reverse his recusal. In particular, at some point after the May 17, 2017 appointment of the Special Counsel, Sessions recalled, the President called him at home and asked if Sessions would "unrecuse" himself.[736] According to Sessions, the President asked him to reverse his recusal so that Sessions could direct the Department of Justice to investigate and prosecute Hillary Clinton, and the "gist" of the conversation was that the President wanted Sessions to unrecuse from "all of it," including the Special Counsel's Russia investigation.[737] Sessions listened but did not respond, and he did not reverse his recusal or order an investigation of Clinton.[738]

In early July 2017, the President asked Staff Secretary Rob Porter what he thought of Associate Attorney General Rachel Brand.[739] Porter recalled that the President asked him if Brand was good, tough, and "on the team."[740] The President also asked if Porter thought Brand was interested in being responsible for the Special Counsel's investigation and whether she would want

---

[736] Sessions 1/17/18 302, at 15.  That was the second time that the President asked Sessions to reverse his recusal from campaign-related investigations.  *See* Volume II, Section II.C.1, *supra* (describing President's March 2017 request at Mar-a-Lago for Sessions to unrecuse).

[737] Sessions 1/17/18 302, at 15.

[738] Sessions 1/17/18 302, at 15.

[739] Porter 4/13/18 302, at 11; Porter 5/8/18 302, at 6.

[740] Porter 4/13/18 302, at 11; Porter 5/8/18 302, at 6.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

to be Attorney General one day.[741]  Because Porter knew Brand, the President asked him to sound her out about taking responsibility for the investigation and being Attorney General.[742] Contemporaneous notes taken by Porter show that the President told Porter to "Keep in touch with your friend," in reference to Brand.[743]  Later, the President asked Porter a few times in passing whether he had spoken to Brand, but Porter did not reach out to her because he was uncomfortable with the task.[744]  In asking him to reach out to Brand, Porter understood the President to want to find someone to end the Russia investigation or fire the Special Counsel, although the President never said so explicitly.[745]  Porter did not contact Brand because he was sensitive to the implications of that action and did not want to be involved in a chain of events associated with an effort to end the investigation or fire the Special Counsel.[746]

McGahn recalled that during the summer of 2017, he and the President discussed the fact that if Sessions were no longer in his position the Special Counsel would report directly to a non-recused Attorney General.[747]  McGahn told the President that things might not change much under a new Attorney General.[748]  McGahn also recalled that in or around July 2017, the President frequently brought up his displeasure with Sessions.[749]  Hicks recalled that the President viewed Sessions's recusal from the Russia investigation as an act of disloyalty.[750]  In addition to criticizing Sessions's recusal, the President raised other concerns about Sessions and his job performance with McGahn and Hicks.[751]

---

[741] Porter 4/13/18 302, at 11; Porter 5/8/18 302, at 6.  Because of Sessions's recusal, if Rosenstein were no longer in his position, Brand would, by default, become the DOJ official in charge of supervising the Special Counsel's investigation, and if both Sessions and Rosenstein were removed, Brand would be next in line to become Acting Attorney General for all DOJ matters. *See* 28 U.S.C. § 508.

[742] Porter 4/13/18 302, at 11; Porter 5/8/18 302, at 6.

[743] SC_RRP000020 (Porter 7/10/17 Notes).

[744] Porter 4/13/18 302, at 11-12.

[745] Porter 4/13/18 302, at 11-12.

[746] Porter 4/13/18 302, at 11-12.  Brand confirmed that no one ever raised with her the prospect of taking over the Russia investigation or becoming Attorney General.  Brand 1/29/19 302, at 2.

[747] McGahn 12/14/17 302, at 11.

[748] McGahn 12/14/17 302, at 11.

[749] McGahn 12/14/17 302, at 9.

[750] Hicks 3/13/18 302, at 10.

[751] McGahn 12/14/17 302, at 9; Hicks 3/13/18 302, at 10.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

2.   Additional Efforts to Have Sessions Unrecuse or Direct Investigations Covered by his Recusal

Later in 2017, the President continued to urge Sessions to reverse his recusal from campaign-related investigations and considered replacing Sessions with an Attorney General who would not be recused.

On October 16, 2017, the President met privately with Sessions and said that the Department of Justice was not investigating individuals and events that the President thought the Department should be investigating.[752] According to contemporaneous notes taken by Porter, who was at the meeting, the President mentioned Clinton's emails and said, "Don't have to tell us, just take [a] look."[753] Sessions did not offer any assurances or promises to the President that the Department of Justice would comply with that request.[754] Two days later, on October 18, 2017, the President tweeted, "Wow, FBI confirms report that James Comey drafted letter exonerating Crooked Hillary Clinton long before investigation was complete. Many people not interviewed, including Clinton herself. Comey stated under oath that he didn't do this-obviously a fix? Where is Justice Dept?"[755] On October 29, 2017, the President tweeted that there was "ANGER & UNITY" over a "lack of investigation" of Clinton and "the Comey fix," and concluded: "DO SOMETHING!"[756]

On December 6, 2017, five days after Flynn pleaded guilty to lying about his contacts with the Russian government, the President asked to speak with Sessions in the Oval Office at the end of a cabinet meeting.[757] During that Oval Office meeting, which Porter attended, the President again suggested that Sessions could "unrecuse," which Porter linked to taking back supervision of the Russia investigation and directing an investigation of Hillary Clinton.[758] According to contemporaneous notes taken by Porter, the President said, "I don't know if you could un-recuse yourself. You'd be a hero. Not telling you to do anything. Dershowitz says POTUS can get involved. Can order AG to investigate. I don't want to get involved. I'm not going to get involved. I'm not going to do anything or direct you to do anything. I just want to be treated fairly."[759] According to Porter's notes, Sessions responded, "We are taking steps; whole new leadership

---

[752] Porter 5/8/18 302, at 10.

[753] SC_RRP000024 (Porter 10/16/17 Notes); *see* Porter 5/8/18 302, at 10.

[754] Porter 5/8/18 302, at 10.

[755] @realDonaldTrump 10/18/17 (6:21 a.m. ET) Tweet; @realDonaldTrump 10/18/17 (6:27 a.m. ET) Tweet.

[756] @realDonaldTrump 10/29/17 (9:53 a.m. ET) Tweet; @realDonaldTrump 10/29/17 (10:02 a.m. ET) Tweet; @realDonaldTrump 10/29/17 (10:17 a.m. ET) Tweet.

[757] Porter 4/13/18 302, at 5-6; *see* SC_RRP000031 (Porter 12/6/17 Notes) ("12:45pm With the President, Gen. Kelly, and Sessions (who I pulled in after the Cabinet meeting)"); SC_RRP000033 (Porter 12/6/17 Notes) ("Post-cabinet meeting – POTUS asked me to get AG Sessions. Asked me to stay. Also COS Kelly.").

[758] Porter 5/8/18 302, at 12; Porter 4/13/18 302, at 5-6.

[759] SC_RRP000033 (Porter 12/6/17 Notes); *see* Porter 4/13/18 302, at 6; Porter 5/8/18 302, at 12.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

team.  Professionals; will operate according to the law."[760]  Sessions also said, "I never saw anything that was improper," which Porter thought was noteworthy because it did not fit with the previous discussion about Clinton.[761]  Porter understood Sessions to be reassuring the President that he was on the President's team.[762]

At the end of December, the President told the New York Times it was "too bad" that Sessions had recused himself from the Russia investigation.[763]  When asked whether Holder had been a more loyal Attorney General to President Obama than Sessions was to him, the President said, "I don't want to get into loyalty, but I will tell you that, I will say this: Holder protected President Obama.  Totally protected him.  When you look at the things that they did, and Holder protected the president.  And I have great respect for that, I'll be honest."[764]  Later in January, the President brought up the idea of replacing Sessions and told Porter that he wanted to "clean house" at the Department of Justice.[765]  In a meeting in the White House residence that Porter attended on January 27, 2018, Porter recalled that the President talked about the great attorneys he had in the past with successful win records, such as Roy Cohn and Jay Goldberg, and said that one of his biggest failings as President was that he had not surrounded himself with good attorneys, citing Sessions as an example.[766]  The President raised Sessions's recusal and brought up and criticized the Special Counsel's investigation.[767]

Over the next several months, the President continued to criticize Sessions in tweets and media interviews and on several occasions appeared to publicly encourage him to take action in the Russia investigation despite his recusal.[768]  On June 5, 2018, for example, the President

---

[760] SC_RRP000033 (Porter 12/6/17 Notes); *see* Porter 4/13/18 302, at 6.

[761] SC_RRP000033 (Porter 12/6/17 Notes); Porter 4/13/18 302, at 6.

[762] Porter 4/13/18 302, at 6-7.

[763] Michael S. Schmidt & Michael D. Shear, *Trump Says Russia Inquiry Makes U.S. "Look Very Bad"*, New York Times (Dec. 28, 2017).

[764] Michael S. Schmidt & Michael D. Shear, *Trump Says Russia Inquiry Makes U.S. "Look Very Bad"*, New York Times (Dec. 28, 2017).

[765] Porter 4/13/18 302, at 14.

[766] Porter 5/8/18 302, at 15.  Contemporaneous notes Porter took of the conversation state, "Roy Cohn (14-0) / Jay Goldberg (12-0)." SC_RRP000047 (Porter 1/27/18 Notes).

[767] Porter 5/8/18 302, at 15-16.

[768] *See, e.g.*, @realDonaldTrump 2/28/18 (9:34 a.m. ET) Tweet ("Why is A.G. Jeff Sessions asking the Inspector General to investigate potentially massive FISA abuse.  Will take forever, has no prosecutorial power and already late with reports on Comey etc.  Isn't the I.G. an Obama guy?  Why not use Justice Department lawyers?  DISGRACEFUL!"); @realDonaldTrump 4/7/18 (4:52 p.m. ET) Tweet ("Lawmakers of the House Judiciary Committee are angrily accusing the Department of Justice of missing the Thursday Deadline for turning over UNREDACTED Documents relating to FISA abuse, FBI, Comey, Lynch, McCabe, Clinton Emails and much more.  Slow walking – what is going on?  BAD!"); @realDonaldTrump 4/22/18 (8:22 a.m. ET) Tweet ("'GOP Lawmakers asking Sessions to Investigate Comey and Hillary Clinton.' @FoxNews  Good luck with that request!"); @realDonaldTrump 12/16/18 (3:37 p.m. ET) Tweet

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

tweeted, "The Russian Witch Hunt Hoax continues, all because Jeff Sessions didn't tell me he was going to recuse himself. . . . I would have quickly picked someone else.  So much time and money wasted, so many lives ruined . . . and Sessions knew better than most that there was No Collusion!"[769]  On August 1, 2018, the President tweeted that "Attorney General Jeff Sessions should stop this Rigged Witch Hunt right now."[770]  On August 23, 2018, the President publicly criticized Sessions in a press interview and suggested that prosecutions at the Department of Justice were politically motivated because Paul Manafort had been prosecuted but Democrats had not.[771]  The President said, "I put in an Attorney General that never took control of the Justice Department, Jeff Sessions."[772]  That day, Sessions issued a press statement that said, "I took control of the Department of Justice the day I was sworn in . . . .  While I am Attorney General, the actions of the Department of Justice will not be improperly influenced by political considerations."[773]  The next day, the President tweeted a response: "'Department of Justice will not be improperly influenced by political considerations.'  Jeff, this is GREAT, what everyone wants, so look into all of the corruption on the 'other side' including deleted Emails, Comey lies & leaks, Mueller conflicts, McCabe, Strzok, Page, Ohr, FISA abuse, Christopher Steele & his phony and corrupt Dossier, the Clinton Foundation, illegal surveillance of Trump campaign, Russian collusion by Dems – and so much more.  Open up the papers & documents without redaction?  Come on Jeff, you can do it, the country is waiting!"[774]

On November 7, 2018, the day after the midterm elections, the President replaced Sessions with Sessions's chief of staff as Acting Attorney General.[775]

## Analysis

In analyzing the President's efforts to have Sessions unrecuse himself and regain control of the Russia investigation, the following considerations and evidence are relevant to the elements of obstruction of justice:

a.  Obstructive act.  To determine if the President's efforts to have the Attorney General unrecuse could qualify as an obstructive act, it would be necessary to assess evidence on whether those actions would naturally impede the Russia investigation.  That inquiry would take into account the supervisory role that the Attorney General, if unrecused, would play in the Russia investigation.  It also would have to take into account that the Attorney General's recusal covered

("Jeff Sessions should be ashamed of himself for allowing this total HOAX to get started in the first place!").

[769] @realDonaldTrump 6/5/18 (7:31 a.m. ET) Tweet.

[770] @realDonaldTrump 8/1/18 (9:24 a.m. ET) Tweet.

[771] Fox & Friends Interview of President Trump, Fox News (Aug. 23, 2018).

[772] Fox & Friends Interview of President Trump, Fox News (Aug. 23, 2018).

[773] Sessions 8/23/18 Press Statement.

[774] @realDonaldTrump 8/24/18 (6:17 a.m. ET) Tweet; @ realDonaldTrump 8/24/18 (6:28 a.m. ET) Tweet.

[775] @realDonaldTrump 11/7/18 (2:44 p.m. ET) Tweet.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

other campaign-related matters. The inquiry would not turn on what Attorney General Sessions would actually do if unrecused, but on whether the efforts to reverse his recusal would naturally have had the effect of impeding the Russia investigation.

On multiple occasions in 2017, the President spoke with Sessions about reversing his recusal so that he could take over the Russia investigation and begin an investigation and prosecution of Hillary Clinton. For example, in early summer 2017, Sessions recalled the President asking him to unrecuse, but Sessions did not take it as a directive. When the President raised the issue again in December 2017, the President said, as recorded by Porter, "Not telling you to do anything. . . . I'm not going to get involved. I'm not going to do anything or direct you to do anything. I just want to be treated fairly." The duration of the President's efforts—which spanned from March 2017 to August 2018—and the fact that the President repeatedly criticized Sessions in public and in private for failing to tell the President that he would have to recuse is relevant to assessing whether the President's efforts to have Sessions unrecuse could qualify as obstructive acts.

b. <u>Nexus to an official proceeding</u>. As described above, by mid-June 2017, the existence of a grand jury investigation supervised by the Special Counsel was public knowledge. In addition, in July 2017, a different grand jury supervised by the Special Counsel was empaneled in the District of Columbia, and the press reported on the existence of this grand jury in early August 2017.[776] Whether the conduct towards the Attorney General would have a foreseeable impact on those proceedings turns on much of the same evidence discussed above with respect to the obstructive-act element.

c. <u>Intent</u>. There is evidence that at least one purpose of the President's conduct toward Sessions was to have Sessions assume control over the Russia investigation and supervise it in a way that would restrict its scope. By the summer of 2017, the President was aware that the Special Counsel was investigating him personally for obstruction of justice. And in the wake of the disclosures of emails about the June 9 meeting between Russians and senior members of the campaign, *see* Volume II, Section II.G, *supra*, it was evident that the investigation into the campaign now included the President's son, son-in-law, and former campaign manager. The President had previously and unsuccessfully sought to have Sessions publicly announce that the Special Counsel investigation would be confined to future election interference. Yet Sessions remained recused. In December 2017, shortly after Flynn pleaded guilty, the President spoke to Sessions in the Oval Office with only Porter present and told Sessions that he would be a hero if he unrecused. Porter linked that request to the President's desire that Sessions take back supervision of the Russia investigation and direct an investigation of Hillary Clinton. The President said in that meeting that he "just want[ed] to be treated fairly," which could reflect his perception that it was unfair that he was being investigated while Hillary Clinton was not. But a principal effect of that act would be to restore supervision of the Russia investigation to the Attorney General—a position that the President frequently suggested should be occupied by someone like Eric Holder and Bobby Kennedy, who the President described as protecting their

---

[776] *E.g.*, Del Quentin Wilbur & Byron Tau, *Special Counsel Robert Mueller Impanels Washington Grand Jury in Russia Probe*, Wall Street Journal (Aug. 3, 2017); Carol D. Leonnig et al., *Special Counsel Mueller using grand jury in federal court in Washington as part of Russia investigation*, Washington Post (Aug. 3, 2017).

presidents.  A reasonable inference from those statements and the President's actions is that the President believed that an unrecused Attorney General would play a protective role and could shield the President from the ongoing Russia investigation.

## I.     The President Orders McGahn to Deny that the President Tried to Fire the Special Counsel

### *Overview*

In late January 2018, the media reported that in June 2017 the President had ordered McGahn to have the Special Counsel fired based on purported conflicts of interest but McGahn had refused, saying he would quit instead.  After the story broke, the President, through his personal counsel and two aides, sought to have McGahn deny that he had been directed to remove the Special Counsel.  Each time he was approached, McGahn responded that he would not refute the press accounts because they were accurate in reporting on the President's effort to have the Special Counsel removed.  The President later personally met with McGahn in the Oval Office with only the Chief of Staff present and tried to get McGahn to say that the President never ordered him to fire the Special Counsel.  McGahn refused and insisted his memory of the President's direction to remove the Special Counsel was accurate.  In that same meeting, the President challenged McGahn for taking notes of his discussions with the President and asked why he had told Special Counsel investigators that he had been directed to have the Special Counsel removed.

### *Evidence*

### 1.   The Press Reports that the President Tried to Fire the Special Counsel

On January 25, 2018, the New York Times reported that in June 2017, the President had ordered McGahn to have the Department of Justice fire the Special Counsel.[777]  According to the article, "[a]mid the first wave of news media reports that Mr. Mueller was examining a possible obstruction case, the president began to argue that Mr. Mueller had three conflicts of interest that disqualified him from overseeing the investigation."[778]  The article further reported that "[a]fter receiving the president's order to fire Mr. Mueller, the White House counsel . . . refused to ask the Justice Department to dismiss the special counsel, saying he would quit instead."[779]  The article stated that the president "ultimately backed down after the White House counsel threatened to resign rather than carry out the directive."[780]  After the article was published, the President

---

[777] Michael S. Schmidt & Maggie Haberman, *Trump Ordered Mueller Fired, but Backed Off When White House Counsel Threatened to Quit*, New York Times (Jan. 25. 2018).

[778] Michael S. Schmidt & Maggie Haberman, *Trump Ordered Mueller Fired, but Backed Off When White House Counsel Threatened to Quit*, New York Times (Jan. 25. 2018).

[779] Michael S. Schmidt & Maggie Haberman, *Trump Ordered Mueller Fired, but Backed Off When White House Counsel Threatened to Quit*, New York Times (Jan. 25. 2018).

[780] Michael S. Schmidt & Maggie Haberman, *Trump Ordered Mueller Fired, but Backed Off When White House Counsel Threatened to Quit*, New York Times (Jan. 25. 2018).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

dismissed the story when asked about it by reporters, saying, "Fake news, folks.  Fake news.  A typical New York Times fake story."[781]

The next day, the Washington Post reported on the same event but added that McGahn had not told the President directly that he intended to resign rather than carry out the directive to have the Special Counsel terminated.[782]  In that respect, the Post story clarified the Times story, which could be read to suggest that McGahn had told the President of his intention to quit, causing the President to back down from the order to have the Special Counsel fired.[783]

### 2.   The President Seeks to Have McGahn Dispute the Press Reports

On January 26, 2018, the President's personal counsel called McGahn's attorney and said that the President wanted McGahn to put out a statement denying that he had been asked to fire the Special Counsel and that he had threatened to quit in protest.[784]  McGahn's attorney spoke with McGahn about that request and then called the President's personal counsel to relay that McGahn would not make a statement.[785]  McGahn's attorney informed the President's personal counsel that the Times story was accurate in reporting that the President wanted the Special Counsel removed.[786]  Accordingly, McGahn's attorney said, although the article was inaccurate in some other respects, McGahn could not comply with the President's request to dispute the story.[787]  Hicks recalled relaying to the President that one of his attorneys had spoken to McGahn's attorney about the issue.[788]

---

[781] Sophie Tatum & Kara Scannell, *Trump denies he called for Mueller's firing*, CNN (Jan. 26, 2018); Michael S. Schmidt & Maggie Haberman, *Trump Ordered Mueller Fired, but Backed Off When White House Counsel Threatened to Quit*, New York Times (Jan. 25, 2018).

[782] The *Post* article stated, "Despite internal objections, Trump decided to assert that Mueller had unacceptable conflicts of interest and moved to remove him from his position. . . .  In response, McGahn said he would not remain at the White House if Trump went through with the move. . . .  McGahn did not deliver his resignation threat directly to Trump but was serious about his threat to leave."  Rosalind S. Helderman & Josh Dawsey, *Trump moved to fire Mueller in June, bringing White House counsel to the brink of leaving*, Washington Post (Jan. 26, 2018).

[783] Rosalind S. Helderman & Josh Dawsey, *Trump moved to fire Mueller in June, bringing White House counsel to the brink of leaving*, Washington Post (Jan. 26, 2018); *see* McGahn 3/8/17 302, at 3-4.

[784] McGahn 3/8/18 302, at 3 (agent note).

[785] McGahn 3/8/18 302, at 3 (agent note).

[786] McGahn 3/8/18 302, at 3-4 (agent note).

[787] McGahn 3/8/18 302, at 4 (agent note).

[788] Hicks 3/13/18 302, at 11.  Hicks also recalled that the President spoke on the phone that day with Chief of Staff John Kelly and that the President said Kelly told him that McGahn had totally refuted the story and was going to put out a statement.  Hicks 3/13/18 302, at 11.  But Kelly said that he did not speak to McGahn when the article came out and did not tell anyone he had done so.  Kelly 8/2/18 302, at 1-2.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Also on January 26, 2017, Hicks recalled that the President asked Sanders to contact McGahn about the story.[789]  McGahn told Sanders there was no need to respond and indicated that some of the article was accurate.[790]  Consistent with that position, McGahn did not correct the *Times* story.

On February 4, 2018, Priebus appeared on Meet the Press and said he had not heard the President say that he wanted the Special Counsel fired.[791]  After Priebus's appearance, the President called Priebus and said he did a great job on Meet the Press.[792]  The President also told Priebus that the President had "never said any of those things about" the Special Counsel.[793]

The next day, on February 5, 2018, the President complained about the *Times* article to Porter.[794]  The President told Porter that the article was "bullshit" and he had not sought to terminate the Special Counsel.[795]  The President said that McGahn leaked to the media to make himself look good.[796]  The President then directed Porter to tell McGahn to create a record to make clear that the President never directed McGahn to fire the Special Counsel.[797]  Porter thought the matter should be handled by the White House communications office, but the President said he wanted McGahn to write a letter to the file "for our records" and wanted something beyond a press statement to demonstrate that the reporting was inaccurate.[798]  The President referred to McGahn as a "lying bastard" and said that he wanted a record from him.[799]  Porter recalled the President

---

[789] Hicks 3/13/18 302, at 11.  Sanders did not recall whether the President asked her to speak to McGahn or if she did it on her own.  Sanders 7/23/18 302, at 2.

[790] Sanders 7/23/18 302, at 1-2.

[791] Meet the Press Interview with Reince Priebus, NBC (Feb. 4, 2018).

[792] Priebus 4/3/18 302, at 10.

[793] Priebus 4/3/18 302, at 10.

[794] Porter 4/13/18 302, at 16-17.  Porter did not recall the timing of this discussion with the President.  Porter 4/13/18 302, at 17.  Evidence indicates it was February 5, 2018.  On the back of a pocket card dated February 5, 2018, Porter took notes that are consistent with his description of the discussion: "COS: (1) Letter from DM – Never threatened to quit – DJT never told him to fire M."  SC_RRP000053 (Porter Undated Notes).  Porter said it was possible he took the notes on a day other than February 5.  Porter 4/13/18 302, at 17.  But Porter also said that "COS" referred to matters he wanted to discuss with Chief of Staff Kelly, Porter 4/13/18 302, at 17, and Kelly took notes dated February 5, 2018, that state "POTUS – Don McGahn letter – Mueller + resigning."  WH000017684 (Kelly 2/5/18 Notes).  Kelly said he did not recall what the notes meant, but thought the President may have "mused" about having McGahn write a letter.  Kelly 8/2/18 302, at 3.  McGahn recalled that Porter spoke with him about the President's request about two weeks after the New York Times story was published, which is consistent with the discussion taking place on or about February 5.  McGahn 3/8/18 302, at 4.

[795] Porter 4/13/18 302, at 17.

[796] Porter 4/13/18 302, at 17.

[797] Porter 4/13/18 302, at 17.

[798] Porter 4/13/18 302, at 17; Porter 5/8/18 302, at 18.

[799] Porter 4/13/18 302, at 17; Porter 5/8/18 302, at 18.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

saying something to the effect of, "If he doesn't write a letter, then maybe I'll have to get rid of him."[800]

Later that day, Porter spoke to McGahn to deliver the President's message.[801]  Porter told McGahn that he had to write a letter to dispute that he was ever ordered to terminate the Special Counsel.[802]  McGahn shrugged off the request, explaining that the media reports were true.[803]  McGahn told Porter that the President had been insistent on firing the Special Counsel and that McGahn had planned to resign rather than carry out the order, although he had not personally told the President he intended to quit.[804]  Porter told McGahn that the President suggested that McGahn would be fired if he did not write the letter.[805]  McGahn dismissed the threat, saying that the optics would be terrible if the President followed through with firing him on that basis.[806]  McGahn said he would not write the letter the President had requested.[807]  Porter said that to his knowledge the issue of McGahn's letter never came up with the President again, but Porter did recall telling Kelly about his conversation with McGahn.[808]

The next day, on February 6, 2018, Kelly scheduled time for McGahn to meet with him and the President in the Oval Office to discuss the Times article.[809]  The morning of the meeting, the President's personal counsel called McGahn's attorney and said that the President was going to be speaking with McGahn and McGahn could not resign no matter what happened in the meeting.[810]

The President began the Oval Office meeting by telling McGahn that the New York Times story did not "look good" and McGahn needed to correct it.[811]  McGahn recalled the President said, "I never said to fire Mueller.  I never said 'fire.'  This story doesn't look good.  You need to correct this.  You're the White House counsel."[812]

---

[800] Porter 4/13/18 302, at 17.

[801] Porter 4/13/18 302, at 17; McGahn 3/8/18 302, at 4.

[802] Porter 4/13/18 302, at 17; McGahn 3/8/18 302, at 4.

[803] Porter 4/13/18 302, at 17; McGahn 3/8/18 302, at 4.

[804] Porter 4/13/18 302, at 17; McGahn 3/8/18 302, at 4.

[805] Porter 4/13/18 302, at 17; McGahn 3/8/18 302, at 4.

[806] Porter 4/13/18 302, at 17-18; McGahn 3/8/18 302, at 4.

[807] McGahn 3/8/18 302, at 4.

[808] Porter 4/13/18 302, at 18.

[809] McGahn 3/8/18 302, at 4; WH000017685 (Kelly 2/6/18 Notes).  McGahn recalled that, before the Oval Office meeting, he told Kelly that he was not inclined to fix the article.  McGahn 3/8/18 302, at 4.

[810] McGahn 3/8/18 302, at 5 (agent note); 2/26/19 Email, Counsel for Don McGahn to Special Counsel's Office (confirming February 6, 2018 date of call from the President's personal counsel).

[811] McGahn 3/8/18 302, at 4; Kelly 8/2/18 302, at 2.

[812] McGahn 3/8/18 302, at 4; Kelly 8/2/18 302, at 2.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

In response, McGahn acknowledged that he had not told the President directly that he planned to resign, but said that the story was otherwise accurate.[813]  The President asked McGahn, "Did I say the word 'fire'?"[814]  McGahn responded, "What you said is, 'Call Rod [Rosenstein], tell Rod that Mueller has conflicts and can't be the Special Counsel.'"[815]  The President responded, "I never said that."[816]  The President said he merely wanted McGahn to raise the conflicts issue with Rosenstein and leave it to him to decide what to do.[817]  McGahn told the President he did not understand the conversation that way and instead had heard, "Call Rod.  There are conflicts.  Mueller has to go."[818]  The President asked McGahn whether he would "do a correction," and McGahn said no.[819]  McGahn thought the President was testing his mettle to see how committed McGahn was to what happened.[820]  Kelly described the meeting as "a little tense."[821]

The President also asked McGahn in the meeting why he had told Special Counsel's Office investigators that the President had told him to have the Special Counsel removed.[822]  McGahn responded that he had to and that his conversations with the President were not protected by attorney-client privilege.[823]  The President then asked, "What about these notes?  Why do you take notes?  Lawyers don't take notes.  I never had a lawyer who took notes."[824]  McGahn responded that he keeps notes because he is a "real lawyer" and explained that notes create a record and are not a bad thing.[825]  The President said, "I've had a lot of great lawyers, like Roy Cohn.  He did not take notes."[826]

After the Oval Office meeting concluded, Kelly recalled McGahn telling him that McGahn and the President "did have that conversation" about removing the Special Counsel.[827]  McGahn recalled that Kelly said that he had pointed out to the President after the Oval Office that McGahn

---

[813] McGahn 3/8/18 302, at 4.

[814] McGahn 3/8/18 302, at 4; Kelly 8/2/18 302, at 2.

[815] McGahn 3/8/18 302, at 5.

[816] McGahn 3/8/18 302, at 5.

[817] McGahn 3/8/18 302, at 5.

[818] McGahn 3/8/18 302, at 5.

[819] McGahn 3/8/18 302, at 5; Kelly 8/2/18 302, at 2.

[820] McGahn 3/8/18 302, at 5.

[821] Kelly 8/2/18 302, at 2.

[822] McGahn 3/8/18 302, at 5.

[823] McGahn 3/8/18 302, at 5.

[824] McGahn 3/8/18 302, at 5.  McGahn said the President was referring to Donaldson's notes, which the President thought of as McGahn's notes.  McGahn 3/8/18 302, at 5.

[825] McGahn 3/8/18 302, at 5.

[826] McGahn 3/8/18 302, at 5.

[827] Kelly 8/2/18 302, at 2.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

had not backed down and would not budge.[828]  Following the Oval Office meeting, the President's personal counsel called McGahn's counsel and relayed that the President was "fine" with McGahn.[829]

### Analysis

In analyzing the President's efforts to have McGahn deny that he had been ordered to have the Special Counsel removed, the following evidence is relevant to the elements of obstruction of justice:

a.  <u>Obstructive act</u>.  The President's repeated efforts to get McGahn to create a record denying that the President had directed him to remove the Special Counsel would qualify as an obstructive act if it had the natural tendency to constrain McGahn from testifying truthfully or to undermine his credibility as a potential witness if he testified consistently with his memory, rather than with what the record said.

There is some evidence that at the time the New York Times and Washington Post stories were published in late January 2018, the President believed the stories were wrong and that he had never told McGahn to have Rosenstein remove the Special Counsel.  The President correctly understood that McGahn had not told the President directly that he planned to resign.  In addition, the President told Priebus and Porter that he had not sought to terminate the Special Counsel, and in the Oval Office meeting with McGahn, the President said, "I never said to fire Mueller.  I never said 'fire.'"  That evidence could indicate that the President was not attempting to persuade McGahn to change his story but was instead offering his own—but different—recollection of the substance of his June 2017 conversations with McGahn and McGahn's reaction to them.

Other evidence cuts against that understanding of the President's conduct.  As previously described, *see* Volume II, Section II.E, *supra*, substantial evidence supports McGahn's account that the President had directed him to have the Special Counsel removed, including the timing and context of the President's directive; the manner in which McGahn reacted; and the fact that the President had been told the conflicts were insubstantial, were being considered by the Department of Justice, and should be raised with the President's personal counsel rather than brought to McGahn.  In addition, the President's subsequent denials that he had told McGahn to have the Special Counsel removed were carefully worded.  When first asked about the New York Times story, the President said, "Fake news, folks.  Fake news.  A typical New York Times fake story."  And when the President spoke with McGahn in the Oval Office, he focused on whether he had used the word "fire," saying, "I never said to fire Mueller.  I never said 'fire'" and "Did I say the word 'fire'?"  The President's assertion in the Oval Office meeting that he had never directed McGahn to have the Special Counsel removed thus runs counter to the evidence.

In addition, even if the President sincerely disagreed with McGahn's memory of the June 17, 2017 events, the evidence indicates that the President knew by the time of the Oval Office

---

[828] McGahn 3/8/18 302, at 5.  Kelly did not recall discussing the Oval Office meeting with the President after the fact.  Kelly 8/2/18 302, at 2.  Handwritten notes taken by Kelly state, "Don[:] Mueller discussion in June. - Bannon Priebus - came out okay."  WH000017685 (Kelly 2/6/18 Notes).

[829] McGahn 3/8/18 302, at 5 (agent note).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

meeting that McGahn's account differed and that McGahn was firm in his views. Shortly after the story broke, the President's counsel told McGahn's counsel that the President wanted McGahn to make a statement denying he had been asked to fire the Special Counsel, but McGahn responded through his counsel that that aspect of the story was accurate and he therefore could not comply with the President's request. The President then directed Sanders to tell McGahn to correct the story, but McGahn told her he would not do so because the story was accurate in reporting on the President's order. Consistent with that position, McGahn never issued a correction. More than a week later, the President brought up the issue again with Porter, made comments indicating the President thought McGahn had leaked the story, and directed Porter to have McGahn create a record denying that the President had tried to fire the Special Counsel. At that point, the President said he might "have to get rid of" McGahn if McGahn did not comply. McGahn again refused and told Porter, as he had told Sanders and as his counsel had told the President's counsel, that the President had in fact ordered him to have Rosenstein remove the Special Counsel. That evidence indicates that by the time of the Oval Office meeting the President was aware that McGahn did not think the story was false and did not want to issue a statement or create a written record denying facts that McGahn believed to be true. The President nevertheless persisted and asked McGahn to repudiate facts that McGahn had repeatedly said were accurate.

   b.   Nexus to an official proceeding. By January 2018, the Special Counsel's use of a grand jury had been further confirmed by the return of several indictments. The President also was aware that the Special Counsel was investigating obstruction-related events because, among other reasons, on January 8, 2018, the Special Counsel's Office provided his counsel with a detailed list of topics for a possible interview with the President.[830] The President knew that McGahn had personal knowledge of many of the events the Special Counsel was investigating and that McGahn had already been interviewed by Special Counsel investigators. And in the Oval Office meeting, the President indicated he knew that McGahn had told the Special Counsel's Office about the President's effort to remove the Special Counsel. The President challenged McGahn for disclosing that information and for taking notes that he viewed as creating unnecessary legal exposure. That evidence indicates the President's awareness that the June 17, 2017 events were relevant to the Special Counsel's investigation and any grand jury investigation that might grow out of it.

   To establish a nexus, it would be necessary to show that the President's actions would have the natural tendency to affect such a proceeding or that they would hinder, delay, or prevent the communication of information to investigators. Because McGahn had spoken to Special Counsel investigators before January 2018, the President could not have been seeking to influence his prior statements in those interviews. But because McGahn had repeatedly spoken to investigators and the obstruction inquiry was not complete, it was foreseeable that he would be interviewed again on obstruction-related topics. If the President were focused solely on a press strategy in seeking to have McGahn refute the New York Times article, a nexus to a proceeding or to further investigative interviews would not be shown. But the President's efforts to have McGahn write a letter "for our records" approximately ten days after the stories had come out—well past the typical

---

[830] 1/29/18 Letter, President's Personal Counsel to Special Counsel's Office, at 1-2 ("In our conversation of January 8, your office identified the following topics as areas you desired to address with the President in order to complete your investigation on the subjects of alleged collusion and obstruction of justice"; listing 16 topics).

time to issue a correction for a news story—indicates the President was not focused solely on a press strategy, but instead likely contemplated the ongoing investigation and any proceedings arising from it.

c.   Intent.   Substantial evidence indicates that in repeatedly urging McGahn to dispute that he was ordered to have the Special Counsel terminated, the President acted for the purpose of influencing McGahn's account in order to deflect or prevent further scrutiny of the President's conduct towards the investigation.

Several facts support that conclusion.  The President made repeated attempts to get McGahn to change his story.  As described above, by the time of the last attempt, the evidence suggests that the President had been told on multiple occasions that McGahn believed the President had ordered him to have the Special Counsel terminated.  McGahn interpreted his encounter with the President in the Oval Office as an attempt to test his mettle and see how committed he was to his memory of what had occurred.  The President had already laid the groundwork for pressing McGahn to alter his account by telling Porter that it might be necessary to fire McGahn if he did not deny the story, and Porter relayed that statement to McGahn.  Additional evidence of the President's intent may be gleaned from the fact that his counsel was sufficiently alarmed by the prospect of the President's meeting with McGahn that he called McGahn's counsel and said that McGahn could not resign no matter what happened in the Oval Office that day.  The President's counsel was well aware of McGahn's resolve not to issue what he believed to be a false account of events despite the President's request.  Finally, as noted above, the President brought up the Special Counsel investigation in his Oval Office meeting with McGahn and criticized him for telling this Office about the June 17, 2017 events.   The President's statements reflect his understanding—and his displeasure—that those events would be part of an obstruction-of-justice inquiry.

**J.      The President's Conduct Towards Flynn, Manafort, HOM**

### Overview

In addition to the interactions with McGahn described above, the President has taken other actions directed at possible witnesses in the Special Counsel's investigation, including Flynn, Manafort, HOM and as described in the next section, Cohen.  When Flynn withdrew from a joint defense agreement with the President, the President's personal counsel stated that Flynn's actions would be viewed as reflecting "hostility" towards the President.  During Manafort's prosecution and while the jury was deliberating, the President repeatedly stated that Manafort was being treated unfairly and made it known that Manafort could receive a pardon. Harm to Ongoing Matter

### Evidence

1.   Conduct Directed at Michael Flynn

As previously noted, see Volume II, Section II.B, *supra*, the President asked for Flynn's resignation on February 13, 2017.  Following Flynn's resignation, the President made positive public comments about Flynn, describing him as a "wonderful man," "a fine person," and a "very

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

good person."[831] The President also privately asked advisors to pass messages to Flynn conveying that the President still cared about him and encouraging him to stay strong.[832]

In late November 2017, Flynn began to cooperate with this Office. On November 22, 2017, Flynn withdrew from a joint defense agreement he had with the President.[833] Flynn's counsel told the President's personal counsel and counsel for the White House that Flynn could no longer have confidential communications with the White House or the President.[834] Later that night, the President's personal counsel left a voicemail for Flynn's counsel that said:

> I understand your situation, but let me see if I can't state it in starker terms. . . . [I]t wouldn't surprise me if you've gone on to make a deal with . . . the government. . . . [I]f . . . there's information that implicates the President, then we've got a national security issue, . . . so, you know, . . . we need some kind of heads up. Um, just for the sake of protecting all our interests if we can. . . . [R]emember what we've always said about the President and his feelings toward Flynn and, that still remains . . . .[835]

On November 23, 2017, Flynn's attorneys returned the call from the President's personal counsel to acknowledge receipt of the voicemail.[836] Flynn's attorneys reiterated that they were no longer in a position to share information under any sort of privilege.[837] According to Flynn's attorneys, the President's personal counsel was indignant and vocal in his disagreement.[838] The President's personal counsel said that he interpreted what they said to him as a reflection of Flynn's

---

[831] *See, e.g., Remarks by President Trump in Press Conference*, White House (Feb. 16, 2018) (stating that "Flynn is a fine person" and "I don't think [Flynn] did anything wrong. If anything, he did something right . . . You know, he was just doing his job"); *Interview of Donald J. Trump*, NBC (May 11, 2017) (stating that Flynn is a "very good person").

[832] *See* Priebus 1/18/17 302, at 9-10 (the President asked Priebus to contact Flynn the week he was terminated to convey that the President still cared about him and felt bad about what happened to him; Priebus thought the President did not want Flynn to have a problem with him); McFarland 12/22/17 302, at 18 (about a month or two after Flynn was terminated, the President asked McFarland to get in touch with Flynn and tell him that he was a good guy, he should stay strong, and the President felt bad for him); Flynn 1/19/18 302, at 9 (recalling the call from Priebus and an additional call from Hicks who said she wanted to relay on behalf of the President that the President hoped Flynn was okay); Christie 2/13/19 302, at 3 (describing a phone conversation between Kushner and Flynn the day after Flynn was fired where Kushner said, "You know the President respects you. The President cares about you. I'll get the President to send out a positive tweet about you later," and the President nodded his assent to Kushner's comment promising a tweet).

[833] Counsel for Flynn 3/1/18 302, at 1.

[834] Counsel for Flynn 3/1/18 302, at 1.

[835] 11/22/17 Voicemail Transcript, President's Personal Counsel to Counsel for Michael Flynn.

[836] Counsel for Flynn 3/1/18 302, at 1.

[837] Counsel for Flynn 3/1/18 302, at 1.

[838] Counsel for Flynn 3/1/18 302, at 1.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

hostility towards the President and that he planned to inform his client of that interpretation.[839] Flynn's attorneys understood that statement to be an attempt to make them reconsider their position because the President's personal counsel believed that Flynn would be disturbed to know that such a message would be conveyed to the President.[840]

On December 1, 2017, Flynn pleaded guilty to making false statements pursuant to a cooperation agreement.[841]  The next day, the President told the press that he was not concerned about what Flynn might tell the Special Counsel.[842]  In response to a question about whether the President still stood behind Flynn, the President responded, "We'll see what happens."[843]  Over the next several days, the President made public statements expressing sympathy for Flynn and indicating he had not been treated fairly.[844]  On December 15, 2017, the President responded to a press inquiry about whether he was considering a pardon for Flynn by saying, "I don't want to talk about pardons for Michael Flynn yet.  We'll see what happens.  Let's see.  I can say this: When you look at what's gone on with the FBI and with the Justice Department, people are very, very angry."[845]

### 2. Conduct Directed at Paul Manafort

On October 27, 2017, a grand jury in the District of Columbia indicted Manafort and former deputy campaign manager Richard Gates on multiple felony counts, and on February 22, 2018, a grand jury in the Eastern District of Virginia indicted Manafort and Gates on additional felony

---

[839] Counsel for Flynn 3/1/18 302, at 2.  Because of attorney-client privilege issues, we did not seek to interview the President's personal counsel about the extent to which he discussed his statements to Flynn's attorneys with the President.

[840] Counsel for Flynn 3/1/18 302, at 2.

[841] Information, *United States v. Michael T. Flynn*, 1:17-cr-232 (D.D.C. Dec. 1, 2017), Doc. 1; Plea Agreement, *United States v. Michael T. Flynn*, 1:17-cr-232 (D.D.C. Dec. 1, 2017), Doc. 3.

[842] *President Trump Remarks on Tax Reform and Michael Flynn's Guilty Plea*, C-SPAN (Dec. 2, 2017).

[843] *President Trump Remarks on Tax Reform and Michael Flynn's Guilty Plea*, C-SPAN (Dec. 2, 2017).

[844] *See* @realDonaldTrump 12/2/17 (9:06 p.m. ET) Tweet ("So General Flynn lies to the FBI and his life is destroyed, while Crooked Hillary Clinton, on that now famous FBI holiday 'interrogation' with no swearing in and no recording, lies many times . . . and nothing happens to her?  Rigged system, or just a double standard?"); President Trump Departure Remarks, C-SPAN (Dec. 4, 2017) ("Well, I feel badly for General Flynn.  I feel very badly.  He's led a very strong life.  And I feel very badly.").

[845] *President Trump White House Departure*, C-SPAN (Dec. 15, 2017).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

counts.[846]  The charges in both cases alleged criminal conduct by Manafort that began as early as 2005 and continued through 2018.[847]

In January 2018, Manafort told Gates that he had talked to the President's personal counsel and they were "going to take care of us."[848]  Manafort told Gates it was stupid to plead, saying that he had been in touch with the President's personal counsel and repeating that they should "sit tight" and "we'll be taken care of."[849]  Gates asked Manafort outright if anyone mentioned pardons and Manafort said no one used that word.[850]

As the proceedings against Manafort progressed in court, the President told Porter that he never liked Manafort and that Manafort did not know what he was doing on the campaign.[851]  The President discussed with aides whether and in what way Manafort might be cooperating with the Special Counsel's investigation, and whether Manafort knew any information that would be harmful to the President.[852]

In public, the President made statements criticizing the prosecution and suggesting that Manafort was being treated unfairly.  On June 15, 2018, before a scheduled court hearing that day on whether Manafort's bail should be revoked based on new charges that Manafort had tampered with witnesses while out on bail, the President told the press, "I feel badly about a lot of them

---

[846] Indictment, *United States v. Paul J. Manafort, Jr. and Richard W. Gates III*, 1:17-cr-201 (D.D.C. Oct, 27, 2017), Doc. 13 ("*Manafort and Gates* D.D.C. Indictment"); Indictment, *United States v. Paul J. Manafort, Jr. and Richard W. Gates III*, 1:18-cr-83 (E.D. Va. Feb. 22, 2018), Doc. 9 ("*Manafort and Gates* E.D. Va. Indictment")

[847] *Manafort and Gates* D.D.C. Indictment; *Manafort and Gates* E.D. Va. Indictment.

[848] Gates 4/18/18 302, at 4.  In February 2018, Gates pleaded guilty, pursuant to a cooperation plea agreement, to a superseding criminal information charging him with conspiring to defraud and commit multiple offenses (*i.e.*, tax fraud, failure to report foreign bank accounts, and acting as an unregistered agent of a foreign principal) against the United States, as well as making false statements to our Office.  Superseding Criminal Information, *United States v. Richard W. Gates III*, 1:17-cr-201 (D.D.C. Feb. 23, 2018), Doc. 195; Plea Agreement, *United States v. Richard W. Gates III*, 1:17-cr-201 (D.D.C. Feb. 23, 2018), Doc. 205.  Gates has provided information and in-court testimony that the Office has deemed to be reliable.

[849] Gates 4/18/18 302, at 4.

[850] Gates 4/18/18 302, at 4.  Manafort told this Office that he never told Gates that he had talked to the President's personal counsel or suggested that they would be taken care of.  Manafort also said he hoped for a pardon but never discussed one with the President, although he noticed the President's public comments about pardons.  Manafort 10/1/18 302, at 11.  As explained in Volume I, Section IV.A.8, *supra*, Manafort entered into a plea agreement with our Office.  The U.S. District Court for the District of Columbia determined that he breached the agreement by being untruthful in proffer sessions and before the grand jury.  Order, *United States v. Manafort*, 1:17-cr-201 (D.D.C. Feb. 13, 2019), Doc. 503.

[851] Porter 5/8/18 302, at 11.  Priebus recalled that the President never really liked Manafort.  *See* Priebus 4/3/18 302, at 11.  Hicks said that candidate Trump trusted Manafort's judgment while he worked on the Campaign, but she also once heard Trump tell Gates to keep an eye on Manafort.  Hicks 3/13/18 302, at 16.

[852] Porter 5/8/18 302, at 11; McGahn 12/14/17 302, at 14.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

because I think a lot of it is very unfair.  I mean, I look at some of them where they go back 12 years.  Like Manafort has nothing to do with our campaign.  But I feel so—I tell you, I feel a little badly about it.  They went back 12 years to get things that he did 12 years ago? . . .  I feel badly for some people, because they've gone back 12 years to find things about somebody, and I don't think it's right."[853]  In response to a question about whether he was considering a pardon for Manafort or other individuals involved in the Special Counsel's investigation, the President said, "I don't want to talk about that.  No, I don't want to talk about that. . . .  But look, I do want to see people treated fairly.  That's what it's all about."[854]  Hours later, Manafort's bail was revoked and the President tweeted, "Wow, what a tough sentence for Paul Manafort, who has represented Ronald Reagan, Bob Dole and many other top political people and campaigns.  Didn't know Manafort was the head of the Mob.  What about Comey and Crooked Hillary and all the others?  Very unfair!"[855]

Immediately following the revocation of Manafort's bail, the President's personal lawyer, Rudolph Giuliani, gave a series of interviews in which he raised the possibility of a pardon for Manafort.  Giuliani told the New York Daily News that "[w]hen the whole thing is over, things might get cleaned up with some presidential pardons."[856]  Giuliani also said in an interview that, although the President should not pardon anyone while the Special Counsel's investigation was ongoing, "when the investigation is concluded, he's kind of on his own, right?"[857]  In a CNN interview two days later, Giuliani said, "I guess I should clarify this once and for all. . . .  The president has issued no pardons in this investigation.  The president is not going to issue pardons in this investigation. . . .  When it's over, hey, he's the president of the United States.  He retains his pardon power.  Nobody is taking that away from him."[858]  Giuliani rejected the suggestion that his and the President's comments could signal to defendants that they should not cooperate in a criminal prosecution because a pardon might follow, saying the comments were "certainly not intended that way."[859]  Giuliani said the comments only acknowledged that an individual involved in the investigation would not be "excluded from [a pardon], if in fact the president and his advisors . . . come to the conclusion that you have been treated unfairly."[860]  Giuliani observed that pardons were not unusual in political investigations but said, "That doesn't mean they're going to happen

---

[853] Remarks by President Trump in Press Gaggle, White House (June 15, 2018).

[854] Remarks by President Trump in Press Gaggle, White House (June 15, 2018).

[855] @realDonaldTrump 6/15/18 (1:41 p.m. ET) Tweet.

[856] Chris Sommerfeldt, *Rudy Giuliani says Mueller probe 'might get cleaned up' with 'presidential pardons' in light of Paul Manafort going to jail*, New York Daily News (June 15, 2018).

[857] Sharon LaFraniere, *Judge Orders Paul Manafort Jailed Before Trial, Citing New Obstruction Charges*, New York Times (June 15, 2018) (quoting Giuliani).

[858] *State of the Union with Jake Tapper Transcript*, CNN (June 17, 2018); *see* Karoun Demirjian, *Giuliani suggests Trump may pardon Manafort after Mueller's probe*, Washington Post (June 17, 2018).

[859] *State of the Union with Jake Tapper Transcript*, CNN (June 17, 2018).

[860] *State of the Union with Jake Tapper Transcript*, CNN (June 17, 2018).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

here. Doesn't mean that anybody should rely on it. . . . Big signal is, nobody has been pardoned yet."[861]

On July 31, 2018, Manafort's criminal trial began in the Eastern District of Virginia, generating substantial news coverage.[862]  The next day, the President tweeted, "This is a terrible situation and Attorney General Jeff Sessions should stop this Rigged Witch Hunt right now, before it continues to stain our country any further.  Bob Mueller is totally conflicted, and his 17 Angry Democrats that are doing his dirty work are a disgrace to USA!"[863]  Minutes later, the President tweeted, "Paul Manafort worked for Ronald Reagan, Bob Dole and many other highly prominent and respected political leaders.  He worked for me for a very short time.  Why didn't government tell me that he was under investigation.  These old charges have nothing to do with Collusion—a Hoax!"[864]  Later in the day, the President tweeted, "Looking back on history, who was treated worse, Alfonse Capone, legendary mob boss, killer and 'Public Enemy Number One,' or Paul Manafort, political operative & Reagan/Dole darling, now serving solitary confinement—although convicted of nothing?  Where is the Russian Collusion?"[865]  The President's tweets about the Manafort trial were widely covered by the press.[866]  When asked about the President's tweets, Sanders told the press, "Certainly, the President's been clear.  He thinks Paul Manafort's been treated unfairly."[867]

On August 16, 2018, the Manafort case was submitted to the jury and deliberations began.  At that time, Giuliani had recently suggested to reporters that the Special Counsel investigation needed to be "done in the next two or three weeks,"[868] and media stories reported that a Manafort acquittal would add to criticism that the Special Counsel investigation was not worth the time and expense, whereas a conviction could show that ending the investigation would be premature.[869]

---

[861] *State of the Union with Jake Tapper Transcript*, CNN (June 17, 2018).

[862] *See, e.g.*, Katelyn Polantz, *Takeaways from day one of the Paul Manafort trial*, CNN (July 31, 2018); Frank Bruni, *Paul Manafort's Trial Is Donald Trump's, Too*, New York Times Opinion (July 31, 2018); Rachel Weiner et al., *Paul Manafort trial Day 2: Witnesses describe extravagant clothing purchases, home remodels, lavish cars paid with wire transfers*, Washington Post (Aug. 1, 2018).

[863] @realDonaldTrump 8/1/18 (9:24 a.m. ET) Tweet.  Later that day, when Sanders was asked about the President's tweet, she told reporters, "It's not an order.  It's the President's opinion."  Sarah Sanders, *White House Daily Briefing*, C-SPAN (Aug. 1, 2018).

[864] @realDonaldTrump 8/1/18 (9:34 a.m. ET) Tweet.

[865] @realDonaldTrump 8/1/18 (11:35 a.m. ET) Tweet.

[866] *See, e.g.*, Carol D. Leonnig et al., *Trump calls Manafort prosecution "a hoax," says Sessions should stop Mueller investigation "right now"*, Washington Post (Aug. 1, 2018); Louis Nelson, *Trump claims Manafort case has "nothing to do with collusion"*, Politico (Aug. 1. 2018).

[867] Sarah Sanders, *White House Daily Briefing*, C-SPAN (Aug. 1, 2018).

[868] Chris Strohm & Shannon Pettypiece, *Mueller Probe Doesn't Need to Shut Down Before Midterms, Officials Say*, Bloomberg (Aug. 15, 2018).

[869] *See, e.g.*, Katelyn Polantz et al., *Manafort jury ends first day of deliberations without a verdict*, CNN (Aug. 16, 2018); David Voreacos, *What Mueller's Manafort Case Means for the Trump Battle to*

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

On August 17, 2018, as jury deliberations continued, the President commented on the trial from the South Lawn of the White House. In an impromptu exchange with reporters that lasted approximately five minutes, the President twice called the Special Counsel's investigation a "rigged witch hunt."[870] When asked whether he would pardon Manafort if he was convicted, the President said, "I don't talk about that now. I don't talk about that."[871] The President then added, without being asked a further question, "I think the whole Manafort trial is very sad when you look at what's going on there. I think it's a very sad day for our country. He worked for me for a very short period of time. But you know what, he happens to be a very good person. And I think it's very sad what they've done to Paul Manafort."[872] The President did not take further questions.[873] In response to the President's statements, Manafort's attorney said, "Mr. Manafort really appreciates the support of President Trump."[874]

On August 21, 2018, the jury found Manafort guilty on eight felony counts. Also on August 21, Michael Cohen pleaded guilty to eight offenses, including a campaign-finance violation that he said had occurred "in coordination with, and at the direction of, a candidate for federal office."[875] The President reacted to Manafort's convictions that day by telling reporters, "Paul Manafort's a good man" and "it's a very sad thing that happened."[876] The President described the Special Counsel's investigation as "a witch hunt that ends in disgrace."[877] The next day, the President tweeted, "I feel very badly for Paul Manafort and his wonderful family. 'Justice' took a 12 year old tax case, among other things, applied tremendous pressure on him and, unlike Michael Cohen, he refused to 'break'—make up stories in order to get a 'deal.' Such respect for a brave man!"[878]

In a Fox News interview on August 22, 2018, the President said: "[Cohen] makes a better deal when he uses me, like everybody else. And one of the reasons I respect Paul Manafort so much is he went through that trial—you know they make up stories. People make up stories. This

---

*Come*, Bloomberg (Aug. 2, 2018); Gabby Morrongiello, *What a guilty verdict for Manafort would mean for Trump and Mueller*, Washington Examiner (Aug. 18, 2018).

[870] President Trump Remarks on John Brennan and Mueller Probe, C-SPAN (Aug. 17, 2018).

[871] President Trump Remarks on John Brennan and Mueller Probe, C-SPAN (Aug. 17, 2018).

[872] President Trump Remarks on John Brennan and Mueller Probe, C-SPAN (Aug. 17, 2018).

[873] President Trump Remarks on John Brennan and Mueller Probe, C-SPAN (Aug. 17, 2018).

[874] *Trump calls Manafort "very good person,"* All In with Chris Hayes (Aug. 17, 2018) (transcript); *Manafort lawyer: We appreciate Trump's support,* CNN (Aug. 17, 2018) (https://www.cnn.com/videos/politics/2018/08/17/paul-manafort-attorney-trump-jury-deliberations-schneider-lead-vpx.cnn).

[875] Transcript at 23, *United States v. Michael Cohen*, 1:18-cr-602 (S.D.N.Y. Aug. 21, 2018), Doc. 7 (*Cohen* 8/21/18 Transcript).

[876] *President Trump Remarks on Manafort Trial*, C-SPAN (Aug. 21, 2018).

[877] *President Trump Remarks on Manafort Trial*, C-SPAN (Aug. 21, 2018).

[878] @realDonaldTrump 8/22/18 (9:21 a.m. ET) Tweet.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

whole thing about flipping, they call it, I know all about flipping."[879]   The President said that flipping was "not fair" and "almost ought to be outlawed."[880]   In response to a question about whether he was considering a pardon for Manafort, the President said, "I have great respect for what he's done, in terms of what he's gone through. . . . He worked for many, many people many, many years, and I would say what he did, some of the charges they threw against him, every consultant, every lobbyist in Washington probably does."[881]   Giuliani told journalists that the President "really thinks Manafort has been horribly treated" and that he and the President had discussed the political fallout if the President pardoned Manafort.[882]   The next day, Giuliani told the Washington Post that the President had asked his lawyers for advice on the possibility of a pardon for Manafort and other aides, and had been counseled against considering a pardon until the investigation concluded.[883]

On September 14, 2018, Manafort pleaded guilty to charges in the District of Columbia and signed a plea agreement that required him to cooperate with investigators.[884]   Giuliani was reported to have publicly said that Manafort remained in a joint defense agreement with the President following Manafort's guilty plea and agreement to cooperate, and that Manafort's attorneys regularly briefed the President's lawyers on the topics discussed and the information Manafort had provided in interviews with the Special Counsel's Office.[885]   On November 26, 2018, the Special Counsel's Office disclosed in a public court filing that Manafort had breached his plea agreement by lying about multiple subjects.[886]   The next day, Giuliani said that the President had been "upset for weeks" about what he considered to be "the un-American, horrible treatment of

[879] *Fox & Friends Exclusive Interview with President Trump*, Fox News (Aug. 23, 2018) (recorded the previous day).

[880] *Fox & Friends Exclusive Interview with President Trump*, Fox News (Aug. 23, 2018) (recorded the previous day).

[881] *Fox & Friends Exclusive Interview with President Trump*, Fox News (Aug. 23, 2018) (recorded the previous day).

[882] Maggie Haberman & Katie Rogers, *"How Did We End Up Here?" Trump Wonders as the White House Soldiers On*, New York Times (Aug. 22, 2018).

[883] Carol D. Leonnig & Josh Dawsey, *Trump recently sought his lawyers' advice on possibility of pardoning Manafort, Giuliani says*, Washington Post (Aug. 23, 2018).

[884] Plea Agreement, *United States v. Paul J. Manafort, Jr.*, 1:17-cr-201 (D.D.C. Sept. 14, 2018), Doc. 422.

[885] Karen Freifeld & Nathan Layne, *Trump lawyer: Manafort said nothing damaging in Mueller interviews*, Reuters (Oct. 22, 2018); Michael S. Schmidt et al., *Manafort's Lawyer Said to Brief Trump Attorneys on What He Told Mueller*, New York Times (Nov. 27, 2018); Dana Bash, *Manafort team briefed Giuliani on Mueller meetings*, CNN, Posted 11/28/18, *available at* https://www.cnn.com/videos/politics/2018/11/28/manafort-lawyers-keeping-trump-lawyers-giuliani-updated-mueller-probe-bash-sot-nr-vpx.cnn; *see* Sean Hannity, *Interview with Rudy Giuliani*, Fox News (Sept. 14, 2018) (Giuliani: "[T]here was a quote put out by a source close to Manafort that the plea agreement has, and cooperation agreement has, nothing to do with the Trump campaign. . . . Now, I know that because I've been privy to a lot of facts I can't repeat.").

[886] Joint Status Report, *United States v. Paul J. Manafort, Jr.*, (D.D.C Nov. 26, 2018), Doc. 455.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Manafort."[887]  In an interview on November 28, 2018, the President suggested that it was "very brave" that Manafort did not "flip":

> If you told the truth, you go to jail.  You know this flipping stuff is terrible.  You flip and you lie and you get—the prosecutors will tell you 99 percent of the time they can get people to flip.  It's rare that they can't.  But I had three people: Manafort, Corsi—I don't know Corsi, but he refuses to say what they demanded.[888]  Manafort, Corsi `HOM`          .  It's actually very brave.[889]

In response to a question about a potential pardon for Manafort, the President said, "It was never discussed, but I wouldn't take it off the table.  Why would I take it off the table?"[890]

3.  **Harm to Ongoing Matter**

**Harm to Ongoing Matter**

[891] **Harm to Ongoing Matter**

[892] **Harm to Ongoing Matter**

93

**Harm to Ongoing Matter**

[894] **Harm to Ongoing Matter**

---

[887] Stephen Collinson, *Trump appears consumed by Mueller investigation as details emerge*, CNN (Nov. 29, 2018).

[888] "Corsi" is a reference to Jerome Corsi, `HOM`             who was involved in efforts to coordinate with WikiLeaks and Assange, and who stated publicly at that time that he had refused a plea offer from the Special Counsel's Office because he was "not going to sign a lie."  Sara Murray & Eli Watkins, `HOM`         *says he won't agree to plea deal*, CNN (Nov. 26, 2018).

[889] Marisa Schultz & Nikki Schwab, *Oval Office Interview with President Trump: Trump says pardon for Paul Manafort still a possibility*, New York Post (Nov. 28, 2018).  That same day, the President tweeted:  "While the disgusting Fake News is doing everything within their power not to report it that way, at least 3 major players are intimating that the Angry Mueller Gang of Dems is viciously telling witnesses to lie about facts & they will get relief.  This is our Joseph McCarthy Era!"  @realDonaldTrump 11/28/18 (8:39 a.m. ET) Tweet.

[890] Marisa Schultz & Nikki Schwab, *New York Post Oval Office Interview with President Trump: Trump says pardon for Paul Manafort still a possibility*, New York Post (Nov. 28, 2018).

[891] **Harm to Ongoing Matter**

[892] **Harm to Ongoing Matter**

[893] **Harm to Ongoing Matter**

[894] **Harm to Ongoing Matter**

128

U.S. Department of Justice

Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

Harm to Ongoing Matter

Harm to Ongoing Matter

Harm to Ongoing Matter

Harm to Ongoing Matter

Harm to Ongoing Matter

Harm to Ongoing Matter
Harm to Ongoing Matter
Harm to Ongoing Matter

Harm to Ongoing Matter

895 Harm to Ongoing Matter

896 Harm to Ongoing Matter

897 Harm to Ongoing Matter

898 Harm to Ongoing Matter

899 Harm to Ongoing Matter

129

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

**Harm to Ongoing Matter**

00

**Harm to Ongoing Matter**

901 **Harm to Ongoing Matter**

02 **Harm to Ongoing Matter**

903

**Harm to Ongoing Matter**

04

**Harm to Ongoing Matter**

05

**Harm to Ongoing Matter**

06

**Harm to Ongoing Matter**
**Harm to Ongoing Matter**

907

08

900 **Harm to Ongoing Matter**
901 **Harm to Ongoing Matter**

902 **Harm to Ongoing Matter**

903 **Harm to Ongoing Matter**

904 **Harm to Ongoing Matter**

905 **Harm to Ongoing Matter**
906 **Harm to Ongoing Matter**

907 **Harm to Ongoing Matter**
908 **Harm to Ongoing Matter**

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

### *Analysis*

In analyzing the President's conduct towards Flynn, Manafort, <span>HOM</span>, the following evidence is relevant to the elements of obstruction of justice:

a. <u>Obstructive act</u>. The President's actions towards witnesses in the Special Counsel's investigation would qualify as obstructive if they had the natural tendency to prevent particular witnesses from testifying truthfully, or otherwise would have the probable effect of influencing, delaying, or preventing their testimony to law enforcement.

With regard to Flynn, the President sent private and public messages to Flynn encouraging him to stay strong and conveying that the President still cared about him before he began to cooperate with the government. When Flynn's attorneys withdrew him from a joint defense agreement with the President, signaling that Flynn was potentially cooperating with the government, the President's personal counsel initially reminded Flynn's counsel of the President's warm feelings towards Flynn and said "that still remains." But when Flynn's counsel reiterated that Flynn could no longer share information under a joint defense agreement, the President's personal counsel stated that the decision would be interpreted as reflecting Flynn's hostility towards the President. That sequence of events could have had the potential to affect Flynn's decision to cooperate, as well as the extent of that cooperation. Because of privilege issues, however, we could not determine whether the President was personally involved in or knew about the specific message his counsel delivered to Flynn's counsel.

With respect to Manafort, there is evidence that the President's actions had the potential to influence Manafort's decision whether to cooperate with the government. The President and his personal counsel made repeated statements suggesting that a pardon was a possibility for Manafort, while also making it clear that the President did not want Manafort to "flip" and cooperate with the government. On June 15, 2018, the day the judge presiding over Manafort's D.C. case was considering whether to revoke his bail, the President said that he "felt badly" for Manafort and stated, "I think a lot of it is very unfair." And when asked about a pardon for Manafort, the President said, "I do want to see people treated fairly. That's what it's all about." Later that day, after Manafort's bail was revoked, the President called it a "tough sentence" that was "Very unfair!" Two days later, the President's personal counsel stated that individuals involved in the Special Counsel's investigation could receive a pardon "if in fact the [P]resident and his advisors . . . come to the conclusion that you have been treated unfairly"—using language that paralleled how the President had already described the treatment of Manafort. Those statements, combined with the President's commendation of Manafort for being a "brave man" who "refused to 'break'," suggested that a pardon was a more likely possibility if Manafort continued not to cooperate with the government. And while Manafort eventually pleaded guilty pursuant to a cooperation agreement, he was found to have violated the agreement by lying to investigators.

The President's public statements during the Manafort trial, including during jury deliberations, also had the potential to influence the trial jury. On the second day of trial, for example, the President called the prosecution a "terrible situation" and a "hoax" that "continues to stain our country" and referred to Manafort as a "Reagan/Dole darling" who was "serving solitary confinement" even though he was "convicted of nothing." Those statements were widely picked up by the press. While jurors were instructed not to watch or read news stories about the case and

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

are presumed to follow those instructions, the President's statements during the trial generated substantial media coverage that could have reached jurors if they happened to see the statements or learned about them from others. And the President's statements during jury deliberations that Manafort "happens to be a very good person" and that "it's very sad what they've done to Paul Manafort" had the potential to influence jurors who learned of the statements, which the President made just as jurors were considering whether to convict or acquit Manafort.

**Harm to Ongoing Matter**

 

b.    Nexus to an official proceeding. The President's actions towards Flynn, Manafort, **HOM** appear to have been connected to pending or anticipated official proceedings involving each individual. The President's conduct towards Flynn **HOM** principally occurred when both were under criminal investigation by the Special Counsel's Office and press reports speculated about whether they would cooperate with the Special Counsel's investigation. And the President's conduct towards Manafort was directly connected to the official proceedings involving him. The President made statements about Manafort and the charges against him during Manafort's criminal trial. And the President's comments about the prospect of Manafort "flipping" occurred when it was clear the Special Counsel continued to oversee grand jury proceedings.

c.    Intent. Evidence concerning the President's intent related to Flynn as a potential witness is inconclusive. As previously noted, because of privilege issues we do not have evidence establishing whether the President knew about or was involved in his counsel's communications with Flynn's counsel stating that Flynn's decision to withdraw from the joint defense agreement and cooperate with the government would be viewed as reflecting "hostility" towards the President. And regardless of what the President's personal counsel communicated, the President continued to express sympathy for Flynn after he pleaded guilty pursuant to a cooperation agreement, stating that Flynn had "led a very strong life" and the President "fe[lt] very badly" about what had happened to him.

Evidence concerning the President's conduct towards Manafort indicates that the President intended to encourage Manafort to not cooperate with the government. Before Manafort was convicted, the President repeatedly stated that Manafort had been treated unfairly. One day after Manafort was convicted on eight felony charges and potentially faced a lengthy prison term, the President said that Manafort was "a brave man" for refusing to "break" and that "flipping" "almost ought to be outlawed." At the same time, although the President had privately told aides he did not like Manafort, he publicly called Manafort "a good man" and said he had a "wonderful family." And when the President was asked whether he was considering a pardon for Manafort, the President did not respond directly and instead said he had "great respect for what [Manafort]'s done, in terms of what he's gone through." The President added that "some of the charges they threw against him, every consultant, every lobbyist in Washington probably does." In light of the President's counsel's previous statements that the investigations "might get cleaned up with some presidential pardons" and that a pardon would be possible if the President "come[s] to the conclusion that you have been treated unfairly," the evidence supports the inference that the

U.S. Department of Justice
Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

President intended Manafort to believe that he could receive a pardon, which would make cooperation with the government as a means of obtaining a lesser sentence unnecessary.

We also examined the evidence of the President's intent in making public statements about Manafort at the beginning of his trial and when the jury was deliberating. Some evidence supports a conclusion that the President intended, at least in part, to influence the jury. The trial generated widespread publicity, and as the jury began to deliberate, commentators suggested that an acquittal would add to pressure to end the Special Counsel's investigation. By publicly stating on the second day of deliberations that Manafort "happens to be a very good person" and that "it's very sad what they've done to Paul Manafort" right after calling the Special Counsel's investigation a "rigged witch hunt," the President's statements could, if they reached jurors, have the natural tendency to engender sympathy for Manafort among jurors, and a factfinder could infer that the President intended that result. But there are alternative explanations for the President's comments, including that he genuinely felt sorry for Manafort or that his goal was not to influence the jury but to influence public opinion. The President's comments also could have been intended to continue sending a message to Manafort that a pardon was possible. As described above, the President made his comments about Manafort being "a very good person" immediately after declining to answer a question about whether he would pardon Manafort.



Harm to Ongoing Matter

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

K.     **The President's Conduct Involving Michael Cohen**

*Overview*

The President's conduct involving Michael Cohen spans the full period of our investigation. During the campaign, Cohen pursued the Trump Tower Moscow project on behalf of the Trump Organization. Cohen briefed candidate Trump on the project numerous times, including discussing whether Trump should travel to Russia to advance the deal. After the media began questioning Trump's connections to Russia, Cohen promoted a "party line" that publicly distanced Trump from Russia and asserted he had no business there. Cohen continued to adhere to that party line in 2017, when Congress asked him to provide documents and testimony in its Russia investigation. In an attempt to minimize the President's connections to Russia, Cohen submitted a letter to Congress falsely stating that he only briefed Trump on the Trump Tower Moscow project three times, that he did not consider asking Trump to travel to Russia, that Cohen had not received a response to an outreach he made to the Russian government, and that the project ended in January 2016, before the first Republican caucus or primary. While working on the congressional statement, Cohen had extensive discussions with the President's personal counsel, who, according to Cohen, said that Cohen should not contradict the President and should keep the statement short and "tight." After the FBI searched Cohen's home and office in April 2018, the President publicly asserted that Cohen would not "flip" and privately passed messages of support to him. Cohen also discussed pardons with the President's personal counsel and believed that if he stayed on message, he would get a pardon or the President would do "something else" to make the investigation end. But after Cohen began cooperating with the government in July 2018, the President publicly criticized him, called him a "rat," and suggested his family members had committed crimes.

*Evidence*

1.   Candidate Trump's Awareness of and Involvement in the Trump Tower Moscow Project

The President's interactions with Cohen as a witness took place against the background of the President's involvement in the Trump Tower Moscow project.

As described in detail in Volume I, Section IV.A.1, *supra*, from September 2015 until at least June 2016, the Trump Organization pursued a Trump Tower Moscow project in Russia, with negotiations conducted by Cohen, then-executive vice president of the Trump Organization and special counsel to Donald J. Trump.[909]   The Trump Organization had previously and

---

[909] In August 2018 and November 2018, Cohen pleaded guilty to multiple crimes of deception, including making false statements to Congress about the Trump Tower Moscow project, as described later in this section. When Cohen first met with investigators from this Office, he repeated the same lies he told Congress about the Trump Tower Moscow project. Cohen 8/7/18 302, at 12-17. But after Cohen pleaded guilty to offenses in the Southern District of New York on August 21, 2018, he met with investigators again and corrected the record. The Office found Cohen's testimony in these subsequent proffer sessions to be consistent with and corroborated by other information obtained in the course of the Office's investigation. The Office's sentencing submission in Cohen's criminal case stated: "Starting with his second meeting with the [Special Counsel's Office] in September 2018, the defendant has accepted responsibility not only for

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

unsuccessfully pursued a building project in Moscow.[910]  According to Cohen, in approximately September 2015 he obtained internal approval from Trump to negotiate on behalf of the Trump Organization to have a Russian corporation build a tower in Moscow that licensed the Trump name and brand.[911]  Cohen thereafter had numerous brief conversations with Trump about the project.[912]  Cohen recalled that Trump wanted to be updated on any developments with Trump Tower Moscow and on several occasions brought the project up with Cohen to ask what was happening on it.[913]  Cohen also discussed the project on multiple occasions with Donald Trump Jr. and Ivanka Trump.[914]

In the fall of 2015, Trump signed a Letter of Intent for the project that specified highly lucrative terms for the Trump Organization.[915]  In December 2015, Felix Sater, who was handling negotiations between Cohen and the Russian corporation, asked Cohen for a copy of his and Trump's passports to facilitate travel to Russia to meet with government officials and possible financing partners.[916]  Cohen recalled discussing the trip with Trump and requesting a copy of Trump's passport from Trump's personal secretary, Rhona Graff.[917]

By January 2016, Cohen had become frustrated that Sater had not set up a meeting with Russian government officials, so Cohen reached out directly by email to the office of Dmitry

---

his false statements concerning the [Trump Tower] Moscow Project, but also his broader efforts through public statements and testimony before Congress to minimize his role in, and what he knew about, contacts between the [Trump Organization] and Russian interests during the course of the campaign. . . .  The information provided by Cohen about the [Trump Tower] Moscow Project in these proffer sessions is consistent with and corroborated by other information obtained in the course of the [Special Counsel's Office's] investigation. . . .  The defendant, without prompting by the [Special Counsel's Office], also corrected other false and misleading statements that he had made concerning his outreach to and contacts with Russian officials during the course of the campaign." Gov't Sentencing Submission at 4, *United States v. Michael Cohen*, 1:18-cr-850 (S.D.N.Y. Dec. 7, 2018), Doc. 14.  At Cohen's sentencing, our Office further explained that Cohen had "provided valuable information . . . while taking care and being careful to note what he knows and what he doesn't know." Transcript at 19, *United States v. Michael Cohen*, 1:18-cr-850 (S.D.N.Y. Dec. 12, 2018), Doc. 17 (*Cohen* 12/12/18 Transcript).

[910] *See* Volume I, Section IV.A.1, *supra* (noting that starting in at least 2013, several employees of the Trump Organization, including then-president of the organization Donald J. Trump, pursued a Trump Tower Moscow deal with several Russian counterparties).

[911] Cohen 9/12/18 302, at 1-4; Cohen 8/7/18 302, at 15.

[912] Cohen 9/12/18 302, at 2, 4.

[913] Cohen 9/12/18 302, at 4.

[914] Cohen 9/12/18 302, at 4, 10.

[915]  MDC-H-000618-25 (10/28/15 Letter of Intent, signed by Donald J. Trump, Trump Acquisition, LLC and Andrey Rozov, I.C. Expert Investment Company); Cohen 9/12/18 302, at 3; Written Responses of Donald J. Trump (Nov. 20, 2018), at 15 (Response to Question III, Parts (a) through (g)).

[916] MDC-H-000600 (12/19/15 Email, Sater to Cohen).

[917] Cohen 9/12/18 302, at 5.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Peskov, who was Putin's deputy chief of staff and press secretary.[918]  On January 20, 2016, Cohen received an email response from Elena Poliakova, Peskov's personal assistant, and phone records confirm that they then spoke for approximately twenty minutes, during which Cohen described the Trump Tower Moscow project and requested assistance in moving the project forward.[919]  Cohen recalled briefing candidate Trump about the call soon afterwards.[920]  Cohen told Trump he spoke with a woman he identified as "someone from the Kremlin," and Cohen reported that she was very professional and asked detailed questions about the project.[921]  Cohen recalled telling Trump he wished the Trump Organization had assistants who were as competent as the woman from the Kremlin.[922]

Cohen thought his phone call renewed interest in the project.[923]  The day after Cohen's call with Poliakova, Sater texted Cohen, asking him to "[c]all me when you have a few minutes to chat . . . It's about Putin they called today."[924]  Sater told Cohen that the Russian government liked the project and on January 25, 2016, sent an invitation for Cohen to visit Moscow "for a working visit."[925]  After the outreach from Sater, Cohen recalled telling Trump that he was waiting to hear back on moving the project forward.[926]

After January 2016, Cohen continued to have conversations with Sater about Trump Tower Moscow and continued to keep candidate Trump updated about those discussions and the status of the project.[927]  Cohen recalled that he and Trump wanted Trump Tower Moscow to succeed and that Trump never discouraged him from working on the project because of the campaign.[928]  In March or April 2016, Trump asked Cohen if anything was happening in Russia.[929]  Cohen also

---

[918] *See* FS00004 (12/30/15 Text Message, Cohen to Sater); TRUMPORG_MC_000233 (1/11/16 Email, Cohen to pr_peskova@prpress.gof.ru); MDC-H-000690 (1/14/16 Email, Cohen to info@prpress.gov.ru); TRUMPORG_MC_000235 (1/16/16 Email, Cohen to pr_peskova@prpress.gov.ru).

[919] 1/20/16 Email, Poliakova to Cohen; Call Records of Michael Cohen. (Showing a 22-minute call on January 20, 2016, between Cohen and the number Poliakova provided in her email); Cohen 9/12/18 302, at 2-3. After the call, Cohen saved Poliakova's contact information in his Trump Organization Outlook contact list. 1/20/16 Cohen Microsoft Outlook Entry (6:22 a.m.).

[920] Cohen 11/20/18 302, at 5.

[921] Cohen 11/20/18 302, at 5-6; Cohen 11/12/18 302, at 4.

[922] Cohen 11/20/18 302, at 5.

[923] Cohen 9/12/18 302, at 5.

[924] FS00011 (1/21/16 Text Messages, Sater & Cohen).

[925] Cohen 9/12/18 302, at 5; 1/25/16 Email, Sater to Cohen (attachment).

[926] Cohen 11/20/18 302, at 5.

[927] Cohen 9/12/18 302, at 6.  In later congressional testimony, Cohen stated that he briefed Trump on the project approximately six times after January 2016.  *Hearing on Issues Related to Trump Organization Before the House Oversight and Reform Committee*, 116th Cong. (Feb. 27, 2019) (CQ Cong. Transcripts, at 24) (testimony of Michael Cohen).

[928] Cohen 9/12/18 302, at 6.

[929] Cohen 9/18/18 302, at 4.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

recalled briefing Donald Trump Jr. in the spring—a conversation that Cohen said was not "idle chit chat" because Trump Tower Moscow was potentially a $1 billion deal.[930]

Cohen recalled that around May 2016, he again raised with candidate Trump the possibility of a trip to Russia to advance the Trump Tower Moscow project.[931] At that time, Cohen had received several texts from Sater seeking to arrange dates for such a trip.[932] On May 4, 2016, Sater wrote to Cohen, "I had a chat with Moscow. ASSUMING the trip does happen the question is before or after the convention. . . . . Obviously the premeeting trip (you only) can happen anytime you want but the 2 big guys [is] the question. I said I would confirm and revert."[933] Cohen responded, "My trip before Cleveland. Trump once he becomes the nominee after the convention."[934] On May 5, 2016, Sater followed up with a text that Cohen thought he probably read to Trump:

> Peskov would like to invite you as his guest to the St. Petersburg Forum which is Russia's Davos it's June 16-19. He wants to meet there with you and possibly introduce you to either Putin or Medvedev. . . . This is perfect. The entire business class of Russia will be there as well. He said anything you want to discuss including dates and subjects are on the table to discuss.[935]

Cohen recalled discussing the invitation to the St. Petersburg Economic Forum with candidate Trump and saying that Putin or Russian Prime Minister Dmitry Medvedev might be there.[936] Cohen remembered that Trump said that he would be willing to travel to Russia if Cohen could "lock and load" on the deal.[937] In June 2016, Cohen decided not to attend the St. Petersburg Economic Forum because Sater had not obtained a formal invitation for Cohen from Peskov.[938] Cohen said he had a quick conversation with Trump at that time but did not tell him that the project was over because he did not want Trump to complain that the deal was on-again-off-again if it were revived.[939]

During the summer of 2016, Cohen recalled that candidate Trump publicly claimed that he had nothing to do with Russia and then shortly afterwards privately checked with Cohen about the status of the Trump Tower Moscow project, which Cohen found "interesting."[940] At some point

---

[930] Cohen 9/12/18 302, at 10.

[931] Cohen 9/12/18 302, at 7.

[932] Cohen 9/12/18 302, at 7.

[933] FS00015 (5/4/16 Text Message, Sater to Cohen).

[934] FS00015 (5/4/16 Text Message, Cohen to Sater).

[935] FS00016-17 (5/5/16 Text Messages, Sater & Cohen).

[936] Cohen 9/12/18 302, at 7.

[937] Cohen 9/12/18 302, at 7.

[938] Cohen 9/12/18 302, at 7-8.

[939] Cohen 9/12/18 302, at 8.

[940] Cohen 3/19/19 302, at 2.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

that summer, Cohen recalled having a brief conversation with Trump in which Cohen said the Trump Tower Moscow project was going nowhere because the Russian development company had not secured a piece of property for the project.[941]  Trump said that was "too bad," and Cohen did not recall talking with Trump about the project after that.[942]  Cohen said that at no time during the campaign did Trump tell him not to pursue the project or that the project should be abandoned.[943]

## 2. Cohen Determines to Adhere to a "Party Line" Distancing Candidate Trump From Russia

As previously discussed, *see* Volume II, Section II.A, *supra*, when questions about possible Russian support for candidate Trump emerged during the 2016 presidential campaign, Trump denied having any personal, financial, or business connection to Russia, which Cohen described as the "party line" or "message" to follow for Trump and his senior advisors.[944]

After the election, the Trump Organization sought to formally close out certain deals in advance of the inauguration.[945]  Cohen recalled that Trump Tower Moscow was on the list of deals to be closed out.[946]  In approximately January 2017, Cohen began receiving inquiries from the media about Trump Tower Moscow, and he recalled speaking to the President-Elect when those inquiries came in.[947]  Cohen was concerned that truthful answers about the Trump Tower Moscow project might not be consistent with the "message" that the President-Elect had no relationship with Russia.[948]

In an effort to "stay on message," Cohen told a New York Times reporter that the Trump Tower Moscow deal was not feasible and had ended in January 2016.[949]  Cohen recalled that this was part of a "script" or talking points he had developed with President-Elect Trump and others to

---

[941] Cohen 3/19/19 302, at 2. Cohen could not recall the precise timing of this conversation, but said he thought it occurred in June or July 2016. Cohen recalled that the conversation happened at some point after candidate Trump was publicly stating that he had nothing to do with Russia. Cohen 3/19/19 302, at 2.

[942] Cohen 3/19/19 302, at 2.

[943] Cohen 3/19/19 302, at 2.

[944] Cohen 11/20/18 302, at 1; Cohen 9/18/18 302, at 3, 5; Cohen 9/12/18 302, at 9.

[945] Cohen 9/18/18 302, at 1-2; *see also* Rtskhiladze 4/4/18 302, at 8-9.

[946] Cohen 9/18/18 302, at 1-2.

[947] Cohen 9/18/18 302, at 3.

[948] Cohen 11/20/18 302, at 4.

[949] Cohen 9/18/18 302, at 5. The article was published on February 19, 2017, and reported that Sater and Cohen had been working on plan for a Trump Tower Moscow "as recently as the fall of 2015" but had come to a halt because of the presidential campaign. Consistent with Cohen's intended party line message, the article stated, "Cohen said the Trump Organization had received a letter of intent for a project in Moscow from a Russian real estate developer at that time but determined that the project was not feasible." Megan Twohey & Scott Shane, *A Back-Channel Plan for Ukraine and Russia, Courtesy of Trump Associates*, New York Times (Feb. 19, 2017).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

dismiss the idea of a substantial connection between Trump and Russia.[950]  Cohen said that he discussed the talking points with Trump but that he did not explicitly tell Trump he thought they were untrue because Trump already knew they were untrue.[951]  Cohen thought it was important to say the deal was done in January 2016, rather than acknowledge that talks continued in May and June 2016, because it limited the period when candidate Trump could be alleged to have a relationship with Russia to an early point in the campaign, before Trump had become the party's presumptive nominee.[952]

3. <u>Cohen Submits False Statements to Congress Minimizing the Trump Tower Moscow Project in Accordance with the Party Line</u>

In early May 2017, Cohen received requests from Congress to provide testimony and documents in connection with congressional investigations of Russian interference in the 2016 election.[953]  At that time, Cohen understood Congress's interest in him to be focused on the allegations in the Steele reporting concerning a meeting Cohen allegedly had with Russian officials in Prague during the campaign.[954]  Cohen had never traveled to Prague and was not concerned about those allegations, which he believed were provably false.[955]  On May 18, 2017, Cohen met with the President to discuss the request from Congress, and the President instructed Cohen that he should cooperate because there was nothing there.[956]

Cohen eventually entered into a joint defense agreement (JDA) with the President and other individuals who were part of the Russia investigation.[957]  In the months leading up to his congressional testimony, Cohen frequently spoke with the President's personal counsel.[958]  Cohen

---

[950] Cohen 9/18/18 302, at 5-6.

[951] Cohen 9/18/18 302, at 6.

[952] Cohen 9/12/18 302, at 10.

[953] P-SCO-000000328 (5/9/17 Letter, HPSCI to Cohen); P-SCO-000000331 (5/12/17 Letter, SSCI to Cohen).

[954] Cohen 11/20/18 302, at 2-3.

[955] Cohen 11/20/18 302, at 2-3.

[956] Cohen 11/12/18 302, at 2; Cohen 11/20/19 302, at 3.

[957] Cohen 11/12/18 302, at 2.

[958] Cohen 11/12/18 302, at 2-3; Cohen 11/20/18, at 2-6. Cohen told investigators about his conversations with the President's personal counsel after waiving any privilege of his own and after this Office advised his counsel not to provide any communications that would be covered by any other privilege, including communications protected by a joint defense or common interest privilege. As a result, most of what Cohen told us about his conversations with the President's personal counsel concerned what Cohen had communicated to the President's personal counsel, and not what was said in response. Cohen described certain statements made by the President's personal counsel, however, that are set forth in this section. Cohen and his counsel were better positioned than this Office to evaluate whether any privilege protected those statements because they had knowledge of the scope of their joint defense agreement and access to privileged communications that may have provided context for evaluating the statements they shared. After interviewing Cohen about these matters, we asked the President's personal counsel if he wished to provide information to us about his conversations with Cohen related to Cohen's congressional testimony about

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

said that in those conversations the President's personal counsel would sometimes say that he had just been with the President.[959]  Cohen recalled that the President's personal counsel told him the JDA was working well together and assured him that there was nothing there and if they stayed on message the investigations would come to an end soon.[960]  At that time, Cohen's legal bills were being paid by the Trump Organization,[961] and Cohen was told not to worry because the investigations would be over by summer or fall of 2017.[962]  Cohen said that the President's personal counsel also conveyed that, as part of the JDA, Cohen was protected, which he would not be if he "went rogue."[963]  Cohen recalled that the President's personal counsel reminded him that "the President loves you" and told him that if he stayed on message, the President had his back.[964]

In August 2017, Cohen began drafting a statement about Trump Tower Moscow to submit to Congress along with his document production.[965]  The final version of the statement contained several false statements about the project.[966]  First, although the Trump Organization continued to pursue the project until at least June 2016, the statement said, "The proposal was under consideration at the Trump Organization from September 2015 until the end of January 2016.  By the end of January 2016, I determined that the proposal was not feasible for a variety of business reasons and should not be pursued further.  Based on my business determinations, the Trump Organization abandoned the proposal."[967]  Second, although Cohen and candidate Trump had discussed possible travel to Russia by Trump to pursue the venture, the statement said, "Despite overtures by Mr. Sater, I never considered asking Mr. Trump to travel to Russia in connection with this proposal.  I told Mr. Sater that Mr. Trump would not travel to Russia unless there was a definitive agreement in place."[968]  Third, although Cohen had regularly briefed Trump on the status

---

Trump Tower Moscow.  The President's personal counsel declined and, through his own counsel, indicated that he could not disaggregate information he had obtained from Cohen from information he had obtained from other parties in the JDA.  In view of the admonition this Office gave to Cohen's counsel to withhold communications that could be covered by privilege, the President's personal counsel's uncertainty about the provenance of his own knowledge, the burden on a privilege holder to establish the elements to support a claim of privilege, and the substance of the statements themselves, we have included relevant statements Cohen provided in this report.  If the statements were to be used in a context beyond this report, further analysis could be warranted.

[959] Cohen 11/20/18 302, at 6.

[960] Cohen 11/20/18 302, at 2, 4.

[961] Cohen 11/20/18 302, at 4.

[962] Cohen 9/18/18 302, at 8; Cohen 11/20/18 302, at 3-4.

[963] Cohen 11/20/18 302, at 4.

[964] Cohen 9/18/18 302, at 11; Cohen 11/20/18 302, at 2.

[965] P-SCO-000003680 and P-SCO-0000003687 (8/16/17 Email and Attachment, Michael Cohen's Counsel to Cohen).  Cohen said it was not his idea to write a letter to Congress about Trump Tower Moscow.  Cohen 9/18/18 302, at 7.

[966] P-SCO-00009478 (Statement of Michael D. Cohen, Esq. (Aug. 28, 2017)).

[967] P-SCO-00009478 (Statement of Michael D. Cohen, Esq. (Aug. 28, 2017)).

[968] P-SCO-00009478 (Statement of Michael D. Cohen, Esq. (Aug. 28, 2017)).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

of the project and had numerous conversations about it, the statement said, "Mr. Trump was never in contact with anyone about this proposal other than me on three occasions, including signing a non-binding letter of intent in 2015."[969]  Fourth, although Cohen's outreach to Peskov in January 2016 had resulted in a lengthy phone call with a representative from the Kremlin, the statement said that Cohen did "not recall any response to my email [to Peskov], nor any other contacts by me with Mr. Peskov or other Russian government officials about the proposal."[970]

Cohen's statement was circulated in advance to, and edited by, members of the JDA.[971]  Before the statement was finalized, early drafts contained a sentence stating, "The building project led me to make limited contacts with Russian government officials."[972]  In the final version of the statement, that line was deleted.[973]  Cohen thought he was told that it was a decision of the JDA to take out that sentence, and he did not push back on the deletion.[974]  Cohen recalled that he told the President's personal counsel that he would not contest a decision of the JDA.[975]

Cohen also recalled that in drafting his statement for Congress, he spoke with the President's personal counsel about a different issue that connected candidate Trump to Russia: Cohen's efforts to set up a meeting between Trump and Putin in New York during the 2015 United Nations General Assembly.[976]  In September 2015, Cohen had suggested the meeting to Trump, who told Cohen to reach out to Putin's office about it.[977]  Cohen spoke and emailed with a Russian official about a possible meeting, and recalled that Trump asked him multiple times for updates on the proposed meeting with Putin.[978]  When Cohen called the Russian official a second time, she told him it would not follow proper protocol for Putin to meet with Trump, and Cohen relayed that

---

[969] P-SCO-00009478 (Statement of Michael D. Cohen, Esq. (Aug. 28, 2017)).

[970] P-SCO-00009478 (Statement of Michael D. Cohen, Esq. (Aug. 28, 2017)).

[971] Cohen 9/12/18 302, at 8-9.  Cohen also testified in Congress that the President's counsel reviewed and edited the statement.  *Hearing on Issues Related to Trump Organization Before the House Oversight and Reform Committee*, 116th Cong. (Feb. 27, 2019) (CQ Cong. Transcripts, at 24-25) (testimony by Michael Cohen).  Because of concerns about the common interest privilege, we did not obtain or review all drafts of Cohen's statement.  Based on the drafts that were released through this Office's filter process, it appears that the substance of the four principal false statements described above were contained in an early draft prepared by Cohen and his counsel.  P-SCO-0000003680 and P-SCO-0000003687 (8/16/17 Email and Attachment, Cohen's counsel to Cohen).

[972] P-SCO-0000003687 (8/16/17 Draft Statement of Michael Cohen); Cohen 11/20/18 302, at 4.

[973] Cohen 11/20/18 302, at 4.  A different line stating that Cohen did "not recall any response to my email [to Peskov in January 2016], nor any other contacts by me with Mr. Peskov or other Russian government officials about the proposal" remained in the draft.  *See* P-SCO-0000009478 (Statement of Michael D. Cohen, Esq. (Aug. 28, 2017)).

[974] Cohen 11/20/18 302, at 4.

[975] Cohen 11/20/18 302, at 5.

[976] Cohen 9/18/18 302, at 10-11.

[977] Cohen 9/18/18 302, at 11; Cohen 11/12/18 302, at 4.

[978] Cohen 9/18/18 302, at 11; Cohen 11/12/18 302, at 5.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

message to Trump.[979]  Cohen anticipated he might be asked questions about the proposed Trump-Putin meeting when he testified before Congress because he had talked about the potential meeting on Sean Hannity's radio show.[980]  Cohen recalled explaining to the President's personal counsel the "whole story" of the attempt to set up a meeting between Trump and Putin and Trump's role in it.[981]  Cohen recalled that he and the President's personal counsel talked about keeping Trump out of the narrative, and the President's personal counsel told Cohen the story was not relevant and should not be included in his statement to Congress.[982]

Cohen said that his "agenda" in submitting the statement to Congress with false representations about the Trump Tower Moscow project was to minimize links between the project and the President, give the false impression that the project had ended before the first presidential primaries, and shut down further inquiry into Trump Tower Moscow, with the aim of limiting the ongoing Russia investigations.[983]  Cohen said he wanted to protect the President and be loyal to him by not contradicting anything the President had said.[984]  Cohen recalled he was concerned that if he told the truth about getting a response from the Kremlin or speaking to candidate Trump about travel to Russia to pursue the project, he would contradict the message that no connection existed between Trump and Russia, and he rationalized his decision to provide false testimony because the deal never happened.[985]  He was not concerned that the story would be contradicted by individuals who knew it was false because he was sticking to the party line adhered to by the whole group.[986]  Cohen wanted the support of the President and the White House, and he believed that following the party line would help put an end to the Special Counsel and congressional investigations.[987]

Between August 18, 2017, when the statement was in an initial draft stage, and August 28, 2017, when the statement was submitted to Congress, phone records reflect that Cohen spoke with the President's personal counsel almost daily.[988]  On August 27, 2017, the day before Cohen

---

[979] Cohen 11/12/18 302, at 5.

[980] Cohen 9/18/18 302, at 11.

[981] Cohen 3/19/19 302, at 2.

[982] Cohen 3/19/19 302, at 2; *see* Cohen 9/18/18 302, at 11 (recalling that he was told that if he stayed on message and kept the President out of the narrative, the President would have his back).

[983] Cohen 9/12/18 302, at 8; Information at 4-5, *United States v. Michael Cohen*, 1:18-cr-850 (S.D.N.Y. Nov. 29, 2018), Doc. 2 (*Cohen* Information).

[984] Cohen 11/20/18 302, at 4.

[985] Cohen 11/20/18 302, at 4; Cohen 11/12/18 302, at 2-3, 4, 6.

[986] Cohen 9/12/18 302, at 9.

[987] Cohen 9/12/18 302, at 8-9.

[988] Cohen 11/12/18 302, at 2-3; Cohen 11/20/18 302, at 5; Call Records of Michael Cohen (Reflecting three contacts on August 18, 2017 (24 seconds; 5 minutes 25 seconds; and 10 minutes 58 seconds); two contacts on August 19 (23 seconds and 24 minutes 26 seconds); three contacts on August 23 (8 seconds; 20 minutes 33 seconds; and 5 minutes 8 seconds); one contact on August 24 (11 minutes 59 seconds); 14 contacts on August 27 (28 seconds; 4 minutes 37 seconds; 1 minute 16 seconds; 1 minutes 35

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

submitted the statement to Congress, Cohen and the President's personal counsel had numerous contacts by phone, including calls lasting three, four, six, eleven, and eighteen minutes.[989]  Cohen recalled telling the President's personal counsel, who did not have first-hand knowledge of the project, that there was more detail on Trump Tower Moscow that was not in the statement, including that there were more communications with Russia and more communications with candidate Trump than the statement reflected.[990]   Cohen stated that the President's personal counsel responded that it was not necessary to elaborate or include those details because the project did not progress and that Cohen should keep his statement short and "tight" and the matter would soon come to an end.[991]   Cohen recalled that the President's personal counsel said "his client" appreciated Cohen, that Cohen should stay on message and not contradict the President, that there was no need to muddy the water, and that it was time to move on.[992]  Cohen said he agreed because it was what he was expected to do.[993]  After Cohen later pleaded guilty to making false statements to Congress about the Trump Tower Moscow project, this Office sought to speak with the President's personal counsel about these conversations with Cohen, but counsel declined, citing potential privilege concerns.[994]

At the same time that Cohen finalized his written submission to Congress, he served as a source for a Washington Post story published on August 27, 2017, that reported in depth for the first time that the Trump Organization was "pursuing a plan to develop a massive Trump Tower in Moscow" at the same time as candidate Trump was "running for president in late 2015 and early 2016."[995]  The article reported that "the project was abandoned at the end of January 2016, just before the presidential primaries began, several people familiar with the proposal said."[996]  Cohen recalled that in speaking to the Post, he held to the false story that negotiations for the deal ceased in January 2016.[997]

---

seconds; 6 minutes 16 seconds; 1 minutes 10 seconds; 3 minutes 5 seconds; 18 minutes 55 seconds; 4 minutes 56 seconds; 11 minutes 6 seconds; 8 seconds; 3 seconds; 2 seconds; 2 seconds).

[989] Cohen 11/20/18 302, at 5; Call Records of Michael Cohen. (Reflecting 14 contacts on August 27, 2017 (28 seconds; 4 minutes 37 seconds; 1 minute 16 seconds; 1 minutes 35 seconds; 6 minutes 16 seconds; 1 minutes 10 seconds; 3 minutes 5 seconds; 18 minutes 55 seconds; 4 minutes 56 seconds; 11 minutes 6 seconds; 8 seconds; 3 seconds; 2 seconds; 2 seconds)).

[990] Cohen 11/20/18 302, at 5.

[991] Cohen 11/20/18 302, at 5. Cohen also vaguely recalled telling the President's personal counsel that he spoke with a woman from the Kremlin and that the President's personal counsel responded to the effect of "so what?" because the deal never happened.  Cohen 11/20/18 302, at 5.

[992] Cohen 11/20/18 302, at 5.

[993] Cohen 11/20/18 302, at 5.

[994] 2/8/19 email, Counsel for personal counsel to the President to Special Counsel's Office.

[995] Cohen 9/18/18 302, at 7; Carol D. Leonnig et al., *Trump's business sought deal on a Trump Tower in Moscow while he ran for president*, Washington Post (Aug. 27, 2017).

[996] Carol D. Leonnig et al., *Trump's business sought deal on a Trump Tower in Moscow while he ran for president*, Washington Post (Aug. 27, 2017).

[997] Cohen 9/18/18 302, at 7.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

On August 28, 2017, Cohen submitted his statement about the Trump Tower Moscow project to Congress.[998] Cohen did not recall talking to the President about the specifics of what the statement said or what Cohen would later testify to about Trump Tower Moscow.[999] He recalled speaking to the President more generally about how he planned to stay on message in his testimony.[1000] On September 19, 2017, in anticipation of his impending testimony, Cohen orchestrated the public release of his opening remarks to Congress, which criticized the allegations in the Steele material and claimed that the Trump Tower Moscow project "was terminated in January of 2016; which occurred before the Iowa caucus and months before the very first primary."[1001] Cohen said the release of his opening remarks was intended to shape the narrative and let other people who might be witnesses know what Cohen was saying so they could follow the same message.[1002] Cohen said his decision was meant to mirror Jared Kushner's decision to release a statement in advance of Kushner's congressional testimony, which the President's personal counsel had told Cohen the President liked.[1003] Cohen recalled that on September 20, 2017, after Cohen's opening remarks had been printed by the media, the President's personal counsel told him that the President was pleased with the Trump Tower Moscow statement that had gone out.[1004]

On October 24 and 25, 2017, Cohen testified before Congress and repeated the false statements he had included in his written statement about Trump Tower Moscow.[1005] Phone records show that Cohen spoke with the President's personal counsel immediately after his testimony on both days.[1006]

### 4.   The President Sends Messages of Support to Cohen

In January 2018, the media reported that Cohen had arranged a $130,000 payment during the campaign to prevent a woman from publicly discussing an alleged sexual encounter she had

---

[998] P-SCO-000009477 - 9478 (8/28/17 Letter and Attachment, Cohen to SSCI).

[999] Cohen 11/12/18 302, at 2; Cohen 9/12/18 302, at 9.

[1000] Cohen 9/12/18 302, at 9.

[1001] Cohen 9/18/18 302, at 7; *see, e.g., READ: Michael Cohen's statement to the Senate intelligence committee*, CNN (Sept. 19, 2017).

[1002] Cohen 9/18/18 302, at 7.

[1003] Cohen 9/18/18 302, at 7; Cohen 11/20/18 302, at 6.

[1004] Cohen 11/20/18 302, at 6.  Phone records show that the President's personal counsel called Cohen on the morning of September 20, 2017, and they spoke for approximately 11 minutes, and that they had two more contacts that day, one of which lasted approximately 18 minutes.  Call Records of Michael Cohen. (Reflecting three contacts on September 20, 2017, with calls lasting for 11 minutes 3 seconds; 2 seconds; and 18 minutes 38 seconds).

[1005] *Cohen* Information, at 4; Executive Session, Permanent Select Committee on Intelligence, U.S. House of Representatives, Interview of Michael Cohen (Oct. 24, 2017), at 10-11, 117-119.

[1006] Call Records of Michael Cohen. (Reflecting two contacts on October 24, 2017 (12 minutes 8 seconds and 8 minutes 27 seconds) and three contacts on October 25, 2017 (1 second; 4 minutes 6 seconds; and 6 minutes 6 seconds)).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

with the President before he ran for office.[1007]  This Office did not investigate Cohen's campaign-period payments to women.[1008]  However, those events, as described here, are potentially relevant to the President's and his personal counsel's interactions with Cohen as a witness who later began to cooperate with the government.

On February 13, 2018, Cohen released a statement to news organizations that stated, "In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to [the woman].  Neither the Trump Organization nor the Trump campaign was a party to the transaction with [the woman], and neither reimbursed me for the payment, either directly or indirectly."[1009]  In congressional testimony on February 27, 2019, Cohen testified that he had discussed what to say about the payment with the President and that the President had directed Cohen to say that the President "was not knowledgeable . . . of [Cohen's] actions" in making the payment.[1010]  On February 19, 2018, the day after the New York Times wrote a detailed story attributing the payment to Cohen and describing Cohen as the President's "fixer," Cohen received a text message from the President's personal counsel that stated, "Client says thanks for what you do."[1011]

On April 9, 2018, FBI agents working with the U.S. Attorney's Office for the Southern District of New York executed search warrants on Cohen's home, hotel room, and office.[1012]  That day, the President spoke to reporters and said that he had "just heard that they broke into the office of one of my personal attorneys—a good man."[1013]  The President called the searches "a real disgrace" and said, "It's an attack on our country, in a true sense.  It's an attack on what we all

---

[1007] *See, e.g.,* Michael Rothfeld & Joe Palazzolo, *Trump Lawyer Arranged $130,000 Payment for Adult-Film Star's Silence,* Wall Street Journal (Jan. 12, 2018).

[1008] The Office was authorized to investigate Cohen's establishment and use of Essential Consultants LLC, which Cohen created to facilitate the $130,000 payment during the campaign, based on evidence that the entity received funds from Russian-backed entities.  Cohen's use of Essential Consultants to facilitate the $130,000 payment to the woman during the campaign was part of the Office's referral of certain Cohen-related matters to the U.S. Attorney's Office for the Southern District of New York.

[1009] *See, e.g.,* Mark Berman, *Longtime Trump attorney says he made $130,000 payment to Stormy Daniels with his money,* Washington Post (Feb. 14, 2018).

[1010] *Hearing on Issues Related to Trump Organization Before the House Oversight and Reform Committee,* 116th Cong. (Feb. 27, 2019) (CQ Cong. Transcripts, at 147-148) (testimony of Michael Cohen).  Toll records show that Cohen was connected to a White House phone number for approximately five minutes on January 19, 2018, and for approximately seven minutes on January 30, 2018, and that Cohen called Melania Trump's cell phone several times between January 26, 2018, and January 30, 2018.  Call Records of Michael Cohen.

[1011] 2/19/18 Text Message, President's personal counsel to Cohen; *see* Jim Rutenberg et al., *Tools of Trump's Fixer: Payouts, Intimidation and the Tabloids,* New York Times (Feb. 18, 2018).

[1012] Gov't Opp. to Def. Mot. for Temp. Restraining Order, *In the Matter of Search Warrants Executed on April 9, 2018,* 18-mj-3161 (S.D.N.Y. Apr. 13, 2018), Doc. 1 ("On April 9, 2018, agents from the New York field office of the Federal Bureau of Investigation . . . executed search warrants for Michael Cohen's residence, hotel room, office, safety deposit box, and electronic devices.").

[1013] Remarks by President Trump Before Meeting with Senior Military Leadership, White House (Apr. 9, 2018).

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

stand for."[1014]  Cohen said that after the searches he was concerned that he was "an open book," that he did not want issues arising from the payments to women to "come out," and that his false statements to Congress were "a big concern."[1015]

A few days after the searches, the President called Cohen.[1016]  According to Cohen, the President said he wanted to "check in" and asked if Cohen was okay, and the President encouraged Cohen to "hang in there" and "stay strong."[1017]  Cohen also recalled that following the searches he heard from individuals who were in touch with the President and relayed to Cohen the President's support for him.[1018]  Cohen recalled that PP_____, a friend of the President's, reached out to say that he was with "the Boss" in Mar-a-Lago and the President had said "he loves you" and not to worry.[1019]  Cohen recalled that Personal Privacy_____ for the Trump Organization, told him, "the boss loves you."[1020]  And Cohen said that PP_____, a friend of the President's, told him, "everyone knows the boss has your back."[1021]

On or about April 17, 2018, Cohen began speaking with an attorney, Robert Costello, who had a close relationship with Rudolph Giuliani, one of the President's personal lawyers.[1022]  Costello told Cohen that he had a "back channel of communication" to Giuliani, and that Giuliani had said the "channel" was "crucial" and "must be maintained."[1023]  On April 20, 2018, the New York Times published an article about the President's relationship with and treatment of Cohen.[1024]  The President responded with a series of tweets predicting that Cohen would not "flip":

> The New York Times and a third rate reporter . . . are going out of their way to destroy Michael Cohen and his relationship with me in the hope that he will 'flip.'  They use non-existent 'sources' and a drunk/drugged up loser who hates Michael, a fine person with a wonderful family.  Michael is a businessman for his own account/lawyer who I have always liked & respected.  Most people will flip if the Government lets them out of trouble, even

---

[1014] Remarks by President Trump Before Meeting with Senior Military Leadership, White House (Apr. 9, 2018).

[1015] Cohen, 10/17/18 302, at 11.

[1016] Cohen 3/19/19 302, at 4.

[1017] Cohen 3/19/19 302, at 4.

[1018] Cohen 9/12/18 302, at 11.

[1019] Cohen 9/12/18 302, at 11.

[1020] Cohen 9/12/18 302, at 11.

[1021] Cohen 9/12/18 302, at 11.

[1022] 4/17/18 Email, Citron to Cohen; 4/19/18 Email, Costello to Cohen; MC-SCO-001 (7/7/18 redacted billing statement from Davidoff, Hutcher & Citron to Cohen).

[1023] 4/21/18 Email, Costello to Cohen.

[1024] See Maggie Haberman et al., Michael Cohen Has Said He Would Take a Bullet for Trump. Maybe Not Anymore., New York Times (Apr. 20, 2018).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

if it means lying or making up stories. Sorry, I don't see Michael doing that despite the horrible Witch Hunt and the dishonest media![1025]

In an email that day to Cohen, Costello wrote that he had spoken with Giuliani.[1026]  Costello told Cohen the conversation was "Very Very Positive[.]  You are 'loved'. . . they are in our corner. . . . Sleep well tonight[], you have friends in high places."[1027]

Cohen said that following these messages he believed he had the support of the White House if he continued to toe the party line, and he determined to stay on message and be part of the team.[1028]  At the time, Cohen's understood that his legal fees were still being paid by the Trump Organization, which he said was important to him.[1029]  Cohen believed he needed the power of the President to take care of him, so he needed to defend the President and stay on message.[1030]

Cohen also recalled speaking with the President's personal counsel about pardons after the searches of his home and office had occurred, at a time when the media had reported that pardon discussions were occurring at the White House.[1031]  Cohen told the President's personal counsel he had been a loyal lawyer and servant, and he said that after the searches he was in an uncomfortable position and wanted to know what was in it for him.[1032]  According to Cohen, the President's personal counsel responded that Cohen should stay on message, that the investigation was a witch hunt, and that everything would be fine.[1033]  Cohen understood based on this conversation and previous conversations about pardons with the President's personal counsel that as long as he stayed on message, he would be taken care of by the President, either through a pardon or through the investigation being shut down.[1034]

---

[1025] @realDonaldTrump 4/21/18 (9:10 a.m. ET) Tweets.

[1026] 4/21/18 Email, Costello to Cohen.

[1027] 4/21/18 Email, Costello to Cohen. **Harm to Ongoing Matter**

[1028] Cohen 9/12/18 302, at 11.

[1029] Cohen 9/12/18 302, at 10.

[1030] Cohen 9/12/18 302, at 10.

[1031] Cohen 11/20/18 302, at 7.  At a White House press briefing on April 23, 2018, in response to a question about whether the White House had "close[d] the door one way or the other on the President pardoning Michael Cohen," Sanders said, "It's hard to close the door on something that hasn't taken place. I don't like to discuss or comment on hypothetical situations that may or may not ever happen.  I would refer you to personal attorneys to comment on anything specific regarding that case, but we don't have anything at this point."  Sarah Sanders, *White House Daily Briefing*, C-SPAN (Apr. 23, 2018).

[1032] Cohen 11/20/18 302, at 7; Cohen 3/19/19 302, at 3.

[1033] Cohen 3/19/19 302, at 3.

[1034] Cohen 3/19/19 302, at 3-4.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

On April 24, 2018, the President responded to a reporter's inquiry whether he would consider a pardon for Cohen with, "Stupid question."[1035]  On June 8, 2018, the President said he "hadn't even thought about" pardons for Manafort or Cohen, and continued, "It's far too early to be thinking about that.  They haven't been convicted of anything.  There's nothing to pardon."[1036]  And on June 15, 2018, the President expressed sympathy for Cohen, Manafort, and Flynn in a press interview and said, "I feel badly about a lot of them, because I think a lot of it is very unfair."[1037]

### 5.   The President's Conduct After Cohen Began Cooperating with the Government

On July 2, 2018, ABC News reported based on an "exclusive" interview with Cohen that Cohen "strongly signaled his willingness to cooperate with special counsel Robert Mueller and federal prosecutors in the Southern District of New York—even if that puts President Trump in jeopardy."[1038]  That week, the media reported that Cohen had added an attorney to his legal team who previously had worked as a legal advisor to President Bill Clinton.[1039]

Beginning on July 20, 2018, the media reported on the existence of a recording Cohen had made of a conversation he had with candidate Trump about a payment made to a second woman who said she had had an affair with Trump.[1040]  On July 21, 2018, the President responded: "Inconceivable that the government would break into a lawyer's office (early in the morning)—almost unheard of.  Even more inconceivable that a lawyer would tape a client—totally unheard of & perhaps illegal.  The good news is that your favorite President did nothing wrong!"[1041]  On July 27, 2018, after the media reported that Cohen was willing to inform investigators that Donald Trump Jr. told his father about the June 9, 2016 meeting to get "dirt" on Hillary Clinton,[1042] the President tweeted:  "[S]o the Fake News doesn't waste my time with dumb questions, NO, I did NOT know of the meeting with my son, Don jr.  Sounds to me like someone is trying to make up

---

[1035] Remarks by President Trump and President Macron of France Before Restricted Bilateral Meeting, The White House (Apr. 24, 2018).

[1036] *President Donald Trump Holds Media Availability Before Departing for the G-7 Summit*, CQ Newsmaker Transcripts (June 8, 2018).

[1037] Remarks by President Trump in Press Gaggle, The White House (June 15, 2018).

[1038] *EXCLUSIVE: Michael Cohen says family and country, not President Trump, is his 'first loyalty'*, ABC (July 2, 2018).  Cohen said in the interview, "To be crystal clear, my wife, my daughter and my son, and this country have my first loyalty."

[1039] *See e.g.*, Darren Samuelsohn, *Michael Cohen hires Clinton scandal veteran Lanny Davis*, Politico (July 5, 2018).

[1040] *See, e.g.*, Matt Apuzzo et al., *Michael Cohen Secretly Taped Trump Discussing Payment to Playboy Model*, New York Times (July 20, 2018).

[1041] @realDonaldTrump 7/21/18 (8:10 a.m. ET) Tweet.

[1042] *See, e.g.*, Jim Sciutto, *Cuomo Prime Time Transcript*, CNN (July 26, 2018).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

stories in order to get himself out of an unrelated jam (Taxi cabs maybe?).  He even retained Bill and Crooked Hillary's lawyer.  Gee, I wonder if they helped him make the choice!"[1043]

On August 21, 2018, Cohen pleaded guilty in the Southern District of New York to eight felony charges, including two counts of campaign-finance violations based on the payments he had made during the final weeks of the campaign to women who said they had affairs with the President.[1044]  During the plea hearing, Cohen stated that he had worked "at the direction of" the candidate in making those payments.[1045]   The next day, the President contrasted Cohen's cooperation with Manafort's refusal to cooperate, tweeting, "I feel very badly for Paul Manafort and his wonderful family.  'Justice' took a 12 year old tax case, among other things, applied tremendous pressure on him and, unlike Michael Cohen, he refused to 'break'—make up stories in order to get a 'deal.'  Such respect for a brave man!"[1046]

On September 17, 2018, this Office submitted written questions to the President that included questions about the Trump Tower Moscow project and attached Cohen's written statement to Congress and the Letter of Intent signed by the President.[1047]  Among other issues, the questions asked the President to describe the timing and substance of discussions he had with Cohen about the project, whether they discussed a potential trip to Russia, and whether the President "at any time direct[ed] or suggest[ed] that discussions about the Trump Moscow project should cease," or whether the President was "informed at any time that the project had been abandoned."[1048]

On November 20, 2018, the President submitted written responses that did not answer those questions about Trump Tower Moscow directly and did not provide any information about the timing of the candidate's discussions with Cohen about the project or whether he participated in any discussions about the project being abandoned or no longer pursued.[1049]   Instead, the President's answers stated in relevant part:

> I had few conversations with Mr. Cohen on this subject.  As I recall, they were brief, and they were not memorable.  I was not enthused about the proposal, and I do not recall any discussion of travel to Russia in connection with it.  I do not remember discussing it with

---

[1043] @realDonaldTrump 7/27/18 (7:26 a.m. ET) Tweet; @realDonaldTrump 7/27/18 (7:38 a.m. ET) Tweet; @realDonaldTrump 7/27/18 (7:56 a.m. ET) Tweet.  At the time of these tweets, the press had reported that Cohen's financial interests in taxi cab medallions were being scrutinized by investigators.  *See, e.g.*, Matt Apuzzo et al., *Michael Cohen Secretly Taped Trump Discussing Payment to Playboy Model*, New York Times (July 20, 2018).

[1044] *Cohen* Information.

[1045] *Cohen* 8/21/18 Transcript, at 23.

[1046] @realDonaldTrump 8/22/18 (9:21 a.m. ET) Tweet.

[1047] 9/17/18 Letter, Special Counsel's Office to President's Personal Counsel (attaching written questions for the President, with attachments).

[1048] 9/17/18 Letter, Special Counsel's Office to President's Personal Counsel (attaching written questions for the President), Question III, Parts (a) through (g).

[1049] Written Responses of Donald J. Trump (Nov. 20, 2018).

U.S. Department of Justice

~~Attorney-Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

anyone else at the Trump Organization, although it is possible. I do not recall being aware at the time of any communications between Mr. Cohen and Felix Sater and any Russian government official regarding the Letter of Intent.[1050]

On November 29, 2018, Cohen pleaded guilty to making false statements to Congress based on his statements about the Trump Tower Moscow project.[1051]  In a plea agreement with this Office, Cohen agreed to "provide truthful information regarding any and all matters as to which this Office deems relevant."[1052]  Later on November 29, after Cohen's guilty plea had become public, the President spoke to reporters about the Trump Tower Moscow project, saying:

> I decided not to do the project. . . .  I decided ultimately not to do it.  There would have been nothing wrong if I did do it.  If I did do it, there would have been nothing wrong.  That was my business. . . .  It was an option that I decided not to do. . . .  I decided not to do it. The primary reason . . . I was focused on running for President. . . .  I was running my business while I was campaigning.  There was a good chance that I wouldn't have won, in which case I would've gone back into the business.  And why should I lose lots of opportunities?[1053]

The President also said that Cohen was "a weak person.  And by being weak, unlike other people that you watch—he is a weak person.  And what he's trying to do is get a reduced sentence.  So he's lying about a project that everybody knew about."[1054]  The President also brought up Cohen's written submission to Congress regarding the Trump Tower Moscow project: "So here's the story: Go back and look at the paper that Michael Cohen wrote before he testified in the House and/or Senate.  It talked about his position."[1055]  The President added, "Even if [Cohen] was right, it doesn't matter because I was allowed to do whatever I wanted during the campaign."[1056]

In light of the President's public statements following Cohen's guilty plea that he "decided not to do the project," this Office again sought information from the President about whether he participated in any discussions about the project being abandoned or no longer pursued, including when he "decided not to do the project," who he spoke to about that decision, and what motivated

---

[1050] Written Responses of Donald J. Trump (Nov. 20, 2018), at 15 (Response to Question III, Parts (a) through (g)).

[1051] *Cohen* Information; *Cohen* 8/21/18 Transcript.

[1052] Plea Agreement at 4, *United States v. Michael Cohen*, 1:18-cr-850 (S.D.N.Y. Nov. 29, 2018).

[1053] *President Trump Departure Remarks*, C-SPAN (Nov. 29, 2018).  In contrast to the President's remarks following Cohen's guilty plea, Cohen's August 28, 2017 statement to Congress stated that Cohen, not the President, "decided to abandon the proposal" in late January 2016; that Cohen "did not ask or brief Mr. Trump . . . before I made the decision to terminate further work on the proposal"; and that the decision to abandon the proposal was "unrelated" to the Campaign. P-SCO-000009477 (Statement of Michael D. Cohen, Esq. (Aug. 28, 2017)).

[1054] *President Trump Departure Remarks*, C-SPAN (Nov. 29, 2018).

[1055] *President Trump Departure Remarks*, C-SPAN (Nov. 29, 2018).

[1056] *President Trump Departure Remarks*, C-SPAN (Nov. 29, 2018).

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

the decision.[1057]   The Office also again asked for the timing of the President's discussions with Cohen about Trump Tower Moscow and asked him to specify "what period of the campaign" he was involved in discussions concerning the project.[1058]   In response, the President's personal counsel declined to provide additional information from the President and stated that "the President has fully answered the questions at issue."[1059]

In the weeks following Cohen's plea and agreement to provide assistance to this Office, the President repeatedly implied that Cohen's family members were guilty of crimes.   On December 3, 2018, after Cohen had filed his sentencing memorandum, the President tweeted, "'Michael Cohen asks judge for no Prison Time.' You mean he can do all of the TERRIBLE, unrelated to Trump, things having to do with fraud, big loans, Taxis, etc., and not serve a long prison term?  He makes up stories to get a GREAT & ALREADY reduced deal for himself, and *get his wife and father-in-law (who has the money?) off Scott Free*. He lied for this outcome and should, in my opinion, serve a full and complete sentence."[1060] **Harm to Ongoing Matter**

[1061]

On December 12, 2018, Cohen was sentenced to three years of imprisonment.[1062]  The next day, the President sent a series of tweets that said:

> I never directed Michael Cohen to break the law. . . .  Those charges were just agreed to by him in order to embarrass the president and get a much reduced prison sentence, which he did—including the fact that *his family was temporarily let off the hook*.  As a lawyer, Michael has great liability to me![1063]

On December 16, 2018, the President tweeted, "Remember, Michael Cohen only became a 'Rat' after the FBI did something which was absolutely unthinkable & unheard of until the Witch Hunt was illegally started.  They BROKE INTO AN ATTORNEY'S OFFICE!  Why didn't they break into the DNC to get the Server, or Crooked's office?"[1064]

In January 2019, after the media reported that Cohen would provide public testimony in a congressional hearing, the President made additional public comments suggesting that Cohen's

---

[1057] 1/23/19 Letter, Special Counsel's Office to President's Personal Counsel.

[1058] 1/23/19 Letter, Special Counsel's Office to President's Personal Counsel.

[1059] 2/6/19 Letter, President's Personal Counsel to Special Counsel's Office.

[1060] @realDonaldTrump 12/3/18 (10:24 a.m. ET and 10:29 a.m. ET) Tweets (emphasis added).

[1061] @realDonaldTrump 12/3/18 (10:48 a.m. ET) Tweet.

[1062] *Cohen* 12/12/18 Transcript.

[1063] @realDonaldTrump 12/13/18 (8:17 a.m. ET, 8:25 a.m. ET, and 8:39 a.m. ET) Tweets (emphasis added).

[1064] @realDonaldTrump 12/16/18 (9:39 a.m. ET) Tweet.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

family members had committed crimes.  In an interview on Fox on January 12, 2019, the President was asked whether he was worried about Cohen's testimony and responded:

> [I]n order to get his sentence reduced, [Cohen] says "I have an idea, I'll ah, tell—I'll give you some information on the president."  Well, there is no information.  But *he should give information maybe on his father-in-law because that's the one that people want to look at because where does that money—that's the money in the family.  And I guess he didn't want to talk about his father-in-law,* he's trying to get his sentence reduced.  So it's ah, pretty sad.  You know, it's weak and it's very sad to watch a thing like that.[1065]

On January 18, 2019, the President tweeted, "Kevin Corke, @FoxNews 'Don't forget, Michael Cohen has already been convicted of perjury and fraud, and as recently as this week, the Wall Street Journal has suggested that he may have stolen tens of thousands of dollars. . . .' Lying to reduce his jail time!  *Watch father-in-law!*"[1066]

On January 23, 2019, Cohen postponed his congressional testimony, citing threats against his family.[1067]  The next day, the President tweeted, "So interesting that bad lawyer Michael Cohen, who sadly will not be testifying before Congress, is using the lawyer of Crooked Hillary Clinton to represent him—Gee, how did that happen?"[1068]

Also in January 2019, Giuliani gave press interviews that appeared to confirm Cohen's account that the Trump Organization pursued the Trump Tower Moscow project well past January 2016.  Giuliani stated that "it's our understanding that [discussions about the Trump Moscow project] went on throughout 2016.  Weren't a lot of them, but there were conversations.  Can't be sure of the exact date.  But the president can remember having conversations with him about it. . . .   The president also remembers—yeah, probably up—could be up to as far as October, November."[1069]  In an interview with the New York Times, Giuliani quoted the President as saying that the discussions regarding the Trump Moscow project were "going on from the day I announced to the day I won."[1070]  On January 21, 2019, Giuliani issued a statement that said: "My recent statements about discussions during the 2016 campaign between Michael Cohen and candidate Donald Trump about a potential Trump Moscow 'project' were hypothetical and not based on conversations I had with the president."[1071]

---

[1065] *Jeanine Pirro Interview with President Trump*, Fox News (Jan. 12, 2019) (emphasis added).

[1066] @realDonaldTrump 1/18/19 (10:02 a.m. ET) Tweet (emphasis added).

[1067] Statement by Lanny Davis, Cohen's personal counsel (Jan. 23, 2019).

[1068] @realDonaldTrump 1/24/19 (7:48 a.m. ET) Tweet.

[1069] Meet the Press Interview with Rudy Giuliani, NBC (Jan. 20, 2019).

[1070] Mark Mazzetti et al., *Moscow Skyscraper Talks Continued Through "the Day I Won," Trump Is Said to Acknowledge*, New York Times (Jan. 20, 2019).

[1071] Maggie Haberman, *Giuliani Says His Moscow Trump Tower Comments Were "Hypothetical"*, New York Times (Jan. 21, 2019).  In a letter to this Office, the President's counsel stated that Giuliani's public comments "were not intended to suggest nor did they reflect knowledge of the existence or timing

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

### *Analysis*

In analyzing the President's conduct related to Cohen, the following evidence is relevant to the elements of obstruction of justice.

a.    <u>Obstructive act</u>.  We gathered evidence of the President's conduct related to Cohen on two issues: (i) whether the President or others aided or participated in Cohen's false statements to Congress, and (ii) whether the President took actions that would have the natural tendency to prevent Cohen from providing truthful information to the government.

i.    First, with regard to Cohen's false statements to Congress, while there is evidence, described below, that the President knew Cohen provided false testimony to Congress about the Trump Tower Moscow project, the evidence available to us does not establish that the President directed or aided Cohen's false testimony.

Cohen said that his statements to Congress followed a "party line" that developed within the campaign to align with the President's public statements distancing the President from Russia. Cohen also recalled that, in speaking with the President in advance of testifying, he made it clear that he would stay on message—which Cohen believed they both understood would require false testimony.  But Cohen said that he and the President did not explicitly discuss whether Cohen's testimony about the Trump Tower Moscow project would be or was false, and the President did not direct him to provide false testimony.  Cohen also said he did not tell the President about the specifics of his planned testimony.  During the time when his statement to Congress was being drafted and circulated to members of the JDA, Cohen did not speak directly to the President about the statement, but rather communicated with the President's personal counsel—as corroborated by phone records showing extensive communications between Cohen and the President's personal counsel before Cohen submitted his statement and when he testified before Congress.

Cohen recalled that in his discussions with the President's personal counsel on August 27, 2017—the day before Cohen's statement was submitted to Congress—Cohen said that there were more communications with Russia and more communications with candidate Trump than the statement reflected.  Cohen recalled expressing some concern at that time.  According to Cohen, the President's personal counsel—who did not have first-hand knowledge of the project— responded by saying that there was no need to muddy the water, that it was unnecessary to include those details because the project did not take place, and that Cohen should keep his statement short and tight, not elaborate, stay on message, and not contradict the President.  Cohen's recollection of the content of those conversations is consistent with direction about the substance of Cohen's draft statement that appeared to come from members of the JDA.  For example, Cohen omitted any reference to his outreach to Russian government officials to set up a meeting between Trump and Putin during the United Nations General Assembly, and Cohen believed it was a decision of

---

of conversations beyond that contained in the President's [written responses to the Special Counsel's Office]."  2/6/19 Letter, President's Personal Counsel to Special Counsel's Office.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

the JDA to delete the sentence, "The building project led me to make limited contacts with Russian government officials."

The President's personal counsel declined to provide us with his account of his conversations with Cohen, and there is no evidence available to us that indicates that the President was aware of the information Cohen provided to the President's personal counsel. The President's conversations with his personal counsel were presumptively protected by attorney-client privilege, and we did not seek to obtain the contents of any such communications. The absence of evidence about the President and his counsel's conversations about the drafting of Cohen's statement precludes us from assessing what, if any, role the President played.

      ii.     Second, we considered whether the President took actions that would have the natural tendency to prevent Cohen from providing truthful information to criminal investigators or to Congress.

Before Cohen began to cooperate with the government, the President publicly and privately urged Cohen to stay on message and not "flip." Cohen recalled the President's personal counsel telling him that he would be protected so long as he did not go "rogue." In the days and weeks that followed the April 2018 searches of Cohen's home and office, the President told reporters that Cohen was a "good man" and said he was "a fine person with a wonderful family . . . who I have always liked & respected." Privately, the President told Cohen to "hang in there" and "stay strong." People who were close to both Cohen and the President passed messages to Cohen that "the President loves you," "the boss loves you," and "everyone knows the boss has your back." Through the President's personal counsel, the President also had previously told Cohen "thanks for what you do" after Cohen provided information to the media about payments to women that, according to Cohen, both Cohen and the President knew was false. At that time, the Trump Organization continued to pay Cohen's legal fees, which was important to Cohen. Cohen also recalled discussing the possibility of a pardon with the President's personal counsel, who told him to stay on message and everything would be fine. The President indicated in his public statements that a pardon had not been ruled out, and also stated publicly that "[m]ost people will flip if the Government lets them out of trouble" but that he "d[idn't] see Michael doing that."

After it was reported that Cohen intended to cooperate with the government, however, the President accused Cohen of "mak[ing] up stories in order to get himself out of an unrelated jam (Taxi cabs maybe?)," called Cohen a "rat," and on multiple occasions publicly suggested that Cohen's family members had committed crimes. The evidence concerning this sequence of events could support an inference that the President used inducements in the form of positive messages in an effort to get Cohen not to cooperate, and then turned to attacks and intimidation to deter the provision of information or undermine Cohen's credibility once Cohen began cooperating.

     b.     <u>Nexus to an official proceeding</u>. The President's relevant conduct towards Cohen occurred when the President knew the Special Counsel's Office, Congress, and the U.S. Attorney's Office for the Southern District of New York were investigating Cohen's conduct. The President acknowledged through his public statements and tweets that Cohen potentially could cooperate with the government investigations.

U.S. Department of Justice

~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

c.      Intent.  In analyzing the President's intent in his actions towards Cohen as a potential witness, there is evidence that could support the inference that the President intended to discourage Cohen from cooperating with the government because Cohen's information would shed adverse light on the President's campaign-period conduct and statements.

i.      Cohen's false congressional testimony about the Trump Tower Moscow project was designed to minimize connections between the President and Russia and to help limit the congressional and DOJ Russia investigations—a goal that was in the President's interest, as reflected by the President's own statements.  During and after the campaign, the President made repeated statements that he had "no business" in Russia and said that there were "no deals that could happen in Russia, because we've stayed away."  As Cohen knew, and as he recalled communicating to the President during the campaign, Cohen's pursuit of the Trump Tower Moscow project cast doubt on the accuracy or completeness of these statements.

In connection with his guilty plea, Cohen admitted that he had multiple conversations with candidate Trump to give him status updates about the Trump Tower Moscow project, that the conversations continued through at least June 2016, and that he discussed with Trump possible travel to Russia to pursue the project.  The conversations were not off-hand, according to Cohen, because the project had the potential to be so lucrative.  In addition, text messages to and from Cohen and other records further establish that Cohen's efforts to advance the project did not end in January 2016 and that in May and June 2016, Cohen was considering the timing for possible trips to Russia by him and Trump in connection with the project.

The evidence could support an inference that the President was aware of these facts at the time of Cohen's false statements to Congress.  Cohen discussed the project with the President in early 2017 following media inquiries.  Cohen recalled that on September 20, 2017, the day after he released to the public his opening remarks to Congress—which said the project "was terminated in January of 2016"—the President's personal counsel told him the President was pleased with what Cohen had said about Trump Tower Moscow.  And after Cohen's guilty plea, the President told reporters that he had ultimately decided not to do the project, which supports the inference that he remained aware of his own involvement in the project and the period during the Campaign in which the project was being pursued.

ii.      The President's public remarks following Cohen's guilty plea also suggest that the President may have been concerned about what Cohen told investigators about the Trump Tower Moscow project.  At the time the President submitted written answers to questions from this Office about the project and other subjects, the media had reported that Cohen was cooperating with the government but Cohen had not yet pleaded guilty to making false statements to Congress.  Accordingly, it was not publicly known what information about the project Cohen had provided to the government.  In his written answers, the President did not provide details about the timing and substance of his discussions with Cohen about the project and gave no indication that he had decided to no longer pursue the project.  Yet after Cohen pleaded guilty, the President publicly stated that he had personally made the decision to abandon the project.  The President then declined to clarify the seeming discrepancy to our Office or answer additional questions.  The content and timing of the President's provision of information about his knowledge and actions regarding the Trump Tower Moscow project is evidence that the President may have been concerned about the information that Cohen could provide as a witness.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

       iii.     The President's concern about Cohen cooperating may have been directed at the Southern District of New York investigation into other aspects of the President's dealings with Cohen rather than an investigation of Trump Tower Moscow.  There also is some evidence that the President's concern about Cohen cooperating was based on the President's stated belief that Cohen would provide false testimony against the President in an attempt to obtain a lesser sentence for his unrelated criminal conduct.  The President tweeted that Manafort, unlike Cohen, refused to "break" and "make up stories in order to get a 'deal.'"  And after Cohen pleaded guilty to making false statements to Congress, the President said, "what [Cohen]'s trying to do is get a reduced sentence.  So he's lying about a project that everybody knew about."  But the President also appeared to defend the underlying conduct, saying, "Even if [Cohen] was right, it doesn't matter because I was allowed to do whatever I wanted during the campaign."  As described above, there is evidence that the President knew that Cohen had made false statements about the Trump Tower Moscow project and that Cohen did so to protect the President and minimize the President's connections to Russia during the campaign.

       iv.     Finally, the President's statements insinuating that members of Cohen's family committed crimes after Cohen began cooperating with the government could be viewed as an effort to retaliate against Cohen and chill further testimony adverse to the President by Cohen or others.  It is possible that the President believes, as reflected in his tweets, that Cohen "ma[d]e[] up stories" in order to get a deal for himself and "get his wife and father-in-law . . . off Scott Free." It also is possible that the President's mention of Cohen's wife and father-in-law were not intended to affect Cohen as a witness but rather were part of a public-relations strategy aimed at discrediting Cohen and deflecting attention away from the President on Cohen-related matters.  But the President's suggestion that Cohen's family members committed crimes happened more than once, including just before Cohen was sentenced (at the same time as the President stated that Cohen "should, in my opinion, serve a full and complete sentence") and again just before Cohen was scheduled to testify before Congress.  The timing of the statements supports an inference that they were intended at least in part to discourage Cohen from further cooperation.

**L.     Overarching Factual Issues**

     Although this report does not contain a traditional prosecution decision or declination decision, the evidence supports several general conclusions relevant to analysis of the facts concerning the President's course of conduct.

     1.  Three features of this case render it atypical compared to the heartland obstruction-of-justice prosecutions brought by the Department of Justice.

     First, the conduct involved actions by the President.  Some of the conduct did not implicate the President's constitutional authority and raises garden-variety obstruction-of-justice issues.  Other events we investigated, however, drew upon the President's Article II authority, which raised constitutional issues that we address in Volume II, Section III.B, *infra*.  A factual analysis of that conduct would have to take into account both that the President's acts were facially lawful and that his position as head of the Executive Branch provides him with unique and powerful means of influencing official proceedings, subordinate officers, and potential witnesses.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

Second, many obstruction cases involve the attempted or actual cover-up of an underlying crime. Personal criminal conduct can furnish strong evidence that the individual had an improper obstructive purpose, *see, e.g., United States v. Willoughby*, 860 F.2d 15, 24 (2d Cir. 1988), or that he contemplated an effect on an official proceeding, *see, e.g., United States v. Binday*, 804 F.3d 558, 591 (2d Cir. 2015). But proof of such a crime is not an element of an obstruction offense. *See United States v. Greer*, 872 F.3d 790, 798 (6th Cir. 2017) (stating, in applying the obstruction sentencing guideline, that "obstruction of a criminal investigation is punishable even if the prosecution is ultimately unsuccessful or even if the investigation ultimately reveals no underlying crime"). Obstruction of justice can be motivated by a desire to protect non-criminal personal interests, to protect against investigations where underlying criminal liability falls into a gray area, or to avoid personal embarrassment. The injury to the integrity of the justice system is the same regardless of whether a person committed an underlying wrong.

In this investigation, the evidence does not establish that the President was involved in an underlying crime related to Russian election interference. But the evidence does point to a range of other possible personal motives animating the President's conduct. These include concerns that continued investigation would call into question the legitimacy of his election and potential uncertainty about whether certain events—such as advance notice of WikiLeaks's release of hacked information or the June 9, 2016 meeting between senior campaign officials and Russians—could be seen as criminal activity by the President, his campaign, or his family.

Third, many of the President's acts directed at witnesses, including discouragement of cooperation with the government and suggestions of possible future pardons, occurred in public view. While it may be more difficult to establish that public-facing acts were motivated by a corrupt intent, the President's power to influence actions, persons, and events is enhanced by his unique ability to attract attention through use of mass communications. And no principle of law excludes public acts from the scope of obstruction statutes. If the likely effect of the acts is to intimidate witnesses or alter their testimony, the justice system's integrity is equally threatened.

2. Although the events we investigated involved discrete acts—*e.g.*, the President's statement to Comey about the Flynn investigation, his termination of Comey, and his efforts to remove the Special Counsel—it is important to view the President's pattern of conduct as a whole. That pattern sheds light on the nature of the President's acts and the inferences that can be drawn about his intent.

a. Our investigation found multiple acts by the President that were capable of exerting undue influence over law enforcement investigations, including the Russian-interference and obstruction investigations. The incidents were often carried out through one-on-one meetings in which the President sought to use his official power outside of usual channels. These actions ranged from efforts to remove the Special Counsel and to reverse the effect of the Attorney General's recusal; to the attempted use of official power to limit the scope of the investigation; to direct and indirect contacts with witnesses with the potential to influence their testimony. Viewing the acts collectively can help to illuminate their significance. For example, the President's direction to McGahn to have the Special Counsel removed was followed almost immediately by his direction to Lewandowski to tell the Attorney General to limit the scope of the Russia investigation to prospective election-interference only—a temporal connection that suggests that both acts were taken with a related purpose with respect to the investigation.

U.S. Department of Justice
~~Attorney Work Product~~ // ~~May Contain Material Protected Under Fed. R. Crim. P. 6(e)~~

The President's efforts to influence the investigation were mostly unsuccessful, but that is largely because the persons who surrounded the President declined to carry out orders or accede to his requests. Comey did not end the investigation of Flynn, which ultimately resulted in Flynn's prosecution and conviction for lying to the FBI. McGahn did not tell the Acting Attorney General that the Special Counsel must be removed, but was instead prepared to resign over the President's order. Lewandowski and Dearborn did not deliver the President's message to Sessions that he should confine the Russia investigation to future election meddling only. And McGahn refused to recede from his recollections about events surrounding the President's direction to have the Special Counsel removed, despite the President's multiple demands that he do so. Consistent with that pattern, the evidence we obtained would not support potential obstruction charges against the President's aides and associates beyond those already filed.

b. In considering the full scope of the conduct we investigated, the President's actions can be divided into two distinct phases reflecting a possible shift in the President's motives. In the first phase, before the President fired Comey, the President had been assured that the FBI had not opened an investigation of him personally. The President deemed it critically important to make public that he was not under investigation, and he included that information in his termination letter to Comey after other efforts to have that information disclosed were unsuccessful.

Soon after he fired Comey, however, the President became aware that investigators were conducting an obstruction-of-justice inquiry into his own conduct. That awareness marked a significant change in the President's conduct and the start of a second phase of action. The President launched public attacks on the investigation and individuals involved in it who could possess evidence adverse to the President, while in private, the President engaged in a series of targeted efforts to control the investigation. For instance, the President attempted to remove the Special Counsel; he sought to have Attorney General Sessions unrecuse himself and limit the investigation; he sought to prevent public disclosure of information about the June 9, 2016 meeting between Russians and campaign officials; and he used public forums to attack potential witnesses who might offer adverse information and to praise witnesses who declined to cooperate with the government. Judgments about the nature of the President's motives during each phase would be informed by the totality of the evidence.