UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BIJAN RAFIEKIAN, *et al.*, | ) | Case Number 1:18-cr-457-AJT |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **ORDER**

On July 3, 2019, the United States filed an under seal Notice of Correction to the Record [Doc. No. 261] (the "Notice of Correction") stating that the government will not be calling Michael T. Flynn as a witness in its case-in-chief. That same day, upon consideration of the Government's *Ex Parte* Motion for Temporary Nondisclosure Order [Doc. No. 260] (the "*Ex Parte* Motion"), the Court issued an under seal Nondisclosure Order [Doc. No. 246] (the "Order") prohibiting the parties from disclosing the existence of the Order or the Notice of Correction until otherwise ordered by the Court. On July 8, 2019, Non-Party Michael T. Flynn filed a Motion to File Under Seal [Doc. No. 265], together with an under seal Memorandum Opposing Coconspirator Designation of Non-Party Witness Michael T. Flynn [Doc. No. 270]. That same day, the Court held a hearing on whether the Order, the Notice of Correction, and the related filings should remain under seal. Upon consideration of the Notice of Correction, the submissions of the parties and Non-Party Michael T. Flynn in response thereto, and the arguments of counsel at the July 8 hearing, and for the reasons stated on the record at that hearing, it is hereby

ORDERED that the Notice of Correction to the Record [Doc. No. 261], Nondisclosure Order [Doc. No. 246], and all related orders and filings and exhibits thereto [Doc. Nos. 249, 256,

262, 269, 270, and 277] be, and the same hereby are, UNSEALED; with the exception of the

sealed exhibit to the Government's Response to Defendant's Memorandum Regarding Notice of

Correction to the Record [Doc. No. 277-1] and the Government's *Ex Parte* Motion for

Temporary Nondisclosure Order [Doc. No. 260], which shall remain under seal until further

order of the Court; and it is further

ORDERED that Non-Party Michael T. Flynn's Motion to File Under Seal [Doc. No. 265]

be, and the same hereby is, DENIED as moot.

The Clerk is directed to forward copies of this Order to all counsel of record.

_____/s/_____

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
July 9, 2019



IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA )
                                     )
              v.                     )
                                     )      No. 1:18-CR-457-AJT
BIJAN RAFIEKIAN, *et al.*,             )
                                       )      **UNDER SEAL**
         Defendants.             )

## NOTICE OF CORRECTION TO THE RECORD

At the June 13, 2019, hearing, the following colloquy took place between the Court and

the attorney for the government:

> THE COURT:      Let me ask you this. It's not in the indictment. Is the government
>
>                            alleging that Mr. Flynn was part of this conspiracy?
>
> MR. GILLIS:      We are not, Your Honor.
>
> THE COURT:      Right. So you're not presenting any statements by him, any testimony
>
>                            – there would be no evidence from him as to the existence of the
>
>                             conspiracy?
>
> MR. GILLIS:      Well, Your Honor – no, Your Honor, as to that. There will certainly be
>
>                             testimony from General Flynn. And from that testimony, the jury
>
>                             could draw a reasonable inference that there was a conspiracy, but we
>
>                             are not – we do not contend that General Flynn was a part of that
>
>                             conspiracy.

Tr. 65.

The government must amend this representation. At trial, the government will ask the

Court to find, based upon a preponderance of the evidence presented at trial, that Flynn was a co-

conspirator in the conspiracy charged in the superseding indictment. The government will introduce out-of-court statements by Flynn pursuant to FED. R. EVID. 801(d)(2)(E). The government does not plan to call Flynn as a witness in its case-in-chief.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

/s/
Evan N. Turgeon
Trial Attorney
Counterintelligence
    and Export Control Section
National Security Division
United States Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 353-0176
Evan.Turgeon@usdoj.gov

By: _____ /s/ _____
James P. Gillis
Virginia Bar No. 65055
John T. Gibbs
Virginia Bar No. 40380
Assistant United States Attorneys
The Justin W. Williams
    United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
(703) 299-3982 (fax)
James.P.Gillis@usdoj.gov
John.Gibbs@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2019, I sent the foregoing by email to counsel for the

defendant and to counsel for Michael T. Flynn.

Respectfully submitted,

James P. Gillis
Assistant United States Attorney

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal Case No. 1:18-CR-457 (AJT)** |
| | : | |
| **BIJAN RAFIEKIAN, et al.** | : | |

**MOTION FOR JULY 8, 2019 HEARING ON NONDISCLOSURE ORDER AND
GOVERNMENT'S NOTICE OF CORRECTION TO THE RECORD**

Mr. Rafiekian respectfully moves the Court to reset the next Docket Call in this case—

currently scheduled for July 9, 2019 at 10:00 A.M.—for July 8, 2019, at a time convenient to the

Court.  The government does not object to a July 8, 2019 Docket Call.

Trial in this case will begin on Monday, July 15, 2019.

On July 3, 2019, the government filed a document styled "Notice of Correction to the

Record" (the "Notice") in which the government seeks to reverse its prior and longstanding

representations to the Court and the Defendant with regard to the role of Michael Flynn as a co-

conspirator in the conspiracy charged in the Indictment of this case.  At the same time, the

government informed the Court and the Defendant that (a) Flynn will not testify in the

government's case-in-chief (b) the government will now seek admission of Flynn's statements

into evidence as out-of-court statements of a co-conspirator pursuant to Federal Rule of Evidence

801(d)(2)(e).  The Court then granted, on the government's motion, an Order placing the Notice

and its contents under seal.

On the eve of trial, the gravity of this reversal of position by the government with regard

to Flynn – the witness whose allegations gave rise to this criminal case and who was repeatedly

identified by the government as not a co-conspirator – cannot be overstated.  With only a few

days remaining before jury selection, the loss of an additional day before being heard by the

Court on this matter will only increase the obstacles lately created by the government on the ability of Mr. Rafiekian's lawyers to prepare and present an effective trial defense.

Mr. Rafiekian will shortly submit a memorandum to the Court that will address in detail (a) additional facts relating to the recent disclosures by the government, (b) the legal effect of these disclosures on this case and the trial and (c) the reasons that the Notice and its content should not be maintained under seal.

Further, Mr. Rafiekian's counsel has a long scheduled commitment to be in Boston on behalf of another client in connection with another criminal case on Tuesday, July 9, 2019.

For these reasons, and subject in all respects to the demands of the Court's calendar, Mr. Rafiekian respectfully requests that the hearing in this case, that is currently scheduled for Tuesday, July 9, 2019, be reset for any time on Monday, July 8, 2019.

Dated: July 5, 2019

Respectfully submitted,

*/s/*_____
Mark J. MacDougall (*Pro Hac Vice*)
Stacey H. Mitchell (*Pro Hac Vice*)
John C. Murphy (*Pro Hac Vice*)
Adam A. Bereston (*Pro Hac Vice*)
Samantha J. Block (*Pro Hac Vice*)
*Counsel for Bijan Rafiekian*
Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
Telephone:  (202) 887-4000
Fax:  (202) 887-4288
E-mail:  mmacdougall@akingump.com
           shmitchell@akingump.com


*/s/*_____
Robert P. Trout (VA Bar # 13642)
*Counsel for Bijan Rafiekian*
Trout Cacheris & Solomon PLLC
1627 Eye Street, NW
Suite 1130

Washington, DC 20006
Telephone:  (202) 464-3311
Fax:  (202) 463-3319
E-mail:  rtrout@troutcahceris.com

## **CERTIFICATE OF SERVICE**

I hereby certify that, on the 5th day of July 2019, true and genuine copies of Defendant

Rafiekian's Motion for July 8, 2019 Hearing on Nondisclsoure Order and Government's Notice

of Correction to the Record were sent via email to the following:

> James P. Gillis
> John T. Gibbs
> Evan N. Turgeon
> U.S. Attorney's Office (Alexandria-VA)
> 2100 Jamieson Avenue
> Alexandria, VA 22314
> Telephone: (703) 299-3700
> Email: james.p.gillis@usdoj.gov
>         john.gibbs@usdoj.gov
>         evan.turgeon@usdoj.gov
>
> Jesse R. Binnal
> Philip John Harvey
> Harvey & Binnall PLLC
> 717 King Street, Suite 300
> Alexandria, Virginia 22314
> Telephone: (703) 888-1943
> Email: jbinnalll@harveybinnall.com
>         pharvey@harveybinnall.com
>
> Sidney Powell
> Sidney Powell, P.C.
> 2911 Turtle Creek Blvd., Suite 300
> Dallas, Texas 75219
> Telephone: (352) 630-5788
> Email: sidney@federalappeals.com

/s/
_____
Robert P. Trout (VA Bar # 13642)

FILED

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal Case No. 1:18-CR-457 (AJT)** |
| | : | |
| **BIJAN RAFIEKIAN, et al.** | : | **UNDER SEAL** |

## DEFENDANT'S MEMORANDUM REGARDING
## NOTICE OF CORRECTION TO THE RECORD

Defendant Bijan Rafiekian, through counsel, respectfully submits this memorandum regarding the government's *ex parte* Notice of Correction to the Record ("Notice"). As set forth below (1) the government should be precluded from "correcting" the record and introducing out-of-court statements by Michael T. Flynn under Federal Rule of Evidence 801(d)(2)(E), (2) the Court should order the government to produce all grand jury transcripts and 302 memoranda pertaining to Flynn, (3) the Court should hold an evidentiary hearing to determine whether the Indictment against the Defendant was procured through false statements by Flynn, and (4) the Notice, this memoranda, and all associated docket entries should immediately be unsealed and made part of the public record of this case.

## BACKGROUND

The government's investigation of this matter began more than two years ago. Over 18 months ago, Michael T. Flynn pled guilty to lying to the government about a matter completely unrelated to this case and this defendant. Ex. A (Flynn Guilty Plea). At the time of his guilty plea, the government insisted that Flynn sign a Statement of Offense that included "facts" that were entirely unrelated to the offense to which Flynn pled guilty—but calculated to advance the prosecution theory underlying the current case. Ex. B (Statement of the Offense). The "facts"

included in the Statement of Offense purported to describe false representations in the Foreign

Agent Registration Act ("<u>FARA</u>") filings that Flynn alone had signed on behalf of Flynn Intel

Group ("<u>FIG</u>"). That Statement of Offense is, itself, demonstrably false.[1]

Since Michael Flynn's guilty plea on December 1, 2017, the government has had

unlimited access to him as a cooperating witness and has interviewed him on multiple occasions

about the facts of this case. Based in large part on Flynn's interviews and testimony, Mr.

Rafiekian was indicted by a grand jury in December 2018. Flynn was featured prominently in

the Indictment, in which he was described as "Person A."

Armed with all of the information that the grand jury, the FBI, the National Security

Division of the Department of Justice, and the U.S. Attorney's Office has gathered, the

government maintained (and presumably the grand jury concluded) that Flynn was not a co-

conspirator in this case. On February 13, 2019, in response to Mr. Rafiekian's motion for a bill

of particulars, the Court ordered the government to disclose names of persons whose statements

the government planned to introduce at trial as statements of a co-conspirator—pursuant to

Federal Rule of Evidence 801(d)(2)(E). On April 10, 2019, the government made that disclosure

---

[1] The Flynn Statement of the Offense, prepared by the government and signed by Flynn and his attorneys, asserts that the FARA filings falsely stated that "FIG did not know whether or the extent to which the Republic of Turkey was involved in the Turkey project." Ex. B at 5. But that does not accurately describe what is in the FARA filings. Here is the relevant language from the FARA filing:

> Flynn Intel Group does not know whether or the extent to which the Republic of Turkey was involved *with its retention by Inovo for the three-month project.* Flynn Intel Group is aware that Mr. Alptekin consulted with officials of the Republic of Turkey regarding potential work by Flynn Intel Group, and Mr. Alptekin introduced officials of the Republic of Turkey to Flynn Intel Group officials at a meeting on September 19, 2016, in New York.

Ex. C (FARA Filing) at [A-12].

2

of alleged co-conspirator testimony—with Flynn's name absent. As recently as June 13, 2019, the Court directly asked the government whether Flynn was a co-conspirator and, notwithstanding Flynn's December 1, 2017 signed Statement of Offense, the government unequivocally declared that he was not. But on July 3, 2019, the government advised the Court that it was changing its position and now labeling Flynn a co-conspirator. Rather than calling Flynn as a witness, the government has now stated that it will seek to introduce Flynn's statements as co-conspirator hearsay pursuant to Federal Rule of Evidence 801(d)(2)(E).

There are no new facts that the government has discovered about Flynn's role or his actions during the period charged in the Indictment. What has changed is that the government has determined that (a) Flynn's testimony is not to be believed, (b) the government lawyers cannot sponsor false testimony from Flynn, and (c) the government now cannot call Flynn as a witness. On the eve of trial, and more than four months after being ordered to identify all co-conspirators whose hearsay statements the government planned to introduce, the government wants a "do-over." That is to say, the government now seeks to sponsor hearsay from a declarant the government has conceded is not a credible witness about factual matters that are central to this case. The Court should not permit this to happen—either as a matter of law or pursuant to the Court's discretionary authority to prevent the government from making up its case as trial approaches.

The following is what Mr. Rafiekian's counsel knows about the specifics of this surprising last minute development. On July 2, 2019, defense counsel received an email from the government that stated:

> According to General Flynn's counsel, Flynn did not provide his Covington
> attorneys with any untruthful information, he did not read the FARA filing when
> he signed it, and he was not aware at the time that he signed the FARA filing that

3

> it contained the false statements and omissions that are listed in paragraph 5 of his
> statement of offense. According to Flynn's counsel, he agrees that the statements
> in the FARA filing are, in fact, false and misleading. According to Flynn's
> counsel, his testimony would remain consistent with the facts of his plea colloquy,
> his statement of the offense, and his testimony before the grand jury. We do not
> necessarily agree with these characterizations.

Ex. D. Defense counsel interpreted the email's final sentence as a euphemism for, "We've

concluded [Flynn] is lying." Seeking clarity, defense counsel sought to arrange a call with the

government lawyers. Before that call took place, the Court issued its Order of July 3 disclosing

that the government would not be calling Flynn as a witness and as a result is seeking to amend

its previous declaration that Flynn was not a co-conspirator, and seeking to introduce statements

from Flynn as co-conspirator hearsay.

## ARGUMENT

### I. The Court Should Preclude the "Correction" of the Record and Exclude Out-of-Court Statements by Flynn Pursuant to Federal Rule of Evidence 801(d)(2)(E)

The government has styled its filing as a "Notice of Correction to the Record," but that is

a misnomer because there is no mistake to "correct." This is not a case where the government

has misstated a fact on the record. This is a conscious reversal. The government previously took

the position, based on all of the available facts at its disposal, that Flynn was not a co-

conspirator. Now, the government has reversed their legal position. The government should not

be permitted to *change* the record retroactively and pretend that its prior position does not exist.

The government's reversal on the eve of trial regarding Flynn's status as an alleged co-

conspirator should be rejected outright. The government's new position that Flynn is now

considered a co-conspirator is disingenuous. Every shred of evidence about Flynn's role and

actions during the alleged conspiracy has been known by the government for many months. As

recently as three weeks ago, the government affirmatively represented to the Court that Flynn

4

was not a co-conspirator. The new Flynn version of events is not a disclosure of previously unknown facts relating to the alleged conspiracy. It is an unbelievable explanation, intended to make Flynn look less culpable than his signed December 1, 2017 Statement of Offense and consistent with his position at his sentencing hearing. In short, Flynn wants to benefit off his plea agreement without actually being guilty of anything. There are no new facts to suggest that Flynn has been revealed to be a co-conspirator. In truth, the only thing significant about this new version of events is that even the government is now convinced that Flynn is making it up.

More than four months have passed since the Court ordered the government to identify all alleged co-conspirators whose hearsay statements the government would seek to introduce at trial. (Docket # 47, Feb. 13, 2019). In addition to the co-defendant Alptekin, the government identified certain senior Turkish officials as unindicted co-conspirators. Flynn was conspicuously not on the government's list of co-conspirators whose hearsay the government planned to introduce. The government's approach to labeling individuals as co-conspirators is not rooted in any principled showing that the person knowingly participated in a criminal conspiracy. Rather, the government clearly views the question of who participated in the alleged conspiracy as a tool to avoid the hearsay rule.

Flynn is available to testify at trial. But the government has now declared Flynn to not be a credible witness, yet seeks to admit his out-of-court statements (and not his testimony) as true and not subject to cross-examination. This is not a case where the defense alone is saying the declarant is unreliable. Here, the government acknowledges that the declarant is not credible about matters that are at the heart of this case. The government should not be permitted to introduce Flynn's alleged co-conspirator hearsay because (a) such designation was not disclosed by the government, as ordered by the Court in February, (b) as recently as June 13, 2019, the

5

government reiterated its position that Flynn was not a co-conspirator, and (c) given the government's concession that Flynn, although available, would not testify truthfully, none of his statements bear any indicia of credibility.

Permitting the government to proceed at trial as it has now requested—in the presence of this contorted record—would deny Mr. Rafiekian the basic due process rights of any citizen facing a criminal trial.

## II.    The Court Should Order the Immediate Production of Grand Jury Transcripts and 302 Memoranda Regarding Contacts with Flynn and Flynn's Counsel

The government's case against Mr. Rafiekian was made possible only through the extensive cooperation of Michael Flynn—a convicted liar. The investigation and Indictment proceeded only because Flynn, as part of his plea agreement, was willing to sign onto a concocted Statement of Offense that included false representations entirely unrelated to the offense to which he pled guilty. He sat for dozens of interviews with government attorneys and agents, produced tens of thousands of documents, and until this week was the presumptive cornerstone witness for the government. At the same time, the government turned a blind eye to related unlawful conduct by Flynn including: (a) unlawful waiver of FIG's attorney-client privilege without the Defendant's consent and (b) filing of a demonstrably false certificate of dissolution with the Delaware Secretary of State.

The government has belatedly realized what should have been clear all along—Flynn is not to be believed. If Flynn made false statements to the grand jury—as now seems likely—that would provide strong grounds to dismiss the Indictment. The district court can exercise its supervisory authority to dismiss an Indictment for errors in grand jury proceedings where the defendant can demonstrate an irregularity in the proceedings that operated to his prejudice. *See*

6

*United States v. Brewer*, 1 F.3d 1430, 1433 (4th Cir. 1993). Such prejudice exists where (1) the irregularity substantially influences the decision to indict or (2) there is grave doubt that the decision to indict was free from the substantial influence of such irregularities. *Id.* Because Flynn's testimony was surely central to the evidence considered by the grand jury, there is significant reason for concern that false statements made by Flynn to the grand jury substantially influenced its decision to issue the Indictment. For these reasons, the government should be compelled to produce Flynn's grand jury testimony to the defense, as well as any pertinent 302 memoranda, so that the defense may evaluate whether grounds exist to move the court to dismiss the Indictment. [2]

## III. The Government's Notice of Correction to the Record Should be Unsealed and the Government's Ex Parte Motion Should be Produced to the Defense

It is well-settled that defendants in criminal cases and the public have a right to a trial open to public scrutiny, grounded in the First and Sixth Amendments. *See Press-Enter. Co. v. Superior Court of Cal.*, 464 U.S. 501, 510 (1984) (public's First Amendment right); *Waller v. Georgia*, 467 U.S. 39, 44-45 (1984) (defendant's Sixth Amendment right). The standard governing whether the public trial right has been infringed is the same whether the right is asserted by the media under the First Amendment or by a defendant under the Sixth Amendment. *Waller*, 467 U.S. at 46-47. Under this constitutional standard, trial proceedings, pre-trial proceedings, and court documents are presumptively open to the public and may be closed only if certain criteria are met. These criteria are:

---

[2] Although the defense would normally be given access to Flynn's grand jury transcript as *Jencks* material, in light of the government's decision not to call him, the defense will not have access to the transcript without the Court ordering it to be produced.

1. an "overriding interest" must exist to close the trial,

2. the closure is no broader than necessary to protect that interest,

3. the court considers reasonable alternatives to closure, and

4. the court makes specific findings on the record concerning the existence of the overriding interest, the breadth of the closure, and the unavailability of alternatives to facilitate appellate review.

*See Press-Enterp.*, 464 U.S. at 510; *Bell v. Jarvis*, 236 F.3d 149, 164-65 (4th Cir. 2000); *United States v. Harris*, 890 F.3d 480, 492 (4th Cir. 2018).

The government suggests that maintaining the Notice under seal is necessary to maintain the impartiality of the venire. This explanation is unpersuasive and, if applied broadly, would have all noteworthy criminal cases proceed in secret—contrary to the clear First and Sixth Amendment doctrines that assure free and open criminal proceedings. Moreover, whatever media coverage takes place will likely focus on the fact that Flynn will not be a witness after all—something the jury will learn before retiring to deliberate. If the publicity includes conjecture that the government is not calling Flynn because the prosecutors believe he has lied— or would lie if called to testify—that speculation will not bear on any witness whose testimony the jury will hear. In short, any such media discussion will relate to a person who is not going to be a witness (Flynn) and will not relate to any of the evidence at trial. Finally, the tool for dealing with any potential bias in the venire associated with pretrial publicity is a proper *voir dire*—not secrecy in the conduct of pre-trial proceedings.

Dated: July 5, 2019                                     Respectfully submitted,

                                                        /s/_____
                                                        Mark J. MacDougall (*Pro Hac Vice*)
                                                        Stacey H. Mitchell (*Pro Hac Vice*)

John C. Murphy (*Pro Hac Vice*)
Adam A. Bereston (*Pro Hac Vice*)
Samantha J. Block (*Pro Hac Vice*)
*Counsel for Bijan Rafiekian*
Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
Telephone: (202) 887-4000
Fax: (202) 887-4288
E-mail: mmacdougall@akingump.com
       shmitchell@akingump.com


/s/ _____
Robert P. Trout (VA Bar # 13642)
*Counsel for Bijan Rafiekian*
Trout Cacheris & Solomon PLLC
1627 Eye Street, NW
Suite 1130
Washington, DC 20006
Telephone: (202) 464-3311
Fax: (202) 463-3319
E-mail: rtrout@troutcahceris.com

## CERTIFICATE OF SERVICE

I hereby certify that, on the 5th day of July 2019, true and genuine copies of Defendant Rafiekian's Memorandum Regarding Notice of Correction to the Record were sent via email to the following:

James P. Gillis
John T. Gibbs
Evan N. Turgeon
U.S. Attorney's Office (Alexandria-VA)
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3700
Email: james.p.gillis@usdoj.gov
   john.gibbs@usdoj.gov
   evan.turgeon@usdoj.gov

_/s/_ _____
Robert P. Trout (VA Bar # 13642)

FILED

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT**
**Alexandria Division**

UNITED STATES OF AMERICA,

v.

BIJAN RAFIEKIAN, *et al.,*

Defendants.

Criminal Case No. 1:18-cr-00457

**FILE UNDER SEAL**

---

**MEMORANDUM OPPOSING COCONSPIRATOR DESIGNATION**
**OF NON-PARTY WITNESS MICHAEL T. FLYNN,**
**ENFORCE THE GOVERNMENT'S JUDICIAL ADMISSION**
**AND VACATE THE NON-DISCLOSURE ORDER**

Non-party witness Michael Flynn hereby requests relief from the order issued July 3, 2019, upon *ex parte* application of the government.[1] The government, which is "not an ordinary party to a controversy,"[2] should be bound by the judicial admissions it made in open court on June 13, 2019, in direct response to this Court's questions:  that Mr. Flynn is not a co-conspirator in the case before the Court.  This is not a mere "Correction to the Record."

Moreover, designating Mr. Flynn as an unindicted co-conspirator and requesting such a finding by this Court by a preponderance of the evidence is unnecessary even according to the government's response, which, due to an oversight by the government, new counsel received at 9:03 pm last night, Sunday July 7, 2019.  The government itself concedes that the one document it seeks to admit per that designation is "*otherwise admissible.*"

---

[1]  Non-party witness Flynn has requested any and all filings the government made to obtain the *ex parte* order on July 3. Mr. Flynn's rights are directly implicated by the government's filing and this resulting order, yet this counsel does not know what has been filed against him.  Given more time, counsel will gladly provide the Court any additional information we find on these issues.

[2]  *Berger v. United States*, 295 U.S. 78, 88 (1935).

Once the government's "correction" has been denied, this Court's Temporary Nondisclosure Order, entered on the same day under seal, would have served its purpose of preserving the status quo until this hearing could be held, and it should be vacated.[3]  In the alternative, if there is reason for it to remain, it should be significantly narrowed to comply with the First Amendment.

1. **The Government Should Be Legally Bound by Its Judicial Admissions and Repeated Representations to Counsel.**

While Mr. Flynn does not dispute the government's right to decide how to present its case and which witnesses to call, the government's sudden decision to reverse its long-stated position that Mr. Flynn is *its* cooperating witness, and to turn him into an unindicted coconspirator, is extremely prejudicial to Mr. Flynn.

Given recent events, which Mr. Flynn describes *infra*, the government's reversal also sounds an alarm of possible retaliation and may have ramifications for Mr. Flynn beyond this trial. Mr. Flynn is still willing to cooperate with the government and provide testimony consistent with his grand jury testimony and prior interviews. Indeed, Mr. Flynn is cooperating now by providing more information and further waiving the attorney-client privilege and work-product protections specific to material in this filing.  And, in the last two weeks, he and his new counsel have scoured the record of his interactions with others and with his former counsel to demonstrate the soundness of his testimony regarding the facts of the underlying events and transactions.

Not only did the prosecutors advise the Court on the record that Mr. Flynn is not a

---

[3] By its terms, the Nondisclosure Order applied to prevent "[disclosure] to anyone the existence of this Order or the Government's Notice of Correction to the Record, to be filed, unless otherwise ordered by the Court." The Order then concluded by setting a hearing "on *whether* this Order and the Government's Notice of Correction of the Record shall remain under seal" (emphasis supplied).

coconspirator, AUSA Gillis has stated repeatedly in interviews of Mr. Flynn and representations to counsel that Mr. Flynn was not implicated in the charged conspiracy.[4] The government's "about-face" is not a "correction" of the record. There is no misstatement or typographical error which can simply be "corrected." The prosecutors made deliberate and affirmative admissions to counsel and this Court.

The government's representations and clear statements constituted a judicial admission and are binding. A judicial admission or stipulation is "an 'express waiver made . . . by the party or his attorney conceding for the purposes of the trial the truth of some alleged fact." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) (citing 9 J. Wigmore, Evidence § 2588, p. 821). Although a judicial admission comes most often as 'a formal concession in the pleadings or stipulations          by          a          party          or          counsel], ' *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001) (citation omitted), it can be made orally in the course of litigation. The determination centers on the knowledge and intent of the party making the admission, thus "'[a] lawyer's statements may constitute a binding admission of a party[ ]' if the statements are 'deliberate, clear, and unambiguous[.]'" *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) (quoting *Fraternal Order of Police Lodge No. 98 v. Prince George's County, MD*, 608 F.3d 183, 190 (4th Cir. 2010)).

United States Attorneys are fully empowered to bind the government, which authority is

---

[4] Mr. Gillis informed undersigned counsel and Mr. Flynn twice on June 6 alone that Mr. Flynn was not charged in this conspiracy, and they did not intend to charge him. This is one reason new counsel for Mr. Flynn understood that the government was only interested in and satisfied with Mr. Flynn's factual testimony as given repeatedly to date—which, as Mr. Gillis put it, "would allow the jury to infer supervision and control" of the project by the Government of Turkey—the ultimate question for the jury here—if it found the facts beyond a reasonable doubt. Dkt. 213: Hearing of 06/13/19; Tr. 65.

"incidental to [their] statutory authority to prosecute crimes." *Thomas v. I.N.S.*, 35 F.3d 1332, 1340 (9th Cir. 1994). The Fourth Circuit has held that in settling disputes between a defendant and the government over the latter's commitments, it relies heavily on commercial contract law, enhanced by two factors that favor the defendant. The first factor stems from the inherent rights of the defendant, which are "constitutionally based and therefore reflect[] concerns that differ fundamentally from and run wider than those of commercial contract law." *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986). The second concern, applicable to federal prosecutions, considers the "honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government." *Id.* These two factors— the "constitutional and supervisory concerns"—"require holding the [g]overnment to a greater degree of responsibility" for the representations it makes within the course of litigation. *Id.*

In this case, the colloquy between this Court and the government was very clear. Not only did the government, in response to a direct question, unequivocally state that Mr. Flynn was not a member of the conspiracy, but in the course of further questioning on the nature of the testimony Mr. Flynn would give, the government reiterated, "we do not contend that Mr. Flynn was a member of the conspiracy." Counsel could not have been more deliberate or clear. Nor was the question one that the government had not had time to consider, since Mr. Flynn's potential status as a co-conspirator must have been explored in considerable depth in the course of the last few months. The theory of estoppel generally is "intended to protect the integrity of the judicial system and to prevent a party from 'playing fast and loose' with the courts to suit the party's purposes." 6 Handbook of Fed. Evid. § 801:26 (8th ed.). Because counsel's clear representation to the court was knowing and wholly unambiguous, it should be binding.

In addition, Mr. Flynn was not required by his plea agreement or otherwise to cooperate

4

with the prosecution in this case. The Special Counsel Office released him and advised that he had fulfilled his cooperation prior to his scheduled sentencing and again thereafter.[5] Yet Mr. Flynn has continued to cooperate with the government for hours upon hours—at great expense of time and defense funds—as he did long before he was charged and would have continued to do even if he had never been charged.

Mr. Flynn delayed his sentencing before Judge Sullivan to continue his cooperation here, for whatever benefit—if any—that might have in his sentencing, but he could have chosen not to cooperate further, proceeded to sentencing, and be done with all of it. The government should not be allowed to place him in a worse position now and name him as a co-conspirator in this proceeding—for the feeding-frenzy of the press or for any future use it might contemplate.

## 2. The Government's "About-Face" Could Be Retaliation For Mr. Flynn's Truthful Testimony The Government Does Not Like.

As the Court knows, Mr. Flynn has new counsel. Virtually all of new counsel's intense work to date has been assisting him in cooperating with the prosecutors in this case. It amounts to hundreds of hours. Undersigned counsel are still working all hours to try to get up to speed on the case.

After participating in further trial prep sessions with the government, new counsel advised the prosecutors last week, as Mr. Flynn has said in prior interviews, his testimony of the underlying facts of the transactions remains consistent with his prior testimony and interviews. Unfortunately, the government was not satisfied with that. The prosecutors have been adamant Mr. Flynn testify that he authorized filing the FARA form knowing and intending that it contain false statements. Mr. Flynn cannot give that testimony because it is not true.

---

[5] *See* Ex. 1, Joint Status Report of 03/12/19.

5

Mr. Flynn advised the government, as Mr. Flynn has said before, that much of what he understands is with the benefit of hindsight. When Mr. Flynn agreed in his "Statement of Offense" in Judge Sullivan's court that certain information in the FARA filing was false, he was doing so with some hindsight. Undersigned counsel advised the prosecutors that Mr. Flynn did not know and did not authorize signing the FARA form believing there was anything wrong in it. He honestly answered the questions his former counsel posed to him to the best of his recollection, and some with the benefit of hindsight. He authorized and paid for their extensive independent investigation to the tune of approximately $170,000.

Mr. Flynn trusted his former counsel who held themselves out as experts in this area of law. They had the facts, interviewed multiple people, and reviewed many documents and emails while he was incoming and then-serving National Security Advisor, then in the uproar attending his departure. In addition, former counsel had to decide what to file under extreme and unprecedented pressure from and extensive interactions with the National Security Division— including then-NSD head, David Laufman.[6] Admittedly, former counsel had to make difficult judgment calls, and they did so with input from the NSD itself.[7] As for the final filing, Mr. Flynn recalls only reading the cover letter. Regardless of what he read, he did not intend to or knowingly make any false statements, and this is a complex area of law about which he knew nothing.

After counsel advised the prosecutors that Mr. Flynn could not testify that he authorized the filing of the FARA registration knowing that it contained any false statements, the government

---

[6] Mr. Laufman suddenly resigned "for personal reasons" on February 8, 2017, amid the Inspector General investigation of irregularities in the Clinton email investigation and the National Security Division. However, he remained in the Department long enough to pressure Mr. Flynn's FARA filing.

[7] Ex.4, Kelner email of February 20, 2017 to Kristen Verderame in preparation for meeting with Department of Justice. This email is quoted in more detail, *infra*.

cancelled and rescheduled an interview of Mr. Flynn and encouraged us to reconsider our position. The prosecutors requested new counsel review hundreds of pages of notes from prior counsel (many of them handwritten) and both plea colloquies.

In the process of reviewing that material, and in the spirit of full cooperation to provide truthful testimony pursuant to his agreement with the government, Mr. Flynn partially waived attorney-client privilege on June 27 to provide the government with contemporaneous notes by former counsel of conversations with Mr. Flynn prior to the FARA filing—after the government advised us of two specific issues with respect to which they claimed Mr. Flynn was not fulsome with prior counsel. Those conversations were of an interview of Mr. Flynn on January 2, 2107, and a phone conference on February 14, 2017.[8] In a meeting with the prosecutors on June 27, undersigned counsel walked the prosecutors through the notes which rebutted—if not flat out belied—the government's misunderstanding of Mr. Flynn's statements to his own counsel on issues the government raised. This prompted a heated exchange with Mr. Van Grack who participated via speakerphone. After new counsel left, Mr. Van Grack and his team seemed to double-down. They have apparently put former counsel in a direct conflict with Mr. Flynn.

They scheduled an interview by the FBI with Mr. Kelner at Covington and Burling for July 3, which they later canceled in favor of moving his preparation session from Tuesday July 2 to July 3. Also July 3, an FBI Agent also called the younger Michael Flynn directly to question him despite knowing that he was represented by counsel. The Agent persisted in trying to speak with him even after he said to call his attorney.

New counsel were informed the government would question Mr. Kelner in his July 3 interview about the notes counsel had provided, but Mr. Turgeon did not do so. Instead, Mr.

---

[8] Exs 2 and 3 provided to the government on June 27; see Ex. 3-A for transcription.

7

Turgeon carefully worded his questions to elicit responses from former counsel that the notes by Covington's notetaker and partner Brian Smith actually *contradict*.

Within minutes of concluding the interview of Mr. Kelner, AUSA Gillis called us only to notify us that he would not be calling Mr. Flynn as a witness, and that counsel would be receiving a gag order that prohibited us from disclosing that fact. He did not even mention that the government had made the remarkable decision to re-cast Mr. Flynn as a co-conspirator—contrary to many prior representations—and that they would seek a ruling from this Court finding him to be a coconspirator by a preponderance of the evidence in this high-profile proceeding in which he cannot defend himself.

In the spirit of full transparency and cooperation, Mr. Flynn hereby adds to his earlier production to the government the notes counsel have reviewed and transcribed since then, and pertinent emails new counsel has found—still prior to the FARA filing—and Mr. Flynn also hereby agrees to waive his own protections of the work-product doctrine and attorney-client privilege associated specifically with these notes and emails.

In these notes and emails, attached hereto as exhibits, it is clear Mr. Flynn's former counsel were aware before the FARA filing was made:

1. The Government of Turkey was involved in the project and likely the principal beneficiary, rendering the previously filed LDA insufficient.[9]

2. Ms. Verderame, personal counsel for Mr. Flynn, advised from the first meeting with former counsel that "Ekim – emails show Turkey. Mike copied on many of the emails." "August *4?* Money from ministry... Government behind it, and Mike copied."[10] [Note, no money was ever traced to Turkey to our knowledge.]

---

[9] Ex. 5, 02/22/2017 handwritten notes of Brian Smith of extensive meeting with FARA unit of DOJ.

[10] Ex.2, 01/02/2017 handwritten notes of Brian Smith of interview with Mr. Flynn, Ms. Verderame, and Mr. Kelner.

3. Mr. Alptekin set up meeting in September. Flynn "met 2 ministers – Transportation and Foreign." [11]

4. "[T]he GOT [government of Turkey] had role of some kind." "Meeting in NY – Ekim and ministers." "No argument that Gulen focus was for commercial purpose." [12]

5. It was apparent Ekim Alptekin had a relationship with Erdogan's son-in-law. They brought up Gulen. [13]

6. Counsel had the "Green light [email authorization from Alptekin by Turkish officials to go ahead with the project] and 2 emails on NY/Confidence" [14]

7. FIG was to do "research into Gulen." "Project Confidence" is detailed in a "75 pp report re Gulen" about which Mr. Flynn and his personal and FIG counsel Kristen Verderame told his former lawyers in their first meeting. "Plan for "disseminating what they found, based on the report." [15]

8. That 75-page document, which prior counsel possessed, is all about Gulen and as reflected in counsel's notes, was used as the basis for the op-ed. [16] Flynn correctly told his counsel Bijan Kian did the first draft of the op-ed. [17]

9. Mr. Flynn pointed former counsel to the "other emails that show details." Former counsel recognized that "op-ed and sleeper networks, plus criminal referrals changes context." [18]

10. Former counsel: "Documents – Gulen, op research, not commercial." [19]

11. The focus of the project quickly narrowed to Gulen. [20]

---

[11] Ex.2, 01/02/2017 notes of Brian Smith in interview of Mr. Flynn with Mr. Kelner and Ms. Verderame.

[12] Ex. 6, 1/26/2017 notes of Brian Smith in phone conference with Mr. Kelner and Ms. Verderame.

[13] Ex. 2.

[14] Ex. 6.

[15] Ex. 2.

[16] Ex. 2, 01/02/2017 notes of Brian Smith with Mr. Flynn, Mr. Kelner, Ms. Verderame, and Ex. 7, the Project Confidence report itself.

[17] Ex. 2 at 8.

[18] Ex. 2; *see also*, Ex. 3.

[19] *Id.* at 9.

[20] Handwritten notes of 2/22/2017 meeting with Mr. Flynn were transcribed a year later and omit the crucial fact that Mr. Flynn told counsel the "business activities" reason that originated the project quickly "crystalized" down to "Gulen" which the raw notes show with a V diagram. The later transcription also omits or misinterprets the fact that the op-ed was *pushed* at the time for

12. "[T]he focus on Gulen." [21]

13. Former counsel notes: "Emails, docs, interviews -- little evidence of business/commercial." [22]

14. [there was] "little evidence of commercial" [purposes] [23] "No argument that Gulen focus was for commercial purpose. No evidence of commercial except conclusory statement." [24]

15. Former counsel: "And we have bad facts. No commercial facts." [25]

16. The "Op-ed on same topic → Gulen" and "paid through the contract." [26]

17. Unknown at the time to Mr. Flynn, Mr. Kian sent Ekim Alptekin a copy of the op-ed. Alptekin wanted changes made to it, and Mr. Flynn did not make them. [27]

18. They were still trying to decide even if they had to file the FARA registration on February 14, 2017. That call to Mr. Flynn was prompted by a call on February 13, 2017, from then-resigning head of the NSD at DOJ, David Laufman himself. This was the day Mr. Flynn had to resign as National Security Advisor. Mr. Laufman and others called Mr. Flynn's former counsel and pressured them to file the FARA. In counsel's call with Mr. Flynn, in which they advised him where they stood, he said very little, but authorized his former counsel to file it and "Be precise." [28]

19. This level of involvement, interest and pressure from the FARA division was unprecedented in Mr. Kelner's significant experience. [29]

---

campaign reasons (in addition to for the Inovo project). Compare Ex. 8 with Ex. 9. *See* Ex. 8-A, transcription of handwritten notes.

[21] Ex. 3, 02/14/17 handwritten notes of Brian Smith of phone conference of Kelner informing Mr. Flynn of status.

[22] *Id.*

[23] *Id.*

[24] Ex. 6, 01/26/2017 notes of Brian Smith in call with Mr. Kelner and Ms. Verderame.

[25] *Id.*

[26] Ex. 3, 02/14/2017 notes of Brian Smith of call with Kelner, Kristen Verderame, Mr. and Mrs. Flynn.

[27] Ex. 8, 02/22/17 Flynn interview notes; Ex.13.

[28] Ex. 3, 02/14/2017 notes of Brian Smith.

[29] Ex. 10, 2/09/2017 email of Robert Kelner noting: "Heather Hunt [of FARA unit] has been all over us. She emailed and then left a voicemail yesterday afternoon asking for a call this weekend." * * * "We've never seen her this engaged in any matter (ever)." There is substantially more evidence of unprecedented pressure from the FARA section that we could provide the Court with more time.

20. Former counsel told the General to take time with the draft-- "high level—don't have the detail."[30]

21. Former counsel advised the government in pre-trial preparation on May 29, 2019, the legal team preparing the FARA registration "did not necessarily go through every doc; were trying to capture the high-level info of who the client was and nature of the work."[31]

22. Current counsel for Mr. Flynn will hereby waive both the attorney-client privilege and the application of the work-product doctrine specifically as to the notes and information provided herein regarding the FARA filing and its preparation.

23. One of the statements in the FARA filing the government alleges as false came directly from information provided to former counsel for Mr. Flynn by counsel for Ekim Alptekin at Arent Fox and was inserted in the filing despite former counsel's concerns with the Arent Fox submission.[32]

24. Significantly, former counsel's email of February 20, 2017[33] in preparation for meeting with the Department of Justice recognizes it was all a judgment call made in extensive communication with the NSD:

   a. "At the same time, we recognize that Gulen is a major focus for the Turkish government, and extradition of Gulen was probably the primary focus of the Turkish government in its dealings with the United States during the period in which FIG was performing work for Inovo."

   b. "Arguably, the work [by FIG] could be viewed as principally benefitting the Turkish government."

   c. "But we don't view this meeting [that Alptekin arranged between General Flynn and two Turkish ministers] by itself as resulting in agency on behalf of the government, and there is no indication that the meeting or any other contacts involved the Turkish government *directing* FIG's activities." (Emphasis supplied.)

   d. "So FIG had a commercial client with commercial objectives, and no *known* foreign government client. This left us [the lawyers] somewhat straining to determine whether registration could be required solely on the basis that the work performed could be construed as principally benefitting the Turkish

---

[30] 02/14/2017 handwritten notes of Brian Smith of Kelner, Verderame, Flynn phone conference.

[31] Ex. 11, 05/29/2019 typed notes of Kelner interview with EDVA at page 8.

[32] Ex.12, 01/21/17, Kelner email; Rafiekian indictment paragraph 58.

[33] Ex. 4, Kelner email of February 20, 2017 to Kristen Verderame and Covington lawyers regarding meeting with Department of Justice.

government rather than Inovo or business interests generally. *We welcome your input on that judgment call.*" (Last emphasis in original.)

### 3. The Non-Disclosure Order Must Be Vacated as Overbroad and Unconstitutional or Revised and Narrowed.

If any non-disclosure order proves to be needed, it must be narrowed. The order the government obtained on July 3 contravenes the First Amendment. Gag orders are disfavored because they are prior restraints on speech and are content-based speech restrictions. *In re: Murphy-Brown, LLC,* 907 F.3d 788, 796-97 (4th Cir. 2018). Consequently, such an order must survive strict scrutiny. *Id.*

To survive strict scrutiny, the gag order must serve a compelling public interest and, if such an interest exists, the government must show the order uses the least restrictive means. *Id.* at 797-800. A fair trial can be a compelling government interest, if the government was able to show that there was a reasonable likelihood that a party would be denied a fair trial without the order. *Id.* at 797. (citing *In re: Russell*, 726 F.2d, 1007, 1010 (4th Cir. 1984). The government has failed to lay such a foundation here.

More important, the government cannot show that the order uses the least restrictive means. The order goes far beyond the order struck down in *Murphy-Brown,* which limited the order to extra-judicial statements that could reasonably reach "public communications media." Here the order prohibits Flynn and his lawyers from discussing the matter with anyone, including Mrs. Flynn, government officials, or even other courts. The order is far too broad. Mr. Flynn and his attorneys have no intention of discussing this matter with the press, but any restriction that goes beyond that fails a strict scrutiny analysis. If there is any reason for a non-disclosure order to remain, it should be rewritten to exclude Mr. Flynn and substantially limited so that it complies

with the First Amendment.[34]

## CONCLUSION

In sum, the Government should not be permitted to abandon its prior judicial admissions and designate Michael Flynn as a co-conspirator in this case. As even a cursory reading of the Government's July 5, 2019 Response reveals, to do so would be totally gratuitous—not to mention outrageously prejudicial to Mr. Flynn and unwarranted by the evidence.

The Government has now represented to both the defendant and to this Court—another judicial admission, and even later in the game—that it proposes to deploy Federal Rule of Evidence 801(d)(2)(E) to introduce only a single document. Furthermore, it concedes the document would be admissible *without using Mr. Flynn as the declarant*.

Under these circumstances, this Court's path seems clear. If the Government's request to designate Michael Flynn as a co-conspirator for purposes of this case is denied, *no* stakeholder's interest is harmed. The Government can introduce its exhibit, the defendant will have to contend with an exhibit that he would have faced in any event, and Mr. Flynn would not gratuitously have his reputation tarnished—or worse.

Regardless of the reasons behind the Government's request to "correct" its earlier judicial admissions and representations, it is enough to say that its remarkable reversal is unnecessary to present its case and introduce the designated document—according to the government's own Response. Accordingly, the government's request to name Mr. Flynn as an unindicted co-

---

[34] To the extent the government is relying upon its *ex parte* motion as a basis for showing a compelling government interest, Flynn is obviously unaware of what such arguments might be. This raises the curious question of why the government chose to file the motion *ex parte* instead of simply under seal. Should the Court rely upon the reasons in the *ex parte* motion as a basis for a compelling public interest, then the motion should be provided to Flynn with further opportunity to respond.

conspirator should be denied and the order of July 3, 2019, vacated in its entirety.

Dated: July 8, 2019                    Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall, VSB No. 79292
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, Virginia 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jbinnalll@harveybinnall.com

/s/ Sidney Powell
Sidney Powell
Sidney Powell, P.C.
2911 Turtle Creek Blvd., Suite 300
Dallas, Texas 75219
Tel: (352) 630-5788
sidney@federalappeals.com
Admitted *Pro Hac Vice*

W. William Hodes
The William Hodes Law Firm
3658 Conservation Trail
The Villages, Florida 32162
Tel: (352) 399-0531
Fax: (352) 240-3489
Admitted *Pro Hac Vice*

*Counsel for Non-Party Michael T. Flynn*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2019, I filed the foregoing in the office of the Clerk and I

will email copies to counsel for the government and the defendant.

/s/ Jesse R. Binnall
Jesse R. Binnall, VSB # 79292
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jbinnall@harveybinnall.com

*Counsel for Non-Party Michael T. Flynn*

# EXHIBIT 1

## ·UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | **Crim. No. 17-232 (EGS)** |
| **MICHAEL T. FLYNN,** | |
| **Defendant** | |

### JOINT STATUS REPORT

COMES NOW, the United States of America, by and through Special Counsel Robert S. Mueller, III, and the defendant through his counsel, and file this joint status report to provide the Court with the current status of this matter.

1. On December 18, 2018, the Court held a sentencing hearing in this matter. The defendant requested a continuance at that hearing, "to allow him to complete [his] cooperation" in a related case charged in the Eastern District of Virginia ("EDVA"). *See* Dec. 18, 2018 Sentencing Hearing Transcript, at 46-47. The Court granted the defendant's request and ordered the parties to file a status report by no later than March 13, 2019.

2. At this time, the defendant continues to request a continuance since the case in EDVA has not been resolved, and there may be additional cooperation for the defendant to provide pursuant to the plea agreement in this matter. A trial in the EDVA case is scheduled to begin on July 15, 2019. Accordingly, the defendant respectfully requests that the parties provide a status report within 90 days.

3.    The government takes no position on the defendant's request for a
continuance. However, while the defendant remains in a position to cooperate with
law enforcement authorities, and could testify in the EDVA case should it proceed to
trial, in the government's view his cooperation is otherwise complete.

Respectfully submitted,

ROBERT S. MUELLER, III
Special Counsel
BRANDON L. VAN GRACK
ZAINAB N. AHMAD
Senior Assistant Special Counsels

ROBERT K. KELNER
STEPHEN P. ANTHONY
Attorneys for Defendant

2

# EXHIBIT 2

A·C-WP-PAC

ME

No other

levicks — W. Coast - Covyx - Irania Arania founder.
Brainworks— Bluesky. Dead media combine

Abac - Advice, consult Business development

Introduced Lougee to Verizon
Founder Dr "Reza Sadri" — grew up in US.

Drein were Saina - Advisor to the company
India American Krishna Sarkar
US company in Massachusetts
Tried to ban Enforcement
Trained it to enforcement — FIG
Founder may have reached out to government
Business development → Sales and revenue

Fnove - Committee
Vice Chair - Bija
"Aynin" Altekin — Served on Turkish-Am Business Council
Melamen Committee - India America New Years
They call rep Andamakur.

July/August 2016 - Bijil discussions
Consult for Invo. Post case.
Greek candidate is Turkish business to trust in Turkey

Agreement to consult to Invo. August 9.
- Advising consult regards to Invo. Govt candidate d
Invest in Turkey

MTF-EDVA00047

Post Convention - Agent 9-11 in Texas
Duty ✓ Capain and Troop
Drop schedule

Bijan - Vice chairman 3o2
Mike owns 35% ⎤ renewing lease
Mike has LLC for bank and speaking ⎦ Sept 2o1

Bijan - Iranian American : BDS naturalized
Former member of Exec Jan
Served Bush as Clerk
Ex'd Deuly of State of Col.

Nelrouse Corrillion, USA, Iranian-American staff

Again - is the Iranian.
Bijan longs business to FIG.

Conversation on what we would do.
Come to DC. Friday afternoon phone calls to Again
Update on our efforts
2 x calls ≈ 30 minutes each.

Again set up meeting in September.
Minister of Turkey in NY for UNGA
met w minister - Transportation and Foreign
Mr. Woolsey, Again, Bijan
30 - 45 minutes.

MTF-EDVA00048

RK - Debrk?

MF - only in the agreement - bid
Could and be Again in how we'd do what we do
Head from then on the dollars they're fixing
= 2 months the corp
Research — how are things in Turkey

RK - Gulen?

MF - They did. Then we are of reshipts
LL - Notes?
MF - Don't know if any - Maybe on Turkish side

K - the email from Milos, account
use Virtue

MF 2
FG accounts shut down in December. except ME
Bedigen me and Bijan
How Bo Ruti backing of Bijan
Can get the file from him.
Cak access his. Have mine and MF/
Comril accounts - Virtue on top of certain emails
He has access to them, we don't

Virtru

K - How sim emails -

MTF-EDVA00049

K: need to sit w/ Turhil Minister?

MFI - yes had just came from the meeting on copyright side.
    Talked about where we were @ that time
    Were not very far

KW  Research into  Gulela -  Tom _____, Brian McCarley
                                Senior    principal
    Project  confidence  75 pp report  re  Gulela  firm AI
    Plan for Document on what they found, based on the report

Pijon says that report was an idea

RK:  Specific  contract.  Codified  of  individuals.
    Have retained film and publication  cover

MFI  other emails that show details.
    Mike Austin

PH -  Findings and Criminal referrals.
    Sphere Consulting

MFI :  Investigation was conducted
RK - Network in US.
MFI - Sphere Sought in by Pijon.
    To weak value story. Trying to to invest in.
    Confidence in the County to Invest
RK: opened and closer network, plus winning attend
    Changes confined

MTF-EDVA00050

MF1 (gets the details to Rija

RK. O.S Kelly - an CDI
MF1 - Sgr/ Agent - Abundance of contens
    R.S Kelly - register - Bu 4 know what the L is
    we H be doing used for they make up
    Out of my depth
    Kelly did work on underlying work.
RK - Kelly hired not you
MF1 - yes.
KV - they asked B.b. Auth company.
    Rijon ___ told me it was Bath company
    that is why

    Mike Borden responsible to owner.
    Bija gave prices to everyone
MF1. I can't track day to day
    Contract ed. and meeting
    Contract is for 90 days.
    Decided not to continue

RK. Captain Athenian ?
MF1 - Dout know.

KV - Rijon has access. Contacted by emails
    Trav - Several copy Again is consulted.
    Rijon said it's he H hask smart in meetings

MTF-EDVA00051

KV. Ekin - emails show Turkey
Mike copied on most of the emails
MFI by calendar - if jamal packed - few hours only.
KV Akin → Bijan and MFI - August 4
Money from Ministry

Bob Kelly - Sole partners - Council outside "to the project"
Government behind it, and Mike copied.

RK - Call from Jameson in 06 August.
FARA advice - referred to other lawyer.

MFI July 19. Conversation -
Did some speeds on LLC
fee

MF2 - This project. Comm of Bijan or win transfer
To FIG and to Ekin
Accepted payments from Inovo
Ekin paid

KV: Contract 3 x 2006
Second was 105
The rest was 105
Bijan said no PR or lobbying so sent them money back
Hired Ekin to as consultant
MF2. Mens asked or doubted
KV - Trusted Bijan
FIG shut down Nov 30.
MF2. He has the back to zip file this FIG materials
KV - Motive to preserve of delay or denying

MTF-EDVA00052

MF 2 - Bijan acknowledged

KV - Shut down. Dunt delete end of November.

RK - Where is it?

MF 2 - Gough business - Anytime data - yes
It sends you an email of links

ID) - Gough my shh how it? Paid y.

MF 2 - You paid by MF1 still has email.

RK - Do exactly humanly possible.
Shoz?

MF 2 - How ecom to his email - land turn, never
landed as may on of only
61 of emails.

KV - Lots of emails say Mike in charge
Gird in partly of us.

MF 2 - He didn't bring computer to meeting

RK - oged.

MF1 - Wanted it to go before the election. Slapped out
Hill picked it up
I'm see very strong on villa. Tea page birded Clarke thal,
Russic tight down wedge,
Fraud is new is bred indeed - my title.
Publish! Moshatrain or my port. Almin Living an ally - NATO
being to Russia
Gulu we suck creating tension

MTF-EDVA00053

Rk - Connection to Inovo?

MF1 - Logic, close attention to it, yet we're thinking
Rick. tour in Texas, Ron White

Irving tries Mayor - Agreement - Challenges w/ Color charter
Deal on July 12 -
rebed 1

Wrote emcee of edit

RK - whose idea

MF1 - Tried to do it. I authored chron - He had other people edit

RK. first draft

MF1 - He did.

Talked about ways to enhance project Confidence project.

MF2. Elim ink confidential - 

KW. Given documents to review and edit

MF1 - Elim says list the whole.

KW. Hank Cox. Sphere Consulting - had role in edits
Sphere did the shopping of up ed

(Have 3 pm meeting @ GIA building

1:07

Break to read documents

1:35

MTE-EDVA00054

RK - Chief ? Control of FIG.

KV   35% MF ⟩ outstanding shares
     30% BA ⟩

                                          0.5% Dr. Abushi
              25% ockley - friendly        1.0% Dark Shore

MF1 Bijan is aware of Letter.

RK- Sphere registered. November
    Documents - Guram, up research, not commercial.

    sphere do?
KV- Clipping, consulting - Positioned for the documentary.
RK - Stake lobbying ?
RK - Counsel?
        Chinese Wall - PJ.

    Outreach Targets email

    Oct 19 - met up state officials

RK - Prisons ?
MF1 Show McCan the Letter

        Brian McCanley
        Bijan
        Mike Boston - only talked to Ekim ≈ 2 x
        Paul Prechart → LAB

MF1 Sphere of Ekim a handful of times

# EXHIBIT 3

Conference w/ Flynn
2-14-17  4:30 pm
RK, KV, M Flynn, Lori

KV - Ø Spoke before
  Documents in email do look a him
  W/ first to read more carefully

RK - David Laufman call. HH, CF, on call.
  Unrelated to stuff in the press.
  Time to collect our interviews - facts.
  Possible draft registration. To Precision of Client
  When telling? he asked Call and let us know able to talk.
  Read it - File or subpoena may follow.
  If file, publish they'll still look. Take = let it wind away.
  Focus is whether you register. Could audit the filing
  Subpoena less likely
  not yesterday?
RK - yes.

RK - Where we are. Told them is Jan we expected to file.
  Emails, docs, interviews - little evidence of business/commercial
    except after the fact letter
  not discussed previously - other than fct.
  Talk to people involved. Little on oil field.
  Focus on Gulen, and a drive off EOP free on Gulen / Turkey
  Meeting of govt in September - tied to Confidence.
  Op-Ed. distributed by Sphere - paid thing contract.
  Op-ed. on same topic → below
  LDA - only if Turkey not deny and act prin- beneficiary
  Email - green light Bijan ninety not confidence.
  Other view - Ekim / Ratio business - green light unrelated.
  We could fight it out. whole likely answer. Court. expensive.
    right win = but big fight
  Media storm. Conspiracy theories, etc.

MTF-EDVA00055

- Payments added to chart
- <s>illegible</s>
- Vast this from being factor
- FCPA interconnected

MF - Filing Cats - Legality ____
Smart thing to file. be precise.

R.K: Take time with the doct. ___
High level - don't have the detail.
Gaps to explore?
Meet of Heather w/ the document.
Address any of her concerns.
Cover and cover letter. Single letter summarizing the position.
Cogent explanation of our position.
Careful of public statements - Interconnected. Can all blow back

MTF-EDVA00056

# EXHIBIT 3-A

02-14-17 Brian Smith notes. Phone call with RK, KV, MF and LORI.

KV: Spoke before

    Documents in email to look *Ekim?*

*w/ final?* to read more carefully

RK: David Laufman call. HH, CR on call.

    Unrelated to stuff in the press.

    Time to collect and interview – facts.

    Possible draft registration. Decision of client.

    When talking? He asked. Call and let us know able to talk.

    Read it: File or subpoena may follow.

    If file, possible they'll still look. Take a lot of wind away.

    Focus is whether you register. Could audit the filing.

    Subpoena less likely.

MF: YESTERDAY?

RK: Yes.

RK: Where we are. Told them in Jan we expected to file.

Emails, docs, interviews – little evidence of business/commercial.

    Except after the fact letter.

    Not discussed previously – after the fact.

    Talk to people involved. Little on oil field.

    Focus on Gulen, at time of FIG? focus on Gulen/Turkey

    Meeting with government in September – tied to Confidence.

    Op-ed distributed by Sphere – paid through contract.

    Op-ed on same topic → Gulen

    LDA only if Turkey not directing and not principle beneficiary.

Email – Green light. Bijan insists, not Confidence.

Other view – Ekim/Ratio, business, green light unrelated.

We could fight if ___. Would likely pursue. Court. Expensive. Might win – but big fight

Media storm. Conspiracy theories, etc.

MF: Filing late – legality.

Smart thing to file. Be precise.

RK: Take time with the draft.

High level – don't have the detail.

Gaps to explore?

Meet w/Heather with the document.

Address any of her concerns.

Could send cover letter. Simple letter summarizing the position

Cogent explanation of our position.

Careful of public statements. Interconnected. Can all blow back.


Notes in upper right corner: Payments added to chat.

Kept this from being factor

FCPA interconnected

# EXHIBIT 4

## Smith, Brian

| | |
|---|---|
| **From:** | Kelner, Robert |
| **Sent:** | Monday, February 20, 2017 11:12 PM |
| **To:** | 'K Verderame' |
| **Cc:** | Smith, Brian; Langton, Alexandra; Anthony, Stephen |
| **Subject:** | Outline for DOJ Meeting |

*[handwritten notes in right margin]*
2 Letters
O Atts
Redron for delon
upon exeption prior

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

Here is an outline for what I propose to cover tomorrow at the meeting, though obviously they may lead us in other directions:

We wanted to come in, as we have done before potential retroactive filings for other clients, to walk through the draft filing and solicit any input, so that we could address any issues with the draft. But in this case, as we discussed with Heather, we also wanted to talk through the arguments for and against filing a FARA registration, in the circumstances presented here, to get the Unit's input.

We've addressed in the draft we brought with us the answers to the various questions you had in your letter. And I can walk you through those answers today. Let me do that briefly now.

[Walk through each question and our response]

The client that engaged FIG, Inovo BV, is a Netherlands based corporation. A business consulting firm. Its CEO, Ekim Alptekin, a US-Dutch citizen, indicated that he was interested in restoring confidence in the Turkish economy, and he viewed Mr. Gulen and his followers as an obstacle to that. Although FIG did know that initially Mr. Alptekin was in touch with the Turkish government about the possibility of engaging FIG, Alptekin ultimately engaged FIG directly through Inovo and indicated that the Turkish government would not be involved in directing or funding FIG's engagement.

FIG agreed to conduct research from public sources on Gulen and to develop a video based on the research, which could be disseminated through a PR firm that FIG would retain.

After a contract was executed in August 2016, FIG engaged various independent contractors who conducted the open source research and began preliminary work on the video. FIG later retained a PR firm, Sphere. Sphere engaged in some federal and state level outreach to public officials, engagement with the media, and preparation of a monopoly themed graphic about the Gulen organization, called Gulenopoly. FIG also engaged in some outreach on the Hill regarding Gulen, including a meeting with Chairman McCall's staff.

Originally, the expectation was that the initial 3-month contract would be extended so that the research and video could be disseminated. But the contract was allowed to lapse on Nov. 15 without being extended, in light of the expectation that Gen. Flynn would join the administration. FIG suspended operations in mid-November 2016 and began to shut down. To the best of FIG's knowledge, FIG's research and the early work on the video was not disseminated by FIG. We do not know what Inovo may have elected to do with work product that was in its possession. We have seen, for example, Gulenopoly popping up on social media and in publications such as The Hill. FIG is not involved in circulating Gulenopoly to the best of our knowledge.

1

As noted, toward the end of the initial contract period, General Flynn himself wrote an op-ed about Gulen. He was not asked to do this. He viewed this as something he was doing on his own. But the subject matter overlapped with the work for Inovo, he did seek input from Alptekin, and FIG did ask Sphere to place the article.

*Based on this fact pattern, a credible argument could be made that registering under LDA, as FIG did, was sufficient, under the terms of the LDA exemption to FARA registration.*

At the same time, we recognize that Gulen is a major focus for the Turkish government, and extradition of Gulen was probably the primary focus of the Turkish government in its dealings with the United States during the period in which FIG was performing work for Inovo. This raises the question of whether the Turkish government is the principal beneficiary of the work for Inovo, within the meaning of the Department's regulation applying the LDA exemption. Arguably the work could be viewed as principally benefiting the Turkish government.

During the course of performing work for Inovo, Aptekin arranged for General Flynn to meet two Turkish ministers while they were visiting New York. But we don't view this meeting by itself as resulting in agency on behalf of the government, and there is no indication that the meeting or any other contacts involved the Turkish government directing FIG's activities.

After the post-election publicity about FIG's work for Inovo, and after we received your letter, FIG also received a letter from Mr. Alptekin's counsel at Arent Fox. Arent Fox asserted that Inovo had retained FIG in connection with Mr. Alptekin's business dealings with an Israeli company that was involved with the Leviathan oil field.

So FIG had a commercial client with commercial objectives, and no known foreign government client. This left us somewhat straining to determine whether registration could be required solely on the basis that the work performed could be construed as principally benefiting the Turkish government rather than Inovo or business interests generally. *We welcome your input on that judgment call.*

[Then, depending on their response, distribute draft filing for discussion]

If they ask about the reported payments to Inovo, I expect to respond as follows:

We did see two payments of 40k each to Inovo. We've included them in the filing as they appear in accounting records. Early on, there was a proposed consulting agreement for Aptekin. These payments, based on available records, appear to tie to that contract. But we have also been told that while Aptekin did not end up playing a role as a consultant on the project, he did nonetheless want part of Inovo's funding of the project to be refunded. The details of the arrangement are not particularly clear, amid the shut down of operations. [Beyond that, I will punt for now, if they press.]

**Robert Kelner**

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5503 | rkelner@cov.com
www.cov.com

**COVINGTON**

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

# EXHIBIT 5

.

_meeting to_
_Revise of draft_

AM - Things we saw in filed    Look @ these issues    2/22/17

1. Residence addresses. Appreciate why not listed.    noon
   not a gov request.
   R.t in the filing - redact.
   R.t on the form "Provide separately to DOJ"
      and submit a letter
   Redact in Exhibit C. also.

_Revise home addresses_

_Request redaction of exhibit C_

Leaning toward Registration — pencil benching Tuesday.
Will give it more thought, then definitive view.
Pretty much there. · Make decision now.

_Register · unless (D)_

Want something in writing?
Electing to file is CPA rule

2. Reg 2573
   9 retroactive — put on there
      60 days prior

_Add retroactive note to 60 day look back_

    60
   (Because retroactive, Receipts /Disbursements, appear on Supplemental)

   "to the filing of the statement" — Problem

3. 13-16
   Budget established
      yes. - Attachment —

_No on budget - clarify into published budget_

   #13   No — no separate budget
         Look again @ Sphere contract — can they specify

_Check "other" check box but not_

   13-16 - check a box — even if "other"

Exhibit A.

Check Hen Consul to Albania.  Attorney Consul from Turkey to Albania. ?

Check.

If Turkey, list it

Meeting of officials.

Add mtg location (NY) 2 spots  Add in New York

Add in #11 of Supp. Statements

Cliff #15  Payments to Inovo of 40

Payments to Inovo  Message

TP  Return of meeting ?

(RP)- note @ top still taking not clear)

Sphere  Sphere draft. ?
Coordinate filing

Reach out to them
Happy to look @ draft for them too.
Same format
(A)  Coordinate.
HFA  Has to be @ same time.

Exhibit B  HFA/Cliff  Ex B — Cirlon not mentioned
Cirlon or  ok to put in Supp.

Date of McCarl meeting  Tion Supp — McCarl meeting date possible?

Details on State meeting-  Various state governments → date location if possible
governor, Legislature.

Coscini — File by email
so they can handle the timing and
publication

file by
email
Courier of check

Send check for fees — Courier of check

he can idk while sphinx finishes filing

# EXHIBIT 6

KV— Mick(?) - pressing for interview                    Call with
        Sarah Flaroly, Flynn new PR person            Kristen V., RK
        Questions about FLG creation and clients       1·26·17 noon.

RK - Don't say anything until Fil.
        They box us in if talk now.
KV - Might talk y him.


RK· Ben Ginsberg.  Sphere doesn't need do register
        based on Arent Fox memo.
KV— How get.
RK · Don't know.
        Also argument that Calera Advisor was for commercial purpose
        No evidence of commercial except condesay statement
        On top of that GoT had role of some kind
        Meeting in NY — Flens & Ministers.
        Other the docs. — They asked to see.
        Read: Green light and 2 emails on NY/Confidence
        Foolish if they don't file and we do.
        Ben Ginsberg.  Aggressive guy
        There is an argument that Reg goes beyond statute.
        Fine to litigate — we're not in position to litigate
        And we have bad facts.  No commercial facts.
        Datt - Can't file tomorrow.
        Then need to talk y General.
        Media storm
KV— He doesn't care what they print.
        Trump!
RK — Andy Donaldson, his deputy
KV— DOJ back clearance person — approval form.
        Calls trying to find out if he went thru process.

Rhm In theory, draft, gaps in knowledge. Must triage — failed to report.

Videographer — oral agreement per emails
CNN Host — did we pay

Rudy

Lot of people involved — Alex — w/ description

Alex — ) docs — 2 n/a
1 Green Light
Other MSA?

# EXHIBIT 6-A

EXHIBIT 6-A

Transcribed by Sidney Powell from Brian Smith handwritten notes of 1-26-17 call with KV and RK at noon

KV- Mick? – pressing for interview

    Sarah Flaherty. Flynn new PR person

    Questions about FIG creation and clients

RK – Don't say anything until file

    May box us in if talk now

KV – Might talk w/ him

RK – Ben Ginsberg. Sphere doesn't need to register.

    Based on Arent Fox memo.

KV – how got

RK – don't know

    No argument that Gulen focus was for commercial purpose

    No evidence of commercial except conclusory statement

    On top of that GOT had role of some kind

    Meeting in NY – Ekim and ministers

    Other docs – They asked to see.

    Read: Green light and 2 emails on NY/Confidence

    Foolish if they don't file and we do.

    Ben Ginsberg.  Aggressive guy

    There is an argument that Reg goes beyond the statute.

    Fine to litigate – were' not in position to litigate

    And we have bad facts – No commercial facts.

Draft – can't file tomorrow.

＿ need to talk w/ General.

Media storm

KV – He doesn't care what they print.

Trump?

RK – Andy Donaldson, his deputy

KV – DOD book clearance person – approval form.

Calls trying to find out if he went through process.

RK – In _?____, draft, gaps in knowledge. ____ things – __? To report.

[ a few more lines not apparently relevant]

# EXHIBIT 7

"Working Papers"
nbbk.docx

11/5/16



## Statement of the Problem

**How do we restore confidence in the government of the Republic of Turkey
and expose the Fethullah Gülen cult in the United States?**

# Facts Bearing on the Problem and the

# Gülen Ecosystem

MTF-EDVA00003

| Where we were on August 15, 2016 | Where we are on November 4, 2016 | Where are we headed? | How will we get there? |
|---|---|---|---|
| Facing a global, strong, well masked, well funded network that enjoys tacit support in the executive and legislative branch of the U.S. Government.<br><br>Public perception is in his favor.<br><br>Legal battles against the irregularities or possible illegal activities in his charter schools are overlooked, pushed over and not successful.<br><br>Strong support in Congress.<br><br>Almost TEFLON. No one wants to see him as who he really is. | We are changing the narrative FROM:<br><br>An aging man of God who is fighting an autocratic leader in his home country while running a network of charter schools with high quality education.<br><br>TO:<br><br>FG is a terrorist. He is a follower of Hasan Al Bana and Seyed Outb, Founder of Muslim Brotherhood. U.S. taxpayers are funding a masked terror organization. Math and Science and English teachers from Turkey are here to brainwash our youth. He is perfecting the first phase of Jihad. Preparing the battlefield to unleash his "soldiers" at the right time. | Changing the public perception.<br><br>Educating Congress.<br><br>Exposing Turkey's Usama Bin Laden.<br><br>Building U.S. grassroots support to expose the true face of FG.<br><br>Documenting the story in two effective ways:<br><br>A three minute video teaser showing the true face of FG.<br><br>A 60 minute video that will be sent to all members of congress and selected USG. | DISCOVER AND DISPLAY<br><br>Expose FG as a strategic national security threat.<br><br>Deep open source intelligence<br><br>Very senior voices with unique authority on the subject. Remove doubt.<br><br>Formal congressional hearings at Foreign Affairs and Homeland Security Committees<br><br>IRS<br>Immigration<br>Homeland Security |

# Public and Congressional Perception of Gülen



| STATUS QUO = EASY TO BELIEVE | | REALITY & FACTS = HARD TO BELIEVE |
|---|---|---|
| • POLITICAL PROTECTION<br>• DISSIDENT<br>• OLD MAN<br>• IMAM |  | • COMPLEX NETWORK<br>• SECURITY RISK<br>• GLOBAL REACH |

MTF-EDVA00004

# Our Roadmap Philosophy



MTF-EDVA00005



We accomplish discovery by examining the following:

- Public Perception
- Tom Neers' "looking behind the curtain" - First Phase of Jihad
- Congressional Action/hearings
- IRS, Tax irregularities and Non-profit status
- Immigration- H1B Visa's
- 1782 Process of discovery

We expose by:

- Producing a 3 minute video with Sebastian Gorka, Philip Haney, Clare Lopez and Mike Flynn and selected other highly credible voices.
- Bring to the attention of US government agencies-IRS, INS, and DHS potential Rule of Law/Criminal wrong doing

MTF-EDVA00006

● **Produce a longer, in depth video**

# Talking Points

## Phase Zero

Define the subject's sphere of influence, advantages and vulnerabilities. Design an effective strategy with tactical and strategic goals.

Findings:

### INFLUENCE

The subject enjoys widespread support in congress. There is little or no real opposition to the subject's presence or activities. There are strong indications that the subject has built strong advocacy on the Hill. Likewise, there are strong indications that the subject has built an influence network in a number of key states. The public perception about the subject is generally positive.

### ADVANTAGES

The subject is widely viewed as a legitimate political dissident seeking refuge in the United States. The request for extradition has raised the subject's public appraised value. This action has created even a stronger shield for the subject. Consolidation

and centralization of power by the leadership in the subject's home country provides an easy conclusion by the public that he is an old man of God despised by an authoritarian leader in his home country. Any criticism of the subject's acts is immediately interpreted as "political pressure", illegitimate "smear campaign" and unjust attacks on a nice old man. Our asymmetric assessment indicates that an announcement lifting the extradition request by the home country will reduce public appraised value of the subject. This action, if executed will open the space necessary for public scrutiny of the subject's activities. This action will reduce the subject's shield of legitimacy as a political dissident. The Extradition request has made the subject a lot more important that he really is.

## VULNERABILITIES

The subject organization operates over 150 U.S. tax payer funded charter schools in 28 states. There are a number of irregularities in the operation of said schools. Legal professionals have shed light on these irregularities in the states of Ohio and Texas. Importing teachers from Turkey presents a number of easily observed irregularities that may prove to be direct violations of U.S. law. Creative/improper financial operations by the subject's organization offer a strong opportunity to unmask the true nature of dangerous, strategic activity under the guise of education. There may be illegal political contributions to political campaigns and nonprofit organizations also pose a potential vulnerability which will be

MTF-EDVA00008

explored. When the subject's methods are compared to theoretical and historical teachings of Islamic Political activists of Hasan Al Banna, founder of Muslim Brotherhood (1928), Sayed Qutb (1950s-1960s), and deeper in the history, Hasan Sabbah (late 11th century), there are strong indications that the subject is very likely conducting the first phase of Jihad by slowly building a global loyal force to be activated at the right time. Subject lectures provide easily observed indicators of his long term objective. The resemblance of the subject's activities to Ayatollah Khomeini who duped the west in believing that he was a man of the cloth and a benevolent servant of the people serves as a basis to uncover and unmask the subject's ultimate goal of destabilizing his home country and the region.

## TACTICAL and STRATEGIC Countermeasures

Devise specific actions to restrict the subject's influence. Exploit the vulnerabilities and reduce the systemic advantages enjoyed by the subject to open space for strategic goal on unmasking the subject's ultimate goal. We have determined that unmasking the subject's true objectives requires unmasking his most visible violations. Tactically, we will search, find and expose the subject's clear violations, influence operation, financial irregularities, illegal contributions, and violations of immigration law. As the legal professionals uncover and engage the subject's activities in the legal arena, we will expose the subject in the public arena. Concurrently with our tactical engagement,

MTF-EDVA00009

we are producing a short video suitable for quick and wide distribution to key influence providers to the subject including but not limited to members of congress and key law enforcement agencies. Our strategic communication advisors have confirmed our plan that it is essential to have an easy to access, portable (easy to distribute) means of educating the influence providers to the subject. The ultimate aim of the video production is to ask the question:

**IS THE SUBJECT ENGAGED IN THE FIRST PHASE OF JIHAD?**

**PHASE ONE**

Operationalize the plan. Harmonize Cyber Research, Field Investigations, Strategic Communications and Congressional outreach.

**ACTIONS**

- Identified key organizations and individuals in the subject's critical circles.
- Engaged subject's key supporter in Congress. No major change of position by the supporter. However, feedback suggests that the supporter is alarmed by receiving additional relevant, fact based information and is likely to reduce support for the subject.
- Briefed senior staff at the Homeland Security Committee with the aim of organizing a hearing on the subject's activities and strategic aims.

MTF-EDVA00010

- Have deployed an experienced videography team (brand names Aljazeera, France 24) and a former CNN Anchor to create credible, durable, easy to distribute document in the form of a short video.
- Have interviewed/created effective footage of three victims of the subject's activities in his home country
- Have secured the opportunity for testimony by experts on the subject's masked activities, Sebastian Gorka, Philip Haney, Steve Emerson and other credible witnesses who are authorities on the subject of political Islam, Islamism and Jihadism.
- Our investigation team is engaged in the field within the boundaries of U.S. law.
- Our Cyber research team is also engaged within the boundaries of U.S. law.
- There is a total of 5 professional investigators in the field headed by our principal in charge of investigations.
- Cyber research team is comprised of 3 highly skilled professionals.
- The strategic communications team is actively reviewing and designing a creative tool to convey the masked operation of the subject. We expect the tool to be fully developed and ready for distribution in short order.

The aim of the investigation is to uncover indisputable unlawful activities of the subject and his organization and make a criminal referral.

Operationalize the plan Harmonize Cyber Research, Field Investigations, Strategic Communications and Congressional outreach.

MTF-EDVA00011

## CLOSE OUT OF PHASE 1 ACTIONS AND DISCUSSION

We continue to explore avenues of open source investigation of subject's schools in the US. This is an ambitious list that when completed is expected to help narrow the focus regarding who among subject's school organizers and/or supporters may have possible associations with terrorist organizations such as the Muslim Brotherhood. More importantly, this is the best way to obtain such information (i.e., via financial investigation and/or surveillance, or via other sources).

Our ongoing research has concluded that the schools were the brainchild of the iconic, but reclusive, 75-year old subject, a Sunni Muslim cleric from his home country whose has a reported 3 and 6 million followers who regard him as their spiritual leader. The subject's movement in his home country is known as Hizmet. For the past 17 years, subject has resided on his highly protected country estate in the shadows of the Pocono mountains near Saylorsville, Pennsylvania. To his advocates, subject is a pious imam who promotes a tolerant Islamic view stressing the importance of hard work, benevolence and education. To his detractors, he is powerful and crafty politician committed to overthrowing the existing order in his home country. In the US, he was barely known, except to teachers and students who have defected from his schools, concerned parents, and to auditors for Charter schools,

MTF-EDVA00012

grant providers, public official's and even to investigative agencies such as the FBI, concerned about possible fraud and other criminal violations until the most recent coup attempt in the subject's home country.

It should be noted that the term "subject's name schools" is actually a misnomer and is not used by the schools themselves, although for simplicity, we will use this term hereafter to refer to the general aggregation of these schools. In states where the subject schools have the greatest presence, they use innocent sounding names such as Harmony Schools (Texas), Magnolia Science Academy (California), Horizon Schools (Ohio, Illinois), and Sonoran Science Academy (Arizona).

Many people do not realize that merely being a supporter of subject schools is not a crime. In fact, during the past several years, many members of Congress (bipartisian) have been courted by subject schools, even taking paid trips to subject's home country, to meet with subject adherents extoling the virtues of their schools. Many graduates of these schools, though precise numbers are seldom reported, reportedly move on to college and successful careers. The Bill Gates Foundation has reportedly made a sizeable donation to subject schools, and the Cosmos Foundation appears to be the largest benefactor. President Obama reportedly visited and praised the work being done in the Harmony School in Washington, DC

MTF-EDVA00013

The creation and operation of subject schools in the US appears to be the result of a broad strategy that involves the use of a sophisticated business model with complex organizational structuring, multiple layers of private and public funding, clever marketing, and aggressive legal representation in the context of an educational system that by its very design, though certainly not intended, is ripe for abuse and exploitation.

- Continue to identify key organizations and individuals in the subject's critical circles and areas of influence.
- Continue to 'flesh' out the details to brief the senior staff at the Homeland Security Committee with the aim of organizing a hearing on the subject's activities and strategic aims with an optimistic timeline of before the Christmas recess, with a realistic timeline of January 2017. Our team is already in the process of preparing relevant material which highlights the subjects
- The videography team (brand names Aljazeera, France 24) and a former CNN Anchor are reviewing and having footage subtitled in English of the three victims of the subject's activities in his home country.
- Our investigation team is engaged in the field within the boundaries of U.S. law.
    - Develop spreadsheet of U.S.-based subject schools to include when opened or, if closed, reasons why.
    - Compile history of criminal or civil suits against subject schools.

MTF-EDVA00014

Locate and review both pro-subject & anti-subject websites to identify perspectives, biases, and methods used by the latter to support their stated intentions.

· Identify political leaders at the local and national level who ae either supporting or criticizing subject schools, and summarize their respective arguments

· Identify journalists reporting on subject schools and explain their unique areas of focus

• Our Cyber research team is also engaged within the boundaries of U.S. law and is conducting baseline monitoring of a multitude of Social and traditional Media sites.

**Subject Related Websites:**

• gulenmovement.ca
• fgulen.com/en
• gulenmovementca.blogspot.ca
• fethullah-gulen.org
• fethullahgulenforum.org
• gulenmovement.us

**Associated Hashtags:**

• #GulenMovement
• #HizmetMovement
• #FethullahGulen
• #Hizmet
• #gulenistes
• #NeverForgetJuly15
• #FETO

**Associated Social Media Accounts:**

• facebook.com/GulenMovementCanada
• plus.google.com/+FethullahGulenEN

**Associated You Tube Accounts:**

• youtube.com/channel/UCDfIDhRLl7M32qylaRImQtQ
• youtube.com/channel/UCykpGY1yIAF6rP1zuWTJC2A

- youtube.com/channel/UC-5_J80Fi7lr92C8h8mmevg

**He's in the News:**

- dailysabah.com/war-on-terror/2016/10/12/3-gulen-linked-charter-schools-in-california-face-closure
- latimes.com/local/lanow/la-me-edu-magnolia-charter-ties-to-gulen-20160829-snap-story.html
- dailysabah.com/war-on-terror/2016/10/10/us-must-show-turkey-empathy-over-gulens-extradition-justice-minister
- dailysabah.com/war-on-terror/2016/10/10/iraqi-kurdish-administration-seizes-schools-run-by-gulenists
- reuters.com/article/us-un-assembly-turkey-erdogan-idUSKCN11Q2K5
- france24.com/en/20160916-turkey-coup-fethullah-gulen-extradition-how-will-us-respond
- dailysabah.com/war-on-terror/2016/09/15/top-eu-officials-admit-regret-over-failure-to-grasp-feto-threat
- dailysabah.com/war-on-terror/2016/09/09/pkk-terrorists-informed-about-gulenist-coup-attempt-in-advance
- shaber3.com/inanmadiniz-aldattiniz-sayin-bozdag-haberi/1273365
- lehighvalleylive.com/news/index.ssf/2016/07/rare_look_at_exiled_turkish_cl.html

**Charter Schools:**

- Website:
- charterschoolscandals.blogspot.com/p/list-of-us-gulen-schools.html
- Last Updated 12/7/2015

**60 minutes:**

- youtube.com/watch?v=ktl--lDnM7l

**Ties to Clinton:**

- dailycaller.com/2016/07/13/new-ties-emerge-between-clinton-and-mysterious-islamic-cleric

- **The strategic communications team has developed a very complex approach to their efforts which include a Strategic Objectives; Target Audiences, and Activities and Timing.**

MTF-EDVA00016

They are actively designing a creative visual tool to convey the masked operation of the subject. A copy of the initial draft is done and is attached. We expect the visual tool to be fully developed and ready for distribution in short order. The draft "wireframe" version of the board and a citation document which provides public record of the "accusations" within the board. We welcome any and all feedback and will continue working to build out a more "produced" version with graphics, etc.

- Active engagement of media outlets.
  - Drudge Report and have followed up with several different articles and angles. (Clinton foundation connections, etc.) Drudge Report has an unprecedented active readership and even if they don't use this development, they are confident the outreach this week will serve as a strong foundation for future coverage.
  - Politico Morning Education - We have also compiled this week's coverage of both Ohio and California (LA TIMES) coverage in hopes of inclusion in tomorrow (Thursday) morning's daily email. Politico is a leading policy outlet and the "Morning Education" email is a subscription based news aggregator received by top education policy influencers in DC and the around the country. See attached PowerPoint slide with a screen shot of this coverage.
- Teachers Unions - Teachers unions are a ripe ally in this project given their automatic resistance to all things related to charter schools. While our most impactful messaging might be on the homeland security front, the education/teachers angle could be a valuable flank that

MTF-EDVA00017

appeals to Democratic policymakers, whereas Homeland Security might appeal more to Republicans. As such initiated contact today with:

- Gene Bruskin, formerly of the American Federation of Teachers and author of "The Story Behind the subject Charter Schools and Their Reclusive Founder". Have requested a phone meeting to compare notes and gauge his interest in participating in and assisting with the organization of an effort to coalesce issue experts in his field to persuade policy makers to take action. Updates to follow.

- Policymaker Fact Sheet - Producing a briefing document ahead of policymaker meetings. An initial draft is complete and attached.

High Ranking State Level Elected Official - Engaged in conversation with a high ranking elected official in a state with multiple subject Charter Schools. He is "extremely interested" and we are briefing him soon, but wish to keep this outreach confidential at the moment per his wishes.

MTF-EDVA00018

## GULEN BRIEFING SHEET

**Background:**

In the wake of the recent attempted coup in Turkey, new focus and scrutiny has been applied to Fethullah Gulen, a Muslim cleric living in exile in rural Pennsylvania. The Turkish government considers the man a terrorist and has petitioned the U.S. government for his extradition. Gulen has millions of global followers, known informally as the Hizmet, meaning service, or the "Gulen Movement". The Movement's primary source of funding is its network of schools around the world. Over 150 of these are US Charter Schools that have used taxpayer dollars to expand their operations into 26 states.

**Fethullah Gulen is a radical:**

MTF-EDVA00019

- In his sermons in the 1990s, Gulen urged his followers to infiltrate the Turkish military, media, and government and wait for the right moment to rise up, ordering them to "move within the arteries of the system, without anyone noticing your existence, until you reach all the power centers." Gulen promised that doing so would provide *the guarantee of our Islamic future."*
- Despite his seeming moderate position, at times, Fethullah Gulen has called the United States his *"merciless enemy."* Additionally, he has claimed that the Jews are responsible for ideas like Communism that have purposefully steered the world towards cataclysm.

**Gulen Controls a network of corrupt US Charter Schools:**

- Gulen-associated schools participate in a process called "closed-loop leasing," where the charter schools use taxpayer money to pay excessive rent to a Gulen-associated real estate corporation. The real estate corporation funnels those profits back to Gulen or uses the funds to start more schools.
- Gulen-associated schools exploit the H-1B visa program, which are to be used when there are no qualified American workers, to bring Turks to the United States as teachers. In 2009, the Gulen schools received government approval for 684 visas, over 200 more than Google. Parents and other teachers have complained that the Turkish educators are clearly unqualified.
- Gulen-associated schools have been investigated by authorities and journalists in the states of Ohio, California, Texas, Louisiana, Illinois, Massachusetts, Virginia, Pennsylvania and Georgia, as well as by the FBI, for a litany of offenses, including the misappropriation of funds, the falsification of standardized tests, immigration fraud, and bid-rigging.

**Gulen is Politically Powerful and Influential in the US:**

- In 2002, Fethullah Gulen applied for permanent residence in the United States, claiming that he was an "exceptional individual" who deserved special consideration. His application was denied, but a few years later, Gulen won his appeal with the help of letters from George Fidas, a former director of outreach for the C.I.A., Morton Abramowitz, a former American ambassador and Graham Fuller, a former senior C.I.A. official.
- This was a surprising development after an American diplomat in Turkey had cabled to Washington about Gulen's sharply radical past as an Islamic preacher, the cult-like obedience that Gulen demands, and his involvement in the affairs of almost 100 countries.
- The Gulen movement has illegally financed Congressional travel abroad and provided hundreds of thousands of dollars of improper campaign donations to congressional and presidential candidates.

MTF-EDVA00020

- Gulen's chief liaison to New York, Recep Ozkan, donated between $500,001 and $1,000,000 to the Clinton Global Initiative.

**Responsible for the attempted Coup in Turkey:**

- Western diplomats have called Erdogan's accusations of Gulenist involvement "compelling," saying that "Gülenists played a credible role in [the coup]."
- General Hulusi Akar, the highest ranking member of the Turkish armed forces and a captive during the July coup, has claimed that his abductors offered to put him in touch with their opinion leader, Fethullah Gulen.
- Several plotters have released statements identifying themselves as loyal Fethullah Gulen and claimed that the coup was in response to an imminent crackdown on Gulenists in the Turkish military.

**Statements by Senior US officials:**

**President Obama:** President Barack Obama and Turkish President Tayyip Erdogan discussed the status of U.S.-based cleric Fethullah Gulen, blamed by Turkish authorities for masterminding a recent failed coup, during a call on Tuesday, the White House said.

The Turkish government has filed material in electronic form about Gulen with the U.S. government, which has been waiting for a formal extradition request, White House spokesman Josh Earnest said.

U.S. officials have said Turkey must provide proof that Gulen was involved in the coup attempt. Any extradition request from Turkey, once submitted, would be evaluated under the terms of a treaty between the two countries, Earnest said.

Obama offered U.S. assistance for Ankara's investigation into the attempted coup and pressed Erdogan to proceed according to the democratic principles outlined in Turkey's constitution, Earnest said.

**"The principles of democracy should be adhered to even as a thorough investigation is conducted,"** he said.

The U.S. State Department said it was still in the process of analyzing the documents submitted by Turkey and could not characterize them as an extradition request for Gulen. Source: http://www.reuters.com/article/us-turkey-security-usa-extradition-idUSKCN0ZZ23E?il=0

MTF-EDVA00021

**Anthony Blinken: Question:** We see that the U.S. government is taking Turkey's request regarding the return of Fethullah Gulen seriously. Do you agree with Ankara that this topic may damage Turkish-American relations?

**Deputy Secretary Blinken:** We are determined to do everything we can to help Turkey as it pursues its investigations of those responsible for the attempted coup. And with regards specifically to the case of Mr. Gulen, we've had an exchange of experts visiting both Turkey and the U.S. – legal experts, so that Turkey fully understands the legal process that's involved. I just want to be very clear, this is not a political question at all for the United States – it's simply a legal question. We have laws and requirements when it comes to the extradition of any person from a country with whom we have an extradition treaty and we need to work through those legal requirements. But we've had very good exchanges with Turkey on this question and we're working through the information that's been provided. Source: https://tr.usembassy.gov/deputy-secretary-antony-blinkens-interview-ntvs-ahmet-yesiltepe/

**Ambassador James Jeffrey:** U.S. Ankara Ambassador James Jeffrey, on Dec. 4, 2009, briefed in regards to Gülen's application for Permanent Residence status in the U.S., with a background about Gülen and his movement. Saying that Gülen faced charges in Turkey of plotting to overthrow the state, Jeffrey mentioned a sermon in 1986, where Gülen is heard declaring that "our friends, who have positions in legislative and administrative bodies, should learn its details and be vigilant all the time so they can transform it and be more fruitful on behalf of Islam in order to carry out a nationwide restoration." Holding a Green Card now and living in Pennsylvania's Pocono Mountains, Fethullah Gülen was doubted to have infiltrated the TNP, and they "have found no one who disputes it."

Additionally, Jeffrey found out that the "TNP applicants who stay at Gülenist pensions are provided with the answers in advance of the TNP entrance exam." Apart from that, even more subtly, "Gülen's lack of transparency creates doubt about his motives and leads to suspicions about what lies ahead," Jeffrey says. As for the aspects of concern in the allegations that the U.S. government is somehow behind the Gülen Movement, Jeffrey concluded that "the U.S. is not 'sheltering' Mr. Gülen and his presence in the U.S. is not based on any political decision." Source: http://www.dailysabah.com/war-on-terror/2016/08/02/a-decade-of-the-gulen-movement-on-wikileaks-more-than-meets-the-eye

**Stuart Smith:** The Gülenists' penetration of the National Police (TNP), media outlets and their record of going after anyone who criticizes Gülen were among the items on the annual agenda of the U.S. Embassy in Ankara in 2005, when a decision by U.S. immigration authorities for the first time denied him the right to travel outside of the country. Stuart Smith, the U.S. vice consul general of the

MTF-EDVA00022

Intelligence Department in Ankara, reported that three ranking TNP asked for a meeting with the Istanbul legate as a means of asking whether the "FBI could provide some sort of clean bill of health" for Fethullah Gülen. Upon such a request, Smith juxtaposes some concerns about the Gülen Movement's actions: "Severe pressure on businessmen to continue to give money to support Gülenist schools or other activities," "using their school networks to cherry-pick students they think are susceptible to being molded as proselytizers and to indoctrinate boarding students," "the cult-like obedience and conformity" the movement insists on its substructures. Source: http://www.dailysabah.com/war-on-terror/2016/08/02/a-decade-of-the-gulen-movement-on-wikileaks-more-than-meets-the-eye

**Deborah K. Jones:** A cable, with a more suspicious and questioning tone, classified by Consul General Deborah K. Jones on May 23, 2006, clarifies that U.S. authorities in Turkey started to count Gülen Movement's institutions and academies in the U.S., Central Asia, Caucasus, Russia, the Balkans, Africa, South East Asia, the Far East, the Middle East and Europe. Furthermore, the cable shows that a profile recognition for those traveling to the U.S., particularly with the aim of visiting Fethullah Gülen, was also actively carried out by Consular officers. Compiling a list of Gülenist organizations as well as periodical meetings to discuss trends within the Gülenist applicant pool let Consular officers in Ankara and Istanbul notice "what appears to a purposeful 'shifting' of applicant profiles appearing for visa interviews in what may be an effort by Gülenists to identify 'successful' profiles." After giving the general features of applicants and visitors (the young exchange visitor; the married middle-aged male with no English and traveling alone; the middle-school-aged English student; the graduate student going for English), the Consul General Jones claims that "evasiveness of Gülenist applicants leaves Consular officers uneasy" although there seems to be "a benign humanitarian movement" on the surface. Source: http://www.dailysabah.com/war-on-terror/2016/08/02/a-decade-of-the-gulen-movement-on-wikileaks-more-than-meets-the-eye

MTF-EDVA00023

BREIFING ON GULEN RELATED CHARTER SCHOOLS IN TEXAS

## Current Situation

There are approximately 46 Gulen-affiliated charter schools serving 31,000 students in the state of Texas. Chairman McCaul has two schools within his district.

In May, Amsterdam & Partners filed a 32-page complaint alleging that Harmony Public Schools, the state's largest charter school network, hires under-qualified Turkish teachers and steers business to companies run by Turkish nationals, including some former Harmony employees.

Amsterdam & Partners additionally alleged that Harmony Schools are guilty of funneling money to Fethullah Gulen via tithes from teachers, that Harmony schools have misused bond money from the state of Texas to operate schools in Arkansas, and that Harmony abuses the H-1B visa program to bring in Turkish workers as teachers and then shuffle them around the United States in various positions.

The Texas Education Agency had found the allegations credible and were investigating the complaint. However, on October 17, the TEA cleared Harmony of allegations that it illegally steered business to vendors with ties to Harmony and the nation of Turkey. But, the TEA only dismissed several other claims that involved teacher hiring, special education and other matters, saying it was its jurisdiction.

In response, Amsterdam & Partners has criticized the TEA for only investigating two of the ten allegations, saying "this cursory inquiry not only ignored the majority of the issues raised in the complaint, but also failed to look beyond the registered agents of the contracting companies without even considering who the beneficiaries are." Amsterdam continued, "Knowing the Gülenists, they will undoubtedly attempt to portray this whitewash as a victory. But the fact is that there are many areas that TEA did not address, and we intend to request other state agencies and public officials to scrutinize Harmony's activity."

## Inadequate Investigation

Among the issues in the complaint that were left aside by TEA include evidence of discrimination in hiring, pay, and promotion favoring Turkish males, preference for related Turkish vendors in major contracts, discrimination against English Language learners and Students with Disabilities, abuse of the H-1B visa program to bring in underqualified Turkish nationals for teaching and leadership positions, misuse of federal program funding for low socioeconomic students and students with special needs, and systematic overcharging of leases to Harmony schools by Harmony's private real estate arm to siphon over $18 million of public funds out of the schools.

Despite finding that Harmony had paid over $18.7 million dollars to Turkish owned vendors in the last two years, TEA conducted no analysis to determine whether these vendors had illegal relationships to Harmony's leadership, as alleged in the complaint. This deserves more investigation because it is known that some of these local funds Harmony receives come from questionable sources. For example, Harmony received $175,000 from Gulen-affiliated schools in Oklahoma that in a recent audit by the Oklahoma State Auditor were considered an improper use of state funds.

## Past Improprieties

This is not the first time that Harmony Public Schools has been accused of impropriety.

In 2011, *The New York Times* found that Harmony gives the vast majority of its construction and renovation contracts to Turkish-owned companies, even when other firms had offered to do the job for less money. *The Times* also noted that Harmony applies for hundreds of H-1B visas, claiming that there are no skilled Americans qualified to teach children. Texas has a population of almost 30,000,000 people.

In 2014, Harmony Public Schools settled a federal civil rights complaint that involved a female American teacher who made less than her male colleagues from Turkey, including those with less experience.

Also in 2014, Harmony reached an agreement with the U.S. Department of Education over how it teaches children who are learning English or have disabilities. A federal investigation found that those students were "significantly underrepresented" at Harmony, and that Harmony didn't ensure those students received the extra help they needed.

MTF-EDVA00025



To:   Flynn Intel Group
From: Sphere Consulting
Date: October 18, 2016
RE:   Charter Schools and the Department of Education

## The Charter Schools Program (CSP)

The Department of Education has a Charter Schools Program that disburses discretionary grants to "create new high-quality public charter schools, as well as to disseminate information about ones with a proven track record." Federal funds are also available to replicate and expand successful schools; help charter schools find suitable facilities; reward high-quality charter schools that form exemplary collaborations with the non-chartered public school sector; and invest in national activities and initiatives that support charter schools.

The CSP is part of the Department of Education's Office of Innovation and Improvement (OII). The OII has a self-state mission "to accelerate the pace at which the U.S. identifies, develops, and scales solutions to education's most important or persistent challenges," which it accomplishes through strategic investments and discretionary grant programs.

## CSP Grants

The CSP disburses grants and funding in about a half dozen ways. These are listed with their FY 2016 funding levels.

1.  The Secretary of Education awards grants to State Educational Agencies (SEAs) to enable them to conduct charter school programs through sub-grants at the state level.
    a.  $177,209,326 for new awards and $11,548,828 for continuation awards
2.  The Secretary of Education awards grants for "Planning, Program Design, And Initial Implementation Grant" directly to programs that do not have a State Educational Agency or that do not have a State Educational Agency with an approved application for CSP grants.
    a.  $3,325,107 for new awards and $2,784,727 for continuing awards
3.  The Secretary of Education awards grants for "dissemination" (including assisting the foundation of new charter schools, developing partnership, producing curriculum materials, and conducting evaluations) directly to programs that do not

MTF-EDVA00026

have a State Educational Agency or that do not have a State Educational Agency with an approved application for CSP grants.

    a. This grant has not been awarded or continued since 2014.

4. The CSP awards grants to charter schools or non-profit charter management programs to expand enrollment of high-achieving programs by substantially increasing the number of available seats per school, or to open one or more new charter schools based on the model for which the eligible applicant has presented evidence of success.

    a. $65,759,488 for new awards and $32,316,646 continuing awards

5. The CSP awards funds that are used to match programs funded with nonfederal dollars that make payments, on a per-pupil basis, to provide charter schools with facilities financing. The funds scale down annually and are phased out after 5 years.

    a. Funding data is not available for 2016. In 2015, $9,000,000 was disbursed as a continuation of previous grants.

6. The CSP awards grants that support efforts by eligible entities to improve the quality of charter schools by providing technical assistance and other types of support on issues of national significance and scope.

    a. In 2015, provided $4,123,072 in new awards.

7. The CSP provides grants to eligible entities to permit them to enhance the credit of charter schools so that the charter schools can access private-sector and other non-Federal capital in order to acquire, construct, and renovate facilities at a reasonable cost.

    a. In 2015, provided $14,069,608

## Gulen Schools Receiving Federal Funding

| School | Chartering Org. | Location | Year | Grant Details |
|---|---|---|---|---|
| Harmony Schools* | Cosmos Foundation | Houston, TX | 2011 | 3 years $4,940,897 |
| Horizon Science Academy-Southwest | Concept Schools | Chicago, IL | 2015 | 3 years $337,138 |
| Chesapeake Math & IT Academy-South | Chesapeake Lighthouse Foundation | Hanover, MD | 2014 | 3 years $617,120 |
| Thomas Edison Energy Smart | Apple Educational Services | Somerset, NJ | 2010 | 3 years $530,507 |
| Triad Math & Science Academy | Washington Educational Foundation | Greensboro, NC | 2010 | 1 year $530,432 |
| Triad Math & Science Academy | Washington Educational Foundation | Greensboro, NC | 2012 | 2 years $751,145 |
| Noble Schools* | Concept Schools | Chicago, IL | 2014 | 3 years $507,209 |

MTF-EDVA00027

| Young Scholars of Western Pennsylvania | Apple Educational Services | Pittsburgh, PA | 2012 | 2 years $301,500 |
| Vision Academy | Apple Educational Services | Lansdowne, PA | 2016 | 3 years $783,104 |

*Grant was awarded to a network of schools, rather than an individual institution

https://innovation.ed.gov/what-we-do/charter-schools/credit-enhancement-for-charter-school-facilities-program/awards/
FIND OUT WHAT BUILDERS BUILD GULEN SCHOOLS THEN CROSS REFERENCE

https://innovation.ed.gov/what-we-do/charter-schools/charter-school-program-state-educational-agencies-sea/awards/
WHEN THERE IS AN APPLICATION PDF, FIGURE OUT IF THE STATE HAS DISBURSED FEDERAL FUNDS

MTF-EDVA00028

# EXHIBIT 8

~~m ʒ~~

22
2/~~~~/17

# I. FARA

- Ekim/Cfnovo ~~payment~~ - consulting on refunds - accorend to BX - refund

    - Bijan was ~~paying~~ them back (that is what ~~Bijan~~ told Flynn).

    - consultant agreement w/ Ekim: don't remember.
    - don't remember side convos w/ Ekim regarding consulting ~~specifically~~. Had 2 weekly update calls; meeting in NJ, met @ FIG's office early on.

- Bijan - GF has known him since 2007. consider him as ~~Bijan~~ family. we are good friends. I don't know him to mislead.

- Bijan ~~too~~ is charming, network, but not great business acumen.

- ~~providing~~ to see on calendar now many days Flynn was in FIG office during. FIG ε w/ cfnovo.

- ~~had to~~ had written 3 or 4 op-ds on ~~campaign's~~ ~~plan to or~~ fight ISIS / cfslamism / ~~radicalism~~

    ~~pull~~ every article

- learned about Gulen charter schools through book tour. (learned more about it through novo representation).

- ALAC - law to use U.S. Law in American courts, not shria Law (learned about on book tour).

commercial activity

V crystallize

Gulen

- Bijan had done a video w/ woolsey on Azerbijan.

- push for placement of article was for campaign reasons. (fighting until the end to show that Trump campaign was serious on fighting Islamic extremism).

↳ maybe tried to get out through campaign channels (initially had tried to push article out on Saturday before).

- didn't know that Bijan had shared draft w/ Ckim.

- ~~Don't~~

- LOA: Bijan said he would contact Bob Kelly. (concern of potentially up. foreign gov't (?))

- Bijan was handling all discussions w/ Ckim.

# EXHIBIT 8-A

## EXHIBIT 8-A

Transcription by Sidney Powell of handwritten notes of Covington attorney, possibly Alexandra Langton, on 2-22-2017 with Mike Flynn re: FARA

[Yellow highlighting denotes information omitted from her transcription almost one year later]

- Ekim/Inovo payment – consulting or refunds –accommodation to BK – refund
- Bijan was paying them back (that is what Bijan told Flynn)
- Consultant agreement w/Ekim: don't remember
- Don't remember side convos w/Ekim regarding consulting.  Specifically had 2 weekly update calls, meeting in NY, met at FIG's office early on.
- Bijan – GF has known him since 2007. Consider him as family.  We are good friends.  I don't know him to mislead.
- Bijan is charming, network, but not great business acumen.
- Interesting to see on calendar how many days Flynn was in FIG office during FIG K w/ Inovo.
- Had written 3 or 4 op-eds on campaign's plan to fight ISIS/Islamism/radicalism.
-         CB Internal note to pull every article.
- Learned about Gulen charter schools through book tour. ( learned more about it through Inovo representation)
- ALAC – law to use US law in American courts—not sharia law (learned about on book tour).
- Commercial Activity



Bijan had done a video w/Woolsey on Azerbaijan

Push for placement of article was for campaign reasons. (fighting until the end to show that Trump campaign was serious on fighting Islamic extremism).

1

Maybe tried to get out through campaign channels (initially tried to push article [cut off]

Didn't know that Bijan had shared draft with Ekim

LDA: Bijan said he would contact Bob Kelly (concern potential rep. foreign government?)

Bijan was handling all discussions with Ekim

[a few more lines not relevant]

# EXHIBIT 9

# COVINGTON & BURLING LLP

February 11, 2018

## Memorandum

To:   Flynn File

From: Alexandra Langton

Re:   **2/22/17 Flynn Interview**

On February 22, 2017, Robert Kelner ("Kelner"), Steve Anthony ("Anthony"), and Alexandra Langton ("Langton"), interviewed General Michael T. Flynn ("Flynn") at 850 10th St. NW, 20001 from approximately 9:00a.m. to 4:00p.m. Brian D. Smith ("Smith") attended later in the afternoon. Lori Flynn, Flynn's wife, also attended the meeting. Langton prepared this memorandum on February 11, 2018 based on handwritten notes taken contemporaneously with the interview that took place on February 22, 2017.

**COVINGTON & BURLING** LLP

February 11, 2018
Page 5

## VII.   Turkey/Inovo

Brian Smith joined the interview in the afternoon to update the group on his meeting with the FARA Unit regarding Flynn Intel Group's ("FIG") draft FARA filing. Smith highlighted that Clifford Rones had asked him about the two $40,000 payments to Inovo BV listed in the supplemental statement. Smith told the group that he merely responded that the supplemental statement reflected information in the FIG accounting records. Smith also noted that there were several other minor changes that the FARA Unit had suggested. He believed that FIG would be in a position to file in the near future.

Kelner asked Flynn what the purpose of the $40,000 payments to Ekim were for. Flynn responded that Bijan Kian told him that the payments were refunds. Flynn further stated that he didn't remember the consulting agreement between Ekim Alptekin and FIG. He also didn't remember any side conversations with Ekim regarding the consulting contract. Flynn said that he had two "update" calls, a meeting in New York, and a meeting at FIG's office with Ekim. Flynn commented that it would be interesting to see how much he was actually in D.C. during the period of the contract. He didn't seem to think he was around much between August and November 2016. Flynn added that he had written 3-4 op-eds for the campaign and he wrote this op-ed primarily for campaign reasons. The purpose of publishing the op-ed before election day was to "fight until the end [and] to show the Trump campaign that [he] was serious on fighting Islamic extremism." Kelner asked if Flynn tried to get the article published through campaign channels. Flynn responded, "maybe." Kelner asked Flynn if he knew that Bijan had shared a draft of the op-ed with Ekim. Flynn responded that he did not and that "Bijan was handling all discussions with Ekim."

**COVINGTON & BURLING** LLP

February 11, 2018
Page 6


     Kelner asked if he was concerned about possibly having to register as a foreign agent during the contract. Flynn responded that Bijan said he would connect with Bob Kelley and he thought they had figured it out.

# EXHIBIT 10

# RE: GEN Flynn meeting

| | |
|---|---|
| **From:** | "Kelner, Robert" <rkelner@cov.com> |
| **To:** | K Verderame <kverderame@ponderainternational.com> |
| **Cc:** | "Smith, Brian" <"/o=covington & burling/ou=cb/cn=recipients/cn=c&b.cbpowa02.smithbd"> |
| **Date:** | Thu, 09 Feb 2017 18:19:21 -0500 |

sure thing

**Robert Kelner**

Covington & Burling LLP
One City Center, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5503 | rkelner@cov.com
www.cov.com

# COVINGTON

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

**From:** K Verderame [mailto:kverderame@ponderainternational.com]
**Sent:** Thursday, February 09, 2017 6:16 PM
**To:** Kelner, Robert
**Cc:** Smith, Brian
**Subject:** RE: GEN Flynn meeting

Ok – yes please let her know that the delay is not intentional but due to the difficulty of scheduling with your client in his new role!

Not a good sign . . .

Do you guys want to come to my office for a change – happy to host. 1747 Penn, 2nd floor

K

**From:** Kelner, Robert [mailto:rkelner@cov.com]
**Sent:** Thursday, February 09, 2017 5:28 PM
**To:** 'K Verderame' <kverderame@ponderainternational.com>
**Cc:** Smith, Brian <bdsmith@cov.com>
**Subject:** RE: GEN Flynn meeting

OK. It's also my wife's birthday..... But we'll figure that out. In some ways that time might be easier for me than this weekend. Does he want to meet here at Covington?

Meantime, Heather Hunt has kind of been all over us. She emailed and then left a voicemail yesterday afternoon asking for a call this weekend (because I had indicated I thought this weekend was the earliest we could meet with our client). She said she just needed to know when we will be coming in to meet her, so she can arrange her schedule. We've never seen her this engaged in any matter (ever). I'll let her know tomorrow we wouldn't be prepared to meet her until later next week sometime.

Best,
Rob

**Robert Kelner**

Confidential -- Subject to Protective Order

Rafiekian_EDVA_00020435

# EXHIBIT 11

# COVINGTON & BURLING LLP

*DRAFT*                                                                May 29, 2019

## Memorandum

To:    Flynn File

From:  Roger Polack

Re:    **May 29, 2019 Kelner EDVA Interview**

On May 29, 2019 Robert Kelner ("R") participated in an interview with prosecutors from the Eastern District of Virginia ("EDVA") at 850 10th Street, NW, Washington, DC from approximately 2:00p.m. to 4:30p.m. Bruce Baird ("BB") and Roger Polack represented Kelner during the interview. Jim Gillis ("JG") of the United States Attorney for the Eastern District of Virginia's Office ("EDVA"), Evan Turgeon ("ET") of the National Security Division of the Department of Justice ("NSD") and Bryan Alfredo of the Federal Bureau of Investigations conducted the interview. This memorandum summarizes the discussion at that meeting.

ET: First in a few meetings; preliminary questions, may have discussed in less detail previously; rough outline of direct and go through that. BB as emailed, we are subject to the same agreement as last time.

ET: Ever testified before?

R: With exception of Administrative procedure when Sch. C employee at Housing Dept. and there was a labor dispute.

ET: Want to learn more about who did what in investigation between you and Brian Smith. Who was more involved in collection of docs?

R: Brian and associate Alex Langton.

ET: How many times was Bijan Kian ("BK") formally interviewed by Covington ("Cov")?

R: Believe it was two formal interviews. But there were other conversations.

BB: Before FARA filing?

ET: Yes.

R: Recall a few phone calls that were to him to addressed specific issues; and then other conversations that that were through Kristen Verderame ("KV").

**COVINGTON & BURLING** LLP

May 29, 2019
Page 2

ET: Who was principle POC with Bijan?  R: I was.

ET: And with Matthew Nolan?  R: That was Brian Smith.

ET: Cov still represenetes General Flynn ("MF") and FIG?  R: Correct.

ET: When did engagement start?  Initially engaged at very end of Dec 2016, sometime between Christmas and Jan 1.  Engagements were formalized via engagement letters in early Jan.  So while engagement letters may be early Jan, engagement practically began between Christmas and New Year's 2016.

ET: And KV also rep'd both FIG and MF?  R: My general understanding, yes, but would have to ask her for specifics.

ET: Did her engagement precede Cov?  R: Yes.

ET: Did your engagement overlap?  R: Yes, there was a substantial period of overlap.

ET: And BK was not client of Cov?  R: Correct.

ET: Was he client of KV?  R: Not that I'm aware of.

Mock direct examination:

ET: How employed?  R: Partner at C&B LLP.

ET: What kind of biz is Cov?  R: Law firm.

ET: How long been at Cov?  R: Almost 21 years.

ET: Is Brian Smith also a partner at C&B?  R: Yes.

ET: Relative to this case who do you rep currently?  R: MF and FIG.

ET: When did you begin rep'ing FIG?  R: At the same time we began rep'ing MF, just after Christmas 2016.

ET: Who at FIG hired you?

R: We were hired initially by KV, who was the outside general counsel for MF and for FIG.  But that engagement was formalized in engagement letters that were signed by MF.

R: Stepping back from mock; KV engaged us but ultimately MF formalized it.

ET: Do you still rep FIG?  R: Yes.

ET: What work did you perform for FIG between late December 2016 - March 2017?

**COVINGTON & BURLING** LLP

May 29, 2019
Page 3

R: We were retained to review a letter they had received from DOJ concerning FARA and to advise whether they had any obligations under FARA, which was focus of letter received from DOJ.

ET: Apx when did FIG received the letter?

R: It was first noticed by FIG around Christmas

ET: actually not going to ask you that. Will just show you the letter.

1. Exhibit 90

ET: Showing gov exhibit #90. Letter from FARA unit. Seen letter before? R: Yes.

ET: What is letter?

R: This is letter DOJ sent FIG about possible obligation to register under FARA.

ET: What did Cov do in response to the letter?

R: Doesn't look like I actually saw this letter; this looks like a version from the government that I wouldn't have seen. Saw a letter substantially similar to this document without the marking on the bottom.

ET: What did Cov do for FIG in response to this letter?

R: We began to gather information; we met with Bijan Kian, as we understood him to be called.

BB: do you want him to flow on?

ET: That'll depend.

R: We met with BK, we met with MF; asked to receive any docs that FIG could readily collect and provide that related to the work they performed for Inovo. There was an initial set or sets of document that they sent us to review. So did initial review of docs and initial interviews with BK and MF. After initial review of docs, made rec to the client about how to respond to letter. We interacted with DOJ; called them early on, around end of Dec or beginnig of Jan; let them know we received letter. We made a submission to government in early Jan, providing an initial response to their letter.

ET: Who worked on initial response to the letter?

ET: It was myself, Brian Smith - who since made partner; and Alexandra Langton, a junior associate; other tech support; and possibly other attorneys that we consulted with in Cov.

ET: Who supervised? R: I did.

**COVINGTON & BURLING** LLP

May 29, 2019
Page 4

ET: Did interviews include interview of defendant ("D")?

R: Yes, there were two, and other email and phone communications either directly or through KV.

ET: Were you present for both of those interviews?  R: I was.

ET: Did you interview Ekim Altepkin ("EA")?  R: No.

ET: Did you request an interview with him?

R: At some point became aware that he was rep'd by counsel; and therefore spoke with his counsel to obtain information.  Under applicable bar rules when know that individual is rep'd, required to speak with counsel.  As I sit here, I don't know if we spoke to him through his counsel, but I do know we spoke to his counsel.

ET:  Were you able to obtain info from counsel?  Yes.

2. Exhibit 93-A

ET: Exhibit 93-A.  Have you seen this email before?

R: Believe saw email, but recall more clearly the letter attached.

ET: Can you describe?

R: This was an email from Ekim to Bijan letting him know that his lawyer had recommended an opinion on his firm vis-à-vis FARA and transmitting that opinion.

ET: Black box in 93-A; would be curious to know what is under the redaction.  If we have a copy would like to see what is under there.

R: Definitely seen the email before.

Details: From Ekim to Bijan wed, Jan 18, 2017 at 2:45 Subj: Fwd: time sensitive.

3. Ex. 93-B.

ET:  Have you seen, what is it?

R: This is the opinion letter from Ekim's lawyer.

ET: Did you review it?  R: I did.  ET: Who wrote it?  was signed by Matthew Nolan; don't know who drafted it.

ET: To whom is it addressed?  Ekim Alptekin

ET: What were circumstances in which you came into possession of letter?

R: I believe BK sent it to us or else he sent it to KV who sent it to us.

ET: did you see memorandum at time of investigation? R: Believe answer is yes, and believe saw it in close prox to the time it was dated.

ET: Ask to read third para of 93-B.

ET: When D provided copy of memo, what if anything did he tell you about the accuracy of the facts stated in the memo.

R: I don't recall him characterizing the memo or the accuracy of it.

ET: Do you recall him making any rep's about the memo?

R: Like I said, think it came from KV, which I think it did. If it came directly, may have just been forwarded. I don't recall as I sit here, BK characterizing the accuracy of the memo.

ET: Do you recall him asking about the accuracy about the memo?

R: I don't recall asking him about the memo, but did ask him about the topics in the memo; and he did review the draft filing that used the memo.

G: Did you have the letter before interviewing him?

R: Likely received the letter after the second interview; did not interview him about the content of the memo. During this period, KV was principal handling MF and BK; presumably you'll speak to her.

G: Sorry, said subject matter of the letter, you did question him about; can you say more?

R: The memo dealt in part with the relationship between Ekim and Inovo on the one hand and the Turkish gov on the other, or lack thereof. Parts of memo were ultimately quoted in FARA filing, and in our interviews of Bijan Kian we covered topics, some of which are covered in this memo. Including for example, nature of Ekim's firm Inovo and including the LDA and FARA registration, so overlap in subject matter in what is covered in memo and what we spoke with BK about.

ET: Over course of investigation, what did D tell you about involvement of Turkish gov officials in FIG's work?

R: BK told us that the work was not conducted on behalf of Turkey, but was on behalf of Inovo, Dutch based company owned by EA, and concerned improving biz climate between US and Turkey.

ET: What if anything did D tell you about contact between EA and Turksih gov offocials?

R: We became aware that there was a meeting that took place on Sep 16, 2016 in NY, attended by BK, MF, and others from FIG, in which meeting with officials from Turkish government.

ET: How did you become aware of it?

R: May have learned from docs we saw versus BK telling us, but need to reconstruct that.

ET: Did you ask D about meeting in NY in Sep 2016?  R: Yes.

ET: What did he tell you about?

R: Said not related to Inovo contract; rather it was to talk about radical Islam and to have an exchange of views with Turkish officials and the problem of radical Islamic terrorism. Then saw emails that characterized the meeting as being related to the work that FIG was performing for Inovo. We went back and asked him about that and he said that he wasn't sure why he used that phrasing, but he reiterated again that these were two separate things; meeting was about rad Islam and Muslim brotherhood and not to talk about Inovo and work being done on behalf of Inovo.

ET: Was there a term that was used to refer to the meeting about radical Islam?

R: He may have said it was a meet and greet.

R: Is there a term you're looking for?

ET: Project Truth; did he use that?

R: He did not use those with us, but he did discuss whether there was just one project. He discussed an initial project that was discussed with Turkish gov officials that Turkish gov ultimately backed out; but don't think he used Project Truth. He then talked about a different project, with Inovo, that was different than the one with the Turkish Government. But he did not use Truth with me; that was in emails we saw.

ET: Did he give an explanation of why Turkey backed out?

R: Don't believe he gave a reason.

ET: Back to 93-B. Top of page 3. Point to couple sections. "Inovo rep'ing Ratio . . . 50 percent share in Israel; export gas into Turkey . . . " Bottom of page 14, 4 lines from bottom: "hired Inovo to assist in work providing to Ratio to assist with Turkish relations." Did you discuss these representations with the D?

R: This is where my memory is getting challenging.

G: Something that would be in Alex's notes?

**COVINGTON & BURLING LLP**

May 29, 2019
Page 7

R: Will double check her notes. But don't think I discussed this in the interview; may have passed question through KV, or asked him on the phone. My recollection is he did not have an awareness of Israeli company. Have a vague recollection that we bounced it off him and he didn't know about it, but don't have a crisp recollection of whether was phone or interview.

ET: Exihibit 50: Op-Ed; Seen this op-ed? Yes. Author? MF. When published: Nov 8, 2016.

ET: in conducting investigation with D, did you discuss with D?

R: Yes. He said it was something MF wanted to do, and would be helpful to campaign as well; something wanted to do.

ET: What did D say about op-eds relation to Inovo?

R: He said it was unrelated to Inovo. He did say he had run it by Ekim to get Ekim's reaction from client-relations POV; said that Ekim was unhappy with it; thought it would be not well-liked b/c of reference to Muslim Brotherhood and Ekim wanted him to change it so it did not address Muslim Brotherhood.

4. Exhibit 43-A

ET: Seen this email?

R: Yes, have a vague recollection of seeing it. It's an email from Mike Boston, who was described as day-to-day project manager of Inovo contract. From MB to Bijan believe it is an update on progress in getting the project for Inovo up and running. Dates Oct 13,2016.

ET: First sentence? R: "Please see all attached docs for tomorrow's call; boss in the air; MG have call scheduled?"

5. Exhibit 43-B: Attachment to 43-A email

R: Think it is TPs for one of weekly calls or regular calls with EA.

ET: have you seen these TPs before?

R: Been a while, but yes have seen.

ET: See page 7: Please read seventh bullet:

R: "We will attempt to have an op-ed written that links funding of subject with mullahs and imams."

ET: Do you have an understanding who subject is?

R: my understanding is Gulen.

ET: What is that based on?

May 29, 2019
Page 8

R: Essentially everything they did related to Gulen; when speak of reasearch, op-ed, etc. related to Gulen.

ET: Did you speak to D about this document?

R: Not sure; it would have depended on when we obtained this doc. Even if had it before, did not necessarily go through every doc; were trying to capture high-level info of who client was and nature of work.

ET: Do you recall showing him some docs? R: Yes.

ET: Recall specific ones?

R: Some, but not all. Showed him early exchanges of emails in which Ekim discussed project with Turkish gov, specifically Green Light email; and emails and docs related to Sep 19 NYC meeting; remember showing emails and docs related to contracts with Inovo and with Ekim Alp.

G: These were during the formal interviews?

R: Yes. And during these we made clear we do not represent him personally.

ET: Anything else remember?

R: Let me go to one point early on. Start out by asking for internal investigation -- that's a bit of a term of art. At that point helping a client respond to an inquiry; internal investigation implies looking for wrong doing.

G: We get it; understand.

   6. Exhibit 48-A

ET: Have you seen this email before?

R: Yes. This is an email from BK to Ekim Alp letting him know that the op-ed about Turkey was about to be published.

ET: Any attachments to email?

R: Appears to indicate that there was an attachment.

ET: Is this an email you remember discussing with BK?

R: I don't know; may have, but don't recall. Certainly discussed the topic, but don't recall two years later whether we discussed the specific email.

G: What was topic?

R: Nature and origin of op-ed published in the Hill. One of my challenges is remembering which emails we had and saw when; so don't recall whether had this at the time of interview; even if did have, don't know if had shown.

G: was there something preventing you from going back to him after receiving initial emails?

R: Sort of; will discuss with Bruce.

G: Tell us later.

R: Key point is not impeded from consulting with him things we needed to consult about. Let's find out if we showed it to him this "the arrow has left the bow" email.

ET: Did you discuss. .. what of anything did D tell you about why he sent EA the op-ed?

R: He said, well, here is how it came up, we were questioning him about who wrote op-ed, how it was written and how it came up. He was trying to assure us that Ekim did not write it, did not have input, just had some typographical input. Then he told us that Ekim did have concerns about MB and how that might play in Turkey.

ET: So D said would send for typographical edits?

G: Tried to assure you of what?

R: That EA just sent typographical edits, and believe we confirmed that through emails. Don't recall BK explaining why he sent the op-ed to EA. This came up organically in our conversation who wrote the op-ed.

R: Suggest a question: if question is what did he say about the origins of op-ed; answer is this was MF's idea and not an idea that came from Ekim or the Turkish government at all.

G: Did he say anything about what his role was?

R: What Bijan's role was? Yes, he arranged for a copy-editor, to edit the op-ed. And it was Bijan who helped place the op-ed; which he did through Sphere, a PR firm that happened to be under contract in relation to Inovo contract; BK described this as something that Sphere was doing as a favor and not part of Inovo project. Recall BK saying this was all coming together very quickly and that's why needed Sphere's help in placing it.

G: Did he say why it needed to be placed? Why was there a rush to get the op-ed placed? FOLLOW UP ON THIS. Want to be certain who told you what you remember.

G: Did Bijan say anything about who did the initial draft?

R: I recall his telling us that MF wrote it, with editing assitance from Hank Cox. Think he also told us that he, BK, had some input, commenting on the draft/reacting to it.

**COVINGTON & BURLING LLP**

May 29, 2019
Page 10

    7.  Exhibit 49

ET:  Seen this email before?  Who is to and from?

R: From EA to BK.  ET:  What is date, Nov 5, 2016.  ET: Read?  R: Hi Bijan, the General is right on target; misspelling of Erdogan and Fatullah is best written with one L.

ET: Did you discuss this email with D?

R: Don't recall if discussed this specific email, but do recall that D said EA made some typographical edits and this would be an example of this.

ET: Back to Arent Fox memo.

ET: Page 3, final paragraph. R: "General independently expressed concern with rad Islam .. . never consulted EA on opinion; would have strongly advised against publishing article in The Hill."

ET: Do you remember discussing this info from the memo with him?

R: I don't, but Brian Smith was principally dealing with Matthew Nolan; he may have discussed with KV; but I don't recall speaking with BK about this paragraph.

ET: What if anything did D tell you about how Turkey project was being funded?

R: His understanding was Ekim was paying for it; Ekim may have had support from others in Turkish biz community; but not sure of even that.  Adament that no payment by Turkish government.

ET: What did else did he tell you about who in biz community?

R: Don't recall him saying anything about that.

ET: Did you ask?

R: Yes and we asked others and no one had information about who the business community was, but that payment was coming from Inovo.

ET: You don't recall Bijan saying anything about other members of biz community funding project?

R: No, and that really wasn't a focus; we were focused on whether it was Turkish government or not.

ET: And what did he say about that?  R: Absolutely not.

G: And he said, there may have been funding from others in the Turkish business community, but he did not know?

**COVINGTON & BURLING** LLP

May 29, 2019
Page 11


R: To the best of my recollection. Like I said, we asked others about it as well, e.g., Mike Boston, and he said there were others, but I don't recall what the foundation was for his saying that.

8. Exhibit 16.

ET: Seen this email? R: Yes. ET: To/From? R: From Ekim Alp to Bijan and MF.

ET: Read first three paras..

R: "Just finished meeting with [Turkish officials] can discuss contract; flying to LA can discuss.. ."

ET: Did you discuss this email with EA?

R: Yes, he told us there were discussions with Turkish government that this related to (and the green light email related to) but that subsequent to this email, the Turkish government backed out and it never went forward.

ET: Recall anything else?

R: Recall that we, Cov, dwelled on this email with BK and others.

ET: Why did you dwell on it?

BB: That's probably not okay.

BB: What did you say to him and what did he say to you?

R: Think we asked more than once whether this could be related to Inovo contract and asked for a description of what the earlier project was that he was describing. My main recollection is that he reiterated several times is that this was totally unrelated to Inovo contract; there were earlier discussions about radical Islam and that is what the Green Light email related to; and when the gov backed out, Ekim stepped in on his own and did a different project.

G: Do you recall whether the subject was different between the two?

R: My recollection is that BK described the subject matter as different. He described the project that didn't go forward as relating to radical islam and the one that did go forward as improvising the business climate between Turkey and the US.

G: Was there some connection, or do you recall discussing with BK whether there was a connection between the Turkish gov pulling out .. . did EA intervene in some way or was it coincidence in timing?

R: He described the projects as distinct, but he said when Turkish government backed out EA decided to go forward with this different project anyways.

ET: What financial transactions did you examine in the course of your inquiry?

R: The team analyzed various documents, including accounting documents; team would have brought any transactions to my attention that were significant.

ET: Were there any financial transactions you thought were significant?

BB: Hesitant about that questions.

R: If you ask me, did you look at financial transactions between FIG and Inovo, answer is yes.

BB: Which ones?

R: We looked for transactions between EA and FIG and there were transactions between FIG and EA.

ET: Describe those.

R: There were several payments made for $40k between FIG and EA and a last one of a different amount, can't recall.

ET: Where were EA's account located?

R: Believe in Turkey.

ET: FIG's account?

R: In the US.

ET: Inovo's?

R: Believe in The Netherlands.

9. Bank of America statement

ET: What does second entry show?

R: $200k payment ...

BB: What are we doing here?

ET: Did you look at this document during your review?

R: To be honest don't know.

ET: To your knowledge, what account would FIG use to receive money for the contract?

R: Don't remember, think I knew at some point, but don't remember.

ET: Payments from FIG to Inovo . . . how did D describe those payments?

R: He described those as refunds b/c there was certain lobbying and PR work that EA was expecting FIG to do, which it hadn't done and EA insisted on a refund b/c not done.

ET: Did you review FIG's accounting records about these? R: Yes.

ET: How listed? R: As consulting fees.

ET: Did you ask D about this?

R: Yes, did not know why recorded that way; he did not put them that way, but that was inaccurate as they were in fact refunds for services not rendered.

    10. Exhibit 17

ET: Seen this email before? R: Yes.

ET: Recall asking D about this email?

R: I don't recall whether we showed this email or asked about it; but did describe the topic of advisory support and 20 percent figure ref'd in large paragraph of email. BK said there had been some discussion about having EA serve as a consultant, but those discussions did not reach fruition and EA did not end up serving as a consultant.

ET: In that large para. "so our costs will not improve PR." What's your understanding about PR?

R: Public relations.

ET: What is your understanding about project not including PR, but refund being for PR?

R: Would like to go back and refresh recollection whether discussed this email, but we dwelled on this topic b/c had engaged Sphere, a PR firm, and PR services were performed. "August 11, 2016 email, Re: Welcome back!" See if did ask about this specific email.

ET: What did he say about that?

R: He just kept repeating that EA wanted his money back b/c PR and lobbying services were not performd.

ET: Do you recall pointing out that PR was performed?

R: I do recall that lobbying and PR was performed.

ET: And his response was the same? R: Correct.

May 29, 2019
Page 14

11. Exhibit 19

ET: Seen? R: Yes. "Thank you for engaging us on Project Confidence." "MF and I have allocated 20 percent for advisory and support costs."

ET: Recall discussing this particular email with D.

R: Don't recall, but we can check.

R: My recollection is when we questioned him about payments made to Ekim and draft consulting contract with Ekim, we had some emails, but I just don't recall which ones. I would add.

BB: Not sure that our notes are sufficiently specific to determine which documents were used in that interview.

12. Exhibit 33-A

ET: Recall seeing this email / attachment?

R: recall seeing invoice for $200k, may have been more than one for $200k, but did see an invoice substantially similar to this, yes.

13. Exhibit 33-C

ET: Seen this email? R: Yes. ET: Read first para. R: Michael please initiate payment for $40k as soon as EA sends invoice for his consulting.

ET: Who is that email to/from. R: From BK to MG, cc'ing Ekim and MF.

ET: Recall asking D about this email?

R: Almost certain we did. Look back at records, think about it further.

ET: Recall anything about that?

R: Recall him being asked about the topic; he said the $40k was a refund; there was a separate discussion about a consulting contract that never came together and that EA never actually became a consultant; and the $40k was for a refund, notwithstanding what was in the email and draft contract.

BB: It's a sense of well, maybe the answers didn't make sense, but they were what they were and the FARA filing ultimately used language to deal with.

R: Currently constrained by terms of engagement, but if there is a court order, that could open up this discussion more.

ET: Did you ask why payments were going to Inovo in Netherlands, and not EA's account in Turkey.

R: Don't recall asking about that, but do think I recall why the question was not asked.

ET: At conclusion of its fact gathering, what did Covington do?

R: There were a couple milestones. 1) sending letter to DOJ in January based on preliminary findings. At that point we had reached a conclusion as we told DOJ that FARA filing was required, but we had not reached a conclusion on who foreign principal was.

R: we then entered a second phase of fact gathering, looking at additional facts and filings; that led to filing of FARA Statement on March 7, 2017.

G: That was after initial letter of response. What was sequence of events?

R: There was an initial period of intensive fact gathering that reflected our initial findings; told DOJ that a FARA filing was likely, but not sure who foreign principal was. After that we did initial fact gathering to focus on preparing the FARA filing.

ET: Can you give an explanation of FARA?

R: FARA is a law enacted by Congress in 1938, requires registration of individuals who are acting within US as an agent of foreign government or entity, in certain circumstances.

    14. Ex. 56 - to the end (each exhibit related to a specific paragraph of the filing)

ET: Please ID the files?

R: These are what we call collectively "the FARA filing."

ET: Who drafted the FARA filing?

R: A number of people; lawyers at Cov, principaly Brian Smith and Alex, with participation from me and KV. Steve Anthony also had input into the draft though may not have literally typed words, but he did have input.

ET: Who on behalf of FIG reviewed the filing before it was submitted?

R: Principally reviewed by KV; also reviewed by BK. Reviewed by MF as well. Think that is it.

ET: Receive feedback from D?

G: How do you know BK reviewed the draft?

R: I remember receiving comments from him; I can't recall how we transmitted them to him, but I recall his reactions to him, I also recall that during that drafting process we posed questions to him on specific points through KV and he responded either through KV or directly.

**COVINGTON & BURLING** LLP

May 29, 2019
Page 16


G: You don't recall if in some cases were from him and which were from him?

R: They were in some cases from him and her; even when he responded KV was on copy.

G: As an aside; don't think those were produced, right?  R: Correct.

G: Do you expect to be within the scope of the judges order requiring to produce stuff.  Who is handling our response?

R: Me, Steve Anthony, and Dan Johnson.  We have already complied fully with judges order to produce docs to Refikien and internal communications from FIG employees to counsel to the extent responsive, would have been responsive to subpoena.

G: Initially had discussed given those to us.

R: Our reading of judges order is that they are still privileged.

BB: he's a director.

ET: What were D's reaction to the draft?  [BB: confirmed within scope of waiver].

R: Will share what can recollect.  he was very upset that we were showing payments to Ekim as they were recorded in FIG's books.  He was very exercised that those should be changed to refunds.  In addition, he was very upset that the word "kickback" appeared in the FARA filing.  Those are the only comments I recall him making.  We also had back and forth about his political contributions and recall him providing his political contributions.  We also needed his help clarifying which US gov officials had been contracted.  Otherwise our understanding was that he had no objection with the filing.

G: Where did you get that understanding from?  R: That's in the negative/  G: So he gave you no other comments.

ET: Give EA or lawyer a draft?

R: No.  Receive feedback from EA or his lawyer.  No.  Take that back.  Do recall BK telling us that EA was unhappy that we were going to be filing under FARA and that this had been conveyed to BK.  Have a vague recollection that perhaps Matt Nolan at Arent Fox had questioned the need to file at all.  Talk to Brian about that; it's not first hand.

ET: Did D tell you he discussed characterization of the return payments to EA?

R: As I sit here today I don't recall that.

ET: Run through several statements in FARA filing and on what Cov/FIG based the rep.

**COVINGTON & BURLING LLP**

May 29, 2019
Page 17

Ex. 56 para 7, pg. 3. "List every foreign principal: Inovo BV" That was based on full-scope of review of facts; spent considerable time reviewing the facts; great deal of information fed into that response. Can try to catalogue the principal pieces of information.

ET: Was that consistent with the information provided to you by D?

R: Yes.

ET: Don't think we need full itemization.

ET: para. 8: Will you engage or have you engaged in activity benefitting foreign principal. MF spoke, provided interview... not at the direction of any foreign principal." What did you base that statement on?

R: That response is based on information that we gathered principally from BK and MF.

G: Was that information consistent with what each of them told you? R: Yes.

   15. Ex. 58

ET: third page, final para.

R: "Flynn Intel Group does not know whether or extent to which Turkey was involved with its retention by Inovo for the three-month project."

ET: What based that statement on?

R: That is based on essentially all of our interviews with FIG personnel. And our review of FIG documents.

ET: Is that consistent with information provided by the D?

R: Yes, though would add that BK was adamant that the government of Turkey played no role. So strike my response. Not quite consistent b/c BK's view was the gov of Turkey played no role whatsoever; no not consistent with what government told us.

BB: What was information based on?

R: Based on fact that contract was with Inovo and not Gov of Turkey; didn't see any payments from Gov of Turkey. But at the same time, there was some discussion with Turkish officials, including a very significant meeting with Turkish officials on Sep 19 meeting.

G: So apart from the two or three comments we already talked about, did BK reiterate an objection to this point?

B: He did not reiterate an objection to this point by then, to my recollection.

G: Taking line by line. "FIG doesn't know the extent to which Turkey was involved in retention of project." Consistent or inconsistent with what BK told you? Or did he tell you anything that was inconsistent with that?

R: He told us that the Gov of Turkey played no role ICW retention of Inovo for the three month project.

G: So he did not talk to you about this particular statement, but his statement to you was a more emphatic statement that gov of Turkey was not involved.

R: Much more.

G: Second line: "FIG is aware that EA consulted with GOT regarding work that FIG might do." He was not inconsistent/ did not take issue on this point, right?

E: Correct.

G: Third, EA introduced to Turkish gov officials in meeting . . . Not inconsistent/did not take issue on that.

R: Correct.

G: So only the first is inconsistent/or something he might take issue with.

R: I'd state it differently: He emphatically stated that the Gov of Turkey had nothing to do with the retention of FIG by Inovo.

G: Do you recall versions that were passed back and forth in which he may have commented on and he proposed revision and were sent back, etc.?

R: There wasn't a lot of that, but have to caveat, KV was principally involved with him. My recollection is that we sent a draft and he gave limited comments, and a part from those comments, well, I'll leave it at that.

ET: Preceding page 8b. "Foreign principal was not supervised by foreign government, foreign political party, etc.": What did you base that on?

R: Important to note that says see attachment; that attachment applies to A and B; it then refers to the attachment we were just discussing.

ET: So it's your position that when it says see attachment it applies to both?

R: Yes, might not be best position of it, but that was the intent.

    16. Exhibit 61

ET: Paragraph 13, page 4

R: "neither Inovo or any other person directed the op-ed and in gerneal such activities not taken under control of foreign principal"; what did you base that on?

R: Interviews with BK and MF and our review of available emails and documents.

G: Were those interview with MF and BK consistent with one another and what is in this paragraph?

R: Yes and yes.

ET: Attachment to this; read it to you: "FIG understood the engagement to be focused on confidence regarding biz relations, etc." mid-way through first para. What was basis for that statement?

R: Several FIG personnel told us that, including BK, MF, Boston, perhaps others.

ET: Bottom of page; Sep 19 2016 meeting; purpose was to get background for project. What was the basis for that statement?

R: Will have to go back and check; not sure precisely; might be question that Brian might be better placed, but will need to go back and refresh my recollection. Bates 356; first sentence of last paragraph.

G: This paragraph; Sep 2016 meeting, is that something that BK took issue with in the final draft?

R: No, not that I recall.

G: Based on what he had told you, his position was that it had absolutely nothing to do with the Inovo project?

R: That is correct.

G: So, where did then that particular paragraph . . .

R: That's what I need to go back and reconstruct, but you correctly note that it is different than what he told us.

ET: Did FARA unit review a draft of the filing?

R: Yes, they did.

ENDS

# EXHIBIT 12

**Smith, Brian**
_____

| | |
|---|---|
| **From:** | Kelner, Robert |
| **Sent:** | Saturday, January 21, 2017 2:14 PM |
| **To:** | 'Kristen Verderame'; Smith, Brian |
| **Cc:** | Langton, Alexandra |
| **Subject:** | RE: Time sensitive- Ekim Alptekin- engagement letter |

I've now had a chance to read this Arent Fox memo more carefully. First, it is so filled with garbled English that I suspect parts were written by someone other than Nolan (and then not edited by him). Second, it is flagrantly wrong on the law. It misunderstands the LDA exemption, making no mention of the regulatory requirement that the activities not principally benefit the interests of a foreign government. Third, it repeatedly states that Sphere was never retained, which is preplexing. Fourth, it frames the whole FIG engagement around Inovo's work for the Israeli oil deal, which Bijan said he knew nothing about.

*)little background on details /diligence*

When you speak with Nolan, I would ask:

(1) If this all had to do with an Israeli oil field, how is it that was never mentioned to Bijan or Mike Flynn? Was there a reason that wasn't shared with them?

(2) Sphere filed an LDA report for its work for Inovo through FIG. Was he not aware of that? How can Ekim say Sphere was never retained?

(3) Ekim had told Bijan he was discussing with members of the Turkish cabinet, including the Minister of Foreign Affairs, a proposal and budget for a project with FIG. Was Nolan aware of that? Does that change his conclusion at all that this was purely an exercise for a private Dutch based company?

(4) Ekim arranged a meeting for FIG with the Turkish Minister of Foreign Affairs in New York, shortly after the Inovo contract was executed, and the meeting related in some way to the project Inovo was performing for Inovo. Was Nolan aware of that? Does that change his conclusion? *(9/19)*

The point of asking these questions is to do our due diligence, and to see if it shakes loose any additional facts. As we discussed, we should assume this will not be a privileged discussion.

Rob

*5) LDA exemption*

**Robert Kelner**

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5503 | rkelner@cov.com
www.cov.com

# COVINGTON

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

> **From:** Kristen Verderame [mailto:Kristen.Verderame@intercede.com]
> **Sent:** Wednesday, January 18, 2017 4:22 PM

# EXHIBIT 13

OMB No. 1124-0001; Expires April 30, 2017

**U.S. Department of Justice**
Washington, DC 20530

**Registration Statement**
**Pursuant to the Foreign Agents Registration Act of 1938, as amended**

## INSTRUCTION SHEET-READ CAREFULLY

1. *Use.* All persons required to register under this Act shall use this form in submitting the information required by Section 2(a).

2. *Read Act and Rules.* Registrant should carefully read the Act and the Rules thereunder before completing this form.

3. *Answer.* Unless otherwise specifically instructed in this form, a registrant shall answer every item on this form. Whenever the item is inapplicable or the appropriate response to an item is "none", an express statement to that effect shall be made.

4. *Attachments.* Inserts and riders of less than full page size shall not be used. Whenever insufficient space is provided for response to any item, reference shall be made in such space to a full insert page or pages on which the item number and inquiry shall be restated and a complete answer given.

5. *Filing.* The completed statement, including all exhibits, shall be filed in electronic form with the Registration Unit, Counterespionage Section, National Security Division, U.S. Department of Justice at http://www.fara.gov. The statement must be filed in accordance with 28 U.S.C. § 1746. A copy should be retained by the registrant.

6. *Filing Fee.* The filing of this document requires the payment of a filing fee for each listed foreign principal as set forth in Rule 5(d)(1), 28 C.F.R. § 5.5(d)(1).

7. *Privacy Act Statement.* The filing of this document is required for the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, for the purposes of registration under the Act and public disclosure. Provision of the information requested is mandatory, and failure to provide the information is subject to the penalty and enforcement provisions established in Section 8 of the Act. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, DC. Statements are also available online at the Registration Unit's webpage: http://www.fara.gov. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public in print and online at: http://www.fara.gov.

8. *Public Reporting Burden.* Public reporting burden for this collection of information is estimated to average 1.375 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Counterespionage Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

Note: *Omit this instruction sheet when filing this Statement.*

FORM NSD-1
Revised 03/14

MTF-EDVA00032

| 11/22/2016 | Paul Becker | Consulting | | $6,000.00 |
| 10/03/2016 | Sam Pemberton | Administrative | | $712.00 |
| 10/24/2016 | Sam Pemberton | Administrative | | $ 710.00 |
| 10/11/2016 | SGR LLC | Public Affairs | | $15,000.00 |
| 10/24/2016 | SGR LLC | Public Affairs | | $10,000.00 |
| 11/16/2016 | SGR LLC | Public Affairs | | $15,000.00 |
| TOTAL: | | | | $574, 662.00 |

*Answers to questions posed in letter dated November 30, 2016:*

1) At any time prior or subsequent to the November 8, 2016, op-ed in The Hill, did you or anyone else at Flynn Intel Group have any communications with any official in the Turkish Government or Mr. Alptekin regarding the op-ed? If yes, please describe the nature and content of such communications.

   A draft of the op-ed was shared with Mr. Alptekin in advance of publishing. Mr. Alptekin suggested changes but no such changes were accepted.

2) To your knowledge, at any time prior or subsequent to publication of the op-ed, did Mr. Alptekin or anyone else associated with Inovo BV have any communications with any official in the Turkish Government regarding the op-ed?

   Not to our knowledge.

3) Other than yourself, who was involved in preparation of the op-ed?

   My business partner, Bijan Kian, and his long-time editor, Hank Cox.

4) Did any official in the Turkish Government, or anyone acting on behalf of the Turkish Government, ask or direct that the op-ed be written, or have any involvement in the preparation of the op-ed? If yes, please explain.

   No.

5) Did the Turkish Government, or anyone acting on its behalf, receive a copy of the op-ed (or a draft thereof) prior to its publication?

   Not to our knowledge.

6) Did you, or any other person or entity, receive any compensation for writing the op-ed? If so, who was the source of that compensation?

   No.

MTF-EDVA00042