FILED

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT
### Alexandria Division

**UNITED STATES OF AMERICA,**

**v.**

**BIJAN RAFIEKIAN,** *et al.,*

**Defendants.**

**Criminal Case No. 1:18-cr-00457**

**FILE UNDER SEAL**

---

## MEMORANDUM OPPOSING COCONSPIRATOR DESIGNATION
## OF NON-PARTY WITNESS MICHAEL T. FLYNN,
## ENFORCE THE GOVERNMENT'S JUDICIAL ADMISSION
## AND VACATE THE NON-DISCLOSURE ORDER

Non-party witness Michael Flynn hereby requests relief from the order issued July 3, 2019, upon *ex parte* application of the government.[1] The government, which is "not an ordinary party to a controversy,"[2] should be bound by the judicial admissions it made in open court on June 13, 2019, in direct response to this Court's questions: that Mr. Flynn is not a co-conspirator in the case before the Court. This is not a mere "Correction to the Record."

Moreover, designating Mr. Flynn as an unindicted co-conspirator and requesting such a finding by this Court by a preponderance of the evidence is unnecessary even according to the government's response, which, due to an oversight by the government, new counsel received at 9:03 pm last night, Sunday July 7, 2019. The government itself concedes that the one document it seeks to admit per that designation is "*otherwise admissible.*"

---

[1] Non-party witness Flynn has requested any and all filings the government made to obtain the *ex parte* order on July 3. Mr. Flynn's rights are directly implicated by the government's filing and this resulting order, yet this counsel does not know what has been filed against him. Given more time, counsel will gladly provide the Court any additional information we find on these issues.

[2] *Berger v. United States*, 295 U.S. 78, 88 (1935).

Once the government's "correction" has been denied, this Court's Temporary Nondisclosure Order, entered on the same day under seal, would have served its purpose of preserving the status quo until this hearing could be held, and it should be vacated.[3]  In the alternative, if there is reason for it to remain, it should be significantly narrowed to comply with the First Amendment.

1.  **The Government Should Be Legally Bound by Its Judicial Admissions and Repeated Representations to Counsel.**

While Mr. Flynn does not dispute the government's right to decide how to present its case and which witnesses to call, the government's sudden decision to reverse its long-stated position that Mr. Flynn is *its* cooperating witness, and to turn him into an unindicted coconspirator, is extremely prejudicial to Mr. Flynn.

Given recent events, which Mr. Flynn describes *infra*, the government's reversal also sounds an alarm of possible retaliation and may have ramifications for Mr. Flynn beyond this trial. Mr. Flynn is still willing to cooperate with the government and provide testimony consistent with his grand jury testimony and prior interviews. Indeed, Mr. Flynn is cooperating now by providing more information and further waiving the attorney-client privilege and work-product protections specific to material in this filing.  And, in the last two weeks, he and his new counsel have scoured the record of his interactions with others and with his former counsel to demonstrate the soundness of his testimony regarding the facts of the underlying events and transactions.

Not only did the prosecutors advise the Court on the record that Mr. Flynn is not a

---

[3]  By its terms, the Nondisclosure Order applied to prevent "[disclosure] to anyone the existence of this Order or the Government's Notice of Correction to the Record, to be filed, unless otherwise ordered by the Court." The Order then concluded by setting a hearing "on *whether* this Order and the Government's Notice of Correction of the Record shall remain under seal" (emphasis supplied).

coconspirator, AUSA Gillis has stated repeatedly in interviews of Mr. Flynn and representations to counsel that Mr. Flynn was not implicated in the charged conspiracy.[4] The government's "about-face" is not a "correction" of the record. There is no misstatement or typographical error which can simply be "corrected." The prosecutors made deliberate and affirmative admissions to counsel and this Court.

The government's representations and clear statements constituted a judicial admission and are binding. A judicial admission or stipulation is "an 'express waiver made . . . by the party or his attorney conceding for the purposes of the trial the truth of some alleged fact." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) (citing 9 J. Wigmore, Evidence § 2588, p. 821). Although a judicial admission comes most often as 'a formal concession in the pleadings or stipulations by a party or counsel], ' *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001) (citation omitted), it can be made orally in the course of litigation. The determination centers on the knowledge and intent of the party making the admission, thus "'[a] lawyer's statements may constitute a binding admission of a party[ ]' if the statements are 'deliberate, clear, and unambiguous[.]'" *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) (quoting *Fraternal Order of Police Lodge No. 98 v. Prince George's County, MD*, 608 F.3d 183, 190 (4th Cir. 2010)).

United States Attorneys are fully empowered to bind the government, which authority is

---

[4] Mr. Gillis informed undersigned counsel and Mr. Flynn twice on June 6 alone that Mr. Flynn was not charged in this conspiracy, and they did not intend to charge him. This is one reason new counsel for Mr. Flynn understood that the government was only interested in and satisfied with Mr. Flynn's factual testimony as given repeatedly to date—which, as Mr. Gillis put it, "would allow the jury to infer supervision and control" of the project by the Government of Turkey—the ultimate question for the jury here—if it found the facts beyond a reasonable doubt. Dkt. 213: Hearing of 06/13/19; Tr. 65.

"incidental to [their] statutory authority to prosecute crimes." *Thomas v. I.N.S.*, 35 F.3d 1332, 1340 (9th Cir. 1994). The Fourth Circuit has held that in settling disputes between a defendant and the government over the latter's commitments, it relies heavily on commercial contract law, enhanced by two factors that favor the defendant. The first factor stems from the inherent rights of the defendant, which are "constitutionally based and therefore reflect[] concerns that differ fundamentally from and run wider than those of commercial contract law." *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986). The second concern, applicable to federal prosecutions, considers the "honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government." *Id.* These two factors— the "constitutional and supervisory concerns"—"require holding the [g]overnment to a greater degree of responsibility" for the representations it makes within the course of litigation. *Id.*

In this case, the colloquy between this Court and the government was very clear. Not only did the government, in response to a direct question, unequivocally state that Mr. Flynn was not a member of the conspiracy, but in the course of further questioning on the nature of the testimony Mr. Flynn would give, the government reiterated, "we do not contend that Mr. Flynn was a member of the conspiracy." Counsel could not have been more deliberate or clear. Nor was the question one that the government had not had time to consider, since Mr. Flynn's potential status as a co-conspirator must have been explored in considerable depth in the course of the last few months. The theory of estoppel generally is "intended to protect the integrity of the judicial system and to prevent a party from 'playing fast and loose' with the courts to suit the party's purposes." 6 Handbook of Fed. Evid. § 801:26 (8th ed.). Because counsel's clear representation to the court was knowing and wholly unambiguous, it should be binding.

In addition, Mr. Flynn was not required by his plea agreement or otherwise to cooperate

with the prosecution in this case. The Special Counsel Office released him and advised that he had fulfilled his cooperation prior to his scheduled sentencing and again thereafter.[5] Yet Mr. Flynn has continued to cooperate with the government for hours upon hours—at great expense of time and defense funds—as he did long before he was charged and would have continued to do even if he had never been charged.

Mr. Flynn delayed his sentencing before Judge Sullivan to continue his cooperation here, for whatever benefit—if any—that might have in his sentencing, but he could have chosen not to cooperate further, proceeded to sentencing, and be done with all of it. The government should not be allowed to place him in a worse position now and name him as a co-conspirator in this proceeding—for the feeding-frenzy of the press or for any future use it might contemplate.

## 2. The Government's "About-Face" Could Be Retaliation For Mr. Flynn's Truthful Testimony The Government Does Not Like.

As the Court knows, Mr. Flynn has new counsel. Virtually all of new counsel's intense work to date has been assisting him in cooperating with the prosecutors in this case. It amounts to hundreds of hours. Undersigned counsel are still working all hours to try to get up to speed on the case.

After participating in further trial prep sessions with the government, new counsel advised the prosecutors last week, as Mr. Flynn has said in prior interviews, his testimony of the underlying facts of the transactions remains consistent with his prior testimony and interviews. Unfortunately, the government was not satisfied with that. The prosecutors have been adamant Mr. Flynn testify that he authorized filing the FARA form knowing and intending that it contain false statements. Mr. Flynn cannot give that testimony because it is not true.

---

[5] *See* Ex. 1, Joint Status Report of 03/12/19.

Mr. Flynn advised the government, as Mr. Flynn has said before, that much of what he understands is with the benefit of hindsight. When Mr. Flynn agreed in his "Statement of Offense" in Judge Sullivan's court that certain information in the FARA filing was false, he was doing so with some hindsight. Undersigned counsel advised the prosecutors that Mr. Flynn did not know and did not authorize signing the FARA form believing there was anything wrong in it. He honestly answered the questions his former counsel posed to him to the best of his recollection, and some with the benefit of hindsight. He authorized and paid for their extensive independent investigation to the tune of approximately $170,000.

Mr. Flynn trusted his former counsel who held themselves out as experts in this area of law. They had the facts, interviewed multiple people, and reviewed many documents and emails while he was incoming and then-serving National Security Advisor, then in the uproar attending his departure. In addition, former counsel had to decide what to file under extreme and unprecedented pressure from and extensive interactions with the National Security Division—including then-NSD head, David Laufman.[6] Admittedly, former counsel had to make difficult judgment calls, and they did so with input from the NSD itself.[7] As for the final filing, Mr. Flynn recalls only reading the cover letter. Regardless of what he read, he did not intend to or knowingly make any false statements, and this is a complex area of law about which he knew nothing.

After counsel advised the prosecutors that Mr. Flynn could not testify that he authorized the filing of the FARA registration knowing that it contained any false statements, the government

---

[6] Mr. Laufman suddenly resigned "for personal reasons" on February 8, 2017, amid the Inspector General investigation of irregularities in the Clinton email investigation and the National Security Division. However, he remained in the Department long enough to pressure Mr. Flynn's FARA filing.

[7] Ex.4, Kelner email of February 20, 2017 to Kristen Verderame in preparation for meeting with Department of Justice. This email is quoted in more detail, *infra*.

cancelled and rescheduled an interview of Mr. Flynn and encouraged us to reconsider our position. The prosecutors requested new counsel review hundreds of pages of notes from prior counsel (many of them handwritten) and both plea colloquies.

In the process of reviewing that material, and in the spirit of full cooperation to provide truthful testimony pursuant to his agreement with the government, Mr. Flynn partially waived attorney-client privilege on June 27 to provide the government with contemporaneous notes by former counsel of conversations with Mr. Flynn prior to the FARA filing—after the government advised us of two specific issues with respect to which they claimed Mr. Flynn was not fulsome with prior counsel. Those conversations were of an interview of Mr. Flynn on January 2, 2107, and a phone conference on February 14, 2017.[8]  In a meeting with the prosecutors on June 27, undersigned counsel walked the prosecutors through the notes which rebutted—if not flat out belied—the government's misunderstanding of Mr. Flynn's statements to his own counsel on issues the government raised. This prompted a heated exchange with Mr. Van Grack who participated via speakerphone. After new counsel left, Mr. Van Grack and his team seemed to double-down. They have apparently put former counsel in a direct conflict with Mr. Flynn.

They scheduled an interview by the FBI with Mr. Kelner at Covington and Burling for July 3, which they later canceled in favor of moving his preparation session from Tuesday July 2 to July 3. Also July 3, an FBI Agent also called the younger Michael Flynn directly to question him despite knowing that he was represented by counsel. The Agent persisted in trying to speak with him even after he said to call his attorney.

New counsel were informed the government would question Mr. Kelner in his July 3 interview about the notes counsel had provided, but Mr. Turgeon did not do so. Instead, Mr.

---

[8]  Exs 2 and 3 provided to the government on June 27; see Ex. 3-A for transcription.

Turgeon carefully worded his questions to elicit responses from former counsel that the notes by Covington's notetaker and partner Brian Smith actually *contradict*.

Within minutes of concluding the interview of Mr. Kelner, AUSA Gillis called us only to notify us that he would not be calling Mr. Flynn as a witness, and that counsel would be receiving a gag order that prohibited us from disclosing that fact. He did not even mention that the government had made the remarkable decision to re-cast Mr. Flynn as a co-conspirator—contrary to many prior representations—and that they would seek a ruling from this Court finding him to be a coconspirator by a preponderance of the evidence in this high-profile proceeding in which he cannot defend himself.

In the spirit of full transparency and cooperation, Mr. Flynn hereby adds to his earlier production to the government the notes counsel have reviewed and transcribed since then, and pertinent emails new counsel has found—still prior to the FARA filing—and Mr. Flynn also hereby agrees to waive his own protections of the work-product doctrine and attorney-client privilege associated specifically with these notes and emails.

In these notes and emails, attached hereto as exhibits, it is clear Mr. Flynn's former counsel were aware before the FARA filing was made:

1. The Government of Turkey was involved in the project and likely the principal beneficiary, rendering the previously filed LDA insufficient.[9]

2. Ms. Verderame, personal counsel for Mr. Flynn, advised from the first meeting with former counsel that "Ekim – emails show Turkey. Mike copied on many of the emails." "August *4?* Money from ministry. . . Government behind it, and Mike copied."[10] [Note, no money was ever traced to Turkey to our knowledge.]

---

[9] Ex. 5, 02/22/2017 handwritten notes of Brian Smith of extensive meeting with FARA unit of DOJ.

[10] Ex.2, 01/02/2017 handwritten notes of Brian Smith of interview with Mr. Flynn, Ms. Verderame, and Mr. Kelner.

3. Mr. Alptekin set up meeting in September. Flynn "met 2 ministers – Transportation and Foreign." [11]

4. "[T]he GOT [government of Turkey] had role of some kind." "Meeting in NY – Ekim and ministers." "No argument that Gulen focus was for commercial purpose." [12]

5. It was apparent Ekim Alptekin had a relationship with Erdogan's son-in-law. They brought up Gulen.[13]

6. Counsel had the "Green light [email authorization from Alptekin by Turkish officials to go ahead with the project] and 2 emails on NY/Confidence"[14]

7. FIG was to do "research into Gulen." "Project Confidence" is detailed in a "75 pp report re Gulen" about which Mr. Flynn and his personal and FIG counsel Kristen Verderame told his former lawyers in their first meeting. "Plan for "disseminating what they found, based on the report."[15]

8. That 75-page document, which prior counsel possessed, is all about Gulen and as reflected in counsel's notes, was used as the basis for the op-ed.[16] Flynn correctly told his counsel Bijan Kian did the first draft of the op-ed.[17]

9. Mr. Flynn pointed former counsel to the "other emails that show details." Former counsel recognized that "op-ed and sleeper networks, plus criminal referrals changes context."[18]

10. Former counsel: "Documents – Gulen, op research, not commercial."[19]

11. The focus of the project quickly narrowed to Gulen.[20]

---

[11] Ex.2, 01/02/2017 notes of Brian Smith in interview of Mr. Flynn with Mr. Kelner and Ms. Verderame.

[12] Ex. 6, 1/26/2017 notes of Brian Smith in phone conference with Mr. Kelner and Ms. Verderame.

[13] Ex. 2.

[14] Ex. 6.

[15] Ex. 2.

[16] Ex. 2, 01/02/2017 notes of Brian Smith with Mr. Flynn, Mr. Kelner, Ms. Verderame, and Ex. 7, the Project Confidence report itself.

[17] Ex. 2 at 8.

[18] Ex. 2; *see also*, Ex. 3.

[19] *Id.* at 9.

[20] Handwritten notes of 2/22/2017 meeting with Mr. Flynn were transcribed a year later and omit the crucial fact that Mr. Flynn told counsel the "business activities" reason that originated the project quickly "crystalized" down to "Gulen" which the raw notes show with a V diagram. The later transcription also omits or misinterprets the fact that the op-ed was *pushed* at the time for

12. "[T]he focus on Gulen." [21]

13. Former counsel notes: "Emails, docs, interviews -- little evidence of business/commercial." [22]

14. [there was] "little evidence of commercial" [purposes] [23] "No argument that Gulen focus was for commercial purpose. No evidence of commercial except conclusory statement." [24]

15. Former counsel: "And we have bad facts. No commercial facts." [25]

16. The "Op-ed on same topic → Gulen" and "paid through the contract." [26]

17. Unknown at the time to Mr. Flynn, Mr. Kian sent Ekim Alptekin a copy of the op-ed. Alptekin wanted changes made to it, and Mr. Flynn did not make them. [27]

18. They were still trying to decide even if they had to file the FARA registration on February 14, 2017. That call to Mr. Flynn was prompted by a call on February 13, 2017, from then-resigning head of the NSD at DOJ, David Laufman himself. This was the day Mr. Flynn had to resign as National Security Advisor. Mr. Laufman and others called Mr. Flynn's former counsel and pressured them to file the FARA. In counsel's call with Mr. Flynn, in which they advised him where they stood, he said very little, but authorized his former counsel to file it and "Be precise." [28]

19. This level of involvement, interest and pressure from the FARA division was unprecedented in Mr. Kelner's significant experience. [29]

---

campaign reasons (in addition to for the Inovo project). Compare Ex. 8 with Ex. 9. *See* Ex. 8-A, transcription of handwritten notes.

[21] Ex. 3, 02/14/17 handwritten notes of Brian Smith of phone conference of Kelner informing Mr. Flynn of status.

[22] *Id.*

[23] *Id.*

[24] Ex. 6, 01/26/2017 notes of Brian Smith in call with Mr. Kelner and Ms. Verderame.

[25] *Id.*

[26] Ex. 3, 02/14/2017 notes of Brian Smith of call with Kelner, Kristen Verderame, Mr. and Mrs. Flynn.

[27] Ex. 8, 02/22/17 Flynn interview notes; Ex.13.

[28] Ex. 3, 02/14/2017 notes of Brian Smith.

[29] Ex. 10, 2/09/2017 email of Robert Kelner noting: "Heather Hunt [of FARA unit] has been all over us. She emailed and then left a voicemail yesterday afternoon asking for a call this weekend." * * * "We've never seen her this engaged in any matter (ever)." There is substantially more evidence of unprecedented pressure from the FARA section that we could provide the Court with more time.

20. Former counsel told the General to take time with the draft-- "high level—don't have the detail."[30]

21. Former counsel advised the government in pre-trial preparation on May 29, 2019, the legal team preparing the FARA registration "did not necessarily go through every doc; were trying to capture the high-level info of who the client was and nature of the work."[31]

22. Current counsel for Mr. Flynn will hereby waive both the attorney-client privilege and the application of the work-product doctrine specifically as to the notes and information provided herein regarding the FARA filing and its preparation.

23. One of the statements in the FARA filing the government alleges as false came directly from information provided to former counsel for Mr. Flynn by counsel for Ekim Alptekin at Arent Fox and was inserted in the filing despite former counsel's concerns with the Arent Fox submission.[32]

24. Significantly, former counsel's email of February 20, 2017[33] in preparation for meeting with the Department of Justice recognizes it was all a judgment call made in extensive communication with the NSD:

    a. "At the same time, we recognize that Gulen is a major focus for the Turkish government, and extradition of Gulen was probably the primary focus of the Turkish government in its dealings with the United States during the period in which FIG was performing work for Inovo."

    b. "Arguably, the work [by FIG] could be viewed as principally benefitting the Turkish government."

    c. "But we don't view this meeting [that Alptekin arranged between General Flynn and two Turkish ministers] by itself as resulting in agency on behalf of the government, and there is no indication that the meeting or any other contacts involved the Turkish government *directing* FIG's activities." (Emphasis supplied.)

    d. "So FIG had a commercial client with commercial objectives, and no *known* foreign government client. This left us [the lawyers] somewhat straining to determine whether registration could be required solely on the basis that the work performed could be construed as principally benefitting the Turkish

---

[30] 02/14/2017 handwritten notes of Brian Smith of Kelner, Verderame, Flynn phone conference.

[31] Ex. 11, 05/29/2019 typed notes of Kelner interview with EDVA at page 8.

[32] Ex.12, 01/21/17, Kelner email; Rafiekian indictment paragraph 58.

[33] Ex. 4, Kelner email of February 20, 2017 to Kristen Verderame and Covington lawyers regarding meeting with Department of Justice.

government rather than Inovo or business interests generally. *We welcome your input on that judgment call.*" (Last emphasis in original.)

### 3. The Non-Disclosure Order Must Be Vacated as Overbroad and Unconstitutional or Revised and Narrowed.

If any non-disclosure order proves to be needed, it must be narrowed. The order the government obtained on July 3 contravenes the First Amendment. Gag orders are disfavored because they are prior restraints on speech and are content-based speech restrictions. *In re: Murphy-Brown, LLC,* 907 F.3d 788, 796-97 (4th Cir. 2018). Consequently, such an order must survive strict scrutiny. *Id.*

To survive strict scrutiny, the gag order must serve a compelling public interest and, if such an interest exists, the government must show the order uses the least restrictive means. *Id.* at 797-800. A fair trial can be a compelling government interest, if the government was able to show that there was a reasonable likelihood that a party would be denied a fair trial without the order. *Id.* at 797. (citing *In re: Russell*, 726 F.2d, 1007, 1010 (4th Cir. 1984). The government has failed to lay such a foundation here.

More important, the government cannot show that the order uses the least restrictive means. The order goes far beyond the order struck down in *Murphy-Brown,* which limited the order to extra-judicial statements that could reasonably reach "public communications media." Here the order prohibits Flynn and his lawyers from discussing the matter with anyone, including Mrs. Flynn, government officials, or even other courts. The order is far too broad. Mr. Flynn and his attorneys have no intention of discussing this matter with the press, but any restriction that goes beyond that fails a strict scrutiny analysis. If there is any reason for a non-disclosure order to remain, it should be rewritten to exclude Mr. Flynn and substantially limited so that it complies

with the First Amendment.[34]

## CONCLUSION

In sum, the Government should not be permitted to abandon its prior judicial admissions and designate Michael Flynn as a co-conspirator in this case. As even a cursory reading of the Government's July 5, 2019 Response reveals, to do so would be totally gratuitous—not to mention outrageously prejudicial to Mr. Flynn and unwarranted by the evidence.

The Government has now represented to both the defendant and to this Court—another judicial admission, and even later in the game—that it proposes to deploy Federal Rule of Evidence 801(d)(2)(E) to introduce only a single document. Furthermore, it concedes the document would be admissible *without using Mr. Flynn as the declarant*.

Under these circumstances, this Court's path seems clear. If the Government's request to designate Michael Flynn as a co-conspirator for purposes of this case is denied, *no* stakeholder's interest is harmed. The Government can introduce its exhibit, the defendant will have to contend with an exhibit that he would have faced in any event, and Mr. Flynn would not gratuitously have his reputation tarnished—or worse.

Regardless of the reasons behind the Government's request to "correct" its earlier judicial admissions and representations, it is enough to say that its remarkable reversal is unnecessary to present its case and introduce the designated document—according to the government's own Response. Accordingly, the government's request to name Mr. Flynn as an unindicted co-

---

[34] To the extent the government is relying upon its *ex parte* motion as a basis for showing a compelling government interest, Flynn is obviously unaware of what such arguments might be. This raises the curious question of why the government chose to file the motion *ex parte* instead of simply under seal. Should the Court rely upon the reasons in the *ex parte* motion as a basis for a compelling public interest, then the motion should be provided to Flynn with further opportunity to respond.

conspirator should be denied and the order of July 3, 2019, vacated in its entirety.

Dated: July 8, 2019                  Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall, VSB No. 79292
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, Virginia 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jbinnalll@harveybinnall.com

/s/ Sidney Powell
Sidney Powell
Sidney Powell, P.C.
2911 Turtle Creek Blvd., Suite 300
Dallas, Texas 75219
Tel: (352) 630-5788
sidney@federalappeals.com
Admitted *Pro Hac Vice*

W. William Hodes
The William Hodes Law Firm
3658 Conservation Trail
The Villages, Florida 32162
Tel: (352) 399-0531
Fax: (352) 240-3489
Admitted *Pro Hac Vice*

*Counsel for Non-Party Michael T. Flynn*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2019, I filed the foregoing in the office of the Clerk and I will email copies to counsel for the government and the defendant.

/s/ Jesse R. Binnall
Jesse R. Binnall, VSB # 79292
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jbinnall@harveybinnall.com

*Counsel for Non-Party Michael T. Flynn*

# EXHIBIT 1

·UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.                                          Crim. No. 17-232 (EGS)

MICHAEL T. FLYNN,

                    Defendant

## JOINT STATUS REPORT

COMES NOW, the United States of America, by and through Special Counsel Robert S. Mueller, III, and the defendant through his counsel, and file this joint status report to provide the Court with the current status of this matter.

1.      On December 18, 2018, the Court held a sentencing hearing in this matter. The defendant requested a continuance at that hearing, "to allow him to complete [his] cooperation" in a related case charged in the Eastern District of Virginia ("EDVA"). *See* Dec. 18, 2018 Sentencing Hearing Transcript, at 46-47. The Court granted the defendant's request and ordered the parties to file a status report by no later than March 13, 2019.

2.      At this time, the defendant continues to request a continuance since the case in EDVA has not been resolved, and there may be additional cooperation for the defendant to provide pursuant to the plea agreement in this matter. A trial in the EDVA case is scheduled to begin on July 15, 2019. Accordingly, the defendant respectfully requests that the parties provide a status report within 90 days.

3.    The government takes no position on the defendant's request for a

continuance. However, while the defendant remains in a position to cooperate with

law enforcement authorities, and could testify in the EDVA case should it proceed to

trial, in the government's view his cooperation is otherwise complete.

Respectfully submitted,

ROBERT S. MUELLER, III
Special Counsel
BRANDON L. VAN GRACK
ZAINAB N. AHMAD
Senior Assistant Special Counsels

ROBERT K. KELNER
STEPHEN P. ANTHONY
Attorneys for Defendant

# EXHIBIT 2

A·C-WP-PAC

ME

No other

levichs — W. Coast - Covyx - Iranian American founder.

Brainware— Bluesey . Dead nodes combine

Abbas - Advise, consult Business development

Introduced League to Verizon
Founder Dr "Reza Sadri " — grew up in U.S.

Drein were Scirca - Advisor to the company
India American Krishna Sarka

W company in Massachusetts
Price to law Enforcement
Training it law enforcement — FBI
Founder may have reached out to governments
Business development → Sales and _____

Frov- Con boom
Vice Chair -Aija
"Aymia" Altekin — Serves on Turkish-Am Business Council
Melanna Committees — Iranian American New Years
thy coll rept Ambassador.

July/August 2016 - Rihl discussions
Consult for Invo. Post coup.
Greek backdoor is Turkish business to travel in Turkey

Arrest to want to Invo. August 9.
- Advising consult services to Invo. Greek backdoor d
Invest in Turkey

MTF-EDVA00047

Put Convention - Agent 5-11 in Turco
Duty of Capoign and Trip
Drop schedule

Bijan - Vice chair man 202
Mike and 35%
) racing lane
small 2,1

Mike has LLC for both and speaking

Bijan - Iranian American - BDS Naturalized
Former member of E. Jn
Served Brit as Cliens
Fam B Deuty of State of Cl.

Nelroose Corrillian, USA, Iranian-American SLA

Again - is the Iran.
Bijan long term in FIG.

Conversation on what we would do.
Came to DC. Friday afternoon phone calls to Again
Update on our efforts
2 x calls ≈ 30 minutes each

Again set up meeting in September.
Minister of Turkey in NY for UNGA
met w minister - Traspublic and Foreign
Me, Woolsey, Again, Bijan
30 - 45 minutes

MTF-EDVA00048

RK - Debut?

MF - only in the agreement - bill

Could ask for Ajmin B. how we'd do what we do

Hand from then on the dollars they're fixing

≈ 2 months the corp

Research - how are things in Turkey

RK - Gulen?

MF - They did. Chan we can of reaching

LL - Notes?

MC - Don't know if any - Maybe on Turkish side

K - the emails from Miller, account

use Virtue

MF 2

FIG accounts shut down i December except ME

Dedicated me and Bijan

How the Rati's seeking at Bijan

Can get the file from him.

Cork access his. Have mine and MF/

Comail accounts - Virtue on top of certain emails

He has access to them, we don't

Virtru

K. Have sim emails -

MTF-EDVA00049

K: need to rid of Technical Minutes?

MFI - yes had just come from other meeting on copyright side.
Talked about where we were @ that time
were not very far

KW Research into Culola - Team Arlson, Brian McCarley
Senior       principal
Project confidence 75 pp report re Culola       new AI
Plan for Documentry on what they found, based on the report

Bijan says that report was an idea

RK: Specific contract. Codirecty of individual's.
Have retained film and production crew

MFI other emails that show detail.
Mike Oster

PM - Findings and criminal referrals.
Sphere Consulting

MFI: Investigation we conducted
RK: Network in US.
MFI - Sphere bought in by Bijan.
To seek video, story. Techs do to invest in.
Confidence in the county to invest
RK: oped and sleeper networks, plus biennial steals
Charges curbed

MTF-EDVA00050

MFI Gets the details to Rijan

RK. Does Kelly - an LDI

MFI - Sept/August. Abundance of contacts
Does Kelly - register. Don't know what the L is
Can't be doing work for Then make up
Out of my depth
Kelly did work on underlying work.

RK - Kelly listed not you
MFI - yes.

KV - they asked B.b. Oubel company.
Rijan ~~~~ told me it was Buble company
but is silly

Mike Gordon responsible to owner.
Rijan gave prices to everyone
MFI. I can't control day to day
Conference calls and meeting
Contract is for 90 days.
Decided not to continue

RK. Captain Ahenin?
MFI - Don't know.

KV - Rijan has access. Contacted by emails
Knows - Several comps Agnin is consulted.
Rijan said it's to the back front in meetings

MTF-EDVA00051

KV. Ekin - emails show Turkey

Mike copied on many of the emails

MFI by schedule - if journal packed - fee hours only.

KV Akin → ☐ Bijan and MFI - August 4

Money from Minist

Bob Kelly - Sole partner. Counsel outside "to the project"

Government behind it, and Mike copied

RK- Call from someone in ex Agent.

FARA advice - relieved to other lawyer.

MFI July 19. Conversation -

Did some spreads on LLC

FEE

MF2 - This project. Comm of Bijan or win transfer

To FIG and to Ekim

Accepted payments from Invo

Ekim paid

KV: Contact 3 × 200k

Second was 185

The ask a 185

Bijan said no PR or Lobbying to sent then many back

Hired Ekim to as consultant

MF2 · News asked or doubted

KV - Trusted Bijan

FIG shut down Nov 30.

MF2. He has the back to zip file this FIG materials

KV - Motive to preserve of defng or Agning

MTF-EDVA00052

ME 2 - Bijan acknowledged

KV - Shut down. Dont delete. end of November.

RK. Where is it?

ME 2: Google business - Antline data. - yes
It sent you an email of links

BD)- Google my shit have it? Paid y.'
ME 2: you paid by ME1 shit has email.

RK - Do everthing humanly possible.
Shoz?

ME 2: How can h his email - kind time, never
lead or may one of only
of n emails

KV - Lots of emails say Mike is change
had to prettig of us.

ME 2: He didn't bring computer to meeting

RK - agreed.

ME1 - Wanted it to go before the election. Slapped out
Hill picked it up.
I'm see very strong in relam. Tea-pye funded Clinton stuff,
Russia high down wedge.
Email is now is trend indeed - my title
Publish! machination or my part. Always losing - and ally - NATO
losing to Russia
Cube we want creating tensions

MTF-EDVA00053

Rk - Conversation to Inovo?

MF1 - Pages, close attention to it, put on me thinking

Rob tour in Texas, Ron White

Turning towns Mayor - Agent - Challenges w/ Color chart

Desk on July 12 -

reheats

Wrote even up edit

Rk - whose idea

MF1 - Tried to do it. I crafted chron - He had other people edit

Rk. First draft

MF1 - He did.

Talked about ways to enhance & project confidence project.

MF 2. Elim ink confidish -

Kel. Crison down to review and edit

MF1 - Elim say listed the whole.

Kel. Hank Cox. Sphere Consulting = had role in edit

Sphere did the shopping of up ed

(Have 3 pm meeting @ GIA building

1:07

Break to read documents

1:35

MTE-EDVA00054

RK - Chisil? Control of FIG.

KV  35%  MF  ⟩ outstanding shares
    30%  BA

                                    0.5%  Dr. Abashi
                   25% oakley - friendly    1.0%  Dark Shore

MF1  Bijan is aware of Letter.

RK- Sphere registered. November
    Documents- Guban, op research, not commercial.

    Sphere du?
KV- Clipping, consulting. Positioned for the documentary.
RK - Stak lobbying?
RK - Counsel?
    Chinese Wall - PJ.

    Outreach Targets email

    Oct 19 - met up state officials

RK - PBSNS 2
MF1  Show mcGon the Letter

    Brian McCarley
    Bijan
    Mike Boston  - only talked to Ekim ≈ 2 x
    Paul Prechart  ⟶ LAB

    MF1  State of Ekim a handful of times

# EXHIBIT 3

Conference of Flynn
2·14·17   4:30 pm
RK, KV, M Flynn, Lori

KV - Bob spoke before
    Documents in email to look @ him
    W/ first to read more carefully.

RK - David Laufman. Coll. HH. Cl. on call.
    Unrelated to stuff in the press.
    Time to collect our interests - facts.
    Possible draft registration. To decision of client
    When telling, he asked Coll and let us know able to talk.
    Read it - File or subpoena may follow.
    Id file, publisher they'll still look. Take - let it wind away.
    Focus is whether you register. Could audit the filing
    Subpoena less likely
    not - yesterday?
    RK - yes.


RK - Where we are. Told them in Jan we expected to file.
    Emails, docs, intervows - Little evidence of business/commercial
    except after the fact CoVFeFe
    not discussed previously - other than fact.
    Talk to people involved. Little on oil field.
    Focus on Gulen, and a drive off EMRE Guru on Gulen / Turkey
    Meetings / work in September - tied to Confidence.
    Op-Ed distributed by Sphere - paid thru contract.
    Op-ed on some topic → below
    LDA - only if Turkey not deriving and not principal beneficiary
    Email - green light Bijan ninety, not confidence.
    Other view - Ekim / Ratio, business - green light unrelated.
    We could fight it out. Whether likely owner. Court. expensive.
        right mix = but big fight
    Media storm. Conspiracy theories, etc.

MTF-EDVA00055

- Payments added to
  [redacted]
- Vast this from being
  factor
- FCPA intersected

MF - Filing Cats - Legality ___
   Smart thing to file be precise.
R.K. Take time with the doc.
      High level - don't have the detail.
      Gaps to explore?
      Meet w/ Heather w/ the document.
      Address any of her concerns.
      Could send cover letter   Single letter summarizing the position
         Cogent explanation of our position.
      Careful of public statements - Interconnected. Can all blow back

MTF-EDVA00056

# EXHIBIT 3-A

02-14-17 Brian Smith notes. Phone call with RK, KV, MF and LORI.

KV: Spoke before

>    Documents in email to look *Ekim?*

*w/ final?* to read more carefully

RK: David Laufman call. HH, CR on call.

>    Unrelated to stuff in the press.
>
>    Time to collect and interview – facts.
>
>    Possible draft registration. Decision of client.
>
>    When talking? He asked. Call and let us know able to talk.
>
>    Read it: File or subpoena may follow.
>
>    If file, possible they'll still look. Take a lot of wind away.
>
>    Focus is whether you register. Could audit the filing.
>
>    Subpoena less likely.

MF: YESTERDAY?

RK: Yes.

RK: Where we are. Told them in Jan we expected to file.

Emails, docs, interviews – little evidence of business/commercial.

>    Except after the fact letter.
>
>    Not discussed previously – after the fact.
>
>    Talk to people involved. Little on oil field.
>
>    Focus on Gulen, at time of FIG? focus on Gulen/Turkey
>
>    Meeting with government in September – tied to Confidence.
>
>    Op-ed distributed by Sphere – paid through contract.
>
>    Op-ed on same topic → Gulen
>
>    LDA only if Turkey not directing and not principle beneficiary.

Email – Green light. Bijan insists, not Confidence.

Other view – Ekim/Ratio, business, green light unrelated.

We could fight if ___.  Would likely pursue.  Court.  Expensive. Might win – but big fight

Media storm. Conspiracy theories, etc.

MF: Filing late – legality.

Smart thing to file. Be precise.

RK: Take time with the draft.

High level – don't have the detail.

Gaps to explore?

Meet w/Heather with the document.

Address any of her concerns.

Could send cover letter. Simple letter summarizing the position

Cogent explanation of our position.

Careful of public statements. Interconnected. Can all blow back.


Notes in upper right corner:  Payments added to chat.

Kept this from being factor

FCPA interconnected

2

# EXHIBIT 4

# Smith, Brian

**From:** Kelner, Robert
**Sent:** Monday, February 20, 2017 11:12 PM
**To:** 'K Verderame'
**Cc:** Smith, Brian; Langton, Alexandra; Anthony, Stephen
**Subject:** Outline for DOJ Meeting

*[handwritten notes in right margin:]*
*2Letter 5*
*D pdf1)*
*Reason for delay*
*Less exeption pin*

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

Here is an outline for what I propose to cover tomorrow at the meeting, though obviously they may lead us in other directions:

We wanted to come in, as we have done before potential retroactive filings for other clients, to walk through the draft filing and solicit any input, so that we could address any issues with the draft. But in this case, as we discussed with Heather, we also wanted to talk through the arguments for and against filing a FARA registration, in the circumstances presented here, to get the Unit's input.

We've addressed in the draft we brought with us the answers to the various questions you had in your letter. And I can walk you through those answers today. Let me do that briefly now.

[Walk through each question and our response]

The client that engaged FIG, Inovo BV, is a Netherlands based corporation. A business consulting firm. Its CEO, Ekim Alptekin, a US-Dutch citizen, indicated that he was interested in restoring confidence in the Turkish economy, and he viewed Mr. Gulen and his followers as an obstacle to that. Although FIG did know that initially Mr. Alptekin was in touch with the Turkish government about the possibility of engaging FIG, Alptekin ultimately engaged FIG directly through Inovo and indicated that the Turkish government would not be involved in directing or funding FIG's engagement.

FIG agreed to conduct research from public sources on Gulen and to develop a video based on the research, which could be disseminated through a PR firm that FIG would retain.

After a contract was executed in August 2016, FIG engaged various independent contractors who conducted the open source research and began preliminary work on the video. FIG later retained a PR firm, Sphere. Sphere engaged in some federal and state level outreach to public officials, engagement with the media, and preparation of a monopoly themed graphic about the Gulen organization, called Gulenopoly. FIG also engaged in some outreach on the Hill regarding Gulen, including a meeting with Chairman McCall's staff.

Originally, the expectation was that the initial 3-month contract would be extended so that the research and video could be disseminated. But the contract was allowed to lapse on Nov. 15 without being extended, in light of the expectation that Gen. Flynn would join the administration. FIG suspended operations in mid-November 2016 and began to shut down. To the best of FIG's knowledge, FIG's research and the early work on the video was not disseminated by FIG. We do not know what Inovo may have elected to do with work product that was in its possession. We have seen, for example, Gulenopoly popping up on social media and in publications such as The Hill. FIG is not involved in circulating Gulenopoly to the best of our knowledge.

As noted, toward the end of the initial contract period, General Flynn himself wrote an op-ed about Gulen. He was not asked to do this. He viewed this as something he was doing on his own. But the subject matter overlapped with the work for Inovo, he did seek input from Alptekin, and FIG did ask Sphere to place the article.

*Based on this fact pattern, a credible argument could be made that registering under LDA, as FIG did, was sufficient, under the terms of the LDA exemption to FARA registration.*

At the same time, we recognize that Gulen is a major focus for the Turkish government, and extradition of Gulen was probably the primary focus of the Turkish government in its dealings with the United States during the period in which FIG was performing work for Inovo. This raises the question of whether the Turkish government is the principal beneficiary of the work for Inovo, within the meaning of the Department's regulation applying the LDA exemption. Arguably the work could be viewed as principally benefiting the Turkish government.

During the course of performing work for Inovo, Aptekin arranged for General Flynn to meet two Turkish ministers while they were visiting New York. But we don't view this meeting by itself as resulting in agency on behalf of the government, and there is no indication that the meeting or any other contacts involved the Turkish government directing FIG's activities.

After the post-election publicity about FIG's work for Inovo, and after we received your letter, FIG also received a letter from Mr. Alptekin's counsel at Arent Fox. Arent Fox asserted that Inovo had retained FIG in connection with Mr. Alptekin's business dealings with an Israeli company that was involved with the Leviathan oil field.

So FIG had a commercial client with commercial objectives, and no known foreign government client. This left us somewhat straining to determine whether registration could be required solely on the basis that the work performed could be construed as principally benefiting the Turkish government rather than Inovo or business interests generally. *We welcome your input on that judgment call.*

[Then, depending on their response, distribute draft filing for discussion]

If they ask about the reported payments to Inovo, I expect to respond as follows:

We did see two payments of 40k each to Inovo. We've included them in the filing as they appear in accounting records. Early on, there was a proposed consulting agreement for Aptekin. These payments, based on available records, appear to tie to that contract. But we have also been told that while Aptekin did not end up playing a role as a consultant on the project, he did nonetheless want part of Inovo's funding of the project to be refunded. The details of the arrangement are not particularly clear, amid the shut down of operations. [Beyond that, I will punt for now, if they press.]

## Robert Kelner

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5503 | rkelner@cov.com
www.cov.com

## COVINGTON

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

# EXHIBIT 5

meeting to
Revise of draft

AM - Things we saw if filed   look @ these issues      2/22/17
   1. Residence addresses. Appreciate only not listed.      Noon
         not a gov request.
         Put in the filing - redact.
         Put on the form "Provided separately to DoJ "
                  and submit a letter
         Redact in Exhibit C. also.
   Leaning toward Registration — prior briefing Turkey.
   Will give it more thought, then definitive view.
   Pretty much there. .   Make decision now.
   Want something in writing ?
   Electing to file is CYA risk

   2.  Reg
         9  retroactive — put on there
                  60 days prior
            60
         (Because retroactive, Receipts (Disbursements, appear on Supplemental)
         "to the filing of the statement" — Problem

   3.  13-16
         Budget established
         eyes- Attachment —
         #13    No — no separate budget
         Look again @ Sphere contract — anything specific
         13-16 — check a box — even if "other"

Exhibit A.

Check Her Counsel
to Albania                    Honorary Consul from Turkey to Albania.  ?

                              Check .

                        If Turkey, list it

                    meeting of officials.

Add any              Add in New York
location
(NY)                 Also in #11 of Supp. Statements
2 3 parts

                     Cliff
                     #15    Payments to Themaso of 40
Payments                        sharge
to Thomaso            TP Return at meeting ?
                                    (Aff - note @ top
                                     still looking not clear)

Sphere               Sphere draft. ?
Coordinate
filing               Reach out to them
                     Happy to look @ draft for them too.
                     Same format
 (A)                 Coordinate
                     Htt  Goin to be @ same time.

Exhibit            Htt / Cliff    Ex B — Gulen not mentioned
B                                 ok to put in Supp.
Gulen
or
                     Turc  Supp — McCain meeting date possible ?
Date of McCain
meeting
                     Various state governments → date location id possible
Details on State
meetings                           governor, Legislature.
    also for
    Sphere

Coscini — Rly by email
so they can handle the timing and
publication

Both by
email
Courier

check

Send check for Lea, — Cosmin a check

he can rep while Sphere finalizes filing

# EXHIBIT 6

KV— Mick(??) - pressing for interview                    Call with
        Sarah Flaherty, Flynn new PR person            Kristen V., RK
        Questions about FIG creation and clients       1.26.17 noon.
RK — Don't say anything until Fil.
        They have no in if talk now.
KV— Might talk y him.


RK· Ben Ginsberg. Sphere doesn't need to ~~gov~~ register
        based on Arent Fox memo.
KV— How get.
RK· Don't know.
        Also agreement that Calon Flaar was for commercial purpose
        No evidence of commercial except conclusory statement
        On top of that GoT had role of some kind
        Meeting in NY— Elenin & Ministers
        Other the docs. — They asked to see.
        Read: Green light and 2 emails on NY/Confidence
        Foolish if they don't file and we do.
        Ben Ginsberg. Aggressive guy
        There is an argument that Reg goes beyond statute.
        Force to litigate — we're not in position to litigate
        And we have bad ~~facts~~ facts — No commercial facts.
        Datt - Can't ~~file~~ file tomorrow.
        Then need to talk y General.
        Media storm
KV— He doesn't care what they print.
        Trump!
RK — Andy Donaldson, his deputy
KV— ~~DOB~~ bush clearance person — approval form.
        Calls trying to find out if he went thyp process.

Rthm In theory, draft, gaps in knowledge. Miss things — failed report.

Videographer — oral greement per emails
CNN Host — did we pay

Rudy

Gift of people involved — Alex — w/ description

Alex — 1 does — 2 nry
1 from light
other most?

# EXHIBIT 6-A

EXHIBIT _6-A_

Transcribed by Sidney Powell from Brian Smith handwritten notes of 1-26-17 call with KV and RK at noon

KV- Mick? – pressing for interview

    Sarah Flaherty. Flynn new PR person

    Questions about FIG creation and clients


RK – Don't say anything until file

    May box us in if talk now


KV – Might talk w/ him

RK – Ben Ginsberg. Sphere doesn't need to register.

    Based on Arent Fox memo.

KV – how got

RK – don't know

    No argument that Gulen focus was for commercial purpose

    No evidence of commercial except conclusory statement

    On top of that GOT had role of some kind

    Meeting in NY – Ekim and ministers

    Other docs – They asked to see.

    Read: Green light and 2 emails on NY/Confidence

    Foolish if they don't file and we do.

    Ben Ginsberg.  Aggressive guy

    There is an argument that Reg goes beyond the statute.

    Fine to litigate – were' not in position to litigate

    And we have bad facts – No commercial facts.

Draft – can't file tomorrow.

__ need to talk w/ General.

Media storm

KV – He doesn't care what they print.

Trump?

RK – Andy Donaldson, his deputy

KV – DOD book clearance person – approval form.

Calls trying to find out if he went through process.

RK – In _?____, draft, gaps in knowledge. ____ things – __? To report.

[ a few more lines not apparently relevant]

# EXHIBIT 7

*" Working Papers "*
*mbbk.docx*        11/5/16



# Statement of the Problem

**How do we restore confidence in the government of the Republic of Turkey and expose the Fethullah Gülen cult in the United States?**

# Facts Bearing on the Problem and the Gülen Ecosystem

MTF-EDVA00003

| Where we were on August 15, 2016 | Where we are on November 4, 2016 | Where are we headed? | How will we get there? |
|---|---|---|---|
| Facing a global, strong, well masked, well funded network that enjoys tacit support in the executive and legislative branch of the U.S. Government.<br><br>Public perception is in his favor.<br><br>Legal battles against the irregularities or possible illegal activities in his charter schools are overlooked, pushed over and not successful.<br><br>Strong support in Congress.<br><br>Almost TEFLON. No one wants to see him as who he really is. | We are changing the narrative FROM:<br><br>An aging man of God who is fighting an autocratic leader in his home country while running a network of charter schools with high quality education.<br><br>TO:<br><br>FG is a terrorist. He is a follower of Hasan Al Bana and Seyed Outb, Founder of Muslim Brotherhood. U.S. taxpayers are funding a masked terror organization. Math and Science and English teachers from Turkey are here to brainwash our youth. He is perfecting the first phase of jihad. Preparing the battlefield to unleash his "soldiers" at the right time. | Changing the public perception.<br><br>Educating Congress.<br><br>Exposing Turkey's Usama Bin Laden.<br><br>Building U.S. grassroots support to expose the true face of FG.<br><br>Documenting the story in two effective ways:<br><br>A three minute video teaser showing the true face of FG.<br><br>A 60 minute video that will be sent to all members of congress and selected USG. | DISCOVER AND DISPLAY<br><br>Expose FG as a strategic national security threat.<br><br>Deep open source intelligence<br><br>Very senior voices with unique authority on the subject. Remove doubt.<br><br>Formal congressional hearings at Foreign Affairs and Homeland Security Committees<br><br>IRS<br>Immigration<br>Homeland Security |

## Public and Congressional Perception of Gülen



| STATUS QUO = EASY TO BELIEVE | | REALITY & FACTS = HARD TO BELIEVE |
|---|---|---|
| · POLITICAL PROTECTION<br>· DISSIDENT<br>· OLD MAN<br>· IMAM |  | · COMPLEX NETWORK<br>· SECURITY RISK<br>· GLOBAL REACH |

MTF-EDVA00004

# Our Roadmap Philosophy



MTF-EDVA00005



We accomplish discovery by examining the following:

- Public Perception
- Tom Neers' "looking behind the curtain" - First Phase of Jihad
- Congressional Action/hearings
- IRS, Tax irregularities and Non-profit status
- Immigration- H1B Visa's
- 1782 Process of discovery

We expose by:

- Producing a 3 minute video with Sebastian Gorka, Philip Haney, Clare Lopez and Mike Flynn and selected other highly credible voices.
- Bring to the attention of US government agencies-IRS, INS, and DHS potential Rule of Law/Criminal wrong doing

MTF-EDVA00006

- Produce a longer, in depth video

# Talking Points

## Phase Zero

Define the subject's sphere of influence, advantages and vulnerabilities. Design an effective strategy with tactical and strategic goals.

Findings:

### INFLUENCE

The subject enjoys widespread support in congress. There is little or no real opposition to the subject's presence or activities. There are strong indications that the subject has built strong advocacy on the Hill. Likewise, there are strong indications that the subject has built an influence network in a number of key states. The public perception about the subject is generally positive.

### ADVANTAGES

The subject is widely viewed as a legitimate political dissident seeking refuge in the United States. The request for extradition has raised the subject's public appraised value. This action has created even a stronger shield for the subject. Consolidation

MTF-EDVA00007

and centralization of power by the leadership in the subject's home country provides an easy conclusion by the public that he is an old man of God despised by an authoritarian leader in his home country. Any criticism of the subject's acts is immediately interpreted as "political pressure", illegitimate "smear campaign" and unjust attacks on a nice old man. Our asymmetric assessment indicates that an announcement lifting the extradition request by the home country will reduce public appraised value of the subject. This action, if executed will open the space necessary for public scrutiny of the subject's activities. This action will reduce the subject's shield of legitimacy as a political dissident. The Extradition request has made the subject a lot more important that he really is.

## VULNERABILITIES

The subject organization operates over 150 U.S. tax payer funded charter schools in 28 states. There are a number of irregularities in the operation of said schools. Legal professionals have shed light on these irregularities in the states of Ohio and Texas. Importing teachers from Turkey presents a number of easily observed irregularities that may prove to be direct violations of U.S. law. Creative/improper financial operations by the subject's organization offer a strong opportunity to unmask the true nature of dangerous, strategic activity under the guise of education. There may be illegal political contributions to political campaigns and nonprofit organizations also pose a potential vulnerability which will be

MTF-EDVA00008

explored. When the subject's methods are compared to theoretical and historical teachings of Islamic Political activists of Hasan Al Banna, founder of Muslim Brotherhood (1928), Sayed Qutb (1950s-1960s), and deeper in the history, Hasan Sabbah (late 11th century), there are strong indications that the subject is very likely conducting the first phase of Jihad by slowly building a global loyal force to be activated at the right time. Subject lectures provide easily observed indicators of his long term objective. The resemblance of the subject's activities to Ayatollah Khomeini who duped the west in believing that he was a man of the cloth and a benevolent servant of the people serves as a basis to uncover and unmask the subject's ultimate goal of destabilizing his home country and the region.

## TACTICAL and STRATEGIC Countermeasures

Devise specific actions to restrict the subject's influence. Exploit the vulnerabilities and reduce the systemic advantages enjoyed by the subject to open space for strategic goal on unmasking the subject's ultimate goal. We have determined that unmasking the subject's true objectives requires unmasking his most visible violations. Tactically, we will search, find and expose the subject's clear violations, influence operation, financial irregularities, illegal contributions, and violations of immigration law. As the legal professionals uncover and engage the subject's activities in the legal arena, we will expose the subject in the public arena. Concurrently with our tactical engagement,

MTF-EDVA00009

we are producing a short video suitable for quick and wide distribution to key influence providers to the subject including but not limited to members of congress and key law enforcement agencies. Our strategic communication advisors have confirmed our plan that it is essential to have an easy to access, portable (easy to distribute) means of educating the influence providers to the subject. The ultimate aim of the video production is to ask the question:

**IS THE SUBJECT ENGAGED IN THE FIRST PHASE OF JIHAD?**

**PHASE ONE**

Operationalize the plan. Harmonize Cyber Research, Field Investigations, Strategic Communications and Congressional outreach.

**ACTIONS**

- Identified key organizations and individuals in the subject's critical circles.
- Engaged subject's key supporter in Congress. No major change of position by the supporter. However, feedback suggests that the supporter is alarmed by receiving additional relevant, fact based information and is likely to reduce support for the subject.
- Briefed senior staff at the Homeland Security Committee with the aim of organizing a hearing on the subject's activities and strategic aims.

MTF-EDVA00010

- Have deployed an experienced videography team (brand names Aljazeera, France 24) and a former CNN Anchor to create credible, durable, easy to distribute document in the form of a short video.
- Have interviewed/created effective footage of three victims of the subject's activities in his home country
- Have secured the opportunity for testimony by experts on the subject's masked activities, Sebastian Gorka, Philip Haney, Steve Emerson and other credible witnesses who are authorities on the subject of political Islam, Islamism and Jihadism.
- Our Investigation team is engaged in the field within the boundaries of U.S. law.
- Our Cyber research team is also engaged within the boundaries of U.S. law.
- There is a total of 5 professional investigators in the field headed by our principal in charge of investigations.
- Cyber research team is comprised of 3 highly skilled professionals.
- The strategic communications team is actively reviewing and designing a creative tool to convey the masked operation of the subject. We expect the tool to be fully developed and ready for distribution in short order.

The aim of the investigation is to uncover indisputable unlawful activities of the subject and his organization and make a criminal referral.


Operationalize the plan  Harmonize Cyber Research, Field Investigations, Strategic Communications and Congressional outreach.

MTF-EDVA00011

## CLOSE OUT OF PHASE 1 ACTIONS AND DISCUSSION

We continue to explore avenues of open source investigation of subject's schools in the US. This is an ambitious list that when completed is expected to help narrow the focus regarding who among subject's school organizers and/or supporters may have possible associations with terrorist organizations such as the Muslim Brotherhood. More importantly, this is the best way to obtain such information (i.e., via financial investigation and/or surveillance, or via other sources).

Our ongoing research has concluded that the schools were the brainchild of the iconic, but reclusive, 75-year old subject, a Sunni Muslim cleric from his home country whose has a reported 3 and 6 million followers who regard him as their spiritual leader. The subject's movement in his home country is known as Hizmet. For the past 17 years, subject has resided on his highly protected country estate in the shadows of the Pocono mountains near Saylorsville, Pennsylvania. To his advocates, subject is a pious imam who promotes a tolerant Islamic view stressing the importance of hard work, benevolence and education. To his detractors, he is powerful and crafty politician committed to overthrowing the existing order in his home country. In the US, he was barely known, except to teachers and students who have defected from his schools, concerned parents, and to auditors for Charter schools,

MTF-EDVA00012

grant providers, public official's and even to investigative agencies such as the FBI, concerned about possible fraud and other criminal violations until the most recent coup attempt in the subject's home country.

It should be noted that the term "subject's name schools" is actually a misnomer and is not used by the schools themselves, although for simplicity, we will use this term hereafter to refer to the general aggregation of these schools. In states where the subject schools have the greatest presence, they use innocent sounding names such as Harmony Schools (Texas), Magnolia Science Academy (California), Horizon Schools (Ohio, Illinois), and Sonoran Science Academy (Arizona).

Many people do not realize that merely being a supporter of subject schools is not a crime. In fact, during the past several years, many members of Congress (bipartisian) have been courted by subject schools, even taking paid trips to subject's home country, to meet with subject adherents extolling the virtues of their schools. Many graduates of these schools, though precise numbers are seldom reported, reportedly move on to college and successful careers. The Bill Gates Foundation has reportedly made a sizeable donation to subject schools, and the Cosmos Foundation appears to be the largest benefactor. President Obama reportedly visited and praised the work being done in the Harmony School in Washington, DC

MTF-EDVA00013

The creation and operation of subject schools in the US appears to be the result of a broad strategy that involves the use of a sophisticated business model with complex organizational structuring, multiple layers of private and public funding, clever marketing, and aggressive legal representation in the context of an educational system that by its very design, though certainly not intended, is ripe for abuse and exploitation.

- Continue to identify key organizations and individuals in the subject's critical circles and areas of influence.
- Continue to 'flesh' out the details to brief the senior staff at the Homeland Security Committee with the aim of organizing a hearing on the subject's activities and strategic aims with an optimistic timeline of before the Christmas recess, with a realistic timeline of January 2017. Our team is already in the process of preparing relevant material which highlights the subjects
- The videography team (brand names Aljazeera, France 24) and a former CNN Anchor are reviewing and having footage subtitled in English of the three victims of the subject's activities in his home country.
- Our investigation team is engaged in the field within the boundaries of U.S. law.
  - Develop spreadsheet of U.S.-based subject schools to include when opened or, if closed, reasons why.
  - Compile history of criminal or civil suits against subject schools.

MTF-EDVA00014

        Locate and review both pro-subject & anti-subject websites to identify perspectives, biases, and methods used by the latter to support their stated intentions.

·  Identify political leaders at the local and national level who ae either supporting or criticizing subject schools, and summarize their respective arguments

·  Identify journalists reporting on subject schools and explain their unique areas of focus

•  **Our Cyber research team is also engaged within the boundaries of U.S. law and is conducting baseline monitoring of a multitude of Social and traditional Media sites.**

**Subject Related Websites:**

- gulenmovement.ca
- fgulen.com/en
- gulenmovementca.blogspot.ca
- fethullah-gulen.org
- fethullahgulenforum.org
- gulenmovement.us

**Associated Hashtages:**

- #GulenMovement
- #HizmetMovement
- #FethullahGulen
- #Hizmet
- #gulenistes
- #NeverForgetJuly15
- #FETO

**Associated Social Media Accounts:**

- facebook.com/GulenMovementCanada
- plus.google.com/+FethullahGulenEN

**Associated You Tube Accounts:**

- youtube.com/channel/UCDflDhRLI7M32qyIaRImQtQ
- youtube.com/channel/UCykpGY1yIAF6rP1zuWTJC2A

MTF-EDVA00015

- youtube.com/channel/UC-5_J80Fi7lr92C8h8mmevg

**He's in the News:**

- dailysabah.com/war-on-terror/2016/10/12/3-gulen-linked-charter-schools-in-california-face-closure
- latimes.com/local/lanow/la-me-edu-magnolia-charter-ties-to-gulen-20160829-snap-story.html
- dailysabah.com/war-on-terror/2016/10/10/us-must-show-turkey-empathy-over-gulens-extradition-justice-minister
- dailysabah.com/war-on-terror/2016/10/10/iraqi-kurdish-administration-seizes-schools-run-by-gulenists
- reuters.com/article/us-un-assembly-turkey-erdogan-idUSKCN11Q2K5
- france24.com/en/20160916-turkey-coup-fethullah-gulen-extradition-how-will-us-respond
- dailysabah.com/war-on-terror/2016/09/15/top-eu-officials-admit-regret-over-failure-to-grasp-feto-threat
- dailysabah.com/war-on-terror/2016/09/09/pkk-terrorists-informed-about-gulenist-coup-attempt-in-advance
- shaber3.com/inanmadiniz-aldattiniz-sayin-bozdag-haberi/1273365
- lehighvalleylive.com/news/index.ssf/2016/07/rare_look_at_exiled_turkish_cl.html


**Charter Schools:**

- Website:
- charterschoolscandals.blogspot.com/p/list-of-us-gulen-schools.html
- Last Updated 12/7/2015

**60 minutes:**

- youtube.com/watch?v=ktl--IDnM7I

**Ties to Clinton:**

- dailycaller.com/2016/07/13/new-ties-emerge-between-clinton-and-mysterious-islamic-cleric

- **The strategic communications team has developed a very complex approach to their efforts which include a Strategic Objectives; Target Audiences, and Activities and Timing.**

MTF-EDVA00016

They are actively designing a creative visual tool to convey the masked operation of the subject. A copy of the initial draft is done and is attached. We expect the visual tool to be fully developed and ready for distribution in short order. The draft "wireframe" version of the board and a citation document which provides public record of the "accusations" within the board. We welcome any and all feedback and will continue working to build out a more "produced" version with graphics, etc.

- Active engagement of media outlets.
  - Drudge Report and have followed up with several different articles and angles. (Clinton foundation connections, etc.) Drudge Report has an unprecedented active readership and even if they don't use this development, they are confident the outreach this week will serve as a strong foundation for future coverage.
  - Politico Morning Education - We have also compiled this week's coverage of both Ohio and California (LA TIMES) coverage in hopes of inclusion in tomorrow (Thursday) morning's daily email. Politico is a leading policy outlet and the "Morning Education" email is a subscription based news aggregator received by top education policy influencers in DC and the around the country. See attached PowerPoint slide with a screen shot of this coverage.
- Teachers Unions - Teachers unions are a ripe ally in this project given their automatic resistance to all things related to charter schools. While our most impactful messaging might be on the homeland security front, the education/teachers angle could be a valuable flank that

MTF-EDVA00017

appeals to Democratic policymakers, whereas Homeland Security might appeal more to Republicans. As such initiated contact today with:

- **Gene Bruskin, formerly of the American Federation of Teachers and author of "The Story Behind the subject Charter Schools and Their Reclusive Founder".** Have requested a phone meeting to compare notes and gauge his interest in participating in and assisting with the organization of an effort to coalesce issue experts in his field to persuade policy makers to take action. Updates to follow.

- **Policymaker Fact Sheet** - Producing a briefing document ahead of policymaker meetings. An initial draft is complete and attached.

**High Ranking State Level Elected Official** - Engaged in conversation with a high ranking elected official in a state with multiple subject Charter Schools. He is "extremely interested" and we are briefing him soon, but wish to keep this outreach confidential at the moment per his wishes.

MTF-EDVA00018

## GULEN BRIEFING SHEET

**Background:**

In the wake of the recent attempted coup in Turkey, new focus and scrutiny has been applied to Fethullah Gulen, a Muslim cleric living in exile in rural Pennsylvania. The Turkish government considers the man a terrorist and has petitioned the U.S. government for his extradition. Gulen has millions of global followers, known informally as the Hizmet, meaning service, or the "Gulen Movement". The Movement's primary source of funding is its network of schools around the world. Over 150 of these are US Charter Schools that have used taxpayer dollars to expand their operations into 26 states.

**Fethullah Gulen is a radical:**

MTF-EDVA00019

- In his sermons in the 1990s, Gulen urged his followers to infiltrate the Turkish military, media, and government and wait for the right moment to rise up, ordering them to "move within the arteries of the system, without anyone noticing your existence, until you reach all the power centers." Gulen promised that doing so would provide *the guarantee of our Islamic future.*
- Despite his seeming moderate position, at times, Fethullah Gulen has called the United States his *"merciless enemy."* Additionally, he has claimed that the Jews are responsible for ideas like Communism that have purposefully steered the world towards cataclysm.

## Gulen Controls a network of corrupt US Charter Schools:

- Gulen-associated schools participate in a process called "closed-loop leasing," where the charter schools use taxpayer money to pay excessive rent to a Gulen-associated real estate corporation. The real estate corporation funnels those profits back to Gulen or uses the funds to start more schools.
- Gulen-associated schools exploit the H-1B visa program, which are to be used when there are no qualified American workers, to bring Turks to the United States as teachers. In 2009, the Gulen schools received government approval for 684 visas, over 200 more than Google. Parents and other teachers have complained that the Turkish educators are clearly unqualified.
- Gulen-associated schools have been investigated by authorities and journalists in the states of Ohio, California, Texas, Louisiana, Illinois, Massachusetts, Virginia, Pennsylvania and Georgia, as well as by the FBI, for a litany of offenses, including the misappropriation of funds, the falsification of standardized tests, immigration fraud, and bid-rigging.

## Gulen is Politically Powerful and Influential in the US:

- In 2002, Fethullah Gulen applied for permanent residence in the United States, claiming that he was an "exceptional individual" who deserved special consideration. His application was denied, but a few years later, Gulen won his appeal with the help of letters from George Fidas, a former director of outreach for the C.I.A., Morton Abramowitz, a former American ambassador and Graham Fuller, a former senior C.I.A. official.
- This was a surprising development after an American diplomat in Turkey had cabled to Washington about Gulen's sharply radical past as an Islamic preacher, the cult-like obedience that Gulen demands, and his involvement in the affairs of almost 100 countries.
- The Gulen movement has illegally financed Congressional travel abroad and provided hundreds of thousands of dollars of improper campaign donations to congressional and presidential candidates.

MTF-EDVA00020

- Gulen's chief liaison to New York, Recep Ozkan, donated between $500,001 and $1,000,000 to the Clinton Global Initiative.

## Responsible for the attempted Coup in Turkey:

- Western diplomats have called Erdogan's accusations of Gulenist involvement "compelling," saying that "Gülenists played a credible role in [the coup]."
- General Hulusi Akar, the highest ranking member of the Turkish armed forces and a captive during the July coup, has claimed that his abductors offered to put him in touch with their opinion leader, Fethullah Gulen.
- Several plotters have released statements identifying themselves as loyal Fethullah Gulen and claimed that the coup was in response to an imminent crackdown on Gulenists in the Turkish military.

## Statements by Senior US officials:

**President Obama:** President Barack Obama and Turkish President Tayyip Erdogan discussed the status of U.S.-based cleric Fethullah Gulen, blamed by Turkish authorities for masterminding a recent failed coup, during a call on Tuesday, the White House said.

The Turkish government has filed material in electronic form about Gulen with the U.S. government, which has been waiting for a formal extradition request, White House spokesman Josh Earnest said.

U.S. officials have said Turkey must provide proof that Gulen was involved in the coup attempt. Any extradition request from Turkey, once submitted, would be evaluated under the terms of a treaty between the two countries, Earnest said.

Obama offered U.S. assistance for Ankara's investigation into the attempted coup and pressed Erdogan to proceed according to the democratic principles outlined in Turkey's constitution, Earnest said.

**"The principles of democracy should be adhered to even as a thorough investigation is conducted,"** he said.

The U.S. State Department said it was still in the process of analyzing the documents submitted by Turkey and could not characterize them as an extradition request for Gulen. Source: http://www.reuters.com/article/us-turkey-security-usa-extradition-idUSKCN0ZZ23E?il=0

MTF-EDVA00021

**Anthony Blinken: Question:** We see that the U.S. government is taking Turkey's request regarding the return of Fethullah Gulen seriously. Do you agree with Ankara that this topic may damage Turkish-American relations?
**Deputy Secretary Blinken:** We are determined to do everything we can to help Turkey as it pursues its investigations of those responsible for the attempted coup. And with regards specifically to the case of Mr. Gulen, we've had an exchange of experts visiting both Turkey and the U.S. – legal experts, so that Turkey fully understands the legal process that's involved. I just want to be very clear, this is not a political question at all for the United States – it's simply a legal question. We have laws and requirements when it comes to the extradition of any person from a country with whom we have an extradition treaty and we need to work through those legal requirements. But we've had very good exchanges with Turkey on this question and we're working through the information that's been provided. Source: https://tr.usembassy.gov/deputy-secretary-antony-blinkens-interview-ntvs-ahmet-yesiltepe/

**Ambassador James Jeffrey:** U.S. Ankara Ambassador James Jeffrey, on Dec. 4, 2009, briefed in regards to Gülen's application for Permanent Residence status in the U.S., with a background about Gülen and his movement. Saying that Gülen faced charges in Turkey of plotting to overthrow the state, Jeffrey mentioned a sermon in 1986, where Gülen is heard declaring that "our friends, who have positions in legislative and administrative bodies, should learn its details and be vigilant all the time so they can transform it and be more fruitful on behalf of Islam in order to carry out a nationwide restoration." Holding a Green Card now and living in Pennsylvania's Pocono Mountains, Fethullah Gülen was doubted to have infiltrated the TNP, and they "have found no one who disputes it."

Additionally, Jeffrey found out that the "TNP applicants who stay at Gülenist pensions are provided with the answers in advance of the TNP entrance exam." Apart from that, even more subtly, "Gülen's lack of transparency creates doubt about his motives and leads to suspicions about what lies ahead," Jeffrey says. As for the aspects of concern in the allegations that the U.S. government is somehow behind the Gülen Movement, Jeffrey concluded that "the U.S. is not 'sheltering' Mr. Gülen and his presence in the U.S. is not based on any political decision." Source: http://www.dailysabah.com/war-on-terror/2016/08/02/a-decade-of-the-gulen-movement-on-wikileaks-more-than-meets-the-eye

**Stuart Smith:** The Gülenists' penetration of the National Police (TNP), media outlets and their record of going after anyone who criticizes Gülen were among the items on the annual agenda of the U.S. Embassy in Ankara in 2005, when a decision by U.S. immigration authorities for the first time denied him the right to travel outside of the country. Stuart Smith, the U.S. vice consul general of the

MTF-EDVA00022

Intelligence Department in Ankara, reported that three ranking TNP asked for a meeting with the Istanbul legate as a means of asking whether the "FBI could provide some sort of clean bill of health" for Fethullah Gülen. Upon such a request, Smith juxtaposes some concerns about the Gülen Movement's actions: "Severe pressure on businessmen to continue to give money to support Gülenist schools or other activities," "using their school networks to cherry-pick students they think are susceptible to being molded as proselytizers and to indoctrinate boarding students," "the cult-like obedience and conformity" the movement insists on its substructures. Source: http://www.dailysabah.com/war-on-terror/2016/08/02/a-decade-of-the-gulen-movement-on-wikileaks-more-than-meets-the-eye

**Deborah K. Jones:** A cable, with a more suspicious and questioning tone, classified by Consul General Deborah K. Jones on May 23, 2006, clarifies that U.S. authorities in Turkey started to count Gülen Movement's institutions and academies in the U.S., Central Asia, Caucasus, Russia, the Balkans, Africa, South East Asia, the Far East, the Middle East and Europe. Furthermore, the cable shows that a profile recognition for those traveling to the U.S., particularly with the aim of visiting Fethullah Gülen, was also actively carried out by Consular officers. Compiling a list of Gülenist organizations as well as periodical meetings to discuss trends within the Gülenist applicant pool let Consular officers in Ankara and Istanbul notice "what appears to a purposeful 'shifting' of applicant profiles appearing for visa interviews in what may be an effort by Gülenists to identify 'successful' profiles." After giving the general features of applicants and visitors (the young exchange visitor; the married middle-aged male with no English and traveling alone; the middle-school-aged English student; the graduate student going for English), the Consul General Jones claims that "evasiveness of Gülenist applicants leaves Consular officers uneasy" although there seems to be "a benign humanitarian movement" on the surface. Source: http://www.dailysabah.com/war-on-terror/2016/08/02/a-decade-of-the-gulen-movement-on-wikileaks-more-than-meets-the-eye

MTF-EDVA00023

BREIFING ON GULEN RELATED CHARTER SCHOOLS IN TEXAS

**Current Situation**

There are approximately 46 Gulen-affiliated charter schools serving 31,000 students in the state of Texas. Chairman McCaul has two schools within his district.

In May, Amsterdam & Partners filed a 32-page complaint alleging that Harmony Public Schools, the state's largest charter school network, hires under-qualified Turkish teachers and steers business to companies run by Turkish nationals, including some former Harmony employees.

Amsterdam & Partners additionally alleged that Harmony Schools are guilty of funneling money to Fethullah Gulen via tithes from teachers, that Harmony schools have misused bond money from the state of Texas to operate schools in Arkansas, and that Harmony abuses the H-1B visa program to bring in Turkish workers as teachers and then shuffle them around the United States in various positions.

The Texas Education Agency had found the allegations credible and were investigating the complaint. However, on October 17, the TEA cleared Harmony of allegations that it illegally steered business to vendors with ties to Harmony and the nation of Turkey. But, the TEA only dismissed several other claims that involved teacher hiring, special education and other matters, saying it was its jurisdiction.

In response, Amsterdam & Partners has criticized the TEA for only investigating two of the ten allegations, saying "this cursory inquiry not only ignored the majority of the issues raised in the complaint, but also failed to look beyond the registered agents of the contracting companies without even considering who the beneficiaries are." Amsterdam continued, "Knowing the Gülenists, they will undoubtedly attempt to portray this whitewash as a victory. But the fact is that there are many areas that TEA did not address, and we intend to request other state agencies and public officials to scrutinize Harmony's activity."

**Inadequate Investigation**

Among the issues in the complaint that were left aside by TEA include evidence of discrimination in hiring, pay, and promotion favoring Turkish males, preference for related Turkish vendors in major contracts, discrimination against English Language learners and Students with Disabilities, abuse of the H-1B visa program to bring in underqualified Turkish nationals for teaching and leadership positions, misuse of federal program funding for low socioeconomic students and students with special needs, and systematic overcharging of leases to Harmony schools by Harmony's private real estate arm to siphon over $18 million of public funds out of the schools.

MTF-EDVA00024

Despite finding that Harmony had paid over $18.7 million dollars to Turkish owned vendors in the last two years, TEA conducted no analysis to determine whether these vendors had illegal relationships to Harmony's leadership, as alleged in the complaint. This deserves more investigation because it is known that some of these local funds Harmony receives come from questionable sources. For example, Harmony received $175,000 from Gulen-affiliated schools in Oklahoma that in a recent audit by the Oklahoma State Auditor were considered an improper use of state funds.

### Past Improprieties

This is not the first time that Harmony Public Schools has been accused of impropriety.

In 2011, *The New York Times* found that Harmony gives the vast majority of its construction and renovation contracts to Turkish-owned companies, even when other firms had offered to do the job for less money. *The Times* also noted that Harmony applies for hundreds of H-1B visas, claiming that there are no skilled Americans qualified to teach children. Texas has a population of almost 30,000,000 people.

In 2014, Harmony Public Schools settled a federal civil rights complaint that involved a female American teacher who made less than her male colleagues from Turkey, including those with less experience.

Also in 2014, Harmony reached an agreement with the U.S. Department of Education over how it teaches children who are learning English or have disabilities. A federal investigation found that those students were "significantly underrepresented" at Harmony, and that Harmony didn't ensure those students received the extra help they needed.

MTF-EDVA00025



**sphere**
Managers of Issues
& Reputations

To: Flynn Intel Group
From: Sphere Consulting
Date: October 18, 2016
RE: Charter Schools and the Department of Education

## The Charter Schools Program (CSP)

The Department of Education has a Charter Schools Program that disburses discretionary grants to "create new high-quality public charter schools, as well as to disseminate information about ones with a proven track record." Federal funds are also available to replicate and expand successful schools; help charter schools find suitable facilities; reward high-quality charter schools that form exemplary collaborations with the non-chartered public school sector; and invest in national activities and initiatives that support charter schools.

The CSP is part of the Department of Education's Office of Innovation and Improvement (OII). The OII has a self-state mission "to accelerate the pace at which the U.S. identifies, develops, and scales solutions to education's most important or persistent challenges," which it accomplishes through strategic investments and discretionary grant programs.

### CSP Grants

The CSP disburses grants and funding in about a half dozen ways. These are listed with their FY 2016 funding levels.

1. The Secretary of Education awards grants to State Educational Agencies (SEAs) to enable them to conduct charter school programs through sub-grants at the state level.
    a. $177,209,326 for new awards and $11,548,828 for continuation awards
2. The Secretary of Education awards grants for "Planning, Program Design, And Initial Implementation Grant" directly to programs that do not have a State Educational Agency or that do not have a State Educational Agency with an approved application for CSP grants.
    a. $3,325,107 for new awards and $2,784,727 for continuing awards
3. The Secretary of Education awards grants for "dissemination" (including assisting the foundation of new charter schools, developing partnership, producing curriculum materials, and conducting evaluations) directly to programs that do not

MTF-EDVA00026

have a State Educational Agency or that do not have a State Educational Agency with an approved application for CSP grants.

    a. This grant has not been awarded or continued since 2014.

4. The CSP awards grants to charter schools or non-profit charter management programs to expand enrollment of high-achieving programs by substantially increasing the number of available seats per school, or to open one or more new charter schools based on the model for which the eligible applicant has presented evidence of success.

    a. $65,759,488 for new awards and $32,316,646 continuing awards

5. The CSP awards funds that are used to match programs funded with nonfederal dollars that make payments, on a per-pupil basis, to provide charter schools with facilities financing. The funds scale down annually and are phased out after 5 years.

    a. Funding data is not available for 2016. In 2015, $9,000,000 was disbursed as a continuation of previous grants.

6. The CSP awards grants that support efforts by eligible entities to improve the quality of charter schools by providing technical assistance and other types of support on issues of national significance and scope.

    a. In 2015, provided $4,123,072 in new awards.

7. The CSP provides grants to eligible entities to permit them to enhance the credit of charter schools so that the charter schools can access private-sector and other non-Federal capital in order to acquire, construct, and renovate facilities at a reasonable cost.

    a. In 2015, provided $14,069,608

## Gulen Schools Receiving Federal Funding

| School | Chartering Org. | Location | Year | Grant Details |
|---|---|---|---|---|
| Harmony Schools* | Cosmos Foundation | Houston, TX | 2011 | 3 years $4,940,897 |
| Horizon Science Academy- Southwest | Concept Schools | Chicago, IL | 2015 | 3 years $337,138 |
| Chesapeake Math & IT Academy-South | Chesapeake Lighthouse Foundation | Hanover, MD | 2014 | 3 years $617,120 |
| Thomas Edison Energy Smart | Apple Educational Services | Somerset, NJ | 2010 | 3 years $530,507 |
| Triad Math & Science Academy | Washington Educational Foundation | Greensboro, NC | 2010 | 1 year $530,432 |
| Triad Math & Science Academy | Washington Educational Foundation | Greensboro, NC | 2012 | 2 years $751,145 |
| Noble Schools* | Concept Schools | Chicago, IL | 2014 | 3 years $507,209 |

MTF-EDVA00027

| Young Scholars of Western Pennsylvania | Apple Educational Services | Pittsburgh, PA | 2012 | 2 years $301,500 |
| Vision Academy | Apple Educational Services | Lansdowne, PA | 2016 | 3 years $783,104 |

*Grant was awarded to a network of schools, rather than an individual institution

https://innovation.ed.gov/what-we-do/charter-schools/credit-enhancement-for-charter-school-facilities-program/awards/
FIND OUT WHAT BUILDERS BUILD GULEN SCHOOLS THEN CROSS REFERENCE

https://innovation.ed.gov/what-we-do/charter-schools/charter-school-program-state-educational-agencies-sea/awards/
WHEN THERE IS AN APPLICATION PDF, FIGURE OUT IF THE STATE HAS DISBURSED FEDERAL FUNDS

MTF-EDVA00028

# EXHIBIT 8

22
2/28/17

## V. FARA

- Ekim/Flynn payment - consulting on refunds - accrued to BX - refund

- Bijan was paying them back (that is what Bijan told Flynn).

- consultant agreement w/ Ekim: don't remember.

- Don't remember side convos w/ Ekim regarding consulting specifically. Had 2 weekly update calls; meeting in NY, met @ FIG's office early on.

- Bijan - GF has known him since 2007. consider him as family. we are good friends. I don't know him to mislead.

- Bijan is charming, networks, but not great business acumen.

- graduating to see on calendar how many days Flynn was in FIG office during. FIG & w/ Flynn.

- had written 3 or 4 op-ds on campaign's plan to fight ISIS / Islamism / radicalism

- pull every article

- learned about Gulen charter schools through book tour. (learned more about it through novo representation).

- ALAC - law to use U.S. Law in American courts, not Sharia Law (learned about on book tour).

commercial activity

V cystalized

Gulen

- Bijan had done a video w/ woolsey on Azerbijan.

- push for placement of article was for campaign reasons. (fighting until the end to show that Trump campaign was serious on fighting Islamic extremism).
  ↳ maybe tried to get out through campaign channels (initially had tried to push article out the Saturday before).

- didn't know that Bijan had shared draft w/ Ckim.

- ~~Don't u~~
- LDA: Bijan said he would contact Bob Kelly. (concern) of potentially up. foreign gov't (?)

- Bijan was handling all discussions w/ Ckim.

# EXHIBIT 8-A

## **EXHIBIT 8-A**

Transcription by Sidney Powell of handwritten notes of Covington attorney, possibly Alexandra Langton, on 2-22-2017 with Mike Flynn re: FARA

[Yellow highlighting denotes information omitted from her transcription almost one year later]

- Ekim/Inovo payment – consulting or refunds –accommodation to BK – refund
- Bijan was paying them back (that is what Bijan told Flynn)
- Consultant agreement w/Ekim: don't remember
- Don't remember side convos w/Ekim regarding consulting. Specifically had 2 weekly update calls, meeting in NY, met at FIG's office early on.
- Bijan – GF has known him since 2007. Consider him as family. We are good friends. I don't know him to mislead.
- Bijan is charming, network, but not great business acumen.
- Interesting to see on calendar how many days Flynn was in FIG office during FIG K w/ Inovo.
- Had written 3 or 4 op-eds on campaign's plan to fight ISIS/Islamism/radicalism.
-         CB Internal note to pull every article.
- Learned about Gulen charter schools through book tour. ( learned more about it through Inovo representation)
- ALAC – law to use US law in American courts—not sharia law (learned about on book tour).
- Commercial Activity



Crystalized [down to] Gulen

Bijan had done a video w/Woolsey on Azerbaijan

Push for placement of article was for campaign reasons. (fighting until the end to show that Trump campaign was serious on fighting Islamic extremism).

Maybe tried to get out through campaign channels (initially tried to push article [cut off]

Didn't know that Bijan had shared draft with Ekim

LDA: Bijan said he would contact Bob Kelly (concern potential rep. foreign government?)

Bijan was handling all discussions with Ekim

[a few more lines not relevant]

# EXHIBIT 9

# COVINGTON & BURLING LLP

February 11, 2018

## Memorandum

To:    Flynn File

From:  Alexandra Langton

Re:    **2/22/17 Flynn Interview**

On February 22, 2017, Robert Kelner ("Kelner"), Steve Anthony ("Anthony"), and Alexandra Langton ("Langton"), interviewed General Michael T. Flynn ("Flynn") at 850 10th St. NW, 20001 from approximately 9:00a.m. to 4:00p.m. Brian D. Smith ("Smith") attended later in the afternoon. Lori Flynn, Flynn's wife, also attended the meeting. Langton prepared this memorandum on February 11, 2018 based on handwritten notes taken contemporaneously with the interview that took place on February 22, 2017.

**COVINGTON & BURLING** LLP

February 11, 2018
Page 5

## VII.  Turkey/Inovo

Brian Smith joined the interview in the afternoon to update the group on his meeting with the FARA Unit regarding Flynn Intel Group's ("FIG") draft FARA filing. Smith highlighted that Clifford Rones had asked him about the two $40,000 payments to Inovo BV listed in the supplemental statement. Smith told the group that he merely responded that the supplemental statement reflected information in the FIG accounting records. Smith also noted that there were several other minor changes that the FARA Unit had suggested. He believed that FIG would be in a position to file in the near future.

Kelner asked Flynn what the purpose of the $40,000 payments to Ekim were for. Flynn responded that Bijan Kian told him that the payments were refunds. Flynn further stated that he didn't remember the consulting agreement between Ekim Alptekin and FIG. He also didn't remember any side conversations with Ekim regarding the consulting contract. Flynn said that he had two "update" calls, a meeting in New York, and a meeting at FIG's office with Ekim. Flynn commented that it would be interesting to see how much he was actually in D.C. during the period of the contract. He didn't seem to think he was around much between August and November 2016. Flynn added that he had written 3-4 op-eds for the campaign and he wrote this op-ed primarily for campaign reasons. The purpose of publishing the op-ed before election day was to "fight until the end [and] to show the Trump campaign that [he] was serious on fighting Islamic extremism." Kelner asked if Flynn tried to get the article published through campaign channels. Flynn responded, "maybe." Kelner asked Flynn if he knew that Bijan had shared a draft of the op-ed with Ekim. Flynn responded that he did not and that "Bijan was handling all discussions with Ekim."

**COVINGTON & BURLING** LLP

February 11, 2018
Page 6

Kelner asked if he was concerned about possibly having to register as a foreign agent during the contract. Flynn responded that Bijan said he would connect with Bob Kelley and he thought they had figured it out.

# EXHIBIT 10

# RE: GEN Flynn meeting

**From:** "Kelner, Robert" <rkelner@cov.com>
**To:** K Verderame <kverderame@ponderainternational.com>
**Cc:** "Smith, Brian" <"/o=covington & burling/ou=cb/cn=recipients/cn=c&b.cbpowa02.smithbd">
**Date:** Thu, 09 Feb 2017 18:19:21 -0500

sure thing

**Robert Kelner**

Covington & Burling LLP
One City Center, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5503 | rkelner@cov.com
www.cov.com

# COVINGTON

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

**From:** K Verderame [mailto:kverderame@ponderainternational.com]
**Sent:** Thursday, February 09, 2017 6:16 PM
**To:** Kelner, Robert
**Cc:** Smith, Brian
**Subject:** RE: GEN Flynn meeting

Ok – yes please let her know that the delay is not intentional but due to the difficulty of scheduling with your client in his new role!

Not a good sign . . .

Do you guys want to come to my office for a change – happy to host.  1747 Penn, 2nd floor

K

**From:** Kelner, Robert [mailto:rkelner@cov.com]
**Sent:** Thursday, February 09, 2017 5:28 PM
**To:** 'K Verderame' <kverderame@ponderainternational.com>
**Cc:** Smith, Brian <bdsmith@cov.com>
**Subject:** RE: GEN Flynn meeting

OK.  It's also my wife's birthday.....  But we'll figure that out.  In some ways that time might be easier for me than this weekend.  Does he want to meet here at Covington?

Meantime, Heather Hunt has kind of been all over us.  She emailed and then left a voicemail yesterday afternoon asking for a call this weekend (because I had indicated I thought this weekend was the earliest we could meet with our client).  She said she just needed to know when we will be coming in to meet her, so she can arrange her schedule.  We've never seen her this engaged in any matter (ever).  I'll let her know tomorrow we wouldn't be prepared to meet her until later next week sometime.

Best,
Rob

**Robert Kelner**

Confidential -- Subject to Protective Order

Rafiekian_EDVA_00020435

# EXHIBIT 11

# COVINGTON & BURLING LLP

*DRAFT*                                                                                      May 29, 2019

## Memorandum

To:   Flynn File

From: Roger Polack

**Re:   May 29, 2019 Kelner EDVA Interview**

On May 29, 2019 Robert Kelner ("R") participated in an interview with prosecutors from the Eastern District of Virginia ("EDVA") at 850 10th Street, NW, Washington, DC from approximately 2:00p.m. to 4:30p.m. Bruce Baird ("BB") and Roger Polack represented Kelner during the interview. Jim Gillis ("JG") of the United States Attorney for the Eastern District of Virginia's Office ("EDVA"), Evan Turgeon ("ET") of the National Security Division of the Department of Justice ("NSD") and Bryan Alfredo of the Federal Bureau of Investigations conducted the interview. This memorandum summarizes the discussion at that meeting.



**COVINGTON & BURLING LLP**

May 29, 2019
Page 2



**COVINGTON & BURLING** LLP

May 29, 2019
Page 3



**COVINGTON & BURLING** LLP

May 29, 2019
Page 4



**COVINGTON & BURLING LLP**

May 29, 2019
Page 5



**COVINGTON & BURLING LLP**

May 29, 2019
Page 6



**COVINGTON & BURLING LLP**

May 29, 2019
Page 7



R: Essentially everything they did related to Gulen; when speak of reasearch, op-ed, etc. related to Gulen.

ET: Did you speak to D about this document?

R: Not sure; it would have depended on when we obtained this doc. Even if had it before, did not necessarily go through every doc; were trying to capture high-level info of who client was and nature of work.

ET: Do you recall showing him some docs? R: Yes.

ET: Recall specific ones?

R: Some, but not all. Showed him early exchanges of emails in which Ekim discussed project with Turkish gov, specifically Green Light email; and emails and docs related to Sep 19 NYC meeting; remember showing emails and docs related to contracts with Inovo and with Ekim Alp.

G: These were during the formal interviews?

R: Yes. And during these we made clear we do not represent him personally.

ET: Anything else remember?

R: Let me go to one point early on. Start out by asking for internal investigation -- that's a bit of a term of art. At that point helping a client respond to an inquiry; internal investigation implies looking for wrong doing.

G: We get it; understand.

6. Exhibit 48-A

ET: Have you seen this email before?

R: Yes. This is an email from BK to Ekim Alp letting him know that the op-ed about Turkey was about to be published.

ET: Any attachments to email?

R: Appears to indicate that there was an attachment.

ET: Is this an email you remember discussing with BK?

R: I don't know; may have, but don't recall. Certainly discussed the topic, but don't recall two years later whether we discussed the specific email.

G: What was topic?

May 29, 2019
Page 9


R: Nature and origin of op-ed published in the Hill. One of my challenges is remembering which emails we had and saw when; so don't recall whether had this at the time of interview; even if did have, don't know if had shown.

G: was there something preventing you from going back to him after receiving initial emails?

R: Sort of; will discuss with Bruce.

G: Tell us later.

R: Key point is not impeded from consulting with him things we needed to consult about. Let's find out if we showed it to him this "the arrow has left the bow" email.

ET: Did you discuss. .. what of anything did D tell you about why he sent EA the op-ed?

R: He said, well, here is how it came up, we were questioning him about who wrote op-ed, how it was written and how it came up. He was trying to assure us that Ekim did not write it, did not have input, just had some typographical input. Then he told us that Ekim did have concerns about MB and how that might play in Turkey.

ET: So D said would send for typographical edits?

G: Tried to assure you of what?

R: That EA just sent typographical edits, and believe we confirmed that through emails. Don't recall BK explaining why he sent the op-ed to EA. This came up organically in our conversation who wrote the op-ed.

R: Suggest a question: if question is what did he say about the origins of op-ed; answer is this was MF's idea and not an idea that came from Ekim or the Turkish government at all.

G: Did he say anything about what his role was?

R: What Bijan's role was? Yes, he arranged for a copy-editor, to edit the op-ed. And it was Bijan who helped place the op-ed; which he did through Sphere, a PR firm that happened to be under contract in relation to Inovo contract; BK described this as something that Sphere was doing as a favor and not part of Inovo project. Recall BK saying this was all coming together very quickly and that's why needed Sphere's help in placing it.

G: Did he say why it needed to be placed? Why was there a rush to get the op-ed placed? FOLLOW UP ON THIS. Want to be certain who told you what you remember.

G: Did Bijan say anything about who did the initial draft?

R: I recall his telling us that MF wrote it, with editing assitance from Hank Cox. Think he also told us that he, BK, had some input, commenting on the draft/reacting to it.

**COVINGTON & BURLING LLP**

May 29, 2019
Page 10



**COVINGTON & BURLING LLP**

May 29, 2019
Page 11



**COVINGTON & BURLING** LLP

May 29, 2019
Page 12



**COVINGTON & BURLING LLP**

May 29, 2019
Page 13



**COVINGTON & BURLING LLP**

May 29, 2019
Page 14



**COVINGTON & BURLING LLP**

May 29, 2019
Page 15



**COVINGTON & BURLING LLP**

May 29, 2019
Page 16



**COVINGTON & BURLING LLP**

May 29, 2019
Page 17



I

**COVINGTON & BURLING LLP**

May 29, 2019
Page 18



**COVINGTON & BURLING LLP**

May 29, 2019
Page 19



# EXHIBIT 12

**Smith, Brian**

| | |
|---|---|
| **From:** | Kelner, Robert |
| **Sent:** | Saturday, January 21, 2017 2:14 PM |
| **To:** | 'Kristen Verderame'; Smith, Brian |
| **Cc:** | Langton, Alexandra |
| **Subject:** | RE: Time sensitive- Ekim Alptekin- engagement letter |

I've now had a chance to read this Arent Fox memo more carefully. First, it is so filled with garbled English that I suspect parts were written by someone other than Nolan (and then not edited by him). Second, it is flagrantly wrong on the law. It misunderstands the LDA exemption, making no mention of the regulatory requirement that the activities not principally benefit the interests of a foreign government. Third, it repeatedly states that Sphere was never retained, which is preplexing. Fourth, it frames the whole FIG engagement around Inovo's work for the Israeli oil deal, which Bijan said he knew nothing about.

*) a litte background on dehils /diligence*

When you speak with Nolan, I would ask:

(1) If this all had to do with an Israeli oil field, how is it that was never mentioned to Bijan or Mike Flynn? Was there a reason that wasn't shared with them?

(2) Sphere filed an LDA report for its work for Inovo through FIG. Was he not aware of that? How can Ekim say Sphere was never retained?

(3) Ekim had told Bijan he was discussing with members of the Turkish cabinet, including the Minister of Foreign Affairs, a proposal and budget for a project with FIG. Was Nolan aware of that? Does that change his conclusion at all that this was purely an exercise for a private Dutch based company?

(4) Ekim arranged a meeting for FIG with the Turkish Minister of Foreign Affairs in New York, shortly after the Inovo contract was executed, and the meeting related in some way to the project Inovo was performing for Inovo. Was Nolan aware of that? Does that change his conclusion? *4/19*

The point of asking these questions is to do our due diligence, and to see if it shakes loose any additional facts. As we discussed, we should assume this will not be a privileged discussion.

Rob

*5) LDA exemption*

**Robert Kelner**

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5503 | rkelner@cov.com
www.cov.com

# COVINGTON

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

**From:** Kristen Verderame [mailto:Kristen.Verderame@intercede.com]
**Sent:** Wednesday, January 18, 2017 4:22 PM

1

# EXHIBIT 13

OMB No. 1124-0001; Expires April 30, 2017

**U.S. Department of Justice**
Washington, DC 20530

**Registration Statement**
**Pursuant to the Foreign Agents Registration Act of**
**1938, as amended**

## INSTRUCTION SHEET—READ CAREFULLY

1. *Use.* All persons required to register under this Act shall use this form in submitting the information required by Section 2(a).

2. *Read Act and Rules.* Registrant should carefully read the Act and the Rules thereunder before completing this form.

3. *Answer.* Unless otherwise specifically instructed in this form, a registrant shall answer every item on this form. Whenever the item is inapplicable or the appropriate response to an item is "none", an express statement to that effect shall be made.

4. *Attachments.* Inserts and riders of less than full page size shall not be used. Whenever insufficient space is provided for response to any item, reference shall be made in such space to a full insert page or pages on which the item number and inquiry shall be restated and a complete answer given.

5. *Filing.* The completed statement, including all exhibits, shall be filed in electronic form with the Registration Unit, Counterespionage Section, National Security Division, U.S. Department of Justice at http://www.fara.gov. The statement must be filed in accordance with 28 U.S.C. § 1746. A copy should be retained by the registrant.

6. *Filing Fee.* The filing of this document requires the payment of a filing fee for each listed foreign principal as set forth in Rule 5(d)(1), 28 C.F.R. § 5.5(d)(1).

7. *Privacy Act Statement.* The filing of this document is required for the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, for the purposes of registration under the Act and public disclosure. Provision of the information requested is mandatory, and failure to provide the information is subject to the penalty and enforcement provisions established in Section 8 of the Act. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, DC. Statements are also available online at the Registration Unit's webpage: http://www.fara.gov. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public in print and online at: http://www.fara.gov.

8. *Public Reporting Burden.* Public reporting burden for this collection of information is estimated to average 1.375 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Counterespionage Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

Note: *Omit this instruction sheet when filing this Statement.*

FORM NSD-1
Revised 03/14

MTF-EDVA00032

| | | | | |
|---|---|---|---|---|
| 11/22/2016 | Paul Becker | Consulting | | $6,000.00 |
| 10/03/2016 | Sam Pemberton | Administrative | | $712.00 |
| 10/24/2016 | Sam Pemberton | Administrative | | $710.00 |
| 10/11/2016 | SGR LLC | Public Affairs | | $15,000.00 |
| 10/24/2016 | SGR LLC | Public Affairs | | $10,000.00 |
| 11/16/2016 | SGR LLC | Public Affairs | | $15,000.00 |
| TOTAL: | | | | $574,662.00 |

*Answers to questions posed in letter dated November 30, 2016:*

1) At any time prior or subsequent to the November 8, 2016, op-ed in The Hill, did you or anyone else at Flynn Intel Group have any communications with any official in the Turkish Government or Mr. Alptekin regarding the op-ed? If yes, please describe the nature and content of such communications.

   A draft of the op-ed was shared with Mr. Alptekin in advance of publishing. Mr. Alptekin suggested changes but no such changes were accepted.

2) To your knowledge, at any time prior or subsequent to publication of the op-ed, did Mr. Alptekin or anyone else associated with Inovo BV have any communications with any official in the Turkish Government regarding the op-ed?

   Not to our knowledge.

3) Other than yourself, who was involved in preparation of the op-ed?

   My business partner, Bijan Kian, and his long-time editor, Hank Cox.

4) Did any official in the Turkish Government, or anyone acting on behalf of the Turkish Government, ask or direct that the op-ed be written, or have any involvement in the preparation of the op-ed? If yes, please explain.

   No.

5) Did the Turkish Government, or anyone acting on its behalf, receive a copy of the op-ed (or a draft thereof) prior to its publication?

   Not to our knowledge.

6) Did you, or any other person or entity, receive any compensation for writing the op-ed? If so, who was the source of that compensation?

   No.

MTF-EDVA00042