# memo

To:        Jim Gillis and Prosecution Team in U.S. v. Rafiekian

From:      Sidney Powell and Michael Flynn Defense Team

Date:      June 27, 2019 [CORRECTED]

Subject:     Unprivileged Material from Covington & Burling Flynn File

We have partially reviewed the materials we received from Covington & Burling as successor counsel in the Michael Flynn representation, for the chief purpose of assuring ourselves (and you) that the testimony our client will give in the Rafiekian matter is consistent with his grand jury testimony and statements made in his plea agreement and plea allocution and colloquy.

During that review, we discovered several items of interest that we hereby transmit to you. Out of an abundance of caution, we note that the items attached to this memorandum are not covered by the attorney client privilege that Michael Flynn had with Covington & Burling.

ITEM ONE.

There has been considerable discussion about the significance of the original designation of the FIG-Inovo project as the "confidence" project, with the implication that this referred to "confidence" that investors and others might have in the stability of the Turkish government and social fabric—thus concealing that the true focus was on Fethullah Gulen.

In fact, however, a long set of working papers, entitled "Statement of the Problem," has the subtitle, "How do we restore confidence in the government of the Republic of Turkey and expose the Fethullah Gulen cult in the United States?"

It is fair to say that in the ensuing pages of the working papers, all or nearly all of the material concerns Gulen.

**A**

ITEM TWO.

On or about February 15, 2017, Covington & Burling lawyers worked with FIG lawyer Kristen Verderame to prepare a draft of a FARA Registration Statement, and a draft of an Exhibit A form. The final versions of these documents were filed on March 7, 2017.

The draft Registration Statement included a 4-page Attachment. The first page included comments about "confidence" about Turkey in the context first mentioned in connection with ITEM ONE, but immediately turned to Fethullan Gulen as well.

The next two pages of the draft Attachment included considerable information that was *omitted* from the final Registration Statement that was filed on March 7, 2017.

The last page of the draft Attachment included specific answers to the questions that had been raised in the DOJ's original inquiry letter of November 30, 2016, specifically focusing on the op-ed that was published in *The Hill* on November 8, 2016.

None of this material was included in the Registration Statement that was filed on March 7, 2017. In particular, the response that "A draft of the op-ed was shared with Mr. Alptekin in advance of publishing. Mr. Alptekin suggested changes *but no such changes were accepted*" (emphasis supplied) was *omitted* from the final filing.

The draft Attachment to Exhibit A contained information that had been provided by Ekim Alptekin through his counsel at Arent Fox. Some, but not all, of this information subsequently appeared on the Registration Statement and Supplemental Statement filed on March 7, 2017.

# memo

To:      Jim Gillis and Prosecution Team in U.S. v. Rafiekian

From:    Sidney Powell and Michael Flynn Defense Team

Date:    September 27, 2019

Subject:        Unprivileged Material from Covington & Burling Flynn File

We have partially reviewed the materials we received from Covington & Burling as successor counsel in the Michael Flynn representation, for the chief purpose of assuring ourselves (and you) that the testimony our client will give in the Rafiekian matter is consistent with his grand jury testimony and statements made in his plea agreement and plea allocution and colloquy.

During that review, we discovered several items of interest that we hereby transmit to you. Out of an abundance of caution, we note that the items attached to this memorandum are not covered by the attorney client privilege that Michael Flynn had with Covington & Burling.

ITEM ONE.

There has been considerable discussion about the significance of the original designation of the FIG-Inovo project as the "confidence" project, with the implication that this referred to "confidence" that investors and others might have in the stability of the Turkish government and social fabric—thus concealing that the true focus was on Fethullah Gulen.

In fact, however, a long set of working papers, entitled "Statement of the Problem," has the subtitle, "How do we restore confidence in the government of the Republic of Turkey and expose the Fethullah Gulen cult in the United States?"

It is fair to say that in the ensuing pages of the working papers, all or nearly all of the material concerns Gulen.

MTF-EDVA00001

ITEM TWO.

On or about February 15, 2017, Covington & Burling lawyers worked with FIG lawyer Kristen Verderame to prepare a draft of a FARA Registration Statement, and a draft of an Exhibit A form. The final versions of these documents were filed on March 7, 2017.

The draft Registration Statement included a 4-page Attachment. The first page included comments about "confidence" about Turkey in the context first mentioned in connection with ITEM ONE, but immediately turned to Fethullan Gulen as well.

The next two pages of the draft Attachment included considerable information that was *omitted* from the final Registration Statement that was filed on March 7, 2017.

The last page of the draft Attachment included specific answers to the questions that had been raised in the DOJ's original inquiry letter of November 30, 2016, specifically focusing on the op-ed that was published in *The Hill* on November 8, 2016.

None of this material was included in the Registration Statement that was filed on March 7, 2017. In particular, the response that "A draft of the op-ed was shared with Mr. Alptekin in advance of publishing. Mr. Alptekin suggested changes *but no such changes were accepted*" (emphasis supplied) was *omitted* from the final filing.

The draft Attachment to Exhibit A contained information that had been provided by Ekim Alptekin through his counsel at Arent Fox. Some, but not all, of this information subsequently appeared on the Registration Statement and Supplemental Statement filed on March 7, 2017.

MTF-EDVA00002

"Working Papers"
mbbk.docx

11/5/16



## Statement of the Problem

**How do we restore confidence in the government of the Republic of Turkey and expose the Fethullah Gülen cult in the United States?**

# Facts Bearing on the Problem and the
# Gülen Ecosystem

MTF-EDVA00003

| Where we were on August 15, 2016 | Where we are on November 4, 2016 | Where are we headed? | How will we get there? |
|---|---|---|---|
| Facing a global, strong, well masked, well funded network that enjoys tacit support in the executive and legislative branch of the U.S. Government.

Public perception is in his favor.

Legal battles against the irregularities or possible illegal activities in his charter schools are overlooked, pushed over and not successful.

Strong support in Congress.

Almost TEFLON. No one wants to see him as who he really is. | We are changing the narrative FROM:

An aging man of God who is fighting an autocratic leader in his home country while running a network of charter schools with high quality education.

TO:

FG is a terrorist. He is a follower of Hasan Al Bana and Seyed Qutb, Founder of Muslim Brotherhood. U.S. taxpayers are funding a masked terror organization. Math and Science and English teachers from Turkey are here to brainwash our youth. He is perfecting the first phase of Jihad. Preparing the battlefield to unleash his "soldiers" at the right time. | Changing the public perception.

Educating Congress.

Exposing Turkey's Usama Bin Laden.

Building U.S. grassroots support to expose the true face of FG.

Documenting the story in two effective ways:

A three minute video teaser showing the true face of FG.

A 60 minute video that will be sent to all members of congress and selected USG. | DISCOVER AND DISPLAY

Expose FG as a strategic national security threat.

Deep open source intelligence

Very senior voices with unique authority on the subject. Remove doubt.

Formal congressional hearings at Foreign Affairs and Homeland Security Committees

IRS
Immigration
Homeland Security |

# Public and Congressional Perception of Gülen





STATUS QUO = EASY TO BELIEVE

- POLITICAL PROTECTION
- DISSIDENT
- OLD MAN
- IMAM

REALITY & FACTS = HARD TO BELIEVE

- COMPLEX NETWORK
- SECURITY RISK
- GLOBAL REACH

MTF-EDVA00004



MTF-EDVA00005



**We accomplish discovery by examining the following:**

● **Public Perception**

● **Tom Neers' "looking behind the curtain" - First Phase of**
  **Jihad**

● **Congressional Action/hearings**

● **IRS, Tax irregularities and Non-profit status**

● **Immigration- H1B Visa's**

● **1782 Process of discovery**

**We expose by:**

● **Producing a 3 minute video with Sebastian Gorka, Philip**
  **Haney,  Clare Lopez and Mike Flynn and selected other highly**
  **credible voices.**

● **Bring to the attention of US government agencies-IRS, INS,**
  **and DHS potential Rule of Law/Criminal wrong doing**

- Produce a longer, in depth video

# Talking Points

## Phase Zero

Define the subject's sphere of influence, advantages and vulnerabilities. Design an effective strategy with tactical and strategic goals.

Findings:

### INFLUENCE

The subject enjoys widespread support in congress. There is little or no real opposition to the subject's presence or activities. There are strong indications that the subject has built strong advocacy on the Hill. Likewise, there are strong indications that the subject has built an influence network in a number of key states. The public perception about the subject is generally positive.

### ADVANTAGES

The subject is widely viewed as a legitimate political dissident seeking refuge in the United States. The request for extradition has raised the subject's public appraised value. This action has created even a stronger shield for the subject. Consolidation

and centralization of power by the leadership in the subject's home country provides an easy conclusion by the public that he is an old man of God despised by an authoritarian leader in his home country. Any criticism of the subject's acts is immediately interpreted as "political pressure", illegitimate "smear campaign" and unjust attacks on a nice old man. Our asymmetric assessment indicates that an announcement lifting the extradition request by the home country will reduce public appraised value of the subject. This action, if executed will open the space necessary for public scrutiny of the subject's activities. This action will reduce the subject's shield of legitimacy as a political dissident. The Extradition request has made the subject a lot more important that he really is.

## VULNERABILITIES

The subject organization operates over 150 U.S. tax payer funded charter schools in 28 states. There are a number of irregularities in the operation of said schools. Legal professionals have shed light on these irregularities in the states of Ohio and Texas. Importing teachers from Turkey presents a number of easily observed irregularities that may prove to be direct violations of U.S. law. Creative/improper financial operations by the subject's organization offer a strong opportunity to unmask the true nature of dangerous, strategic activity under the guise of education. There may be illegal political contributions to political campaigns and nonprofit organizations also pose a potential vulnerability which will be

explored. When the subject's methods are compared to theoretical and historical teachings of Islamic Political activists of Hasan Al Banna, founder of Muslim Brotherhood (1928), Sayed Qutb (1950s-1960s), and deeper in the history, Hasan Sabbah (late 11th century), there are strong indications that the subject is very likely conducting the first phase of Jihad by slowly building a global loyal force to be activated at the right time. Subject lectures provide easily observed indicators of his long term objective. The resemblance of the subject's activities to Ayatollah Khomeini who duped the west in believing that he was a man of the cloth and a benevolent servant of the people serves as a basis to uncover and unmask the subject's ultimate goal of destabilizing his home country and the region.

## TACTICAL and STRATEGIC Countermeasures

Devise specific actions to restrict the subject's influence. Exploit the vulnerabilities and reduce the systemic advantages enjoyed by the subject to open space for strategic goal on unmasking the subject's ultimate goal. We have determined that unmasking the subject's true objectives requires unmasking his most visible violations. Tactically, we will search, find and expose the subject's clear violations, influence operation, financial irregularities, illegal contributions, and violations of immigration law. As the legal professionals uncover and engage the subject's activities in the legal arena, we will expose the subject in the public arena. Concurrently with our tactical engagement,

MTF-EDVA00009

we are producing a short video suitable for quick and wide distribution to key influence providers to the subject including but not limited to members of congress and key law enforcement agencies. Our strategic communication advisors have confirmed our plan that it is essential to have an easy to access, portable (easy to distribute) means of educating the influence providers to the subject. The ultimate aim of the video production is to ask the question:

IS THE SUBJECT ENGAGED IN THE FIRST PHASE OF JIHAD?

PHASE ONE

Operationalize the plan. Harmonize Cyber Research, Field Investigations, Strategic Communications and Congressional outreach.

ACTIONS

- Identified key organizations and individuals in the subject's critical circles.
- Engaged subject's key supporter in Congress. No major change of position by the supporter. However, feedback suggests that the supporter is alarmed by receiving additional relevant, fact based information and is likely to reduce support for the subject.
- Briefed senior staff at the Homeland Security Committee with the aim of organizing a hearing on the subject's activities and strategic aims.

MTF-EDVA00010

- Have deployed an experienced videography team (brand names Aljazeera, France 24) and a former CNN Anchor to create credible, durable, easy to distribute document in the form of a short video.
- Have interviewed/created effective footage of three victims of the subject's activities in his home country
- Have secured the opportunity for testimony by experts on the subject's masked activities, Sebastian Gorka, Philip Haney, Steve Emerson and other credible witnesses who are authorities on the subject of political Islam, Islamism and Jihadism.
- Our investigation team is engaged in the field within the boundaries of U.S. law.
- Our Cyber research team is also engaged within the boundaries of U.S. law.
- There is a total of 5 professional investigators in the field headed by our principal in charge of investigations.
- Cyber research team is comprised of 3 highly skilled professionals.
- The strategic communications team is actively reviewing and designing a creative tool to convey the masked operation of the subject. We expect the tool to be fully developed and ready for distribution in short order.

The aim of the investigation is to uncover indisputable unlawful activities of the subject and his organization and make a criminal referral.

Operationalize the plan  Harmonize Cyber Research, Field Investigations, Strategic Communications and Congressional outreach.

## CLOSE OUT OF PHASE 1 ACTIONS AND DISCUSSION

We continue to explore avenues of open source investigation of subject's schools in the US.  This is an ambitious list that when completed is expected to help narrow the focus regarding who among subject's school organizers and/or supporters may have possible associations with terrorist organizations such as the Muslim Brotherhood.  More importantly, this is the best way to obtain such information (i.e., via financial investigation and/or surveillance, or via other sources).

Our ongoing research has concluded that the schools were the brainchild of the iconic, but reclusive, 75-year old subject, a Sunni Muslim cleric from his home country whose has a reported 3 and 6 million followers who regard him as their spiritual leader. The subject's movement in his home country is known as Hizmet. For the past 17 years, subject has resided on his highly protected country estate in the shadows of the Pocono mountains near Saylorsville, Pennsylvania. To his advocates, subject is a pious imam who promotes a tolerant Islamic view stressing the importance of hard work, benevolence and education. To his detractors, he is powerful and crafty politician committed to overthrowing the existing order in his home country.  In the US, he was barely known, except to teachers and students who have defected from his schools, concerned parents, and to auditors for Charter schools,

MTF-EDVA00012

grant providers, public official's and even to investigative agencies such as the FBI, concerned about possible fraud and other criminal violations until the most recent coup attempt in the subject's home country.

It should be noted that the term "subject's name schools" is actually a misnomer and is not used by the schools themselves, although for simplicity, we will use this term hereafter to refer to the general aggregation of these schools. In states where the subject schools have the greatest presence, they use innocent sounding names such as Harmony Schools (Texas), Magnolia Science Academy (California), Horizon Schools (Ohio, Illinois), and Sonoran Science Academy (Arizona).

Many people do not realize that merely being a supporter of subject schools is not a crime. In fact, during the past several years, many members of Congress (bipartisan) have been courted by subject schools, even taking paid trips to subject's home country, to meet with subject adherents extoling the virtues of their schools. Many graduates of these schools, though precise numbers are seldom reported, reportedly move on to college and successful careers. The Bill Gates Foundation has reportedly made a sizeable donation to subject schools, and the Cosmos Foundation appears to be the largest benefactor. President Obama reportedly visited and praised the work being done in the Harmony School in Washington, DC

MTF-EDVA00013

The creation and operation of subject schools in the US appears to be the result of a broad strategy that involves the use of a sophisticated business model with complex organizational structuring, multiple layers of private and public funding, clever marketing, and aggressive legal representation in the context of an educational system that by its very design, though certainly not intended, is ripe for abuse and exploitation.

- Continue to identify key organizations and individuals in the subject's critical circles and areas of influence.
- Continue to 'flesh' out the details to brief the senior staff at the Homeland Security Committee with the aim of organizing a hearing on the subject's activities and strategic aims with an optimistic timeline of before the Christmas recess, with a realistic timeline of January 2017. Our team is already in the process of preparing relevant material which highlights the subjects
- The videography team (brand names Aljazeera, France 24) and a former CNN Anchor are reviewing and having footage subtitled in English of the three victims of the subject's activities in his home country.
- Our investigation team is engaged in the field within the boundaries of U.S. law.
  - Develop spreadsheet of U.S.-based subject schools to include when opened or, if closed, reasons why.
  - Compile history of criminal or civil suits against subject schools.

MTF-EDVA00014

> Locate and review both pro-subject & anti-subject websites to identify perspectives, biases, and methods used by the latter to support their stated intentions.
>
> · Identify political leaders at the local and national level who ae either supporting or criticizing subject schools, and summarize their respective arguments
>
> · Identify journalists reporting on subject schools and explain their unique areas of focus

- Our Cyber research team is also engaged within the boundaries of U.S. law and is conducting baseline monitoring of a multitude of Social and traditional Media sites.

**Subject Related Websites:**

- gulenmovement.ca
- fgulen.com/en
- gulenmovementca.blogspot.ca
- fethullah-gulen.org
- fethullahgulenforum.org
- gulenmovement.us

**Associated Hashtags:**

- #GulenMovement
- #HizmetMovement
- #FethullahGulen
- #Hizmet
- #gulenistes
- #NeverForgetJuly15
- #FETO

**Associated Social Media Accounts:**

- facebook.com/GulenMovementCanada
- plus.google.com/+FethullahGulenEN

**Associated You Tube Accounts:**

- youtube.com/channel/UCDfIDhRLI7M32qyIaRImQtQ
- youtube.com/channel/UCykpGY1yIAF6rP1zuWTJC2A

- youtube.com/channel/UC-5_J80Fi7lr92C8h8mmevg

He's in the News:

- dailysabah.com/war-on-terror/2016/10/12/3-gulen-linked-charter-schools-in-california-face-closure
- latimes.com/local/lanow/la-me-edu-magnolia-charter-ties-to-gulen-20160829-snap-story.html
- dailysabah.com/war-on-terror/2016/10/10/us-must-show-turkey-empathy-over-gulens-extradition-justice-minister
- dailysabah.com/war-on-terror/2016/10/10/iraqi-kurdish-administration-seizes-schools-run-by-gulenists
- reuters.com/article/us-un-assembly-turkey-erdogan-idUSKCN11Q2K5
- france24.com/en/20160916-turkey-coup-fethullah-gulen-extradition-how-will-us-respond
- dailysabah.com/war-on-terror/2016/09/15/top-eu-officials-admit-regret-over-failure-to-grasp-feto-threat
- dailysabah.com/war-on-terror/2016/09/09/pkk-terrorists-informed-about-gulenist-coup-attempt-in-advance
- shaber3.com/inanmadiniz-aldattiniz-sayin-bozdag-haberi/1273365
- lehighvalleylive.com/news/index.ssf/2016/07/rare_look_at_exiled_turkish_cl.html

Charter Schools:

- Website:
- charterschoolscandals.blogspot.com/p/list-of-us-gulen-schools.html
- Last Updated 12/7/2015

60 minutes:

- youtube.com/watch?v=ktl--lDnM7l

Ties to Clinton:

- dailycaller.com/2016/07/13/new-ties-emerge-between-clinton-and-mysterious-islamic-cleric

- **The strategic communications team has developed a very complex approach to their efforts which include a Strategic Objectives; Target Audiences, and Activities and Timing.**

MTF-EDVA00016

They are actively designing a creative visual tool to convey the masked operation of the subject. A copy of the initial draft is done and is attached. We expect the visual tool to be fully developed and ready for distribution in short order. The draft "wireframe" version of the board and a citation document which provides public record of the "accusations" within the board. We welcome any and all feedback and will continue working to build out a more "produced" version with graphics, etc.

- Active engagement of media outlets.
  - Drudge Report and have followed up with several different articles and angles. (Clinton foundation connections, etc.) Drudge Report has an unprecedented active readership and even if they don't use this development, they are confident the outreach this week will serve as a strong foundation for future coverage.
  - Politico Morning Education - We have also compiled this week's coverage of both Ohio and California (LA TIMES) coverage in hopes of inclusion in tomorrow (Thursday) morning's daily email. Politico is a leading policy outlet and the "Morning Education" email is a subscription based news aggregator received by top education policy influencers in DC and the around the country. See attached PowerPoint slide with a screen shot of this coverage.
- Teachers Unions - Teachers unions are a ripe ally in this project given their automatic resistance to all things related to charter schools. While our most impactful messaging might be on the homeland security front, the education/teachers angle could be a valuable flank that

appeals to Democratic policymakers, whereas Homeland
Security might appeal more to Republicans.  As such
initiated contact today with:

- Gene Bruskin, formerly of the American Federation of
  Teachers and author of "The Story Behind the subject
  Charter Schools and Their Reclusive Founder".   Have
  requested a phone meeting to compare notes and gauge
  his interest in participating in and assisting with the
  organization of an effort to coalesce issue experts in his
  field to persuade policy makers to take action.  Updates
  to follow.

- Policymaker Fact Sheet -  Producing a briefing document
  ahead of policymaker meetings.   An initial draft is
  complete and attached.

- High Ranking State Level Elected Official - Engaged in
  conversation with a high ranking elected official in a state
  with multiple subject Charter Schools.  He is "extremely
  interested" and we are briefing him soon, but wish to keep
  this outreach confidential at the moment per his wishes.

MTF-EDVA00018

<u>GULEN BRIEFING SHEET</u>

**Background:**

In the wake of the recent attempted coup in Turkey, new focus and scrutiny has been applied to Fethullah Gulen, a Muslim cleric living in exile in rural Pennsylvania. The Turkish government considers the man a terrorist and has petitioned the U.S. government for his extradition. Gulen has millions of global followers, known informally as the Hizmet, meaning service, or the "Gulen Movement". The Movement's primary source of funding is its network of schools around the world. Over 150 of these are US Charter Schools that have used taxpayer dollars to expand their operations into 26 states.

**Fethullah Gulen is a radical:**

MTF-EDVA00019

- In his sermons in the 1990s, Gulen urged his followers to infiltrate the Turkish military, media, and government and wait for the right moment to rise up, ordering them to "move within the arteries of the system, without anyone noticing your existence, until you reach all the power centers." Gulen promised that doing so would provide *"the guarantee of our Islamic future."*
- Despite his seeming moderate position, at times, Fethullah Gulen has called the United States his *"merciless enemy."* Additionally, he has claimed that the Jews are responsible for ideas like Communism that have purposefully steered the world towards cataclysm.

**Gulen Controls a network of corrupt US Charter Schools:**

- Gulen-associated schools participate in a process called "closed-loop leasing," where the charter schools use taxpayer money to pay excessive rent to a Gulen-associated real estate corporation. The real estate corporation funnels those profits back to Gulen or uses the funds to start more schools.
- Gulen-associated schools exploit the H-1B visa program, which are to be used when there are no qualified American workers, to bring Turks to the United States as teachers. In 2009, the Gulen schools received government approval for 684 visas, over 200 more than Google. Parents and other teachers have complained that the Turkish educators are clearly unqualified.
- Gulen-associated schools have been investigated by authorities and journalists in the states of Ohio, California, Texas, Louisiana, Illinois, Massachusetts, Virginia, Pennsylvania and Georgia, as well as by the FBI, for a litany of offenses, including the misappropriation of funds, the falsification of standardized tests, immigration fraud, and bid-rigging.

**Gulen is Politically Powerful and Influential in the US:**

- In 2002, Fethullah Gulen applied for permanent residence in the United States, claiming that he was an "exceptional individual" who deserved special consideration. His application was denied, but a few years later, Gulen won his appeal with the help of letters from George Fidas, a former director of outreach for the C.I.A., Morton Abramowitz, a former American ambassador and Graham Fuller, a former senior C.I.A. official.
- This was a surprising development after an American diplomat in Turkey had cabled to Washington about Gulen's sharply radical past as an Islamic preacher, the cult-like obedience that Gulen demands, and his involvement in the affairs of almost 100 countries.
- The Gulen movement has illegally financed Congressional travel abroad and provided hundreds of thousands of dollars of improper campaign donations to congressional and presidential candidates.

MTF-EDVA00020

- Gulen's chief liaison to New York, Recep Ozkan, donated between $500,001 and $1,000,000 to the Clinton Global Initiative.

**Responsible for the attempted Coup in Turkey:**

- Western diplomats have called Erdogan's accusations of Gulenist involvement "compelling," saying that "Gülenists played a credible role in [the coup]."
- General Hulusi Akar, the highest ranking member of the Turkish armed forces and a captive during the July coup, has claimed that his abductors offered to put him in touch with their opinion leader, Fethullah Gulen.
- Several plotters have released statements identifying themselves as loyal Fethullah Gulen and claimed that the coup was in response to an imminent crackdown on Gulenists in the Turkish military.

**Statements by Senior US officials:**

**President Obama:** President Barack Obama and Turkish President Tayyip Erdogan discussed the status of U.S.-based cleric Fethullah Gulen, blamed by Turkish authorities for masterminding a recent failed coup, during a call on Tuesday, the White House said.

The Turkish government has filed material in electronic form about Gulen with the U.S. government, which has been waiting for a formal extradition request, White House spokesman Josh Earnest said.

U.S. officials have said Turkey must provide proof that Gulen was involved in the coup attempt. Any extradition request from Turkey, once submitted, would be evaluated under the terms of a treaty between the two countries, Earnest said.

Obama offered U.S. assistance for Ankara's investigation into the attempted coup and pressed Erdogan to proceed according to the democratic principles outlined in Turkey's constitution, Earnest said.

**"The principles of democracy should be adhered to even as a thorough investigation is conducted,"** he said.

The U.S. State Department said it was still in the process of analyzing the documents submitted by Turkey and could not characterize them as an extradition request for Gulen. Source: http://www.reuters.com/article/us-turkey-security-usa-extradition-idUSKCN0ZZ23E?il=0

MTF-EDVA00021

**Anthony Blinken:  Question:** We see that the U.S. government is taking Turkey's request regarding the return of Fethullah Gulen seriously. Do you agree with Ankara that this topic may damage Turkish-American relations?
**Deputy Secretary Blinken:** We are determined to do everything we can to help Turkey as it pursues its investigations of those responsible for the attempted coup. And with regards specifically to the case of Mr. Gulen, we've had an exchange of experts visiting both Turkey and the U.S. – legal experts, so that Turkey fully understands the legal process that's involved. I just want to be very clear, this is not a political question at all for the United States – it's simply a legal question. We have laws and requirements when it comes to the extradition of any person from a country with whom we have an extradition treaty and we need to work through those legal requirements. But we've had very good exchanges with Turkey on this question and we're working through the information that's been provided. Source: https://tr.usembassy.gov/deputy-secretary-antony-blinkens-interview-ntvs-ahmet-yesiltepe/

**Ambassador James Jeffrey:** U.S. Ankara Ambassador James Jeffrey, on Dec. 4, 2009, briefed in regards to Gülen's application for Permanent Residence status in the U.S., with a background about Gülen and his movement. Saying that Gülen faced charges in Turkey of plotting to overthrow the state, Jeffrey mentioned a sermon in 1986, where Gülen is heard declaring that "our friends, who have positions in legislative and administrative bodies, should learn its details and be vigilant all the time so they can transform it and be more fruitful on behalf of Islam in order to carry out a nationwide restoration." Holding a Green Card now and living in Pennsylvania's Pocono Mountains, Fethullah Gülen was doubted to have infiltrated the TNP, and they "have found no one who disputes it."

Additionally, Jeffrey found out that the "TNP applicants who stay at Gülenist pensions are provided with the answers in advance of the TNP entrance exam." Apart from that, even more subtly, "Gülen's lack of transparency creates doubt about his motives and leads to suspicions about what lies ahead," Jeffrey says. As for the aspects of concern in the allegations that the U.S. government is somehow behind the Gülen Movement, Jeffrey concluded that "the U.S. is not 'sheltering' Mr. Gülen and his presence in the U.S. is not based on any political decision." Source: http://www.dailysabah.com/war-on-terror/2016/08/02/a-decade-of-the-gulen-movement-on-wikileaks-more-than-meets-the-eye

**Stuart Smith:** The Gülenists' penetration of the National Police (TNP), media outlets and their record of going after anyone who criticizes Gülen were among the items on the annual agenda of the U.S. Embassy in Ankara in 2005, when a decision by U.S. immigration authorities for the first time denied him the right to travel outside of the country. Stuart Smith, the U.S. vice consul general of the

Intelligence Department in Ankara, reported that three ranking TNP asked for a meeting with the Istanbul legate as a means of asking whether the "FBI could provide some sort of clean bill of health" for Fethullah Gülen. Upon such a request, Smith juxtaposes some concerns about the Gülen Movement's actions: "Severe pressure on businessmen to continue to give money to support Gülenist schools or other activities," "using their school networks to cherry-pick students they think are susceptible to being molded as proselytizers and to indoctrinate boarding students," "the cult-like obedience and conformity" the movement insists on its substructures.  Source: http://www.dailysabah.com/war-on-terror/2016/08/02/a-decade-of-the-gulen-movement-on-wikileaks-more-than-meets-the-eye

**Deborah K. Jones**:  A cable, with a more suspicious and questioning tone, classified by Consul General Deborah K. Jones on May 23, 2006, clarifies that U.S. authorities in Turkey started to count Gülen Movement's institutions and academies in the U.S., Central Asia, Caucasus, Russia, the Balkans, Africa, South East Asia, the Far East, the Middle East and Europe. Furthermore, the cable shows that a profile recognition for those traveling to the U.S., particularly with the aim of visiting Fethullah Gülen, was also actively carried out by Consular officers. Compiling a list of Gülenist organizations as well as periodical meetings to discuss trends within the Gülenist applicant pool let Consular officers in Ankara and Istanbul notice "what appears to a purposeful 'shifting' of applicant profiles appearing for visa interviews in what may be an effort by Gülenists to identify 'successful' profiles." After giving the general features of applicants and visitors (the young exchange visitor; the married middle-aged male with no English and traveling alone; the middle-school-aged English student; the graduate student going for English), the Consul General Jones claims that "evasiveness of Gülenist applicants leaves Consular officers uneasy" although there seems to be "a benign humanitarian movement" on the surface. Source: http://www.dailysabah.com/war-on-terror/2016/08/02/a-decade-of-the-gulen-movement-on-wikileaks-more-than-meets-the-eye

MTF-EDVA00023

## BREIFING ON GULEN RELATED CHARTER SCHOOLS IN TEXAS

### Current Situation

There are approximately 46 Gulen-affiliated charter schools serving 31,000 students in the state of Texas. Chairman McCaul has two schools within his district.

In May, Amsterdam & Partners filed a 32-page complaint alleging that Harmony Public Schools, the state's largest charter school network, hires under-qualified Turkish teachers and steers business to companies run by Turkish nationals, including some former Harmony employees.

Amsterdam & Partners additionally alleged that Harmony Schools are guilty of funneling money to Fethullah Gulen via tithes from teachers, that Harmony schools have misused bond money from the state of Texas to operate schools in Arkansas, and that Harmony abuses the H-1B visa program to bring in Turkish workers as teachers and then shuffle them around the United States in various positions.

The Texas Education Agency had found the allegations credible and were investigating the complaint. However, on October 17, the TEA cleared Harmony of allegations that it illegally steered business to vendors with ties to Harmony and the nation of Turkey. But, the TEA only dismissed several other claims that involved teacher hiring, special education and other matters, saying it was its jurisdiction.

In response, Amsterdam & Partners has criticized the TEA for only investigating two of the ten allegations, saying "this cursory inquiry not only ignored the majority of the issues raised in the complaint, but also failed to look beyond the registered agents of the contracting companies without even considering who the beneficiaries are." Amsterdam continued, "Knowing the Gülenists, they will undoubtedly attempt to portray this whitewash as a victory. But the fact is that there are many areas that TEA did not address, and we intend to request other state agencies and public officials to scrutinize Harmony's activity."

### Inadequate Investigation

Among the issues in the complaint that were left aside by TEA include evidence of discrimination in hiring, pay, and promotion favoring Turkish males, preference for related Turkish vendors in major contracts, discrimination against English Language learners and Students with Disabilities, abuse of the H-1B visa program to bring in underqualified Turkish nationals for teaching and leadership positions, misuse of federal program funding for low socioeconomic students and students with special needs, and systematic overcharging of leases to Harmony schools by Harmony's private real estate arm to siphon over $18 million of public funds out of the schools.

MTF-EDVA00024

Despite finding that Harmony had paid over $18.7 million dollars to Turkish owned vendors in the last two years, TEA conducted no analysis to determine whether these vendors had illegal relationships to Harmony's leadership, as alleged in the complaint. This deserves more investigation because it is known that some of these local funds Harmony receives come from questionable sources. For example, Harmony received $175,000 from Gulen-affiliated schools in Oklahoma that in a recent audit by the Oklahoma State Auditor were considered an improper use of state funds.

## Past Improprieties

This is not the first time that Harmony Public Schools has been accused of impropriety.

In 2011, *The New York Times* found that Harmony gives the vast majority of its construction and renovation contracts to Turkish-owned companies, even when other firms had offered to do the job for less money. *The Times* also noted that Harmony applies for hundreds of H-1B visas, claiming that there are no skilled Americans qualified to teach children. Texas has a population of almost 30,000,000 people.

In 2014, Harmony Public Schools settled a federal civil rights complaint that involved a female American teacher who made less than her male colleagues from Turkey, including those with less experience.

Also in 2014, Harmony reached an agreement with the U.S. Department of Education over how it teaches children who are learning English or have disabilities. A federal investigation found that those students were "significantly underrepresented" at Harmony, and that Harmony didn't ensure those students received the extra help they needed.

MTF-EDVA00025



To:     Flynn Intel Group
From:   Sphere Consulting
Date:   October 18, 2016
RE:     Charter Schools and the Department of Education

## The Charter Schools Program (CSP)

The Department of Education has a Charter Schools Program that disburses discretionary grants to "create new high-quality public charter schools, as well as to disseminate information about ones with a proven track record." Federal funds are also available to replicate and expand successful schools; help charter schools find suitable facilities; reward high-quality charter schools that form exemplary collaborations with the non-chartered public school sector; and invest in national activities and initiatives that support charter schools.

The CSP is part of the Department of Education's Office of Innovation and Improvement (OII). The OII has a self-state mission "to accelerate the pace at which the U.S. identifies, develops, and scales solutions to education's most important or persistent challenges," which it accomplishes through strategic investments and discretionary grant programs.

## CSP Grants

The CSP disburses grants and funding in about a half dozen ways. These are listed with their FY 2016 funding levels.

1. The Secretary of Education awards grants to State Educational Agencies (SEAs) to enable them to conduct charter school programs through sub-grants at the state level.
   a. $177,209,326 for new awards and $11,548,828 for continuation awards
2. The Secretary of Education awards grants for "Planning, Program Design, And Initial Implementation Grant" directly to programs that do not have a State Educational Agency or that do not have a State Educational Agency with an approved application for CSP grants.
   a. $3,325,107 for new awards and $2,784,727 for continuing awards
3. The Secretary of Education awards grants for "dissemination" (including assisting the foundation of new charter schools, developing partnership, producing curriculum materials, and conducting evaluations) directly to programs that do not

MTF-EDVA00026

have a State Educational Agency or that do not have a State Educational Agency with an approved application for CSP grants.

    a. This grant has not been awarded or continued since 2014.

4. The CSP awards grants to charter schools or non-profit charter management programs to expand enrollment of high-achieving programs by substantially increasing the number of available seats per school, or to open one or more new charter schools based on the model for which the eligible applicant has presented evidence of success.

    a. $65,759,488 for new awards and $32,316,646 continuing awards

5. The CSP awards funds that are used to match programs funded with nonfederal dollars that make payments, on a per-pupil basis, to provide charter schools with facilities financing. The funds scale down annually and are phased out after 5 years.

    a. Funding data is not available for 2016. In 2015, $9,000,000 was disbursed as a continuation of previous grants.

6. The CSP awards grants that support efforts by eligible entities to improve the quality of charter schools by providing technical assistance and other types of support on issues of national significance and scope.

    a. In 2015, provided $4,123,072 in new awards.

7. The CSP provides grants to eligible entities to permit them to enhance the credit of charter schools so that the charter schools can access private-sector and other non-Federal capital in order to acquire, construct, and renovate facilities at a reasonable cost.

    a. In 2015, provided $14,069,608

### Gulen Schools Receiving Federal Funding

| School | Chartering Org. | Location | Year | Grant Details |
|---|---|---|---|---|
| Harmony Schools* | Cosmos Foundation | Houston, TX | 2011 | 3 years $4,940,897 |
| Horizon Science Academy-Southwest | Concept Schools | Chicago, IL | 2015 | 3 years $337,138 |
| Chesapeake Math & IT Academy-South | Chesapeake Lighthouse Foundation | Hanover, MD | 2014 | 3 years $617,120 |
| Thomas Edison Energy Smart | Apple Educational Services | Somerset, NJ | 2010 | 3 years $530,507 |
| Triad Math & Science Academy | Washington Educational Foundation | Greensboro, NC | 2010 | 1 year $530,432 |
| Triad Math & Science Academy | Washington Educational Foundation | Greensboro, NC | 2012 | 2 years $751,145 |
| Noble Schools* | Concept Schools | Chicago, IL | 2014 | 3 years $507,209 |

MTF-EDVA00027

| Young Scholars of Western Pennsylvania | Apple Educational Services | Pittsburgh, PA | 2012 | 2 years $301,500 |
|---|---|---|---|---|
| Vision Academy | Apple Educational Services | Lansdowne, PA | 2016 | 3 years $783,104 |

*Grant was awarded to a network of schools, rather than an individual institution

https://innovation.ed.gov/what-we-do/charter-schools/credit-enhancement-for-charter-school-facilities-program/awards/
FIND OUT WHAT BUILDERS BUILD GULEN SCHOOLS THEN CROSS REFERENCE

https://innovation.ed.gov/what-we-do/charter-schools/charter-school-program-state-educational-agencies-sea/awards/
WHEN THERE IS AN APPLICATION PDF, FIGURE OUT IF THE STATE HAS DISBURSED FEDERAL FUNDS

MTF-EDVA00028



**sphere**
Managers of Issues
& Reputations

To:     Flynn Intel Group
From:  Sphere Consulting
Date:  October 18, 2016
RE:    Charter Schools and the IRS

## Overview

Charter schools are usually classified as 501(c)(3) organizations and therefore avoid federal income taxes and, in some instances, state income taxes as well. To maintain 501(c)(3) status, charter schools must demonstrate that they are not operated by a for-profit business. However, a charter school can maintain 501(c)(3) status and contract a for-profit management company for its operation, provided that that the school demonstrates that it is organized and operated for exclusively charitable purposes and not for the benefit of private management companies and/or for service providers.

When examining the 501(c)(3) status of charter schools, the IRS assesses whether the: (1) charter school board remains in control and continues to exercise its fiduciary responsibility to the school; and (2) board delegates its responsibility and ultimate accountability for the school's operations to a for-profit management company. Examples of charter schools losing 501(c)(3) status are sparse.

The IRS has conveniently provided a list of factors used in its assessment.

## IRS Guidelines for Non-Profit Assessment

1. *Is the school governed by an independent Board of Directors?*

    "A board appointed or dominated by a comprehensive management company raises questions as to whether the school will be operated for the benefit of the management company. The examiner should determine whether a structurally independent board is involved in active oversight of the school's operations or whether the board has delegated its duties and responsibilities to the management company."

2. *Does the Board of Directors actively oversee the school?*

    "A Board must show that it is not a front for the benefit of the management company." To demonstrate active oversight, a Board has: (1) regular meetings,

MTF-EDVA00029

with recorded minutes, more often than once or twice a year; (2) a conflict of interest policy requiring members to disclose all financial interests they have in any service provided to the school, even if specific policies are left to the discretion of the school's bylaws; (3) ultimate responsibility for meeting the terms of its charter by setting and approving broad school policies such as the budget, curriculum, admissions procedures, student conduct, school calendars, and dispute resolution procedures; and (4) fiscal responsibility and takes appropriate action to ensure the fiscal health of the school.

3. *Are contracts negotiated at arms' length and for the benefit of the school?*

"A charter school must show that contracts, especially comprehensive management contracts, have been negotiated at arm's length and are for the benefit of the school rather than the service provider. Boilerplate contracts may be an indicium that the terms of the contract were not the subject of negotiations between independent parties. Representation of both the school and the management by the same attorney is also an indication of the absence of arm's length negotiations."

4. *Are the terms of contracts consistent with the charter school's expressed purposes?*

Some contract terms, may result in a finding that the school is operated for the benefit of the management and preclude exemption. These are the IRS's areas of concern: (1) the length of a contract should balance a management company's long-term needs with the school's flexibility to meet its fiduciary responsibility; (2) Board policies should not be contracted as they are necessary to define a school's identity; (3) service agreements should detail the responsibilities of both the management company and the school; (4) personnel contracts with management companies should not have non-compete clauses as these benefit the management company by preventing a school from retaining teachers should a separation between school and management organization; (5) management fees should be reasonable and commensurate with services provided; (6) a service contract should specify the provisions for termination and the procedure for evaluating when the terms of the contract are in default.

5. *Does a contractual provision require the name of the school to be associated with the management organization?*

"In many cases, contractual provisions require a charter school to attach the management's name to the school (i.e., Company X Charter School or Charter School, a Company X affiliate.) "Name branding" has no clear exempt purpose. It links management companies to exempt schools and allows the company to draw goodwill from the relationship. It allows the management companies to build name recognition without additional expense. It also places a contractual burden on the charter schools, making it more difficult for the school to terminate the

MTF-EDVA00030

relationship with the management. A "name branding" requirement may be an indicator of private benefit depending upon the facts and circumstances."

6. *Are ancillary services the result of arm's length negotiation or are they adhesion contracts with a captive school board?*

On the Charter School Site of Research:

Attached is the broad overview of Horizon Science Academies and their online presence. We are continuing to build out this network and persons of interest within it; however, we haven't found anything significant yet related to this investigation.

Of interest, however, is that of all the "umbrella"-type organizations related to the Ohio Charter Schools, Horizon seems to be the only one with a significant online presence. Noble, Concept and New Plan Learning have very little to no online presence that has been found thus far. We will keep digging on them, but I think it's very interesting and worth running down the "why" behind this as we go.

MTF-EDVA00031

OMB No. 1124-0001; Expires April 30, 2017

**U.S. Department of Justice**

Washington, DC 20530

**Registration Statement**

**Pursuant to the Foreign Agents Registration Act of 1938, as amended**

## INSTRUCTION SHEET-READ CAREFULLY

1. *Use.* All persons required to register under this Act shall use this form in submitting the information required by Section 2(a).

2. *Read Act and Rules.* Registrant should carefully read the Act and the Rules thereunder before completing this form.

3. *Answer.* Unless otherwise specifically instructed in this form, a registrant shall answer every item on this form. Whenever the item is inapplicable or the appropriate response to an item is "none", an express statement to that effect shall be made.

4. *Attachments.* Inserts and riders of less than full page size shall not be used. Whenever insufficient space is provided for response to any item, reference shall be made in such space to a full insert page or pages on which the item number and inquiry shall be restated and a complete answer given.

5. *Filing.* The completed statement, including all exhibits, shall be filed in electronic form with the Registration Unit, Counterespionage Section, National Security Division, U.S. Department of Justice at http://www.fara.gov. The statement must be filed in accordance with 28 U.S.C. § 1746. A copy should be retained by the registrant.

6. *Filing Fee.* The filing of this document requires the payment of a filing fee for each listed foreign principal as set forth in Rule 5(d)(1), 28 C.F.R. § 5.5(d)(1).

7. *Privacy Act Statement.* The filing of this document is required for the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, for the purposes of registration under the Act and public disclosure. Provision of the information requested is mandatory, and failure to provide the information is subject to the penalty and enforcement provisions established in Section 8 of the Act. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, DC. Statements are also available online at the Registration Unit's webpage: http://www.fara.gov. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public in print and online at: http://www.fara.gov.

8. *Public Reporting Burden.* Public reporting burden for this collection of information is estimated to average 1.375 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Counterespionage Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

---

Note: *Omit this instruction sheet when filing this Statement.*

OMB No. 1124-0001; Expires April 30, 2017

**U.S. Department of Justice**

Washington, DC 20530

# Registration Statement
## Pursuant to the Foreign Agents Registration Act of 1938, as amended

## I—REGISTRANT

1. Name of Registrant

   Flynn Intel Group, Inc.

2. Registration No. (To Be Assigned By the FARA Registration Unit)


3. Principal Business Address

   44 Canal Center Plaza, Alexandria VA 22314


4. If the registrant is an individual, furnish the following information:

   (a) Residence address(es)


   (b) Other business address(es), if any


   (c) Nationality

   (d) Year of birth

   (e) Present citizenship

   (f) If present citizenship not acquired by birth, state when, where and how acquired

   (g) Occupation

5. If the registrant is not an individual, furnish the following information:

   (a) Type of organization: Committee ☐    Association ☐    Partnership ☐    Voluntary group ☐
   Corporation ☒    Other *(specify)* _____

   (b) Date and place of organization   Delaware Secretary of State, June 12, 2015

   (c) Address of principal office   44 Canal Center Plaza, Alexandria VA 22314


   (d) Name of person in charge   Michael T. Flynn and Bijan Kian

   (e) Locations of branch or local offices   N/A


   (f) If a membership organization, give number of members   N/A

(g) List all partners, officers, directors or persons performing the functions of an officer or director of the registrant.

| Name | Residence Address(es) | Position | | Nationality |
|---|---|---|---|---|
| Michael T. Flynn | available upon request | Chairman and CEO | US | |
| Bijan Kian | | Vice-Chairman and Director | US | |
| Philip Oakley | | President | US | |

(h) Which of the above named persons renders services directly in furtherance of the interests of any of the foreign principals?

Michael T. Flynn, Bijan Kian

(i) Describe the nature of the registrant's regular business or activity.

Flynn Intel Group is a consulting firm that provided intelligence research and advisory services.

(j) Give a complete statement of the ownership and control of the registrant.

Ownership as of November 31, 2016 was as follows:
Michael T. Flynn (350,000 shares), Bijan Kian (300,000 shares), Philip Oakley (250,000 shares), Dr. Payman Arabshahi (5,000 shares), Darkshore LLC (1,000 shares). The Corporation acts pursuant to is By-Laws pursuant to which the Board of Director governs the organization. Directors include Michael T. Flynn, Bijan Kian and Philip Oakley.

6. List all employees who render services to the registrant directly in furtherance of the interests of any of the foreign principals in other than a clerical, secretarial, or in a related or similar capacity.

| Name | Residence Address(es) | Nature of Services |
|---|---|---|
| Michael T. Flynn | available upon request | Director, consulting |
| Bijan Kian | | Director, consulting |

MTF-EDVA00034

(PAGE 3)

## II--FOREIGN PRINCIPAL

7. List every foreign principal[1] for whom the registrant is acting or has agreed to act.

| Foreign Principal | Principal Address(es) |
|---|---|
| Inovo B.V. | 47 Adireaanstraat, 3581 SC Ultrecht, The Netherlands |

## III--ACTIVITIES

8. In addition to the activities described in any Exhibit B to this statement, will you engage or are you engaging now in activity on your own behalf which benefits any or all of your foreign principals?   Yes ☒   No ☐

If yes, describe fully.

Since this is filed retrospective to activity under this engagement, we note that during the course of the engagement and thereafter, Flynn Intel Group officials (particularly Michael T. Flynn, in his capacity as a public figure separate from Flynn Intel Group) frequently wrote, spoke or provided interviews relating to national security. Although not undertaken at the direction of any foreign principal including but not limited to Inovo, it is possible that such activities may have an indirect benefit to Inovo and its clients on whose behalf Inovo engaged Flynn Intel Group or other foreign principals unrelated to this engagement.

## IV--FINANCIAL INFORMATION

9. (a) RECEIPTS-MONIES

During the period beginning 60 days prior to the date of your obligation to register[2] to the time of filing this statement, did you receive from any foreign principal named in Item 7 any contribution, income, or money either as compensation or for disbursement or otherwise?   Yes ☐   No ☒

If yes, set forth below in the required detail and separately for each such foreign principal an account of such monies.[3]

| Foreign Principal | Date Received | Purpose | Amount |
|---|---|---|---|
| | | | |

| | Total |
|---|---|

---

1  The term "foreign principal," as defined in Section 1(b) of the Act, includes a foreign government, foreign political party, foreign organization, foreign individual and, for the purpose of registration, an organization or an individual any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign government, foreign political party, foreign organization or foreign individual.
2  An agent must register within ten days of becoming an agent, and before acting as such.
3  A registrant is required to file an Exhibit D if he collects or receives contributions, loans, moneys, or other things of value for a foreign principal, as part of a fundraising campaign. There is no printed form for this exhibit. (See Rule 201(e), 28 C.F.R. § 5.201(e)).

MTF-EDVA00035

**(b) RECEIPTS-THINGS OF VALUE**

During the period beginning 60 days prior to the date of your obligation to register[4] to the time of filing this statement, did you receive from any foreign principal named in Item 7 anything of value[5] other than money, either as compensation, or for disbursement, or otherwise?           Yes ☐           No ☒

If yes, furnish the following information:

| Foreign Principal | Date Received | Thing of Value | Purpose |
|---|---|---|---|
| | | | |

10. **(a) DISBURSEMENT-MONIES**

During the period beginning 60 days prior to the date of your obligation to register[6] to the time of filing this statement, did you spend or disburse any money in furtherance of or in connection with your activities on behalf of any foreign principal named in Item 7?           Yes ☐           No ☒

If yes, set forth below in the required detail and separately for each such foreign principal named including monies transmitted, if any, to each foreign principal.

| Date | To Whom | Purpose | Amount |
|---|---|---|---|
| | | | |

**(b) DISBURSEMENTS-THINGS OF VALUE**

During the period beginning 60 days prior to the date of your obligation to register[7] to the time of filing this statement, did you dispose of any thing of value[8] other than money in furtherance of or in connection with your activities on behalf of any foreign principal named in Item 7?           Yes ☐           No ☒

If yes, furnish the following information:

| Date | Recipient | Foreign Principal | Thing of Value | Purpose |
|---|---|---|---|---|
| | | | | |

**(c) DISBURSEMENTS-POLITICAL  CONTRIBUTIONS**

During the period beginning 60 days prior to the date of your obligation to register[9] to the time of filing this statement, did you, the registrant, or any short form registrant, make any contribution of money or other thing of value from your own funds and on your own behalf in connection with an election to any political office or in connection with any primary election, convention, or caucus held to select candidates for any political office?           Yes ☐           No ☒

If yes, furnish the following information:

| Date | Amount or Thing of Value | Political Organization or Candidate | Location of Event |
|---|---|---|---|
| | | | |

---

4, 6, 7 and 9  See Footnote 2, on page 3.
5 and 8  Things of value include but are not limited to gifts, interest free loans, expense free travel, favored stock purchases, exclusive rights, favored treatment over competitors, "kickbacks", and the like.

MTF-EDVA00036

# V—INFORMATIONAL MATERIALS[10]

11. Will the activities of the registrant on behalf of any foreign principal include the preparation or dissemination of informational materials?     Yes ☒     No ☐

    IF YES, RESPOND TO THE REMAINING ITEMS IN THIS SECTION V.

12. Identify each such foreign principal.
    Inovo B.V.

13. Has a budget been established or specified sum of money allocated to finance your activities in preparing or disseminating informational materials?     Yes ☐     No ☒

    If yes, identify each such foreign principal, specify amount and for what period of time.

    See attachment

14. Will any public relations firms or publicity agents participate in the preparation or dissemination of such informational materials?
    Yes ☒     No ☐

    If yes, furnish the names and addresses of such persons or firms.

    See attachment

15. Activities in preparing or disseminating informational materials will include the use of the following:

☐ Radio or TV broadcasts     ☐ Magazine or newspaper     ☐ Motion picture films     ☐ Letters or telegrams
☐ Advertising campaigns     ☐ Press releases     ☐ Pamphlets or other publications     ☐ Lectures or speeches
☐ Other *(specify)* __See attachment__

**Electronic Communications**
☐ Email
☐ Website URL(s): _____
☐ Social media website URL(s): _____
☐ Other *(specify)* __See attachment__

16. Informational materials will be disseminated among the following groups:

☐ Public officials          ☐ Civic groups or associations
☐ Legislators               ☐ Libraries
☐ Government agencies        ☐ Educational groups
☐ Newspapers                 ☐ Nationality groups
☐ Editors                    ☐ Other *(specify)* __See attachment__

17. Indicate language to be used in the informational materials:
    ☒ English          ☐ Other *(specify)* ___

10 The term informational materials includes any oral, visual, graphic, written, or pictorial information or matter of any kind, including that published by means of advertising, books, periodicals, newspapers, lectures, broadcasts, motion pictures, or any means or instrumentality of interstate or foreign commerce or otherwise. Informational materials disseminated by an agent of a foreign principal as part of an activity in itself exempt from registration, or an activity which by itself would not require registration, need not be filed pursuant to Section 4(b) of the Act.

MTF-EDVA00037

## VI—EXHIBITS AND ATTACHMENTS

18. (a)   The following described exhibits shall be filed with an initial registration statement:

   *Exhibit A-*    This exhibit, which is filed on Form NSD-3, sets forth the information required to be disclosed concerning each foreign principal named in Item 7.

   *Exhibit B-*    This exhibit, which is filed on Form NSD-4, sets forth the information concerning the agreement or understanding between the registrant and the foreign principal.

   (b)   An Exhibit C shall be filed when applicable.  This exhibit, for which no printed form is provided, consists of a true copy of the charter, articles of incorporation, association, constitution, and bylaws of a registrant that is an organization.  A waiver of the requirement to file an Exhibit C may be obtained for good cause shown upon written application to the Assistant Attorney General, National Security Division, U.S. Department of Justice, Washington, DC 20530. (See Rule 201(c) and (d)).

   (c)   An Exhibit D shall be filed when applicable.  This exhibit, for which no printed form is provided, sets forth an account of money collected or received as a result of a fundraising campaign and transmitted for a foreign principal. (See Rule 201 (e)).

## VII—EXECUTION

In accordance with 28 U.S.C. § 1746, the undersigned swear(s) or affirm(s) under penalty of perjury that he/she has (they have) read the information set forth in this registration statement and the attached exhibits and that he/she is (they are) familiar with the contents thereof and that such contents are in their entirety true and accurate to the best of his/her (their) knowledge and belief, except that the undersigned make(s) no representation as to truth or accuracy of the information contained in the attached Short Form Registration Statement(s), if any, insofar as such information is not within his/her (their) personal knowledge.

(Date of signature)                                        (Print or type name under each signature or provide electronic signature[11])

_____                    _____

_____                    _____

_____                    _____

_____

---

11  This statement shall be signed by the individual agent, if the registrant is an individual, or by a majority of those partners, officers, directors or persons performing similar functions, if the registrant is an organization, except that the organization can, by power of attorney, authorize one or more individuals to execute this statement on its behalf.

MTF-EDVA00038

*Flynn Intel Group, Inc., Supplemental Statement*

**Attachment**

*15, 16. Activities*

> Note:  In September 2016, the Flynn Intel Group filed a registration under the Lobbying Disclosure Act for its representation of Inovo BV ("Inovo").  Upon further review, and to eliminate any potential doubt, the Flynn Intel Group is electing to file a registration and supplemental statement under the Foreign Agents Registration Act in lieu of its prior LDA registration.  Although the Flynn Intel Group was engaged by a private firm, Inovo BV, and not by any foreign government, Flynn Intel Group's work for Inovo could be construed to have principally benefitted the Republic of Turkey.  The Department's regulations provide that the LDA exemption from FARA registration is not available if a foreign government or political party is the principal beneficiary.  *See* 28 C.F.R. § 5.307.  This retroactive supplemental statement is being filed after the Flynn Intel Group began to close its operations in November 2016, and the supplemental statement is therefore based on information that is currently available to Flynn Intel Group, to the best of its knowledge, after undertaking due diligence with the assistance of counsel.

In August 2014, Flynn Intel Group entered into a contract with Inovo, a consulting firm based in the Netherlands.  The contract provided that Flynn Intel Group would perform research, engage a public relations firm and a filming and production crew to potentially distribute the results of its research, and hold weekly calls with the client to discuss progress on the project. Flynn Intel Group understood the engagement to be focused on improving U.S. business organizations' confidence regarding doing business in Turkey, particularly with respect to the stability of Turkey and its suitability as a venue for investment and commercial activity.  Inovo has represented through its counsel that no part of the fees paid to Flynn Intel Group by Inovo was provided by any foreign government.

Under the contract, Flynn Intel Group conducted open-source research for Inovo and at Inovo's direction.  The research, which was conducted by independent contractors retained for this purpose, focused on Mr. Fethullah Gülen and charter schools in the United States that are associated with, or allegedly associated with, Mr. Gülen.  The results of Flynn Intel Group's research were provided to Inovo and Mr. Alptekin, and to Sphere Consulting, a public relations firm engaged by Flynn Intel Group, at the direction of Inovo.  Flynn Intel Group and the public relations firm developed various materials and documents related to this research for potential dissemination.  Because the project was terminated early, the full scope of the contract was not performed, and to the best of Flynn Intel Group's knowledge, none of the research materials prepared by the Flynn Intel Group wereever disseminated to third parties.

In early September 2016, Flynn Intel Group was invited by Mr. Alptekin to meet with a group of government officials from Turkey for the purpose of understanding better the political climate in Turkey at the time as background for the project.  Officials of the Republic of Turkey attending this meeting on September 19, 2016 were the Minister of Foreign Affairs and the

Minister of _____, to the best of Flynn Intel Group's current understanding. Unrelated to the contract with Inovo, also in September 2016, Flynn Intel Group Vice-Chairman, Mr. Bijan Kian, was invited to speak at a "Turkey Investment Conference." Mr. Alptekin and officials of the Republic of Turkey also participated in the conference.

Mr. Kian met with the staff of Rep. Michael McCaul on two occasions in approximately October 2016. It is the Flynn Intel Group's understanding that the meetings were not initially related to the Inovo matter, but over the course of the discussions, Mr. Kian raised the firm's representation of Inovo and issues related to the research conducted for Inovo concerning Mr. Gülen and Turkey.

The Flynn Intel Group conducted outreach to an individual associated with a U.S. labor organization regarding charter schools in the United States that are associated with, or allegedly associated with, Mr. Gülen. Flynn Intel Group also oversaw outreach, which was conducted by a public relations firm, to officials in various state governments in the United States.

Pursuant to its contract with Inovo, Flynn Intel Group informally engaged a group of individuals (independent contractors) to form a film and production crew for the purposes of producing a video documentary based on its research associated with Mr. Gülen. The activities included a couple of videotaped interviews and other initial development of content. Because the contract was terminated early, to the best of Flynn Intel Group's current knowledge, the video was neither finished nor disseminated to any third parties.

In late October and early November 2016, representatives of Flynn Intel Group developed an op-ed article based, in part, on the research conducted by Flynn Intel Group under the Inovo engagement. The op-ed was not written or published at the request of, or under the direction or control of, Inovo, the Republic of Turkey, or any other party. Nonetheless, the op-ed addresses subject matter related to the research that Flynn Intel Group conducted for Inovo, and a draft of the op-ed was shared with Inovo in advance of publication. No changes were made to the op-ed based on any feedback from Inovo. Sphere Consulting assisted Flynn Intel Group with placement of the op-ed with The Hill publication.

**Attachment #2**

*14. Receipt of Monies*

| Date Received | Foreign Principal | Purpose | Amount |
|---|---|---|---|
| 09/09/2016 | Inovo BV | Consulting | $200,000.00 |
| 10/11/2016 | Inovo BV | Consulting | $185,000.00 |
| 11/14/2016 | Inovo BV | Consulting | $145,000.00 |
| TOTAL: | | | $530,000.00 |

**Attachment #3**

*15. Disbursements of Monies*

| Date | To Whom | Purpose | Amount |
|---|---|---|---|
| 9/13/2016 | Ekim Alptekin | Refund for reduction in scope | $40,000.00 |
| 10/17/2016 | Ekim Alptekin | Refund for reduction in scope | $40,000.00 |
| 09/14/2016 | Bijan Kian | Consulting | $ 12,000.00 |
| 09/30/2016 | Bijan Kian | Consulting | $10,000.00 |
| 09/30/2016 | Bijan Kian | Consulting | $ 2,000.00 |
| 10/11/2016 | Bijan Kian | Consulting | $10,000.00 |
| 11/15/2016 | Bijan Kian | Consulting | $40,000.00 |
| 11/22/2016 | Bijan Kian | Consulting | $50,000.00 |
| 11/22/2016 | Bijan Kian | Consulting | $4,000.00 |
| 10/14/2016 | Bob Kelley | Consulting | $2,500.00 |
| 10/31/2016 | Bob Kelley | Consulting | $2,500.00 |
| 11/21/2016 | Bob Kelley | Consulting | $5,000.00 |
| 10/04/2016 | Brian McCauley | Consulting | $5,000.00 |
| 10/13/2016 | Brian McCauley | Consulting | $3,000.00 |
| 11/14/2016 | Brian McCauley | Consulting | $5,000.00 |
| 12/05/2016 | Brian McCauley | Consulting | $15,000.00 |
| 09/19/2016 | Carl Pilgram | Administrative Support | $ 4,000.00 |
| 10/25/2016 | Carl Pilgram | Administrative Support | $4,000.00 |
| 11/16/2016 | Carl Pilgram | Administrative Support | $4,000.00 |
| 10/11/2016 | David Enders | Videography | $1,700.00 |
| 10/11/2016 | David Enders | Videography | $850.00 |
| 12/02/2016 | David Enders | Videography | $850.00 |
| 12/02/2016 | Hank Cox | Editing | $300.00 |
| 09/13/2016 | Michael G Flynn | Administrative Support | $4,000.00 |
| 10/21/2016 | Michael G Flynn | Administrative Support | $4,000.00 |
| 11/22/2016 | Michael G Flynn | Administrative Support | $4,000.00 |
| 09/14/2016 | Michael T. Flynn | Consulting | $12,000.00 |
| 10/20/2016 | Michael T. Flynn | Consulting | $10,000.00 |
| 10/20/2016 | Michael T. Flynn | Consulting | $ 12,000.00 |
| 11/21/2016 | Michael T. Flynn | Consulting | $54,000.00 |
| 11/21/2016 | Michael T. Flynn | Consulting | $ 40,000.00 |
| 10/11/2016 | Mike Boston | Consulting | $ 8,000.00 |
| 10/14/2016 | Mike Boston | Consulting | $8,000.00 |
| 11/21/2016 | Mike Boston | Consulting | $8,000.00 |
| 11/10/2016 | Operational Behavioral Services | Consulting | $20,000.00 |
| | White Canvas Group | Open source research – social media | |
| 10/12/16 | Rudi Bakhtiar | Interview | $1,200 |
| 10/13/2016 | Paul Becker | Consulting | $1,500.00 |

MTF-EDVA00041

| 11/22/2016 | Paul Becker | Consulting | $6,000.00 |
|---|---|---|---|
| 10/03/2016 | Sam Pemberton | Administrative | $712.00 |
| 10/24/2016 | Sam Pemberton | Administrative | $ 710.00 |
| 10/11/2016 | SGR LLC | Public Affairs | $15,000.00 |
| 10/24/2016 | SGR LLC | Public Affairs | $10,000.00 |
| 11/16/2016 | SGR LLC | Public Affairs | $15,000.00 |
| TOTAL: | | | $574, 662.00 |

*Answers to questions posed in letter dated November 30, 2016:*

1) At any time prior or subsequent to the November 8, 2016, op-ed in The Hill, did you or anyone else at Flynn Intel Group have any communications with any official in the Turkish Government or Mr. Alptekin regarding the op-ed? If yes, please describe the nature and content of such communications.

   A draft of the op-ed was shared with Mr. Alptekin in advance of publishing. Mr. Alptekin suggested changes but no such changes were accepted.

2) To your knowledge, at any time prior or subsequent to publication of the op-ed, did Mr. Alptekin or anyone else associated with Inovo BV have any communications with any official in the Turkish Government regarding the op-ed?

   Not to our knowledge.

3) Other than yourself, who was involved in preparation of the op-ed?

   My business partner, Bijan Kian, and his long-time editor, Hank Cox.

4) Did any official in the Turkish Government, or anyone acting on behalf of the Turkish Government, ask or direct that the op-ed be written, or have any involvement in the preparation of the op-ed? If yes, please explain.

   No.

5) Did the Turkish Government, or anyone acting on its behalf, receive a copy of the op-ed (or a draft thereof) prior to its publication?

   Not to our knowledge.

6) Did you, or any other person or entity, receive any compensation for writing the op-ed? If so, who was the source of that compensation?

   No.

OMB No. 1124-0006; Expires April 30, 2017

**U.S. Department of Justice**

Washington, DC 20530

## Exhibit A to Registration Statement
## Pursuant to the Foreign Agents Registration Act of 1938, as amended

INSTRUCTIONS. Furnish this exhibit for EACH foreign principal listed in an initial statement and for EACH additional foreign principal acquired subsequently. The filing of this document requires the payment of a filing fee as set forth in Rule (d)(1), 28 C.F.R. § 5.5(d)(1). Compliance is accomplished by filing an electronic Exhibit A form at http://www.fara.gov.

Privacy Act Statement. The filing of this document is required by the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, for the purposes of registration under the Act and public disclosure. Provision of the information requested is mandatory, and failure to provide this information is subject to the penalty and enforcement provisions established in Section 8 of the Act. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, DC. Statements are also available online at the Registration Unit's webpage: http://www.fara.gov. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public in print and online at: http://www.fara.gov.

Public Reporting Burden. Public reporting burden for this collection of information is estimated to average .49 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Counterespionage Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

| 1. Name and Address of Registrant<br>Flynn Intel Group, Inc.<br>44 Canal Center Plaza, Alexandria, VA 22314 | 2. Registration No. |
|---|---|

| 3. Name of Foreign Principal<br><br>Inovo BV | 4. Principal Address of Foreign Principal<br><br><br>47 Adriaanstraat, 3581 SC Utrecht, The Netherlands |
|---|---|

5. Indicate whether your foreign principal is one of the following:

☐ Government of a foreign country [1]

☐ Foreign political party

☐ Foreign or domestic organization: If either, check one of the following:

| ☐ Partnership | ☐ Committee |
|---|---|
| ☐ Corporation | ☐ Voluntary group |
| ☐ Association | ☒ Other *(specify)* Besloten vennootschapprivate (private limited company) organized under the laws of the Netherlands |
| ☐ Individual-State nationality | |

6. If the foreign principal is a foreign government, state:

   a) Branch or agency represented by the registrant


   b) Name and title of official with whom registrant deals


7. If the foreign principal is a foreign political party, state:

   a) Principal address


   b) Name and title of official with whom registrant deals

   c) Principal aim

---

1 "Government of a foreign country," as defined in Section 1(e) of the Act, includes any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country, other than the United States, or over any part of such country, and includes any subdivision of any such group and any group or agency to which such sovereign de facto or de jure authority or functions are directly or indirectly delegated. Such term shall include any faction or body of insurgents within a country assuming to exercise governmental authority whether such faction or body of insurgents has or has not been recognized by the United States.

FORM NSD-3
Revised 03/14
MTF-EDVA000-2

8. If the foreign principal is not a foreign government or a foreign political party:

    a) State the nature of the business or activity of this foreign principal.

See attachment.

    b) Is this foreign principal:                      See attachment.

| | |
|---|---|
| Supervised by a foreign government, foreign political party, or other foreign principal | Yes ☐ No ☐ |
| Owned by a foreign government, foreign political party, or other foreign principal | Yes ☐ No ☐ |
| Directed by a foreign government, foreign political party, or other foreign principal | Yes ☐ No ☐ |
| Controlled by a foreign government, foreign political party, or other foreign principal | Yes ☐ No ☐ |
| Financed by a foreign government, foreign political party, or other foreign principal | Yes ☐ No ☐ |
| Subsidized in part by a foreign government, foreign political party, or other foreign principal | Yes ☐ No ☐ |

9. Explain fully all items answered "Yes" in Item 8(b). *(If additional space is needed, a full insert page must be used.)*

See attachment.

10. If the foreign principal is an organization and is not owned or controlled by a foreign government, foreign political party or other foreign principal, state who owns and controls it.

See attachment.

## EXECUTION

In accordance with 28 U.S.C. § 1746, the undersigned swears or affirms under penalty of perjury that he/she has read the information set forth in this Exhibit A to the registration statement and that he/she is familiar with the contents thereof and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

| Date of Exhibit A | Name and Title | Signature |
|---|---|---|
| | | |

*Flynn Intel Group, Inc., Registration Statement, Exhibit A*

## Attachment

*Item 7- Foreign Principal*

Inovo BV ("Inovo") is a Dutch company incorporated in 2005 to provide business consultancy services.

According to Arent Fox, LLP, counsel to Mr. Alptekin/Inovo:

1.  Inovo is a privately owned company that has not received, directly or indirectly, funds or financial support from any government during the course of its engagement of Flynn Intel Group Inc. including the Republic of Turkey;

2.  At the time Inovo hired Flynn Intel Group, Inovo represented a private sector Israeli company that sought to export natural gas to Turkey, and it was for support of its consulting work for this client that Inovo engaged Flynn Intel Group, specifically to understand the tumultuous political climate at the time between the United States and Turkey so that Inovo could advise its client regarding its business opportunities and investment in Turkey;

3.  Mr. Alptekin is dual citizen of the United States and the Netherlands, and is a businessman who holds a number of positions in international business organizations such as Honorary Counsel to the Republic of Albania, Chairman of the Turkish-American Business Council, and Mr. Alptekin nor any organization in which he participates is an agent of the government of the Republic of Turkey.

Flynn Intel Group does not know whether or the extent to which the Republic of Turkey was involved with its retention by Inovo for the three-month project. Flynn Intel Group is aware that Mr. Alptekin consulted with officials of the Republic of Turkey regarding potential work by Flynn Intel Group, and Mr. Alptekin introduced officials of the Republic of Turkey to Flynn Intel Group officials at a meeting on September 19, 2016.

MTF-EDVA00045