## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**Plaintiff,**

**v.**

**MICHAEL T. FLYNN,**

**Defendant.**

**Criminal Action No. 17-232-EGS**
**SEALED**

## FLYNN REPLY IN SUPPORT OF HIS MOTION TO COMPEL PRODUCTION OF _BRADY_ MATERIAL AND TO HOLD THE PROSECUTORS IN CONTEMPT

Jesse R. Binnall
Jesse R. Binnall, VSB # 79292
Lindsay R. McKasson
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
jbinnall@harveybinnall.com

W. William Hodes
The William Hodes Law Firm
3658 Conservation Trail
The Villages, Florida 32163
Tel: (352) 399-0531
wwh@hodeslaw.com
Admitted _Pro Hac Vice_

Sidney Powell
Sidney Powell
Molly McCann
Sidney Powell, P.C.
2911 Turtle Creek Blvd., Suite 300
Dallas, Texas 75219
Tel: (214) 07-1775
sidney@federalappeals.com
_Admitted Pro Hac Vice_

**ATTORNEYS FOR DEFENDANT MICHAEL T. FLYNN**

# TABLE OF CONTENTS

*ARGUMENTS AND AUTHORITIES IN REPLY*.......................................................... 3

A.  The Government's Suppression of the Actual Strzok-Page Texts Mandates a Finding of Contempt......................................................................................................... 5

   1. "A Pretext to Interview Some People." ........................................................... 6

   2. "Many Meetings" to Strategize the Interview of Flynn.................................... 7

   3.  "Off the Rails" ................................................................................................ 8

   4. The Plan Worked: Mr. Flynn was "Relaxed," "Jocular," and "Unguarded.".............. 9

   5. Reporting Back: Flynn's "Demeanor Was Sure."
   He Was Telling the Truth or Believed He Was Telling the Truth................................. 10

   6. Agents Manipulate the Flynn 302. .................................................................. 10

   7. February 14: "Launch f 302." ........................................................................ 11

   8. The Media Leak Strategy with DOJ................................................................ 12

   9. The FBI Opens Obstruction Case on President Trump
   and "Locks In" Case on "Flynn?" ...................................................................... 12

B. The FBI Knew Its Entire Investigation of Flynn Was A Pretext. .................................. 14

C. *Brady* Requires the Government to Produce Exculpatory Evidence in Time for the Defense to Use It. ...................................................................................................... 18

D. Full, Actual, Unredacted Documents, The Original 302, Drafts Prior to February 10, 2019, and the 1A File and Subfiles Must be Produced Pursuant to *Brady*.  22

   1. Agent Strzok's notes do not appear to have been taken contemporaneously during the interview....................................................................................................... 24

   2. The 302 statement that Mr. Flynn was told the "nature of the interview" is false. ... 25

   3. Mr. Van Grack's Productions of Flynn 302s Were Incomplete and Misleading. ....... 25

   4. The Final 302 Falsely States that Mr. Flynn Remembered Making Four to Five Calls from the Dominican Republic When Both Sets of Notes State He Does Not Remember.
   ........................................................................................................................ 26

**5. The Notes Provide No Support for a Chunk of the 302 That Purports to Provide a "Factual Basis" for the Plea.** ........................................................................... 27

**6. Mr. Flynn's Statements Were Not Material.** ................................................. 27

**7. The Flynn 302 Is Discussed in the Page-Strzok Texts and Was Not Approved by McCabe Until the Day After Flynn Resigned from the White House.** ........................... 28

**E. Classified Information Will Prove that Any Investigation of Mr. Flynn Was Pretextual.** ...................................................................................................... 28

**1. *Yunis* Mandates Disclosure of The Classified Information Requested as *Brady*.** ........ 28

**2. The DIA Reports of Briefing and Debriefings Belie Any Basis to Investigate Mr. Flynn and Likely Further Undermine the Factual Basis for the Plea.** ........................... 29

**3. The Letter from Sir Mark Lyall Grant to the Incoming National Security Team Invalidates Any Use of Information from Christopher Steele, Further Undermines Any "Russia" Connection, and is Being Suppressed.** ......................................................... 30

***CONCLUSION*** ................................................................................................ 32

***CERTIFICATE OF SERVICE*** ...................................................................... 33

## INDEX OF EXHIBITS

Flynn Timeline of Key Events …………………………………………………..…   Exhibit 01

Excerpts of Strzok- Page Texts …………………………………………..............   Exhibit 02

Relevant Comey Memos ………………………………………………………..   Exhibit 03

CNN Article …………………………………………………………………….   Exhibit 04

Strzok 7/26/17 Statement [SEALED] …………………………………………...   Exhibit 05

Strzok 302 [SEALED] ………………………………………………………..…   Exhibit 06

Steele Dossier Excerpts re Flynn …………………………………………………...   Exhibit 07

Excerpts from *Crossfire Hurricane* by Josh Campbell ………………………………   Exhibit 08

Unnamed Agent's Notes and Transcription [SEALED] ……………………………   Exhibit 09

Strozk's Notes and Transcription [SEALED] ………………………………………   Exhibit 10

Comparison Draft Flynn 302, 2/10/17 and 2/11/17;

and Final 302 [SEALED] …………………………………………………….…   Exhibit 11

Lisa Page 302 [SEALED] ……………………………………………….……...   Exhibit 12

12/2/17 Articles (2) …………………………………………….…………   Exhibit 13

Program Information from Flynn Speaking Engagements

Booked by Leading Authorities …………………………………………………....   Exhibit 14

Timeline of Meetings with Prosecutors & Government's

Productions of Documents ………………………………………………………....   Exhibit 15

Decl. of Handwriting Expert …………………………………………………....   Exhibit 16

For eighty-seven years, the Supreme Court has held that "[t]he first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it. . . [I]t is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it." *Sorrells v. United* States, 287 U.S. 435, 444-45 (1932) (quoting *Butts v. United States*, 273 F. 35, 38 (8th Cir. 1921)).  Application of the criminal law under such circumstances "is foreign to its purpose . . . [and] so shocking to the sense of justice that it has been urged that it is the duty of the court to stop the prosecution in the interest of the Government itself, to protect it from the illegal conduct of its officers and to preserve the purity of its courts." *Id.* at 446.

In this case, high-ranking FBI officials orchestrated an ambush-interview of the new president's National Security Advisor, not for the purpose of discovering any evidence of criminal activity—they already had tapes of all the relevant conversations about which they questioned Mr. Flynn—but for the purpose of trapping him into making statements they could allege as false.

This is no paranoid "conspiracy" delusion, as the government implies.  It is well documented by the evidence already made public, which was long known to the government — yet withheld from the defense—until after Mr. Flynn pleaded guilty and in clear violation of *Brady v. Maryland* and its progeny.  This includes a still undisclosed discussion by the lead agent to use news of the "Steele dossier" as "a pretext to interview some people;" the FBI Director's calculated decision (contrary to FBI/DOJ protocol) not to notify the White House Counsel that the FBI wanted to speak with a key member of the President's staff; a strategically-planned personal call

from FBI Deputy Director Andrew McCabe, designed to prevent Mr. Flynn from seeking the advice of counsel or notifying the Department of Justice; planning and rehearsing tactics calculated to keep Mr. Flynn "relaxed" and "unguarded" so as not to alert him to the significance of the conversation; anxious text messages between Agent Strzok and his paramour, Lisa Page—McCabe's Special Counsel—disclosing the deep personal involvement of these officials and others in an enterprise without a legitimate law enforcement objective.

The government works hard to persuade this Court that the scope of its discovery obligation is limited to facts relating to punishment for the crime to which Mr. Flynn pleaded guilty. However, the evidence already produced or in the public record reveals far larger issues are at play: namely, the integrity of our criminal justice system and public confidence in what used to be our premier law enforcement institution.  When the Director of the FBI, and a group of his close associates, plot to set up an innocent man and create a crime—while taking affirmative steps to ensnare him by refusing to follow procedures designed to prevent such inadvertent missteps—this amounts to conduct so shocking to the conscience and so inimical to our system of justice that it requires the dismissal of the charges for outrageous government conduct.

"Regard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.'" *Rochin v. California*, 342 U.S. 165, 169 (1952) (Frankfurter, J.) (quoting *Malinski* v. *New York*, 324 U.S. 401, 416-17 (1945)). When the government transgresses these boundaries—as it has here—the Court must dismiss the case and free the defendant to reconstitute his life.

2

As new counsel has made clear from her first appearance, Mr. Flynn will ask this Court to dismiss the entire prosecution based on the outrageous and un-American conduct of law enforcement officials and the subsequent failure of the prosecution to disclose this evidence— which it had in its possession all along—either in a timely fashion or at all.  Moreover, the defendant still needs and is still entitled to *all* the facts in the government's possession—not just those Mr. Van Grack was forced to provide because they had already leaked into the public domain. The government's tactic of disclosing information because it had made its way into the news and the internet is tantamount to no *Brady* disclosure at all, while its self-serving minimized disclosures were outright deceptive.

## ARGUMENTS AND AUTHORITIES IN REPLY

Despite a polite reminder from this Court that its *Brady* order is paramount,[1] the government's response depends heavily on its assertion—forty-five times in twenty pages—that Mr. Flynn pleaded guilty, and thirteen assertions that he waived any right to further *Brady* material.[2]  As expected, the government touts its many *Brady* disclosures.  What it elides, however,

---

[1] "[T]hat provision is not binding on the Court. That's an agreement between the parties. Notwithstanding that information in the plea agreement or any statement therein or subsequent thereto that suggests Mr. Flynn has waived his right to further discovery, the government must comply with the Court's standing *Brady* order of February the 16th, 2018, or at some point demonstrate why it should not be required to comply with that." Hr'g Tr. 8:21-24, Sept. 10, 2019.

[2] At the status conference in this Court on September 10, 2019, Mr. Van Grack assured the Court he had never claimed that Mr. Flynn's plea truncated the government's responsibility to provide *Brady* material or comply with this Court's Standing Order. Dkt. 114 at 22:13-19. To the contrary, however, in his letter to new counsel dated June 26, 2019, he wrote:  "[I]n the plea agreement your client signed on November 30, 2017, your client waived the right to any further discovery or disclosures of information.  As such, the government does not anticipate providing additional information in response to your letter." On July 12, 2019, Mr. Van Grack again denied there was any further material owed to Mr. Flynn under either *Brady* or the Court's Standing Order, noting "much of which [production] occurred even after your client had waived his right to any further discovery or disclosures of information, pursuant to the plea agreement."

3

is that its "disclosures" were so limited, misleading, untimely, or deliberately trivialized as to render them meaningless—and in some instances, outright deceitful. As the Supreme Court has recognized, and which happened in the extreme here, an incomplete response could "represent[] to the defense that the evidence does not exist" and cause it "to make pretrial and trial decisions on the basis of this assumption." *United States v. Bagley*, 473 U.S. 667, 682-83 (1985).

Every "disclosure" the government touts came *after* the government had interviewed Mr. Flynn for five days, and all but the final version of the much-deliberated 302 came *after* Mr. Flynn agreed to plead guilty. At the same time, the government tries to shift its affirmative obligation to produce *Brady* evidence to former defense counsel, but "[a] rule . . . declaring 'prosecutor may hide, defendant may seek' is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004).

Here, the government's limited and misleading productions confirm the suppression of additional *Brady* evidence which warrants a finding of contempt. Remarkably, Mr. Van Grack prefaced his blandly eleventh-hour "disclosure" with the disclaimer that he had "no legal or ethical obligation" to give the information to the defense. What he described as "electronic communications" of "one of the agents who interviewed Mr. Flynn" "showed a preference for one of the presidential candidates" was painfully short of the bombshell of truth that exploded in the national news only one day after Mr. Flynn's plea.

The real *evidence* the government had long suppressed caused a cavalcade of major events—many within mere days of Mr. Flynn's plea—and all unknown to him before it. Lisa Page, Special Counsel to Deputy Director McCabe, resigned; she had edited Mr. Flynn's 302 and was part of the small, high-level group that strategically planned his ambush. Lead Agent Peter Strzok was demoted from the Mueller investigation and ultimately fired. Strzok, who had met

extensively with McCabe and the high-level, small group, was primarily responsible for creating the only basis for the charge alleged against Flynn. Ex. 1.

The day after Mr. Flynn's plea, the press exploded with the news of Strzok and Page's prolific text messages, their affair, and their malice toward President Trump.[3]   The Inspector General issued a rare statement that he was investigating the entire matter.   MTC 23.   Bruce Ohr, the fourth highest-ranking member of DOJ, was demoted.   Judge Contreras, who accepted Mr. Flynn's plea only days before, was suddenly and inexplicably recused—only for it to be disclosed much later that he was a topic of conversation in the Strzok-Page texts because he was a friend of Agent Strzok.[4]   And, remarkably, DOJ's Bruce Ohr was demoted a second time.   Ex. 1.   This is merely a snapshot of the aftershock from the earliest revelations into the public domain and to Mr. Flynn.

## A.  The Government's Suppression of the Actual Strzok-Page Texts Mandates a Finding of Contempt.

The government's purported "productions" of the actual Strzok-Page texts also reveal contempt for this Court's order and its *Brady* obligation. MTC 6, 9, 10, 30, 31.  The government did not produce a single text message (among the *50,000*) until nine months after it had been

---

[3] However, the government's disclosure as Mr. Flynn was signing the plea agreement did not even name the agent, or the candidate, while the statements by the *two* key agents showed sheer hatred of Mr. Trump; for example: *"God trump is a loathsome human," "Stupid fuck," "Donald Trump is an enormous d\*uche," and "Trump is a fucking idiot."* Ex. 2.

[4] The government knew that well in advance of Mr. Flynn's plea that Judge Contreras was a friend of Peter Strzok and his recusal was even discussed in an exchange of multiple texts.  In one text exchange between Strzok and Page on July 25, 2016, Page said to Strzok: *"I can't imagine either one of you could talk about anything in detail meaningful enough to warrant recusal*," apparently referring to Judge Contreras.  *"Really?"* Strzok replied.  *"Rudy, I'm in charge of espionage for the FBI.  Any espionage* [warrant request that] *comes before him, what should he do? Given his friend oversees them?"*  Ex. 2.  None of this was disclosed to the defense or in court.

handed countless egregious examples; three months after this Court entered its order; and long after the actual evidence would have made a material difference to Mr. Flynn. Even then, Mr. Van Grack did not provide the texts to the defense to honor his *Brady* obligation or this Court's order. Rather, he produced them only after they had been exposed publicly by others. The government is still suppressing crucial evidence.

Mr. Van Grack "produced" the first batch on March 13, 2018, by link to texts already released to the public by the Senate Judiciary Committee. He produced the second batch on June 24, 2018, by link to the "Scribd account" of reporter Peter Hasson. Those cannot even be downloaded. And for his third production, it gave the defense two pages on October 4, 2018. These go precisely to the issue of McCabe's Special Counsel Lisa Page editing the Flynn 302. Ex. 2.

The government still hides countless damaging texts—exculpatory and material to Mr. Flynn—that our independent work only recently uncovered. These were reported by CNN but have not been produced. These demonstrate violations of *Brady* and this Court's order that go to the core of Mr. Flynn's claim of outrageous government misconduct and to his innocence.

### 1. "A Pretext to Interview Some People."

On January 10, 2017, Buzzfeed and CNN broke the news of the "Steele dossier" on which (it was later revealed) the Carter Page FISA application was premised. MTC 7, 26, 24, 27.[5] Then-

---

[5] It was only much later the defense learned what the FBI already knew: This document had been bought and paid for by the Clinton campaign and the DNC. Both the FBI and Fusion GPS hired former British spy Christopher Steele. Fusion GPS was on the Clinton payroll, and it also hired Nellie Ohr—a Russia specialist with CIA ties whose husband Bruce was the fourth highest-ranking official in DOJ. Ms. Ohr was researching Mr. Flynn also, and his name appears twice in the "Steele dossier." Ms. Ohr and Steele funneled their "work" through Bruce Ohr in a back-channel to the FBI, long after the FBI fired Steele for lying. Ex. 7; MTC 25, 26, 28. Bruce Ohr also brought future Special Counsel members Andrew Weissmann and Zainab Ahmad into his

Director Comey had briefed the President-Elect about these "salacious and unverified" allegations on January 6, 2017, a day after meeting in the Oval Office with President Obama, Vice-President Biden, Acting Attorney General Sally Yates, Susan Rice, James Clapper, and John Brennan. Ex. 3.

As news of the "salacious and unverified" allegations of the "Steele dossier" dominated the media, Strzok wrote to Page: ***"Sitting with Bill watching CNN. A TON more out. . . We're discussing whether, now that this is out, we can use it as a pretext to go interview some people."*** The government has not produced this text and others around it, in a stunning violation of *Brady* and this Court's order. Ex. 4.

### 2. "Many Meetings" to Strategize the Interview of Flynn

In the next two weeks, there were "many meetings" between Strzok and McCabe to discuss "whether to interview [] National Security Advisor Michael Flynn and if so, what interview strategies to use." Ex. 5.

January 23, the day before the interview, the upper echelon of the FBI met to orchestrate it all. Deputy Director McCabe, General Counsel James Baker, ███████, Lisa Page, Strzok, David Bowdich, Trish Anderson, and Jen Boone strategized to talk with Mr. Flynn in such a way as to keep from alerting him from understanding that he was being interviewed in a criminal investigation of which he was the target. Ex.12. Knowing they had no basis for an investigation,[6] they deliberately decided not to notify DOJ for fear DOJ officials would follow protocol and notify White House Counsel. They decided not to tell Flynn their true purpose nor give him 1001

---

back-channel communications with the FBI, DOJ, and Christopher Steele. Bruce Ohr Testimony to Congress, Aug. 28, 2018, https://tinyurl.com/yxcujccg.

[6] ███████████████████████████████████████
Ex.6.

warnings, so as to keep him "relaxed." They planned not to show him the transcript of his calls to refresh his recollection, nor confront him directly if he did not remember. In short, they planned to deceive him about the entire scenario, and keep him "unguarded." Exs. 5, 6; MTC 34.

### 3. "Off the Rails"

They knew what they were doing was wrong. Lisa Page wrote: *"I can feel my heart beating harder, I'm so stressed about all the ways THIS has the potential to go fully off the rails."* Strzok replied: "*I know. I just talked with* ████*, we're getting together as soon as I get in to finish that write up for Andy [McCabe] this morning. I reminded* ████ *about how I told Bill [Priestap] and the entire group that we should wait 30 to 60 days after the inauguration to change how we were managing this stuff. As it is, he went ahead, and everything is completely falling off the rails. I think our stuff is good on our cases, but I have no hope or understanding about what they're doing on Jen [Boone's] side of the house.*" Ex. 2.

The next day, at Comey's direction to "screw it" in contravention of longstanding DOJ protocols,[7] McCabe personally called Flynn to pave the way for the uncounseled conversation. They used their "pretext" to circumvent DOJ and ambush interview Mr. Flynn in the White House.

---

[7] The government did not disclose this to Mr. Flynn until *after* Mr. Comey bragged about his breach on national television—*not* because Mr. Van Grack was complying with this Court's order. This short video (https://www.youtube.com/watch?v=NxNhjFrjXqI) reveals Mr. Comey's deliberate disregard for DOJ and FBI rules. In fact, Mr. Van Grack only disclosed a bland summary *four days after* Comey gloated about it on national television to a laughing audience—four days *before* Mr. Flynn's scheduled sentencing, and because this Court entered its minute order of December 12, 2017. Dkt. 10. Mr. Flynn seeks disclosure of the full report of Mr. Comey's conduct, any memos, notes, and 302s documenting his decision, which was admittedly the subject of "many intensive discussions" within the FBI. There must be at least notes of several others, including Comey's Special Assistant Mr. Campbell, that document the efforts directed against Mr. Flynn. Ex. 8; MTC 4, 12-14.

As summarized by Inspector General Horowitz: "We have previously faulted Comey for acting unilaterally and inconsistent with Department policy. Comey's unauthorized disclosure of sensitive law enforcement information about the Flynn investigation merits similar criticism. **In a**

**4. The Plan Worked: Mr. Flynn was "Relaxed," "Jocular," and "Unguarded."**

Strzok admitted Flynn was alone, "relaxed and jocular," "unguarded," and saw the two agents as "allies." Flynn gave them a tour. He talked about hotels they stayed in during the campaign and the President's "knack for interior design," and the long hours of the job. He complained about politics, but he "always seemed to work his way to the subject of terrorism." Exs. 5, 6. Of course, the FBI had already read the transcripts of his phone calls, and the agents knew there was no criminal intent or any crime in his conversations.

This and Strzok's admissions make clear that Comey and McCabe were executing their own agenda—not investigating a crime. This is why, in *Brady* evidence still suppressed, Deputy Attorney General Sally Yates candidly opined that the interview "was problematic" and "it was not always clear what the FBI was doing to investigate Flynn."[8] This is also why Strzok admitted that Yates "was not happy" to learn of the interview and PDAG Axelrod argued with FBI General Counsel James Baker about the FBI's unilateral decision to interview Flynn. Ex. 6.

---

**country built on the rule of law, it is of utmost importance that all FBI employees adhere to Department and FBI policies, particularly when confronted by what appear to be extraordinary circumstances or compelling personal convictions**. Comey had several other lawful options available to him to advocate for the appointment of a Special Counsel, which he told us was his goal in making the disclosure. What was not permitted was the unauthorized disclosure of sensitive investigative information, obtained during the course of FBI employment, in order to achieve a personally desired outcome." Office of the Inspector General, U.S. Dept. of Justice, *Report of Investigation of Former Federal Bureau of Investigation Director James Comey's Disclosure of Sensitive Investigative Information and Handling of Certain Memoranda*, 61, (29 Aug. 2019), olg.justice.gov/reports/2019/o1902.pdf. By so doing, "Comey set a dangerous example for the over 35,000 current FBI employees—and the many thousands more former FBI employees—who similarly have access to or knowledge of non-public information.". *Id.* at 60 (emphasis added).

[8] The prosecutors disclosed a seven-line summary of Ms. Yates statement six months after Mr. Flynn's plea. Obviously, the Department of Justice knew this around the time of the interview. The same is true for PDAG Axelrod. MTC 2, 9, 18, 19.

### 5. Reporting Back: Flynn's "Demeanor Was Sure."
### He Was Telling the Truth or Believed He Was Telling the Truth.

The agents returned from interviewing Mr. Flynn, describing their excitement over it, and with a belief contrary to what they expected, that he had been honest with them.   After the interview, they briefed it three times.   Strzok texted Page: *"Describe the feeling, nervousness, excitement knowing we had just heard him denying it all.  Knowing we'd have to pivot into asking. Puzzle round and round about it.  Talk about the funny details.  Remember what I said that made Andy laugh and ask if he really said that."*

Strzok urged: *"Also have some faith in* ███ *and my assessment.  . . . I'm finding it hard to go out on a counterintuitive yet strongly felt ledge with so many competent voices expressing what I feel too:  bullsh\*t – that doesn't make sense. [] I made some joke about what F said. Something patriotic or military.*"

Page responded: *"It was clear that you both walked in and felt very strongly, so that obviously counts for something. [] You made a joke about a military band.*" Ex. 2.  The agents did three briefings the day of the interview.  They reported he had a sure demeanor, and he was telling the truth or believed he was—even though he did not remember it all.  Ex. 6.

Not long after, the FBI and DOJ wrote an internal memo dated January 30, 2017, exonerating Mr. Flynn of acting as an "agent of Russia;" and, they all knew there was no Logan Act violation.   The government owes Mr. Flynn the full versions of these exculpatory statements. MTC 9, 18, 19, 26.  He has been smeared as being an agent of a foreign government for several years now.

### 6. Agents Manipulate the Flynn 302.

On February 10, 2017, the news broke—attributed to "senior intelligence officials"—that Mr. Flynn had discussed sanctions with Ambassador Kislyak, contrary to what Vice President

Pence had said on television previously.  Overnight, the most important substantive changes were made to the Flynn 302.  Those changes added an unequivocal statement that "FLYNN stated he did not"—in response to whether Mr. Flynn had asked Kislyak to vote in a certain manner or slow down the UN vote.  This is a deceptive manipulation because, as the notes of the agents show, Mr. Flynn was not even sure he had spoken to Russia/Kislyak on this issue.  He had talked to dozens of countries.  Exs. 9, 10, 11.

Second, they added: "or if KISLYAK described any Russian response to a request by FLYNN."  That question and answer do not appear in the notes, yet it was made into a criminal offense.  The typed version of the highly unusual "deliberative" 302 by that date already included an entire section from whole cloth that also serves as a criminal charge in the Information and purported factual basis regarding "Russia's response" to any request by Flynn.  The draft also shows that the agents moved a sentence to make it seem to be an answer to a question it was not. Exs. 9, 10, 11.

Flynn resigned and left the White House on February 13, 2017.  Ex. 1.

**7. February 14: "Launch f 302."**

The next day, Valentine's Day, Strzok texted:  "*Also, is Andy good with F 302*?"  Page replied:  "*Launch f302*."

The same day, David Laufman in the National Security Division of DOJ, with whom they also worked, personally called Covington & Burling to pressure them to file the FARA registration form for Flynn Intel Group. Ex. 1. MTC 39.[9]

---

[9] Mr. Kelner and two more Covington lawyers even had an extensive meeting with six members of the FARA section including Heather Hunt, David Laufman, ▇▇▇▇▇ and others to decide how to write the registration and review a draft, and they had a follow-up call with them.  Kelner had never seen the FARA section "this engaged." Dkt. 98.

Also, the same day, Strzok and Page discussed the Bureau's leak to the press regarding a *New York Times* article describing the FBI's interview of Mr. Flynn.  Again, the government has withheld these texts in contempt of this Court's order and *Brady:*

> Strzok:  "*Bottom line Mike [Kortan] ran through the boss' thinking/timeline/narrative of this.  Bunch of additional detail [*redacted*] has etc.*"
>
> Page:  "*Did you mention my attendance to kortan [Mike]*?"
>
> Strzok:  "*Not to Mike, he had left.  The guys left seemed to think no, said Mike was going to talk to you.*"

Another message refers to cooperation and "*access*" but they do not name the outlet.

"*Going to be very apparent we cooperated and gave access A LOT for an article that I think is going to be very negative.  Bad enough for negative press.  Far worse to chose* [sic] *to*" Ex. 4.

### 8. The Media Leak Strategy with DOJ.

April 20, 2017, Strzok texts Page:  "*I had literally just gone to find this phone to tell you I want to talk to you about media leak strategy with DOJ before you go.*" Ex. 2.

### 9. The FBI Opens Obstruction Case on President Trump and "Locks In" Case on "Flynn?"

On May 9, 2017, the day Comey was fired, Strzok texted:  "*We need to open the case we've been waiting on now while Andy is acting.*" Ex. 2.

On May 10, McCabe opened the "obstruction" investigation of President Trump as suggested by Comey's memo of February 14. Ex. 1.

Also on May 10, in an important but still wrongly redacted text, Strzok says:  "*We need to lock in [*redacted*].  In a formal chargeable way.  Soon.*"  Page replies:  "*I agree.  I've been pushing and I'll reemphasize with Bill [Priestap].*" Ex. 2. Both from the space of the redaction, its timing, and other events, the defense strongly suspects the redacted name is **Flynn**.  But, whether it is

Flynn or someone else, it shows the extraordinary deliberation of specific (and now mostly fired) elements of the FBI to "target" certain people in their pretextual investigation—antithetical to the Rule of Law.

Mr. Mueller was named Special Counsel on May 17, and the Flynn 302 was reentered on May 31, 2017, for Special Counsel Mueller to use. The government has refused to produce unredacted text messages for this crucial time.

Mr. Flynn made critical decisions based on a belief that none of this evidence existed. He was placed on a path to cooperate with the government, work out a deal, and meet with Special Counsel for days—all under false pretenses.  Then after he was compelled by multiple circumstances to agree to plead, the government made a deliberately misleading revelation at the eleventh hour in a self-serving attempt to avoid the outcry and ramifications of the imminent media explosion of damning truths.[10]  The government continues to hide evidence of the original 302, other exculpatory texts, and other forms of information completely. By its incomplete and trivialized disclosure, the government effectively "represented to the defense that the [real and egregious] evidence does not exist" and caused it "to make . . . decisions on the basis of this assumption." *Bagley*, 473 U.S. at 682-83; s*ee also, United States v. Ferrara*, 456 F.3d 278, 293

---

[10] Not only did Mr. Van Grack not disclose a single text message before Mr. Flynn agreed to plead guilty, but Special Counsel apparently managed to control the press on the issue until the plea was entered on December 1, 2017, in Judge Contreras's court.  It defies credulity to suggest that it was only *unlucky* for Mr. Flynn that the story broke the very next day. Part of the evidence we request includes communications between the press and SCO, which will likely establish that Special Counsel intensified pressure on Mr. Flynn to plead immediately while it was pressuring the press not to explode the truth that destroyed the entire case.  Karoun Demirjian, *Top FBI official assigned to Mueller's Russia probe said to have been removed after sending anti-Trump texts*, THE WASH. POST (Dec. 2, 2017), https://www.washingtonpost.com/world/national-security/two-senior-fbi-officials-on-clinton-trump-probes-exchanged-politically-charged-texts-disparaging-trump/2017/12/02/9846421c-d707-11e7-a986-d0a9770d9a3e_story.html; MTC 11; Ex. 13.

n.11 (1st Cir. 2006) ("When the government responds incompletely to a discovery obligation, that response not only deprives the defendant of the missing evidence but also has the effect of misrepresenting the nonexistence of that evidence.").

## B. The FBI Knew Its Entire Investigation of Flynn Was A Pretext.

The FBI had no factual or legal basis for a criminal investigation, nor did they have a valid basis for a counter-intelligence investigation against an American citizen, and they all knew it.[11] Exs. 5, 6. The evidence the defense requests will eviscerate any factual basis for the plea and reveal conduct so outrageous—if there is not enough already—to mandate dismissal of this prosecution for egregious government misconduct.

The government's assertion that Mr. Flynn "is not charged with being an agent of Russia and the government has never alleged in this case that he was an agent of Russia" is false. Dkt. 122. That was the FBI's public pretext for investigating Mr. Flynn—although the agents did not inform Mr. Flynn they were actually "investigating" him for anything. MTC 23. Obviously, *someone* in DOJ understood Mr. Flynn was accused of being a Russian agent, because there is an internal document dated January 30, 2017, exonerating Mr. Flynn. Having been publicly and falsely accused of treason and being a "foreign agent," assertions which also misled this Court, Mr. Flynn is entitled to all documentation that exonerates him. The accusations were a stake

---

[11] Under federal law, to establish that an American is acting as an agent of a foreign power, the government must show that the American is purposefully engaging in clandestine activities on behalf of a foreign power, and that it is probable that these activities violate federal criminal law. *See* FISA, Title 50, U.S. Code, Section 1801(b)(2). Mr. Comey and Mr. McCabe publicly admitted that in the summer of 2016, they took it upon themselves to single out four individuals associated with the Trump campaign for investigation. Admittedly, the FBI had no evidence that any of the four had committed a crime—much less that they "knowingly engage[d] in clandestine intelligence gathering activities for or on behalf of a foreign power." *Id; see* Ex. 3.

through the heart of a thirty-three-year Army veteran who wrote a blank check on his life for five

years in active combat in devotion to our country.[12]

   The Mueller Report established that there was no conspiracy between anyone in the Trump

campaign and Russia.  It is also apparent now, or will be upon the release of the FISA report of

the Inspector General, that the FBI and DOJ had no legal basis to obtain a FISA warrant against

Carter Page or to investigate Mr. Flynn.[13]  Yet, the government wants us to accept its word that

---

[12] Mr. McCabe pointed to Mr. Flynn's "very public interactions with Vladimir Putin and other Russians." These "interactions" seem to have arisen from the work of CIA/FBI operatives Stefan Halper and Joseph Mifsud, and bookings made by Mr. Flynn's American speakers' bureau, Leading Authorities (which books engagements for countless former government officials and prominent people).  Leading Authorities booked him for three events with "Russian connections": one in Moscow for RT and two in Washington.  All were well attended by prominent persons from around the world because of the important issues discussed and the presence of other recognized experts on the programs. *See* Ex. 14; MTC 4, 16.

Mifsud was present at the RT dinner in Moscow, and it is his cell phones recently obtained by the government that are expected to confirm that he was working for "western intelligence."  Dkt. 124.

Stefan Halper is a known long-time operative for the CIA/FBI.  He was paid exorbitant sums by the FBI/CIA/DOD through the Department of Defense Department's Office of Net Assessment in 2016.  His tasks seem to have included slandering Mr. Flynn with accusations of having an affair with a young professor (a British national of Russian descent) Flynn met at an official dinner at Cambridge University when he was head of DIA in 2014.  Flynn has requested the records of Col. James Baker because he was Halper's "handler" in the Office of Net Assessment in the Pentagon, and ONA Director Baker regularly lunched with *Washington Post* Reporter David Ignatius.  Baker is believed to be the person who illegally leaked the transcript of Mr. Flynn's calls to Ignatius.  The defense has requested the phone records of James Clapper to confirm his contacts with Washington Post reporter Ignatius—especially on January 10, 2017, when Clapper told Ignatius in words to the effect of "take the kill shot on Flynn."  It cannot escape mention that the press has long had transcripts of the Kislyak calls that the government has denied to the defense. MTC 34, 35, 37.

[13] The government's *Brady* violations have suppressed evidence of Fourth Amendment defenses Mr. Flynn was entitled to pursue, especially if that evidence also shows government misconduct. Information was obtained against Mr. Flynn either through the illegal FISA warrant on Carter Page, baseless National Security Letters, an undisclosed FISA warrant, or the abuses of the NSA database documented in the heavily redacted opinion of Judge Rosemary Collyer (https://www.dni.gov/files/documents/icotr/51117/2016_

the defense has everything to which it is entitled.  Fortunately *Brady* exists to protect the accused "from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations."  *Kyles v. Whitley*, 514 U.S. 419, 440 (1995).

While Flynn was cooperating extensively on all issues the Special Counsel wanted to address, the government has trickled out productions over the last year that reveal many things. Ex. 15. Some of the most notable include : (i) the original notes of the agents differ materially from the 302s; (ii) there were material alterations to the 302s to set up the "false statements," and (iii) the government has extensive reports of Mr. Flynn's briefings and debriefings on all his foreign contacts—including his Russia trip and his meeting with Turkish officials—giving lie yet again to the public pretext of the FBI "investigation" of Mr. Flynn.  Further, what is still a heavily redacted 302 for former Agent Strzok, since January 2017, the government knew, but still has not disclosed the full statements and notes that show Deputy Attorney General Sally Yates said the interview of Mr. Flynn was "problematic," and she was "unclear" why the FBI was investigating or interviewing Mr. Flynn at all.

Neither Mr. Flynn nor his former counsel had any of these documents or knowledge of the plethora of information discussed above when Mr. Flynn entered his plea.  However, one of the government's chief arguments is that because Mr. Flynn was represented by counsel (Covington & Burling) at all stages of the proceedings, and because counsel was present at all interviews and other critical events including his plea and concomitant *Brady* waiver, that either excuses the government's failures or renders his waiver of them conclusive.

---

Cert_FISC_Memo_Opin_Order_Apr_2017.pdf), and the more recent decision of Judge Boasberg (https://www.intelligence.gov/assets/documents/702%20Documents/declassified/2018_Cert_FISC_Opin_18Oct18.pdf).

The government fails to acknowledge, however, that Covington & Burling was the very firm that Mr. Flynn paid more than $1 million to investigate, prepare, and then defend the FARA registration in response to NSD/FARA section's and David Laufman's demands. *See* n.9 *supra*. By August 2017, when the government threatened Mr. Flynn with criminal charges related to the same FARA registration, former counsel were immediately caught in the vice of an intractable conflict of interest that they never escaped until Flynn engaged new counsel. By no later than August 2017, the conflict between Mr. Flynn and his former lawyers was non-consentable and not subject to waiver. Even *if* Mr. Flynn had been fully informed in writing of the conflict at that time, the lawyers were obligated to withdraw from the representation without regard to his wishes.[14]

Some conflicts of interest are so likely to interfere with the effectiveness of counsel, and so destructive of the fairness of the proceeding, that courts must prophylactically *override* a defendant's proffered waiver of the right to conflict-free counsel. *Wheat v. United States,* 486 U.S. 153, 162 (1988) ("[W]here a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that defendants be separately represented."). In other words, conflicts of interest that are non-consentable according to professional norms are also not subject to waiver by a criminal defendant under the Sixth Amendment.

"Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who

---

[14] According to D.C. Rule of Professional Conduct 1.7(c)(2), conflicted representation may not commence or continue unless the affected client provides informed consent, after full disclosure of the possible adverse consequences "and the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client." Comment [7] to this Rule ensures that the words are taken seriously: the client can be asked to weigh in and judge its own interests only after the lawyer has become "satisfied that the representation can be wholeheartedly and zealously undertaken."

observe them." *Id.* at 160.  Although in another case, a court could have remedied this, *this* Court had no way of learning the extent of the conflict.  That difficulty lies, in part, at the government's door.  After *Wheat*, it is open to *the government* to bring such matters to the attention of the court, because public rights are also at stake.  Here, the government sat back and harvested a guilty plea.

## C. *Brady* Requires the Government to Produce Exculpatory Evidence in Time for the Defense to Use It.

For almost six decades the Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  A *Brady* violation "has three components: "[1] The evidence at issue must be favorable to the accused . . .; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *United States v. Pasha*, 797 F.3d 1122, 1133 (D.C. Cir. 2015) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

*Brady*'s mandate is central to due process and crucial to ensure that prosecutors fulfill their obligation to seek justice rather than convictions.  The rule of *Brady* does so "[b]y requiring the prosecutor to assist the defense in making its case," and in that respect "the *Brady* rule represents a limited departure from a pure adversary model." *Bagley*, 473 U.S. at 675 n.6.  Most fundamentally, *Brady* is enforced "to ensure that a miscarriage of justice does not occur." *Id.* at 675. By claiming "conspiracy theories" and "fishing expeditions," the government engages in "label-lynching" to avoid addressing the facts, its misconduct, and the law.[15]  But the government is bound to see that "justice shall be done." *United States v. Berger*, 295 U.S. 78, 88 (1935)

---

[15] The government relies on out of Circuit cases that provide more support for the defense than for the prosecution.  The government cites *United States v. Caro-Muniz*, 406 F.3d 22, 29 (1st Cir.

This Circuit holds that exculpatory and impeaching evidence must be disclosed in time for a defendant to use in preparing his defense.  In *Pasha*, the court slammed the government for suppressing important exculpatory evidence from a witness for eight months, until the eve of trial. 797 F.3d at 1133.   The appellate court agreed with the district court that this delay was

2005), for the proposition that "*Brady* does not permit a defendant to conduct an *in camera* fishing expedition through the government's files." Mr. Flynn agrees with this unexceptional point of law, and *Caro-Muniz* is an excellent case to underscore why his request is far from what courts consider fishing expeditions. In *Caro-Muniz*, the FBI sent an undercover informant to talk with the defendant multiple times before indicting him on charges of bribery. There were 140 tape recordings and the government disclosed 71 prior to trial.  The defendant moved for the production of the rest of the tapes "on the basis that they might contain exculpatory or impeachment evidence." *Id.* at 28.

Without any further showing, the trial court tasked an FBI agent to listen to all the tapes to make sure "the [defendant's] voice [wa]s not heard in any of them and nor is he or anyone related to the facts of this case mentioned in these recordings."  After that review, the court ordered the production of "three recordings where [the defendant's] voice could be heard, six additional recordings that were directly or indirectly related to the [] investigation, and transcripts of eight recordings that were not directly or indirectly related to the investigation." *Id.*

As a last-ditch effort, the defendant requested more tapes on appeal, which is when the First Circuit *affirmed* the lower court's production order, but denied the defendant's request for even more tapes because he "presented neither a theory regarding the existence of potentially exculpatory evidence on the tapes, nor has he made any showing that the tapes would be of substantial assistance to his defense." *Id.* By the First Circuit's standard, Mr. Flynn is entitled to all *Brady* material he has listed. Mr. Flynn has shown ways this material would have been of substantial assistance to him in defeating the government's allegations.  It is also relevant to the motion to dismiss he expects to file.

Similarly, the government quotes *Kasi v. Angelone*, 300 F.3d 487 (4th Cir. 2002), for the proposition that "the *Brady* right to obtain exculpatory evidence [does not] equate to a right to rummage through government files" but, again, in that case, the Fourth Circuit noted that the defendant "concedes that he cannot point a specific identifiable piece of evidence that may have been favorable or in any way material to his guilt or innocence" and that he had not "giv[en] a clue" as to what evidence would be useful to him.  Mr. Flynn has specifically identified the evidence he requests and how it relates to his case.

19

"inexcusable," for the Government should have understood as soon as they were finished talking with that gentleman they had an obligation to give that information to the defense."  *Id.*[16]

Mr. Flynn was entitled to all the *Brady* evidence in the government's possession well before November 2017. The D.c. district court's decision in *United States v. Quinn* underscores *Bagley*'s rule that both late and *incomplete* disclosures are tantamount to suppression of evidence and violate a defendant's due process rights. 537 F. Supp. 2d 99 (D.D.C. 2008).[17] The court studied the government's limited disclosure and concluded "the government had no excuse for withholding this information from [the defendant], and its decision to do so violates its *Brady* duty of disclosure." *Id.* at 112 (citing a S.D.N.Y. case where the court dismissed because the government "failed to inform the defense until a week before trial that it would not be calling a witness whose credibility was now in doubt by the government").  Many high-profile cases make

---

[16] The *Pasha* court footnoted the district court's chastisement of the prosecutors, wherein the district court noted that "failure to comply with *Brady* obligations had more than once been a problem in this case."  797 F.3d at n.8. The district court also noted: "What is particularly troubling is that this is the second time in this case that the Government has withheld significant *Brady* information for an extended period of time. When is the Government going to learn?" *Id.* Apparently not by January 2017, despite the district court's decision nine years earlier.

[17] In *Quinn*, the government did not disclose to the defendant that its chief witness was almost certainly lying about the defendant's conduct, *Quinn*, 537 F.Supp. at 105, and instead only announced—after trial began—that it no longer planned to call the witness.  *Id.*  The court held that "the government must disclose *Brady* information at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case." *Id.* at 108.

Although the government claimed that it did not know with absolute certainty that its star witness had lied, the *Quinn* court held that this "constituted a breach of the government's duty to search for *Brady*" *id.* at 110 [quotations omitted], and the defendant "was misled and left with the incorrect perception that he alone doubted [the witness's] credibility." *Id.* at 109.

clear that the government will not learn until prosecutions are dismissed and it is held to the highest standard of accountability.[18]

The government dismisses its duty to produce impeachment evidence in a single sentence, claiming the Supreme Court has held its *Brady* obligation "does not extend to impeachment evidence." *United States v. Ruiz*, 536 U.S. 622 (2002); Gov. Reply Brief, 7, Oct. 1, 2019.  But *Ruiz* did not overrule *Giglio v. United States,* 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within the general rule [of *Brady*.]"), and *Bagley*, 473 U.S. at 676-77 (stating emphatically "[t]his Court has rejected any such distinction between impeachment evidence and exculpatory evidence").  Both hold that impeachment evidence is encompassed within *Brady*, and no court has held that *Ruiz* radically altered the *Brady/Giglio* landscape.  Rather, *Ruiz* focused on the voluntariness of the plea, and there was not even an allegation that any information was withheld.

This Circuit applies the *Giglio* and *Bagley* standard that "'impeachment evidence . . . as well as exculpatory evidence falls within the *Brady* rule.'"  *In re Sealed Case No. 99-3096 (Brady Obligation*s), 185 F.3d 887, 892 (D.C. Cir. 1999) (quoting *Bagley*, 473 U.S. at 676).  This is because "evidence that impeaches the [government's witnesses] is almost invariably 'favorable' to the accused, because by making the government's case less credible it enhances the defendant's" case.  185 F.3d at 893.  When impeachment evidence is exculpatory, as noted in *Giglio* and *Bagley*, it is *Brady* like any other.  *McCann v. Mangialardi*, 337 F.3d 782, 787 (7th Cir. 2003).  The

---

[18] *In re Contempt Finding in United States v. Stevens*, 744 F. Supp. 2d 253 (D.D.C. 2010) (aff'd by *United States v. Stevens*, 663 F.3d 1270 (D.C. Cir. 2011); *United States v. Kohring*, 647 F.3d 895 (9th Cir. 2011); *United States v. Kott*, 423 Fed. Appx. 736 (9th Cir. 2011); *United States v. Brown*, 459 F.3d 509 (5th Cir. 2006).

government cannot be the "architect of a proceeding that does not comport with standards of justice." *Brady*, 373 U.S. at 88.

The government views the charges against Mr. Flynn in a vacuum, arguing "[w]hether or not the FBI or DOJ contacted members of the White House before the defendant's January 24 interview has no bearing on whether the defendant lied to the agents during the interview." Dkt. 122 at 16. But, circumstances that brought about his improper interview, the conduct and credibility of the agents who interviewed him, and the broader landscape that precipitated this unjust prosecution are all relevant to Mr. Flynn's alleged guilt. Here, the conduct of the government is "so outrageous that due process principles would absolutely bar the government from invoking the judicial process to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973). Indeed, this entire investigation and prosecution is so fundamentally unfair as to be "shocking to the universal sense of justice." *Id*. at 432.

**D. Full, Actual, Unredacted Documents, The Original 302, Drafts Prior to February 10, 2019, and the 1A File and Subfiles Must be Produced Pursuant to *Brady*.**

The only basis for the allegations against Mr. Flynn depends on the agents' characterizations of his statements to them in January 24, 2017, in the ambush interview. Yet, their own notes contradict the 302, fail to support it at all in other ways, do not support the factual basis for the plea, and cannot serve as evidence of any crime. Mr. Strzok's "notes" appear that they were not taken contemporaneously with the interview, which only creates more suspicion. Both sets of notes are redacted, but neither redacted documents nor summaries can substitute for the actual, full documents—especially in this case. Summaries are not evidence at all, and as this Court has warned, "they are opportunities for mistake and mischief." Tr. of Mot. Hr'g 9, *United States v. Stevens,* No. 08-231 (D.D.C. Apr. 7, 2009); Flynn Br. in Supp. of Mot. to Compel Production, Dkt. 109 at 16.

Inexplicably, the government asserts: "both interviewing agents have been clear, since the beginning and in their documentation, that the defendant made false statements to them on January 24, 2017, about multiple topics."  But the government has no cite for this claim, nor does the defense have one. To the contrary, Mr. Flynn was honest with the agents to the best of his recollection at the time, and the agents knew it.  The belatedly-disclosed Strzok-Page texts make clear that the agents left the interview with a firm conviction Mr. Flynn was being honest, and they maintained that conviction despite strong expressions of disbelief and cries of "bullshit" from their colleagues.  Ex. 2.  Nonetheless, for whatever reason, the agents did not record all Mr. Flynn's responses, nor did they record them all correctly in their notes, and the ultimate 302 and prosecution are even more questionable.  Exs. 9, 10, 11.

The evidence the defense requests, if produced, would defeat the factual basis for the plea.[19] The original 302 is crucial to this as are the original notes.  The government elides the truth that the FBI has it and any other drafts prior to February 10, 2017.  The FBI can retrieve it from its

---

[19] This is one of the many reasons no one should be prosecuted for a violation of 18 USC 1001 unless the statement has been recorded.  Every law enforcement officer has that ability on his phone.  Sidney Powell & Harvey Silverglate, *Conviction Machine* (Encounter Books 2020). Everyone knows a simple difference in tone can completely change the meaning of a sentence.

Note that the criminal referral of former Deputy Director McCabe is predicated on several recorded interviews, under oath, with full knowledge of the purpose of the proceedings and an opportunity to correct any misstatements. After initially lying to James Comey by claiming or leading the then-Director to believe that "McCabe had not authorized the disclosure [to the media] and did not know who did," the INSD of the FBI interviewed him under oath where he again claimed "he had not authorized the disclosure to the WSJ and did not know who did." Several months later, under oath to the OIG—in a recorded interview—he swore that he was unaware  his own Special Counsel Lisa Page was authorized to speak to the media on the issue or where she was at that time, and finally some four months after that, McCabe lied under oath about having lied under oath in all the previous incidents. The OIG determined McCabe authorized the leak to the WSJ via his Special Counsel "to advance his personal interests at the expense of Department leadership," and referred his case for prosecution. Office of the Inspector General, U.S. Dept. of Justice, *A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe*, Feb. 2018.

Sentinel system that logs and serializes the drafts, or the FBI can retrieve it from the file or sub-file in which it is buried.  Neither the FBI nor its Sentinel system loses the most important of its reports that is supposed to support the federal felony of the President's National Security Advisor. The only reason for it to be suppressed is that it is favorable to the defense.  If the agents recorded in the original 302 their impressions that Flynn was being truthful, had "a sure demeanor," and "showed no signs of deception," and that was edited out, it is "game over" for the government. Tellingly, Mr. Van Grack has chosen his words carefully, and he has not denied an original 302 exists.

This was the most important interview the FBI did—carefully orchestrated by the Director and Deputy Director after many internal discussions, and extensive meeting of the upper crust of the FBI for no valid purpose. [20]   The original 302 is not "missing."  If the government will not produce it, it could only have been deliberately destroyed, and this prosecution should be dismissed on that basis alone.  *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1992) (holding that the district court properly dismissed the indictment due to the government's destruction of evidence by relying on the test articulated by the Supreme Court in *California v. Trombetta*, 467 U.S. 479, 489 (1984) and *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

**1. Agent Strzok's notes do not appear to have been taken contemporaneously during the interview.**

---

[20] The FBI knew that its questions had nothing to do with "Russian interference" in the election. Indeed, it had nothing to do with the election at all.  As recently apparent from the Report of the Inspector General, this was Comey and McCabe's personally motivated operation in defiance of all protocols and procedures—deliberately circumventing DOJ. Office of the Inspector General, U.S. Dept. of Justice, *Report of Investigation of Former FBI Director James Comey's Disclosure of Sensitive Investigative Information and Handling of Certain Memoranda*, August 2019. The government is also required to produce these statements under Fed. R. Crim. P. 16(a)(B)(i).

Only the junior agent was taking notes during the interview. Strzok's 302 of July 2017 says that he was handling the interview and his partner was taking notes.  A 302 is to be written into Sentinel within five days.  Notes are to be signed and dated by the notetaker.  Inexplicably, we have two sets of notes with significant redactions—neither of which is signed and dated as required.  Exs. 9, 10.  Agent Strzok's notes are far more detailed, lengthy, and written in a way that would not appear to be physically possible to write in a contemporaneous, casual setting. Ex. 10. The defense requests production of the actual, original notes, and handwriting samples of Strzok of contemporaneous and non-contemporaneous notes to evaluate another anomaly that further calls into question the entire effort by the FBI to manipulate and set up Mr. Flynn, and its report of that interview.  Ex. 16.

### 2. The 302 statement that Mr. Flynn was told the "nature of the interview" is false.

As discussed *supra*, the government is suppressing evidence of notes, reports, or recordings of the significant meeting the upper echelon of the FBI held to orchestrate the agents' ambush of Mr. Flynn so as to keep him "relaxed."  They purposely did not tell him they were investigating him and strategized at length to avoid raising any concerns. Ex. 6 ("Flynn was unguarded and clearly saw the FBI agents as allies.").

### 3. Mr. Van Grack's Productions of Flynn 302s Were Incomplete and Misleading.

But it gets worse.  When Mr. Van Grack made his first official production to former counsel of any actual documents (other than the (final) Flynn 302 produced on Nov. 22, 2017) on March 13, 2018—all of which should have been produced before Mr. Flynn pleaded guilty—Mr. Van Grack made it sound like there was only one 302:

Attachment I, which consists of two documents, is the interview report for the January 24, 2017, interview.  SSA [redacted] and DAD Strzok digitally signed and certified the report on two occasions.  They first digitally signed and certified the report in February 2017.  They later digitally re-signed and re-certified the report in order to

25

remove a header.  Specifically, the [sic] initially signed and certified the report, dated February 15, 2017 had mistakenly stated that it was a "DRAFT;" the documents are otherwise identical.

This is false.

On May 25, 2018, Mr. Van Grack dribbled out another production—again denying any obligation to do so under *Brady* or the Court's Standing Order.  This included a draft 302 dated February 10, 2017, as if it were the only other one.

That was also misleading.  After former counsel called Mr. Van Grack, on June 1, 2018, the government produced two more drafts of the 302—these dated February 11, 2017, and February 14, 2017.  Mr. Van Grack did not explain why all these intervening drafts were not produced in March, nor how they suddenly turned up, and there are material differences— especially from February 10 to February 11. Ex. 11.

Obviously, there are drafts of the 302, including an original draft in the files or subfiles of the Sentinel System of the FBI dating back to January 24, 2017, or so—the date of the actual interview of Mr. Flynn.  *Brady* requires the production of the original 302, all drafts, notes, recordings, statements, and all testimony of the two agents along with all participants in any of the meetings to plan the ambush of Mr. Flynn "to keep him relaxed."  If they are not there, then they were wrongfully destroyed.  Either way, the government must be held to account.

### 4. The Final 302 Falsely States that Mr. Flynn Remembered Making Four to Five Calls from the Dominican Republic When Both Sets of Notes State He Does Not Remember.

Notes by both agents state that Mr. Flynn does *not* remember making four to five calls to Ambassador Kislyak from the Dominican Republic, where he was on vacation, but that if he did so, it was because phone service was poor and he kept getting dropped.  "I don't remember making 4-5 calls. If I did lousy place to call."  The final 302 states the opposite: "Flynn remembered

making four to five calls that day about this issue, but that the Dominican Republic was a difficult place to make a call as he kept having connectivity issues." Ex. 11. This dramatically demonstrates the wrongheadedness of allowing a 302 to create a federal felony.

### 5. The Notes Provide No Support for a Chunk of the 302 That Purports to Provide a "Factual Basis" for the Plea.

Two out of four of the alleged false statements in the Statement of Offense are based on what the agents claim Mr. Flynn said or did not say about the response of the Russian Ambassador on two separate issues.[21]  Even if we assume the skimpy, vague, and ambiguous notes correctly represent anything the agents might claim, the notes provide no support for a question or an answer about the Russian Ambassador's response—either to the UN vote or the sanctions.  Exs. 9, 10.

### 6. Mr. Flynn's Statements Were Not Material.

At the conclusion of the December 18, 2018, hearing, this Court expressed concern about the factual basis for the plea on the issue of materiality, and rightfully so.  The government publicly asserted the "FBI had an open investigation into the Government of Russia's ('Russia') efforts to interfere in the 2016 presidential election, including the nature of any links between individuals associated with the Campaign and Russia, and whether there was any coordination between the Campaign and Russia's effort."  Statement of Offense, pg. 1.  However, the *Brady* material disclosed long after the plea and still undisclosed evidence shows that the agents asked him nothing relevant to "efforts to interfere in the 2016 election."  *Id.*  Likewise, nothing about his calls to Kislyak in late December 2016 as part of the transition into office had anything to do with

---

[21] "FLYNN also falsely stated that he did not remember a follow-up conversation in which the Russian Ambassador stated that Russia had chosen to moderate its response to those sanctions as a result of FLYNN's request." ¶3, Statement of Offense.  "FLYNN also falsely stated that the Russian Ambassador never described to him Russia's response to FLYNN's request regarding the resolution." ¶ 4, *Id.*

coordination between anyone in the campaign and Russia.  The agents did not ask even a single question about any coordination.

To the extent one can say the "interview" addressed "the nature of any links between any individuals associated with the campaign and Russia," all pretexts for the interview of Mr. Flynn are belied by evidence that the FBI knew exactly what Mr. Flynn had discussed with the Russian Ambassador on the issue of sanctions and the UN vote.  They asked no question related to election interference or coordination between the campaign and Russia, and policy discussions by the incoming National Security Advisor were none of the FBI's business.

Whatever Mr. Flynn said to anyone regarding the UN issues had nothing to do with the FBI's alleged "investigation" about the 2016 election and could not be the basis for false statements "material" to that issue.  According to the notes, he was not even sure he had spoken to Kislyak on that issue. Exs. 9, 10.

### 7. The Flynn 302 Is Discussed in the Page-Strzok Texts and Was Not Approved by McCabe Until the Day After Flynn Resigned from the White House.

Flynn resigned on February 13, 2017.  The next day, Strzok texts: "*Is Andy good with [Flynn] 302?*"  Page replies: "*Launch on f[lynn] 302.*"  It is no accident that McCabe himself approved the Flynn 302 the day after Mr. Flynn left the White House—three weeks after the interview and a prolonged "deliberative process" —which is not even appropriate for a 302.

### E. Classified Information Will Prove that Any Investigation of Mr. Flynn Was Pretextual.

#### 1. *Yunis* Mandates Disclosure of The Classified Information Requested as *Brady*.

The balancing test in *Yunis* only applies to classified information for which the government affirmatively asserts a valid privilege against production. *United States v. Yunis*, 867 F.2d 617 (D.C. Cir. 1989).  In its opposition to Mr. Flynn's Motion to Compel, the government does not assert a privilege against disclosure of information or even identify which information the defense

has requested is classified.  Accordingly, it should all be produced because either (i) *Yunis* does not apply unless information is classified, and most of the *Brady* evidence the defense requests is not classified; or (ii) the government has failed to assert a privilege.  *Id.* at 623 ("the requested discovery and the response of privilege trigger a further inquiry").  The privilege asserted in *Yunis* is the basic national security privilege and is analogous to the informant's privilege. It protects critical "intelligence sources and methods." *Id.* at 620.  There are no sources or methods to protect in this case.

The government cannot conceal its wrongdoing behind a claim of classification.   As President Obama made clear in Executive Order 13526, §1.7: "In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to: (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency."   *Yunis* is merely a final protection to make sure that classified information is properly requested, but once a showing has been made, the door opens to accommodate a defendant's constitutional rights.

### 2. The DIA Reports of Briefing and Debriefings Belie Any Basis to Investigate Mr. Flynn and Likely Further Undermine the Factual Basis for the Plea.

The defense is entitled to the reports the DIA has of all the work Mr. Flynn did for the Agency while the FBI was asserting he was a foreign agent. The government has long known that Mr. Flynn pre-briefed the DIA on his meeting with Turkish officials in New York in September 2016, yet it produced nothing until August 2019—again, when Mr. Van Grack learned it was being produced elsewhere.  This undercuts (i) the government's contention that he ever worked as an "agent of Turkey" in violation of 18 U.S.C. §951; (ii) the factual basis for his plea; and (iii) that he received any benefit from not being charged with a FARA-related violation. *See United States v. Rafiekian*, No. 1:18-cr-457-AJT-1 (E.D. Va. Sept. 24, 2019).

29

Similarly, even though the DIA briefings and debriefings Mr. Flynn has requested, and other information that has been redacted here and there, have been classified, *Yunis* does not prohibit their disclosure to Flynn. The requested information includes the government's records of Mr. Flynn's own statements—some of which supposedly form the basis for the charges against him, and *Yunis* itself makes clear he is entitled to those statements. *See Yunis*, 867 F.2d at 621 (noting that Fed. R. Crim. P. 16(a)(1)(A) entitles a defendant to his own relevant written recorded statements, and that production of such statements is "practically a matter of right"). *See also,* Fed. R. Crim. P. 16(a)(1)(B), which details a defendant's right to his written and recorded statements.

There is no doubt the DIA information is exculpatory. Senator Grassley has stated that it is exculpatory of Mr. Flynn, and it consists of his own statements and communications.[22] The DIA reports the defense requests will not only exonerate him of being any kind of foreign agent but evince that the FBI/DOD knew this all along. This information meets the standard for disclosure required by *Yunis*—even if the government invokes a privilege to exempt it. Ten people briefed Mr. Flynn before his trip to Russia—███████████████████████████████████

███████████████████████████████████████.

Simply put, the information the defense requests through its motion will reveal the investigation and prosecution were unprecedented in their motivation, tactics, and overreach.

**3. The Letter from Sir Mark Lyall Grant to the Incoming National Security Team Invalidates Any Use of Information from Christopher Steele, Further Undermines Any "Russia" Connection, and is Being Suppressed.**

---

[22] Letter of Sen. Charles Grassley to Deputy Attorney General Rod Rosenstein (June 6, 2019), https://tinyurl.com/y9jcg4ad.

Mr. Van Grack knows about this letter, and he questioned people about it. He may have seen it and have a copy of it. It was written by the United Kingdom's National Security Advisor, Sir Mark Lyall Grant, and hand-delivered January 12, 2017, from the British Consulate to the incoming National Security team in New York. It was not classified. Protocol dictates that it was also provided to the then active national security advisor—Susan Rice. This was two weeks before the pretextual interview of Mr. Flynn, and it eviscerates the credibility of Christopher Steele whose false and unverified assertions mention Mr. Flynn and were used by the FBI to obtain illegal FISA warrants that likely reached the communications of Mr. Flynn. It undermines the entire "Russia-collusion" fable that Comey, McCabe and others used to justify their unlawful conduct. Ex. 7. (two pages of Steele dossier). In fact, that letter alone should have mandated termination of the FISA warrant, which was wrongly renewed twice after the Grant letter was delivered—including once for the wrongful benefit of Special Counsel. Anything obtained as a result of that warrant would have to be suppressed and could not be used against Mr. Flynn.

## CONCLUSION

In its relentless pursuit of Mr. Flynn, the government became the architect of an injustice so egregious it is "repugnant to the American criminal system." *Russell*, 411 U.S. at 428 (citations omitted).   For these reasons and those in our original Motion and Brief in Support, this Court should compel the government to produce the evidence the defense requests in its full, unredacted form.   Given the clear and convincing evidence herein, this Court should issue an order to show cause why the prosecutors should not be held in contempt; and should dismiss the entire prosecution for outrageous government misconduct.

Dated: October 22, 2019

Respectfully submitted,

Jesse R. Binnall
Jesse R. Binnall, VSB # 79292
Lindsay R. McKasson
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
jbinnall@harveybinnall.com


W. William Hodes
The William Hodes Law Firm
3658 Conservation Trail
The Villages, Florida 32163
Tel: (352) 399-0531
wwh@hodeslaw.com
Admitted *Pro Hac Vice*

Sidney Powell
Sidney Powell
Molly McCann
Sidney Powell, P.C.
2911 Turtle Creek Blvd., Suite 300
Dallas, Texas 75219
Tel: (214) 07-1775
sidney@federalappeals.com
*Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 22, 2019, a true and genuine copy of Mr. Flynn's Motion for Leave to File Under Seal was filed under seal using the Court's CM/ECF system. The same copy was sent to all counsel of record by electronic mail, including:

Jessie K. Liu, U.S. Attorney for the District of Columbia
Brandon L. Van Grack, Special Assistant U.S. Attorney
Deborah Curtis, Assistant U.S. Attorney
Jocelyn Ballantine, Assistant U.S. Attorney
555 4th Street, NEW
Washington, D.C. 20530

/s/ Sidney Powell
Sidney Powell, P.C.
2911 Turtle Creek Blvd.,
Suite 300
Dallas, Texas 75219
Tel: 214-707-1775
sidney@federalappeals.com
Admitted *Pro Hac Vice*

33