role, Trump was signaling that he had no understanding of or appreciation for the time-honored independence the White House typically affords federal law enforcement.

The FBI director's statutorily mandated ten-year term is meant to ensure that a new president won't simply clean house upon arrival and install a crony in the position. Custom held that a director could be fired for specific reasons—such as in the case of Director William Sessions, who was fired by President Bill Clinton in 1993 after various ethical violations came to light—so it was a generally accepted norm that a director would be removed only for cause. By telegraphing to Comey that Trump himself would be making the decision on whether Comey would remain in the job, he was chipping away at an important institutional norm, which he would altogether obliterate in four months' time.

Contrary to the narrative since promoted by Trump, the FBI did not set out to bring down the incoming national security adviser. Quite the opposite. In fact, one former official described Flynn as the Crossfire Hurricane investigation subject the FBI actually felt the most comfortable about. Prior to the discovery of his calls with the Russian ambassador, it appeared as though Flynn had exercised puzzling behavior vis-à-vis the Kremlin, but the FBI had yet to discover anything that would warrant prosecution. Nevertheless, with knowledge that Flynn had potentially run afoul of the Logan Act and with the strange *Face the Nation* development suggesting that Flynn had lied to the incoming vice president (or worse), the FBI had to do what it does best: go have a conversation and gather facts.

The question of how to proceed with interviewing Flynn was the subject of intense discussion inside the director's suite. Comey and his counterintelligence team thought it was imperative to get Flynn's side of the story, but there were two issues that first had to be resolved.

The first was what notice, if any, the FBI should give to Flynn and the White House before conducting an interview of the president's chief national security aide. A key aspect of determining someone's truthfulness is maintaining an element of surprise in order for agents to assess for themselves whether the subject of an interview is attempting to hide something. For many FBI agents—myself included—the real-time analysis of words and physical reaction to an agent's line of questioning is one of the most fascinating and enlightening parts of the job. An entire block of instruction at the FBI Academy centers not only on asking good questions, but also on studying a subject's reaction to a particular topic. In the case of Flynn, if he got wind of the bureau's specific purpose in speaking with him, he might have time to concoct and rehearse a fictitious narrative explaining his actions.

Another issue: one does not just walk up to the front gates of 1600 Pennsylvania Avenue and ask for entry into the West Wing—even

if you're an FBI agent. Concentric rings of security ensure that anyone actually making their way into the White House compound has an authorized purpose that has been vetted well in advance. One thing the FBI had going for it was the fact that White House staff were still settling into their new roles, and the place was abuzz with personnel eager to get started on a host of initiatives and a press corps cataloguing the frenetic pace.

"With all the chaos," Comey told me, "we thought we might actually get away with sending agents over to the White House to sit down with Flynn." Typical protocol would involve sending over a request to the White House counsel's office, explaining the nature of the inquiry, and then waiting by the phone for clearance. After much discussion, Comey gave the green light to his deputy, Andrew McCabe, to call Flynn and tell him the FBI was sending over two agents to speak with him about something important. "We just decided, you know, screw it," Comey said. Flynn would not be in custody—any interview would be voluntary—so there would be no requirement to tell him that he had a right to remain silent and the right to counsel. If Flynn refused to talk, so be it.

Comey's next decision was equally gutsy and would land him in the familiar position of ruffling feathers over at the Justice Department. Comey always studied each high-profile move by the FBI—studying each issue through the lens of how it might be perceived by differing factions—and then sought to land on decisions that would ensure public confidence in the FBI as an apolitical and independent institution. Comey told me that his decision in the Flynn episode centered on his concern that taking overt investigative steps against the new national security adviser might be perceived as a last-ditch effort by holdover Obama administration officials at the Justice Department to target Team Trump. One of those officials was Sally Yates, Obama's deputy attorney general, who had been elevated to the position of acting attorney general after the inauguration while the White House found a replacement for Loretta Lynch. Yates is an accomplished government lawyer who rose through the ranks of the Justice Department in a career that spanned nearly thirty years. She would soon become a household name after standing up to the Trump administration over the "Muslim ban"—ultimately leading to her firing—but at the time she was merely known in DOJ and FBI circles as a respected apolitical career public servant.

Despite the confidence in Yates inside the FBI, Comey worried that bringing her into the decision-making process on the Flynn matter might risk the perception of an Obama appointee leading the charge against Flynn. He also thought that not telling Yates would offer her deniability, ensuring that Comey would take whatever heat came from the administration if the Flynn affair turned into something major. So he decided not to tell her—at least not yet. Despite his good intentions, being kept out of the loop would anger her.