UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL T. FLYNN,<br><br>        **Defendant** | Crim. No. 17-232 (EGS) |

**GOVERNMENT'S SURREPLY TO DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO COMPEL THE PRODUCTION OF *BRADY* MATERIAL AND FOR AN ORDER TO SHOW CAUSE**

The United States of America, by and through its undersigned counsel, respectfully files this surreply to respond to arguments and claims raised for the first time by defendant Michael Flynn in his Reply in Support of His Motion to Compel Production of *Brady* Material and to Hold the Prosecutors in Contempt, *United States v. Flynn*, 17-cr-232 (Doc. 129-2) ("Reply"), filed on October 22, 2019. Although the defendant ostensibly accepts that *Brady v. Maryland*, 373 U.S. 83 (1963), and the Court's Standing Order, pertain to information that is favorable and material to his guilt or punishment, his Reply is untethered to that standard. As described below, each new argument or claim is unsupported by fact or law, and does not identify favorable and material information that the government has failed to produce. Accordingly, the defendant's motion should be denied.

**I.**     ***Brady* Does Not Require the Government to Produce Material to an Uncharged Individual During an Ongoing Criminal Investigation**

The defendant alleges in his Reply, for the first time, that the government violated *Brady* when it failed to produce alleged *Brady* material to him during the government's pending criminal investigation, in advance of his five voluntary meetings with the government that

preceded his December 1, 2017 guilty plea. *Brady* imposes no such requirement for uncharged individuals. *Brady* requires the government to disclose all evidence that is "favorable to an *accused* . . . where the evidence is material either to guilt or punishment." *United States v. Bagley*, 473 U.S. 667, 669 (1985) (quoting *Brady*, 373 U.S. at 87) (emphasis added). *Brady* is rooted in the Constitutional right to due process. "Due process" imposes constraints on governmental decisions that deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The defendant identifies no court that has found the *Brady* doctrine applicable outside the context of a formally charged criminal case.[1]

Here, the defendant alleges that he was "entitled to all the *Brady* evidence in the government's possession well before November 2017." Reply at 20. Prior to December 1, 2017, however, the defendant had not been charged with a crime. After communications between the government and the defendant's counsel, the defendant agreed to meet with the government in November 2017 (specifically, on November 16, 17, 20, 21, and 29). Each interview was voluntary. The defendant was represented by counsel, was free to leave at any time, and was afforded protections by the government against his statements during those meetings being used against him. During the entirety of the interviews, the government had not filed criminal charges

---

[1] Courts outside of this district have applied *Brady*-type disclosure in civil cases "in rare situations" where a person's liberty was at stake. *See Brodie v. Dep't of Health & Human Servs.*, 951 F. Supp. 2d 108, 118 (D.D.C. 2013), *aff'd sub nom. Brodie v. U.S. Dep't of Health & Human Servs.*, No. 13-5227, 2014 WL 211222 (D.C. Cir. Jan. 10, 2014). The three decisions applying that rule, however, all involved proceedings that the government had formally initiated against a defendant. *See id.* at 118-19 (explaining that the cases involved extradition and denaturalization, a civil commitment proceeding, and a complaint alleging discriminatory employment practices); *see also United States v. Project on Gov't Oversight* ("*POGO* "), 839 F. Supp. 2d 330, 342–43 (D.D.C. 2012).

against the defendant, and a plea agreement had not been signed. In short, the government had no obligation to provide the defendant with any information before or during those voluntary interviews.[2]

Thereafter, the government disclosed to the defendant multiple pieces of information that he now claims are exculpatory: one of the interviewing agents was under investigation for misconduct relating to certain text messages that showed a preference for one of the candidates for President; the same interviewing agent believed that the defendant had a sure demeanor and did not give any indicators of deception during the January 24 interview; and both interviewing agents had the impression at the time that the defendant was not lying or did not think he was lying. The government also answered various questions from defense counsel. *See* Government's Response to Defendant's Motion to Compel the Production of *Brady* Material and For an Order to Show Cause at 5-6, *United States v. Flynn*, 17-cr-232 (D.D.C. Oct. 1, 2019) (Doc. 122) ("Opposition").

After the government made those disclosures, on November 30, 2017, the defendant signed the plea agreement and the government filed an information with the Court, charging the defendant with one count of "willfully and knowingly" making material false statements about his communications with the Russian Ambassador during an interview with the Federal Bureau of Investigation ("FBI") on January 24, 2017 ("January 24 interview"). On December 1, 2017, the defendant entered a knowing and voluntary guilty plea. Thereafter, this case was transferred to this Court, which issued its Standing Order. *Id.* at 3-7.

---

[2] Despite having no obligation to do so, the government provided materials to the defendant during this period. On November 22, 2017, the government provided the defendant with the FBI report for the defendant's January 24 interview. Moreover, throughout the five interviews, the government presented the defendant with dozens of relevant documents.

Beginning on March 18, 2018, after the issuance of a protective order, the government provided additional discovery to the defendant. Although the defendant now complains about the pace of that discovery, before December 18, 2018, the defendant was in possession of all of the information on which he now bases his argument that the case should be dismissed due to government misconduct. *See* Reply at 1-2, 16, 26; Notice of Discovery Correspondence, *United States v. Flynn*, 17-cr-232 (D.D.C. Oct. 1, 2019) (Doc. 123). Thereafter, on December 18, 2018, the defendant and his counsel affirmed for this Court that they had no concerns that potential *Brady* material or other relevant material had not been provided to the defendant. *See* Hearing Transcript at 8-10, *United States v. Flynn*, No. 17-cr-232 (D.D.C. Dec. 18, 2018) ("12/18/2018 Hearing Tr."). The defendant further affirmed, under oath, that he wished to proceed to sentencing because he was guilty of making false statements to the FBI. *See id*. at 16.

II.   **The Government Did Not Suppress Exculpatory Information Relating to the Creation of the January 24 Interview Report**

The defendant now asserts that the government has suppressed exculpatory material pertaining to the January 24 interview report that documents his false statements to the FBI. The Reply alleges that the government has suppressed the "original 302" of the January 24 interview, and fabricated certain notes and reports of the January 24 interview. Reply at 23-24. The arguments appear premised on three contentions: that "material" changes were made to the interview report after February 10, 2017; that the government hid the fact that the defendant had a sure demeanor; and that former Deputy Assistant Director ("DAD") Peter Strzok's handwritten notes were not taken contemporaneously during the interview. *See* Reply at 10-11, 23-27. Each contention is divorced from the facts.

The interviewing agents' handwritten notes, interview report, drafts of the interview report, and statements are consistent and clear that the defendant made multiple false statements

to the agents about his communications with the Russian Ambassador on January 24, 2017. Both interviewing agents' handwritten notes are clear that when they first asked the defendant about his contacts with Russia, the defendant spoke about multiple communications, but omitted his communications with the Russian Ambassador about the United Nations ("UN") Vote or U.S. Sanctions. *See* Exhibit 1, DAD Strzok's Handwritten Notes of January 24 Interview at 2 ("Strzok Notes") (no mention of U.S. Sanctions or the UN Vote before the agents provided a "reminder" about the UN Vote); Exhibit 2, Other Interviewing Agent's Handwritten Notes of January 24 Interview at 3 ("Other Agent Notes") (same). Both interviewing agents' notes are clear that when they ultimately prompted the defendant about his conversations on the UN Vote, he repeatedly denied that his efforts were intended to get Russia (or other foreign governments) to change their vote. *See* Other Agent Notes at 3 ("What is your position // No: hey if you do this…;" Question: "Any vote this way, slow down[?]," Answer: "No."); Strzok Notes at 2 ("Get sense where stood on that vote;" "Wasn't hey if you do this it will be that;" Question: "Ø please consider voting this way?," Answer: "No. Where do you stand? What's position."). And both interviewing agents' notes are clear that the defendant maintained that he had "[n]o recollection" of speaking with the Russian Ambassador about U.S. Sanctions, and that the defendant did not have a "long drawn out" conversation with the Russian Ambassador about "don't do something." Other Agent Notes at 4; Strzok Notes at 3 ("Ø recollection? Not really, I don't remember. Hey don't do anything;" "Ø long drawn out about don't do something"). The final interview report and *every* draft of that report document those same false statements, in a clear and consistent manner. *See* Drafts of FD-302 Report of January 24 Interview (Exhibit 3).

Contrary to the defendant's assertion, there were no material changes made after February 10, 2017, to the draft of the January 24 interview report. *See* Reply at 26. On February 10, 2017, DAD Strzok highlighted two—and only two—sentences where he did not recall a

statement that the other interviewing agent included in the draft of the report. *See* Exhibit 3 at 2, 4. Neither of those sentences pertain to the defendant's false statements. A careful review of the draft of the interview report dated February 10, 2017, details each of the defendant's material false statements—which track the agents' handwritten notes. *Id.* at 1-5. In describing his communications with Russian officials, including his call with the Russian Ambassador on December 29, 2016, the defendant did not disclose his communications with the Russian Ambassador about the UN Vote or U.S. Sanctions. *Id.* at 1-3. When prompted about the UN Vote, the defendant acknowledged he had such a communication, but falsely stated that the purpose was to "get a sense of where countries stood on the vote." *Id.* at 4. When the agents asked him if he made any comment to the Russian Ambassador about voting in a particular way, "Flynn answered, 'No.'" *Id.* With respect to U.S. Sanctions, the defendant specifically said "he did not" recall such a conversation with the Russian Ambassador (despite having two such calls). *Id.* at 4. When the agents pressed the matter, and asked whether the defendant encouraged the Russian Ambassador to not engage in a "tit-for-tat," the defendant false stated, "Not really. I don't remember. It wasn't, 'Don't do anything.'" *Id.* at 4-5. When they agents pressed yet again, the defendant stated that "he did not have a long drawn out discussion about 'don't do something.'" *Id.* at 5. The final interview report, just like the agent's handwritten notes, reflect all of the above material false statements. *See* Notice (Official Record of January 24 Interview Report), *United States v. Flynn*, No. 17-cr-232 (D.D.C. June 6, 2019) (Doc. 85). The edits to the interview report between February 10 and February 15, largely grammatical and stylistic, did not alter the above-described false statements.

The Reply nonetheless suggests that there is a suppressed "original 302" that would exonerate the defendant. *See* Reply at 27-30. There is no evidence to support the defendant's claim. First, the government has provided the defendant with every draft of the January 24

6

interview report in its possession. Second, the most "original" interview documents are the handwritten notes themselves, which the government provided to the defendant and detail the defendant's multiple false statements. Third, even if an earlier draft of the interview report once existed, there is *no* reason to believe it would materially differ from the interviewing agents' handwritten notes or the other drafts—all of which state that the defendant made the specific false statements to which the defendant admitted guilt. Fourth, the interviewing agents' statements to FBI and Department of Justice ("DOJ") officials immediately following the interview on January 24, 2017, confirm that the defendant made multiple false statements[3]—that is why DOJ officials immediately contacted the White House after the interview (the National Security Advisor had just lied to the FBI about his communications with Russia). And, fifth, the defendant's false statements to the FBI on January 24, 2017, were the same false statements that he made just days earlier to Vice President Michael Pence, White House Chief of Staff Reince Priebus, White House Press Secretary Sean Spicer, and *The Washington Post*.[4]

The defendant also now adopts the position that DAD Strzok's handwritten notes were not taken contemporaneously during the interview. *See* Reply at 24-25. However, for support, the defendant relies on a handwriting expert, whose declaration provides the unremarkable

---

[3]  *See, e.g.*, Reply, Ex. 2 at 4 (DAD Strzok described the defendant to former FBI attorney Lisa Page on January 24, 2017, as "denying it all").

[4]  *See Face the Nation Transcript January 15, 2017: Pence, Manchin, Gingrich*, CBS NEWS (Jan. 15, 2017) (Vice President recounting that defendant told the Vice President that he (defendant) did not discuss sanctions with the Russian Ambassador); *Meet The Press 01/15/17*, NBC NEWS (Jan. 15, 2017) (Priebus recounting defendant told him "[t]he subject matter of sanctions or the actions taken by the Obama [sic] did not come up in the conversation [with the Russian Ambassador.]"); *White House Briefing by Sean Spicer – Full Transcript, Jan. 23, 2017*, CBS NEWS (Jan. 24, 2017) (Spicer recounting that the day before defendant again denied having spoken to the Russian Ambassador about sanctions); David Ignatius, *Why did Obama Dawdle on Russia's hacking?*, WASH. POST (Jan. 12, 2017) (article noted two members of the Presidential Transition Team stated defendant "didn't cover" sanctions with the Russian Ambassador).

7

conclusion that the expert could render "no conclusion" on whether the notes were written during the interview. Reply, Ex. 16 at 3.[5] The defendant also does not contest the authenticity of the other interviewing agents' notes, which confirm the defendant's multiple false statements. Both interviewing agents repeatedly attested to the accuracy of the final interview report, which again confirm the defendant's false statements. *See, e.g.,* FD-302 of Other Interviewing Agent dated Jan. 31, 2018 (Exhibit 4) ("all of the information in the FD-302 [of the January 24 interview] is accurate").

The defendant also places significant weight on DAD Strzok's remark that the defendant had "a very 'sure' demeanor and did not give any indicators of deception." Strzok 302 at 3. Without citation or explanation, the defendant intimates that such words were edited out of an earlier draft of the interview report. *See* Reply at 24. There is no evidence that that occurred, or that the government attempted to suppress those statements. It informed the defendant of the assessment before the defendant signed the plea agreement and pleaded guilty, and documented DAD Strzok's assessment in a separate interview of DAD Strzok (which it provided to the defendant in discovery). Moreover, DAD Strzok's assessment does not exonerate the defendant. There is ample public evidence that the defendant also convincingly lied to other government officials about his conversations with the Russian Ambassador. The defendant made the same false statements to the Vice President, White House Chief of Staff, and White House Press Secretary, each of whom repeated the defendant's false statements on national television.

---

[5] The government maintains that the defendant misquoted the interview of DAD Strzok on July 26, 2017. Rather than indicating he took no notes, DAD Strzok reported that the other interviewing agent was the person "primarily" responsible for taking notes. FD-302 of Peter Strzok dated July 19, 2017 at 3 (Doc. 56-2) ("Strzok 302").

### III. The Government Did Not Suppress Exculpatory Text Messages

The defendant further alleges that the government is "suppressing" text messages between DAD Strzok and Page that are "exculpatory and material."[6] Reply at 6. They are neither. Specifically, the defendant refers to text messages quoted in a CNN article. One text message concerns a January 10, 2017, discussion to conduct interviews based on the public release of a report from Christopher Steele. There is no indication that Strzok and Page were referring to the defendant. To the contrary, the interview of the defendant was not related to the Steele report, or any such "pretext." Rather, the interview of the defendant followed events on January 23, 2017, the day before his FBI interview, when the White House Press Secretary recounted that he had recently spoken with the defendant, and the defendant had again denied speaking to the Russian Ambassador about U.S. Sanctions. *See White House Briefing by Sean Spicer – Full Transcript*, Jan. 23, 2017, CBS NEWS. The defendant also refers to text messages that appear to relate to FBI conversations with the media. There is nothing "exculpatory" about

---

[6] The government informed the defendant about the existence of the text messages and their import on November 30, 2017; later informed the defendant that it had learned there were additional text messages that it did not have access to at that time; provided a hyperlink to those new text messages when they became available; and provided additional text messages pertaining to the defendant when it later came in possession of still more text messages. *See* Opposition at 8-9. For the first time, the defendant claims that text messages from a hyperlink that the government provided on June 24, 2018, can no longer be downloaded. *See* Reply at 6. Upon reading the Reply, the government revisited the hyperlink and determined that many of the text messages can no longer be viewed. Accordingly, on October 28, 2019, the government provided a hard copy of those messages to defense counsel. However, none of those text messages are favorable and material to the defendant's guilt or punishment. It is also telling that the defendant did not represent to the Court that it was unable to obtain access to those text messages; indeed it appears the defendant included some of them in his Reply at Ex. 2.

9

the messages. They occurred on February 14, 2017—weeks after the defendant had provided false statements to the FBI.[7]

## IV. The Defendant's Lies Were Material Under the Law

The defendant also claims, again for the first time, that his lies to the FBI were not material because the agents asked him "nothing relevant to efforts to interfere in the 2016 election." Reply at 27-28; *but see* Statement of Offense at 1-2, *United States v. Flynn*, No. 17-cr-232 (D.D.C. Dec. 1, 2017) (Doc. 4) ("FLYNN's false statements and omissions impeded and otherwise had a material impact on the FBI's ongoing investigation into the existence of any links or coordination between individuals associated with the [Trump] Campaign and Russia's efforts to interfere with the 2016 presidential election."). His false statements to the FBI on January 24, 2017, were absolutely material. At the time of the January 24 interview, the FBI was conducting a counterintelligence investigation into whether individuals associated with the campaign of then-candidate Donald J. Trump were coordinating with the Russian government in its activities to interfere with the 2016 presidential election. *See* SPECIAL COUNSEL ROBERT S. MUELLER III, REPORT ON THE INVESTIGATION INTO RUSSIAN INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION (Mar. 2019) ("Special Counsel Report"), Vol. I. at 1. The defendant's conduct and communications with Russia went to the heart of that inquiry. Actions such as the defendant's communications with the Russian Ambassador about U.S. Sanctions could have been indicative of such coordination.

The Supreme Court has held that a false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decision making body to which it

---

[7] The defendant maintains that a redaction in a May 10, 2017 text message about an effort to "lock in" someone refers to the defendant. *See* Reply at 12. The redacted name is not the defendant.

was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995).[8] The defendant's multiple false statements during the January 24 interview clearly meet that standard. It was imperative that the FBI determine whether and why such communications with the Russian Ambassador had occurred. The defendant's false statements inhibited the FBI's ability to obtain that critical information, raised questions about why the defendant would lie to the FBI about such communications, and fundamentally influenced the FBI's investigative activity going forward.

## V.     The Defendant Waived Any Potential Conflict of Interest

For the first time in his Reply, the defendant proclaims that his representation by prior counsel presented an "intractable conflict of interest," and through that conflict "the government sat back and harvested a guilty plea." Reply at 17-18. The defendant, however, omits that the government had discussions about this issue with his counsel. Whether or not there was a conflict of interest, the government raised the potential issue with the defendant's counsel before the government ever spoke to the defendant. *See* Brandon L. Van Grack, Memo to File, Nov. 16, 2017 (Exhibit 5). On November 1, 2017, and November 16, 2017, the government affirmatively flagged the potential issue for the defendant's counsel. In both instances, the defendant's counsel indicated that they had "thoroughly discussed" the issue with their client, who waived "any such conflict." *Id.* Additionally, during the scheduled sentencing hearing on December 18, 2018, the defendant declined the Court's invitation to have the Court appoint "an independent attorney to speak with [the] defendant, review the defendant's file, and conduct necessary research to render a second opinion for [the] defendant." 12/18/2018 Hearing Tr. at 9.

---

[8]     "A statement 'need not actually influence an agency in order to be material.'" *United States v. Verrusio*, 762 F.3d 1, 20 (D.C. Cir. 2014), quoting *United States v. Moore*, 612 F.3d 698, 701-02 (D.C. Cir. 2010). *See also United States v. Stone*, 394 F. Supp. 3d 1, 12–13 (D.D.C. 2019).

## VI. The Government Had Ample Justification to Interview the Defendant as Part of Its Ongoing Investigation

The defendant also now argues that the information he seeks will prove that the "FBI had no factual or legal basis for a criminal investigation." Reply at 14-16. In support, the defendant cites to the standard necessary to obtain a warrant pursuant to the Foreign Intelligence Surveillance Act ("FISA"). *See* Reply at 14, n.11. Obtaining a FISA warrant, however, is entirely different from the FBI interviewing an individual as part of an ongoing counterintelligence investigation. Here, there were multiple bases for the FBI to interview the defendant. The defendant's false statements publicly attributed to him by White House officials about his communications with Russia were alone a sufficient and appropriate basis for conducting the investigative step of interviewing the defendant.

## VII. There is No Basis for Sanctions, Including Dismissal

In his Reply, the defendant also seeks a new category of relief, that "this Court . . . dismiss the entire prosecution for outrageous government misconduct." Reply at 32; *see also id.* at 3 ("dismiss the entire prosecution based on the outrageous and un-American conduct of law enforcement officials and the subsequent failure of the prosecution to disclose this evidence . . . in a timely fashion or at all"). The defendant does not state under what federal or local rule he is seeking such relief, or cite to relevant case law.[9] In order to provide a response, the government presumes, given the context in which this request for relief arose, that the defendant is seeking

---

[9] Local Criminal Rule 47(a) specifically requires that "[e]ach motion <u>shall</u> include or be accompanied by a statement of the specific points of law and authority that support the motion, including where appropriate a concise statement of the facts" (emphasis added). The defendant now seeks relief from this Court for claims that he has not properly raised; the government is hampered in its ability to accurately respond to the defendant's argument because he has failed to state the specific points of law and authority that support his motion.

dismissal as a remedy or sanction for a purported failure to comply with *Brady* and/or this Court's Standing Order.

There is no basis for the new relief requested, or any sanction.  In the first instance, the government has complied with *Brady*, and this Court's Standing Order, as set forth in detail in the government's Opposition and herein.  The government tendered more than 22,000 pages of material, including much of the material that the defendant relies upon for its allegations.  For example, the defendant's suppression allegations in his Reply (at 5-14, 28) are based entirely on text messages and other materials that the government provided in discovery, or that were publicly available prior to the defendant reaffirming his guilt on December 18, 2018.  As described *supra*, there is no merit to the defendant's claims that the government "suppressed" exculpatory text messages or an exculpatory "original 302."

Nor did law enforcement officials engage in "outrageous" conduct during the criminal investigation and prosecution of the defendant.  On January 24, 2017, when the defendant lied in his interview, the FBI was engaged in a legitimate and significant investigation into whether individuals associated with the campaign of then-candidate Donald J. Trump were coordinating with the Russian government in its activities to interfere with the 2016 presidential election.  The defendant was not "ambushed" at the interview, and the interviewing agents certainly did not engage in "outrageous" conduct that undermines the fact that he lied.  Reply at 1, 7.  The documents produced by the government in discovery show that the FBI asked the defendant for permission to conduct the interview, informed the defendant that the questions would concern his "contacts with the Russian Ambassador to the United States," interviewed the defendant in his own office, and afforded him multiple opportunities to correct his false statements by revisiting key questions.  *See, e.g.,* Memorandum of Andrew McCabe dated January 24, 2017 (Doc. 56-1) ("McCabe Memo"); Strzok 302.  Tellingly, the defendant supports his allegation by selectively

quoting from documents.  For example, the Reply states that, according to the Strzok 302, the agents decided they would not confront the defendant if he did not confirm his statements.  *See* Reply at 8.  But the Reply omits the sentence in the Strzok 302 preceding that reference, where DAD Strzok explained that "if Flynn said he did not remember something they knew he said, *they would use the exact words Flynn used . . . to try to refresh his recollection*."  Reply, Ex. 6 (emphasis added).

The interviewing agents' handwritten notes and report provide further confirmation that the defendant was not "trap[ped]."  Reply at 1.  The interviewing agents repeatedly sought to prompt the defendant to provide a truthful response.  When the defendant first failed to mention his calls with the Russian Ambassador about the UN Vote and U.S. Sanctions, the agents raised the topics themselves. When the defendant then denied making a request to the Russian Ambassador about the UN Vote, the agents nevertheless asked him if he made any comment to the Russian Ambassador about voting in a particular way.  And when the defendant specifically denied talking at all about U.S. Sanctions, the agents nevertheless asked him whether the Russian Ambassador told him that the Russian government had taken the defendant's request into account.  Such conduct demonstrates that the agents were not in search of a crime, but the truth about what had happened and why—which the defendant failed to provide.  Had they wanted to "trap[]" the defendant into a false statement charge, they would not have prompted him repeatedly to correct his statements.

For all of the above reasons, it is no surprise that with the same set of facts, the defendant and his prior counsel previously represented to this Court that the circumstances of the interview had no impact on his guilt, or guilty plea.  On December 18, 2018, when the Court asked the defendant if he wished to "challenge the circumstances on which you were interviewed by the

14

FBI," he responded, under oath, "No, Your Honor." 12/18/2018 Hearing Tr. at 8.[10] The Court then asked the defendant if he understood that "by maintaining your guilty plea and continuing with sentencing, you will give up your right forever to challenge the circumstances under which you were interviewed," to which the defendant answered, "Yes, Your Honor." *Id.* And when the Court queried whether the defendant wanted an opportunity to withdraw his plea because one of the interviewing agents had been investigated for misconduct, the defendant stated "I do not, Your Honor." *Id.* at 9. His counsel likewise represented to the Court that their client was not "entrapped by the FBI," and that they did not contend "any misconduct by a member of the FBI raises any degree of doubt that Mr. Flynn intentionally lied to the FBI." *Id.* at 11-12.

The Reply, thus, fails to identify any *Brady* violations or "outrageous" conduct in this criminal case, and certainly no such conduct that is "clear and convincing." Reply at 32.[11]

---

[10] *See also* 12/18/2018 Hearing Tr. at 8 (Court: "At the time of your January 24th, 2017 interview with the FBI, were you not aware that lying to FBI investigators was a federal crime?"; Defendant: "I was not – I was aware."; Court: "You were aware?"; Defendant: "Yeah.").

[11] Even if the Court were to find that the government had violated *Brady*, which it has not, the relief that the defendant requests for the first time in his Reply would be inappropriate. The baseline remedy for a *Brady* violation in this district is retrial, not dismissal. *United States v. Pettiford*, 627 F.3d 1223, 1228 (D.C. Cir. 2010) ("If we find a Brady violation, a new trial follows as the prescribed remedy, not as a matter of discretion.") (internal quotation marks omitted). Only where "the lingering prejudice of a Brady violation has removed all possibility that the defendant could receive a new trial that is fair," should a case be dismissed. *United States v. Pasha*, 797 F.3d 1122, 1139 (D.C. Cir. 2015). Dismissal of a criminal case is appropriate only as a last resort, where no other remedy would cure prejudice against a defendant. *See Bank of Nova Scotia v. United States,* 487 U.S. 250, 263 (1988) (holding that district court had no authority to dismiss where lesser remedy was available).

## VIII. Conclusion

Though rife with new claims, allegations, and arguments, the Reply does not identify information favorable and material to the defendant's guilt or sentencing that the government did not provide. The defendant's protestations of innocence and being misled into a guilty plea are demonstrably false, and do not justify the production of additional material under *Brady* or the Court's Standing Order. Accordingly, the defendant's motions to compel production of *Brady* material should be denied.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845

By: _____/s/_____

Brandon L. Van Grack
Special Assistant U.S. Attorney
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 233-0968

Jocelyn Ballantine
Assistant United States Attorney
555 4th Street, NW
Washington, D.C. 20530
(202) 252-7252

Dated: November 1, 2019

## CERTIFICATE OF SERVICE

I, Brandon L. Van Grack, certify that I caused to be served a copy of the foregoing by electronic means on counsel of record for the defendant on November 1, 2019.

/s/
Brandon L. Van Grack
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 233-0968

*Attorney for the United States of America*