UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

Plaintiff,

v.

MICHAEL T. FLYNN,

Defendant.

Criminal Action No.17-232-EGS

**FLYNN REPLY IN SUPPORT OF MR. FLYNN'S MOTION TO COMPEL PRODUCTION
OF _BRADY_ MATERIAL AND TO HOLD THE PROSECUTORS IN CONTEMPT**

Jesse R. Binnall
Jesse R. Binnall, VSB # 79292
Lindsay R. McKasson
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
jbinnall@harveybinnall.com

W. William Hodes
The William Hodes Law Firm
3658 Conservation Trail
The Villages, Florida 32163
Tel: (352) 399-0531
wwh@hodeslaw.com
Admitted _Pro Hae Vice_

Sidney Powell
Sidney Powell
Molly McCann
Sidney Powell, P.C.
2911 Turtle Creek Blvd., Suite 300
Dallas, Texas 75219
Tel: (214) 07-1775
sidney@federalappeals.com
_Admitted Pro Hae Vice_

**ATTORNEYS FOR DEFENDANT MICHAEL T. FLYNN**

# TABLE OF CONTENTS

*ARGUMENTS AND AUTHORITIES IN REPLY* ....................................................................... 3

A.  The Government's Suppression of the Actual Strzok-Page Texts Mandates a Finding of Contempt.................................................................................................................... 5

  1. "A Pretext to Interview Some People." ............................................................. 6

  2. "Many Meetings" to Strategize the Interview of Flynn ................................. 7

  3.  "Off the Rails" ........................................................................................................ 8

  4. The Plan Worked: Mr. Flynn was "Relaxed," "Jocular," and "Unguarded." ............. 9

  5. Reporting Back: Flynn's "Demeanor Was Sure."
  He Was Telling the Truth or Believed He Was Telling the Truth .................................. 10

  6. Agents Manipulate the Flynn 302. ................................................................... 10

  7. February 14: "Launch f 302." ........................................................................... 11

  8. The Media Leak Strategy with DOJ. ............................................................... 12

  9. The FBI Opens Obstruction Case on President Trump
  and "Locks In" Case on "Flynn?" .......................................................................... 12

B. The FBI Knew Its Entire Investigation of Flynn Was A Pretext.................................. 14

C. *Brady* Requires the Government to Produce Exculpatory Evidence in Time for the Defense to Use It.......................................................................................................... 18

D. Full, Actual, Unredacted Documents, The Original 302, Drafts Prior to
February 10, 2019, and the 1A File and Subfiles Must be Produced Pursuant to *Brady*.  22

  1. Agent Strzok's notes do not appear to have been taken contemporaneously during the interview.......................................................................................................... 24

  2. The 302 statement that Mr. Flynn was told the "nature of the interview" is false .... 25

  3. Mr. Van Grack's Productions of Flynn 302s Were Incomplete and Misleading. ....... 25

  4. The Final 302 Falsely States that Mr. Flynn Remembered Making Four to Five Calls from the Dominican Republic When Both Sets of Notes State He Does Not Remember. ................................................................................................................................ 26

**5. The Notes Provide No Support for a Chunk of the 302 That Purports to Provide a "Factual Basis" for the Plea.** ................................................................................ **27**

**6. Mr. Flynn's Statements Were Not Material** .................................................. **27**

**7. The Flynn 302 Is Discussed in the Page-Strzok Texts and Was Not Approved by McCabe Until the Day After Flynn Resigned from the White House** ............................ **28**

**E. Classified Information Will Prove that Any Investigation of Mr. Flynn Was Pretextual** ........................................................................................................ **28**

**1. *Yunis* Mandates Disclosure of The Classified Information Requested as *Brady*** ........ **28**

**2. The DIA Reports of Briefing and Debriefings Belie Any Basis to Investigate Mr. Flynn and Likely Further Undermine the Factual Basis for the Plea.** ........................... **29**

**3. The Letter from Sir Mark Lyall Grant to the Incoming National Security Team Invalidates Any Use of Information from Christopher Steele, Further Undermines Any "Russia" Connection, and is Being Suppressed** .................................................. **30**

***CONCLUSION*** .......................................................................................................... ***32***

***CERTIFICATE OF SERVICE*** .................................................................................. ***33***

# INDEX OF EXHIBITS

Flynn Timeline of Key Events ...........................................................................Exhibit 01

Excerpts of Strzok-Page Texts ........................................................................Exhibit 02

Relevant Comey Memos ....................................................................................Exhibit 03

CNN Article ........................................................................................................Exhibit 04

Strzok 7/26/17 Statement [SEALED] ..............................................................Exhibit 05

Strzok 302 [SEALED] ........................................................................................Exhibit 06

Steele Dossier Excerpts re Flynn......................................................................Exhibit 07

Excerpts from *Crossfire Hurricane* by Josh Campbell ....................................Exhibit 08

Unnamed Agent's Notes and Transcription [SEALED] ..................................Exhibit 09

Strozk's Notes and Transcription [SEALED] .................................................Exhibit 10

Comparison Draft Flynn 302, 2/10/17 and 2/11/17;

and Final 302 [SEALED]...................................................................................Exhibit 11

Lisa Page 302 [SEALED] ................................................................................. Exhibit 12

12/2/17 Articles (2) ......................................................................................... Exhibit 13

Program Information from Flynn Speaking Engagements

Booked by Leading Authorities ....................................................................... Exhibit 14

Timeline of Meetings with Prosecutors & Government's

Productions of Documents .............................................................................. Exhibit 15

Decl. of Handwriting Expert........................................................................... Exhibit 16

For eighty-seven years, the Supreme Court has held that "[t]he first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it. . . [I]t is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it." *Sorrells v. United* States, 287 U.S. 435, 444-45 (1932) (quoting *Butts v. United States*, 273 F. 35, 38 (8th Cir. 1921)). Application of the criminal law under such circumstances "is foreign to its purpose . . . [and] so shocking to the sense of justice that it has been urged that it is the duty of the court to stop the prosecution in the interest of the Government itself, to protect it from the illegal conduct of its officers and to preserve the purity of its courts." *Id.* at 446.

In this case, high-ranking FBI officials orchestrated an ambush-interview of the new president's National Security Advisor, not for the purpose of discovering any evidence of criminal activity—they already had tapes of all the relevant conversations about which they questioned Mr. Flynn—but for the purpose of trapping him into making statements they could allege as false.

This is no paranoid "conspiracy" delusion, as the government implies. It is well documented by the evidence already made public, which was long known to the government — yet withheld from the defense—until after Mr. Flynn pleaded guilty and in clear violation of *Brady v. Maryland* and its progeny. This includes a still undisclosed discussion by the lead agent to use news of the "Steele dossier" as "a pretext to interview some people;" the FBI Director's calculated decision (contrary to FBI/DOJ protocol) not to notify the White House Counsel that the FBI wanted to speak with a key member of the President's staff; a strategically-planned personal call

from FBI Deputy Director Andrew McCabe, designed to prevent Mr. Flynn from seeking the advice of counsel or notifying the Department of Justice; planning and rehearsing tactics calculated to keep Mr. Flynn "relaxed" and "unguarded" so as not to alert him to the significance of the conversation; anxious text messages between Agent Strzok and his paramour, Lisa Page—McCabe's Special Counsel—disclosing the deep personal involvement of these officials and others in an enterprise without a legitimate law enforcement objective.

The government works hard to persuade this Court that the scope of its discovery obligation is limited to facts relating to punishment for the crime to which Mr. Flynn pleaded guilty. However, the evidence already produced or in the public record reveals far larger issues are at play: namely, the integrity of our criminal justice system and public confidence in what used to be our premier law enforcement institution. When the Director of the FBI, and a group of his close associates, plot to set up an innocent man and create a crime—while taking affirmative steps to ensnare him by refusing to follow procedures designed to prevent such inadvertent missteps—this amounts to conduct so shocking to the conscience and so inimical to our system of justice that it requires the dismissal of the charges for outrageous government conduct.

"Regard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.'" *Rochin v. California*, 342 U.S. 165, 169 (1952) (Frankfurter, J.) (quoting *Malinski* v. *New York*, 324 U.S. 401, 416-17 (1945)). When the government transgresses these boundaries—as it has here—the Court must dismiss the case and free the defendant to reconstitute his life.

As new counsel has made clear from her first appearance, Mr. Flynn will ask this Court to dismiss the entire prosecution based on the outrageous and un-American conduct of law enforcement officials and the subsequent failure of the prosecution to disclose this evidence— which it had in its possession all along—either in a timely fashion or at all. Moreover, the defendant still needs and is still entitled to *all* the facts in the government's possession—not just those Mr. Van Grack was forced to provide because they had already leaked into the public domain. The government's tactic of disclosing information because it had made its way into the news and the internet is tantamount to no *Brady* disclosure at all, while its self-serving minimized disclosures were outright deceptive.

## ARGUMENTS AND AUTHORITIES IN REPLY

Despite a polite reminder from this Court that its *Brady* order is paramount,[1] the government's response depends heavily on its assertion—forty-five times in twenty pages—that Mr. Flynn pleaded guilty, and thirteen assertions that he waived any right to further *Brady* material.[2]  As expected, the government touts its many *Brady* disclosures.  What it elides, however,

---

[1] "[T]hat provision is not binding on the Court. That's an agreement between the parties. Notwithstanding that information in the plea agreement or any statement therein or subsequent thereto that suggests Mr. Flynn has waived his right to further discovery, the government must comply with the Court's standing *Brady* order of February the 16th, 2018, or at some point demonstrate why it should not be required to comply with that." Hr'g Tr. 8:21-24, Sept. 10, 2019.

[2] At the status conference in this Court on September 10, 2019, Mr. Van Grack assured the Court he had never claimed that Mr. Flynn's plea truncated the government's responsibility to provide *Brady* material or comply with this Court's Standing Order. Dkt. 114 at 22:13-19. To the contrary, however, in his letter to new counsel dated June 26, 2019, he wrote: "[I]n the plea agreement your client signed on November 30, 2017, your client waived the right to any further discovery or disclosures of information. As such, the government does not anticipate providing additional information in response to your letter." On July 12, 2019, Mr. Van Grack again denied there was any further material owed to Mr. Flynn under either *Brady* or the Court's Standing Order, noting "much of which [production] occurred even after your client had waived his right to any further discovery or disclosures of information, pursuant to the plea agreement."

is that its "disclosures" were so limited, misleading, untimely, or deliberately trivialized as to render them meaningless—and in some instances, outright deceitful. As the Supreme Court has recognized, and which happened in the extreme here, an incomplete response could "represent[] to the defense that the evidence does not exist" and cause it "to make pretrial and trial decisions on the basis of this assumption." *United States v. Bagley*, 473 U.S. 667, 682-83 (1985).

Every "disclosure" the government touts came *after* the government had interviewed Mr. Flynn for five days, and all but the final version of the much-deliberated 302 came *after* Mr. Flynn agreed to plead guilty. At the same time, the government tries to shift its affirmative obligation to produce *Brady* evidence to former defense counsel, but "[a] rule . . . declaring 'prosecutor may hide, defendant may seek' is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004).

Here, the government's limited and misleading productions confirm the suppression of additional *Brady* evidence which warrants a finding of contempt. Remarkably, Mr. Van Grack prefaced his blandly eleventh-hour "disclosure" with the disclaimer that he had "no legal or ethical obligation" to give the information to the defense. What he described as "electronic communications" of "one of the agents who interviewed Mr. Flynn" "showed a preference for one of the presidential candidates" was painfully short of the bombshell of truth that exploded in the national news only one day after Mr. Flynn's plea.

The real *evidence* the government had long suppressed caused a cavalcade of major events—many within mere days of Mr. Flynn's plea—and all unknown to him before it. Lisa Page, Special Counsel to Deputy Director McCabe, resigned; she had edited Mr. Flynn's 302 and was part of the small, high-level group that strategically planned his ambush. Lead Agent Peter Strzok was demoted from the Mueller investigation and ultimately fired. Strzok, who had met

4

extensively with McCabe and the high-level, small group, was primarily responsible for creating the only basis for the charge alleged against Flynn. Ex. 1.

The day after Mr. Flynn's plea, the press exploded with the news of Strzok and Page's prolific text messages, their affair, and their malice toward President Trump.[3] The Inspector General issued a rare statement that he was investigating the entire matter. MTC 23. Bruce Ohr, the fourth highest-ranking member of DOJ, was demoted. Judge Contreras, who accepted Mr. Flynn's plea only days before, was suddenly and inexplicably recused—only for it to be disclosed much later that he was a topic of conversation in the Strzok-Page texts because he was a friend of Agent Strzok.[4] And, remarkably, DOJ's Bruce Ohr was demoted a second time. Ex. 1. This is merely a snapshot of the aftershock from the earliest revelations into the public domain and to Mr. Flynn.

## A.  The Government's Suppression of the Actual Strzok-Page Texts Mandates a Finding of Contempt.

The government's purported "productions" of the actual Strzok-Page texts also reveal contempt for this Court's order and its *Brady* obligation. MTC 6, 9, 10, 30, 31. The government did not produce a single text message (among the *50,000*) until nine months after it had been

---

[3] However, the government's disclosure as Mr. Flynn was signing the plea agreement did not even name the agent, or the candidate, while the statements by the *two* key agents showed sheer hatred of Mr. Trump; for example: *"God trump is a loathsome human," "Stupid fuck," "Donald Trump is an enormous d\*uche," and "Trump is a fucking idiot."* Ex. 2.

[4] The government knew that well in advance of Mr. Flynn's plea that Judge Contreras was a friend of Peter Strzok and his recusal was even discussed in an exchange of multiple texts. In one text exchange between Strzok and Page on July 25, 2016, Page said to Strzok: *"I can't imagine either one of you could talk about anything in detail meaningful enough to warrant recusal,"* apparently referring to Judge Contreras. *"Really?"* Strzok replied. *"Rudy, I'm in charge of espionage for the FBI. Any espionage* [warrant request that] *comes before him, what should he do? Given his friend oversees them?"* Ex. 2. None of this was disclosed to the defense or in court.

handed countless egregious examples; three months after this Court entered its order; and long after the actual evidence would have made a material difference to Mr. Flynn. Even then, Mr. Van Grack did not provide the texts to the defense to honor his *Brady* obligation or this Court's order. Rather, he produced them only after they had been exposed publicly by others. The government is still suppressing crucial evidence.

Mr. Van Grack "produced" the first batch on March 13, 2018, by link to texts already released to the public by the Senate Judiciary Committee. He produced the second batch on June 24, 2018, by link to the "Scribd account" of reporter Peter Hasson. Those cannot even be downloaded. And for his third production, it gave the defense two pages on October 4, 2018. These go precisely to the issue of McCabe's Special Counsel Lisa Page editing the Flynn 302. Ex. 2.

The government still hides countless damaging texts—exculpatory and material to Mr. Flynn—that our independent work only recently uncovered. These were reported by CNN but have not been produced. These demonstrate violations of *Brady* and this Court's order that go to the core of Mr. Flynn's claim of outrageous government misconduct and to his innocence.

### 1. "A Pretext to Interview Some People."

On January 10, 2017, Buzzfeed and CNN broke the news of the "Steele dossier" on which (it was later revealed) the Carter Page FISA application was premised. MTC 7, 26, 24, 27.[5] Then-

---

[5] It was only much later the defense learned what the FBI already knew: This document had been bought and paid for by the Clinton campaign and the DNC. Both the FBI and Fusion GPS hired former British spy Christopher Steele. Fusion GPS was on the Clinton payroll, and it also hired Nellie Ohr—a Russia specialist with CIA ties whose husband Bruce was the fourth highest-ranking official in DOJ. Ms. Ohr was researching Mr. Flynn also, and his name appears twice in the "Steele dossier." Ms. Ohr and Steele funneled their "work" through Bruce Ohr in a back-channel to the FBI, long after the FBI fired Steele for lying. Ex. 7; MTC 25, 26, 28. Bruce Ohr also brought future Special Counsel members Andrew Weissmann and Zainab Ahmad into his

Director Comey had briefed the President-Elect about these "salacious and unverified" allegations on January 6, 2017, a day after meeting in the Oval Office with President Obama, Vice-President Biden, Acting Attorney General Sally Yates, Susan Rice, James Clapper, and John Brennan. Ex. 3.

As news of the "salacious and unverified" allegations of the "Steele dossier" dominated the media, Strzok wrote to Page: ***"Sitting with Bill watching CNN. A TON more out. . . We're discussing whether, now that this is out, we can use it as a pretext to go interview some people."*** The government has not produced this text and others around it, in a stunning violation of *Brady* and this Court's order. Ex. 4.

### 2. "Many Meetings" to Strategize the Interview of Flynn

In the next two weeks, there were "many meetings" between Strzok and McCabe to discuss "whether to interview [] National Security Advisor Michael Flynn and if so, what interview strategies to use." Ex. 5.

January 23, the day before the interview, the upper echelon of the FBI met to orchestrate it all. Deputy Director McCabe, General Counsel James Baker, ████████, Lisa Page, Strzok, David Bowdich, Trish Anderson, and Jen Boone strategized to talk with Mr. Flynn in such a way as to keep from alerting him from understanding that he was being interviewed in a criminal investigation of which he was the target. Ex.12. Knowing they had no basis for an investigation,[6] they deliberately decided not to notify DOJ for fear DOJ officials would follow protocol and notify White House Counsel. They decided not to tell Flynn their true purpose nor give him 1001

---

back-channel communications with the FBI, DOJ, and Christopher Steele. Bruce Ohr Testimony to Congress, Aug. 28, 2018, https://tinyurl.com/yxcujccg.

[6] ████████████████████████████████████████████████████████████
Ex.6.

warnings, so as to keep him "relaxed." They planned not to show him the transcript of his calls to refresh his recollection, nor confront him directly if he did not remember. In short, they planned to deceive him about the entire scenario, and keep him "unguarded." Exs. 5, 6; MTC 34.

### 3. "Off the Rails"

They knew what they were doing was wrong. Lisa Page wrote: *"I can feel my heart beating harder, I'm so stressed about all the ways THIS has the potential to go fully off the rails."* Strzok replied: *"I know. I just talked with* ███*, we're getting together as soon as I get in to finish that write up for Andy [McCabe] this morning. I reminded* ███ *about how I told Bill [Priestap] and the entire group that we should wait 30 to 60 days after the inauguration to change how we were managing this stuff. As it is, he went ahead, and everything is completely falling off the rails. I think our stuff is good on our cases, but I have no hope or understanding about what they're doing on Jen [Boone's] side of the house."* Ex. 2.

The next day, at Comey's direction to "screw it" in contravention of longstanding DOJ protocols,[7] McCabe personally called Flynn to pave the way for the uncounseled conversation. They used their "pretext" to circumvent DOJ and ambush interview Mr. Flynn in the White House.

---

[7] The government did not disclose this to Mr. Flynn until *after* Mr. Comey bragged about his breach on national television—*not* because Mr. Van Grack was complying with this Court's order. This short video (https://www.youtube.com/watch?v=NxNhjFrjXqI) reveals Mr. Comey's deliberate disregard for DOJ and FBI rules. In fact, Mr. Van Grack only disclosed a bland summary *four days after* Comey gloated about it on national television to a laughing audience— four days *before* Mr. Flynn's scheduled sentencing, and because this Court entered its minute order of December 12, 2017. Dkt. 10. Mr. Flynn seeks disclosure of the full report of Mr. Comey's conduct, any memos, notes, and 302s documenting his decision, which was admittedly the subject of "many intensive discussions" within the FBI. There must be at least notes of several others, including Comey's Special Assistant Mr. Campbell, that document the efforts directed against Mr. Flynn. Ex. 8; MTC 4, 12-14.

As summarized by Inspector General Horowitz: "We have previously faulted Comey for acting unilaterally and inconsistent with Department policy. Comey's unauthorized disclosure of sensitive law enforcement information about the Flynn investigation merits similar criticism. **In a**

**4. The Plan Worked: Mr. Flynn was "Relaxed," "Jocular," and "Unguarded."**

Strzok admitted Flynn was alone, "relaxed and jocular," "unguarded," and saw the two agents as "allies." Flynn gave them a tour. He talked about hotels they stayed in during the campaign and the President's "knack for interior design," and the long hours of the job. He complained about politics, but he "always seemed to work his way to the subject of terrorism." Exs. 5, 6. Of course, the FBI had already read the transcripts of his phone calls, and the agents knew there was no criminal intent or any crime in his conversations.

This and Strzok's admissions make clear that Comey and McCabe were executing their own agenda—not investigating a crime. This is why, in *Brady* evidence still suppressed, Deputy Attorney General Sally Yates candidly opined that the interview "was problematic" and "it was not always clear what the FBI was doing to investigate Flynn."[8] This is also why Strzok admitted that Yates "was not happy" to learn of the interview and PDAG Axelrod argued with FBI General Counsel James Baker about the FBI's unilateral decision to interview Flynn. Ex. 6.

---

country built on the rule of law, it is of utmost importance that all FBI employees adhere to Department and FBI policies, particularly when confronted by what appear to be extraordinary circumstances or compelling personal convictions. Comey had several other lawful options available to him to advocate for the appointment of a Special Counsel, which he told us was his goal in making the disclosure. What was not permitted was the unauthorized disclosure of sensitive investigative information, obtained during the course of FBI employment, in order to achieve a personally desired outcome." Office of the Inspector General, U.S. Dept. of Justice, *Report of Investigation of Former Federal Bureau of Investigation Director James Comey's Disclosure of Sensitive Investigative Information and Handling of Certain Memoranda*, 61, (29 Aug. 2019), olg.justice.gov/reports/2019/o1902.pdf. By so doing, "Comey set a dangerous example for the over 35,000 current FBI employees—and the many thousands more former FBI employees—who similarly have access to or knowledge of non-public information.". *Id.* at 60 (emphasis added).

[8] The prosecutors disclosed a seven-line summary of Ms. Yates statement six months after Mr. Flynn's plea. Obviously, the Department of Justice knew this around the time of the interview. The same is true for PDAG Axelrod. MTC 2, 9, 18, 19.

**5. Reporting Back: Flynn's "Demeanor Was Sure."**
**He Was Telling the Truth or Believed He Was Telling the Truth.**

The agents returned from interviewing Mr. Flynn, describing their excitement over it, and with a belief contrary to what they expected, that he had been honest with them. After the interview, they briefed it three times. Strzok texted Page: *"Describe the feeling, nervousness, excitement knowing we had just heard him denying it all. Knowing we'd have to pivot into asking. Puzzle round and round about it. Talk about the funny details. Remember what I said that made Andy laugh and ask if he really said that."*

Strzok urged: *"Also have some faith in ▮ and my assessment. ....... I'm finding it hard to go out on a counterintuitive yet strongly felt ledge with so many competent voices expressing what I feel too: bullsh\*t – that doesn't make sense. [] I made some joke about what F said. Something patriotic or military."*

Page responded: *"It was clear that you both walked in and felt very strongly, so that obviously counts for something. [] You made a joke about a military band."* Ex. 2. The agents did three briefings the day of the interview. They reported he had a sure demeanor, and he was telling the truth or believed he was—even though he did not remember it all. Ex. 6.

Not long after, the FBI and DOJ wrote an internal memo dated January 30, 2017, exonerating Mr. Flynn of acting as an "agent of Russia;" and, they all knew there was no Logan Act violation. The government owes Mr. Flynn the full versions of these exculpatory statements. MTC 9, 18, 19, 26. He has been smeared as being an agent of a foreign government for several years now.

**6. Agents Manipulate the Flynn 302.**

On February 10, 2017, the news broke—attributed to "senior intelligence officials"—that Mr. Flynn had discussed sanctions with Ambassador Kislyak, contrary to what Vice President

10

Pence had said on television previously. Overnight, the most important substantive changes were made to the Flynn 302. Those changes added an unequivocal statement that "FLYNN stated he did not"—in response to whether Mr. Flynn had asked Kislyak to vote in a certain manner or slow down the UN vote.  This is a deceptive manipulation because, as the notes of the agents show, Mr. Flynn was not even sure he had spoken to Russia/Kislyak on this issue. He had talked to dozens of countries. Exs. 9, 10, 11.

Second, they added: "or if KISLYAK described any Russian response to a request by FLYNN." That question and answer do not appear in the notes, yet it was made into a criminal offense. The typed version of the highly unusual "deliberative" 302 by that date already included an entire section from whole cloth that also serves as a criminal charge in the Information and purported factual basis regarding "Russia's response" to any request by Flynn. The draft also shows that the agents moved a sentence to make it seem to be an answer to a question it was not. Exs. 9, 10, 11.

Flynn resigned and left the White House on February 13, 2017. Ex. 1.

**7. February 14: "Launch f 302."**

The next day, Valentine's Day, Strzok texted: "*Also, is Andy good with F 302*?" Page replied: "*Launch f302.*"

The same day, David Laufman in the National Security Division of DOJ, with whom they also worked, personally called Covington & Burling to pressure them to file the FARA registration form for Flynn Intel Group. Ex. 1. MTC 39.[9]

---

[9] Mr. Kelner and two more Covington lawyers even had an extensive meeting with six members of the FARA section including Heather Hunt, David Laufman, ▮▮▮▮▮ and others to decide how to write the registration and review a draft, and they had a follow-up call with them. Kelner had never seen the FARA section "this engaged." Dkt. 98.

Also, the same day, Strzok and Page discussed the Bureau's leak to the press regarding a *New York Times* article describing the FBI's interview of Mr. Flynn. Again, the government has withheld these texts in contempt of this Court's order and *Brady:*

> Strzok: "*Bottom line Mike [Kortan] ran through the boss' thinking/timeline/narrative of this. Bunch of additional detail [*redacted*] has etc.*"
>
> Page: "*Did you mention my attendance to kortan [Mike]*?"
>
> Strzok: "*Not to Mike, he had left. The guys left seemed to think no, said Mike was going to talk to you.*"

Another message refers to cooperation and "*access*" but they do not name the outlet.

"*Going to be very apparent we cooperated and gave access A LOT for an article that I think is going to be very negative. Bad enough for negative press. Far worse to chose* [sic] *to*" Ex. 4.

### 8. The Media Leak Strategy with DOJ.

April 20, 2017, Strzok texts Page: "*I had literally just gone to find this phone to tell you I want to talk to you about media leak strategy with DOJ before you go.*" Ex. 2.

### 9. The FBI Opens Obstruction Case on President Trump and "Locks In" Case on "Flynn?"

On May 9, 2017, the day Comey was fired, Strzok texted: "*We need to open the case we've been waiting on now while Andy is acting.*" Ex. 2.

On May 10, McCabe opened the "obstruction" investigation of President Trump as suggested by Comey's memo of February 14. Ex. 1.

Also on May 10, in an important but still wrongly redacted text, Strzok says: "*We need to lock in [*redacted*]. In a formal chargeable way. Soon.*" Page replies: "*I agree. I've been pushing and I'll reemphasize with Bill [Priestap].*" Ex. 2. Both from the space of the redaction, its timing, and other events, the defense strongly suspects the redacted name is **Flynn**. But, whether it is

Flynn or someone else, it shows the extraordinary deliberation of specific (and now mostly fired) elements of the FBI to "target" certain people in their pretextual investigation—antithetical to the Rule of Law.

Mr. Mueller was named Special Counsel on May 17, and the Flynn 302 was reentered on May 31, 2017, for Special Counsel Mueller to use. The government has refused to produce unredacted text messages for this crucial time.

Mr. Flynn made critical decisions based on a belief that none of this evidence existed. He was placed on a path to cooperate with the government, work out a deal, and meet with Special Counsel for days—all under false pretenses. Then after he was compelled by multiple circumstances to agree to plead, the government made a deliberately misleading revelation at the eleventh hour in a self-serving attempt to avoid the outcry and ramifications of the imminent media explosion of damning truths.[10] The government continues to hide evidence of the original 302, other exculpatory texts, and other forms of information completely. By its incomplete and trivialized disclosure, the government effectively "represented to the defense that the [real and egregious] evidence does not exist" and caused it "to make . . . decisions on the basis of this assumption." *Bagley*, 473 U.S. at 682-83; s*ee also, United States v. Ferrara*, 456 F.3d 278, 293

---

[10] Not only did Mr. Van Grack not disclose a single text message before Mr. Flynn agreed to plead guilty, but Special Counsel apparently managed to control the press on the issue until the plea was entered on December 1, 2017, in Judge Contreras's court.  It defies credulity to suggest that it was only *unlucky* for Mr. Flynn that the story broke the very next day. Part of the evidence we request includes communications between the press and SCO, which will likely establish that Special Counsel intensified pressure on Mr. Flynn to plead immediately while it was pressuring the press not to explode the truth that destroyed the entire case.  Karoun Demirjian, *Top FBI official assigned to Mueller's Russia probe said to have been removed after sending anti-Trump texts*, THE WASH. POST (Dec. 2, 2017), https://www.washingtonpost.com/world/national-security/two-senior-fbi-officials-on-clinton-trump-probes-exchanged-politically-charged-texts-disparaging-trump/2017/12/02/9846421c-d707-11e7-a986-d0a9770d9a3e_story.html; MTC 11; Ex. 13.

n.11 (1st Cir. 2006) ("When the government responds incompletely to a discovery obligation, that response not only deprives the defendant of the missing evidence but also has the effect of misrepresenting the nonexistence of that evidence.").

**B. The FBI Knew Its Entire Investigation of Flynn Was A Pretext.**

The FBI had no factual or legal basis for a criminal investigation, nor did they have a valid basis for a counter-intelligence investigation against an American citizen, and they all knew it.[11] Exs. 5, 6. The evidence the defense requests will eviscerate any factual basis for the plea and reveal conduct so outrageous—if there is not enough already—to mandate dismissal of this prosecution for egregious government misconduct.

The government's assertion that Mr. Flynn "is not charged with being an agent of Russia and the government has never alleged in this case that he was an agent of Russia" is false.  Dkt. 122. That was the FBI's public pretext for investigating Mr. Flynn—although the agents did not inform Mr. Flynn they were actually "investigating" him for anything. MTC 23. Obviously, *someone* in DOJ understood Mr. Flynn was accused of being a Russian agent, because there is an internal document dated January 30, 2017, exonerating Mr. Flynn. Having been publicly and falsely accused of treason and being a "foreign agent," assertions which also misled this Court, Mr. Flynn is entitled to all documentation that exonerates him.  The accusations were a stake

---

[11] Under federal law, to establish that an American is acting as an agent of a foreign power, the government must show that the American is purposefully engaging in clandestine activities on behalf of a foreign power, and that it is probable that these activities violate federal criminal law. *See* FISA, Title 50, U.S. Code, Section 1801(b)(2).  Mr. Comey and Mr. McCabe publicly admitted that in the summer of 2016, they took it upon themselves to single out four individuals associated with the Trump campaign for investigation. Admittedly, the FBI had no evidence that any of the four had committed a crime—much less that they "knowingly engage[d] in clandestine intelligence gathering activities for or on behalf of a foreign power." *Id; see* Ex. 3.

through the heart of a thirty-three-year Army veteran who wrote a blank check on his life for five years in active combat in devotion to our country.[12]

The Mueller Report established that there was no conspiracy between anyone in the Trump campaign and Russia. It is also apparent now, or will be upon the release of the FISA report of the Inspector General, that the FBI and DOJ had no legal basis to obtain a FISA warrant against Carter Page or to investigate Mr. Flynn.[13] Yet, the government wants us to accept its word that

---

[12] Mr. McCabe pointed to Mr. Flynn's "very public interactions with Vladimir Putin and other Russians." These "interactions" seem to have arisen from the work of CIA/FBI operatives Stefan Halper and Joseph Mifsud, and bookings made by Mr. Flynn's American speakers' bureau, Leading Authorities (which books engagements for countless former government officials and prominent people). Leading Authorities booked him for three events with "Russian connections": one in Moscow for RT and two in Washington. All were well attended by prominent persons from around the world because of the important issues discussed and the presence of other recognized experts on the programs. *See* Ex. 14; MTC 4, 16.

Mifsud was present at the RT dinner in Moscow, and it is his cell phones recently obtained by the government that are expected to confirm that he was working for "western intelligence." Dkt. 124.

Stefan Halper is a known long-time operative for the CIA/FBI. He was paid exorbitant sums by the FBI/CIA/DOD through the Department of Defense Department's Office of Net Assessment in 2016. His tasks seem to have included slandering Mr. Flynn with accusations of having an affair with a young professor (a British national of Russian descent) Flynn met at an official dinner at Cambridge University when he was head of DIA in 2014. Flynn has requested the records of Col. James Baker because he was Halper's "handler" in the Office of Net Assessment in the Pentagon, and ONA Director Baker regularly lunched with *Washington Post* Reporter David Ignatius. Baker is believed to be the person who illegally leaked the transcript of Mr. Flynn's calls to Ignatius. The defense has requested the phone records of James Clapper to confirm his contacts with Washington Post reporter Ignatius—especially on January 10, 2017, when Clapper told Ignatius in words to the effect of "take the kill shot on Flynn." It cannot escape mention that the press has long had transcripts of the Kislyak calls that the government has denied to the defense. MTC 34, 35, 37.

[13] The government's *Brady* violations have suppressed evidence of Fourth Amendment defenses Mr. Flynn was entitled to pursue, especially if that evidence also shows government misconduct. Information was obtained against Mr. Flynn either through the illegal FISA warrant on Carter Page, baseless National Security Letters, an undisclosed FISA warrant, or the abuses of the NSA database documented in the heavily redacted opinion of Judge Rosemary Collyer (https://www.dni.gov/files/documents/icotr/51117/2016_

the defense has everything to which it is entitled. Fortunately *Brady* exists to protect the accused "from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations." *Kyles v. Whitley*, 514 U.S. 419, 440 (1995).

While Flynn was cooperating extensively on all issues the Special Counsel wanted to address, the government has trickled out productions over the last year that reveal many things. Ex. 15. Some of the most notable include : (i) the original notes of the agents differ materially from the 302s; (ii) there were material alterations to the 302s to set up the "false statements," and (iii) the government has extensive reports of Mr. Flynn's briefings and debriefings on all his foreign contacts—including his Russia trip and his meeting with Turkish officials—giving lie yet again to the public pretext of the FBI "investigation" of Mr. Flynn.  Further, what is still a heavily redacted 302 for former Agent Strzok, since January 2017, the government knew, but still has not disclosed the full statements and notes that show Deputy Attorney General Sally Yates said the interview of Mr. Flynn was "problematic," and she was "unclear" why the FBI was investigating or interviewing Mr. Flynn at all.

Neither Mr. Flynn nor his former counsel had any of these documents or knowledge of the plethora of information discussed above when Mr. Flynn entered his plea. However, one of the government's chief arguments is that because Mr. Flynn was represented by counsel (Covington & Burling) at all stages of the proceedings, and because counsel was present at all interviews and other critical events including his plea and concomitant *Brady* waiver, that either excuses the government's failures or renders his waiver of them conclusive.

---

Cert_FISC_Memo_Opin_Order_Apr_2017.pdf), and the more recent decision of Judge Boasberg (https://www.intelligence.gov/assets/documents/702%20Documents/declassified/2018_Cert_FIS C_Opin_18Oct18.pdf).

The government fails to acknowledge, however, that Covington & Burling was the very firm that Mr. Flynn paid more than $1 million to investigate, prepare, and then defend the FARA registration in response to NSD/FARA section's and David Laufman's demands. *See* n.9 *supra*. By August 2017, when the government threatened Mr. Flynn with criminal charges related to the same FARA registration, former counsel were immediately caught in the vice of an intractable conflict of interest that they never escaped until Flynn engaged new counsel. By no later than August 2017, the conflict between Mr. Flynn and his former lawyers was non-consentable and not subject to waiver.  Even *if* Mr. Flynn had been fully informed in writing of the conflict at that time, the lawyers were obligated to withdraw from the representation without regard to his wishes.[14]

Some conflicts of interest are so likely to interfere with the effectiveness of counsel, and so destructive of the fairness of the proceeding, that courts must prophylactically *override* a defendant's proffered waiver of the right to conflict-free counsel. *Wheat v. United States,* 486 U.S. 153, 162 (1988) ("[W]here a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that defendants be separately represented."). In other words, conflicts of interest that are non-consentable according to professional norms are also not subject to waiver by a criminal defendant under the Sixth Amendment.

"Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who

---

[14] According to D.C. Rule of Professional Conduct 1.7(c)(2), conflicted representation may not commence or continue unless the affected client provides informed consent, after full disclosure of the possible adverse consequences "and the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client." Comment [7] to this Rule ensures that the words are taken seriously: the client can be asked to weigh in and judge its own interests only after the lawyer has become "satisfied that the representation can be wholeheartedly and zealously undertaken."

observe them." *Id.* at 160. Although in another case, a court could have remedied this, *this* Court

had no way of learning the extent of the conflict. That difficulty lies, in part, at the government's

door. After *Wheat*, it is open to *the government* to bring such matters to the attention of the court,

because public rights are also at stake. Here, the government sat back and harvested a guilty plea.

## C. *Brady* Requires the Government to Produce Exculpatory Evidence in Time for the Defense to Use It.

For almost six decades the Supreme Court has held that "the suppression by the prosecution

of evidence favorable to an accused . . . violates due process where the evidence is material either

to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v.*

*Maryland*, 373 U.S. 83, 87 (1963). A *Brady* violation "has three components: "[1] The evidence

at issue must be favorable to the accused . . .; [2] that evidence must have been suppressed by the

State, either willfully or inadvertently; and [3] prejudice must have ensued." *United States v.*

*Pasha*, 797 F.3d 1122, 1133 (D.C. Cir. 2015) (quoting *Strickler v. Greene*, 527 U.S. 263,  281-82

(1999)).

*Brady*'s mandate is central to due process and crucial to ensure that prosecutors fulfill

their obligation to seek justice rather than convictions. The rule of *Brady* does so "[b]y requiring

the prosecutor to assist the defense in making its case," and in that respect "the *Brady* rule

represents a limited departure from a pure adversary model." *Bagley*, 473 U.S. at 675 n.6. Most

fundamentally, *Brady* is enforced "to ensure that a miscarriage of justice does not occur." *Id.* at

675. By claiming "conspiracy theories" and "fishing expeditions," the government engages in

"label-lynching" to avoid addressing the facts, its misconduct, and the law.[15] But the government

is bound to see that "justice shall be done." *United States v. Berger*, 295 U.S. 78, 88 (1935)

---

[15] The government relies on out of Circuit cases that provide more support for the defense than for the prosecution. The government cites *United States v. Caro-Muniz*, 406 F.3d 22, 29 (1st Cir.

This Circuit holds that exculpatory and impeaching evidence must be disclosed in time for a defendant to use in preparing his defense. In *Pasha*, the court slammed the government for suppressing important exculpatory evidence from a witness for eight months, until the eve of trial. 797 F.3d at 1133. The appellate court agreed with the district court that this delay was

---

2005), for the proposition that "*Brady* does not permit a defendant to conduct an *in camera* fishing expedition through the government's files." Mr. Flynn agrees with this unexceptional point of law, and *Caro-Muniz* is an excellent case to underscore why his request is far from what courts consider fishing expeditions. In *Caro-Muniz*, the FBI sent an undercover informant to talk with the defendant multiple times before indicting him on charges of bribery. There were 140 tape recordings and the government disclosed 71 prior to trial. The defendant moved for the production of the rest of the tapes "on the basis that they might contain exculpatory or impeachment evidence." *Id.* at 28.

Without any further showing, the trial court tasked an FBI agent to listen to all the tapes to make sure "the [defendant's] voice [wa]s not heard in any of them and nor is he or anyone related to the facts of this case mentioned in these recordings." After that review, the court ordered the production of "three recordings where [the defendant's] voice could be heard, six additional recordings that were directly or indirectly related to the [] investigation, and transcripts of eight recordings that were not directly or indirectly related to the investigation." *Id.*

As a last-ditch effort, the defendant requested more tapes on appeal, which is when the First Circuit *affirmed* the lower court's production order, but denied the defendant's request for even more tapes because he "presented neither a theory regarding the existence of potentially exculpatory evidence on the tapes, nor has he made any showing that the tapes would be of substantial assistance to his defense." *Id.* By the First Circuit's standard, Mr. Flynn is entitled to all *Brady* material he has listed. Mr. Flynn has shown ways this material would have been of substantial assistance to him in defeating the government's allegations. It is also relevant to the motion to dismiss he expects to file.

Similarly, the government quotes *Kasi v. Angelone*, 300 F.3d 487 (4th Cir. 2002), for the proposition that "the *Brady* right to obtain exculpatory evidence [does not] equate to a right to rummage through government files" but, again, in that case, the Fourth Circuit noted that the defendant "concedes that he cannot point a specific identifiable piece of evidence that may have been favorable or in any way material to his guilt or innocence" and that he had not "giv[en] a clue" as to what evidence would be useful to him. Mr. Flynn has specifically identified the evidence he requests and how it relates to his case.

19

"inexcusable," for the Government should have understood as soon as they were finished talking with that gentleman they had an obligation to give that information to the defense." *Id.*[16]

Mr. Flynn was entitled to all the *Brady* evidence in the government's possession well before November 2017. The D.C. district court's decision in *United States v. Quinn* underscores *Bagley*'s rule that both late and *incomplete* disclosures are tantamount to suppression of evidence and violate a defendant's due process rights. 537 F. Supp. 2d 99 (D.D.C. 2008).[17] The court studied the government's limited disclosure and concluded "the government had no excuse for withholding this information from [the defendant], and its decision to do so violates its *Brady* duty of disclosure." *Id.* at 112 (citing a S.D.N.Y. case where the court dismissed because the government "failed to inform the defense until a week before trial that it would not be calling a witness whose credibility was now in doubt by the government"). Many high-profile cases make

---

[16] The *Pasha* court footnoted the district court's chastisement of the prosecutors, wherein the district court noted that "failure to comply with *Brady* obligations had more than once been a problem in this case." 797 F.3d at n.8. The district court also noted: "What is particularly troubling is that this is the second time in this case that the Government has withheld significant *Brady* information for an extended period of time. When is the Government going to learn?" *Id.* Apparently not by January 2017, despite the district court's decision nine years earlier.

[17] In *Quinn*, the government did not disclose to the defendant that its chief witness was almost certainly lying about the defendant's conduct, *Quinn*, 537 F.Supp. at 105, and instead only announced—after trial began—that it no longer planned to call the witness. *Id.* The court held that "the government must disclose *Brady* information at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case." *Id.* at 108.

Although the government claimed that it did not know with absolute certainty that its star witness had lied, the *Quinn* court held that this "constituted a breach of the government's duty to search for *Brady*" *id.* at 110 [quotations omitted], and the defendant "was misled and left with the incorrect perception that he alone doubted [the witness's] credibility." *Id.* at 109.

clear that the government will not learn until prosecutions are dismissed and it is held to the highest standard of accountability.[18]

The government dismisses its duty to produce impeachment evidence in a single sentence, claiming the Supreme Court has held its *Brady* obligation "does not extend to impeachment evidence." *United States v. Ruiz*, 536 U.S. 622 (2002); Gov. Reply Brief, 7, Oct. 1, 2019.  But *Ruiz* did not overrule *Giglio v. United States,* 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within the general rule [of *Brady*.]"), and *Bagley*, 473 U.S. at 676-77 (stating emphatically "[t]his Court has rejected any such distinction between impeachment evidence and exculpatory evidence").  Both hold that impeachment evidence is encompassed within *Brady*, and no court has held that *Ruiz* radically altered the *Brady/Giglio* landscape.  Rather, *Ruiz* focused on the voluntariness of the plea, and there was not even an allegation that any information was withheld.

 This Circuit applies the *Giglio* and *Bagley* standard that "'impeachment evidence . . . as well as exculpatory evidence falls within the *Brady* rule.'" *In re Sealed Case No. 99-3096 (Brady Obligation*s), 185 F.3d 887, 892 (D.C. Cir. 1999) (quoting *Bagley*, 473 U.S. at 676).  This is because "evidence that impeaches the [government's witnesses] is almost invariably 'favorable' to the accused, because by making the government's case less credible it enhances the defendant's" case.  185 F.3d at 893.  When impeachment evidence is exculpatory, as noted in *Giglio* and *Bagley*, it is *Brady* like any other. *McCann v. Mangialardi*, 337 F.3d 782, 787 (7th Cir. 2003). The

---

[18] *In re Contempt Finding in United States v. Stevens*, 744 F. Supp. 2d 253 (D.D.C. 2010) (aff'd by *United States v. Stevens*, 663 F.3d 1270 (D.C. Cir. 2011); *United States v. Kohring*, 647 F.3d 895 (9th Cir. 2011); *United States v. Kott*, 423 Fed. Appx. 736 (9th Cir. 2011); *United States v. Brown*, 459 F.3d 509 (5th Cir. 2006).

government cannot be the "architect of a proceeding that does not comport with standards of justice." *Brady*, 373 U.S. at 88.

The government views the charges against Mr. Flynn in a vacuum, arguing "[w]hether or not the FBI or DOJ contacted members of the White House before the defendant's January 24 interview has no bearing on whether the defendant lied to the agents during the interview." Dkt. 122 at 16. But, circumstances that brought about his improper interview, the conduct and credibility of the agents who interviewed him, and the broader landscape that precipitated this unjust prosecution are all relevant to Mr. Flynn's alleged guilt. Here, the conduct of the government is "so outrageous that due process principles would absolutely bar the government from invoking the judicial process to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973). Indeed, this entire investigation and prosecution is so fundamentally unfair as to be "shocking to the universal sense of justice." *Id*. at 432.

### D. Full, Actual, Unredacted Documents, The Original 302, Drafts Prior to February 10, 2019, and the 1A File and Subfiles Must be Produced Pursuant to *Brady*.

The only basis for the allegations against Mr. Flynn depends on the agents' characterizations of his statements to them in January 24, 2017, in the ambush interview. Yet, their own notes contradict the 302, fail to support it at all in other ways, do not support the factual basis for the plea, and cannot serve as evidence of any crime. Mr. Strzok's "notes" appear that they were not taken contemporaneously with the interview, which only creates more suspicion. Both sets of notes are redacted, but neither redacted documents nor summaries can substitute for the actual, full documents—especially in this case. Summaries are not evidence at all, and as this Court has warned, "they are opportunities for mistake and mischief." Tr. of Mot. Hr'g 9, *United States v. Stevens,* No. 08-231 (D.D.C. Apr. 7, 2009); Flynn Br. in Supp. of Mot. to Compel Production, Dkt. 109 at 16.

Inexplicably, the government asserts: "both interviewing agents have been clear, since the beginning and in their documentation, that the defendant made false statements to them on January 24, 2017, about multiple topics." But the government has no cite for this claim, nor does the defense have one. To the contrary, Mr. Flynn was honest with the agents to the best of his recollection at the time, and the agents knew it. The belatedly-disclosed Strzok-Page texts make clear that the agents left the interview with a firm conviction Mr. Flynn was being honest, and they maintained that conviction despite strong expressions of disbelief and cries of "bullshit" from their colleagues. Ex. 2. Nonetheless, for whatever reason, the agents did not record all Mr. Flynn's responses, nor did they record them all correctly in their notes, and the ultimate 302 and prosecution are even more questionable. Exs. 9, 10, 11.

The evidence the defense requests, if produced, would defeat the factual basis for the plea.[19] The original 302 is crucial to this as are the original notes. The government elides the truth that the FBI has it and any other drafts prior to February 10, 2017. The FBI can retrieve it from its

___

[19] This is one of the many reasons no one should be prosecuted for a violation of 18 USC 1001 unless the statement has been recorded. Every law enforcement officer has that ability on his phone. Sidney Powell & Harvey Silverglate, *Conviction Machine* (Encounter Books 2020). Everyone knows a simple difference in tone can completely change the meaning of a sentence.

Note that the criminal referral of former Deputy Director McCabe is predicated on several recorded interviews, under oath, with full knowledge of the purpose of the proceedings and an opportunity to correct any misstatements. After initially lying to James Comey by claiming or leading the then-Director to believe that "McCabe had not authorized the disclosure [to the media] and did not know who did," the INSD of the FBI interviewed him under oath where he again claimed "he had not authorized the disclosure to the WSJ and did not know who did." Several months later, under oath to the OIG—in a recorded interview—he swore that he was unaware his own Special Counsel Lisa Page was authorized to speak to the media on the issue or where she was at that time, and finally some four months after that, McCabe lied under oath about having lied under oath in all the previous incidents. The OIG determined McCabe authorized the leak to the WSJ via his Special Counsel "to advance his personal interests at the expense of Department leadership," and referred his case for prosecution. Office of the Inspector General, U.S. Dept. of Justice, *A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe*, Feb. 2018.

23

Sentinel system that logs and serializes the drafts, or the FBI can retrieve it from the file or sub-file in which it is buried. Neither the FBI nor its Sentinel system loses the most important of its reports that is supposed to support the federal felony of the President's National Security Advisor. The only reason for it to be suppressed is that it is favorable to the defense. If the agents recorded in the original 302 their impressions that Flynn was being truthful, had "a sure demeanor," and "showed no signs of deception," and that was edited out, it is "game over" for the government. Tellingly, Mr. Van Grack has chosen his words carefully, and he has not denied an original 302 exists.

This was the most important interview the FBI did—carefully orchestrated by the Director and Deputy Director after many internal discussions, and extensive meeting of the upper crust of the FBI for no valid purpose. [20] The original 302 is not "missing." If the government will not produce it, it could only have been deliberately destroyed, and this prosecution should be dismissed on that basis alone. *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1992) (holding that the district court properly dismissed the indictment due to the government's destruction of evidence by relying on the test articulated by the Supreme Court in *California v. Trombetta*, 467 U.S. 479, 489 (1984) and *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

**1. Agent Strzok's notes do not appear to have been taken contemporaneously during the interview.**

---

[20] The FBI knew that its questions had nothing to do with "Russian interference" in the election. Indeed, it had nothing to do with the election at all. As recently apparent from the Report of the Inspector General, this was Comey and McCabe's personally motivated operation in defiance of all protocols and procedures—deliberately circumventing DOJ. Office of the Inspector General, U.S. Dept. of Justice, *Report of Investigation of Former FBI Director James Comey's Disclosure of Sensitive Investigative Information and Handling of Certain Memoranda*, August 2019. The government is also required to produce these statements under Fed. R. Crim. P. 16(a)(B)(i).

Only the junior agent was taking notes during the interview. Strzok's 302 of July 2017 says that he was handling the interview and his partner was taking notes. A 302 is to be written into Sentinel within five days. Notes are to be signed and dated by the notetaker. Inexplicably, we have two sets of notes with significant redactions—neither of which is signed and dated as required. Exs. 9, 10. Agent Strzok's notes are far more detailed, lengthy, and written in a way that would not appear to be physically possible to write in a contemporaneous, casual setting. Ex. 10. The defense requests production of the actual, original notes, and handwriting samples of Strzok of contemporaneous and non-contemporaneous notes to evaluate another anomaly that further calls into question the entire effort by the FBI to manipulate and set up Mr. Flynn, and its report of that interview. Ex. 16.

**2. The 302 statement that Mr. Flynn was told the "nature of the interview" is false.**

As discussed *supra*, the government is suppressing evidence of notes, reports, or recordings of the significant meeting the upper echelon of the FBI held to orchestrate the agents' ambush of Mr. Flynn so as to keep him "relaxed." They purposely did not tell him they were investigating him and strategized at length to avoid raising any concerns. Ex. 6 ("Flynn was unguarded and clearly saw the FBI agents as allies.").

**3. Mr. Van Grack's Productions of Flynn 302s Were Incomplete and Misleading.**

But it gets worse. When Mr. Van Grack made his first official production to former counsel of any actual documents (other than the (final) Flynn 302 produced on Nov. 22, 2017) on March 13, 2018—all of which should have been produced before Mr. Flynn pleaded guilty—Mr. Van Grack made it sound like there was only one 302:

> Attachment I, which consists of two documents, is the interview report for the January 24, 2017, interview. SSA [redacted] and DAD Strzok digitally signed and certified the report on two occasions. They first digitally signed and certified the report in February 2017. They later digitally re-signed and re-certified the report in order to

25

remove a header. Specifically, the [sic] initially signed and certified the report, dated February 15, 2017 had mistakenly stated that it was a "DRAFT;" the documents are otherwise identical.

This is false.

On May 25, 2018, Mr. Van Grack dribbled out another production—again denying any obligation to do so under *Brady* or the Court's Standing Order. This included a draft 302 dated February 10, 2017, as if it were the only other one.

That was also misleading. After former counsel called Mr. Van Grack, on June 1, 2018, the government produced two more drafts of the 302—these dated February 11, 2017, and February 14, 2017. Mr. Van Grack did not explain why all these intervening drafts were not produced in March, nor how they suddenly turned up, and there are material differences— especially from February 10 to February 11. Ex. 11.

Obviously, there are drafts of the 302, including an original draft in the files or subfiles of the Sentinel System of the FBI dating back to January 24, 2017, or so—the date of the actual interview of Mr. Flynn. *Brady* requires the production of the original 302, all drafts, notes, recordings, statements, and all testimony of the two agents along with all participants in any of the meetings to plan the ambush of Mr. Flynn "to keep him relaxed." If they are not there, then they were wrongfully destroyed. Either way, the government must be held to account.

### 4. The Final 302 Falsely States that Mr. Flynn Remembered Making Four to Five Calls from the Dominican Republic When Both Sets of Notes State He Does Not Remember.

Notes by both agents state that Mr. Flynn does *not* remember making four to five calls to Ambassador Kislyak from the Dominican Republic, where he was on vacation, but that if he did so, it was because phone service was poor and he kept getting dropped. "I don't remember making 4-5 calls. If I did lousy place to call." The final 302 states the opposite: "Flynn remembered

26

making four to five calls that day about this issue, but that the Dominican Republic was a difficult

place to make a call as he kept having connectivity issues." Ex. 11. This dramatically demonstrates

the wrongheadedness of allowing a 302 to create a federal felony.

### 5. The Notes Provide No Support for a Chunk of the 302 That Purports to Provide a "Factual Basis" for the Plea.

Two out of four of the alleged false statements in the Statement of Offense are based on

what the agents claim Mr. Flynn said or did not say about the response of the Russian Ambassador

on two separate issues.[21] Even if we assume the skimpy, vague, and ambiguous notes correctly

represent anything the agents might claim, the notes provide no support for a question or an answer

about the Russian Ambassador's response—either to the UN vote or the sanctions. Exs. 9, 10.

### 6. Mr. Flynn's Statements Were Not Material.

At the conclusion of the December 18, 2018, hearing, this Court expressed concern about

the factual basis for the plea on the issue of materiality, and rightfully so.  The government publicly

asserted the "FBI had an open investigation into the Government of Russia's ('Russia') efforts to

interfere in the 2016 presidential election, including the nature of any links between individuals

associated with the Campaign and Russia, and whether there was any coordination between the

Campaign and Russia's effort." Statement of Offense, pg. 1. However, the *Brady* material

disclosed long after the plea and still undisclosed evidence shows that the agents asked him nothing

relevant to "efforts to interfere in the 2016 election." *Id.* Likewise, nothing about his calls to

Kislyak in late December 2016 as part of the transition into office had anything to do with

---

[21] "FLYNN also falsely stated that he did not remember a follow-up conversation in which the Russian Ambassador stated that Russia had chosen to moderate its response to those sanctions as a result of FLYNN's request." ¶3, Statement of Offense. "FLYNN also falsely stated that the Russian Ambassador never described to him Russia's response to FLYNN's request regarding the resolution." ¶ 4, *Id.*

coordination between anyone in the campaign and Russia. The agents did not ask even a single question about any coordination.

To the extent one can say the "interview" addressed "the nature of any links between any individuals associated with the campaign and Russia," all pretexts for the interview of Mr. Flynn are belied by evidence that the FBI knew exactly what Mr. Flynn had discussed with the Russian Ambassador on the issue of sanctions and the UN vote. They asked no question related to election interference or coordination between the campaign and Russia, and policy discussions by the incoming National Security Advisor were none of the FBI's business.

Whatever Mr. Flynn said to anyone regarding the UN issues had nothing to do with the FBI's alleged "investigation" about the 2016 election and could not be the basis for false statements "material" to that issue. According to the notes, he was not even sure he had spoken to Kislyak on that issue. Exs. 9, 10.

**7. The Flynn 302 Is Discussed in the Page-Strzok Texts and Was Not Approved by McCabe Until the Day After Flynn Resigned from the White House.**

Flynn resigned on February 13, 2017. The next day, Strzok texts: "*Is Andy good with [Flynn] 302*?" Page replies: "*Launch on f[lynn] 302*." It is no accident that McCabe himself approved the Flynn 302 the day after Mr. Flynn left the White House—three weeks after the interview and a prolonged "deliberative process" —which is not even appropriate for a 302.

**E. Classified Information Will Prove that Any Investigation of Mr. Flynn Was Pretextual.**

**1. *Yunis* Mandates Disclosure of The Classified Information Requested as *Brady*.**

The balancing test in *Yunis* only applies to classified information for which the government affirmatively asserts a valid privilege against production. *United States v. Yunis*, 867 F.2d 617 (D.C. Cir. 1989). In its opposition to Mr. Flynn's Motion to Compel, the government does not assert a privilege against disclosure of information or even identify which information the defense

has requested is classified. Accordingly, it should all be produced because either (i) *Yunis* does not apply unless information is classified, and most of the *Brady* evidence the defense requests is not classified; or (ii) the government has failed to assert a privilege. *Id.* at 623 ("the requested discovery and the response of privilege trigger a further inquiry"). The privilege asserted in *Yunis* is the basic national security privilege and is analogous to the informant's privilege. It protects critical "intelligence sources and methods." *Id.* at 620. There are no sources or methods to protect in this case.

The government cannot conceal its wrongdoing behind a claim of classification. As President Obama made clear in Executive Order 13526, §1.7: "In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to: (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency." *Yunis* is merely a final protection to make sure that classified information is properly requested, but once a showing has been made, the door opens to accommodate a defendant's constitutional rights.

### 2. The DIA Reports of Briefing and Debriefings Belie Any Basis to Investigate Mr. Flynn and Likely Further Undermine the Factual Basis for the Plea.

The defense is entitled to the reports the DIA has of all the work Mr. Flynn did for the Agency while the FBI was asserting he was a foreign agent. The government has long known that Mr. Flynn pre-briefed the DIA on his meeting with Turkish officials in New York in September 2016, yet it produced nothing until August 2019—again, when Mr. Van Grack learned it was being produced elsewhere. This undercuts (i) the government's contention that he ever worked as an "agent of Turkey" in violation of 18 U.S.C. §951; (ii) the factual basis for his plea; and (iii) that he received any benefit from not being charged with a FARA-related violation. *See United States v. Rafiekian*, No. 1:18-cr-457-AJT-1 (E.D. Va. Sept. 24, 2019).

29

Similarly, even though the DIA briefings and debriefings Mr . Flynn has requested, and other information that has been redacted here and there, have been classified, *Yunis* does not prohibit their disclosure to Flynn. The requested information includes the government's records of Mr. Flynn's own statements- some of which supposedly form the basis for the charges against him, and *Yunis* itself makes clear he is entitled to those statements. *See Yunis,* 867 F.2d at 621 (noting that Fed. R. Crim. P. 16(a)(1)(A) entitles a defendant to his own relevant written recorded statements, and that production of such statements is "practically a matter of right"). *See also,* Fed. R. Crim. P. 16(a)( 1 )(B), which details a defendant' s right to his written and recorded statements.

There is no doubt the DIA information is exculpatory.  Senator Grassley has stated that it is exculpatory of Mr . Flynn, and it consists of his own statements and communications[22]  The DIA reports the defense requests will not only exonerate him of being any kind of foreign agent but evince that the FBI/DOD knew this all along.  This information meets the standard for disclosure required by *Yuni*s-even if thegovernment invokes a privilege to exempt it.  Ten people briefed Mr         .         Flynn         before         his         trip         to         Russia

███████████████████████████████████████████████████████

Simply put, the information the defense requests through its motion will reveal the investigation and prosecution were unprecedented in their motivation, tactics, and overreach.

### 3. The Letter from Sir Mark Lyall Grant to the Incoming National Security Team Invalidates Any Use of Information from Christopher Steele, Further Undermines Any "Russia" Connection, and is Being Suppressed.

---

[22] Letter of Sen. Charles Grassley to Deputy Attorney General Rod Rosenstein (June 6, 2019), https://tinyurl.com/y9jcg4ad.

30

Mr. Van Grack knows about this letter, and he questioned people about it. He may have seen it and have a copy of it. It was written by the United Kingdom's National Security Advisor, Sir Mark Lyall Grant, and hand-delivered January 12, 2017, from the British Consulate to the incoming National Security team in New York. It was not classified. Protocol dictates that it was also provided to the then active national security advisor—Susan Rice.  This was two weeks before the pretextual interview of Mr. Flynn, and it eviscerates the credibility of Christopher Steele whose false and unverified assertions mention Mr. Flynn and were used by the FBI to obtain illegal FISA warrants that likely reached the communications of Mr. Flynn. It undermines the entire "Russia-collusion" fable that Comey, McCabe and others used to justify their unlawful conduct. Ex. 7. (two pages of Steele dossier). In fact, that letter alone should have mandated termination of the FISA warrant, which was wrongly renewed twice after the Grant letter was delivered—including once for the wrongful benefit of Special Counsel. Anything obtained as a result of that warrant would have to be suppressed and could not be used against Mr. Flynn.

## CONCLUSION

In its relentless pursuit of Mr. Flynn, the government became the architect of an injustice so egregious it is "repugnant to the American criminal system." *Russell*, 411 U.S. at 428 (citations omitted). For these reasons and those in our original Motion and Brief in Support, this Court should compel the government to produce the evidence the defense requests in its full, unredacted form. Given the clear and convincing evidence herein, this Court should issue an order to show cause why the prosecutors should not be held in contempt; and should dismiss the entire prosecution for outrageous government misconduct.

Dated: November 1, 2019

Respectfully submitted,

Jesse R. Binnall
Jesse R. Binnall, VSB # 79292
Lindsay R. McKasson
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
jbinnall@harveybinnall.com

Sidney Powell
Sidney Powell
Molly McCann
Sidney Powell, P.C.
2911 Turtle Creek Blvd., Suite 300
Dallas, Texas 75219
Tel: (214) 07-1775
sidney@federalappeals.com
*Admitted Pro Hac Vice*

W. William Hodes
The William Hodes Law Firm
3658 Conservation Trail
The Villages, Florida 32163
Tel: (352) 399-0531
wwh@hodeslaw.com
Admitted *Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2019, a true and genuine copy of Mr. Flynn's

Motion to Compel Production of *Brady* Material and for an Order to Show Cause was filed

using the Court's CM/ECF system, which will serve a copy of the filing on all counsel record.

Jessie K. Liu, U.S. Attorney for the District of Columbia
Brandon L. Van Grack, Special Assistant U.S. Attorney
Deborah Curtis, Assistant U.S. Attorney
Jocelyn Ballantine, Assistant U.S. Attorney
555 4th Street, NEW
Washington, D.C. 20530

/s/ Sidney Powell
Sidney Powell, P.C.
2911 Turtle Creek Blvd.,
Suite 300
Dallas, Texas 75219
Tel: 214-707-1775
sidney@federalappeals.com
Admitted *Pro Hac Vice*

| | |
|---|---|
| **FLYNN KEY EVENT TIMELINE** | |

| Date | Event |
|---|---|
| 07/19/2016 | Lisa Page texts Peter Strzok "*Donald Trump is an enormous d\*uche*" |
| 07/21/2016 | Trump accepts the GOP nomination (General Flynn joined the Trump Campaign sometime in 2015) |
| 07/25/2016 | Lisa Page texts Peter Strzok: "*I can't imagine either one of you could talk about anything in detail meaningful enough to warrant recusal,*" referring to Judge Contreras. Peter Strzok replies: "*Really? Rudy, I'm in charge of espionage for the FBI. Any espionage FISA comes before him, what should he do? Given his friend oversees them?*" |
| 10/15/2016 | John Carlin announced his resignation on 9/27/2016 - Formally left the NSD on 10/15/2016 |
| 10/20/2016 | Strzok texts "…*Trump is a fucking idiot…*" |
| 11/8/2016 | Trump Election Day; Gen. Flynn publishes op-ed in The Hill about Gulen |
| 11/17/2016 | President-elect Trump names Michael Flynn as his National Security Advisor |
| 11/30/2016 | DOJ issues FARA to Flynn |
| 12/22/2016 | Flynn calls multiple countries re: UN Action |
| 12/29/2017 | Flynn returns call from Kislyak in DR |
| 01/10/2017 | Passing the Baton Ceremony |
| Jan/2017 | DOJ/FBI know no basis to prosecute Flynn for Logan Act |
| 01/12/2017 | David Ignatius -- Washington Post: "According to a senior U.S. government official, Flynn phoned Russian Ambassador Sergey Kislyak several times on Dec. 29, the day the Obama administration announced the expulsion of 35 Russian officials. . . . " |
| 01/22/2017 | General Flynn is sworn in as National Security Advisor. The Wall Street Journal reports that US counterintelligence agents have been investigating Flynn's communications with Russian officials |
| 01/23/2017 | WP reports, "There was no active investigation on Flynn & no evidence of wrong doing U.S. officials said." |
| 01/23/2017 | Lisa Page texts Peter Strzok: "*I can feel my heart beating harder, I'm so stressed about all the ways THIS has the potential to go fully off the rails.*" |
| 01/23/2017 | Multiple FBI executives meet to plan/strategize interview of Flynn so as not to alert him to investigation and to keep him "relaxed" |
| 01/24/2017 | FBI Agents interview Flynn; report to multiple people they believed Flynn |
| 01/24/2017 | Peter Strzok texts Lisa Page: "*Describe the feeling, nervousness, excitement knowing we had just heard him denying it all, knowing we'd have to pivot into asking. Puzzle round and round about it. Talk about the funny details. Remember what I said that made Andy laugh and ask if he really said that.*" |

| 01/30/2017 | DOJ has internal memo--still not produced--that clears Flynn of being an "agent of Russia." |
| 02/13/2017 | Gen. Flynn resigns as National Security Advisor |
| 02/13/2017 | DOJ FARA division David Laufman calls Covington to pressure FARA filing |
| 02/14/2017 | Comey meets with Trump who "hopes" he will "let the Flynn thing go." Comey writes memo with obstruction claim. Strzok-Page text: "Also, is Andy good with F 302?" Strzok-Page text "Launch on f 302" |
| 02/15/2017 | McCabe approves Flynn 302 |
| 03/07/2017 | Covington files FARA Registration |
| 03/31/2017 | First reports allege Flynn relationship with Svetlana Lokhova - instigated by Stefan Halper |
| 04/05/2017 | The Department of Justice issues subpoena on Flynn Intel Group Inc. re: FARA registration |
| 05/09/2017 | President Trump fires James Comey |
| 05/09/2017 | Page/Strzok text: "And we need to open the case we have been waiting on now while Andy is acting." |
| 05/10/2017 | McCabe opens obstruction investigation on President Trump |
| 05/10/2017 | Senate Intel Committee Subpoenas Flynn |
| 05/10/2017 | Page/Strzok Text: "We need to lock in [redacted]. In a formal chargeable way. Soon." |
| 05/11/2017 | Mary McCord - Acting Assistant Attorney General - DOJ's National Security Division leaves DOJ |
| 05/16/2017 | NYT Publishes story based on Comey's leaked memo |
| 05/17/2017 | Robert Mueller named Special Counsel |
| 5/23/2017 | Covington receives 2 subpoenas from SSCI to FIG Inc., FIG LLC, and a narrow subpoena to Gen. Flynn |
| 5/31/2017 | Covington receives 2 subpoenas from HPSCI to Gen. Flynn and FIG LLC dated 5/25/2017 |
| Mid June | Lisa Page leaves Special Counsel and DOJ. IG notifies Mueller of text messages. |
| 07/26/2017 | FBI raids Manafort's home; searches his wife in bed at gunpoint |
| 07/27/2017 | Peter Strzok demoted |
| 07/28/2017 | The Department of Justice collects Gen. Flynn's phone and computer |
| 10/20/2017 | Rosenstein Authorizes Mueller to Target Michael Flynn Jr. |
| 11/16/2017 | General Flynn interviews with the SCO |
| 11/17/2017 | General Flynn interviews with the SCO |
| 11/19/2017 | General Flynn interviews with the SCO |
| 11/20/2017 | General Flynn interviews with the SCO |
| 11/21/2017 | General Flynn interviews with the SCO |
| 11/22/2017 | Prosecution produces Flynn 302 (final one) to Covington |
| 11/29/2017 | Extensive meeting with SCO; late in day Flynn agrees to plead to one count and continue cooperating with US |

| | |
|---|---|
| 11/30/2017 | Late afternoon, prosecutors make last minute telephonic disclosure of electronic communications showing a preference for one candidate<br><br>General Flynn signs plea agreement to one 1001 count for making false statements to the FBI on 01/24/2017 and signs cooperation agreement |
| 12/01/2017 | Judge Contreras takes Flynn guilty plea at 10:30 a.m. |
| 12/02/2017 | Press breaks news of Strzok Page texts, affair, and anti-Trump malice; OIG issues rare statement re investigation |
| 12/04/2017 | CNN reveals that Strzok changed wording of Comey's Clinton speech to avoid statutory language of gross negligence |
| 12/06/2017 | Bruce Ohr demoted at DOJ |
| 12/07/2017 | News breaks that Bruce Ohr was in contact with Fusion GPS while FISA application was submitted and granted;<br>Judge Contreras recused |
| 12/07/2017 | Judge Sullivan assigned case |
| 02/12/2017 | First Brady order entered (Dkt. 10) |
| 12/20/2017 | James Baker - FBI General Counsel - demoted and reassigned |
| 12/23/2017 | Andrew McCabe - Deputy FBI Director - announced retirement effective March 17, 2018 |
| 01/08/2018 | Bruce Ohr - demoted a second time. |
| 01/23/2018 | James Rybicki - Chief of Staff to FBI Director James Comey resigns |
| 01/29/2018 | Andrew McCabe forced to Resign Acting Director Position |
| 02/02/2018 | Josh Campbell - Special Assistant to James Comey – Announced his resignation |
| 02/08/2018 | Michael Kortan FBI Asst. Director Public Affairs - Resigned - Effective 02/15/2018 |
| 02/07/2018 | David Laufman - DOJ National Security Division, Deputy Asst. – announces resignation |
| 02/09/2018 | Rachel Brand - Associate Attorney General - Resigned |
| 02/16/2018 | Judge Sullivan enters Second Brady order (see Dkt. 20) |
| 03/13/2018 | Prosecution's first Brady production includes first actual Strzok-Page texts by link to publicly available information |
| 03/16/2018 | Andrew McCabe - Deputy FBI Director - Fired |
| 3/30/2018 | Greg Bower - FBI Assistant Director for the Office of Congressional Affairs - Resigned |
| 05/04/2018 | James Baker - Senior-Most Legal Counsel at FBI- Resigned |
| 8/10/2018 | Peter Strzok Fired |
| 12/05/2018 | Bill Priestap - Assistant Director - Head of FBI Counterintelligence – announced retirement |

| 2016-07-19 02:23:29, Tue | OUTBOX | And wow, Donald Trump is an enormous d*uche. |
| 2016-07-19 10:16:23, Tue | INBOX | Hi. How was Trump, other than a douche? Melania? |
| 2016-07-19 10:18:31, Tue | OUTBOX | Trump barely spoke, but the first thing out of his mouth was "we're going to win soooo big." The whole thing is like living in a bad dream. |
| 2016-07-19 10:19:41, Tue | INBOX | Jesus |

| 2016-07-19 11:20:06, Tue | OUTBOX | God, it's just a two-bit organization. I do so hope his disorganization comes to bite him hard in November. |
| 2016-07-19 11:21:13, Tue | INBOX | It HAS to, right? Right?!? Panicked \U0001f628 |

| 2016-07-20 00:14:02, Wed | INBOX | Hopefully you get home in time for crazy - ass grain storage pyramid Ben Carson tonight. |
| 2016-07-20 00:14:10, Wed | INBOX | Pence being introduced |
| 2016-07-20 00:14:42, Wed | INBOX | Blech eating late. |
| 2016-07-20 00:55:52, Wed | OUTBOX | Omg you need to read the top four most popular on nyt right now. Kinda makes you feel like this is all a bad dream?... |
| 2016-07-20 00:58:22, Wed | INBOX | Hell, look at the top 6. I think the downfall of Rome wad like this... |
| 2016-07-20 01:12:03, Wed | OUTBOX | Mitch McConnell always reminds me of a turtle. |

| 2016-07-21 08:52:19, Thu | OUTBOX | This is really shocking.\n\nDonald Trump Sets Conditions for Defending NATO Allies Against Attack http://nyti.ms/2ai4u3g |
| 2016-07-21 09:09:58, Thu | OUTBOX | This campaign is like watching a train wreck happen over and over and over again.\n\nHow Donald Trump Picked His Running Mate http://nyti.ms/2a8aCJ9 |
| 2016-07-21 09:40:02; Thu | INBOX | Trump is a disaster. I have no idea how destabilizing his Presidency would be |

| Date/Time | Box | Message |
|---|---|---|
| 2016-07-25 00:44:07, Mon | OUTBOX | Peter. It wasn't me. No memory of minority mention or any of it. I'm sorry. |
| 2016-07-25 00:44:47, Mon | OUTBOX | Go ask her. Thought of it because you had to Google FISC judges and saw him there. I'm telling you. |
| 2016-07-25 00:50:43, Mon | INBOX | I just did. She confirmed I hadn't.   So either in told you or wanted to tell you and hadn't. She brought up a good point about being circumspect in talking to him in terms of not placing him into a situation where he'd have to recuse himself. |
| 2016-07-25 00:52:07, Mon | OUTBOX | I can't imagine either one of you could talk about anything in detail meaningful enough to warrant recusal. |
| 2016-07-25 00:52:23, Mon | OUTBOX | Anyway, maybe you meant to, but you didn't. |
| 2016-07-25 00:53:08, Mon | INBOX | Really? Rudy, I'm in charge of espionage for the FBI. Any espionage FISA comes before him, what should he do? Given his friend oversees them? |
| 2016-07-25 00:53:55, Mon | INBOX | Ok, I believe you that I didn't. Thought I had. Happy to (indeed, wanted to and thought I did) talk about it with you. |
| 2016-07-25 00:56:24, Mon | OUTBOX | standards for recusal are quite high. I just don't think this poses an actual conflict. And he doesn't know what you do? |
| 2016-07-25 01:00:00, Mon | INBOX | Generally he does know what I do.  Not the level or scope or area. But he's super thoughtful and rigorous about ethics and conflicts. M suggested a social setting with others would probably be better than a one on one meeting. I'm sorry, I'm just going to have to invite you to that cocktail party. |
| 2016-07-25 00:09:56, Mon | OUTBOX | Jesus, did you read this?\n\nIs Donald Trump a Racist? http://nyti.ms/2aiqD08 |
| 2016-07-27 00:21:39, Wed | OUTBOX | Yeah, it is pretty cool. She just has to win now. I'm not going to lie, I got a flash of nervousness yesterday about trump. The sandernistas have the potential to make a very big mistake here... |
| 2016-08-06 14:38:09, Sat | OUTBOX | Jesus. You should read this. And Trump should go f himself. \n\nMoment in Convention Glare Shakes Up Khans\u2019 American Life http://nyti.ms/2aHuLE0 |
| 2016-08-06 14:53:36, Sat | INBOX | God that's a great article. \U0001f621\U0001f61e\U0001f61e\u2764\n\nThanks for sharing. \n\nAnd F Trump. |
| 2016-08-06 14:55:00, Sat | OUTBOX | And maybe you're meant to stay where you are because you're meant to protect the country from that menace. To that end, read this: |
| 2016-08-06 14:55:19, Sat | OUTBOX | Trump\u2019s Enablers Will Finally Have to Take a Stand http://nyti.ms/2aFakry |
| 2016-08-06 15:04:43, Sat | INBOX | Thanks. It's absolutely true that we're both very fortunate. \n\nAnd of course I'll try and approach it that way. I just know it will be tough at times.\n\nI can protect our country at many levels, not sure if that helps... |

| 2016-08-26 16:42:40, Fri | INBOX | Just went to a southern Virginia Walmart. I could SMELL the Trump support.... |
|---|---|---|

| | | |
|---|---|---|
| 2016-10-19 11:54:12, Wed | INBOX | It's ⬚ Briefed up Bill with that and dates. He will provide to Andy. |
| 2016-10-19 13:04:19, Wed | INBOX | Came up with election night plan - we should all hit HH somewhere. Figure this damn thing better be called early. \U0001f612\n\nYou watching the debate tonight? |
| 2016-10-19 13:04:50, Wed | OUTBOX | That's a good plan. |
| 2016-10-19 13:04:59, Wed | OUTBOX | ▮▮▮▮▮ |
| 2016-10-19 20:18:08, Wed | OUTBOX | DAG approved. I told ⬚ already to stand by for one edit. Am going to go tell andy now. |
| 2016-10-19 20:23:06, Wed | OUTBOX | Might be a minute past 4:30 because I am waiting for Andy to leave d office to tell him. |
| 2016-10-19 20:31:29, Wed | OUTBOX | Yeah. But still waiting for Andy. |
| 2016-10-20 00:34:16, Thu | INBOX | You got a bonus from MYE. |
| 2016-10-20 00:37:04, Thu | INBOX | Just write, look, I'm supposed to get some small amount, ⬚ or something I, for MYE. Plus some time off. Then do 4-5 days. \n\nPlease. I insist. I'll make up the $ in per diem in London... |
| 2016-10-20 00:54:15, Thu | INBOX | You gotta watch the debates.... |
| 2016-10-20 00:57:07, Thu | OUTBOX | I'm not watching. I honestly don't want to. It is not worth the stress to me. |
| 2016-10-20 01:15:12, Thu | INBOX | I cannot believe what I.am hearing. |
| 2016-10-20 01:15:44, Thu | INBOX | I am riled up. Trump is a fucking idiot, is unable to provide a coherent answer. |
| 2016-10-20 01:16:28, Thu | OUTBOX | Please. I honestly don't want to know. |
| 2016-10-20 01:20:41, Thu | OUTBOX | It's not worth your stress either. ⬚ |

| 2016-11-08 01:56:33, Tue | INBOX | OMG THIS IS F*CKING TERRIFYING:\nA victory by Mr. Trump remains possible: Mrs. Clinton\u2019s chance of losing is about the same as the probability that an N.F.L. kicker misses a 38-yard field goal. |
|---|---|---|
| 2016-11-08 02:05:51, Tue | OUTBOX | Yeah, that's not good. |

| 2017-01-23 06:45:42 | ▊ | Incoming | | I can feel my heart beating harder, I'm so stressed out about all the ways this has the potential to go fully off the rails. |
|---|---|---|---|---|
| 2017-01-23 06:56:28 | ▊ | Outgoing | Read | I know. I just talked with ▊ we're getting together as soon as I get in to finish that write up for Andy this morning. I reminded ▊ about how I had told Bill and the entire group that we should wait 30 to 60 days after the inauguration to change how were managing this stuff. As it is, he went ahead, and everything is completely falling off the rails. I think our stuff is good on our cases, but I have no hope or understanding about what they're doing on Jens side of the house. ▊ |

| PS-outgoing | 1/24/17 | 19:24 | Describe the feeling, nervousness, excitement knowing we had just h |
|---|---|---|---|
| PS-outgoing | 1/24/17 | 19:24 | eard him denying it all, knowing we'd have to pivot into asking. |
| PS-outgoing | 1/24/17 | 19:24 | Puzzle round and round about it. Talk about the funny details. Reme |
| PS-outgoing | 1/24/17 | 19:24 | mber what I said that made Andy laugh and ask if he really said tha |
| PS-outgoing | 1/24/17 | 19:52 | Also, have some faith in ▊ and my assessment. Of course there's room for disagreement or error. But we were pretty convinced.  It's fine to disagree - |
| PS-outgoing | 1/24/17 | 19:52 | your hesitation to tell me you did worried me a little bit. |
| PS-incoming | 1/24/17 | 21:31 | Okay, I'm crawling into bed now. I have the utmost faith in both your thinking. And I don't remember andy laughing or saying that! What was it about? Sur |
| PS-outgoing | 1/24/17 | 21:51 | A) thank you. Its important to me that you feel that. I'm finding it hard to go out on a counterintuitive yet strongly felt ledge with so many competent |
| PS-outgoing | 1/24/17 | 21:51 | voices expressing what I feel, too: bullsh*t - that doesn't make sense. B) I made some joke about what F said. Something patriotic or military. C) not t |
| PS-incoming | 1/25/17 | 05:45 | A) I get it. I'm sorry that I don't know what advice to offer you; it was clear that you both walked in and felt very strongly, so that obviously counts |
| PS-incoming | 1/25/17 | 05:45 | for something.  B) You made a joke about the military band, though I can remember exactly what you said. C) Jesus, what happened now?! |

| 2017-02-07 19:21:33 | ▊ | Incoming | How did convo re Jen go? |
|---|---|---|---|
| | | | And god, thP◆◆f▦3▯ %▯ |
| 2017-02-08 19:02:37 | ▊ | Outgoing | Just heard from ▊ , he said he went "up to Flynn's office" and was unable to get valiu◆◆n▦3 %▯ |

| PS-outgoing | 2/10/17 | 18:02 | Hey I was considering what you said, please just drop off what you have, I will incorporate it tonight /tomorrow and email back out to you. Thanks for yo |
| PS-outgoing | 2/10/17 | 18:02 | ur time on it. |
| PS-incoming | 2/10/17 | 19:09 | It's fine.  Unrelated, but you need to finalize that asap. I wouldn't be surprised if following this evening's events that a request comes in to see it. |
| PS-outgoing | 2/10/17 | 19:11 | A) I don+M1625't believe you. And I love you.   B) thank yiu. I'm going back in tonight to do so |
| PS-incoming | 2/10/17 | 19:12 | I gave my edits to Bill to put on your desk. |
| PS-outgoing | 2/10/17 | 21:50 | Bill didn't leave your edits in my office. I found them in his, so pls let me know if you're not ok with my grabbing them (ie, you told me you gave them |
| PS-outgoing | 2/10/17 | 21:50 | to him).  And thank you. I appreciate your time. |
| PS-incoming | 2/10/17 | 22:32 | Yes, it's no problem. You can say I emailed you to tell you I left them with him. |
| PS-outgoing | 2/10/17 | 22:36 | I made your edits, and sent them to Joe. I also emailed you an updated 302. I'm not asking you to edit it this weekend, I just wanted to send it to you. |
| PS-outgoing | 2/10/17 | 22:37 | And hopefully it doesn't need much more editing. I will polish it this weekend, and have it ready for Monday. I really appreciate your time and edits. |

| Date | Phone Number | Direction | Status | Text Content |
|---|---|---|---|---|
| 2017-02-13 07:58:53 | ████ | Outgoing | | Cool. Sure. I just told ████ I was going to go based on what ████ told me but that I needed to talk to Bill. |
| 2017-02-13 08:28:23 | ████ | Outgoing | | Hi. You go to morning briefs? |
| 2017-02-13 08:32:42 | | Incoming | | No |
| 2017-02-13 08:32:53 | | Incoming | | Had to meet with ████ re the EAD prep today. |
| 2017-02-13 08:43:35 | | Outgoing | | Talk quickly? |
| 2017-02-13 08:43:55 | | Incoming | | Sure. Call dek◆◆ |
| 2017-02-13 08:54:52 | | Incoming | | I'm done if you want to call back. |
| 2017-02-13 08:56:15 | | Incoming | | Nevermind I'm making calls. |
| 2017-02-14 15:37:38 | | Outgoing | | Also, is Andy good with F 302? |

| Date | Phone Number | | Direction | Status | Text Content |
|---|---|---|---|---|---|
| 2017-02-14 15:38:20 | | | Outgoing | | Fyi, have wrap at 345. Done at 430 |
| 2017-02-14 15:50:41 | ████ | | Incoming | | Launch on f 302. |
| 2017-02-14 15:56:29 | | | Outgoing | | K thank you.<br><br>Andy still leaving early? |
| 2017-02-14 15:56:49 | ████ | | Incoming | | Supposed to, but still here. |
| 2017-02-14 21:06:39 | | | Outgoing | | Just imsged |
| 2017-02-15 21:24:00 | From: | ████ Lisa Page | Incoming | Read | Note the bcc. |
| 2017-02-15 21:25:00 | To: | ████ Lisa Page | Outgoing | Sent | K |

| | | | | |
|---|---|---|---|---|
| | Strzok | | | |
| 2017-05-09 20:14:00 | From: ▓▓▓ Peter P. II Strzok ▓▓▓ | Outgoing | Read | And we need to open the case we've been waiting on now while Andy is acting. |

| | | | | The call will be fine. IVI will be fine. |
|---|---|---|---|---|
| 2017-05-10 05:29:00 | To: ▓▓▓ Peter P. II Strzok | Incoming | Sent | We need to lock in ▓▓▓. In a formal chargeable way. Soon. |
| 2017-05-10 05:30:00 | From: ▓▓▓ Peter P. II Strzok ▓▓▓ | Outgoing | Read | I agree. I've been pushing and I'll reemphasize with Bill. |

| | | | |
|---|---|---|---|
| 2017-06-01 10:33:55, Thu | INBOX | Lisa. I don't think that's true. You won't be least impressive. You (and/or i, if I go) will solidly hold our own. Thats more than enough for you when it's all done. And that group will forever take take of itself. Look at the Enron crew. | sms |

~~SECRET//NOFORN~~

## RYBICKI, JAMES E. (DO) (FBI)

| | |
|---|---|
| From: | COMEY, JAMES B. (DO) (FBI) |
| Sent: | Saturday, January 07, 2017 1:42 PM |
| To: | MCCABE, ANDREW G. (DO)(FBI); BAKER, JAMES A. (OGC) (FBI); RYBICKI, JAMES E. (DO) (FBI) |
| Cc: | COMEY, JAMES B. (DO) (FBI) |
| Subject: | My notes from private session with PE on 1/6/17 -- ~~SECRET//ORCON/NOFORN~~ |

Classification: ~~SECRET//ORCON/NOFORN~~

Classified By: Director
Derived From: FBI NS1C dated 20130301
Declassify On: 20271231

What follows are notes I typed in the vehicle immediately upon exiting Trump Tower on 1/6/17.  Although I wrote this less than five minutes after the meeting and have tried to use actual words spoken, including quoting directly in some places, I have not used quotation marks throughout because my purpose was to capture the substance of what was said.  I am not sure of the proper classification here so have chosen SECRET.  Please let me know of it should be higher or lower than that.

Notes begin here:

1.4)(C) uring my briefing on the ███████ material in the main body of the meeting, I mentioned the derog files on
1.4)(C)
███████████████████████████ I said we were doing that.

At the conclusion of our session, the COS asked whether there is anything we haven't mentioned that they should know or that might come out.  I said there was something that Clapper wanted me to speak to the PE about alone or in a very small group.  COS asked whether the group of COS, VPL, and PE was okay or whether I wanted to be alone.  I told him it was up to the PE, who quickly said that he and I would meet alone.

After others left the room, we sat at the table.  He began by telling me that I had had one heck of a year but that I had conducted myself honorably and had a great reputation.  He said I was repeatedly put in impossible positions.  He said you saved her and then they hated you for what you did later, but what choice did you have?  He said he thought very highly of me and looked forward to working with me, saying he hoped I planned to stay on  I assured him I intended to stay  He said good.

I then executed the session exactly as I had planned.  I told him that I wanted to meet with him to tell him more about
1.4)(C) hat is in the reports written by ███████, although I didn't use that name)  I said that the written reports
1.4)(C) emselves were ██████████████████████ and the content known at IC senior level and that I
didn't want him caught cold by some of the detail.  I then explained that the ████████████████████████████
1.4)(C)

~~SECRET//NOFORN~~

*Classified by: AB CD*
*Derived from: FBI NS16...*
*dated 20130301*
*Declassify on: 20421231*

SECRET//NOFORN

I said, the Russians allegedly had tapes involving him and prostitutes at the Presidential Suite at the Ritz Carlton in Moscow from about 2013. He interjected, "there were no prostitutes; there were never prostitutes." He then said something about him being the kind of guy who didn't need to "go there" and laughed (which I understood to be communicating that he didn't need to pay for sex). He said "2013" to himself, as if trying to remember that period of time, but didn't add anything. He said he always assumed that hotel rooms he stayed in when he travels are wired in some way. I replied that I do as well.

I said I wasn't saying this was true, only that I wanted him to know both that it had been reported and that the reports were in many hands. I said media like CNN had them and were looking for a news hook. I said it was important that we **1.4)(c)** not give them the excuse to write that the FBI has the material or ▮▮▮▮▮▮▮▮▮▮▮ and that we were keeping it very close-hold. He said he couldn't believe they hadn't gone with it. I said it was inflammatory stuff that they would get killed for reporting straight up from the source reports.

He then started talking about all the women who had falsely accused him of grabbing or touching them (with particular mention of a "stripper" who said he grabbed her) and gave me the sense that he was defending himself to me. I responded that we were not investigating him and the stuff might be totally made up but it was being said out of Russia and our job was to protect the President from efforts to coerce him. I said we try to understand what the Russians are doing and what they might do. I added that I also wanted him to know this in case it came out in the media.

He said he was grateful for the conversation, said more nice things about me and how he looks forward to working with me and we departed the room.

JBC

Classification: SECRET//ORCON/NOFORN

2

SECRET//NOFORN

UNCLASSIFIED//FOUO

I attended an Oval office homeland threat briefing for the President today. The meeting was scheduled for 4 pm but was delayed by a prior meeting, which was apparently related to the ongoing litigation over the immigration executive order. The AG and Sec DHS were in the earlier meeting and remained in the Oval when my meeting began, at about 4:15.

There were about a dozen people in the Oval for the homeland session. I sat facing the President over the Resolute Desk in a semi-circle of 6 chairs. DD/CIA sat to my left and D/NCTC to my right. Staff members occupied the couches and chairs behind me. Tom Bossert perched on the arm of a couch to steer the session. I noticed Jared Kushner and Stephen Bannon by face. Mike Dempsey and the VP's NSA were also there, and two or three others (I think including Reince Priebus).

At the completion of the session, the President thanked everyone and said he wanted to speak with me alone. The AG lingered momentarily by my chair, but the President thanked him and said he wanted to meet with Jim. He repeated this at least one more time to usher people out. Everyone left except Jared Kushner, who stopped by my chair to shake hands and exchange pleasantries, including a few brief words about the challenges of the email investigation. The President joined in this brief exchange but then told Mr. Kushner that he wanted to meet with me. That left the two of us alone.

He began by saying he wanted to "talk about Mike Flynn." He then said that, although Flynn "hadn't done anything wrong" in his call with the Russians (a point he made at least two more times in the conversation), he had to let him go because he misled the Vice President, whom he described as "a good guy." He explained that he just couldn't have Flynn misleading the Vice President and, in any event, he had other concerns about Flynn, and had a great guy coming in, so he had to let Flynn go.

He asked me if I had seen Sean Spicer's press briefing today and I replied that I hadn't. He said he had done a great job of explaining why they did what they did. He then asked if "you saw my Tweet this morning," and quickly added that "it is really about the leaks." He then reviewed in some detail the leaks of his calls with the leaders of Mexico and Australia, including how the calls had gone, how he assumed that calls he made on "this beautiful phone [touching the gray phone on the desk]" were confidential, how it couldn't have come from the Mexicans or Australians, how the transcripts actually include things he doesn't remember saying ("and they say I have one of the world's greatest memories"), and that it makes us look terrible to have these things leaking. He then referred at length to the leaks relating to Mike Flynn's call with the Russians, which he stressed was not wrong in any way ("he made lots of calls"), but that the leaks were terrible.

I tried to interject several times to agree with him about the leaks being terrible, but was unsuccessful. When he finished, I said I agreed very much that it was terrible that his calls with foreign leaders leaked. I said they were classified and he needed to be able to speak to foreign leaders in confidence. [NOTE: because this is an

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

unclassified document. I will be limited in how I describe what I said next]. I then explained why leaks purporting to be about FBI intelligence operations were also terrible and a serious violation of the law. I explained that the FBI gathers intelligence in part to equip the President to make decisions, and if people run around telling the press what we do, that ability will be compromised. I said I was eager to find leakers and would like to nail one to the door as a message. I said something about it being difficult and he replied that we need to go after the reporters, and referred to the fact that 10 or 15 years ago we put them in jail to find out what they know, and it worked. He mentioned Judy Miller by name. I explained that I was a fan of pursuing leaks aggressively but that going after reporters was tricky, for legal reasons and because DOJ tends to approach it conservatively. He replied by telling me to talk to "Sessions" and see what we can do about being more aggressive. I told him I would speak to the Attorney General.

At about this point, Reince Priebus opened the wall door by the clock and the President sent him away, saying he would be another minute or two and he knew people were waiting.

He then returned to the topic of Mike Flynn, saying that Flynn is a good guy, and has been through a lot. He misled the Vice President but he didn't do anything wrong in the call. He said, "I hope you can see your way clear to letting this go, to letting Flynn go. He is a good guy. I hope you can let this go." I replied by saying, "I agree he is a good guy," but said no more.

The President then wrapped up our conversation by returning to the issue of finding leakers. I said something about the value of putting a head on a pike as a message. He replied by saying it may involve putting reporters in jail. "They spend a couple days in jail, make a new friend, and they are ready to talk." I laughed as I walked to the door Reince Priebus had opened.

As I walked out the Vice President was standing just outside the door, waiting. We shook hands. There was a large group with him, including Priebus and the newly sworn-in Secretary of HHS, Tom Price. I walked through the group and away from the Oval office, went downstairs, and exited onto the West Executive Drive. On the way out downstairs, I saw John Kelly gathered with staff. I stopped to greet him and he told me he has previously accepted an invitation to speak to HRT at Quantico about leadership and wondered if it was still okay to do it. I said by all means; that would be great.

JBC
2/14/17

*[signature]* 2/14/17

UNCLASSIFIED//FOUO

 **politics**

● **LIVE TV** ≡

# Text messages between former FBI officials capture reactions to stories on Russia investigation

 

**By** Laura Jarrett **and** Manu Raju , CNN

**Updated 1:47 PM ET, Fri September 14, 2018**

**(CNN)** — Two former FBI officials who have come under fire for exchanging text messages critical of President Donald Trump have come under greater scrutiny this week, as additional texts capture their immediate reactions to a stream of news articles that poured in during the early months of the Trump presidency about the FBI's investigation into Russian interference in the 2016.

Lawmakers received five months' worth of recovered messages between former FBI special agent Peter Strzok and FBI lawyer Lisa Page in early August, but North Carolina Republican Rep. Mark Meadows released specific extracts this week, indicating in a letter to the Justice Department that they "suggest a coordinated effort on the part of the FBI and DOJ to release information in the public domain potentially harmful to President Donald Trump's administration."

That issue is part of an ongoing inquiry currently being reviewed by the Justice Department's internal watchdog as witnesses continue to be interviewed by the inspector general's office about how FBI officials conducted the Russia investigation.

While that investigation remains ongoing and additional messages could surface, CNN's

By using this site, you agree to our updated Privacy Policy and our Terms of Use. 

 politics

● **LIVE TV**   ☰

communication with the former head of the FBI's press office, Michael Kortan, is a consistent theme throughout their interactions. And at times, they were consulted as subject matter experts by the press office to help facilitate accurate reporting -- according to source familiar with their interactions -- a regular occurrence as journalists fact-check stories before publication.

"It will make your head spin to realize how many stories we played a personal role in," Page wrote to Strzok on December 19, 2016. "Sheesh, this has been quite a year," she added, forwarding a link to The New York Times' Most Read Stories of 2016.

The reference to playing a "role" in the stories, while open to interpretation, did not mean contributing to the underlying reporting, but rather their professional roles meant they were privy to certain information that only a small group of people knew at the time, according to a source familiar with the exchange.

In another text, the two appear to discuss CNN's January 2017 reporting that Trump was briefed on the dossier compiled by ex-British intelligence operative Christopher Steele.

"Sitting with Bill watching CNN. A TON more out," Strzok texted Page on January 10, 2017. "Hey let me know when you can talk. We're discussing whether, now that this is out, we use it as a pretext to go interview some people."

It is not clear what was meant by "pretext," but in counterintelligence investigations it is common practice to approach someone for questioning without divulging the true reason for the interview, which might be highly classified. Something of interest publicly reported in the media might serve as an effective way for an FBI agent to question someone while protecting any sensitive sources and methods, explained Josh Campbell, a CNN analyst and former FBI supervisory special agent.

A straightforward explanation of their intent, however, is rarely offered explicitly via text, and, as a result, these cryptic lines result in a Rorschach-like test of their meaning in a week where the credibility of Page and Strzok has again been put to the test

The previous sets of texts show Strzok and Page mocking politicians on both sides of the aisle, but their unyielding contempt for Trump has been repeatedly cited as evidence by the President and his allies that special counsel Robert Mueller's investigation was irreparably tainted from the beginning because Strzok and Page both briefly worked on his team.

By using this site, you agree to our updated Privacy Policy and our Terms of Use.



 politics

work-issued phone with Page. He was fired from the FBI in August. Page was also on Mueller's team for a brief stint before returning to the FBI, and she resigned from the bureau in May.

Representatives for Page and Strzok declined to offer comment for this story.

# Not 'freelancing'

Besides regularly tracking the alerts from news outlets on their phones, the two often also appear troubled by what they viewed as inaccuracies in reporting or gripes about headlines.

On January 19, 2017, Page texted Strzok, "I'm really angry about the times article. This just has got to stop." He agreed, responding the next day, "Yeah and it's not even news! No substance, and largely wrong. The press is going to undermine its credibility.'

A CNN review of New York Times articles published that day shows one titled, "Intercepted Russian Communications Part of Inquiry Into Trump Associates" but it is unclear whether their texts were in reference to that article and no texts suggest they provided information for it.

On February 14, 2017, after the New York Times  published its account of the FBI's interview with former National Security Adviser Michael Flynn, Page and Strzok appear to discuss Kortan's involvement in the following exchange:

Strzok: Bottom line Mike ran through boss' thinking/timeline/narrative on this. Bunch of additional detail (redacted) has etc

Page: K. Did you mention my attendance to kortan?

Strzok: Not to Mike, he had left. The guys left seemed to think no, said Mike was going to talk to you.

Another message refers to cooperation and "access," but they do not name the outlet

"Going to be very apparent we cooperated and gave access A LOT for an article that I think is going to be very negative. Bad enough for negative press. Far worse to chose to

By using this site, you agree to our update Privacy Policy and our Terms of Use.

 politics

● **LIVE TV**   ☰

office.

Moreover, other messages show their befuddlement and unease as they try to figure out the source of "leaks" to the news media and struggle with guarding against their own information falling into the wrong hands of those "with partisan axes to grind.

"Think our sisters have begun leaking like mad," Strzok told Page on December 15, 2016, without further elaboration. "Scorned and worried and political, they're kicking in to overdrive."

Strzok does not specify who their "sisters" were, but Campbell explained that agents often referred to colleagues at the CIA and NSA as "sisters."

Search CNN...   🔍

By using this site, you agree to our updatePrivacy Policy and ourTerms of Use.



07/26/2017
**Washington, District Of Columbia**

I, Peter P. Strzok, having been duly sworn by ███████████

███████████████████████████ hereby make the following

statement to ███████████ and ████████████████████, whom I know to

be SSAs of the Federal Bureau of Investigation (FBI), assigned to

the Inspection Division, Internal Investigations Section:

I entered on duty (EOD) on 09/29/1996, as a Professional

Staff employee, and EOD on 04/26/1998 as a Special Agent (SA).  I

am currently assigned to the Counterintelligence Division (CD) as

a Deputy Assistant Director (DAD).

I understand that this is an internal investigation

regarding an allegation that Subject(s) Unknown may have provided

information to the media concerning a statement made by FBI

Executive Management in violation of 4.10 - Unauthorized

Disclosure - Sensitive Information.  I have been further advised

of my rights and responsibilities in connection with this inquiry

as set forth on a "Warning and Assurance to Employee Required to

Provide Information" form FD-645 which I have read and signed.  I

understand from my review of the FD-645 that should I **refuse to

answer or fail to reply fully and truthfully during this

interview, I can expect to be dismissed from the rolls of the

FBI**.

I am temporarily assigned to assist with the former FBI

director Mueller's Special Counsel's investigation, as of

approximately early June 2017.

During my interview, ███████████ referred to an email

message, dated February 21, 2017, sent by Ms. Sara Carter,

identifying herself as a Correspondent with Circa News and

**Page 1 of 8**

07/26/2017
**Washington, District Of Columbia**

Sinclair Broadcasting Group, to Office of Public Affairs (OPA)
Assistant Director (AD) Michael P. Kortan.  I do not know Ms.
Carter and I do not recall ever having any interaction or
contact(s) with her.

During my interview, I was provided with a copy of the
referenced email message dated February 21, 2017 from Ms. Carter
to AD Michael Kortan for my review.  *I initialed the copy of the
email, which is attached to my statement as Exhibit #1.*



**Page 2 of 8**

made reference to three issues that were
specifically addressed in the referenced email message from Ms.
Carter.  With respect to the first issue contained within the
referenced email, which reads:

> *''POTUS wanted to meet with the sheriff's association
> and had Flynn call the FBI to arrange for the White
> House. The NSA office had called the FBI for the POC
> contacts for the early February discussion. After the
> call and the request was [sic] made - Deputy Director
> Andy McCabe was overheard in a staff meeting saying
> ''Fuck Flynn, and I fucking hate Trump.'' Ghattas was in
> this meeting as well.''*

I do not recall being in a meeting wherein these matters were
discussed, and I do not know to what extent the statements might
be accurate regarding the substantive portions.  However, my
overall impression of the paragraph is that it is ludicrous.  I
have never heard DD McCabe use language even remotely similar to
what is reflected therein.  I further feel that whoever spoke to
the media about this paragraph was not a person who attended the
alleged meeting because the allegations are too wild and
inflammatory in nature.  Instead, I opine and suspect that the
person talking to the media might have learned of the information
from someone who have may have overheard someone else talking
about the meeting and embellished the details.

With respect to the second issue contained within the
referenced email from Ms. Carter relative to an alleged a meeting
where two or more Agents disagreed with the nature of General

DOJSCO-700021208

07/26/2017
**Washington, District Of Columbia**

(Gen) Flynn's interview and threatened to testify on his behalf,
my overall impression is that it does not make sense.  I have
attended many meetings with DD McCabe regarding Russian influence
investigations, including meetings which discussed whether to
interview former National Security Advisor Michael Flynn and if
so, what interview strategies to use.  I do not recall there
being any disagreement about Gen Flynn's statement or any
employee saying words to the effect of, ''I want to testify.''
There was never any ''threat'' as alleged in Ms. Carter's email.
In fact, I am a little confused about this assertion in that the
scenario and outcome of Gen Flynn's interview(s) did not lend
themselves to anyone needing to ''testify'' on his behalf.  If
someone were to want to testify, then to whom would they be
testifying to?   There had not been any charges brought against
Gen Flynn at the time of the article and the investigation is
currently within the work being done by Special Counsel Mueller.

With respect to the third issue contained within the
referenced email from Ms. Carter relative to FBI employees
allegedly executing ''high fives'' and saying, ''We got him,'' I
have never heard anyone say or do any of the things alleged.



**Page 4 of 8**



07/26/2017
Washington, District Of Columbia



DOJSCO-700021210

07/26/2017
Washington, District Of Columbia



Page 6 of 8

DOJSCO-700021211

**07/26/2017**
**Washington, District Of Columbia**



I am willing to voluntarily take a polygraph examination concerning the truthfulness of the information contained in this signed, sworn statement.  I have no other pertinent information regarding the aforementioned allegations.  I have been advised that I should submit any additional information of which I may become aware, regarding this inquiry, to the Internal Investigations Section (IIS)/Inspection Division (INSD) or to the Office of Professional Responsibility (OPR).

I have been given the opportunity to review this statement and make any changes prior to signing it.



**Page 7 of 8**

07/26/2017
**Washington, District Of Columbia**

I have read this statement, consisting of this and seven other pages and it is true and correct.

_____
DAD Peter P. Strzok

Sworn to and subscribed before me on the ___ day of August, 2017, in Washington, District Of Columbia.

Witness:

**Page 8 of 8**

07/26/2017

▮▮▮▮▮▮ (FBI)

Ехнiвi #1

**Subject:**            FW: press inquiry from 2-21-17

------- Original message --------
From: "Kortan, Michael P. (DO) (FBI)" ▮▮▮▮▮▮ @ic.fbi.gov>
Date: 3/9/17 9:00 AM (GMT-05:00)
To: "McNamara, Nancy (INSD) (FBI)" ▮▮▮▮▮▮ @ic.fbi.gov>
Subject: press inquiry from 2-21-17

**From:** Sara Carter [mailto ▮▮▮ @circanews.com]
**Sent:** Tuesday, February 21, 2017 11:47 AM
**To:** Kortan, Michael P. (DO) (FBI) ▮▮▮▮ @ic.fbi.gov>; John Solomon ▮▮▮ @circanews.com>
**Subject:** Hello

Hi Mike,

I hope all is well.

Below is information I've gathered from several sources and I'm sending this to you because of its sensitivity. Please let me know if we can meet or talk by phone. I've Cc'd John on this and he's been on the long haul with me.

1. POTUS wanted to meet with the sheriff's association and had Flynn call the FBI to arrange for the White House. The NSA office had called the FBI for the POC contacts for the early February discussion. After the call and request was made - Deputy Director Andy McCabe was overheard in a staff meeting saying "Fuck Flynn, and I fucking hate Trump." Ghattas was in this meeting as well.
2. There was another meeting where at least two agents disagreed with the nature of the Flynn interview threatening to testify on Flynn's behalf.
3. After Flynn resigned there were witnesses – high fives and "we got him." –

Can you please check on these – sources are solid but I'm doing everything I can to double and triple check. Also, looking for comment?
My cell is below.

Thanks,

Sara

Sara A. Carter
Senior Correspondent
Sinclair Broadcast Group
Circa News

▮▮▮▮▮▮▮

1

FD-302 (Rev. 5-8-10)                    - 1 of 5 -



████████████████

FEDERAL BUREAU OF INVESTIGATION

Date of entry    08/22/2017

DOCUMENT RESTRICTED TO CASE PARTICIPANTS

This document contains information that is restricted to case participants.


(U//FOUO)    FBI Deputy Assistant Director (DAD) Peter P. Strzok was
interviewed in his office in the Special Counsel's Office in Washington D.
C.  Participating in the interview were Senior Assistant Special Counsel
████████████████ and FBI Supervisory Special Agent ████████████    The
purpose of the interview was to collect certain information regarding
Strzok's involvement in various aspects of what has become the Special
Counsel's investigation.  Strzok provided the following information:

████    As FBI Counterintelligence DAD, Strzok had involvement in
several FBI investigations which were subsequently taken over by the
Special Counsel.  Specifically, FBI investigations regarding then-National
Security Adviser, General Michael Flynn; ████████████████████████
████    At various times, Strzok and then-FBI Director James Comey
briefed Deputy Attorney General/Acting Attorney General Sally Yates and
other DOJ representatives on the entire span of the FBI's Russian election
interference/collusion investigations.

(U//FOUO) ████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████    He worked closely with
multiple DOJ National Security Division (NSD) attorneys, up to Acting NSD
Assistant Attorney General Mary McCord.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████
████████████████████████████
████████████████████████████

Investigation on  07/19/2017   at   Washington, District Of Columbia, United States (In
                                     Person)

File #  ████████████████                              Date drafted   07/20/2017

by  ████████████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)



Continuation of FD-302 of  (U//FOUO) DAD Peter P. Strzok interview        , On  07/19/2017  , Page  2 of 5



(U//FOUO)    On January 24, 2017, McCabe told Strzok to interview
Flynn.  McCabe called Flynn at 12:30 p.m. and Flynn agreed to be
interviewed that day at 2:30 p.m.  McCabe may have documented the
conversation.  Comey was going to tell Yates right before the interview,
but she called him first for another reason before he had a chance to

FD-302a (Rev. 05-08-10)

▮▮▮▮▮▮▮

Continuation of FD-302 of  (U//FOUO) DAD Peter P. Strzok interview ___, On _07/19/2017_ , Page _3 of 5_

call.  When he told her the FBI was interviewing Flynn she was not happy.

(U//FOUO)  Strzok and FBI SSA ▮▮▮▮▮▮ his interview partner, got access to the White House with the assistance of an FBI White House detailee.  Flynn met them at about 2:15, which was earlier than agreed.  Flynn was alone and "relaxed and jocular."  He wanted to give them a little tour of the area around his office.  During their walk through the West Wing, President Trump and some movers who were discussing where to place some art work walked between Strzok and ▮▮▮▮▮▮ but nobody paid attention to the agents.  Flynn did not introduce them to anyone.

(U//FOUO)  Before the interview, McCabe, FBI General Counsel James Baker and others decided the agents would not warn Flynn that it was a crime to lie during an FBI interview because they wanted Flynn to be relaxed, and they were concerned that giving the warnings might adversely affect the rapport.

(U//FOUO)  Flynn was unguarded and clearly saw the FBI agents as allies.  He talked about various subjects, including hotels where they stayed during the campaign and the President's knack for interior design.  He talked about the long hours of the job and complained about the politics surrounding it, but Flynn always seemed to work his way to the subject of terrorism.  Flynn was so talkative, and had so much time for them, that Strzok wondered if the National Security Adviser did not have more important things to do than have such a relaxed, non-pertinent discussion with them.

▮▮▮▮▮▮▮ It was decided before the interview the agents ▮▮▮▮▮▮ , but if Flynn said he did not remember something they knew he said, they would use the exact words Flynn used, such as ▮▮▮▮▮▮ to try to refresh his recollection.  If Flynn still would not confirm what he said ▮▮▮▮▮▮ ▮▮▮▮▮▮ , they would not confront him or talk him through it.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(U//FOUO)  Strzok conducted the interview and ▮▮▮▮▮▮ was primarily responsible for taking notes and writing the FD-302.

(U//FOUO)  Throughout the interview, Flynn had a very "sure" demeanor and did not give any indicators of deception.  He did not parse his words or hesitate in any of his answers.  He only hedged once, which they

▮▮▮▮▮▮

FD-302a (Rev. 05-08-10)



Continuation of FD-302 of (U//FOUO) DAD Peter P. Strzok interview .On 07/19/2017 .Page 4 of 5

documented in the 302. Strzok and ▮▮▮▮▮ both had the impression at the
time that Flynn was not lying or did not think he was lying. Flynn struck
Strzok as "bright, but not profoundly sophisticated."

(U//FOUO)   The agents left Flynn in a collegial, positive way. There was
no discussion of follow-up.

(U//FOUO)   Strzok and ▮▮▮▮▮ returned to FBI Headquarters and briefed
McCabe and Baker on the interview. McCabe briefed Comey. Strzok was
aware that Baker and Principal Associate Deputy Attorney General Matt
Axelrod later argued about the FBI's decision to interview Flynn.

(U//FOUO)   Shortly after the interview, Yates and McCord briefed White
House staff on the Flynn calls.

FD-302a (Rev. 05-08-10)



Continuation of FD-302 of (U//FOUO) DAD Peter P. Strzok interview , On 07/19/2017 , Page 5 of 5

COMPANY INTELLIGENCE REPORT 2016/101

**RUSSIA/US PRESIDENTIAL ELECTION: SENIOR KREMLIN FIGURE OUTLINES EVOLVING RUSSIAN TACTICS IN PRO-TRUMP, ANTI-CLINTON OPERATION**

Summary

- Head of PA, IVANOV assesses Kremlin intervention in US presidential election and outlines leadership thinking on operational way forward

- No new leaks envisaged, as too politically risky, but rather further exploitation of (WikiLeaks) material already disseminated to exacerbate divisions

- Educated US youth to be targeted as protest (against CLINTON) and swing vote in attempt to turn them over to TRUMP

- Russian leadership, including PUTIN, celebrating perceived success to date in splitting US hawks and elite

- Kremlin engaging with several high profile US players, including STEIN, PAGE and (former DIA Director Michael Flynn), and funding their recent visits to Moscow

Details

1. Speaking in confidence to a close colleague in early August 2016, Head of the Russian Presidential Administration (PA), Sergei IVANOV, assessed the impact and results of Kremlin intervention in the US presidential election to date. Although most commentators believed that the Kremlin was behind the leaked DNC/CLINTON e-mails, this remained technically deniable. Therefore the Russians would not risk their position for the time being with new leaked material, even to a third party like WikiLeaks. Rather the tactics would be to spread rumours and misinformation about the content of what already had been leaked and make up new content.

2. Continuing on this theme, IVANOV said that the audience to be targeted by such operations was the educated youth in America as the PA assessed that there was still a chance they could be persuaded to vote for Republican candidate Donald TRUMP as a protest against the Washington establishment (in the form of Democratic candidate Hillary CLINTON). The hope was that even if she won, as a result of this CLINTON in power would be bogged down in working for internal reconciliation in the US, rather than being able to focus on foreign policy which would damage Russia's interests. This also should give President PUTIN more room for manoeuvre in the run-up to Russia's own presidential election in 2018.

3. IVANOV reported that although the Kremlin had underestimated the strength of US media and liberal reaction to the DNC hack and TRUMP's links to Russia, PUTIN was generally satisfied with the progress of the anti-CLINTON operation to date. He recently had had a drink with PUTIN to mark this. In IVANOV's view, the US had tried to divide the Russian elite with sanctions but failed, whilst they, by contrast, had succeeded in splitting the US hawks inimical to Russia and the Washington elite more generally, half of whom had refused to endorse any presidential candidate as a result of Russian intervention.

4. Speaking separately, also in early August 2016, a Kremlin official involved in US relations commented on aspects of the Russian operation to date. Its goals had been threefold- asking sympathetic US actors how Moscow could help them; gathering relevant intelligence; and creating and disseminating compromising information ('kompromat'). This had involved the Kremlin supporting various US political figures, including funding indirectly their recent visits to Moscow. S/he named a delegation from Lyndon LAROUCHE; presidential candidate Jill STEIN of the Green Party; TRUMP foreign policy adviser

15

Carter PAGE; and former DIA Director Michael Flynn, in this regard and as successful in terms of perceived outcomes.

10 August 2016

role, Trump was signaling that he had no understanding of or appreciation for the time-honored independence the White House typically affords federal law enforcement.

The FBI director's statutorily mandated ten-year term is meant to ensure that a new president won't simply clean house upon arrival and install a crony in the position. Custom held that a director could be fired for specific reasons—such as in the case of Director William Sessions, who was fired by President Bill Clinton in 1993 after various ethical violations came to light—so it was a generally accepted norm that a director would be removed only for cause. By telegraphing to Comey that Trump himself would be making the decision on whether Comey would remain in the job, he was chipping away at an important institutional norm, which he would altogether obliterate in four months' time.

Contrary to the narrative since promoted by Trump, the FBI did not set out to bring down the incoming national security adviser. Quite the opposite. In fact, one former official described Flynn as the Crossfire Hurricane investigation subject the FBI actually felt the most comfortable about. Prior to the discovery of his calls with the Russian ambassador, it appeared as though Flynn had exercised puzzling behavior vis-à-vis the Kremlin, but the FBI had yet to discover anything that would warrant prosecution. Nevertheless, with knowledge that Flynn had potentially run afoul of the Logan Act and with the strange *Face the Nation* development suggesting that Flynn had lied to the incoming vice president (or worse), the FBI had to do what it does best: go have a conversation and gather facts.

The question of how to proceed with interviewing Flynn was the subject of intense discussion inside the director's suite. Comey and his counterintelligence team thought it was imperative to get Flynn's side of the story, but there were two issues that first had to be resolved.

The first was what notice, if any, the FBI should give to Flynn and the White House before conducting an interview of the president's chief national security aide. A key aspect of determining someone's truthfulness is maintaining an element of surprise in order for agents to assess for themselves whether the subject of an interview is attempting to hide something. For many FBI agents—myself included—the real-time analysis of words and physical reaction to an agent's line of questioning is one of the most fascinating and enlightening parts of the job. An entire block of instruction at the FBI Academy centers not only on asking good questions, but also on studying a subject's reaction to a particular topic. In the case of Flynn, if he got wind of the bureau's specific purpose in speaking with him, he might have time to concoct and rehearse a fictitious narrative explaining his actions.

Another issue: one does not just walk up to the front gates of 1600 Pennsylvania Avenue and ask for entry into the West Wing—even

if you're an FBI agent. Concentric rings of security ensure that anyone actually making their way into the White House compound has an authorized purpose that has been vetted well in advance. One thing the FBI had going for it was the fact that White House staff were still settling into their new roles, and the place was abuzz with personnel eager to get started on a host of initiatives and a press corps cataloguing the frenetic pace.

"With all the chaos," Comey told me, "we thought we might actually get away with sending agents over to the White House to sit down with Flynn." Typical protocol would involve sending over a request to the White House counsel's office, explaining the nature of the inquiry, and then waiting by the phone for clearance. After much discussion, Comey gave the green light to his deputy, Andrew McCabe, to call Flynn and tell him the FBI was sending over two agents to speak with him about something important. "We just decided, you know, screw it," Comey said. Flynn would not be in custody—any interview would be voluntary—so there would be no requirement to tell him that he had a right to remain silent and the right to counsel. If Flynn refused to talk, so be it.

Comey's next decision was equally gutsy and would land him in the familiar position of ruffling feathers over at the Justice Department. Comey always studied each high-profile move by the FBI—studying each issue through the lens of how it might be perceived by differing factions—and then sought to land on decisions that would ensure public confidence in the FBI as an apolitical and independent institution. Comey told me that his decision in the Flynn episode centered on his concern that taking overt investigative steps against the new national security adviser might be perceived as a last-ditch effort by holdover Obama administration officials at the Justice Department to target Team Trump. One of those officials was Sally Yates, Obama's deputy attorney general, who had been elevated to the position of acting attorney general after the inauguration while the White House found a replacement for Loretta Lynch. Yates is an accomplished government lawyer who rose through the ranks of the Justice Department in a career that spanned nearly thirty years. She would soon become a household name after standing up to the Trump administration over the "Muslim ban"—ultimately leading to her firing—but at the time she was merely known in DOJ and FBI circles as a respected apolitical career public servant.

Despite the confidence in Yates inside the FBI, Comey worried that bringing her into the decision-making process on the Flynn matter might risk the perception of an Obama appointee leading the charge against Flynn. He also thought that not telling Yates would offer her deniability, ensuring that Comey would take whatever heat came from the administration if the Flynn affair turned into something major. So he decided not to tell her—at least not yet. Despite his good intentions, being kept out of the loop would anger her.

Contact w/ GOR [GOR=Govt of Russia] Trump campaign thru  inaug[uration]
Walk thru GOR contact
Who, purpose, form
In person?
Email?
Phone?
Calls: Approx how many? Logs
LARGE REDACTION [1/3 page]

1st to be invited GRU HQ [OPD] Summer '13 4 day trip
Kislyak knew not sure if then
Sergun GRU head VTC [video tele-conference]
28 Feb 14 visit to US but then Crimea cancelled



Next trip to Russia
Doing media stuff but not paid
RT after hours? + Al Jazeera Sky + many others
LAI speakers bureau: speak in Moscow re ME [Middle East]
RT 10th Aniv
1-1 panel discussion LAI set up + paid him
Contracted + had a fee @ 75%
Heard Sergun had heart attack @ Lebanon



Died @ Lebanon and called Kislyak to send condolences
Around death
Not [past?] of Sergun = felt we US could work w/ him
Common fighting terr scars Chechnya and AF (Afghanistan)
Next time Turk Ambo killed post-election

Up to 20 Jan spoke easily 30 different countries
+ multiple people w/in countries
Kislyak only person in Russia
4+1 PRC, DPRC, Iran, Russia, ISIS
If common partner

Short call: sorry it happened, common enemy in
Radical Islam, that was it before Xmas
Mid-Dec day after assassination
(Xmas day airplane crash USO equiv)
Called w/ condolences for crash + that was it
Goal: keep relationship going

Xmas day vacation to Dom Rep 5 days
28th (Tues): Kislyak sends text: can you call
Didn't see text til 29th not checking
29th I'll call 15-20 min
K asked: can we set up a VTC btwn P + T for 21st
Conference in Astana: Rus (sends some from amb)
Turk Iran, oppo groups
My level? No, someone lower
Will get back, but didn't until this past
Week
Didn't decide until this Fri-Sat to attend
Rus wants lead in ME peace we want Turkey

Met in NY post-election, In Nov early or before Thanksgiving
Greats of future admin
Met in NY post-election, came to Trump Tower w/
Jared Kushner
Been to Emb before speaking
DIA due diligence, prep, then saw Ambo @
Prior Amb Res.
30-45 min courtesy call

Kislyak in NY mtg w/ UN Ambo I + JK @ Trump
Tower
Treasury sanctions still awaiting Treasury action
He wasn't aware of meeting, invited late
--That's a good reminder

22 Dec UN                                    Egypt Israel
                                             Senegal
                                             France

Called a bunch          UK
Don't know if called K (Kislyak) maybe I did
14 total 5 + 1? Need to abstain
What is your position
No: hey if you do this . . . .



Any        vote this way, slow down
     No
Egypt didn't like, was able to delay 1 day
Appreciate you reminding me that was another convo

Maybe Thurs-Fri prior to Xmas, had been @ FL w/ POTUS
Did from GSA campaign R
Spoke on 29th
Expectations                                    No recollection of that
Surprise



[Shill?]
4-5 calls that day? If so, don't remember. If so, lousy place to make phone calls
Nothing long drawn out don't do something

DT: Hope
John McEntree
Dan Scavino    older [???] [nature??]

Later classified setting: Examples
Things in play
More substantial now than cold war
Ezra: someone known introduced themselves to Hicks
[Unknown unknown]

4 Subjects
[ ? ]    1. Trump-Putin Call Set-Up
         2. Exchange Holiday Greeting
         3. Offering condolences for lives lost Russian plane crash
         4. Syria continuance on ISIS



DIA 1st invited [unknown] GRU leadership OPD.  All approved. 4 day trip. Summer 2013
Kislyak – I don't know if I met him there. Very appreciative visit. Sergon-GRU UTC- in uniform.
Set-up big visit him to come to US. 28th Feb 2014. Went to Crimea – Nothing more to that.
Next time. Trip to Russia so much press unbelievable. Never paid by media.



Did RT, Al Jazeera, Sky, MSNBC. Speakers bureau LAI. Request to speak in Moscow @ me. At RT
10th Anniversary. I was paid for that. Speakers bureau paid me. They took 25%.  I may have.  Sergun
heart attack in Lebanon. He was like me. Similar background. Sons. Heard death – send condolences.
Really wasn't part of campaign. Really thought Sergun was okay we could work with. Connections

fight terrorism. Chechnya combat scars. Talked @ Afghanistan. Turkish ambassador killed. 20 Jan – up to probably spoken to 30 countries. Multiple people in countries.



4+1
China
NK
Russia
Iran
ISIS

Only Russia Kislyak. Direction.
Common partner in these things. Don't know Trump/Putin got along. Figure out POTUS work with Russia. Russia amb. Turk. Sorry. Common problems. That was it.
 Before Christmas. Mid December. Called next day. He said his family love, Christmas Day - plane crash. Russian USO. Choir sang at my dinner. Took opportunity to pass condolences. Trying to keep relationship. CJS –  report [conversation??]



No affinity Russia – Kislyak counterpart. Vacay Dom Republic.
28th Dec a Tuesday – he sends me a text. Can you call me? I didn't see it.
24 hours later. Call you in 15-20 mins. 1 hour ahead Dom Republic.
Asks me. Set-up UTC Putin/Trump – 21st. Have him qued into
Conference in Astana, Kazakhstan, Russia, Turkey, Iran, opposition groups.
Sent US Embassy person. Didn't get back to him. Probably only this past week.
Make decision for representation – FRI/SAT. Observer.

*[handwritten notes]*

Russia wants lead role for mid east peace. US. Turkey under wing.
Lack of engagement. Email – receptive person. Met in NY post election.
Closed door meeting Jared Kushner.
Been to Rus emb – before I went to speak at speaker bureau.

*[handwritten notes]*

DIA briefing prior. Intel courtesy to see Ambo. 30-45 mins. Son with me.
Late middle of day. Ambas. Res. University Club. NY Meet in Nov.
Maybe before Thanksgiving. He was in NY. Relatively sensitive meeting JK @
Sensitive – Countries don't want white house to know. No personal > WH relationship Trump
Tower.
Set expectations – set high for countries.

UN Vote – settlements. Yes good reminder. Yeah so 22nd December litany countries
get sense where stood on that vote. UK. Senegal. Egypt, Israel, maybe France. Maybe Kislyak.

*[handwritten notes]*

Get a sense abstain, veto. This very
More where they stand. I don't believe we would change anything. There
Needed to be so many to abstain. 14 countries permanent counsel 5+9.
Only US Abstain. US. Wasn't hey if you do this it will be that kind of thing, hey where do you stand.
Senegal came up – how much.
Not please consider voting this way?
No. Where do you stand? What's position.
Egypt – did not like it. Other channels. Delayed on own accord.
Drill exercise – how fast can you get someone on the line – battle drill.
NK – how do we act? How respond?
Mar-a-Lago – Friday or Thursday. Right before Christmas. Boxed us in.

*[handwritten notes]*

Transition not good. Policy.
Kislyak – Repp? 29th spoke. I don't, the conversation was on
VTC,  Astana thing, I had no TV, my government blackberry
No recollection? Not really. I don't remember. Hey don't do anything.
Total surprise. I didn't know about it until media.

Cyber briefing. Decision, what
Kislyak – start off on good foot. Looking forward to relationship.
I wouldn't understand it. I can understand PNG of one.

Start good relationship. Move forward.
I don't remember making 4-5 calls. If I did lousy place to call.
Nothing long drawn out about don't do something.

Ezra
1 person here. Approached Hope Hicks. Someone I introduced
Close to Trump.
Hope Hicks, John McEntee, Dan Scavino
Leak of [unknown] classified [unknown], electronic devices,
real world examples, here is what is in play. [To beat?]
maybe we take moderate

**SUBJECT TO PROTECTIVE ORDER**



<u>-</u>1  of  5 <u>-</u>-

FEDERAL  BUREAU  OF INVESTIGATION

Date of entry_

02/~~10~~11/2017

DRAFT DOCUMENT/DELIBERATIVE MATERIAL
Do not disseminate outside  the  FBI  without  the  permission  of  the  originator
or  program manager.

On January 24, 2017, Deputy Assistant Director (DAD) Peter
P. Strzok II and ████████████████, interviewed United States
(U.S.) National Security Advisor Michael T. FLYNN, date of birth
(DOB) ████████████████, at his office at the White House. After
being advised of the identities of the interviewing agents and the
nature of the interview, FLYNN provided the following <u>information</u>:

-        FLYNN~'s first   invitation  to  Russia  occurred  when  he  was
the
Director of the Defense Intelligence Agency (DIA).   FLYNN was the
first DIA Director to be invited to GRU headquarters.      During
that four day trip in 2013, he participated in a leadership
development  program  at GRU <u> (Russian Military Intelligence)</u>
headquarters.   FLYNN received proper authorization within
the U.S. Government prior to conducting the trip. FLYNN could not
recall if he met Russia's Ambassador to the United States, Sergey
Ivanovich KISLYAK, during this trip.  ~~He~~FLYNN
described the Russians as very appreciative of his visit.
During this trip to Russia as DIA Director, FLYNN first met
the then -GRU Director Igor SERGUN. Following the trip, FLYNN and
SERGUN continued ~~official~~ their relationship on at least one
occasion through video teleconference (VTC) and were planning a
visit for SERGUN to travel to the United States on February 28,
2014.  Russia invaded Crimea in the weeks prior to SERGUN's planned
trip<u>, SERGUN's trip was cancelled,</u> and FLYNN had no further
contact with the GRU Director.    FLYNN described SERGUN as ~~being~~
~~akin to~~having common ground with FLYNN in that they had similar
backgrounds, their sons were the same age, and they had a
connection in fighting terrorism.  SERGUN had scars from Chechnya
and they shared stories about Afghanistan. FLYNN  stated he called
Ambassador KISLYAK following SERGUN's death in



DOJSCO-700022303

FD-302<sup>a</sup>(Rev. 05-08-10)

Continuation of FD-302 of ▮▮▮▮▮          Michael Flynn                    ,Ou  01/24/2017   Page   2  of 5

Lebanon early last year to express his condolences.   FLYNN described

SERGUN ~~was~~as someone the U.S. could work with.      FLYNN said he was not really part of the TRUMP campaign at the time of ~~his~~this call to KISLYAK.

- FLYNN stated his second  trip to Russia, after he left U.S.  government service, had received so much press attention that "it [was] unbelievable."      As background, FLYNN explained that he was never paid directly by media entities, however, he ~~has~~had been a contributor on a variety of media entities including Al Jazeera, Russia Today (RT), ~~SKY~~Sky, and MSNBC.  FLYNN received a request ~~by~~from his speakers bureau, Leading Authorities (LAI), to speak about Middle East issues at the RT 10th Anniversary reception in Moscow.   FLYNN was paid for the speech by LAI ~~(who took what FLYNN estimated to be a 25 percent fee), who paid FLYNN's fee.~~.    FLYNN did not know from whom LAI received payment.
FLYNN met with ~~KISLYAK~~ at the Russian Ambassador's residence next to the University Club prior to this trip to Russia. ~~It~~The visit was a courtesy call to the Ambassador prior to his trip, and FLYNN took his son with him to this meeting.      The meeting occurred in the mid-afternoon. In addition, FLYNN received a DIA threat briefing prior to the travel.

- Prior to the Presidential inauguration, FLYNN ~~said he~~ spoke to multiple representatives in each of approximately thirty countries' ~~representatives and multiplepeople in each country. The ''~~governments.                           FLYNN stated the only ~~i~~ exception to that practice was Russia, in that FLYNN ~~has~~had substantive conversations only with KISLYAK, and no other members of the Government of Russia.              FLYNN's interest in Russia was as a common partner in the war on terror.

FLYNN does not know if PUTIN and TRUMP will get along, but it is FLYNN's job to figure out paths to work with Russia to fight terrorism. FLYNN named the primary threats to the U.S. as the "four plus one:" China, Russia, Iran, North Korea and ISIS.   FLYNN stated if the U.S.    could neutralize_ one of the four, or even better, ~~to~~ leverage their cooperation fighting a common enemy such as terrorism, that would be a success for U.S. national security.

- Sometime prior to Christmas, 2016, the Russian Ambassador to Turkey was assassinated. FLYNN called KISLYAK  the next day to say he was sorry and to reinforce that terrorism was ~~their~~our common problem.              FLYNN noted that it was a short call, _and "that was it." On Christmas Day, a Russian military plane crashed and killed all on board to include what was the equivalent to the "Russian USO;" it

was the same Russian choir that sang at the RT event.   FLYNN called
KISYLAK to pass his condolences, as his intent was to try to keep
the relationship with KISLYAK going.   ████ ~~I don't remember this:~~
FLYNN expanded that he has no particular affinity ~~to~~for Russia~~—~~
~~and~~, but that KISLYAK ~~is~~was his

DOJSC0-700022304

FD 302a(Rev_05-08-10)

Continuation of FD-302 of ▮▮▮▮▮▮ Michael Flynn ▮▮▮▮▮▮▮▮▮▮▮▮ , On 01/24/2017 , Page 3 of 5

counterpart, and maintaining trusted relationships within foreign governments is important.

Shortly after Christmas, 2016, FLYNN took a vacation to the Dominican Republic with his wife. On December 28th, KISYLAK sent FLYNN a text stating, "Can you call me?" FLYNN noted cellular reception was poor and he was not checking his phone regularly, and consequently did not see the text until approximately 24 hours later. Upon seeing the text, FLYNN responded that he would call in 15-20 minutes, and he and KISLYAK subsequently spoke. The Dominican Republic was one hour ahead of the time in Washington, D.C. During the call, KISYLAK asked FLYNN to set-up a VTC between President-elect TRUMP and Russian President PUTIN on January 21st. In addition, FLYNN and KISLYAK discussed the U.S. sending an observer to a terrorism conference in Astana, Kazakhstan, that would be attended by Russia, Turkey, Iran and Syrian opposition groups. FLYNN stated he did not respond back to KISLYAK about the conference until probably this week. FLYNN did not make the decision on who would represent the U.S. until the 20th or 21st of January, and finally determined an observer from the U.S. Embassy in Astana would attend. FLYNN expanded to interviewing agents noted that while Russia wanted to take the lead for peace in the Middle East, but the U.S. needed to be the leader, particularly to keep Turkey under the U.S.'s wing. FLYNN noted added there was a complete lack of engagement from the prior administration.

FLYNN was The interviewing agents asked FLYNN if he had any other text, email, text, or personal meetings with KISLYAK or other. Russians. FLYNN volunteered that after the election, he had a closed door meeting with KISLYAK, KISLYAK and Jared KUSHNER at Trump Tower in New York City. KISLYAK was in New York to meet with his diplomats, and the three had a relatively sensitive meeting. FLYNN was a late addition to the meeting and did not participate in setting it up. FLYNN believed the meeting took place before Thanksgiving but was unsure of the date. FLYNN explained that other meetings between the TRUMP campaign team and various foreign countries took place prior to the inauguration, and were sensitive inasmuch as many countries did not want the then-current administration to know about them. There were no personal relationships between the leaders of many countries and the prior administration. FLYNN stated that he and personnel from the incoming administration met with many countries "to set expectations for them, and the expectations were set very high."

FLYNN was asked by the The interviewing agents asked FLYNN if he recalled any discussions with KISLYAK about a United Nations (UN) vote



DOJSCO-700022305

█████████████████████

=302•(Rev_OS--08-10)

████████████████████████

Continuation of FD-302 of ██████ █ ██████  M i c h a e l  F l y n n          .on 01/24/2017   .Page    4  of  5

surrounding the issue of Israeli settlements.  FLYNN ~~commented~~quickly responded, "Yes, good reminder." On the 22nd of December, FLYNN called a litany of countries to include~~,~~ Israel, the UK, Senegal, Egypt, maybe France and maybe KISLYAK. Part of the reason for FLYNN's calls was to conduct an exercise to see how fast ~~he~~the incoming administration could get someone on the line. FLYNN ~~equated~~likened it to a  battle drill to see who the administration could reach in a crisis. ~~This~~The exercise ~~which~~was conducted at the campaign's GSA transition building on 18th and I ~~Streets~~streets N.W., which FLYNN described as a somewhat chaotic environment. FLYNN stated he conducted these calls to attempt~~,~~ to get a sense of where countries stood on the UN vote, specifically~~,~~, whether they intended to vote or abstain.

~~FLYNN was asked by~~The interviewing agents asked FLYNN if he made any request of KISLYAK to vote in a particular way or  take any action. FLYNN stated he did not.      FLYNN stated he did not believe his calls to the various countries would~~-~~ change anything. FLYNN recalled there needed to be a certain number _of abstention votes to alter the outcome, and that having looked at the math at the time, he knew it~~could not~~could not be achieved.    FLYNN said 14 countries were voting, and had a recollection of the number of five votes being important. In the end, only the U.S. abstained~~,~~. FLYNN stated his calls were about asking where countries would stand on a vote, not any requests of, "hey if you do this."

~~FLYNN was asked by~~The interviewing agents asked FLYNN if he made any comment to KISLYAK about voting in a certain manner, or slowing down the ~~vote.~~vote, or if KISLYAK described any Russian response to a request by FLYNN. FLYNN answered, "No.~~"~~-~~"~~  FLYNN ~~continued~~ ~~that~~stated the conversations were along the lines of where do you stand, and what's your position.
FLYNN heard through other channels that Egypt didn't like the vote, and believed the ~~Egyptians~~Egyptians of their own accord delayed the vote a ~~elay of their own accord~~day.    FLYNN again stated that he appreciated the interviewing agents reminding him that he had another conversation with KISLYAK.

~~FLYNN was asked by~~The interviewing agents asked FLYNN if he recalled any conversation with KISLYAK surrounding the expulsion of Russian diplomats or closing of Russian ~~representations~~properties in response to Russian hacking activities surrounding the election. FLYNN ~~said~~stated that he did not. FLYNN ~~again seated~~reiterated his conversation was about the PUTIN/TRUMP VTC and the "Astana thing" (the Kazakhstan conference described earlier).    FLYNN noted he was not aware of the then-upcoming actions as he did not have access to television ~~reporting~~news.

in the Dominican Republic and his government BlackBerry ~~[____; did he specify government blackberry? Dont recall that/have in my notes]~~ wasn't ~~wasn't~~ working.

~~FLYNN was asked by~~The interviewing agents asked FLYNN if he recalled any conversation with KISLYAK in which the expulsions were discussed, where FLYNN might have encouraged KISLYAK ~~to~~ not to escalate the situation, to keep the Russian response reciprocal, ~~to~~or not to engage in a "tit-for-tat." FLYNN responded, "Not really. I  don't remember.It wasn't, 'Don't do anything.'"The U.S. Government's response was a total surprise to FLYNN.   FLYNN didn't know about the Persona Non-Grata (~~PNGs~~PNG) action it until it was in the media. KISLYAK and FLYNN were starting off on a good ~~foot~~footing and FLYNN was looking forward to the relationship. With ~~regards~~regard to the scope of the Russians who were expelled, FLYNN said he didn't understand it. FLYNN stated he could understand one PNG, but not thirty~~-~~ five.


~~FLYNN was asked by~~The interviewing agents asked FLYNN if he recalled any conversation with KISLYAK in which KISLYAK told him the Government of Russia had taken into account the incoming administration's position about the expulsions, or where KISLYAK said the Government of Russia had responded, or chosen to modulate their response, in any way to the U.S.'s actions as a result of a request by the incoming administration.   FLYNN stated it was possible that he talked to KISLYAK on the issue, but if he did, he did not remember doing so. FLYNN stated he was attempting to start a good relationship with KISLYAK and move forward.   FLYNN remembered making 4 to 5 calls that day ~~making four or five calls over~~about this issue, but that the Dominican Republic was a difficult place to make a  call as he kept having connectivity issues. FLYNN ~~stated it was possible that he talked to KISLYAK on the issue, but if he did, he did not remember doing so.  FLYNN~~reflected and stated he didn't think he would have had a conversation with KISLYAK about the matter, as he did not know the expulsions were coming. FLYNN stated he did not have a long drawn out discussion ~~about ''~~with KISLYAK where he would have asked him to "don't do something.~~''~~"

Document comparison by Workshare Compare on Tuesday, June 05, 2018 8:17:07 AM

| Input: | |
|---|---|
| Document 1 ID | ████████████████████████████ |
| Description | 2017-02-10 Draft CLEAN |
| Document 2 ID | ████████████████████████████ |
| Description | 2017-02-11 Draft CLEAN |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 131 |
| Deletions | 90 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |

| Total changes | 223 |
|---|---|

FD-302 (Rev 5-8-10)                        -1 of 5-


**OFFICIAL RECORD**

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    02/15/2017

Do not disseminate outside the FBI without the permission of the originator or program manager.

On January 24, 2017, Deputy Assistant Director (DAD) Peter P. Strzok II and ██████████████, interviewed United States (U.S.) National Security Advisor Michael T. FLYNN, date of birth (DOB) ██████████████, at his office at the White House. After being advised of the identities of the interviewing agents and the nature of the interview, FLYNN provided the following information:

FLYNN's first invitation to Russia occurred when he was the Director of the Defense Intelligence Agency (DIA). FLYNN was the first DIA Director to be invited to GRU headquarters. During that four day trip in 2013, he participated in a leadership development program at GRU (Russian Military Intelligence) headquarters. FLYNN received proper authorization within the U.S. Government prior to conducting the trip. FLYNN could not recall if he met Russia's Ambassador to the United States, Sergey Ivanovich KISLYAK, during this trip. FLYNN described the Russians as very appreciative of his visit. During this trip to Russia as DIA Director, FLYNN first met the then-GRU Director Igor SERGUN. Following the trip, FLYNN and SERGUN continued their relationship on at least one occasion through video teleconference (VTC) and were planning a visit for SERGUN to travel to the United States on February 28, 2014. Russia invaded Crimea in the weeks prior to SERGUN's planned trip, SERGUN's trip was cancelled, and FLYNN had no further contact with the GRU Director. FLYNN described SERGUN as having common ground with FLYNN in that they had similar backgrounds, their sons were the same age, and they had a connection in fighting terrorism. SERGUN had scars from Chechnya and they shared stories about Afghanistan. FLYNN stated he called Ambassador KISLYAK following SERGUN's death in

Investigation on   01/24/2017   at   Washington, District Of Columbia, United States (In Person)

File ██████████                                        Date drafted   01/24/2017

by ███████████, STRZOK PETER P II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)



Continuation of FD-302 of _____ Michael Flynn _____ , On  01/24/2017 , Page  2 of 5

Lebanon early last year to express his condolences.  FLYNN described
SERGUN as someone the U.S. could work with.  FLYNN said he was not
really part of the TRUMP campaign at the time of this call to
KISLYAK.

FLYNN stated his second trip to Russia, after he left U.S.
government service, had received so much press attention that "it
[was] unbelievable."  As background, FLYNN explained that he was
never paid directly by media entities, however, he had been a
contributor to a variety of media entities including Al Jazeera,
Russia Today (RT), Sky, and MSNBC.  FLYNN received a request from
his speakers bureau, Leading Authorities (LAI), to speak about
Middle East issues at the RT 10th Anniversary reception in Moscow.
FLYNN was paid for the speech by LAI.  FLYNN did not know from whom
LAI received payment.  FLYNN met with KISLYAK at the Russian
Ambassador's residence next to the University Club prior to this
trip to Russia.  The visit was a courtesy call to the Ambassador
prior to his trip, and FLYNN took his son with him to this meeting.
The meeting occurred in the mid-afternoon.  In addition, FLYNN
received a DIA threat briefing prior to the travel.

Prior to the Presidential inauguration, FLYNN spoke to
multiple representatives in each of approximately thirty countries'
governments.  FLYNN stated the only exception to that practice was
Russia, in that FLYNN had substantive conversations only with
KISLYAK, and no other members of the Government of Russia.  FLYNN's
interest in Russia was as a common partner in the war on terror.
FLYNN does not know if PUTIN and TRUMP will get along, but it is
FLYNN's job to figure out paths to work with Russia to fight
terrorism.  FLYNN named the primary threats to the U.S. as the "four
plus one:" China, Russia, Iran, North Korea and ISIS.  FLYNN stated
if the U.S. could neutralize one of the four, or even better,
leverage their cooperation fighting a common enemy such as
terrorism, that would be a success for U.S. national security.

Sometime prior to Christmas, 2016, the Russian Ambassador
to Turkey was assassinated.  FLYNN called KISLYAK the next day to
say he was sorry and to reinforce that terrorism was our common
problem.  FLYNN noted that it was a short call, and "that was it."
On Christmas Day, a Russian military plane crashed and killed all on
board to include what was the equivalent to the "Russian USO;" it
was the same Russian choir that sang at the RT event.  FLYNN called
KISLYAK to pass his condolences, as his intent was to try to keep
the relationship with KISLYAK going.  FLYNN expanded that he has no
particular affinity for Russia, but that KISLYAK was his

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of _____ Michael Flynn _____ , On  01/24/2017 , Page  3 of 5

counterpart, and maintaining trusted relationships within foreign
governments is important.

Shortly after Christmas, 2016, FLYNN took a vacation to the
Dominican Republic with his wife.  On December 28th, KISYLAK sent
FLYNN a text stating, "Can you call me?"  FLYNN noted cellular
reception was poor and he was not checking his phone regularly, and
consequently did not see the text until approximately 24 hours
later.  Upon seeing the text, FLYNN responded that he would call in
15-20 minutes, and he and KISLYAK subsequently spoke.  The Dominican
Republic was one hour ahead of the time in Washington, D.C.  During
the call, KISYLAK asked FLYNN to set-up a VTC between
President-elect TRUMP and Russian President PUTIN on January 21st.
In addition, FLYNN and KISLYAK discussed the U.S. sending an
observer to a terrorism conference in Astana, Kazakhstan, that would
be attended by Russia, Turkey, Iran and Syrian opposition groups.
FLYNN stated he did not respond back to KISYLAK about the conference
until probably this week.  FLYNN did not make the decision on who
would represent the U.S. until the 20th or 21st of January, and
finally determined an observer from the U.S. Embassy in Astana would
attend.  FLYNN noted Russia wanted to take the lead for peace in the
Middle East, but the U.S. needed to be the leader, particularly to
keep Turkey under the U.S.'s wing.  FLYNN added there was a complete
lack of engagement from the prior administration.

The interviewing agents asked FLYNN if he had any other
text, email, or personal meetings with KISLYAK or other Russians.
FLYNN volunteered that after the election, he had a closed door
meeting with KISLYAK and Jared KUSHNER at Trump Tower in New York
City.  KISLYAK was in New York to meet with his diplomats, and the
three had a relatively sensitive meeting.  FLYNN was a late addition
to the meeting and did not participate in setting it up.  FLYNN
believed the meeting took place before Thanksgiving but was unsure
of the date.  FLYNN explained that other meetings between the TRUMP
team and various foreign countries took place prior to the
inauguration, and were sensitive inasmuch as many countries did not
want the then-current administration to know about them.  There were
no personal relationships between the leaders of many countries and
the prior administration.  FLYNN stated that he and personnel from
the incoming administration met with many countries "to set
expectations for them, and the expectations were set very high."

The interviewing agents asked FLYNN if he recalled any
discussions with KISLYAK about a United Nations (UN) vote
surrounding the issue of Israeli settlements.  FLYNN quickly

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of _____ Michael Flynn _____ , On  01/24/2017 , Page  4 of 5

responded, "Yes, good reminder." On the 22nd of December, FLYNN
called a litany of countries to include Israel, the UK, Senegal,
Egypt, maybe France and maybe Russia/KISLYAK. Part of the reason
for FLYNN's calls was to conduct an exercise to see how fast the
incoming administration could get someone on the line. FLYNN
likened it to a battle drill to see who the administration could
reach in a crisis. The exercise was conducted at the campaign's GSA
transition building on 18th and I Streets N.W., which FLYNN
described as a somewhat chaotic environment. FLYNN stated he
conducted these calls to attempt to get a sense of where countries
stood on the UN vote, specifically, whether they intended to vote or
abstain.

The interviewing agents asked FLYNN if he made any request
of KISLYAK to vote in a particular way or take any action. FLYNN
stated he did not. FLYNN stated he did not believe his calls to the
various countries would change anything. FLYNN recalled there
needed to be a certain number of abstention votes to alter the
outcome, and that having looked at the math at the time, he knew it
could not be achieved. FLYNN said 14 countries were voting, and had
a recollection of the number of five votes being important. In the
end, only the U.S. abstained. FLYNN stated his calls were about
asking where countries would stand on a vote, not any requests of,
"hey if you do this."

The interviewing agents asked FLYNN if he made any comment
to KISLYAK about voting in a certain manner, or slowing down the
vote, or if KISLYAK described any Russian response to a request by
FLYNN. FLYNN answered, "No." FLYNN stated the conversations were
along the lines of where do you stand, and what's your position.
FLYNN heard through other channels that Egypt did not like the vote,
and believed the Egyptians of their own accord delayed the vote a
day. FLYNN again stated that he appreciated the interviewing agents
reminding him that he had another conversation with KISLYAK.

The interviewing agents asked FLYNN if he recalled any
conversation with KISLYAK surrounding the expulsion of Russian
diplomats or closing of Russian properties in response to Russian
hacking activities surrounding the election. FLYNN stated that he
did not. FLYNN reiterated his conversation was about the
PUTIN/TRUMP VTC and the "Astana thing" (the Kazakhstan conference
described earlier). FLYNN noted he was not aware of the
then-upcoming actions as he did not have access to television news
in the Dominican Republic and his government BlackBerry was not
working.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of _____ Michael Flynn _____ , On 01/24/2017 , Page 5 of 5

        The interviewing agents asked FLYNN if he recalled any
conversation with KISLYAK in which the expulsions were discussed,
where FLYNN might have encouraged KISLYAK not to escalate the
situation, to keep the Russian response reciprocal, or not to engage
in a "tit-for-tat." FLYNN responded, "Not really. I don't
remember. It wasn't, 'Don't do anything.'" The U.S. Government's
response was a total surprise to FLYNN. FLYNN did not know about
the Persona Non-Grata (PNG) action until it was in the media.
KISLYAK and FLYNN were starting off on a good footing and FLYNN was
looking forward to the relationship. With regard to the scope of
the Russians who were expelled, FLYNN said he did not understand
it. FLYNN stated he could understand one PNG, but not thirty-five.

        The interviewing agents asked FLYNN if he recalled any
conversation with KISLYAK in which KISLYAK told him the Government
of Russia had taken into account the incoming administration's
position about the expulsions, or where KISLYAK said the Government
of Russia had responded, or chosen to modulate their response, in
any way to the U.S.'s actions as a result of a request by the
incoming administration. FLYNN stated it was possible that he
talked to KISLYAK on the issue, but if he did, he did not remember
doing so. FLYNN stated he was attempting to start a good
relationship with KISLYAK and move forward. FLYNN remembered making
four to five calls that day about this issue, but that the Dominican
Republic was a difficult place to make a call as he kept having
connectivity issues. FLYNN reflected and stated he did not think he
would have had a conversation with KISLYAK about the matter, as he
did not know the expulsions were coming. FLYNN stated he did not
have a long drawn out discussion with KISLYAK where he would have
asked him to "don't do something."

FD-302 (Rev. 5-8-10)

- 1 of 3 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     11/01/2018

**Lisa Page** was contacted at the offices of Arnold & Porter, 601 Massachusetts Avenue, N.W., Washington, D.C. Page was accompanied by attorney Amy Jeffress, as well as an associate of the firm. Present for the interview was Senior Assistant Special Counsel (SASC) Brandon Van Grack, SASC Zainab Ahmad, and Assistant Special Agent in Charge (ASAC) William E. McCausland. After being apprised of the official identities of the interviewers, Page provided the following information:

{NOTE: At the outset of the interview, Page and her attorneys were shown two documents: an email dated 2/10/2017 from Peter Strzok to Page with an attached FD-302; and a two page document listing text messages. Upon completing their review of these documents, Page provided the following:}

Page stated that on 1/23/2017, a 'pre-meeting' was held at FBIHQ to discuss the next day's proposed interview of National Security Advisor Michael Flynn. Among those present for the 1/23/2017 meeting were Dave Bowdich, Jen Boone, ███████, Strzok, Trish Anderson, and Andrew McCabe.

Following the interview of Flynn on 1/24/2017, a debriefing took place in McCabe's office at FBIHQ. Page believes that among those present were ███████, Strzok, Jon Moffa, McCabe, Bill Priestap, possibly Bowdich, ███████, and Anderson, and definitely Jim Baker. Page recalled that in the course of the debriefing, the two individuals who interviewed General Flynn, Strzok and ███████, stated they didn't believe he (Flynn) was lying, but were "torn on it." Indications of deception by Flynn in their interaction with him had been hard to see. Their view was that, if he (Flynn) was a liar, he was a good one. As the discussion continued, McCabe was not critical of Strzok or ███████. According to Page, McCabe had no interest in 'jamming up' Flynn. At no point in time did McCabe say "Fuck Flynn."

Page stated that McCabe never pressured Strzok or ███████ in their drafting of the FD-302 of the interview of Flynn. Rather, the FD-302 was consistent with what was discussed in the debriefing. With respect for Strzok and ███████, McCabe told them to 'write up what you've got.' Page

| Investigation on | 10/25/2018 | at | Washington, District Of Columbia, United States (In Person) |
|---|---|---|---|

File # ████████████     Date drafted  10/30/2018

by  MCCAUSLAND WILLIAM E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

noted that because both agents were very experienced and Strzok in particular was so senior and well-respected, nobody in the room questioned their assessment. McCabe expressed no hostility towards agents in the 1/24 /2017 meeting.

{NOTE: Page was asked about certain text messages exchanged with Peter Strzok and shown to her. Her responses are as follows:}
In the text message from 1/24/2017, "denying it all" pertained to General Flynn's response to questions in his interview as to whether his conversation with the Russian Ambassador pertained to sanctions.
In the text message from 1/24/2017, "faith in ▮▮ and my assessment" was described by Page as a casual conversation in which Strzok stated that he and ▮▮▮ were giving their read out on their interview with Flynn and asked that everyone have faith in how they 'read it.' No one in FBI management questioned Strzok and ▮▮▮ assessment. However, Page, in casual conversation, had pushed Strzok on whether he was certain.

In the text message from 1/24/2017 mentioning "disagreement," Page stated there was no disagreement between McCabe and the agents. Rather, it was Strzok describing his own internal thinking.

In the text message of 1/24/2017, "finding it hard" was Strzok trying to reconcile whether Flynn believed he was lying in his interview.

In the text message of 1/25/2017, "it was clear you both felt strongly" pertained to Strzok and ▮▮▮.

Page didn't recall whether she took part in editing the FD-302 of the Flynn interview, but upon seeing a text message and the email of 2/10/2017 she believes she must have seen it at some point in the process. Page stated that if she had made any edits to the FD-302, they were merely grammatical edits as part of a peer review and not substantive. As Page put it, with no substantive knowledge she could make no substantive edits. Her edits would likely have been done by hand and handed back. At no point in time did Page consult with McCabe on edits, nor was she ever requested by McCabe to make edits or changes to the FD-302. She doesn't recall any objections from Strzok or ▮▮▮ to her edits. Page stated that it was not unusual for Strzok to ask her to review important documents he was drafting to ensure the use of proper grammar and therefore would not have been out of the ordinary for Strzok to have given her a draft FD-302 to look at.

{NOTE: Page was asked about certain text messages exchanged with Peter Strzok and shown to her. Her responses are as follows:}

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ▮▮▮▮▮▮  Interview of Lisa Page _____ , On _10/25/2018_ , Page _3 of 3_

  In the text message of 2/10/2017, Page was unsure what "considering what you said" meant.

  The text of 2/10/2017 containing "Gave my edits to Bill" likely referred to Bill Priestap. Page stated that she possibly tried to return her peer review document to Strozk, whose door may have been locked. In that instance, she would have left the document in Priestap's office. Page had no specific recollection of Priestap wanting to see any edits.

  Page could not recall any details regarding the 2/10/2017 text containing "I'm not asking you to edit it this weekend."

POLITICS NEWS

# Mueller reassigned top FBI agent in Russia probe over anti-Trump texts, reports say



FBI Director Robert Mueller testifies before a Senate Judiciary Committee hearing in Dirksen Building on oversight of the FBI on June 19, 2013 in Washington.  Tom Williams / CQ-Roll Call file

Dec. 2, 2017, 1:57 PM EST / Updated Dec. 2, 2017, 3:15 PM EST

**By Hallie Jackson and Chelsea Bailey**

Special counsel Robert Mueller removed a top FBI agent over the summer helping to investigate Russian interference in the 2016 election, a spokesman for Mueller's office said Saturday. Confirmation of the agent's dismissal from his role on Mueller's team came after two reports surfaced that said the agent may have shared texts that were critical of President Donald Trump.

The agent, Peter Strzok, a counterintelligence veteran, was reassigned when the Justice Department inspector general's office found potentially disparaging texts he sent to a colleague, The Washington Post and The New York Times first reported.

The matter is now an ongoing investigation by the inspector general's office, the FBI said.

Strzok was exchanging the texts with Lisa Page, an FBI lawyer with whom he was having an extramarital affair, The Post reported. Page was also on Mueller's team but left two weeks before the alleged anti-Trump texts were found. NBC News has not confirmed the contents of the messages and other details of Strzok's removal.

"Immediately upon learning of the allegations, the Special Counsel's Office removed Peter Strzok from the investigation," said Peter Carr, a spokesman for the special counsel's office. "Lisa Page completed her brief detail and had returned to the FBI weeks before our office was aware of the allegations."

Strzok had also worked on the FBI's inquiry into whether former Secretary of State Hillary Clinton mishandled classified information on a private email server, The Times and The Post reported.

Trump responded to the news in a tweet early Sunday morning.



**Donald J. Trump**
@realDonaldTrump

Report: "ANTI-TRUMP FBI AGENT LED CLINTON EMAIL PROBE" Now it all starts to make sense!

112K   9:36 AM - Dec 3, 2017

80.5K people are talking about this



How will Michael Flynn's guilty plea affect the Trump family?

DEC. 1, 201708:20

Strzok's dismissal from the Russia probe came as the Mueller investigation was gaining momentum. FBI agents searched the residence of Trump's former campaign manager Paul Manafort mere days before Strzok was removed.

Evidence uncovered during that raid was ultimately used to indict Manafort and his longtime business associate Rick Gates on 12 charges, including conspiracy against the United States.

In May, Mueller, who previously ran the FBI for more than a decade, was tasked with heading the investigation into potential collusion between the Trump campaign and Russia. The special counsel's office has not said publicly whether anyone on the campaign conspired with Russia to help Trump win.

Attorney General Jeff Sessions, who has recused himself from matters relating to the Russia investigation, said in a statement that if proven to be true the agent's actions "would raise serious questions of public trust."

"My job is to restore confidence in the Department of Justice in all aspects of our work and I intend to do so," said Sessions, whose recusal following revelations that he had failed to disclose meetings with Russia's ambassador to the U.S effectively paved the way for the appointment of Mueller as special counsel.

"As such, I have directed that the FBI Director review the information available on this and other matters and promptly make any necessary changes to his management and investigative teams consistent with the highest professional standards."

**Related: Trump tweet suggests he knew Flynn had lied to FBI at time of firing**

Meanwhile, the reasons behind Strzok's dismissal was revealed less than a day after Trump's ex-National Security Adviser Michael Flynn pleaded guilty to giving a false statement to the FBI about his communications with Russia.

Flynn is the first senior White House official to be charged in the special counsel's investigation into Russian meddling in last year's presidential election. The retired Army general and former head of the Defense Intelligence Agency during the Obama administration was among Trump's early and most prominent supporters.

Throughout the campaign, Flynn advised then-candidate Trump on national security issues and was even considered to be a vice presidential candidate.

A source close to the White House told NBC News that the Trump administration was "blindsided" by the news of Flynn's plea Friday.

**Related: Michael Flynn pleads guilty to lying to FBI in Mueller probe**

And on Saturday, the president made his first public comments about Flynn's plea, in a tweet that appeared to suggest that he knew Flynn had lied to the FBI at the time he was fired.

A two-page charging document filed Thursday lists two false statements Flynn made about his interactions with Russian ambassador Sergey Kislyak in late December 2016.

Flynn had contacted the Russians at the urging of two top transition officials, according to a court document.

Three people familiar with the matter told NBC News that one of the officials referenced in the document is Jared Kushner, Trump's son-in-law and senior adviser. Two people familiar with the matter said the other is K.T. McFarland, who served as a deputy national security adviser from January to May.



**Hallie Jackson**

Hallie Jackson is the chief White House correspondent for NBC News.

**Chelsea Bailey**

Tom Winter and Andrea Mitchell contributed.



ABOUT

CONTACT

CAREERS

PRIVACY POLICY

TERMS OF SERVICE

NBCNEWS.COM SITE MAP

ADVERTISE

ADCHOICES

© 2019 NBC UNIVERSAL

The Washington Post

**National Security**

# Top FBI official assigned to Mueller's Russia probe said to have been removed after sending anti-Trump texts

By Karoun Demirjian and
Devlin Barrett

December 2, 2017

The former top FBI official assigned to special counsel Robert S. Mueller III's probe of Russian interference in the 2016 election was taken off that job this summer after his bosses discovered he and another member of Mueller's team had exchanged politically charged texts disparaging President Trump and supporting Hillary Clinton, according to multiple people familiar with the matter.

Peter Strzok, as deputy head of counterintelligence at the FBI, was a key player in the investigation into Clinton's use of a private email server to do government work as secretary of state, as well as the probe into possible coordination between the Trump campaign and Russia in the 2016 election.

During the Clinton investigation, Strzok was involved in a romantic relationship with FBI lawyer Lisa Page, who worked for Deputy Director Andrew McCabe, according to the people familiar with the matter, who spoke on the condition of anonymity because of the sensitivity of the issue.

The extramarital affair was problematic, these people said, but of greater concern among senior law enforcement officials were text messages the two exchanged during the Clinton investigation and campaign season in which they expressed anti-Trump sentiments and other comments that appeared to favor Clinton.

The people discussing the matter did not further describe the political messages between Strzok and Page, except to say the two would sometimes react to campaign news of the moment.

The Justice Department inspector general's office said in a statement Saturday that its investigators are "reviewing allegations involving communications between certain individuals, and will report its findings regarding those allegations promptly upon completion of the review of them."



A spokesman for Mueller's office said Strzok was removed "immediately upon learning of the allegations" and added that Page left the Mueller team two weeks before it became aware of the allegations.

The FBI declined to comment.

The Post repeatedly sought comment from Strzok and Page but got no response.

Defenders of Page and Strzok insisted that the issue is "overblown" and that there was no misconduct between the two.

A friend of Page's said there was no professional misconduct at issue in the matter, and she said Page left the Mueller team in July before any of the issues came to light.

Page also no longer works much with McCabe, these people said.

When the issue arose, Strzok was taken off the Mueller team in late July, and he was given a job in the human resources division of the FBI — widely viewed internally as a demotion, according to people familiar with the matter.

A former senior Trump administration official said Strzok was evenhanded in all his dealings with the Trump White House. "I had the occasion to work closely with Special Agent Peter Strzok and never experienced even a hint of political bias. He was one of the most competent [counterintelligence] agents, and a role model," the official said. "The country is tearing itself apart, and men like Pete Strzok are victims. The enemy is better off with him sidelined," the former official added, referring to foreign adversaries.

At the time of the two departures from Mueller's group, no one publicly linked them. For months, officials have refused to explain why Strzok was reassigned, but people familiar with the matter said it was ultimately Mueller's decision.

Among federal law enforcement officials, there is great concern that exposure of the texts they exchanged may be used by the president and his defenders to attack the credibility of the Mueller probe and the FBI more broadly, according to the people familiar with the matter.

Defenders of Strzok and Page inside the FBI said that because there was no direct supervisory role between Page and Strzok in the workplace, there wasn't anything professionally wrong about having an affair, but they added that they understood why Mueller would not want anyone engaged in such conduct on his team. For one thing, if a foreign intelligence agency learned of such an affair, they could try to use it as a means of blackmail, although there's no evidence anyone outside the FBI was aware of the relationship.

The president's most vociferous defenders in Congress have called for a special counsel to investigate how the FBI handled the Clinton probe and other Clinton-connected matters. Word of the texts could give new fuel to those demands.

The Clinton investigation formally ended in July 2016, when FBI Director James B. Comey announced he would recommend Clinton face no charges for her use of a private email server as secretary of state. But the

issue was resurrected in late October, when Comey informed congressional leaders that the FBI had discovered new Clinton emails on a laptop belonging to former congressman Anthony Weiner, then the subject of a separate FBI investigation. Days later, Comey announced that the emails on the laptop did not change the FBI's view of the case.



Clinton and her supporters say Comey's moves in October cost her the 2016 election, and Trump and his Republican allies have used it to justify Comey's firing — the event that ultimately led to Mueller's appointment as special counsel.

A lawyer for Comey said the former FBI director would not comment on the situation concerning Page and Strzok.

Mueller has so far charged four people in his investigation of possible coordination between the Trump campaign and Russian officials, most recently former national security adviser Michael Flynn. Of the four, two have pleaded guilty to lying to the FBI — Flynn and a former Trump campaign adviser.

During the Clinton email investigation, Page was a regular participant when Comey would hold "skinny group" meetings on the case — a small collection of advisers who gathered to address sensitive cases, according to people familiar with the case.

Current and former FBI officials say the Strzok matter points to a larger unresolved issue facing the agency as it tries to investigate the president and make a fresh start with a new director, Christopher A. Wray. Much of the agency's senior leadership jobs are currently filled by people who were put in those positions by Comey, and Wray has yet to make many significant changes at the top. But a major house cleaning by the new director is widely anticipated inside the bureau.

McCabe, the deputy director, has faced repeated questions from the White House and Republican lawmakers about whether he should have been involved in the Clinton case at all — given the hundreds of thousands of dollars in political donations made by a key Clinton ally to McCabe's wife, a 2015 candidate for political office in Virginia.

*Adam Entous contributed to this report.*

**Karoun Demirjian**
Karoun Demirjian is a congressional reporter covering national security, including defense, foreign policy, intelligence and matters concerning the judiciary. She was previously a correspondent based in The Post's bureau in Moscow. Follow 🐦

**Devlin Barrett**
Devlin Barrett writes about national security and law enforcement for The Washington Post. He has previously worked at the Wall Street Journal, the Associated Press and the New York Post, where he started as a copy boy. Follow 🐦

The Washington Post

## We dig deeper.

Original reporting, exclusive scoops and more. Subscribe for **$1**.

| Get this offer |
| --- |

| Send me this offer |
| --- |

Already a subscriber? **Sign in**

**Leading Authorities, Inc.**
1990 M Street, NW, Suite 800, Washington, DC 20036
www.leadingauthorities.com
1-800-SPEAKER | Fax: 202-783-0301



GREAT EVENTS START HERE
WASHINGTON, DC | CHICAGO | LONDON

*Michael Flynn*
*Volga-Dnepr Airlines - Middle East & Africa Logistical Logistical & Regional Security Challenges Conference*
*Wednesday, August 19, 2015*

| | |
|---|---|
| **MEETING SITE:** | **Dupont Circle Hotel**<br>1500 New Hampshire Avenue, NE<br>Washington, DC 20036 |
| **ON SITE CONTACT:** | **Colon Miller,** *Director Government & Defense Programs*<br>Office: (832) 585-8611<br>Cell: (713) 298-7724 |
| **LEADING AUTHORITIES CONTACTS:** | **McKenna Wilkinson,** *Event Coordinator*<br>Office: (202) 416-4675<br>Cell: (603) 313-1815 |
| | **Erin Owenby,** *Event Coordinator*<br>Office: (202) 416-4672<br>Cell: (828) 712-9672 |
| | **Lisa Raines,** *Senior Program Consultant*<br>Office: (202) 721-7679<br>Cell: (202) 460-4501 |
| **TALENT ONSITE CONTACT:** | **Michael Flynn**<br>Cell: (703) 772-8909<br>**Emergency Use Only** |

**SCHEDULE OF EVENTS:**

<u>**Wednesday, August 19, 2015**</u>

| | |
|---|---|
| 7:00 am | **Ground Transportation from Home to Dupont Circle Hotel** |
| | *Driver to wait outside residence* |
| | Transportation Company: ACL Transportation |
| | Contact: (703) 830-8901 |
| | Confirmation #: 22855 |
| | Travel Time: 28 minutes |
| | *Arranged By LAI* |

8:15 am  **Michael Flynn Arrives for Breakfast**
*will be greeted by Colon Miller Cell:(713) 298-7724*

Location:  DuPont Circle Hotel Entrance

8:45 am  **AV Check**

<u>AV Requirements:</u> Brings powerpoint and video, glass of water

Location:  The DuPont Room (Main Ballroom)

9:00 am  **Meeting Begins**

Location:  The DuPont Room (Main Ballroom)

**Introducer:** Colon Miller, *Director Government & Defense Programs*
** Bio on page 3**

9:30-10:45 am  **Michael Flynn's Presentation**
*Cyber Security*
*Format:60  Minutes of prepared remarks plus Q&A*
*Moderated by Colon Miller*

***Presentation will not  be recorded and no media will be present***
**Attire:** Business

**Audience Description:**
Leaders from various countries in the Middle East and Africa; US
company representatives from both Commercial and Government
Sectors, etc.

Following:  General Flynn is invited to attend presentations and lunch

10:45 am  **Ground Transportation from Dupont Circle Hotel to Home**
*Driver to wait at hotel entrance*
Transportation Company: ACL Transportation
Contact: (703) 830-8901
Confirmation #: 22856
Travel Time: 28 minutes
*Arranged By LAI*

**Volga-Dnepr Airlines Information:**

The Group's core businesses are charter cargo operations using unique AN-124-100 and IL-76TD-90VD heavy transporters (Volga-Dnepr Airlines) and scheduled cargo operations using the fleet of Boeing 747 (AirBridgeCargo Airlines) and Boeing 737 (Atran Airlines) freighters. The synergy achieved through combination of these businesses greatly expands the reach and flexibility of air logistics solutions available to clients and enables the Group to sustainably grow and effectively compete in the global air cargo market. Aircraft MRO services (Volga-Dnepr Technics) in Russia, Germany and the United Arab Emirates comprise the third core business of Volga-Dnepr Group.

Volga-Dnepr Group Engineering and Logistics Center (ELC) works 24/7/365 and provides customers with comprehensive logistics services. ELC professionals have over 20 years of experience in the air cargo industry.

Volga-Dnepr Group also includes companies which provide customers and partners with insurance, consulting and educational services. Volga-Dnepr Moscow LLC acts as the managing company and is in charge of strategic management of all structural units within the Group.

Volga-Dnepr pursues the strategy of leadership which is built around promotion of the "Cargo Supermarket" concept and contemplates for mutually complementary use of the best Russian and Western transport aircraft. In its business initiatives and strategic development, the Group advocates for the principles of care for the future, high professionalism, client-centric approach, financial stability and transparency, safety and leadership.

**Biography of Introducer:**

## Colon Miller's Intro Bio - Volga-Dnepr Unique Air Cargo

Colon Miller is the Director, Government & Defense Programs for Volga-Dnepr Unique Air Cargo from the North American office out of Houston, Texas.

Colon is a retired Air Force Veteran with over 22 years of service, and 30 years of experience in airlift and logistics. Colon is responsible for logistics and airlift shipments of commercial and military cargo and equipment world-wide. He's responsible for many U.S. Government Key Accounts, working closely with such organizations as; U.S. Department of State, Department of Defense, Department of Transportation, U.S. Transportation Command, Air Mobility Command, USAID, the United Nations, NATO and many Fortune 500 Companies around the globe where he provides logistical support and solutions in support of their global and strategic objectives.

**Leading Authorities, Inc.**
1990 M Street, NW, Suite 800, Washington, DC 20036
www.leadingauthorities.com
1-800-SPEAKER | Fax: 202-783-0301



### General Michael Flynn
### Kaspersky Government Security Solutions, Inc. - 2015 Kaspersky Government Cybersecurity Forum
### Tuesday, October 20, 2015

**MEETING SITE:**      **Ronald Reagan Building and International Trade Center**
1300 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: (202) 312-1399

**ON SITE CONTACT:**      **Sara Herrmann,** *KGSS Marketing Director*
Cell: (339) 234-0978

**LEADING AUTHORITIES CONTACTS:**      **Monica Zakeri,** *Event Manager*
Office: (202) 721-2360
Cell: (703) 282-2360

**Erin Owenby,** *Event Coordinator*
Office: (202) 416-4672
Cell: (828) 712-9672

**Debbie Saylor,** *Vice President*
Office: (202) 721-7654
Cell: (571) 236-0010

**TALENT ONSITE CONTACT:**      **General Michael Flynn**
Cell: (703) 772-8909
***Emergency Use Only***

**SCHEDULE OF EVENTS:**

<u>Monday, October 19, 2015</u>

| | |
|---|---|
| 4:45 pm | **Ground Transportation from Home to City Club of Washington** |

*Driver to wait outside Michael Flynn's residence then continue to pick up General Flynn*
Transportation Company: ACL Transportation
Contact: (703) 830-8901
Confirmation #: 23165
Travel Time: Approx. 24 minutes
*Arranged By LAI*

5:30-8:30 pm    **VIP Dinner Reception**

Location: The City Club of Washington
*The City Club is downstairs when you enter the building from the street.*

**Attendee Description:**
VIP guests include conference speakers, sponsors and a few others of our business development prospects from the public and private sector. There will be approximately 60 people in attendance with the inclusion of KGSS staff.

8:30 pm    **Ground Transportation from City Club of Washington to Home**
*Driver to wait at entrance*
Transportation Company: ACL Transportation
Contact: (703) 830-8901
Confirmation #: 23165
Travel Time: Approx. 24 minutes
*Arranged By LAI*

<u>Tuesday, October 20, 2015</u>

7:00 am    **Ground Transportation from Home to Ronald Reagan Building**
*Driver to wait outside Michael Flynn's residence then continue to pick up General Flynn*
Transportation Company: ACL Transportation
Contact: (703) 830-8901
Confirmation #: 23166
Travel Time: Approx. 22 minutes
*Arranged By LAI*

7:45 am    **Michael Flynn Arrives**
*Meet Sara Herrmann Cell: (339) 234-0978 at registration table*

Location:  Atrium Hall Foyer

8:00 am    **AV Check**

<u>AV Requirements:</u> Lav Mic and glass of water and powerpoint

Location:  Atrium Hall

| | |
|---|---|
| **8:30 am** | **Breakfast Begins**<br>\*\*Agenda on page 5\*\* |
| | Location:  Atrium Hall |
| | **Introducer:** Phil Bond, *President & CEO, Bond & Associates*<br>\*\* Bio on page 4\*\* |
| **9:00-10:00 am** | **Michael Flynn's Presentation**<br>***Anonymity, Privacy, Technology, Security: Identifying Concerns and Impacts***<br>*Format: 45 Minutes of prepared remarks plus 15 minutes of Q&A*<br>*Stage set-up: The Atrium stage will have a podium and lavaliere for keynote speakers. There will also be a table for panel sessions to follow. A confidence monitor will be available.* |
| | ***\*\*This presentation WILL be recorded\*\****<br>***\*\*Media WILL be invited\*\**** |
| | **Michael Flynn's Attire:** Business<br>**Audience Attire:** Business |
| | **Audience Description:**<br>400 members of the Information Security community, Government technologists, integrators/solution providers, Washington policy makers, Intelligence Community |
| **10:00 am** | **General Flynn is free to depart** |
| **10:00 am** | **Ground Transportation from Ronald Reagan Building to Home**<br>*Driver to wait outside hotel*<br>Transportation Company: ACL Transportation<br>Contact: (703) 830-8901<br>Confirmation #: 23166<br>Travel Time: Approx. 22 minutes<br>*Arranged By LAI* |

**Kaspersky Government Security Solutions, Inc. Information:**

KGSS designs, implements and delivers world-class cybersecurity services and customize solutions to the US Government, their contractors, and the National Critical Infrastructure sector.

**Biography of Introducer:**

Phil Bond is one of America's most honored technology policy experts and leader of the firm that bears his name.

A former US Under Secretary of Commerce for Technology, his 25-plus year career in Washington has included numerous citations for his leadership roles in the Executive branch, on Capitol Hill, at major high technology companies, and most recently as the CEO of TechAmerica, the largest technology advocacy association in the US.
Bond has been accorded numerous accolades during his 25-plus years in Washington, DC, including:
- Named to the *Federal 100*, the annual listing by Federal Computer Week of the most influential people in government technology;
- Named one of the *Top 50 Tech Leaders* of 2003 by Scientific American magazine for his policy leadership around nanotechnology;
- Elected Deputy Chair of the World Information Technology and Services Alliance, a federation of more than 70 national technology associations around the world;
- Named a Tech Titan in Washingtonian Magazine's annual listing of tech leaders;
- Recognized by Roll Call, the Capitol Hill newspaper, as one of The Fabulous Fifty, a listing of the most powerful staff in Congress

Earlier in his career, Bond served as Senior Vice President of Government Relations for Monster Worldwide, the world's largest online career site, and General Manager of Monster Government Solutions.

From 2001 to 2005, Bond was Under Secretary of the U.S. Department of Commerce for Technology and, from 2002-2003, served concurrently as Chief of Staff to Commerce Secretary Donald Evans. In his dual role, Bond worked closely with Secretary Evans to increase market access for U.S. goods and services and further advance America's technological leadership at home and around the world. He oversaw the operations of the National Institute of Standards and Technology (NIST), the Office of Technology Policy, and the National Technical Information Service. During his tenure, the Technology Administration was the pre-eminent portal between the federal government and the U.S. technology industry.

Bond joined the Administration from the private sector, where he served as Director of Federal Public Policy for the Hewlett-Packard Company, and previously as Senior Vice President for Government Affairs and Treasurer of the Information Technology Industry Council.

From 1993 to 1998, Bond served as Chief of Staff to the late Congresswoman Jennifer Dunn (R-WA). He was Principal Deputy Assistant Secretary of Defense for Legislative Affairs from 1992 to 1993. Earlier, Bond was Chief of Staff and Rules Committee Associate for Congressman Bob McEwen (R-OH) from 1990 to 1992. From 1987 to 1990, he served as Special Assistant to the Secretary of Defense for Legislative Affairs.

He is a graduate of Linfield College in Oregon. Bond and his wife, Diane, have two daughters and reside in Fairfax Station, Virginia.

**Event Agenda:**

| TIME | DESCRIPTION | SPEAKER(S) |
|------|-------------|------------|
| 8:00 AM | Breakfast & Registration | N/A |
| 8:30 AM | Welcome & Scripted Skit | Phil Bond /4 Hired Actors |
| 9:00 AM | Opening Keynote: Anonymity, Privacy, Technology, Security: Identifying Concerns and Impacts | Lieutenant General Michael Flynn |
| 10:00 AM | Panel Discussion: The Stumbling Blocks to Removing Anonymity | Dr. Thomas Cellucci<br>John Scott<br>Dr. Beverly Magda<br>Marco Santori<br>Robert Burton<br>Mike Lennon (Moderator) |
| 11:00 AM | Networking Break | N/A |
| 11:15 AM | Morning Keynote: Anonymity, Privacy, Technology, Security: Aligning Top Level Requirements | Adam Firestone |
| 12:15 PM | Lunch Fireside Chat | Joseph Lorenzo Hall<br>Daniel Ford, D. Sc.<br>Henry J. Sienkiewicz |
| 2:15 PM | Congressional Discussion | Congressman Michael T. McCaul |
| 2:45 PM | Networking Break | N/A |
| 3:00 PM | Panel Discussion: The Technical Road Ahead: Ones and Zeroes to Meaningful Privacy and Security | Hillary Fielden<br>Richard Marshall<br>Chuck Brooks<br>César Andrés López<br>Jim Jones<br>Dan Verton (Moderator) |
| 4:00 PM | Closing Keynote: Trustworthy Locks: The Key to Security and Privacy | Deviant Ollam |
| 5:00 PM | Closing Remarks | Phil Bond |

**RT** 10 years on air

December 10, 2015, Moscow
Metropol Hotel Conference hall

## INTERNATIONAL CONFERENCE

### INFORMATION, MESSAGES, POLITICS: THE SHAPE-SHIFTING POWERS OF TODAY'S WORLD

### Program

| | |
|---|---|
| 9:30– 10:00 | Welcome coffee |
| 10:00 | Welcome address |
| 10:05 – 11:00 | Session 1<br>Frenemies: Defining foes and allies in proxy politics. |
| 11:00 – 12:00 | Session 2<br>InfoWar: Will there be a winner? |
| 12:00 – 12:30 | Coffee break |
| 12:30 – 13:15 | Session 3<br>Public talk: Q&A with U.S. Lieutenant General & frm. Director of Defense Intelligence Agency Michael Flynn on the crisis in the Middle East. |
| 13:15 – 14:15 | Session 4<br>Security or Surveillance: Can the right to privacy and effective anti-terror security coexist in the digital age? |
| 14:15 – 15:00 | Lunch |
| 15:00 – 16:15 | Session 5<br>The role of international news media on the new geopolitical chessboard. |

International Conference
**Information, messages, politics:
the shape-shifting powers of today's world**

## 10:05 – 11:00 Frenemies: defining foes and allies in proxy politics.

The conversation will focus on the causes and consequences of Russia's geopolitical re-emergence over the last decade, how it was received and responded to in different parts of the world, and the outlook for the international community.

Moderator: Oksana Boyko, senior political correspondent and host of RT's current affairs program "Worlds Apart".



**Ken Livingstone**
UK politician

Most recently Livingstone was appointed to co-chair the opposition defence review in the UK. He served as the Leader of the Greater London Council (GLC) from 1981 until the Council was abolished in 1986, and then as the first elected Mayor of London from the creation of the office in 2000 until 2008; his leadership during the 2005 London bombings was widely praised. Livingstone also served as the Member of Parliament (MP) 1987-2001 as a member of the Labour Party.



**Cyril Svoboda**
Czech politician

Between 1996 and 1998 Svoboda led the negotiations on Czech accession to the EU. Thereafter he held the posts of the Interior Minister, Deputy Prime Minister and the Minister of Foreign Affairs, Chairman of the government's legislative council and Minister for Regional Development of the Czech Republic.



**Horst Teltschik**
German politician

Teltschik is an expert on foreign policy and security affairs. He served as the National Security Advisor to German Chancellor Helmut Kohl, as well as the Chairman of the Munich Conference on Security Policy, Director General of the Foreign and Domestic Relations, Development Policy and Foreign Security at the Federal Chancellery, Deputy Chief of Staff for the Federal Chancellery and Chief of Staff of the Chairman of the Christian Democratic Union/Christian Social Union (CDU/CSU) Parliamentary Group.



**Willy Wimmer**
German politician

Wimmer was a member of the German Parliament from 1976 to 2009, the defense spokesman of "Union parties" of Germany, and the Parliamentary State Secretary in the Ministry of Defense. His main commitments concerned global security, integration of the armed forces of the GDR into the German Army during and after Unification. Wimmer went on to become the Vice-President of CSCE/OSCE from 1994 to 2000, as well as the member of the foreign affairs committee of the Bundestag & special advisor on global security and international relations to former chancellor Helmut Kohl.



Jill Stein was the Green Party's 2012 candidate for President of the United States. She is an activist, physician, and pioneering environmental-health advocate. She was a principal organizer for the Global Climate Convergence for People, Planet and Peace over Profit.

**RT** 10 years on air

International Conference

**Information, messages, politics:**
**the shape-shifting powers of today's world**

## 11:00 – 12:00 InfoWar: will there be a winner?

Escalating "info-wars" between Western news media and that of other countries, particularly Russia, has become a popular talking point over the last few years. The session will explore the prevalent narratives in the media today, who and what is behind the rhetoric, whether it harms the international dialogue, and how we can break the "info-war" cycle.

Moderator: Anissa Naouai, senior political correspondent and host of RT's media and politics commentary show "In the Now".



**Rocky Anderson**
U.S. politician

Anderson is an American attorney and politician, who was the Justice Party's 2012 candidate for President of the United States. He served two terms as the 33rd mayor of Salt Lake City, Utah, from 2000 to 2008. He is the Executive Director of High Road for Human Rights.



**Javier Couso Permuy**
Member of the European Parliament

Prior to becoming elected to the EP, Permuy directed the documentaries about misinformation in Spain and the treatment of information in Latin America. In the European Parliament Permuy is the VP of the Committee on Foreign Affairs, and is a member of the Subcommittee on Security and Defense. He brought the only still-open war crimes court case against the U.S. Army following the death of his brother in the U.S. shelling of a Baghdad hotel in 2003.



**Gregory Copley**
Historian, author and strategic analyst

Australian-born Copley is the President of the International Strategic Studies Association in Washington, DC. He serves as an advisor on strategic issues to a number of governments and leaders. He has authored or co-authored 32 books on strategic and geopolitical issues, history, energy, aviation, and defense; including UnCivilization: Urban Geopolitics in a Time of Chaos and The Art of Victory.

International Conference
**Information, messages, politics:
the shape-shifting powers of today's world**

## 11:00 – 12:00 InfoWar: will there be a winner?

>>>



**Oliver Stone**
Oscar-winning
filmmaker

Stone is a legendary American filmmaker, an Academy Award-winning writer-director of films that often deal with controversial political issues of the 1960s, such as America's involvement with the Vietnam War. His works include such world-famous titles as JFK, Platoon, Wall Street, Nixon, Bush and Born on the Fourth of July. He is currently producing a film about Edward Snowden, the whistleblower who disclosed information about NSA's surveillance programs.



**Max Blumenthal**
American journalist
and author

Blumenthal is known for his reporting in Israel and Palestine. He was one of the journalists reporting in the Gaza strip during the Israeli offensive in the Summer of 2014. Blumenthal is a senior writer for AlterNet; his writing on Israel-Palestine issues and other foreign-policy issues has appeared in The New York Times, The Los Angeles Times, The Daily Beast, The Nation, The Guardian, The Huffington Post, Salon.com and Al Jazeera English.



**Peter Kuznick**
Director of the Nuclear
Studies Institute at
American University

Kuznick, Professor of History at American University, is active in antiwar and nuclear abolition efforts. In 1995 he founded American University's Nuclear Studies Institute. He is an acclaimed commentator on foreign policy, and particularly nuclear policy issues, for the Washington Post, the New York Times, CBS Sunday Morning, CNN, Al Jazeera, Reuters, and Voice of America and other news outlets. Together with filmmaker Oliver Stone he co-authored the Showtime documentary film series and book both titled The Untold History of the United States.



International Conference

**Information, messages, politics:**
**the shape-shifting powers of today's world**

**11:00 – 12:00  Public talk: Q&A with U.S. Lieutenant General &**
**frm. Director of Defense Intelligence Agency**
**Michael Flynn on the crisis in the Middle East.**

After 13 years of ongoing conflicts in the Arab world and the Middle East (Iraq, Afghanistan – now Libya, Egypt and of course, Syria), what do we need to do to bring peace to this region?

Interviewer: Sophie Shevardnadze, host of RT's interview series "SophieCo".



Lieutenant General Michael Flynn is a 33-year veteran of the U.S. Army who has led a long and distinguished intelligence career. One of the nation's foremost cyber security experts, he headed the Defense Intelligence Agency (2012-2014), which functions as the main foreign military espionage organization in the United States.

International Conference
Information, messages, politics:
the shape-shifting powers of today's world

**RT** 10 years on air

## 13:15 – 14:15   Security OR Surveillance: Can the right to privacy and effective anti-terror security coexist in the digital age?

Moderator: Thom Hartmann, acclaimed American author, progressive political commentator, and  host of "The Big Picture", political commentary show, on RT America.



**Julian Assange**
Co-founder,
WikiLeaks

Assange is the co-founder and editor-in-chief of WikiLeaks. WikiLeaks achieved particular prominence in 2010 after publishing leaked U.S. military and diplomatic cables. Since 2012, facing extradition to Sweden, Assange has been receiving political asylum at the Embassy of Ecuador in London. His award-winning interview series The Julian Assange Show aired exclusively on RT, generating a media firestorm.



**Annie Machon**
Whistleblower and
frm. MI5 intelligence
officer

Machon was an intelligence officer for the UK's MI5 in the 1990s, before leaving to help blow the whistle on the activities of the British spy agencies. She is now a writer, media commentator, political campaigner, and international public speaker on a variety of related issues from the war on terrorism to the war on whistleblowers, to the war on drugs, to cyberactivism.  She is the Co-Director of Code Red, a global initiative to accelerate reform of security organisations.



**Philip Giraldi**
Military intelligence
expert, frm. CIA officer

Giraldi is a former CIA counter-terrorism specialist and military intelligence officer who served nineteen years overseas in Turkey, Italy, Germany, and Spain.  He was the CIA Chief of Base for the Barcelona Olympics in 1992 and was one of the first Americans to enter Afghanistan in December 2001. Giraldi is the Executive Director of the Council for the National Interest, a Washington-based advocacy group that seeks to encourage and promote a U.S. foreign policy in the Middle East that is consistent with American values and interests.



**Raymond  McGovern**
Whistleblower and
frm. CIA officer

After serving as an Army intelligence officer, McGovern joined the Analysis Division of CIA, and served there from the Kennedy administration to that of the first President Bush.  Ray was Chief of CIA's Soviet Foreign Policy Branch in the 70s, chairing National Intelligence Estimates and preparing the President's Daily Brief, for Reagan's senior national security advisers. In 2003, McGovern helped create Veteran Intelligence Professionals for Sanity (VIPS) to expose the intelligence fraud used to justify the 2003 US invasion of Iraq. He protested CIA's involvement in torture activities and publicly questioned Defense Secretary's Donald Rumsfeld about misleading the American public in the run-up to the war.

International Conference

**Information, messages, politics:**
**the shape-shifting powers of today's world**

## 15:00 – 16:15   The role of international news media on the new geopolitical chessboard.

The conversation will address the causes, benefits and challenges resulting from the growing number of international news broadcasters, changes in audiences' demands and expectations when it comes to news, and the role that different opinions play in creating checks and balances for a multipolar world.

Moderator: Raymond Snoddy, British journalist, television presenter, author and media commentator. Until September 2012 he presented the BBC News Channel's weekly viewer right-to-reply programme NewsWatch. Today he writes for a number of publications on issues relating to the news industry.



**Margarita Simonyan**
Editor-in-Chief, RT

Simonyan is the Editor-in-Chief of Russia Today, Russia's first 24/7 global news network, broadcasting in multiple languages to over 700 million people in 100+ countries. RT's mission, embodied by the tagline Question More, is to deliver alternative perspectives on world affairs. Under Ms. Simonyan's helm, RT became the only Russian TV network to garner three International Emmy nominations for news coverage, and the #1 TV news network on the platform with more than 3 billion views. Prior to heading up RT, Simonyan had reported from Chechnya during the Second Chechen Campaign, from the Beslan School Siege, and from Abkhazia, and has received several awards for journalism.



**Patricia Villegas**
President, teleSUR

Villegas is one of the founders of teleSUR international news network and its current president. teleSUR is sponsored by the governments of Argentina, Bolivia, Cuba, Ecuador, Nicaragua, Uruguay and Venezuela, where the channel is headquartered.  TeleSUR was launched in 2005 with the objective of providing information to promote the integration of Latin America. In 2014, teleSUR launched an English-language website, with English-language broadcasting kicking off in 2015.



**Nigel Parsons**
CEO, TVC News

Parsons is the CEO of TVC News, a 24-hour pan-African news channel launched in Nigeria in early 2013. As an MD at Al Jazeera English, he oversaw the channel from concept to launch. AJE was quickly recognised as an important global news channel, and within a year had won the accolade of 'Best News Programme of the Year' at the Monte Carlo TV Festival. Previously, Parsons was a Director of Associated Press Television News and, before that, a Vice President of Worldwide Television News. He has also worked as an editor, reporter and producer for the BBC, ABC America, CBC Canada, The New Zealand Herald, and RTHK Hong Kong.



**Liu Ge**

Liu Ge is the deputy director of CCTV NEWS, which is a global news provider & China's 24-hour live English TV news channel, broadcasting worldwide from news centers in Beijing, Washington DC & Nairobi. Prior to the current position, She worked in London as CCTV'S foreign correspondent and later chief editor at Beijing Headquarters' news desk. Currently, as a member of senior management of the channel, she is responsible for the channel's news output, including daily rolling news

| FLYNN MEETINGS WITH SCO AND PROSECUTORS & GOVERNMENT PRODUCTIONS OF DOCS | | |
|---|---|---|
| **Date** | With Whom | Person Interviewed |
| **Nov. 16, 2017** | SCO | Flynn |
| **Nov. 17, 2017** | SCO | Flynn |
| **Nov. 20, 2017** | SCO | Flynn |
| **Nov. 21, 2017** | SCO | Flynn |
| **Nov. 22, 2017** | SCO produces 302 (final) | |
| **Nov. 29, 2017** | SCO | Flynn agreed to plead |
| **Nov. 30, 2017** | SCO | Plea agreement signed |
| **Jan. 11, 2018** | SCO | Flynn |
| **Jan. 19, 2018** | SCO | Flynn |
| **Jan. 24, 2018** | SCO | Flynn |
| **March 1, 2018** | SCO | CB Phone Call |
| **March 13, 2018** | First Government Production | |
| **Apr. 25, 2018** | SCO | Flynn |
| **May 1, 2018** | SCO | Flynn |
| **May 4, 2018** | SCO | Flynn |
| **May 17, 2018** | SCO | Flynn |
| **May 23, 2018** | SCO | Flynn |
| **May 25, 2018** | Second Gov. Production | |
| **June 1, 2018** | Third Gov. Production | |
| **June 13, 2018** | SCO | Flynn |
| **June 14, 2018** | SCO | Flynn |
| **June 24, 2018** | Fourth Gov. Production | |
| **June 25, 2018** | EDVA | Flynn |
| **July 26, 2018** | EDVA | Flynn |
| **July 26, 2018** | SCO | Flynn |
| **Sept. 17, 2018** | SCO | Flynn |
| **Oct. 4, 2018** | Fifth Gov. Production Letter | |
| **Oct. 24, 2018** | CB Call with SCO | |
| **Nov. 8, 2018** | Gov. reply to Oct. 15 letter from CB | |
| **Nov. 15, 2018** | CB Call with SCO | |
| **Dec. 14, 2018** | Sixth Production Letter | |
| **Dec. 17, 2018** | CB Call with SCO | |
| **Dec. 18, 2018** | Scheduled Sentencing | POSTPONED |
| **Jan. 28, 2019** | EDVA | Flynn |
| **Feb. 5, 2019** | EDVA | Flynn |
| **Feb. 28, 2019** | EDVA | Flynn |
| **Apr. 5, 2019** | EDVA | Flynn |
| **June 6, 2019** | EDVA | Flynn |
| **June 25, 2019** | EDVA | Flynn |
| **August 16, 2019** | Seventh Gov. Production letter | |

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

Plaintiff,

v.

MICHAEL T. FLYNN,

Defendant.

Criminal Action No. 17-232-EGS

DECLARATION OF
KHODY R. DETWILER

 I, Khody R. Detwiler of Lesnevich & Detwiler, 7550 Woodbury Pike, Roaring Spring, PA 16673, swear and affirm as follows:

1. I am of sound mind and over the age of eighteen, and I make the following declaration based on my personal knowledge.

EXPERT QUALIFICATIONS

2. I am a forensic document examiner and principal of Lesnevich & Detwiler located in Roaring Spring, Pennsylvania.  I have been involved in the field of forensic document examination since 2008.  My initial training was completed in accordance with the SWGDOC *Standard for Minimum Training Requirements for Forensic Document Examiners*, under the direct supervision and instruction of senior forensic document examiner, Gus R. Lesnevich.

3. I specialize in handwriting and signature analysis and regularly conduct examinations pertaining to alterations, obliterations, and erasures, as well as non-destructive ink, paper, and

indentation analysis, among other specialties specific to forensic document examination. Since the beginning of my career in the field of forensic document examination over a decade ago, I have conducted a wide variety of forensic examinations on thousands of individual documents and signatures involved in various litigations throughout the United States and abroad.   My international casework has required extensive travel to locations throughout South America, Europe, and the Middle East.

4.      I have been received as an expert, and have presented evidence, on numerous occasions in both state and federal courts throughout the United States, and internationally.   A sampling of some of the key cases I have been involved with are included in my curriculum vitae, attached hereto as *Exhibit 1*.   I also contract with a variety of state and federal law enforcement agencies, insurance companies, and private entities to perform forensic document examination services on a regular basis.   My professional qualifications and affiliations are set forth more fully in my curriculum vitae.

**ASSIGNMENT**

5.      I have been retained in this matter by Attorney Sidney Powell, on behalf of Defendant Michael T. Flynn in the above-captioned action, to undertake and address the following:

5.1.    To conduct a forensic handwriting examination and comparison of a series of handwritten notations purported created during an interview that occurred on January 24, 2017, herein referred to as "the (Q-1) notations".   Specifically, I have been asked to determine, if possible, whether the (Q-1) notations were completed in a contemporaneous manner (*i.e.,* during the course of the open interview) or whether they were prepared at some point in time after the interview concluded.   Additionally, I have been asked to determine whether any portion(s) of the submitted notations were modified and/or added to after the fact.

**MATERIALS PROVIDED FOR EXAMINATION**

6.     For the purpose of my analysis, I have been provided with a PDF file containing reproductions of three (3) pages of handwritten notations (Q-1), purportedly authored by FBI Agent, Peter Strzok during an interview with General Michael T. Flynn commencing on January 24, 2017[1].

**SUMMARY OF CONCLUSION**

7.     Based upon the inherent limitations arising from the examination of non-original evidence, compounded with the lack of <u>any</u> known comparison handwritten notations of Agent Peter Strzok (*i.e.,* other non-contested handwritten notations prepared under like conditions), it has been determined that no conclusion can be rendered as to whether the submitted (Q-1) notations were written during the course of the January 24th interview, or prepared at a subsequent time period. Moreover, as a result of the submission of sub-par reproduction quality evidence, no specialized forensic document examinations, such as spectral ink analysis or electrostatic detection analysis, could be conducted to further address whether any portion(s) of the submitted (Q-1) notations were changed or added after the fact.

8.     The conclusion summarized above corresponds to the "no conclusion (totally inconclusive, indeterminable)" point on the nine-point conclusion scale propounded by the Scientific Working Group for Forensic Document Examination ("SWGDOC") [2] *Standard Terminology for Expressing*

---

[1]     Attached as ***Exhibit 2*** is a true and accurate reproduction of the Exhibit Q-1 notations submitted for analysis in this matter.

[2]     The Scientific Working Group for Forensic Document Examination develops standards and guidelines for the field of forensic document examination.  SWGDOC is composed of private examiners and government examiners from local, state, and federal laboratories throughout the United States.  SWGDOC began in 1997 as TWGDOC (Technical Working Group for Questioned Documents), was renamed SWGDOC in 1999, and was reorganized in 2001.  From 2000 to 2012 SWGDOC published their standards through the American Society for Testing and Materials International (now simply ASTM International).  In 2012  SWGDOC stopped publishing their standards

*Conclusions of Forensic Document Examiners*.   On that scale, "no conclusion" is defined as follows: "This is the zero point of the confidence scale.  It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing <u>or a lack of comparable writing</u>, and the examiner does not have even a leaning one way or another."

**ANALYSIS DISCUSSION**

9.      When attempting to determine whether a handwritten entry has been modified or changed, there are several non-destructive examinations that can be conducted by forensic document examiners in an effort to address such a query; however, most (if not all) of these types of specialized examinations require that the analysis be conducted with the original evidence.

10.     On the basis thereof, one of the more common types of non-destructive specialized examinations conducted by forensic document examiners is referred to as a "filtered-light" or "spectral" examination.  In many cases, this type of analysis is routinely completed with the aid of a Video Spectral Comparator (more commonly referred to as a "VSC®").  In our laboratory, we carry out these types of specialized examinations and comparisons with a Foster + Freeman Video Spectral Comparator (Model: VSC®6000/HS)[3].

11.     In short, the VSC® is a scientific instrument, or platform, that allows an examiner to non-destructively examine and evaluate materials, such as inks and papers, beyond the visible light spectrum; which is accomplished by using different light sources (*e.g.,* Infrared and Ultraviolet) together with various light filters.  Since different ink compositions will often absorb and reflect light at different wavelengths, it may be possible through spectral ink analysis to determine if a

---

through ASTM and began self-publishing their standards as is the practice for nearly every other SWG group (http://www.swgdoc.org).

[3]      Attached as ***Exhibit 3*** is a true and correct copy of the product brochure for the Foster + Freeman Video Spectral Comparator VSC®6000/HS.

handwritten entry (or portions of a handwritten entry) found within a document were written with different writing ink formulas.

12.    Specifically, if you were to examine a handwritten entry that was prepared with two different writing ink formulas, using infrared lighting and bandpass filters, differences in the optical properties of the two ink formulas may become visible.  With the VSC®, these "differences" are often observed as "Grayscale" variations which result in the illusion that one ink formula "disappears" from the document, while the other remains perceptible; however, this phenomenon is the actual visualization of the different ink components absorbing and reflecting the light source at that particular wavelength.  Therefore, if you were to examine a series of handwritten notations that were modified or prepared with a multiple writing ink formulas, it may be possible to visualize and image the changes or additions through non-destructive VSC® spectral ink analysis; however, the original evidence would be required to complete this analysis.

13.    Aside from the vast ink discrimination capabilities, non-destructive VSC® spectral analysis may provide additional pertinent information through a variety of other specialized examinations, including: paper stock analysis, paper fiber disturbance detection (caused by erasures, chemicals, and/or other means), watermark visualization and examination, indentation imaging and decipherment, latent image analysis, security feature detection and examination, as well as font and print process identification and comparison.  When original evidence is submitted for examination, non-destructive VSC® spectral analysis is customarily completed in conjunction with a variety of other forensic document examinations.

14.    When tasked with determining whether modifications or insertions have occurred within a questioned entry or document, non-destructive indentation analysis may provide key evidence when making such a determination.

15.     Indentation examinations are routinely conducted utilizing a variety of lighting techniques (*e.g.,* oblique lighting), as well as a Foster + Freeman Electrostatic Detection Apparatus (more commonly referred to as an "ESDA®")[4].

16.     The ESDA® analysis allows for an examiner to non-destructively develop and examine writing indentations, either visible or latent, that may appear on the surface of a document.  The physical results of the ESDA® analysis are encapsulated as "ESDA®  Lifts" which can be used for further examination to sequence writings, or to link the writing impressions to other documents and/or sources.  Additionally, through ESDA® indentation analysis it may possible to establish the "date" a document or entry if the recovered impressions or indentations can be sourced back to another item of a known date or origin.

17.     As indicated, the original evidence would be required to conduct both the VSC® and ESDA® examinations.  If the original (Q-1) notations were made available for inspection a definitive conclusion as to whether or not any portion(s) of the notations were modified or added may be possible through the non-destructive methods outlined above.

### EXAMINATIONS CONDUCTED

18.     In an attempt to fully-address the proposed assignment in this matter, I completed a series of visual examinations and comparisons of the (Q-1) notations.  To the extent possible, each of the handwriting examinations and comparisons conducted in this matter were non-destructive and conform to the SWGDOC *Standard Guide for Examination of Handwritten Items*.

---

[4]        Attached as ***Exhibit 4*** is a true and correct copy of the product brochure for the Foster + Freeman ESDA®2.

**OBSERVATIONS AND RESULTS OF EXAMINATION**

19.    Although the overall format of (Q-1) notations may not appear to be entirely consistent with the "anticipated" writing format often associated with notetaking (*e.g.,* inter/intra word spacing, formatting, and overall writing size), without access to comparison notations it is not possible to establish a baseline, or habit pattern for how Agent Strzok would normally record notations under similar conditions.  As such, there is no way to determine whether the (Q-1) notations are representative of the complete normal and natural handwriting habits and characteristics of Agent Strzok exhibited under "like" conditions.  Consequently, ***no conclusion***[5] can be rendered as to whether the (Q-1) handwritten notations were prepared during the interview as purported, or at subsequent time.

20.    If additional *comparable*[6] notations of Agent Strzok written under similar conditions could be obtained and submitted for analysis, it may be possible to determine whether the (Q-1) notations were prepared as purported.  In consideration of both the observations made, as well as limitations present, further analysis of the original evidence would likely be necessary to support any definitive conclusions in this matter.

21.    In the event circumstances may warrant, I reserve the right to supplement this declaration upon the receipt of any additional evidence, including the originals or better-quality reproductions, and/or any other pertinent information specific to my analysis in connection with this matter.

---

[5]       "No conclusion (totally inconclusive, indeterminable) – This is the zero point of the confidence scale.  It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another." - SWGDOC Standard Terminology for Expressing Conclusions of Forensic Document Examiners.

[6]       "Comparable - pertaining to handwritten items that contain the same type(s) of writing and similar characters, words, and combinations. Contemporaneousness and writing instruments may also be factors." - SWGDOC Standard for Examination of Handwritten Items.

22.     Should testimony become necessary, the appropriate comparison chart illustrations will be produced in advance of any such testimony.   The comparison chart illustrations are detailed demonstrative exhibits (*i.e.,* court charts) which assist in demonstrating, and further explaining, the observations and conclusion rendered in this matter.   In particular, the comparison chart illustrations are comprised of isolated images of the evidence referenced in this report to assist in explaining, and understanding, the basis for the conclusion that has been reached.

I declare under the penalty of perjury that the foregoing is true and correct.

Date: October 16, 2019

Khody R. Detwiler
Forensic Document Examiner

# EXHIBIT 1

CURRICULUM VITAE OF
*KHODY R. DETWILER*

The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com 

linkedin.com/in/ khody-r-detwiler 

7550 Woodbury Pike Roaring Spring, PA 16673 

Roaring Spring, PA 814.793.2377 

Pittsburgh, PA 412.430.3887

Philadelphia, PA 215.800.0120 

www.lesnevich.com 

## SKILLS



Trials

Civil Litigation

Forensic Research

Criminal Prosecution

Criminal Investigations

Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and signature analysis

electronic signature verification

Non-destructive ink, paper, and indentation analysis

forensic document examination and authentication

## PROFESSIONAL PROFILE

A forensic document specialist with a focus in handwriting and signature analysis. I provide detailed, proprietary reports, and high-quality demonstrative exhibits for attorneys, state and federal law enforcement agencies, insurance agencies, mid to large sized businesses, and private clientele. My objective for every consultation is to provide my clients with the expertise needed so they can confidently proceed to court or make an informed internal decision about the nature or authenticity of a written or digital document.

## HIGHLIGHTS/MAJOR CASES

### PEOPLE VS. CORY BYRD (IND. #2011-749) & PEOPLE V. DAVID STEVENSON (IND. #2013-067)

- Retained by the Orange County District Attorney's Office in Goshen, New York to examine evidence, and provide expert witness testimony, in two separate highly publicized homicide trials involving the murder of a 4-year-old child, and the murder of a 35-year-old mother of four. Both trials resulted in guilty verdicts.

### EXONERATION OF SHAURN THOMAS (PHILADELPHIA, PA)

- Retained by the Pennsylvania Innocence Project and Dechert LLP in the successful exoneration of Shaurn Thomas.   Mr. Thomas spent 24 years in a Pennsylvania prison for a murder that he did not commit.

### PEOPLE VS. ANTHONY D. MARSHALL AND FRANCIS X. MORRISSEY, JR. (BROOKE ASTOR)

- Assisted on a matter in which our firm was retained by the New York County District Attorney's Office (Manhattan) in a highly publicized criminal case involving the Estate of Brooke Astor.

### PAUL D. CEGLIA VS. MARK ELLIOT ZUCKERBERG AND FACEBOOK INC.

- Retained by counsel representing Facebook and Mark Zuckerberg in a breach of contract action brought in Federal Court in Buffalo, New York; alleging a multi-billion-dollar ownership interest in Facebook.

### FLETCHER ET AL. VS. DOIG  ET AL.

- Retained by counsel representing famed European artist, Peter Doig, in a civil action brought in Federal Court in Chicago, Illinois; pertaining to the authentication of a purported original "Peter Doig" painting; with an estimated value in excess of 10 million dollars.

The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com 

linkedin.com/in/
khody-r-detwiler 

7550 Woodbury Pike
Roaring Spring, PA 16673 

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

www.lesnevich.com 

## SKILLS

Trials

Civil Litigation

Forensic Research

Criminal Prosecution

Criminal Investigations

Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and
signature analysis

electronic signature verification

Non-destructive ink, paper,
and indentation analysis

forensic document examination
and authentication

## HIGHLIGHTS/MAJOR CASES continued

### THE ISLAMIC BANK OF ASIA LTD., VS. AHMAD HAMAD ALGOSAIBI & BROTHERS CO. (SINGAPORE)
- Retained by counsel representing the Islamic Bank of Asia Ltd. in a matter involving multiple fraud claims in connection with a series of multi-million-dollar banking transactions originating from Singapore and Saudi Arabia.

### CHEVRON VS. DONZINGER, ET. AL., (S.D.N.Y.); AGUINDA V. CHEVRON (LAGO AGRIO, ECUADOR); CHEVRON V. REPUBLIC OF ECUADOR (THE HAGUE, NETHERLANDS)
- Retained by counsel representing Chevron Corporation in several different international legal proceedings stemming from a multi-billion-dollar environmental lawsuit originating from Lago Agrio, Ecuador.

### ALGOSAIBI (AHAB) VS. MAAN AL SANEA (SAAD GROUP) (AL KHOBAR, SAUDI ARABIA)
- Retained by counsel representing Saudi businessman, Maan Al Sanea, in a matter involving multi-billion-dollar fraud claims in multiple jurisdictions with connections to over 100 international banking institutions originating from Saudi Arabia.

### REPUBLIC OF GUINEA (SIMANDOU MINING RIGHTS)
- Retained by counsel representing the interests of a large international mining firm in a matter stemming from allegations that the multi-billion-dollar mining rights to Simandou (a large untapped deposit of high grade iron ore located in the Republic of Guinea) were secured through bribery, corruption and fraud.

### ESTATE OF BADRI "ARKADY" PATARKATSISHVILI (TBILISI, REPUBLIC OF GEORGIA)
- Assisted on a matter in which our firm was retained by counsel representing the multi-billion-dollar business estate of former Georgian presidential candidate, Badri "Arkady" Patarkatshvili, originating from Tbilisi, Georgia.

### SANUM INVESTMENTS LTD VS. GOVERNMENT OF THE LAO PEOPLE'S DEMOCRATIC REPUBLIC
- Retained by counsel representing Macau-based Sanum Investments and Netherlands-based Lao Holdings, NV in bilateral investment treaty arbitration claims against the Government of Laos.

The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com 

linkedin.com/in/ khody-r-detwiler 

7550 Woodbury Pike Roaring Spring, PA 16673 

Roaring Spring, PA 814.793.2377 

Pittsburgh, PA 412.430.3887

Philadelphia, PA 215.800.0120

www.lesnevich.com 

## SKILLS

Trials

Civil Litigation

Forensic Research

Criminal Prosecution

Criminal Investigations

Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and signature analysis

electronic signature verification

Non-destructive ink, paper, and indentation analysis

forensic document examination and authentication

## TRAINING EXPERIENCE/EMPLOYMENT

FORENSIC DOCUMENT EXAMINER
Lesnevich & Detwiler | December 2008 - Present (Partner 2011)

After completion of the mandatory senior internship, sponsored through Penn State University; I began the formal training program in the field of Forensic Document Examination under the direct supervision and instruction of Gus Lesnevich.

The training program consists of a 24 month, full-time, training period covering all aspects of the Forensic Document Examination field.

My training was completed in accordance with the Scientific Working Group for Forensic Document Examination (SWGDOC) Standard for Minimum Training Requirements for Forensic Document Examiners (formerly known as the ASTM International Standard Designation E-2388-11, Standard for Minimum Training Requirements for Forensic Document Examiners).

Some of the specific areas of instruction included in the training program are as follows:

- Evidence Handling Procedures
- Handwriting/Printing Examination
- Photography and Digital Imaging
- Alterations, Obliterations and Erasures
- Specialized Lighting Techniques
- Expert Witness and Legal Proceedings
- Electronic Signature Analysis
- Demonstrative Court Chart Production
- Examination Procedures
- Printing Processes
- Photocopiers/Facsimiles
- Mechanical Impressions
- Paper and Font Analysis
- Ink Analysis (VSC)
- Indentation Analysis (ESDA)
- Report Preparation

As part of my training, I was also responsible for conducting a wide variety of case-specific research and literature reviews correlating to each of the individual cases submitted to our laboratory for analysis.

This task was primarily accomplished through extensive review and study of the leading authoritative texts and peer-reviewed journal articles published within the Forensic Document Examination field.

The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com 

linkedin.com/in/
khody-r-detwiler 

7550 Woodbury Pike
Roaring Spring, PA 16673 

Roaring Spring, PA
814.793.2377 

Pittsburgh, PA
412.430.3887 

Philadelphia, PA
215.800.0120 

www.lesnevich.com 

## SKILLS

Trials

Civil Litigation

Forensic Research

Criminal Prosecution

Criminal Investigations

Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and
signature analysis

electronic signature verification

Non-destructive ink, paper,
and indentation analysis

forensic document examination
and authentication

## TECHNICAL TRAINING

TECHNICAL TRAINING BY FOSTER + FREEMAN USA INC.
(Sterling, Virginia - September 2, 2009)
• Non-Destructive Ink Analysis -Video Spectral Comparator (VSC)
        - Models: VSC 6000, VSC 2000HR and VSC 400
• Non-Destructive Indentation Analysis - Electrostatic Detection Apparatus (ESDA)
        - Models: ESDA2 and ESDA Lite

TECHNICAL TRAINING IN PHOTOGRAPHY AND DIGITAL IMAGING SOFTWARE
(Martinsburg, Pennsylvania)
• Instruction in Adobe Products by professional photographer Gerald T. Leidy
• Following graduation from the Brooks Institute of Photography in Santa Barbara,
  California, Mr. Leidy enlisted with the United States Navy - Atlantic Fleet Combat
  Camera Group stationed in Norfolk, Virginia. In 1974, after serving four years with
  the United States Navy, Mr. Leidy established, and currently maintains, a professional
  photography studio located in Martinsburg, Pennsylvania.

APPLETON PAPERS SECURITY PAPER SCHOOL
(Roaring Spring, Pennsylvania - December 1, 2011)
• Overview of the paper making and Dandy Roll Processes
• Watermarking and Securities Technology

FUNDAMENTALS OF FORENSIC QUESTIONED DOCUMENTS
Continuing & Professional Education Certificate Program through West Virginia University
(November 2012)
• Instructed by Anthony Iten of West Virginia University

ADVANCED VIDEO SPECTRAL COMPARATOR (VSC) WORKSHOP
(Indianapolis, Indiana - August 29, 2013)
• Instructed by Foster + Freeman Application Engineers Michael Zontini & Owen Lang

ROCHESTER INSTITUTE OF TECHNOLOGY - PRINTING PROCESS IDENTIFICATION AND
IMAGE ANALYSIS FOR FORENSIC DOCUMENT EXAMINERS SEMINAR
(Rochester, New York - November 12-15, 2013)
• Some of the topics of instruction included the following:
        - Traditional and Digital Printing Process Identification and Discrimination
        - Image Analysis and Digital Image Processing
        - Security Inks and Security Papers

The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com 

linkedin.com/in/
khody-r-detwiler 

7550 Woodbury Pike
Roaring Spring, PA 16673 

Roaring Spring, PA
814.793.2377 

Pittsburgh, PA
412.430.3887 

Philadelphia, PA
215.800.0120 

www.lesnevich.com 

## SKILLS

Trials
Civil Litigation
Forensic Research
Criminal Prosecution
Criminal Investigations
Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and
signature analysis

electronic signature verification

Non-destructive ink, paper,
and indentation analysis

forensic document examination
and authentication

## TECHNICAL TRAINING continued

ADVANCED VIDEO SPECTRAL COMPARATOR (VSC) WORKSHOP
(Honolulu, Hawaii - August 15, 2014)
• Instructed by Foster + Freeman Application Engineers Michael Zontini & F.L. Jim Lee

VIDEO SPECTRAL COMPARATOR (VSC) &
ELECTROSTATIC DETECTION APPARATUS (ESDA) TECHNOLOGY:
EXPLAINING TO THE LAYPERSON WORKSHOP
(San Diego, California - September 1, 2017)
• Instructed by Foster + Freeman Application Engineer Michael Zontini

PIKASO WRITE-ON 3.0 DOCUMENT COMPARISON SOFTWARE WORKSHOP
(Park City, Utah - August 18, 2018)
• Instructed by Pierre Goudreault and Brian Lindblom

## EDUCATION

BACHELOR OF SCIENCE
Criminal Justice
The Pennsylvania State University
University Park, Pennsylvania
2005 - 2009
• Deans List Honors
• From August through December of 2008, I completed a mandatory semester long
  internship with Gus Lesnevich for partial fulfillment of my bachelor's degree in the
  Criminal Justice program at Penn State University.

The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com 

linkedin.com/in/ 
khody-r-detwiler

7550 Woodbury Pike 
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

www.lesnevich.com

## SKILLS

Trials
Civil Litigation
Forensic Research
Criminal Prosecution
Criminal Investigations
Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and
signature analysis

electronic signature verification

Non-destructive ink, paper,
and indentation analysis

forensic document examination
and authentication

## CONTINUING EDUCATION

AMERICAN ACADEMY OF FORENSIC SCIENCES (AAFS)
64TH ANNUAL SCIENTIFIC MEETING
(Atlanta, Georgia - February 20-25, 2012)
• Workshop/Panel Discussion: Flawed Forensics: Recognizing and Challenging
   Misleading Forensic Evidence and Disingenuous Expert Testimony

AMERICAN ACADEMY OF FORENSIC SCIENCES (AAFS)
65TH ANNUAL SCIENTIFIC MEETING
(Washington, D.C. - February 18-23, 2013)
• Workshop: Signature Examination of Healthy and Impaired Writers
      - (Instructed by Michael Caligiuri & Linton Mohammed)
• Workshop: Hyperspectral Imaging - United States Library of Congress
      - (Instructed by Fanella G. France & Joseph C. Stevens)

AMERICAN ACADEMY OF FORENSIC SCIENCES (AAFS)
67TH ANNUAL SCIENTIFIC MEETING
(Orlando, Florida - February 16-21, 2015)
• Workshop: Classification of Typewritten Documents
      - (Instructed by Karen J. Nobles & Peter V. Tytell)
• Workshop: Automating Image Production for Forensic Document Examiners
      - (Instructed by Mark Goff)

AMERICAN ACADEMY OF FORENSIC SCIENCES (AAFS)
71ST ANNUAL SCIENTIFIC MEETING
(Baltimore, Maryland - February 18-23, 2019)
• Workshop: Deciphering Complex Electrostatic Detection Device (EDD) Impressions
      -(Instructed by Mark Goff)

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
69TH ANNUAL MEETING
(Philadelphia, Pennsylvania - August 20-25, 2011)
• Workshop: Printing Process Identification for Forensic Document Examiners
      - (Instructed by Scott Walters & Jeffrey Payne)
• Workshop: Using Adobe Photoshop in a Forensic Document Workflow
      - (Instructed by George Reis)

The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com 

linkedin.com/in/ khody-r-detwiler 

7550 Woodbury Pike Roaring Spring, PA 16673 

Roaring Spring, PA 814.793.2377 

Pittsburgh, PA 412.430.3887

Philadelphia, PA 215.800.0120

www.lesnevich.com 

## SKILLS

Trials

Civil Litigation

Forensic Research

Criminal Prosecution

Criminal Investigations

Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and signature analysis

electronic signature verification

Non-destructive ink, paper, and indentation analysis

forensic document examination and authentication

## CONTINUING EDUCATION continued

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
70TH ANNUAL MEETING
(Charleston, South Carolina - August 18-23, 2012)
• Workshop: The Individuality of Inkjet Printing
  - Instructed by Rolf Fauser)
• Workshop: Electrostatic Detection Devices (EDD)
  Theoretical and Operational Considerations
    -(Instructed by Dan C. Purdy, Grant Sperry & Robert Muehlberger)

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
71ST ANNUAL MEETING
(Indianapolis, Indiana - August 24-29, 2013)
• Workshop: Conclusion Scales and Logical Inference
    - (Instructed by R. Brent Ostrum)
• Workshop: Forensic Examination of Digital Signatures
    - (Instructed by William Flynn & Kathleen Annunziata Nicolaides)
• Workshop: Challenging Signatures
    - (Instructed by A. Frank Hicks)

JOINT ANNUAL MEETING OF THE AMERICAN SOCIETY OF QUESTIONED
DOCUMENT EXAMINERS (ASQDE - 72ND) AND THE AUSTRALASIAN SOCIETY OF
FORENSIC DOCUMENT EXAMINERS (ASFDE)
(Honolulu, Hawaii - August 11-15, 2014)
• Workshop: Skillful Freehand Signature Simulation
    - (Instructed by Lloyd Cunningham & Linton Mohammed
• Workshop: Adobe, Digital Media and Evidence
    - (Instructed by John Penn II of Adobe)

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
73RD ANNUAL MEETING
(Toronto, Ontario - August 9-13, 2015)
• Workshop: Characteristics of Fountain Pen Writing and Aqueous Ink Analysis
    - (Instructed by Lloyd Cunningham, Valery Aginsky, Linton Mohammed &
      William Flynn)
• Workshop: Principles of Forensic Examination of Arabic Signatures
    - (Instructed by Mohammed Aloyoni & Dr. Abdulaziz Alkahtani)

The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com 

linkedin.com/in/
khody-r-detwiler 

7550 Woodbury Pike
Roaring Spring, PA 16673 

Roaring Spring, PA
814.793.2377 

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

www.lesnevich.com 

## SKILLS

Trials

Civil Litigation

Forensic Research

Criminal Prosecution

Criminal Investigations

Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and
signature analysis

electronic signature verification

Non-destructive ink, paper,
and indentation analysis

forensic document examination
and authentication

## CONTINUING EDUCATION continued

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
75TH ANNUAL MEETING
(San Diego, California - August 28 through September 1, 2017)
• Workshop: Forensic Science Research: Your Mission to Propose,
  Innovate and Collaborate
      - (Instructed by Heather Waltke, Gerald LaPorte, Lisa Hanson & Melissa Taylor)
• Workshop: Preparing a Digital Signature File for Forensic Analysis
      - (Instructed by Kathleen Annunziata Nicolaides & William Flynn)
• Workshop: Chinese Handwriting and Signatures:
  Hanzi through the Eyes of the Forensic Document Examiner
      - (Instructed by Chiew Yung Yang & Chin Chin Lim)
• Workshop: Write or Wrong? Bias, Decision-Making and the use of
  Contextual Information in Forensic Document Examination
      - (Instructed by Niki Osborne, Lloyd Cunningham & Jane Lewis )

JOINT ANNUAL MEETING OF THE AMERICAN SOCIETY OF QUESTIONED
DOCUMENT EXAMINERS (ASQDE - 76TH ANNUAL MEETING) AND THE
SOUTHWEST ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS (SWAFDE)
(Park City, Utah - August 19-23, 2018)
• Workshop: Mark Hofmann – Master Forger and Murderer
      - (Instructed by George Throckmorton, William Flynn & Lloyd Cunningham)
• Workshop: Latin American Writing
      - (Instructed by Manuel Gonzales, Eric Cedeno & Leydis Gonzalez)

DOCUMENT SECURITY ALLIANCE (DSA) MEETING
(Washington, D.C. - October 20, 2011)
• Discussion:  Document security before and after September 11th 2001

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com 

linkedin.com/in/
khody-r-detwiler 

7550 Woodbury Pike
Roaring Spring, PA 16673 

Roaring Spring, PA
814.793.2377 

Pittsburgh, PA
412.430.3887 

Philadelphia, PA
215.800.0120 

www.lesnevich.com 

## SKILLS

Trials
Civil Litigation
Forensic Research
Criminal Prosecution
Criminal Investigations
Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and
signature analysis

electronic signature verification

Non-destructive ink, paper,
and indentation analysis

forensic document examination
and authentication

## CONTINUING EDUCATION continued

MEASUREMENT SCIENCE & STANDARDS IN FORENSIC
HANDWRITING ANALYSIS CONFERENCE
(Gaithersburg, Maryland - June 4-5, 2013)
• National Institute of Standards and Technology Campus (NIST)
• In collaboration with the following organizations:
- American Academy of Forensic Sciences - QD Section (AAFS)
- American Board of Forensic Document Examiners (ABFDE)
- American Society of Questioned Document Examiners (ASQDE)
- Federal Bureau of Investigation Laboratory (FBI)
- National Institute of Justice (NIJ)
- Scientific Working Group for Forensic Document Examination (SWGDOC)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS)
ANNUAL MEETING
(State College, Pennsylvania - May 19-23, 2014)
• Attended various presentations sponsored by the Questioned Documents Section.
• Some of the topics of discussion included the following:
- Thermal Ribbon Analysis and the Thermal Ribbon Analysis Platform (TRAP)
- The Use of Photoshop Macros to Simplify the Creation of Working Charts
- Spectral Analysis of Documents Subjected to Latent Print Examinations
utilizing the Video Spectral Comparator (VSC)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS) QUESTIONED
DOCUMENTS SECTION (QD) FALL WORKSHOP: "VALUABLE SIGNATURES AND
MEMORABILIA" NATIONAL BASEBALL HALL OF FAME
(Cooperstown, New York - November 12, 2015)
• Instructed by the following individuals:
- Michael Posner - Manager of Major League Baseball's Authentication Program
- Special Agent, Brian Brusokas - Art Crime Team (FBI)
- Special Agent, John Iannuzzi - Interstate Robbery Apprehension Team (FBI)
- Gregg Mokrzychi – Forensic Document Examiner (FBI)
- Peter J. Belcastro, Jr. - Forensic Document Examiner (FBI)
• National Baseball Hall of Fame and Museum Panel Discussion:
- Erik Strohl - VP of Exhibitions and Collections -National Baseball HOF
- Jim Gates - Library Director -National Baseball HOF
- Sue MacKay - Director of Collections -National Baseball HOF

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com 

linkedin.com/in/
khody-r-detwiler 

7550 Woodbury Pike
Roaring Spring, PA 16673 

Roaring Spring, PA
814.793.2377 

Pittsburgh, PA
412.430.3887 

Philadelphia, PA
215.800.0120 

www.lesnevich.com 

## SKILLS

Trials
Civil Litigation
Forensic Research
Criminal Prosecution
Criminal Investigations
Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and
signature analysis

electronic signature verification

Non-destructive ink, paper,
and indentation analysis

forensic document examination
and authentication

## CONTINUING EDUCATION continued

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS)
ANNUAL MEETING
(Cambridge, Maryland - May 18-22, 2015)
• Workshop: Forensic Examination of Biometrically Captured e-Signatures
    - (Instructed by William Flynn & Kathleen Annunziata Nicolaides)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS) ANNUAL
MEETING
(Richmond, Virginia - May 17-20, 2016)
• Workshop: The Application of QD Examinations of the Analysis of Fine Art and Other
Antiques
    - (Instructed by Gregg Mokrzycki)
• Workshop: Identification Science
    - (Instructed by Stephen McKasson)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS)
ANNUAL MEETING
(Pittsburgh, Pennsylvania - May 23-26, 2017)
• Workshop: The Examination of Questioned Documents with Complicated Specimens
Requiring Multiple Examination Types
    - (Instructed by Nadeem-Ul-Hassan Khan)
• Workshop: Covert Communications and Concealment Techniques
    - (Instructed by Gregg Mokrzycki)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS) QUESTIONED
DOCUMENTS SECTION (QD) FALL WORKSHOP: "QUESTIONED DOCUMENTS
EXPERT TESTIMONY WORKSHOP"
VIRGINIA DEPARTMENT OF FORENSIC SCIENCES
(Manassas, Virginia - December 5, 2017)
• In addition to myself, this workshop was instructed by the following individuals:
    - (Joseph Stevens, Michael Wallace, Kenneth E. Melson, Ted Burkes, Kathleen
      Storer & Kelly Pearson)

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com 

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

www.lesnevich.com

## SKILLS

Trials
Civil Litigation
Forensic Research
Criminal Prosecution
Criminal Investigations
Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and
signature analysis

electronic signature verification

Non-destructive ink, paper,
and indentation analysis

forensic document examination
and authentication

## CONTINUING EDUCATION continued

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS)
ANNUAL MEETING
(Hunt Valley, Maryland - May 15-18, 2018)
• Workshop: VSC & ESDA Technology: Explaining to the Layperson
    - (Instructed by Allyce McWhorter & Rebecca Walls of Foster + Freeman)
• Workshop: Handwriting Examination of Signatures
    - (Instructed by Ronald N. Morris)
• Workshop: Charred and Water Soaked Documents
    - (Instructed by Gregg Mokrzycki & Peter J. Belcastro, Jr.)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS)
ANNUAL MEETING
(Morgantown, West Virginia - May 7-10, 2019)
• Workshop: Examining Writing on Unusual Surfaces
    - (Instructed by Gregg Mokrzycki & Peter J. Belcastro, Jr.)
• Workshop: Examination of Torn/Cut Edges
    - (Instructed by Lorie Cousin & Peter J. Belcastro, Jr.)
• Workshop: How Chemical Examinations of Inks and Paper Can Corroborate and
Supplement Forensic Document Examinations
    - (Instructed by Gerald M. LaPorte)

NORTHEASTERN ASSOCIATION OF FORENSIC SCIENTISTS (NEAFS) 40TH
ANNUAL MEETING
(Hershey, Pennsylvania - November 3-6, 2014)
• Workshop: Ethics in the Practice of Forensic Science
    - (Instructed by Robin Bowen of West Virginia University)

The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com 

linkedin.com/in/
khody-r-detwiler 

7550 Woodbury Pike
Roaring Spring, PA 16673 

Roaring Spring, PA
814.793.2377 

Pittsburgh, PA
412.430.3887 

Philadelphia, PA
215.800.0120 

www.lesnevich.com 

## SKILLS

Trials

Civil Litigation

Forensic Research

Criminal Prosecution

Criminal Investigations

Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and
signature analysis

electronic signature verification

Non-destructive ink, paper,
and indentation analysis

forensic document examination
and authentication

## CONTINUING EDUCATION continued

3RD INTERNATIONAL WORKSHOP ON
AUTOMATED FORENSIC HANDWRITING ANALYSIS (AFHA)
(Honolulu, Hawaii - August 9-10, 2014)
• This particular workshop explored a variety of automated systems which may be used
  to assist in the examination of both "online" and "offline" signatures and writings.
  Some of the specific topics of discussion included the following:
    - Overview of handwriting pattern recognition systems
      • Kinematic approaches to signature analysis
      • Mathematical approaches to signature complexity and stability
    - Endorsed by the following organizations:
      • German Research Centre for Artificial Intelligence (DFKI)
      • Netherlands Forensic Institute - Ministry of Security and Justice (NFI)
      • American Society of Questioned Document Examiners (ASQDE)

MIDWESTERN ASSOCIATION OF FORENSIC SCIENTISTS (MAFS)
44TH ANNUAL MEETING
(Mackinac Island, Michigan - September 20-25, 2015)
• Workshop: Forensic Examination of Electronic Signatures
    - (Instructed by William Flynn & Kathleen Annunziata Nicolaides)
• Workshop: Getting the Most Out of Your Visual Spectral Comparator
    - (Instructed by David Tobin & Michael Zontini of Foster + Freeman USA)
• Workshop: The Examination of Documents Requiring a Multi-Faceted Approach
    - (Instructed by Brian Lindblom)
• Workshop: Evaluating Signatures: What Matters?
    - (Instructed by A. Frank Hicks)
• Workshop: The Application of Questioned Document Examinations to the Analysis of
  Valuable Signatures & Other Antiques
    - (Instructed by Peter J. Belcastro, Jr. & Gregg Mokrzycki)

The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT



khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

www.lesnevich.com

## SKILLS

Trials
Civil Litigation
Forensic Research
Criminal Prosecution
Criminal Investigations
Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and
signature analysis

electronic signature verification

Non-destructive ink, paper,
and indentation analysis

forensic document examination
and authentication

## CONTINUING EDUCATION continued

THE SOUTHWESTERN ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS (SWAFDE) ANNUAL MEETING
(Denver, Colorado - October 11-13, 2019)
• Workshop: A Behind the Scenes (and under the covers) Tour of PDF's from Adobe's PDF Architect
        - (Instructed by Leonard Rosenthol of Adobe)
• Workshop: How Chemical Examinations of Inks and Paper Can Corroborate and Supplement Forensic Document Examinations
            - (Instructed by Gerald M. LaPorte)
• Workshop: Dispelling the Myths about the Forensic Examination of Handprinting
        - (Instructed by Lloyd Cunningham and Linton Mohammed)

## INTERNATIONAL EXPERIENCE

Since beginning my career in the field of Forensic Document Examination, I have conducted a wide variety of forensic examinations on thousands of individual documents and signatures involved in various litigations throughout the United States and abroad. My international casework has required extensive travel throughout Europe, South America and the Middle East. In addition, I have also been retained on numerous international matters that have not required international travel.

## TESTIMONY EXPERIENCE

I have been received as an expert, and have presented expert evidence, on numerous occasions in both state and federal courts throughout the United States, and internationally. A complete testimony list is available upon request.

The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com 

linkedin.com/in/
khody-r-detwiler 

7550 Woodbury Pike
Roaring Spring, PA 16673 

Roaring Spring, PA
814.793.2377 

Pittsburgh, PA
412.430.3887 

Philadelphia, PA
215.800.0120 

www.lesnevich.com 

## SKILLS

Trials

Civil Litigation

Forensic Research

Criminal Prosecution

Criminal Investigations

Courtroom Demonstratives

## SERVICES

forensic consulting

handwriting and
signature analysis

electronic signature verification

Non-destructive ink, paper,
and indentation analysis

forensic document examination
and authentication

## PROFESSIONAL AFFILIATIONS

INTERNATIONAL ASSOCIATION FOR IDENTIFICATION (IAI)
Regular Member

AMERICAN ACADEMY OF FORENSIC SCIENCES (AAFS)
Associate Member

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS)
Regular Member | Currently Serving as Questioned Document Section Chair

NORTHEASTERN ASSOCIATION OF FORENSIC SCIENTISTS (NEAFS)
Associate Member

MIDWESTERN ASSOCIATION OF FORENSIC SCIENTISTS, INC. (MAFS)
Regular Member

ASTM INTERNATIONAL: COMMITTEE E30 - FORENSIC SCIENCE (ASTM)
Voting Member

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
Provisional Member

AAFS AMERICAN STANDARDS BOARD (ASB)
Forensic Document Examination Consensus Body | Currently serving as Vice Chair

# EXHIBIT 2

THE (Q-1) NOTATIONS

KBO

[REDACTED]

4 subjects

2 calls ① TRUMP - PUTIN call SET-UP

② Exchange HOLIDAY GREETINGS

③ Official condolences for [his] lost RUSSIAN plane crash

④ SYRIA conference on ISIS

Fla 1st invited inside GRU [Lookoncip] 600. All APPROVED. 4 DAY TRIP. Summer 2013
KISLYAK - I don't know if I met him then. Very appreciative. Sergun - GRU DTC - IN UNIFORM. SET-UP
BIG VISIT him to come to US. 28th Feb 2014. Went to CRIMEA - ① more to def.
NEXT TIME. TRIP TO RUSSIA Someich pass unbelievable. Never paid by media.
Did RT, Al JAZEERA, SKY, MSNBC, SPEAKERS BUREAU LAI. [Request] To SPEAK
IN MOSCOW @ ME. AT RT 10th ANNIVERSARY. I was PAID FOR THAT. SPEAKERS BUREAU PAID
ME. They took 25%. I may have. Sergun Wanted talk in Lebanon. He was like me.
SIMILAR BACKGROUND. SVRs. Mopro REALLY - SEND CONDOLENCES. Really wasn't part of
CAMPAIGN. REALLY THOUGHT 1 SERGUN WAS A GUY WE COULD WORK WITH. Connection FIGHT
TERRORISM, CHECHNYA combat SCARS. TALKED @ AFGHANISTAN. TURKISH AMBASSADOR KILLED
2 Jan - up to probably Spoken to 30 countries. MULTIPLE people in countries
Only RUSSIA KISLYAK. DIRECTION

4+1
China
~k
RUSSIA
IRAN
ISIS

⟶

Common PARTNER IN THESE TOPICS. ① KNOW TRUMP/PUTIN FAVOR ALONE. FIGURE OUT
PATHS WORK WITH RUSSIA. RUSSIA AND TURK. Sorry, Common problem. THAT WAS IT.
BEFORE CHRISTMAS. NEO December. CALLED NEXT DAY. He SAID his FAMILY loved, Christmas
DAY - PLANE CRASH. RUSSIAN USO. CYBER SASE @ my DINNER. TOOK opportunity
to PASS condolences. TRYING TO KEEP RELATIONSHIP. C/S - MEPT CONVERSATION.

NO AFFINITY RUSSIA - KISLYAK    counterpart.    VACAY DOM REPUBLIC

28TH Dec Tuesday - he sends me a text. Can you call me? I didn't see it.

24 hours later. Call you 15 - 20 mins. I hook ahead Dom Republic.

Asked me. Set-up UTC Putin/Trump - 21st. Have him good jabs

Conference in Astana, Kazakh, Russia, Turkey, Iran, opposition groups

Sent Usemb person. Ø got back to him. Probably only this postweek.

Make Decision for representation - FRI/SAT. Obscure.

Russia wants lead role for Mid East peace. US. Turkey under wing.

Lack of engagement. Email - meeting person. Met in NY post election.

Closed door meeting. Jared Kushner.

Been to Russia - before I went to speak at Sbarro Board

DIA briefing person. Intel courtesy to see Ambo    30-45 mins. Son w/77 m

Late March of day. Ambas Rus. University Club.    NY meeting Nov

MAYBE before Thanksgiving. He was in NY. Relatively sensitive meeting. LKE E

Sensitive - countries Ø want White House takeover. No personal relationship Trump w/.

Set expectations - Set high for countries.

UN vote - settlements - Yas good reminder. Yay SD 22nd December. Litany countries

got sense where stood on that vote. UK. Several. Egypt, Israel, Maybe France. Maybe Kislyak

Get a sense abstain, veto, abstain. This very

more where they stand. I Ø believe we would change anything. There

needed to be so many to abstain. 14 permanent Council 519.
                                              countries

only US abstain. US.        Wasn't Hey if you do this I will be that

Surgical care up - how much            Kind of thing, Hey where do
                                                    you stand.
Ø please consider voting this way?

Ng. Where do you stand? Whats position

Egypt. Ø Like it. Other channels. Delayed on own accord.

DRILL  Exercise - how fast can you get someone on the line - Battle Drill.

NK - how do we act? How respond?

MDR info - Friday or Thursday, right before christmas. Roped us in.

TRANSITION & ROOM. POLICY

KISLYAK - ROPP? 29TH SPOKE. I DONT. THE CONVERSATION WAS ON
UTC, ASTONA THINK, I HAVE NO TV, MY GUMT BLACKBERRY
OF RECOLLECTION? NOT REALLY, I DONT REMEMBER. THEY DONT DO ANYTHING.
TOTAL SURPRISE. I DIDNT KNOW ABOUT IT UNTIL MEDIA.

CYBER BRIEFING - DECISION. WHAT

KISLYAK - START OFF ON GOOD FOOT.    LOOKING FORWARD TO RELATIONSHIP.
          I WOULDNT UNDERSTAND IT. I CAN UNDERSTAND PUS OF ONE.

  START GOOD RELATIONSHIP. MOVE FORWARD.

  I DREMEMBER MAKING 4-5 CALLS IF I DID LOUSY PLACE TO CALL.

  Ø LOOK ARROWN GOT ABOUT DONT DO SOMETHING.

EZRA

I PERSON HERE. APPROACHED HOPE HICKS - SOMEONE INTRODUCED.
CLOSE TO TRUMP.

HOPE HICKS, JOHN MCAFEE, DAN SCAVINO

   LEAK OF GOVT CLASSIFIED HANDLING, ELECTRONIC DEVICES,
   REAL WORLD EXAMPLES, HERE IS WHAT IS IN PLAY. THREAT
   MAYBE WE TAKE APPROPRIATE.

DOJSCO-700021198

# EXHIBIT 3

## PRODUCT BROCHURE:
### *FOSTER + FREEMAN VSC®6000/HS*

# VSC®6000/HS

## The advanced examination system for detecting altered and counterfeit security documents

*The new VSC®6000/HS - a high resolution imaging system for authenticating passports, visas, ID cards and many other security documents that provides facilities for examining...*

- UV activated luminescent features under short, medium and long wave UV.
- Tampering and photo-substitution under high magnification.
- Anti-Stokes security features using intense IR lighting.
- Retro-reflective features with coaxial lighting.
- Surface features under oblique lighting.
- Watermarks with transmitted lighting.
- OVDs using multi-angled lighting.
- Suspected alterations using differential infrared absorption and luminescence properties of inks.
- Embedded Invisible Personal Information *(IPI)* and Invisible Constant Images *(ICI)*.
- ICAO coded data.
- e-Passports.
- Multiple laser images.
- Latent images.
- Birefringent security features
- Taggants.
- 1D and 2D barcodes.



**Below:** OVDs viewed with angled lighting.



**Below:** OVDs revealed with LED illumination.



**Below:** Security features viewed with incident UV lighting showing fluorescence.







**Above:** Differences in infrared absorption (upper image) and differences in infrared fluorescence .



**Above:** Zoom magnification is essential for scrutinising fine detail and to identify possible tampering or alterations.





