# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **Plaintiff,** | |
| **v.** | **Criminal Action No. 17-232-EGS** |
| **MICHAEL T. FLYNN,** | |
| **Defendant.** | |

## MR. FLYNN'S SUR-SURREPLY IN SUPPORT OF HIS MOTION TO COMPEL PRODUCTION OF BRADY MATERIAL AND FOR AN ORDER TO SHOW CAUSE

The government sought and received permission to file a Surreply by complaining that the defendant had bootlegged "new" arguments into his Reply. Yet its Surreply either elides the supposedly new material altogether or does not address it in terms. The government's Surreply is new only in its stunning admissions and untenable paradoxes. According to the government, it had no obligation to produce its superfluity of *Brady* evidence *before* Mr. Flynn pleaded guilty—because he was not a defendant until he was formally charged. And, it had no obligation to produce its cache *after* he pleaded guilty (the same or next day)—well . . . because his guilty plea erased its obligation.[1]

---

[1]   The government could hardly claim to have been surprised by the defendant's position on the scope of its *Brady* obligation. As Mr. Flynn's lead counsel said in open court: "I think the point is going to be that there is egregious government misconduct and long-time suppression of crucial *Brady* material that should have been provided to the defense before there ever was a plea. But Mr. Van Grack told counsel that he didn't have an ethical or legal obligation to produce anything pre-plea, and then post-plea he's maintained that he has no obligation to produce it because he pled guilty. So I'm trying to figure out how the government conceives of its *Brady* obligation in this case, because it seems to be that it doesn't have one." Hr'g Tr. Sept. 10, 2019, 15:10-20.

If accepted, the government's approach would allow endless manipulation by prosecutors: target individuals, run search warrants, seize devices, interrogate for days, threaten family members, cajole, but never charge until the clock strikes midnight once a plea is extracted. Yet playing cat-and-mouse with the Due Process Clause is the opposite of what the *Brady-Bagley-Giglio* line of cases is all about. Perhaps even more significantly, the government's position wholly ignores this Court's Standing Order, which not only has no such timing requirements, but is issued for the precise purpose of *eliminating* the games the government played here.

One point is new. Mr. Van Grack finally admits he recognized a serious conflict of interest between Mr. Flynn and the counsel who prepared his FARA filing. Yet, he fails to respond to the point made in Mr. Flynn's Reply that this conflict existed only because *the government* insisted not only on incessantly attacking Flynn's FARA registration (beginning within weeks of its filing), but also on demanding its pairing with the completely unrelated White House interview prosecution. Simultaneously, the government did not even advert to the primary argument that the conflict was *non-consentable*, which meant that *even if* former counsel had fully disclosed and explained the risks associated with the conflict, Flynn could not agree to waive it. The Covington & Burling lawyers could not remain in the case. Most important of all, the government did not move to disqualify the lawyers or bring the matter to the attention of any court.

Far from addressing whatever it claims was "new" in Mr. Flynn's Reply, the government largely regurgitates its prior denials of any *Brady* obligation before the first plea. But Mr. Flynn's Motion, Brief, and Reply also highlighted material the government suppressed long after this Court's *Brady* order, through what was scheduled to be a sentencing hearing, and continuing to this day—despite persistent, detailed requests by new counsel. Thumbing its nose at this Court's *Brady* Order, ignoring this Court's gentle reminder of its primacy*,* and failing even to produce the

requested evidence *in camera*, the government has stonewalled against producing so much as a single document the government itself identified as exculpatory but provided only heavily-redacted or in meager "summary."[2]   It is *all* this conduct that demonstrates contempt for this Court's Order.

The government has known since prior to January 24, 2017, that it intended to target Mr. Flynn for federal prosecution.  That is why the entire "investigation" of him was created at least as early as summer 2016 and pursued despite the absence of a legitimate basis.  That is why Peter Strzok texted Lisa Page on January 10, 2017: "*Sitting with Bill watching CNN. A TON more out. . . We're discussing whether, now that this is out, we can use it as a **pretext** to go interview some people.*"[3]   The word "pretext" is key.  Thinking he was communicating secretly only with his

---

[2]   A simple review of the confidential June 6 letter from new defense counsel to Deputy Attorney General Rosen before counsel even appeared officially in the case shows that Mr. Flynn gave the government every opportunity to meet its *Brady* obligation on its own and without involving this Court.  Indeed, counsel strongly hoped the government would do so.  The government itself filed that letter at Dkt.122-2, but instead of producing *Brady* and following the mandate of *Berger v. United States,* 295 U.S. 78, 88 (1935) "that justice shall be done," Mr. Van Grack continues to harp on Mr. Flynn's plea and little else.

Nor was there "an extraordinary reversal" pursuant to which Mr. Flynn claims he is innocent.  At no time did new, conflict-free counsel affirm the validity of Mr. Flynn's guilty plea.  In that same letter, counsel explained that "as was ingrained in [Mr. Flynn] from childhood," he "took responsibility for what the SCO *said* he did wrong."  Counsel wrote that they "used the ancient Logan Act as a pretext" for his interview, the "FBI interview was worse than 'entrapment,'" and that Mr. Flynn was "truthful" with the agents.  From undersigned counsel's first brief in this Court, the defense cited Judge Jed Rakoff's article on "*Why the Innocent Plead Guilty*."  Dkt. 109 at n.1.  Rather, as a matter of procedure, counsel advised the Court that we anticipated seeking dismissal rather than withdrawal.  Nothing we have found in the law requires a defendant to withdraw his guilty plea rather than seek dismissal for egregious government misconduct.  Analogously, this Court did not have to grant a new trial to Ted Stevens before it could dismiss the entire prosecution in the interest of justice.

[3]   The government claims, without support, that this "*pretext to interview some people*" does not apply to Mr. Flynn.  But, Strzok's admission that he and McCabe then had "many meetings" to decide whether, when, and how to interview Flynn in the next few weeks, and the small group meeting on the day before the interview to plan the ambush at the highest levels, belie the government's claim. Dkt. 133-6.  Presumably, Mr. Van Grack was not part of that planning

paramour before their illicit relationship and extreme bias were revealed to the world, Strzok let

the cat out of the bag as to what the FBI was up to.  Try as he might, Mr. Van Grack cannot stuff

that cat back into that bag.[4]

Former Deputy Director Andrew McCabe as much as admitted the FBI's intent to set up

Mr. Flynn on a criminal false statement charge from the get-go.  On Dec. 19, 2017, McCabe told

the House Intelligence Committee in sworn testimony:  "*[T]he conundrum that we faced on their

return from the interview is that although [the agents] didn't detect deception in the statements

that he made in the interview . . . the statements were inconsistent with our understanding of the

conversation that he had actually had with the ambassador.*"  McCabe proceeded to admit to the

Committee that "*the two people who interviewed [Flynn] didn't think he was lying, [which] was

not [a] great beginning of a false statement case.*"  Ex. 1.

Had the FBI not intended all along to create a false statement case, there would have been

no "conundrum" at all.  The matter simply would have concluded with the interview.  Further,

there would have been no comment about "a false statement case"—because no such case would

be assumed.  Finally, there would be no lamenting the "poor start" of a false statement case,[5]

because there would not have been "a start."  False statement cases normally arise incidentally

when government agents are investigating a matter and the interviewee makes a misstatement

about that matter.  Agents then seek to get to the truth by giving 1001 warnings to coax truthful

---

process, so his unsupported assertions about what Strzok and Page had in mind when they texted
about pretext is pure speculation.  *Brady* entitles a defendant to exculpatory evidence, not
unsupported, self-serving denials.

[4]  Mr. Flynn requests the notes, 302s, statements, recordings of any and all the participants in the
meetings of the small group to plan and then debrief his interview.  The government did not attempt
to rebut these issues because it cannot.

[5]  House Permanent Select Committee on Intelligence, Report on Russian Active Measures, 54
(March 22, 2017), Ex. 1.

information from the suspect.  But here, to use Strzok's own words, the investigation was "a pretext;" the object of the interview was to secure, rather than prevent, a 1001 violation.  The "poor start" further reveals Mr. McCabe's determination to create a case despite the agents' belief Mr. Flynn was telling the truth.  Having such concrete evidence as to the prosecution's thinking processes is rare; having it in text messages and sworn congressional testimony is priceless.

**1. The Original 302 Or Evidence of its Attempted Destruction Are Being Suppressed.**

The government attempts to gloss over the existence of at least one earlier draft of the Flynn 302, then asks this Court to leap blindly to the conclusion that *if it did exist*, it contained the same information as the government has already deigned to produce.  Aside from this inherent contradiction, as explained in Mr. Flynn's Reply, the FBI Sentinel system can retrieve any draft. Drafts are numerically serialized when placed in the system.  Those numbers—apparently redacted from the 302 drafts that have been produced—would probably provide further information.

It is no excuse that the original Flynn 302 is not "in the possession of" Mr. Van Grack at this moment.  Rather, his obligation is to reach out to his colleagues and obtain it.  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("Prosecutors ha[ve] a duty to learn of any favorable evidence known to [] others acting on the government's behalf.").  It is in the FBI's system, or can be retrieved, along with the audit trail, the A1 files, information about any attempt made to destroy it, and all the metadata for the changes which are more important now than ever in light of the absurdity of the government's Surreply.  Tellingly, Mr. Van Grack does not deny that such information is, in fact, available.

The Strzok-Page text messages confirm that Lisa Page had two opportunities to edit drafts of the crucial 302.  Strzok returned to his FBI office the night of February 10, 2017, to input the edits she made on the draft she had earlier left in Bill [Priestap's] office (about which they hatch a

cover-story), then sent her another version over the weekend.    The government thus implicitly admits there was at least one version prior to the February 10 edition.

To add to its brazen disregard for its obligation to preserve and locate exculpatory evidence, the government claims entitlement to a favorable assumption about the suspiciously *lost* document when it argues that "there is no reason to believe it would materially differ" from other drafts. Dkt. 132 at 7. To the contrary, spoliation law requires the assumption that the evidence is favorable to the defense.  *See United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993) (the district court properly dismissed the indictment due to the government's destruction of evidence, relying on the test articulated by the Supreme Court in *California v. Trombetta*, 467 U.S. 479, 489 (1984) and *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

## 2.  The Handwritten Notes Raise Questions that Mandate Production of the Originals and More.

The government contends—without any support—that Mr. Flynn's assertion that Agent Strzok's notes were not taken contemporaneously with the interview is "divorced from the facts." Surreply at 4.  But according to Mr. Strzok himself, in a 302 created from an interview he gave to Senior Assistant Special Counsel Andrew Goldstein and FBI Supervisory Special Agent Eric Ruona, on July 19, 2017—for which he was warned—Strzok said he asked the questions and that Agent 2 was "primarily responsible for taking notes and writing the FD-302."

Moreover, even a layman can look at the two sets of notes and discern that Strzok's miniscule, printed, within-the-lines, longer, and more detailed notes bear none of the hallmarks of being written during the press of an interview—much less by the secondary note-taker.  That observation is even more obvious when compared with Agent 2's notes, which do appear to be contemporaneous.  Of course, the defense cannot prove this without handwriting samples and the original notes, but there is sufficient basis for this Court to compel the government's production

of that original evidence (including the 1A files, the audit trail, and the metadata) and handwriting samples for analysis in light of the government's dogged insistence that Strzok wrote the notes contemporaneously.  The FBI already breached its own protocols in this case and is apparently willing to send a man to prison based on notes that do not seem to be as represented.[6]

In addition, the notes bear no signature and date as required by the FBI, casting doubt on their authenticity.  If the signatures and dates are present in the originals, the government has unjustifiably redacted that information, possibly without leaving a black mark to disclose a redaction, which itself is a form of deception.

### 3.   The Notes Do Not Support the Factual Basis for the Plea.

Most importantly, the notes, which the government claims are the most "original" interview documents and "detail the defendant's multiple false statements," do nothing of the sort. Surreply at 4.   Two allegations depend on Ambassador Kislyak's *response* to purported questions about the UN vote and sanctions.  Read the notes of both agents for hours, and you won't find a question or an answer about Kislyak's *response* on either the UN vote or the sanctions—yet those assertions underpin the factual basis for the plea.  Dkt. 133.  By failing to join issue on these points, the government has effectively conceded that the notes do not support the purported false statements in the factual basis for the plea.

---

[6]  Ironically, neither the Court nor defense counsel even knows what differences exist between what Mr. Flynn told the agents and the actual recordings of the calls to Ambassador Kislyak, Surreply at 5-6, as neither defense counsel nor the Court has ever heard the calls.  One would imagine there are differences between the recordings of the calls and what Mr. Flynn recalled to the agents who stopped by his office that day, but that is not evidence that he lied, and he did not. As the agents themselves realized when they spoke to him, he may have been wrong, but he was honest to the best of his recollection at the time.  Unlike Lisa Page, Mr. Flynn was not shown the transcript of the call (or a text message) and given an opportunity to say "oh yes, that's right." Dkt. 133-12.  The upper echelon of the FBI decided in their strategy meeting they would deny him that opportunity, contrary to standard FBI practice when a violation of 18 U.S.C. § 1001 is suspected.

Similarly, the notes do not state that Mr. Flynn "made the specific false statements" to which he pled guilty. The notes do not say that he made any false statement at all. The agents reported back believing he either was honest or believed he was telling the truth. There is nothing in the 302s—draft or final—that says he made false statements. And, the notes do not even match each other—especially on the statements regarding the UN vote and sanctions.

As Mr. Comey testified to the House Permanent Select Committee on Intelligence, on March 2, 2017, "*the agents . . . discerned no physical indications of deception. They didn't see any change in posture, in tone, in inflection, in eye contact. They saw nothing that indicated to them that he knew he was lying to them." Ex. 1.* As many people have used the same language to describe the agents' reactions, it strains credulity to suggest the original 302 or some other 302 does not exist from the interview of Mr. Flynn that includes these statements or similar ones.[7] This Court should order the government to conduct a thorough search of its records, including the FBI's Sentinel database, and produce unredacted versions of every 302 in this case, including redaction history, audit trail, and metadata. Given the already well documented history of "pretext," manipulation, violation of standing rules and practices ("screw it") and other malfeasance by the FBI in this case, there can be no justification for withholding this information from the defense and the Court.

### 4. There Were Material Changes Made in the 302 Overnight on February 10, 2017.

Contrary to the government's bald assertion that no material changes were made to the Flynn 302, Surreply at 5-6, the drafts of the 302s, the agents notes, and the Strzok-Page texts show

---

[7] Even in its claim of disclosure, the government elides that it shared a minimized version of this information only by last minute phone call with conflicted counsel the day *after* Mr. Flynn agreed to plead guilty and as they were signing the deal—while it also insisted that the unrelated FARA admissions be included in the plea.

material changes were made, and this is why, among other reasons, Mr. Flynn requested these documents in his original Motion to Compel.  MTC 2, 6, 40.  We know that on February 10, 2017, McCabe and possibly Strzok went to the White House to visit Vice President Pence.  Then news broke asserting that Mr. Flynn had lied to the Vice President and others about his calls with Ambassador Kislyak.[8]

That same night, Lisa Page texted Peter Strzok: "[Y]ou need to finalize that asap.  I wouldn't be surprised if following this evening's events that a request comes in to see it." Strzok replied: "I'm going back in tonight to do so."  Page then told Strzok that she "gave my edits to Bill to put on your desk."

We do know that the same evening, Strzok went into the office, picked up Page's edits, and made changes that any reasonable person would deem material to the 302.  He added a definitive statement: "*FLYNN stated he did not*."  This was in response to whether, on the issue of UN vote, Flynn had asked Kislyak to vote in a particular way.  This is materially different from the notes which state Flynn *did not recall* speaking to Kislyak on the UN vote issue.  Another material change was to add the entire phrase: "*or if KISLYAK described any Russian response to a request by FLYNN*" to which Flynn answered "no."  The notes reflect neither a question nor an answer about a "*Russian response*" to anything at all.  This is what the Surreply characterizes as

---

[8]  *See* Timeline for January-February 2017, Ex. 2.

"largely grammatical and stylistic" edits.[9]  Surreply at 6.  Defendant is entitled to compare Lisa Page's suggested edits with the changes made by Strzok to determine whether his changes reflected his purported recollection of the event or fabrications suggested by McCabe's special counsel.

Previously, someone added an entire assertion untethered from either set of notes:  "The interviewing agents asked FLYNN if he recalled any conversation with KISLYAK in which KISLYAK told him the Government of Russia had taken into account the incoming administration's position about the expulsions, or where KISLYAK said the Government of Russia had responded, chosen to modulate their response, in any way to the U.S.'s actions as a result of a request by the incoming administration."  Although absent from the notes of both agents, this "Russian response" underpins the alleged crime.[10]  The government does not even attempt to rebut this issue, because it cannot.

---

~~FLYNN was asked by~~The interviewing agents asked FLYNN if he made any request of KISLYAK to vote in a particular way or take any action.  FLYNN stated he did not.        FLYNN stated he did not believe his calls to the various countries would change anything. FLYNN recalled there needed to be a certain number of abstention votes to alter the outcome, and that having looked at the math at the time, he knew it could not be achieved.   FLYNN said 14 countries were voting, and had a recollection of the number of five votes being important. In the end, only the U.S. abstained. FLYNN stated his calls were about asking where countries would stand on a vote, not any requests of, "hey if you do this."

~~FLYNN was asked by~~The interviewing agents asked FLYNN if he made any comment to KISLYAK about voting in a certain manner, or slowing down the ~~vote~~vote, or if KISLYAK described any Russian response to a request by FLYNN.  FLYNN answered, "No." FLYNN ~~continued that~~stated the conversations were along the lines of where do you stand, and what's your position.
FLYNN heard through other channels that Egypt didn't like the vote, and believed the ~~Egyptians~~Egyptians of their own accord delayed the vote a ~~elay of their own accord~~day.       FLYNN again stated that he appreciated the interviewing agents reminding him that he had another conversation with KISLYAK.

[10]  *See* Flynn Reply Dkt. 133-2 at 11.

**5.  Mr. Flynn's Statements Were Not Material.**

The government has been on notice since December 18, 2018, that this Court had serious questions about the materiality of Mr. Flynn's statements from the factual basis for the plea.  After expressing concern earlier in the hearing about the facts that surrounded Mr. Flynn's statements to the FBI agents on Jan. 24, this Court reiterated its concern at the end of the hearing: "[I]t probably won't surprise you that I had many, many, many more questions . . . such as, you know, how the government's investigation was impeded? What was the material impact of the criminality? Things like that."  Hr'g Tr. 50:12-13, 20-22, Dec. 18, 2018.  Defendant is entitled to access the government's documents that show there was none.

Trying to shoehorn the FBI's interview of Flynn into its investigation of whether the Trump campaign was "coordinating with the Russian government in its activities to interfere with the 2016 presidential election," the government claims that Mr. Flynn's "conduct and communications with Russia went to the heart of that inquiry.  Actions such as the defendant's communications with the Russian Ambassador about U.S. sanctions could have been indicative of such coordination."  Surreply at 10.

There are serious problems with this mantra.  First and foremost, the agents already knew exactly what Mr. Flynn said in all his communications with the Russian Ambassador, so the FBI agents did not ask questions to discover the existence or substance of those communications. And, second, the agents did not ask Mr. Flynn a single question about anything even approaching "interference with the 2016 election."  Nor did the agents try to connect the post-election communications to pre-election interference.  The interview, by "pretext," was purely to "start" a "false statement case" as McCabe admitted in his congressional testimony.

The government's claim that "it was imperative that the FBI determine whether and why such communications with the Russian Ambassador had occurred," *id.* at 11, is belied by the unalterable truth that the FBI had recordings and transcripts of those very conversations.  It knew exactly whether, what, and why "such communications" "occurred" between Mr. Flynn and the Ambassador.   It heard the calls.[11]  Nothing the agents asked Mr. Flynn on January 24 was material to any valid investigation, and because the agents and Mr. Flynn knew they had the transcripts, recordings, and knew exactly what was said, nothing impeded their purported investigation.

In this Circuit, *Brady* evidence is to be produced promptly to the defense—in time for it to *use* it.  The government here used every conceivable strategy and tactic to circumvent *Brady*'s letter and spirit, and its own responsibility as a servant of the law, from the inception of this entire operation.  The government attempts to paint its pre-plea interactions with Mr. Flynn as cordial and completely voluntary, but that defies reality.

Mr. Flynn was one of the Special Counsel's first four targets—following on from Mr. Comey and Mr. McCabe's pretextual target selection of mid-2016.  After having been compelled by the facts to clear Mr. Flynn in January, Mr. McCabe opened the obstruction case on President Trump and the FBI re-entered the 302 of Mr. Flynn's interview into the Sentinel system on May 31, 2017, for Mr. Mueller's special use.   Mr. Flynn was named in Mr. Mueller's first target authorization letter.  The Mueller team soon obtained a search warrant and took possession of all

---

[11]   Likewise, whatever the Vice-President and others in the White House said publicly or privately that Mr. Flynn told them was not grist for an FBI investigation.  The Executive Branch has different reasons for saying different things publicly and privately, and not everyone is told the details of every conversation.  If the FBI is charged with investigating discrepancies in statements made by government officials to the public, the entirety of its resources would be consumed in a week.  Furthermore, Mr. Van Grack's team interviewed all the relevant White House officials.  The defense has reason to believe there is exculpatory evidence from those interviews, requested at MTC 17, 28, IV(g), that has been withheld as well.

Mr. Flynn's electronic devices—phones and computers—which they hold to this day.  Then, they obtained authority to target his son, and they seized all his devices.  Moreover, the prosecutors mislead by omission when they claim Mr. Flynn was "afforded protections by the government against his statements during those [proffer] meetings being used against him."  Dkt. 132, 2.[12]

As the *Brady* Court made clear, a prosecutor should not be the "architect of a proceeding that does not comport with standards of justice."  *Brady v. Maryland*, 373 U.S. 83, 88 (1963).  This Circuit has excoriated the government for failing to produce exculpatory evidence as soon as they finished the conversation that revealed it.  *United States v. Pasha*, 797 F.3d 1122, 1133 (D.C. Cir. 2015).  In *United States v. Nelson*, the district court discussed the government's pre-plea *Brady*

---

[12] The letter sent by the Special Counsel to Mr. Flynn's then-counsel, Covington & Burling, before the proffer interviews made clear that, "by receiving [Mr. Flynn's] proffer, the government does not agree to make any motion on [his] behalf or to enter into a cooperation agreement, plea agreement, immunity agreement or non- prosecution agreement with Client."  Although the letter made a general promise not to use statements made in the interviews against Mr. Flynn, the promise included an important final clause: "Should Client be prosecuted, no statements made by Client during the meeting will be used against Client in the government's case-in-chief at trial or for purposes of sentencing, *except as provided below*." (emphasis added).  The listed exceptions render the "promise" a practical nullity.

It is disingenuous to suggest that the proffer sessions were not adversarial when the government had permission to target Mr. Flynn, seized all his electronic devices, targeted his son, and seized his son's devices. The government fails to mention that, to obtain the plea, it threatened Mr. Flynn with indictment *the next day*, the indictment of his son who had a new baby, promised him "the Manafort treatment," and promised to pile on charges sufficient to put him in prison the rest of his life.  The short fuse was no doubt motivated by the government's knowledge, which it did not disclose to Flynn, that the salacious Strzok-Page emails, disclosing their vitriolic hatred of President Trump and his team, the key agents' affair, and their termination from Mueller's Special Counsel operation were going to be exposed the very next day.  No individual, no matter how innocent, can withstand such pressure, particularly when represented by conflicted defense counsel.  The advice a client is given by his lawyer in such fraught circumstances can make all the difference between standing his ground or caving to the immense pressure.  Mr. Flynn caved, not because he is guilty, but because of the government's failure to put its cards on the table, as *Brady*, requires, and its failure to ensure that Mr. Flynn was represented by un-conflicted counsel when he was forced to make that decision.

obligations and held the government has the obligation to disclose *Brady* before a plea.    *United States v. Nelson*, 979 F. Supp. 2d 123, 129 (D.D.C. 2013).   The *Nelson* court noted that "a defendant who is forced to make a choice about going to trial or pleading guilty unaware that the government has not disclosed evidence which if made available, would tend to exculpate him, suffers unfair treatment unworthy of the bedrock ideal inscribed on the Justice Department walls," and that "precluding a defendant from raising such a *Brady* claim after a guilty plea could create a risk too costly to the integrity of the system of justice to countenance—tempting a prosecutor to stray from that bedrock ideal and deliberately withhold exculpatory information as part of an attempt to elicit guilty pleas." *Id.* at 130 (internal quotes omitted).

This district and most circuits agree that if this question were put to the Supreme Court, it "would find that the government has an obligation to disclose exculpatory evidence at the plea stage." *Id.* at 129.  As Judge Betty Fletcher wrote in a companion case to *United States v. Stevens*, it is "an affront to the integrity of our system of justice" that the prosecutors had withheld "material documents—including FBI reports, memoranda, and police reports" and knowingly suppressed "information that undermine[d] the prosecution's star witness. *United States v. Kohring*, 637 F.3d 895, 914 (9th Cir. 2011) (B. Fletcher, J. concurring).

### 6.  Covington's Non-Consentable Conflict of Interest Was Not Ameliorated by Mr. Van Grack's Discussion with Conflicted Counsel.

When the government's Response relied pervasively on Mr. Flynn's representation by and (theoretical) ability to consult with chosen counsel at all stages of the proceedings, the conflict of interest necessarily became an element of his Reply, and the government is wrong to complain that Mr. Flynn strayed outside the bounds of a proper Reply.  Dkt. 131; Surreply at 11.  Since it was the government that first raised the supposed impartial advice Mr. Flynn received from his lawyers

at the time of his plea and then, again, when he confirmed his plea before this Court, this became a proper subject for addressing in Mr. Flynn's Reply.

Even given leave to file a Surreply, however, the government completely ignores the gravamen of Mr. Flynn's argument. While Mr. Van Grack admits he was aware of the serious conflict of interest inherent in Covington & Burling's representation of Mr. Flynn in this case because of its responsibility for the FARA registration, Surreply at 11, he concedes he did nothing meaningful about it. In fact, his reaction was wholly inadequate: he accepted at face value the conflicted lawyers' report that Mr. Flynn was aware of the problem, that they had discussed it, and that Mr. Flynn had agreed to waive the conflict. *Id.* In such circumstances, the government must do more—much more.

The government's response is not only inadequate as a matter of legal ethics, which it also failed to address, but it ignores the crux of Mr. Flynn's argument in his Reply. The conflict was *non-consentable.* Instead of seeking Flynn's consent to their continued representation of him, Covington lawyers were obligated to *withdraw* from the representation, regardless of his wishes. Dkt. 133-2, Reply at 16-18. Continued representation under these circumstances, in turn, amounts to constitutionally inadequate representation under the Sixth Amendment. It must be remembered that in *Wheat v. United States*, 486 U.S. 153 (1988), the district court *overrode* the formally expressed wishes of both the defendant and his lawyers; the defendant's chosen counsel was removed from the case on the government's contested motion.

Mr. Van Grack could have avoided this part of the government's present difficulty by moving to disqualify Flynn's original counsel years ago, thus putting the ultimate decision into a court's hands, as in *Wheat* and other cases. But, he chose to speak only to the very counsel that had either not adverted at all to consentability, or had already reached the self-serving

determination both that the conflict was consentable *and* that the client's purported consent was adequately informed.

Mr. Van Grack unilaterally eliminated the possibility that the Court would learn enough to investigate further.  He was content to allow hopelessly-conflicted counsel not merely to walk Mr. Flynn into five days of interviews with the Special Counsel team, but into an immediate, high-pressured plea of guilty without any demands for or production of *Brady* material, facilitated the waiver of countless rights, and signed an agreement for endless years of cooperation with the government at extraordinary personal expense.  In addition to those benefits, the government was able to turn Mr. Flynn's own counsel into the equivalent of adverse witnesses against him in the Rafiekian FARA case in the Eastern District of Virginia.

All the while, the government was suppressing the evidence we outlined comprehensively in Mr. Flynn's Reply and this Sur-Surreply.  Some conflicts of interest are not waivable as a matter of constitutional law, but a court cannot realistically press the inquiry further unless alerted to it by the parties.  By the time of the sentencing hearing before this Court in December 2018, it was simply impossible for the Court to unearth the seriousness of conflict of interest.

The normal plea colloquy was insufficient to alert this Court to the problem, and Mr. Flynn did not know what Mr. Flynn did not know.  When Mr. Flynn was asked if he was satisfied with the representation he was receiving, he had no way of knowing of the depths of the conflict of interest, and he had no way of knowing that some conflicts of interest are non-consentable.  The prosecutors were more than just aware of this issue, they took full advantage of it.  Their failure to address the issue in their Surreply concedes the non-consentable conflict.  This is precisely why the government is *required* to focus the court's attention to the issue by moving to disqualify

counsel and thus letting the Court—not the government in cahoots with uber-conflicted counsel—persuade a defendant that he is getting advice from a safe source.

## CONCLUSION

In conclusion, yes, the government engaged in conduct so shocking to the conscience and so inimical to our system of justice that it requires the dismissal of the charges for outrageous government conduct. *See United States v. Russell, 411 U.S. 423, 428 (1973)*. However, as fully briefed in our Motion to Compel and Reply, at this time, Mr. Flynn only requests an order compelling the government to produce the additional *Brady* evidence he has requested—in full and unredacted form—and an order to show cause why the government should not be held in contempt. At the appropriate time, Mr. Flynn will file a separate motion asking that the Court dismiss the prosecution for egregious government misconduct and in the interest of justice. Mr. Flynn is entitled to discovery of the materials he has requested in these motions and briefs that will help him support such a motion.

Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall, VSB # 79292
Lindsay R. McKasson
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
jbinnall@harveybinnall.com

W. William Hodes
The William Hodes Law Firm
3658 Conservation Trail
The Villages, Florida 32163
Tel: (352) 399-0531
wwh@hodeslaw.com
Admitted *Pro Hac Vice*

/s/ Sidney Powell
Molly McCann
Sidney Powell, P.C.
2911 Turtle Creek Blvd., Suite 300
Dallas, Texas 75219
Tel: (214) 07-1775
sidney@federalappeals.com
*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2019, a true and genuine copy of Mr. Flynn's Sur-

Surreply in Support of His Motion to Compel Production of *Brady* Material and for an Order to

Show Cause was filed using the Court's CM/ECF system, which will serve a copy of the filing

upon all counsel and record.

> Jessie K. Liu, U.S. Attorney for the District of Columbia
> Brandon L. Van Grack, Special Assistant U.S. Attorney
> Deborah Curtis, Assistant U.S. Attorney
> Jocelyn Ballantine, Assistant U.S. Attorney
> 555 4th Street, NEW Washington, D.C. 20530

/s/ Jesse R. Binnall
Jesse R. Binnall, VSB # 79292
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
jbinnall@harveybinnall.com
