**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **MICHAEL T. FLYNN,** | **Crim. No. 17-232 (EGS)** |
| **Defendant** | |

## UNITED STATES' SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits its Supplemental Memorandum in Aid of Sentencing for defendant Michael T. Flynn.  In its initial sentencing memorandum, the government recommended that the defendant receive a sentence at the low end of the Guidelines range. *See* Government's Memorandum in Aid of Sentencing, *United States v. Flynn*, No. 17-cr-232 (D.D.C. Dec. 4, 2018) (Doc. 46) ("Gov't Sent'g Mem.").  At that time, the government represented that the defendant had accepted responsibility, and it filed a motion for a downward departure pursuant to Section 5K1.1 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").

At the initial sentencing hearing in December 2018, the Court raised concerns about proceeding to sentencing without "fully understanding the true extent and nature" of the defendant's assistance.  Hearing Transcript at 31, *United States v. Flynn*, No. 17-cr-232 (D.D.C. Dec. 18, 2018) ("12/18/2018 Hearing Tr.").  Upon a motion of the defendant predicated on a desire to "complete his cooperation" in the case of *United States v. Bijan Rafiekian*, No. 18-cr-457, in the U.S. District Court for the Eastern District of Virginia ("EDVA"), the Court continued his sentencing.  12/18/2018 Hearing Tr. at 46-47.

The defendant is now scheduled to be sentenced almost exactly three years from the date of his primary criminal conduct – lying to the FBI – and the intervening years have included periods where the defendant has sought to assist and aid the government, and periods where the defendant has sought to thwart the efforts of the government to hold other individuals, principally Bijan Rafiekian, accountable for criminal wrongdoing.  Given the serious nature of the defendant's offense, his apparent failure to accept responsibility, his failure to complete his cooperation in – and his affirmative efforts to undermine – the prosecution of Bijan Rafiekian, and the need to promote respect for the law and adequately deter such criminal conduct, the government recommends that the court sentence the defendant within the applicable Guidelines range of 0 to 6 months of incarceration.

## I.     Background

On December 1, 2017, the defendant entered a plea of guilty to a single count of "willfully and knowingly" making material false statements to the Federal Bureau of Investigation ("FBI") regarding his contacts with the Government of Russia's Ambassador to the United States ("Russian Ambassador") during an interview with the FBI on January 24, 2017 ("January 24 interview"), in violation of 18 U.S.C. § 1001(a)(2).  *See* Information, *United States v. Flynn*, No. 17-cr-232 (D.D.C. Nov. 30, 2017) (Doc. 1); Statement of Offense at ¶¶ 3-4, *United States v. Flynn*, No. 17-cr-232 (D.D.C. Dec. 1, 2017) (Doc. 4) ("SOF").  In addition, at the time of his plea, the defendant admitted making other material false statements and omissions in multiple documents that he filed on March 7, 2017, with the Department of Justice ("DOJ") pursuant to the Foreign Agents Registration Act ("FARA"), which pertained to his work for the principal benefit of the Government of Turkey.  *See* SOF at ¶ 5.  These additional material false statements are relevant conduct that the Court can and should consider in determining where within the Guidelines range to sentence the defendant.

2

The defendant was initially scheduled to be sentenced by this Court on December 18, 2018, even though the defendant had not completed his cooperation.  The parties sought to hold the hearing at that time because the defendant had expressed a desire to be sentenced as soon as possible.  The government assented to his request because the sole outstanding area of cooperation pertained to the *Rafiekian* case, and the defendant had already testified under oath before a federal grand jury in that matter.  The government expected that, in the event the *Rafiekian* case went to trial, the defendant would testify at trial consistent with that grand jury testimony and the Statement of Offense.

In anticipation of that hearing, the parties filed sentencing memoranda.  As part of its submission, the government requested that the Court grant a downward departure for providing substantial assistance to the government.  The government provided a detailed accounting of the defendant's assistance to the government in several ongoing investigations, including the investigation by the Special Counsel's Office ("SCO").  *See* Addendum to Government's Memorandum in Aid of Sentencing, *United States v. Flynn*, No. 17-cr-232 (D.D.C. Dec. 19, 2019) (Doc. 146) ("Addendum").  Notably, only the assistance he had provided in the *Rafiekian* case was deemed "substantial."  *Id.* at 2.  The government recognized that "some of that benefit [of the defendant's substantial assistance] may not be fully realized at this time," but it represented that the government and the defendant "agree that sentencing at this time is nonetheless appropriate because sufficient information is available to allow the Court to determine the import of the defendant's assistance to his sentence."  *Id.* at 2.  In addition to asking the Court to credit the defendant with providing substantial assistance, the government recommended that the defendant receive credit for accepting responsibility.  For the reasons detailed below, the government now withdraws both requests.

3

The defendant was not sentenced at the December 18 hearing. The Court first engaged in an "extension . . . of the plea colloquy." Hearing Transcript at 5, *United States v. Flynn*, No. 17-cr-232 (D.D.C. Dec. 18, 2018) ("12/18/2018 Hearing Tr."). Based upon the defendant's responses, the Court found that the defendant entered his earlier guilty plea while "competent and capable." *Id.* at 16. The Court then engaged in a colloquy with the government, during which the government represented that "based on the totality of the assistance that the defendant had provided at that point," it believed that a motion for a downward departure based on his substantial assistance was warranted. *Id.* at 27. The government further stated that based not only on "the assistance he provided, but the nature of the investigations . . . , that the defendant had provided the vast majority of cooperation that could be considered," concluding that the Court "was in a position to consider the vast majority of not just the cooperation, but the *potential* benefit of that cooperation." *Id.* (emphasis added). The Court inquired whether the defendant could have been charged as a co-defendant in the *Rafiekian* case, and the government affirmed that the defendant could have been charged with various offenses in connection with his false statements in his FARA filings, consistent with his Statement of Offense. *Id.* at 28.

With respect to sentencing, the Court reminded the defendant that he could be sentenced to a term of imprisonment, and reminded the defendant of the government's representation that some of the benefit of his cooperation "may not be fully realized at this time." *Id.* at 30. The Court then asked whether the defendant therefore wished to fully complete his cooperation with the government in order to improve potentially his sentence. *Id.* at 30-34, 44. The defendant noted that any remaining cooperation consisted of testifying at the *Rafiekian* trial, and requested that the Court continue the sentencing hearing. *Id.* at 46-47.

It is within the government's sole discretion to determine whether the defendant has "substantially assisted" the government. In light of the complete record, including actions

subsequent to December 18, 2018, that negate the benefits of much of the defendant's earlier cooperation, the government no longer deems the defendant's assistance "substantial."

Based on the defendant's conduct since the time of the December 18, 2018, sentencing hearing, the government also does not believe the defendant should receive credit for acceptance of responsibility.  Indeed, the government has reason to believe, through representations by the defendant's counsel, that the defendant has retreated from his acceptance of responsibility in this case regarding his lies to the FBI.  For that reason, the government asks this Court to inquire of the defendant as to whether he maintains those apparent statements of innocence or whether he disavows them and fully accepts responsibility for his criminal conduct.

## II.      Factual Summary of the Defendant's Conduct Relevant to Sentencing

The underlying facts in this case should not be in dispute.  As the Court has noted, the defendant admitted to the underlying criminal conduct "when he entered his guilty pleas in this case." *See* Memorandum Opinion at 4, *United States v. Flynn*, No. 17-cr-232 (D.D.C. Dec. 16, 2019) (Doc. 144) ("Mem. Opinion").  At sentencing, just one year ago, the defendant reiterated that he "d[id] not take issue" with the government's description of that conduct.  *See* Defendant's Memorandum in Aid of Sentencing at 7, *United States v. Flynn*, No. 17-cr-232 (D.D.C. Dec. 11, 2018) (Doc. 50) ("Def. Sent'g Mem.").  In his recent filings and statements, however, the defendant has disputed that conduct and the underlying facts.  Accordingly, the government below highlights relevant facts for purposes of sentencing.  As described in the Statement of Offense, this case is about multiple false statements that the defendant made to various DOJ entities.  The defendant's first series of false statements occurred during an interview with the FBI about his communications with the Russian Ambassador.  The defendant also made a second series of false statements in his FARA filings that pertain to his work for the Government of Turkey.

> i.      _False Statements to the FBI About Communications with the Russian Ambassador_

In July 2016, the FBI opened an investigation into the Russian government's efforts to interfere in the 2016 presidential election, including the nature of any links or coordination between the Russian government and individuals associated with the campaign of then-candidate Donald J. Trump ("FBI counterintelligence investigation").  The inquiry included examining relationships between individuals associated with the campaign and the Russian government, as well as identifying actions of such individuals that would have benefited the Russian government.  During the presidential election, the defendant served as a surrogate and national security advisor for the campaign of Donald J. Trump.  *See* SOF at ¶ 1.  After the election, the defendant became a senior member of the President-Elect's transition team and was chosen to become the National Security Advisor.  *Id.*

On December 28, 2016, then-President Barack Obama signed an executive order that implemented a series of sanctions against Russia in response to that government's actions to interfere with the 2016 presidential election; concurrently, the Obama Administration expelled 35 Russian government officials and closed two Russian government-owned compounds in the United States (collectively, "sanctions").  *See* SOF at ¶ 3; SPECIAL COUNSEL ROBERT S. MUELLER III, REPORT ON THE INVESTIGATION INTO RUSSIAN INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION (Mar. 2019) ("Special Counsel Report"), Vol. I. at 168-69.  The U.S. Intelligence Community assessed that Russian President Vladimir Putin "ordered an influence campaign in 2016 aimed at the US presidential election[,]" with a goal of "undermin[ing] public faith in the US democratic process."  INTELLIGENCE CMTY. ASSESSMENT, "ASSESSING RUSSIAN ACTIVITIES AND INTENTIONS IN RECENT US ELECTIONS," at ii (Jan. 6, 2017).

That evening, the Russian Ambassador texted the defendant, "can you kindly call me back at your convenience."  Special Counsel Report, Vol. I. at 169.  At the time, the defendant

was on vacation, while multiple senior officials from the transition team were with President-Elect Trump in Palm Beach, Florida.  *See* SOF at ¶ 3.  When the sanctions were announced publicly on December 29, 2016, the defendant texted a transition team member: "Russian AMBO reaching out to me today."  Special Counsel Report, Vol. I. at 170.  The defendant then spoke to K.T. McFarland, the incoming Deputy National Security Advisor who was in Palm Beach, to discuss what to communicate to the Russian Ambassador about the sanctions.  That conversation included a discussion that the transition team did not want Russia to escalate the situation, and that the defendant would relay such a message to the Russian Ambassador.  *See* SOF at ¶ 3.  Immediately after speaking with McFarland, the defendant spoke with the Russian Ambassador and discussed the sanctions, among other topics.  *Id.*  With respect to the sanctions, the defendant requested that Russia not escalate the situation and only respond in a reciprocal manner.  *Id.*  After the conversation, the defendant reported to McFarland his discussion of sanctions with the Russian Ambassador.  *Id.*

The next day, Putin released a statement that Russia would not take retaliatory measures in response to the sanctions at that time.  *Id.*  On December 31, 2016, the Russian Ambassador called the defendant and told him the request had been received at the highest levels and that Russia had chosen not to retaliate to the sanctions in response to the request.  *See* Special Counsel Report, Vol. I. at 171.  Later that day, the defendant spoke with McFarland and relayed his conversation with the Russian Ambassador.  *See* SOF at ¶ 3.

In the days that followed, the Russian government's actions to interfere in the election remained a significant topic for the transition team and the public.  On January 6, 2017, the U.S. Intelligence Community briefed the President-Elect and members of his national security team—including the defendant—on a joint assessment that concluded with high confidence that Russia

had interfered in the election.  *See* Special Counsel Report, Vol. II. at 27.  A declassified version of the assessment was publicly released that same day.

A few days later, on January 12, 2017, the *Washington Post ("Post")* published a story alleging that the defendant had spoken with the Russian Ambassador on December 29, 2016, the day the sanctions were announced.  *See* David Ignatius, *Why did Obama Dawdle on Russia's hacking?*, WASH. POST (Jan. 12, 2017).  The *Post* story queried whether the defendant's actions had undercut the sanctions and violated the Logan Act.  In response, the defendant had K.T. McFarland contact the *Post* on January 13 and convey false information about his communications with the Russian Ambassador.  *See* Government's Reply to Defendant's Memorandum in Aid of Sentencing at 2, *United States v. Flynn*, No. 17-cr-232 (D.D.C. Dec. 14, 2018) (Doc. 56) ("Gov't Reply to Def. Sent'g Mem.")*.*

Over the next two weeks, the defendant repeated the same false statements about the sanctions to multiple members of the transition team, including Vice President-Elect Michael Pence, who repeated those false statements on national television.[1]  On January 23, 2017, the White House Press Secretary recounted that he had recently spoken with the defendant, and the defendant had again denied speaking to the Russian Ambassador about sanctions.  *See White House Briefing by Sean Spicer – Full Transcript*, Jan. 23, 2017, CBS NEWS (Jan. 24, 2017).

The following day, as part of the FBI counterintelligence investigation, the FBI interviewed the defendant about his conversations with the Russian Ambassador.  During the

---

[1]   *See, e.g., Face the Nation transcript January 15, 2017: Pence, Manchin, Gingrich*, CBS NEWS (Jan. 15, 2017) (Vice President Pence recounting that defendant told him he did not discuss sanctions with the Russian ambassador); *Meet The Press 01/15/17*, NBC NEWS (Jan. 15, 2017) (Priebus recounting that he had talked to the defendant and "[t]he subject matter of sanctions or the actions taken by the Obama [sic] did not come up in the conversation [with the Russian ambassador]").

interview, the defendant disclosed some communications that he had had with Russian government officials, but omitted his communications with the Russian Ambassador about the sanctions. *See* Notice (Official Record of January 24 Interview Report), *United States v. Flynn*, No. 17-cr-232 (D.D.C. June 6, 2019) (Doc. 85). The defendant also omitted references to his communications with the Russian Ambassador in December 2016 about requesting that Russia vote against or delay a United Nations Security Council resolution. *Id.* The defendant's request was contrary to the position of the then-current administration, and was relevant to the FBI's investigation. When the interviewing agents attempted to refresh the defendant's recollection about his conversations with the Russian Ambassador about the sanctions, the defendant continued to deny that such conversations had occurred. *Id.* It was material to the FBI's counterintelligence investigation to know the full extent of the defendant's communications with the Russian Ambassador, and why he lied to the FBI about those communications.

On February 8, 2017, the defendant spoke to the *Post*, and again denied that he had discussed sanctions with the Russian Ambassador. The next day, the *Post* reported that U.S. officials stated that the defendant had discussed sanctions with the Russian Ambassador. *See* Greg Miller, et al., *National security adviser Flynn discussed sanctions with Russian ambassador, despite denials, officials say*, WASH. POST (Feb. 9, 2017). The defendant then changed his story, and started claiming that "he couldn't be certain that the topic [of sanctions] never came up." *Id.* Four days later, on February 13, 2017, President Trump asked for the defendant's resignation, and the defendant complied.

    ii.    *False Statements to the DOJ About his Work for the Government of Turkey*

The defendant's false statements to the DOJ pertain to work that he and his company, the Flynn Intel Group ("FIG"), performed for the Government of Turkey. On July 15, 2016, a coup d'état was attempted in Turkey. The Government of Turkey maintained that a cleric living in the

United States, Fethullah Gulen, was responsible for the failed coup.  Just twelve days later, the defendant and Rafiekian (Vice Chairman of FIG) began exchanging emails with Ekim Alptekin, a Turkish national with connections to high-level Government of Turkey officials, about assisting the Government of Turkey's effort to obtain custody of Gulen.  *See* Attachment 1 (selected trial exhibits from *United States v. Bijan Rafiekian*, No. 18-cr-457, 2019 WL 4647254 (E.D. Va. Sept. 24, 2019)), Ex. 8B.[2]  The decision to hire the defendant and his company was based in part on the defendant's work for and relationship with then-presidential candidate Trump.

The defendant, Rafiekian, and Alptekin devised a campaign pertaining to Gulen, which they called the "Truth" campaign, with the direction, support, and authorization of the Government of Turkey.  For example, on August 8, 2016, Alptekin reported that he had just had a "long meeting with [the Turkish] Minister of Economy upon the referral of [Turkish Minister of Foreign Affairs Mevlut] Cavusoglu.  I explained what we can offer.  He agreed to discuss in general lines at the council of ministers today and subsequently with [Turkish Prime Minister Binali] Yildirim in more detail."  *See* Attachment 1, Ex. 14A.  Just two days later, Alptekin informed the defendant and Rafiekian that he had just "finished in Ankara after several meetings today with Min of Economy and [Minister of Foreign Affairs] Cavusoglu.  I have a green light to discuss confidentiality, budget and the scope of the contract."  *See* Attachment 1, Ex. 16.  On September 8, 2016, Alptekin reported that he "will send the agreement // just left [Prime Minister]'s office."  *See* Attachment 1, Ex. 67J.  That same day, the defendant and Alptekin signed a contract that would pay FIG $600,000 for 90 days of work.  *See* Attachment 1, Ex. 58.

---

[2]      Exhibits in Attachment 1 are not consecutively numbered, and are referred to by the exhibit number used in the *Rafiekian* trial.

One of the first actions that the defendant and Rafiekian took after signing the contract and receiving payment was attending a meeting in New York City with Turkish ministers. On September 19, 2016, the defendant, Rafiekian, Alptekin, and two other FIG associates met with Turkish Minister of Foreign Affairs Cavusoglu and the Turkish Minister of Energy. *See In re Grand Jury*, Testimony of Michael T. Flynn (June 26, 2018) ("Grand Jury Tr.") at 22-25 (Attachment 2); Attachment 1, Ex. 61.  The conversation centered on Gulen and the Government of Turkey's efforts to obtain custody of Gulen.  *See, e.g.,* Attachment 1, Ex. 26B (talking points for the meeting).

After receiving feedback from those Turkish officials, work on the project began.[3] During September and October 2016, members of the team lobbied a member of Congress, a Congressional staffer, and a state government official about Gulen, including the prospect of holding Congressional hearings on Gulen.  *See* Attachment 1, Exs. 30A, 30B, 61.  The team also discussed publishing an op-ed about Gulen.  During a meeting towards the end of the project, on November 2, 2016, Alptekin expressed frustration with the team's lack of progress. In response, later that day, Rafiekian emailed Alptekin a draft of an op-ed that urged the United States to extradite Gulen.  *See* Attachment 1, Ex. 45A.  In that email, Rafiekian wrote, "A promise made is a promise kept."  *Id.*  The next day, Rafiekian emailed the defendant that Rafiekian had asked an editor to "review and edit my 1000 word draft to make sure it is tight before I send it out to you."  Attachment 1, Ex. 47.  Four days later, on November 8, 2016, the day of the presidential

---

[3]     The Government of Turkey provided supervision and direction throughout the project. For example, the defendant sent a text message on October 22, 2016, explaining that he had just talked to Alptekin who thought FIG's social media analysis was "worth talking to [Minister of Foreign Affairs Cavusoglu] about as well as all the other talking points."  Attachment 1, Ex. 40. The district judge in *Refiekian* ruled that this exhibit was not admissible as a coconspirator statement, based in part on the defendant's decision to intervene against the government, in a legal, evidentiary argument.  *See infra,* at 24-25.

election, the op-ed, credited as authored by the defendant, was published in *The Hill*. *See* Attachment 1, Ex. 50; *see also* Grand Jury Tr. at 31-32. The op-ed blamed Gulen for the attempted coup and urged the U.S. government to deny him refuge in the United States. At no point during FIG's lobbying efforts or in the op-ed did the defendant disclose his affiliation with the Government of Turkey.

Following the publication of the defendant's op-ed, the FARA Unit of the DOJ sent the defendant a letter requesting information in order to determine whether the defendant had an obligation to register as an agent of a foreign government under FARA. *See* Attachment 1, Ex. 90. From December 2016 to March 2017, the defendant worked with attorneys from the law firm of Covington & Burling ("Covington") to determine whether he and his company had an obligation to register and to draft such registration documents. On March 7, 2017, the defendant and Rafiekian filed multiple documents with the DOJ pursuant to FARA. *See* Attachment 1, Ex. 56 (Registration Statement); Ex. 58 (Exhibits A and B); Ex 61 (Supplemental Statement); Ex. 64 (Short Form Registration Statement – Flynn); Ex. 65 (Short Form Registration Statement – Rafiekian). All but one of the filings was signed by the defendant. *Id.*

The FARA filings contained multiple false statements and made at least one material omission, including:

1. The filings affirmatively stated that FIG did not know whether or the extent to which the Republic of Turkey was involved in the Turkey project. *See* Attachment 1, Ex. 58 (Registration Statement, Exhibit A).

2. The filings omitted that officials from the Republic of Turkey provided supervision and direction over the Turkey project. *See, e.g.,* Attachment 1, Ex. 56 (Registration Statement, Para. 7 & 8).

3. The filings affirmatively stated that FIG "understood the engagement to be focused on improving U.S. business organizations' confidence regarding doing business in Turkey." *See* Attachment 1, Ex. 61 (Supplemental Statement, Attachment).

4.    The filings affirmatively stated that the defendant published the op-ed "on his own initiative;" and it was not undertaken at the direction or control of a foreign principal. *See* Attachment 1, Ex. 61 (Supplemental Statement, Paragraph 13).

These false statements were described in the Statement of Offense, and at the time of his initial guilty plea, the defendant admitted under oath that these statements were material and false. *See* SOF at ¶ 5.

The evidence and the defendant's sworn testimony before the grand jury in the *Rafiekian* case demonstrate overwhelmingly that these three affirmative statements are false, and that the omitted statement is true. With respect to #1 and #2, the defendant's and Rafiekian's communications with Alptekin show that work on the project did not begin until the Government of Turkey approved the work and the budget. *See, e.g.,* Attachment 1, Exs. 14A, 16, 40, 67J. The defendant also testified before the grand jury that the project "was always on behalf of elements within the Turkish government," and Turkish officials were involved throughout the project. *See* Grand Jury Tr. at 5-12. With respect to #3, the defendant denied before the grand jury that the project focused on improving U.S. business organizations' confidence regarding doing business in Turkey. *See, e.g.,* Grand Jury Tr. at 9 ("Q: Was any work done regarding business opportunities and investment in Turkey? A: Not that I'm aware of."). And with respect to #4, the emails between the defendant, Rafiekian, and Alptekin show that the op-ed was drafted immediately after Alptekin expressed frustration with the lack of progress on the project, and Rafiekian indicated that the op-ed was part of his "promise" to Alptekin. *See, e.g.,* Attachment 1, Exs. 45A, 47. The defendant likewise testified before the grand jury that Rafiekian drafted the op-ed, that it was a deliverable for the project, and that it was necessary because FIG "needed to

show [they] had done something because [they] really hadn't done much by that point."  Grand Jury Tr. at 31-32.[4]

### III.     Sentencing Recommendation and Analysis

The defendant's multiple lies to various DOJ entities warrant a sentence within the Guidelines range that is "'sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing, in light of the Guidelines and other § 3553(a) factors."  *Freeman v. United States*, 564 U.S. 522, 529 (2011) (citing 18 U.S.C. § 3553(a)).

"Federal sentencing law requires the district judge in every case to impose 'a sentence sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing, in light of the Guidelines and other § 3553(a) factors."  *Freeman*, 564 U.S. at 529 (citing 18 U.S.C. § 3553(a)).  When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives—that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care.  *See* 18 U.S.C. §§ 3553(a)(1) and (2).  Furthermore, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

---

[4]      Rafiekian was not charged in EDVA with making false statements in the FARA filings, which is the relevant conduct as to defendant Flynn that the government highlights in this submission, and to which the defendant admitted in the Statement of Offense.  Instead, Rafiekian was charged with being an agent of the Government of Turkey without notifying the Attorney General, in violation of 18 U.S.C. § 951, and conspiring to do so and to violate FARA, in violation of 18 U.S.C. § 371.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court ruled that the Guidelines are no longer mandatory.  However, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.  *Gall v. United States*, 552 U.S. 38, 49 (2007) (citations omitted).  The Supreme Court has "recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).  As one member of this Court has held, "*Booker* requires judges to engage in a two-step analysis to determine a reasonable sentence."  *United States v. Doe*, 412 F. Supp. 2d 87, 90 (D.D.C. 2006) (Bates, J.).  Accordingly, after reviewing the Guidelines calculation, "the [court] should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the court] may not presume that the Guidelines range is reasonable . . . [but] must make an individualized assessment based on the facts presented."  *Gall,* 552 U.S. 38 at 49-50 (citations omitted).

A.    <u>**United States Sentencing Guidelines Calculation**</u>

The government submits that under the Guidelines, the appropriate total offense level is six, which based on the defendant's criminal history category of I, results in a Guidelines range of 0 to 6 months of incarceration and a fine of $1000-$9500.  With respect to other relevant Guidelines provisions, the Court should consider the defendant's lies to the DOJ in connection with his FARA filings as relevant conduct for the purpose of determining his sentence within the applicable Guidelines range under U.S.S.G. §§ 1B1.3 and 1B1.4.  Based on the assertions made in recent defense filings, and absent the defendant clearly and credibly disavowing those assertions during a colloquy with the Court at the sentencing hearing, the defendant is not

entitled to credit under U.S.S.G. § 3E1.1(a) for accepting responsibility.  Finally, the government

is no longer moving for a departure under U.S.S.G. § 5K1.1 for providing substantial assistance

to the government.

> i.      *Base Offense Level*

The government agrees with the Presentence Report ("PSR") that the appropriate

Guidelines for the criminal conduct at issue here, violating 18 U.S.C. § 1001, is U.S.S.G. §

2B1.1(a)(2), results in a base offense level of six.  *See* PSR at ¶ 27.  That conclusion also reflects

the parties' Guidelines calculation in the plea agreement.  *See* Plea Agreement at 2, *United States

v. Flynn*, No. 17-cr-232 (D.D.C. Dec. 1, 2017) (Doc. 3) ("Plea Agmt").

> ii.     *Relevant Conduct Analysis*

In fashioning its sentence, the Court must consider all relevant criminal conduct.  Under

the Guidelines, "the sentencing range for a particular offense is determined on the basis of all

'relevant conduct' in which the defendant was engaged and not just with regard to the conduct

underlying the offense of conviction."  *Witte v. United States*, 515 U.S. 389, 393 (1995) (citing

U.S.S.G. § 1B1.3, "[c]onduct that is not formally charged or is not an element of the offense of

conviction may enter into the determination of the applicable guideline sentencing range."

U.S.S.G. § 1B1.3, comment, backg'd).  Section 1B1.4 of the Guidelines further provides: "[i]n

determining the sentence to impose within the Guidelines range, or whether a departure from the

Guidelines is warranted, the court may consider, without limitation, any information concerning

the background, character and conduct of the defendant, unless otherwise prohibited by law."

U.S.S.G. § 1B1. 4 (citing 18 U.S.C. § 3661).  Courts may consider such relevant conduct in

determining the sentence within the range prescribed by the base offense level.  *See United

States v. Dorcely*, 454 F.3d 366, 276 (D.C. Cir. 2006) (upholding as reasonable the District

Court's reliance on acquitted conduct in sentencing the defendant to 24 months in a false

statements case); *see also United States v. Pinnick,* 47 F.3d 434, 438 (D.C. Cir. 1995) (citing *United States v. Wood*, 924 F.2d 399, 403 (1st Cir. 1991) (the court may consider conduct related to other offenses when selecting the specific sentence within that range)).

Here, in determining where within the Guidelines range to sentence the defendant, the Court should consider not just the defendant's lies to the FBI regarding his contact with the Russian Ambassador, but also his lies to the DOJ in his FARA filings concerning his work on behalf of the Government of Turkey.  *See* SOF at ¶ 5.  His lies pertaining to FARA constitute relevant conduct under Section 1B1.3(a)(1)(A) ("all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant").  Those lies are particularly relevant here, as they demonstrate a pattern of lies to DOJ entities that, collectively, deprived the DOJ of the ability to learn about foreign governments' efforts to influence the public and our government.

The defendant's false statements to the FBI were significant.  When it interviewed the defendant, the FBI did not know the totality of what had occurred between the defendant and the Russians.  Any effort to undermine the recently imposed sanctions, which were enacted to punish the Russian government for interfering in the 2016 election, could have been evidence of links or coordination between the Trump Campaign and Russia.  Accordingly, determining the extent of the defendant's actions, why the defendant took such actions, and at whose direction he took those actions, were critical to the FBI's counterintelligence investigation.

For similar reasons, the defendant's materially false statements and omissions in his FARA filings are relevant conduct, and should be considered by the Court in determining where within the applicable Guidelines range to sentence the defendant.[5]  The purpose of FARA is to

---

[5]    The defendant now asserts that the FARA paragraph in the Statement of Offense, Paragraph 5, is "meaningless" because the word "willful" was not included in the Statement of

provide transparency on efforts by foreign entities, in particular foreign governments, to influence the American public and our government.  FARA ensures that the public and our government know when foreign actors are behind activity intended to influence policy or opinion, so that policymakers and the public can properly evaluate the activity.  Here, the defendant was working under the "supervision and direction" of the Government of Turkey, but never made such disclosures.  SOF ¶5.  During the entirety of the defendant's time as the National Security Advisor and a senior advisor to the Presidential Transition Team, the public and our government did not know about his relationship with the Government of Turkey.  When he published an op-ed seeking to remove a U.S. resident from the United States, the public was not informed that he and his company had been paid to do so at the behest of the Government of Turkey.  Instead, he falsely represented in his FARA filings that the op-ed was written at his own

---

Offense when describing the defendant's false statements to the FARA Unit.  *See* Defendant's Response to the Court's Order of July 9 and Government's Filing of July 10 at 7, *United States v. Flynn*, 17-cr-232 (D.D.C. July 11, 2019) (Doc. 98) ("Def. Resp. to Court") ("Nowhere, however, did [the defendant] sign or recite that he willfully allowed the filing to proceed"); SOF at ¶ 5. The defendant's new position on the FARA offense is contradicted by his prior statements, his prior conduct, and the evidence.  As the government noted in its reply to the defendant's original sentencing memo, the defendant "chose to make" those false statements after receiving an explicit warning that providing false information was a federal offense.  *See* Gov't Reply to Def. Sent'g Mem. at 5.  The defendant did not object when the government represented at the defendant's initial sentencing hearing that the Statement of Offense represented the defendant's "unlawful" conduct, or that he could have been indicted in EDVA for that conduct.  *See* 12/18/2018 Hearing Tr. at 27-28, 35.  The defendant's lack of objection at that time was not surprising in light of the evidence.  One year earlier, he told the FBI that he had seen FIG's FARA application prior to it being filed. *See* June 25, 2018, Interview of Defendant at 4 (Attachment 3). When one of the defendant's attorneys who was helping him prepare the filings sent the defendant an email with a draft of the FARA filings, which requested that he review the filings, the defendant responded, "Yes, approved, this is as discussed."  July 3, 2019 Interview of Robert Kelner at 5 (Attachment 4).  Multiple Covington attorneys similarly informed the FBI that the defendant reviewed the FARA filings.  *See* June 21, 2018 Interview of Brian Smith at 6 (Attachment 5); June 21, 2018 Interview of Robert Kelner at 7 (Attachment 6).  And when the defendant signed five of the FARA filings, he affirmed, "under penalty of perjury," that he "read the information" in the filings, was "familiar with the contents thereof[,] and that such contents are in their entirety true and accurate."  *See* Attachment 1, Ex. 56 p. 6; Ex. 58 pp. 2, 5; Ex 61 p. 9; Ex. 64 p. 2.

initiative.  And when individuals hired by his company lobbied federal and state officials, those individuals never disclosed that their activity was all being done under the "supervision and direction" of the Government of Turkey.

Accordingly, the defendant's false statements regarding his work for the Government of Turkey are relevant conduct for purposes of sentencing.

> iii.   *Based on the Current Record, the Defendant Has Failed to Accept Responsibility*

Based on statements made in recent defense filings, the defendant has not accepted responsibility for his criminal conduct, and therefore is not entitled to any such credit unless he clearly and credibly disavows those statements in a colloquy with the Court.  The Guidelines provide for a two-level reduction "[i]f the defendant *clearly* demonstrates acceptance of responsibility for his offense."  U.S.S.G. § 3E1.1(a) (emphasis added). A "defendant who enters a guilty plea is not entitled to an adjustment . . . as a matter of right." *United States v. Saani*, 650 F.3d 761, 767 (D.C. Cir. 2011) (quoting U.S.S.G. § 3E1.1 cmt. n.3).  The defendant bears the burden of convincing the Court that he is entitled to a downward adjustment for acceptance of responsibility.  *See United States v. McLean*, 951 F.2d 1300, 1302 (D.C. Cir. 1991).  The plea agreement mirrors the Guidelines, conditioning credit for accepting responsibility on the defendant "*clearly* demonstrat[ing] acceptance of responsibility, *to the satisfaction of the Government*, through [the defendant's] allocation, adherence to every provision of this Agreement, and conduct between entry of the plea and imposition of sentence."  Plea Agmt at 2 (emphasis added).  The defendant has made no such demonstration, clear or otherwise.[6]

At the time of the defendant's initial sentencing hearing on December 18, 2018, the government supported the defendant receiving credit for accepting responsibility because the

---

[6]     The PSR was prepared over one year ago, on November 20, 2018. On December 26, 2019, the government informed the Probation Office that due to the defendant's recent conduct,

defendant appeared to have accepted responsibility for all of his criminal conduct.  During the

hearing, the Court engaged in a dialogue with the defendant concerning arguments in his

sentencing memorandum that appeared to challenge the circumstances of the January 24

interview.  *See* 12/18/2018 Hearing Tr. at 6-7.  However, when questioned by the Court, the

defendant declined to challenge the circumstances of that interview.  *Id.* at 8.  When pressed by

the Court about whether he wanted to proceed with his guilty plea "[b]ecause you are guilty of

this offense," the defendant unequivocally responded, "Yes, Your Honor."  *Id.* at 16.  And when

the Court asked whether he was "continuing to accept responsibility for [his] false statements,"

the defendant replied, "I am, Your Honor."  *Id.* at 10.  The defendant's recent conduct and

statements dramatically differ from those representations to the Court, which he made under

oath.

Six months later, in June 2019, the defendant began retracting those admissions and

denying responsibility for his criminal conduct.  Far from accepting the consequences of his

unlawful actions, he has sought to blame almost every other person and entity involved in his

case, including his former counsel.  Most blatantly, the defendant now professes his innocence.

*See, e.g.*, Reply in Support of His Motion to Compel Production of *Brady* Material and to Hold

the Prosecutors in Contempt at 2, 6, *United States v. Flynn*, 17-cr-232 (D.D.C. Oct. 22, 2019)

(Doc. 129-2) ("Reply") ("When the Director of the FBI, and a group of his close associates, plot

to set up an innocent man and create a crime . . . ;" alleging that text messages provided by the

government "go to the core of Mr. Flynn's . . . innocence").  With respect to his false statements

to the FBI, he now asserts that he "was honest with the agents [on January 24, 2017] to the best

---

it did not believe the defendant was entitled to a two-level reduction for accepting responsibility
pursuant to U.S.S.G. § 3E1.1(a).  As of the date of this filing, the government has not had the
opportunity to meet with the Probation Office to explain its position.

of his recollection at the time." Reply at 23.  Such a claim is far from accepting responsibility

for his actions.  As the defendant admitted in his plea agreement and before this Court, during

the January 24 interview the defendant knew he was lying to the FBI, just as he knew he was

lying to the Vice President of the United States.

The defendant has also chosen to reverse course and challenge the elements and

circumstances of his false statements to the FBI.  *See, e.g.,* June 6, 2019 Sidney Powell Letter to

the Attorney General (Doc. 122-2) ("Powell Letter to AG").  The defendant now claims that his

false statements were not material, *see* Reply at 27-28, and that the FBI conducted an "ambush-

interview" to trap him into making false statements, *see* Reply at 1.  The Circuit Court recently

stated in *United States v. Leyva*, 916 F.3d 14 (D.C. Cir. 2019), *cert. denied*, No. 19-5796, 2019

WL 5150737 (U.S. Oct. 15, 2019), that "[i]t is not error for a district court to 'require an

acceptance of responsibility that extended beyond the narrow elements of the offense' to 'all of

the circumstances' surrounding the defendant's offense."  *Id.* at 28 (citing *United States v.

Taylor*, 937 F.2d 676, 680-81 (D.C. Cir. 1991)).  A defendant cannot "accept responsibility for

his conduct and simultaneously contest the sufficiency of the evidence that he engaged in that

conduct."  *Id.* at 29.  Any notion of the defendant "clearly" accepted responsibility is further

undermined by the defendant's efforts over the last four months to have the Court dismiss the

case. *See* Reply at 32.[7]

---

[7]     Even where defendants have asserted a defense of entrapment, it is permissible for a
court to bar a defendant from receiving an acceptance of responsibility reduction.  *See United
States v. Layeni*, 90 F.3d 514, 524 (D.C. Cir. 1996) (no error where court used entrapment
arguments to find a defendant had not accepted responsibility); *United States v. Hoenscheidt*, 7
F.3d 1528, 1532 (10th Cir. 1993) (no error where sentencing court acknowledged entrapment
defense does not necessarily bar Section 3E1.1 reduction and "used his entrapment arguments to
find [he] had not accepted responsibility").

iv.     *The Defendant Has Not Substantially Assisted the Government*

At the time of his initial sentencing on December 18, 2018, the government represented to the Court that the defendant had provided substantial assistance.  As described in the Addendum to its original sentencing memorandum, at that time the government represented that the defendant had assisted in three investigations, but only deemed his assistance in the *Rafiekian* case as "substantial."  *See* Addendum at 2.  In reference to the *Rafiekian* case, the government informed the Court that "the defendant's cooperation and assistance have been critical to [the government's] investigation;" that the defendant had interviewed multiple times with the prosecutors, "testified before the Grand Jury in EDVA, and provided materials that substantially aided its investigation;" and that the defendant's assistance had "cemented" the prosecutors' decision to charge Rafiekian and Alptekin.  *Id.* at 2-3.

In reference to the SCO's investigation, the government stated that the defendant had assisted the SCO's investigation on "a range of issues," through the course of 19 interviews, and it provided three examples of such assistance.  *Id.* at 3-5.  The government also highlighted the timeliness of the defendant's assistance, stating: "The usefulness of the defendant's assistance is connected to its timeliness.  The defendant began providing information to the government not long after the government first sought his cooperation.  His early cooperation was particularly valuable because he was one of the few people with long-term and firsthand insight regarding events and issues under investigation by the SCO.  Additionally, the defendant's decision to plead guilty and cooperate likely affected the decisions of related firsthand witnesses to be forthcoming with the SCO and cooperate."  *Id.* at 5.

Although the government noted that "some of th[e] benefit" of the defendant's assistance "may not be fully realized at th[at] time," it proceeded to sentencing because it believed the defendant's anticipated testimony in the *Rafiekian* case had been secured through his grand jury

testimony and the Statement of Offense.[8]  The Court, however, expressed that "courts are reluctant to proceed to sentencing unless and until cooperation has been completed . . . [b]ecause the Court wants to be in a position to fully evaluate someone's efforts to assist the government." 12/18/2018 Hearing Tr. at 26.  The Court's concern that the parties had prematurely proceeded to sentencing was prescient.

The defendant retained new counsel in June 2019.  Less than three weeks before the *Rafiekian* trial, as prosecutors were in the process of preparing for the defendant's testimony, his new counsel proffered a new version of events surrounding the FARA filings.  That version of events was, in the view of the *Rafiekian* prosecutors, among other things, contradicted by the defendant's sworn grand jury testimony, statements he had made to the FBI in several interviews, and the testimony of other expected trial witnesses.  In light of that view, the *Rafiekian* prosecutors made a rational, strategic decision not to call the defendant as a witness, and promptly disclosed the proffered new version of events to *Rafiekian's* counsel.[9]

The most serious charge against Bijan Rafiekian was acting as an agent of a foreign government without notifying the Attorney General, in violation of 18 U.S.C. § 951.  The contested issue at trial with respect to that charge was whether Rafiekian knew that the Government of Turkey was exercising direction and control over the Turkey project.  The defendant's anticipated testimony at trial would have provided the best and most direct evidence

---

[8]     While the defendant provided information that was "useful" to the SCO investigation, Addendum at 4, his assistance in that investigation was never "substantial."

[9]     Rafiekian's counsel characterized the "new Flynn version of events" as "an unbelievable explanation, intended to make Flynn look less culpable than his signed December 1, 2017 Statement of Offense and consistent with his position at his sentencing hearing.  In short, Flynn wants to benefit off his plea agreement without actually being guilty of anything."  *See* Defendant's Memorandum Regarding Correction at 5, *United States v. Bijan Rafiekian*, No. 18-cr-457 (E.D. Va. July 5, 2019) (Doc. 262).

of that allegation, to include that his knowledge of the Government of Turkey's role came from

what Rafiekian told him.  *See* Grand Jury Tr. at 5, 6, 12-13.[10]

Once the *Rafikeian* prosecutors made the rational, strategic determination not to call the

defendant as a witness, the government moved to designate the defendant as a coconspirator in

order to admit an exhibit as a statement of a coconspirator pursuant to FED. R. EVIDENCE

801(d)(2)(E).  *See* Notice of Correction to the Record at 2, *United States v. Bijan Rafiekian*, No.

18-cr-457 (E.D. Va. July 3, 2019) (Doc. 261); *see also* Hearing Transcript at 23-25, *United*

*States v. Bijan Rafiekian*, No. 18-cr-457 (E.D. Va. July 12, 2019) (Doc. 309).  This designation

would have permitted the introduction at the *Rafiekian* trial of a single email, Exhibit 40,

discussed *supra* at 11, authored by the defendant, which would have provided some evidence of

the direction and control exercised over the project by the Government of Turkey.[11]

Remarkably, the defendant, through his counsel, then affirmatively intervened in the *Rafiekian*

case and filed a memorandum opposing the government's theory of admissibility on the grounds

that the defendant was not charged or alleged as a coconspirator.  *See* Flynn Memorandum

Opposing Designation, *United States v. Bijan Rafiekian*, No. 18-cr-457 (E.D. Va July 8, 2019)

(Doc. 270).  This action was wholly inconsistent with the defendant assisting (let alone

---

[10]     The import of such testimony is evidenced by the district judge's decision to overturn the
guilty verdict in the case, which was based in part on his finding that there was "no substantial
evidence that Rafiekian agreed to operate subject to the direction or control of the Turkish
government."  *United States v. Rafiekian*, No. 18-cr-457, 2019 WL 4647254, at *12 (E.D. Va.
Sept. 24, 2019).  The district judge's decision to overturn the verdict is currently on appeal to the
Fourth Circuit. *United States v. Rafekian*, No. 19-4803 (4th Cir. Oct. 31, 2019).

[11]     Because the Court found that there was insufficient evidence that Rafiekian was, himself,
a member of a conspiracy, this document was entered into evidence only to show that it had been
received by Rafiekian, not for its truth.

substantially assisting) or cooperating with the government in that case.[12] Accordingly, while the defendant initially helped the prosecutors in EDVA bring the *Rafiekian* case, he ultimately hindered their prosecution of it.

The Guidelines provide for a downward departure, upon "motion of the government," if the "defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense."  U.S.S.G. § 5K1.1. As the Guidelines make clear, the discretion to seek such a departure rests with the government. The plea agreement is explicit on that point, stating that the "[g]overnment determines" whether the defendant "has provided such substantial assistance" to merit a departure, and that such a determination "is within the *sole* discretion of the Government and not reviewable by the Court."  Plea Agmt at 9 (emphasis

---

[12]      Any claim by the defendant that the *Rafiekian* prosecution was aided by his agreement to waive the attorney-client privilege and the attorney work-product doctrine regarding his attorneys' preparation and filing of the FARA documents would be unfounded.  The defendant explicitly did not waive any privileges or protections with respect to the preparation and filing of the FARA documents.  No waiver occurred because the government (and the defendant's attorneys) did not believe a waiver for such information was necessary—information provided to a lawyer for the purposes of a public filing is not privileged.  The district judge in *Rafiekian* agreed with that conclusion, and permitted the defendant's attorneys to testify about what the defendant and Rafiekian told them because those statements were not privileged or protected as opinion work product.  *See United States v. Rafiekian*, No. 18-cr-457, 2019 WL 3021769, at *2, 17-19 (E.D. Va. July 9, 2019).

added).[13]  Here, in the sole exercise of its discretion, the government withdraws its prior motion

for a downward departure pursuant to Section 5K1.1.[14]

### B. **Analysis of Factors Enunciated in 18 U.S.C. § 3553(a)**

The factors enunciated in Section 3553(a) all favor the imposition of a sentence within

the Guidelines range.  The defendant's offense is serious, his characteristics and history present

aggravating circumstances, and a sentence reflecting those factors is necessary to deter future

criminal conduct.  Similarly situated defendants have received terms of imprisonment.

i.        *Nature and Circumstances of the Offense*

Public office is a public trust.  The defendant made multiple, material and false

statements and omissions, to several DOJ entities, while serving as the President's National

Security Advisor and a senior member of the Presidential Transition Team.  As the government

represented to the Court at the initial sentencing hearing, the defendant's offense was serious.

*See* Gov't Sent'g Mem. at 2; 12/18/2018 Hearing Tr. at 32 (the Court explaining that "[t]his

crime is very serious").

The integrity of our criminal justice depends on witnesses telling the truth.  That is

precisely why providing false statements to the government is a crime. As the Supreme Court has

noted:

---

[13]        The government does not believe it is prudent or necessary to relitigate before this Court
every factual dispute between the defendant and the *Rafiekian* prosecutors.  The above
explanation of the decision not to call the defendant as a witness in the *Rafiekian* trial is provided
as background for the Court to understand the basis for the government's decision to exercise its
discretion to determine that the defendant has not provided substantial assistance to the
government.  The government is not asking this Court to make factual determinations concerning
the defendant's interactions with the *Rafiekian* prosecutors, other than the undisputed fact that
the defendant affirmatively litigated against the admission of evidence by the government in that
case.

[14]        The government notes its decision to withdraw its motion for substantial assistance has
no impact on the applicable Guidelines range, which will remain 0 to 6 months of incarceration.

> In this constitutional process of securing a witness' testimony, perjury simply has no place whatsoever. Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings. Effective restraints against this type of egregious offense are therefore imperative. The power of subpoena, broad as it is, and the power of contempt for refusing to answer, drastic as that is -- and even the solemnity of the oath -- cannot insure truthful answers. Hence, Congress has made the giving of false answers a criminal act punishable by severe penalties; in no other way can criminal conduct be flushed into the open where the law can deal with it.

*United States v. Mandujano*, 425 U.S. 564, 576 (1975); *see also Nix v. Whiteside*, 457 U.S. 157, 185 (1986) ("[t]his Court long ago noted: 'All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth.'") (quoting *In re Michael*, 326 U.S. 224, 227 (1945)). All persons carry that solemn obligation to tell the truth, especially to the FBI.

The defendant's repeated failure to fulfill his obligation to tell the truth merits a sentence within the applicable Guidelines range. As the Court has already found, his false statements to the FBI were material, regardless of the FBI's knowledge of the substance of any of his conversations with the Russian Ambassador. *See* Mem. Opinion at 51-52. The topic of sanctions went to the heart of the FBI's counterintelligence investigation. Any effort to undermine those sanctions could have been evidence of links or coordination between the Trump Campaign and Russia. For similar reasons, the defendant's false statements in his FARA filings were serious. His false statements and omissions deprived the public and the Trump Administration of the opportunity to learn about the Government of Turkey's covert efforts to influence policy and opinion, including its efforts to remove a person legally residing in the United States.

The defendant's conduct was more than just a series of lies; it was an abuse of trust. During the defendant's pattern of criminal conduct, he was the National Security Advisor to the President of the United States, the former Director of the Defense Intelligence Agency, and a retired U.S. Army Lieutenant General. He held a security clearance with access to the

government's most sensitive information.  The only reason the Russian Ambassador contacted the defendant about the sanctions is because the defendant was the incoming National Security Advisor, and thus would soon wield influence and control over the United States' foreign policy. That is the same reason the defendant's fledgling company was paid over $500,000 to work on issues for Turkey.  The defendant monetized his power and influence over our government, and lied to mask it.  When the FBI and DOJ needed information that only the defendant could provide, because of that power and influence, he denied them that information.  And so an official tasked with protecting our national security, instead compromised it.

       ii.     <u>*History and Characteristics of the Offender*</u>

The defendant's extensive military record, as described in his prior sentencing submission, presents a clear factor in mitigation.  *See* Def. Sent'g Mem. at 7-12.  However, that extensive record and government service, at the highest levels of the national security apparatus, and his "many years" of working with the FBI, should have made him particularly aware of the harm caused by providing false statements to the government.  *See id.* at 13.  That work also exposed him to the threat posed by foreign governments, in particular Russia, seeking to covertly influence our government and democracy.

      iii.     <u>*The Need for Adequate Deterrence and to Promote Respect for the Law*</u>

The sentence should adequately deter the defendant from violating the law, and to promote respect for the law.  It is clear that the defendant has not learned his lesson.  He has behaved as though the law does not apply to him, and as if there are no consequences for his actions.  That has been reinforced by his failure to accept responsibility and by his affirmative litigation against the admission of evidence proffered by the government in the *Rafiekian* case.

The sentence should also to deter others from lying to the government.  The FBI protects our homeland from terrorism, espionage, cyber-based attacks, and all other manner of threats.

Lying to the FBI, in any context, cannot be tolerated.  That is particularly true in a counterintelligence investigation targeting efforts by a foreign government to interfere in our democratic process—a threat that continues to this day.  Our criminal justice system depends on the solemn obligation of witnesses to tell the truth, regardless of their motives to do otherwise.  Minimizing the seriousness of the defendant's actions would tempt future witnesses to flout that obligation.  Similarly, FARA is at the focal point of the government's efforts to combat covert foreign influence.  That is particularly the case for senior government officials, who should be held to a higher standard when it comes to being honest and transparent, especially when those officials hold positions of trust and power.

       *iv.*    <u>*Avoiding Unwarranted Sentencing Disparities*</u>

It goes without saying that this case is unique.  *See* 12/18/2018 Hearing Tr. at 43 (Court noting that "[t]his case is in a category by itself").  Few courts have sentenced a high-ranking government official and former military general for making false statements.  And the government is not aware of any case where such a high-ranking official failed to accept responsibility for his conduct, continued to lie to the government, and took steps to impair a criminal prosecution.  Accordingly, while Section 3553(a)(6) requires the court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," there are no similarly situated defendants.

Although other persons investigated by the SCO pleaded guilty to lying to the FBI and were sentenced to varying terms of incarceration, those individuals and their conduct are easily distinguishable.  *See id.* at 42-43 ("The Court's of the opinion that those two cases aren't really analogous to this case.  I mean, neither one of those individuals was a high-ranking government official who committed a crime while on the premises of and in the West Wing of the White House.").  Alex van der Zwaan lied to the SCO, pled guilty to violating 18 U.S.C. § 1001, and

was sentenced to 30 days incarceration and a fine of $20,000.  *See United States v. van der Zwaan*, No. 18-cr-31 (ABJ).  George Papadopoulos likewise lied to the SCO, pled guilty to violating 18 U.S.C. § 1001, and was sentenced to serve 14 days incarceration, to perform 200 hours of community service, and pay a fine of $9,500.  *See United States v. Papadopoulos*, No. 17-cr-182 (RDM).  Neither defendant was a high-ranking government official, held a position of trust vis-à-vis the United States, held a security clearance, had a special understanding of the impact of providing misleading information to investigators, or denied responsibility for his unlawful conduct.

The most recent sentencing pertaining to an individual charged by the SCO is also distinguishable.  Last month, Richard W. Gates III was sentenced to 45 days of intermittent confinement during a 36-month probationary period for lying to the SCO and conspiring to commit multiple offenses, including tax fraud and violating FARA.  *See United States v. Richard W. Gates III*, 17-CR-201-2 (ABJ).  As Judge Amy Berman Jackson noted at the sentencing hearing, Gates' assistance was "extraordinary," including more than 50 interviews and truthful testimony in three different federal trials (Paul Manafort, Gregory Craig, and Roger Stone).  *See Sentencing Hearing Transcript at 30, 35, United States v. Richard W. Gates III*, 17-CR-201-2 (D.D.C. Dec. 17, 2019).  Moreover, Gates accepted responsibility for all of his unlawful conduct, including uncharged conduct.  *See id.* at 26, 30-31 ("it is telling and it is particularly positive that this defendant has accepted responsibility").  The Court granted the government's motion for a significant downward departure pursuant to Section 5K1.1 for providing substantial assistance, gave Gates credit for accepting responsibility, and still sentenced him to 45 days of confinement. *See id.* at 8, 38.

Just over one year ago, James A. Wolfe, who had served as the Director of Security for the Senate Select Committee on Intelligence for 30 years, was sentenced to two months of

incarceration and a fine of $7,500 for lying to the FBI.  *See United States v. James A. Wolfe,* 17-CR-170 (KBJ).  At sentencing, Judge Ketanji Brown Jackson stressed that "[l]ying to the FBI is a serious crime, especially when it is committed by a government official who understands the importance of truthfulness in the context of a national security investigation."  *See* Sentencing Hearing Transcript at 60, *United States v. James A. Wolfe*, 17-CR-170 (D.D.C. Dec. 20, 2018). The court concluded that Wolfe's position—which was far less significant than the defendant's position as National Security Advisor—was an aggravating factor to consider at sentencing, and one that distinguished his case from those of Papadopoulos and van der Zwaan.  Moreover, in that case, the defendant received credit for accepting responsibility.

In the above cases, a term of imprisonment was imposed.  The government acknowledges that the defendant's history of military service, and his prior assistance to the government, though not substantial, may distinguish him from these other defendants.   The government asks the Court to consider all of these factors, and to impose an appropriate sentence within the Guidelines range.

# CONCLUSION

For the foregoing reasons, the government submits that a sentence within the Guidelines range is appropriate and warranted.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845

By: _____/s/_____

Brandon L. Van Grack
Special Assistant U.S. Attorney
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 233-0968

Jocelyn Ballantine
Assistant United States Attorney
555 4th Street, NW
Washington, D.C. 20530
(202) 252-7252

Dated:  January 7, 2020

## **CERTIFICATE OF SERVICE**

I, Jocelyn Ballantine, certify that I caused to be served a copy of the foregoing by electronic means on counsel of record for the defendant on January 7, 2020.


_____/s/_____
Jocelyn Ballantine
Assistant United States Attorney
555 4th Street, NW
Washington, D.C. 20530
(202) 252-7252
*Attorney for the United States of America*