# Attachment 4



UNCLASSIFIED//FOUO

FEDERAL BUREAU OF INVESTIGATION

Date of entry    07/09/2019

(U//FOUO) On 7/3/2019 Rob KELNER of Covington & Burling LLP, was interviewed at the Eastern District of Virginia (EDVA) United States Attorneys Office (USAO). Present for and conducting the interview were Counterintelligence and Export Control Section Trial Attorney Evan Turgeon, Assistant United States Attorney (AUSA) James P. Gillis, and Special Agent (SA) Bryan T. Alfredo. KELNER was represented by his attorneys, Bruce A. Baird, Roger Pollack. Also present was EDVA paralegal Latoya Horsford, EDVA AUSA Neil Hammerstrom, Michael Flynn's attorney Sidney Powell who was accompanied by Jesse Binall and an unidentified associate, Flynn Intel Group attorney John Washington, Senior Assistant Special Counsel Brandon Van Grack, D.C. USAO AUSA Jocelyn Ballantine and AUSA Deborah Curtis. After being advised of the identities of the interviewing Agents and the nature of the interview, KELNER provided the following information based on the best of his recollection:

(U//FOUO) {Note: KELNER was presented with a document, Government Exhibit (GEX) 14, email sent by Ekim ALPTEKIN to Michael FLYNN and Bijan RAFIEKIAN on 8/8/2016.}

(U//FOUO) KELNER believed he had asked RAFIEKIAN about this particular email during the one of the interviews KELNER conducted with RAFIEKIAN. RAFIEKIAN described the conversation in the email to KELNER as having been a discussion about an earlier project which did not come to fruition.

(U//FOUO) When asked by KELNER who "MFA" was in reference to in the email, RAFIEKIAN was not certain if it was in reference to a Turkish official or FLYNN. KELNER was not certain he asked RAFIEKIAN about this reference specifically.

(U//FOUO) KELNER did not recall if he had ever asked RAFIEKIAN what "PM" referred to in GEX 14.

UNCLASSIFIED//FOUO

Investigation on  07/03/2019  at  Alexandria, Virginia, United States (In Person)

File #                                                                Date drafted  07/08/2019

by  Bryan T. Alfredo

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**(U//FOUO) {Note: KELNER was presented with a document, GEX 24B, email sent from RAFIEKIAN to FLYNN and Michael FLYNN Jr. sent on 9/9/2016}**

(U//FOUO) KELNER believed he had asked RAFIEKIAN about this email during the second, of his two interviews, conducted of RAFIEKIAN. KELNER recalled having asked RAFIEKIAN to describe the part in the email, "As I mentioned, the meeting is with high level audience (Cabinet+level) related to "CONFIDENCE"". RAFIEKIAN informed KELNER the aforementioned meeting had nothing to do with the project FIG worked on for INOVO and it was more of a "happenstance" with similar issues FIG/INOVO were having with its project. The aforementioned meeting and the FIG/INOVO project had overlapping subject matter. This was the impression KELNER got from RAFIEKIAN, although he did not remember the exact words RAFIEKIAN used.

**(U//FOUO) OP-ED**

(U//FOUO) KELNER did not recall having asked RAFIEKIAN about the timing of the published FLYNN 11/8/2016 Op-Ed.

**(U//FOUO) {Note: KELNER was presented with a document, GEX 43A, email dated 10/13/2016.}**

(U//FOUO) KELNER had seen the email presented to him and confirmed it was related to GEX 43B, Project Confidence Talking Points.

**(U//FOUO) {Note: KELNER was presented with a document, GEX 93B, Letter from Arent Fox to ALPTEKIN.}**

(U//FOUO) KELNER did not recall having discussed this letter with RAFIEKIAN.

**(U//FOUO) {Note: KELNER was presented with a document, GEX 22A, email sent from RAFIEKIAN to ALPTEKIN and FLYNN on 9/3/2016.}**

(U//FOUO) The email was in reference to the attached FIG/INOVO contract. When asked about the statement in the email, "We have been at work on this engagement since July 31st", KELNER thought it was somewhat consistent with what RAFIEKIAN informed him of about the timing of the FIG/INOVO contract. KELNER did not recall having discussed this email with RAFIEKIAN.

**(U//FOUO) {Note: KELNER was presented with a document, GEX 25C,**

email/attachment sent from RAFIEKIAN to FLYNN and FLYNN Jr on 9/12/2016.}

(U//FOUO) KELNER described this email as having been associated with the FIG/ALPTEKIN contract. KELNER did ask RAFIEKIAN about the Draft Advisory and this particular email during the time he interviewed him. After ALPTEKIN and FIG agreed on the contract, RAFIEKIAN informed KELNER that ALPTEKIN had asked for a refund for public relations and lobbying services which were ultimately not going to be conducted as a service provided by FIG to INOVO. RAFIEKIAN claimed the audit trail mentioned in the email was necessary for the terms of the refund.

**(U//FOUO) Refund vs Kickbacks**

**(U//FOUO) {Note: KELNER was presented with a document, GEX 25A, FIG Bank of America records (BOA).}**

(U//FOUO) KELNER recalled having previously reviewed the BOA records. Regarding the $40,000 payments from FIG to INOVO recorded in FIG's accounting records, labeled as "Consulting Fees", RAFIEKIAN informed KELNER that he, RAFIEKIAN, was not responsible for handling FIG's accounting records and it must have been labeled "Consulting Fees" as a mistake.

**(U//FOUO) {Note: KELNER was presented with a document, GEX 19, email sent from RAFIEKIAN to ALPTEKIN and FLYNN on 8/25/2016.}**

(U//FOUO) KELNER believed he asked RAFIEKIAN about this specific email during his interview of him. KELNER did not recall RAFIEKIAN's reaction to the email when asked about it. Regarding the 20% of the $150K per month going back to ALPTEKIN as the advisory support cost provided to INOVO, mentioned in the email, RAFIEKIAN informed KELNER there were discussions of ALPTEKIN providing advisory services on an earlier project that did not come to fruition. The funds going to ALPTEKIN/INOVO from FIG were for services not performed.

**(U//FOUO) {Note: KELNER was presented with a document, GEX 33C, email sent from RAFIEKIAN to FLYNN and ALPTEKIN on 10/11/2016.}**

(U//FOUO) KELNER recalled having discussed an email with RAFIEKIAN during his interview of him which documented the sending of a payment in the amount of $40,000 from FIG to INOVO. KELNER did not recall if it was this specific

email presented to him which triggered his discussion with RAFIEKIAN. RAFIEKIAN informed KELNER he did not always choose the correct words and the money sent back to INOVO/ALPTEKIN was supposed to be refunds for services not rendered.

**(U//FOUO) Foreign Agents Registration Act (FARA) Filing**

(U//FOUO) KELNER opined RAFIEKIAN was upset that FIG registered under FARA. During a late –night phone call RAFIEKIAN made to KELNER, which KELNER said he was certain occurred before the 3/7/2017 filing, KELNER described RAFIEKIAN as distressed about the upcoming filing and informed KELNER that he, RAFIEKIAN, had a heart condition. RAFIEKIAN objected to the term "kickback" having been used in the FARA draft in reference to political contributions, and he wanted the term removed.

(U//FOUO) KELNER informed agents the final draft of the FARA filing prepared by Covington was sent to FLYNN through his attorney, Kristen VERDERAME.

(U//FOUO) KELNER may have learned from VERDERAME or ALPTEKIN's attorney [Mathew] Nolan that ALPTEKIN was not happy with FIG having filed under FARA.

**(U//FOUO) {Note: KELNER was presented with a document, GEX 13, email sent from RAFIEKIAN to ALPTEKIN and FLYNN on 8/4/2016.}**

(U//FOUO) KELNER did not recall if he discussed this email with RAFIEKIAN during one of the interviews he conducted with him. KELNER conducted two interviews of RAFIEKIAN and at least one phone call, with the possibility of more, which Covington used to obtain information to file the FARA application on behalf of FIG. Pertaining to the draft of FIG's FARA application, the Department of Justice (DOJ) FARA unit did review a draft of the filing. The DOJ FARA unit did notice the $40,000 payment sent from FIG to INOVO. KELNER's understanding on what the FARA unit informed Covington's Brian SMITH, was that they asked, "What's that about?" SMITH informed the FARA unit he noticed this in FIG's accounting records.

(U//FOUO) KELNER recalled having spoken to SMITH about the draft and SMITH provided minor comments of it. When asked if anything prevented Covington/KELNER from speaking with RAFIEKIAN again before the FARA filing, KELNER described he could not answer the question given the potential

mentioning of work product.

(U//FOUO) When asked why he, KELNER, listed on the FARA application the money sent back to INOVO as "Consulting Fees" after he was informed by RAFIEKIAN the money sent back to INOVO were for refunds, KELNER responded by saying this was work product information.

(U//FOUO) An email was sent from Covington/SMITH to VERDERAME, and then from VERDERAME to FLYNN which contained the FARA draft. SMITH asked Verderame to have FLYNN review the FARA application so Covington could apply his, FLYNN's, electronic signature to it. FLYNN responded, according to KELNER, "Yes, approved, this is as discussed" to the email via VERDERAME which she then sent to SMITH. To the best of his recollection, KELNER did not recall having phone calls with FLYNN regarding feedback on the FARA draft.

### (U//FOUO) Information provided to KELNER by FLYNN prior to the 3/7/2017 FARA filing

(U//FOUO) FLYNN did not inform KELNER of the Turkish officials who were involved with the FIG/INOVO project. FLYNN did not indicate to KELNER that Turkish officials gave the go-ahead to proceed with the project.

(U//FOUO) FLYNN informed KELNER the September 2016 meeting in New York City which consisted of Turkish officials and members of FIG was organized by ALPTEKIN. FLYNN informed KELNER the meeting was late at night and acted as a meet-and-greet about the situation in Turkey. FLYNN informed KELNER the meeting included a brief reference to the work FIG performed for INOVO but FIG's work for INOVO was not a focus of the meeting, which consisted mainly of listening to the Turkish officials.

(U//FOUO) FLYNN did not inform KELNER that Fethullah GULEN was a focus of the FIG/INOVO project. FLYNN did not inform KELNER that ALPTEKIN was a conduit or go-between for FIG and Turkish officials during the project. FLYNN did not inform KELNER that ALPTEKIN talked to Turkish government officials about the FIG/INOVO project. FLYNN described the FIG/INOVO project as dealing with improving the economic relations between Turkey and the United States. FLYNN never provided inconsistences to KELNER on the work FIG provided to INOVO.

**(U//FOUO) {Note: at approximately 4pm (approximately two hours into the interview of KELNER), Sidney Powell asked Turgeon why KELNER was being asked questions about FLYNN considering RAFIEKIAN was the defendant. Turgeon explained to Powell that KELNER could expect these types of questions during his cross examination by defense attorneys.}**

(U//FOUO) KELNER did not recall having asked FLYNN about what/if any work product was completed by FIG for INOVO which pertained to Gulen. KELNER understood from FLYNN that FIG's work for INOVO focused on the business environment in Turkey.

(U//FOUO) KELNER was informed by FLYNN the published 11/8/2016 Op-Ed article in The Hill was something he, FLYNN, had wanted to do out of his own interest. FLYNN wanted to show how Russia was attempting to create a wedge between Turkey and the United States. FLYNN informed KELNER the Op-Ed was not on behalf of FIG's project with INOVO.