# Attachment 6

FD-302 (Rev. 5-8-10)                                    - 1 of 7 -



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry  07/27/2018

**DOCUMENT RESTRICTED TO CASE PARTICIPANTS**
This document contains information that is restricted to case participants.

(U//FOUO) On 6/21/2018 ROB KELNER of Covington & Burling LLP, was interviewed at Covington & Burling LLP, 850 10th Street NW, Washington, DC 20001. Present for and conducting the interview were Trial Attorney Counterintelligence and Export Control Section Evan Turgeon, Assistant United States Attorney (AUSA) James P. Gillis, Senior Assistant Special Counsel Brandon Van Grack, and Special Agent (SA) Bryan T. Alfredo. KELNER was represented by his attorneys, Bruce A. Baird and Roger Pollack of Covington & Burling LLP. After being advised of the identities of the interviewing Agents and the nature of the interview, KELNER provided the following information based on the best of his recollection:

**Sources of products used by Covington to complete the Flynn Intelligence Group (FIG) FARA filing**

(U//FOUO) The sources of products used by Covington to complete the Flynn Intel Group (FIG) Foreign Agents Registration Act (FARA) filing came from multiple parties. Covington conducted separate interviews of Bijan RAFIEKIAN and Michael T. FLYNN. RAFIEKIAN was possibly interviewed a second time by Covington. Michael G. FLYNN (FLYNN JR) was present for FLYNN's interview with Covington. KELNER did not recall if FLYNN JR provided information during the interview of FLYNN. Covington received and reviewed records consisting of documentation, emails and accounting records from FIG. These records from FIG were given to Covington by FLYNN JR. Kristen VERDERAME, who represented both FIG and FLYNN personally, may have handed the records over to Covington on behalf of FLYNN JR. Up to the 3/7/2017 FIG FARA filing, most of the communication associated with the FIG FARA filing was conducted through VERDERAME and Covington. VERDERAME shared conversations she had with RAFIEKIAN with Covington. Prior to the 1/11/2017 letter drafted by Covington, Covington communicated with FLYNN JR. It is possible Brian SMITH or Alexandra LANGTON, both of Covington, received the records directly from FLYNN JR. Some public records, such as the Lobbying Disclosure Act (LDA) were used for the FIG FARA filing. It

UNCLASSIFIED//FOUO

Investigation on  06/21/2018  at  Washington, District Of Columbia, United States (In Person)

File # ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   Date drafted  06/21/2018

by  Bryan T. Alfredo

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

UNCLASSIFIED//FOUO

Continuation of FD-302 of  (U//FOUO) Interview of Rob Kelner  , On  06/21/2018  , Page  2 of 7

was possible during this time Covington started to review and collect encrypted communication from FIG. FIG's encrypted communications were stored via an iCloud service provided by Virtue. Virtue was a service provider used by FIG. Virtue's services enabled FIG employees to access FIG records on their phones. Virtue was represented by Morrison & Foerster LLP. Additional documents were produced by Virtue and given to Covington for FIG's FARA filing. FIG was partially shut down during the time Covington gathered records for FIG's FARA filing. This made it harder to collect records from FIG and Virtue. KELNER was not aware if FIG's computer systems were still operating when FIG was shut down. KELNER did not know if FIG's computer systems still existed. All of FIG's records or systems accessed by Covington were preserved. Covington primarily relied on the records produced by FLYNN JR to draft FIG's FARA application. Covington possibly received emails from RAFIEKIAN to be used for the FARA filing. Michael BOSTON, project lead for the INOVO project, was interviewed by Covington. Bob [Robert] KELLEY, General Counsel for FIG, was interviewed the same day as BOSTON. Covington received additional FIG records from BOSTON. FLYNN JR was interviewed by SMITH and Stephen ANTHONY of Covington. KELNER did not participate in the interview of FLYNN JR. KELNER spoke with Ekim ALPTEKIN's, attorney, Matthew NOLAN of Arent Fox LLP. NOLAN produced emails to Covington on behalf of ALPTEKIN. Covington spoke with Sphere Consulting and Sphere Government Relations (SGR) General Council, Benjamin GINSBERG and Grayson YEARGIN of Jones Day. Covington also interviewed James CORTOVICH [founder and operator of SGR] and Graham MILLER [employed by SGR] who were represented by Jones Day. Brian MCCAULEY [employed by FIG] was interviewed by Covington prior to FIG FARA filing. KELNER did not recall an interview of Tim NEWBERRY [founder of the White Canvass Group (WCG) and provided open source research for FIG].

(U//FOUO) KELNER was the primary supervisor of the team formed by Covington to file FARA on FIG's behalf. SMITH and LANGTON were the principles of the team. Covington's technical staff participated in and assisted Covington's team with the gathering of records for FIG's FARA filing.

### INOVO BV Contract

(U//FOUO) When asked if he was aware, prior to FIG's FARA filing, an agreement for FIG to pay 20% to ALPTEKIN, KELNER and Covington observed accounting transactions between INOVO and FIG. Covington had a draft contract between FIG and ALPTEKIN which detailed payments to ALPTEKIN. Covington maintained this draft contract prior to FIG's FARA filing. Covington did not possess the executed contract/documentation between both parties concerning these payments. Covington did have information from RAFIEKIAN's second interview about the contract between FIG and ALPTEKIN.

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

Continuation of FD-302 of (U//FOUO) Interview of Rob Kelner , On 06/21/2018 , Page 3 of 7

RAFIEKIAN informed Covington the payments being sent from FIG to INOVO were refunds because ALPTEKIN was upset he did not receive public relations (PR) and lobbying services from FIG. RAFIEKIAN did not view the contract between FIG and INOVO as having been executed by FIG, which warranted the refunds. KELNER recalled RAFIEKIAN stated the money sent back to ALPTEKIN were refunds and not consulting fees. RAFIEKIAN could not explain why FIG had logged the transactions to INOVO as a consulting fee. RAFIEKIAN did not keep the accounting records for FIG. KELNER recalled RAFIEKIAN informed him that he, RAFIEKIAN, had not always chosen the correct words to use in emails. RAFIEKIAN maintained that the payments were refunds and not consulting fees that were paid to ALPTEKIN.

(U//FOUO) When asked about what statements RAFIEKIAN made which pertained to payments from FIG, KELNER did not recall RAFIEKIAN offering an explanation about why the two payments from FIG to INOVO were in close proximity. KELNER did not recall RAFIEKIAN having informed him about why payments were going from FIG to ALPTEKIN and not to INOVO. In general and in a later correspondence, RAFIEKIAN focused on the payments having been refunded for the contract not being fulfilled by FIG. The fees and payments sent back to ALPTEKIN were for public relations and lobbying services which were not completed by FIG and which ALPTEKIN expected the service of FIG. RAFIEKIAN described lobbying on FIG's Project Confidence (PC), though he did not use the exact wording of "lobbying." RAFIEKIAN did have Congressional contact with Congressional staffer Miles [TAYLOR] during the time period of FIG's contract with INOVO and prior to filling the FIG's FARA registration. The meeting with TAYLOR did not relate to INOVO, however, during the course of communication, the topic of Turkey did come up. KELNER was not aware of the specific conversations RAFIEKIAN had with Congressman ROHRABACHER and did not recall how ROHRABACHER's name came up.

(U//FOUO) RAFIEKIAN and KELNER did not discuss the topic of a draft consulting agreement between FIG and ALPTEKIN. RAFIEKIAN did not inform KELNER or explain to him why there were separate agreements. Prior to the FARA filing, FLYNN was not able to give an explanation of the $40,000 in payments sent from FIG to ALPTEKIN/INOVO. The topic of the two payments were mentioned by FLYNN and not explained. RAFIEKIAN did not explain to KELNER why FIG's records indicated the payments to ALPTEKIN were recorded as consulting fees and not refunds. KELNER recalled when preparing FIG's FARA filing, RAFIEKIAN objected to FIG's accounting records which indicated payments from/to ALPTEKIN/INOVO as consulting fees and not refunds and that this was discussed between RAFIEKIAN and ALPTEKIN. KELNER was aware ALPTEKIN would be upset if the payments were described as consulting fees. KELNER did not recall why payments from INOVO to FIG

UNCLASSIFIED//FOUO

decreased over time after each payment. The subject of the consulting agreement and whether ALPTEKIN would receive a consulting fee may have come up in other interviews conducted by KELNER/Covington with FLYNN JR. FLYNN JR was in charge of keeping FIG's accounting records. FLYNN JR recalled RAFIEKIAN had informed him to wire funds to ALPTEKIN and did not give an explanation why the funds were going to him.

(U//FOUO) It was fair to say Covington did not produce emails received from FIG employees to be used in the FIG FARA filing. KELNER was uncertain if Covington received all the emails from RAFIEKIAN, ALPTEKIN and FLYNN which could have been used for FIG's FARA filing. Covington did not receive ALPTEKIN'S emails or text messages. Covington received answers proposed to ALPTEKIN from his general council, NOLAN, who provided the information voluntarily. Covington received information from ALPTEKIN'S attorneys and not directly from him.

(U//FOUO) KELNER did review FIG's Lobbying Disclosure Agreement (LDA). RAFIEKIAN informed Covington he had relied on KELLEY for advice on the LDA filing. FLYNN understood from RAFIEKIAN, that he, RAFIEKIAN, had worked with KELLEY on the LDA.

**{Note: KELNER was presented with a document, Declaration of Robert K. KELLEY}**

(U//FOUO) KELLEY's declaration reflects what KELLEY had informed Covington. In paragraph 10 of KELLEY's declaration, KELLEY did not inform KELNER why he purposely put a false statement in the FARA filing, specifically the FARA filing which contained wording on Congressional House(s) bills. KELNER interviewed KELLEY prior to KELLEY's declaration. KELNER did not prepare KELLEY's declaration. KELLEY's declaration was obtained by an investigator of Covington and hired specifically for this purpose. KELNER did not know who specifically drafted KELLEY's declaration. Paragraph 11 of KELLEY's declaration, stating he never performed lobbying services for FIG, reflected and was similar to what KELLEY had informed Covington. KELNER was not certain who the lawyer from Jones Day is referred to in paragraph 15 of KELLEY's declaration. KELNER did not recall conversations pertaining to House(s) bills having been mentioned in his interview with KELLEY. KELLEY was familiar with FARA and had experience with LDA. KELNER did not recall if RAFIEKIAN suggested to KELLEY to file FARA on FIG's behalf.

(U//FOUO) RAFIEKIAN was referred to Covington by CORTOVICH. RAFIEKIAN contacted Covington and spoke with one of KELNER'S partners, Robert LENHARD. RAFIEKIAN informed LENHARD of FIG and that he may have to file FARA. RAFIEKIAN informed LENHARD that FIG intended to acquire a Dutch

client. RAFIEKIAN called Covington on behalf of FIG for legal advice. LENHARD informed RAFIEKIAN he was a Democrat, which per RAFIEKIAN, disqualified LENHARD from being able to assist FIG with legal advice. LENHARD referred RAFIEKIAN to KELNER who RAFIEKIAN then emailed and eventually called. KELNER asked RAFIEKIAN if FIG was associated with FLYNN. KELNER was not aware of FIG, though he was aware of FLYNN. KELNER informed RAFIEKIAN he was a Republican, however, he had been a "very vocal never Trumper" and displayed these political views on social media. RAFIEKIAN informed KELNER he could not use him for legal advice because of KELNER's view on President Donald J. TRUMP. KELNER recommended Jan BARAN of Wiley Rein LLC to RAFIEKIAN.

(U//FOUO) RAFIEKIAN informed KELNER he had handed the LDA matter over to KELLEY and KELLEY handled it from there. KELNER did not recall RAFIEKIAN having said he had reviewed the substance of the LDA filing.

(U//FOUO) When asked what facts he knew regarding Turkey's involvement with PC, FLYNN had informed Covington the client for PC was INOVO. FLYNN recalled a meeting he had with Turkish ministers in New York City (NYC) in September of 2016. The meeting in NYC was a meet-and-greet and a brief discussion of PC. Turkish ministers talked to FLYNN and members of FIG about issues Turkey faced.

(U//FOUO) RAFIEKIAN informed Covington that discussions between ALPTEKIN and Turkey pertained to entering an agreement on "Project Truth" (PT). The purpose for PT was to deter and fight against radical Islam. Turkey eventually backed out of PT and engaged in PC. ALPTEKIN did not give RAFIEKIAN an explanation why Turkey backed out of PT. RAFIEKIAN did not indicate Turkey was going to be involved with dealings with INOVO. RAFIEKIAN informed Covington the meeting in NYC was unrelated to PC and was an opportunity to talk to Turkish ministers about radical Islam. KELNER was not certain if RAFIEKIAN had brought up Fetullah GULEN at the NYC meeting. KELNER found out later, through emails, PC was the purpose of the NYC meeting.

(U//FOUO) FLYNN indicated to KELNER he had no recollection of back-and-forth conversations regarding business dealings between FIG and Turkey. FLYNN indicated he did not have a recollection of emails associated with Turkey's involvement with PC. FLYNN did not indicate to KELNER/Covington that ALPTEKIN talked to Turkish government officials about PC. FLYNN, RAFIEKIAN and Michael BOSTON informed Covington the INOVO contract for PC was for the purpose of improving U.S. business confidence in Turkey.

(U//FOUO) When asked what facts were provided to Covington about PC, which contradict FIG's FARA filing, KELNER explained according to RAFIEKIAN,

UNCLASSIFIED//FOUO

Continuation of FD-302 of (U//FOUO) Interview of Rob Kelner , On 06/21/2018 , Page 6 of 7

GULEN was the problem and was destroying the confidence in Turkey. In order to increase confidence in Turkey, GULEN had to be stopped. KELNER did not recall if RAFIEKIAN mentioned why GULEN's name was masked in some of FIG's documents.

### Op-ed

(U//FOUO) FLYNN informed Covington he and RAFIEKIAN jointly discussed the possibility of writing an opinion editorial (op-ed). FLYNN had wanted to write an op-ed. FLYNN thought it would be helpful to the TRUMP Presidential Campaign to post an op-ed which concerned Turkey. FLYNN described the op-ed as having been completed on his own behalf and not for PC. RAFIEKIAN informed Covington the op-ed was FLYNN's idea and was not part of PC and was just something FLYNN wanted to do. RAFIEKIAN had sent the op-ed to Hank COX for editing. RAFIEKIAN sent the op-ed to ALPTEKIN to get his reaction. ALPTEKIN did not want the op-ed published and thought it would hurt Turkish President, ERDOGAN. ALPTEKIN thought the op-ed misrepresented the Muslim Brotherhood.

**{Note: KELNER was presented with an 11/2/2016 email sent from RAFIEKIAN to KELLEY and ALPTEKIN regarding a draft document which mirrors in substance Flynn's November 8, 2016 op-ed.}**

(U//FOUO) KELNER did not recall having discussed this email with anyone.

### Project Confidence Funding

(U//FOUO) RAFIEKIAN had informed Covington that INOVO BV was paying for PC and RAFIEKIAN was not aware of Turkey being involved. BOSTON implied Turkey was involved with PC. FLYNN had informed Covington, PC was funded by ALPTEKIN's company, INOVO.

(U//FOUO) KELNER recalled a meeting with David Laufman from CES, where KELNER did not recall having said FLYNN did not have contact with Turkish officials for PC. KELNER did not recall having said that FLYNN did not remember having had conversations with Turkish government officials regarding the op-ed published by FLYNN.

(U//FOUO) KELNER was not aware, prior to FIG's FARA filing, of other contacts, he, KELNER, or FIG may have had with Turkish officials other than those FIG had with ALPTEKIN.

(U//FOUO) KELNER was only aware of RAFIEKIAN, FLYNN, and the staff of the FARA filing unit to have received a draft of FIG's FARA filing. KELNER was not aware if KELLEY had received the FARA filing prior to its submission

UNCLASSIFIED//FOUO

to the FARA unit. A draft of FIG's FARA filing was given to FLYNN by his attorney, VERDERAME. VERDERAME provided written and oral feedback to Covington about FIG's FARA filing. VERDERAME participated in writing the FIG FARA filing. SMITH, KELNER, LANGTON, and Stephen ANTHONY of Covington were involved with the drafting and providing of substantive information for FIG's FARA filing. No one outside of Covington was involved with the drafting of the FARA filing except for RAFIEKIAN, VERDERAME and the FARA unit. RAFIEKIAN wanted to change the draft of FIG's FARA application to indicate refunds were paid to ALPTEKIN from FIG and not that of consulting fees. RAFIEKIAN objected to FIG's FARA filing having disclosed James WOOLSEY [member of FIG's advisory board] as being involved with the contract between FIG and INOVO. RAFIEKIAN did not want to upset WOOLSEY. WOOLSEY was involved with a phone call and the 9/19/2016 meeting in NYC which consisted of Turkish government officials. Further, RAFIEKIAN objected to the word "kickback" having been mentioned in FIG's FARA filing draft. RAFIEKIAN had provided his objections to FIG's FARA filing draft via email to Covington.

**FIG's FARA Registration Statement**

(U//FOUO) The primary principal in FIG's FARA filing was INOVO. KELNER did not recall RAFIEKIAN having mentioned the subject of FIG having been engaged in support of a private sector company in Israel. FLYNN was not aware of Israel having been involved with PC and gave no comment or objections to the matter.

(U//FOUO) Prior to FIG's FARA filing on 3/7/2017, FLYNN informed KELNER about one or two conversations he had with ALPTEKIN. FLYNN did not share these conversations he had with ALPTEKIN in detail with KELNER. BOSTON had mentioned to Covington phone calls FIG had with ALPTEKIN. KELNER did not recall having asked RAFIEKIAN about the weekly updates given to ALPTEKIN on behalf of FIG which pertained to PC.