```
1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF VIRGINIA
2                    ALEXANDRIA DIVISION

3  UNITED STATES OF AMERICA,  )  Case 1:18-cr-00457
                              )
4            Plaintiff,       )
                              )
5       v.                    )  Alexandria, Virginia
                              )  July 17, 2019
6  BIJAN RAFIEKIAN,           )  9:04 a.m.
                              )
7            Defendant.       )  Day 3 (AM Session)
                              )  Pages 364 - 515
8

9                    TRANSCRIPT OF TRIAL

10        BEFORE THE HONORABLE ANTHONY J. TRENGA

11           UNITED STATES DISTRICT COURT JUDGE

12                       AND A JURY
```

25    COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1  have.
2  THE COURT: All right. May the witness be
3  excused?
4  MR. GIBBS: He may be, Judge. Thank you.
5  THE COURT: All right. Mr. Smith, you're
6  excused. Do not discuss your testimony outside of the
7  courtroom with any other witness.
8  THE WITNESS: Thank you, Your Honor.
9  (The witness stands aside.)
10  THE COURT: The government will call its next
11  witness.
12  MR. TURGEON: The United States calls Brian
13  McCauley.
14  THE COURT: Mr. McCauley will come forward.
15  BRIAN MCCAULEY, PLAINTIFF'S WITNESS, AFFIRMED
16  DIRECT EXAMINATION
17  BY MR. TURGEON:
18  Q  Could you please tell us your name.
19  A  My name is Brian McCauley.
20  Q  What is your current occupation?
21  A  I'm currently retired.
22  Q  What did you do before you were retired?
23  A  I was a deputy assistant director with the FBI.
24  Q  When did you work at the FBI?
25  A  I worked at the FBI from 1997 until I retired in

1 A    It was very brief. And Bijan introduced me to
2 Alptekin and said: This is Brian McCauley. He'll be
3 helping out on this project.
4 Q    Did you and Alptekin have any conversations at
5 that time?
6 A    No, sir.
7 Q    After Alptekin left, did you and the defendant
8 have any discussions?
9 A    Yes, sir, we did.
10 Q    What did you talk about?
11 A    A possible trip to New York to meet with some
12 Turkish officials.
13 Q    Did the defendant tell you anything about that
14 planned meeting in New York City?
15 A    No.
16 Q    Did he say with whom you'd be meeting?
17 A    Just -- at that point, it was just Turkish
18 officials.
19 Q    Did the defendant say who organized the meeting in
20 New York City with the Turkish government officials?
21 A    Sure. I believe it was Ekim Alptekin, but I
22 just -- I don't remember seeing it coming out of his
23 mouth and hearing it.
24 Q    Did you eventually attend a meeting in New York
25 City with Turkish government officials?

McCauley - Direct

1  A     Yes, sir, I did.
2  Q     Sir, could you please turn to Exhibit -- take a
3  look at Government Exhibit 2B.
4  A     Yes.
5  Q     Who is sitting on the right side in that
6  photograph?
7  A     That would be Ekim Alptekin.
8  Q     And who is sitting on the left side in that
9  photograph?
10 A     That would be the Turkish foreign minister.
11           MR. TURGEON:  Your Honor, at this time, we'd
12 move Government Exhibit 2B into evidence.
13           THE COURT:  Any objection?
14           MR. TROUT:  No objection.
15           THE COURT:  2B is admitted.
16           MR. TURGEON:  Could we publish that to the
17 jury?
18           THE COURT:  Yes.
19           MR. TURGEON:  Thank you.
20 BY MR. TURGEON:
21 Q     Did the defendant offer you any compensation for
22 attending the New York meeting?
23 A     Yes.
24 Q     How much did he offer you?
25 A     My daily rate of $5,000.

McCauley - Direct

1  officials?
2  A    Yes.  He was going to meet with or have lunch with
3  Ekim.
4  Q    Do you know if that lunch meeting took place?
5  A    No, sir, I don't.
6  Q    Around what time of day did you and the defendant
7  arrive in New York City?
8  A    Approximately noontime.
9  Q    And what time of day was the meeting with the
10 Turkish government officials scheduled for?
11 A    It was later that night at approximately
12 10:00 p.m.
13 Q    And where in New York City did that meeting take
14 place?
15 A    It took place at the Helmsley Hotel.
16 Q    I just want to make sure you've said what time of
17 day was that meeting.
18 A    It was evening.  It was about 10:00 p.m.
19 Q    Who was at that meeting?
20 A    At that meeting, it was Bijan.  It was General
21 Flynn.  It was James Woolsey.  It was myself, the
22 Turkish -- Ekim, the Turkish foreign minister, the
23 minister of energy from Turkey -- that was Erdogan's
24 son-in-law -- and the translator.
25 Q    Now, how do you know that the Turkish minister of

McCauley - Direct

1  Q    And for the Turkish side, who sat across from
2  those folks?
3  A    On the Turkish side, from left to right, across
4  from Bijan, it was Ekim Alptekin.  Across from General
5  Flynn, it was the foreign minister, the Turkish foreign
6  minister.  Across from Jim Woolsey, it was the minister
7  of energy, Erdogan's son-in-law, and across from me was
8  the translator.
9  Q    Now, at the meeting, did anyone use the
10 translator?
11 A    No, sir.
12 Q    After sitting down, how did the meeting begin?
13 A    Introductions starting with Bijan, General Flynn,
14 Jim Woolsey, and myself, and then it went down to the
15 Turkish side.
16 Q    And after those introductions, how did the meeting
17 begin?
18 A    I remember the foreign minister wished General
19 Flynn and Trump good luck in the election and that he
20 hoped that the Turkish government would be working
21 close with the new administration, whoever it is.
22 Q    Did the foreign minister say anything else?
23 A    Yes.  He brought up the subject of Fethullah
24 Gulen.
25 Q    And what was his focus at the meeting?

McCauley - Direct

MR. TROUT: Objection, Your Honor. I ask that he ask what he said.

THE COURT: Well, instead of asking that characterization, why don't you ask what people actually said.

MR. TURGEON: Yes. Thank you, Your Honor.

BY MR. TURGEON:

Q What did the foreign minister say at that meeting?

A The foreign minister said that he was concerned that they had a terrorist living in the U.S., and they considered Gulen, Fethullah Gulen, the Osama bin Laden of Turkey.

Q Now, what language was the foreign minister speaking?

A English.

Q How would you describe his English language skills?

A Fine. I could hear him. I understood him perfectly.

Q Did the foreign minister say anything about the attempted coup in Turkey?

A Yes, he did. He believed that Gulen was responsible for the attempted coup in Turkey.

Q Did he say anything about what the Turkish government wanted done about Gulen?

McCauley - Direct

1  A    He brought up that they would like to have him
2  tried -- charged and tried in Turkey.
3  Q    Did you say anything at the meeting?
4  A    Yes, I did.  Towards the end of the meeting -- the
5  meeting lasted 25 minutes -- I did say that if, in
6  fact, Fethullah Gulen is a terrorist and we found him
7  violating U.S. law, he would be charged and possibly
8  deported, but it would be U.S. law.
9  Q    What topics were discussed at that meeting other
10 than Gulen?
11 A    Sir, I can't think of any.
12 Q    How long did that meeting last?
13 A    That meeting lasted approximately 25 to
14 30 minutes.
15 Q    And what happened at the end of the meeting?
16 A    Exchange of cards, a handshake, and that was about
17 it.
18 Q    By cards, do you mean business cards?
19 A    Business cards, yes, sir.  Sorry.
20 Q    Did you leave the meeting with anyone?
21 A    I left the meeting with Bijan and General Flynn.
22 Q    Where did you go?
23 A    We went back to the hotel.
24 Q    When you got back to the hotel, did you and the
25 defendant discuss the Gulen project?

1 Q    How did that conversation come about?
2 A    Bijan called me on the phone and asked me if I
3 could come into the office.
4 Q    And did you go into the office?
5 A    Yes, sir, I did.
6 Q    And when you got there, what did the defendant
7 say?
8 A    The defendant said that we got the contract.
9 Q    Did he say anything about how or why FIG got the
10 contract?
11 A    No, sir.
12 Q    What happened next during that meeting?
13 A    As I came into the office, Bijan's office, he was
14 coming out of General Flynn's office.  And he said:
15 Brian, we got the contract.
16      He also mentioned that I was to build a team of
17 investigative -- retired agents, investigators to build
18 my team.
19 Q    Did the defendant say anything else to you after
20 coming out of General Flynn's office?
21 A    He did.
22 Q    What did he say?
23 A    He said:  Brian, the General wants me to file with
24 DOJ.
25      He said:  But -- and he used his finger.  He

1  pointed up.  He said; but I have a better idea to file
2  with -- it was either commerce or Congress.
3  Q    Please describe for the jury how the defendant
4  acted when he said that to you.
5  A    He was excited.
6         MR. TROUT:  Objection.  Your Honor, I'm
7  sorry.  Objection, describing how he acted.
8         THE COURT:  Overruled.  You can describe his
9  reaction.
10        MR. TURGEON:  Thank you.
11 BY MR. TURGEON:
12 Q    Can you please describe the defendant's reaction
13 or how the defendant acted when he said that to you?
14 A    He was very happy, very pleased, excited that we
15 got this contract.
16 Q    Now, what did he say about keeping the project
17 under the radar?
18        MR. TROUT:  Objection, Your Honor.
19        THE COURT:  I'm sorry.  There's been no
20 testimony of that.
21        MR. TURGEON:  I apologize, Your Honor.  I
22 apologize, Your Honor.
23 BY MR. TURGEON:
24 Q    When the defendant came out of General Flynn's
25 office, do you recall him saying anything else?

McCauley - Direct

1 A    Yes.  He said: Brian, the General wants me to
2 file with DOJ.
3      He said:  But to keep it under the radar, we'll
4 file with -- it was either commerce or Congress.
5 Q    Did the defendant say why he wanted to keep the
6 project under the radar?
7 A    Not during that conversation.
8 Q    Did he ever say anything about that to you?
9 A    Yes, he did.
10 Q   What did he say?
11 A   The purpose of keeping it under the radar was to
12 avoid detection by Tony Podesta and other members of
13 Congress who were favorable to Gulen.
14 Q   And when was that conversation?
15 A   That was a follow-on conversation.  I'm not sure
16 how many days or weeks after.
17 Q   Now, what did you say in response to the defendant
18 saying that he was going to file this other way?
19 A   When he told me he was not going to follow General
20 Flynn's direction and file with DOJ -- excuse my
21 language, ladies -- I told him:  I wouldn't fuck around
22 with that.
23 Q   Why did you say that?
24 A   Because I know coming from my previous -- my past
25 that when you file -- when you work with foreign

McCauley - Direct

1           Could we publish that to the jury, please?
2           THE COURT: Yes.
3  BY MR. TURGEON:
4  Q    Do you see where General Flynn refers to the FM?
5  A    Yes.
6  Q    Who is the FM?
7  A    Foreign minister.
8  Q    How do you know that FM refers to the foreign
9  minister?
10 A    Again, going back to my previous job, I would meet
11 with ministers.  Prime minister would be PM; FM,
12 foreign minister; and minister of defense, MD.
13 Q    And who is RA?
14 A    RA is -- it's Robert or Richard Amsterdam.  I
15 believe it's Robert Amsterdam.
16 Q    How do you know that?
17 A    I found out just in discussions with Tom Neer, as
18 well as Bijan.
19 Q    So after the New York City meeting, did you ever
20 meet with Alptekin in person again?
21 A    Yes, we did.
22 Q    What was the purpose of that meeting?
23 A    That was to provide him the final -- our 6 weeks,
24 45 days was up.  We were going to provide him the final
25 product of what we had come up with at that point.

McCauley - Direct

1  page to the jury?

2           THE COURT: Yes.

3           MR. TURGEON: Thank you.

4  BY MR. TURGEON:

5  Q    How did you present this report to Alptekin?

6  A    I summarized the report. I gave him a verbal

7  assessment, and I told him what we had found out is

8  that there's potentially fraud going on with human

9  trafficking, immigration fraud, visa fraud, but also

10 fraud against the United States government in the sum

11 of $500 million a year.

12 Q    How did Alptekin react to this written report?

13 A    He was not dismissive towards me the way he was

14 with Mike Boston, but he responded: I know this.

15      He said: I'm looking for dirt.

16 Q    Did he say anything about how he knew this?

17 A    No, sir, I don't remember him saying that.

18 Q    Did Alptekin take the report with him when he

19 left?

20 A    No, he didn't. He left it on the table.

21 Q    Now, did Alptekin say anything in that meeting

22 about what he wanted?

23 A    He said he wanted dirt, and then he said: Can't

24 you plant dirt?

25      And I said: No, we cannot.

Case 1:17-cr-00232-EGS   Document 151-10   Filed 01/14/20   Page 14 of 17

442

McCauley - Cross

1  Q     Okay.  But there was no request from any Turkish
2  official for Flynn Intel Group to do anything?
3  A     No, sir.
4  Q     As you've reflected on the meeting, it occurred to
5  you or it seemed to you that this was simply a meeting
6  that Mr. Alptekin had set up in order to be able to
7  demonstrate that he could bring -- to demonstrate to
8  these Turkish officials that he could bring some big
9  shots to the meeting, correct?
10 A     I felt that it was Alptekin and Bijan.  They were
11 both measuring up, seeing what they could bring to the
12 table.  Yes, sir.
13 Q     Now, you mentioned in your testimony that there
14 were a couple of occasions where Mr. Alptekin conveyed
15 requests to Flynn Intel Group as part of the work that
16 it was doing for Mr. Alptekin, correct?
17 A     Yes, sir.
18 Q     On one of those occasions, you said that he wanted
19 surveillance, correct?
20 A     Yes, sir.
21 Q     This was surveillance of Gulenists in the District
22 of Columbia?
23 A     Yes, sir.
24 Q     And he wanted some sort of audio surveillance as
25 well, correct?

McCauley - Cross

1  A     Yes, sir.
2  Q     And then you basically told him, You're not doing
3  that?
4  A     I believe I told him: You watch too many movies.
5  We don't do that.
6  Q     In fact, you never did any surveillance, correct?
7  A     No, sir, I did not.
8  Q     You also indicated in another conversation he
9  wanted dirt on Gulen?
10 A     He mentioned that several times.
11 Q     All right.  He wanted to be able to show that he
12 was a terrorist, correct?
13 A     Yes, sir.
14 Q     That's what he wanted you-all to do?
15 A     Right.  Correct.
16 Q     And you told him you don't do that?
17 A     We don't do that.  FIG doesn't do that.  Only the
18 FBI does that.
19 Q     All right.  And you didn't do that, correct?
20 A     Correct, sir.
21 Q     And he also met with you on November 2, 2016; is
22 that correct?  That was the meeting that you described
23 where he was dismissive of Mike Boston and his work?
24 A     Sir, I don't -- I'm not sure if it was November 2.
25 I know the report said November 2, but I do remember it

McCauley - Cross

1 was the day before the election. So whatever date that
2 was.
3 Q   All right. In any event, you're at a meeting
4 before the election where he attended?
5 A   Yes, sir.
6 Q   At that meeting, he said that he wanted something
7 more. He wanted -- what did he want at that meeting?
8 A   I need more than this. I need dirt.
9     Then he said he was kidding. He said: Plant
10 dirt.
11    I said: We don't do that.
12 Q   And he said he was kidding?
13 A   Yes, he did say he was kidding.
14 Q   In fact, you didn't do anything as a result of any
15 request that he made at that meeting, correct?
16 A   No, sir, we didn't.
17 Q   Do you recall any other request that he made of
18 you that we have not discussed?
19 A   No, sir.
20 Q   So every request that he made of you in your
21 presence, you basically rejected, correct?
22 A   Correct, yes, sir.
23         MR. TROUT: One moment, Your Honor.
24     (Counsel confer.)
25         MR. TROUT: I have no further questions.

658

1  into evidence now.
2          THE COURT:  All right.
3          MR. MacDOUGALL:  Thank you, Your Honor.
4          THE COURT:  Any objections?
5          MR. MacDOUGALL:  This is Defense 102.
6          THE COURT:  Right.
7          MR. MacDOUGALL:  This, this is Ms. Langton's e-mail
8  that had all the attachments with it.  We're just moving in 102
9  that talks about -- that we discussed yesterday.
10         THE COURT:  All right.  Without objection, Defense
11 Exhibit 102 will be admitted.
12         (Defendant's Exhibit No. 102 was received in
13 evidence.)
14         THE COURT:  Anything else?
15         MR. GILLIS:  No, Your Honor, thank you.
16         THE COURT:  All right.  We'll convene at 9:00
17 tomorrow morning.
18         MR. GILLIS:  Thank you, Your Honor.
19         (Recess from 5:36 p.m., until 9:00 a.m., July 18,
20 2019.)
21                    CERTIFICATE OF THE REPORTER
22    I certify that the foregoing is a correct transcript of
23 the record of proceedings in the above-entitled matter.
24
25                                        /s/
                                      Anneliese J. Thomson