# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **Plaintiff,** | |
| **v.** | **Criminal Action No. 17-232-EGS** |
| **MICHAEL T. FLYNN,** | |
| **Defendant.** | |

## SUPPLEMENTAL MOTION TO WITHDRAW PLEA OF GUILTY
## AND BRIEF IN SUPPORT

Sidney Powell
Molly McCann
Sidney Powell, P.C.
2911 Turtle Creek Blvd.,
Suite 300
Dallas, Texas 75219
Tel: 214-707-1775
sidney@federalappeals.com
Admitted *Pro Hac Vice*
molly@federalappeals.com
Admitted *Pro Hac Vice*

Jesse R. Binnall
Lindsay R. McKasson
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jbinnall@harveybinnall.com
lmckasson@harveybinnall.com
Admitted *Pro Hac Vice*

W. William Hodes
The William Hodes Law Firm
3658 Conservation Trail
The Villages, Florida 32162
Tel: (352) 399-0531
Fax: (352) 240-3489
Admitted *Pro Hac Vice*

**Attorneys for Lt. General Michael T. Flynn (USA) (Retired)**

## Table of Contents

I. THE STANDARD FOR WITHDRAWING A
GUILTY PLEA PRIOR TO SENTENCING.................................................3

    A. Mr. Flynn Asserts a Viable Claim of Innocence..........................................4.

    B. The Government's Ability to Prosecute the Case
    has not been Substantially Prejudiced.................................................5

    C. Sixth Amendment Violations—The Ineffectiveness
    of Mr. Flynn's Former Counsel—Tainted his Guilty
    Plea as well as the Subsequent Colloquy at his
    December 2018 Hearing.........................................................6

II. IF THE GOVERNMENT DOES NOT AGREE
TO ALLOW MR. FLYNN TO WITHDRAW HIS
PLEA, AND IF ANY MATERIAL FACTS ARE
ACTUALLY DISPUTED, THEN THIS COURT
HOLD AN EVIDENTIARY HEARING.....................................................7

III.    SUMMARY OF THE CONFLICTS AND ARGUMENTS.............................7

IV. THE EVER-DEEPENING CONFLICTS OF
INTEREST RESULTING IN COVINGTON'S
DEFECTIVE ASSISTANCE OF COUNSEL..............................................10

    A. The FARA Section and David Laufman at DOJ
    Pressure Covington for the FARA Filing, and Covington
    Magnifies Its Mistake........................................................12

    B. By the Summer, SCO Takes Down Paul Manafort
    and Signals FARA Issues Are on its Radar.........................................14

    C. After Learning the SCO Has the FARA Filings
    in Its Sights, Covington Quietly Begins Its FARA
    Assessment Anew............................................................15

    D. Judge Howell Unseals a Crime-Fraud Order
    in the Manafort FARA Case, and Covington's
    Fears of its Own Exposure Increase.................................................16

    E. The SCO Etches Covington's Conflict of Interest
    in Stone by Putting Covington on Notice of FARA

Charges against Mr. Flynn, Along with Charges
under 18 U.S.C. §1001........................................................................................18

F. Remarkably, SCO Specifically Raises the
Conflict of Interest with Covington and Instructs
Covington to Discuss with Mr. Flynn.................................................................18

G. Covington Does Not Raise the Likely
FARA Charges—Much Less the Stunning
Conflict with Mr. Flynn......................................................................................19

H. Covington Calls SCO to Arrange a Deal
for The Firm—Not Mr. Flynn.............................................................................19

I. Covington Met with Mr. Flynn the Next Day
but Did Not Disclose the FARA Target, the
Firm's FARA Liability, or Covington's Pernicious
Lawyer-Client Conflict of Interest......................................................................20

J. Covington Still Did Not Discuss the Conflict with Flynn.................................22

K. Self-Interested Covington Subjected Flynn to Two
Days of "Exposure" on Russia and "False Statements" to the FBI.........................23

L. Before the Plea Documents were Even Shared
with Mr. Flynn, Covington Was Gleefully Planning
its Marketing Campaign Based on Flynn's Plea.............................................24

M. Covington Does Not Share with Mr. Flynn the
Crucial Details of the Government's Last-Minute "Disclosure.".................................25

N. Covington Receives Awards for Flynn's Guilty Plea...........................................26

O. March 13, 2018, SCO Began Producing Exculpatory
Evidence, Which Continues to this Day..........................................................27

P. Covington Recognized Significant Defenses
as in 2018, the Attorneys Kept Mr. Flynn on "The Path.".........................................28

Q. For the Hearing in this Court, Covington Prepared
Flynn Only to Affirm His Plea................................................................................29

V. COVINGTON & BURLING'S LAWYER-TO-CLIENT

CONFLICTS OF INTEREST WERE EITHER NON-CONSENTABLE
OR NOT VALIDLY CONSENTED TO..................................................................29

    A.  Non-Consentable Conflicts of Interest...................................................29

    B. Even if Any Aspects of the Dramatic Covington-Flynn
    Conflicts of Interest were Consentable, Mr. Flynn's
    Purported Consent was not "Informed."...................................................34

VI.  BECAUSE OF THE PERVASIVE CONFLICTS OF INTEREST,
COVINGTON REPEATEDLY FAILED TO PROVIDE MR. FLYNN
WITH THE CONSTITUTIONALLY MANDATED EFFECTIVE
ASSISTANCE OF COUNSEL. AS A CONSEQUENCE,
HIS DEFENSE WASIRREPARABLYPREEJUDICED....................................37

    A. Covington Withheld Crucial Information from
    Mr. Flynn that the SCO Disclosed Immediately Before
    Flynn Signed the Plea Agreement...........................................................38

    B. Covington Continued to Fail to Act on Mr. Flynn's
    Behalf as New Evidence Came to Light After His Plea.........................40

    C. By December 18, 2018, Covington Prepared Mr. Flynn
    to Reaffirm his Plea of Guilty and Nothing Else...................................40

    D. Covington Knew Special Counsel's Statements
    in the Statement of Offense Regarding the FARA
    Filing Were False or Wrong, But Covington Simply Stood Down.........41

       i.    The "Smoking Gun" Email Shows Covington
          Knew the SCO's Assertions Were False..................................42

       ii.   Covington did not inform Mr. Flynn that it
          was the alleged "false statements" in the
          Statement of Offense that were false......................................42

       iii.  Covington Counseled Flynn to Sign A Statement
          of Offense It Knew Was False.................................................43

       iv.  Covington *Signed* an Attorney's Acknowledgement
          of the Statement of Offense....................................................43

VII. The Law of This Circuit Requires Allowing Mr. Flynn

to Withdraw his Plea......................................................................................................44

VIII.   Rule 11 Failures Also Support Withdrawal Pursuant to *Cray*.....................................46

IX.     CONCLUSION.........................................................................................................48

More than a year ago, at the December 18, 2018, Sentencing Hearing, this Court declared that it could not "recall any incident in which the Court has ever accepted a plea of guilty from someone who maintained that he was not guilty," and that it did not "intend to start" that day.[1] Michael T. Flynn ("Mr. Flynn") *does* maintain that he is innocent of the 18 U.S.C. §1001 charges; and he did not lie to the FBI agents who interviewed him in the White House on January 24, 2017. As will be seen below, and at any evidentiary hearing ordered by this Court, Mr. Flynn's guilty plea (and later failure to withdraw it) was the result of the ineffective assistance of counsel provided by his former lawyers, who were in the grip of intractable conflicts of interest, and severely prejudiced him.

This brief provides this Court every reason to honor its commitment to protect a man who earnestly maintains his innocence.  Mr. Flynn moved on January 13, 2020, to withdraw his plea of guilty because of the government's bad faith, vindictiveness, and breach of the plea agreement. ECF No. 151.  This Supplemental Motion addresses alternate reasons why it would only be "fair and just" for the Court to permit Mr. Flynn to withdraw his plea. *United States v. Cray*, 47 F.3d 1203, 1206 (D.C. Cir. 1995).

First, Mr. Flynn's former counsel at Covington & Burling LLP ("Covington") developed what is often referred to as an "underlying work" lawyer-to-client  conflict of interest early in the representation.[2] It arose from mistakes that the firm made in the Foreign Agents Registration Act (FARA) filings it had made for Mr. Flynn and his company Flynn Intel Group ("FIG").  Rather than disclosing the errors—and insisting Mr. Flynn obtain new counsel to fix the problem, or

---

[1] Hr'g Tr. Dec. 18, 2018 at 7.

[2] Geoffrey Hazard, William Hodes & Peter Jarvis, The Law of Lawyering, §10.07.6 (4th ed. 2015).

allowing Covington to continue the representation (and the fix), knowing the truth—the lawyers said nothing to Mr. Flynn, charged him hundreds of thousands of dollars to re-do its own prior work, and *still* did not take the readily available steps of amending or supplementing the FARA forms.

In August 2017, the Special Counsel's Office ("SCO") began to threaten Covington's work with criminal FARA-related charges by way of an indictment of Mr. Flynn's former business partner, Bijan Rafiekian.  Covington's "underlying work" conflict of interest suddenly escalated into a non-consentable conflict of interest that tainted every moment up to and through the guilty plea in December 2017 and the Sentencing Hearing in this Court in December 2018.   That pernicious conflict infected and prejudiced his defense until he retained new counsel in 2019.

As a result of this debilitating lawyer-to-client conflict of interest, the Covington lawyers lost all ability to provide the effective assistance of counsel that the Sixth Amendment requires. At every turn, the lawyers' interest was in obscuring their original errors, hiding the fact that they had never come clean with their client, and trying ever-harder to sweep their problems under the rug by arranging for and preserving a plea that Mr. Flynn wanted to withdraw.

Mindful of their own interests, Mr. Flynn's former counsel repeatedly gave him advice that was not "within the range of competence demanded of attorneys in criminal cases." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Repeatedly, "counsel actually acted in a manner that adversely affected [their] representation by doing something, or refraining from doing something, that [] non-conflicted counsel would not have done." *United States v. Taylor*, 139 F.3d 924, 930 (D.C. Cir. 1998).  They did irreparable damage to Mr. Flynn.

They next kept the SCO's November 1, 2017, express concerns and demands about the conflict of interest from Mr. Flynn; and, they represented to the government that they discussed

the conflict—all while they worked to position themselves favorably at Mr. Flynn's expense. On the eve of his plea, they kept from him information they knew was crucial to his decision.

In this Circuit, a defendant seeking to withdraw a guilty plea before sentencing must establish the "prejudice" element by showing "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Taylor*, 139 F.3d at 929-30. In this case, the evidence will show that if Mr. Flynn had been given constitutionally adequate advice, he would *not* have pled guilty in 2017, and he *would* have withdrawn his plea in 2018. The taint of Covington's constitutional violations permeates this case.

In addition, there were defects in the Rule 11 plea colloquy. When this Court extended the colloquy in December 2018, among the questions this Court did not ask was if any additional promises or threats were made to Mr. Flynn. The answer to that question is yes, there were. Moreover, this Court ended the sentencing hearing noting that it had "many, many, many more questions" about the factual basis for the plea. Hr'g Tr. Dec. 18, 2018 at 50:12-13. Accordingly, withdrawal of the plea should be allowed pursuant to *Cray,* 47 F.3d 1203.

## I.    THE STANDARD FOR WITHDRAWING A GUILTY PLEA PRIOR TO SENTENCING.

The Federal Rules of Criminal Procedure allow for withdrawal of a guilty plea before sentencing "if the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B) (paraphrasing *Kercheval v. United States*, 274 U.S. 220, 224 (1927)). In this Circuit, the trial courts (and the appellate courts on review) consider three factors, the last of which is the most important: "(1) whether the defendant has asserted a viable claim of innocence; (2) whether the delay between the guilty plea and the motion to withdraw has substantially prejudiced the government's ability to prosecute the case; and (3) whether the guilty plea was

somehow tainted." *United States v. McCoy*, 215 F.3d 102, 106 (D.C. Cir. 2000).  Mr. Flynn readily

satisfies each of the three factors, and the taint is overwhelming.

### A.      Mr. Flynn Asserts a Viable Claim of Innocence.

"The District Court should not attempt to decide the merits of the proffered defense, thus

determining the guilt or innocence of the defendant."  *Everett v. United States*, 336 F.2d 979, 982

(D.C. Cir. 1964), *quoting Gearhart v. United States*, 272 F.2d 499, 502 (1959).  Only if the district

court concludes that the defendant has not alleged any cognizable claim for relief, or that the

defendant's "conclusory allegations [are] unsupported by specifics," or that the defendant's

allegations "in the face of the record are wholly incredible," may it summarily dismiss the motion."

*Taylor*, 139 F.3d at 933.

Courts typically employ something of a sliding scale to decide whether a claim of

innocence is "viable" in this context: where it is clear that a plea was constitutionally "tainted," a

defendant needs to show correspondingly less to establish a viable claim of innocence.  As this

Circuit remarked in *Taylor*, "[t]he third [taint] factor is the "most important," and the standard for

allowing withdrawal of a plea is fairly lenient when the defendant can show that the plea was

entered unconstitutionally." 139 F.3d at 929 (internal citations omitted).  *See also, McCoy, supra,*

215 F.3d at 106.

Mr. Flynn's claim of innocence is more than viable, and there is a very strong showing of

constitutional taint here.  Mr. Flynn would be able to start his defense with evidence that the FBI

agents who interviewed him at the White House believed that he was *not* lying and maintained that

belief in the face of objection and even derision from senior FBI colleagues.  In addition, he would

be able to present the actual recordings and transcripts of his calls with Russian Ambassador

Kislyak, and he knew that the FBI already had those recordings and transcripts. In addition, Mr.

Flynn would presumably be able to present whatever 302s are now "missing," and countless other *Brady* disclosures that the government has dribbled over the last year. He would also be able to demand additional evidence the government continues to suppress. Mr. Flynn could present numerous other defenses and suppress evidence illegally obtained. The standard does not require Mr. Flynn prove he would be acquitted. It is enough to say that Mr. Flynn's claim of innocence is "viable," and it is.

### B. The Government's Ability to Prosecute the Case has not been Substantially Prejudiced.

This Court should not tarry long over the second factor: whether the lapse in time between the original plea and the motion to withdraw the plea has "substantially prejudiced the government's ability to prosecute the case." *McCoy*, 215 F.3d at 106. The test does not depend upon whether the government will be annoyed or even inconvenienced. Not only must there be *substantial* prejudice, but the prejudice must go to the government's very ability to prosecute the case. No witnesses have died, the documents are readily available, and if the government ever had a case, it should still be able to prove it. Indeed, the defense and the government have been in active litigation over those records for much of the time since the original plea. *See United States v. Russell*, 686 F.2d 35, 40 (D.C. Cir. 1982) (holding that the government was not prejudiced where the government had not shown the unavailability of crucial witnesses or that its case was prejudiced by the passage of time).

Finally, although Mr. Flynn's chief argument about the "taint" that infected his case emanated from the ineffective assistance of his former counsel, the government's coercive tactics and other wrongful conduct contributed as well. Thus, any claim that the government might make about "substantial prejudice" would have to be discounted by the government's self-inflicted damages.

### C.    Sixth Amendment Violations—The Ineffectiveness of Mr. Flynn's Former Counsel—Tainted his Guilty Plea as well as the Subsequent Colloquy at his December 2018 Hearing.

The third and most important factor in determining whether a defendant should be permitted to withdraw a guilty plea before sentencing is "whether the guilty plea was somehow tainted." *United States v. McCoy*, 215 F.3d at 106.  "Taint" in this context typically means that the plea was entered "unconstitutionally," which in turn often means that the plea was not "voluntary and intelligent" because it was based on advice of counsel that fell below the level of "reasonable competence" that is required to satisfy the Sixth Amendment.  *Strickland*, 466 U.S. at 714.  A year after *Strickland* was decided, the Supreme Court assimilated its test for claims of ineffective assistance of counsel to the context of guilty pleas in *Hill v. Lockhart*, 474 U.S. 52 (1985).  This Circuit summarized the resulting rule as follows:

> The *Hill-Strickland* test requires the defendant to show both that counsel's advice was not 'within the range of competence demanded of attorneys in criminal cases,' and that as a result he was prejudiced, *i.e.* 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'

*United States v. Horne*, 987 F.2d 833, 835 (D.C. Cir. 1993) (internal citations omitted).  Focusing on different language from *Strickland* and *Hill*, the same court summarized similarly a few years later:

> [a] defendant must [] show first, that his counsel's performance 'fell below an objective standard of reasonableness' by identifying specific 'acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,' and second a defendant 'must demonstrate that the deficiencies in his representation were prejudicial to his defense. He 'must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'

*Taylor*, 139 F.3d at 929-30 (citations omitted).  Mr. Flynn meets those tests throughout this case, including with both his 2017 guilty plea and his colloquy with this Court. The multiple instances

in which Mr. Flynn's former lawyers' conflicts of interest and actions fell completely short of

professional norms, thus depriving him of the constitutionally mandated effective assistance of

counsel, nullified his opportunity to make informed decisions about his own case, and it grossly

prejudiced his defense.

## II.    IF THE GOVERNMENT OPPOSES WITHDRAWAL OF THIS PLEA, AND IF ANY MATERIAL FACTS ARE ACTUALLY DISPUTED, THEN THIS COURT SHOULD HOLD AN EVIDENTIARY HEARING.

No hard and fast rule governs whether an evidentiary hearing is required before a court can

properly adjudicate ineffective assistance of counsel claims, including those undergirding a motion

to withdraw a guilty plea. Much depends on exactly what is being contested and what materials

the court will have to consider in deciding the merits.  In *Taylor*, 139 F.3d at 932-33, this Circuit

wrote:

> Ordinarily, when a defendant seeks to withdraw a guilty plea on the basis of
> ineffective assistance of trial counsel the district court should hold an evidentiary
> hearing to determine the merits of the defendant's claims. . . . On the other hand,
> some claims of ineffective assistance of counsel can be resolved on the basis of the
> trial transcripts and pleadings alone.[3]

## III.    SUMMARY OF THE CONFLICTS AND ARGUMENTS

Mr. Flynn's former counsel at Covington made some initial errors or statements that were

misunderstood in the FARA registration process and filings, which the SCO amplified, thereby

creating an "underlying work" conflict of interest between the firm and its client.  Because

Covington attempted to hide the difficulty instead of addressing it forthrightly with Mr. Flynn,

what began as a manageable conflict of interest devolved into an inescapable morass of ever-

---

[3] Since his rights have already been severely compromised by his prior counsel, as discussed in
detail, *infra*, he also requests that any testimony that he give be heard *ex parte* so that it does not
prejudice his Fifth Amendment rights.  *See United States v. Tucker*, 2018 U.S. Dist. LEXIS
172319, 22-23 (D. N.H. 2018) (allowing a defendant seeking to withdraw his guilty plea to testify
at a sealed hearing on an *ex parte* basis).

worsening and eventually non-consentable conflicts.  Those conflicts led to a series of instances in which Covington provided ineffective assistance of counsel that irreparably tainted Mr. Flynn's guilty plea and the December 2018 hearing in this Court.

Had Mr. Flynn been timely and properly informed of the serious *self-interest* of his attorneys and the firm—and the ever-deepening conflict versus his own defense—he would not have permitted the representation to continue beyond August 2017 when Covington began to re-investigate the FARA issues.  Had Mr. Flynn been informed of the facts, he would have retained an independent firm to provide a second opinion—not the original one that made mistakes it wouldn't own or correct.

By November 1, 2017, Special Counsel ["SCO"] notified Covington that it recognized Covington's conflict of interest from the FARA registration.  Government counsel specified Mr. Flynn's liability for "false statements" in the FARA registration, and he told Covington to discuss it with Mr. Flynn.  This etched the conflict in stone.  Covington betrayed Mr. Flynn.  His lawyers did not discuss this concrete attorney-to-client conflict with him.  They did not insist he obtain independent counsel.  They did not advise him Special Counsel had focused on FARA issues. They did not withdraw.  Instead, his own lawyers kept it all a secret from him for weeks.  Then, they tendered him defenseless and uninformed to SCO for two full days of proffers for everything the SCO wanted from Flynn on Russia and his own "exposure."  They schooled him to "get through the proffer" to satisfy SCO, and instead of objecting or defending him in the face of a room full of government agents and lawyers, they even asked him questions to elicit the answers SCO wanted.

There is no dispute there was a serious conflict of interest.  It is undeniable.  Covington and SCO discussed it.  That minute Mr. Van Grack informed Covington the SCO was considering FARA false statement charges against Mr. Flynn, the question became: Were the suspected false

statements the result of Covington's misfeasance or malfeasance, *or*, did Mr. Flynn lie to his lawyers?[4]

Showing that Mr. Flynn was truthful with his lawyers would cast aspersion on the competence, or perhaps even the honesty of the Covington lawyers and the reputation of "the Firm;" so would withdrawing from the representation of the highest profile figure in the SCO investigation.   Thus, the SCO put Mr. Flynn's lawyers' interests in direct collision with Mr. Flynn's.   Covington chose the "Flynn-lied-to-his-lawyers" option they had discussed by email the prior night.

These factors, especially the egregious taint of a lawyer-client conflict of interest known to the Covington lawyers and the government—but not immediately, fully, or ever accurately disclosed to Mr. Flynn—warrant granting this motion.[5]   From every angle, this case presents stunning Sixth Amendment violations of Mr. Flynn's constitutional rights.   "Long ago, the Supreme Court instructed that '[t]he right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client,' an admonition which we ourselves have had occasion to observe. 'Undivided allegiance and faithful, devoted service to a client,' the Court declared, 'are prized traditions of the American lawyer.  It is this kind of service for which the Sixth Amendment makes provision.'" *United States v. Hurt*, 543 F.2d 162 (D.C. Cir. 1976) (citing *Von*

---

[4]  The obvious solution to this for the ethical lawyer would have been to inform the SCO that all mistakes, errors or omissions, if any, belonged to Covington and file an amended or supplemental form.  Then, it should have informed Mr. Flynn immediately of the entire situation and given him the choice of how to proceed.  Covington, however, proceeded to sacrifice Mr. Flynn in its own efforts to cooperate with Special Counsel—all behind his back—and quickly jumped on the "Flynn-lied-to-his-lawyer" bandwagon.

[5]  Mr. Flynn acknowledges the government may make every effort to seek an indictment against him for all the charges prosecutors originally threatened.

*Moltke v. Gillies*, 332 U.S. 708, 725 (1948)). "[T]he 'assistance of counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired . . . If the right to the assistance of counsel means less than this, a valued constitutional safeguard is substantially impaired." *Glasser v. United States*, 315 U.S. 60, 70 (1942).

## IV.   THE EVER-DEEPENING CONFLICTS OF INTEREST RESULTING IN COVINGTON'S DEFECTIVE ASSISTANCE OF COUNSEL.

In late 2016, Mr. Flynn received an official inquiry letter from the Foreign Agents Registration Act ("FARA") unit of the DOJ.  Mr. Flynn promptly turned to his personal counsel and attorney for Flynn Intel Group ("FIG,") Kristen Verderame. [6]   She encouraged him to retain Robert Kelner—a nationally known FARA expert at the international powerhouse of Covington in Washington, D.C.  Mr. Flynn, Ms. Verderame, and Mr. Flynn's son Michael G. Flynn met with Covington FARA lawyers Robert Kelner and Brian Smith extensively on January 2, 2017.  ECF No. 151-12.  Mr. Flynn provided Covington all documents, emails, and contracts he or FIG had, and gave the lawyers all the information he could remember—specifically pointing them to the emails for the details.  *Id.*  Significantly, Mr. Flynn told Covington that Bijan Rafiekian, his former

---

[6] FIG had only existed for a few months, and FIG was already closed because Mr. Flynn was a key member of the Presidential Transition Team.  The three-month project for which FIG received the inquiry was its first of any significance.  Moreover, upon advice of counsel, FIG had timely filed an "LDA" ["Lobbying Disclosure Act"] registration in September 2017—which often substitutes for a FARA filing.  *Foreign Agents Registration Act*, United States Department of Justice, https://www.justice.gov/nsd-fara. According to the DOJ's response to a letter from Congress, the FARA unit of DOJ only issued 130 "inquiry letters" in the last 10 years from 2015.  Ex. 35.  Yet, on November 30, 2016, within approximately three weeks of the mere publication of Mr. Flynn's opinion piece in *The Hill*—an article that was critical of Fetullah Gulen and the powerful "Muslim Brotherhood"—and within thirteen days of Flynn's designation as the National Security Advisor for the new president—the FARA unit sent an "inquiry letter" to FIG.

partner in FIG, wrote the first draft of the op-ed, that was the primary object of the FARA section's letters. *Id.* at 17.

Mr. Flynn authorized Covington to investigate all the facts, work with multiple lawyers from multiple firms—including Robert Kelley, Kristen Verderame, attorneys for the public relations firm Sphere, and attorneys from Jones Day and Arent Fox. They also conferred and then met with the DOJ, interviewed many witnesses—all independently of each other and Mr. Flynn— and prepared and filed the FARA forms. *See also*, *United States v. Rafiekian*, 1:18-cr-00457, ECF No. 270-4. Kelner soon wrote the FARA section a letter where he first made a fateful error. He stated that Mr. Flynn "*initiated* the op-ed."[7] Somehow it morphed into a felony (as construed by the SCO), and Covington apparently never corrected or clarified it.

> Your letter asked several questions regarding an op-ed authored by General Flynn and published in *The Hill* newspaper on November 8, 2016. It is our current understanding that the op-ed was initiated by General Flynn himself, and that he intended the op-ed to summarize a number of his longstanding public statements and positions regarding issues related to Turkey, Syria, and the Islamic State in Iraq and Syria. We also believe that the op-ed may have been prepared in the context of FIG's representation of Inovo BV, as the draft op-ed was shared with a representative of Inovo BV prior to publication and the op-ed related to subject matters overlapping with FIG's representation of Inovo BV. Again, our efforts to understand the relevant facts are ongoing, and we will continue to keep you and the Department apprised as our efforts continue. Ex. 1.

This was one of many communications, meetings, and phone conferences between the FARA unit and Covington over the FIG filing.[8]

---

[7] This happened despite Mr. Flynn's clear statement on January 2, 2017, that Mr. Rafiekian wrote the first draft of the op-ed, and despite Rafiekian having separately informed Covington of this fact and providing even more information shortly thereafter. ECF No. 151-12 at 17; ECF No. 150-5 at 7.

[8] On January 13, 2017, Heather Hunt replied to Covington's January 11, 2017, letter and said, "[b]ased on your letter and our previous communications, we anticipate that General Flynn and the Flynn Intel Group will be filing a FARA registration statement imminently. . . Please continue to keep us informed regarding your progress." Ex. 2. Hunt emailed Kelner many times over the

Hunt and the FARA unit did not leave it to Covington to keep them informed. Kelner recognized the unprecedented interest of the FARA unit in Mr. Flynn: "Heather Hunt [of FARA unit] has been all over us. She emailed and then left a voicemail yesterday afternoon asking for a call this weekend." * * * "We've never seen her this engaged in any matter (ever)." Ex. 5.

Meanwhile, on January 24, 2017, as we have briefed elsewhere, FBI Director Comey and Deputy Director McCabe dispatched Agents Strzok and "SSA 1" to the White House—deliberately contrary to DOJ and FBI policy and protocols—without notifying DOJ.[9]

### A. The FARA Section and David Laufman at DOJ Pressure Covington for the FARA Filing, and Covington Magnifies Its Mistake.

On February 13, 2017, the day Mr. Flynn resigned from the White House, David Laufman, along with Heather Hunt of the FARA Unit, among others, had a call with Covington to pressure them to file the FARA forms immediately.[10]  Ex. 5.

---

following weeks—relentlessly checking in on the status of the filing. On January 19, 2017, Heather Hunt emailed Kelner, "Rob, any updates?"  Kelner replied that Covington was working "expeditiously" to compile the registration, and the firm did.  Ex. 3.

[9]  This was actually the FBI's second surreptitious interview of Mr. Flynn—without informing him even so much as that he was the subject of their investigation.  SSA 1 had "interviewed him" in a "sample Presidential Daily Briefing" ("PDB") on August 17, 2016—unbeknownst to anyone outside the FBI or DOJ until revealed in the recent Inspector General Report of December 9, 2019.

This also goes to Mr. Flynn's claim of actual innocence. Against the baseline interview the FBI surreptitiously obtained under the guise of the PDB (in August 2016), the agents conducted the White House interview and immediately reported back in three extensive briefings during which both agents assured the leadership of the DOJ and FBI they "saw no indications of deception," and they believed so strongly that Mr. Flynn was shooting straight with them that Strzok pushed back against Lisa Page's disbelief and Deputy Director McCabe's cries of "bullshit." ECF No. 133-2 at 4.  This development is addressed in Flynn's Motion to Dismiss for Egregious Government Misconduct filed contemporaneously herewith.

[10]  Even when it was filed, lawyers at Covington were not sure it was required, and the FARA expert at Arent Fox was adamant it was not required.  Ex. 6.

The next day—Mr. Flynn's first day out of the White House, with media camped around his house 24/7—Rob Kelner and Brian Smith of Covington, and Kristen Verderame, called Mr. Flynn to give him a status update on the FARA issues. Mr. Flynn accepted their recommendation that it was better to file, and he instructed the lawyers to "be precise."[11]

On February 21, 2017, David Laufman, Heather Hunt, Tim Pugh, and multiple others from the FARA Unit telephone-conferenced with Covington. Ex. 8. Laufman directed the content, scope, and duration of the call. In this lengthy conversation, Kelner exacerbated his prior mistake, stating that "Flynn *wrote* [the op-ed]," and that Mr. Rafiekian, Mr. Flynn's former business partner, provided "input." Ex. 8 at 2. Kelner apparently misremembered or misspoke, but the SCO parlayed the description in the FARA form into a felony attributable to Mr. Flynn. Meanwhile, Covington—instead of owning any error and correcting it—began a campaign of obfuscation that deepened the conflicts, created Mr. Flynn's criminal exposure, and led to repeated instances of ineffective assistance of counsel.[12]

That evening, Heather Hunt requested a meeting the next day at Covington's offices to review the draft FARA filing in person. She and several others from the FARA unit, arrived and reviewed the FARA draft and discussed logistics. Mr. Smith made notes of matters to include in the filing, such as the New York meeting with Turkish officials, payments to Inovo, specifics of the Sphere contract, and Sphere's budget (if established). The team noted that if Turkey was involved, it must be listed on the filing, and they created various reminders. Finally, Ms. Hunt

---

[11] Ex. 7: Smith Notes of 2/14/17 call.

[12] Covington lawyer Brian Smith's notes of January 2, 2017, and reconfirmed in his 302 of June 21, 2018, show that Mr. Flynn stated Rafiekian wrote the first draft. ECF No. 151-12 at 17. ECF No. 150-5 at 7. Rafiekian told Covington this also, and the emails confirmed it. Ex. 10.

reminded the Covington team to file by email and send a check to cover filing fees by a courier.[13] Ex. 9.

Covington filed the forms on March 7, 2017.  Hunt acknowledged receipt at 10:50 p.m., prompting Smith to remark to his colleagues, "They are working late at the FARA Unit."  Ex.12.

Hardly had the FARA registration been uploaded on the FARA website when the onslaught of subpoenas began.[14]   On May 17, 2017, Special Counsel was appointed, and the much-massaged "final" Flynn 302 was reentered for use by the SCO.   Soon thereafter, the SCO issued a search warrant for all Flynn's electronic devices.   Meanwhile, Covington's August 14, 2017, invoice alone was $726,000, having written off 10% of its actual time. Ex. 13 at 3.

**B.      By the Summer, SCO Takes Down Paul Manafort and Signals FARA Issues Are on its Radar.**

In late May/early June 2017, Mr. McCabe's former Special Counsel Lisa Page left the SCO, FBI, and DOJ, soon followed by FBI Agent Peter Strzok who had interviewed Mr. Flynn at the White House.   The Inspector General for DOJ had found thousands of texts proving an affair between Strzok and Page and their shared hatred of Trump and his supporters.   ECF No. 133-2. The SCO did not notify Congress or anyone of the reason for the departure of two of its most important team members, but it did kick into high gear against its targets.   On July 26, 2017, a swarm of FBI agents raided Paul Manafort's home in the pre-dawn hours.   They ransacked his

---

[13] On March 3, 2017, Kelner emailed Hunt to tell her "we are not quite ready to file, but close." Hunt wanted more detail and demanded to know, "close as in later today, or close as in next week?" Kelner responded, Tuesday, March 7, 2017.  Ex. 11.

[14]   Covington received multiple subpoenas from the DOJ FARA unit, as well as subpoenas from the House Permanent Select Committee on Intelligence, the Senate Select Committee on Intelligence, and then Special Counsel Office. In response to these subpoenas, Covington provided many thousands of documents in sixteen productions from April 2017 through October 2017 alone, and Mr. Flynn's legal fees exceeded two million dollars.

home and searched his wife in her nightgown in their bed.[15]   The SCO was contemplating multiple charges against Manafort—including FARA. *Id.*

### C.   After Learning the SCO Has the FARA Filings in Its Sights, Covington Quietly Begins Its FARA Assessment Anew.

By August 10, 2017, Covington learned the SCO was examining Covington's FARA filing for FIG and Mr. Flynn.   Covington began re-interviewing all FIG witnesses, redoing its entire FARA assessment, and even interviewing Robert Kelley (prior counsel for FIG).   Covington never notified Mr. Flynn of what it was doing, or—even more important—*why*.   This escalated the conflict to a new level and rendered a simple resolution impossible.

In late August 2017, Covington learned SCO was threatening an imminent indictment of FIG partner Bijan Rafiekian for FARA violations.    On August 30, Covington emailed Mr. Flynn that there had "been a development" that was "not urgent," but the lawyers wanted to chat. Ex. 14.

The Flynns, who were at their home in Rhode Island, replied that they were heading to dinner with friends.   Kelner and Anthony called them while the Flynns were *en route*.   On that brief call, Kelner and Anthony relayed that Rafiekian was facing imminent indictment on FARA charges.   The lawyers mentioned a "possible conflict," that Kelner might have to testify, but they assured Mr. Flynn they would still be able to "vigorously defend" his case.   But this was not just another unfortunate, but manageable, conflict of interest.   By this time, Covington now knew there was a distinct possibility that one of Mr. Flynn's lawyers not only might have to testify against his former partner Rafiekian, but that he would be required to testify against his own client.   That instantly created a non-consentable conflict of interest that only worsened.

---

[15] Del Quentin Wilber and Byron Tau, *FBI Raided Home of Paul Manafort in Russia Probe*, WALL ST. J. (Aug. 9, 2017, 12:00 PM), https://www.wsj.com/articles/fbi-raided-home-of-paul-manafort-in-money-laundering-probe-1502294411.

Although the Covington lawyers knew they were in a conflict situation that should have led to their immediate withdrawal from the representation, they did not bother with a written or serious in-person explanation of the conflict. They did not insist that Mr. Flynn consult independent counsel to seek advice as to the wisdom of continuing to be represented by conflicted counsel. And even if the new conflict of interest had been *consentable*, they did not seek their client's informed consent. Beyond this, Mr. Flynn's former counsel failed even to bring to his attention the additional (also non-consentable) conflicts that they could see coming—but he obviously could not. What had begun as a simple mistake in doing the FARA filing suddenly had the potential of exposing *the Covington lawyers* to civil or criminal liability, significant headlines, and reputational risk. That the Covington lawyers thought that a "drive-by" cell-phone chat, while their client was on his way to dinner with his wife, was sufficient disclosure in these dire circumstances revealed their cavalier attitude and presaged far worse.

**D.      Judge Howell Unseals a Crime-Fraud Order in the Manafort FARA Case, and Covington's Fears of its Own Exposure Increase.**

On the weekend of October 28-29, 2017, the Special Counsel's investigation reached full boil. SCO charged Paul Manafort and his longtime associate Rick Gates with multiple criminal violations, including FARA violations. On October 30, 2017, Judge Beryl Howell unsealed an order allowing the government access to Manafort's communications with his lawyers, applying the crime-fraud exception to the attorney-client privilege.[16]

The Covington lawyers knew that their work on the FARA filing for Mr. Flynn posed multiple risks for the firm. In an internal email, they noted that the SCO was *so far* unlikely to be

---

[16] As Judge Howell explained, "the [crime-fraud] exception comes into play when a privileged relationship is used to further a crime, fraud, or other fundamental misconduct." *In Re Grand Jury Investigation*, 2017 U.S. Dist. LEXIS 186420, *21-22 (D.D.C. Oct. 2, 2017).

able to obtain a similar crime-fraud order in the Flynn case, and *so far* was "stymied" in pursuing "a Flynn-lied-to-his-lawyers theory of a FARA violation." Ex. 15.  Yet they were highly attuned to the risk that the situation could change and determined to proceed with extra caution to prevent their fear from becoming the reality. After the Manafort order was unsealed, Steven Anthony wrote to Rob Kelner:

> I just had a flash of a thought that we should consider, among many many factors with regard to Bob Kelley, the possibility that the SCO has decided it does not have, [with regard to] Flynn, the same level of showing of crime fraud exception as it had [with regard to] Manafort. And that the SCO currently feels stymied in pursuing a Flynn-lied-to-his-lawyers theory of a FARA violation. So, we should consider the conceivable risk that a disclosure of the Kelley declaration might break through a wall that the SCO currently considers impenetrable. [17]

Remarkably, Mr. Flynn's former lawyers still said nothing to their client about this important development and its impact on their ability to continue to represent him.  Yet, the lawyers were aware of and responding to the increased pressure that they felt.  The same day, Mr. Kelner forwarded to Mr. Anthony, without comment, a copy of the January 11, 2017, letter he had sent to FARA's Heather Hunt—the one in which Kelner had confused the difference between "writing," "publishing," or "initiating" an op-ed.

Heightening Covington's concerns about the SCO's apparent focus on its FARA filing, Kelner received a phone call from SCO prosecutor Brandon Van Grack at 4 p.m. on October 31, 2017, in which Mr. Van Grack demanded a meeting.  Ex. X (4pm meeting email).

---

[17] Robert Kelley was FIG's lawyer—first consulted by Mr. Rafiekian—who filed the LDA registration for FIG in September 2016.  Other emails show the Covington lawyers' surprise (or fear) about Kelley's candor in explaining his prior actions.  Ex. 16. Mr. Kelley took full responsibility for the decision to file an LDA (as opposed to FARA) for FIG and for the contents of that filing—both in his declaration and on the witness stand in the Rafiekian case.  Exs. 17, 18. Mr. Kelley was never charged with any wrongdoing.

### E. The SCO Etches Covington's Conflict of Interest in Stone by Putting Covington on Notice of FARA Charges against Mr. Flynn, Along with Charges under 18 U.S.C. §1001.

The Covington team went to the Special Counsel's Office to meet with Mr. Van Grack and his colleague Zainab Ahmad.  Van Grack etched Covington's conflict of interest in stone.  He said the SCO saw Mr. Flynn's exposure as "(1) FARA (failure to register); (2) FARA false statements; and (3) false statements to government officials." Ex. 19. This was the "universe of charges" they were considering against Mr. Flynn. Ex. 19.

Kelner mentioned statutory immunity only in passing, but he did nothing to make a stand for it or Mr. Flynn.  *Id* at 2.[18]  He recognized there was exposure for his client in agreeing to a proffer with only a "queen for a day" agreement.  *Id.* at 3.  Van Grack claimed the proffer was not "supposed to be a 'gotcha' interview."  *Id.* at 3.  Anthony acknowledged "this would definitely be a leap of faith on our part."  *Id.*

### F. Remarkably, SCO Specifically Raises the Conflict of Interest with Covington and Instructs Covington to Discuss with Mr. Flynn.

The lawyer-to-client conflict became unescapable.  Had there been *any* justification for Covington not withdrawing previously, or at least advising the client and insisting he obtain

---

[18]   Immunity would seem particularly appropriate to demand for a national hero like Mr. Flynn—especially in light of the immunity grants freely awarded to at least five Clinton colleagues including Cheryl Mills, and Heather Samuelson—who destroyed evidence and Clinton emails—Brian Pagliano who set up her server, and others; not to mention SCO's decisions not to prosecute others who lied to them, such as former CIA Director James Woolsey (who attended the FIG NY meeting with Turkish officials) and Joseph Mifsud (whom they allowed to leave the country despite his lies); and, an apparent grant of immunity to Tony Podesta for many of the same offenses Manafort committed.)  Michael Biesecker, *GOP lawmaker: FBI gave immunity to top Clinton aide*, AP (September 23, 2016), https://apnews.com/5eb9830643084dfa9fcbedd8b18b08e0/gop-lawmaker-fbi-gave-immunity-clinton-aides-testimony.

independent counsel to advise him on the entire situation, it evaporated at that moment.  "There's one more issue I want to bring up," Van Grack told Anthony and Kelner, "Because Covington prepared the FARA registration, that would make you [Kelner] a fact witness.  It isn't something we are considering."  Kelner dug in.  "If we were to get to that point, we would litigate it very aggressively."  *Id.*  Kelner replied: "[w]e saw what you guys did with Manafort, and we'll definitely raise it with our client."  *Id.* at 4.

**G.     Covington Does Not Raise the Likely FARA Charges—Much Less the Stunning Conflict with Mr. Flynn.**

Despite SCO's expressed concerns, and despite Kelner's promise to address with his client that remarkable fact that the SCO had just raised the conflict of interest and Mr. Kelner's position as a witness adverse to his own client, Kelner and Anthony said nothing to Mr. Flynn.  Covington did not raise the preclusive conflict with their client on November 1st.   They did not raise it when they met with Mr. Flynn three days later on November 4th.   They did not raise it in proffer preparation.  They did not raise it before the first proffer, and they did not raise it the night of the first proffer or the day of the second proffer.  Indeed, they did not raise it until almost three weeks later—late Sunday, November 19th.  Instead, the Covington lawyers created talking points for their own dealings with the SCO. Ex. 23.

**H.     Covington Calls SCO to Arrange a Deal for The Firm—Not Mr. Flynn.**

Instead of withdrawing then or even just informing Mr. Flynn of this stunning development, on November 3, 2017, Covington called the SCO.  Kelner said that the meeting two days earlier left the defense team with "a few critical questions as to whether we could get comfortable bringing [Flynn] in for a proffer." Ex. 20 at 1.  Van Grack and Ahmad said the proffer had to happen because of "where we are in our investigation."  *Id.*  They said the focus of the first proffer was going to be on issues and activities Mr. Flynn was aware of or witnessed during the

transition and his time in the White House.  *Id.* at 2.  Specifically, Van Grack claimed that the "initial focus" would *not* be on topics "that could [] incriminate."  *Id.*  Ahmad clarified that "[w]e're eventually going to want to talk about everything.  That will include topics he has criminal exposure on.  We aren't interested in Turkey right now."  *Id.*

Anthony got the point that the firm's own FARA problem could be postponed from its perspective.  "Cutting to the chase, are you going to ask him 'what is Inovo' or do you intend to leave Turkey aside and talk about the types of things [Van Grack] was talking about?" *Id.*  Notably, Anthony limited his concern to the FARA issues, as to which he and Covington had exposure. This is not the work of an unconflicted counsel whose sole interest is protecting his client's rights and interests.

Van Grack agreed to postpone discussion of issues as to which Covington had potential liability.  He said "What I would propose is, right now, we want to talk with your client for more than one day. Right now, initially, we are fine not talking about Turkey or the FARA piece because our investigation is not focused on Turkey/FARA."[19]  *Id.*

With that exchange, the false statements Mr. Flynn allegedly made to the FBI and all the "Russia collusion" issues were *on* the table first, where he had "exposure."  His own lawyers teed him up to discuss what SCO really wanted.  Simultaneously, Covington took the FARA issues off the table—the only risk of problems for the firm.  *Id*. at 4.

**I.    Covington Met with Mr. Flynn the Next Day but Did Not Disclose the FARA Target, the Firm's FARA Liability, or Covington's Pernicious Lawyer-Client Conflict of Interest.**

---

[19]   This is a significant change from Van Grack's original position that listed FARA charges as first and second in the "universe" of three charges against Mr. Flynn.

On November 4, 2017, the Covington team met with Mr. Flynn to discuss the proffer and supposedly to update him on its conversations with SCO.  They urged him to accept the proffer. They pointed out risks, and they advised Mr. Flynn that "the prosecutors seemed really worked up about the [January 24, 2017] FBI interview."  Exs. 21, 22.  Despite recognizing on October 30 (only 4 days earlier) the "impenetrable wall" of attorney-client privilege between Covington and Flynn—and the inability of SCO to prove a "Flynn-lied-to-his-lawyer case" on the FARA filing— they warned, however, that a proffer "may be our only way of talking them out of the indictment." *Id.*  Covington's self-interest reared its head, and it cannot be disentangled from its advice to Mr. Flynn to proceed to discuss what the SCO wanted and divert attention from the firm's problematic FARA registration.  Covington withheld information its fiduciary relationship with its client required it to disclose.  It withheld the secret of the firm's FARA liability, that SCO identified a clear conflict of interest, that SCO had instructed Covington to discuss it with Mr. Flynn, that SCO identified two FARA charges at least, and that Covington needed to protect itself.

Anthony gave a list of twelve factors to consider about going in for a proffer, but there was not a mention of FARA.  In fact, Covington did not raise FARA issues *at all* with Mr. Flynn. *Id.* When Mr. Flynn, *sua sponte,* asked about the charges, Anthony deflected, strongly encouraging the Flynns to participate in the proffer because it would give the SCO the chance to "get to know the real Mike Flynn…" Ex. Flynn).[20] Then Covington prepared talking points for a call with the SCO to set up the meeting. Ex. 23.

---

[20]   The next day, NBC ran a story that described "sources" saying that the SCO was going to proceed with charges against Flynn.  One paragraph was particularly clear: "If the elder Flynn is willing to cooperate with investigators to help his son, two of the sources said, it could also change his own fate, potentially limiting any legal consequences." Ex. 24. Kelner and Anthony had already predicted that if Mr. Flynn didn't proceed with the proffer, he would likely be indicted within weeks, and his son was at risk of indictment also.

Kelner called Van Grack the next day, and SCO agreed to postpone any discussion of the FARA issues.  Van Grack suggested a two-day proffer, over consecutive days, "talking between 4-5 hours each day."  Now Covington was being asked to prepare a client for a multiple day proffer in *days*.  *Id*.  Covington agreed to proffer sessions on November 16 and 17, 2017, and provided Mr. Flynn some preparation on November 15, 2017.  Ex. 25.  Still Covington did not disclose to Mr. Flynn that SCO included in its entire "universe of charges" his "FARA (failure to register);" and "FARA false statements."  They did disclose the assertion of false statements to government officials regarding contacts with Russian officials during transition.  Ex19.

The Covington lawyers continued to withhold the most important information: (i) that the prosecutors themselves had raised Covington's serious conflict of interest; (ii) the fact that the SCO had suggested calling Kelner as a witness; (iii) the lawyers had their own fear of the firm being subjected to the "Manafort treatment"; the headline risk of *Covington* in federal crime-fraud order because of their FARA filing; and, their own *criminal* exposure if the SCO deemed the lawyers co-conspirators instead of having the government operate on the theory of "Flynn-lied-to-his-lawyers" discussed in their internal email only days earlier.  Ex. 15.

Van Grack told them if the "proffer tomorrow and Friday 'goes well,' they would want Flynn to come back in Monday to proceed to the proffer on Turkey/Inovo/FARA."  Kelner said they had not prepared him for that. [Van Grack] said that "because of time pressures… they might need to tell us to be prepared to do the Turkey proffer Monday."  Ex. 26.

**J.      Covington Still Did Not Discuss the Conflict with Flynn.**

On the first day of the proffer, which was to start in the afternoon of November 16, 2017, Van Grack called Anthony to discuss whether they had talked with Mr. Flynn about the conflict.  "Nothing to worry about," Anthony wrote to Kelner to report on the call.  "They wanted to ask

what they'd previously asked: have we considered and disclosed to the client (a) RK's potentially being a fact witness and (b) Covington's own interest with respect to its prior advice to FIG/MF regarding FARA—and that the client is OK proceeding with us? Answer: yes."  Ex. 27. Apparently, Mr. Anthony misled the government. [21]

### K.  Self-Interested Covington Subjected Flynn to Two Days of "Exposure" on Russia and "False Statements" to the FBI.

Covington subjected Mr. Flynn to two full days of proffers on the issues on which he had the greatest "exposure" while they hid their conflict of interest.  Not only did they not object to any questions by the SCO, they asked questions of him themselves to elicit answers the SCO wanted, and they strongly encouraged him, the second day, to say what they deemed would "get him through the proffer" to the satisfaction of the SCO. Ex. 21.

After those two days of proffers, Covington acceded to SCO's scheduling demands, cancelled trips, including Mr. Flynn's return home, and took the weekend (November 18-19, 2017) to begin preparing on FARA issues so Mr. Flynn could start a third proffer session on Monday, November 20, 2017.

It was not until *Sunday afternoon, November 19, 2017, at 1:13 p.m.*, when Mr. Flynn was at his lowest, that Covington partner Anthony finally sent Mr. Flynn with a written request for consent to a "potential" conflict of interest that would have taken an ethics expert to comprehend. Astonishingly, that email referenced and relied on the *wrong* ethics rules. Ex. 28.  Mr. Flynn did

---

[21]  Giving Mr. Anthony the benefit of the doubt, he must have been referring to the brief August 30 phone call, when Kelner and Anthony described "a development" that was "not urgent" in an email, then spoke to the Flynns as they were driving to dinner.  The lawyers raised the possibility of Rafiekian being indicted on FARA charges; they mentioned "a conflict" but did not elaborate; and they assured Mr. Flynn they would "vigorously defend" the case.  Exs.21, 22.  That does not even constitute a cognizable "drive-by" of what was required.

not even read and reply to the email until noon the following day—an hour before his third day of proffers.

He had been told that his freedom and his son's freedom hung in the balance based on how these time-critical proffers went, and he would likely be indicted in days if the proffers "didn't go well"—which meant to SCO's satisfaction.  The timing of Covington's "notice" letter was only to Covington's advantage and Mr. Flynn's complete disadvantage.  He had been strongly encouraged by his self-interested counsel through the worst two days and increased his "exposure."  Secretly-conflicted Covington counsel did him an irreparable disservice, while completely protecting itself.  And then they did not even bother making their disclosure in person, so he could ask questions and discuss with them any concerns, nor did they advise him that he *should or must* consult independent counsel before making a decision, since their advice on the matter was, well, conflicted.

After replying to Anthony's email and expressing his uninformed but profound trust for his lawyers, Mr. Flynn proceeded through three more days of "proffers" with the SCO on FARA and tangential issues through November 29, 2017.  The exchange of documents for a guilty plea began on November 27, 2017.

### L.   Before the Plea Documents were Even Shared with Mr. Flynn, Covington Was Gleefully Planning its Marketing Campaign Based on Flynn's Plea

They had barely started exchanging plea documents before Kelner wrote his partners an email on November 27, 2017, with his plan to capitalize for the firm on Mr. Flynn's plea.

> I've been thinking about this. Assuming we reach a resolution of the Flynn case this week, after that resolution is fully public, including the FARA discussion, I would feel free to issue a meatier client advisory on FARA. I am trying, as time permits, to work up a draft. After that goes out, I am thinking we could do a client briefing in DC, one in NY, and one in LA. We would need to generate a unique slide deck for this, based partly on the advisory. We could perhaps divide and conquer, pairing

with Zack and Derek, so that we could cover more locations quickly. Just sending out announcements of the events would be good advertising.

This may be a lot to bite off, with the holidays coming up, but we may as well strike when the iron is hot, and I think Flynn would be fine with that, since the chances of our getting paid for his case are looking grim.

Ex. 29.

Brian Smith agreed:

I agree. I had a conversation last week with Derek, encouraging him and Zack to take advantage of the environment while you and I are constrained from doing so. I like the idea of client briefings, coupled with an advisory. I'm happy to help draft the advisory and update our prior decks, of course.

All that said, I really worry about a press backlash if we launch something right on the heels of a plea. I agree that the General won't mind, but we could take a beating in the press if it's too close to the plea.

With that in mind, we should definitely include Zack and Derek (to make it less of "Flynn's lawyers"). And I think some space from the plea is wise, notwithstanding the challenge that presents with the holidays and doing events while attention is high.

Honestly, I think the attention will remain high, and you doing an event on FARA will generate a lot of attention itself. *Id.*

Their concern for their own reputations, and what marketing advantage they could gain—rather than their client's welfare—is obvious and grossly unethical.

### M.   Covington Does Not Share with Mr. Flynn the Crucial Details of the Government's Last-Minute "Disclosure."

On November 30, 2017, the day before Mr. Flynn's plea, the SCO has said it disclosed to Covington that "one of the agents who interviewed Mr. Flynn was being investigated by the DOJ Inspector General" and had electronic communications that "showed a preference for one of the

candidates for President."[22]   The SCO also said it disclosed that the agents said Mr. Flynn had a "sure demeanor," and "did not give any indicators of deception" and that the agents "had the impression at the time that Mr. Flynn was not lying or did not think he was lying."  But, Kelner and Anthony did not transmit this important information from the SCO to Mr. Flynn.  Whether an oversight or deliberate strategy to keep Mr. Flynn from changing his mind about the plea, by that time, it would have exposed Covington to significant reputational risk—at a minimum—*and* scuttle the big marketing campaign.

Mr. Flynn even specifically instructed Anthony and Kelner to call SCO immediately and ask if the agents believed that he lied.  Ex. 21.  However, when Kelner and Anthony returned to the room where Mr. Flynn was about to sign the plea agreement, they did not inform the Flynns that Van Grack said, "both agents said 'they saw no indication of deception,'" he had "a sure demeanor," and they "did not believe he was lying or he did not believe he was lying."  Ex.21.  Rather, they said "the agents stood by their statement."  Not only had Mr. Flynn neither been properly informed nor properly consented (if such were even possible) to the pernicious conflict of interest impairing his lawyers, but he also signed the plea without being fully informed of or understanding the government's eleventh-hour disclosure. Ex. 21.  The SCO rushed them into court the next morning for Judge Contreras to accept Mr. Flynn's plea.

### N.   Covington Receives Awards for Flynn's Guilty Plea.

---

[22]   The SCO put nothing in writing.  Van Grack said nothing to explain the full breadth of the text messages, nor did Van Grack even name Strzok. He did not disclose the massive quantity of messages or the significant ramifications.  ECF No. 133-2.  Ironically, through 2018, as more news came out, Kelner and Anthony assumed that the President would fire Mueller or pardon Mr. Flynn. Cite email.  Indeed, Anthony never anticipated "filing anything in this case, ever."  Ex. 30.

The publicity poured in for Covington.  *American Lawyer* named Kelner and Anthony "Litigators of the Week" for Mr. Flynn's plea.  Ex. 30.  Emails of congratulations and digital backslapping flew.[23]  Ex. 31.  But the publicity was not all good. On December 30, 2017, Kelner shared the news that "the Government of Israel decided not to retain us to provide FARA advice. While our work on the Flynn matter seems to have initially drawn them to us, the Prime Minister's Office apparently saw things differently and decided that our Flynn representation was a minus not a plus." Ex. 32.[24]

What came next was more evidence of Sixth Amendment violations by Covington.  On January 29, 2018, Kelner received an email from a *New York Times* reporter saying that it was the reporter's understanding that "SSA1" (the Agent who interviewed Flynn with Strzok) "was pressured by McCabe to change [his] 302." Ex. 33.  Kelner contacted Van Grack and Ahmad and had two conversations over the next two days.  While Kelner questioned the SCO, he did not follow-up, much less file a motion to obtain *Brady* evidence.  Moreover, these seem to be the questions he was supposed to have asked before Mr. Flynn signed the plea.

**O.   March 13, 2018, SCO Began Producing Exculpatory Evidence, Which Continues to this Day.**

---

[23] The accolade was sent to all the attorneys and paralegals in the firm, to the marketing department, and to the management committee. Ex. 30. Anthony emailed the other lawyers involved in the case, bragging that it represented their "well-deserved recognition – to be added to your growing clips collection." Ex. 31.

[24] While the loss of this one potential client was a disappointment, it does not take much to imagine how much worse it would have been if they were called upon to testify against Michael T. Flynn or be subject to civil or criminal penalties for any mishandling of FIG's FARA filing in the height of the SCO operation, or even named in a crime-fraud order as in Manafort's case. The Covington lawyers had every reason to keep the Flynn plea from blowing up.

The SCO finally began producing *Brady* documents in March 2018.  Soon an entirely different picture emerged.  With every disclosure and IG Report of the last eighteen months, it has become increasingly clear the FBI was not trying to learn facts from Mr. Flynn on January 24, 2017.  Rather, the Agents were executing a well-planned, high-level trap that began at least as far back as August 15, 2016, when Strzok and Page texted about the "insurance policy" they discussed in McCabe's office, opened the "investigation" on Mr. Flynn the next day, and inserted SSA 1 surreptitiously into the "sample PDB" the next day to investigate and assess Mr. Flynn.  The IG reported:

> "[T]he FBI also had an investigative purpose when it specifically selected SSA 1, a supervisor for the Crossfire Hurricane investigation, to provide the FBI briefings. SSA 1 was selected, in part, because Flynn, who would be attending the briefing with candidate Trump, was a subject in one of the ongoing investigations related to Crossfire Hurricane. SSA 1 told us that the briefing provided him 'the opportunity to gain assessment and possibly some level of familiarity with [Flynn]. So, should we get to the point where we need to do a subject interview…I would have that to fall back on."[25]

### P.   Covington Recognized Significant Defenses as in 2018, the Attorneys Kept Mr. Flynn on "The Path."

Covington recognized significant defenses were arising from the government's productions in 2018, but the Covington lawyers repeatedly pointed out the worse-case scenario and the parade of horribles to Mr. Flynn, filed no *Brady* motion, and kept Mr. Flynn on "the path." Even worse, even though there was plenty of time and reason to reconsider everything, they took

---

[25] *See* U.S. Department of Justice (DOJ) Office of the Inspector General (OIG), *A Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation,* Oversight and Review Division Report 20-012 Revised (December 2019), https://www.justice.gov/storage/120919-examination.pdf (last accessed January 2, 2020), (hereinafter *Review of Four FISA Applications and Other Aspects of FBI's Crossfire Hurricane Investigation),* at 408.

no action to withdraw or insist he consult new counsel for an unconflicted perspective on the many issues that arose.  Keeping control of Mr. Flynn, so they could keep him from straying, was clearly part of the Covington agenda.

**Q.     For the Hearing in this Court, Covington Prepared Flynn Only to Affirm His Plea.**

Despite all the new *Brady* material produced and Mr. Flynn's numerous concerns and questions about withdrawing his plea, when it came time to prepare for the scheduled sentencing hearing, December 18, 2018, Anthony and Kelner were clear to Mr. Flynn: he should not withdraw his plea.  They warned that if Judge Sullivan asked if he wanted to withdraw his guilty plea he must say, no, because the Court would simply be giving Mr. Flynn the "rope to hang [him]self." When the December 18, 2018, national-news-breaking hearing stunned everyone, and the Flynns accepted this Court's offer to discuss the issue among themselves, the Flynns *instructed* counsel to accept the delay.  *See* ECF No. 133 at 17.[26]

**V.     COVINGTON & BURLING'S LAWYER-TO-CLIENT CONFLICTS OF INTEREST WERE EITHER NON-CONSENTABLE OR NOT VALIDLY CONSENTED TO.**

**A.     Non-Consentable Conflicts of Interest.**

Non-consentable conflicts of interest come in two flavors. The first type of conflict— *not* relied on by Mr. Flynn in earlier briefings—but mentioned by this Court in its Memorandum

---

[26] In Spring 2019, Covington finally insisted, and Mr. Flynn sought new counsel, who in turn sought expert ethics counsel immediately.  Both new lawyers instantly recognized the conflict of interest held by Covington. Kelner soon became a witness in the EDVA case against Mr. Flynn's former partner, Rafiekian, and Van Grack and Turgeon proved he was adverse to Mr. Flynn. Kelner's testimony played an important part in convincing the EDVA jury to convict Rafiekian for conspiracy and acting as a foreign agent; however, Judge Trenga acquitted him.  *United States v. Rafiekian*, 1:18-cr-457-AJT-1, ECF No. 372.

Opinion at ECF No. 144 at 81-89, arises under Rule 1.7(a) of the D.C. Rules of Professional Conduct.  That rule flatly states that "[a] lawyer shall not advance two or more adverse positions in the same matter." That form of non-consentability is often referred to as arising "by operation of law,"[27] and does not apply to this case.

The second form of non-consentability—squarely presented here—requires reading Rules 1.7(b) and 1.7(c) together.  The point of Rule 1.7(c) is that all the conflicts set out in Rule 1.7 (b)— including lawyer-to-client "personal interest" conflicts—are disqualifying unless two conditions are *both* met.  Obtaining informed client consent under Rule 1.7(c)(1) is meaningless unless Rule 1.7(c)(2) has *also* been satisfied.  That subparagraph puts the onus on *the lawyer* to first make a judgment that the representation is proper: "the lawyer *reasonably believes* that the lawyer *will* be able to provide competent and diligent representation to each affected client" (emphasis added).

If the lawyer cannot satisfy Rule 1.7(c)(2), then the lawyer cannot ethically even *ask* for client consent under Rule 1.7(c)(1).  In that situation, the second form of non-consentability arises from what might be called "discretionary judgment."[28]  Conflicts falling into this category are non-consentable because the client will never even be given a chance to consent.  An ethical lawyer will voluntarily withdraw from the representation, and all lawyers will be *required* to withdraw by D.C. Rules of Professional Conduct Rule 1.16(a)(1) in any event.[29]

Although the second form of non-consentability depends upon the judgment of the lawyer on the scene, that judgment is itself further cabined by the Rules of Professional Conduct.  D.C.

---

[27] Hazard, Hodes & Jarvis, supra n. 2 at §12.30.

[28] Hazard, Hodes & Jarvis, supra n. 2 at §12.31.

[29] Rule 1.16(a) states in part that "a lawyer shall not represent a client or, where representation has commenced, *shall withdraw from the representation* of a client if: (1) The representation *will* result in violation of the Rules of Professional Conduct or other law" (emphasis added).

Rule 1.7(c)(2) sets the standard for even seeking client consent at the lawyer's "reasonable belief," but those terms are then defined in Rule 1.0(a) and Rule 1.0(j). Under the former, "belief" is established if the person—here the lawyers at Covington— "actually supposed the fact in question to be true." But for such a belief to be "reasonable," the latter definition specifies that it must be associated with "the conduct of a reasonably prudent and competent lawyer."

The concept of a "reasonably prudent and competent lawyer" is an ethics-related term of art, has some objective meaning, and is given further (indirect) elaboration in the Comments to the Rules:

> The underlying premise [of paragraph (b) and (c)] is that *disclosure* and *informed consent* are required before assuming a representation if there is any reason to doubt the lawyer's ability to provide *wholehearted and zealous* representation of a client or if a client might reasonably consider the representation of its interests to be adversely affected by the lawyer's assumption of the other representation in question. Although *the lawyer* must be satisfied that the representation can be wholeheartedly and zealously undertaken, *if an objective observer would have any reasonable doubt on that issue*, the client has a right to disclosure of all relevant considerations and the opportunity to be the judge of its own interests.

Comment [7] to Rule 1.7 (emphases added).

Under the remarkable circumstances of this case, it would be absurd to maintain that Mr. Flynn's former counsel could have had a "reasonable belief" that they *already had* or *could ever* "provide competent and diligent representation" to their client when their own interests were at equal risk and the choice was "him or us." At minimum, the Covington defense team lawyers had misstated or allowed the government to misinterpret their statement of the origins of Mr. Flynn's election day op-ed in the FARA filing they prepared. They never corrected it in any supplemental filing. They never made an amended filing. They never admitted any role in the travesty. At the same time, they discussed among themselves their *own* potential civil and criminal FARA liability, they feared entry of a crime-fraud order, and they were leery of substantial "headline risks."

31

Anything antagonizing the omnipotent SCO jeopardized tipping the delicate balance they struggled to maintain, and they effectively positioned themselves to minimize these and other risks.

Especially telling is the fact that despite multiple opportunities to discuss this crucial problem in person with Mr. Flynn and answer his questions face-to-face, from August until November 19, 2017, when they nominally sought his written "consent" in an extremely problematic email that is discussed below.  They chose not to do so.  They certainly did not advise him of the advisability—much less the *necessity*—of consulting non-conflicted counsel before making any decision to proceed with the firm.

Even this partial inventory of the lawyers' and law firm's interests that were at risk during the representation renders any purported belief in its integrity wholly untenable and, in the language of the applicable rules, wholly *unreasonable*.  No reasonable lawyers or law firm could possibly meet the "reasonable belief" standard when its own work product has put the lawyers and the law firm at serious risk of criminal exposure,  reputational damage, "headline risk," and civil liability—not merely the loss of an advantage in a business transaction or civil dispute.  No law firm could possibly meet the "reasonable belief" standard in the face of even a minimal risk of its own possible criminal exposure—especially when confronted by an aggressive Special Counsel and the FARA unit of the Department of Justice that Covington itself acknowledged had an unprecedented interest in this matter.

Judging the severity of conflicts of interest to determine whether they rise to the level of non-consentability is especially risky when lawyer-client conflicts are at issue, because the judgment must be made by the very lawyers and law firms whose interests are threatened.  There is an ever-present danger, therefore, that the lawyer will—consciously or not—*underestimate* the dangers faced by the client.  By contrast, in client-to-client conflicts, at least the lawyer is

mediating between interests *other than his own*.  In this case, not only was the conflict between lawyer and client, the most insidious of all, but the evidence of Covington's self-interest was so significant and dangerous that it could not *reasonably* be set aside.

Lawyer-to-client conflicts also demand the most rigorous review, because if the lawyer *does* proceed to seek the client's consent, the client will have no good way of judging whether the disclosure and explanation of the conflict has itself been compromised by the self-interest of the lawyer seeking consent.

Clients rightly have a bias *towards* trusting the lawyers they have earlier chosen—in whom they have invested hundreds of thousands of dollars, months of time, and developed a trusting relationship.  Moreover, they have no realistic ability to double-check the sincerity of the request for consent.  This is especially true when any purported "notice" is presented when the client is in the worst possible position, under enormous stress, and watching his life unravel.  Indeed, the particular insidiousness of lawyer-to-client conflicts is that even the most well-intentioned lawyer can never be certain whether what would ordinarily have been a reasonable judgment call was tainted by his own self-interest, and if so, to what extent.

The lawyer-client conflicts of interest that are presented here are well recognized not only in legal ethics generally, but in longstanding Sixth Amendment jurisprudence.  As the D.C. Circuit said over forty years ago:

> To be sure, most conflicts of interest seen in criminal litigation arise out of a lawyer's dual representation of co-defendants, but the constitutional principle is not narrowly confined to instances of that type. The cases reflect the sensitivity of the judiciary to an obligation to apply the principle whenever counsel is so situated that the caliber of his services may be substantially diluted. *Competition between the client's interests and counsel's own interests plainly threatens that result, and we have no doubt that the conflict corrupts the relationship when counsel's duty to his client calls for a course of action which concern for himself suggests that he avoid.* (emphasis added).

*United States v. Hurt*, 543 F.2d 162, 166 (D.C. Cir. 1976) (internal citations omitted.)[30]

**B.     Even if Any Aspects of the Dramatic Covington-Flynn Conflicts of Interest were Consentable, Mr. Flynn's Purported Consent was not "Informed."**

Even *if* the egregious conflicts of interest described throughout *were* consentable, much more would be required before any waiver (or consent) could be deemed valid.[31]   The D.C. Rules of Professional Conduct include a number of formal definitions, including Rule 1.0(e) which states that: "'[i]nformed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated *adequate information* and *explanation* about the *material risks* of and *reasonably available alternatives* to the proposed course of conduct." (emphasis added).

Making this already high standard even tougher to meet, Comment [27] to Rule 1.7 provides in part: "Disclosure and informed consent are not mere formalities. Adequate disclosure requires such disclosure of the parties and their interests and positions as to enable each potential client to make a fully informed decision as to whether to proceed with the contemplated representation."   More tellingly, Comment [28] to Rule 1.7 contains the important reminder that "under the District of Columbia substantive law, *the lawyer bears the burden of proof that informed consent was secured.*" (emphasis added).

---

[30] Cf., *Ambush v. Engelberg*, 282 F. Supp.3d 58 (D.D.C. 2017), in which this Court recognized that a "personal interest" conflict of interest was cognizable for purposes of a motion to disqualify counsel, before it denied the motion chiefly on standing grounds.

[31] In its Memorandum Opinion of December 16, 2019, this Court repeatedly stressed that during Mr. Flynn's original guilty plea and his later colloquy with the Court at the Sentencing Hearing, he was accompanied by and able to consult with his former counsel. ECF No. 144 at 2, 4, 9, 31, and 90.  Moreover, this Court noted that *former counsel* had assured *the government* that Mr. Flynn had been made aware of possible conflicts of interests inherent in the representation, and that Mr. Flynn had waived those conflicts [Memorandum Opinion, ECF. No. 144 at 83].  As shown here, the Court's observations were presumably correct, but the assurances given by former counsel were not.

As the facts discussed above establish, Covington did not give Mr. Flynn adequate or honest information at any stage.  It was not until November 19, 2017, two days after the proffer sessions began, and on the eve of the FARA proffers themselves, that Steven Anthony wrote a long email to Mr. Flynn, belatedly seeking his consent.  He sought Mr. Flynn's "informed consent" to permit the representation to continue despite the intractable and pernicious conflict under which Covington had already been representing him.  Mr. Flynn responded by email at noon the next day, as he was about to go into the third (FARA) proffer. Ex. 28.  He did not have time to consult any un-conflicted lawyer before consenting, even if Covington had insisted he do so, which it did not.

Although the Anthony email nominally explained the elements of an "underlying work" conflict of interest, correctly noted the additional difficulty that the Covington lawyers might be called *by the government* as fact witnesses *against* Mr. Flynn, and offered Mr. Flynn an opportunity to consult with independent counsel, it did not advise him that he *should* do so—much less *insist*, and it was far too little and far too late.  Covington should have withdrawn in August, three months earlier, when new counsel could have appeared and amended the FARA registration to correct any mistakes, clarify the situation, and fight for Mr. Flynn.  Instead Covington charged Mr. Flynn hundreds of thousands of extra fees to reinvestigate its own flawed prior work.

The lawyers passed over weeks of time and at least three face-to-face meetings with Mr. Flynn before the first proffer.  They ignored SCO's pointed request to discuss the most threatening conflict with Mr. Flynn—that Mr. Kelner could become an adverse witness to his own client and the "Flynn-lied-to-his-lawyer" theory of his criminal conduct that Covington had every incentive to adopt.  Instead, the lawyers acted for the firm's interest by pushing the FARA issues to the later

days by which time SCO had Mr. Flynn undefended on the §1001 charges about Russia and his own exposure.

If all of this were not enough, Mr. Anthony's email negated any semblance of validity to the very request for consent—let alone Mr. Flynn's supposed agreement to provide that consent. In the November 19, 2017 email, Mr. Anthony stated that "under Rule 1.7 of the D.C. rules of professional conduct, a lawyer shall not represent a client if there is *a significant risk* that the representation will be *materially limited* by a personal interest of the lawyer, unless the client gives informed consent." (emphasis added).  But the D.C. Rules say no such thing. What Mr. Anthony actually quoted was language from the American Bar Association Model Rules of Professional Conduct; he made no mention of the actually applicable (and stricter) D.C. Bar rule.

The applicable language in D.C. Rule 1.7 creates a much lower threshold at which a lawyer must bow out: "the lawyer's professional judgment on behalf of the client will be *or reasonably may be adversely affected* by . . . the lawyer's own financial, business, property, or personal interests." (emphasis added). The D.C. standard and the ABA standard quoted by Anthony are dramatically different. "Adversely affected" judgment is much more likely to occur than representation that is "materially limited." And, risks that "reasonably may be" presented will occur far more often than "significant risks."

Seeking client consent under the wrong rule and an inapplicable standard, Covington cannot even plausibly *claim* to have satisfied its obligation to make an "adequate disclosure" to Mr. Flynn to enable him "to make a fully informed decision." D.C. Rule 1.7 Comment [27].  And it certainly was neither timely nor fulsome.   The firm cannot shoulder the burden of persuasion—presumably to this Court—that informed consent had been secured. D.C. Rule 1.7 Comment [28]. It decidedly was not.

Beyond this, even if Mr. Anthony had checked the applicable rules of professional conduct he had been practicing under for many years, his recitation of the risks posed by both of the conflicts in play—*underlying work and adverse testimony*—was generic and bland. There is nothing in his advice that would bring home to a layperson in the crisis, and under stress, Mr. Flynn faced that would alert him to the seriousness and outrageousness of the matter.[32]   Even worse, the greatest damage had already been done.  His own lawyers had served Mr. Flynn up on a "silver platter" to the SCO to facilitate its "Russia investigation" and increased Mr. Flynn's risk of criminal exposure, innocent misstatements, unrefreshed recollection—and all in the unprecedented pressure of trying to "get through" the proffer to SCO's satisfaction—with no understanding of the real ramifications to himself.

Time and again, the conflicts caused Covington to favor its own interests over those of its client, and, *as a result*, the lawyers repeatedly violated the constitutionally mandated standard of the Sixth Amendment.

## VI.  BECAUSE OF THE PERVASIVE CONFLICTS OF INTEREST, COVINGTON REPEATEDLY FAILED TO PROVIDE MR. FLYNN WITH THE CONSTITUTIONALLY MANDATED EFFECTIVE ASSISTANCE OF COUNSEL. AS A CONSEQUENCE, HIS DEFENSE WAS IRREPARABLYPREEJUDICED.

To meet the prevailing standard in this Circuit for withdrawing a guilty plea on the ground of the ineffectiveness of his counsel, Mr. Flynn must demonstrate both that counsel's advice or performance was "not within the range of competence demanded of attorneys in criminal cases," and that "there is a reasonable probability that, but for counsel's errors, he would not have

---

[32] Mr. Anthony contented himself with these words, which are essentially tautological and both self-serving and self-congratulatory: "We do not believe that our commitment, dedication, and ability to effectively represent you will be adversely affected by our own interests, and we believe that we will be able to provide you with competent and diligent representation."  He provided no reason or fact on which such a "belief" could have rested.

pleaded guilty and would have insisted on going to trial." *United States v. Horne*, 987 F.2d 833, 835 (D.C. Cir. 1993) (internal citations and quotation marks omitted).  That standard is the result of the Supreme Court's assimilation, in *Hill v. Lockhart*, 474 U.S. 52 (1985), of the general standard for showing ineffectiveness of counsel set out in *Strickland v. Washington*, 466 U.S. 668, 714 (1984).  Mr. Flynn's former lawyers from Covington repeatedly acted *outside* the range of competence demanded of attorneys in criminal cases. Because of these failings, Mr. Flynn was essentially on his own (at best) and battling two opponents simultaneously (at worst). As a result, his defense was prejudiced and his ability to make knowing and intelligent decisions in his own interest was destroyed.

In terms of the second prong of the *Horne* test, there is not merely a "reasonable probability that absent counsel's failings he would not have pleaded guilty. There is certainty. If his own lawyers had not withheld critical information from him at the time of the first plea, and had not continued to obscure their own role in creating his predicament, Mr. Flynn would *not* have pled guilty in 2017, and he *would* have withdrawn his plea in 2018.

### A.    Covington Withheld Crucial Information from Mr. Flynn that the SCO Disclosed Immediately Before Flynn Signed the Plea Agreement.

At perhaps the single most crucial moment of the whole case, Mr. Flynn's former counsel betrayed his trust by withholding the very pieces of information Mr. Flynn needed to make his final decision whether to plead guilty on November 30, 2017. Covington should have shared with Mr. Flynn the precise information the government disclosed to them at the last minute.[33]   The

---

[33]   Any "disclosure" by the government—especially when prefaced with a claim of "no legal or ethical obligation to share"—should have been reduced to writing by the government and then shown to the client and personally acknowledged in further writing signed by the client.  This was a case of national and international importance.  It changed the President of the United States' administration.  It altered the course of history and the life of a man and his entire family hung in the balance.

lawyers did not do so.  The Flynns did not hear or understand what the government had advised it told Covington at the eleventh hour.  ECF No. 122 at 16.   This remarkable and directly prejudicial failure of Mr. Flynn's former counsel to provide the effective assistance of counsel required by the Sixth Amendment at the most crucial time is sufficient alone to require withdrawal of his plea.[34] It is wholly unreasonable and  outside the range of acceptable lawyerly behavior, let alone competence, for counsel—*not the government, but the defendant's own counsel*—to withhold crucial information that effectively *disables* the defendant from making a truly voluntary or intelligent decision whether or not to plead guilty.

The information that counsel withheld concerned prior statements that the two FBI agents who interviewed Mr. Flynn in the White House had made about his "sure demeanor," the lack of "indicators of deception," and similar observations. Exs. Michael Flynn Declaration;Lori Flynn Declaration.

In an earlier round of briefing in this case, the government represented that it had communicated this information *to the defendant* on the day that the plea agreement was signed, November 30, 2017 [Gov't's Opp'n, ECF No. 122 at 16]. In its December 16, 2019 Opinion, moreover, this Court accepted and relied on that representation [Memorandum Opinion, ECF No. 144 at 32].As the Flynn Declarations demonstrate, however, that representation was mistaken: the government almost certainly made a disclosure to the defendant's *counsel* on that day, but Covington *did not then communicate the information to the defendant himself.*  Of course, in the vast majority of cases, communication to counsel *is* communication to the client, but it was not that day.

_____

But that merely makes the point—if it needed making—that Mr. Flynn's former attorneys acted far outside of ordinary professional norms. Whether one consults formal Rules of Professional Conduct, the traditions and lore of the legal profession, or case law discussing the meaning of the "assistance of counsel" provision in the Sixth Amendment, the core values of loyalty and zealous service always loom large.

### B. Covington Continued to Fail to Act on Mr. Flynn's Behalf as New Evidence Came to Light After His Plea.

Covington repeatedly failed to reevaluate its position in light of significant developments in the case, or to encourage Mr. Flynn to seek new counsel when the developments arose that further invalidated the advice they had already given him. They repeatedly convinced him to "stay on the path" they had placed him on and to discount or render meaningless the astonishing facts that began surfacing from the day after he entered his rushed and misinformed plea.

Moreover, the Covington lawyers had most of 2018, production upon production of *Brady* evidence from the government, and ample time before the next court appearance, in which they could have fully and honestly discussed the conflict of interest with Mr. Flynn. At any time during all of 2018, had Covington been forthright and ethical, Mr. Flynn would have been able to consult meaningfully with non-conflicted counsel well in advance of the December 18, 2018, sentencing hearing in this Court. Instead, time and time again, they persuaded him to "stay on the path."

### C. By December 18, 2018, Covington Prepared Mr. Flynn to Reaffirm his Plea of Guilty and Nothing Else.

Before the Sentencing Hearing of December 18, 2018, Mr. Flynn's lawyers essentially advised him only to "stay the path," say as little as possible, *and refuse to consider any suggestion by the Court that he might want to withdraw his plea*. Ex. 21. They explicitly told him: "If the

judge offers you a chance to withdraw your plea, he is giving you the rope to hang yourself. Don't do it." *Id.*

That advice is the capstone showing how Mr. Flynn's former counsel provided nothing but ineffective and self-interested assistance of counsel to the last. Not coincidentally, it also satisfies the prejudice prong of *Hill v. Lockhart*, 474 U.S. 52 (1985). *See Berkeley*, 567 F.3d at 708. The "result" of the prior proceedings in this case would have been different at every turn. Absent the actual secret self-interest of Mr. Flynn's conflicted former counsel: (i) he would have terminated Covington in August 2017; (ii) he would not have gone into the proffer; (iii) he would not have pled guilty in 2017; and, (iv) he would have withdrawn his plea in 2018. This is confirmed by the change in his defense immediately upon his retention of unconflicted and tenacious lawyers whose allegiance and devotion are only to him.

> **D.  Covington Knew Special Counsel's Statements in the Statement of Offense Regarding the FARA Filing Were False or Wrong, But Covington Simply Stood Down.**

Covington's internal emails show it knew the "false statements" asserted by the government in the FARA filing were either false, made by someone other than Flynn, included because of Covington's own judgment calls, or were falsely crafted by the government. *See* ECF No. 150-1 at 35-68. Covington simply stood down.

Covington possessed, from its first conversation with Michael Flynn and the emails provided to it in early January 2017 by Flynn, his former partner Rafiekian, and then-FIG counsel Kristen Verderame, ample information and documents to make a correct FARA filing. The choice

of information to include in that filing was made primarily by Covington lawyers Smith and Kelner who advertised their expertise as FARA lawyers.[35]

> ### i.    The "Smoking Gun" Email Shows Covington Knew the SCO's Assertions Were False.

The email Ex. 34 alone requires withdrawal of the plea and dismissal of this case.  On November 27, 2017, three days before the rushed plea of Mr. Flynn, Brian Smith, Kelner, Anthony and other Covington lawyers exchanged a stunning email.  It copied the full Covington team on Mr. Flynn's defense, including senior partner Michael Chertoff:

> "Paragraph 5 of the Statement (regarding FARA) is hardly brief or passing, as they suggested it would be. Several of the 'false statements' are contradicted by the caveats or qualifications in the filing. For example, the Statement says 'Flynn made' false statements that are, in the filing, attributed to Arent Fox and the accounting records."

Kelner acknowledges having made "the same point about the caveats" to SCO. Ex. 34. Smith's own quotation marks around "false statements" and "Flynn made" show Smith knew it was the SCO's allegations that were false.  Moreover, it suggests that Covington had an understanding with SCO to keep any FARA comments "brief or passing"—about which they were disappointed on their own behalf.

> ### ii.   Covington did not inform Mr. Flynn that it was the alleged "false statements" in the Statement of Offense that were false.

Despite Covington's significant re-investigation of all the FARA issues after August 10, 2017, they did not make certain Mr. Flynn understood it was the government's allegations in the Statement of Offense regarding the FARA filing that were the actual falsehoods.[36]  For reasons

---

[35] ECF No. 151-5.

[36] Despite the huge importance of *Brady v. Maryland*, 373 U.S. 83 (1963) to any criminal defendant, and the documented and well-publicized "epidemic of *Brady* violations" in this country, Covington did not make a written *Brady* demand before walking Mr. Flynn into the proffer and a plea that signed away his rights.  It finally made a *Brady* demand a year later, but watered-it down

new counsel cannot imagine, Brian Smith also thought it was "helpful" that "the double negatives in the Information and the Statement" "make it hard to comprehend."  Ex. 34.

### iii. Covington Counseled Flynn to Sign A Statement of Offense It Knew Was False.

Despite knowing the government's allegations regarding false FARA statements in the Statement of Offense were false or wrong, Covington counseled Mr. Flynn to sign the Statement of Offense. Ex. 21.

### iv. Covington *Signed* an Attorney's Acknowledgement of the Statement of Offense.

Kelner and Anthony themselves signed the Statement of Offense for the plea even though they knew they had provided predominantly correct information to the government, and that mistakes, if any, were their own or the government's—not Flynn's.[37]  Nonetheless, they joined the

---

in deference to the SCO, and it never followed up.  Indeed, the defense did not even have the "final Flynn 302" McCabe approved until November 20, 2017.  Although some courts have held the duty to produce exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963) does not extend to persons who have not been indicted, competent counsel would have insisted on *Brady* disclosures before permitting Mr. Flynn to walk into a proffer with SCO—not to mention before relinquishing his rights pursuant to a plea.  *See White v. United States*, 858 F.2d 416 (8th Cir. 1988) (adopting the Sixth Circuit's framework that acknowledged a *Brady* claim can attack a guilty plea); *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995) (holding that "a defendant challenging the voluntariness of a guilty plea may assert a *Brady* claim"); *United States v. Webb*, 277 Fed.Appx. 775 (10th Cir. 2016) (noting that *Ruiz* only addressed impeachment and pointing to other Circuits that have held the government is still required to produce exculpatory evidence in the plea stage); *United States v. McCoy*, 636 Fed.Appx. 996 (11th Cir. 2016) ("This Court has not decided whether a guilty plea waives a *Brady* claim."). *See United States v. Saffarinia*, 2019 U.S. Dist. LEXIS 176174 (citing *United States v. Hsia*, 24 F. Supp. 2d 14 (D.D.C. 1998) (court no longer trusting the government).

[37]  Conflations and choices of words muddied the ridiculous point of who wrote the op-ed.  There was no dispute that Rafiekian wrote the first draft.  The documents also showed that. ECF No. 150-5 at 7.

"Flynn-lied-to-his-lawyer" theory of the SCO—the very subject they raised in their October 30, 2017 email and they effectively demolished the "impenetrable wall."

### ATTORNEYS' ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: __11/30/17__ _____

Robert K. Kelner
Attorney for Defendant

_____

Stephen P. Anthony
Attorney for Defendant

## VII.   THE LAW OF THIS CIRCUIT REQUIRES ALLOWING MR. FLYNN TO WITHDRAW HIS PLEA.

*United States v. Cray*, 47 F.3d 1203 (D.C. Cir. 1995), which this Court requested counsel address, denied withdrawal of a guilty plea because there was no violation of Rule 11. As more recent circuit decisions hold, Rule 11 violation is only one of the reasons that warrants granting a motion to withdraw a plea. Here, Sixth Amendment violations taint Mr. Flynn's plea, and it cannot stand.[38] *United States v. McCoy*, 215 F.3d 102, 107 (D.C. Cir. 2000) ("A plea based upon advice of counsel that 'falls below the level of reasonable competence such that the defendant does not receive effective assistance' is neither voluntary nor intelligent.") (internal citation omitted).

---

[38] "Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). *E.g., Cuyler v. Sullivan,* 446 U. S. 335 (1980); *Holloway v. Arkansas,* 435 U. S. 475, 481 (1978).

In *United States v. Taylor*, this Circuit also hammered out parameters for a defendant to benefit from the relaxed *Cuyler v. Sullivan* standard which allows a presumption of prejudice because of an actual conflict of interest.   139 F.3d at 929.   Relying on *Cuyler*, this Court wrote that "prejudice[] will be presumed if the defendant demonstrates that counsel actively represented conflicting interests, and that the conflict adversely affected his lawyer's performance."   A defendant must "show that his counsel advanced his own, or another client's, interest to the detriment of the defendant. *Id.* at 930.   Counsel must know of the conflict, but "if an attorney fails to make a legitimate argument, because of the attorney's conflicting interest…than the *Cuyler* standard is met. *Id.*  Mr. Flynn must show that "counsel actually acted in a manner that adversely affected his representation by doing something, or refraining from doing something, that a non-conflicted counsel would not have done." *Id.* Mr. Flynn's case is painfully replete with evidence of Covington acting secretly in its self-interest and to Mr. Flynn's prejudice.

In *United States v. Berkeley*, this Circuit again addressed a conflict of interest and ineffective assistance of counsel as the basis for a plea withdrawal. In that 2009 case, the court reiterated that "prejudice is presumed…if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance."  567 F.3d 703, 708 (D.C. Cir. 2009).[39]

Finally, in *United States v. McCoy* (five years after *Cray*), this Circuit applied the two-prong *Strickland* standard to a defendant's request to withdraw his plea based upon ineffective

---

[39] The defendant claimed that his counsel failed to pursue an entrapment defense, because he knew it would require testimony from a former client, thereby necessitating his own withdrawal from the case. *Id.* at 709.  The Court took issue with only one element of the defendant's argument— defense counsel did not know the necessary fact that would have alerted him to the looming conflict. Without his attorney's knowledge of the conflict, the court held the defendant's "logical chain collapses." *Id.* at 709.

assistance of counsel when the defendant's lawyer calculated the wrong jail sentence he was facing with his plea.   215 F.3d 102 (D.C. Cir. 2000).   The Court held that such a mistake in "fail[ing] to follow the formula specified on the face of the guidelines" was deficient performance under *Strickland*. *Id.* at 108.   The court found that McCoy did not need to "prove[] he would have gone to trial," only that there was "a reasonable probability" that "but for counsel's mistake he would not have pled guilty." *Id.*   Significantly, this Circuit remanded the denial of McCoy's motion to withdraw to the district court with instruction to grant withdrawal. Id. Mr. Flynn satisfies *Strickland*'s test—with or without the more relaxed presumption of *Cuyler*.   Most of all, Mr. Flynn meets the "lenient" standard for plea withdrawal pre-sentencing, because he has demonstrated that it is only "fair and just" to grant his motion.

There is not merely a "reasonable probability" that Mr. Flynn would have proceeded differently had his own lawyers been honest with him, there is certainty:  (1) he would have hired a different law firm to redo the FARA investigation in August if he had been fully informed; (2) he never would have agreed to a proffer; (3) he would not have been disarmed and effectively unrepresented in the proffer—much less tried to please SCO; (4) he would not have pleaded guilty; and (5) he would have *withdrawn* his plea in December 2018.  There are no subtle judgments about "prejudice" here.   Covington could not represent the colliding interests of itself vis-à-vis the omnipotent SCO and also represent Mr. Flynn.

## VIII.   RULE 11 FAILURES ALSO SUPPORT WITHDRAWAL PURSUANT TO *CRAY*.

In what was scheduled to be a sentencing hearing on December 18, 2018, this Court began an unexpected "extended" colloquy with Mr. Flynn.  His counsel had prepared him only to refuse to withdraw his plea—lest this Court be "giving him rope to hang himself."  Flynn declaration.

That plea colloquy did not, however, inquire into whether any undisclosed promises or threats induced the plea agreement. Moreover, the Court specifically expressed its dissatisfaction with the underlying facts supposedly supporting the factual basis for the plea. *United States v. Cray*, 47 F.3d 1203, 1207 (D.C. Cir. 1995) ("Where the defendant has shown his plea was taken in violation of Rule 11, we have never hesitated to correct the error.)"

As previously discussed, there was substantial pressure on Mr. Flynn to participate in a quick proffer and reach a quick plea agreement with the government. The government leveraged the threat of charges against Mr. Flynn's son to induce that agreement. Yet the government's decision not to charge his son was not reduced to writing as part of the plea agreement; it was a secret, side deal between counsel.   Yet, that "understanding" was one of two necessary pre-conditions for Mr. Flynn to enter into the plea agreement. The government and Mr. Flynn's prior counsel chose not to disclose that agreement to this court. By doing so, they concealed from this Court that the plea was driven by threats and promises that were foreign to the plea agreement, thus showing that the plea was not voluntary.   That evidence is now in plain view, and the government's conduct since the plea was entered on December 1, 2017, shows as much. Exs. 21, 22.

Moreover, the Court did not complete the full colloquy to ensure that Mr. Flynn fully understood the conduct that was required for his actions to be considered a violation of 18 U.S.C. § 1001. While the Court did ask him about whether he considered himself guilty, it did not inquire into the basis of that belief.  That was crucial here because it may have been that Mr. Flynn was pleading guilty to take responsibility for something that was not criminal activity.

Finally, the Court was not satisfied with the factual basis for the plea. It said it had "many, many, many questions." Hr'g Tr. Dec. 18, 2018 at 20. The Court, sensing the materiality issues in the case, specifically left those questions open for another day. *Id.* at 50.[40]

## IX.   CONCLUSION

For these reasons, and/or those briefed at ECF No. 151, this Court should allow Mr. Flynn to withdraw his plea. Indeed, the government should agree that this plea be allowed to be withdrawn. Not only was Mr. Flynn denied his Sixth Amendment right to "zealous counsel" devoted solely to his interests, he was misled, misinformed and betrayed by counsel mired in non-consentable conflicts of interests that only worsened to Mr. Flynn's increasing prejudice.

In addition, when this Court unexpectedly extended his Rule 11 colloquy, it did not address a fundamental point that would invalidate his plea, and it ended the hearing with significant dissatisfaction over the information underlying the factual basis for his plea and with "many, many,

---

[40] The element of materiality boils down to whether a misstatement "has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body to which it was addressed." *United States v. Gaudin,* 515 U.S. 506, 522-23 (1995). In applying this rule, courts analyze the statement that was made and the decision that the agency was considering. *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002-03 (2016). For a misstatement to be material, the agency must show that it would have made a different decision had the defendant told the truth.

The government alleges misstatements that were not material because the FBI agents did not come to the White House for a legitimate investigative purpose; they did not come to investigate an alleged crime. Instead, they came to get leverage over Mr. Flynn at a time when they felt the new administration was still disorganized. So they ignored policies and procedures. They went around the Department of Justice and the White House Counsel's office, and they walked into the National Security Advisor's office under false pretenses. They decided not to confront Mr. Flynn with any alleged misstatement not for a legitimate law enforcement purpose, but rather because they did not know if the effort to purge him from his office would be successful. If it was not, they wanted to maintain a collegial working relationship with him. If Mr. Flynn had answered the questions the way in which they imagine he should, nothing at all would have changed in the actions the FBI would have taken.

many questions" remaining.   There is every reason in this case that the Court must exercise its

discretion and allow withdrawal of the plea.  It is the only "fair and just" result short of dismissing

the entire prosecution for outrageous and egregious government misconduct.


Dated: January 23, 2020                     Respectfully submitted,


/s/ Jesse R. Binnall                              /s/ Sidney Powell
Jesse R. Binnall                                  Sidney Powell
Lindsay R. McKasson                               Molly McCann
Harvey & Binnall, PLLC                            Sidney Powell, P.C.
717 King Street, Suite 300                        2911 Turtle Creek Blvd.,
Alexandria, VA 22314                              Suite 300
Tel: (703) 888-1943                               Dallas, Texas 75219
Fax: (703) 888-1930                               Tel: 214-707-1775
jbinnall@harveybinnall.com                        sidney@federalappeals.com
lmckasson@harveybinnall.com                       Admitted *Pro Hac Vice*
Admitted *Pro Hac Vice*                           molly@federalappeals.com
                                                  Admitted *Pro Hac Vice*
W. William Hodes
The William Hodes Law Firm
3658 Conservation Trail
The Villages, Florida 32162
Tel: (352) 399-0531
Fax: (352) 240-3489
Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2020 a true and genuine copy of this Supp. Motion to Withdraw Plea of Guilty and Brief in Support was served via electronic mail by the Court's CM/ECF system to all counsel of record, including:

> Jessie K. Liu, U.S. Attorney for the District of Columbia
> Brandon L. Van Grack, Special Assistant U.S. Attorney
> Jocelyn Ballantine, Assistant U.S. Attorney
> 555 4th Street, NW
> Washington, D.C. 20530

<div style="margin-left: 50%">

Respectfully submitted,

/s/  Jesse R. Binnall
Jesse R. Binnall, VSB# 79272
HARVEY & BINNALL, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jbinnall@harveybinnall.com

</div>