```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                       ALEXANDRIA DIVISION

 3  UNITED STATES OF AMERICA,    )  Case 1:18-cr-00457
                                 )
 4              Plaintiff,       )
                                 )
 5       v.                      )  Alexandria, Virginia
                                 )  July 18, 2019
 6  BIJAN RAFIEKIAN,             )  9:00 a.m.
                                 )
 7              Defendant.       )  Day 4 (AM Session)
                                 )  Pages 659 - 799
 8

 9                      TRANSCRIPT OF TRIAL

10         BEFORE THE HONORABLE ANTHONY J. TRENGA

11             UNITED STATES DISTRICT COURT JUDGE

12                         AND A JURY
```

25   COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

R. Kelley - Direct ──────United States v. Rafiekian──────

856

1  Q.   Did you have a role with the Nowruz Commission?
2  A.   I was secretary general.  I was -- I attended the board
3  meetings, but I was not on the board.
4  Q.   Did you provide legal services at all for the Nowruz
5  Commission?
6  A.   No.
7  Q.   And Mr. Rafiekian, did he have a role in it as well?
8  A.   Yes, he was the vice chairman.
9  Q.   And did there come a time -- again, we're talking about
10 the second half of 2016 -- when Mr. Rafiekian contacted you
11 about a legal matter?
12 A.   Yes.
13 Q.   Do you recall about when that happened?
14 A.   It was in the first week of September 2016.
15 Q.   And do you recall how he contacted you?  In telephone?
16 In person?
17 A.   Yes, telephone.  He telephoned me.  And he knew my number
18 from -- it was a friend.
19 Q.   And what did you understand him to be interested in legal
20 advice about?
21 A.   He said that we have to register at FARA, the Justice
22 Department Foreign Agents Registration Act.  And if you could
23 come out, he said, to assist me with the registration.
24 Q.   When you say "we," was he talking about a particular
25 business company?

R. Kelley - Direct
United States v. Rafiekian
857

1  A.   I don't know.  I don't know.
2  Q.   Okay.
3  A.   It was Flynn Intelligence Group, I think.
4  Q.   Okay.  And what did you know about the Flynn Intel Group
5  at the time when Mr. Rafiekian --
6  A.   I don't know anything about him.
7  Q.   You just knew --
8  A.   At the time.
9  Q.   Okay.  And what did you learn in your initial discussion
10 with Mr. Rafiekian about the Flynn Intel Group and what he was
11 interested in?
12 A.   Well, I -- I assumed that I was not a part of the Flynn
13 Intelligence Group and I should steer away from -- I didn't --
14 did not want to pry about how much the money they're making
15 or -- it was a client.
16 Q.   And when Mr. Rafiekian contacted you, how specific was he
17 in describing the issue?
18 A.   He said that I have to -- the firm has to register at the
19 Foreign Agents Registration Act.
20 Q.   And following this initial contact, did there come a time
21 when a meeting took place?
22 A.   Sunday afternoon -- or in early September.
23 Q.   Do you recall where that was?
24 A.   In his house.
25 Q.   Was anyone else present?

1  A.   No.
2  Q.   And did you gather further information at that meeting at
3  Mr. Rafiekian's home?
4  A.   No.  I said that I was -- is it a foreign government or a
5  foreign political party, and he said, no, it's a private
6  company.
7           And I said, You don't have to register at FARA.  You
8  can register at LD -- Lobbying Disclosure Act in the Congress.
9  Q.   About how many times in your career had you had a client
10 in some fashion inquire or led you to discuss with them the
11 Foreign Agents Registration Act versus the LDA?
12 A.   About 30 times.
13 Q.   Thirty times.
14 A.   I represented -- at the Law Office of John Sears, I
15 represented South Africa and Belize Ambique and Japan Airlines
16 and Japan automobile manufacturers.  And I filed for both of
17 them, all of them, four of them, every six months for ten
18 years.
19 Q.   You mentioned a minute ago, is there a common alternative
20 to the Foreign Agents Registration Act, FARA?
21 A.   There's the Lobbying Disclosure Act.  The Foreign Agents
22 Registration Act was passed in 1938 by Congress and signed
23 into law by F.D.R.  And it was a disclosures statute and you
24 can do anything you want, but you have to disclose it to the
25 government and to the American people.  The public records are

R. Kelley - Direct ──────United States v. Rafiekian────── 859

1  on file.
2       And in 1995, the -- the Congress passed the Lobbying
3  Disclosure Act, which removed a class of lobbyists for the
4  governments and foreign governments and foreign political
5  parties.
6  Q.  Under what circumstances in your practice did you
7  typically advise a client to file under the LDA versus FARA?
8  A.  I didn't.  I made the decision in 1993 to register at
9  FARA -- oh, LDA, Lobbying Disclosure Act, for the Japanese
10 automobile manufacturers because I was lobbying and I fell
11 under the statute.
12 Q.  Let's go back to the day you met with Mr. Rafiekian at
13 his home.
14      What -- did you learn anything that led you to reach
15 a conclusion about whether FARA or the LDA was the proper
16 place to register?
17 A.  Yeah.  I said that the -- it was a -- I asked the
18 question:  Is it a foreign government or foreign political
19 party?
20      And they said no -- and he said, no, it was a
21 private company.
22      And I said, You don't have to register at Foreign
23 Agents Registration Act.  You can register in the U.S.
24 Congress.
25      And I asked him, Will lobbying be involved?

1              And I said -- he said, It might.
2              And I said, You can register at Lobbying Disclosure
3    Act.
4    Q.   Why is the fact that the contract was with a private
5    company an important consideration for you?
6    A.   Well, the 1995 act removed a class of lobbyists who are
7    representing a foreign company and -- or the private company
8    altogether, American companies, and they didn't have to
9    register at FARA.
10   Q.   And you testified a few minutes ago that Mr. Rafiekian in
11   his initial contact with you said, I need to register with
12   FARA.
13             Is that a fair summary?
14   A.   Yes.
15   Q.   And what was it that made you steer --
16   A.   It was a private company and it didn't have to register
17   at -- he didn't have to register at FARA.
18   Q.   Was that the advice you gave Mr. Rafiekian?
19   A.   Yes.
20   Q.   About how soon after this meeting with Mr. Rafiekian do
21   you recall you filed the Lobbying Disclosure Act registration?
22   A.   I think it was in September or a couple weeks afterwards.
23   Q.   Where did you find -- how did you gather the information
24   that you used to fill out the form?
25   A.   I knew how to fill out the form.

1  Q.   Where did you gather the factual information that you
2  entered?
3  A.   Oh, I called -- I asked Bijan what was the address of the
4  private company, and he said it was the Netherlands and he
5  gave me his address and I wrote it down.  And so the client
6  was a Dutch company.
7  Q.   Do you recall the name of the company?
8  A.   Inovo.
9       MR. MACDOUGALL:  Your Honor, to avoid having
10 competing exhibits, I would like to use the government's
11 exhibits with this witness.
12      THE COURT:  That's fine.
13      MR. GIBBS:  No objection, Judge.
14 BY MR. MACDOUGALL:
15 Q.   Mr. Kelley, I would like you to please have a look at
16 what's been previously marked as Government Exhibit 166.  And
17 that's just for identification right now.
18      Thank you, Mr. Burns.
19 A.   166.
20 Q.   Yes, sir.
21 A.   I've got it, I think.  It's the lobbying registration --
22 Lobbying Registration Act, Government Exhibit 166.
23 Q.   Okay.  Could you tell the jury or tell the Court if you
24 recognize this document?
25 A.   Yes.

1  Q.   And if you'd just repeat, please, what it is.
2  A.   The lobbying registration.  It's LDA -- LD-1 disclosure
3  form.  It says it at the top.
4  Q.   Did you prepare this yourself?
5  A.   Yes.
6  Q.   Do you recall about what date?
7  A.   Something -- I remember in late September.
8  Q.   Did anyone help you do this or did you do this yourself?
9  A.   I used an intern, Sam Soberie (ph), who is the -- is
10 sitting at the front desk, and later he was a paralegal or
11 something.
12 Q.   Is it at your law firm?
13 A.   Yeah.
14 Q.   Okay.  So it was a paralegal or intern at your law firm?
15 A.   Yeah.
16 Q.   Okay.  And where did you file this form once you
17 completed it for Flynn Intel Group?
18 A.   The clerk of the Senate or the -- the Senate -- Secretary
19 of the Senate and the clerk of the House.  It was filed
20 online.  It was different than earlier when I went to the
21 Japanese Automobile Manufacturers Association and I -- they
22 didn't have it online and it was a clerk of the House, and it
23 was papers everywhere.
24 Q.   So you filed this online and I take it you affixed your
25 signature electronically as well; is that right?

R. Kelley - Direct ──────United States v. Rafiekian──────

863

1 A.  Yes.

2     MR. MACDOUGALL:  Your Honor, the defense would move

3 the admission of Government Exhibit 166.

4     THE COURT:  I believe it's already in.

5     MR. GIBBS:  Yeah.  And there will be no objection.

6 But I think it is, and just to confirm that, but if it's not

7 in, we have no objection.

8     THE COURT:  All right.  Exhibit 166 is in.

9     THE WITNESS:  There should be a second page to this.

10 There's only one page.  My digital signature is on the other

11 side of -- oh, here.

12 BY MR. MACDOUGALL:

13 Q.  Do you have the entire document, Mr. Kelley?

14 A.  Yes.  I took it out of the plastic.

15 Q.  That's perfectly fine.

16 A.  Yeah.

17 Q.  Are you able to see --

18 A.  It says September 30th, 9/30/2016, digitally signed by

19 Robert Kelley.

20 Q.  Just a few questions about this document.

21     MR. MACDOUGALL:  If I could ask it to be published

22 to the jury, Your Honor.

23     THE COURT:  Yes.

24 BY MR. MACDOUGALL:

25 Q.  Who is registrant under this Lobbying Disclosure Act form

R. Kelley - Direct ──United States v. Rafiekian──

864

1   that you completed after meeting with Rafiekian --
2   A.   Flynn Intelligence Group is the line of the registrant.
3   Q.   What's the address for Flynn Intel Group?
4   A.   44 Canal Center Plaza.  I call it 44 Canal Square,
5   Alexandria, Virginia.
6   Q.   Mr. Kelley --
7   A.   It was on the Potomac River.
8   Q.   Mr. Kelley, who is listed as the individual contact on
9   the form?
10  A.   Me.
11  Q.   Why did you list --
12  A.   Since the -- I was filling out the form and I was -- it
13  made sense to put myself down as the contact person.
14  Q.   And did you believe that you would be doing any lobbying
15  for Flynn Intel Group and Mr. Alptekin --
16  A.   I think so, yeah.
17  Q.   Is that right?
18  A.   Yes, yes.
19  Q.   And is that the reason that you put yourself down as the
20  contact?
21  A.   Yes.
22  Q.   Going forward, after you filed the Lobbying Disclosure
23  Act form after Flynn Intel Group, what discussions, if any,
24  did you have regarding a regular working relationship with
25  that firm?

──Tonia M. Harris OCR-USDC/EDVA 703-646-1438──
EASTERN DISTRICT OF VIRGINIA

R. Kelley - Direct United States v. Rafiekian

865

1  A.  Well, Bijan asked me to be the general counsel of the
2  Flynn Intelligence Group, and I didn't move from -- I didn't
3  have an office in the Flynn Intelligence Group. I stayed at
4  14th and K, Jefferson Waterman law firm.
5  Q.  That was your law firm?
6  A.  Yes. And I thought of him as a client.
7  Q.  In your experience, is that completely usual that a
8  lawyer may remain physically present in a law firm while
9  providing general counsel?
10 A.  Yes.
11 Q.  Along those same lines, did you have an office at the
12 Flynn Intel Group ever?
13 A.  No.
14 Q.  How about an e-mail address?
15 A.  I think I had an e-mail, but I never checked it. I -- my
16 wife have to ask about Twitter.
17 Q.  I understand. I do too.
18      Tell me the reason why you never checked your e-mail
19 box beyond just a lack of --
20 A.  Well, I was -- you know, if you have 15 things to check,
21 it's not sensible. I -- if a person wanted to send me an
22 e-mail, they knew this e-mail address.
23 Q.  It was really important to call you, right?
24 A.  Yes. And Bijan traditionally called me.
25 Q.  One more question on Government Exhibit 166. Mr. Kelley,

R. Kelley - Direct ─────United States v. Rafiekian─────
866

1  could you have a look, please, at line item 12, which you will
2  find at the very bottom of the first page?
3  A.    Yes.
4  Q.    That asked a question: Specific lobbying issues (current
5  and anticipated.)
6           What did you respond there?
7  A.    I responded the registrant will advise on U.S. domestic
8  and foreign policy, period, and S.1635 and the House
9  counterpart H.1735 and the Senate counterpart.
10 Q.    Let's take those one at a time. S.1635, what was that
11 about?
12 A.    I think it was the National Defense Authorization Act.
13 Q.    And S stands for Senate; is that right?
14 A.    Huh?
15 Q.    S in the S.165 [sic] stands for Senate?
16 A.    Yes, yes, the U.S. Senate.
17 Q.    And the other entry is H.R.1735. And HR stands for House
18 of Representatives, right?
19 A.    Yes.
20 Q.    Okay. What was that about? What --
21 A.    I think it was the State Department authorization bill.
22 Q.    Why did you enter those statutes here where the form
23 asked for specific lobbying issues current and anticipated?
24 A.    Well, it was not -- it was the committee action. And the
25 Senate Foreign Relations Committee and the Senate Armed

R. Kelley - Direct   ──United States v. Rafiekian──   867

1  Services Committee, they had hearings.  And they -- one Pompeo
2  goes to the hearing on the budget of the State Department.  I
3  know the guy that prepared the binder.  And he doesn't ask --
4  the congressmen do not ask questions of Pompeo, but why are we
5  in Yemen or why is NATO demanding to increase the
6  contribution.  They don't ask about the budget.
7           And I knew that the -- from my experience with the
8  Japan automobile -- automobile manufactures and the Japan
9  airlines, that private company is interested in U.S. foreign
10 policy and defense policy and the State Department.
11 Q.   So that was your best estimate at the time?
12 A.   Yes.
13 Q.   And did Mr. Rafiekian ask you to put that in?
14 A.   No.  I just put it in myself.
15 Q.   Could you please have a look -- in the same binder,
16 Mr. Kelley, at Government Exhibit 168 for identification?
17 A.   It is the --
18 Q.   And you're welcome to take it out of the sleeve if you'd
19 like.
20 A.   Okay.
21 Q.   Do you recognize that document?
22 A.   It's the Department of State Authorities Act fiscal year
23 2017.
24 Q.   And on the upper right-hand corner of the first page,
25 there's a numerical designation that follows.

R. Kelley - Direct United States v. Rafiekian

868

1  A.   S.1635.

2  Q.   And how does that relate to the entry you had made on

3  the --

4  A.   I made the entry following the -- I was going to monitor

5  the State Department authorization bill.  They call it the

6  authorization bill and for the next year fiscal year 2017.

7  And they had -- typically they would have a lot of hearings.

8  And Pompeo would come up and Secretary of -- Secretary of

9  State Tillerson, was it, and he testified but not on the

10 budget, the -- but the process.

11 Q.   So in other words, Exhibit 169 was one of the pieces of

12 legislation you cited in the --

13 A.   Yes.

14 Q.   -- application; is that right?

15 A.   I was going to monitor the committee hearings.

16          MR. MACDOUGALL:  Your Honor, may I ask the Court to

17 take -- I'm sorry -- Government Exhibit 168, may I ask the

18 Court to take judicial notice of --

19          THE COURT:  168 or 169?

20          MR. MACDOUGALL:  Well, it's 168 initially, then

21 169 --

22          THE COURT:  Right.  I believe they're both in

23 evidence.  They're already in evidence.

24          MR. GIBBS:  They are.

25          MR. MACDOUGALL:  Thank you, Your Honor.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438
EASTERN DISTRICT OF VIRGINIA

R. Kelley - Direct United States v. Rafiekian

869

1  BY MR. MACDOUGALL:
2  Q.   So I'm sorry, I misspoke.  Mr. Kelley, if you could have
3  a look quickly at Government Exhibit 169, which should be
4  right after that in the binder?
5  A.   Yes.  Okay.  Defense Authorization Act for fiscal year
6  2016.
7  Q.   And how does that document relate to the entry you made
8  in -- on space 12 of the --
9  A.   Well, I know it was -- after the fact, I knew it was
10 vetoed, but -- by President Obama, but it was -- it was the
11 process that I was interested in, not the bill number.  And
12 they have -- Richard Thornberry -- Mac -- William Mac
13 Thornberry, I went to see him for when I represented the vice
14 president of Iraq and the -- I was in Iraq for two years in
15 2003 through 2005.  And I had a Top Secret clearance.  And I
16 was organizing a company at the -- the senators and
17 representatives, and they came about every three days and --
18 for the period of time for two years.  And it was 350 or
19 something.  And --
20 Q.   So were you paid by the Flynn Intel Group for the legal
21 work you did?
22 A.   Yes.
23 Q.   Do you recall how much?
24 A.   I think $10,000.
25 Q.   Do you remember who paid you?

```
 1              CERTIFICATE OF REPORTER
 2
 3         I, Tonia Harris, an Official Court Reporter for
 4   the Eastern District of Virginia, do hereby certify that I
 5   reported by machine shorthand, in my official capacity, the
 6   proceedings had and testimony adduced upon the Jury trial
 7   in the case of the UNITED STATES OF AMERICA versus BIJAN
 8   RAFIEKIAN, Criminal Action No. 1:18-CR-457, in said court
 9   on the 18th day of July, 2019.
10         I further certify that the foregoing 116 pages
11   constitute the official transcript of said proceedings, as
12   taken from my machine shorthand notes, my computer realtime
13   display, together with the backup tape recording of said
14   proceedings to the best of my ability.
15         In witness whereof, I have hereto subscribed my
16   name, this July 18, 2019.
17
18
19
20
21                        _____
                          Tonia M. Harris, RPR
22                        Official Court Reporter
23
24
25
```