# COVINGTON & BURLING LLP

Privileged & Confidential

November 3, 2017

## Memorandum

To:    Rob Kelner, Steve Anthony, Brian Smith, Mike Chertoff, Josh Debold, and Roger Polack

From: Alexandra Langton

Re:    **November 3, 2017 Notes from Covington's Call with Special Counsel's Office**

On November 3, 2017, Robert Kelner ("Rob"), Stephen Anthony ("Steve"), and Alexandra Langton had a call with Brandon Van Grack ("BVG") and Zainab Ahmad ("ZA") at the Special Counsel's Office ("SCO") from approximately 8:30a.m. to 9:10a.m. This memorandum summarizes the discussion on that call.

## I.    Summary of the Call

<u>Rob</u>: I know we had said we'd talk on Tuesday, but we wanted to have at least an interim conversation today. We have been thinking about the discussion the other day and that has left us with a few critical questions as to whether we could get comfortable bringing him in for a proffer.

You suggested that there is something General Flynn knows that would be valuable to your investigation, although it wouldn't be as valuable several weeks from now. You also said you're confident that he knows this information and you want to ask him about it. You haven't given us a sense about the topic. That leaves us in a situation where we'd be bringing him in completely cold as to that issue without us having any chance to test with him his recollection. It would be in everyone's interest to not bring him in cold. Is it a meeting? Something that happened in the WH? Is it classified? Do you have more specific information so we can assess whether he can give you what you need and we could bring him in. That's the first of a couple of key issues. I'll stop there to let you react.

<u>BVG</u>: I'm glad you raised that. One of the important takeaways is understanding that there is value we think your client has. The timing point is related to where we are in the broader investigation and not necessarily the notion of the specific information. I want to make sure we separate the two. The timing issues relates to where we are in the investigation.

<u>ZA</u>: Another way to say that is this is the best moment for us to talk to General Flynn and hear his story based on where we are in our investigation. We don't necessarily agree with your characterization of this being best for everyone. This is the right moment given the arch of our investigation to hear him out.

**COVINGTON & BURLING** LLP

November 3, 2017
Page 2

BVG: Perhaps a slight misunderstanding on or end. There isn't a particular question that we think General Flynn is going to answer. There are a number of different points, communications, perceptions, and meetings that are helpful to our investigation. This is not a situation where there is one particular question from one day where we know he has the answer. It is broader than that. Broadly, the focus of the questions would be:

- Communications your client had during transition with foreign officials, including Russian officials.

- Whether anyone provided him directions on those communication.

- Communications he is aware of that other members of the transition had with foreign officials.

- Communications he had with foreign officials during his time at the WH.

- Communications other people had with foreign officials.

Steve: We had a slightly different takeaway from our meeting. We're still interested in exploring this. I don't think it's in anyone's interest to reach a misinformed conclusion that we have to keep him away from you. We'd like to get to yes. We'd like to explore how we could make this work. Are the topics you want to ask about inculpatory? Are there questions you view as being relevant to exposure to some other person or do you want to ask about things that are the subject of the charges against him?

BVG: I do take your point. I think we represented what the charges are: FARA and false statements. There are a number of them. When we talk about topics that could in incrimination. Those wouldn't be our initial focus. The only incriminating thing would be false making a false statement.  If he's being truthful about what was said, I don't think we would be setting your client up for culpability.

ZA: We're eventually going to want to talk about everything. That will include topics he has criminal exposure on. We aren't interested in Turkey right now. We're asking him to come in because we think he has information that will shed criminality on other actors. It will cover everything.

Steve: Cutting to the chase, are you going to ask him "what is Inovo" or do you intend to leave Turkey aside and talk about the types of things Brandon was talking about?

BVG: When you talk about a general proffer, at some point, your client will need to have a truthful discussion about any topic we'd want to talk about. What I would propose is, right now, we want to talk to your client initially for more than one day. Right now, initially, we are fine not talking about Turkey or the FARA piece because our investigation is not focused on Turkey/FARA. In terms of broader next steps, at some point, we would need to have that conversation.

**COVINGTON & BURLING** LLP

November 3, 2017
Page 3

Rob: There are a number of issues. Regarding contacts with foreign officials during the transition or his time at the WH, without getting into attorney-client conversations, this is a topic on which he doesn't necessarily have a granular recollection on every interaction. It is not an incredibly attractive topic on which to bring somebody in to pass a test of candor. Frankly, if you asked me about meetings I had with clients, I don't know if I could pull it off with any precision. To ask someone about meetings and calls during an incredibly busy period of his life as an evaluation of candor is not a particularly attractive option. What I am hearing now is that you want a general proffer.

BVG: I want to make sure we all have clarity. I will just say a couple of things. It seems like you think there is a specific topic we think he can answer. That's true; we have multiple topics. This is a multiple question exam and not a single question exam. Just to be clear, we're interested in a broader range of topics than it seems that you walked away with.

Rob: What we thought was that there was some topic or episode where he had information regarding your investigation of some third party. If that were the case, we were contemplating a limited proffer on that topic. We now see that we misunderstood and what I'm hearing now is more of a conventional, general proffer. You also want the ability to question him on the variety of topics on which he has exposure. Is that a fair description?

BVG: I want to be sincere. The reason why it is important to knowing there is value is that there is a broad range of topics and information that General Flynn has. We feel confident having him coming in and being truthful will be helpful. I don't think there is exposure for your client. The only potential exposure is false statements by your client. That's the exposure of anyone coming in for a proffer.

Steve: You mean false statements during the interview?

BVG: That's right. I thought you were clear in our meeting about the importance of the use of prompts. I can set him up and say, you were in Mar-a-Lago on this date, show him the record, and set him up that way. We have prompts that can help jog his memory and a lot of information you might not have.

Rob: I want to reiterate something we said the other day. We've spent a lot of time with him. It can be difficult to reconstruct a recollection. Not because of any intention on his part to conceal, there is sometimes a quality of fogginess to consider that requires a lot of work. That's one reason why this requires a good bit of thought. I think I clearly understand what you're asking and what is on the table. It is going to be a tough call for us.

Steve: I think where, possibly, the misunderstanding came from is our discussion of how this is different from a typical white collar case. I think it was in the course of that conversation, you guys gave us reasons to persuade us that this would be something we could wisely do. I think your premise is there are topics that wouldn't have exposure to him, and topics that are of interest in your investigation. I take it that this could have real value to you and General Flynn could do himself good even if he's talking about topics that wouldn't be obvious to us or to him.

Privileged/Attorney Work Product

**COVINGTON & BURLING** LLP

November 3, 2017
Page 4

Rob: We don't think there's a FARA violation. We don't think he made false statements. You think he did. Inevitably, what that means is he's going to come in and give you answers to questions, and you won't agree with his answers to at least some of the questions. I sense there will be numerous points of disagreement as to what happened. That's why coming in for a general proffer, although we would like to get to yes, is difficult. We feel we have strong defenses across these issues and you feel differently. It doesn't tee up a situation where you will nod and accept his answers.

BVG: This is not a usual situation. If all we were charging someone with a false statement, we wouldn't need to have this conversation with your client at all because the only crime is he lied and this opportunity wouldn't present itself. We think there is other information he has that doesn't involve criminal activity he did. If we were in EDVA, we would not be having this conversation because if it is false statements; there's nothing your client could provide. I don't think you walked away with the wrong impression. We want to talk about information he has that doesn't have to do with his potential criminal activity.

Second, to the extent your questions involve Turkey/FARA, I would propose our initial session doesn't cover Turkey/FARA. In terms of a long-term proffer, that would have to be on the table. In terms of our priorities for our broader investigation, we would be fine having the initial sessions be focused on his time as NSA, the transition, etc.

Rob: I think we understand that clarification. We just want to note a couple factual points. Apart from the fact that this is a guy who doesn't have a detailed catalogue of dates, times, and places, he also was not in fact a central player in the campaign in the way that he was perceived to be publically. He did, certainly, spend a lot of time with the candidate traveling, but I want to make sure you guys are aware of that.

BVG: That's not a surprise to us and that doesn't change our prior representation.

Rob: Ok, good. The information he has is not as encyclopedic as others' might be. We had also asked about seeing the 302. You said that you would think about it. We would like to renew that request in the context of figuring this out. We have not thought of the FBI interview as being a significant point of exposure. If we are wrong about that, it would be clarifying to see why you think we're wrong. That's why the 302 is important. It seemed that you were highlighting the FBI interview in particular.

BVG: The answer right now is not at this time in terms of sharing the 302 because it might reveal more about our investigation and other investigative priorities. It is about what has been widely reported regarding the December 29, 2017 call. We can't now because I have confidence that your client will be able to provide helpful information on those communications.

Rob: There are a few other points, but I want to talk to Steve about it first. We'll caucus on our end and we might circle back with a couple other questions.

BVG: Let me say two things before we leave. I would still like to set a time on Tuesday to talk. I would propose 9:00a.m. on Tuesday. I have not circulated our standard proffer letter. I will send it to you guys. If we do move forward, we can talk about the specifics of the proffer letter on Tuesday.

**COVINGTON & BURLING** LLP

November 3, 2017
Page 5

<u>Steve</u>: We appreciate you working in good faith with us. Thank you.

Privileged/Attorney Work Product