## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**Plaintiff,**

**v.**                                    **Criminal Action No. 17-232-EGS**

**MICHAEL T. FLYNN,**

**Defendant.**

## DECLARATION OF MICHAEL T. FLYNN

I, Michael T. Flynn, declare:

1. I am a citizen of the United States and more than 18 years old.

2. I served over thirty-three years in the United States Army. Five of those years I spent deployed in active combat in Afghanistan, Iraq, and elsewhere around the world in support of United States foreign policy objectives.

3. I was a life-long Democrat and President Barack Obama twice appointed me to positions that required Senate confirmation. In my final military assignment, I served as head of the Defense Intelligence Agency (DIA) until September 2014.

4. On December 1, 2017 (reiterated on December 18, 2018), I pled guilty to lying to agents of the FBI.

5. I am innocent of this crime, and I request to withdraw my plea.

6. In December 2016, while I was working on then President-Elect Trump's transition team, I received a letter from the FARA unit at the Department of Justice. In that letter I learned that the FARA unit sought information about work that my former business, the Flynn Intel

1

Group, did for a company called Inovo BV that related to Turkey. I responded by seeking out respected counsel who were known and respected FARA lawyers; I chose Rob Kelner and his colleagues at Covington & Burling. I met with Covington lawyers on several occasions about FIG's FARA issues. I gave them the information they requested and answered their questions truthfully. The most important instruction I gave them was to "be precise."

7. On January 20, 2017, I entered office as the President's National Security Advisor. Four days later, FBI Deputy Director McCabe called me and asked if I would meet with a couple of FBI agents at the White House. I agreed.

8. While I was willing to oblige Deputy Director McCabe by meeting with a couple of agents on the fourth day of the new administration, I was extremely busy and only had a limited amount of time to give them. I tried to answer their questions as best I could during that brief meeting before again moving on to a schedule packed with new presidential and national security requirements.

9. I was an intelligence officer for over 33 years. Since 1981 and throughout my military and government career, I have held the highest-level security clearances our government provides. When FBI agents came to the White House on January 24, 2017, I did not lie to them. I believed I was honest with them to the best of my recollection at the time.

10. I still don't remember if I discussed sanctions on a phone call with Ambassador Kislyak nor do I remember if we discussed the details of a UN vote on Israel. In regards to the sanctions issue, I told the agents that tit-for-tat is a phrase I use, which suggests that the topic of sanctions could have been raised. The phone calls with Kislyak are still events of

which I do not have a clear memory and it related to a general category of information (phone calls about foreign policy) that are both sensitive and classified.

11. My baseline reaction to questions posed by people outside of my superiors, immediate command, or office of responsibility is to protect sensitive or classified information, except upon "need to know" and the proper level of security clearance. That type of filter is ingrained in me and virtually automatic after a lifetime of honoring my duty to protect the most important national and military secrets.

12. I am and was fully aware that federal officials routinely monitor, record, and transcribe such conversations with foreign officials.

13. Of course, I was embarrassed and angered by the furor that erupted in the press over the felonious leak of highly sensitive and classified information that was my phone call with Ambassador Kislyak. It was distracting to my work to be the center of such a commotion and it was upsetting to be the cause of disruption to the busy and important work in support of the new President of the United States.

14. I resigned as National Security Advisor on February 13, 2017.

15. I believe my resignation letter to President Trump stated quite accurately what happened and both he and the Vice President graciously accepted my apology. The transition period was an incredibly intense time. I was communicating with representatives of multiple foreign countries on countless and varied issues every day. Frankly, of the national security dangers and concerns that weighed on our minds at that time, "sanctions" on Russia were far from the most pressing threat or concern. We were dealing with many more serious crises around the world. The calls with Ambassador Kislyak were brief and few; they were no more exceptional than my numerous calls and personal interactions with senior

3

representatives of governments from around the world during an exceedingly demanding work schedule.

16. After I left the White House, I agreed to engage Kelner, his colleague Stephen Anthony, and other Covington lawyers to represent me in any FBI investigations and, eventually, the Special Counsel's Office investigation. They also continued to represent me and FIG in regards to FARA related issues. At one of my first meetings with Mr. Kelner and Mr. Anthony they asked me if I "had anything" on President Trump, as it would provide much more leverage with the government. I told them from the beginning that I was unaware of President Trump doing anything wrong.

17. With respect to the FARA filing, my Covington counsel did not explain to me that there were any problems with the FARA filing that required Covington to re-examine any of the issues in August 2017. I would have hired independent counsel to reevaluate the FARA filing and amend it if necessary, had I known the severity of the conflict.

18. To the best of my recollection, and from my re-examination of the emails from August 2017, the vast majority of email traffic between me and Covington during that time was focused on the creation of my Legal Defense Fund to pay my skyrocketing legal defense fees (by that time approaching $3 million). To that end, we put our Alexandria, Virginia home on the market in late November or early December 2017 timeframe to help pay the rising legal bills that we were incurring. We then moved to our family home in Rhode Island.

19. In late August 2017, my wife and I were in Rhode Island. Kelner and Anthony emailed us to arrange a telephone call. The call then occurred while we were driving to have dinner with some friends. It was an approximately 15-minute phone call, where we had pulled off

4

to the side of a highway. They informed us that there was a development regarding a conflict of interest. They also mentioned the possibility of Bijan being indicted. Speaking to the conflict of interest, they stated that they were prepared to defend us vigorously, if the conflict became an issue. We told them we trusted them.

20. In November 2017, the Special Counsel's Office (SCO) created sudden and intense time-pressure on me to plead guilty. On November 4, 2017, I believe, my Covington attorneys told my wife and me that the Special Counsel's Office (SCO) wanted to conduct a proffer session with me. They told me the SCO "had yet to make a decision about how to proceed with me" and doing a proffer session would be a good way to let the SCO prosecutors "get to know the real Mike Flynn." During this same meeting, my previous lawyers, Mr. Kelner and Mr. Anthony proceeded to walk us through a series of items—essentially describing the risks of doing the proffer. From this meeting, I believe the following day, I agreed to do the proffer, primarily based on my understanding that they said if the proffer went well, being indicted would be less likely; otherwise my indictment would be soon. They did not raise FARA issues with me that day or anything about a conflict of interest.

21. November 16, 2017, was the first day of the proffer with the SCO. That same evening, after concluding the first proffer, we returned to the Covington offices where my attorneys told me that the first day's proffer did not go well and then proceeded to walk me through a litany of conceivable charges I was facing and told me that I was looking at the possibility of "fifteen years in prison."

22. They reiterated the threat of charges against me, my son, as well as the potential of a long term prison sentence. That evening, we discussed and they encouraged me to use words

and phrases they believed would help me "get through" the next day's proffer and satisfy the special counsel, phrases that are not part of my normal vocabulary.

23. During the second day of the proffer, I used words and phrases that were not really my own voice, and I regret that—just as I regret pleading guilty.  People think that a three-star general must know everything, but I was a fish-out-of-water in a terrifying and completely foreign situation, with none of the legal skills necessary to deal with the many things being thrown at me. I hired the team of the best lawyers I had been told I could find, and I relied on them completely.  One of the ways a person becomes a 3-star general is by being a good soldier, taking orders, being part of a team, and trusting the people who provide information and support.  Lori and I trusted Mr. Kelner and Mr. Anthony to guide us through the most stressful experience of our lives, in a completely incomprehensible situation.  I have never felt more powerless.  I should have stood my ground firmly for what I knew to be the truth—that I did not lie to the agents, and I should have told this Court on December 18, 2018, that I needed to consult new counsel.  My relationship with Covington disintegrated soon thereafter.

24. This effort to "say-what-they-want" approach during the proffer was noted by one of the interviewing agents, who stopped me at some point to ask whether what I was saying was something that really happened, or whether I was just speculating—analyzing the past with the benefit of hindsight.  I agreed with the agent I was mostly speculating.

25. I recall Mr. Kelner's mention of a conflict of interest in late August in a brief phone call, but I did not attach any serious significance to it. Likewise, I did not understand the legalistic email I received on November 19, 2017, the eve of my third day of proffers—

almost three months later. We trusted my attorneys and expected them to put my interests first—as they said they would do.

26. To have devoted my life to my country, only to be accused of crimes, slandered in the media with false and outrageous claims, and have my family threatened was an unimaginable nightmare—one that those who have not walked in these shoes will find difficult to comprehend.

27. Following the four-day proffer, on November 22, 2017, Kelner and Anthony called my wife and me as we were driving home to Rhode Island to spend Thanksgiving with family to tell me the SCO planned to bring charges and that I should consider a plea.

28. The week leading up to November 30, 2017, Kelner and Anthony advised that if I did not plead, I would be indicted on multiple counts and that my son, Michael G. Flynn could or would face indictment. They repeated that I would be looking at the potential of fifteen years in prison, and said that I would be subjected to "the Manafort treatment."

29. On November 30, 2017, as plea negotiations with the SCO were coming to a head, I reiterated to my former lawyers, specifically Robert Kelner and Stephen Anthony, that I did not believe that I had lied in my White House interview with the FBI agents. I reminded them that I had spoken to representatives of well over thirty countries, many in a single 24-hour period, during that very busy holiday season and presidential transition period. In fact, some of these calls occurred while I was supposedly on "vacation" out of the country. Although I may have had an incomplete memory of the many details of certain conversations when speaking to the agents, I did not consciously or intentionally lie.

30. During this same day, later in the afternoon, Kelner and Anthony explained their view of how the government would go about proving its case and urged me to accept the plea deal

that was on the table. They walked me through the "Final 302" in detail. They explained if I did not accept the plea deal, that I should "expect to be indicted the next day."

31. Still struggling with the decision whether to plead guilty, I asked my former attorneys to make further inquiry with the SCO prosecutors about whether the FBI agents believed that I had lied to them. In the preceding months leading up to this moment, I had read articles and heard rumors that the agents did not believe that I lied, something I also firmly believed.

32. Mr. Kelner and Mr. Anthony left the room to call the SCO prosecutors. When they returned, they informed my wife and me that they had been told that the "agents stand by their statements." Because I was then unaware that the agents had made the statements described in this Declaration, and because I was unaware of what had passed between my former lawyers and the SCO outside of the room, I then understood them to be telling me that the FBI agents believed that I had lied.

33. My Covington attorneys counseled me to sign the Statement of Offense.

34. I agreed to plead guilty that next day, December 1, 2017, because of the intense pressure from the Special Counsel's Office, which included a threat to indict my son Michael, and the lack of crucial information from my counsel. The SCO had already made Michael the subject of their investigation and taken all his files and communications devices (computer, phone, files, and thumb drive). At the time, Michael and his wife had a four-month old baby. Nonetheless, I would not have pled guilty if my former lawyers had informed me that both agents who interviewed me at the White House on January 24, 2017, had advised that a) I displayed a "sure demeanor;" b) I "did not give any indications of deception"; and

c) both agents believed there was "no indication that I was lying, or that I believed I was lying."

35. At no time before my plea did my former lawyers explain or disclose this to me. Had I been informed of these disclosures, I never would have pled guilty. Moreover, I would have expected my Covington counsel to refuse to allow me to plead guilty with that information.

36. I have spent my entire adult life accepting great responsibility. I accepted the plea agreement to stop the pain and threats to my family and to accept responsibility for what the government I have defended and served for more than thirty-three years said I did wrong. However, if my counsel had informed me both agents said I showed "sure demeanor," "did not give any indications of deception," and that I showed "no indication that I was lying, or that I believed I was lying," I would not have signed the plea agreement, or entered a guilty plea.

37. My former lawyers from Covington also assured me on November 30, 2017, that if I accepted the plea, my son Michael would be left in peace. After I signed the plea, the attorneys returned to the room and confirmed that the SCO would no longer be pursuing my son.

38. It was well after I pled guilty on December 1, 2017, that I heard or read that the agents had stated that they did not believe that I had lied during the January 24, 2017, White House interview (and the other information described in this Declaration). Still later, I heard it reported that former FBI Director Comey and FBI Deputy Director McCabe testified to Congress that the agents did not believe I lied. After learning this information, I reiterated

to my former attorneys numerous times that I did not lie to the agents and questioned if I might be able to withdraw my plea.

39. Each time I raised this issue with my former attorneys, they urged me to stick with my plea deal, "it was a good deal," or the government would indict me for multiple other offenses and also drag my son back into the crosshairs. Their constant refrain was to "stay on the path" with the deal they had negotiated.

40. In the days leading up to the December 18, 2018, sentencing hearing, Robert Kelner and Steven Anthony continued to urge me to "stay on the path." They predicted (correctly) that the government would recommend a term of probation and that my son would not be further targeted.

41. However, during the December 2018 hearing, Judge Sullivan's decision to proceed with an extended plea colloquy took both me and my former counsel completely by surprise. They had not prepared me for what occurred. The Court's comments that day stunned me. The entire experience was surreal, and that day was one of the worst days of my life.

42. My Covington attorneys had only prepared me for a simple hearing in which I would be sentenced to probation, as the government had agreed. I was not prepared for this Court's plea colloquy, much less to decide, on the spot, whether I should withdraw my plea, consult with independent counsel, or continue to follow my existing lawyers' advice. Prior to the sentencing hearing, they counseled me that if the Court were to ask me if I wanted to withdraw my plea, that I should say "no," because "the Court would be giving you the rope to hang yourself." Regretfully, I followed my lawyers' strong advice to confirm my plea even though it was all I could do to not cry out "no" when this Court asked me if I was guilty.

43. During the break in the hearing offered by the Court, my former attorneys were as shocked as I was at the colloquy and the way in which the hearing had proceeded. My wife Lori counseled me (and my attorneys) that we should accept the Court's offer to postpone sentencing.

44. In late spring 2019, when Covington actually insisted I seek "independent counsel," I did. New counsel immediately identified the conflict of interest and I then terminated Covington.

45. I realize my statement and determination to assert my innocence means the prosecutors, who already seek to imprison me, may retaliate further by seeking additional charges against me and dramatically increasing the penalty I face.

46. I express my profound apology to this Court, my family, the President, our country, and all who have supported and had faith in me throughout this incomprehensible ordeal. I tried to "accept responsibility" by admitting to offenses I understood the government I love and trusted said I committed. In truth, I never lied. My guilty plea has rankled me throughout this process, and while I allowed myself to succumb to the threats from the government to save my family, I believe that I was grossly misled about what really happened.

47. I will not confirm a plea of guilty I should never have entered. I have served my country honorably all my life, and accepted responsibility for myself and others from a young age (as my sister Clare wrote to you in her beautiful letter on behalf of my siblings). As God is my witness, the truth is I am innocent of these charges and any other alleged "criminal conduct," and I request to withdraw my plea of guilty, and I will fight to restore my good name.

48. To the best of my recollection, the foregoing is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on $\underline{29^{TH}}$ day of January, 2020.

Michael T. Flynn