# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **Plaintiff,** | |
| **v.** | **Criminal Action No. 17-232-EGS** |
| **MICHAEL T. FLYNN,** | |
| **Defendant.** | |

## MR. FLYNN'S MOTION TO DISMISS FOR EGREGIOUS GOVERNMENT MISCONDUCT AND IN THE INTEREST OF JUSTICE

Sidney Powell
Molly McCann
Sidney Powell, P.C.
2911 Turtle Creek Blvd.,
Suite 300
Dallas, Texas 75219
Tel: 214-707-1775
sidney@federalappeals.com
Admitted *Pro Hac Vice*
molly@federalappeals.com
Admitted *Pro Hac Vice*

Jesse R. Binnall
Lindsay R. McKasson
Harvey & Binnall, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jbinnall@harveybinnall.com
lmckasson@harveybinnall.com
Admitted *Pro Hac Vice*

W. William Hodes
The William Hodes Law Firm
3658 Conservation Trail
The Villages, Florida 32162
Tel: (352) 399-0531
Fax: (352) 240-3489
Admitted *Pro Hac Vice*

**Attorneys for Lt. General Michael T. Flynn (USA) (Retired)**

**TABLE OF CONTENTS**

I. THIS COURT HAS THE AUTHORITY PURSUANT TO ITS
SUPERVISORY POWERS TO DISMISS THIS PROSECUTION
IN THE INTEREST OF JUSTICE.............................................................................3

II. THE IG REPORT DISCLOSES OUTRAGEOUS
GOVERNMENT MISCONDUCT THAT MANDATES
DISMISSAL OF THIS PROSECUTION.....................................................................6

    A.  The December 2019 IG Report is Replete with
       Information Exculpatory to Mr. Flynn and Damning
       of the FBI's Conduct Employed Against Him...................................................9

    B.  From the IG Report, Extraordinary Facts about SSA 1
       Emerge That Should Have Been Disclosed to Mr. Flynn
       as *Brady* Evidence Prior to His Plea................................................................10

    C.  SSA 1'S Deceitful Participation in
       the Presidential Briefing Alone is
       so Egregious it Requires Dismissal.................................................................13

    D.  The Inspector General Abhorred
       this Conduct as did FBI Director
       Christopher Wray...........................................................................................16

III. SUPPRESSION OF UNDENIABLE *BRADY* EVIDENCE MANDATES
DISMISSAL OF THIS CASE.................................................................................16

IV. THE GOVERNMENT'S ROLE IN DEMANDING, RUSHING,
REVIEWING, AND COORDINATING THE FARA FILING FORECLOSES
USE OF IT TO PROSECUTE FLYNN......................................................................21

V. PROSECUTORS CREATED THE "FALSE STATEMENTS" IN THE
FARA FILINGS AND SOUGHT TO SUBORN PERJURY.........................................22

CONCLUSION....................................................................................................22

Michael T. Flynn ("Mr. Flynn") hereby moves to dismiss the charges against him for outrageous government misconduct and in the interest of justice.[1]  This motion is based on exculpatory evidence ("*Brady*")  as well as egregious government misconduct that was discovered after Mr. Flynn's Motion to Compel *Brady* Material (ECF No. 109) and related briefing.

Such exculpatory evidence and outrageous misconduct includes that on December 9, 2019, the Inspector General of the Department of Justice ("DOJ") issued its 478-page report on the "Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation" ("IG Report").[2]  The IG Report illustrates the misconduct by the government as further detailed below.

Further, on December 15, 2019, the government produced to Mr. Flynn's defense team 637 pages of documents—including sixteen long-awaited FD-302s and 206 pages of corresponding FBI handwritten notes—all of interviews of Mr. Flynn.  Additionally, in its Supplemental Sentencing Memorandum (which also breaches the plea agreement), the government included never-produced FD-302s of the government's interviews with Mr. Flynn's prior counsel at Covington & Burling ("Covington"), Robert Kelner and Brian Smith, from June 2018.  ECF No.

---

[1] Contrary to a suggestion in this Court's recent opinion, Mr. Flynn did not previously move to dismiss the case against him.  ECF No. 144 at 2.  As the docket sheet and this Court's recital of motions show, this is Mr. Flynn's only Motion to Dismiss.  In Mr. Flynn's previous filings, he made clear he *would ultimately move* for dismissal, that the evidence requested in his *Brady* motion would further support the basis for dismissal, and that the case should be dismissed.  *See* ECF No. 133 at n.15.

[2] *See* U.S. Department of Justice (DOJ) Office of the Inspector General (OIG), *A Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation,* Oversight and Review Division Report 20-012 Revised (December 2019) https://www.justice.gov/storage/120919-examination.pdf (hereinafter, "IG Report").

150-4 through 150-6.  The government also belatedly produced to Mr. Flynn FD-302s and related documents as recently as January 23, 2020.  ECF No. 157.

These documents contain remarkable new *Brady* evidence that the prosecution has long suppressed.  For instance, this evidence not only belies the bogus FARA "false statement" charges Mr. Van Grack leveraged against Covington and Mr. Flynn, but also demonstrates Mr. Van Grack knew these charges were bogus, yet sought to have Mr. Flynn make a false statement in his EDVA interview on June 25, 2019, and was encouraging subornation of perjury by Mr. Flynn.  *See* ECF No. 151. Additionally, the IG Report shows that the government long suppressed evidence of shocking malfeasance by the leadership of the FBI and Supervisory Special Agent 1 ("SSA 1") that was favorable to Mr. Flynn's defense.  For these reasons, and those outlined in prior briefing, Mr. Flynn moves to dismiss this entire prosecution for outrageous government misconduct and in the interest of justice.

This factually and legally baseless "investigation" and prosecution of Mr. Flynn has no precedent.  From the FBI's insertion of SSA 1 into the August 17, 2016 presidential briefing of candidate Trump and Mr. Flynn, to the former Director of the FBI bragging and laughing on national television about his own cleverness and violations of FBI/DOJ rules in dispatching agents to the White House to interview the new President's National Security Advisor, to the still missing original FBI FD-302 of the January 24, 2017 interview—everything about this prosecution has violated long-standing standards and policy for the FBI and the DOJ.  In addition to the myriad of breaches and irregularities identified in our prior filings, the IG Report released on December 9,

2019, reveals even more evidence of the FBI's deceitful and wrongful conduct that should have been disclosed to Mr. Flynn's defense.[3]

There were two FBI agents who interviewed Mr. Flynn in the White House on January 24, 2017—Agent Peter Strzok and SSA 1. The IG Report confirms both participated in government misconduct. As explained in further detail below, not only was Strzok so biased, calculated, and deceitful he had to be terminated from Mueller's investigation and then the FBI/DOJ, but it has also now been revealed that SSA 1 was surreptitiously inserted in the mock presidential briefing on August 17, 2016, to collect information and report on Mr. Trump and Mr. Flynn. Moreover, SSA 1 was involved in every aspect of the debacle that is Crossfire Hurricane and significant illegal surveillance resulting from it. Further, SSA 1 bore ultimate responsibility for four falsified applications to the FISA court and oversaw virtually every abuse inherent in Crossfire Hurricane— including suppression of exculpatory evidence. *See generally* IG Report.

Only the dismissal of this prosecution in its entirety would begin to get the attention of the government, the FBI, and the DOJ needed to impress upon them the "reprehensible nature of its acts and omissions." *United States* v. *Kohring*, 637 F.3d 895, 914 (9th Cir. 2011) (Fletcher, J., concurring in part and dissenting in part).

---

[3] Despite the defense, the government, and this Court agreeing to abate the schedule in this case because of the pending and admittedly-relevant IG Report (ECF No. 140 and this Court's Minute Order of November 27, 2019), this Court denied Mr. Flynn's Motion to Compel Production of *Brady* Evidence without allowing for additional briefing in light of that report or considering any of the deliberate government misconduct it disclosed. ECF Nos. 143 and 144. Mr. Flynn now moves to dismiss the indictment for the additional egregious misconduct documented in the IG Report, other recently produced materials, all previously briefed issues, and in the interest of justice.

I.    **THIS COURT HAS THE AUTHORITY PURSUANT TO ITS SUPERVISORY POWERS TO DISMISS THIS PROSECUTION IN THE INTEREST OF JUSTICE**.

"[G]uided by considerations of justice, and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress." *United States v. Hasting*, 461 U.S. 499, 505 (1983). The supervisory power of federal courts has a threefold purpose: "to implement a remedy for violation of recognized rights, to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, and finally, as a remedy designed to deter illegal conduct." *Id*.

The exercise of this authority can take many forms, including dismissal of a case altogether so long as the prosecutorial misconduct was harmful to the defendant. *Id.* at 505. A defendant seeking to dismiss a conviction for prosecutorial misconduct must show that he was prejudiced by the misconduct. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 263 (1988). Prejudice is found when "the government's conduct had at least some impact" on the outcome. *United States v. Bundy*, No. 2:16-cr-046, Transcript of Proceedings at 13:1-2 (D. Nev. Jan. 8, 2018). Ex. 1.

Although dismissal is unusual, "[s]paring use, of course, does not mean no use. Even 'disfavored remedies' must be used in certain situations." *United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1438 (D. Md. 1986). Dismissal is particularly appropriate when the government has engaged in conduct that perverts the rule of law and grossly abuses its power and might—as it has done against Mr. Flynn. Quoting Justice Brandeis, the D.C. Circuit noted that "[i]t is desirable that criminals should be detected. . . .It is also desirable that the government should not itself foster and pay for other crimes, when they are the means by which the [conviction] is to be obtained." *United States v. McCord*, 509 F.2d 334, 350 (D.C. Cir. 1974). This Circuit continued:

> This is so because the principle is not one of fairness to the defendant alone but rather, in Justice Brandeis' words, is one designed to 'maintain respect for law; . . .

to promote confidence in the administration of justice; . . . to preserve the judicial process from contamination. . . .Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means- -to declare that the government may commit crimes in order to secure the conviction of a private criminal- -would bring terrible retribution.'

*Id.*

Although Ninth Circuit case law is not controlling, it is persuasive and useful in evaluating these issues. The Ninth Circuit has developed the most robust framework addressing this issue. In *Bundy*, the district court dismissed the case for egregious government misconduct after the prosecution suppressed *Brady* that "bolstered the defense and was useful to rebut the government's theory," and that the government had "failed to disclose potentially exculpatory, favorable and material information," including a number of FD-302s, an unredacted FBI TOC log, and more. *United States v. Bundy*, No. 2:16-cr-046, Transcript of Proceedings at 13:9-22 (D. Nev. Jan. 8, 2018). Ex. 1. The court in *Bundy* based its dismissal on two separate grounds— first, as a due process violation and second, as an exercise of its supervisory powers to deter illegal conduct. *United States v. Bundy*, 406 F. Supp. 3d 932, 935 (D. Nev. 2018).

The court explained that it could dismiss an indictment on the ground of "outrageous government conduct if the conduct amount[ed] to a due process violation," *United States v. Bundy*, No. 2:16-cr-046, Transcript of Proceedings at 8:18-20 (D. Nev. Jan. 8, 2018). Ex. 1. Such misconduct must be "attributable to and directed by the government" *Id.* at 9:7 (quoting *United States v. Barrera-Morena,* 951 F.2d 1089, 1092 (9th Cir. 1991)), and the government conduct must be "so grossly shocking and so outrageous as to violate the universal sense of justice." *Id.* at 9:2-3 (quoting *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991)).

Part of the rationale that undergirds this supervisory authority to deter conduct that is abhorrent to a "universal sense of justice," finds foundation in *Sorrells v. United States*: "it is the duty of the court to stop the prosecution in the interest of the Government itself, to protect it from the illegal conduct of its officers and to preserve the purity of its courts." 287 U.S. 435, 446 (1932). *Sorrells* is a prohibition-era case where the court determined that "the act for which defendant was prosecuted was instigated by the prohibition agent, that it was the creature of his purpose, that defendant had no previous disposition to commit it but was an industrious, law-abiding citizen, and that the agent lured defendant, otherwise innocent, to its commission…" *Id.* at 441.

This motion demonstrates the government's outrageous misconduct and the corresponding prejudice to Mr. Flynn that undoubtedly violated his rights. Accordingly, the prosecution should be dismissed.

## II.     THE IG REPORT DISCLOSES OUTRAGEOUS GOVERNMENT MISCONDUCT THAT MANDATES DISMISSAL OF THIS PROSECUTION.

There is a long and troubling history of misconduct in the DOJ and the FBI that has dramatically worsened over the years. In 2015, Henry F. Schuelke III returned a 500-page report to this Court in which he found "pervasive, systematic and intentional misconduct" in the DOJ, specifically with respect to suppressing evidence favorable to the defense.[4] Instead of correcting this, the DOJ lawyers immediately attempted to excuse the same misconduct in two related cases by claiming the exculpatory evidence was not material.[5] Those cases found their way to the Ninth Circuit.

---

[4] Henry F. Schuelke III, Special Counsel, *Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order, dated Apr. 7, 2009, In re Special Proceedings*, No. 1:09-mc-00198-EGS (D.D.C. Mar. 15, 2012) (available at http://legaltimes.typepad.com/files/Stevens_report.pdf.)

[5] Foreign Intelligence Surveillance Court, *Document Regarding the Section 702 2018 Certification*, (Oct. 18, 2018) (Boasberg, J.) (available at

There, the Ninth Circuit was furious with the government's misconduct. Judge Betty Fletcher wrote separately to excoriate the prosecution's "flagrant, willful bad-faith misbehavior" which she said was "an affront to the integrity of our system of justice." *Kohring*, 637 F.3d at 914 (Fletcher, J., concurring in part and dissenting in part). Further, she found "[t]he prosecution's refusal to accept responsibility for its misconduct [] deeply troubling and indicat[ive] that a stronger remedy is necessary to impress upon it the reprehensible nature of its acts and omissions." *Id*. Even Judge Fletcher's strong language is insufficient for the outrageous conduct of the FBI and DOJ in Mr. Flynn's case.[6]

More recently, the government's lack of candor and suppression of evidence favorable to the defense has been playing out in the FBI, DOJ, and NSA's endless abuses of the government's

---

https://www.intelligence.gov/assets/documents/702%20Documents/declassified/2018_Cert_FISC_Opin_18Oct18.pdf).

[6] The Honorable Alex Kozinski cited to case law in a preface to *The Georgetown Law Journal* that is also helpful. Hon. Alex Kozinski, Preface, n.120, 44 GEO. L.J. ANN. REV. CRIM. PROC (2015):

> See *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2010); *United States v. Kott*, 423 Fed. App'x 736 (9th Cir. 2011); s*ee also* [Sidney Powell, *Licensed to Lie* 190-201], 231 (2014), holding that the prosecution had yet again violated *Brady* by failing to disclose the very evidence deemed material in the Stevens case, a panel of my court vacated both defendants' convictions and remanded for a new trial. Judge Betty Fletcher lambasted the prosecution's "flagrant, willful bad-faith misbehavior" as "an affront to the integrity of our system of justice" and found "[t]he prosecution's refusal to accept responsibility for its misconduct [] deeply troubling and indicat[ive] that a stronger remedy is necessary to impress upon it the reprehensible nature of its acts and omissions." *Kohring*, 637 F.3d at 914 (Fletcher, J., concurring in part and dissenting in part); see *Kott*, 423 Fed. App'x at 738 (Fletcher, J., concurring in part and dissenting in part) ("Despite their assurances that they take this matter seriously, the government attorneys have attempted to minimize the extent and seriousness of the prosecutorial misconduct and even assert that Kott received a fair trial . . . . The government's stance on appeal leads me to conclude that it still has failed to fully grasp the egregiousness of its misconduct, as well as the importance of its constitutionally imposed discovery obligations.").

powerful surveillance apparatus.  The abuses became so overwhelming that Judge Rosemary Collyer wrote and later partially declassified a 99-page decision in 2016 in which she excoriated the FBI and NSA for their lack of candor and abuses of the search queries of the NSA database.[7] Not only did the last administration—especially from late 2015-16—dramatically increase the abuse of "about queries" in the NSA database, which Judge Collyer noted was "a very serious Fourth Amendment issue," but it also expanded the distribution of the illegally obtained information among federal agencies.[8]  *See also* ECF No. 109 at 8.

In October 2019, Judge Boasberg, also sitting on the FISC, publicly released a heavily redacted opinion describing the FBI's repeated non-compliant queries of Section 702 information and relaxed procedures that have led to systemic Fourth Amendment violations at that agency.[9] Judge Boasberg wrote, "In a number of cases, a single improper decision or assessment resulted

---

[7]  Foreign Intelligence Surveillance Court, *FISC Memorandum and Order*, (Apr. 26, 2018) (Collyer, R.) (available at https://www.dni.gov/files/documents/icotr/51117/2016_Cert_FISC_Memo_Opin_Order_Apr_20 17.pdf) at 19, 87 (noting that 85% of the queries targeting American citizens were unauthorized and illegal), n. 69 (saying "the improper access granted the [redacted] contractors was apparently in place [redacted] and seems to have been the result of deliberate decision making" including by lawyers); *see also* Charlie Savage, *NSA Gets More Latitude to Share Intercepted Communications*, THE N.Y. TIMES (Jan. 12, 2017) (reporting that Attorney General Loretta Lynch signed new rules for the NSA that permitted the agency to share raw intelligence with sixteen other agencies, thereby increasing the likelihood that personal information would be improperly disclosed), https://www.nytimes.com/2017/01/12/us/politics/nsa-gets-more-latitude-to-share-intercepted-communications.html; *See also* Exec. Order No. 12,333, 3 C.F.R. 200 (1982), as amended by Exec. Order No. 13, 284, 68 Fed. Reg. 4075 (Jan. 23, 2003).  Judge Collyer just stepped down early from serving as Chief Judge of the FISA court, and Judge Boasberg was assigned to the role.

[8] *Id.* at 19.

[9] *Supra* n. 5.

in the use of query terms corresponding to a large number of individuals, including U.S. persons." *Id.* at 68. He continued:

> During March 24-27, 2017, the FBI conducted queries using identifiers for over 70,000 communication facilities "associated with" persons with access to FBI facilities and systems. *See* Nov. 22, 2017, Notice at 2. [Redacted] proceeded with those queries notwithstanding advice from the office of General Counsel (OGC) that they should not be conducted without approval by OGC and the National Security Division (NSD) of the Department of Justice.

*Id.* at 69.

These are flagrant and deliberate violations of law that affect the Fourth Amendment rights of thousands of Americans.[10] Further, these violations directly impact Mr. Flynn, who was the subject of a felony leak of classified information and was illegally unmasked by the prior administration.

On December 9, 2019, the Inspector General for the Department of Justice has released his tome—reporting on the FBI's deliberate deceit, malfeasance, and misfeasance in its applications for FISA warrants against Carter Page and the overarching Crossfire Hurricane investigation, which also targeted Mr. Flynn and enabled the FBI to obtain—illegally—the communications of hundreds of people, including Mr. Flynn. *See generally* IG Report.

**A. The December 2019 IG Report is Replete with Information Exculpatory to Mr. Flynn and Damning of the FBI's Conduct Employed Against Him.**

The IG Report reveals information that is exculpatory, material, and favorable to the defense, which the government did not previously disclose to Mr. Flynn. Mr. Flynn is one of the four people originally targeted by the FBI in Crossfire Hurricane because of his purported "ties to

---

[10] Foreign Intelligence Surveillance Court, *In Re Carter W. Page, A U.S. Person*, No. 16-1182, 17-52, 17-375, 17-679 (Jan. 7, 2020) (Boasberg, J.) (available at https://www.fisc.uscourts.gov/sites/default/files/FISC%20Declassifed%20Order%2016-1182%2017-52%2017-375%2017-679%20%20200123.pdf).

Russia."[11]  The IG Report is a scathing indictment of the conduct of the leadership and small group

in the FBI that ran this operation against Mr. Flynn.  This is especially true for the two FBI agents

who interviewed Mr. Flynn on January 24, 2017, and on whose remarkably edited FD-302 the

felonious "false statement" allegations depend, Strzok and SSA 1.[12]  To the extent he could, under

the limitations of his role in the DOJ, IG Horowitz exposed lies, misrepresentations, and material

omissions in four applications for FISA warrants to the FISC.[13]  The IG Report shows Strzok and

SSA 1 repeatedly and deliberately hid exculpatory evidence from the FISC.  Moreover, as IG

Horowitz testified in front of the Homeland Security Committee, he "could not rule out" political

preferences and bias as the explanation for the government misconduct he found at every turn.[14]

---

[11] The innocence of Mr. Flynn's supposed "Russia ties" is thoroughly documented in reports of the DIA which show the extent to which Mr. Flynn was working with the government—just as Carter Page was—but this Court has denied this exculpatory information to Mr. Flynn's defense. ECF No. 144.  The DIA information negates the FBI's sheer pretext for "investigating" Mr. Flynn. Members of Congress are also interested in exculpatory information.  Ex. 2.

[12] The government asserts that the name of SSA 1 is covered by the Protective Order, but that name was known to Ms. Powell before she became counsel to Mr. Flynn, and the agent's name has been published throughout the media.

[13] For example, the Inspector General could not interview persons with the CIA and only had access to documents that were sent to the DOJ or the FBI.  He could not question former FBI Director Comey on certain issues because Mr. Comey refused to accept a security clearance for that purpose and did not cooperate with the Inspector General's investigation. "Certain former FBI employees who agreed to interviews, including Comey and Mr. Baker, chose not to request that their security clearances be reinstated for their OIG interviews.  Therefore, we were unable to provide classified information or documents to them during their interviews to develop their testimony, or to assist their recollections of relevant events." IG Report at 12. As Attorney General Barr noted, this meant that Comey "couldn't be questioned about classified matters." Pete Williams, *Interview with Attorney General William Barr* (Dec. 10, 2019), NBC News, https://www.youtube.com/watch?v=LRKFo0JmuBc.

[14]  C-SPAN, *Justice Dept. IG Testifies on Origins of FBI's Russia Inquiry*, C-SPAN.COM, Dec. 18, 2019, https://www.c-span.org/video/?467350-1/justice-department-inspector-general-testifies-origins-fbis-russia-inquiry.

Indeed, there were no satisfactory explanations for the many violations, falsehoods, and errors the Inspector General found.

**B.      From the IG Report, Extraordinary Facts About SSA 1 Emerge that Should Have Been Disclosed to Mr. Flynn as *Brady* Evidence Prior to his Plea.**

SSA 1 also played a much larger role in the FBI's Crossfire Hurricane than the defense was led to believe.  He was in fact the Supervisor of Crossfire Hurricane.  IG Report at 305.  He helped pick the team.  *Id*. at 65.  The agents reported to him.  *Id*.  Then, he reported operational activities to Strzok.  *Id*.  Even more remarkable, DOJ official Bruce Ohr provided information collected by Christopher Steele ("Steele") (through his contract with Fusion GPS[15]) to the FBI "out of the blue."  *Id*. at 99.  SSA 1 reviewed this information.  *Id*. at 100.  SSA 1 knew that Steele was "desperate that Mr. Trump not get elected."  *Id*. at n. 217.   He was responsible for making sure the FISA applications were *verified* by providing a "factual accuracy review,"[16] yet he included false and incomplete information for the court, and he failed to inform the court of significant exculpatory information.  *See generally* IG Report.

One of the FBI lawyers falsified a document in support of one of the FISA applications.[17] IG Report at 160.  Aside from falsifying documents, the IG Report confirmed SSA 1, through his

---

[15] *See* IG Report at 95-96.

[16] IG Report at 151.

[17] This unnamed FBI lawyer is likely Kevin Clinesmith.  Jerry Dunleavy, *FBI Lawyer Under Criminal Investigation Altered Document to Say Carter Page 'was Not a Source' for Another Agency*, WASH. EXAMIN'R (Dec. 9, 2019), https://www.washingtonexaminer.com/news/fbi-lawyer-under-criminal-investigation-altered-document-to-say-carter-page-was-not-a-source-for-another-agency ("in a scathing July 2018 inspector general report on the FBI's Clinton emails investigation, Clinesmith was criticized at least 56 times as being one of the FBI officials who conveyed a bias against Mr. Trump in instant messages, along with Peter Strzok and FBI lawyer Lisa Page, both of whom have left the Bureau.").  As documented in the June 2018 IG Report, Clinesmith played a pivotal role in the small group working against Mr. Flynn.  Both he and Sally Moyer, FBI Unit Chief in the Office of General Counsel, had extreme anti-Trump bias as reflected

supervision of Case Agent 1,[18] withheld exculpatory information from the court that was material to its determination regarding the warrants. *Id.* at 232-33. Shockingly, as further briefed below, SSA 1 also participated surreptitiously in a presidential briefing with candidate Trump and Mr. Flynn for the express purpose of taking notes, monitoring anything Mr. Flynn said, and in particular, observing and recording anything Mr. Flynn or Mr. Trump said or did that might be of interest to the FBI in its "investigation." IG Report at 340.

In addition to myriad problems with Christopher Steele, the IG Report confirmed that other unverified information from another source (Source 2, likely Stefan Halper[19]), was used to obtain FISA warrants to wiretap Carter Page (and thereby reach Mr. Flynn). IG Report at 313-33. Source 2 was closed by the FBI in 2011; however, Source 2 was re-opened by Case Agent 1. *Id.* Case Agent 1 reported to SSA 1 during Crossfire Hurricane. *Id.* at 81. Source 2's involvement in the Crossfire Hurricane investigation arose out of Case Agent 1's pre-existing relationship with Source 2. *Id.* at 313. "SSA 1 told the OIG that he did not know about Source 2, or know that Case Agent 1 was Source 2's handler, prior to Case Agent 1 proposing the meeting [on August 11, 2016], which SSA 1 approved." *Id.* Notably, there was "no supporting documentation" to support that

---

in the aforementioned IG Report. Clinesmith texted Sally Moyer after Hillary Clinton's loss, "I am numb." Moyer replied, "I can't stop crying," and "You promised me this wouldn't happen. YOU PROMISED." In the course of comforting Moyer, Clinesmith said, "I am so stressed about what I could have done differently." *See* U.S. Department of Justice (DOJ) Office of the Inspector General (OIG), *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* at 417 (June 2018) https://www.justice.gov/file/1071991/download.

[18] IG Report at 81.

[19] Madeline Osburn, *FBI Terminated Anti-Trump Source Stefan Halper 'For Cause' in 2011*, THE FEDERALIST (Dec. 9, 2019), https://thefederalist.com/2019/12/09/fbi-terminated-anti-trump-source-stefan-halper-for-cause-in-2011/.

"Source 2 has routinely provided reliable information that has been corroborated by the FBI." *Id.*

at 418 ("Appendix One").  Despite the lack of documentation, it was relied upon in the first FISA

application.  *Id.*  Notably, Mr. Flynn requested information relating to Source 2/Halper in his

Motion to Compel the Production of *Brady* Material and for an Order to Show Cause.  ECF No.

111 at 4; ECF No. 116 at 1 (relating to additional material for Col. (Ret.) James Baker who ran

Halper through the Department of Defense Office ONA).  That request was denied.  ECF No. 143.

    **C.**    **SSA 1's Deceitful Participation in the Presidential Briefing Alone is So Egregious It Requires Dismissal.**

Strzok and Lisa Page texted about an "insurance policy" on August 15, 2016.[20]  They

opened the FBI "investigation" of Mr. Flynn on August 16, 2016.  IG Report at 2.  The very next

day, SSA 1 snuck into what was represented to candidate Trump and Mr. Flynn as a presidential

briefing.  IG Report at 340.  It appears that the "insurance policy" on candidate Trump was "taking

out" Mr. Flynn. As explained in the IG Report:

> …during the presidential election campaign, the FBI was invited by ODNI to provide a baseline counterintelligence and security briefing (security briefing) as part of ODNI's strategic intelligence briefing given to members of both the Trump campaign and the Clinton campaign… We also learned that, because Flynn was expected to attend the first such briefing for members of the Trump campaign on August 17, 2016, the FBI viewed that briefing as a possible opportunity to collect information potentially relevant to the Crossfire Hurricane and Flynn investigations.  We found no evidence that the FBI consulted with the Department leadership or ODNI officials about this plan.

IG Report at 340.

While SSA 1's stated purpose of the presidential briefing on August 17, 2016, was "to

provide the recipients 'a baseline on the presence and threat posed by foreign intelligence services

---

[20] U.S. Department of Justice (DOJ) Office of the Inspector General (OIG), *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* at 404 (June 2018) https://www.justice.gov/file/1071991/download.

to the National Security of the U.S,'" IG Report at xviii (Executive Summary), the IG Report confirmed that, in actuality, the Trump campaign was never given any defensive briefing about the alleged national security threats. IG Report at 55. Thus, SSA 1's participation in that presidential briefing was a calculated subterfuge to record and report for "investigative purposes" anything Mr. Flynn and Mr. Trump said in that meeting. IG Report at 408. The agent was there only because Mr. Flynn was there. IG Report at 340. Ironically, Mr. Flynn arranged this meeting with ODNI James Clapper for the benefit of candidate Trump.

More specifically, as the Inspector General explained further in his testimony to Congress on December 11, 2019, SSA 1 surreptitiously interviewed and sized-up Mr. Flynn on August 17, 2016, under the "pretext" of being part of what was actually a presidential briefing but reported dishonestly to others as a "defensive briefing."[21] The IG Report states:

> In August 2016, the supervisor of the Crossfire Hurricane investigation, SSA 1, participated on behalf of the FBI in an ODNI strategic intelligence briefing given to candidate Trump and his national security advisors, including Flynn, and in a separate briefing given to candidate Clinton and her national security advisors. The stated purpose of the FBI's participation in the counterintelligence and security portion of the briefing was to provide the recipients 'a baseline on the presence and threat posed by foreign intelligence services to the National Security of the U.S.' However, we found the FBI also had an investigative purpose when it specifically selected SSA 1, a supervisor for the Crossfire Hurricane investigation, to provide the FBI briefings. SSA 1 was selected, in part, because Flynn, who would be attending the briefing with candidate Trump, was a subject in one of the ongoing investigations related to Crossfire Hurricane. SSA 1 told us that the briefing provided him 'the opportunity to gain assessment and possibly some level of familiarity with [Flynn]. So, should we get to the point where we need to do a subject interview…I would have that to fall back on.'
>
> After the meeting, SSA 1 drafted an Electronic Communication (EC) documenting his participation in the ODNI strategic intelligence briefing attended by Trump, Flynn, and another advisor, and added the EC to the Crossfire Hurricane

---

[21]   C-SPAN, *Inspector General Report on Origins of FBI's Russia Inquiry*, C-SPAN.COM, Dec. 11, 2019, https://www.c-span.org/video/?466593-1/justice-department-ig-horowitz-defends-report-highlights-fisa-problems.

investigative file. The EC described the purpose, location, and attendees of the briefing, and recounted in summary fashion the portion of the briefing SSA 1 provided. Woven into the briefing summary were questions posed to SSA 1 by Trump and Flynn, and SSA 1's responses, as well as comments made by Trump and Flynn. SSA 1 told us that he documented those instances where he was engaged by the attendees, as well as anything related to the FBI or pertinent to the Crossfire Hurricane investigation, such as comments about the Russian Federation. SSA 1 said that he also documented information that may not have been relevant at the time he recorded it, but might prove relevant in the future.

IG Report at 407-08.

In clear and certain terms, the Inspector General found "members of the Crossfire Hurricane team repeatedly failed to provide OI [Office of Intelligence] with all relevant information." IG Report at 362.   SSA 1 even "speculated" that Steele's information was corroborated—when it was not—and he was responsible for numerous "inaccuracies," "omissions," and "unsupported statements" in the FISA applications. *See generally* IG Report at Chs. 5, 9. The last two FISA warrants including the one entered specifically for the benefit of the SCO were illegal. Any and all evidence derived from those warrants regarding Mr. Flynn must be suppressed.

An objective view of SSA 1's purported handwritten notes with the FD-302 of the January 24, 2017 interview of Mr. Flynn that Lisa Page instructed Agent Strzok to edit on February 10, 2017, reveals equally troubling "inaccuracies," "omissions," and "unsupported statements." [22] The

---

[22]   As previously briefed by Mr. Flynn, aside from the fact that the FD-302 was in a "deliberative process" for weeks and material changes were made to it with the knowledge and instruction of Counsel to McCabe (Lisa Page) on the night of February 10, 2017, there are statements in the FD-302 that find no support in the notes of either agent. ECF No. 129-2 at 14-17 (Sections 6 through 9). The changes include the addition of the line "'or if KISLYAK described any Russian response to a request by FLYNN.'" That question and answer do not appear in the notes. *Id.* This Court excused those additions by pointing out that agents also include information from their memory. ECF No. 144 at 41. That simply makes finding the original FD-302 that much more important—as it would have been the freshest version. The FD-302 that serves as the basis for the false statements charge against Mr. Flynn was altered weeks after the interview and long past the five days in which a FD-302 is to be finalized under FBI rules.

IG Report evinces that Mr. Flynn has still not been provided with all the evidence of egregious government misconduct dishonestly wielded to destroy the National Security Advisor to President Trump as part of their larger anti-Trump scheme.

### D. The Inspector General Abhorred this Conduct as did FBI Director Christopher Wray.

This intolerable breach of trust and deceitful conduct by the FBI leadership and SSA 1 alone is enough to warrant dismissal of all charges against Mr. Flynn.  Current FBI Director Christopher Wray immediately responded to the IG Report to confirm that this would not happen again.[23]  It was simply so outrageous there was not a formal policy to foreclose it at the time.  No rational person could have anticipated that anyone entrusted with the "Fidelity, Bravery, and Integrity" of the FBI would suggest such an operation against a presidential nominee.

The case against Mr. Flynn should be dismissed immediately for this egregious abuse of power and trust, and for the prosecution's failure to disclose it to the defense from November 29, 2017, until the release of the IG Report—more than two years later.[24]

---

[23] Press Release, FBI Director Christopher Wray's Response to Inspector General Report (Dec. 9, 2019) (on file with FBI.gov), https://www.fbi.gov/news/pressrel/press-releases/fbi-director-christopher-wray-response-to-inspector-general-report.

[24] The electronic communication written by SSA 1 arising from the presidential briefing was approved by Strzok.  It was uploaded into Sentinel August 30, 2016.  IG Report at 343 and n. 479.  In truth, but unknown to Mr. Flynn until the release of this Report, SSA1 was actually there because he was investigating the candidate's national security advisor as being "an agent of Russia."  This report of that interaction including purported statements by Mr. Flynn was put it in a sub-file of the Crossfire Hurricane file.  That, and the DOJ document completely exonerating Mr. Flynn of that slanderous assertion, has never been produced to Mr. Flynn.  This was extraordinary *Brady* and *Giglio* information that should have been provided to Mr. Flynn by Mr. Van Grack no later than upon entry of this Court's *Brady* order.

### III.   SUPPRESSION OF UNDENIABLE *BRADY* EVIDENCE MANDATES DISMISSAL OF THIS CASE.

This Court should dismiss this prosecution for the government's recurring *Brady* violations revealed or disclosed only since December 9, 2019.  As Glen Greenwald wrote: "the FBI's gross abuse of its power – its serial deceit – is so grave and manifest that it requires little effort to demonstrate it.  In sum, the IG Report documents multiple instances in which the FBI – in order to convince a FISA court to allow it to spy on former Trump campaign operative Carter Page during the 2016 election – manipulated documents, concealed crucial exonerating evidence, and touted what it knew were unreliable if not outright false claims."[25]

The IG Report is damning evidence of *Brady* violations and outrageous government misconduct by the FBI agents who deceitfully listened to Mr. Flynn on August 17, 2016, and interviewed him on January 24, 2017.  Neither time did they even advise him he was under investigation.  He had no warnings—not even those given to government employees.  The entire scenario was planned and rehearsed to keep from alerting him to the seriousness of it all.  Surely, such alleged conduct cannot be a foundation for a federal felony.  *Sorrells,* 287 U.S. at 442 ("A different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.").

Remarkably, FBI agents continued to alter and manipulate Mr. Flynn's January 24, 2017 FD-302 until it met the approval of Deputy Director McCabe's Special Counsel and McCabe

---

[25] Glen Greenwald, *The Inspector General's Report on 2016 FBI Spying Reveals a Scandal of Historic Magnitude: Not Only for the FBI but Also the U.S. Media*, The Intercept, https://theintercept.com/2019/12/12/the-inspector-generals-report-on-2016-fb-i-spying-reveals-a-scandal-of-historic-magnitude-not-only-for-the-fbi-but-also-the-u-s-media/?comments=1 (Dec. 12, 2019, 11:44 AM).

approved it.  As previously explained, SSA 1 was responsible for false and wrong information

repeatedly presented to the FISA court.  The government and that agent failed to provide this

exculpatory evidence to that court at every turn.  The same agents and the prosecutors also failed

to provide such important *Brady* material to Mr. Flynn.[26]

    Mr. Van Grack's suppression of this crucial *Brady* information—and his failure to disclose

that SSA 1 had a "baseline" read on Mr. Flynn—demands dismissal of this case.[27]   The

---

[26] See Judge Boasberg opinion, *see supra* n. 11.  Mr. Flynn's communications were obtained in
violation of the Fourth Amendment—whether through illegal FISA abuses or abuses of the NSA
database or mishandling Presidential Transition Team Materials.

    In the January 2020 FISC report, Judge Boasberg wrote that "due in large part to the work
of the Office of the Inspector General," the Court has received notice of "material misstatements
and omissions in the applications filed by the government in the above-captioned dockets [16-
1182, 17-52, 17-375, 17-769]."   Order Regarding Handling and Disposition of Information at 1
(1/7/20).  The DOJ acknowledges "there was insufficient predication to establish probable cause
to believe that [Carter] Page was acting as an agent of a foreign power" with respect to when it
filed its applications, "if not earlier." *Id.*  The FBI was sequestering documents it acquired pursuant
to the listed docket numbers but did not give a deadline or methods of sequestration – merely
promising to update the court. *Id.*  As of January 7, 2020, no update had been received. *Id.*  As a
result of the situation, the Court ordered that the government make a submission of the FBI's
handling of information obtained pursuant to these dockets, including: detailed steps taken to
restrict access in unminimized form, detailed steps taken to restrict access to such information in
other forms, timetable for completion of steps, explanation of the "further review of the OIG
Report" and "related investigations and any litigation" that would require retention of the above
information, and an explanation of why the retention comports with FISA. *Id.* at 2. This is a
developing issue that Mr. Flynn wants to preserve in light of Judge Boasberg's holding that the
FISA warrant was invalid, thereby invalidating information illegally obtained that likely relates to
Mr. Flynn.

[27] The Government's misconduct also provides further support for Mr. Flynn's motion to withdraw
his plea, filed contemporaneously herewith.  A defendant's plea is only valid if it was entered
knowingly and intelligently. *See e.g.*, *Hill v. Lockhart, 474 U.S. 52 (1985).*  But, "this test suffices
only in the "absen[ce of] misrepresentation or other impermissible conduct by state agents. *Miller
v. Angliker*, 848 F.2d 1312, 1320 (2d Cir. 1988). "[T]he validity of the plea must be reassessed if
it resulted from "impermissible conduct by state agents." *United States v. Avellino*, 136 F.3d 249,
255 (2d Cir. 1998) (quoting *Brady v. Maryland*, 397 U.S. 742, 757 (1970)).  "[E]ven a guilty plea
that was 'knowing' and 'intelligent' may be vulnerable to challenge if it was entered without
knowledge of material evidence withheld by the prosecution." *Miller v. Angliker*, 848 F.2d 1312,
1320 (2d Cir. 1988). After all, "if a defendant may not raise a *Brady* claim after a guilty plea,

government's suppression (or destruction) of the original FD-302 of the interview of January 24, 2017 is now even more important.  That SSA 1 participated in two interviews of Mr. Flynn and immediately reported to multiple people—as did Strzok—that Mr. Flynn was being honest with the agents dramatically magnifies the importance of SSA 1's statements and perceptions as written on January 24, 2017.

Another stunning revelation in the IG Report is that SSA 1 played a large part in the lies to the FISA court from the first application on Carter Page onward. *See supra* 12.  Much like the fabricated FISA application based on the "Steele dossier" used against Carter Page, the FBI knew this was nonsense because Mr. Flynn worked with the FBI as allies for years, including as head of the Defense Intelligence Agency ("DIA"), and he continued working with the DIA on all his foreign contacts thereafter—including contacts in Russia and Turkey.[28]  Mr. Flynn requested this DIA information in his Motion to Compel *Brady* Material.  ECF No. 133 at 29-30.

---

prosecutors may be tempted to deliberately withhold exculpatory information as part of an attempt to elicit guilty pleas."  *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995).  A majority of the Circuits agree that *Brady* violations can be the basis to withdraw a plea.

The D.C. District Court held that the government's suppression of *Brady* was sufficient to permit him to withdraw his plea *post-sentencing*—despite the high standard of "manifest injustice." *United States v. Nelson,* 59 F. Supp. 3d 15, 17 (D.D.C. 2014) (holding a suppressed exculpatory email sufficient to withdraw the plea); *see also, United States v. Lough*, 203 F. Supp. 3d 747 (N.D. W. Va. 2016) (granting a motion to withdraw a guilty plea where counsel *was not aware* that, and therefore did not inform the defendant that, *a substantial portion of the government's evidence against the defendant could have been suppressed* because of the invalidity of the government's warrant that led to the collection of that evidence. *Id.* at 753-54. This failure stripped defendant of "close assistance of competent counsel," thus his guilty plea was not knowingly entered. *Id.* at 754-55.  These are additional grounds to allow Mr. Flynn to withdraw his plea.  ECF No. 151.

[28] The documentation of his work with the DIA after he retired is a significant part of the *Brady* evidence the government has refused to produce to Mr. Flynn.

The government's conduct in this case shows contempt for the law at every turn.  Mr. Flynn was targeted and deliberately destroyed by corrupt factions within the FBI and intelligence community.  While Mr. Flynn's case is not even the focus of the IG Report, the Report reveals illegal, wrongful, and improper conduct that affected Mr. Flynn, and is the subject of an ongoing criminal investigation by United States Attorney John Durham.  Both Attorney General Barr and John Durham issued statements on the heels of the Inspector General's Report to clarify that more information was being discovered in Mr. Durham's investigation, and, as Mr. Durham stated: "[W]e advised the Inspector General that we do not agree with some of the report's conclusions as to predication and how the FBI case was opened."[29]  The defense expects additional information to be developed that exonerates Mr. Flynn.

"Exercising the inherent authority [of the court] is most appropriate in particular fact situations that do not lend themselves to rules of general application.  *Omni Int'l Corp.*, 634 F. Supp. at 1438.  That is certainly the case here, where Mr. Flynn's facts arise in the midst of what has been exposed as a shamefully abusive and corrupt period in FBI history, an operation that has sparked a massive investigation by the Inspector General, and now an ongoing criminal investigation by United States Attorney John Durham.  At bottom, Mr. Flynn was framed and set-up by his own government in a shockingly inappropriate and wrongful conduct by the "leadership" of the FBI, DOJ, and "intelligence officials."  The FBI "leadership" schemed to interview Mr. Flynn twice—with no warning—not just of his rights—but even of the fact that they were investigating him.  This was a coordinated, deliberate, unconscionable, and result-driven

---

[29] U.S. Attorney John H. Durham, Statement (Dec. 9, 2019) (transcript available at https://www.justice.gov/usao-ct/pr/statement-us-attorney-john-h-durham).

mechanism to create a "crime" they clearly sought. This abuse of power is so pernicious it undermines the very foundations of our constitutional republic.

Even though the investigation pertains to the abuses of the FISA process, not the FBI and DOJ's misconduct regarding Mr. Flynn, the IG Report simultaneously documents at least some of FISA process abuses and misconduct against Mr. Flynn. The IG Report is replete with exculpatory evidence that, had it been known to Mr. Flynn, he never would have pled guilty. The government's suppression of evidence drove a three-star military veteran of multiple conflicts to plead to a crime he did not believe he committed. It now raises the specter that the foremost intelligence officer of this generation, a combat veteran and war hero, will serve time behind bars. This is not only manifestly unjust, it makes a mockery of *Brady* and due process. *See United States v. Brown*, 250 F.3d 811, 818 (3d Cir. 2001) (acknowledging that a *Brady* violation is "closely bound to due process guarantees"); *Campbell v. Marshall*, 769 F.2d 314, 321 (6th Cir. 1985) (determining that "in *Tollet* and the *Brady* trilogy, the Supreme Court did not intend to insulate all misconduct of constitutional proportions from judicial scrutiny solely because that misconduct was followed by a plea which otherwise passes constitutional muster as knowing and intelligent").

## IV.   THE GOVERNMENT'S ROLE IN DEMANDING, RUSHING, REVIEWING, AND COORDINATING THE FARA FILING FORECLOSES USE OF IT TO PROSECUTE FLYNN.

As briefed extensively in Mr. Flynn's Supplemental Motion to Withdraw His Plea (ECF No. 150), David Laufman, former Chief of the U.S. Department of Justice's Counterintelligence and Export Control Section, and the FARA Unit of the DOJ were adamant that Flynn Intel Group ("FIG") file a FARA registration even though FARA experts at Covington and at Arent Fox were not sure that one was warranted. Indeed, Matthew Nolan, FARA expert at Arent Fox, was adamant that no filing was required in this case. Ex. 3.

Mr. Flynn wanted to "do the right thing." He authorized his lawyers to "be precise," complete the task, and file the registration. Ex. 4. Moreover, in September 2016, FIG Partner Bijan Rafiekian had timely sought legal counsel requesting to file a FARA, but he was advised by attorney Robert Kelley to file an LDA instead. Ex. 5. An LDA filing is the largest single exception to the requirement of filing FARA, and in many cases, filing an LDA satisfies FARA. 22 U.S.C. § 613(h) (2019).

Mr. Laufman applied extraordinary pressure on Covington and repeatedly inserted himself and others including multiple members of the FARA division—into the planning, content, and filing of FIG's registration. ECF No. 151 at n. 3 and at 4-5. There is no valid FARA offense against Mr. Flynn. The extraordinary involvement of the FARA Unit and Mr. Laufman in this process (as fully briefed in ECF No. 98-7 at 11) should foreclose or estop any use of the registration against Mr. Flynn. *Sorrells*, 287 U.S. at 444 (quoting *Butts v. United States*, 273 F. 35 (8th Cir. 1921)) ("The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it.").

## V.     PROSECUTORS CREATED THE "FALSE STATEMENTS" IN THE FARA FILINGS AND SOUGHT TO SUBORN PERJURY.

As we briefed in full previously at ECF No. 133 and ECF No. 151, the SCO in general and Mr. Van Grack in particular, cooked-up the "false statements" in the FARA filing and have long been in possession of statements by Covington lawyer Brian Smith that completely contradict the government's assertions of any wrongdoing by Mr. Flynn on the FARA registration. The same documents show that Mr. Van Grack sought to have Mr. Flynn make affirmative false statements in his June 2019 interview with the FBI and EDVA prosecutors, and Mr. Turgeon, and compounded that atrocity by demanding Mr. Flynn testify falsely on the same point in the

*Rafiekian* trial.  Mr. Van Grack has spent the last year taking retaliatory action against Mr. Flynn over the same issues as the defense has briefed.

## CONCLUSION

The government's misconduct undoubtedly harmed and prejudiced Mr. Flynn.  For these reasons, if the United States Department of Justice does not come forth to meet its most solemn duty and move to dismiss this travesty, this Court should dismiss this prosecution because of the government's outrageous and egregious misconduct directed specifically against Lt. General Michael T. Flynn (Retired).   "[I]t is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it." *Sorrells*, 287 U.S. at 444-45 (quoting *Butts*, 273 F. at 38).

Dated: January 29, 2020

Respectfully submitted,

/s/ Sidney Powell
Sidney Powell
Molly McCann
Sidney Powell, P.C.
2911 Turtle Creek Blvd.,
Suite 300
Dallas, Texas 75219
Tel: 214-707-1775
sidney@federalappeals.com
Admitted *Pro Hac Vice*
molly@federalappeals.com
Admitted *Pro Hac Vice*

W. William Hodes
The William Hodes Law Firm
3658 Conservation Trail
The Villages, Florida 32162

/s/ Jesse R. Binnall
Jesse R. Binnall
Lindsay R. McKasson
Harvey & Binnall, PLLC

23

Tel: (352) 399-0531
Fax: (352) 240-3489
Admitted *Pro Hac Vice*

717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jbinnall@harveybinnall.com
lmckasson@harveybinnall.com
Admitted *Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2020, a true and genuine copy of Mr. Flynn's Motion to Dismiss for Egregious Government Misconduct and in the Interest of Justice was served via electronic mail by the Court's CM/ECF system to all counsel of record, including:

Jessie K. Liu, U.S. Attorney for the District of Columbia
Brandon L. Van Grack, Special Assistant U.S. Attorney
Jocelyn Ballantine, Assistant U.S. Attorney
555 4th Street, NW
Washington, D.C. 20530

Respectfully submitted,

/s/  Jesse R. Binnall
Jesse R. Binnall, VSB # 79272
HARVEY & BINNALL, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jbinnall@harveybinnall.com

1

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                    Plaintiff,       )
                                      )  Case No. 2:16-cr-046-GMN-PAL
6            vs.                      )
                                      )  Las Vegas, Nevada
7    CLIVEN D. BUNDY (1),             )  Monday, January 8, 2018
     RYAN C. BUNDY (2),               )  Courtroom 7C, 9:28 a.m.
8    AMMON E. BUNDY (3),              )
     RYAN W. PAYNE (4),               )  MOTION TO DISMISS
9                                     )
                     Defendants.      )
10   _____)  C E R T I F I E D   C O P Y

11

12                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE GLORIA M. NAVARRO
13              UNITED STATES DISTRICT CHIEF JUDGE

14   APPEARANCES:

15    For the Plaintiff:

16             UNITED STATES ATTORNEY'S OFFICE
               BY:  STEVEN W. MYHRE
17                  DANIEL R. SCHIESS
                    NADIA JANJUA AHMED
18             501 Las Vegas Boulevard South, Suite 1100
               Las Vegas, Nevada 89101
19             (702) 388-6336

20

21    (Appearances continued on Page 2)

22    Court reporter:  Heather K. Newman, RPR, CRR, CCR #774
                       333 South Las Vegas Boulevard
23                     Las Vegas, NV 89101
                       (702) 471-0002   HN@nvd.uscourts.gov

24

25    Proceedings reported by machine shorthand, transcript produced
      by computer-aided transcription.

8

1          However, defendant Payne argues that the Double

2   Jeopardy Clause still bars retrial "where the government

3   conduct in question is intended to 'goad' the defendant into

4   moving for a mistrial," quoting *Oregon v. Kennedy*.  Considering

5   what has occurred throughout the trial up to this point, the

6   Court finds no evidence that the government's failure to

7   disclose evidence was a strategy decision on the prosecution's

8   part to abort the trial.  Rather, it appears the government has

9   attempted to provide the defense with the identified *Brady*

10  evidence in order to move forward with trial and not to

11  purposely goad the defense into moving for mistrial.

12          For these reasons, the Court finds the Double

13  Jeopardy Clause does not bar retrial.

14          Next we have the claim of outrageous government

15  conduct and that a dismissal is appropriate for either --

16  either under a due process violation theory or under the

17  Court's supervisory powers.

18          "A district court may dismiss an Indictment on the

19  ground of outrageous government conduct if the conduct amounts

20  to due process violation," quoting from *Simpson*, Ninth Circuit

21  case.  If the conduct does not rise to the level of a due

22  process violation, the Court may nonetheless dismiss a case for

23  outrageous government misconduct under its supervisory powers.

24          So turning first to the due process violation

25  allegation.

1    government's conduct had at least some impact on the verdict

2    and thus redounded to the defendant's prejudice.

3            In order for the Court to dismiss an Indictment under

4    the supervisory powers, the Court must find that there has been

5    flagrant prosecutorial misconduct, substantial prejudice to the

6    defendants, and that no lesser remedial action is available.

7            The Court found previously that there had been

8    multiple *Brady* violations because the government failed to

9    produce evidence that bolstered the defense and was useful to

10   rebut the government's theory.  Additionally, the Court

11   concluded that the government willfully failed to disclose

12   potentially exculpatory, favorable and material information,

13   including, but not limited to, the following documents and

14   their contents:

15           The FBI Law Enforcement Operation order; the FBI

16   Burke 302 about Agent Egbert; the FBI 302 about BLM Agent

17   Delmolino authored by FBI Agent Willis; the FBI 302 about BLM

18   Special Agent Felix observing the LP/OP, the Listening

19   Post/Operation Post; the FBI 302 about BLM Racker and his

20   assignment to the LP/OP; the unredacted FBI TOC log; and the

21   various threat assessments created by different agencies,

22   including the BLM and FBI.

23           It seems no coincidence that most, if not all, of

24   these documents are authored by the FBI.

25           I do need to make one correction.  Apparently I

1                          --oOo--

2                 COURT REPORTER'S CERTIFICATE

3

4        I, Heather K. Newman, Official Court Reporter, United

5    States District Court, District of Nevada, Las Vegas, Nevada,

6    do hereby certify that pursuant to Section 753, Title 28,

7    United States Code, the foregoing is a true, complete, and

8    correct transcript of the proceedings had in connection with

9    the above-entitled matter.

10

11   DATED:  1-9-2018          ____/s/ Heather K. Newman___
                               Heather K. Newman, CCR #774
12                             OFFICIAL FEDERAL REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25

CHARLES E. GRASSLEY, IOWA, CHAIRMAN

ORRIN G. HATCH, UTAH
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TED CRUZ, TEXAS
BEN SASSE, NEBRASKA
JEFF FLAKE, ARIZONA
MIKE CRAPO, IDAHO
THOM TILLIS, NORTH CAROLINA
JOHN KENNEDY, LOUISIANA

DIANNE FEINSTEIN, CALIFORNIA
PATRICK J. LEAHY, VERMONT
RICHARD J. DURBIN, ILLINOIS
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT
MAZIE K. HIRONO, HAWAII
CORY A. BOOKER, NEW JERSEY
KAMALA D. HARRIS, CALIFORNIA

KOLAN L. DAVIS, Chief Counsel and Staff Director
JENNIFER DUCK, Democratic Chief Counsel and Staff Director

**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

June 6, 2018

The Honorable Rod J. Rosenstein
Deputy Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Deputy Attorney General Rosenstein:

The Department's reply to my May 11, 2018 letter seeking information about the circumstances surrounding Lt. General Michael Flynn's reported conversations with the Russian ambassador and FBI records related to those conversations is insufficient. The letter only recounts a series of publicly known facts about Lt. General Flynn's plea agreement and relies on improper excuses in refusing to provide the requested information. The Committee requires this information to fulfill its Constitutional function and its charge under Senate Rules to conduct oversight of the Department of Justice.

First, as you know, some of that information was first requested on a bipartisan basis before your confirmation. The Committee has waited patiently for much more than a year for the criminal inquiry related to Lt. General Flynn to conclude. It has been more than five months since his guilty plea. Thus, there is no longer any legitimate reason to withhold facts from the Senate about the circumstances of his conversations with the Russian ambassador and his FBI interview.

Second, the Department's letter erroneously suggests that complying with Congressional oversight would result in "the reality or the appearance of political interference" in a "pending criminal prosecution." There is no pending prosecution. The guilty plea was more than five months ago. The Department's letter describes in detail what everyone already knows. Lt. General Flynn admitted to the Statement of Offense with the able assistance of counsel. All that remains is for Lt. General Flynn to be sentenced. Simply disclosing facts to the Committee could not possibly "interfere" with the case at this late date, assuming those facts are consistent with the representations that prosecutors arranged for Lt. General Flynn to swear to in federal court.

If the facts are inconsistent with the plea agreement, that would be an entirely different kettle of fish.

Third, as both the Committee's request and the Department's reply note, any exculpatory evidence must be turned over to the defense. However, the Department's assurance that, "Mr. Flynn is represented by skilled and experience attorneys who … *will have* access to favorable evidence in the government's possession," is not relevant to the Committee's inquiry. Regardless of whether all exculpatory evidence has already been or will be produced to the defense, Congress has a wholly separate, independent, constitutional oversight interest in the information. It might not be in the interests of either the defendant or the prosecutors to disclose facts inconsistent with the plea agreement. However, it would absolutely be in the interest of Congress and the American people to be aware of any such inconsistencies that may exist. Congress needs to see the underlying evidence itself, not merely the conclusions about the evidence that prosecutors and a defendant have agreed to describe publicly.

This is no ordinary criminal case. It is at the heart of a political firestorm over the President's alleged statements about it to the former FBI Director, whom he later dismissed. Congress has a right to know the full story and to know it now.

Presuming that the facts are consistent with the plea agreement, there is absolutely nothing for the Department to hide and no reason to act like it has something to hide. Resisting Congressional oversight only serves to further undermine public trust in the Department. By contrast, cooperation could enhance public trust in the Department by demonstrating that its work can withstand independent scrutiny. The lack of transparency feeds public skepticism about the Department's actions regarding Lt. General Flynn and related matters. For example, a summary of Lt. General Flynn's intercepted calls with the Russian ambassador was illegally leaked to the media, presumably by a current or former government official. One of the FBI agents who reportedly conducted the interview of Lt. General Flynn, Peter Strzok, was later removed from the Russia investigation after his texts demonstrating animus and bias toward Mr. Trump were uncovered. Additionally, former Director McCabe was fired for lack of candor regarding a leak to the *Wall Street Journal,* and Lt. General Flynn was an adverse witness in a pending sexual discrimination case against Mr. McCabe at the time Mr. McCabe was supervising a criminal inquiry targeting Lt. General Flynn.[1]

Former Director Comey also has made public statements about the FBI's actions regarding Lt. General Flynn on his book tour that contradict his previous descriptions to this Committee and the House Intelligence Committee while he was FBI Director. Moreover, newly released information tends to support the version of events former Director Comey relayed to the congressional committees. According to a memorandum drafted by the President's attorneys, the White House Counsel's office believed there was likely no ongoing investigation of Flynn at the time it was briefed by the Department of Justice about Flynn's FBI interview, and Flynn himself "had told both White House Counsel and the Chief of Staff at least twice that the FBI agents had told him he would *not* be charged."[2] The memorandum describes both incidents in detail. Those

---

[1] *See* Letter from Chairman Grassley to Inspector General Horowitz (June 29, 2017), https://www.judiciary.senate.gov/imo/media/doc/2017-06-29%20CEG%20to%20DOJ%20IG%20(McCabe%20Conflicts).pdf
[2] *The Trump Lawyer's Confidential Memo to Mueller, Explained,* THE NEW YORK TIMES (June 2, 2018) (quoting Letter from John M. Dowd and Jay A. Sekulow, Counsel to the President to Robert S. Mueller, Special Counsel, U.S. Dep't of Justice (Jan. 29, 2018)), https://www.nytimes.com/interactive/2018/06/02/us/politics/trump-legal-

incidents, along with the interactions between the Department and White House Counsel, as described by the President's attorneys, do not seem to square with the current popular narrative. Thus, regardless of Lt. General Flynn's underlying conduct, the FBI's conduct here is ripe for Congressional oversight.

Finally, it is disingenuous and extremely disturbing that the Department would imply that a request to interview a fact witness, such as Special Agent Pientka, has anything whatsoever to do with "allegations against" that witness. As you well know, seeking information from a fact witness is not the same thing as an allegation of wrongdoing. Quite the contrary, it seems he is likely to be an objective, reliable, and trustworthy witness, which is precisely why the Committee would benefit from his testimony.

Moreover, you also know very well that I am committed to transparency in the Committee's work, and for that reason, I generally post all Committee correspondence, including requests for interviews with government witnesses, on my website so that they are publicly available. Thus, the Department's reference to "Committee staffers" who "chose to release" the letter is an inappropriate and inaccurate deflection from the issue at hand. If the Department has a complaint about the Committee's longstanding policy and practice of publicly posting official correspondence, then please address it directly with me rather than making veiled, uninformed accusations about Committee staff. While I am generally unlikely to make exceptions to my normal policy and practice, the Department has always been free to make a specific request that certain correspondence remain private for a period of time, for good cause. In this case, it did not do so.

Please let me know when you will provide the requested documents, so that we can begin scheduling an interview with Special Agent Pientka. Thank you for your prompt attention to this important matter.

Sincerely,

Charles E. Grassley
Chairman

cc:     The Honorable Dianne Feinstein
        Ranking Member

---

documents.html#footnote-0-26; Byron York, *Trump Lawyers Reveal Previously Unknown Evidence in Michael Flynn Case*, THE WASHINGTON EXAMINER (June 3, 2018), https://www.washingtonexaminer.com/news/newly-leaked-memo-previously-unknown-evidence-michael-flynn-case.

# Arent Fox

Arent Fox LLP / Attorneys at Law
Los Angeles, CA / New York, NY / San Francisco, CA /
Washington, DC
www.arentfox.com

Matthew M. Nolan
Partner
202.857.6013 DIRECT
202.857.6395 FAX
matthew.nolan@arentfox.com

January 18, 2017

Mr. Ekim Alptekin
Burhaniye Mahallesi Tasocaklari Sokak
Bogazici Palmiye Evleri B Kapisi C Blok No :10
34676 Beylerbeyi Burhaniye -ISTANBUL
TURKEY

Re:     **Advice on Regulations for the Foreign Economic Relations Board of Turkey**

Dear Mr. Alptekin:

You have asked for our advice regarding the regulations for the Foreign Economic Relations Board of Turkey (DEIK), specifically, the applicability of this regulation to your election as the Chairman of The Turkish-American Business Council (TAIK) one of the Business Councils of the Foreign Economic Relations Board of Turkey.

In particular, you have asked us to prepare a Memo on the procedure of the election TAIK Chairman and if TAIK Chairman position could be construed as a Turkish government position or an independent position for purposes of the Foreign Agents Registration Act (FARA). We note that a new structure for TAIK was adopted on September 20, 2014 with the regulation numbered 29125, *Regulation on Working Principles and Procedures of Foreign Economic Relations Board and Business Councils,* which was issued by the Ministry of Economy to regulate the working principles and procedures of DEIK and its business councils.

We provide a summary of the relevant facts, our summary conclusions, and a more detailed legal analysis below. If you disagree with any of the facts stated, please advise us immediately, as it is critical to have complete and correct facts in completing the legal analysis and any change in the facts could affect the conclusions as stated.

Confidential -- Subject to Protective Order

Rafiekian_EDVA_00045777

Mr. Ekim Alptekin
January 18, 2017
Page 2

## I.     <u>Summary Conclusions</u>

Based on the facts provided, we do not believe TAIK should be considered an entity or agent of the Government of Turkey (GOT) such that any U.S agents hired by TAIK would be required to register under FARA rather than under the Lobbying Disclosure Act (LDA).    While the GOT's 2014 decrees and approval/veto authority does indicate some potential GOT involvement in TAIK activities and governance, the facts as presented do not indicate that: (a) the GOT is directing the activities of TAIK; (b) TAIK should be treated as part of the GOT; or (c) the GOT has caused TAIK to engage FIC or other U.S. consultants.

      a.  Even if TAIK were to be considered an agent or part of the GOT, Mr. Alptekin' s activities with respect to INOVO BV (INOVO), RATIO Oil Exploration LP (RATIO), and Flynn Intel Group (FIG), would appear to be independent of his position with TAIK and his/INOVO's actions were not directed, controlled or requested by TAIK.  Accordingly, a FARA registration would not be required – an LDA registration, which was filed, would appear to be sufficient to meet U.S disclosure requirements.

## II.    <u>Facts</u>

### A.     <u>Ekim Alptekin, INOVO BV and the Flynn Intel Group Contract</u>

Mr. Ekim Alptekin is a Turkish Businessman and founder and president of EA Havacilik A.Ş, a major shareholder of Eclipse Aerospace; an Albuquerque, New Mexico-based aircraft manufacturer. Eclipse Aerospace was awarded the Commercial Leadership Award by the American Turkish Council in 2011. Ekim Alptekin is commercially active in the Real Estate and Defense industries through his companies EA Gayrimenkul Geliştirme İnşaat Yatırım and ATH Savunma ve Güvenlik Çözümleri A.Ş. and currently serves the Chairman of TAIK . He also serves as an Honorary Consul to the Republic of Albania, and represents the Republic of Turkey in the Board of the United States Nowruz Commission. He is a member of the European Council of Foreign Relations (ECFR) and the Turkish Industry and Business Association TÜSİAD.

INOVO is a Dutch company incorporated in 2005 to provide Turkey-related consultancy services. Ekim Alptekin is the sole owner of INOVO BV. The company has always been in good standing and has represented companies such as Motorola Solutions or international law firms with regard to their plans to invest or do business in Turkey.

Confidential -- Subject to Protective Order

INOVO is representing RATIO, a private sector Israeli company, that owns a 15% share in the Leviathan gas consortium in Israel that wants to export gas into Turkey. INOVO was engaged in March 2016 by RATIO to advice on the investment climate in Turkey. As part of this contract RATIO also asked INOVO to provide geopolitical reporting with a special interest in Turkey's continued alignment with the West/United States.

After some period of time, RATIO determined that the limited reporting on such matters by INOVO was insufficient and RATIO requested that INOVO outsource this service to more expert providers. INOVO subsequently reached out to FIG in August 2016 with the question to measure the strength and challenges of Turkish American relations. The agreement was for 3 months which would only be renewed if both parties so agreed. There was a lack of confidence in the relationship and at some point, while discussing the exact scope of the contract, FIG Lobbyist Mr.  Kelley suggested activities to increase the level of confidence in the relationship. He also indicated that FIG might end up having discussions in Congress, and to this end and he should consider registering under the Lobbying Disclosure Act. Mr. Alptekin and Mr. Kelley agreed to be on the safe side of things and Mr. Kelley registered as the lobbyist. Although the initial aim was merely passive geopolitical reporting,  Mr. Alptekin and Mr. Kelly agreed that at some time in the future there might be a lobbying component and a PR component.  The lobbying PR components ultimately never took place. Mr. Alptekin and Mr. Kelly had several interactions about this.  FIG introduced Mr. Alptekin  to Sphere Consulting as their PR company and during the first meeting in October.  Sphere Consulting explained that a 3 month contract was not enough and little could be done. Mr. Alptekin argued INOVO should be reimbursed for part of the retainer since both the Lobbying and PR components never materialized.  INOVO never hired Sphere Consulting.

On election Day, November 8, 2016, in "The Hill", a US political newspaper,  General Flynn authored a strongly worded  opinion piece condemning the cleric Fetullah Gulen who lives in the U.S. and Gulen's U.S activities, and calling upon the U.S government to support the Turkish Government.  The article was subsequently linked by certain reporters to the contract FIG had with INOVO and Mr. Alptekin.

Mr. Alptekin told the press that he had very few interactions with General Flynn.  They never discussed details of the contract between INOVO and FIG; and they never discussed his personal involvement.  When Mr. Alptekin met him in person, the General independently expressed his concern about Radical Islam and said he feel Turkey should do more on combatting it. He did not commit to or announce that he had any intentions of writing an article; nor did Mr. Alptekin never ask him to do so.  He never consulted Mr. Alptekin on this, or asked his opinion.  If he had, Mr. Alptekin  would have strongly advised against publishing an article along the lines of his opinion letter that appeared in the Hill on election day.

Confidential -- Subject to Protective Order

Mr. Ekim Alptekin
January 18, 2017
Page 4

A subsequent article (http://dailycaller.com/2016/11/24/michael-flynns-consulting-firm-may-have-violated-federal-lobbying-law/) was published without asking Mr. Alptekin for a comment. The author Chuck Ross did check Mr. Alptekin' s Linkedin profile but never contacted him for a comment. The second article that appeared was in Politico.  When Mr. Alptekin reacted, Politico authored a minor amendment to the article but reported the two assumptions that were first drawn by the Daily Caller article: 1. Ekim Alptekin via TAIK is an extension of the Turkish government and 2. General  Flynn has written the article as a Lobbyist in the context of the INOVO/FIG contract.

**B.**      **DEIK and The Turkish-American Business Council (TAIK)**

DEIK's mission is to assist in managing the foreign economic relations of the Turkish private sector.  DEIK monitors the economic, commercial, industrial and financial relations of Turkey with foreign countries or international communities, to support the establishment and development of such relations; provides opinions and suggestions; collects information and statistical data; performs works in order to enhance the import of Turkey and to encourage the international investments for export; prepares strategies for general economic matters or in respect of sectors for relations with several countries, regions, institutions and establishes business councils (Article 5 of the Regulation).

As of November 2014, DEIK has 99 founding institutions, 121 business councils, and approximately 900 member companies which form these councils, as well as 2000 representatives from the member companies.

DEIK's organs are the General Assembly, Board of Directors, Executive Board, Board of Auditors,  Business Councils, High Advisory Board and Advisory Boards. (Article 6 of the Regulation).

DEIK does not receive government funding. In addition to the corporate members of DEIK, Union of Chambers and Commodity Exchanges of Turkey (TOBB) and Turkish Exporters' Association ("TIM").   DEIK's Board of Directors is composed of thirty five members including the Chairman of the Board. DEIK's Board of Directors is composed of five permanent members, who are the representatives of certain founding institutions - namely TOBB, TIM, Turkish Industrialist and Businessmen's Association ("TUSİAD"), Independent Industrialist and Businessmen's Association ("MUSİAD"), Turkish Contractors Association ("TMB") and business council leaders, representative of other founding institutions and other members elected among other General Assembly delegates. **DEIK's Chairman is assigned among the Board members by the Turkish Minister of Economy (Article 9 of the Regulation).**

Rafiekian_EDVA_00045780

The Executive Board is composed of the Chairman of the Executive Board and twelve members who are elected among and by the members of the Board of Directors. The Chairman of the Board of Directors also functions as the Chairman of the Executive Board. Five members of the Executive Board are elected among the representatives of TOBB, TIM, TUSIAD, MUSIAD and TMB;  two members among the representatives of other founding institutions, four members among the business council chairmen while one other is elected among other General Assembly delegates. Two vice chairmen are elected among and by the Executive Board members (Article 12 of the Regulation)

It is through Business Councils that DEIK establishes corporate cooperation (Article 14-15 of the Regulation)

There are three different types of business councils, namely Country Business Councils, Sectoral Business Councils, and Special Purpose Business Councils.  Business Councils are established through cooperation agreements signed with foreign counterparts with the purpose of promoting business relations with these countries. Bilateral country councils which are founded in 114 countries as of February 2015 have been gathered under 8 regional councils (in Africa, America, Asia-Pacific, Eurasia, the European Union, South East Europe, the Gulf and the Middle East). Business Councils consist of two parties, one is the Turkish party and the other one is a counterpart institution in the relevant country, which is usually a representative body of the respective country's private sector. Councils meet regularly each year at "Business Councils Joint Meetings". Each sectoral and special purpose business council within DEIK convenes a separate General Assembly annually and a general assembly meeting with an election every two years. Each business council elects its own Executive Committee during these general assembly meetings. The Executive Committee members then elect the Chairman for the Business Council.

Executive Boards of the Business Councils meet at regular intervals to discuss bilateral or multilateral cooperation opportunities, challenges and current developments. The executive boards are responsible for developing recommendations about the policies, solutions and mechanism which are necessary to improve commercial and economic relations within the framework of the main strategies designated by the Board of Directors, and doing research in order to identify related opportunities.  Several sectoral business councils have been established within the body of DEIK in order to improve Turkey's place in the global value chain and promote the export of services. Health Tourism Business Council, Education Economy Business Council, Energy Business Council, Logistics Business Council, and International Technical Consultancy Business Council continue their operations.

High Advisory Board of DEIK convenes at least once annually under the chairmanship of the Turkish Minister of Economy to determine DEIK's annual activities and harmonization and evaluation of them with Turkey's economic strategies and interests. Members of the Board are assigned by the Minister (Article 17 of the Regulation).

Confidential -- Subject to Protective Order

TAIK is one of the Business Councils of DEIK. TAIK was formed as the first business council in Turkey in 1985 with the aim to enhance trade and investment relations between the United States of America and Turkey. TAIK is organized pursuant to Government decree, but is composed of and acts for member companies. TAIK's vision is primarily to increase the trade and investment volume between the US and Turkey; to be recognized as a reliable source of information and networking channel on bilateral trade issues for both countries and to make the US companies view Turkish companies as a key partner and Turkey as a destination for direct investments in the region. TAIK operates with a mission to create platforms to facilitate the development of economic relations between the U.S. and Turkey through its wide spectrum of activities such as conferences, forums, business summits, lobbying visits, networking luncheons and dinners, educational site visits, etc.

TAIK's Executive Board consists of top-level executives of the leading companies in Turkey. The Executive Board is elected by the General Assembly of DEIK/Turkey-Americas Business Councils in every 2 years and the Board elects its Chairman and the Vice Chairmen. TAIK operates under DEIK, but has a separate membership and separate budget from DEIK. It does not receive government funding. TAIK's budget only comes from its member companies and event sponsors. TAIK's Executive Board is elected every 2 years by the General Assembly of DEIK and Turkey American Business Councils.  It consists of senior executives from Turkish companies.

Prior to September 2012, DEIK operated as an independent organization composed of various business chambers and commodity exchanges with a budget determined by the Union of Chambers and Commodity Exchanges of Turkey (TOBB). TOBB, in turn, derived its budget from assessment s on various member Chambers of Commerce and Commodity Exchanges, and is subject to control indirectly by the Government of Turkey. However, in September 2014, DEIK's authorization law and governance structure significantly changed. The Turkish Government Ministry of the Economy issued revised regulations which expanded the Ministry of Economy's authority over the operations of DEIK, including the ability to cancel or revise the institution, appointing the Chairman and certain other officials, designating 25 members of the General Assembly, potential funding from the Ministry, and other authority.

Mr. Alptekin  was transparently elected into office as Chairman of TAIK by other peer company members of TAIK on October 25, 2016.[1]  The executive committee list in **Appendix A** has the list of  private Turkish companies which voted to elect Mr. Alptekin. These companies has been member of TAIK for many years. Mr. Alptekin was elected by the votes of business

---

[1] Please see the Minutes of Ordinary General Assembly Meeting of TAIK dated October 26, 2015; Minutes of the Meeting of the Executive Committee of TAIK dated October 26, 2015; General Assembly Meeting List of Attendees; Suggestions for the General Assembly Presiding Committee; Meeting Agenda and pictures of the TAIK meeting in **Appendix A.**

Confidential -- Subject to Protective Order

entities not by any government entity representative. The position of Chairman at TAIK is voluntary; Mr. Alptekin receives no salary or compensation from TAIK or the Government. Some limited expenses incurred as Chairman may be reimbursed, but major expenses, such as travel to the annual American Turkish Council Conference in the United States, is paid for out of personal or company funds.

We note that documents leaked by Wikileaks indicate that certain individuals with close ties to the Turkish government have tried to convince the Turkish government to influence TAIK's elections. None of these emails were on Mr. Alptekin's behalf; quite the contrary. The same leaks only show emails to members of the Cabinet asking for an intervention to favor another candidate. TAIK regulations and procedures, however, do not allow for an intervention.

C.    **Turkish Government Control of DEIK / Under the New Regulation**

DEIK adopted a new structure on September 20, 2014 with the regulation numbered 29125, *Regulation on Working Principles and Procedures of Foreign Economic Relations Board and Business Councils,* which was issued by the Ministry of Economy to regulate the working principles and procedures of DEIK and its business councils ("Regulation"). Please see the Regulation in **Appendix B.**

Under the Regulation, the Ministry of Economy ("Ministry") may designate or cancel the status of the founding institutions (Article 4 of the Regulation), designate the twenty-five members of the General Assembly (Article 7 of the Regulation) and designate or remove the Chairman of the Board of Directors (Article 4 of the Regulation). Business Councils are established by the Ministry with the proposal of the Board of Directors (Article 14 of the Regulation). The Chairmen of the business councils and the executive committee members may be discharged by the Minister or upon the proposal of the Board of Directors with the approval of Ministry. In the event that the members of the executive committee and the chairman are discharged or a vacancy in the membership or presidency is occurred for any reason, the new chairman shall be assigned with the approval of the Ministry upon the proposal of the Board of Directors and the members shall be assigned by the members of the executive committee from among the associate members to serve until the following date of election (Article 16 of the Regulation). The Secretary General shall be assigned upon the approval of the Ministry and with the proposal of the Board of Directors (Article 19 of the Regulation). DEIK may open representative agencies at home or abroad upon the approval of the Ministry (Article 16 of the Regulation). Ministry allocates income to DEIK among other contributions fees and donations (Article 24 of Regulation). Under the regulation, the directives covering the working principles and procedures such as the way of work of DEIK bodies, relationships with each other, the principles of the right to elect and be elected, budget, accounting, human resources shall take effect upon the approval of the Ministry (Article 27 of the Regulation)

Mr. Ekim Alptekin
January 18, 2017
Page 8

## III.   **The Law**

The Foreign Agents Registration Act of 1938, as amended (FARA)[2], requires persons acting as "agents" of foreign "principals" in a political or quasi-political capacity to register and make periodic public disclosure of their relationship with the foreign principal, as well as activities, receipts and disbursements in support of those activities. Disclosure of the required information is intended to facilitate evaluation by the government and the American people of the statements and activities of foreign agents. FARA was originally enacted in 1938 in reaction to certain subversive and propaganda activities by Nazi and Communist agents operating in the United States, and continues to this day as a way of ensuring disclosure of any foreign interests lobbying or conducting media campaigns in the United States. The Department of Justice, FARA Registration Unit of the Counterespionage Section in the National Security Division is responsible for the administration and enforcement of FARA.

### A.   **Activities Covered**

FARA covers a variety of activities by the agent on behalf of a foreign principal. They include:

a)     Engaging in political activities;

b)     Acting as public relations counsel, publicity agent, information service employee or political consultant;

c)     Soliciting, collecting, disbursing, or dispensing contributions, loans money or other things of value in the United States;

d)     Representing the interests of the foreign principal before any agency or official of the United States. [3]

The range of activities covered is quite broad, and basically covers any form of lobbying, media interaction, and public relations campaigns conducted on behalf of a foreign principal. In recent years there has been an increased emphasis on public relations firms' activities on behalf of foreign governments.

---

[2] 22 U.S.C. §611, et seq.
[3] 22 U.S.C. §611(c).

Confidential -- Subject to Protective Order                                      Rafiekian_EDVA_00045784

**B.**     <u>Who are Foreign Principals?</u>

**All foreign governments are explicitly defined as foreign principals**.  The term also covers:

a)     Foreign political parties;

b)     A person or organization based outside the United States, except U.S. citizens;

c)     A partnership, **association**, corporation, **organization**, or other combination of persons inside the United States that is **organized under the laws of a foreign country**; and

d)     A partnership, association, corporation, organization, or other combination of persons inside the United States that has its principal place of business in a foreign country.[4]

Thus the definition specifically encompasses foreign governments and trade associations. Further, the definition of foreign government includes any group or agency that the foreign government delegates authority to operate on its behalf.[5]

**C.**     <u>Who is An Agent?</u>

This is perhaps the topic that is most subject to interpretation under FARA. The law defines an agent as:

"any person who acts as an agent, **representative, employee, or servant,** or any person who acts in any other capacity **at the order, request, or under the direction or control** of a foreign principal or of a person any of whose activities are directly or indirectly supervised, controlled, financed, or subsidized, in whole or in major part, by a foreign principal, . . . [6]

The FARA definition of agent is quite broad, and treats an agent as any person acting under the direction, control of a foreign principal.   Note there are several exemptions for certain categories of agents, such as:

---

[4] 22 U.S.C. §611(b).
[5] 22 U.S.C. §611(e).
[6] 22 U.S.C. §611(c).

     Rafiekian_EDVA_00045785

1.   diplomats and officials of foreign governments;

2.   an agent whose foreign principal is a government of a foreign country the defense of which the President deems vital to the interests of the United States;

3.   the activities involved do not serve predominantly a foreign interest;

4.   persons soliciting or collecting funds for medical aid and assistance, or for food and clothing (e.g. the Red Crescent);

5.   a person engaging solely in activities in furtherance of bona fide religious, scholastic, academic, or scientific pursuits or of the fine arts;

6.   lawyers representing foreign principal in courts or other legal proceedings as long as the attorney does not attempt to influence policy and the request of the foreign client; and;

7.   any agent engaged in lobbying for the foreign principal and is registered under Lobbying Disclosure Act.[7]

**D.   Interpreting the Agency Relationship**

While there have been few cases interpreting FARA, the courts have considered what type of relationship exists triggering a FARA registration requirement.  In *United States v. German-American Vocational League*[8] the 3rd Circuit Court interpreted the meaning of an agency relationship under FARA as applied to a group of German-Americans acting as Nazi propagandists. The Court considered and rejected an argument that there was no written employment contract with the Germany Reich, hence no agency.   Instead the Court applied a traditional *Restatement* Standard to determine the existence of agency under FARA:[9]

The true test, we think, was whether agency in fact existed, with the term agency defined substantially as in the Restatement of Agency, Section 1, which states it to be: 'The relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his **control, and consent** by the other so to act.'[10]

The court then applied a control test to the German agents to find that an agency relationship existed which triggered a FARA registration requirement.

---

[7] 22 U.S.C. §613.
[8] 153 F. 2d 860 (3rd Cir, cert. denied 329 U.S. 760 (1946)
[9] Id. at 862.
[10] Id at 864.

Confidential -- Subject to Protective Order                                      Rafiekian_EDVA_00045786

More recently, in 1982 the federal courts considered a FARA registration requirement in the context of whether the Irish National Aid Committee (INAC) in the US was the event of the Irish Republican Army.[11]  In affirming the lower court decision requiring INAC to register, the Circuit Court commented on the type of relationship that triggers a FARA filing, finding that registration is not required unless the relationship between the foreign principal and the U.S party is of a nature that requires registration to fulfill the "informative" purposes of FARA:

> We add these few additional words to what Judge Haight has written because, while we agree with his construction of the Act, **we wish to express a note of caution concerning the statute's coverage of those who act at the "request" of a foreign principal.** As the District Court held, "(I) t is sufficient to establish agency under the Act that defendant is a 'representative' of the IRA, or acts as its 'request.' "  We agree that the agency relationship sufficient to require registration need not, as INAC urges, meet the standard of the Restatement (Second) of Agency with its focus on "control" of the agent by the principal.  Control is an appropriate criterion for a determination of common law agency because the agent contemplated by the Restatement has the power to bind his principal. In determining agency for purposes of the Foreign Agents Registration Act, however, **our concern is not whether the agent can impose liability upon his principal but whether the relationship warrants registration by the agent to carry out the informative purposes of the Act.**
>
> Nevertheless, while we acknowledge that the Act requires registration by a person who acts, in specified ways, at a foreign principal's "request," we caution that this word is not to be understood in its most predatory sense. Such an interpretation would sweep within the statute's scope many forms of conduct that Congress did not intend to regulate. **The exact perimeters of a "request" under the Act are difficult to locate, falling somewhere between a command and a plea.  Despite this uncertainty, the surrounding circumstances will normally provide sufficient indication as to whether a "request" by a "foreign principal" requires the recipient to register as an "agent."**
>
> [emphasis added, footnotes and citation omitted][12]

There has been some criticism of the INAC decision as it creates some uncertainty regarding the concept of requiring FARA registration based on its more expensive reading of agency and the link to FARA's "informative purposes."  Nevertheless, the current jurisprudence indicates that there must be some form of "control" relationship exercised by the foreign principal that the agent has consented to, or at least actions at the "request" of the foreign principal which the agent construes as some form more required action.

---

[11] *United States v. Irish National Aid Committee (INAC)*, 668 F 2d 159 (2d Cir. 1982) *aff'g* 530 F. Supp. 241 (SDNY 1981)..

[12] 686 F2d 159-160.

Confidential -- Subject to Protective Order

Rafiekian_EDVA_00045787

### E.      Lobbying Disclosure Act Exception

There is an exception to filing a FARA registration for certain foreign parties who engage lobbyists in the United States. The Lobbying Disclosure Act of 1995 (LDA), 2 U.S.C. § 1601, removed from FARA a class of agents who are engaged in lobbying activities and who register under the LDA. This Act is administered by Congress.  The LDA requires disclosure of lobbying activities, including the issue lobbied and expenditures related to such lobbying.   A party engaged in lobbying activity by a foreign principal may register under the LDA instead of FARA if the individual is lobbying on behalf of foreign individuals or entities (companies) for private and nonpolitical activities in furtherance of trade or commerce.  If, however, the individual providing lobbying services is representing a foreign government  or foreign political party with the objective of influencing U.S. policy, then a FARA registration is required.

## IV.    <u>Analysis/Application of Law to TAIK and Mr. Alptekin</u>

The questions presented are:

1.      Are TAIK and DEIK  entities or extensions of the Turkish Government, such that any activities by TAIK would require Registration under FARA.

2.      Is Mr. Alptekin, as Chairman of TAIK, a representative or agent of the Government of Turkey which would require any agents hired in the U.S. s to register under FARA rather than the LDA?

We consider each question separately below.

### 1.      Are TAIK and DEIK entities or extensions of the Turkish Government, such that any activities by TAIK would require Registration under FARA.

Whether TAIK is an entity affiliated with the Government of Turkey is significant because if it is considered an entity or agent of the GOT, then actions by any party hired by TAIK in the United States for lobbying or public relations work would trigger FARA filing requirements, instead of an LDA filing (which was made).  In such a case, a US agent hired by TAIK could be deemed an agent of the GOT.

FARA itself does not define what constitutes a government agency, or an organization controlled by or affiliated with same, nor does it define who is an agent of a foreign government. In general, a foreign government is considered to include the government  of a foreign country, or any agency, department, ministry, or political subdivision thereof. [13]  In other U.S. laws, some context is provided. For example, under the U.S. Foreign Corrupt Practices Act (FCPA), it is unlawful for U.S persons to pay bribes to *"any officer or employee of a foreign government or any department, agency or instrumentality thereof [. . . ] or any person acting in an official*

---

[13] See, e.g. 18 U.S.C. §11; 17 C.F.R. §240.3b-4 (securities law),

Confidential -- Subject to Protective Order

Rafiekian_EDVA_00045788

Mr. Ekim Alptekin
January 18, 2017
Page 13

*capacity for or on behalf of any such government, department, agency, or instrumentality. "[14]*
Similarly, in other laws an "agent" of a foreign government has been defined to include an
individual or entity that operates subject to the direction and control of a foreign government.[15]
Under some U.S laws, government has been interpreted to include state owned  Under the
FCPA, the definition has been interpreted to include state owned enterprises (SOEs).

The facts of this case are unusual in that the GOT does have some involvement in
DEIK/TAIK's activities.  As we understand it, DEIK and TAIK were created out of a
Government decree which authorized the formation of DEIK and its business councils, including
TAIK.  The GOT has  authority to cancel or revoke the status of TAIK as a business council,
may remove the Chairman of the Board of TAIK, and any new Chairman must be approved by
the Ministry of the Economy (MOE).  Further the MOE approves TAIK's budget and allocation
of funds for its activities.  At least once per year the MOE meets with the DEIK advisory board
to harmonize DEIKs activities with Turkey's economic strategies and interests. So it is clear that
there is some level of government participation/control.

However, DEIK/TAIK also exhibits the characteristics of a private business association.
The purposes of DEIK/TAIK are decidedly private sector oriented – to enhance trade and
investment relations for its members.  Its members are all private sector companies, and TAIK's
Executive Board is comprised entirely of private sector company representatives, who are
elected by the membership.  Programs and activities are developed and approved by the private
membership and Board.   It operates much like a trade association in the United States, on behalf
of its members.

Recently another branch of the U.S. Government has considered the status of Turkish
trade associations. By coincidence we represent the Turkish steel producer, Icdas Enerji which is
involved in a government subsidies case. The question presented was whether financial
assistance provided by the Turkish Steel Exporter's Association ("TSEA"), part of the Istanbul
Mineral and Metals Exporters Association ("IMMIB"), should be treated as a government
subsidy to Icdas Enerji.  We believe the governing decrees for IMMIB are similar to DEIK and
TAIK.  In the Icdas Enerji subsidy case, the U.S. Department of Commerce preliminarily found
"that" there is no evidence on the record of a monetary contribution from the GOT to TSEA's
financial accounts."[16]  Since TSEA did in fact provide financial support to Icdas Enerji in the
case, the implication is that the GOT was not involved and did not direct TSEA's action.

---

[14] 15 U.S.C. §78dd-1(f)(1).

[15] See 18 U.S.C. §951(d).
[16] See Decision Memorandum for Preliminary Results of Countervailing Duty 2014 Administrative Review of Steel
Concrete Reinforcing Bar from the Republic of Turkey, Admin review C-489-819, December 5, 2105, p11.

Confidential -- Subject to Protective Order                                                  Rafiekian_EDVA_00045789

Further, in the last twenty years of conduct, we do not know of a single instance in which a Turkish trade association was considered an extension of the GOT in the United States. On the contrary, Turkish trade associations have always been viewed as member driven organizations supporting their respective ember's interests. Turkish trade association events are generally held with other private sector groups like the American Turkish Council, and attendees are generally private sector Turkish members of TAIK.

Accordingly, while GOT's participation in DEIK and TAIK's governance structure and policy planning clearly exists, based on the facts presented we believe the better argument is that this level of potential interference, without more, is not sufficient to have TAIK treated as an extension or agent of the GOT. Rather, TAIK continues to operate as a predominantly private sector membership organization. Of course this conclusion would be directly affected if the GOT were to exert more direct authority over TAIK activities or to dictate the positions or policies of TAIK.

2.     **Is Mr. Alptekin, as Chairman of TAIK, a representative or agent of the Government of Turkey which would require any agents hired in the U.S. s to register under FARA rather than the LDA?**

However, even if TAIK were to be found to be a an extension or agent of the GOT, a second question would still exist with respect to Mr. Alptekin's activities. Mr. Alptekin is both chairman of TAIK, and also a prominent private sector businessman who operates numerous private businesses including Havacilik A.Ş. in Turkey and Eclipse Aerospace in the United States. He has significant business interests and activities completely independent of and apart from TAIK. Further, Mr. Alptekin's position as Chair of TAIK is completely voluntary: he receives no salary or compensation for his activities on behalf of TAIK. In fact, his position as Chair of TAIK can be attributed in large part to his status as a prominent respected and recognized business leader.

If TAIK were considered an agent of the GOT, and Mr. Alptekin was acting in his capacity as Chairman of TAIK in retaining U.S agents to engage in political activities or public relations, or meet with U.S government officials, then those activities could trigger a FARA filing requirement. If, however, Mr. Alptekin were acting for his private sector companies in retaining U.S. agents or consultants, then a filing under the LDA for potential lobbying contacts would be appropriate.

Based on the facts provided and included in this Memo, Mr. Alptekin was not acting in his capacity as Chair of TAIK when INOVO hired FIG to provide monitoring and reporting services with respect to Turkish American relations. TAIK did not request that FIG be hired, nor does TAIK appear to have any involvement. Rather, INOVO hired FIG to assist it in its representation of a private Israeli company, RATIO in providing advice with respect to the current state of U.S. – Turkish relations. It does not appear from the facts that Mr. Alptekin was operating for TAIK, or at the request TAIK, in any of these activities. Unless there are additional

Confidential -- Subject to Protective Order

Rafiekian_EDVA_00045790

Mr. Ekim Alptekin
January 18, 2017
Page 15

a facts that would suggest some linkage with TAIK, we do not believe the above noted activities can be attributed to Mr. Alptekin' s position in TAIK, and FARA does not confer an automatic filing requirement under these circumstances. Accordingly, we believe that an LDA filing would have been sufficient under these facts.

Moreover, based on the facts it is unclear whether any activity beyond simple monitoring and reporting actually occurred. FIG was retained and filed under the LDA out of an abundance of caution, but it is not clear that any contacts with US Government officials or politicians actually occurred. The public relations firm, Sphere Consulting was never retained. If these activities never occurred, then the whole premise for filing under the LDA or FARA could be questioned.

Please feel free to contact the undersigned should you have any questions.

Sincerely,

Matthew M. Nolan
Arent Fox LLP

MMN/nb

Rafiekian_EDVA_00045791

Conference w/ Flynn

2-14-17 4:30 pm

RK, KV, M Flynn, Lori.

KV:  Spoke before

     Documents in email to look @ leisure*?*

*w/ final?* to read more carefully

RK:  David Laufman call. HH, CR on call.

     Unrelated to stuff in the press.

     Time to collect and interview – facts.

     Possible draft registration.  Decision of client.

     When talking? He asked. Call and let us know able to talk.

     Read it: File or subpoena may follow.

     If file, possible they'll still look.  Take a lot of wind away.

     Focus is whether you register.  Could audit the filing.

     Subpoena less likely.

MF: YESTERDAY?

RK:  Yes.

RK: Where we are.  Told them in Jan we expected to file.

Emails, docs, interviews — little evidence of business/commercial.

     Except after the fact letter.

     Not discussed previously – after the fact.

     Talk to people involved. Little on oil field.

     Focus on Gulen, at time of FIG? focus on Gulen/Turkey

     Meeting with government in September — tied to Confidence.

     Op-ed distributed by Sphere — paid through contract.

     Op-ed on same topic→ Gulen

     LDA only if Turkey not directing and not prin. beneficiary.

Email – Green light. Bijan insists, not Confidence.

Other view – Ekim/Ratio, business, green light unrelated.

We could fight it out.  Would likely pursue.  Court.  Expensive. Might win – but big fight

Media storm. Conspiracy theories, etc.

MF: Filing late – legality.

Smart thing to file. Be precise.

RK: Take time with the draft.

High level — don't have the detail.

Gaps to explore?

Meet w/Heather with the document.

Address any of her concerns.

Could send cover letter.  Simple letter summarizing the position

Cogent explanation of our position.

Careful of public statements. Interconnected. Can all blow back.


Notes in upper right corner:  Payments added to chart.

Kept this from being factor

FCPA interconnected

## DECLARATION OF ROBERT K. KELLEY

1. My name is Robert Kelley. I am over 18 and competent to testify. The information contained herein is true and correct and is based on my personal knowledge.

2. I attended law school at the University of California, Berkeley from 1969-1972. I am a member of the District of Columbia Bar and licensed to practice law in D.C.

3. My background includes the Foreign Service in Germany (1966-1969), Law School at the University of California, Berkeley (1969-1972), Wilmer, Cutler, & Pickering Law Firm (1972-1975), Senate Intelligence Committee (1975-1976), Chief of Staff for Senator Charles Mathias (1977), U.S. Embassy in Iraq (2003-2005), Chief Counsel to the National Security Sub-Committee of the U.S. House of Representatives (2006).

4. Currently, I have my own law firm, The Law Offices of Robert Kelley. My practice includes representing foreign governments as well as other persons and businesses. 

5. I knew Bijan Kian when he was at the U.S. Export/Import Bank. He was one of three guys nominated by the President to run the bank.

6. Bijan co-founded the Nowruz Commission which was set up to coordinate a Persian Spring festival each year on the first day of Spring.  Bijan was the Vice Chairman and I was the Secretary General.

7. Bijan called me up last year and said that his company had to register with FARA, the Foreign Agents Registration Act. At this time, I was not affiliated with FIG, Flynn Intel Group.  It is important to note that I remember he said: "We have to register with FARA at the Justice Department."  FARA is an Act, the Foreign Agents Registration Act, but it's administered by the National Security Division of the Department of Justice. You just register on line. Bijan asked me to come out to his house to assist with the registration.

8. A few days later, on a Sunday afternoon, I went to Bijan's house. It was in September of 2016.  While there, I said to Bijan: "Is this a foreign government or a foreign political party?"  Bijan replied: "No, it's a foreign private company."  I said: "Well, you don't have to register at FARA if it's a foreign private company." I asked Bijan if they were going to do any lobbying. Bijan told me that they might. I then said: "You can register with the U.S. Congress under the LDA which is the Lobby Disclosure Act."  I also showed him the Federal Register that says it is not necessary for a private company to register with FARA. I did not ask any

additional questions nor did I see the contract. I only asked if it was a private company.

9.  Later that same week, I registered the company under the LDA.

10. On the form I had to put down what the company would lobby about. I had no idea so I put the registrant will advise the client on U.S. domestic and foreign policy regarding S.1635 and the House counterpart, and H.R. 1735 and the Senate counterpart. I made this decision on my own without guidance from anyone else.

11. The form also requested the name of who would lobby for the company. I put my name down. Somebody had to put a name down so I decided I would put my name down. I never actually did any lobbying. I made this decision on my own without guidance from anyone else.

12. In October Bijan asked me if I would like to be general counsel and a principal for the Flynn Intel Group. This was a few days after I filed for registration under the LDA.  I agreed. Bijan took my picture in front of the Flynn logo at their office at 44 Canal Square, Alexandria, VA., and put it on the website.

13. The next thing was after the November 8th election. Bijan called me and told me to terminate the registration.  The reason he gave me was that he was involved with the transition team of President Elect Trump and he was not allowed to be a lobbyist. I terminated the registration. This was on-line.

14. One day in December, on a Friday, I went to the FIG office at 44 Canal Square for a meeting with Bijan.  While there, we got Ekim Alptekin on the phone. We called him. Ekim said that his company, INOVA, was a private company and it had no government funding and no relation to the Turkish government. Then Ekim sent us an e-mail to the Flynn Intel Group to that effect. That is, INOVA didn't receive any government funds or have any relationship with any government.  It was just a one line e-mail to Bijan. I saw the e-mail.

15. While at this meeting, we received a call from General Flynn. He asked that we reach out to another attorney from Jones Day. I did not make the call but I understand that Bijan did reach out.

16. My involvement with FIG was limited.  I did not know about or have any involvement with the op-ed in the Hill Newspaper by General Flynn. Nor did I know about any meeting in New York with Turkish government officials or any other matter involving the Flynn Intel Group.  To be complete, on one occasion Bijan asked me to draft a letter to a company in Boston MA.  Later, I was told to

disregard writing the letter. On another occasion, Bijan asked that I coordinate a meeting with a friend of mine to see if they were interested in working with FIG. We met two times but nothing ever formed out of these meetings.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on October 27, 2017.

Robert K. Kelley

# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**Plaintiff,**

**v.**

**MICHAEL T. FLYNN,**

**Defendant.**

**Criminal Action No. 17-232-EGS**

## [PROPOSED] ORDER

Having considered Defendant's Motion to Dismiss, and for good cause shown, it is hereby ORDERED that:

This case is dismissed, with prejudice.

SO ORDERED.

Dated: _____

_____
Emmet G. Sullivan
United States District Judge