# Arent Fox

Arent Fox LLP / Attorneys at Law
Los Angeles, CA / New York, NY / San Francisco, CA /
Washington, DC
www.arentfox.com

Matthew M. Nolan
Partner
202.857.6013 DIRECT
202.857.6395 FAX
matthew.nolan@arentfox.com

January 18, 2017

Mr. Ekim Alptekin
Burhaniye Mahallesi Tasocaklari Sokak
Bogazici Palmiye Evleri B Kapisi C Blok No :10
34676 Beylerbeyi Burhaniye -ISTANBUL
TURKEY

Re:   **Advice on Regulations for the Foreign Economic Relations Board of Turkey**

Dear Mr. Alptekin:

You have asked for our advice regarding the regulations for the Foreign Economic Relations Board of Turkey (DEIK), specifically, the applicability of this regulation to your election as the Chairman of The Turkish-American Business Council (TAIK) one of the Business Councils of the Foreign Economic Relations Board of Turkey.

In particular, you have asked us to prepare a Memo on the procedure of the election TAIK Chairman and if TAIK Chairman position could be construed as a Turkish government position or an independent position for purposes of the Foreign Agents Registration Act (FARA). We note that a new structure for TAIK was adopted on September 20, 2014 with the regulation numbered 29125, *Regulation on Working Principles and Procedures of Foreign Economic Relations Board and Business Councils,* which was issued by the Ministry of Economy to regulate the working principles and procedures of DEIK and its business councils.

We provide a summary of the relevant facts, our summary conclusions, and a more detailed legal analysis below. If you disagree with any of the facts stated, please advise us immediately, as it is critical to have complete and correct facts in completing the legal analysis and any change in the facts could affect the conclusions as stated.

Confidential -- Subject to Protective Order

## I.   <u>Summary Conclusions</u>

Based on the facts provided, we do not believe TAIK should be considered an entity or agent of the Government of Turkey (GOT) such that any U.S agents hired by TAIK would be required to register under FARA rather than under the Lobbying Disclosure Act (LDA).   While the GOT's 2014 decrees and approval/veto authority does indicate some potential GOT involvement in TAIK activities and governance, the facts as presented do not indicate that: (a) the GOT is directing the activities of TAIK; (b) TAIK should be treated as part of the GOT; or (c) the GOT has caused TAIK to engage FIC or other U.S. consultants.

       a.   Even if TAIK were to be considered an agent or part of the GOT, Mr. Alptekin's activities with respect to INOVO BV (INOVO), RATIO Oil Exploration LP (RATIO), and Flynn Intel Group (FIG), would appear to be independent of his position with TAIK and his/INOVO's actions were not directed, controlled or requested by TAIK.  Accordingly, a FARA registration would not be required – an LDA registration, which was filed, would appear to be sufficient to meet U.S disclosure requirements.

## II.   <u>Facts</u>

### A.   <u>Ekim Alptekin, INOVO BV and the Flynn Intel Group Contract</u>

Mr. Ekim Alptekin is a Turkish Businessman and founder and president of EA Havacilik A.Ş, a major shareholder of Eclipse Aerospace; an Albuquerque, New Mexico-based aircraft manufacturer. Eclipse Aerospace was awarded the Commercial Leadership Award by the American Turkish Council in 2011. Ekim Alptekin is commercially active in the Real Estate and Defense industries through his companies EA Gayrimenkul Geliştirme İnşaat Yatırım and ATH Savunma ve Güvenlik Çözümleri A.Ş. and currently serves the Chairman of TAIK . He also serves as an Honorary Consul to the Republic of Albania, and represents the Republic of Turkey in the Board of the United States Nowruz Commission. He is a member of the European Council of Foreign Relations (ECFR) and the Turkish Industry and Business Association TÜSİAD.

INOVO is a Dutch company incorporated in 2005 to provide Turkey-related consultancy services. Ekim Alptekin is the sole owner of INOVO BV. The company has always been in good standing and has represented companies such as Motorola Solutions or international law firms with regard to their plans to invest or do business in Turkey.

Confidential -- Subject to Protective Order

Mr. Ekim Alptekin
January 18, 2017
Page 3

INOVO is representing RATIO, a private sector Israeli company, that owns a 15% share in the Leviathan gas consortium in Israel that wants to export gas into Turkey. INOVO was engaged in March 2016 by RATIO to advice on the investment climate in Turkey. As part of this contract RATIO also asked INOVO to provide geopolitical reporting with a special interest in Turkey's continued alignment with the West/United States.

After some period of time, RATIO determined that the limited reporting on such matters by INOVO was insufficient and RATIO requested that INOVO outsource this service to more expert providers. INOVO subsequently reached out to FIG in August 2016 with the question to measure the strength and challenges of Turkish American relations. The agreement was for 3 months which would only be renewed if both parties so agreed. There was a lack of confidence in the relationship and at some point, while discussing the exact scope of the contract, FIG Lobbyist Mr.  Kelley suggested activities to increase the level of confidence in the relationship. He also indicated that FIG might end up having discussions in Congress, and to this end and he should consider registering under the Lobbying Disclosure Act. Mr. Alptekin and Mr. Kelley agreed to be on the safe side of things and Mr. Kelley registered as the lobbyist. Although the initial aim was merely passive geopolitical reporting,  Mr. Alptekin and Mr. Kelly agreed that at some time in the future there might be a lobbying component and a PR component.  The lobbying PR components ultimately never took place. Mr. Alptekin and Mr. Kelly had several interactions about this.  FIG introduced Mr. Alptekin  to Sphere Consulting as their PR company and during the first meeting in October.  Sphere Consulting explained that a 3 month contract was not enough and little could be done. Mr. Alptekin argued INOVO should be reimbursed for part of the retainer since both the Lobbying and PR components never materialized.  INOVO never hired Sphere Consulting.

On election Day, November 8, 2016, in "The Hill", a US political newspaper,  General Flynn authored a strongly worded  opinion piece condemning the cleric Fetullah Gulen who lives in the U.S. and Gulen's U.S activities, and calling upon the U.S government to support the Turkish Government.  The article was subsequently linked by certain reporters to the contract FIG had with INOVO and Mr. Alptekin.

Mr. Alptekin told the press that he had very few interactions with General Flynn.  They never discussed details of the contract between INOVO and FIG; and they never discussed his personal involvement.  When Mr. Alptekin met him in person, the General independently expressed his concern about Radical Islam and said he feel Turkey should do more on combatting it. He did not commit to or announce that he had any intentions of writing an article; nor did Mr. Alptekin never ask him to do so.  He never consulted Mr. Alptekin on this, or asked his opinion.  If he had, Mr. Alptekin  would have strongly advised against publishing an article along the lines of his opinion letter that appeared in the Hill on election day.

Confidential -- Subject to Protective Order

Mr. Ekim Alptekin
January 18, 2017
Page 4

A subsequent article (http://dailycaller.com/2016/11/24/michael-flynns-consulting-firm-may-have-violated-federal-lobbying-law/) was published without asking Mr. Alptekin for a comment. The author Chuck Ross did check Mr. Alptekin's Linkedin profile but never contacted him for a comment. The second article that appeared was in Politico.  When Mr. Alptekin reacted, Politico authored a minor amendment to the article but reported the two assumptions that were first drawn by the Daily Caller article: 1. Ekim Alptekin via TAIK is an extension of the Turkish government and 2. General  Flynn has written the article as a Lobbyist in the context of the INOVO/FIG contract.

**B.      DEIK and The Turkish-American Business Council (TAIK)**

DEIK's mission is to assist in managing the foreign economic relations of the Turkish private sector.  DEIK monitors the economic, commercial, industrial and financial relations of Turkey with foreign countries or international communities, to support the establishment and development of such relations; provides opinions and suggestions; collects information and statistical data; performs works in order to enhance the import of Turkey and to encourage the international investments for export; prepares strategies for general economic matters or in respect of sectors for relations with several countries, regions, institutions and establishes business councils (Article 5 of the Regulation).

As of November 2014, DEIK has 99 founding institutions, 121 business councils, and approximately 900 member companies which form these councils, as well as 2000 representatives from the member companies.

DEIK's organs are the General Assembly, Board of Directors, Executive Board, Board of Auditors,  Business Councils, High Advisory Board and Advisory Boards. (Article 6 of the Regulation).

DEIK does not receive government funding. In addition to the corporate members of DEIK, Union of Chambers and Commodity Exchanges of Turkey (TOBB) and Turkish Exporters' Association ("TIM").   DEIK's Board of Directors is composed of thirty five members including the Chairman of the Board. DEIK's Board of Directors is composed of five permanent members, who are the representatives of certain founding institutions - namely TOBB, TIM, Turkish Industrialist and Businessmen's Association ("TUSİAD"), Independent Industrialist and Businessmen's Association ("MUSİAD"), Turkish Contractors Association ("TMB") and business council leaders, representative of other founding institutions and other members elected among other General Assembly delegates. **DEIK's Chairman is assigned among the Board members by the Turkish Minister of Economy (Article 9 of the Regulation).**

Confidential -- Subject to Protective Order                                                    Rafiekian_EDVA_00045780

Mr. Ekim Alptekin
January 18, 2017
Page 5

The <u>Executive Board</u> is composed of the Chairman of the Executive Board and twelve members who are elected among and by the members of the Board of Directors. The Chairman of the Board of Directors also functions as the Chairman of the Executive Board. Five members of the Executive Board are elected among the representatives of TOBB, TIM, TUSIAD, MUSIAD and TMB;  two members among the representatives of other founding institutions, four members among the business council chairmen while one other is elected among other General Assembly delegates. Two vice chairmen are elected among and by the Executive Board members (Article 12 of the Regulation)

It is through <u>Business Councils</u> that DEIK establishes corporate cooperation (Article 14-15 of the Regulation)

There are three different types of business councils, namely Country Business Councils, Sectoral Business Councils, and Special Purpose Business Councils.  Business Councils are established through cooperation agreements signed with foreign counterparts with the purpose of promoting business relations with these countries. Bilateral country councils which are founded in 114 countries as of February 2015 have been gathered under 8 regional councils (in Africa, America, Asia-Pacific, Eurasia, the European Union, South East Europe, the Gulf and the Middle East). Business Councils consist of two parties, one is the Turkish party and the other one is a counterpart institution in the relevant country, which is usually a representative body of the respective country's private sector. Councils meet regularly each year at "Business Councils Joint Meetings". Each sectoral and special purpose business council within DEIK convenes a separate General Assembly annually and a general assembly meeting with an election every two years. Each business council elects its own Executive Committee during these general assembly meetings. The Executive Committee members then elect the Chairman for the Business Council.

Executive Boards of the Business Councils meet at regular intervals to discuss bilateral or multilateral cooperation opportunities, challenges and current developments. The executive boards are responsible for developing recommendations about the policies, solutions and mechanism which are necessary to improve commercial and economic relations within the framework of the main strategies designated by the Board of Directors, and doing research in order to identify related opportunities.  Several sectoral business councils have been established within the body of DEIK in order to improve Turkey's place in the global value chain and promote the export of services. Health Tourism Business Council, Education Economy Business Council, Energy Business Council, Logistics Business Council, and International Technical Consultancy Business Council continue their operations.

<u>High Advisory Board</u> of DEIK convenes at least once annually under the chairmanship of the Turkish Minister of Economy to determine DEIK's annual activities and harmonization and evaluation of them with Turkey's economic strategies and interests. Members of the Board are assigned by the Minister (Article 17 of the Regulation).

Confidential -- Subject to Protective Order

TAIK is one of the Business Councils of DEIK. TAIK was formed as the first business council in Turkey in 1985 with the aim to enhance trade and investment relations between the United States of America and Turkey. TAIK is organized pursuant to Government decree, but is composed of and acts for member companies. TAIK's vision is primarily to increase the trade and investment volume between the US and Turkey; to be recognized as a reliable source of information and networking channel on bilateral trade issues for both countries and to make the US companies view Turkish companies as a key partner and Turkey as a destination for direct investments in the region. TAIK operates with a mission to create platforms to facilitate the development of economic relations between the U.S. and Turkey through its wide spectrum of activities such as conferences, forums, business summits, lobbying visits, networking luncheons and dinners, educational site visits, etc.

TAIK's Executive Board consists of top-level executives of the leading companies in Turkey. The Executive Board is elected by the General Assembly of DEIK/Turkey-Americas Business Councils in every 2 years and the Board elects its Chairman and the Vice Chairmen. TAIK operates under DEIK, but has a separate membership and separate budget from DEIK. It does not receive government funding. TAIK's budget only comes from its member companies and event sponsors. TAIK's Executive Board is elected every 2 years by the General Assembly of DEIK and Turkey American Business Councils. It consists of senior executives from Turkish companies.

Prior to September 2012, DEIK operated as an independent organization composed of various business chambers and commodity exchanges with a budget determined by the Union of Chambers and Commodity Exchanges of Turkey (TOBB). TOBB, in turn, derived its budget from assessment s on various member Chambers of Commerce and Commodity Exchanges, and is subject to control indirectly by the Government of Turkey. However, in September 2014, DEIK's authorization law and governance structure significantly changed. The Turkish Government Ministry of the Economy issued revised regulations which expanded the Ministry of Economy's authority over the operations of DEIK, including the ability to cancel or revise the institution, appointing the Chairman and certain other officials, designating 25 members of the General Assembly, potential funding from the Ministry, and other authority.

Mr. Alptekin was transparently elected into office as Chairman of TAIK by other peer company members of TAIK on October 25, 2016.[1] The executive committee list in **Appendix A** has the list of private Turkish companies which voted to elect Mr. Alptekin. These companies has been member of TAIK for many years. Mr. Alptekin was elected by the votes of business

[1] Please see the Minutes of Ordinary General Assembly Meeting of TAIK dated October 26, 2015; Minutes of the Meeting of the Executive Committee of TAIK dated October 26, 2015; General Assembly Meeting List of Attendees; Suggestions for the General Assembly Presiding Committee; Meeting Agenda and pictures of the TAIK meeting in **Appendix A.**

Confidential -- Subject to Protective Order

entities not by any government entity representative. The position of Chairman at TAIK is voluntary: Mr. Alptekin receives no salary or compensation from TAIK or the Government. Some limited expenses incurred as Chairman may be reimbursed, but major expenses, such as travel to the annual American Turkish Council Conference in the United States, is paid for out of personal or company funds.

We note that documents leaked by Wikileaks indicate that certain individuals with close ties to the Turkish government have tried to convince the Turkish government to influence TAIK's elections. None of these emails were on Mr. Alptekin's behalf; quite the contrary. The same leaks only show emails to members of the Cabinet asking for an intervention to favor another candidate. TAIK regulations and procedures, however, do not allow for an intervention.

C.      **Turkish Government Control of DEIK / Under the New Regulation**

DEIK adopted a new structure on September 20, 2014 with the regulation numbered 29125, *Regulation on Working Principles and Procedures of Foreign Economic Relations Board and Business Councils,* which was issued by the Ministry of Economy to regulate the working principles and procedures of DEIK and its business councils ("Regulation"). Please see the Regulation in **Appendix B.**

Under the Regulation, the Ministry of Economy ("Ministry") may designate or cancel the status of the founding institutions (Article 4 of the Regulation), designate the twenty-five members of the General Assembly (Article 7 of the Regulation) and designate or remove the Chairman of the Board of Directors (Article 4 of the Regulation). Business Councils are established by the Ministry with the proposal of the Board of Directors (Article 14 of the Regulation). The Chairmen of the business councils and the executive committee members may be discharged by the Minister or upon the proposal of the Board of Directors with the approval of Ministry. In the event that the members of the executive committee and the chairman are discharged or a vacancy in the membership or presidency is occurred for any reason, the new chairman shall be assigned with the approval of the Ministry upon the proposal of the Board of Directors and the members shall be assigned by the members of the executive committee from among the associate members to serve until the following date of election (Article 16 of the Regulation). The Secretary General shall be assigned upon the approval of the Ministry and with the proposal of the Board of Directors (Article 19 of the Regulation). DEIK may open representative agencies at home or abroad upon the approval of the Ministry (Article 16 of the Regulation). Ministry allocates income to DEIK among other contributions fees and donations (Article 24 of Regulation).  Under the regulation, the directives covering the working principles and procedures such as the way of work of DEIK bodies, relationships with each other, the principles of the right to elect and be elected, budget, accounting, human resources shall take effect upon the approval of the Ministry (Article 27 of the Regulation)

## III.    <u>The Law</u>

The Foreign Agents Registration Act of 1938, as amended (FARA)[2], requires persons acting as "agents" of foreign "principals" in a political or quasi-political capacity to register and make periodic public disclosure of their relationship with the foreign principal, as well as activities, receipts and disbursements in support of those activities.  Disclosure of the required information is intended to facilitate evaluation by the government and the American people of the statements and activities of foreign agents.  FARA was originally enacted in 1938 in reaction to certain subversive and propaganda activities by Nazi and Communist agents operating in the United States, and continues to this day as a way of ensuring disclosure of any foreign interests lobbying or conducting media campaigns in the United States.  The Department of Justice, FARA Registration Unit of the Counterespionage Section in the National Security Division is responsible for the administration and enforcement of FARA.

### A.    <u>Activities Covered</u>

FARA covers a variety of activities by the agent on behalf of a foreign principal.  They include:

a)    Engaging in political activities;

b)    Acting as public relations counsel, publicity agent, information service employee or political consultant;

c)    Soliciting, collecting, disbursing, or dispensing contributions, loans money or other things of value in the United States;

d)    Representing the interests of the foreign principal before any agency or official of the United States. [3]

The range of activities covered is quite broad, and basically covers any form of lobbying, media interaction, and public relations campaigns conducted on behalf of a foreign principal.  In recent years there has been an increased emphasis on public relations firms' activities on behalf of foreign governments.

---

[2] 22 U.S.C. §611, et seq.
[3] 22 U.S.C. §611(c).

Confidential -- Subject to Protective Order                                    Rafiekian_EDVA_00045784

**B.      Who are Foreign Principals?**

**All foreign governments are explicitly defined as foreign principals**.  The term also covers:

a)      Foreign political parties;

b)      A person or organization based outside the United States, except U.S. citizens;

c)      A partnership, **association**, corporation, **organization**, or other combination of persons inside the United States that is **organized under the laws of a foreign country**; and

d)      A partnership, association, corporation, organization, or other combination of persons inside the United States that has its principal place of business in a foreign country.[4]

Thus the definition specifically encompasses foreign governments and trade associations. Further, the definition of foreign government includes any group or agency that the foreign government delegates authority to operate on its behalf.[5]

**C.      Who is An Agent?**

This is perhaps the topic that is most subject to interpretation under FARA. The law defines an agent as:

"any person who acts as an agent, **representative, employee, or servant,** or any person who acts in any other capacity **at the order, request, or under the direction or control** of a foreign principal or of a person any of whose activities are directly or indirectly supervised, controlled, financed, or subsidized, in whole or in major part, by a foreign principal, . . . [6]

The FARA definition of agent is quite broad, and treats an agent as any person acting under the direction, control of a foreign principal.   Note there are several exemptions for certain categories of agents, such as:

---

[4] 22 U.S.C. §611(b).
[5] 22 U.S.C. §611(e).
[6] 22 U.S.C. §611(c).

Confidential -- Subject to Protective Order                                                                Rafiekian_EDVA_00045785

1.     diplomats and officials of foreign governments;

2.     an agent whose foreign principal is a government of a foreign country the defense of which the President deems vital to the interests of the United States;

3.     the activities involved do not serve predominantly a foreign interest;

4.     persons soliciting or collecting funds for medical aid and assistance, or for food and clothing (e.g. the Red Crescent);

5.     a person engaging solely in activities in furtherance of bona fide religious, scholastic, academic, or scientific pursuits or of the fine arts;

6.     lawyers representing foreign principal in courts or other legal proceedings as long as the attorney does not attempt to influence policy and the request of the foreign client; and;

7.     any agent engaged in lobbying for the foreign principal and is registered under Lobbying Disclosure Act.[7]

### D.     Interpreting the Agency Relationship

While there have been few cases interpreting FARA, the courts have considered what type of relationship exists triggering a FARA registration requirement.  In *United States v. German-American Vocational League*[8]  the 3rd Circuit Court interpreted the meaning of an agency relationship under FARA as applied to a group of German-Americans acting as Nazi propagandists. The Court considered and rejected an argument that there was no written employment contract with the Germany Reich, hence no agency.   Instead the Court applied a traditional *Restatement* Standard to determine the existence of agency under FARA:[9]

> The true test, we think, was whether agency in fact existed, with the term agency defined substantially as in the Restatement of Agency, Section 1, which states it to be: 'The relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his **control, and consent** by the other so to act.'[10]

The court then applied a control test to the German agents to find that an agency relationship existed which triggered a FARA registration requirement.

---

[7] 22 U.S.C. §613.
[8] 153 F. 2d 860 (3rd Cir, cert. denied 329 U.S. 760 (1946)
[9] Id. at 862.
[10] Id at 864.

Rafiekian_EDVA_00045786

More recently, in 1982 the federal courts considered a FARA registration requirement in the context of whether the Irish National Aid Committee (INAC) in the US was the event of the Irish Republican Army.[11]  In affirming the lower court decision requiring INAC to register, the Circuit Court commented on the type of relationship that triggers a FARA filing, finding that registration is not required unless the relationship between the foreign principal and the U.S party is of a nature that requires registration to fulfill the "informative" purposes of FARA:

> We add these few additional words to what Judge Haight has written because, while we agree with his construction of the Act, **we wish to express a note of caution concerning the statute's coverage of those who act at the "request" of a foreign principal.** As the District Court held, "(I) t is sufficient to establish agency under the Act that defendant is a 'representative' of the IRA, or acts as its 'request.' "  We agree that the agency relationship sufficient to require registration need not, as INAC urges, meet the standard of the Restatement (Second) of Agency with its focus on "control" of the agent by the principal.  Control is an appropriate criterion for a determination of common law agency because the agent contemplated by the Restatement has the power to bind his principal. In determining agency for purposes of the Foreign Agents Registration Act, however, **our concern is not whether the agent can impose liability upon his principal but whether the relationship warrants registration by the agent to carry out the informative purposes of the Act.**

> Nevertheless, while we acknowledge that the Act requires registration by a person who acts, in specified ways, at a foreign principal's "request," we caution that this word is not to be understood in its most predatory sense. Such an interpretation would sweep within the statute's scope many forms of conduct that Congress did not intend to regulate. **The exact perimeters of a "request" under the Act are difficult to locate, falling somewhere between a command and a plea.  Despite this uncertainty, the surrounding circumstances will normally provide sufficient indication as to whether a "request" by a "foreign principal" requires the recipient to register as an "agent."**

[emphasis added, footnotes and citation omitted][12]

There has been some criticism of the INAC decision as it creates some uncertainty regarding the concept of requiring FARA registration based on its more expensive reading of agency and the link to FARA's "informative purposes." Nevertheless, the current jurisprudence indicates that there must be some form of "control" relationship exercised by the foreign principal that the agent has consented to, or at least actions at the "request" of the foreign principal which the agent construes as some form more required action.

---

[11] *United States v. Irish National Aid Committee (INAC)*, 668 F 2d 159 (2d Cir. 1982) *aff'g* 530 F. Supp. 241 (SDNY 1981)..

[12] 686 F2d 159-160.

Confidential -- Subject to Protective Order          Rafiekian_EDVA_00045787

E.       **Lobbying Disclosure Act Exception**

There is an exception to filing a FARA registration for certain foreign parties who engage lobbyists in the United States. The Lobbying Disclosure Act of 1995 (LDA), 2 U.S.C. § 1601, removed from FARA a class of agents who are engaged in lobbying activities and who register under the LDA. This Act is administered by Congress.  The LDA requires disclosure of lobbying activities, including the issue lobbied and expenditures related to such lobbying.   A party engaged in lobbying activity by a foreign principal may register under the LDA instead of FARA if the individual is lobbying on behalf of foreign individuals or entities (companies) for private and nonpolitical activities in furtherance of trade or commerce.  If, however, the individual providing lobbying services is representing a foreign government  or foreign political party with the objective of influencing U.S. policy, then a FARA registration is required.

IV.     <u>**Analysis/Application of Law to TAIK and Mr. Alptekin**</u>

The questions presented are:

1.      Are TAIK and DEIK  entities or extensions of the Turkish Government, such that any activities by TAIK would require Registration under FARA.

2.      Is Mr. Alptekin, as Chairman of TAIK, a representative or agent of the Government of Turkey which would require any agents hired in the U.S. s to register under FARA rather than the LDA?

We consider each question separately below.

1.      **Are TAIK and DEIK entities or extensions of the Turkish Government, such that any activities by TAIK would require Registration under FARA.**

Whether TAIK is an entity affiliated with the Government of Turkey is significant because if it is considered an entity or agent of the GOT, then actions by any party hired by TAIK in the United States for lobbying or public relations work would trigger FARA filing requirements, instead of an LDA filing (which was made).  In such a case, a US agent hired by TAIK could be deemed an agent of the GOT.

FARA itself does not define what constitutes a government agency, or an organization controlled by or affiliated with same, nor does it define who is an agent of a foreign government. In general, a foreign government is considered to include the government  of a foreign country, or any agency, department, ministry, or political subdivision thereof. [13]  In other U.S. laws, some context is provided. For example, under the U.S. Foreign Corrupt Practices Act (FCPA), it is unlawful for U.S persons to pay bribes to *"any officer or employee of a foreign government or any department, agency or instrumentality thereof [. . . ] or any person acting in an official*

---

[13] See, e.g. 18 U.S.C. §11; 17 C.F.R. §240.3b-4 (securities law),

Confidential -- Subject to Protective Order

Rafiekian_EDVA_00045788

*capacity for or on behalf of any such government, department, agency, or instrumentality.* "[14]
Similarly, in other laws an "agent" of a foreign government has been defined to include an
individual or entity that operates subject to the direction and control of a foreign government.[15]
Under some U.S laws, government has been interpreted to include state owned Under the
FCPA, the definition has been interpreted to include state owned enterprises (SOEs).

The facts of this case are unusual in that the GOT does have some involvement in
DEIK/TAIK's activities. As we understand it, DEIK and TAIK were created out of a
Government decree which authorized the formation of DEIK and its business councils, including
TAIK. The GOT has authority to cancel or revoke the status of TAIK as a business council,
may remove the Chairman of the Board of TAIK, and any new Chairman must be approved by
the Ministry of the Economy (MOE). Further the MOE approves TAIK's budget and allocation
of funds for its activities. At least once per year the MOE meets with the DEIK advisory board
to harmonize DEIKs activities with Turkey's economic strategies and interests. So it is clear that
there is some level of government participation/control.

However, DEIK/TAIK also exhibits the characteristics of a private business association.
The purposes of DEIK/TAIK are decidedly private sector oriented – to enhance trade and
investment relations for its members. Its members are all private sector companies, and TAIK's
Executive Board is comprised entirely of private sector company representatives, who are
elected by the membership. Programs and activities are developed and approved by the private
membership and Board. It operates much like a trade association in the United States, on behalf
of its members.

Recently another branch of the U.S. Government has considered the status of Turkish
trade associations. By coincidence we represent the Turkish steel producer, Icdas Enerji which is
involved in a government subsidies case. The question presented was whether financial
assistance provided by the Turkish Steel Exporter's Association ("TSEA"), part of the Istanbul
Mineral and Metals Exporters Association ("IMMIB"), should be treated as a government
subsidy to Icdas Enerji. We believe the governing decrees for IMMIB are similar to DEIK and
TAIK. In the Icdas Enerji subsidy case, the U.S. Department of Commerce preliminarily found
"that" there is no evidence on the record of a monetary contribution from the GOT to TSEA's
financial accounts."[16] Since TSEA did in fact provide financial support to Icdas Enerji in the
case, the implication is that the GOT was not involved and did not direct TSEA's action.

---

[14] 15 U.S.C. §78dd-1(f)(1).

[15] See 18 U.S.C. §951(d).
[16] See Decision Memorandum for Preliminary Results of Countervailing Duty 2014 Administrative Review of Steel
Concrete Reinforcing Bar from the Republic of Turkey, Admin review C-489-819, December 5, 2105, p11.

Further, in the last twenty years of conduct, we do not know of a single instance in which a Turkish trade association was considered an extension of the GOT in the United States. On the contrary, Turkish trade associations have always been viewed as member driven organizations supporting their respective ember's interests. Turkish trade association events are generally held with other private sector groups like the American Turkish Council, and attendees are generally private sector Turkish members of TAIK.

Accordingly, while GOT's participation in DEIK and TAIK's governance structure and policy planning clearly exists, based on the facts presented we believe the better argument is that this level of potential interference, without more, is not sufficient to have TAIK treated as an extension or agent of the GOT. Rather, TAIK continues to operate as a predominantly private sector membership organization. Of course this conclusion would be directly affected if the GOT were to exert more direct authority over TAIK activities or to dictate the positions or policies of TAIK.

**2.    Is Mr. Alptekin, as Chairman of TAIK, a representative or agent of the Government of Turkey which would require any agents hired in the U.S. s to register under FARA rather than the LDA?**

However, even if TAIK were to be found to be a an extension or agent of the GOT, a second question would still exist with respect to Mr. Alptekin's activities. Mr. Alptekin is both chairman of TAIK, and also a prominent private sector businessman who operates numerous private businesses including Havacilik A.Ş. in Turkey and Eclipse Aerospace in the United States. He has significant business interests and activities completely independent of and apart from TAIK. Further, Mr. Alptekin's position as Chair of TAIK is completely voluntary: he receives no salary or compensation for his activities on behalf of TAIK. In fact, his position as Chair of TAIK can be attributed in large part to his status as a prominent respected and recognized business leader.

If TAIK were considered an agent of the GOT, and Mr. Alptekin was acting in his capacity as Chairman of TAIK in retaining U.S agents to engage in political activities or public relations, or meet with U.S government officials, then those activities could trigger a FARA filing requirement. If, however, Mr. Alptekin were acting for his private sector companies in retaining U.S. agents or consultants, then a filing under the LDA for potential lobbying contacts would be appropriate.

Based on the facts provided and included in this Memo, Mr. Alptekin was not acting in his capacity as Chair of TAIK when INOVO hired FIG to provide monitoring and reporting services with respect to Turkish American relations. TAIK did not request that FIG be hired, nor does TAIK appear to have any involvement. Rather, INOVO hired FIG to assist it in its representation of a private Israeli company, RATIO in providing advice with respect to the current state of U.S. – Turkish relations. It does not appear from the facts that Mr. Alptekin was operating for TAIK, or at the request TAIK, in any of these activities. Unless there are additional

                    Rafiekian_EDVA_00045790

Mr. Ekim Alptekin
January 18, 2017
Page 15

a facts that would suggest some linkage with TAIK, we do not believe the above noted activities can be attributed to Mr. Alptekin' s position in TAIK, and FARA does not confer an automatic filing requirement under these circumstances. Accordingly, we believe that an LDA filing would have been sufficient under these facts.

Moreover, based on the facts it is unclear whether any activity beyond simple monitoring and reporting actually occurred. FIG was retained and filed under the LDA out of an abundance of caution, but it is not clear that any contacts with US Government officials or politicians actually occurred. The public relations firm, Sphere Consulting was never retained. If these activities never occurred, then the whole premise for filing under the LDA or FARA could be questioned.

Please feel free to contact the undersigned should you have any questions.

Sincerely,

Matthew M. Nolan
Arent Fox LLP

MMN/nb

Rafiekian_EDVA_00045791