UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>*v.*<br><br>**MICHAEL T. FLYNN,**<br><br>**Defendant** | **Crim No.: 17-232 (EGS)** |

### COVINGTON & BURLING LLP'S NOTICE OF COMPLIANCE WITH THE COURT'S APRIL 28, 2020 MINUTE ORDER

Covington & Burling LLP ("Covington") hereby provides this Notice of Compliance, as required by this Court's April 28, 2020 Minute Order ("April 28 Order"). The following discussion explains how Covington has complied with the April 28 Order.

**Actions Taken by Covington Prior to the April 28 Order**

Prior to the April 28 Order, Covington had produced to successor counsel approximately 669,800 documents. This production included pleadings, documents submitted to the government, documents submitted to the Court, client interview notes, third-party interview notes, more than a thousand pages of handwritten notes, legal research memoranda, factual research memoranda, strategy memoranda, chronologies, document binders, proffer session binders, interview binders, time records, correspondence, text messages, voicemail messages, emails (including emails written as part of the representation that were internal to Covington, between Covington and Mr. Flynn, between Covington and third parties, and between Mr. Flynn and third parties), documents collected from Mr. Flynn and from third parties, and documents produced to third parties (to Congress, to the Department of Justice, to the Special Counsel's Office, and to counsel for Bijan Rafiekian) (collectively, "Document Categories").

Covington retrieved these Document Categories from a number of physical locations and electronic media, including the following:

(a) The full working case file, contained on a shared computer drive accessible to the Covington lawyers working on the firm's representation of Mr. Flynn and his company, Flynn Intel Group Inc. ("FIG"). This centralized repository contained work product documents, correspondence, pleadings, interview and other notes, legal research and analysis memoranda, factual investigation analyses and memoranda, document productions by various parties and third parties, key document binders, proffer binders, witness interview binders, chronologies, and other significant strategic and analytical materials reflecting the views, thoughts, and strategies of Covington;

(b) The *Brady* and other discovery materials received from the Special Counsel's Office;

(c) Electronic images of the data contained within the cellphones and computers of Mr. Flynn and his son, as well as images of hard drives belonging to Mr. Flynn and FIG;

(d) Documents that were saved outside of the working case file on Covington hard drives by the key lawyers who handled the case;

(e) Documents on the firm's document management system, including those that were stored under the client/matter numbers for Mr. Flynn and FIG. We also conducted searches to locate documents containing the name "Flynn" stored in other locations;

    (f)    Hard-copy files and documents of the key lawyers on the matter concerning the representation. This included scanning and transferring to successor counsel copies of paper binders that previously had been transferred to successor counsel as part of the working case file where a lawyer had written notes on the paper copy;

    (g)    Handwritten notes concerning the representation taken by lawyers in connection with client, witness, and government meetings and calls;

    (h)    Cellphone text messages and cellphone voicemails concerning the representation collected from the phones of the key lawyers on the matter; and

    (i)    Emails sent and received by the key lawyers on the matter, other email communications with Mr. Flynn, and the emails of 24 staff attorneys who had reviewed documents of Mr. Flynn and/or FIG for production to government agencies and other parties.

The identification of emails for transfer to successor counsel took place through a combination of the following methods, including:

    (a)    identification of Flynn-related emails by the key lawyers on the matter;

    (b)    manual review of the contents of the Flynn-related email folders of those custodians;

    (c)    identification of other emails with Mr. Flynn; and

    (d)    electronic searches of the other collected emails based on search terms and/or searches for communications with email addresses of other lawyers within the firm who worked on the matter, as well as persons outside the firm with whom the key lawyers communicated regarding Mr. Flynn and/or FIG.

After identifying emails from the relevant databases as described above, Covington reviewed them to determine whether each one was or was not part of the client file, as distinguished from emails about a variety of matters that applicable authorities (referenced below) state are not part of the client file.  Examples of the latter include: communications with and within firm management about case staffing, workloads, and other management issues; communications among firm personnel about how to respond to invitations to panel discussions or requests for media comments about a wide variety of topics, given the firm's representation of Mr. Flynn (and firm lawyers' opinions regarding the effect of the firm's representation of Mr. Flynn on their latitude to engage in such commentary); communications about billing and collections; and Covington lawyers' privileged consultations with the firm's internal counsel regarding ethical and compliance obligations.  An additional category of documents that are not part of a client file under applicable authorities and thus were not included in the client file transfer are communications referring to the Flynn engagement in the context of conflicts checks relating to prospective clients.  Whether or not those prospective clients became clients, Covington is obligated to preserve their confidences and all privileges pursuant to D.C. Rule of Professional Conduct 1.18(b).

Thus, what Covington transferred to successor counsel before the April 28 Order was the client file, as distinct from each and every communication concerning the firm's representation of Mr. Flynn.  Covington did this in accordance with its understanding of the Court's Minute Order of July 16, 2019, which relayed successor counsel's concern that Mr. Flynn had not yet received the "client files" from Covington.  The Court's Minute Order of August 21, 2019 similarly discussed Covington's Notice, which indicated the transfer of the "client file" to Mr. Flynn was complete.  Covington's approach was consistent with the relevant D.C. Rules of

Professional Conduct, including in particular Rule 1.16(d) and its comments, applicable ethics opinions of the D.C. Bar, and applicable case law. Covington's client file transfer was also supported by oral briefings it provided to successor counsel and communications to help them understand certain handwritten notes.

Although D.C. ethics opinions and other authorities view the client file more broadly than other jurisdictions, they have made clear that the client file does not include every document concerning the representation. For example, D.C. Ethics Opinion 333 (2005), citing approvingly to the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 46(2) (2000) and *Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn L.L.P.*, 689 N.E.2d 879 (N.Y. 1997), makes clear that attorneys are not required to provide to a former client "material that relates solely to the prior management of the case[.]" *See also* RESTATEMENT § 46(2), cmt. c (clarifying that the client file does not include "certain law-firm documents reasonably intended only for internal review, such as a memorandum discussing which lawyers in the firm should be assigned to a case" and "whether a lawyer must withdraw because of the client's misconduct"); *Sage Realty*, 689 N.E.2d at 882-83 (excluding from the client file all documents "intended for internal law office review and use," as well as "documents containing a firm attorney's general or other assessment of the client, or tentative preliminary impressions of the legal or factual issues presented in the representation, recorded primarily for the purpose of giving internal direction to facilitate performance of the legal services entailed in that representation."). Even a senior legal ethics counsel for the D.C. Bar who advocated, in an article, for an expansive view of the client file acknowledged that the ethics rules do not require the production of documents such as "social calendars, internal law firm deliberations and strategies regarding staffing, general case

management policies, and the like." *See* Saul Jay Singer, *Speaking of Ethics: On File*, WASH. LAWYER (Nov. 2012).

**Actions Taken by Covington to Comply with the Court's April 28 Order**

Since the Court issued the April 28 Order, Covington has taken the following actions to comply:

(a) Covington verified that it accurately executed its collection and review protocol. It did so in part by re-executing the searches applied to the sets of data that were collected for the client file transfer. A senior firm e-discovery professional who was not previously involved in the collection and review process conducted this re-executed search process.

(b) Covington compared the original handwritten notes of the key lawyers on the matter, as well as those of other attorneys who were involved in note-taking during meetings, to the documents previously transferred during the rolling productions to successor counsel, in order to verify that the notes had been properly scanned, redacted (*e.g.*, to exclude material related to other firm clients), and transferred to successor counsel. In doing so, Covington identified 32 additional pages of handwritten notes, as well as 43 pages of documents that are duplicates of documents previously transferred, 16 pages of which contain underlining or similar handwritten notations, which should have been scanned and transferred as part of the client file transfer. Those additional pages were transferred to successor counsel today.

(c)     Covington conducted spot checking of electronic documents previously coded by reviewers as not being part of the client file to confirm that they were properly coded during the prior review.

By taking the steps described above, Covington validated the processes it employed to identify and produce the client file, and the firm diligently re-executed its search.

Notwithstanding all of the foregoing, Mr. Flynn's successor counsel has taken the position in correspondence with Covington that the April 28 Order requires Covington to search for and produce a wide range of documents significantly beyond the client file. For example, successor counsel has requested every communication of any kind, including telephone records of every call, of every Covington employee, in which the Flynn case is mentioned. This position is strikingly different from the well-recognized obligation of a law firm to turn over the client file to successor counsel. To accept successor counsel's interpretation would require Covington to conduct a massive sweep of its servers for every document and communication pertaining to the firm's representation of Mr. Flynn, extending to every instance where any firm lawyer made any comment about the firm's high-profile representation of Mr. Flynn. That would be a disproportionately burdensome e-discovery process of great scale and duration.

In fact, Covington already has engaged a respected e-discovery vendor to address a broader collection and review process to encompass documents concerning the Flynn representation, and that vendor has said that just the initial collection and processing of data would likely take many weeks to complete. That would be followed by the necessary page-by-page review of a large volume of documents to prevent the transfer of documents as to which other clients, prospective clients, or Covington itself have claims of privilege, likely taking many more weeks. Covington has asked the e-discovery vendor to develop a work plan, should it be

necessary, and Covington has begun to identify materials previously coded as not part of the client file that may pertain to the representation of Mr. Flynn.

Even such an expanded search, extending far beyond the client file, would not ensure that all documents pertaining to the representation were captured, however.  Searching for every last email that anyone in a law firm generated concerning its representation of a client means searching for documents that are created quickly and frequently throughout the course of a day, often without a name or code stamping it as relating to a particular client.  That is why the long and well-established standard practice for collecting and reviewing massive amounts of electronically stored information ("ESI") requires use of search terms.  In fact, even in civil cases addressing document requests and subpoenas far broader than a client file, courts recognize that review and production of ESI does not require, and cannot achieve, perfection; instead, it requires a diligent search and adopting a reasonably comprehensive search protocol.

For example, in an e-discovery case in the Southern District of New York, the court made the following observation:

> Even in a case involving exclusively hard copy documents, there is no obligation on the part of a responding party to examine every scrap of paper in its potentially voluminous files in order to comply with its discovery obligations. Rather, it must conduct a diligent search, which involves developing a reasonably comprehensive search strategy. Such a strategy might, for example, include identifying key employees and reviewing any of their files that are likely to be relevant to the claims in the litigation. *See, e.g., General Electric Corp. v. Lear Corp.*, 215 F.R.D. 637, 640 (D. Kan. 2003); *McPeek v. Ashcroft*, 202 F.R.D. 31, 32-33 (D.D.C. 2001) ("In a traditional 'paper' case, the producing party searches where she thinks appropriate for the documents requested under Fed. R. Civ. P. 34. She is aided by the fact that files are traditionally organized by subject or chronology ('chron' files), such as all the files of a particular person, independent of subject."). Defined search strategies are even more appropriate in cases involving electronic data, where the number of documents may be exponentially greater.

*Treppel v. Biovail Corp.*, 233 F.R.D. 363, 374 (S.D.N.Y. 2006) (Francis, Mag. J.); *see also Winfield v. City of New York*, No. 15-CV-05236 (LTS) (KHP), 2017 WL 5664852, at *9 (S.D.N.Y. Nov. 27, 2017) (Parker, Mag. J.) (explaining in discovery dispute involving

technology assisted review system that "perfection in ESI discovery is not required; rather, a producing party must take reasonable steps to identify and produce relevant documents"). A collection and review of documents in the files of key lawyers, as Covington has done here, rather than of every person who had any role in a matter (much less an entire law firm) is consistent with sound practices, where review of additional custodians would be unreasonably duplicative. *Treppel*, 233 F.R.D. at 374 (approving "identifying key employees and reviewing any of their files that are likely to be relevant").

Given that a collection and review of ESI inherently cannot achieve perfection, it is not possible for any attorney to certify that every document pertaining to a law firm's representation of the client has been produced. By this Notice, we certify that we executed a planned search and review protocol as described above and transferred the results to successor counsel. In the same way, if the focus were shifted to a much broader production than the client file, as successor counsel now demands, even after a lengthy search and review process lasting many weeks, the certification would be the same—*i.e.*, that a particular protocol was developed and executed, but not that every document concerning the Flynn representation was produced.

Covington respectfully invites any further guidance based on the foregoing that the Court may be inclined to provide in order to help us ensure that we do exactly what the Court requires.

\*   \*   \*

Covington confirms that it diligently executed its protocol to search for and produce the client file, as described herein, and accordingly Covington provides this Notice of Compliance as required by this Court's April 28 Order.

May 2, 2020	Respectfully submitted,

_____
Robert K. Kelner (D.C. Bar No. 466880)
Stephen P. Anthony (D.C. Bar No. 426536)
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000