# EXHIBIT 3

FD-302 (Rev. 5-8-10)

- 1 of 12 -

 OFFICIAL RECORD
Document participants have digitally signed. All signatures have been verified by a certified FBI information system.

## FEDERAL BUREAU OF INVESTIGATION

Date of entry   08/10/2017

■ MARY McCORD, ■■■■■■■■■■■■■■■■■■ ■■■■■■■■ was interviewed at the Office of the Special Counsel, ■■■ ■■■■, Washington, DC. Participating in the interview were Special Agents (SAs) ■■■■■■■■ and ■ ■, and Office of the Special Counsel attorneys Andrew Goldstein and Elizabeth Prelogar. SA ■ advised McCord that it is a violation of criminal law to lie to the FBI in the course of an investigation, which McCord acknowledged. After being advised of the purpose of the interview, McCord provided the following information:

### McCord's Note-Taking Practice

■ McCord took notes on a variety of things, given the scope of her responsibilities. For example, she took notes at White House meetings in order to be able to debrief others when she returned from the meetings. On matters related to Russia, she took notes because the topic was complex and she wanted to remember the details. During phone calls, she took notes on things she needed to do based on the content of the calls. She didn't take notes in the same notebook every time, often using whatever was handy. When she was close to leaving her position in the Department of Justice (DOJ), McCord went back to her various folders and notebooks, pulled out materials related to Russia, and gave them to her colleague George Toscas to hold on to, assuming they may be needed at some point in the future.

### Employment History

■ After law school, McCord clerked for U.S. District Court Judge Thomas Hogan for two years, and then spent two years at the Department of Treasury Office of Legal Counsel. In 1994, she joined the District of Columbia United States Attorney's Office (DC-USAO). She took a leave of absence in 1997, when her husband got a job in Japan. When she returned, she went back to the DC-USAO. In 2001, McCord and her husband left DC and moved to North Carolina, but returned to the DC area about a year later. When they returned, McCord again went back to the DC-USAO. In



Declassified by FBI-C58W88B61
on 5/6/2020
This redacted version only

| | | |
|---|---|---|
| Investigation on | 07/17/2017 at | Washington, District Of Columbia, United States (In Person) |
| File # | ■■■■■■■■■■■■■■■■■■■■■■■■■■■■ | Date drafted  07/20/2017 |
| by | ■■■■■■■■■■■■■■■■■■■■■■■■ | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  Interview of Mary McCord  , On  07/17/2017  , Page  2 of 12

2012, McCord became the Criminal Chief, where she remained until May 2014, when she left to go to Main Justice.

McCord started at DOJ as the acting Principal Deputy Assistant Attorney General for the National Security Division (NSD). In August 2014, she became the Principal Deputy Assistant Attorney General, where she remained until October 2016. In October 2016, after John Carlin's departure, McCord served as acting Assistant Attorney General (AAG) for NSD. McCord's last day at DOJ was May 12, 2017. She currently works at the Georgetown University Law Center.

During the time McCord served as the acting AAG, there was no Principal Deputy in place, so she performed the duties of both positions simultaneously. Her duties included assisting in running NSD's various components, which include the Office of Law and Policy, Counterintelligence and Export Control Section, the Appellate Section, and the CFIUS Unit. On occasion, McCord would attend Deputies Committees (DCs) and Principals Committees (PCs) at the White House when Yates was unavailable.

### The FBI Investigation on LTG Mike Flynn

McCord first learned of the FBI's investigation into Mike Flynn on a phone call with FBI Deputy Director Andy McCabe on January 3, 2017. In that call, McCabe told McCord the FBI had been planning to close their investigation on Flynn before discovering his telephone calls with Russian Ambassador Sergey Kislyak, ███████████████████████ [McCord referenced page #1 in her notes.]

McCabe explained to McCord that an intelligence product was in the works to address the lack of Russian reaction to the U.S.'s December 2016 sanctions. There was a lot of speculation regarding the minimal response from the Russians which was not "what was expected." While the draft product was in the review stage, ███ calls between Kislyak and Flynn were discovered, leading analysts to wonder if those calls were related to the lack of response. McCabe described to McCord, based on what he had been told, the content of the calls.

) Page 2 of McCord's notes indicate General Counsel at the Office of the Director of National Intelligence (ODNI) Bob Litt raised the issue of a possible Logan Act violation. McCord was not familiar with the Logan Act at the time and made a note to herself to look it up later.

Also on page 2 of her notes, McCord noted mention of a "referral," and noted that ultimately no referral was required, as the FBI maintained the information and would not refer a matter to themselves. Her notes also indicate that at the time, the individuals at FBI and ODNI that were aware of the issue were Director of National Intelligence James Clapper, Litt (ODNI), Jim Baker (FBI), and Tricia Anderson (FBI).

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ▮▮▮▮ Interview of Mary McCord , On 07/17/2017 , Page 3 of 12

▮ McCord later learned of the FBI's existing counterintelligence cases on George Papadopoulos, Carter Page, Paul Manafort, and Mike Flynn, which she initially understood were not criminal investigations. McCord later learned of the ongoing Manafort criminal investigation.

▮ In the immediate aftermath of learning of the Flynn calls, McCord was not thinking about a criminal investigation. It seemed logical to her that there may be some communications between an incoming administration and their foreign partners, so the Logan Act seemed like a stretch to her. She described the matter as "concerning" but with no particular urgency. In early January, McCord did not think people were considering briefing the incoming administration. However, that changed when Vice President Michael Pence went on Face the Nation and said things McCord knew to be untrue. Also, as time went on, and then-White House spokesperson Sean Spicer made comments about Flynn's actions she knew to be false, the urgency grew.

▮ On January 13, 2017, the FBI provided a briefing to DOJ on the background of the Flynn investigation, as well as the other pending related FBI counterintelligence cases. McCord recalled the participants on the FBI side to be Deputy Assistant Director Pete Strzok, Assistant Director Bill Priestap, and possibly attorney Sally Moyer. The DOJ participants were McCord, Toscas, Stu Evans, and maybe Tashina Gauhar. The briefing consisted of the "Crown" material, Flynn, and the cases she had already been briefed on. This was the first time McCord heard about these cases in detail, though she was aware of the ICA. Page 3 of her notes indicate President-Elect Trump was not briefed on the existence of the FBI investigations in his early January briefing on the ICA. [Agent note: ICA refers to the Intelligence Community Assessment entitled "Assessing Russian Activities and Intentions in Recent US Elections."]

▮ McCord did not recall what her notation of "Flynn payment" on page 4 of her notes referred to, but surmised it might be related to Russia Today. Also on page 4, McCord made note of a David Ignatius column on Flynn's call and a potential Logan Act violation.

▮ McCord recalled that she and others at DOJ queried the FBI as to their investigative plan if the case ended up moving into the criminal sphere, and Priestap relayed that a tasking to develop a plan had gone out.

▮ Page 5 of McCord's notes say something to the effect of "re: Flynn. Most pressing as NS Advisor. Need to decide what to do w/it and how to discuss w/ incoming." McCord could not recall specifically what that meant, but thought it was when discussions started on what to do with the Flynn information and how to do it. McCord noted they were not thinking about criminal statutes at that point.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ▆▆▆ Interview of Mary McCord , On 07/17/2017 , Page 4 of 12

▆▆▆ Page 10 of McCord's notes reference a defensive briefing. McCord believed those notes related to a conversation with Priestap in which he said a defensive briefing would be difficult, given it seems as though people within the White House are not being honest with one another. If Flynn was lying to people within the White House and is potentially compromised, the value of a defensive briefing was questionable. McCord thought Priestap was likely thinking from a purely counterintelligence perspective, not criminal.

▆▆▆ McCord did not recall exactly when she saw the transcripts of the Flynn calls, but believed she asked to see them after Pence's statements about Flynn on Face the Nation. [Agent note: Pence was on Face the Nation on January 15, 2017.] McCord believed she probably had the transcripts by January 19, 2017, possibly having come over SIPRnet from Strzok. After reading them, she felt they were "worse" than she initially thought; she noted that her recollection of them is that Flynn proactively raised the issue of sanctions, and she feels it is hard to believe he would forget talking about something he raised himself.

### Decision to Notify the White House

▆▆▆ Consulting pages 15 and 16 of her notes, McCord recalled an evening unclassified telephone call she had with Yates and Matt Axelrod. McCord was not certain of the timing of the call, but it might have been after Pence was on Face the Nation or after a January 17, 2017 call with McCabe. The three of them discussed what to do with the Flynn information and agreed someone should discuss their concerns with McCabe. They were concerned because at that point, Pence had said something untrue to the American people, and the Russians knew it was untrue. The implications of that were that the Russians believed one of two things – either that the Vice President was in on it with Flynn, or that Flynn was clearly willing to lie to the Vice President. They ultimately decided McCord would make the call to McCabe to discuss their concerns.

▆▆▆ When McCord called McCabe, he told her the FBI did not want to compromise their counterintelligence investigation, which is what would happen if the White House was notified. McCord believed her notes on page 15 document their phone call.

▆▆▆ Page 17 of McCord's notes relate to another call with McCabe. McCabe relayed to McCord in that call that the FBI was not convinced of a need to notify, the FBI has no "duty" to notify, and the FBI was concerned it would look like a political stunt.

▆▆▆ Around January 17 and 18, 2017, prior to the inauguration, McCord and others at DOJ began soliciting views of others in the Intelligence Community on whether or not the incoming administration needed to know about the existence and content of Flynn's calls with Kislyak. The initial DNI view was that they were "comfortable" with the information being shared, but that it was ultimately the FBI's information, so the FBI should make the final decision. There was some

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  Interview of Mary McCord , On 07/17/2017 , Page 5 of 12

discussion of whether Congressional notification was required, and it was ultimately decided there was no obligation to notify at that point in time. McCord's notes on page 18 indicate that if Congress were to be notified, notification should be to Gang of 8 members only.

Consulting pages 7 and 8 of her notes, McCord believed that on January 19, 2017, Comey was visiting the ODNI, and at that time DOJ was still trying to "drum up support" to notify the White House of the Flynn calls. On a phone call with ODNI attorneys Litt and Brad Brooker that day, it was relayed that the DNI agreed the information should be brought to the attention of the President-Elect and Vice President-Elect, but the primary equity was the FBI's, so they should make the final call. McCord relayed that Yates wanted to be able to say to Comey in a later conversation that the "DNI agrees" with the need to notify, and asked if Clapper and Brennan would call Comey. McCord was told Brennan may have been at the ODNI at the same time (as Comey), and someone would try to arrange for Comey and Clapper to talk. Later, McCord learned that Clapper and Comey talked, but Comey said he would not brief the White House.

Yates and Axelrod were increasingly frustrated with the FBI at this point. One reason for the frustration was their perception that the FBI's perspective on the matter "morphed." Initially, the FBI's resistance to notify was attributed to the desire to protect the FBI's counterintelligence investigation, but later Comey told Yates he was concerned about compromising a criminal investigation. McCord was not sure when the discussion about the criminal investigation occurred, but said it definitely had happened by the week after the inauguration.

McCord "pushed on Andy McCabe" about the FBI's unwillingness to notify the White House. She asked him about the FBI's plan and raised the fact that the DNI and the CIA concurred with the need to notify. She believes the FBI was concerned the FBI would be criticized for appearing to be politically motivated, especially after the reactions to the way the Clinton investigation was handled.

**Flynn Interview by the FBI**

On January 23, 2017, McCord, Yates, Axelrod, and Guahar had a discussion about the Flynn matter, and reinforced their collective position that the White House should be notified. Yates had a conversation with Comey after their discussion, but he did not change his position.

On January 24, 2017, Yates held a meeting in her conference room, attended by McCord, Toscas, Gauhar, Scott Schools, and perhaps others, where Yates said she decided she was going to tell Comey he had to tell the White House Counsel's Office about the Flynn-Kislyak calls. In Yates' view, it was an FBI responsibility. Yates left the room to make the call to Comey and when she returned, reported that Comey told her he just sent FBI Agents to interview Flynn. The

| | | | |
|---|---|---|---|
| Continuation of FD-302 of | Interview of Mary McCord | , On 07/17/2017 | , Page 6 of 12 |

DOJ group was "flabbergasted." McCord's impression was Yates was "dumbfounded" and didn't ask many questions of Comey in their call. Yates, Axelrod, and others were annoyed that they hadn't had an opportunity to weigh in on the decision or offer any input on the interview strategy.

Following the Flynn interview, Priestap, Strzok, ▇ and FBI General Counsel Baker went to DOJ to brief them on the interview. The DOJ attendees included Axelrod, Gauhar, Jim Crowell, Toscas, Stu Evans, and possibly Schools. Strzok provided a readout of the Flynn interview, since he and another agent had conducted it. The FBI's provided rationale for doing the interview was that the existence of the investigation had already leaked, so Flynn was already aware that the information was being discussed publicly and there was no element of surprise. Priestap told the group the goal of the interview was to determine whether or not Flynn was in a clandestine relationship with the Russians. The FBI did not want to insinuate the existence of a criminal investigation to Flynn. To that end, they did not give a Title 18 USC 1001 warning. Toscas raised the issue of the lack of warning, since he and others, after hearing Strzok's description of the interview, thought Flynn lied to the FBI. Toscas also felt there were some loose ends to clean up based on Flynn's answers. However, the FBI position was that there was no need to re-interview at that time.

### ▇) January 26, 2017 Meeting with White House Counsel's Office

The evening of January 25, 2017, Yates called McCord and said she had decided to brief the White House Counsel's Office on the Flynn matter, wanted to do it the following day, and wanted McCord to go with her. McCord believes Yates wanted McCord to go with her because first, she wanted a witness and second, she wanted that witness to be a career employee, rather than a political appointee.

The next day, McCord reviewed the Flynn transcripts and pulled out excerpts for Yates to reference in the discussion with the White House Counsel's Office, should they be necessary.

On January 26, 2017, McCord accompanied Yates to the White House, where they met with White House Counsel Don McGahn and another attorney from his office, James Burnham. The four of them were the only ones at the meeting. Neither Yates nor McCord took notes, but McGahn and Burnham both had notepads with them during the meeting. McCord is not sure if they actually took notes.

Yates did most of the talking in the meeting, and started the conversation by saying there was something she felt they needed to know about Flynn; in light of Pence's interview on Face the Nation, she wanted them to know that what he'd said about Flynn's calls with the Russians was not true. McGahn asked how Yates knew this, and she explained that ▇

She told them that the conversations made it clear that there were discussions on Russian sanctions in those calls, contrary to what Vice President Pence had said on TV. Yates explained to them her concerns were twofold - first, the Vice President needed to know he'd been misled, and second, the Russians themselves knew that what the Vice President said was not true. This posed a potential compromise situation for Flynn.

McGahn asked if Flynn had been interviewed by the FBI and Yates told him that he had been interviewed two days previously, on Tuesday. McCord got the impression that McGahn did not know about the interview before Yates told him. He asked where the interview had taken place, and Yates told him it was in Flynn's White House office. McGahn asked "how'd he do?" and Yates declined to answer. McCord did not think it was a serious inquiry, but just something he said because he was shocked and did not know what else to say. McGahn also asked what he could do with the information, and Yates told him he could do what he needed to do with it. McCord specifically recalled that McGahn at one point asked something to the effect of, "Would it be okay for me to ask if you have a criminal investigation?" to which Yates replied, "It's okay for you to ask, but it's not okay for me to answer."

McCord remembered Burnham raising the Logan Act, mentioning it was in the news, but they didn't talk about it at length. McGahn asked if he could talk to Flynn about the matter, and Yates said he could.

Toward the end of the conversation, McGahn asked about another case where an individual had been prosecuted for taking highly classified pictures of a submarine. Flynn knew this person and had previously openly asked the President to pardon him. McCord thinks someone may have given them a heads up that this would be raised, as she recalled having looked up the details of the case prior to their meeting. Yates explained to McGahn the role of the Office of the Pardon Attorney to McGahn and Burnham in response to their question.

After about fifteen minutes, the meeting ended.

Upon returning to the Department of Justice, McCord and Yates debriefed Axelrod, Schools, Gauhar, Evans, and Toscas. No one from FBI was present - McCord did not think they told the FBI they were going to tell the White House.

) **January 27, 2017 Meeting with White House Counsel's Office**

Continuation of FD-302 of ▮ Interview of Mary McCord , On 07/17/2017 , Page 8 of 12

▮ On January 27, 2017, McCord learned McGahn had asked for a follow-up meeting, and that one had been scheduled for that afternoon. Based on a review of her calendar for that week, McCord believed it was a 2:30 pm meeting.

▮ McCord described the second meeting as "not really significant." She thinks McGahn and Burnham were so dumbstruck the first day, they hadn't had time to fully process the information. Now that they had more time to think about it, they wanted to rehash the material but also to focus on the restrictions on what they could and couldn't do with the information. They may have asked about discussing it with the Vice President in this meeting. Yates reiterated that there were no restrictions on what they could do with the information. The actual ▮ were never shown to them, so there was no need to specify that any particular thing could not be shared.

▮ McGahn asked about getting access to the underlying information, asking "is this something we could see?" Yates responded that they would have to take that question back for discussion. McCord is not sure if Yates characterized the underlying information as "FBI information" but Yates made it clear that the FBI had interviewed Flynn. ▮
▮. McGahn or Burnham may have asked if, in doing whatever they needed to do with the information, they should be worried about harming a criminal investigation. Yates responded that she would not discuss criminal violations with them.

▮ McCord said they did not discuss what McGahn and Burnham did with the information provided the previous day. Neither McGahn nor Burnham gave any indication they had talked to anyone else about the information. Based on their discussion and reactions, McCord believed McGahn and Burnham were caught off guard by the information.

▮ McCord did not think anyone at the White House Counsel's Office ever communicated that they didn't believe there was a legal issue, but she did recall them saying something along the lines of not wanting to jeopardize an investigation.

▮ At the conclusion of the meeting, Yates agreed to come back to them with what underlying information could be made available.

▮ **Notification Follow-Up**

▮ On January 28, 2017, McCord received an email from Flynn's email account, but signed by John Eisenberg, Deputy Counsel to the President for National Security Affairs. The email stated it was a follow-up to McCord's interactions with McGahn, and asked for a time to have a

Continuation of FD-302 of ▓▓▓ Interview of Mary McCord , On 07/17/2017 , Page 9 of 12

secure call. Given that the email was from Flynn's email account, McCord opted to not reply to the email directly. She got Eisenberg's email from a contact at the National Security Council and emailed Eisenberg to set up a time to talk the following day.

McCord was initially shocked to receive an email from Flynn's email account. She surmised at the time that Flynn and Eisenberg had been discussing the DOJ notification regarding Flynn and had agreed that Eisenberg would reach out to McCord, and then had accidentally sent the message to her from Flynn's account.

When McCord and Eisenberg connected on the telephone on January 29, 2017, Eisenberg told McCord he had been in Flynn's office prior to his sending the email to McCord and an assistant had switched his and Flynn's telephones when giving them back. He explained they had the same password, so Eisenberg accidentally sent the email to McCord from Flynn's phone. Eisenberg told McCord he would be handling the Flynn matter from that point on.

On January 30, 2017, McCord and Eisenberg had another telephone call, to discuss some follow up issues, but McCord could not recall specifically what those issues were. Also on that day, Yates had a telephone call with McGahn ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. To McCord's knowledge, Yates did not meet personally with McGahn on January 30, 2017.

On January 30, 2017, McCord, Toscas, Gauhar, and Evans went to the FBI ▓▓▓▓▓▓▓▓▓▓▓. The DOJ personnel wanted ▓▓▓▓▓▓▓▓▓▓ prior to giving access to the White House. FBI personnel in attendance were Strzok, Lisa Page, Priestap, and possibly McCabe.

On January 31, 2017, McCord emailed Eisenberg to tell him the material he had requested was available, and put him in touch with Strzok to coordinate the details.

On February 1, 2017, McCord emailed Eisenberg to ask if he'd been able to get access to the material.

On February 2, 2017, Eisenberg told McCord he was available that day to review the material.

Based on Eisenberg's communications, McCord assumed Eisenberg would be the one reviewing the material. The FBI had the lead on coordinating with Eisenberg, so McCord is not aware of exactly when he reviewed the material, but she had the impression it took a while to happen.

**Vice President Pence's Review of ▓▓▓ Transcripts**

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ▮ Interview of Mary McCord , On 07/17/2017 , Page 10 of 12

▮ McCord recalled McCabe calling her on February 10, 2017. He relayed he had been at the White House, possibly for a Deputies Committee meeting, and as he was leaving, he received a call from his office saying the White House was looking for him. He had not gone far from the White House, so turned around and went back. Once there, he learned that Pence wanted to see the Flynn transcripts. McCabe did not have the transcripts on him, so he returned to the FBI to retrieve them and returned to the White House Situation Room. There, he met with Pence; Pence's Chief of Staff; The President's Chief of Staff, Reince Preibus; and possibly others, and they reviewed the transcripts. Pence, while reviewing, directed his Chief of Staff to get the transcript of his (Pence's) Face the Nation interview, which he then compared to ▮ transcripts. At one point in the meeting, Priebus said he'd seen enough and left the room. McCord was not sure if anyone was with McCabe.

### Flynn's Resignation and Aftermath

▮ On February 13, 2017, Flynn resigned from his position as National Security Advisor.

▮ On February 16, 2017, McCord participated in a briefing to Acting Attorney General Dana Boente on Flynn and the other Russia-related investigations, to include Papadopoulos, Manafort, and Carter Page. McCord's notes (page 42) reflect that at that time, analysis of Flynn's phone records was nearly done.

▮ By that point in time, McCord's understanding is there was both a criminal and a counterintelligence investigation into Flynn. At that point, the Eastern District of Virginia (EDVA) was the central point for criminal process related to the investigations, a decision that had been made by Boente. Prior to that decision, legal process was being handled in other Districts as appropriate. McCord pointed out that if legal process was being used, it was clearly a criminal investigation.

### Additional Contact with White House

▮ At some point in the spring of 2017, the same day the President's Twitter account stated Trump Tower had been tapped, McCord received a call from Eisenberg. He said to her, "What would we have to do to find out if this exists." McCord noted this was a highly unusual request and asked Eisenberg if he was asking her "if this coverage exists." Eisenberg replied, "I guess so." McCord asked Eisenberg to tell her exactly what he was asking for. Eisenberg told her he would send her an article, and he wanted to know if she could tell him if it was true. McCord told Eisenberg she would get back to him. McCord doesn't recall if he sent her an article or if she looked it up on her own, but she recalled reading an article from the Breitbart website on Trump's statements about Trump Tower being tapped. She never heard back from Eisenberg on that matter.

(U//FOUO) Later, ODNI attorney Brooker told McCord he'd gotten a similar request and hadn't called Eisenberg back. McCord considered it inappropriate for Eisenberg to ask for information of that nature.

### Congressional Interactions

[Agent note: Pages 53-81 of McCord's notes are various drafts of a document entitled "Talking Points re Crossfire Hurricane Cases." The talking points in the document were drafted in preparation for a Congressional briefing on the FBI's investigations into ties between Russia and members of the Trump campaign. The pages include handwritten comments as well as in "track changes."]

McCord believed that after briefing Boente on the investigation, the topic of a Congressional briefing to the "Gang of 8" was raised. It was decided they should work on a draft to "see what talking points would look like." Given what was already out in the public, it would be hard to not provide some level of information to Congress. The FBI sent over a set of talking points for DOJ review, and the documents went back and forth with various edits. The DOJ Office of Legislative Affairs was involved in the discussions on who should be briefed.

After reviewing the documents, McCord believed the initials "pps" may refer to Strzok, and "SNS" may be Scott Schools. The edits attributed to "NSD" were either made by McCord, Toscas, or Evans. After examining the documents, McCord thinks it is possible she made handwritten edits and then those edits were later entered as track changes.

Page 73 of the handwritten notes indicate McCord had a telephone call with McCabe in which they both agreed that the level of detail in some of the talking points would lead to a lot of follow up questions that they would not necessarily want to address. McCord believes the talking points were eventually pared down.

### Comey Firing and Appointment of Special Counsel

McCord had no advance notice of Comey's termination as FBI Director; she learned about an hour before she was due to give a speech. McCord did not talk to McCabe, Sessions, or Rosenstein about it in the immediate aftermath. She had no part in writing the letters written by AG Jeff Sessions and DAG Rod Rosenstein.

On May 10, 2017, the morning after Comey was fired, McCord attended an investigative update meeting with Rosenstein and others from DOJ. Also present were Brandon Van Grack, Evans, Gauhar, Jim Crowell, and David Laufman. Rosenstein asked them if anyone there thought he should appoint a Special Counsel for the investigation. Laufman responded that he did

FD-302a (Rev. 05-08-10)



Continuation of FD-302 of ▮ Interview of Mary McCord , On 07/17/2017 , Page 12 of 12

not think it necessary, as the prosecutors in DOJ's Counterintelligence and Export Control Section could handle it. Rosenstein followed with something like, "So nobody here thinks I should appoint a Special Counsel?" McCord was the only one who spoke up, and she told Rosenstein that a Special Counsel may not be legally required, but they needed to consider their tolerance for public perception of the impartiality of the investigation.

### Administrative

▮ Copies of McCord's notes from her time as Acting Assistant Attorney General for DOJ NSD were provided by DOJ to SAs ▮ and ▮ on July 13, 2017 (documented in serial 50 of this case file). A subset of those notes was used in the interview of McCord. SA ▮ numbered the pages 1 - 90 for ease of reference; those numbers are used in the text above. The numbered notes will be maintained in the case file.



▮ McCord provided nineteen pages of unclassified emails and a calendar printout, which she had pulled and reviewed in advance of the interview to refresh her memory. Those documents will be maintained in the case file.