# EXHIBIT 4

FD-302 (Rev. 5-8-10)                              - 1 of 12 -                          OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry  09/07/2017

▇ **SALLY YATES,** ▇ interviewed at the Special Counsel's Office spaces at ▇, Washington, D.C. Yates was accompanied by her personal counsel, David O'Neil, ▇ from the law offices of Debevoise & Plimpton. Participating in the interview were FBI Special Agents (SA) ▇, and Special Counsel's Office attorneys Andrew Goldstein and Elizabeth Prelogar. After being advised of the identities of the interviewing team and the purpose of the interview, Yates provided the following information:

**Yates' Awareness of the Flynn-Kislyak calls:**

Yates first learned of the December 2016 calls between [LTG Michael] Flynn and [Russian Ambassador to the United States, Sergey] Kislyak on January 5, 2017, while in the Oval Office. Yates, along with then-FBI Director James Comey, then-CIA Director John Brennan, and then-Director of National Intelligence James Clapper, were at the White House to brief members of the Obama Administration on the classified Intelligence Community Assessment on Russian Activities in Recent U.S. Elections. President Obama was joined by his National Security Advisor, Susan Rice, and others from the National Security Council. After the briefing, Obama dismissed the group but asked Yates and Comey to stay behind. Obama started by saying he had "learned of the information about Flynn" and his conversation with Kislyak about sanctions. Obama specified he did not want any additional information on the matter, but was seeking information on whether the White House should be treating Flynn any differently, given the information. At that point, Yates had no idea what the President was talking about, but figured it out based on the conversation. Yates recalled Comey mentioning the Logan Act, but can't recall if he specified there was an "investigation." Comey did not talk



Declassified by FBI-C58W88B61
on 5/6/2020
This redacted version only

Investigation on  08/15/2017  at  Washington, District Of Columbia, United States (In Person)

File #  ▇                                                                       Date drafted  08/16/2017

by  ▇

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  Interview of Sally Q. Yates  , On  08/15/2017  , Page  2 of 12

about prosecution in the meeting. It was not clear to Yates from where the President first received the information. Yates did not recall Comey's response to the President's question about how to treat Flynn. She was so surprised by the information she was hearing that she was having a hard time processing it and listening to the conversation at the same time.

Upon leaving the White House, Yates called Mary McCord, the Acting Assistant Attorney General for the National Security Division (NSD) at the time, to ask what was going on and why Yates hadn't been aware of it previously. Yates and McCord briefly spoke when Yates returned to DOJ, and McCord had already scheduled a meeting for that afternoon to discuss the Flynn information. Yates kept the previously scheduled afternoon meeting on the calendar. Yates learned McCord and George Toscas had been briefed on the Flynn information by the FBI the day before, and they then told Yates what they knew. Yates could not recall whether DOJ had in their possession

Yates, McCord, and others had a discussion in that meeting about whether this constituted a violation of the Logan Act, but there was no close analysis of the substance of the Flynn-Kislyak discussions. The feeling among NSD attorneys was Flynn's behavior was a technical violation of the Logan Act, but they were not sure this would have a lot of jury appeal, or if pursuing it would be a good use of the power of the Justice Department. Yates had the impression the FBI was more eager to pursue prosecution initially.

**Discussions Regarding Notification to White House**

In early January, DOJ began to "ramp up" their discussions regarding Flynn, in reaction to a David Ignatius column describing the phone calls in early January 2017, followed by a statement by Sean Spicer around January 13, in which Spicer denied there was sanctions talk on the calls and and stated that the Flynn calls were logistical. The false statement by Spicer, which Yates assessed to be the White House "trying to tamp down" the attention, caused DOJ to really start to wonder what they should do.

On January 15, 2017, things "really got hot." On that day, Vice President Pence was on Face the Nation and stated publicly he'd spoken to Flynn and had been told there had been no discussion of sanctions with Kislyak. Yates recalled she was in New York City that weekend, and received a call from McCord notifying her of the

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of __Interview of Sally Q. Yates__ ,On __08/15/2017__ ,Page __3__ of __12__

statements. Prior to this, there had been some discussion about notifying the White House, but nothing had been decided. Until the Vice President made that statement on TV, there was a sense that they may not need to notify the White House, because others at the White House may already be aware of the calls.

Following January 15, 2017, discussions regarding Flynn and notification to the White House amplified. Yates described several different combinations of people having conversations about the Flynn case, to include internal DOJ discussion, DOJ/NSD and FBI discussions; DOJ/NSD and the intelligence community; Yates and the Deputy Director of the CIA, David Cohen; Yates and Mike Dempsey from the Office of the Director of National Intelligence; and McCord and the General Counsel at ODNI, Bob Litt. According to Yates, the feeling among the intelligence community was that the White House needed to be notified, because the Vice President was entitled to know he'd been saying something untrue to the public. Yates believed Flynn put the Vice President in a position to lie to the American people, creating a compromise situation for Flynn. As this was happening before the Inauguration, Yates' view was the White House should know what the National Security Advisor had been doing before he was officially "in the chair" and in the job.



Prior to inauguration, Yates recalled a conversation with either Comey or Deputy Director Andy McCabe regarding notification, and recalled that the FBI was resistant to the idea. Yates recalled Comey's view was that no one really knew if the Vice President was aware of the calls. The DOJ response was that they shouldn't assume the Vice President was aware and had knowingly lied. Yates said at the time that DOJ wanted to treat the incoming administration the same as the outgoing, and thinks Comey agreed that if this had happened to the Obama Administration, he would have just called Denis McDonough [Chief of Staff to President Obama]. Yates thought the FBI's position was driven by a sense that the FBI didn't want to mess up future relations with the incoming administration, since "we're going to have to work with these guys."

However, Yates didn't think that was the sole factor in not wanting to notify.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ▮▮▮ Interview of Sally Q. Yates , On 08/15/2017 , Page 4 of 12

▮▮▮ The FBI said at some point that notification would mess up an ongoing investigation, but Yates said it was not always clear what exactly the FBI was doing to investigate Flynn.

▮▮▮ In the days immediately leading up to inauguration, Yates was really pushing to notify, while Comey was still very resistant. Yates explained that she understood the criminal equities, but other things should be factored in, such as whether the Logan Act would be prosecuted. It was important to Yates that they all be on the same page and noted that Cohen in particular agreed with her position.

▮▮▮ On or around the day before inauguration, there was an event at which Comey, Brennan, and Clapper were all present. Cohen relayed to Yates that Clapper and Brennan were going to pull Comey aside to talk to him about notification at that event. That night, Cohen called her and said Comey had said something to the effect of there being an "ongoing criminal investigation" and notification would interfere with it. Generally, when the Intelligence Community learns of a "criminal investigation," their reaction is to back off and defer to the FBI; ▮▮▮. Yates did not herself believe the investigation would be negatively impacted, but Brennan and Clapper backed off after their talk with Comey.

▮▮▮ Inauguration day passed without any notification to the White House regarding Flynn, but Yates still felt they had to to figure out what to do.

▮▮▮ The Monday following inauguration, Spicer "doubled down" on the Flynn calls. He was "quite emphatic" that Flynn had one call with Kislyak, there were four topics, and sanctions weren't one of them. At that point, Yates decided "enough was enough" and decided it was time to notify the White House. She talked to the trial attorneys in NSD, and they collectively agreed it was more important to notify than to protect any investigation at that point.

▮▮▮ The next day, Tuesday, Yates gathered her staff and they discussed notification to the White House. They agreed Yates should be accompanied by Mary McCord, an NSD career attorney and subject matter expert on the topic. Yates placed a call to Comey and the group waited for him to call back. When Comey called later - Yates is not certain now if he was returning her call or placing a new call - he informed her that two agents were on their way to interview Mike Flynn at the White House.

Continuation of FD-302 of ▓ Interview of Sally Q. Yates , On 08/15/2017 , Page 5 of 12

▓ Yates was very frustrated in the call with Comey. She felt a decision to conduct an interview of Flynn should have been coordinated with DOJ. There were trial attorneys at NSD working with the FBI and it was not "solely" an FBI investigation. In Yates' view, the prosecutors should be involved in coordinating the type of approach and interview questions. ▓ She also thought there should have been a discussion about recording the interview. In raising these things with Comey, he said something like "you can understand why I did this," to which Yates replied "no" and Comey responded he didn't want it to "look political." Yates was offended by the implication.

▓ Yates relayed to her team that the FBI was conducting an interview and they "hit the roof." She believed the agents had been tasked to do the interview, likely because of the recent Spicer statements. Yates added the interview was problematic to her because as a matter of protocol and as a courtesy, the White House Counsel's Office should have been notified of the interview. The FBI's approach was inconsistent with how things had been done.

▓ Yates received a brief readout of the interview the night it happened, and a longer readout the following day. The gist of what she was told was that Flynn was very accommodating, but the agents had not confronted him directly with the information ▓, but he was "nudged" at one point and he said something like "oh, thank you for reminding me." Yates could not recall the specifics of that interaction. Flynn denied having a conversation about sanctions.

▓ Yates did not speak to the interviewing agents herself, but understood from others that their assessment was that Flynn showed no "tells" of lying and it was possible he really did not remember the substance of his calls with Kislyak. On the other hand, the DOJ prosecutors were very skeptical that Flynn would forget the discussion. After the interview NSD asked FBI if they wanted to do another interview, and the FBI said no. McCabe also said as much to McCord. Yates does not know why the FBI did not want to re-interview, but recalled them being pretty emphatic about it. Yates does not recall if they had a discussion on any exposure to 18 USC 1001, but she did remember McCord effectively "cross examining" the statements Flynn made to the interviewing agents as compared to the transcripts.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ▆▆▆ Interview of Sally Q. Yates , On 08/15/2017 , Page 6 of 12

▆▆▆ Yates reiterated that in hearing about the interview, the DOJ prosecutors thought Flynn was lying, but the FBI didn't say he wasn't lying, just that he didn't exhibit any "tells" that he was lying.

▆▆▆ McCabe told Yates that ▆▆▆, he was convinced Flynn was lying. He noted that Flynn wasn't as engaged in the conversation until the part about the sanctions. NSD told Yates at some point that the interviewing agents hadn't ▆▆▆ read the full transcripts prior to the interview.

▆▆▆ After the readouts of the Flynn interview, DOJ held internal discussions about what to do next, as they still wanted to notify the White House. After confirming the FBI did not want to do a second interview, Yates decided they should notify. She called Comey and told him she was going to notify the White House Counsel about Flynn. She wanted to gauge his reaction to her decision, and Comey said it was a great idea, and agreed a "lawyer to lawyer" talk made sense.

▆▆▆ Yates acknowledged there was a chance that notifying would have some impact on the investigation, but it was outweighed by the national security concerns.

▆▆▆ Yates notified Mike Dempsey at ODNI and a woman whose name she could not recall at CIA in advance of her notification to the White House.

▆▆▆ **January 26, 2017 White House Notification**

▆▆▆ The morning of January 26, 2017, Yates called Don McGahn, the White House Counsel and told him she had a "sensitive matter" to discuss with him and she couldn't do it over the phone. They agreed to meet that afternoon. Yates and McCord met in McGahn's office with him and one of his associates from the White House Counsel's Office.

▆▆▆ Yates and McCord did not have ▆▆▆ transcripts with them, but they took a document that summarized ▆▆▆ because Yates wanted to be able to give them some examples while they talked. She did not take notes and does not recall if McCord took notes. Her impression is that McGahn's associate took notes, but she does not recall if McGahn took any.

▆▆▆ Yates set up the conversation by laying out the fact that Flynn's conversation with the Russian Ambassador had been the subject of a lot of interest lately. She mentioned the Vice President's appearance on Face the Nation and Spicer's statements. Yates then explained that they

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  Interview of Sally Q. Yates  , On  08/15/2017  , Page  7 of 12

knew what the Vice President and Spicer said was not true, and then told them how they knew it. She told them how they knew, because she didn't want them to think there was a wiretap on Flynn, but she did want them to know they had hard evidence. She told them that not only did Flynn discuss sanctions, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and provided specific examples.

▮▮▮▮ Yates pointed out that Flynn actually made a specific request to Kislyak that the Russians not overreact and that they minimize their response, and Kislyak affirmed he had "taken it to the highest levels" and their response was because of the request.



▮▮▮ The specific asks Flynn was making, and the back and forth between him and Kislyak, were contrary to what was being represented in the media at the time. Yates added she was not saying the Vice President was being deliberately misleading, and McGahn noted that he could guarantee anything the Vice President said he'd heard directly from Flynn.

▮▮▮ Yates also told McGahn Flynn had been interviewed by the FBI that week. McGahn asked Yates "how he did" but Yates declined to answer. She "sort of shrugged" in response and wanted to give the impression that "all was not good." McGahn asked Yates if the FBI's investigation was criminal, and Yates declined to answer. She added that she wouldn't normally answer that question.

▮▮▮ Yates stated it is a violation of the Logan Act for someone not a member of the administration to advocate a position contrary to the current administration position. When asked, Yates recalled the Logan Act

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  Interview of Sally Q. Yates  ,On 08/15/2017 ,Page 8 of 12

definitely came up in her second meeting with McGahn but could not recall if it came up in the first one.

Yates told McGahn the reason they were telling him about the calls was that the underlying conduct itself was problematic, plus Flynn lied to the Vice President, Spicer, and the Chief of Staff, causing those people to in turn lie to the American people. The fact that the Russians were aware of the lie created a compromise situation for Flynn.

Yates explained she was providing the information to McGahn so he could take whatever action he deemed appropriate. She described McGahn and his associate's reactions as "reeling." She cannot recall if they asked her what they could do, but she did not offer a recommendation. She did personally think privately that Flynn would be fired.

At the conclusion of the meeting, which was about thirty minutes, McGahn and his associate thanked them, and Yates and McCord left. Yates and McCord remarked to one another that the meeting "went better than they thought it would." Yates thought McGahn and his associate fully appreciated the seriousness of what was discussed.

Yates was not sure if she expected a follow up to the meeting. She did expect McGahn to ask to read the transcripts , but he didn't in that initial meeting.

Yates does not recall if she called Comey personally to let him know, but she does believe someone at NSD notified someone at FBI.

**January 27, 2017 White House Meeting**

On the morning of Friday, January 27, 2017 Yates received a call from McGahn in which he requested another meeting, ideally for that evening. They ultimately scheduled a meeting for late afternoon that day, and Yates again took McCord with her to the White House for the meeting where they met with McGahn and the same associate as the previous day. The second meeting was a distinct "tenor change" from the first. While the first meeting didn't feel adversarial, McGahn started the second meeting with something like, "What's it to DOJ if one White House official lies to another?" Yates was a little taken aback by that and explained again the same reasons for their concern that she had the day before. She told McGahn that there was more to this than one official lying to

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  Interview of Sally Q. Yates  ,On 08/15/2017 ,Page 9 of 12

another, and Flynn's actions themselves were problematic, especially when followed by lies and the public getting a false statement. Yates described McGahn's initial commentary was as almost as if he was saying "what's the crime?" McGahn said to her at one point something along the lines of "Oh, come on, what are the chances DOJ will prosecute the Logan Act?" Yates' impression was McGahn was trying to let her know he knew the Logan Act had never been prosecuted and was minimizing the seriousness of Flynn's actions. Yates got the sense that McGahn had done some research and clearly knew what the Logan Act was by that point.

Yates told McGahn that putting aside whether or not anyone had been successfully prosecuted for a Logan Act violation, they were missing the point that they had a potential compromise situation with their National Security Advisor.

McGahn asked Yates if Flynn should be fired, and she told him it was not for DOJ to make that call.

McGahn told Yates the White House did not want to take any action that would interfere with the investigation, and she replied that he should not worry about it, that DOJ had made the notification specifically so the White House could act on it. Yates does not recall if she told McGahn the investigation into Flynn was a "criminal" investigation, but she knows at the time there was no official decision on prosecution.

Yates had the impression McGahn was looking for a reason not to act, and DOJ did not want the White House to be able to use the ongoing investigation as an excuse not to act. Yates "really hammered" that the White House could and should act because she wanted to make sure they couldn't use the investigation as a shield.

McGahn asked Yates if the White House could review the transcripts, and she said they were inclined to agree, but would get back to them. At that point, DOJ had already agreed they would probably provide access to the transcripts if asked, but they would need to talk to the FBI.

Yates had no sense of what happened between the two meetings. Yates did not get the impression McGahn was fishing for more information on the investigation, but would have shut down that line of questioning if he had. She doesn't recall whether McGahn asked about 1001 violations or the FBI interview of Flynn in the second meeting. She did not say that DOJ was or wasn't going to prosecute the Logan Act, as she

doesn't think it was decided at that point in time. Yates added she wouldn't have told the White House if it had been decided.

Yates believed McGahn "got it" that they couldn't use the ongoing investigation as a reason not to act on Flynn.

The second meeting, which was shorter in duration than the one the day prior, ended shortly after the request for transcripts.

En route to DOJ, Yates and McCord discussed the transcripts and agreed McCord would talk to the FBI about accessing the transcripts, which McCord would do that weekend.

Upon returning to DOJ, Yates likely told Matt Axelrod about the meeting with McGahn. It's also likely Axelrod and McCord told others about the meeting. Yates is not sure if she told Comey about the second White House meeting herself, but she is sure someone at NSD told someone at the FBI.

Yates was scheduled to spend that weekend in Atlanta, and as she was getting ready to go to her plane, Axelrod called her to let her know about the travel ban that had been announced that afternoon. She spent the rest of her weekend working on issues surrounding that.

Yates was not aware at the time that Comey had dinner with President Trump the evening following her second meeting with McGahn. She first learned about it when Comey testified before Congress in June.

### White House Follow-Up

On the morning of Monday, January 30, 2017, Yates called McGahn, and not reaching him immediately, asked for a call back. McCord had told Yates that the FBI had made the arrangements for the transcript review, so Yates wanted to let McGahn know the transcripts were ready. By the time McGahn called her back that afternoon, Yates had issued a directive to the Department of Justice not to defend the travel ban that had come out the previous Friday, so she assumed McGahn wanted to talk about that. She realized once they started talking that he didn't know about her directive on the travel ban and instead was asking only about the transcripts. Yates told McGahn the transcripts were available but he would need to go to the FBI to review them, and then decided she should tell him about her directive regarding the travel ban. Yates was surprised he didn't know, having assumed the senior administration official at DOJ would have told the White House by then.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ▮▮▮ Interview of Sally Q. Yates , On 08/15/2017 , Page 11 of 12

▮▮▮ A few hours after Yates told McGahn about her actions regarding the travel ban, she was fired.

▮▮▮ Yates was gone by the time the White House reviewed the transcripts, but she heard it was some period of time before they did the review. Her understanding was the arrangement for the review would take place at the FBI.

▮▮▮ Yates was aware of another Flynn related issue happening around the same time, specific to a FARA violation. She was aware NSD attorneys were interacting with Flynn's counsel, but the specifics had not risen to her level at the time. She did not share that information with McGahn.

▮▮▮ Yates did not interact with the media regarding the Flynn-Kislyak calls or her interactions with the White House.

▮▮▮ Yates was surprised Flynn wasn't fired earlier, given the reaction to the first meeting.

▮▮▮ Yates noted her schedule at DOJ might provide some insight into her meetings, but not everything made it to her calendar. Her assistant at the time of her departure was Josh Mogil.

▮▮▮ Yates said Spicer's characterization of her notification to the White House as a "heads up" was not accurate. She believes the notification, along with the way it was done, sent a more deliberate message than merely a "heads up."

▮ Administrative



FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ▮▮▮ Interview of Sally Q. Yates ▮▮▮ , On 08/15/2017 , Page 12 of 12

(U//FOUO) The original Non-Disclosure statements are being maintained in the 1A section of the case file.