**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim. No. 17-232 (EGS) |
| v. | |
| MICHAEL T. FLYNN, | |
| Defendant. | |

## BRIEF OF *AMICI CURIAE* THE STEADY STATE AND FORMER NATIONAL SECURITY OFFICIALS IN OPPOSITION TO THE DEPARTMENT OF JUSTICE'S MOTION TO DISMISS

Jerome C. Roth (*pro hac vice pending*)
David H. Fry (*pro hac vice pending*)
Andrew Cath Rubenstein (*pro hac vice pending*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

Elaine J. Goldenberg (D.C. Bar No. 478383)
Brendan B. Gants (DC Bar No. 1031419)
MUNGER, TOLLES & OLSON LLP
1155 F Street NW, Seventh Floor
Washington, D.C. 20004-1357
Telephone:     (202) 220-1100
Facsimile:     (202) 220-2300

*Attorneys for Amici Curiae The Steady State and
Former National Security Officials*

## TABLE OF CONTENTS

**Page**

BRIEF OF *AMICI CURIAE* THE STEADY STATE AND FORMER NATIONAL
  SECURITY OFFICIALS ...................................................................................1

I.   INTEREST OF AMICI ...................................................................................1

II.  INTRODUCTION ..........................................................................................2

III. ARGUMENT ..................................................................................................4

  A.   DOJ's Motion Misconstrues the FBI's Role and Responsibilities .........................4

    1.   The FBI's Role As an Intelligence Agency ...................................4

    2.   The FBI's Role in Background Investigations.............................7

  B.   DOJ's Contention that Mr. Flynn's Statements Were Not Material Is
       Groundless and, If Accepted, Would Impede the FBI's Collection of
       Intelligence to the Detriment of National Security. ................................8

    1.   DOJ Misstates the Materiality Requirement of Section 1001 ....................8

    2.   DOJ Misstates the Predication Requirement ................................9

    3.   Mr. Flynn's False Statements Had the Potential to Influence the
         FBI's Intelligence Activities ........................................................11

      (a)   Mr. Flynn's Statements Regarding His Communications
            with the Russian Ambassador Were Material to U.S.
            Intelligence *Regardless of Their Specific Subject Matter*. .............12

      (b)   Mr. Flynn's Statements Had the Potential to Influence U.S.
            Assessment of Russian Actions and Intentions in Light of
            the Subject Matter of the Calls......................................................13

      (c)   Mr. Flynn's Statements Had the Potential to Influence U.S.
            Assessment of Potential Risks Arising from Mr. Flynn's
            Connections to Russia...................................................................14

      (d)   Mr. Flynn's Statements Were Material to Whether Mr.
            Flynn was Vulnerable to Blackmail by the Russians....................16

      (e)   Mr. Flynn's Statements Were Material to the FBI's
            Responsibility for Background Investigations.............................18

  C.   The Position Taken in DOJ's Motion to Dismiss Poses a Grave Threat to
       the Rule of Law....................................................................................19

APPENDIX OF *AMICI CURIAE* ................................................................................23

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Kelley v. Fed. Bureau of Investigation*,
   67 F. Supp. 3d 240 (D.D.C. 2014) ................................................................11

*United States v. Barr*,
   963 F.2d 641 (3d Cir. 1992) ........................................................................19

*United States v. Gaudin*,
   515 U.S. 506 (1995) ......................................................................................8

*United States v. Hansen*,
   772 F.2d 940 (D.C. Cir. 1985) ......................................................................9

*United States v. Lee*,
   106 U.S. 196 (1882) ....................................................................................20

*United States v. Moore*,
   612 F.3d 698 (D.C. Cir. 2010) ......................................................................8

*United States v. Morton Salt Co.*,
   338 U.S. 632 (1950) ....................................................................................10

*United States v. R. Enterprises*,
   498 U.S. 292 (1991) ....................................................................................10

*United States v. Stadd*,
   636 F.3d 630 (D.C. Cir. 2011) ....................................................................19

*United States v. Verrusio*,
   762 F.3d 1 (D.C. Cir. 2014) ..........................................................................8

**FEDERAL STATUTES**

18 U.S.C. § 953 ................................................................................................15

18 U.S.C. § 1001 .................................................................................... 2, passim

50 U.S.C. § 3003 ................................................................................................5

**EXECUTIVE ORDERS**

Access to Classified Information, Executive Order No. 12968, 60 Fed. Reg.
   40,245 (Aug. 2, 1995) ..................................................................................7

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

Further Amendments to Executive Order 12333, United States Intelligence
Activities, 73 Fed. Reg. 45,325 (July 30, 2008) ....................................................................5, 6

Security Requirements for Government Employment,
Executive Order No. 10450, 18 Fed. Reg. 2489 (Apr. 27, 1953) ...........................................7

OTHER AUTHORITIES

*National Intelligence Strategy of the United States of America*, Office of the
Director of National Intelligence (2019), *available at* https://www.dni.gov/
files/ODNI/documents/National_Intelligence_Strategy_2019.pdf..........................................5

*The Attorney General's Guidelines for Domestic FBI Operations*, *available at*
https://www.justice.gov/archive/opa/docs/guidelines.pdf ...............................................5, 6, 10

Brief and Appendix for the United States, *United States v. Brettschneider*,
No. 19-2423 (2d Cir. May 4, 2020), ECF No. 128 ..................................................................9

Cong. Research Serv., R45720, United States Foreign Intelligence Relationships
(May 15, 2019), https://crsreports.congress.gov/product/pdf/download/R/
R45720/R45720.pdf/..............................................................................................................21

Eli Lake, *The Railroading of Michael Flynn*, Commentary (June 2020), https://
www.commentarymagazine.com/articles/eli-lake/michael-flynn-gets-
railroaded-by-the-fbi/.............................................................................................................18

*Face the Nation Transcript January 15, 2017: Pence, Manchin, Gingrich* (Jan.
15, 2017), https://www.cbsnews.com/news/face-the-nation-transcript-january-
15-2017-pence-manchin-gingrich/..........................................................................................16

Federal Bureau of Investigation, *Counterintelligence*,
https://www.fbi.gov/investigate/counterintelligence ...............................................................5

Federal Bureau of Investigation, *What is the FBI's foreign counterintelligence
responsibility?*, https://www.fbi.gov/about/faqs/what-is-the-fbis-foreign-
counterintelligence-responsibility............................................................................................5

*Interview of James Clapper*, Permanent Select Committee on Intelligence, U.S.
House of Representatives (July 17, 2017), *available at*
https://intelligence.house.gov/uploadedfiles/jc7.pdf .............................................................15

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

*Interview of Mary McCord*, Permanent Select Committee on Intelligence, U.S. House of Representatives (Nov. 1, 2017), *available at* https://www.dni.gov/files/HPSCI_Transcripts/2020-05-04-Mary_McCord-MTR_Redacted.pdf ............................17

*Interview of Sally Yates*, Permanent Select Committee on Intelligence, U.S. House of Representatives (Nov. 3, 2017), *available at* https:// intelligence.house.gov/uploadedfiles/sy57.pdf ................................................................................................17

Jacob Pramuk, *Trump: I fired Flynn because of what he told Pence*, CNBC (Feb. 16, 2017), https://www.cnbc.com/2017/02/16/trump-no-i-didnt-tell-flynn-to-talk-about-sanctions-with-russia.html ..................................................................17

Ken Dilanian & Courtney Kube, *Flynn Never Told DIA That Russians Paid Him, Say Officials*, NBC News (May 8, 2017), https://www.nbcnews.com/news/us-news/flynn-never-told-dia-russians-paid-him-say-officials-n756421 ....................................19

Mary McCord, *Bill Barr Twisted My Words in Dropping the Flynn Case. Here's the Truth*, New York Times (May 10, 2020), https://www.nytimes.com/2020/05/10/opinion/bill-barr-michael-flynn.html ....................................17

*National Counterintelligence Strategy of the United States of America 2020-2022*, National Counterintelligence and Security Center (Jan. 7, 2020) https://www.dni.gov/files/NCSC/documents/features/20200205-National_CI_Strategy_2020_2022.pdf ....................................12

*Overview—Rule of Law*, U.S. Courts website, https://www.uscourts.gov/educational-resources/educational-activities/overview-rule-law............................................20

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*, Office of the Inspector General, U.S Department of Justice (December 2019), *available at* https://www.justice.gov/storage/120919-examination.pdf ..............................................................................10

Special Counsel Robert S. Mueller, III, *Report on the Investigation into Russian Interference in the 2016 Presidential Election*, Vol. I (March 2019)....................................15

*What are the primary investigative functions of the FBI?*, Federal Bureau of Investigation, https://www.fbi.gov/about/faqs/what-are-the-primary-investigative-functions-of-the-fbi ................................................................................5

<u>**BRIEF OF *AMICI CURIAE* THE STEADY STATE AND**</u>
<u>**FORMER NATIONAL SECURITY OFFICIALS**</u>

**I.      INTEREST OF AMICI**

*Amici curiae* are The Steady State, an association of former national security officials of

the United States, as well as additional former national security officials, who share an abiding

interest in safeguarding U.S. national security and intelligence interests and have decades of

experience in doing so.  The members of The Steady State and the individual *amici* have served

in the U.S. national security and intelligence communities, under both Democratic and

Republican administrations, as intelligence officers, defense policymakers, diplomats, and

congressional staffers.  Members of *amicus* The Steady State include the individuals listed in an

Appendix to this brief.  The Appendix also includes a list of the additional *amici*.

*Amici* believe that arguments advanced by the Department of Justice ("DOJ") in its

motion to dismiss the criminal information against Defendant Michael T. Flynn misapprehend

the role of intelligence agencies such as the Federal Bureau of Investigation ("FBI" or "Bureau")

and are inconsistent with U.S. national security interests and with the rule of law that is critical to

those interests.  Were the Court to accept DOJ's parsimonious view of the circumstances in

which FBI counterintelligence agents may properly interview a witness and of the materiality of

statements made during those interviews, the ability of the intelligence community to gather

accurate information and to identify potential threats to national security interests of the United

States would be severely compromised.  *Amici* hope that their views as former members of the

national security and intelligence communities will assist the Court in understanding the many

legitimate bases for, and the clear materiality of misstatements made during, Mr. Flynn's FBI

interview, as well as the risks that DOJ's contrary arguments pose to U.S. national security interests.[1]

## II.    INTRODUCTION

DOJ has moved to dismiss all criminal charges against Mr. Flynn despite his having twice pleaded guilty and twice allocuted to facts establishing that he made false statements to FBI agents during an interview on January 24, 2017, in violation of 18 U.S.C. § 1001.  ECF No. 198 ("Motion" or "Mot.").  In making that extraordinary request, DOJ now contends, contrary to the position it took during plea proceedings, that Mr. Flynn's false statements were not material because the FBI lacked sufficient evidence that Mr. Flynn had engaged in misconduct prior to his telephone communications with the then Russian ambassador to the United States, Sergey Kislyak, in December 2016.

From a national security perspective, that argument is without merit.  It ignores the fundamental role the FBI plays as an integral component of the intelligence community.  The FBI is an intelligence agency.  In that capacity, it is charged with informing national strategic decision-making with respect to U.S. security interests and investigating the activities of foreign governments to discover and thwart their intelligence activities directed against the United States.  The FBI also is responsible for conducting background investigations of incoming and current government officials to assess their fitness for office and their capacity to safeguard the nation's sensitive information.

---

[1] *Amici* affirm that no party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and that no person—other than *amici* or their counsel—contributed money that was intended to fund preparing or submitting this brief.

When the FBI interviewed Mr. Flynn about his communications with Ambassador Kislyak in December 2016, the Obama administration was still in office.  Mr. Flynn had been picked by the President-elect to become National Security Adviser once the new administration took office on January 20, 2017.  The conversations between Mr. Flynn and Ambassador Kislyak concerned the United States' recent imposition of sanctions on Russia based on its interference in the 2016 presidential election.  Although transcripts of the communications to which the FBI had access demonstrated that Mr. Flynn and Ambassador Kislyak had discussed the sanctions, and Mr. Flynn expressly told Ambassador Kislyak that Russia should hold off on responding to the sanctions so that the Trump administration would not be "boxed in," Mr. Flynn falsely stated to the FBI agents that the sanctions had not been discussed.

In light of the FBI's intelligence responsibilities, the Bureau's interview of Mr. Flynn regarding his conversations with Ambassador Kislyak was entirely justified and was fully consistent with standard FBI practice.  In fact, the FBI would have been remiss had it not questioned Mr. Flynn about those discussions.  Further, Mr. Flynn's false statements were plainly material to the FBI's decision-making (including about what additional investigative steps to take, if any) and to the national security and intelligence interests of the United States.  That is true irrespective of the pendency of any criminal investigation against Mr. Flynn, the fact that the FBI had not previously identified "derogatory information" about him, or the legality of Mr. Flynn's underlying conduct in discussing U.S. sanctions with the Russian ambassador.

More generally, DOJ's motion seeks to exempt a high-level administration official from laws applicable to individuals who do not hold such office, and—in light of public statements by the Executive Branch—apparently does so either at the behest of the President of the United States or as a means of gaining the President's approval.  That effort to apply federal law

differently to members of the administration, and to grant them special consideration or privileges amounting to immunity, runs counter to fundamental principles of the rule of law that require equal application of laws, including to the Executive Branch.

Such transgressions of the rule of law threaten the intelligence and national security interests of the United States for several reasons. They increase the risk that corruption of a high-level official within the administration by foreign interests will go undetected because that official will understand that he will not be sanctioned for lying to the FBI about an intelligence-related issue. They decrease the trust of foreign allies in the uprightness of the U.S. government, thus decreasing the chances that intelligence officers will obtain critical information and cooperation from those allies. And they demoralize members of the intelligence community, most of whom serve the country out of dedication to values for which the United States has always stood but which politicization of the criminal-justice system severely undermines.

## III.   ARGUMENT

### A.   DOJ's Motion Misconstrues the FBI's Role and Responsibilities

#### 1.   The FBI's Role As an Intelligence Agency

DOJ's motion is based on a cramped and inaccurate understanding of the FBI's intelligence functions. That motion evaluates the FBI's decision to interview Mr. Flynn through the lens of a law enforcement investigation, asking only whether there was sufficient evidence of prior criminal activity or misconduct by Mr. Flynn. Mot. 13-15. Based on the claim that the FBI had expressed its intent to close an investigation into Mr. Flynn for lack of "derogatory information" *prior to the conversations with Ambassador Kislyak*, DOJ argues that the FBI interview was unjustified and any statements made during it could not have been material.

The FBI's premise is incorrect. The FBI does not merely investigate crime or discrete past events involving misconduct. Rather, the FBI serves a vital role as a intelligence agency.

50 U.S.C. § 3003(4)(H); *see also What are the primary investigative functions of the FBI?*,

Federal Bureau of Investigation, https://www.fbi.gov/about/faqs/what-are-the-primary-

investigative-functions-of-the-fbi.[2]  The principal goal of the FBI's intelligence activities is not

the prosecution of crime; it is "[i]dentify[ing] and assess[ing] the capabilities, activities, and

intentions" of foreign entities that affect the national interest, so as to assist in identifying and

responding to threats to security interests as well as to support national policy and strategic

decisions.  *National Intelligence Strategy of the United States of America*, Office of the Director

of National Intelligence at 8 (2019), *available at* https://www.dni.gov/files/ODNI/documents/

National_Intelligence_Strategy_2019.pdf; *see also* Federal Bureau of Investigation,

*Counterintelligence*, https://www.fbi.gov/investigate/counterintelligence; Federal Bureau of

Investigation, *What is the FBI's foreign counterintelligence responsibility?*, https://www.fbi.gov/

about/faqs/what-is-the-fbis-foreign-counterintelligence-responsibility; Further Amendments to

Executive Order 12333, United States Intelligence Activities, 73 Fed. Reg. 45,325 (July 30,

2008) ("Further Amendments to EO 12333").

Indeed, the Attorney General's policy guidelines for FBI operations expressly state that

the agency's role "is not limited to 'investigation' in a narrow sense, such as solving particular

cases or obtaining evidence for use in particular criminal prosecutions."  *The Attorney General's*

*Guidelines for Domestic FBI Operations* 16 ("FBI Guidelines"), *available at*

---

[2] Under the National Intelligence Act, "foreign intelligence" refers to "information relating to the capabilities, intentions, or activities of foreign governments or elements thereof, foreign organizations, or foreign persons, or international terrorist activities."  50 U.S.C. § 3003(2). "Counterintelligence" refers to "information gathered, and activities conducted, to protect against espionage, other intelligence activities, sabotage, or assassinations conducted by or on behalf of foreign governments or elements thereof, foreign organizations, or foreign persons, or international terrorist activities."  50 U.S.C. § 3003(3).  "Intelligence" includes both foreign intelligence and counterintelligence.  50 U.S.C. § 3003(1).

https://www.justice.gov/archive/opa/docs/guidelines.pdf.  As those guidelines explain, the FBI's

investigative and intelligence gathering "activities also provide critical information needed for

broader analytic and intelligence purposes to facilitate the solution and prevention of crime,

protect the national security, and further foreign intelligence objectives."  *Id.*; *see also, e.g.*, *id.* at

29; Further Amendments to EO 12333 73 Fed. Reg. at 45,325 (stating that federal intelligence

agencies, including the FBI, have the responsibility to "provide the President, the National

Security Council, and the Homeland Security Council with the necessary information on which

to base decisions concerning the development and conduct of foreign, defense, and economic

policies, and the protection of United States national interests from foreign security threats").

The FBI is assigned that information-gathering task because "[t]imely, accurate, and insightful

information about the activities, capabilities, plans, and intentions of foreign powers,

organizations, and persons, and their agents, is essential to informed decision-making in the areas

of national security, national defense, and foreign relations."  *Id.* at 45,337

     To be sure, intelligence investigations are sometimes focused on potential wrongdoing by

a specific individual—but even in that circumstance, those investigations differ from criminal

investigations.  Chief among those distinctions is the investigative goal.  Law enforcement

investigations seek to identify evidence to determine whether an individual can be proven in a

court of law to have committed a crime.  Once a definitive determination is made that the answer

to that question is "no," the investigation may end.  But intelligence investigations have a

different objective.  They seek information for use by the United States to make decisions about

how to interact with foreign powers, including how to protect itself against foreign intelligence

efforts.  The results of such investigations may be used for prosecution where appropriate, but

the U.S. government primarily relies on them for setting strategy and developing national and international policy.

Of course, the intelligence-gathering process may uncover criminal activity, and the FBI's counterintelligence agents investigate crimes and assists in their prosecution.  But such law enforcement operations are often tangential to the main purpose of the underlying investigation. The principal goal remains the collection of information to address threats and to inform national security policy, providing policymakers with a decision advantage through better understanding of concealed information, often referred to as "obscured reality." *National Intelligence Strategy* at 10.

2.    The FBI's Role in Background Investigations

The FBI serves an additional function related to intelligence and national security: background investigations of incoming or current government officials.  The agency is tasked with conducting such investigations for a wide range of employment positions, from line prosecutors to members of the Cabinet.  The vast majority of those investigations are triggered without any evidence or suspicion of criminal activity or of any intelligence threat.  Instead, the investigations are designed to verify that a candidate for office or current employee is "reliable, trustworthy, of good conduct and character, and of complete and unswerving loyalty to the United States."  Security Requirements for Government Employment, Executive Order No. 10450, 18 Fed. Reg. 2489 (Apr. 27, 1953).[3]

---

[3] *See also* Access to Classified Information, Executive Order No. 12968, 60 Fed. Reg. 40,245, 40,250 (Aug. 2, 1995) ("[E]ligibility for access to classified information shall be granted only to employees who are United States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and

Those investigations do not terminate upon the issuance of a security clearance.  New information raising questions about whether an official might disclose sensitive information or take other steps against the national interest often gives rise to additional investigation and affects the decision whether an issued security clearance should be continued or withdrawn.

It is entirely proper and commonplace for the FBI to interview individuals without any suspicion of criminal activity or national security risk as part of the agency's background-investigation function.  And it would gravely undermine national security interests if, in the absence of a pending criminal investigation or known security threat, interviewees could lie to the FBI without consequence.

**B.      DOJ's Contention that Mr. Flynn's Statements Were Not Material Is Groundless and, If Accepted, Would Impede the FBI's Collection of Intelligence to the Detriment of National Security.**

1.      <u>DOJ Misstates the Materiality Requirement of Section 1001</u>

Materiality for purposes of Section 1001 is a broad standard and turns on the nature of the communication and its potential to affect agency decision-making, not on the pendency of an investigation or other formal proceeding.  A statement is "material" under the statute if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (citation omitted).  The statement "need not actually influence an agency in order to be material." *United States v. Verrusio*, 762 F.3d 1, 20 (D.C. Cir. 2014) (citation omitted).  Moreover, "[p]roof of actual reliance on the statement is not required; the Government need only make a reasonable showing of its *potential effects*." *United States v. Moore*, 612 F.3d 698, 702 (D.C. Cir. 2010)

---

willingness and ability to abide by regulations governing the use, handling, and protection of classified information.").

(emphasis added) (citation omitted).  In short, so long as the false statement involves a matter "[]related to the subject of the agency's or department's responsibility," and has the potential to influence the agency, "no more is needed" to establish materiality.  *United States v. Hansen*, 772 F.2d 940, 950 (D.C. Cir. 1985).[4]

DOJ misconstrues that broad standard by arguing that a statement during an FBI interview must be "'material' *to the underlying investigation*," Mot. 12 (emphasis added), thus implicitly suggesting that there must be such an underlying investigation to justify the interview. But there is no support for such a requirement in either the statutory text or applicable case law. The statute does not require the pendency of any investigation, much less one to which the statement is material.  Indeed, in an opinion authored by then-Judge Scalia, the D.C. Circuit specifically rejected the argument that statements were not material because "no federal agency or department 'was conducting any inquiry or investigation, or making any determination whatever, that would have been affected in the slightest'" by the allegedly false statements. *Hansen*, 772 F.2d at 949.  As then-Judge Scalia explained, "[t]his argument misunderstands the nature of the materiality requirement: A lie influencing the possibility that an investigation might commence stands in no better posture under § 1001 than a lie distorting an investigation already in progress."  *Id.*

2.      DOJ Misstates the Predication Requirement

DOJ also misconstrues the FBI's "predication" requirement.  As an initial matter, predication does not require suspicion of criminal activity.  The FBI often engages in intelligence

---

[4] As DOJ asserted in a brief to the Second Circuit three days before filing its motion to dismiss here, "[c]ourts have broadly construed materiality."  Brief and Appendix for the United States at 28, *United States v. Brettschneider*, No. 19-2423 (2d Cir. May 4, 2020), ECF No. 128.  "[I]t is not necessary for an allegedly false statement to have any ill effect at all, so long as it is *capable* of having such an effect."  *Id.* (emphasis added).

activities with no criminal component at all.  For instance, a predicated investigation may seek to "obtain foreign intelligence that is responsive to a foreign intelligence requirement."  FBI Guidelines at 21.  Such an investigation may also occur when "[a]n individual, group, organization, entity, information, property, or activity is or may be a target of attack, victimization, acquisition, infiltration, or recruitment in connection with . . . a threat to the national security and the investigation may obtain information that would help to protect against such . . . threat."  *Id.*

Nor is the FBI precluded from conducting interviews without a "predicated" investigation.  Under DOJ guidelines, no predication is required for the FBI to interview a witness to gather information.  Rather, the Bureau is authorized to interview individuals in connection with "assessments," which require only a lawful purpose "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence."  FBI Guidelines at 19.

In any event, whether an FBI investigation was "predicated" is irrelevant to the materiality determination under Section 1001.  As the DOJ Inspector General has explained, "[t]he predication requirement is not a legal requirement but rather a prudential one imposed by Department and FBI policy."  *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*, Office of the Inspector General, U.S Department of Justice at 350 (December 2019) ("Inspector General Report"), *available at* https://www.justice.gov/ storage/120919-examination.pdf.  In fact, the Supreme Court has held that the FBI may lawfully open a *criminal* investigation even in the absence of predication.  *See United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (a grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not"); *United States v. R.*

*Enterprises*, 498 U.S. 292, 297 (1991) (same).  As a court in this District recently explained—rejecting an argument, like the government's argument here, that the FBI cannot inquire into matters unconnected to an open investigation—"it is axiomatic that the FBI is not precluded from following leads and, if warranted, opening a new investigation based on those leads when they uncover information in the course of a different investigation."  *Kelley v. Fed. Bureau of Investigation*, 67 F. Supp. 3d 240, 286 n.35 (D.D.C. 2014).

>   3.   Mr. Flynn's False Statements Had the Potential to Influence the FBI's Intelligence Activities

In light of the broad legal standard for materiality, the absence of any requirement for a predicated criminal investigation, and the FBI's intelligence role, DOJ is mistaken to claim there was no valid reason for the FBI to interview Mr. Flynn.  Mot. 2.

As an initial matter, both the specific investigation into Mr. Flynn's conduct (which remained open at the time of the interview) and the ongoing umbrella counterintelligence investigation into possible links between the Trump Campaign and Russian officials provided a sufficient basis for the interview.[5]  Those arguments have been addressed elsewhere.

From an intelligence perspective, however, and for the reasons set forth below, the FBI was fully authorized, and it would have been standard practice, to interview Mr. Flynn based exclusively on the Bureau's awareness of the transcripts of his December communications with Ambassador Kislyak, regardless of the pendency of those prior investigations.  In fact, it would

---

[5] As DOJ previously stated, Mr. Flynn's statements were "absolutely material" because they "went to the heart" of the FBI's "counterintelligence investigation into whether individuals associated with the campaign of then-candidate Donald J. Trump were coordinating with the Russian government in its activities to interfere with the 2016 presidential election."  ECF No. 132, at 10.

have been a dereliction of duty had the FBI *failed* to interview him in light of what the Bureau had learned about those calls.

> (a)    Mr. Flynn's Statements Regarding His Communications with the Russian Ambassador Were Material to U.S. Intelligence *Regardless of Their Specific Subject Matter.*

*First*, *any* communication between a U.S. citizen and a member of the Russian intelligence community such as Ambassador Kislyak is a potential source of valuable information for the U.S. intelligence community.  Russia remains among the highest priorities for U.S. intelligence collection, and its activities pose an important threat to U.S. interests.  *E.g.*, *National Counterintelligence Strategy of the United States of America 2020-2022*, National Counterintelligence and Security Center at 1 (Jan. 7, 2020) ("Russia remains a significant intelligence threat to United States interests . . . ."), *available at* https://www.dni.gov/files/ NCSC/documents/features/20200205-National_CI_Strategy_2020_2022.pdf.  Given the priority of that threat, the FBI routinely conducts interviews relating to communications that U.S. citizens have with highly placed Russian officials, and it would have been fully justified in asking Mr. Flynn a variety of questions arising from the communications at issue here—including questions about the nature of Mr. Flynn's relationship with Ambassador Kislyak, Ambassador Kislyak's attitude towards Mr. Flynn and towards the United States in general (as reflected by statements made during their conversations), whether the two men had ever engaged in other communications, and whether Mr. Flynn believed that he might be able to learn additional information from Ambassador Kislyak about Russian intelligence in light of whatever subjects had been discussed.

Of course, Mr. Flynn was not just any U.S. citizen at the time the communications in questions occurred.  The fact that Mr. Flynn was set to become the National Security Advisor ("NSA") a month later and had spent his entire career in the military and intelligence

communities would have rendered his answers to questions like those set forth above of even greater significance.

In short, the FBI could properly have interviewed Mr. Flynn about his communications with Ambassador Kislyak *regardless of the specific subject matter of those communications*, and false statements about what the two men had talked about would have been material to the FBI's assessment of the resulting intelligence and potential further steps.

> (b)   Mr. Flynn's Statements Had the Potential to Influence U.S. Assessment of Russian Actions and Intentions in Light of the Subject Matter of the Calls

*Second*, the fact that Mr. Flynn discussed with Ambassador Kislyak the U.S. sanctions imposed on Russia would, standing alone, have justified an FBI interview with respect to the communications, regardless of DOJ's assertion that the calls were "entirely appropriate on their face." Mot. 13-14.  The FBI could have learned from Mr. Flynn the reason for the discussion, his understanding and subjective impression of the statements made by the Russian ambassador about the sanctions, Mr. Flynn's own intention and meaning with respect to statements he made about the sanctions, and whether there had been any other communications with the ambassador or other Russian agents bearing on the same subject.  Such information cannot be gleaned from recordings or transcripts, and FBI agents routinely interview participants in intercepted telephone calls after the fact to better understand the meaning and nuance of the conversations, their context, and the witness's perceptions of the subjective intent of the speakers.

Answers to questions about the communications would have provided important intelligence regarding Russia's understanding of its relationship with the United States, its contemplated reaction to the sanctions (including whether it intended to retaliate against the United States and, if so, how), and its views of the Obama administration as well as of the incoming Trump administration.  Truthful responses also would have shed further light on the

relationship between Mr. Flynn and Ambassador Kislyak, including whether Mr. Flynn might become a valuable source of intelligence on Russian governmental action, whether the Russians viewed Mr. Flynn as a vulnerable source of intelligence about the intentions of the Trump administration, and whether additional interception or investigation in connection with their relationship was warranted.

      (c)      Mr. Flynn's Statements Had the Potential to Influence U.S. Assessment of Potential Risks Arising from Mr. Flynn's Connections to Russia

*Third*, statements by Mr. Flynn regarding his exchanges with the Russian ambassador were material to the FBI's assessment not only of Russian actions but also of the conduct of Mr. Flynn himself and whether he was being manipulated, knowingly or unknowingly, by his Russian interlocutor.  DOJ is incorrect when it states that "[s]uch calls are not uncommon when [incoming] public officials preparing for their oncoming duties seek to begin and build relationships with soon-to-be counterparts." Mot. 14.  On the contrary, it is extraordinarily *un*common—and raises important security concerns—for an incoming high-level government official to speak with the ambassador or other intelligence official of a foreign power about important policy issues in the absence of close coordination with the current administration. That is particularly true when the incoming official is to be the NSA and the foreign power in question is a hostile one.  As a matter of standard intelligence practice, any such conversation would be undertaken in careful cooperation with current State Department officials, thus allowing for full collaboration on the strategic approach to the communication and ensuring that the U.S. government obtains any significant information that emerges.  The fact that the designated NSA of the United States engaged in a conversation about sanctions policy with the Russian ambassador in the absence of any coordination with or disclosure to the current

administration and the intelligence community raises urgent intelligence red flags and warrants

an FBI interview to understand the substance of and reasons for the discussion.

That conclusion is only reinforced by the statements actually made by Mr. Flynn to the

Russian ambassador.  Recently declassified transcripts of the calls indicate that Mr. Flynn

requested of the ambassador that Russia not retaliate against the United States for the sanctions

imposed or do so on a "reciprocal" basis.  Transcripts at PDF pp. 8, 9, 27, *available at* https://

int.nyt.com/data/documenthelper/6976-flynn-kislyak-transcripts/cd9e96e708a9b0c8ba58/

optimized/full.pdf#page=1.  Mr. Flynn further requested that Russia "not allow [the Obama]

administration to box us in right now," thereby indicating the intention of the incoming NSA to

work in tandem with Russia against the current U.S. administration.  *Id.* at 27.  He also assured

the ambassador that, when the new administration took office, the countries could "then have a

better conversation about where, where we're gonna go . . . regarding our relationship."  *Id.* at 9.

Such statements by Mr. Flynn posed the self-evident risk of undermining the policy of

the then-sitting government of the United States to punish Russian interference in the 2016

election.[6]  That is true regardless of whether Mr. Flynn's conduct could successfully be

prosecuted criminally (for example, under the Logan Act, 18 U.S.C. § 953).  *See* Mot. 15.

Further, the FBI's concerns arising from such a problematic discussion would have been

exacerbated by the information it already had collected regarding Mr. Flynn's pre-existing ties to

---

[6] Then-Director of National Intelligence James Clapper later testified that in his view Mr. Flynn's conversation "essentially neuter[ed] . . . the sanctions that had just been imposed." *Interview of James Clapper*, Permanent Select Committee on Intelligence, U.S. House of Representatives at 53 (July 17, 2017), *available at* https://intelligence.house.gov/uploadedfiles/jc7.pdf.  As Mr. Flynn later acknowledged to the Special Counsel's office, he did not document his discussions regarding sanctions because he recognized that the discussions "could be perceived as getting in the way of the Obama Administration's foreign policy."  Special Counsel Robert S. Mueller, III, *Report on the Investigation into Russian Interference in the 2016 Presidential Election*, Vol. I at 172 (March 2019).

various Russian government entities, his recent travels to Russia, and his receipt of payments from a Russian state-controlled media outlet—all factors that, according to the Inspector General, provided sufficient predication to open the original counterintelligence investigation of Mr. Flynn.  Inspector General Report at 352.

Under those circumstances, the FBI interview of Mr. Flynn was essential—and his failure to admit to the agents the content of his communications was crucial to a determination of whether he had been compromised by the Russians, was being manipulated by them, or was actively conspiring with them.

        (d)        Mr. Flynn's Statements Were Material to Whether Mr. Flynn was Vulnerable to Blackmail by the Russians

*Fourth*, the FBI interview was warranted to understand whether Mr. Flynn had become a security risk because he was potentially subject to blackmail by the Russians.  In mid-January 2017, incoming senior administration officials—including the soon-to-be Vice President, Deputy National Security Advisor, White House Press Secretary, and Chief of Staff—publicly and inaccurately denied that Mr. Flynn had discussed the issue of sanctions with the Russian ambassador.  Vice President-elect Pence specifically stated in a public news broadcast that he had spoken with Mr. Flynn and that Mr. Flynn never discussed the issue of sanctions.  *Face the Nation Transcript January 15, 2017: Pence, Manchin, Gingrich*, CBSNews.com (Jan. 15, 2017), https://www.cbsnews.com/news/face-the-nation-transcript-january-15-2017-pence-manchin-gingrich/.  But the FBI knew that Russia knew that Mr. Flynn *had* discussed sanctions with the ambassador, and that Russian officials could have inferred from Mr. Pence's statement that Mr. Flynn had lied to Mr. Pence about the calls.  Awareness by a foreign power of falsehoods told by an American official to other officials or to the public constitutes a highly troubling red flag within the intelligence community because it creates a significant risk of blackmail:  the foreign

government might seek to use the threat of revealing the falsehood as leverage against the official to induce action against U.S. interests.

The FBI would have been aware of and particularly concerned about that threat here in light of the public statements by the Vice President-elect and others regarding assurances given by Mr. Flynn that the Bureau knew to be untrue.  The validity of such concerns would later be confirmed by the fact that Mr. Flynn was in fact forced to resign by the President once the administration claimed to have learned of the falsehood.  *See* Jacob Pramuk, *Trump: I fired Flynn because of what he told Pence*, CNBC (Feb. 16, 2017), https://www.cnbc.com/2017/02/16/trump-no-i-didnt-tell-flynn-to-talk-about-sanctions-with-russia.html.[7]

The threat that the Russians might blackmail Mr. Flynn made it essential that the FBI question him about his communications with the Russian ambassador regarding the U.S. sanctions, the subject about which he had lied to the Vice President-elect.  As incoming NSA, Mr. Flynn was on the verge of accessing the country's most sensitive intelligence, including, among other things, the names of human intelligence sources in Russia.  The risk that he might

---

[7] Contrary to DOJ's argument that officials were not concerned about this issue, Mot. 16, the situation alarmed DOJ leadership.  Then-acting Attorney General Sally Yates testified that the Vice President's and other officials' denials "really heightened everyone's concern, because at that point we thought not only did this increase the likelihood of this information being able to be used to compromise General Flynn, it also appeared that General Flynn was misleading people in the Trump administration."  *Interview of Sally Yates*, Permanent Select Committee on Intelligence, U.S. House of Representatives at 56 (Nov. 3, 2017), *available at* https://intelligence.house.gov/uploadedfiles/sy57.pdf.  Mary McCord, the former acting Assistant Attorney General for National Security, expressed similar concerns.  *See Interview of Mary McCord*, Permanent Select Committee on Intelligence, U.S. House of Representatives at 41-46 (Nov. 1, 2017), *available at* https://www.dni.gov/files/HPSCI_Transcripts/2020-05-04-Mary_McCord-MTR_Redacted.pdf.  As Ms. McCord later summarized:  "Mr. Flynn was set to become the national security adviser, and it was untenable that Russia—which the intelligence community had just assessed had sought to interfere in the U.S. presidential election—might have leverage over him."  Mary McCord, *Bill Barr Twisted My Words in Dropping the Flynn Case. Here's the Truth*, New York Times (May 10, 2020), https://www.nytimes.com/2020/05/10/opinion/bill-barr-michael-flynn.html.

be exposed to Russian leverage would have been intolerable.  DOJ's cavalier dismissal of

whether Mr. Flynn was "entirely candid with the future Vice President or Press Secretary," Mot.

16, is extraordinary and wholly inconsistent with fundamental U.S. intelligence and security

concerns.[8]

Some commentators, writing in support of Mr. Flynn, have suggested that there was no

reason to assume that Mr. Flynn had lied to the Vice President or other officials, and that it was

entirely possible that those officials had lied in their public statements about what Mr. Flynn told

them, presumably for political purposes.  Eli Lake, *The Railroading of Michael Flynn*,

Commentary (June 2020), https://www.commentarymagazine.com/articles/eli-lake/michael-

flynn-gets-railroaded-by-the-fbi/.  That argument is a red herring.  It was incumbent upon the

FBI to determine *if* Mr. Flynn was potentially subject to Russian pressure, and interviewing him

was a logical, permissible, and in fact necessary investigative step.

     (e)    Mr. Flynn's Statements Were Material to the FBI's Responsibility
             for Background Investigations.

*Fifth*, the FBI's concurrent responsibility to conduct background investigations and

ensure the continuing fitness of government officials to handle the nation's sensitive information

provides another basis for interviewing Mr. Flynn regarding his conversations with the Russian

ambassador and his falsehoods to the incoming Vice President.  That responsibility also makes

clear that Mr. Flynn's misstatements to the interviewing agents about the substance of his

---

[8] DOJ's argument also misses the point.  DOJ asserts that any such failure to be "entirely candid" did not "create a predicate for believing [Mr. Flynn] had committed a crime or was beholden to a foreign power."  Mot. 16.  But the interview of Mr. Flynn was appropriate and his statements were material regardless of whether he had engaged in criminal conduct or whether he then believed himself to be "beholden" to Russia.  The intelligence concern was that his falsehood could subject him to blackmail at any point the Russians chose to make use of their knowledge of that falsehood.

discussions were material to the decision whether he should maintain his clearance and continued access to confidential security information.

Reports further indicate that Mr. Flynn was being vetted for a new level of security clearance at the time of his FBI interview and that the clearance had not yet been granted.  *E.g.*, Ken Dilanian & Courtney Kube, *Flynn Never Told DIA That Russians Paid Him, Say Officials*, NBC News (May 8, 2017), https://www.nbcnews.com/news/us-news/flynn-never-told-dia-russians-paid-him-say-officials-n756421.  The FBI interview was appropriate in light of, and his misstatements were material to, any such additional clearance as well.  Once again, that is true regardless of whether Mr. Flynn had engaged in criminal conduct or was ultimately found to constitute a security risk.  It suffices to establish materiality that truthful answers to the FBI might have raised concerns or led to additional inquiry.  *E.g.*, *United States v. Stadd*, 636 F.3d 630, 639 (D.C. Cir. 2011) (false statements during a background investigation were material because "if [the defendant] had accurately reported the [statement], it would have raised red flags that would have led [the agency] to inquire further"); *United States v. Barr*, 963 F.2d 641, 644-647 (3d Cir. 1992) (same, based on false statements regarding drug use).

For all of those reasons, from the perspective of *amici*, there is no question that the FBI was fully justified in interviewing Mr. Flynn and that his misstatements were material to decisions of the Bureau and of the intelligence community.

## C.     The Position Taken in DOJ's Motion to Dismiss Poses a Grave Threat to the Rule of Law

The position taken in the DOJ motion also runs directly counter to fundamental principles of the rule of law that underlie democracy in the United States and that are essential to its intelligence and national security interests.

The rule of law "is a principle under which all persons, institutions and entities are accountable to laws that are:  Publicly promulgated, Equally enforced, Independently adjudicated And consistent with international human rights principles."  *Overview—Rule of Law*, U.S. Courts website, https://www.uscourts.gov/educational-resources/educational-activities/overview-rule-law.  The principle includes the concept of separation of powers central to our constitutional system, in which the judiciary acts as a check on the executive and legislative branches and has the exclusive power to adjudicate cases.  It also includes the equal application of laws to every individual, regardless of status or affiliation—including to executive branch officials.  *See United States v. Lee*, 106 U.S. 196, 220 (1882) ("No man in this country is so high that he is above the law.  No officer of the law may set that law at defiance with impunity.  All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it.").  Those core precepts distinguish our national political structure from that of autocracies in which judges are subservient to executive authority and are required to follow directives in deciding specific cases, and in which chiefs of state and their associates enjoy special privileges such as immunity from the dictates of laws to which others are subject.

The principles that underlie the rule of law also play an important role in guarding the security of the nation and are key to our intelligence interests in several ways.  First, they ensure that high-level officials, including members of the administration, are subject to laws that protect the interests of the United States.  Key among those interests is the ability of the FBI and other intelligence agencies to conduct intelligence investigations on the basis that witnesses interviewed are required to tell the truth and are subject to criminal penalties if they do not.  Without that assurance, the intelligence community could not fulfill its duties to investigate threats, and the security of the nation would be placed at risk.  Because administration officials

have access to the United States' most sensitive information and because they are often targeted by foreign powers, equal application of the laws to the Executive Branch, including the provisions of Section 1001, is essential to U.S. intelligence and security interests.

Second, the U.S. intelligence community relies extensively on information provided by allies who in turn look to the United States for international leadership, integrity, and protection of the rule of law.  Cong. Research Serv., R45720, United States Foreign Intelligence Relationships at Summary (May 15, 2019) ("From its inception, the United States Intelligence Community . . . has relied on close relations with foreign partners.  These relationships often reflect mutual security interests and the trust each side has of the other's credibility and professionalism."), *available at* https://crsreports.congress.gov/product/pdf/download/R/ R45720/R45720.pdf/.  To the extent the United States is perceived as drifting from the rule of law, such as by exempting high-level officials or associates of the President of the United States from sanctions that apply to others such that the equal application of the laws is vitiated, the country risks losing its leadership role, its moral high ground, and its ability to rely on the cooperation of its allies.  Such a loss would gravely diminish the intelligence capacity of the country and expose the United States to security risks that would otherwise have been detected and thwarted through the assistance of like-minded nations, themselves dedicated to the principle of the rule of law.

Finally, the men and women of our national security, intelligence, and diplomatic communities are among the most dedicated, hard-working, and capable in the world.  They serve their country selflessly, often at great personal sacrifice, and they do so because of their firm belief in the values for which America stands.  Chief among those is our nation's commitment to the rule of law.  Acceptance of DOJ's arguments, which fly in the face of long-standing

intelligence practices, the proper role of intelligence agencies, and essential requirements of the rule of law, will demoralize and disincentivize the national security, intelligence, and diplomatic communities in ways that are hard to measure.  Whatever the other consequences may be, the main casualties will be the confidence of those individuals and the framework they have built through years of painstaking effort to protect the security interests of the United States.

DATED:  June 10, 2020                MUNGER, TOLLES & OLSON LLP
                                     JEROME C. ROTH
                                     DAVID H. FRY
                                     ELAINE J. GOLDENBERG
                                     ANDREW CATH RUBENSTEIN
                                     BRENDAN B. GANTS


                               By:   */s/ Jerome C. Roth*
                                     JEROME C. ROTH


                               By:   */s/ Elaine J. Goldenberg*
                                     ELAINE J. GOLDENBERG

                               *Attorneys for Amici Curiae The Steady State and Former National Security Officials*

## APPENDIX OF *AMICI CURIAE*

Members of *amicus curiae* The Steady State include the following former U.S. national security officials:

1.   **Eric Allison**, Former CIA Senior Intelligence Service

2.   **Marisa  Barthel**, Retired Intelligence Officer

3.   **Brigham Bechtel**, Former Intelligence Officer

4.   **Rand  Beers**, Former Deputy Homeland Security Advisor

5.   **Jeffrey L. Bleich**, U.S. Ambassador to Australia (2009-2013); Member, Senior Advisory Group, Director of National Intelligence (2009-2013)

6.   **Steven A. Browning**, U.S. Ambassador (Ret.)

7.   **Ned Foley Carmody**, Operations Officer

8.   **Edmund R. Carter**, CW5 US Army (Ret.)

9.   **Christy Jobe Carter**, Retired CIA Officer

10.   **Steven A. Cash**, Former CIA Intelligence Officer; Former Chief Counsel to Senator Diane Feinstein

11.   **Judith B. Cefkin**, U.S. Ambassador (Ret.)

12.   **Wendy Chamberlin**, U.S. Ambassador (Ret.)

13.   **Daniel Crocker**, Former Deputy Assistant Secretary for Europe and Eurasia, U.S. Department of Commerce

14.   **J. Michael Daniel**, Former Special Assistant to the President and Cybersecurity Coordinator

15.   **Richard Danzig**, 71st Secretary of the Navy

16.   **Rena Epstein**, Former Assistant Deputy Director for Strategic Planning, Office of the Director of National Intelligence

17.    **Tony Fainberg**, Senior Executive Service, National Security Professional (Ret.)

18.    **Gerald M. Feierstein**, U.S. Ambassador (Ret.); Senior Vice President, Middle East Institute

19.    **Mark Fitzpatrick**, Former Deputy Assistant Secretary of State

20.    **Doug Frantz**, Former Assistant Secretary of State

21.    **Melvin Gamble**, Retired CIA Chief/Africa Division

22.    **Alan Greenfield**, Former Foreign Service Officer

23.    **David M. Hansell**, Former Director for Transportation Security Policy, National Security Council

24.    **Donald Hays**, U.S. Ambassador (Ret.)

25.    **Gail Helt**, Former Intelligence Officer, CIA

26.    **Margaret Helen Henoch**, Senior Intelligence Service

27.    **Vicki Huddleston**, U.S. Ambassador (Ret.), Deputy Assistant Secretary of State and Defense for Africa

28.    **Charles G. Ikins**, Colonel, U.S. Marine Corps. (Ret.)

29.    **Jessica John**, Former Intelligence Officer, CIA

30.    **Laura E. Kennedy**, U.S. Ambassador (Ret.)

31.    **Susan Koch**, Senior Executive Service

32.    **John M. Koenig**, U.S. Ambassador (Ret.)

33.    **Richard Russell La Roche**, Foreign Service Officer (Ret.)

34.    **James C. Lawler**, National Security Consultant and Author; Senior Intelligence Service

35.    **William R. Lenderking**, Foreign Service Officer ret Minister-Counselor

36.  **J. William Leonard**, Former Deputy Assistant Secretary of Defense (Security and Information Operations)

37.  **Andy Liepman**, Former Deputy Director, National Counterterrorism Center, Office of the Director of National Intelligence

38.  **James F. Mcilmail**, Senior Executive Service, National Security Professional

39.  **Christopher K. Mellon**, Former Deputy Assistant Secretary of Defense for Intelligence

40.  **James D. Melville, Jr.**, U.S. Ambassador (Ret.)

41.  **Bowman Miller**, Department of State/Bureau of Intelligence and Research, Retired Director of Analysis for Europe

42.  **Scott Nathan**, Former Associate Director, Office of Management and Budget

43.  **Gary R. Nelson**, Former Deputy Assistant Secretary of Defense for Requirements, Resources and Analysis

44.  **John Norris**, Director of Central Intelligence's Rep. to the Secretary of Defense

45.  **Geoff Odlum**, Retired Senior Foreign Service Officer

46.  **Kristine Pelz**, Retired Foreign Service Officer

47.  **June Carter Perry**, U.S. Ambassador (Ret.)

48.  **Laurence M. Pfeiffer**, Former CIA Chief of Staff and Former Senior Director, White House Situation Room

49.  **Randal Phillips**, Senior Intelligence Service

50.  **Robert Pirie**, Former Assistant Secretary of Defense

51.  **Erik Prentice**, Senior Bio Advisor, National Counterproliferation Center

52.  **Christopher Richardson**, Former Foreign Service Officer

53.   **Thomas B. Robertson**, U.S. Ambassador (Ret.)

54.   **Christine Sarkes**, Former CIA Near East Intelligence Analyst; TSA International Program Manager

55.   **John Sipher**, Former CIA Senior Service

56.   **Mary Anne Sotos**, CIA Senior Intelligence Officer, Retired

57.   **Karen Clark Stanton**, U.S. Ambassador (Ret.)

58.   **Alexander Vershbow**, U.S. Ambassador (Ret.); Distinguished Fellow, The Atlantic Council of the United States

59.   **Jon A. Wiant**, Senior Executive Service (Ret.)

60.   **Jonathan M. Winer**, Former U.S. Special Envoy for Libya; Former U.S. Deputy Assistant Secretary of State for International Law Enforcement

61.   **Douglas H. Wise**, CIA Senior Intelligence Service (Ret.); Former Deputy Director Defense Intelligence Agency

62.   **David T. Wolfson**, Senior Foreign Service Officer (Ret.)

63.   **Johnny Young**, U.S. Ambassador (Ret.)

64.   **Dr. Peter D. Zimmerman**, Former Chief Scientist, Senate Foreign Relations Committee

Additional *amici curiae* former U.S. national security officials are:

65.   **Amb. William C. Eacho**, U.S. Ambassador to Austria (2009-2013); Member, Senior Advisory Group, Director of National Intelligence (2013-2016)

66.   **John Mullen**, Former Assistant Director, CIA; Former Associate Executive Assistant Director for National Security, FBI

67.   **Matthew G. Olsen**, Former Director, National Counterterrorism Center