# EXHIBIT 1

**REDACTED FOR PUBLIC RELEASE**



# Office of the Inspector General
## U.S. Department of Justice

**OVERSIGHT ★ INTEGRITY ★ GUIDANCE**



# Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation

Oversight and Review Division 20-012        December 2019 (Revised)

# CHAPTER THREE
# THE OPENING OF CROSSFIRE HURRICANE, STAFFING, AND THE EARLY STAGES OF THE INVESTIGATION

On July 31, 2016, the FBI opened a counterintelligence investigation known as "Crossfire Hurricane." In this chapter, we provide an overview of the opening and initial steps of the Crossfire Hurricane investigation and its related cases. We first summarize the intelligence available to the FBI in the summer of 2016 regarding the Russian government's efforts to interfere with the 2016 U.S. elections. We then describe the events that led to the opening of the Crossfire Hurricane umbrella investigation and the related counterintelligence investigations of George Papadopoulos, Carter Page, Paul Manafort, and Michael Flynn. We also describe the structure and oversight of these investigations, including the FBI's staffing of the cases and the involvement of senior FBI and Department officials. Finally, we describe the early investigative steps taken in furtherance of the investigations.

## I.     Intelligence Community Awareness of Attempted Russian Interference in the 2016 U.S. Elections

At the time the Crossfire Hurricane investigation was opened in July 2016, the U.S. Intelligence Community (USIC), which includes the FBI, was aware of Russian efforts to interfere with the 2016 U.S. elections. The Russian efforts included cyber intrusions into various political organizations, including the Democratic National Committee (DNC) and Democratic Congressional Campaign Committee (DCCC). Throughout spring and early summer 2016, the FBI became aware of specific cyber intrusions for which the Russian government was responsible, through ongoing investigations into Russian hacking operations conducted by the FBI's Cyber Division and the FBI's Counterintelligence Division (CD).

In March and May 2016, FBI field offices identified a spear phishing campaign by the Russian military intelligence agency, known as the General Staff Intelligence Directorate (GRU), targeting email addresses associated with the DNC and the Hillary Clinton campaign, as well as efforts to place malware on DNC and DCCC computer networks. In June and July 2016, stolen materials were released online through the fictitious personas "Guccifer 2.0" and "DCLeaks." In addition, in late July 2016, WikiLeaks released emails obtained from DNC servers as part of its "Hillary Leak Series." By August 2016, the USIC assessed that in the weeks leading up to the 2016 U.S. elections, Russia was considering further intelligence operations to impact or disrupt the elections.

In addition to the Russian infiltration of DNC and DCCC computer systems, between March and August 2016, the FBI became aware of numerous attempts to hack into state election systems. These included confirmed access into elements of multiple state or local electoral boards using tactics, techniques, and procedures

associated with Russian state-sponsored actors.[163]  The FBI learned that Russian efforts also included cyber-enabled scanning and probing of election related infrastructure in several states.

It was in this context that the FBI received information on July 28, 2016, about a conversation between Papadopoulos and an official of a Friendly Foreign Government (FFG) in May 2016 during which Papadopoulos "suggested the Trump team had received some kind of suggestion" from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to candidate Clinton and President Obama.  As described below, the FBI opened the Crossfire Hurricane investigation 3 days after receiving this information.

## II.   The Friendly Foreign Government Information and the FBI's Decision to Open Crossfire Hurricane and Four Related Counterintelligence Investigations

On July 31, 2016, the FBI opened the Crossfire Hurricane counterintelligence investigation to determine whether individuals associated with the Donald J. Trump for President Campaign were coordinating or cooperating, wittingly or unwittingly, with the Russian government to influence or interfere with the 2016 U.S. elections. According to the opening Electronic Communication (EC), the investigation was predicated on intelligence from an FFG.  In this section, we describe the receipt of the information from the FFG and the decisions to open the Crossfire Hurricane

---

[163]  Beginning in January 2017 and continuing into 2019, several U.S. government agencies, as well as senior intelligence officials, reported on Russia's efforts to interfere with the 2016 U.S. elections.  For example, the Intelligence Community Assessment (ICA) titled "Assessing Russian Activities and Intentions in Recent U.S. Elections," published on January 6, 2017, concluded that Russian President Vladimir Putin and the Russian government conducted an influence campaign followed by a Russian messaging strategy that blended covert intelligence operations, such as cyber activity, with overt efforts in order to undermine public faith in the U.S. democratic process, denigrate then candidate Clinton, and harm Clinton's electability and potential presidency.  Additionally, in June 2017, during a Senate Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Elections, USIC leadership concurred with the ICA and acknowledged that the Russian government was responsible for compromises of and leaks from political figures and institutions, among other activities, as part of its efforts to influence and interfere in U.S. elections.  Similarly, the Senate Select Committee on Intelligence in 2019 and the House Permanent Select Committee on Intelligence in 2018 found, in part, that the Russian government historically has attempted to interfere in U.S. elections and attempted to interfere in the 2016 U.S. elections through attacks on state voter registration databases, cyber operations targeting governments and businesses using tactics such as spear phishing, hacking operations to include the DNC network, and social media campaigns.  U.S. House Permanent Select Committee on Intelligence, *Report on Russian Active Measures*, 115th Cong., 2d sess., 2018, 114-130.  U.S. Senate Select Committee on Intelligence, *Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 1: Russian Efforts Against Election Infrastructure with Additional Views*, 116th Cong., 1st sess., 2019, 1-10.  Further, Special Counsel Robert S. Mueller III concluded that the Russian government interfered with the 2016 U.S. elections through a social media campaign that favored then candidate Trump and disparaged then candidate Clinton, and through cyber intrusion operations against entities and individuals working on the Clinton Campaign.  *See The Special Counsel's Report*, Vol. I at 1, 4-7.

counterintelligence investigation and the related investigations of Papadopoulos, Page, Manafort, and Flynn.

### A.   Receipt of Information from the Friendly Foreign Government and the Opening of Crossfire Hurricane

By March 2016, Papadopoulos, Page, and Flynn were among several individuals serving as foreign policy advisors for the Trump campaign.  Manafort joined the Trump campaign in March 2016 as the campaign convention manager.  In the weeks that followed, Papadopoulos met with officials of an FFG in a European city that had arranged several meetings in May 2016 to engage with members of the Trump campaign.  During one of these meetings, Papadopoulos reportedly "suggested" to an FFG official that the Trump campaign "received some kind of a suggestion from Russia" that it could assist the campaign by anonymously releasing derogatory information about presidential candidate Hillary Clinton.[164]  However, the FFG did not provide information about Papadopoulos's statements to the U.S. government at that time.

On July 26, 2016, 4 days after WikiLeaks publicly released hacked emails from the DNC, the FFG official spoke with a U.S. government (USG) official in the European city about an "urgent matter" that required an in-person meeting.  At the meeting, the FFG official informed the USG official of the meeting with Papadopoulos.  The FFG official also provided ▮▮▮▮▮▮▮▮▮▮▮▮ information from ▮▮▮▮ FFG officials ▮▮▮▮ following the May 2016 meeting (hereinafter referred to as the FFG information).  ▮▮▮▮▮▮ stated, in part, that Papadopoulos

---

[164]  During October 25, 2018 testimony before the House Judiciary and House Committee on Government Reform and Oversight, Papadopoulos stated that the source of the information he shared with the FFG official was a professor from London, Joseph Mifsud.  Papadopoulos testified that Mifsud provided him with information about the Russians possessing "dirt" on Hillary Clinton.  Papadopoulos raised the possibility during his Congressional testimony that Mifsud might have been "working with the FBI and this was some sort of operation" to entrap Papadopoulos.  As discussed in Chapter Ten of this report, the OIG searched the FBI's database of Confidential Human Sources (CHS), and did not find any records indicating that Mifsud was an FBI CHS, or that Mifsud's discussions with Papadopoulos were part of any FBI operation.  In Chapter Ten, we also note that the FBI requested information ▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮

We refer to Joseph Mifsud by name in this report because the Department publicly revealed Mifsud's identity in this report.  According to The Special Counsel's Report, Papadopoulos first met Mifsud in March 2016, after Papadopoulos had already learned that he would be serving as a foreign policy advisor for the Trump campaign.  According to The Special Counsel's Report, Mifsud only showed interest in Papadopoulos after learning of Papadopoulos's role in the campaign, and told Papadopoulos about the Russians possessing "dirt" on then candidate Clinton in late April 2016.  The Special Counsel found that Papadopoulos lied to the FBI about the timing of his discussions with Mifsud, as well as the nature and extent of his communications with Mifsud.  The Special Counsel charged Papadopoulos under Title 18 U.S.C. § 1001 with making false statements.  Papadopoulos pled guilty and was sentenced to 14 days in prison.  *See The Special Counsel's Report*, Vol. 1, at 192-94.

suggested the Trump team had received some kind of suggestion from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to Mrs. Clinton (and President Obama). It was unclear whether he or the Russians were referring to material acquired publicly of [sic] through other means. It was also unclear how Mr. Trump's team reacted to the offer. We note the Trump team's reaction could, in the end, have little bearing of what Russia decides to do, with or without Mr. Trump's cooperation.

On July 27, 2016, the USG official called the FBI's Legal Attaché (Legat) and ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ in the European city to her office and provided them with the FFG information.[165] The Legat told us he was not provided any other information about the meetings between the FFG and Papadopoulos.[166] The Legat also told us that he did not know under what FBI case number the FFG information should be documented and transmitted. At the recommendation of the European city Assistant Legal Attaché (ALAT) for Counterintelligence, the Legat contacted a former ALAT who at the time was an Assistant Special Agent in Charge (ASAC) in the FBI's Philadelphia Field Office. The ASAC told the Legat that he believed the FFG information was related to the hack of DNC emails and identified a case number for that investigation for the Legat to use to transmit the information. The following day, on July 28, 2016, the Legat sent an EC documenting the FFG information to the Philadelphia Field Office ASAC. The same day, the information in the EC was emailed to the Section Chief of the Cyber Counterintelligence Coordination Section at FBI Headquarters.

From July 28 to July 31, officials at FBI Headquarters discussed the FFG information and whether it warranted opening a counterintelligence investigation. The Assistant Director (AD) for CD, E.W. "Bill" Priestap, was a central figure in these discussions. According to Priestap, he discussed the matter with then Section Chief of CD's Counterespionage Section Peter Strzok, as well as the Section Chief of CD's Counterintelligence Analysis Section I (Intel Section Chief); and with representatives of the FBI's Office of the General Counsel (OGC), including Deputy General Counsel Trisha Anderson and a unit chief (OGC Unit Chief) in OGC's National Security and Cyber Law Branch (NSCLB). Priestap told us that he also discussed the matter with either then Deputy Director (DD) Andrew McCabe or then Executive Assistant Director (EAD) Michael Steinbach, but did not recall discussing the matter with then Director James Comey told the OIG that he did not recall being briefed on the FFG information until after the Crossfire Hurricane investigation was opened, and that he was not involved in the decision to open the case. McCabe said that although he did not specifically recall meeting with Comey immediately after the FFG information was received, it was "the kind of thing that would have been brought to Director Comey's attention immediately." McCabe's

---

[165] A Legal Attaché (Legat) is the FBI Director's personal representative in a country in which the FBI has regional responsibility.

[166] According to the Legat, the ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ stated at the meeting with the USG official that the FFG information "sounds like an FBI matter."

contemporaneous notes reflect that the FFG information, Carter Page, and Manafort, were discussed on July 29, after a regularly scheduled morning meeting of senior FBI leadership with the Director. Although McCabe told us he did not have an independent recollection of this discussion, he told us that, based upon his notes, this discussion likely included the Director. McCabe's notes reflect only the topic of the discussion and not the substance of what was discussed.

McCabe told us that he recalled discussing the FFG information with Priestap, Strzok, then Special Counsel to the Deputy Director Lisa Page, and Comey, sometime before Crossfire Hurricane was opened, and he agreed with opening a counterintelligence investigation based on the FFG information. He told us the decision to open the case was unanimous. McCabe said the FBI viewed the FFG information in the context of Russian attempts to interfere with the 2016 U.S. elections in the years and months prior, as well as the FBI's ongoing investigation into the DNC hack by a Russian Intelligence Service (RIS). He also said that when the FBI received the FFG information it was a "tipping point" in terms of opening a counterintelligence investigation regarding Russia's attempts to influence and interfere with the 2016 U.S. elections because not only was there information that Russia was targeting U.S. political institutions, but now the FBI had received an allegation from a trusted partner that there had been some sort of contact between the Russians and the Trump campaign. McCabe said that he did not recall any discussion about whether the FFG information constituted sufficient predication for opening a Full Investigation, as opposed to a Preliminary Investigation, but said that his belief at the time, based on his experience, was that the FFG information was adequate predication.[167]

According to Priestap, he authorized opening the Crossfire Hurricane counterintelligence investigation on July 31, 2016, based upon these discussions. He told us that the FFG information was provided by a trusted source—the FFG— and he therefore felt it "wise to open an investigation to look into" whether someone associated with the Trump campaign may have accepted the reported offer from the Russians. Priestap also told us that the combination of the FFG information and the FBI's ongoing cyber intrusion investigation of the DNC hacks created a counterintelligence concern that the FBI was "obligated" to investigate. Priestap said that he did not recall any disagreement about the decision to open Crossfire Hurricane, and told us that he was not pressured to open the case.

We interviewed all of the senior FBI officials who participated in these discussions about their reactions to the FFG information and assessments of it as

---

[167] As detailed in Chapter Two, the DIOG provides for two types of predicated investigations, Preliminary Investigations and Full Investigations. A Preliminary Investigation may be opened based upon "any allegation or information" indicative of possible criminal activity or threats to the national security; a Full Investigation may be opened based upon an "articulable factual basis" of possible criminal activity or threats to the national security. In cases opened as Preliminary Investigations, all lawful investigative methods (including CHS and UCE operations) may be used except for mail opening, physical searches requiring a search warrant, electronic surveillance requiring a judicial order or warrant (Title III wiretap or a FISA order), or requests under Title VII of FISA. A Preliminary Investigation may be converted to a Full Investigation if the available information provides predication for a Full Investigation.

predication for Crossfire Hurricane.  Each of these officials told us the information warranted opening a counterintelligence investigation.  For example, Anderson told us that when the information from the Legat arrived it was "really disturbing," and that she told Priestap the information needed to be reviewed by the Deputy Director immediately (Anderson and Priestap, in fact, briefed McCabe that day, July 28). She also told us that the decision to open the case was based upon the concern that the U.S. democratic process could be manipulated by a foreign power. Anderson also told us that "[the FBI] would have been derelict in our responsibilities had we not opened the case," and that a foreign power allegedly colluding with a presidential candidate or his team members was a threat to our nation that the FBI was obligated to investigate under its counterintelligence mission.

Similarly, then FBI General Counsel James Baker told us that everyone was in agreement about opening an investigation because the information came from a trusted intelligence partner, and it concerned a "Russian connection to the Trump campaign."  He told us the FBI had information about the Russian's hacking activities, which they considered "a threat."  Baker could not specifically recall whether Crossfire Hurricane was opened as a Preliminary Investigation or a Full Investigation, but told us that a Full Investigation "would have been justified under these facts."

The Intel Section Chief also told us that he recalled the discussions about the FFG information when it arrived and said no one disagreed with opening a counterintelligence investigation based on the information.  The Intel Section Chief also said that in the context of what was occurring with the DNC hacks and the release of the DNC emails, there was a possibility that the Russians reached out to a campaign to offer their assistance, and the FBI needed to investigate the allegation.  The OGC Unit Chief had the same recollection, telling us that there was no real question about whether to investigate and that her impression was everyone thought the FFG information was so serious that the FBI had to investigate the allegations:  "[T]his is not something we were looking to do, but given the allegations, we thought they were serious enough [that] we had to investigate."

Like Priestap, these officials told us that their evaluation of the FFG information was informed by the FBI's ongoing cyber investigation involving Russia and the DNC hack.  According to the Intel Section Chief and Strzok, when the FFG information arrived, the FBI already had strong corroborating information indicating that senior officials in the Russian government were responsible for directing attacks on the 2016 U.S. elections, including the hack of the DNC.  Anderson said the FBI's ongoing cyber investigation supported the decision to open a counterintelligence case based on the FFG information.  Anderson stated:

> …I don't remember exactly when we felt, you know, the moment in
> time when we felt that we had Russian attribution, not just to the
> hack, but also to the release of the emails.  So though that was
> suspected or we had some information to support that theory for quite
> some time, but whether you…can attribute that to the Russians with a

high degree of certainty or…not, it sort of puts the whole thing together.  On the one hand you've got the Russian efforts to obtain material that could be used as part of a foreign influence campaign and then on the other hand you've got [this] information about the possibility of collusion between the Russians and members of a presidential candidate's campaign.

Priestap told the OIG that before arriving at a final decision, he considered whether to provide a "defensive briefing" to any member of the Trump campaign in lieu of opening an investigation. According to Priestap, defensive briefings occur when U.S. government or corporate officials are being targeted by a foreign adversary and the FBI determines the officials should be alerted to the potential threat.  Priestap did not recall who first raised the issue of defensive briefings, but said he discussed the subject collaboratively with other FBI officials.  Priestap told us that he ultimately decided not to conduct defensive briefings and explained his reasoning:

While the Counterintelligence Division does regularly provide defensive briefings to U.S. government officials or possible soon to be officials, in my experience, we do this when there is no indication, whatsoever, that the person to whom we would brief could be working with the relevant foreign adversary.  In other words, we provide defensive briefings when we obtain information indicating a foreign adversary is trying or will try to influence a specific U.S. person, and when there is no indication that the specific U.S. person could be working with the adversary.  In regard to the information the [FFG] provided us, we had no indication as to which person in the Trump campaign allegedly received the offer from the Russians.  There was no specific U.S. person identified.  We also had no indication, whatsoever, that the person affiliated with the Trump campaign had rejected the alleged offer from the Russians.  In fact, the information we received indicated that Papadopoulos told the [FFG] he felt confident Mr. Trump would win the election, and Papadopoulos commented that the Clintons had a lot of baggage and that the Trump team had plenty of material to use in its campaign.  While Papadopoulos didn't say where the Trump team had received the "material," one could reasonably infer that some of the material might have come from the Russians.  Had we provided a defensive briefing to someone on the Trump campaign, we would have alerted the campaign to what we were looking into, and, if someone on the campaign was engaged with the Russians, he/she would very likely change his/her tactics and/or otherwise seek to cover-up his/her activities, thereby preventing us from finding the truth.  On the other hand, if no one on the Trump campaign was working with the Russians, an investigation could prove that.  Because the possibility existed that someone on the Trump campaign could have taken the Russians up on their offer, I thought it wise to open an investigation to look into the situation.

McCabe said that he did not consider a defensive briefing as an alternative to opening a counterintelligence case. He said that based on the FFG information, the FBI did not know if any member of the campaign was coordinating with Russia and that the FBI did not brief people who "could potentially be the subjects that you are investigating or looking for." McCabe told us that in a sensitive counterintelligence matter, it was essential to have a better understanding of what was occurring before taking an overt step such as providing a defensive briefing.[168]

We also asked those FBI officials involved in the decision to open Crossfire Hurricane whether the FBI received any other information, such as from members of the USIC, that the FBI relied upon to predicate Crossfire Hurricane. All of them told us that there was no such information and that predication for the case was based solely on the FFG information.[169] We also asked Comey and McCabe about then CIA Director John Brennan's statements reported in several news articles that he provided to the FBI intelligence on Russian contacts with U.S. persons that predicated or prompted the opening of Crossfire Hurricane. Comey told us that while Brennan shared intelligence on the overarching efforts by the Russian government to interfere in the 2016 U.S. elections, Brennan did not provide any information that predicated or prompted the FBI to open Crossfire Hurricane. McCabe said that he did not recall Brennan providing the FBI with information before the FBI's decision to open an investigation about any U.S person potentially cooperating with Russia in the efforts to interfere with the 2016 U.S. elections. Priestap and the Intel Section Chief also told us that Brennan did not provide the FBI any intelligence that predicated the opening of Crossfire Hurricane. We did not find information in FBI or Department electronic communications, emails, or other documents, or through witness testimony, indicating otherwise.

On July 31, 2016, the FBI opened a full counterintelligence investigation under the code name Crossfire Hurricane "to determine whether individual(s) associated with the Trump campaign were witting of and/or coordinating activities with the Government of Russia." As the predicating information did not indicate a specific individual, the opening EC did not include a specific subject or subjects. As described in Chapter Two, the factual predication required to open a Full Investigation under the Attorney General's Guidelines for Domestic Operations (AG

---

[168] McCabe told us that the decision to brief the DNC and Clinton campaign about the DNC hack was a different situation than the decision not to brief the Trump campaign about allegations of Russian efforts to assist the Trump campaign. He said that the DNC was a victim of hacking and the FBI had known that the DNC was not responsible for the hacks for some time.

[169] As we describe in Chapter Four, although the FBI first received reporting from Christopher Steele regarding alleged Russian interference in the 2016 U.S. elections in early July 2016, the agents and analysts investigating the FFG information (the Crossfire Hurricane team) did not become aware of the Steele reporting until September 19, 2016. We found no evidence the Steele election reporting was known to or used by FBI officials involved in the decision to open the Crossfire Hurricane investigation.

In the OIG's *Review of Various Actions in Advance of the 2016 Election*, we describe in Classified Appendix One certain information that the FBI was in possession of in 2016 but the vast majority of which the FBI had not reviewed by June 2018. Given that timing, we did not see any evidence that any of that information was considered for or part of the predication for the opening of Crossfire Hurricane.

Guidelines) and the FBI's Domestic Investigations and Operations Guide (DIOG) is an "articulable factual basis" that reasonably indicates that one of several circumstances exist:

- An activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity;

- An individual, group, organization, entity, information, property, or activity is or may be a target of attack, victimization, acquisition, infiltration, or recruitment in connection with criminal activity in violation of federal law or a threat to the national security and the investigation may obtain information that would help to protect against such activity or threat; or

- The investigation may obtain foreign intelligence that is responsive to a requirement that the FBI collect positive foreign intelligence—*i.e.*, information relating to the capabilities, intentions, or activities of foreign governments or elements thereof, foreign organizations or foreign persons, or international terrorists.

The opening EC describing the predication for Crossfire Hurricane relied exclusively on Papadopoulos's statements to the FFG ▮▮▮▮▮▮▮▮ in the FFG information.

Crossfire Hurricane was opened by CD and was assigned a case number used by the FBI for possible violations of the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611, *et seq.*, and 18 U.S.C. § 951 (Agents of Foreign Governments).[170]  As described in Chapter Two, the AG Guidelines recognize that activities subject to investigation as "threats to the national security" may also involve violations or potential violations of federal criminal laws, or may serve important purposes outside the ambit of normal criminal investigation and prosecution by informing national security decisions.  Given such potential overlap in subject matter, neither the AG Guidelines nor the DIOG require the FBI to differently label its activities as criminal investigations, national security investigations, or foreign intelligence collections.  Rather, the AG Guidelines state that, where an authorized purpose exists, all of the FBI's legal authorities are available for deployment in all cases to which they apply.[171]

The opening EC also designated Crossfire Hurricane as a "sensitive investigative matter," or SIM, which as described in Chapter Two, includes matters

---

[170]  We have previously found differing understandings between FBI agents and federal prosecutors and NSD officials about the intent of FARA as well as what constitutes a "FARA case."  *See* DOJ OIG, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act*, Audit Division 16-24 (September 2016), https://oig.justice.gov/reports/2016/a1624.pdf (accessed December 19, 2019).

[171]  *See* AG Guidelines § A, II.

involving the activities of a domestic public official or political candidate (involving corruption or a threat to the national security), or a domestic political organization or an individual prominent in such an organization.[172]  The term "domestic political organization" includes, in relevant part, a committee or group formed to elect an individual to public office.  According to David Laufman, then Chief of the National Security Division's (NSD) Counterintelligence and Export Control Section (CES), the case was designated a SIM because it involved a campaign and "people associated with a campaign."  The DIOG requires that cases opened and designated as SIMs by FBI Headquarters be reviewed by OGC and approved by the appropriate FBI Headquarters operational section chief.  The DIOG also requires that the FBI provide an "appropriate NSD official" with written notification of the opening of a SIM.[173]  The DIOG does not impose any additional special requirements on SIMs, but does state particular care should be taken when considering whether a planned course of action is the least intrusive method and if reasonable based upon the circumstances of the investigation.[174]

After Priestap authorized the opening of Crossfire Hurricane, Strzok, with input from the OGC Unit Chief, drafted and approved the opening EC.[175]  Strzok told us that the case agent normally drafts the opening EC for an investigation, but that Strzok did so for Crossfire Hurricane because a case agent was not yet assigned and there was an immediate need to travel to the European city to interview the FFG officials who had met with Papadopoulos.  With respect to the DIOG's notification requirement to NSD, we located in the Crossfire Hurricane case file a Letterhead Memorandum (LHM) dated August 3, 2016, addressed to NSD.  However, NSD officials told us that NSD has no record showing it received the LHM, and we were unable to determine whether the FBI in fact provided the LHM to NSD.[176]

In addition to being designated a SIM, witnesses told us that, because the information being investigated related to an ongoing presidential election campaign, the Crossfire Hurricane case file was designated as "prohibited" meaning that access to the file was restricted and viewable to only those individuals assigned to

---

[172]  The DIOG requires that if a case is designated as a SIM at the time of opening, the title or case caption must contain the words "Sensitive Investigative Matter."  The opening EC for Crossfire Hurricane met this DIOG requirement.

[173]  There is no requirement under the AG Guidelines or the DIOG that a senior Department official approve of or be consulted prior to the opening of an investigation designated a SIM.

[174]  The DIOG requires that the least intrusive means or method be considered and—if reasonable based upon the circumstances of the investigation—used to obtain intelligence or evidence in lieu of a more intrusive method.  The concept of least intrusive method applies to the collection of all information.

[175]  Strzok was promoted to a CD Section Chief in February 2016, and later to Deputy Assistant Director (DAD) of CD's Operations Branch I on September 4, 2016.

[176]  According to FBI documents, although the FBI usually provides an LHM to NSD, "due to the extreme sensitivity of both predication and subject of [Crossfire Hurricane], NSD was orally briefed."  Notes and testimony reflect that in early August, NSD officials were briefed on at least two occasions at FBI Headquarters about the Crossfire Hurricane investigation.

work on the investigation. Agents and analysts referred to the investigation as "close-hold" and, as discussed later in this chapter, used covert investigative techniques to ensure information about the investigation remained known only to the team and FBI and Department officials.

### B.    The FBI Opens Counterintelligence Investigations on Papadopoulos, Carter Page, Manafort, and Flynn

On August 1, 2016, Strzok and a supervisory special agent (SSA 1) traveled to the European city to interview the FFG officials who met with Papadopoulos in May 2016.[177] According to Strzok and SSA 1, during the interview they learned that Papadopoulos did not say that he had direct contact with the Russians; that while his statement did not include him, it did not exclude him either; and that Papadopoulos stated the Russians told "us." Strzok and SSA 1 also said they learned that Papadopoulos did not specify any other individual who received the Russian suggestion. Strzok, the Intel Section Chief, the Supervisory Intelligence Analyst (Supervisory Intel Analyst), and Case Agent 2 told the OIG that, based on this information, the initial investigative objective of Crossfire Hurricane was to determine which individuals associated with the Trump campaign may have been in a position to have received the alleged offer of assistance from Russia.

After conducting preliminary open source and FBI database inquiries, intelligence analysts on the Crossfire Hurricane team identified three individuals— Carter Page, Paul Manafort, and Michael Flynn—associated with the Trump campaign with either ties to Russia or a history of travel to Russia. On August 10, 2016, the team opened separate counterintelligence FARA cases on Carter Page, Manafort, and Papadopoulos, under code names assigned by the FBI. On August 16, 2016, a counterintelligence FARA case was opened on Flynn under a code name assigned by the FBI. The opening ECs for all four investigations were drafted by either of the two Special Agents assigned to serve as the Case Agents for the investigation (Case Agent 1 or Case Agent 2) and were approved by Strzok, as required by the DIOG.[178] Each case was designated a SIM because the individual subjects were believed to be "prominent in a domestic political campaign."[179]

As summarized below, the opening ECs for the investigations provided similar descriptions of the predicating information relied upon to open the cases. The ECs

---

[177] Email exchanges reflect that the FBI planned to interview the FFG officials by telephone; however, the Legat told Strzok that a Senior Executive Service-level (SES) FBI official from CD should make the trip and meet with the FFG officials. Emails also reflect that a USG official advised the FBI that one of the FFG officials the FBI planned to interview would be unavailable on August 9 and suggested the interview take place prior to that date.

[178] Although the opening ECs identified Strzok, SSA 1, and the OGC Unit Chief as approvers, the OGC Unit Chief said that she provided legal review of the opening ECs only. As we described in Chapter Two, when a case is opened and designated a SIM by FBI Headquarters, the case opening requires review by OGC and approval by the FBI Headquarters operational Section Chief (SC).

[179] We did not locate any records that indicated the FBI provided written notification to NSD about the opening of these cases. However, as we described earlier in this chapter, the FBI orally briefed NSD officials on at least two occasions in August 2016 about the Crossfire Hurricane investigation to include Papadopoulos, Manafort, Flynn, and Carter Page.

differed in their descriptions of the particular activities of the subjects that gained the FBI's attention.

- The opening EC for the Carter Page investigation stated that there was an articulable factual basis that Carter Page "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Page was a senior foreign policy advisor for the Trump campaign, had extensive ties to various Russia-owned entities, and had traveled to Russia as recently as July 2016. The EC also noted that Carter Page was the subject of an open, ongoing counterintelligence investigation assigned to the FBI's New York Field Office (NYFO), which we describe in the next section.

- The opening EC for the Manafort investigation stated that there was an articulable factual basis that Manafort "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Manafort was designated the Delegate Process and Convention Manager for the Trump campaign, was promoted to Campaign Manager for the Trump campaign, and had extensive ties to pro-Russian entities of the Ukrainian government.

- The opening EC for the Papadopoulos investigation stated that there was an articulable factual basis that Papadopoulos "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Papadopoulos was a senior foreign advisor for the Trump campaign and had "made statements indicating that he is knowledgeable that the Russians made a suggestion to the Trump team that they could assist the Trump campaign with an anonymous release of information during the campaign that would be damaging to the Clinton Campaign."

- The opening EC for the Flynn investigation stated that there was an articulable factual basis that Flynn "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Flynn was an advisor to the Trump campaign, had various ties to state-affiliated entities of Russia, and traveled to Russia in December 2015.

**C.      The Pre-Existing FBI New York Field Office Counterintelligence
Investigation of Carter Page**

The OGC Unit Chief told us that of all the individuals associated with the
Trump campaign best positioned to have received the alleged offer of assistance
from Russia, Carter Page "quickly rose to the top" of the list because of his past
connections to Russian officials and the FBI's previous contacts with Page.  As
reflected in the FISA applications described in Chapters Five and Seven, as well as
in other FBI documents, NYFO had an interest in Carter Page for several years
before August 2016 and had interviewed him on multiple occasions because of his
relationships with individuals the FBI knew to be Russian intelligence officers.

An FBI counterintelligence agent in NYFO (NYFO CI Agent) with extensive
experience in Russian matters told the OIG that Carter Page had been on NYFO's
radar since 2009, when he had contact with a known Russian intelligence officer
(Intelligence Officer 1).  According to the EC documenting NYFO's June 2009
interview with Page, Page told NYFO agents that he knew and kept in regular
contact with Intelligence Officer 1 and provided him with a copy of a non-public
annual report from an American company.  The EC stated that Page "immediately
advised [the agents] that due to his work and overseas experiences, he has been
questioned by and provides information to representatives of [another U.S.
government agency] on an ongoing basis."  The EC also noted that agents did not
ask Page any questions about his dealings with the other U.S. government agency
during the interviews.[180]

NYFO CI agents believed that Carter Page was "passed" from Intelligence
Officer 1 to a successor Russian intelligence officer (Intelligence Officer 2) in 2013
and that Page would continue to be introduced to other Russian intelligence officers
in the future.[181]  In June 2013, NYFO CI agents interviewed Carter Page about these
contacts.  Page acknowledged meeting Intelligence Officer 2 following an
introduction earlier in 2013.  When agents intimated to Carter Page during the
interview that Intelligence Officer 2 may be a Russian intelligence officer,
specifically, an "SVR" officer, Page told them he believed in "openness" and because

---

[180] On or about August 17, 2016, the Crossfire Hurricane team received a memorandum from
the other U.S. government agency detailing its prior relationship with Carter Page, including that Page
had been approved as an operational contact for the other agency from 2008 to 2013 and information
that Page had provided to the other agency concerning Page's prior contacts with certain Russian
intelligence officers.  We found no evidence that, after receiving the August 17 Memorandum, the
Crossfire Hurricane team requested additional information from the other agency prior to submission
of the first FISA application in order to deconflict on issues that we believe were relevant to the FISA
application.  According to the U.S. government agency, "operational contact," as that term is used in
the August 17 Memorandum, provides "Contact Approval," which allows the agency to contact and
discuss sensitive information with a U.S. person and to collect information from that person via
"passive debriefing," or debriefing a person of information that is within the knowledge of an individual
and has been acquired through the normal course of that individual's activities.  According to the U.S.
government agency, a "Contact Approval" does not allow for operational use of a U.S. person or
tasking of that person.

[181] CI agents refer to this as "slot succession," whereby a departing intelligence officer
"passes" his or her contacts to an incoming intelligence officer.

he did not have access to classified information, his acquaintance with Intelligence Officer 2 was a "positive" for him.  In August 2013, NYFO CI agents again interviewed Page regarding his contacts with Intelligence Officer 2.  Page acknowledged meeting with Intelligence Officer 2 since his June 2013 FBI interview.

In January 2015, three Russian intelligence officers, including Intelligence Officer 2, were charged in a sealed complaint, and subsequently indicted, in the Southern District of New York (SDNY) for conspiring to act in the United States as unregistered agents of the Russian Federation.[182]  The indictment referenced Intelligence Officer 2's attempts to recruit "Male-1" as an asset for gathering intelligence on behalf of Russia.

On March 2, 2016, the NYFO CI Agent and SDNY Assistant United States Attorneys interviewed Carter Page in preparation for the trial of one of the indicted Russian intelligence officers.  During the interview, Page stated that he knew he was the person referred to as Male-1 in the indictment and further said that he had identified himself as Male-1 to a Russian Minister and various Russian officials at a United Nations event in "the spirit of openness."  The NYFO CI Agent told us she returned to her office after the interview and discussed with her supervisor opening a counterintelligence case on Page based on his statement to Russian officials that he believed he was Male-1 in the indictment and his continued contact with Russian intelligence officers.

The FBI's NYFO CI squad supervisor (NYFO CI Supervisor) told us she believed she should have opened a counterintelligence case on Carter Page prior to March 2, 2016 based on his continued contacts with Russian intelligence officers; however, she said the squad was preparing for a big trial, and they did not focus on Page until he was interviewed again on March 2.  She told us that after the March 2 interview, she called CD's Counterespionage Section at FBI Headquarters to determine whether Page had any security clearances and to ask for guidance as to what type of investigation to open on Page.[183]  On April 1, 2016, the NYFO CI Supervisor received an email from the Counterespionage Section advising her to open a ▮▮▮▮▮▮ investigation on Page.  The NYFO CI Supervisor said that ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  In addition, according to FBI records, the relevant CD section at FBI Headquarters, in consultation with OGC, determined at that time that the Page investigation opened by NYFO was not a SIM, but also noted, "should his status change, the appropriate case modification would be made."  The NYFO CI Supervisor told us that based on what was documented in

---

[182] Intelligence Officer 3 pled guilty in March 2016.  The remaining two indicted Russian intelligence officers were no longer in the United States.

[183] CI agents in NYFO told us that the databases containing security clearance information were located at FBI Headquarters.  When a subject possesses a security clearance, the FBI opens an espionage investigation; if the subject does not possess a security clearance, the FBI typically opens a counterintelligence investigation.

the file and what was known at that time, the NYFO Carter Page investigation was not a SIM.

Although Carter Page was announced as a foreign policy advisor for the Trump campaign prior to NYFO receiving this guidance from FBI Headquarters, the NYFO CI Supervisor and CI Agent both told the OIG that this announcement did not influence their decision to open a case on Page and that their concerns about Page, particularly his disclosure to the Russians about his role in the indictment, pre-dated the announcement.  However, the NYFO CI Supervisor said that the announcement required noting his new position in the case file should his new position require he obtain a security clearance.

On April 6, 2016, NYFO opened a counterintelligence ⬛⬛⬛ investigation on Carter Page under a code name the FBI assigned to him (NYFO investigation) based on his contacts with Russian intelligence officers and his statement to Russian officials that he was "Male-1" in the SDNY indictment. Based on our review of documents in the NYFO case file, as well as our interview of the NYFO CI Agent, there was limited investigative activity in the NYFO investigation between April 6 and the Crossfire Hurricane team's opening of its investigation of Page on August 10.  The NYFO CI Agent told the OIG that the steps she took in the first few months of the case were to observe whether any other intelligence officers contacted Page and to prepare national security letters seeking Carter Page's cell phone number(s) and residence information.  The NYFO CI agent said that she did not use any CHSs to target Page during the NYFO investigation.  The NYFO investigation was transferred to the Crossfire Hurricane team on August 10 and became part of the Crossfire Hurricane investigation.

## III.   Organization and Oversight of the Crossfire Hurricane Investigation

The FBI conducted and oversaw the Crossfire Hurricane investigation from July 31, 2016, to May 17, 2017, at which time it was transferred to the Special Counsel's Office.  Over that 10-month period, three different teams of agents and analysts were assigned to the case:  the first team worked out of FBI Headquarters from the opening of the case through December 2016; the second team worked out of three FBI field offices and FBI Headquarters from approximately January 2017 through April 2017; and the third team worked, like the second team, out of the three FBI field offices and FBI Headquarters from April 2017 to May 17, 2017.  In this section, we describe the organization and staffing of the three investigative teams and the FBI's reasons for making changes as to how the investigation was organized.  We also describe the role played by FBI and Department senior leadership in the investigation.

### A.    FBI Staffing of the Crossfire Hurricane Investigation

#### 1.    The Management and Structure of the Crossfire Hurricane Team

Witnesses told us that because of the sensitivity of the investigation, CD officials originally decided to conduct the investigation out of FBI Headquarters, under the program management of Operational Branch I, Section CD-4, rather than out of one or more field offices, which is more typical.  The original team consisted of intelligence analysts, special agents, and SSAs from multiple field offices who were assigned to Headquarters for 90-day temporary duty assignments (TDYs).  CD assigned the original team to the same office space at Headquarters, with both agents and analysts working together in close proximity.  Agents and analysts on the Crossfire Hurricane team told the OIG that the decision to conduct the investigation out of FBI Headquarters instead of a field office presented multiple challenges, such as difficulties in obtaining needed investigative resources, including surveillance teams, electronic evidence storage, technically trained agents, and other investigative assets standard in field offices to support investigations.  We were told that these were known risks consciously taken by CD officials, including Priestap, in order to minimize the potential for unauthorized public disclosure of the investigation and allow for better coordination with Headquarters and interagency partners.

Priestap told us that although he was ultimately responsible for the investigation, Strzok and the Intel Section Chief managed Crossfire Hurricane. Following the opening of the case, the team held meetings three times a week to discuss and determine the next investigative and analytical steps.  The agents and analysts told us that the investigative and analytical decisions for the investigation were made at these meetings by the agents and analysts and then presented to the supervisors.  Priestap said that while Strzok managed the operational side of Crossfire Hurricane, Priestap also sought the opinions of the Intel Section Chief and the OGC Unit Chief on operational decisions.  Priestap also told us that he originally wanted to assign the investigation to a Deputy Assistant Director (DAD) other than Strzok because, although he had confidence in Strzok's counterintelligence capabilities, he had concerns about Strzok's personal relationship with Lisa Page affecting the Crossfire Hurricane team.  According to Priestap, he told Steinbach about his concerns and Steinbach was supportive of his decision to remove Strzok from the team, but his decision was overruled by McCabe.  Steinbach told us that he had concerns about Strzok and Lisa Page working together because he was aware of instances where they bypassed the chain of command to advise McCabe about case related information that had not been provided to Priestap or Steinbach. Priestap and Steinbach said they did not know why McCabe kept Strzok assigned to the investigation.  Strzok told the OIG he did not ask McCabe to keep him on the investigation and does not know whether Lisa Page requested Strzok remain on the investigation in conversations with McCabe.  We found no evidence that Page made any such request of McCabe.

McCabe told us that he recalled separate conversations with Steinbach and Priestap about Strzok's work on Crossfire Hurricane, but he said that in neither

conversation did he (McCabe) overrule a decision by Priestap to remove Strzok from the case. According to McCabe, Steinbach said that he wanted to remove Strzok from his role on Crossfire Hurricane after Strzok became DAD (in September 2016) so that Strzok could have a "traditional DAD experience," rather than spending too much attention on a single, major sensitive case. McCabe told us that he did not disagree with Steinbach, and he saw it as a decision for Steinbach and Priestap to make on their own. McCabe said that in a separate conversation with Priestap, Priestap raised a concern about Strzok and Page, but that it was not about any personal relationship between the two, which McCabe said he did not know about at the time. According to McCabe, Priestap expressed frustration about the amount of time Page and Strzok were spending together talking about casework and that it was interfering with Strzok's ability to carry out his other responsibilities. McCabe told us that he did not recall Priestap requesting that Strzok be removed from the case because of this concern, but McCabe said that he talked to Page about reducing the amount of time she was interacting with Strzok.

Over a dozen agents, analysts, and one Staff Operations Specialist (SOS) were originally assigned on a full-time basis to the Crossfire Hurricane team. Only one of the team members on Crossfire Hurricane, Case Agent 3, had previously been assigned to the team that conducted the investigation, known as "Midyear Exam" or "Midyear," of Secretary of State Hillary Clinton's use of personal email for official purposes. However, the supervisory chain of DAD Strzok, the Intel Section Chief, AD Priestap, EAD Steinbach, Deputy Director McCabe, and Director Comey was the same for the Midyear and Crossfire Hurricane investigations. EAD Steinbach retired in February 2017 and was succeeded by Carl Ghattas. The Crossfire Hurricane team members were selected by Strzok, the Intel Section Chief, and SSA 1. The agents reported to SSA 1 and the analysts reported to the Supervisory Intel Analyst. SSA 1 reported operational activities to Strzok. The Supervisory Intel Analyst reported analytical findings to the Intel Section Chief. In addition, an OGC line attorney (OGC Attorney) was supervised by the OGC Unit Chief and provided legal support to the team.[184] The OGC Unit Chief reported to Anderson, who reported to Baker.

Case Agent 1 and the SOS were the original Crossfire Hurricane team members who had primary responsibility over the Carter Page investigation. They were joined by Case Agent 3 and Case Agent 4 who worked on the Papadopoulos and Manafort investigations, respectively.

Following the November 2016 U.S. elections, the 90-day TDY assignments ended for the agents and analysts on the original investigative team, and many of the team members, including SSA 1, returned to their field offices. In addition, in January 2017, CD reorganized the structure of the Crossfire Hurricane investigation by transferring the day-to-day operations of the four individual investigations to three field offices, and dividing oversight of the investigations between two operational branches at FBI Headquarters—Operations Branch I and Operations Branch II. According to Priestap, he transferred the cases to the field offices

---

[184] Both of these attorneys were also assigned to the Midyear team to provide legal support.

because of the need to conduct investigative activities in cities where the subjects of the investigations were located and to do so efficiently. Priestap told us that he also wanted to incorporate Operations Branch II into the program management of some of the Crossfire Hurricane cases for its expertise on RIS.

With respect to the four individual investigations, CD transferred the Carter Page investigation to NYFO, and it remained assigned to Case Agent 1, who returned to that office following his 90-day TDY. DAD Jennifer Boone and SSA 3 of Operations Branch II at FBI Headquarters assumed program management responsibilities over the case. The Papadopoulos investigation was transferred to the Chicago Field Office and assigned to Case Agent 3. The Flynn investigation was transferred to the Washington Field Office (WFO) and assigned to Case Agent 4. Strzok and SSA 2 of Operations Branch I retained program management responsibilities over both of these investigations. The Manafort investigation was transferred to a white collar criminal squad at WFO.[185]

The Supervisory Intel Analyst told us that the shifting makeup of the teams and the changing leadership created a divide between the analysts and the agents, which resulted in less interaction between the two groups. In April 2017, CD again reorganized the Crossfire Hurricane investigation by restructuring the day-to-day operations of the cases at FBI Headquarters to recentralize the case. Officials told us that the investigation had become too decentralized and that the reason to restructure the investigation at Headquarters was to impose greater structure on the team's investigative and analytical efforts. In addition, in March 2017, Comey notified Congress about the existence of the Crossfire Hurricane investigation. Witnesses told us that this created a need for a more cohesive effort by the Crossfire Hurricane team to keep Priestap regularly informed of case activities so that he was better able to respond to Congressional inquiries.

At the end of this chapter, Figure 3.1 illustrates the FBI chain of command for the Crossfire Hurricane investigation from the opening of the case on July 31, 2016 through December 2016. Figure 3.2 illustrates the chain of command from January 2017 through April 2017, and Figure 3.3 from April 2017 until the cases were transferred to the Special Counsel's Office on May 17, 2017.

## 2.    The Role of Peter Strzok and Lisa Page in Crossfire Hurricane and Relevant Text Messages

In the OIG's June 2018 *Review of Various Actions in Advance of the 2016 Election*, we described text messages between Strzok and Lisa Page expressing statements of hostility toward then candidate Trump and statements of support for then candidate Clinton, and several text messages that appeared to mix political opinions with discussions of the investigation into candidate Clinton's email use and references to the Crossfire Hurricane investigation. One such exchange occurred on July 31, 2016, the date of the opening of the Crossfire Hurricane investigation,

---

[185]  As described further in Chapter Nine, in January 2016, the FBI initiated a money laundering and tax evasion investigation of Manafort predicated on his activities as a political consultant to members of the Ukrainian government and Ukrainian politicians.

when Strzok texted Page: "And damn this feels momentous. Because this matters. The other one did, too, but that was to ensure we didn't F something up. This matters because this MATTERS. So super glad to be on this voyage with you." (Emphasis in original).

The following week, in an exchange on August 6, 2016, Lisa Page forwarded to Strzok a news article relating to Trump's criticism of a Gold Star family who appeared at the Democratic National Convention. The text message stated, in part, "And Trump should go f himself." Strzok responded favorably to the article and added, "And F Trump." Page replied, "So. This is not to take away from the unfairness of it all, but we are both deeply fortunate people." She then forwarded another news article and texted, "And maybe you're meant to stay where you are because you're meant to protect the country from that menace." Strzok responded, "Thanks. It's absolutely true that we're both very fortunate. And of course I'll try and approach it that way. I just know it will be tough at times. I can protect our country at many levels, not sure if that helps…."

Two days later, on August 8, 2016, Lisa Page texted Strzok, "[Trump's] not ever going to become president, right? Right?!" and Strzok replied, "No. No he's not. We'll stop it." In Chapter Twelve of the OIG's June 2018 *Review of Various Actions in Advance of the 2016 Election*, we detail additional text messages by Strzok and Page and the explanations that they provided to the OIG for these and the other text messages and our findings regarding them. *See* https://www.justice.gov/file/1071991/download.

In that review, we found that Strzok led the Midyear investigation shortly after its opening through its conclusion, and that he was deeply and actively involved in investigative decision making throughout the course of that investigation. We further found that Lisa Page served as a liaison between the investigative team and McCabe, and that she also regularly participated in team meetings and in investigative decision making.

As part of this review, in order to determine whether there was any bias in the investigative activities for Crossfire Hurricane that we reviewed, we asked agents and analysts assigned to the case about the roles Strzok and Page played in the Crossfire Hurricane investigation and their level of involvement in decision making. With respect to Strzok, these witnesses told us that while he approved the team's investigative decisions during the time he was in the supervisory chain of command for the investigation, he did not unilaterally make any decisions or override any proposed investigative steps. Priestap, in addition to telling us that it was his (Priestap's) decision to initiate the investigation, told us that to his knowledge, Strzok was not the primary or sole decision maker on any investigative step in Crossfire Hurricane. Further, as described above, in January 2017, the Crossfire Hurricane cases were divided between two operational branches within CD, and Strzok no longer supervised the Carter Page investigation, which was transferred to Operations Branch II, CD-1, under the supervision of then DAD Boone. In this report, we describe those occasions when Strzok was involved in investigative decisions.

With respect to Lisa Page, witnesses told us that she did not work with the team on a regular basis or make any decisions that impacted the investigation. Priestap told us that Lisa Page was "not in charge of anything" and that he never witnessed her attempt to steer the investigation or dictate investigative actions. Baker said that Lisa Page attended high-level meetings and knew the facts of the case, but was not in a "decision making position" and had no "decision making authority." Lisa Page told us that she did not have a formal role in the Crossfire Hurricane investigation but may have participated in team meetings to keep McCabe aware of the status of the investigation. McCabe also told us that she was the "facilitation point" between CD and his office during the investigation. As with Strzok, when we learned in this review of Lisa Page's presence at meetings or involvement in any investigative activity, we include that information in this report.

## B.   The Role of Senior FBI and Department Leadership in the Crossfire Hurricane Investigation

As part of our review, we examined the role that senior FBI and Department leaders played in Crossfire Hurricane, as well as their knowledge of critical events in the case, including its opening, the use of CHSs to gather information, and the decision to seek authority to conduct electronic surveillance. Throughout the chapters of this report, we highlight and describe this involvement and knowledge, where relevant. In this section, we summarize the role of FBI leadership and Department officials in the early stages of the investigation until May 2017 when the Papadopoulos, Carter Page, Manafort, and Flynn cases were transferred to the Special Counsel's Office.

### 1.   FBI Leadership

We learned that CD officials briefed the Crossfire Hurricane investigation to FBI senior leadership throughout the investigation. Comey told the OIG that the FBI had "hundreds of thousands" of counterintelligence cases opened while he was Director, and he would not be involved in a counterintelligence case unless the chain of command made a judgment call about whether the nature of the case required the Director's involvement. He said the decision to brief the Director was based on several things, including whether the case required engagement with Department leadership or whether it was of interest to Congress. Comey said his level of involvement in Crossfire Hurricane was similar to some cases and dissimilar to others. He said:

> I would put [cases in] three buckets. One, cases they'd never tell me about because of a judgment by the leadership chain that it wasn't for the Director to know. Cases that I would be told about, simply to be aware of. And then cases, the third category would be cases that I was told about and, in some detail, and kept informed of as the investigation went on. Crossfire Hurricane was in that third bucket.

According to records reviewed by the OIG, Comey received his first, formal briefing on August 15, 2016, though, as described previously, McCabe's contemporaneous notes suggest Comey may have been told about the FFG

information on July 29. Comey told us that he was updated on the status of the investigation every 2 to 4 weeks. These status updates were provided at the end of his regularly scheduled morning national security briefings conducted by, among others, McCabe, Steinbach, Priestap, and Strzok. According to Comey, these briefings did not typically include discussions about investigative strategy, but he was often briefed on specific investigative actions the Crossfire Hurricane team had taken or planned to take. Comey said that he did not recall playing a role in making any significant investigative decisions and did not have any concerns or disagreements with the investigative actions described by senior CD officials during briefings.

Comey told us that he recalled a discussion with the briefers about taking precautions to keep the case close-hold. Comey said he was mindful that the investigation involved a political campaign, and he advised the team to keep in mind that, "[although] it's smoke that we see, we don't know whether there's fire there." McCabe also told us the FBI wanted "to keep our inquiry as quiet as we could." He said that it was important to keep the investigation covert to avoid alerting the subjects of the investigation or others, and, specifically in this case, it was important due to the pending election.

McCabe told us he received regular briefings on the progress of Crossfire Hurricane and discussed the investigation with Comey at regular briefings. Strzok told us the team briefed McCabe approximately 5-10 times during the investigation, and the OGC Unit Chief told us McCabe was briefed every few weeks until the election in November and less frequently thereafter. According to both Strzok and the OGC Unit Chief, these briefings provided updates on the team's investigative activities and typically were not discussions about what steps to take. The OGC Unit Chief also said that McCabe directed the team to "get to the bottom of this as quickly as possible, but with a light footprint."

Priestap told us that Strzok, the Intel Section Chief, and the OGC Unit Chief frequently briefed him on the investigation and kept him apprised of significant developments. In addition to approving the opening of the Crossfire Hurricane cases, Priestap told us that he was involved in discussions as to whether to seek authority under FISA to conduct electronic surveillance ███████████████ targeting Carter Page, a subject we describe in detail in Chapter Five. Priestap said he briefed Steinbach nearly every day on the case and provided Comey or McCabe with updates on an as-needed basis.

### 2.   Department of Justice

#### a.   National Security Division

The Department was first notified about the opening of Crossfire Hurricane on August 2, 2016, when Priestap and the Intel Section Chief briefed several representatives from NSD, including Deputy Assistant Attorney General (Deputy AAG) George Toscas, Deputy AAG Adam Hickey, and David Laufman, who as

described previously was the CES Section Chief.[186]  According to Laufman and his contemporaneous notes of the briefing, FBI officials described the FFG information and the four individuals the FBI had identified through its initial investigative work who were members of the campaign and had ties to Russia.  Laufman told us that his impression was that the information from the FFG had "raised obvious alarm bells in the FBI" and he said the information "resonated" with him.  He also said that the information the FBI provided at the briefing presented the question of whether someone in the Russian government was working with the campaign of a major party candidate to influence the U.S. elections.  Laufman told us that "we certainly understood the significance of the matter and the need for further investigation" and that it would have been "a dereliction of duty and responsibility of the highest order not to commit the appropriate resources as urgently as possible to run these facts to the ground, and find out what was going on."

After this initial briefing, Toscas contacted Deputy AAG Stuart Evans who oversaw NSD's Office of Intelligence (OI), which prepares and files FISA applications.  Evans told us that he met with Toscas, Hickey, and FBI representatives on or about August 11, 2016, concerning the opening of Crossfire Hurricane.  Evans said he believed the FBI described the information from the FFG that led to the opening of the case and the FBI's preliminary assessment that led the team to focus on the four individuals associated with the Trump campaign.  He said the basis for the investigation did not strike him as "thin" at the time of this briefing or in retrospect, and the steps the FBI had taken up to that point were not dissimilar to how he had seen the FBI handle other counterintelligence cases involving insider threat information reported by a credible source.  Evans told the OIG that he did not recall anyone raising the issue of seeking FISA authority targeting Carter Page at this August briefing.

Following these initial briefings, the FBI invited NSD to attend weekly meetings with the Crossfire Hurricane team.  According to Evans, he and Toscas attended some of the meetings, as did representatives from CES, including Laufman, and OI.  Laufman's notes reflect that Hickey attended some of the meetings as well.  According to Evans, CES and OI maintained "loose involvement and knowledge" of the status of the investigation in case the FBI requested assistance from CES on criminal legal process or from OI on a FISA application.  However, Evans told us that his reaction to these meetings was that the investigation seemed "pretty slow moving," with not much changing week-to-week in terms of the updates the FBI was providing to NSD.

According to Laufman and his deputy, the FBI did not ask CES to assist with criminal legal process at any time before the 2016 U.S. elections.  In December 2016, the FBI briefed NSD officials on the status of the Crossfire Hurricane cases, and, according to Laufman's notes, advised NSD of CD's reorganization of the investigation.  According to his notes, the FBI decided that it would be establishing a new unit or team to focus on Russian influence activities and that none of the

---

[186] Lisa Page was the other FBI representative who attended this briefing.  As described earlier, Strzok was meeting with the FFG officials about their conversations with Papadopoulos on this date.

Crossfire cases had been closed "so far." Laufman told us that he advised the FBI that CES wanted to be in a position to provide input should the FBI decide to close any of the Crossfire Hurricane cases, just to be sure the FBI had exhausted all investigative steps, but he did not recall this ever arising.

Mary McCord was NSD's Principal Deputy AAG when Crossfire Hurricane was opened. She told us that she received a comprehensive briefing from the FBI on the investigation in January 2017, by which time she was the Acting AAG of NSD.[187] She said that prior to that time, she was involved in certain aspects of the investigation through OI's assistance with the first Carter Page FISA application in September and October 2016, as well as through meetings she attended in November and December 2016 about aspects of the Manafort and Flynn cases. She said that she neither attended nor received long debriefs about the weekly Crossfire Hurricane meetings attended by other NSD officials before the election. According to McCord, as a general matter, it was typical for Department attorneys not to become directly involved in a counterintelligence investigation until the case required legal guidance or legal process.

According to McCord, by January 2017, developments in some of the cases, particularly the Flynn and Manafort cases, led to the need for a comprehensive briefing for Department officials on the different cases the FBI was pursuing, as well as for the greater involvement of prosecutors moving forward. In late February 2017, Laufman assigned a CES trial attorney (CES Trial Attorney) to assist the FBI's Crossfire Hurricane team by providing legal guidance as needed on any of the cases. Laufman told us, and his notes reflect, that CES did not receive regular briefings on the investigation from the FBI between December 2016 and March 2017.[188] As we described earlier in this chapter, during this period of time, the Crossfire Hurricane investigation was decentralized, with the individual cases being handled by three different FBI field offices. Witnesses from NYFO who worked on the Carter Page investigation told us that as a result of this, there were no regular team meetings with officials at FBI Headquarters.

### b.   Office of the Deputy Attorney General

Sally Yates was the Deputy Attorney General (DAG) when Crossfire Hurricane was opened on July 31, 2016. Yates told the OIG that she did not specifically recall receiving a formal briefing from the FBI in the summer of 2016 about the case, or at any time before she left the Department on January 30, 2017, though she left open the possibility that such a briefing could have occurred. According to Yates, her office was typically less involved in counterintelligence investigations than criminal investigations.[189] Yates said that although she and others in the Office of

---

[187] McCord became the acting AAG in mid-October 2016 and continued in both roles until Dana Boente became the Acting AAG for NSD in April 2017.

[188] Laufman did not attend the meetings in January, February, and March 2017 that were attended by Boente, McCord, and other senior Department officials.

[189] Matthew Axelrod, then Principal Assistant Deputy Attorney General, told us that ODAG had less involvement in counterintelligence investigations than criminal investigations because most

the Deputy Attorney General (ODAG) attended Monday, Wednesday, and Friday morning threat intelligence briefings with the FBI Director on national security issues, typically those briefings focused on matters involving imminent national security threats and criminal cases. According to Yates, the primary counterintelligence issue for ODAG in the summer of 2016 was the broader issue of Russian interference in the elections and the possible infiltration of voting machines.

Yates told us that she did recall that following one of the morning threat intelligence briefings, Comey pulled her aside to discuss the FFG information the FBI had received regarding Papadopoulos. Yates did not recall specifically when this conversation took place, except that it was some time before she received the first Carter Page FISA application for approval.[190] Yates told us that she did not recall the specific details Comey provided, but did recall that they discussed why the FFG had not notified U.S. officials sooner. She said she recalled learning during that conversation that the FFG did not determine the significance of the information about Papadopoulos until the WikiLeaks release of DNC emails in July 2016. She also said that she did not recall whether Comey told her the FBI had opened an investigation in response to the FFG information. However, she said that an investigation "would be the natural consequence of that," and "[i]t would be strange not to" open an investigation given that what Papadopoulos said in May 2016 would happen, *i.e.*, the release of information damaging to then candidate Clinton, did, in fact, happen in July 2016.

We asked Comey and McCabe about any discussions they had with Yates about the FFG information. Comey told us that he did not recall providing any briefing to Yates, but that the topic was likely discussed at one of the threat intelligence briefings. Comey also told us that the FBI generally tried to keep Department leadership informed about all significant activities to include important public corruption or espionage cases concerning Russian efforts to interfere with the 2016 U.S. elections. McCabe told us that he did not recall briefing Crossfire Hurricane to Yates; however, his contemporaneous notes of a regularly scheduled meeting with the DAG on August 10 reflect that Yates was briefed on the FFG information at that time. According to McCabe, the FBI did not provide regular briefings to Yates on Crossfire Hurricane after this meeting, but the FBI provided updates on developments in the investigation to ODAG following the Attorney General's morning briefings, which Yates typically attended.

Yates told us that she did not recall specific discussions about any of the Crossfire Hurricane cases after her initial conversation with Comey, though she said she was confident that such discussions took place and thought that Tashina Gauhar, the Associate Deputy Attorney General responsible for ODAG's national security portfolio, likely had such discussions with NSD or the FBI. Yates did recall

---

counterintelligence investigations do not lead to prosecution and can last for years while agents gather intelligence.

[190] As described in Chapter Five, ODAG received the first FISA application on or about October 14, 2016.

having a conversation with McCabe regarding the ongoing money laundering investigation of Manafort (described in more detail in Chapter Nine) and about not taking any overt investigative steps before the election. She told us that even though Manafort was no longer chair of the Trump campaign at the time of this conversation, she and McCabe agreed that they did not want to do anything that could potentially impact candidate Trump. She said she did not recall having a similar conversation with McCabe or Comey about the Crossfire Hurricane cases and thought that this was because, to her knowledge, the FBI was not contemplating any overt steps in those cases before the election.

Gauhar told the OIG that she was sure she attended discussions about the Crossfire Hurricane cases, likely during regularly scheduled meetings ODAG held with NSD officials, or possibly during the regularly scheduled morning threat intelligence briefings, but she did not recall any discussions specifically. According to Gauhar, discussions she attended before the election about Russia tended to focus on the broader topic of what Russia was trying to do to influence the upcoming election. She said she did not recall the Crossfire Hurricane cases being an ongoing topic of conversation from her vantage point, until issues came up in the Flynn case in early January 2017. Gauhar also told us that she learned more about the individual Crossfire Hurricane cases and the investigation after Boente requested regular briefings in February 2017.

On January 30, 2017, Boente became the Acting Attorney General after Yates was removed, and ten days later became the Acting DAG after Jefferson Sessions was confirmed and sworn in as Attorney General. Boente simultaneously served as the Acting Attorney General on the FBI's Russia related investigations after Sessions recused himself from overseeing matters "arising from the campaigns for President of the United States." Boente told the OIG that after reading the January 2017 Intelligence Community Assessment (ICA) report on Russia's election influence efforts (described in Chapter Six), he requested a briefing on Crossfire Hurricane. That briefing took place on February 16, and Boente said that he sought regular briefings on the case thereafter because he believed that it was extraordinarily important to the Department and its reputation that the allegations of Russian interference in the 2016 U.S. elections were investigated. Boente told us that he also was concerned that the investigation lacked cohesion because the individual Crossfire Hurricane cases had been assigned to multiple field offices. In addition, he said that he had the impression that the investigation had not been moving with a sense of urgency—an impression that was based, at least in part, on "not a lot" of criminal legal process being used. To gain more visibility into Crossfire Hurricane, improve coordination, and speed up the investigation, Boente directed ODAG staff to attend weekly or bi-weekly meetings with NSD for Crossfire Hurricane case updates.

Boente's calendar entries and handwritten notes reflect multiple briefings in March and April 2017. Boente's handwritten notes of the March meetings reflect that he was briefed on the predication for opening Crossfire Hurricane, the four individual cases, and the status of certain aspects of the Flynn case. Boente told us that when he was briefed on the predication for the investigation, he did not question it and did not have any concerns about the decision to open Crossfire

Hurricane.  Boente's handwritten notes of the meetings focused on the Flynn investigation and potential criminal violations of the Logan Act, the FBI's efforts to corroborate information contained in the source reporting that we describe in Chapters Four and Six, and the FBI's investigative efforts in the Carter Page and Manafort cases.[191]  According to Boente's handwritten notes, he was last briefed on Crossfire Hurricane the day after Rod Rosenstein was sworn in as DAG on April 26, 2017.

Rosenstein told us that he recalled being briefed three times during his initial two weeks as DAG on aspects of the investigation and Russian efforts to influence the 2016 U.S. elections.  The first briefing occurred within a day or two of being sworn in and was provided by Boente and then Principal Associate Deputy Attorney General James Crowell.  That briefing was followed by a meeting with Comey, McCord, and several others from the FBI and NSD.  Rosenstein said he also received a briefing from representatives of the USIC that included an overview of Russian interference with the U.S. elections.

Rosenstein told us that during the initial Department briefings he was most focused on information that had developed into criminal investigations, which he believed were going to be more immediately relevant to his work as DAG. Rosenstein said he did not recall the details provided during the briefings regarding Carter Page other than Page was suspected of being a foreign agent.  Rosenstein said he also did not recall the details of what was explained to him about the predication for opening the Crossfire Hurricane investigation.[192]  He said he would have been focused on the status and direction of the cases at the time of the briefings, and not as much on any historical information concerning their initiation.

In Chapters Five and Seven, we describe ODAG's role in the four Carter Page FISA applications.  As described in Chapter Seven, Yates approved the first Carter Page FISA application on October 21, 2016 and FISA Renewal Application No. 1 on January 12, 2017, Boente approved FISA Renewal Application No. 2 on April 7, 2017, and Rosenstein approved the FISA Renewal Application No. 3 on June 29, 2017.

### c.    Office of the Attorney General

Loretta Lynch was sworn in as Attorney General on April 27, 2015.  Lynch told the OIG that she did not recall receiving a briefing on the Crossfire Hurricane investigation.  Lynch's National Security Counselor told us that she did not receive any briefing on the case and did not know if Lynch received a briefing.  Lynch said

---

[191] The Logan Act, Title 18 U.S.C. § 953, makes it a crime for a citizen to confer with foreign governments against the interest of the United States.  Specifically, it prohibits citizens from negotiating with other nations on behalf of the United States without authorization.

[192] Rosenstein told us that at some later point—most likely in 2018—FBI officials represented to him that the basis for opening Crossfire Hurricane was the FFG information concerning Papadopoulos, and nothing else.  He told us that he did not receive any information from the FBI indicating otherwise.  He also told us that he did not have an opinion about whether the FFG information provided a sufficient basis to open the case.

she did not recall providing any guidance or direction to the FBI on the investigation, or having any awareness of the Carter Page FISA applications before she left the Department on January 20, 2017.  She told us that her office generally did not oversee counterintelligence investigations, but that sometimes counterintelligence issues were raised during morning threat intelligence briefings.  She said that she remembered knowing that Papadopoulos was a concern for the FBI, but she did not recall learning the specific information that came from the FFG relating to him.

Office of the Attorney General (OAG) officials told us that they did not read the Carter Page FISA applications or provide any feedback to OI, but email communications reflect that they were aware the FBI was seeking FISA authority targeting Carter Page before the first application was filed.  These officials included Lynch's Chief of Staff and her National Security Counselor.  The Chief of Staff told us she had no recollection of the email that referenced the FISA application.  The National Security Counselor told us that she believed she would have advised the Attorney General of the application, but she did not have any specific recollection of having done so.

Lynch told the OIG that after one of her weekly security meetings at FBI Headquarters in the spring of 2016, Comey and McCabe pulled her aside and provided information about Carter Page, which Lynch believed they learned from another member of the Intelligence Community.  According to Lynch, Comey and McCabe provided her with information indicating that Russian intelligence reportedly planned to use Page for information and to develop other contacts in the United States, and that they were interested in his affiliation with the campaign. Lynch told us that her understanding was that this information from Comey and McCabe was "preliminary" in that they did not state that any decisions or actions needed to be taken that day.  She said that they discussed the possibility of providing a defensive briefing to the Trump campaign, but she believed it was "preliminary" and "something that might happen down the road."  According to Lynch, she did not recall receiving any further updates on this issue following this conversation.  Lynch's recollection of what Comey and McCabe told her is consistent with information referenced in connection with the 2015 SDNY indictment and subsequent conviction of a Russian intelligence officer referenced earlier in this chapter.

Comey told the OIG that he did not recall having such a conversation with Lynch, and that he did not think it was possible for such conversation to have occurred in the spring of 2016 because the FBI did not receive the FFG information concerning Papadopoulos until late July (as we described earlier in this chapter). He also said that he did not recall himself having any knowledge of Carter Page's existence until the middle of 2016.[193]  Similarly, McCabe told us that he did not

---

[193] The OIG was unable to question Comey further using classified details Lynch described to us because, as noted in Chapter One, Comey chose not to have his security clearances reinstated for our interview.  Internal email communications reflect that in April 2016 NYFO prepared summaries of the information that ultimately led NYFO to open a counterintelligence investigation on Carter Page on

recall having any knowledge of Carter Page at this time.  He told us he had no recollection of briefing Lynch in the spring of 2016 about Carter Page and did not know Carter Page was the subject of an open investigation in NYFO.

### 3.    White House Briefings

Lynch told us that in her interactions with the White House in 2016, she did not recall substantive discussions about the Crossfire Hurricane investigations but did recall discussions about the broader topic of Russian interference in the 2016 U.S. elections.  Lynch said that the FBI, and not the Attorney General, would brief the White House on the investigation if the FBI was able to share information it received, but she did not recall that occurring.  Yates also told us she did not attend any White House briefings where Crossfire Hurricane or the Carter Page FISA application was briefed or discussed, and she had no knowledge of whether any such meetings occurred.

Priestap told the OIG that the FBI does not routinely brief ongoing cases to the White House with the exception of mass shootings, major terrorist attacks, or intelligence that suggests an imminent attack on the United States.  Priestap said that due to certain national security considerations, information from ongoing investigations may also need to be briefed to the White House by the Director.

Comey told us that he received no requests from the White House to investigate members of the Trump campaign or inquiries about whether the campaign was involved with the efforts by the Russians to interfere in the 2016 U.S. elections.  Comey said that he recalled generally the administration's interest in what the FBI was doing as a member of the USIC to understand and defeat Russia's efforts to interfere with the elections.  In fact, according to Strzok, the White House requested a briefing from the USIC in the fall of 2016 about actions the Russians were taking to interfere in the elections.  On September 2, 2016, Lisa Page and Strzok exchanged the following text:

> 9:41 a.m., Strzok to Lisa Page:  "Checkout my 9:30 mtg on the 7th"
>
> 9:42 a.m., Lisa Page to Strzok:  "I can tell you why you're having that meeting."
>
> 9:42 a.m., Lisa Page to Strzok:  "It's not what you think."
>
> 9:49 a.m., Strzok to Lisa Page:  "TPs [Talking Points] for D [Director]?"
>
> 9:50 a.m., Lisa Page to Strzok:  "Yes bc POTUS wants to know everything we are doing."

Strzok told us that these texts referred to the request by the White House to know everything the USIC knew about what Russia was doing to interfere in the 2016 U.S. elections and did not refer to the Crossfire Hurricane cases investigating

---

April 6, 2016 (described previously), and provided them to CD officials at Headquarters to be used for a "Director's note" and a separate "Director's Brief" to be held on April 27, 2016.

U.S. subjects.  Strzok told us that he never attended any White House briefings about Crossfire Hurricane.

McCabe's notes from a morning meeting with Comey and others in late July 2016 reflect that McCabe learned from Comey during the meeting that another U.S. government agency had briefed President Obama on intelligence that agency had suggesting that a RIS was engaged in covert actions to influence the U.S. presidential election in favor of Trump.  McCabe told us he did not attend this White House briefing; however, based on his notes, he said he did not believe the FFG information would have been discussed during this meeting, and our review of his notes did not indicate otherwise.  According to McCabe's notes of what he had been told by Comey, President Obama stated that the FBI should think about doing "defensive briefs."  The notes do not provide any further details about what Obama said regarding defensive briefings, and McCabe told us he did not recall that any further details were provided to him.  However, McCabe said he surmised from his notes that the briefings under discussion were to be given to the Trump campaign. As more fully described in Chapter Ten, the FBI participated in ODNI strategic intelligence briefings that were provided to members of both the Trump campaign and the Clinton campaign, including the candidates, in August and September 2016.  However, those were not defensive briefings and did not address the allegations contained in the FFG information.

When we asked Comey about meetings with the White House concerning Crossfire Hurricane, he said that although he did not brief the White House about the investigation, he did mention to President Obama and others at a meeting in the Situation Room that the FBI was trying to determine whether any U.S. person had worked with the Russians in their efforts to interfere in the 2016 U.S. election.[194]  Comey said he thought it was important that the President know the nature of the FBI's efforts without providing any specifics.  Comey said although he did not recall exactly what he said, he may have said there were four individuals with "some association or connection to the Trump campaign."  Comey stated that after he provided this information, no one at the meeting responded or followed up with any questions.  Comey did not recall specifically when this meeting took place, but believed it may have been in August 2016.  We were unable to determine whether this meeting was part of the same meeting reflected in McCabe's notes discussed above.

## IV.   Investigative Steps in Crossfire Hurricane Prior to Receipt of Christopher Steele Reporting on September 19

According to FBI officials, the early investigative steps taken in Crossfire Hurricane were structured to maintain a close-hold on the investigation and avoid any impact on the 2016 U.S. elections.  FBI officials told us that no steps were

[194] Comey told us that this meeting was attended by then Chief of Staff Dennis McDonough, then National Security Advisor Susan Rice, then Director of National Intelligence (DNI) James Clapper, then CIA Director John Brennan, and then Director of the National Security Agency Michael Rogers.

taken to investigate anyone associated with the Trump campaign prior to the opening of Crossfire Hurricane on July 31.[195]  Department officials including Rosenstein, Evans, Laufman, and Gauhar said they did not learn anything at any time suggesting otherwise.  We reviewed emails of senior CD officials from the 2 months prior to the opening of Crossfire Hurricane and did not find any communications suggesting any investigative actions relating to Trump campaign personnel were taken prior to July 31, 2016, with the exception of the pre-existing Page and Manafort cases discussed previously.

Anderson told us that the investigation began on July 31 with covert investigative techniques to be "very quiet" prior to the election.  We were told that the team's concern was that if the information about the investigation became public, it would disrupt the investigative efforts and could potentially impact the 2016 U.S. elections.  Anderson also told us that counterintelligence investigations are typically "conducted in the dark" because any public confirmation of the existence of the investigation "might alert the hostile foreign power…that we were onto them."  She also said that early on in the investigation, FBI managers overseeing the Crossfire Hurricane team "took off the table any idea of legal process" in conducting the investigation, because the FBI was "trying to move very quietly."  The FBI did not use national security letters or compulsory process prior to obtaining the first FISA orders.

At the outset of the investigation, as described earlier in this chapter, Strzok and SSA 1 traveled to verify the FFG information while analysts conducted open source and database research on the Crossfire Hurricane subjects and monitored their travel.  Analysts also developed profiles on each of the four subjects and reviewed FBI files for information and to identify potential FBI CHSs with useful contacts for the investigation.[196]  Additionally, almost immediately after opening the Page, Papadopoulos, and Manafort investigations on August 10, the case agent assigned to the Carter Page investigation, Case Agent 1, contacted OGC about the possibility of seeking FISA authority for Carter Page.  As we discuss in Chapter Five, FBI documents indicate that by late August, Case Agent 1 had been told that he had not yet presented enough information to support a FISA application targeting Carter Page.

The FBI also sent names of individuals associated with the Trump campaign to other U.S. government agencies and a foreign intelligence agency and requested any information about those individuals.  McCabe said that requesting a name trace from other U.S government agencies is a standard step in counterterrorism and counterintelligence cases that assists investigators by providing information on the

---

[195] As referenced in Chapter Nine, prior to his involvement with the Trump campaign, Manafort was the subject of a federal criminal investigation by the Department for alleged white collar offenses.  Further, as referenced earlier in this chapter, prior to his involvement with the Trump campaign, Carter Page was the subject of a NYFO counterintelligence investigation for his contacts with Russian intelligence officers.

[196] As described in Chapter Ten, early in the investigation, the Crossfire Hurricane team discovered that they had an existing FBI CHS who had previously interacted with three of the named subjects of the investigation.