**Interview of William J. Barnett**

Date of entry 09/21/202

On September 17, 2020, William J. Barnett was interviewed at the Office of the Department of Justice in Washington D.C. Participants included the following: William J. Barnett (BARNETT); Lawrence Berger (BERGER), attorney for BARNETT; Intv. Agent 1 Intv. Agent 1, Special Agent – Federal Bureau of Investigation; Intv. Agent 2, Special Agent – Federal Bureau of Investigation; AUSA-EDMO, Assistant United States Attorney – Eastern District of Missouri; and Jeffery Jensen (JENSEN), United States Attorney – Eastern District of Missouri.

The interview began at approximately 10:06 a.m. eastern time. BERGER said BARNETT understood BARNETT was not a subject of an investigation and only being interviewed as a witness. BERGER said BARNETT understood the interview was voluntary.

BARNETT provided the following information:

BARNETT started working for the Federal Bureau of Investigation (FBI) in August 1999. From 1999 to 2004, BARNETT was assigned to the FBI Newark Division where he worked violations involving illegal drugs and organized crime. In 2004, BARNETT transferred to the FBI Washington Field Office (WFO). From 2004 to 2009, BARNETT worked extra-territorial matters in WFO. In 2009, BARNETT began working espionage cases primarily concerning China. BARNETT then transitioned to working Russian espionage cases. [redacted] In August 2016, BARNETT was contacted by SSA 1 SSA 1 via Lync messaging. BARNETT and SSA 1 discussed the Snowden and Wiki Leaks investigations. BARNETT was assigned to work for SSA 1 as the case agent on the Michael Flynn (FLYNN) and Paul Manafort (MANAFORT) investigations. The FLYNN investigation was assigned the code name Crossfire Razor (RAZOR).

The RAZOR and Manafort investigations were part of the Crossfire Hurricane investigation. BARNETT was briefed on the investigation which was largely based on information alleging that members of the TRUMP Presidential Campaign had compromising information on the Hillary Clinton Campaign and the TRUMP Campaign had been penetrated by the Russians. BARNETT thought the Crossfire Hurricane investigation was "opaque," with little detail concerning specific evidence of criminal events. BARNETT thought the case theory was "supposition on supposition." Initially, BARNETT believed his lack of understanding concerning the case was a result of his just becoming familiar with the case.

Analyst 1 and Analyst 2 were Intelligence Analysts who worked closely with BARNETT. Analyst 1 was assigned to both the MANAFORT and RAZOR investigations. Analyst 2 was assigned to the MANAFORT investigation. BARNETT had difficulty becoming familiar with the investigation, as he could not access portions of the

Investigation on 09/17/2020 at Washington D.C.

By Special Intv. Agent 2 and Special Agent Intv. Agent 1

~~Declassified by FBI-C58W88B61~~
on 9/24/2020
This redacted version only

computerized investigative files. BARNETT had to ask Analyst 1 for files concerning the RAZOR investigation. BARNETT found the RAZOR investigation to be unclear and disorganized.

BARNETT was asked about SA 1. BARNETT said SA 1 was a FBI Special Agent who, at the time, was working matters concerning [redacted]. BARNETT said he never met in person with SA 1 [redacted]

From September 2016 through November 2016, BARNETT advised very little was being done on the RAZOR investigation. The case was opened by the FBI in the field, with FBI Headquarters concurrence and oversight. BARNETT thought the predication in the RAZOR investigation was "not great." One fact used for predication was a speech that Flynn gave in Russia several years prior. BARNETT believed the speech may have been ill-advised but not illegal. BARNETT did not open the RAZOR investigation; and with the little investigative activity conducted on it, BARNETT was not clear on what the persons opening the case wanted to "look for or at." A National Security Letter (NSL) had been prepared to obtain "toll records" for a phone belonging to FLYNN. The request was "pulled back" prior to the records being obtained. Peter Strzok (STRZOK) was the individual who ordered the NSL be pulled back. BARNETT was not told why the NSL was pulled back.

The RAZOR investigation contained information obtained by Special Agent SA 2 through a source in another investigation targeting Carter Page (PAGE). The PAGE investigation was also part of Crossfire Hurricane. The source reported that during an event [redacted] 2014 FLYNN unexpectedly left the event [redacted] The source alleged FLYNN was not accompanied by anyone other [redacted] BARNETT believed the information concerning [redacted] potentially significant and something that could be investigated. However, Intelligence Analysts did not locate information to corroborate this reporting concerning [redacted] FLYNN, including inquiries with other foreign intelligence agencies. BARNETT found the idea FLYNN could leave an event, either by himself or [redacted] without the matter being noted as not plausible. With nothing to corroborate the story, BARNETT thought the information was not accurate.

BARNETT was treading very lightly in the RAZOR investigation due to the upcoming presidential election in 2016. [redacted] BARNETT chose not to obtain records through FISA Business Records because he advised this process is comparatively onerous. Due to the type of investigation, BARNETT did not have access to the Grand Jury process. BARNETT was told to keep low-key, looking at publicly available information. Using the available methods and restrictions, BARNETT advised no evidence of criminal activity was found.

After being involved in the investigation for six weeks, BARNETT was still unsure of the basis of the investigation concerning Russia and the Trump Campaign working together, without

---

Investigation on 09/17/2020 at Washington D.C.

By Special Intv. Agent 2 and Special Agent Intv. Agent 1

---

a specific criminal allegation. There was a news report that a change in the Republican National Convention (RNC) platform statement of general principles concerning Ukraine. The RNC had a recommendation to change "lethal assistance" to "appropriate assistance" be provided to Ukraine. Some persons saw the report and thought the change in wording could be a sign of collusion. BARNETT failed to see the significance of the changed wording and thought the theory was "groping."

BARNETT said accusations by Chris Steele constituted a direct accusation.

The RAZOR investigation continued to remain in a holding pattern through late 2016, with no one making a specific request to him to close the investigation and no one pushing for additional investigative activity to be conducted. No one told BARNETT he was not doing enough concerning the RAZOR investigation. In September 2016, the MANAFORT investigation was occupying a considerable amount of BARNETT's time as there were investigative leads being addressed.

On November 8, 2016, BARNETT said there was a Lync message concerning the closing of the RAZOR investigation. Analyst 1 and BARNETT had a very frank discussion concerning the RAZOR investigation. Analyst 1 believed the investigation was an exercise in futility. BARNETT did not understand the point of the investigation.

Neither BARNETT nor SSA 1 had authority to close the RAZOR investigation. STRZOK was the individual in the position to close the RAZOR investigation.

BARNETT believed Analyst 3 was the lead analyst on RAZOR. Analyst 3 was convinced there was a criminal violation concerning FLYNN. Analyst 3 was referred to by some, including BARNETT and Analyst 1 as "a believer" due to his conviction FLYNN was involved in illegal activity.

The RAZOR investigation became increasingly complex because TRUMP had won the election and FLYNN's position in the incoming administration. BARNETT began to ask SSA 1 and Analyst 3 what they thought the "end game" was in the RAZOR investigation. BARNETT suggested an interview of FLYNN be conducted and the case be closed unless derogatory information was obtained. Analyst 3 cautioned against an interview of FLYNN, as Analyst 3 was concerned an interview would alert FLYNN as to the investigation. BARNETT believed FLYNN's position in the in-coming administration offered an opportunity for the FBI to conduct the interview without alerting any suspicion, as FLYNN would see such an interview as being standard procedure. BARNETT saw the rationale, explaining the reason for the interview as no problem, "an Easy lay-up." BARNETT also believed there was little harm in alerting FLYNN, as the interview would likely be the last step taken prior to closing the case.

BARNETT talked to FBI Assistant Special Agent in Charge of the Washington Field Office (WFO) SAIC 1. BARNETT told SAIC 1 he (BARNETT) wanted to

---

Investigation on 09/17/2020 at Washington D.C.

By Special Intv. Agent 2 and Special Agent Intv. Agent 1

---

interview FLYNN, as there was nothing left to do in the case. SAIC 1 later told BARNETT he ran the request to interview FLYNN "up the chain" and the request was denied. BARNETT explained his idea of the interview being part of a "clearance" with FLYNN being part of an in-coming administration. SAIC 1 said FLYNN already had a clearance through the Department of Defense and the FBI was not the holder of the clearance so there would be no interview. BARNETT said he planned to conduct no further investigation into the RAZOR matter, as he was denied his request for an interview and the NSL for toll records had been "pulled back."

Between Christmas and New Year's Eve 2016, SSA 1 called BARNETT and said STRZOK told them to close the RAZOR investigation. BARNETT began working on a document to close the RAZOR investigation which would include everything they had done of significance in the case. BARNETT wanted to include information obtained during the investigation, including non-derogatory information. BARNETT wanted to include information specifically FLYNN. The and FLYNN were only in the same country the same time on one occasion and at that time they were visiting different cities. BARNETT wanted to include information concerning his request to interview, which was denied. Typically, the closing document states the investigation can be reopened if derogatory information is obtained in the future.

JENSEN asked about a "Trip Wire" that was mentioned in a Lync message sent on 12/05/2016 between Analyst 4 and SSA 1. BARNETT explained a "Trip Wire" was a potential source of future information.

BARNETT was asked if he could explain the meaning of a Lync message from SSA 1 to SA 2 on 11/21/2016. BARNETT said he could not speak directly to the meaning of the Lync message; .

BARNETT said he was working on the document to close the RAZOR investigation on 01/03/2017 and 01/04/2017. Concerning a Lync message on 01/04/2017 from Analyst 2 to BARNETT, which stated, "I know COB it needs to be finished," BARNETT could not recall any timeline or deadline on closing the RAZOR investigation.

On 01/04/2017, Analyst 3 e-mailed BARNETT with information concerning BARNETT wanted to include in the closing document.

At 2:21 pm, on 01/04/2017, BARNETT received a message from SA 2 asking that BARNETT not close the RAZOR investigation, as STRZOK had information to add to the file.

BARNETT was provided the concerning involving FLYNN. BARNETT read a couple of times and did not see what the significant issue or "rub" was BARNETT did not change his view that FLYNN was

Investigation on 09/17/2020 at Washington D.C.

By Special Intv. Agent 2 and Special Agent Intv. Agent 1

not compromised by the Russians after reading [redacted]. At the time, BARNETT was told there was a potential LOGAN ACT violation. BARNETT was not familiar with the LOGAN ACT and had to research the matter. BARNETT did not see a potential LOGAN ACT violation as a major issue concerning the RAZOR investigation. BARNETT did not see the LOGAN ACT as a serious stand-alone charge. There was a conversation between SSA 1 and BARNETT concerning an interview of FLYNN. BARNETT told SSA 1 he (BARNETT) would not be available the following day, 01/05/2020, due to a scheduled medical procedure.

BARNETT was not part of any further conversations concerning an interview of FLYNN until 01/25/2017. On 01/25/2017, SSA 1 told BARNETT that FLYNN had been interviewed on 01/24/2017. SSA 1 was apologetic, as BARNETT was not consulted or asked to participate in the interview. BARNETT assumed the interview was being done as a "check the box" exercise prior to the investigation being closed. BARNETT was not told they were planning the interview. BARNETT assumed the case would be closed after FLYNN had been interviewed. Typically a line agent / case agent would do the interview with a senior FBI official present in cases concerning high ranking political officials. SSA 1 told BARNETT it was a last minute decision to conduct the interview. BARNETT did not think the interview would be significant. In hindsight, BARNETT believed he was "cut out" of the interview.

There was another reorganization of the Crossfire Hurricane investigation after the 01/24/17 interview of FLYNN. STRZOK was supervising the RAZOR investigation along with SA 3 FBI-HQ Program Manager [redacted].

The Department of Justice and FBI Headquarters were having meetings concerning the RAZOR investigation which neither BARNETT nor any other line agents were invited to attend. The RAZOR investigation was "top down," meaning direction concerning the investigation was coming from senior officials. The FBI was reacting to articles being reported in the news, most notably an article written by Ignatius concerning [redacted] involving FLYNN to a Russian Ambassador. After the article by Ignatius, the investigative tempo increased with the issuance of "base-line NSLs" and the aforementioned interview of FLYNN.

BARNETT described the RAZOR investigation as having three phases. Phase one started with the opening of the case and ended on 01/04/2017, prior to the discovery of the [redacted] BARNETT did not believe [redacted] to be significant. Phase two was the time period from 01/04/2017 to 01/24/2017. Phase two included the time period the investigators were advised of the existence of the [redacted] BARNETT was not consulted concerning the investigative plan. Phase three started after the interview on 01/24/2017.

BARNETT was asked about a Lync message between Analyst 1 and Analyst 5 on 01/09/2017 concerning professional liability insurance. BARNETT did not know the specifics concerning the text, however, BARNETT routinely suggested persons obtain professional liability

insurance. BARNETT thought the Lync message did not concern the RAZOR investigation due to the date of the Lync message proceeding the Ignatius article.

In or about early February 2017, BARNETT discussed his wish to be removed from the RAZOR investigation with FBI Unit Chief [Unit Chief 1] and [SA 3]. [Unit Chief 1] and [SA 3] asked why BARNETT wished to be removed from the investigation. BARNETT said the Inspector General (IG) was looking at the Clinton Case and BARNETT believed the RAZOR investigation was problematic and could result in an IG investigation. FBI policy does not allow for an agent to pick and choose his/her cases. An agent can request to be removed from a case. If an agent is not removed but wanted to leave, they could do a "sit down strike," meaning the agent asks for approval to do everything and creates enough problems to have them removed from the case.

BARNETT was not at the meeting on 01/30/2017 during which the FBI told DOJ that they did not believe FLYNN was an agent of Russia.

In February 2017, NSLs were being drafted with [SA 3] instructing BARNETT as to what needed to be done. BARNETT believed Andrew McCabe (MCCABE) was directing the RAZOR investigation. BARNETT still did not see any evidence of collusion between the TRUMP Campaign and the Russian Government. BARNETT was willing to follow instructions being given by the Deputy Director as long as it was not a violation of law. BARNETT believed the investigation was a check the box exercise, making sure all bases were covered, before the case was closed. BARNETT did not think the RAZOR investigation was leading or headed toward prosecution.

BARNETT was asked about a Lync message from [SA 3] to BARNETT on 02/01/2017.

[redacted] There was a significant amount of [redacted] however none of the information appeared to indicate criminal activity to BARNETT.

BARNETT was asked about a Lync message from [SA 3] to BARNETT on 02/01/2017 concerning [Atty 1], [redacted] and the Logan Act. BARNETT said [Atty 1] instructed BOONE to classify the Logan Act information as [redacted] which is a Foreign Agent Registration Act (FARA) violation, as there is no specific Logan Act classification in the FBI.

BARNETT was asked about a series of Lync messages on 02/01/2017 between himself and [SA 3] concerning taskings being done in the RAZOR investigation. BARNETT said the Lync messages concerned different investigative units possessing information needed and how the

requests for the information would be facilitated. BARNETT said the information gathered was what was expected to be found and there was, in BARNETT's opinion, no evidence of criminal activity and no information that would start a new investigative direction.

BARNETT was asked about a series of Lync messages on 02/07/2017 between himself and SA 3. BARNETT said the Lync messages discussed SA 3 providing information to the White House regarding information gathered during the RAZOR investigation.

BARNETT was asked about NSLs completed in the RAZOR investigation. [redacted] BARNETT was provided with a sample request, referred to as a "pony," by Kevin Clinesmith (CLINESMITH), FBI National Security Law Branch (NSLB) Attorney. Working on the RAZOR investigation was the first time BARNETT came into contact with CLINESMITH. In the past, BARNETT worked with NSLB attorney Atty 1 who was regarded as the NSL expert.

BARNETT completed the NSL requests and forwarded the request to CLINESMITH for review and approval. CLINESMITH then physically walked the NSL requests to approvers/reviewers for their initials.

BARNETT was asked specific questions concerning the predication for investigation information provided in the requests for the NSL. BARNETT said he sent an e-mail to CLINESMITH on 02/01/2017 asking CLINESMITH about whether the predication information was acceptable, as it was the same information provided on the original NSL request in 2016. CLINESMITH told BARNETT the information was acceptable and could be used for additional NSLs. BARNETT thought at the time the NSLs were legally justified. While BARNETT questioned the investigative theory, he did not think at the time the investigation was illegal, particularly due to the oversight by attorneys (i.e., CLINESMITH) and the direction being given by top FBI officials.

BARNETT explained the NSL system was less intrusive than a FISA. BARNETT thought the gathering of the information was a logical investigative step and something that should have been done in 2016 in "Phase one." BARNETT was still under the assumption the information was being gathered as a "check the box" exercise and the matter could be resolved definitively. BARNETT explained the reason the date ranges continued to be expanded, asking for information as early as 2015, was to ensure a full understanding to support or dismiss the allegations. BARNETT compared the request of the information during the investigation to "running out ground balls," to obtain a complete picture, and "put the matter to rest."

BARNETT was asked about the request being made for information "up to present." BARNETT said that was common language used in such requests.



The information obtained through the NSLs did not change BARNETT's mind that FLYNN was not working with the Russian government. BARNETT believed there were grounds to investigate the other three subjects in Crossfire Hurricane; however; he thought FLYNN was the "outlier."

BARNETT was asked about an e-mail from CLINESMITH to BARNETT on 03/20/2017 that referenced over-production. BARNETT explained the potential over-production issue was which was utilized by FLYNN. CLINESMITH and possibly others determined there was no over-production issue.

On 03/20/2017, FBI Director James COMEY (COMEY) testified and discussed the investigation of four unnamed persons in the TRUMP Campaign. During the testimony, STRZOK e-mailed BARNETT and asked if the FBI had FLYNN's

BARNETT was asked about a Lync message on 04/06/2017 from Analyst 1 to BARNETT regarding Analyst 1 being removed from the RAZOR investigation. BARNETT said Analyst 1 was very skeptical of the FLYNN collusion investigation. BARNETT also thought it was a "dumb theory" that did not make sense.

BARNETT and STRZOK had a discussion at the time of the appointment of Robert Mueller (MUELLER) as the head of the Special Council Office (SCO). BARNETT told STRZOK case was far stronger than the RAZOR investigation, in that there was specific information that could be investigated. BARNETT was working closely with SCO Atty 1 SCO Atty 1. BARNETT had worked with SCO Atty 1 on other matters.

BARNETT was told to give a brief on FLYNN to a group including SCO attorney Jean Rhee (RHEE), SA 4, , , SCO Atty 1 and possibly . BARNETT said he briefly went over the RAZOR investigation, including the assessment that there was no evidence of a crime, and then started to discuss which BARNETT thought was the more significant investigation. RHEE stopped BARNETT's briefing and asked questions concerning the RAZOR investigation. RHEE wanted to "drill down" on the fees FLYNN was paid for a speech FLYNN gave in Russia. BARNETT explained logical reasons for the amount of the fee, but RHEE seemed to dismiss BARNETT's assessment. BARNETT thought RHEE was obsessed with FLYNN and Russia and she had an agenda. RHEE told BARNETT she looked forward to working together. BARNETT told RHEE they would not be working together.

BARNETT expressed his concerns about RHEE to SCO Atty 1. BARNETT told SCO Atty 1 SCO Atty 1 that he wanted nothing to do with the RAZOR investigation.

---

Investigation on 09/17/2020 at Washington D.C.

By Special Intv. Agent 2 and Special Agent Intv. Agent 1

---

On the day following the brief that BARNETT provided to RHEE, BARNETT was contacted by STRZOK. STRZOK said he (STRZOK) really wanted BARNETT to work with the SCO. STRZOK said he (STRZOK) knew BARNETT had a problem with RHEE. BARNETT told STRZOK that he (BARNETT) wanted to work [redacted] and did not wish to pursue the collusion investigation as it was "not there." STRZOK said he (STRZOK) would run interference between BARNETT and RHEE. SCO Atty 1 and STRZOK told BARNETT he (BARNETT) could work on things other than what RHEE was looking into. BARNETT decided to work at the SCO hoping his perspective would keep them from "group think."

In March or April 2017, Crossfire Hurricane went through another reorganization. All of the investigations were put together.

BARNETT was physically working at the Washington Field Office while others in the SCO were working at the FBI-HQ office.

[redacted] investigation was a separate and new investigative matter. The case was opened by the FBI WFO as a distinct case with new information, questions that could be asked, and plenty to do to include the issuance of Grand Jury Subpoenas.

On 03/30/2017, FLYNN did a Washington Street Journal article in which it was suggested if immunity was granted FLYNN could provide significant information.

On 05/09/2017, COMEY was fired which seemed to trigger a significant amount of activity regarding Crossfire Hurricane. Carter Page was interviewed three times and PAPADOPOULOS was also interviewed. Both investigations seemed to be nearing an end with nothing left to pursue. The MANAFORT case was moved from an investigative squad to a counter intelligence squad [redacted] The Crossfire Hurricane investigations seemed to be winding down.

The appointment of the SCO changed "everything." Mueller was leading the SCO. Search Warrants were being drafted and executed on a regular basis. Attorneys in the SCO were very aggressive and were directing things. BARNETT described the SCO situation as upside down with attorneys drafting search warrants and getting agents to simply act as affiants. BARNETT thought there was a "get TRUMP" attitude by some at the SCO.

BARNETT said the "get TRUMP" attitude was exhibited in two ways. BARNETT referred to incidents involving TRUMP which were taken in the most negative manner, or in some cases misinterpreted. As an example, BARNETT described comments made by TRUMP in that investigators needed to "get to the bottom" of a matter. [redacted], one of the SCO attorneys, said TRUMP wanted to "cover it up." BARNETT corrected [redacted] saying, "no, he said get to the bottom of it." As another example, BARNETT said the firing of FBI Director COMEY was interpreted as obstruction when it could just as easily have been done because TRUMP did not like COMEY and wanted him replaced. BARNETT said [redacted]

Investigation on 09/17/2020 at Washington D.C.

By Special Intv. Agent 2 and Special Agent Intv. Agent 1

[redacted] BARNETT said such statements were simply discounted because they did not fit the opinions formed of some at SCO. Concerning FLYNN, some individuals in the SCO assumed FLYNN was lying to cover up collusion between the TRUMP campaign and Russia. BARNETT believed FLYNN lied in the interview to save his job, as that was the most plausible explanation and there was no evidence to contradict it.

BARNETT said the second way the "get TRUMP" attitude was exhibited at SCO was what BARNETT referred to as Mueller's "all stars," which was a term used in news articles describing the SCO. All of the attorneys wanted to be part of something "big," a successful prosecution. BARNETT said it was not necessarily "get TRUMP" but more the conviction there was "something criminal there" and a competition as to which attorney was going to find it. There was a lack of letting the evidence lead the investigation and more the attitude of "the evidence is there we just have to find it." As an example, BARNETT said SCO attorneys during interviews would be convinced the interviewee had information despite the answers provided. BARNETT suggested to the SCO attorneys the idea the interviewee did not possess the information desired.

During one of the early interviews of KT McFarland (MCFARLAND), MCFARLAND said she was not aware of [redacted] between FLYNN and the Russian Ambassador. At a later interview, MCFARLAND said she was aware of [redacted]. Andrew Weissmann (WEISSMANN), an attorney at the SCO, suggested this was a blatant lie and suggested charging MCFARLAND with a False Statement charge, a "1001." Many including BARNETT and SCO Atty 1 SCO Atty 1 believed MCFARLAND was just trying to minimize her knowledge of what had occurred, as it was embarrassing or inconvenient, and she was being proposed for a possible position as an Ambassador to Singapore. BARNETT believed some of the attorneys in the SCO did not ask clarifying questions, but instead took the information provided and interpreted that information in a way favorable to their opinions.

Many at the SCO had the opinion MCFARLAND had knowledge TRUMP was directing [redacted] between FLYNN and the Russian Ambassador. When MCFARLAND did not provide the information sought, it was assumed she was lying. When BARNETT suggested it was very possible MCFARLAND was providing truthful information, one of the SCO attorneys participating in the interview said BARNETT was the only person who believed MCFARLAND was not holding back the information about TRUMP's knowledge of [redacted]. MUELLER described MCFARLAND as the "key to everything" because MCFARLAND was the link between TRUMP, who was at Mar-a-Lago with MCFARLAND, and FLYNN, who was in the Dominican Republic on vacation, when [redacted] were made.

MCFARLAND was interviewed on numerous occasions. BARNETT was told at one point he was being taken off the MCFARLAND proffer interview because SCO attorneys thought it would be easier for MCFARLAND to talk without BARNETT there, due to her attitude toward BARNETT during past interviews. BARNETT insisted he be on the interview. When BARNETT

was told he would not be allowed on the interview, BARNETT suggested he might take the matter to the Inspectors General or to "11." BARNETT believed some at SCO were trying to get MCFARLAND to change her story to fit the TRUMP collusion theory. SCO Atty 1 later contacted BARNETT and said BARNETT would be part of the MCFARLAND interview.

During the proffer interview with MCFARLAND, the "obstruction team" was leading the interview. BARNETT described the "obstruction team's" questions as general. They did not ask follow-up or clarifying questions. BARNETT was perplexed by their lack of asking follow-up questions. BARNETT began asking MCFARLAND follow-up questions and direct questions. BARNETT was trying to "cut to the chase" and obtain the facts. BARNETT asked questions such as, "Do you know that as a fact or are you speculating?" and "Did you pass information from TRUMP to FLYNN?" Andrew Goldstein (GOLDSTEIN), a SCO attorney, called "time-out" and cautioned BARNETT by saying, "If you keep asking these questions, we will be here all day."

During one interview of FLYNN, possibly the second interview, one of the interviewers asked a series of questions including one which FLYNN's answer seemed to indicate TRUMP was aware of [redacted] between FLYNN and the Russian Ambassador. BARNETT believed FLYNN's answer was an effort to tell the interviewers what they wanted to hear. BARNETT had to ask the clarifying question of FLYNN who then said clearly that TRUMP was not aware of [redacted]

BARNETT said numerous attempts were made to obtain evidence that TRUMP directed FLYNN concerning [redacted] with no such evidence being obtained. BARNETT said it was just an assumption, just "astro projection," and the "ground just kept being retreaded." BARNETT said it seems there was always someone at SCO who claimed to have a lead on information that would prove the collusion only to have the information be a dead end. BARNETT provided an example: WEISSMANN said there was meeting on a yacht near Greece that was going to be the proof of collusion, 'quid pro quo." BARNETT said within a day or two the information was not substantiated.

BARNETT was asked about the investigation [redacted]

BARNETT believed in August 2017 the investigation was focused on [redacted] There was a pivot to Russia in the investigation, and BARNETT assumed it was to close the Russia investigation.

Pending Unsealing by the Court

Investigation on 09/17/2020 at Washington D.C.

By Special Intv. Agent 2 and Special Agent Intv. Agent 1

Pending Unsealing by the Court

Pending Unsealing by the Court

Pending Unsealing by the Court

BARNETT said working with the SCO was a very unique environment for him. Typically investigators push for legal process and have to explain the need for the request to the attorneys. BARNETT said the SCO attorneys were pushing for legal process and just wanted investigators to sign affidavits they prepared. Everything was "green-lighted" by the SCO, *i.e.*, you could get whatever legal process you wanted. BARNETT did not see the investigator/attorney relationship

Investigation on 09/17/2020 at Washington D.C.

By Special Intv. Agent 2 and Special Agent Intv. Agent 1


as 50/50. At the SCO, BARNETT believed the investigators were looked at as a "speed bump" to the attorneys who were leading the investigations. BARNETT said the investigators assigned to the  and RAZOR investigations were doing what they were assigned to do.

Pending Unsealing by the Court

BARNETT was not part of any discussion as to whether or not FLYNN should be reinterviewed after the 01/24/2017 interview.

BARNETT had a cellular telephone issued by the SCO which he did not "wipe." BARNETT did hear other agents "comically" talk about wiping cellular telephones, but was not aware of anyone "wiping" their issued cellular telephones. BARNETT said one agent had a telephone previously issued to STRZOK.

BARNETT thought the TRUMP Campaign may have been aware the Russians were attempting to impact the election, but that was far different from the TRUMP Campaign and the Russians having a deal and/or working together "quid pro quo." BARNETT and others joked about how the investigation into collusion could be made into a game, which they referred to as "Collusion Clue." In the hypothetical game, investigators are able to choose any character conducting any activity, in any location, and pair this individual with another character and interpret it as evidence of collusion. With respect to FLYNN's [redacted] with the Russian Ambassador in December 2016, BARNETT did not believe FLYNN was being directed by TRUMP. BARNETT did not believe FLYNN had any additional information to provide to SCO. BARNETT believed the prosecution of FLYNN by SCO was used as a means to "get TRUMP."

---

Investigation on 09/17/2020 at Washington D.C.

By Special **Intv. Agent 2** and Special Agent **Intv. Agent 1**

---