Leave to file GRANTED

*Emmet G. Sullivan*

United States District Judge

*9-28-2020*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA,

v.

MICHAEL T. FLYNN,

      Defendant.

---

Crim. No. 1:17-cr-00232 (EGS)

## *AMICUS CURIAE* BRIEF OF THE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS IN SUPPORT OF DEFENDANT

David Oscar Markus
MARKUS/MOSS PLLC
40 N.W. Third Street, PH1
Miami, FL 33128
Telephone: (305) 379-6667
Facsimile: (305) 379-6668
dmarkus@markuslaw.com

Prof. Ricardo J. Bascuas
UNIVERSITY OF MIAMI SCHOOL OF LAW
1311 Miller Drive
Coral Gables, FL 33146
Telephone: (305) 284-2672
Facsimile: (305) 284-1588
r.bascuas@miami.edu

Jeffrey T. Green (D.C. Bar No. 426747)
Christopher S. Ross (D.C. Bar No. 1643856)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
jgreen@sidley.com
christopher.ross@sidley.com

*Counsel for Amicus Curiae*
*National Association of Criminal*
*Defense Lawyers*

Dated: June 9, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ................................................. 1

SUMMARY OF ARGUMENT ...................................................................................... 2

ARGUMENT ................................................................................................................. 3

I.      THE FEDERAL JUSTICE SYSTEM IS A SYSTEM OF PLEAS ..................... 3

II.     INNOCENT DEFENDANTS CAN FACE STRONG INSTITUTIONAL
        PRESSURES TO PLEAD GUILTY ................................................................... 6

        A.      The Prosecutor's Arsenal Of Sentencing Tactics Creates A Trial
                Penalty ..................................................................................................... 6

        B.      Defendants Face Significant Pressure To Accept A Plea Offer, Even
                While Maintaining Their Innocence ........................................................ 8

III.    A LEGALLY INNOCENT PERSON WHO NONETHELESS PLEADS
        GUILTY TO A FEDERAL CRIME DOES NOT THEREBY COMMIT
        CRIMINAL CONTEMPT OF COURT ............................................................ 12

        A.      Perjury Is Not A Contempt Of Court ..................................................... 13

        B.      Even If Perjury Did Constitute Contempt Of Court, The Rationale For
                That Would Not Reach A Defendant Who Pleads Guilty Though He
                Believes Himself To Be Legally Innocent .............................................. 16

CONCLUSION ............................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blackledge v. Allison,*
  431 U.S. 63 (1977) .................................................................................. 5

*Blakely v. Washington,*
  542 U.S. 296 (2004) ............................................................................... 18

*Bordenkircher v. Hayes,*
  434 U.S. 357 (1978) ................................................................................. 9

*Brady v. United States,*
  397 U.S. 742 (1970) ......................................................................... 4, 5, 9

*Cage v. Louisiana,*
  498 U.S. 39 (1990), *overruled on other grounds by Estelle v.*
  *McGuire,* 502 U.S. 62 (1991) .................................................................. 6

*California v. Green,*
  399 U.S. 149 (1970) ............................................................................... 18

*Cammer v. United States,*
  350 U.S. 399 (1956) ......................................................................... 12, 15

*Clark v. United States,*
  289 U.S. 1 (1933) ................................................................................... 15

*Dickerson v. United States,*
  530 U.S. 428 (2000) ................................................................................. 6

*Ex parte Hudgings,*
  249 U.S. 378 (1919) ..................................................................... 13, 14, 16

*Hudson v. United States,*
  272 U.S. 451 (1926) ............................................................................... 17

*\*Lafler v. Cooper,*
  566 U.S. 156 (2012) ................................................................................. 3

*McQuiggin v. Perkins,*
  569 U.S. 383 (2013) ............................................................................... 11

\*Authorities chiefly relied upon are marked with asterisks.

*In re Michael,*
   326 U.S. 224 (1945) ..................................................................... 14, 15, 16

*\*Missouri v. Frye,*
   566 U.S. 134 (2012) ......................................................................... 3, 4

*\*North Carolina v. Alford,*
   400 U.S. 25 (1970) .............................................................. 3, 8, 16, 17

*Ramos v. Louisiana,*
   140 S. Ct. 1390 (2020) ........................................................................ 17

*United States v. Appel,*
   211 F. 495 (S.D.N.Y. 1913)................................................................ 14

*United States v. Dunnigan,*
   507 U.S. 87 (1993) ........................................................................ 15, 16

*United States v. Jackson,*
   390 U.S. 570 (1968) ............................................................................ 10

*United States v. Monia,*
   317 U.S. 424 (1943) ............................................................................ 16

*Young v. United States ex rel. Vuitton et Fils S.A.,*
   481 U.S. 787 (1987) ............................................................................ 16

**Constitution and Statute**

U.S. Const. amend. VI .................................................................................. 4

18 U.S.C. § 401............................................................................................. 13

**Scholarly Authorities**

*\*Rachel E. Barkow, Separation of Powers and the Criminal Law,* 58
   Stan. L. Rev. 989 (2006) ................................................................... 5, 6

Ricardo Bascuas, *The American Inquisition: Sentencing After the
   Federal Guidelines,* 45 Wake Forest L. Rev. 1 (2010)............................ 9

Stephanos Bibas, *Plea Bargaining Outside the Shadow of Trial,* 117
   Harv. L. Rev. 2463 (2004) ................................................................. 11

*\*Lucian E. Dervan & Vanessa A. Edkins, The Innocent Defendant's
   Dilemma: An Innovative Empirical Study of Plea Bargaining's
   Innocence Problem,* 103 J. Crim. L. & Criminology 1 (2013)..................... 4, 10, 11

Brian D. Johnson, *Plea-Trial Differences in Federal Punishment:*
*Research and Policy Implications*, 31 Fed. Sent'g Rep. 256 (2019)........................ 7

Marc L. Miller, *Domination & Dissatisfaction: Prosecutors as*
*Sentencers*, 56 Stan. L. Rev. 1211 (2004).................................................................. 5

Sarah French Russell, *Reluctance to Resentence: Courts, Congress, and*
*Collateral Review*, 91 N.C. L. Rev. 79 (2012) ........................................................ 11

**Other Authorities**

Innocence Project, *DNA Exonerations in the United States,*
https://www.innocenceproject.org/dna-exonerations-in-the-united-
states/ (last visited June 9, 2020) ............................................................................ 8

Mark Motivans, Bureau of Justice Statistics, U.S. Dep't of Justice,
NCJ 251770, *Federal Justice Statistics, 2015–2016* (Jan. 2019),
https://www.bjs.gov/content/pub/pdf/fjs1516.pdf.................................................... 11

*Nat'l Ass'n of Crim. Def. Lawyers, *The Trial Penalty: The Sixth*
*Amendment Right to Trial on the Verge of Extinction and How to*
*Save It* (2018), https://www.nacdl.org/getattachment/95b7f0f5-90df-
4f9f-9115-520b3f58036a/the-trial-penalty-the-sixth-amendment-
right-to-trial-on-the-verge-of-extinction-and- .......................................... 7, 8, 9, 12

*Jed S. Rakoff, *Why Innocent People Plead Guilty*, N.Y. Rev. Books
(Nov. 20, 2014), https://www.nybooks.com/articles/2014/11/20/why-
innocent-people-plead-guilty/.......................................................................... 4, 5, 6

U.S. Sentencing Comm'n, *2019 Annual Report and Sourcebook of*
*Federal Sentencing Statistics* (2019),
https://www.ussc.gov/sites/default/files/pdf/research-and-
publications/annual-reports-and-sourcebooks/2019/2019-Annual-
Report-and-Sourcebook.pdf................................................................................ 3, 4

U.S. Sentencing Guidelines Manual (U.S. Sentencing Comm'n 2018)...................... 10

## IDENTITY AND INTEREST OF *AMICUS CURIAE[1]*

The National Association of Criminal Defense Lawyers ("NACDL") is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct. NACDL was founded in 1958. It has a nationwide membership of many thousands of direct members, and up to 40,000 with affiliates. NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges. NACDL is the only nationwide professional bar association for public defenders and private criminal defense lawyers. NACDL is dedicated to advancing the proper, efficient, and just administration of justice. NACDL files numerous amicus briefs each year in the U.S. Supreme Court and other federal and state courts, seeking to provide amicus assistance in cases that present issues of broad importance to criminal defendants, criminal defense lawyers, and the criminal justice system as a whole.

This case presents a question of great importance to NACDL because the vast majority of criminal prosecutions resolve by guilty plea. NACDL has as part of its mission to protect the fairness of the plea-bargaining process through rules of criminal procedure that level the playing field between prosecutors and defendants. This includes the elimination of a "trial penalty" for defendants who elect to exercise

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) and Local Civil Rule 7(o)(5), no counsel for any party authored this brief in whole or in part; no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief; and no person other than *amicus curiae*, its members, or its counsel made such a monetary contribution.

1

their constitutional rights and put the prosecution to its proof. Trials are important for numerous reasons, including the development of the law, clarification of jury instructions, and the public perception of the criminal justice system as one of fairness and integrity that necessarily involves the judgment of peers. Existing trial penalties (e.g., enhanced charges, sentencing increases), however, present not just the risk, but the reality that innocent defendants plead guilty to especially grave charges in order to avoid the risk of a greater term of imprisonment. Such defendants should not be threatened with perjury or contempt of court for doing so. NACDL therefore files this brief in support of Defendant Michael T. Flynn.

## SUMMARY OF ARGUMENT

Although the plea-bargaining system provides important efficiencies, prosecutors enjoy significant institutional leverage over criminal defendants. The prosecutor's ability to bring certain charges and forgo others necessarily defines a defendant's potential sentencing range. And because defendants face a higher sentence as a result of going to trial, many innocent defendants will take the certainty of a lower sentence rather than elect to proceed to trial, where conviction rates are high. The resulting trial penalty, or the gap between the sentence received through a plea bargain versus going to trial, underscores exactly why some innocent defendants must and do plead guilty.

The criminal contempt sanction is a poor fit. A coerced, or even potentially coerced, act of perjury generally does not equate to criminal contempt of a court. And the plea-bargaining system's core justification—efficiency—does not concern itself

2

with the truth-seeking function that a jury trial entails. Hence, the Supreme Court decades ago sanctioned the "*Alford* Plea," allowing defendants to plead guilty while maintaining their innocence. *See North Carolina v. Alford*, 400 U.S. 25 (1970). The contempt sanction better fits those acts of disruption in the courtroom or intransigence (e.g., wholesale failure to respond to a subpoena or to questions) that preclude the administration of justice. Levying contempt sanctions against "lies in the courtroom" can become an unbounded and *ultra vires* exercise that presents separation of powers concerns. Finally, there can be little doubt that this closely followed case will establish precedent. Authorities' reasons for dismissing charges may be wholly laudable in myriad cases, and the exercise of a contempt sanction may provide a novel means for other courts to reject those reasons in future.

## ARGUMENT

### I.   THE FEDERAL JUSTICE SYSTEM IS A SYSTEM OF PLEAS.

The Supreme Court has noted the steep and worrying decline in the use of jury trials and described the modern criminal justice system as "a system of pleas, not a system of trials." *Lafler v. Cooper*, 566 U.S. 156, 169–70 (2012). In 2012, the Court highlighted that "[n]inety-seven percent of federal convictions and ninety-four percent of state convictions [were] the result of guilty pleas." *Missouri v. Frye*, 566 U.S. 134, 143 (2012). Last year's statistics bear out this trend. According to the United States Sentencing Commission, 97.6% of federal convictions are obtained through a guilty plea, and only 2.4% of cases go to trial. *See* U.S. Sentencing Comm'n, *2019 Annual Report and Sourcebook of Federal Sentencing Statistics* tbl.11 (2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-

reports-and-sourcebooks/2019/2019-Annual-Report-and-Sourcebook.pdf. The figures are not much different in this district: 95.2% of convictions result from guilty pleas, and 4.8% from trial. *See id.* With so few cases going to trial, however, prosecutors have broadly been relieved of their duty to prove offenses beyond a reasonable doubt. Accordingly, plea bargaining "is not some adjunct to the criminal justice system; it *is* the criminal justice system." *See Frye*, 566 U.S. at 144 (quoting Robert E. Scott & William J. Stuntz, *Plea Bargaining as Contract*, 101 Yale L.J. 1909, 1912 (1992)). Because the plea-bargaining system can circumvent defendants' right to a trial by jury, *see* U.S. Const. amend. VI, the Supreme Court has recognized that plea bargaining is a "critical point for a defendant" in a prosecution. *See Frye*, 566 U.S. at 143–44. The negotiation is so critical that the defendant's Sixth Amendment right to effective assistance of counsel attaches during it. *See id.*

One proffered justification for the plea-bargaining system is that it functions as "an indispensable solution for an overwhelmed structure." Lucian E. Dervan & Vanessa A. Edkins, *The Innocent Defendant's Dilemma: An Innovative Empirical Study of Plea Bargaining's Innocence Problem*, 103 J. Crim. L. & Criminology 1, 10 (2013) (hereinafter "Dervan and Edkins Study"). Courts largely approved of the use of plea agreements well before the rise of mandatory minimum sentences and mandatory sentencing guidelines in the 1970s and 1980s. *See* Jed S. Rakoff, *Why Innocent People Plead Guilty*, N.Y. Rev. Books (Nov. 20, 2014), https://www.nybooks.com/articles/2014/11/20/why-innocent-people-plead-guilty/; *see also Brady v. United States*, 397 U.S. 742 (1970) (approving of plea bargain). When

made in good faith, a plea bargain can "limit[] the probable penalty," serve "the objectives of punishment," and preserve "scarce judicial and prosecutorial resources." *Brady*, 397 U.S. at 752. "[T]he chief virtues of the plea system [are] speed, economy, and finality." *Blackledge v. Allison*, 431 U.S. 63, 71 (1977).

Even though the chief virtue of the plea system is efficiency, the system gives prosecutors enormous leverage to pressure criminal defendants. Take, for instance, mandatory minimums and sentencing guidelines. Minimums and guidelines "provide prosecutors with weapons to bludgeon defendants into effectively coerced plea bargains." Rakoff, *supra*. A defendant who refuses to plead to a lesser offense may face at trial a more serious charge that has a mandatory minimum sentence of imprisonment of a decade or longer. *See* Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 Stan. L. Rev. 989, 1034 (2006) ("[L]onger sentences exist on the books largely for bargaining purposes."). The prominence of plea bargaining and the existence of sentencing guidelines that define the punishment for nearly every offense have given prosecutors "virtually absolute power ... over federal prosecution and sentencing." Marc L. Miller, *Domination & Dissatisfaction: Prosecutors as Sentencers*, 56 Stan. L. Rev. 1211, 1252 (2004). As Judge Jed S. Rakoff of the United States District Court for the Southern District of New York has explained, "our criminal justice system is almost exclusively a system of plea bargaining, negotiated behind closed doors and with no judicial oversight." *See* Rakoff, *supra*.

Trials serve a specific and laudable purpose in our criminal justice system: to ensure that the prosecution can satisfy a jury of the defendant's peers that the

defendant is guilty beyond a reasonable doubt and to "so state[], publicly, in its verdict." *Id.* Further, pre-trial motions contesting legal theories, constitutional violations, and evidentiary matters are vital to the development of the law. *See, e.g.,* *Dickerson v. United States*, 530 U.S. 428, 441–43 (2000) (reviewing a motion to suppress testimony and concluding that a law enacted by Congress regulating admission of defendants' testimony did not pass muster under *Miranda*). The absence of trials also means that jury instructions are never subjected to adversarial testing, so courts lose the chance to clarify the meaning of those instructions. *Cf. Cage v. Louisiana*, 498 U.S. 39, 40–41 (1990) (per curiam) (reversing conviction where jury instruction inaccurately defined the reasonable-doubt standard), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62 (1991). In addition, the near elimination of trials severely restricts opportunities for the public and the press to interact with the criminal justice system, whether as observers, grand jurors, members of the venire, or petit jurors. Plea deals are, by definition, cut behind closed doors and do not offer an opportunity to see that the system is acting fairly and with integrity. And the system curtails the jury's ultimate and unreviewable power to acquit a defendant, which serves as an important check against the government. *See* Barkow, *supra*, at 1015.

## II. INNOCENT DEFENDANTS CAN FACE STRONG INSTITUTIONAL PRESSURES TO PLEAD GUILTY.

### A. The Prosecutor's Arsenal Of Sentencing Tactics Creates A Trial Penalty.

The prosecutor's arsenal contains sufficient tools to ensure that a defendant who does not enter a guilty plea at the outset of a case will face an increased sentence.

6

Prosecutors are able to choose among charges or stack charges on top of each other, and they have discretion to allege facts that trigger mandatory minimum sentences or maximal sentencing ranges or to manipulate "relevant conduct" under the sentencing guidelines. *See* Nat'l Ass'n of Crim. Def. Lawyers, *The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It* 25, 32–34, 39–47 (2018), https://www.nacdl.org/getattachment/95b7f0f5-90df-4f9f-9115-520b3f58036a/the-trial-penalty-the-sixth-amendment-right-to-trial-on-the-verge-of-extinction-and- ("NACDL Report"). The gap between the sentence that can be bargained for in a plea has widened so far from the sentence that will be received after trial as to become "an overwhelming influence" in defendants' weighing of a plea offer. *See id.* at 6.

The result is a "trial penalty," or a "discrepancy between the sentence offered during plea negotiations and the sentence a defendant will face after trial." *Id.* at 15. *Amicus curiae*'s statistical analysis of the Sentencing Commission's 2015 data files shows that the "average sentence for fraud was three times as high for defendants who went to trial versus those who pled guilty." *Id.* at 17. For burglary, breaking and entering, and embezzlement, the average sentence was nearly eight times as high for the defendant who went to trial. *See id.* Accordingly, "individuals who choose to exercise their Sixth Amendment right to trial face exponentially higher sentences if they invoke the right to trial and lose." *Id.* at 5. Indeed, "[o]n average, trial conviction increases the odds of incarceration by two to six times and produces sentence lengths that are 20 to 60 percent longer." *See* Brian D. Johnson, *Plea-Trial Differences in*

*Federal Punishment: Research and Policy Implications*, 31 Fed. Sent'g Rep. 256, 257 (2019).

Thus, "strong evidence" supports the conclusion that this trial penalty "can compel even an innocent person to plead guilty." NACDL Report, *supra*, at 17 (citing Lucian E. Dervan, *Bargained Justice: Plea-Bargaining's Innocence Problem and the Brady Safety-Valve*, 2012 Utah L. Rev. 51, 95 (2012) ("At some point, the sentencing differential becomes so large that it destroys the defendant's ability to act freely and decide in a rational manner whether to accept or reject the government's offer.")).

The Innocence Project has noted that DNA evidence has helped exonerate 367 defendants. Forty-one of these people (11%) had pled guilty to a crime that they did not commit. *See* Innocence Project, *DNA Exonerations in the United States*, https://www.innocenceproject.org/dna-exonerations-in-the-united-states/ (last visited June 9, 2020); *see also* NACDL Report, *supra*, at 17. And the National Registry of Exonerations documents at least 359 examples of individuals who "were later determined to be innocent of the crimes they originally pled guilty to." NACDL Report, *supra*, at 17. Innocent people can and do take plea bargains, and the trial penalty associated with asserting their right to trial is a looming factor in that decision.

**B.   Defendants Face Significant Pressure To Accept A Plea Offer, Even While Maintaining Their Innocence.**

The federal criminal justice system has long recognized that a defendant may simultaneously proclaim his innocence and enter into a plea bargain. *See Alford*, 400 U.S. at 37. Likewise, when the Supreme Court initially held that plea bargaining was

constitutionally permissible, it noted that it "would have serious doubts" about the practice "if the encouragement of guilty pleas by offers of leniency substantially increased the likelihood that defendants, advised by competent counsel, would falsely condemn themselves." *Brady*, 397 U.S. at 758; *see also Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("Defendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation.").

The federal sentencing guidelines built on *Alford* by providing substantial incentives for nearly all defendants to plead guilty. While the percentage of federal defendants who stood trial between 1960 and 1987 (when the guidelines took effect) was consistently between about 15% and 20%, it has dropped every year under the guidelines. *See* Ricardo J. Bascuas, *The American Inquisition: Sentencing After the Federal Guidelines*, 45 Wake Forest L. Rev. 1, 44–45 (2010). As noted, almost all federal defendants—around 97% of them—now waive trial and plead guilty under the guidelines. NACDL Report, *supra*, at 14.

The Supreme Court's note of caution in *Alford* and *Bordenkircher* was prescient. If an innocent citizen is "[]likely to be driven to false self-condemnation" by an overweening prosecutor, *Bordenkircher*, 434 U.S. at 363, the purported efficiency gains justifying the plea-bargaining system are lost. Innocent Americans now routinely plead guilty because the guidelines changed the conditions that made guilty pleas reliable by virtually ensuring a longer sentence for standing trial. A defendant

is entitled to the substantial "acceptance-of-responsibility" reduction at sentencing only if he does not put "the government to its burden of proof at trial" and admits any conduct relevant to sentencing. U.S. Sentencing Guidelines Manual § 3E1.1 & cmt. nn.1(A) & 2 (U.S. Sentencing Comm'n 2018). It is a barely veiled truth that this provision exists only for the constitutionally impermissible purpose of encouraging defendants to waive their right to a jury trial. *United States v. Jackson*, 390 U.S. 570, 581–83 (1968) (invalidating a federal statute because it "needlessly encourage[d]" guilty pleas and stating that any provision designed to "chill the assertion" of trial rights "by penalizing those who choose to exercise them" is "patently unconstitutional").

The psychology of "plea bargaining's innocence problem" results in "innocent participants [being] willing to falsely admit guilt in return for a perceived benefit." Dervan and Edkins Study, *supra*, at 4. In the Dervan and Edkins Study, college students were confronted for allegedly cheating on an academic exercise. *See id.* at 28–33 (describing methodology of the study). By design, half of the students in fact cheated in the experiment, and half were innocent. *See id.* Once confronted, the student could either admit to cheating and accept a lenient punishment, or the student could try his or her case before an academic panel and face the prospect of a more serious punishment. *See id.* The study's creators "sought to recreate the innocent defendant's dilemma in as real a manner as possible by presenting two difficult and discernible choices to students and asking them to make a decision." *Id.* at 33. For example, study participants were informed that students going before the

academic panel were found "guilty" 80–90% of the time. *Id.* at 32 (explaining that this figure was selected to mirror conviction rates in criminal trials); *cf.* Mark Motivans, Bureau of Justice Statistics, U.S. Dep't of Justice, NCJ 251770, *Federal Justice Statistics, 2015–2016,* at 9 (Jan. 2019), https://www.bjs.gov/content/pub/pdf/fjs1516.pdf (noting that 91% of "defendants whose cases were terminated" in district courts in 2016 "were convicted").

Over 56% of the "innocent" students took the plea offer rather than risk the more serious penalties that could result from a trial. *See* Dervan and Edkins Study, *supra,* at 34. In other words, "well over half of the innocent study participants ... were willing to falsely admit guilt in return for a reduced punishment." *Id.* at 37. At its core, the Dervan and Edkins Study relied on the same incentives—or disincentives—faced by defendants in courtrooms across the country, including the high likelihood of conviction if they go to trial to claim their innocence. *See id.* And the study showed that "innocent individuals are actually highly risk averse." *Id.*

The Dervan and Edkins Study demonstrates why courts should not reject out of hand a defendant's claim of innocence when the defendant seeks to withdraw a guilty plea. In many cases, that claim of innocence is well-founded. But the defendant took the guilty plea to avoid the obvious risks of a harsher penalty at trial. *See* Stephanos Bibas, *Plea Bargaining Outside the Shadow of Trial*, 117 Harv. L. Rev. 2463, 2507–10 (2004). Yet "[a]llowing people to continue to serve years of extra prison time despite a plain error in their sentence undermines the legitimacy of the criminal justice system." Sarah French Russell, *Reluctance to Resentence: Courts, Congress,*

11

*and Collateral Review*, 91 N.C. L. Rev. 79, 161 (2012). And a defendant suffering under an unfair deal is more likely to withdraw or challenge it collaterally later, which undermines the efficiency of the process, as well as society's interest in the finality of sentences. *See McQuiggin v. Perkins*, 569 U.S. 383, 393 (2013).

## III. A LEGALLY INNOCENT PERSON WHO NONETHELESS PLEADS GUILTY TO A FEDERAL CRIME DOES NOT THEREBY COMMIT CRIMINAL CONTEMPT OF COURT.

It is a sad and incontrovertible fact that our criminal justice system forces innocent people to plead guilty. This Court's appointed amicus, The Hon. John Gleeson, said so in the forward to the National Association of Criminal Defense Lawyer's recent report on modern federal criminal practice: "A system characterized by extravagant trial penalties produces guilty pleas in cases where the government cannot satisfy [its] burden, hollowing out those protections and producing effects no less pernicious than innocents pleading guilty." NACDL Report, *supra*, at 3. Subjecting to a contempt conviction people who see no better choice for themselves—because trial was too great a risk, because prosecutors threatened to charge a family member, or because they withheld *Brady* material—than to acquiesce in the government's accusations violates the law.

In 1831, following the impeachment of Judge James Peck, Congress enacted legislation to circumscribe the contempt power that Judge Peck infamously abused. *See Cammer v. United States*, 350 U.S. 399, 405–07 (1956). The resulting statute, codified at 18 U.S.C. § 401, specifies three exclusive categories of contemptuous acts:

12

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, *and none other*, as—
>
> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) Misbehavior of any of its officers in their official transactions;
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401 (emphasis added). The Supreme Court's decisions respecting the judiciary's contempt power confirm that ordinary perjury is not a contempt of court under either the common law or the statute. Even if a witness' perjured testimony at trial did amount to contempt, Supreme Court decisions on the validity of pleading guilty confirm that a defendant is free to plead guilty without penalty even if he believes himself legally innocent. That is especially true in light of the fact that the Federal Sentencing Guidelines affirmatively encourage guilty pleas by punishing the exercise of trial rights.

### A.    Perjury Is Not A Contempt Of Court.

It has been settled for a hundred years that ordinary perjury is not a contempt of court because perjury does not "obstruct the administration of justice" at common law or under the contempt statute, 18 U.S.C. § 401. *See Ex parte Hudgings*, 249 U.S. 378, 383–84 (1919). In *Hudgings*, the district judge thought that a witness had falsely answered the prosecutor's question and, for that reason, jailed the witness for contempt. *Id.* at 381–82. The issue before the Supreme Court was "[w]hether … power to punish for contempt exists in every case where a court is of the opinion that a

13

witness is committing perjury." *Id.* at 382. Because the contempt power's "great and only purpose is to secure judicial authority from obstruction in the performance of its duties," the Court held that "[a]n obstruction to the performance of judicial duty resulting from an act done in the presence of the court is, then, the characteristic upon which the power to punish for contempt must rest." *Id.* at 383. Granting the writ of habeas corpus, the Supreme Court rejected the government's argument that false testimony obstructs a court's ability to do its work, even though an outright refusal to testify does. *Id.* at 383–84. The Court relied on Judge Learned Hand's rule for determining whether a witness' answer is tantamount to a refusal to testify, and therefore contemptuous of the court's authority:

> If the witness' conduct shows beyond any doubt whatever
> that he is refusing to tell what he knows, he is in contempt
> of court. That conduct is, of course, beyond question when
> he flatly refuses to answer, but it may appear in other
> ways. A court, like any one else who is in earnest, ought
> not to be put off by transparent sham, and the mere fact
> that the witness gives some answer cannot be an absolute
> test. For instance, it could not be enough for a witness to
> say that he did not remember where he had slept the night
> before, if he was sane and sober, or that he could not tell
> whether he had been married more than a week. If a court
> is to have any power at all to compel an answer, it must
> surely have power to compel an answer which is not given
> to fob off inquiry. *Nevertheless, this power must not be used
> to punish perjury, and the only proper test is whether on its
> mere face, and without inquiry collaterally, the testimony is
> not a bona fide effort to answer the questions at all.*

*United States v. Appel*, 211 F. 495, 495–96 (S.D.N.Y. 1913) (emphasis added) (cited in *Hudgings*, 249 U.S. at 383).

A quarter century after *Hudgings*, Justice Black's unanimous opinion for the Court in *In re Michael* reaffirmed that perjury, without more, is not a contempt of

court: "[P]erjury alone does not constitute an 'obstruction' which justifies exertion of the contempt power." 326 U.S. 224, 227–28 (1945) (quoting *Hudgings*, 249 U.S. at 383, 384). *Michael* distinguished *Clark v. United States*, which affirmed the contempt conviction of a woman who, "with intent to obstruct justice ... gave answers knowingly misleading and others knowingly false in response to questions affecting her qualifications as a juror." 289 U.S. 1, 6 (1933). The Court affirmed, emphasizing that her contempt conviction was not "for false swearing, though false swearing has been proved," but because it considered jurors court officers under § 401's second category of contemptuous acts. 289 U.S. at 11–12. It is doubtful that *Clark* survived the Court's later determination that a lawyer is not a court officer within the meaning of § 401. *See Cammer*, 350 U.S. at 407–08.

The Federal Sentencing Guidelines have conditioned lawyers and judges to believe that testifying falsely is an "obstruction of justice," but the guidelines give that phrase much broader scope than it has in the contempt context. *See United States v. Dunnigan*, 507 U.S. 87, 97 (1993). *Dunnigan* rejected a constitutional challenge to the obstruction-of-justice enhancement predicated on the defendant's own testimony at her trial. *Id.* However, the Court expressly noted that its holding was based only on the guidelines' commentary, which defines obstruction differently from its accepted meaning in the contempt context. *Id.* at 93–94.

Perjury is not a contempt of court but only an ordinary crime, subject to prosecution in the exclusive discretion of the Executive Branch. "It is ... well established that the judicial power does not generally include the power to prosecute

15

crimes." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 816 (1987)

(Scalia, J., concurring in judgment).

### B. Even If Perjury Did Constitute Contempt Of Court, The Rationale For That Would Not Reach A Defendant Who Pleads Guilty Though He Believes Himself To Be Legally Innocent.

The Supreme Court has repeatedly rejected the best argument the justices

themselves could identify for perjury constituting contempt of court—that it subverts

the judiciary's truth-seeking function. *See Dunnigan*, 507 U.S. at 93–94; *Michael*, 326

U.S. at 227–28; *Hudgings*, 249 U.S. at 383–84. Even if these cases were overruled,

there would still be no valid argument for concluding that a defendant who pleads

guilty, though he believes himself legally innocent, is in contempt of court. A

defendant simply has no duty whatsoever to maintain his innocence if he believes

pleading guilty is to his advantage, especially given that the Sentencing Guidelines

unconstitutionally condition the trial right on exposure to an almost certainly more

severe sentence if the jury convicts.

A *witness* who commits perjury violates the common law duty that all

witnesses owe to testify truthfully. "In the classic phrase of Lord Chancellor

Hardwicke, 'the public has a right to every man's evidence.'" *United States v. Monia*,

317 U.S. 424, 432 (1943) (Frankfurter, J., dissenting). A *defendant*, in contrast, has

no corresponding duty to maintain his innocence, no matter how firmly he believes

himself to be legally innocent. *See Alford*, 400 U.S. at 37. In *Alford*, the Supreme

Court considered whether a defendant's guilty plea to second-degree murder, entered

only to avoid a first-degree murder charge, was unconstitutionally coerced. *Id.* at 28–

29. The Court first reiterated the standard for assessing the validity of a guilty plea,

which makes no mention of truthfulness or accuracy: "The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Id.* at 31. *Alford* thus recognizes that the objective truth underlying a prosecution is often so elusive that it is essentially unknowable—which explains why the Constitution requires criminal jury verdicts to be the product of unanimous consent. *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020) ("As Blackstone explained, no person could be found guilty of a serious crime unless 'the truth of every accusation ... should ... be confirmed by the unanimous suffrage of twelve of his equals and neighbors, indifferently chosen, and superior to all suspicion.'" (omissions in original) (quoting 4 William Blackstone, *Commentaries on the Laws of England* 343 (1769)).

Relying largely on *Hudson v. United States*, 272 U.S. 451 (1926), which held that a federal court can convict an accused who pleads *nolo contendere* and does not admit factual guilt, *Alford* held that a defendant is free to plead guilty even if he believes himself innocent: "An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." 400 U.S. at 37. *Alford* makes clear that an accused who "intelligently concludes that his interests require entry of a guilty plea" is free to enter one, even if he believes himself entirely innocent. *Id.*

Because defendants now must choose between admitting the government's allegations or risking a much higher sentence if a jury returns a guilty verdict, there

is no justification for presuming that guilty pleas are truthful. The guidelines system is designed to promote "efficiency," not to discover the truth. *Blakely v. Washington*, 542 U.S. 296, 313 (2004) ("Our Constitution and the common-law traditions it entrenches, however, do not admit the contention that facts are better discovered by judicial inquisition than by adversarial testing before a jury."). The truth is discovered through trials—where witness are subject to "cross-examination, the 'greatest legal engine ever invented for the discovery of truth,'" *California v. Green*, 399 U.S. 149, 158 (1970) (quoting 5 John Henry Wigmore, *Evidence* § 1367 (3d ed. 1940))—and the guidelines discourage those.

The accused in this case was given a choice between a likely probationary sentence and the risk of a jail sentence if he insisted on his "right" to trial. If, as the Department of Justice now concedes, he succumbed to the pressure to plead guilty even though he was legally innocent, he is hardly unique. His decision to do that in no way obstructed justice or interfered with the judicial function. It is not, by any stretch, a contemptuous act.

Even if this Court is understandably skeptical about the Department's motive is dismissing the charges in this closely followed case, there can be little doubt that the Court's decision will establish precedent. In many cases, the government's reason for dismissing charges—before or after a guilty plea—may be innocuous, or even laudable. Should the Court choose to exercise the contempt sanction here, other courts will look to this case as authority to reject the government's exercise of

prosecutorial discretion. This would be a novel use of the judicial power that could ultimately harm many defendants.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendant's motion to withdraw his plea of guilty.

Dated:  June 9, 2020

Respectfully submitted,

/s/ Jeffrey T. Green

David Oscar Markus
MARKUS/MOSS PLLC
40 N.W. Third Street, PH1
Miami, FL 33128
Telephone: (305) 379-6667
Facsimile: (305) 379-6668
dmarkus@markuslaw.com

Prof. Ricardo J. Bascuas
UNIVERSITY OF MIAMI SCHOOL OF LAW
1311 Miller Drive
Coral Gables, FL 33146
Telephone: (305) 284-2672
Facsimile: (305) 284-1588
r.bascuas@miami.edu

Jeffrey T. Green (D.C. Bar No. 426747)
Christopher S. Ross (D.C. Bar No. 1643856)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
jgreen@sidley.com
christopher.ross@sidley.com

*Counsel for Amicus Curiae*
*National Association of Criminal*
*Defense Lawyers*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing will be served this 9th day of June, 2020, electronically through the Court's CM/ECF system on all registered counsel.

/s/ Jeffrey T. Green

Jeffrey T. Green