Leave to file GRANTED

*Emmet G. Sullivan*

United States District Judge

9-28-2020

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

MICHAEL T. FLYNN,
*Defendant.*

Case No. 17-cr-00232 (EGS)

**BRIEF OF THE CHAIRMAN AND MEMBERS OF THE
COMMITTEE ON THE JUDICIARY, U.S. HOUSE OF REPRESENTATIVES
AS AMICI CURIAE IN SUPPORT OF NEITHER PARTY**

DEEPAK GUPTA
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

June 10, 2020

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Table of authorities ..............................................................................................................ii

Interest of amici curiae .......................................................................................................iv

Introduction .........................................................................................................................2

Argument .............................................................................................................................5

     I.     Attorney General Barr's obstruction of the House Judiciary
          Committee's oversight only underscores the need for this Court's
          careful scrutiny under Rule 48(a). ..............................................................5

     II.    Federal courts possess inherent supervisory authority over the
          administration of criminal justice to ensure the integrity of the
          system. .......................................................................................................10

     III.   Rule 48(a)'s "leave of court" requirement authorizes courts to
          prevent "one corrupt United States attorney" from "dismiss[ing]
          an indictment" and "defeat[ing] the judicial process." ..............................12

     IV.   This Court should conduct an evidentiary hearing to assess the
          government's decision to dismiss this case and—if it concludes that
          the evidence demonstrate "abuse of prosecutorial discretion"—
          should not hesitate to deny the government's motion to dismiss. ...............16

Conclusion .........................................................................................................................18

# TABLE OF AUTHORITIES

## Cases

*Bank Markazi v. Peterson,*
    136 S. Ct. 1310 (2016) ................................................................................................................ 3, 9

*Bank of Nova Scotia v. United States,*
    487 U.S. 250 (1988) ......................................................................................................................... 10

*Buckley v. Valeo*
    424 U.S. 1 (1976) ............................................................................................................................... 10

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991) ..................................................................................................................... 3, 10, 11

*Clinton v. Jones,*
    520 U.S. 681 (1997) ........................................................................................................................... 9

*Eastland v. U.S. Servicemen's Fund,*
    421 U.S. 491 (1975) ........................................................................................................................ 5, 6

*Electric Privacy Information Center v. United States Department of Justice,*
    No. 19-cv-810, 2020 WL 1060633 (D.D.C. Mar. 5, 2020) ...................................................... 7

*Ex parte Robinson,*
    86 U.S. 505 (1973) ........................................................................................................................ 11, 12

*Fletcher v. Peck,*
    6 Cranch 87 (1810) ............................................................................................................................ 9

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
    322 U.S. 238 (1944) .......................................................................................................................... 11

*Immigration and Nationalization Service. v. Chadha,*
    462 U.S. 919 (1983) ........................................................................................................................... 6

*McGrain v. Daughterty,*
    273 U.S. 135 (1927) ....................................................................................................................... 3, 6

*McNabb v. United States,*
    318 U.S. 332 (1943) ..................................................................................................................... 10, 11

*Morrison v. Olson,*
    487 U.S. 654 (1988) .......................................................................................................................... 10

*Olmstead v. United States,*
   277 U.S. 438 (1928) .................................................................................................. 11

*Patchak v. Zinke,*
   138 S. Ct. 897 (2018) ................................................................................................. 9

*Rinaldi v. United States,*
   434 U.S. 22 (1977) ............................................................................................. *passim*

*United States v. Ammidown,*
   497 F.2d 615 (D.C. Cir. 1974) ........................................................................... *passim*

*United States v. Cowan,*
   524 F.2d 504 (5th Cir. 1975) ........................................................................... 4, 14, 15

*United States v. Fokker Services,*
   818 F.3d 733 (D.C. Cir. 2016) ............................................................................ 4, 15

*United States v. Hudson,*
   7 Cranch 32 (1812) ................................................................................................. 10

*United States v. Hyde,*
   520 U.S. 670 (1997) ................................................................................................. 15

*United States v. Nixon,*
   418 U.S. 683 (1974) .............................................................................................. 4, 18

*United States v. Robinson,*
   587 F.3d 1122 (D.C. Cir. 2009) ............................................................................... 15

*Victor v. Nebraska,*
   511 U.S. 1 (1994) ...................................................................................................... 6

*Watkins v. United States,*
   354 U.S. 178 (1957) .................................................................................................. 5

*Young v. United States ex rel Vuitton et Fils S.A.,*
   481 U.S. 787 (1987) ................................................................................................. 11

*Young v. United States,*
   315 U.S. 257 (1942) .............................................................................................. 3, 13

## Constitutional provisions and rules

U.S. Const., art. I ........................................................................................................... 5

Fed. R. Crim. P. 48(a). .................................................................................................. 14

House Rule X.1(l) ........................................................................................................... 5

House Rule X.2(a) ........................................................................................................... 5

House Rule X.2(b)(1)(B) .................................................................................................. 5

## Other Authorities

@realDonaldTrump,
  Twitter (Apr. 30, 2020, 6:47 AM), https://bit.ly/3f7O0az ................................................... 7

@realDonaldTrump,
  Twitter (Feb. 11, 2020, 1:48 AM), https://bit.ly/2XL0FNO .................................................. 7

@realDonaldTrump,
  Twitter (Mar. 31, 2017, 7:04 AM), https://bit.ly/2AQgA1s .................................................. 17

@realDonaldTrump ,
  Twitter (Dec. 13, 2018, 11:07 AM), https://bit.ly/2z01YGk................................................... 17

@realDonaldTrump,
  Twitter (Dec. 18, 2018, 6:41 AM), https://bit.ly/3f8XL8G ................................................. 17

Morgan Chalfant,
  *Trump Criticizes 'Very Unfair' Sentencing Recommendation for Roger Stone*, The Hill
  (Feb. 11, 2020) ...................................................................................................................... 7

Thomas Ward Frampton,
  *Why Do Rule 48(a) Dismissals Require 'Leave of Court?*,
  73 Stan. L. Rev. Online 28 (2020). ................................................................................. *passim*

Letter from Jerrold Nadler, Chairman, House Committee on the Judiciary, et al., to
  Michael E. Horowitz, Inspector General,
  U.S. Department of Justice (May 8, 2020)................................................................... 6, 7, 8

Letter from Stephen E. Boyd, Assistant Attorney General, to Jerrold Nadler, Chairman,
  House Committee on the Judiciary (June 1, 2020)................................................................ 9

Mary McCord,
  *Bill Barr Twisted My Words in Dropping the Flynn Case. Here's the Truth*, N.Y. Times
  (May 10, 2020).................................................................................................................... 2

Kristine Phillips & Kevin Johnson,
  *Justice Department Ends Inquiry of Hush-Money Payments in Final Months of Donald
  Trump's Campaign, Judge Says*, USA Today (July 17, 2019)....................................................... 7

Press Release, House Committee on the Judiciary Chairman Jerrold Nadler, House
  Judiciary Chairman Announces Actions to Hold AG Barr Accountable (June 2,
  2020), ................................................................................................................................ 10

Press Release, House Committee on the Judiciary Chairman Jerrold Nadler, Chairman
    Nadler Introduces Legislation to Reduce AG Barr's Budget, Reign in Efforts to
    Politicize DOJ (June 4, 2020) ........................................................................................9, 10

Michael S. Schmidt,
    *Comey Memo Says Trump Asked Him to End Flynn Investigation*, N.Y. Times (May 16,
    2017) ............................................................................................................................17

Alex Moe & Rebecca Shabad,
    *Barr Declines to Testify Before House Judiciary Committee, Setting Stage for Subpoena Battle*,
    NBC NEWS (May 1, 2019)............................................................................................8

2 Madeline J. Wilken & Nicholas Triffin,
    *Drafting History of the Federal Rules of Criminal Procedure* (1991) .............................. 3, 12

Leon R. Yankwich,
    *Increasing Judicial Discretion in Criminal Proceedings*, 1 F.R.D. 746 (1941) .....................4

Matt Zapotosky & Devlin Barrett,
    *Barr Acknowledges Justice Deptartment Has Created 'Intake Process' to Vet Giuliani's
    Information on Bidens*, Washington Post (Feb. 10, 2020)...........................................8

**INTEREST OF AMICI CURIAE**

This amicus brief is filed in support of neither party by Representative Jerrold Nadler of New York, Chair of the Committee on the Judiciary of the U.S. House of Representatives, and the following members of the Committee:

Representative Mary Gay Scanlon (Pennsylvania)

Representative Zoe Lofgren (California)

Representative Sheila Jackson Lee (Texas)

Representative Steve Cohen (Tennessee)

Representative Henry C. "Hank" Johnson (Georgia)

Representative Theodore E. Deutch (Florida)

Representative Karen Bass (California)

Representative Cedric Richmond (Louisiana)

Representative Hakeem Jeffries (New York)

Representative David N. Cicilline (Rhode Island)

Representative Eric Swalwell (California)

Representative Ted Lieu (California)

Representative Jamie Raskin (Maryland)

Representative Pramila Jayapal (Washington)

Representative Val Butler Demings (Florida)

Representative J. Luis Correa (California)

Representative Sylvia Garcia (Texas)

Representative Joe Neguse (Colorado)

Representative Lucy McBath (Georgia)

Representative Greg Stanton (Arizona)

Representative Madeleine Dean (Pennsylvania)

Representative Debbie Mucarsel-Powell (Florida)

Representative Veronica Escobar (Texas)

1

The House Judiciary Committee has oversight authority over the U.S. Department of Justice, the federal courts, and the criminal justice system. Amici file this brief to emphasize the complementary but distinct responsibilities of Congress and the Judiciary to ensure that federal prosecutorial decisions are never dictated by partisanship, favoritism, or corruption. Specifically, amici write to highlight the critical importance of courts' authority under Federal Rule of Criminal Procedure 48(a) to determine whether "efforts to terminate the prosecution" have been "tainted with impropriety." *Rinaldi v. United States*, 434 U.S. 22, 30 (1977). When the President and his Attorney General intervene, over the objection of career prosecutors, to stop a federal judge from sentencing the President's close political ally for committing a serious crime, it is imperative that the federal courts not "serve merely as a rubber stamp." *United States v. Ammidown*, 497 F.2d 615, 622 (D.C. Cir. 1974).

## INTRODUCTION

This case implicates the Court's authority—indeed, its responsibility—to refuse to lend its imprimatur to a decision of the Executive Branch that threatens the rule of law. Attorney General Barr seeks to prevent this Court from sentencing President Trump's former National Security Advisor, Michael Flynn, who twice pleaded guilty to lying to federal agents about his contacts with the Russian Ambassador and his work for the Republic of Turkey. Barr's motion is unprecedented and highly irregular. The only attorney who agreed to sign it was a political appointee who has since left his post. The motion explains neither the conspicuous absence of any line prosecutors nor a lead prosecutor's withdrawal hours before it was filed. And it includes no declarations from witnesses to support the government's dubious new representations to the Court—including representations since contradicted by high-level officials who were present during the events in question. *See, e.g.*, Mary McCord, *Bill Barr Twisted My Words in Dropping the Flynn Case. Here's the Truth*, N.Y. Times (May 10, 2020), https://perma.cc/3M9B-SXG5.

Few things are more corrosive to the rule of law—and the public's confidence in the criminal justice system—than the injection of partisanship, favoritism, or corruption into

prosecutorial decisions. In this case, the impropriety is barely concealed. The question is what must be done about it. Both Congress and the courts play essential roles, within their spheres of authority, to check such abuses by the Executive Branch. Congress has the power to investigate whether "the Attorney General and his assistants" are "misdirect[ing]" their "duties in respect of the institution and prosecution of proceedings to punish crimes." *McGrain v. Daugherty*, 273 U.S. 135, 177 (1927). But for Congress to intercede in specific cases risks "tread[ing] impermissibly on judicial turf." *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1323 (2016). It is the court itself that has the inherent authority, and responsibility, to police "acts which degrade the judicial system," including "misleading and lying to the Court." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 32, 41-44 (1991). And, here, the need for judicial oversight is even more pronounced because Attorney General Barr has stonewalled congressional oversight at every turn, depriving the House Judiciary Committee of any opportunity to question Barr about his mischaracterization of the Mueller Report, his role in the sentencing of Roger Stone, or the policies he has put in place to facilitate the improper politicization of prosecutorial decisionmaking.

Barr now seeks to stonewall this Court too, arguing that this Court lacks discretion to do anything except lend its imprimatur to his decision to seek dismissal. But Barr's decision "does not relieve this Court of the performance of the judicial function." *Young v. United States*, 315 U.S. 257, 258 (1942). "[T]he proper administration of the criminal law cannot be left merely to the stipulation of parties." *Id.* The D.C. Circuit has made clear, in this very context—where the defendant concurs in a prosecutor's decision to seek dismissal—that the law does not permit courts to "serve merely as a rubber stamp for the prosecutor's decision." *Ammidown*, 497 F.2d at 622. Rule 48(a) instead requires "leave of court"—a requirement that the Supreme Court insisted upon precisely to "guard against dubious dismissals of criminal cases that would benefit powerful and well-connected defendants." Thomas Ward Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of Court"?*, 73 Stan. L. Rev. Online 28, 29 (2020). Without this requirement, a prominent judge warned at the time, "one corrupt United States attorney could dismiss an indictment and defeat the judicial process." 2 Madeleine J. Wilken & Nicholas Triffin, *Drafting History of the Federal Rules of Criminal*

3

*Procedure* 269 (1991). The goal of Rule 48(a) was to prevent courts from being "compelled to grant the dismissal" when the prosecutor's motives "savored too much of favoritism." Leon R. Yankwich, *Increasing Judicial Discretion in Criminal Proceedings*, 1 F.R.D. 746, 752 (1941).

Congress and the Supreme Court, through the Rules Enabling Act, thus empowered this Court to thwart Executive Branch corruption or favoritism, "preserv[ing] the essential judicial function of protecting the public interest in the evenhanded administration of criminal justice." *United States v. Cowan*, 524 F.2d 504, 512 (5th Cir. 1975). In this way, "the phrase 'by leave of court' in Rule 48(a) was intended to modify and condition the absolute power of the Executive, consistent with the Framer's concept of Separation of Powers, by erecting a check on the abuse of the Executive's prerogatives." *Id.* at 513. "[I]t was intended as a power to check power." *Id.*

Because Flynn has already twice pleaded guilty, moreover, this case falls squarely within "the Judiciary's traditional authority over sentencing" and requires no judicial second-guessing of "the Executive's" initial "charging decisions." *United States v. Fokker Servs.*, 818 F.3d 733, 746 (D.C. Cir. 2016); *see also Ammidown*, 497 F.2d at 622 (explaining that Rule 48(a) "protect[s] the sentencing authority reserved to the judge"). Here, "the salient issue . . . [is] whether the Government's later efforts to terminate the prosecution" are "tainted with impropriety"—that is, whether they rest on "bad faith" or were "motivated by considerations" contrary to the "public interest." *Rinaldi*, 434 U.S. at 30. This "require[s]" an inquiry not only into the prosecutor's "reasons" but also a probing of their "underlying factual basis." *Ammidown*, 497 F.2d at 620.

To balance the Court's responsibility to protect the integrity of the criminal justice system with its appropriately limited role in that system—to act only when the facts in the record compel it to do so—this Court should hold an evidentiary hearing. Only through "exposure of the reasons for the dismissal" can this Court assess the true extent to which the Department of Justice has engaged in a "gross abuse[] of prosecutorial discretion." *Id.* at 620-21. "The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts." *United States v. Nixon*, 418 U.S. 683, 709 (1974).

## ARGUMENT

I.  **Attorney General Barr's obstruction of the House Judiciary Committee's oversight only underscores the need for this Court's careful scrutiny under Rule 48(a).**

The government has recently suggested that any "remedy" for prosecutorial "abuses" in this case must lie with Congress rather than this Court. U.S. Br. in *In re Michael Flynn*, No. 20-5143, at 18-19 (D.C. Cir. filed June 1, 2020) (suggesting "congressional retaliation on other matters" as a remedy). To the contrary, Congress and the Supreme Court have assigned this Court—via the Rules Enabling Act and Federal Rule of Criminal Procedure 48(a)—"the role of guarding against abuse of prosecutorial discretion," specifically "to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors." *Ammidown*, 497 F.2d at 620. The need for this Court to play that critical role in this case is only highlighted by Attorney General Barr's obstruction, at every turn, of efforts by the House Judiciary Committee to conduct oversight of Barr's disturbing pattern of political interference in criminal investigations and prosecutions involving the President's close political allies.

The House Judiciary Committee has broad oversight authority over the Attorney General, the U.S. Department of Justice, and the criminal justice system. Article I of the Constitution vests "[a]ll legislative Powers" in the Congress, U.S. Const., art. I, § 1, and grants each House of Congress the authority to "determine the Rules of its Proceedings." U.S. Const., art. I, § 5, cl. 2. Under this authority, House Rule X establishes the Committee on the Judiciary, granting it "broad authority," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 493 (1975), over "[t]he judiciary and judicial proceedings," "[c]riminal law enforcement," and "[f]ederal courts." House Rule X.1(l)(1), (7), (8), (19). As a standing committee, the Judiciary Committee also has "general oversight responsibilities," including the responsibility to oversee the "organization and operation of Federal agencies" within its jurisdiction. House Rule X.2(a), (b)(1)(B).

The Committee's mandate includes the power to investigate whether the Justice Department's "functions [are] being properly discharged or [] are being neglected or misdirected" and whether "the Attorney General and his assistants [are] performing or neglecting their duties

in respect of the institution and prosecution of proceedings to punish crimes and enforce appropriate remedies against the wrongdoers." *McGrain*, 273 U.S. at 177. Oversight—including the authority to "probe[] into departments of the Federal Government to expose corruption," *Watkins v. United States*, 354 U.S. 178, 187 (1957)—is "an important check upon Executive authority," *I.N.S. v. Chadha*, 462 U.S. 919, 987 n.20 (1983). "The power to investigate" is also an "integral part" of the legislative process. *Eastland*, 421 U.S. at 504. It is "inherent in the power to make laws" because "a legislative body cannot legislate wisely or effectively in the absence of information." *Id.* Congress's investigative authority "encompasses inquiries concerning the administration of existing laws" and "includes surveys of defects in our . . . political system for the purpose of enabling the Congress to remedy them." *Watkins*, 354 U.S. at 187.

The House Judiciary Committee therefore has authority to investigate administration of the Department of Justice. Attorney General Barr's pattern of interfering in cases involving President Trump's friends and allies raises troubling questions about improper political interference in criminal cases, rendering the Committee's oversight functions all the more essential here. Evenhanded administration of justice is essential to the rule of law. And "[o]ur democracy rests in no small part on our faith in the ability of the criminal justice system to separate those who are guilty from those who are not." *Victor v. Nebraska*, 511 U.S. 1, 28 (1994) (Blackmun, J., concurring in part and dissenting in part).

In evaluating the Department's decision to seek dismissal in this case, it is "important to observe the divide between Attorney General William Barr and the career staff at the Department of Justice."[1] Mere hours before the government moved to dismiss this case, Brandon Van Grack— a career prosecutor who had led the Flynn case from its inception—abruptly withdrew from the matter. The motion is signed only by Timothy Shea—the then-Acting U.S. Attorney for the District of Columbia, who had been promoted from the Attorney General's personal staff to that post earlier this year. Not a single career prosecutor signed the government's unusual motion.

---

[1] Letter from Jerrold Nadler, Chairman, House Committee on the Judiciary, et al., to Michael E. Horowitz, Inspector General, U.S. Dep't of Justice (May 8, 2020), https://perma.cc/D43F-QJNG.

Standing alone, the decision to dismiss charges against Flynn had the appearance of "corruption and unacceptable political influence in an ongoing criminal matter: President Trump tweeted in defense of his former advisor, and one week later Mr. Flynn is poised to walk free."[2] But this was not the first time that Barr has "appeared to reach into an ongoing criminal case to the President's political bidding."[3]

- Last spring, Barr sent a four-page "summary" of the Mueller Report to the House and Senate Judiciary Committees—a summary that clearly minimized the Special Counsel's findings about the President and his associates.[4] As one judge in this district observed, the letter so "distorted the findings in the Mueller Report" that it "create[d] a one-sided narrative . . . at odds with the . . . Report [itself]." *Elec. Privacy Info. Ctr. v. United States Dep't of Justice*, No. 19-cv-810, 2020 WL 1060633, at *8 (D.D.C. Mar. 5, 2020).

- Last summer, the Department quietly closed its investigation into certain campaign-finance crimes allegedly committed by President Trump and his former personal lawyer, Michael Cohen.[5]

- This February, the Department "abruptly reversed course" and reduced its recommended sentence for Roger Stone, a political ally and "longtime confidant" of the President.[6] The reversal took place after a series of public statements by the President criticizing the Department's initial sentencing recommendation as "very unfair"[7] and led all four career

---

[2] *Id.* at 2; *see also, e.g.*, @realDonaldTrump, Twitter (Apr. 30, 2020, 6:47 AM), https://bit.ly/3f7O0az ("What happened to General Michael Flynn, a war hero, should never be allowed to happen to a citizen of the United States again!").

[3] Letter from Jerrold Nadler to Michael Horowitz, at 2.

[4] *Id.*

[5] *Id.*; *see also* Kristine Phillips & Kevin Johnson, *Justice Department Ends Inquiry of Hush-Money Payments in Final Months of Donald Trump's Campaign, Judge Says*, USA Today (July 17, 2019, 11:50 AM ET).

[6] Letter from Jerrold Nadler to Michael Horowitz, at 2.

[7] Morgan Chalfant, *Trump Criticizes 'Very Unfair' Sentencing Recommendation for Roger Stone*, The Hill (Feb. 11, 2020, 7:29 AM EST); *see also* @realDonaldTrump, Twitter (Feb. 11, 2020, 1:48 AM), https://bit.ly/2XLoFNO ("This is a horrible and very unfair situation. The real crimes were on the other side, as nothing happens to them. Cannot allow this miscarriage of justice!").

prosecutors who had been handling the case to withdraw rather than support the Department's decision.

- This March, the Department suddenly abandoned its two-year prosecution of a Russian firm alleged to have interfered in the 2016 presidential election and charged with conspiring to defraud the United States.[8]

And these are only the formal actions taken by the Department in criminal prosecutions.[9] As the Committee wrote to Inspector General Horowitz in a letter requesting an investigation by his office into this pattern of conduct, "[i]n many other cases, both criminal and civil, the current leadership of the Department has taken extraordinary steps to protect the President's allies and punish his enemies, real and imagined."[10] The Department's decision to request dismissal of this case is thus the latest in a series of decisions that "represent a systemic breakdown of impartial justice at the Department of Justice and suggest overt political bias, including corruption."[11]

In response, the Committee has exercised its oversight authority to ensure that Attorney General Barr is not misusing the criminal justice system for the President's personal political advantage. But Barr has stymied these oversight efforts at every turn.

After agreeing to testify before the House Committee to address questions about the special counsel's report in May of 2019, Attorney General Barr backed out at the last minute to avoid being questioned by staff counsel.[12] In response to Barr's stonewalling, the Committee issued a subpoena for an unredacted copy of the Mueller report and related documents. Barr refused to comply.

---

[8] Letter from Jerrold Nadler to Michael Horowitz, at 2.

[9] This inappropriately political behavior extends to internal Department systems as well. *See, e.g.*, Matt Zapotosky & Devlin Barrett, *Barr Acknowledges Justice Dept. Has Created 'Intake Process' to Vet Giuliani's Information on Bidens*, Wash. Post (Feb. 10, 2020), https://perma.cc/L396-55TQ.

[10] Letter from Jerrold Nadler to Michael Horowitz, at 2-3.

[11] *Id.* at 3.

[12] Alex Moe & Rebecca Shabad, *Barr Declines to Testify Before House Judiciary Committee, Setting Stage for Subpoena Battle*, NBC News (May 1, 2019), https://perma.cc/W64W-HCV5. Mr. Barr reportedly backed out because he objected to the hearing's format. But it is not the role of the administration to dictate the terms of congressional oversight.

Following nearly a year of delay, Attorney General Barr finally agreed to testify before the Committee this June.[13] But once again, Barr backed out at the last minute.[14] The result is that Barr has not appeared before the Committee in his entire tenure as Attorney General in the Trump Administration. The Committee has not had the opportunity to question him about his mischaracterization of the Mueller Report, his role in the sentencing of Roger Stone, or the policies he has put in place at the Justice Department that suggest improper political influence in prosecutorial decisionmaking.

With respect to Michael Flynn, the Committee has recognized the sole authority of the judiciary "to decide cases and controversies," *Clinton v. Jones*, 520 U.S. 681, 701 (1997), and has therefore largely deferred to this Court's authority in this case. While the Legislature "wields the power 'to prescribe general rules for the government of society,'" the "'application of those rules to individuals in society' is the 'duty' of the Judiciary." *Patchak v. Zinke*, 138 S. Ct. 897, 915 (2018) (Roberts, C.J., dissenting) (quoting *Fletcher v. Peck*, 6 Cranch 87, 136 (1810)). The legislature may not insert itself into the adjudication of pending cases, and this Committee makes no attempt to "tread[] impermissibly on judicial turf." *Bank Markazi*, 136 S. Ct. at 1323.

Rather, the Committee's oversight efforts have been focused on decisionmaking processes of the Department of Justice independent of the specifics of any given criminal prosecution. The Department's most recent activities create the unmistakable appearance that Attorney General Barr has improperly interfered with this proceeding for the benefit of President Trump and his political allies. The Committee cannot stand idly by when the rule of law is threatened so brazenly.

The Committee has worked tirelessly to exercise its oversight authority, despite Attorney General Barr's continued evasion. Most recently, the Committee has announced that it will hear testimony from DOJ whistleblowers and former Department officials on the unprecedented

---

[13] The hearing was originally scheduled for March 31, 2020, but was pushed back to June 9, 2020 due to the COVID-19 pandemic.

[14] Letter from Stephen E. Boyd, Assistant Attorney General, to Jerrold Nadler, Chairman, House Committee on the Judiciary (June 1, 2020), https://perma.cc/4FUK-B364.

politicization of the Department under Barr's leadership.[15] And Committee Chairman Nadler has introduced legislation to cut $50 million from the Department of Justice General Administration account, which funds the Attorney General's personal office.[16] This legislation is in direct response to Attorney General Barr's continued defiance of Congress and improper politicization of the DOJ.[17]

In short: The rule of law is threatened by the behavior of Barr's Justice Department. The Committee has acted to exercise its constitutional oversight responsibility. But each branch of our government must act "against the encroachment or aggrandizement of one branch at the expense of the other." *Morrison v. Olson*, 487 U.S. 654, 693 (1988) (quoting *Buckley v. Valeo*, 424 U.S. 1, 122 (1976)). Federal courts have a responsibility to exercise their constitutional independence in order to ensure that the integrity of the criminal justice system is preserved.

## II.     Federal courts possess inherent supervisory authority over the administration of criminal justice to ensure the integrity of the system.

Federal courts possess inherent "supervisory authority over the administration of criminal justice." *McNabb v. United States*, 318 U.S. 332, 341 (1943); *accord Bank of Nova Scotia v. United States*, 487 U.S. 250, 264 (1988) (Scalia, J., concurring) (recognizing a federal court's "inherent supervisory authority over the proceedings conducted before it"). These "implied powers" stem "from the nature of" courts themselves and "are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs.'" *Chambers*, 501 U.S. at 43 (quoting *United States v. Hudson*, 7 Cranch 32, 34 (1812)). The Supreme Court has recognized, for example, that a federal court has the inherent power to "control admission to its bar and discipline attorneys who appear before it." *Id.*

---

[15] Press Release, House Committee on the Judiciary Chairman Jerrold Nadler, House Judiciary Chairman Announces Actions to Hold AG Barr Accountable (June 2, 2020), https://perma.cc/WW2F-ZDEV.

[16] Press Release, House Committee on the Judiciary Chairman Jerrold Nadler, Chairman Nadler Introduces Legislation to Reduce AG Barr's Budget, Reign in Efforts to Politicize DOJ (June 4, 2020), https://perma.cc/UZ5Q-DKQZ.

[17] *Id.*

But the inherent power of federal courts extends beyond mere courtroom management. As institutions tasked with the "administration of justice," federal courts have the inherent authority—and constitutional responsibility—to "preserv[e] the integrity of the judicial process." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944). This authority is particularly strong when a court discovers that acts of corruption, fraud, or "bad-faith conduct" have been perpetrated upon it—be it by private parties or the federal government. *Chambers*, 501 U.S. at 50. In such cases, federal courts have significant authority to remedy the situation. The Supreme Court has recognized, for example, the power of a court to "vacate its own judgment" upon proof that "a fraud has been perpetuated upon the court." *Id.* at 44. And because "[t]he ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches," courts also possess "inherent authority" to "initiate contempt proceedings for disobedience to their orders." *Young v. United States ex rel Vuitton et Fils S.A.*, 481 U.S. 787, 793, 796 (1987); *accord Ex parte Robinson*, 86 U.S. 505, 510 (1973) ("The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings . . . and consequently to the due administration of justice.").

These dramatic remedies are appropriate because misconduct involving corruption, fraud, or bad-faith activity "'involves far more than injury to a single litigant'"—"'[i]t is a wrong against the institutions set up to protect and safeguard the public'" itself. *Chambers*, 501 U.S. at 44 (quoting *Hazel-Atlas*, 322 U.S. at 245). Where "courts themselves become instruments of law enforcement," it is their responsibility to ensure that the practices of law enforcement—be they police officers or prosecutors—do not "undermine the integrity of the criminal proceeding." *McNabb*, 318 U.S. at 332, 342. As Justice Brandeis cautioned: "If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." *Olmstead v. United States*, 277 U.S. 438, 468 (1928) (Brandeis, J., dissenting).

Courts' inherent powers are not unlimited. As creations of Congress, federal courts are ultimately dependent upon "the act calling them into existence, or subsequent acts extending or

limiting their jurisdiction." *Robinson*, 86 U.S. at 511. In other words, the authority of federal courts is subject to the will of Congress, which can restrict—or extend—their power. Where the Federal Rules authorize judicial discretion, courts should not shy away from exercising this authority to promote the public interest. It is against these backdrop principles of inherent supervisory power and congressional authorization that Rule 48(a) operates.

### III.   Rule 48(a)'s "leave of court" requirement authorizes courts to prevent "one corrupt United States attorney" from "dismiss[ing] an indictment" and "defeat[ing] the judicial process."

Federal Rule of Criminal Procedure 48(a) provides that "[t]he government may, with leave of court, dismiss an indictment." The government has taken the extreme position that the rule "does not authorize a court to stand in the way of a dismissal the defendant does not oppose." U.S. Br. at 1. That interpretation is contrary to the text, history, and purpose of Rule 48(a). When considered in light of the well-established supervisory role of federal courts, the history of Rule 48(a)'s enactment powerfully demonstrates that Rule 48(a) contemplates a role for the federal judiciary in detecting—and preventing—politically motivated dismissals of criminal charges. As the Chief Justice of the Supreme Court of Texas put it at the time of Rule 48(a)'s enactment, without a "leave of court" requirement, "[o]ne corrupt United States attorney could dismiss an indictment and defeat the judicial process." 2 Wilken & Triffin, *Drafting History of the Federal Rules*, at 269.

**A.** Before the Federal Rules of Criminal Procedure were enacted, "federal prosecutors wielded the power to drop criminal charges"—to enter a *nolle prosequi*—"at will." Frampton, *Rule 48(a) Dismissals*, at 30. This was in contrast to the practice in most states, which abolished this power in favor of a system where criminal charges could be dismissed only "in furtherance of justice" and with leave of court. *Id.*

In February 1941, under the authority granted by the Rules Enabling Act of 1934, the Supreme Court appointed an Advisory Committee to draft rules governing federal criminal procedure. The issue of the judiciary's role in dismissals was first raised at the Advisory

Committee's January 13, 1942 meeting. *Id.* at 32-33. Committee members were divided. Speaking in favor of judicial oversight, law professor Murray Seasongood argued that he had "seen cases nolled which . . . should not have been nolled"—including some "nolled after intercession from Washington." *Id.* at 33. In opposition, Assistant Attorney General Alexander Holtzoff countered that, "while requiring the consent of the court might be necessary in state court"—where "the average county prosecutor is steeped in politics"—federal prosecutors were "immune to such untoward pressures." *Id.* The Committee vote on the issue resulted in a 7-7 tie. *See id.*

Thus, in the original draft sent to the Supreme Court in May 1942, federal prosecutors retained full *nolle prosequi* power under Rule 48. In their comments on the initial draft, the Supreme Court noted that the proposed version of Rule 48(a)

> apparently gives the Attorney General or the United States Attorney unqualified authority to *nolle pros* a case without consent of the court. Is this now the law, and in any event should it be the law, any more than that the Government can confess error in a criminal case without the consent of the court? *See Young v. United States*, decided this term.

*Id.* at 34-35. In *Young v. United States*, 315 U.S. 257, 258–59 (1942), the Court had held that a prosecutor's confession of error "does not relieve this Court of the performance of the judicial function"; while noting that it gave "great weight" to a prosecutor's "considered judgment . . . that reversible error has been committed," the Court determined that its "judicial obligations compel us to examine independently the errors confessed." The Supreme Court's reference to *Young* when evaluating the proposed Rule 48(a) demonstrates that the Court considered any judicial role in considering a motion to dismiss against the backdrop of the courts' inherent supervisory authority.

In response to this feedback, the Committee debated the provision again. Once again, the Committee was divided. "One contingent . . . insisted that prosecutors could be entrusted with the responsibility to wield their dismissal power responsibly, free from judicial oversight." Frampton, *Rule 48(a) Dismissals*, at 35. The other argued "that a 'leave of court' requirement provided a salutary check against the prosecutor whose independence was compromised by orders from 'Washington.'" *Id.* Again, the effort to insert "leave of court" language into Rule 48(a) fell short, this time by a vote of 6-8. *Id.*

Once again, the Supreme Court provided feedback. In a letter from Chief Justice Stone, the Court informed the Committee that "[t]wo members of the Court think that the United States Attorney should not be permitted to dismiss an indictment without the consent of the court." *Id.* at 36. The Advisory Committee did not immediately take the hint. Instead, the Committee added a compromise provision, requiring prosecutors to supply "a statement of the reasons therefor" along with their dismissal. *Id.* When this draft was circulated among the legal community for feedback, this compromise was deemed insufficient. The Chief Justice of the Supreme Court of Texas said he opposed the language because, without a "leave of court" requirement, "[o]ne corrupt United States attorney could dismiss an indictment and defeat the judicial process." *Id.*[18]

In December 1944, the Supreme Court announced the final version of the Rules. The final version largely adopted the Advisory Committee's proposals, but "there was a significant change to rules governing the dismissal of cases." *Id.* at 37. In the final version of Rule 48(a), the Court replaced the requirement that prosecutors provide a "statement of reasons" with the stronger language that exists today: The government may only dismiss an "indictment, information, or complaint" with "leave of court." Fed. R. Crim. P. 48(a).

Thus, "the history of the Rule belies the notion that its only scope and purpose is the protection of the defendant." *United States v. Cowan*, 524 F.2d 504, 512 (5th Cir. 1975). To the contrary, Rule 48(a) was designed to "preserve the essential judicial function of protecting the public interest in the evenhanded administration of criminal justice" and "condition the absolute power of the Executive, consistent with the Framer's concept of Separation of Powers, by erecting a check on the abuse of the Executive's prerogatives." *Id.* at 513.

**B.** The governing precedent is consistent with this history. Interpreting the Rule against the backdrop of courts' inherent supervisory powers, the Supreme Court and D.C. Circuit have both recognized the appropriate but limited role of federal courts in preventing dismissals tainted by prosecutorial impropriety. The role of the courts is not to second-guess the initial decision to

---

[18] Corruption was yet again the central issue surrounding Rule 48(a). "Not a single correspondent suggested that 'leave of court' language was necessary to protect the rights of the defendant." *Id.* at 36-37.

prosecute. Rather, "the salient issue is . . . whether the Government's later efforts to terminate the prosecution" are "tainted with impropriety." *Rinaldi*, 434 U.S. at 30. That inquiry turns in part on whether the Government has shown "bad faith" or has been "motivated by considerations" that are contrary to the "public interest." *Id.* (quoting *Cowan*, 524 F.2d at 513). The intent of the "leave of court" requirement is not for "the trial court to serve merely as a rubber stamp for the prosecutor's decision." *Ammidown*, 497 F.2d at 622. Rather, it is "to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors." *Id.* A court thus has an important role to play where, as here, "the defendant concurs in the dismissal but the court is concerned whether the action sufficiently protects the public." *Id.*

There is no disputing "[t]he Executive's primacy in criminal charging decisions." *Fokker Services B.V.*, 818 F.3d at 741. But the posture of this case does not implicate that concern. Because Flynn has already pleaded guilty (twice), this case falls squarely within "the Judiciary's traditional authority over sentencing," requiring no judicial second-guessing of "the Executive's" initial "charging decisions." *Id.* at 746; *see also Ammidown*, 497 F.2d at 622 (explaining that Rule 48(a) "protect[s] the sentencing authority reserved to the judge"). This Court is, in effect, being asked to dissolve two findings of guilt, entered by two federal judges. "[I]t is no trifling matter to allow a defendant to withdraw a guilty plea '[a]fter [he] has sworn in open court that he actually committed the crimes, after he has stated that he is pleading guilty because he is guilty, after the court has found a factual basis for the plea, and after the court has explicitly announced that it accepts the plea.'" *United States v. Robinson*, 587 F.3d 1122, 1133 (D.C. Cir. 2009) (quoting *United States v. Hyde*, 520 U.S. 670, 676 (1997)).

In this scenario, the Rule "contemplates exposure of the reasons for dismissal" to "prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors." *Ammidown*, 497 F.2d at 620. Even where a court ultimately upholds the government's decision to dismiss a case, the simple act of requiring prosecutors to present their reasons to the public in open court—thorough "examination of the record," *Rinaldi* 434 U.S. at 30—is a powerful force against corruption. Where

those reasons unearth corrupt prosecutorial activity, the court need not lend its own legitimacy to a prosecutor's tainted decision.

## IV.  This Court should conduct an evidentiary hearing to assess the government's decision to dismiss this case and—if it concludes that the evidence demonstrates "abuse of prosecutorial discretion"—should not hesitate to deny the government's motion to dismiss.

History and precedent provide a clear guide to this case. The history of Rule 48(a) demonstrates that it was intended precisely for situations such as this: "dubious dismissals of criminal cases that would benefit powerful and well-connected defendants." Frampton, *Rule 48(a) Dismissals*, at 29. And far from prohibiting judicial discretion, this Court's precedent requires it, recognizing the court's "role of guarding against abuse of prosecutorial discretion." *Ammidown*, 497 F.2d at 620. To properly fulfill that role, an evidentiary hearing is necessary to unearth the "reasons" and "underlying factual basis" for the government's motion. *Id.*

The dramatic circumstances surrounding the government's motion bear repeating. In November 2017, Flynn waived indictment and pleaded guilty to one count of making materially false statements to the FBI, in violation of 18 U.S.C. § 1001. Flynn attested—under penalty of perjury—to making three sets of materially false statements. First, Flynn attested that, in a January 24, 2017 interview with the FBI, he "falsely stated that he did not ask Russia's Ambassador to the United States . . . to refrain from escalating the situation in response to sanctions that the United States had imposed against Russia." Statement of Offense, ECF 4 at 2 (Dec. 1, 2017). Second, Flynn stipulated that, in the same conversation, he "made additional false statements about calls he made to Russia and several other countries regarding a resolution submitted by Egypt to the United Nations Security Council." *Id.* at 4. Third, Flynn attested to making "materially false statements and omissions" in multiple documents filed with the Department of Justice pursuant to the Foreign Agents Registration Act. *Id.* at 5. As the government itself has recognized, Flynn "reiterated that he 'd[id] not take issue' with the government's description of [his] conduct" over a year after his initial guilty plea. United States' Suppl. Mem. in Aid of Sentencing, ECF 150 at 5 (Jan. 7, 2020).

16

From the beginning, President Trump has expressed his displeasure with the investigation and eventual prosecution of Michael Flynn. In February 2017, President Trump indicated his desire for the investigation to be terminated to then-FBI director James Comey, saying that he hoped Comey could "see [his] way clear to letting this go, to letting Flynn go."[19] And the President has publicly expressed his support for Michael Flynn and his displeasure with the prosecution on multiple occasions, including through Twitter.[20]

Until filing its motion to dismiss last month, the DOJ prosecutorial team had never expressed doubt regarding the materiality of Flynn's lies. The government told this Court that "[t]he defendant's offense is serious," Government's Mem. in Aid of Sentencing, ECF 46 at 2, and that the "false statements to the FBI were significant," ECF 150 at 17. And the government recognized that "[i]t was material to the FBI's counterintelligence investigation to know the full extent of the defendant's communications with the Russian Ambassador, and why he lied to the FBI about those communications." *Id.* at 9. Further, "determining the extent of the defendant's actions, why the defendant took such actions, and *at whose direction he took those actions,* were critical to the FBI's counterintelligence investigation." *Id.* at 17 (emphasis added).

The government now takes a different tack, claiming that any lies by Mr. Flynn in the January 24, 2017 interview with the FBI were "not . . . material." ECF 198 at 2. Notably, the government does not address Mr. Flynn's admission to lying in documents filed with the DOJ under the Foreign Agents Registration Act on March 7, 2017.

---

[19] Michael S. Schmidt, *Comey Memo Says Trump Asked Him to End Flynn Investigation*, N.Y. Times (May 16, 2017), https://perma.cc/F946-HVSQ.

[20] *See, e.g.*, @realDonaldTrump, Twitter (Mar. 31, 2017, 7:04 AM), https://bit.ly/2AQgA1s ("Mike Flynn should ask for immunity in that this is a witch hunt (excuse for big election loss), by media and & Dems, of historic proportion!"); @realDonaldTrump, Twitter (Dec. 13, 2018, 11:07 AM), https://bit.ly/2zo1YGk

("They gave General Flynn a great deal because they were embarrassed by the way he was treated – the FBI said he didn't lie and they overrode the FBI. They want to scare everybody into making up stories that are not true by catching them in the smallest of misstatements. Sad!");

@realDonaldTrump, Twitter (Dec. 18, 2018, 6:41 AM), https://bit.ly/3f8XL8G ("Good luck today in court to General Michael Flynn. Will be interesting to see what he has to say, despite tremendous pressure being put on him, about Russian Collusion in our great and, obviously, highly successful political campaign. There was no Collusion!").

The President's statements, the Department's abrupt change of position, and the lack of career prosecutors on the government's motion to dismiss all suggest improper political interference leading to the government's decision to dismiss this case. There may be a perfectly legitimate explanation for the government's change of heart. But the facts currently available to the public, the Committee, and this Court evoke corruption. Without an evidentiary hearing, this Court—and the American people—can only speculate about the true reasons underlying the Department's decision.

It is the role of this Court to bring that truth to light. "The need to develop all relevant facts" in judicial proceedings "is both fundamental and comprehensive." *United States v. Nixon*, 418 U.S. 683, 709 (1974). "The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts . . . . [t]o ensure that justice is done." *Id.* To that end, the Court, with the assistance of its appointed *amicus*, should exercise its Rule 48(a) authority to "expose [] the reasons for dismissal" through an evidentiary hearing. *Ammidown*, 497 F.2d at 620. Only then will the court be able to determine whether the Government's decision to dismiss the case was "tainted with impropriety." *Rinaldi*, 434 U.S. at 30. And if it was, the Court should deny the motion and proceed to sentencing.

## CONCLUSION

At a minimum, this Court should exercise its authority under Federal Rule of Criminal Procedure 48(a) to conduct an evidentiary hearing to assess the Government's reasons for seeking to dismiss this prosecution. Following that hearing, if the Court determines that it is appropriate to do so, it should deny the government's motion to dismiss and proceed to sentencing.

June 10, 2020

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741

*Counsel for Amici Curiae*                    deepak@guptawessler.com

18