**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA |
| v. |
| MICHAEL T. FLYNN, |
| Defendant. |

Crim. Action No. 17-232 (EGS)

<u>**MEMORANDUM OPINION**</u>

Pending before the Court are: (1) the government's motion to dismiss the criminal information against Mr. Flynn with prejudice pursuant to Federal Rule of Criminal Procedure 48(a), *see* Gov't's Mot. Dismiss Criminal Information Against Def. Michael T. Flynn ("Gov't's Mot. Dismiss"), ECF No. 198; and (2) the government's notice of executive grant of clemency and consent motion to dismiss this case as moot, *see* Notice Executive Grant Clemency Consent Mot. Dismiss Moot ("Consent Mot. Dismiss"), ECF No. 308. Upon careful consideration of the motions, the applicable law, the entire record herein, and for the reasons explained below, the Court **DENIES AS MOOT** the government's motion to dismiss pursuant to Rule 48(a), and **GRANTS** the government's consent motion based on the presidential pardon and **DISMISSES** this case **AS MOOT**.

## I. Background

Mr. Flynn served as a surrogate and national security advisor for then-candidate Donald J. Trump during the 2016 presidential campaign. Statement of Offense ("SOF"), ECF No. 4 at 1 ¶ 1.[1] After the November 2016 election, Mr. Flynn became a senior member of the President-Elect's Transition Team. *Id.* Mr. Flynn served as the National Security Advisor to President Trump from January 22, 2017 until he resigned on February 13, 2017. Ex. 1 to Def.'s Reply Mot. Compel, ECF No. 133-1 at 1-2.

### A. The FBI Investigation Into Mr. Flynn's Activities

The criminal conduct underlying the offense, as set forth in the Information, was admitted to by Mr. Flynn when he entered his guilty pleas in this case. *See, e.g.*, Information, ECF No. 1 at 1-2; Plea Hr'g Tr. (Dec. 1, 2017), ECF No. 16 at 18-19; Sentencing Hr'g Tr. (Dec. 18, 2018), ECF No. 103 at 9-10. The Information, which was filed on November 30, 2017, charged Mr. Flynn with one count of willfully and knowingly making materially false statements to the Federal Bureau of Investigation ("FBI"), in violation of 18 U.S.C. § 1001(a)(2), during his interview with two FBI agents on January 24, 2017 in the White House. *See* Information, ECF No. 1 at 1-2; *see also*

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

Sentencing Hr'g Tr., ECF No. 103 at 32. Under oath and with the advice of counsel, Mr. Flynn pled guilty to the crime on December 1, 2017. Plea Hr'g Tr., ECF No. 16 at 30-31; *see also* Plea Agreement, ECF No. 3 at 10.

According to the record evidence in this case, on July 31, 2016, the FBI opened an investigation, code-named "Crossfire Hurricane," into the Russian Federation's ("Russia") efforts to interfere in the 2016 election, which included determining the existence of any links between Russia and individuals associated with the Trump campaign. SOF, ECF No. 4 at 1 ¶ 1.[2] Among other things, the Crossfire Hurricane investigation set out to determine who, if anyone, from the campaign may have "been in a

---

[2] On May 17, 2017, then-Acting Attorney General Rod J. Rosenstein appointed Robert S. Mueller, III to serve as Special Counsel for the United States Department of Justice and authorized the Special Counsel to investigate the Russian government's efforts to interfere in the 2016 election, including any matters arising from that investigation. Special Counsel Robert S. Mueller, III, U.S. Dep't of Justice, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election*, Vol. I of II ("Mueller Report") (Mar. 2019), ECF No. 79-1 at 19. The Special Counsel was duly authorized to prosecute federal crimes arising from the investigation. *Id.* The Special Counsel concluded that Russia interfered in the 2016 presidential election in two principal ways: (1) carrying out a social media campaign favoring then-candidate Trump and disparaging then-candidate Hillary Rodham Clinton; and (2) "conduct[ing] computer-intrusion operations against entities, employees, and volunteers working on the Clinton Campaign and then releas[ing] stolen documents." *Id.* at 9. The Special Counsel's "investigation also identified numerous links between the Russian government and the Trump Campaign." *Id.*

position to have received the alleged offer of assistance from Russia." Ex. 1 to Amicus Br., ECF No. 225-1 at 13.

Against this backdrop, and "as part of the larger Crossfire Hurricane umbrella," the FBI launched an investigation into Mr. Flynn on August 16, 2016, in order to determine whether he was "being directed and controlled by and/or coordinating activities with the Russian Federation in a manner which may be a threat to the national security and/or possibly a violation of the Foreign Agents Registration Act, [18 U.S.C. § 951 *et seq.*], or other related statutes." *See* Ex. 2 to Gov't's Mot. Dismiss, ECF No. 198-3 at 2-3. The communication describing the opening of the investigation into Mr. Flynn, code-named "Crossfire Razor," noted that: (1) Mr. Flynn was "an adviser to the Trump team on foreign policy issues"; (2) he had "ties to various state-affiliated entities of the Russian Federation"; (3) he had "traveled to Russia in December 2014"; and (4) he had "an active TS/SCI clearance." *Id.* At some point prior to January 4, 2017, though, the FBI drafted a "Closing Communication" to close the case, noting that certain investigative steps had yielded "no derogatory information" on Mr. Flynn and that the "FBI is closing this investigation." *See* Ex. 1 to Gov't's Mot. Dismiss, ECF No. 198-2 at 2, 5. The document also stated: "If new information is identified or reported to the FBI regarding the activities of CROSSFIRE RAZOR, the FBI will consider reopening

4

the investigation if warranted." *Id.* at 5. Despite the written communication, the case was not closed at that time. *See* Gov't's Mot. Dismiss, ECF No. 198 at 4.

On December 21, 2016, Egypt introduced a resolution to the United Nations ("U.N.") Security Council regarding Israeli settlements, and the vote on the resolution was scheduled for December 22, 2016. SOF, ECF No. 4 at 4 ¶ 4. On December 29, 2016, then-President Barack H. Obama imposed sanctions on Russia for its interference in the 2016 presidential election. *See id.* at 2 ¶ 3(a). Before the President-Elect was sworn into office and prior to the closing of Crossfire Razor, Mr. Flynn engaged in conversations with the then-Russian Ambassador between December 22, 2016 and December 31, 2016. *Id.* at 2-5 ¶¶ 3-4. Based on these communications, the FBI continued its investigation into Mr. Flynn and did not close the investigation of him. *See* Gov't's Mot. Dismiss, ECF No. 198 at 4-7.

As the investigation continued, Mr. Flynn made a series of materially false statements to FBI investigators during an interview at the White House on January 24, 2017 about his conversations with the Russian Ambassador. SOF, ECF No. 4 at 1-2 ¶ 2 (stating that "[Mr.] FLYNN's false statements and omissions impeded and otherwise had a material impact on the FBI's ongoing investigation into the existence of any links or coordination between individuals associated with the [Trump] Campaign and

Russia's efforts to interfere with the 2016 presidential election"); *see id.* at 2-5 ¶¶ 3-4; *see also* Information, ECF No. 1 at 1-2. Mr. Flynn admitted to lying to the FBI about his request on or about December 29, 2016 to the Russian Ambassador that Russia refrain from escalating the situation in response to the sanctions imposed by the United States against Russia, and about the Russian Ambassador telling Mr. Flynn that Russia decided to moderate its response to the sanctions. SOF, ECF No. 4 at 2-3 ¶ 3. In addition, Mr. Flynn admitted to making false statements to the FBI about his request on or about December 22, 2016 to the Russian Ambassador that Russia vote against or delay Egypt's resolution to the U.N. Security Council, that the Russian Ambassador never described to Mr. Flynn Russia's response to his request, that Mr. Flynn did not request certain countries to take a particular position on the resolution, and that Mr. Flynn only asked the countries for their respective positions on the vote. *Id.* at 4-5 ¶ 4.

Separately, Mr. Flynn also admitted to making false statements in the documents that he submitted to the United States Department of Justice on March 7, 2017 under the Foreign Agents Registration Act, 22 U.S.C. §§ 611-621 ("FARA"). *Id.* at 5 ¶ 5; *see also* Addendum to Gov't's Mem. in Aid of Sentencing, ECF No. 75 at 3 (stating that "[Mr. Flynn] stipulated and agreed that he violated FARA by making materially false statements" in

the FARA filings). Those FARA filings concerned a project that
Mr. Flynn and his company, Flynn Intel Group, Inc. ("FIG"),
performed on behalf of the Republic of Turkey. SOF, ECF No. 4 at
5 ¶ 5. Mr. Flynn, however, was not charged with any FARA
violations. *See* Information, ECF No. 1 at 1; *see also* Status
Hr'g Tr. (Sept. 10, 2019), ECF No. 114 at 20. For purposes of
sentencing, Mr. Flynn did not dispute the relevance of the FARA
references in the government's description of the nature and
circumstances of his offense. *See* Gov't's Mem. in Aid of
Sentencing, ECF No. 46 at 3-5; *see also* Def.'s Mem. in Aid of
Sentencing, ECF No. 50 at 12. Indeed, the government confirmed
that Mr. Flynn could have been charged with making false
statements in the FARA filings. Sentencing Hr'g Tr., ECF No. 103
at 28. Under the terms of the Plea Agreement, the government
agreed not to further prosecute Mr. Flynn for the criminal
conduct described in the SOF. Plea Agreement, ECF No. 3 at 2 ¶
3. In the final analysis, the government did not charge Mr.
Flynn with violating the Logan Act, 18 U.S.C. § 953, or with
being a foreign agent. *See* Information, ECF No. 1 at 1.

### B. Mr. Flynn's Guilty Pleas And Subsequent Motion To Withdraw His Guilty Plea

On November 30, 2017, Mr. Flynn entered into a plea
agreement with the government upon the advice of counsel. *See*
Plea Agreement, ECF No. 3 at 10. Judge Rudolph Contreras

accepted Mr. Flynn's guilty plea on December 1, 2017, finding that Mr. Flynn entered the plea knowingly, voluntarily, and intelligently with the advice of counsel. Plea Hr'g Tr., ECF No. 16 at 4, 30-31.

On December 7, 2017, this case was randomly reassigned to this Court. *See generally* Docket for Crim. Action No. 17-232. On December 18, 2018, this Court accepted Mr. Flynn's guilty plea a second time. Sentencing Hr'g Tr., ECF No. 103 at 5, 16. During that hearing, the Court extended the plea colloquy in view of Mr. Flynn's statements in his sentencing memorandum, which raised questions as to whether Mr. Flynn sought to challenge the conditions of the FBI interview. *See generally* Def.'s Mem. in Aid of Sentencing, ECF No. 50 at 6-18. Under oath, Mr. Flynn confirmed that his rights were not violated as a result of the circumstances of his January 24, 2017 FBI interview and the allegations of misconduct against FBI officials. *Id.* at 11-12. And Mr. Flynn declined the Court's invitation for the appointment of independent counsel to advise him. *Id.* at 9-10.

Noting that the Court's usual practice is to impose a sentence only after the completion of a defendant's cooperation, the Court granted Mr. Flynn's request to continue the sentencing hearing to allow him to further cooperate with the government after considering defense counsel's representations that Mr. Flynn was prepared to continue his cooperation in the criminal

case in the Eastern District of Virginia. *Id.* at 47-48. The
trial in that case was scheduled to begin in July 2019. *See*
Joint Status Report, ECF No. 71 at 1; *see also* Status Hr'g Tr.
(June 24, 2019), ECF No. 94 at 5-6. In June 2019, Mr. Flynn
retained new counsel. *See* Min. Order (June 14, 2019). Mr. Flynn
did not testify at the trial in the Eastern District of
Virginia. *See, e.g.*, Min. Order (July 9, 2019); Gov't's Resp. to
Order of the Court, ECF No. 97 at 1-2; Def.'s Resp. to Order of
the Court, ECF No. 98 at 1-11; Def.'s Suppl. Status Report, ECF
No. 121 at 1.

Thereafter, in August 2019 and October 2019, respectively,
Mr. Flynn filed motions to compel the production of certain
materials pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and
the Court's Standing *Brady* Order. *See generally* Def.'s Br. in
Supp. of Def.'s Mot. to Compel Produc. of *Brady* Material & Mot.
for Order to Show Cause, ECF No. 109; Def.'s Redacted Mot. to
Compel & Mot. for Order to Show Cause, ECF No. 111; Def.'s
Sealed Mot. to Compel Produc. of *Brady* Material, ECF No. 112;
Def.'s Suppl., ECF No. 116; Def.'s Mot. to Compel Newly
Discovered *Brady* Evid., ECF No. 124. In these motions, Mr. Flynn
asserted his innocence for the first time in this case, alleged
prosecutorial misconduct, and sought dismissal. In December
2019, the Court issued a Memorandum Opinion and separate Order
denying Mr. Flynn's *Brady* motions, finding that Mr. Flynn failed

to establish a single *Brady* violation, and holding that Mr. Flynn's false statements to the FBI were material within the meaning of 18 U.S.C. § 1001(a) for the purpose of resolving those motions. *See* Order, ECF No. 143; Mem. Op., ECF No. 144 at 53, 92.

As the Court and the parties prepared to proceed with sentencing, in January 2020, Mr. Flynn moved to withdraw his guilty plea. *See* Mot. Withdraw Guilty Plea, ECF No. 151; Suppl. Mot. Withdraw Guilty Plea, ECF No. 160-2. On January 29, 2020, Mr. Flynn filed a motion to dismiss for alleged egregious government misconduct and in the interest of justice. *See* Mot. Dismiss Case Egregious Gov't Misconduct, ECF No. 162. In February 2020, the government opposed Mr. Flynn's motion to dismiss, stating that Mr. Flynn "relies on allegations that do not pertain to his case, that the Court already rejected, and that have no relevance to his false statements to the FBI on January 24, 2017." Gov't's Response Def.'s Mot. Dismiss, ECF No. 169 at 11. The government did not file a response to Mr. Flynn's motions to withdraw his guilty pleas due to its incomplete review of Mr. Flynn's former counsel's productions relevant to Mr. Flynn's claims of ineffective assistance of counsel, as well as a dispute between Mr. Flynn and his former counsel. *See* Mot. Continue Briefing, ECF No. 165; *see also* Min. Order (Feb. 10, 2020).

**C. The Government's Motion To Dismiss**

On May 7, 2020, the government filed a motion to dismiss the criminal information against Mr. Flynn with prejudice pursuant to Federal Rule of Criminal Procedure 48(a). *See* Gov't's Mot. Dismiss, ECF No. 198 at 12. For the first time in this case, the government claimed that: (1) Mr. Flynn's false statements to the FBI agents were not "material" to any investigation; (2) the government is doubtful that it could prove the falsity of Mr. Flynn's statements; and (3) the government has no "substantial federal interest in penalizing a defendant for a crime that it is not satisfied occurred and that it does not believe it can prove beyond a reasonable doubt." *Id.* at 1-2.

On the same day, and with the consent of the government, Mr. Flynn filed a motion to withdraw all of his pending motions without prejudice. *See id.* at 10 n.3; Michael Flynn's Mot. Withdraw Pending Mots., ECF No. 199. Mr. Flynn also filed a notice of consent to the government's Rule 48(a) motion on May 12, 2020, demanding the immediate dismissal of this case with prejudice. *See* Michael Flynn's Consent Gov't's Mot. Dismiss, ECF No. 202. On May 13, 2020, the Court appointed John Gleeson ("Mr. Gleeson") as amicus curiae to present arguments in opposition to the government's Rule 48(a) motion and to address whether Mr. Flynn should be held in criminal contempt for perjury pursuant

to 18 U.S.C. § 401; Federal Rule of Criminal Procedure 42; the
Court's inherent authority; and any other applicable statutes,
rules, or controlling law.[3] *See* Order Appointing Amicus Curiae,
ECF No. 205.[4] On May 19, 2020, the Court set a briefing schedule
and scheduled oral argument for July 16, 2020, adding that the
order was subject to a motion for reconsideration, for good
cause shown. *See* Min. Order (May 19, 2020).[5] Thereafter, Mr.
Gleeson filed his brief on June 10, 2020. *See* Amicus Br., ECF
No. 225. Mr. Flynn filed his response and two supplemental
responses, and the government filed its response. *See* Gov't's
Reply, ECF No. 227; Mem. Opp'n, ECF No. 228; Suppl., ECF No.
231; Suppl., ECF No. 237. Mr. Gleeson filed his reply brief on
September 11, 2020. See Amicus Reply Br., ECF No. 243.

---

[3] The Court is persuaded by the arguments presented that issuing
an Order to Show Cause would amount to an atypical action and so
does not address this issue in this Memorandum Opinion.
[4] The Court appreciates the thorough, careful, and thoughtful
analysis provided by Court-appointed amicus curiae.
[5] Pursuant to this schedule, the following amici submitted
briefs: Separation of Powers Scholars; National Association of
Criminal Defense Lawyers; Former Federal Prosecutors and High-
Ranking Department of Justice Officials; Opening Arguments
Media, LLC; We Who Serve-VSO; Kamil Ekim Alptekin; Steady State
and Former National Security Officials; Federal Practitioners;
Chairman and Members of the Committee on the Judiciary, U.S.
House of Representatives; Lawyers Defending American Democracy;
Watergate Prosecutors; Citizens United, Citizens United
Foundation, and Presidential Coalition, LLC; the States of Ohio,
Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Louisiana,
Mississippi, Missouri, Oklahoma, South Carolina, Texas, Utah,
and West Virginia; and Criminal Law Professors. The Court
appreciates the perspectives expressed by *amici*.

**D. Mr. Flynn's Mandamus Petition**

On the same day that the Court set the briefing schedule on the government's motion, Mr. Flynn filed an emergency petition for a writ of mandamus in the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), seeking an order to: (1) direct the Court to grant the government's unopposed Rule 48(a) motion; (2) vacate the Court's Order appointing amicus curiae; and (3) reassign the case to a different district judge for any further proceedings. *See* Pet. Writ Mandamus, *In re Flynn*, No. 20-5143 (D.C. Cir. May 19, 2020). Two days later, the D.C. Circuit ordered this Court to file a response and invited the government, in its discretion, to file a response. *See* Per Curiam Order, *In re Flynn*, No. 20-5143 (D.C. Cir. May 21, 2020). The government and this Court filed their responses on June 1, 2020. *See* Judge Sullivan Response, *In re Flynn*, No. 20-5143 (D.C. Cir. June 1, 2020); Gov't's Response, *In re Flynn*, No. 20-5143 (D.C. Cir. June 1, 2020).

On June 24, 2020, a divided panel of the D.C. Circuit granted in part Mr. Flynn's petition and directed the Court to grant the government's unopposed Rule 48(a) motion. *In re Flynn*, 961 F.3d 1215, 1223, 1227 (D.C. Cir. 2020). The panel majority declined to reassign the case to a new judge, *id.* at 1223; and vacated as moot the Order appointing Mr. Gleeson as amicus

curiae, *id.* at 1227. The Clerk of Court docketed the June 24, 2020 Order in this case. *See* USCA Order, ECF No. 233.

On July 9, 2020, this Court filed a petition for rehearing en banc, *see* Pet. Reh'g En Banc, *In re Flynn*, No. 20-5143 (D.C. Cir. June 9, 2020); to which both Mr. Flynn and the government filed a response, Flynn Response, *In re Flynn*, No. 20-5143 (D.C. Cir. June 20, 2020); Gov't's Response, *In re Flynn*, No. 20-5143 (D.C. Cir. June 20, 2020).

On July 30, 2020, the D.C. Circuit ordered the case to be heard en banc based on a suggestion of a member of the court, and vacated its June 24, 2020 order. *See* Per Curiam Order, *In re Flynn*, No. 20-5143 (D.C. Cir. July 30, 2020); *see also In re Flynn*, 973 F.3d 74, 77 n.1 (D.C. Cir. 2020). Following oral argument, on August 31, 2020, the D.C. Circuit denied Mr. Flynn's petition for a writ of mandamus. The D.C. Circuit, per curiam, denied Mr. Flynn's requests to compel the immediate grant of the government's motion and to vacate the Court's appointment of amicus because Petitioner had not established that he has "no other adequate means to attain the relief he desires." *In re Flynn*, 973 F.3d at 79. The D.C. Circuit also declined to mandate that the case be reassigned to a different district judge because Mr. Flynn had not established a clear and indisputable right to reassignment. *Id.* at 78, 82. The D.C. Circuit further held that the case is not moot. *Id.* at 78 n.2.

**E. Resumption Of Hearing On The Government's Motion To Dismiss**

Following the D.C. Circuit's denial of Mr. Flynn's mandamus petition and pursuant to this Court's September 1, 2020 Minute Order, the parties filed a joint status report proposing deadlines for further briefing on the government's Rule 48(a) motion, as well as proposed dates for a hearing on the motion. *See* Joint Status Report, ECF No. 238. The parties also agreed that the Court need not wait until the D.C. Circuit's Order denying mandamus relief became effective on September 21, 2020 — 21 days after its issuance, pursuant to Circuit Rule 41(a)(3) — to proceed with briefing. *Id.* at 2.

In accordance with the parties' proposed hearing date and briefing schedule, which the Court granted, *see* Min. Order (Sept. 4, 2020), Mr. Gleeson filed his reply brief on September 11, 2020, *see* Amicus Reply Br., ECF No. 243. The government filed a supplement, *see* Gov't's Suppl., ECF No. 249; and Mr. Flynn filed three supplements, *see* Suppl., ECF No. 248; Suppl., ECF No. 251; Suppl., ECF No. 257. The Court heard oral argument on the government's Rule 48(a) motion on September 29, 2020. Following the motion hearing, Mr. Flynn filed a supplement in support of the government's Rule 48(a) motion, *see* Suppl., ECF No. 264; and Mr. Gleeson filed a supplement to his briefing, *see* Amicus Suppl., ECF No. 265. Mr. Flynn also filed a motion for

recusal and other relief. *See* Mot. for Recusal, ECF No. 261. In that motion Mr. Flynn requested, among other things, that the Court grant the government's motion to dismiss pursuant to Rule 48(a) and that, upon dismissal of the case, the Court recuse itself from further proceedings. After the Court dismisses the case as moot pursuant to the presidential pardon, the Court will deny the motion for recusal as moot.

**D. The President Pardons Mr. Flynn**

On November 25, 2020, President Trump granted Mr. Flynn a "full and unconditional pardon" for: (1) "the charge of making false statements to Federal investigators," in violation of 18 U.S.C. § 1001, as charged in the Information in this case; (2) "any and all possible offenses arising from the facts set forth in the Information and Statement of Offense" filed in this case "or that might arise, or be charged, claimed, or asserted, in connection with the proceedings" in this case; (3) "any and all possible offenses within the investigatory authority or jurisdiction of the Special Counsel appointed on May 17, 2017, including the initial Appointment Order No. 3915-2017 and subsequent memoranda regarding the Special Counsel's investigatory authority"; and (4) "any and all possible offenses arising out of facts and circumstances known to, identified by, or in any manner related to the investigation of the Special Counsel, including, but not limited to, any grand jury

16

proceedings" in this District or in the United States District Court for the Eastern District of Virginia. Ex. 1 to Consent Mot. Dismiss, ECF No. 308-1 at 1; *see also* Donald Trump (@realDonaldTrump), Twitter (Nov. 25, 2020, 4:08 PM), https://twitter.com/realDonaldTrump/status/1331706255212228608.[6]

Mr. Flynn accepted the pardon, and Mr. Flynn and the government subsequently moved to dismiss this case as moot. *See* Consent Mot. Dismiss, ECF No. 308 at 2.

## II. Legal Standards And Analyses

### A. Federal Rule Of Criminal Procedure Rule 48(a)

#### 1. The Court Has Discretion To Review The Unopposed Rule 48(a) Motion

Rule 48(a) provides that the "government may, with leave of court, dismiss an indictment, information, or complaint." Fed. R. Crim. P. 48(a). Based on its terms, the "leave of court" requirement "obviously vest[s] some discretion in the court." *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977). As the D.C. Circuit has recognized, the "requirement of judicial leave . . . gives the court a role in dismissals following indictment." *United States v. Ammidown*, 497 F.2d 615, 620-21

---

[6] The Court takes judicial notice of President Trump's tweet as the veracity of this statement "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see Hawaii v. Trump*, 859 F.3d 741, 773 n.14 (9th Cir. 2017), *vacated on other grounds*, 138 S. Ct. 377 (2017).

(D.C. Cir. 1973). The government, however, casts doubt on the
authority of courts to review a Rule 48(a) motion to dismiss
when the defendant in the case does not oppose the motion. The
government argues that the rule "ordinarily allows a court to
review a motion to dismiss only to protect the interests of the
defendant." Gov't's Reply, ECF No. 227 at 17. Yet the text and
history of Rule 48(a), as well as precedent in this and other
circuits, demonstrate that courts have the authority to review
unopposed Rule 48(a) motions as well.

"[T]he history of the Rule belies the notion that its only
scope and purpose is the protection of the defendant." *United
States v. Cowan*, 524 F.2d 504, 512 (5th Cir. 1975). Before Rule
48(a)'s passage in 1944, "federal prosecutors wielded the power
to drop criminal charges," or enter a nolle prosequi, "at will."
*See* Thomas Ward Frampton, *Why Do Rule 48(a) Dismissals Require
"Leave of Court"?*, 73 Stan. L. Rev. Online 28, 30 (2020).
However, the perception that prosecutors were seeking dismissals
for politically well-connected defendants led some judges to
"feel complicit in dealings they deemed corrupt." *Id.*; *see,
e.g.*, *United States v. Woody*, 2 F.2d 262, 262-63 (D. Mont. 1924)
(finding that the prosecution had moved to dismiss the case for
reasons that "savor[ed] altogether too much of some variety of
prestige and influence (family, friends, or money) that too
often enables their possessors to violate the laws with

18

impunity; whereas persons lacking them must suffer all the penalties," but "reluctantly" dismissing the case because leave of court was not required).

In 1941, the Supreme Court appointed an Advisory Committee to create rules of criminal procedure, and the Committee took into consideration such concerns. Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of Court"?*, *supra*, at 31-32. As originally proposed by the Advisory Committee, Rule 48(a) allowed a prosecutor to dismiss without leave of court but required that the prosecutor state reasons for seeking dismissal. *Id.* at 34. The Supreme Court, in response to the draft rule, pointed out that the proposed "rule apparently gives the Attorney General or the United States Attorney unqualified authority to nolle pros a case without consent of the court," inquiring "[i]s this now the law, and in any event should it be the law, any more than that the  Government can confess error in a criminal case without the consent of the court?" *Id.* at 34-35; *see also Cowan*, 524 F.2d at 510. The Supreme Court, in its note, directed the Committee's attention to *Young v. United States*, 315 U.S. 257 (1942), which held that the fact that a prosecutor confesses error in a case "does not relieve th[e] Court of the performance of the judicial function." 315 U.S. at 258. In the opinion, the Supreme Court explained that "[t]he public interest that a result be reached which promotes a well-ordered society

19

is foremost in every criminal proceeding. The interest is entrusted to our consideration and protection as well as that of the enforcing officers." *Id.* at 259.

Despite the Supreme Court's concerns, the Advisory Committee's final draft of Rule 48(a) again required only that prosecutors submit a statement of reasons for dismissal. *See* Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of Court"?*, *supra*, at 36-37. However, in promulgating the rule, the Supreme Court deleted this requirement and added the requirement that the prosecutor obtain leave of court. *Id.* at 37; s*ee also* *Ammidown*, 497 F.2d at 620. In so doing, the Court made it "manifestly clear that [it] intended to clothe the federal courts with a discretion broad enough to protect the public interest in the fair administration of criminal justice." *Cowan*, 524 F.2d at 512.

This Circuit's precedent is consistent with this history. For example, in *Ammidown*, the D.C. Circuit acknowledged that Rule 48(a) "gives the court a role" when "the defendant concurs in the dismissal but the court is concerned whether the action sufficiently protects the public." 497 F.2d at 620. The D.C. Circuit explained that courts carry out this role in such a situation "to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors." *Id.* (citation omitted). Despite this language in *Ammidown*, however, the

20

government relies on *United States v. Fokker Services B.V.*, 818
F.3d 733 (D.C. Cir. 2016), to argue that judicial intervention
is warranted only when the defendant objects to dismissal
because "the 'principal object of the leave of court
requirement' has been understood to be a narrow one—'to protect
a defendant against prosecutorial harassment.'" Gov't's Reply,
ECF No. 227 at 20-21 (quoting *Fokker*, 818 F.3d at 742).

But *Fokker* does not address the Court's authority to
consider an unopposed Rule 48(a) motion; it involved a deferred
prosecution agreement rather than a guilty plea. *Fokker*, 818
F.3d at 737. *Fokker* also does not suggest that courts may *only*
review opposed Rule 48(a) motions for prosecutorial harassment—
the case simply quotes language from *Rinaldi*, stating that
preventing harassment is the *principal* object of the rule. *Id.*
at 742 (quoting *Rinaldi*, 434 U.S. at 29 n.15).

Furthermore, the Court's authority to consider the
unopposed Rule 48(a) motion here is not contrary to the Supreme
Court's decision in *Rinaldi*. In *Rinaldi*, the Court reviewed an
agreement between the defendant and government to dismiss an
indictment based on the government's violation of a federal
policy precluding multiple prosecutions for the same act. 434
U.S. at 24-25. The Supreme Court, in a footnote, stated:

> The words "leave of court" were inserted in
> Rule 48(a) without explanation. While they
> obviously vest some discretion in the court,

the circumstances in which that discretion may
properly be exercised have not been delineated
by this Court. The principal object of the
"leave of court" requirement is apparently to
protect a defendant against prosecutorial
harassment, *e. g.*, charging, dismissing, and
recharging, when the Government moves to
dismiss an indictment over the defendant's
objection. . . . But the Rule has also been
held to permit the court to deny a Government
dismissal motion to which the defendant has
consented if the motion is prompted by
considerations clearly contrary to the public
interest. *See United States v. Cowan*, 524 F.2d
504 (CA5 1975); *United States v. Ammidown*, 162
U.S. App. D.C. 28, 33, 497 F.2d 615, 620
(1973). It is unnecessary to decide whether
the court has discretion under these
circumstances, since, even assuming it does,
the result in this case remains the same.

*Id.* at 29 n.15. Significantly, the *Rinaldi* court thus left this

question open, while also recognizing that courts, including the

D.C. Circuit, have reviewed unopposed Rule 48(a) motions. *Id.*;

*see also Ammidown*, 497 F.2d at 620 (noting that the "primary

concern, at least as discerned by subsequent decisions of other

federal courts, was that of protecting a defendant from

harassment," but nonetheless finding that the court has a role

in reviewing unopposed Rule 48(a) motions).

At the September 29, 2020 motion hearing, the government

emphasized a different aspect of its argument. It conceded that

the Court should not act as a rubber stamp and that it has a

role to play when presented with an unopposed Rule 48(a) motion.

Hr'g Tr., ECF No. 266 at 40:9-12. But, in the government's view,

this role is limited to determining whether "the decision to
dismiss is the considered view, the authoritative view of the
Executive Branch as a whole," *id.*; rather than being the "rogue"
decision of an individual prosecutor, *id.* at 99:16-23.[7] The
government argued that this standard appropriately reconciles
the concerns about favoritism and pretext that led to the "leave
of court" language in the Rule with the separation of powers
principal that "the Executive Branch has exclusive authority and
absolute discretion to decide whether to prosecute a case."
*United States v. Nixon*, 418 U.S. 683, 693 (1974) (citation
omitted); *see also Fokker*, 818 F.3d at 742 ("[D]ecisions to
dismiss pending charges . . . lie squarely within the ken of
prosecutorial discretion."). The Court is not persuaded by the
government's argument, however, because it fails to acknowledge
the possibility that the "considered view of the Executive
Branch as a whole" could be contrary to the public interest.

---

[7] At oral argument during the en banc mandamus proceedings, the
government took the remarkable position that even if,
hypothetically, it was undisputed that the Attorney General of
the United States accepted a bribe in exchange for dismissing a
case, a district court would have no authority under Rule 48(a)
to deny the government's motion once the court ascertained that
the government stood by its decision to dismiss the case. Oral
Argument at 1:53, *In re Flynn*, No. 20-5143 (D.C. Cir. Aug. 11,
2020),
https://www.cadc.uscourts.gov/recordings/recordings.nsf/DocsByRD
ate?OpenView&count=100&SKey=202008.

Accordingly, the Court is persuaded that it has discretion to consider the unopposed Rule 48(a) motion before it.

### 2. The Court May Review Rule 48(a) Motions For Deficient Reasoning Or Prosecutorial Abuse

While courts have a role in considering Rule 48(a) motions, they are limited to narrow circumstances in which they may exercise their discretion in denying leave to dismiss. *See Fokker*, 818 F.3d at 742. After all, "decisions to dismiss pending criminal charges . . . lie squarely within the ken of prosecutorial discretion" and "at the core of the Executive's duty to see to the faithful execution of the laws." *Id.* at 741-42 (citations omitted). But, as explained above, this Circuit's precedent does not hold that Rule 48(a) confers unqualified power or discretion on the Executive Branch. *See id.* at 741-42 (explaining that the "presumption of regularity" applies to prosecutorial decisions only in the "absence of clear evidence to the contrary"); *see also Cowan*, 524 F.2d at 513 (stating that the "leave of court" phrase "was intended to modify and condition the absolute power of the Executive, consistently with the Framer's concept of Separation of Powers, by erecting a check on the abuse of Executive prerogatives").

Instead, consistent with our system of checks and balances, courts are tasked with making their own determination on whether dismissal would be in the "public interest," *Rinaldi*, 434 U.S.

at 29 n.15; in order to uphold the "crucial" responsibility of "maintaining [the] public perception of fairness and integrity in the justice system," *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1907 (2018); *see also Mistretta v. United States*, 488 U.S. 361, 407 (1989) ("The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship."). The court's role is not "to serve merely as a rubber stamp for the prosecutor's decision," even when "the defendant concurs in the dismissal." *Ammidown*, 497 F.2d at 620, 622. Rather, it is the court's "duty to exercise a discretion for the protection of the public interest." *Cowan*, 524 F.2d at 511. The trial court therefore conducts an "examination of the record" to ensure that the government's "efforts to terminate the prosecution [are not] tainted with impropriety." *Rinaldi*, 434 U.S. at 30.

With the above principles in mind, in response to the government's motion to dismiss under Rule 48(a), the Court holds that a judge may deny an unopposed Rule 48(a) motion if, after an examination of the record, (1) she is not "satisfied that the reasons advanced for the proposed dismissal are substantial"; or (2) she finds that the prosecutor has otherwise "abused his discretion." *Ammidown*, 497 F.2d at 620-22.

First, in exercising its role pursuant to Rule 48(a), "the court will not be content with a mere conclusory statement by

the prosecutor that dismissal is in the public interest, but will require a statement of reasons and the underlying factual basis." *Id.* at 620. Rule 48(a) "contemplates exposure of the reasons for dismissal 'in order to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors,' and in pursuance of this purpose 'to gain the Court's favorable discretion, it should be satisfied that the reasons advanced for the proposed dismissal are substantial.'" *Id.* "Thus, to honor the purpose of the rule, the trial court at the very least must know the prosecutor's reasons for seeking to dismiss the indictment and the facts underlying the prosecutor's decision." *United States v. Derr*, 726 F.2d 617, 619 (10th Cir. 1984); *see also United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483, 486 (S.D.N.Y. 1964) ("[T]o gain the Court's favorable discretion, it should be satisfied that the reasons advanced for the proposed dismissal are substantial and the real grounds upon which the application is based.").

Second, a court may deny a Rule 48(a) motion upon a finding of abuse of prosecutorial discretion where dismissal would be "contrary to the public interest." *See In re Richards*, 213 F.3d 773, 787 (3d Cir. 2000). In conducting this analysis, the court determines whether the government's "efforts to terminate the prosecution [are] tainted with impropriety." *Rinaldi*, 434 U.S.

at 30. However, courts must be mindful not to "second-guess the underlying charging decisions" or "impose [their] own views about the adequacy of the underlying criminal charges" because "their conception of the public interest differs from that of the prosecuting attorney." *Fokker*, 818 F.3d at 744-45 (citations omitted). Examples of prosecutorial impropriety would include where dismissal "does not serve due and legitimate prosecutorial interests," *Ammidown*, 497 F.2d at 622; where dismissal "was a sham or a deception," *Cowan*, 524 F.2d at 514; and where the prosecutor's dismissal was based on "acceptance of a bribe, personal dislike of the victim, and dissatisfaction with the jury impaneled," *United States v. Smith*, 55 F.3d 157, 159 (4th Cir. 1995). In addition, as indicated by the history of Rule 48(a), the corrupt dismissal of politically well-connected individuals would also constitute an abuse of discretion. *See Woody*, 2 F.2d at 262.

### 3. Whether To Deny Leave In This Case Is A Close Question, But Is Mooted By Mr. Flynn's Acceptance Of The President's Pardon

As an initial matter, the Court does not find that the government's submission is a mere conclusory statement of the reasons for dismissal, and so denial of leave would not be warranted on this ground. The majority of the cases finding denial of leave appropriate based on "conclusory statements" most often involve motions providing only one or two sentences

referring generally to the "public interest." *See, e.g.*, *Derr*, 726 F.2d at 619 (affirming denial of leave to dismiss when the government offered no reasons for dismissal other than that it would "best meet the ends of justice"). Here, on the other hand, the government has sought to justify its decision to seek dismissal by providing several reasons and facts underlying its decision. *See id.*

However, while not conclusory, many of the government's reasons for why it has decided to reverse course and seek dismissal in this case appear pretextual, particularly in view of the surrounding circumstances. For example, Mr. Flynn was serving as an adviser to President Trump's transition team during the events that gave rise to the conviction here, and, as this case has progressed, President Trump has not hidden the extent of his interest in this case. According to Mr. Gleeson, between March 2017 and June 2020, President Trump tweeted or retweeted about Mr. Flynn "at least 100 times." Amicus Br., ECF No. 225 at 66. This commentary has "made clear that the President has been closely following the proceedings, is personally invested in ensuring that [Mr.] Flynn's prosecution ends, and has deep animosity toward those who investigated and prosecuted [Mr.] Flynn." *Id.*

At the September 29, 2020 motion hearing, Mr. Flynn's counsel, in response to the Court's question, stated that she

had, within weeks of the proceeding, provided the President with a brief update on the status of the litigation. Hr'g Tr., ECF No. 266 at 56:18-20. Counsel further stated that she requested that the President not issue a pardon. *Id.* at 56:23-24. However, the President has now pardoned Mr. Flynn for the actions that instigated this case, among other things. Ex. 1 to Consent Mot. Dismiss, ECF No. 308-1 at 1. And simultaneous to the President's "running commentary," many of the President's remarks have also been viewed as suggesting a breakdown in the "traditional independence of the Justice Department from the President." *See, e.g.*, Amicus Br., ECF No. 225 at 67-68; *id.* at 68 (quoting *Excerpts from Trump's Interview with the Times*, N.Y. Times (Dec. 28, 2017), https://www.nytimes.com/2017/12/28/us/politics/trump-interview-excerpts.html) (reporting President Trump's statement that he enjoys the "absolute right to do what I want to do with the Justice Department").

Given this context, the new legal positions the government took in its Rule 48(a) motion and at the motion hearing raise questions regarding its motives in moving to dismiss. The government advances two primary reasons[8] justifying dismissing

---

[8] The government also asserted that dismissal is warranted because "the interests of justice do not support continuing the prosecution." Gov't's Reply, ECF No. 227 at 9. Because the majority of the government's apparent reasons underlying this rationale "are just the same facts that are legally irrelevant to its materiality and falsity assertions," Amicus Reply Br.,

the case based on its assessment of the strength of the case: (1) it would be difficult to prove the materiality of Mr. Flynn's false statements beyond a reasonable doubt; and (2) it would be difficult to prove the falsity of those statements beyond a reasonable doubt. *See* Gov't's Reply, ECF No. 227 at 31. As explained below, the Court finds both stated rationales dubious to say the least, arguably overcoming the strong presumption of regularity that usually attaches to prosecutorial decisions.

### a.   Materiality

The government's first rationale is that it believes that Mr. Flynn's false "statements were not 'material' to any viable counterintelligence investigation—or any investigation for that matter—initiated by the FBI." Gov't's Mot. Dismiss, ECF No. 198 at 13; *see also* Gov't's Reply, ECF No. 227 at 34-35. In making its arguments, however, the government relies on a newly-minted definition of "materiality" that is more circumscribed than the standard in this Circuit. The government describes the materiality threshold as requiring more than "mere 'relevance'"; rather, the false statement must have "probative weight" and be "reasonably likely to influence the tribunal in making a determination *required to be made*." Gov't's Mot. Dismiss, ECF

---

ECF No. 243 at 24, the Court does not address this argument separately.

No. 198 at 12-13 (quoting *Weinstock v. United States*, 231 F.2d 699, 701 (D.C. Cir. 1956)). Therefore, "[t]he materiality threshold thus ensures that misstatements to investigators are criminalized only when linked to the particular 'subject of [their] investigation.'" *Id.* at 13 (quoting *United States v. Kim*, 808 F. Supp. 2d 44, 59 (D.D.C. 2011)).

However, that is not the law. Rather, "[a] lie influencing the possibility that an investigation might commence stands in no better posture under § 1001 than a lie distorting an investigation already in progress." *See United States v. Hansen*, 772 F.2d 940, 949-50 (D.C. Cir. 1985) ("Application of § 1001 does not require judges to function as amateur sleuths, inquiring whether information specifically requested and unquestionably relevant to the department's or agency's charge would really be enough to alert a reasonably clever investigator that wrongdoing was afoot."). Instead, the standard asks only whether Mr. Flynn's statements were "capable of affecting" the "general function" of the FBI when it interviewed him. *United States v. Verrusio*, 762 F.3d 1, 21 (D.C. Cir. 2014). As the D.C. Circuit held in *United States v. Moore*, 612 F.3d 698 (D.C. Cir. 2010), "a statement is material if it has a natural tendency to influence, or is capable of influencing, either a discrete decision *or any other function of the agency to which it was addressed*." 612 F.3d at 701 (emphasis added); *see also United*

31

*States v. Rodgers*, 466 U.S. 475, 479 (1984) (calling the application of 18 U.S.C. § 1001 "sweeping"). "Proof of actual reliance on the statement is not required; the Government need only make a reasonable showing of its potential effects." *United States v. Diggs*, 613 F.2d 988, 999 (D.C. Cir. 1979); *see Moore*, 612 F.3d at 702 (holding that defendant's false statement "was capable of affecting the Postal Service's general function of tracking packages and identifying the recipients of packages entrusted to it" and defendant's false information "could have impeded the ability of the Postal Service to investigate the trafficking of narcotics through the mails").

Given the materiality threshold's expansive scope, the government's new use of the narrowed definition of "materiality" is perplexing, particularly given that the government has previously argued in this case that the materiality standard required only that a statement have a "natural tendency to influence, or [be] capable of influencing." *See* Gov't's Surreply Def.'s Reply Support Mot. Compel, ECF No. 132 at 10-11. The government, for its part, offers no response as to why it relies on this new, more stringent definition. Nor does the government direct the Court's attention to any other case in which it has advanced this highly-constrained interpretation of materiality as applied to a false statements case.

Notably, during the September 29, 2020 motion hearing, the government seemed to suggest that, when moving for dismissal of an action pursuant to Rule 48(a), the government need not refer to the correct materiality standard at all when determining whether a false statement is "material." *See* Hr'g Tr., ECF No. 266 at 78:21-79:3 ("[W]hen we move to dismiss, the question in our mind is not what is the legal standard of materiality for whether the evidence here will be sufficient to sustain a conviction on appeal. The question is whether we, the Department of Justice, think this evidence is material . . . ."). In view of the government's previous argument in this case that Mr. Flynn's false statements were "absolutely material" because his false statements "went to the heart" of the FBI's investigation, the government's about-face, without explanation, raises concerns about the regularity of its decision-making process.

Furthermore, Rule 48(a)'s "leave of court" standard requires the court to consider the objective reasonableness of the government's justification for seeking dismissal. Where, as here, the government justifies its motion by ignoring applicable law to now question the strength of its case, substantial doubt arises about the government's stated reasons for seeking dismissal.

Several of the government's arguments regarding materiality also appear to be irrelevant or to directly contradict previous

statements the government has made in this case. For example, as
Mr. Gleeson points out, many of the "bureaucratic formalities"
the government asserts reveal the "confusion and disagreement
about the purpose and legitimacy of the interview and its
investigative basis"—such as the drafting of the FBI's Closing
Communication or internal conversations between FBI and
Department of Justice officials regarding whether to notify the
Trump administration of Mr. Flynn's false statements—are not
relevant to proving materiality. *See* Amicus Reply Br., ECF No.
243 at 19. Nor is it relevant whether Mr. Flynn was an "agent of
Russia" or guilty of some other crime at the time he made the
false statements. Furthermore, while the government argues that,
"since the time of [Mr. Flynn's guilty] plea, extensive
impeaching materials had emerged about key witnesses the
government would need to prove its case," Gov't's Reply, ECF No.
227 at 35; the government had been aware of much of this
evidence since early on in the case, *see, e.g.*, Gov't's Response
Def.'s Mot. Compel, ECF No. 122 at 8-9. Under *Ammidown*, the
Court must be satisfied that the government undertook a
"considered judgment," 497 F.2d at 620; and asserting a factual
basis that is largely irrelevant to meeting any legal threshold
likely does not meet this standard.

###    b.    Falsity

The government's second rationale is that it "does not
believe it could prove that Mr. Flynn knowingly and willfully
made a false statement beyond a reasonable doubt." Gov't's Mot.
Dismiss, ECF No. 198 at 18; *see also* Gov't's Reply, ECF No. 227
at 38-39. To support this rationale, the government initially
pointed to the fact, which was known at the time Mr. Flynn pled
guilty, that the FBI agents who interviewed him did not think he
was lying, and it also noted the "equivocal" or "indirect"
nature of Mr. Flynn's responses. Gov't's Mot. Dismiss, ECF No.
198 at 18. The government further contends that evidentiary
problems have "emerged" including: (1) "inconsistent FBI records
as to the actual questions and statements made," *id.* at 19; (2)
"Director [James] Comey's own sentiment that the case was a
'close one,'" *id.* (quoting Ex. 5 to Gov't's Mot. Dismiss, ECF
No. 198); and (3) "substantial impeaching materials on the key
witnesses,"[9] Gov't's Reply, ECF No. 227 at 39. At the September
29, 2020 motion hearing, the government raised two more points:
(4) evidence that Mr. Flynn had a faulty memory, Hr'g Tr., ECF
No. 266 at 44:8, 155:5; and (5) the notes of the FBI's Assistant
Director for Counter Intelligence as to the FBI interview's
goal, *id.* at 83:11-20.

---

[9] The Court has addressed this rationale in the materiality
section *supra*.

The Court is mindful that it is "particularly ill-suited" to reviewing the strength of the case. *Wayte v. United States*, 470 U.S. 598, 607 (1985); *see also In re United States*, 345 F.3d 454, 455 (7th Cir. 2003) (finding that the trial court's belief that "the evidence was strong and conviction extremely likely" was an inappropriate basis to deny leave). That said, the role of the Court is to conduct an "examination of the record" in order to ensure that the government's "efforts to terminate the prosecution [are not] tainted with impropriety." *Rinaldi*, 434 U.S. at 30. Moreover, the Court examines the factual basis underlying the government's reasons because not doing so would amount to rubber stamping the government's decision, contrary to the requirement of Rule 48(a). Here, the government has invited the Court's examination of its evidence. *See* Hr'g Tr., ECF No. 266 at 42:22-43:1 (stating that "we're completely unafraid here to address . . . the specifics as to why we thought we needed to dismiss this case. . . . we'd be happy to go through the evidence."). Accordingly, the Court will briefly address some of the evidence the government points to as it is troubled by the apparently pretextual nature of certain aspects of the government's ever-evolving justifications. *See Foster v. Chatman*, 136 S. Ct. 1737, 1751 (2016) ("[T]he prosecution's principal reasons for the strike shifted over time, suggesting that those reasons may be pretextual.").

As an initial matter, whether or not the FBI agents thought Mr. Flynn was lying is irrelevant in a false statements case. *See Brogan v. United States*, 522 U.S. 398, 402 (1998). And the government has not explained how evidence that the government previously stated was "consistent and clear," Gov't's Surreply, ECF No. 132 at 4-5; suddenly became "equivocal" or "indirect." With regard to the "inconsistent records" rationale, the government has not pointed to evidence in the record in this case that contradicts the FD-302 that memorialized the FBI agents' interview with Mr. Flynn. Furthermore, the government's reliance on Director Comey's opinion about whether Mr. Flynn lied is suspect given that Director Comey was not present at the interview and that there are valid questions regarding the admissibility of his personal opinion.

With regard to Mr. Flynn's alleged "faulty memory," Mr. Flynn is not just anyone; he was the National Security Advisor to the President, clearly in a position of trust, who claimed that he forgot, within less than a month, that he personally asked for a favor from the Russian Ambassador that undermined the policy of the sitting President prior to the President-Elect taking office. With regard to the government's concerns about the Assistant Director for Counter Intelligence's contemplating the goal of the interview, an objective interpretation of the notes in their entirety does not call into question the

legitimacy of the interview. Finally, and critically, under the terms of Mr. Flynn's cooperation agreement, the government could have used his admissions at trial, *see* Plea Agreement, ECF No. 3 at 8 ¶ 11; but the government ignores this powerful evidence. Again, under *Ammidown*, the Court must be satisfied that the government undertook a "considered judgment." 497 F.2d at 620. Asserting factual bases that are irrelevant to the legal standard, failing to explain the government's disavowal of evidence in the record in this case, citing evidence that lacks probative value, failing to take into account the nature of Mr. Flynn's position and his responsibilities, and failing to address powerful evidence available to the government likely do not meet this standard.

Thus, the application of Rule 48(a) to the facts of this case presents a close question. However, in view of the President's decision to pardon Mr. Flynn, Mr. Flynn's acceptance of the pardon, and for the reasons stated in the following section, the appropriate resolution is to deny as moot the government's motion to dismiss pursuant to Rule 48(a).

## B. The Presidential Pardon Power

Article II, Section 2, of the United States Constitution provides that "[t]he President . . . shall have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." U.S. Const. art. II, § 2, cl.

1. Though the Constitution confers the pardoning power on the President generally, it is well-established that "the judiciary has served as the supreme interpreter of the scope of the constitutional powers since *Marbury v. Madison*." *See* William F. Duker, *The President's Power to Pardon: A Constitutional History*, 18 Wm. & Mary L. Rev. 475, 506 (1977); *see also Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Thus, the Court looks to precedent to determine the validity of presidential pardons.

Beginning with *Marbury*, the Supreme Court has long suggested that the President's power to pardon is largely unqualified. While not specifically mentioning the power to pardon, the Supreme Court in *Marbury* explained that, "[b]y the [C]onstitution of the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." 5 U.S. at 165-66. The Supreme Court stated that in such cases, "whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion." *Id.* at 166. Because the power had been "entrusted to the executive, the decision of the executive is conclusive." *Id.* Thus, the Supreme

Court in *Marbury* laid the foundation for the view that the President has a "general, unqualified grant of power to pardon offenses against the United States." *The Laura*, 114 U.S. 411, 413 (1885).

In view of the principles set out in *Marbury*, the Supreme Court thereafter instructed that the President's power to pardon is "granted without limit." *United States v. Klein*, 80 U.S. 128, 147 (1871); *see also Ex parte Garland*, 71 U.S. 333, 380 (1866) ("This power of the President is not subject to legislative control. Congress can neither limit the effect of his pardon, nor exclude from its exercise any class of offenders."). The "executive can reprieve or pardon all offenses *after their commission*, either before trial, during trial or after trial, by individuals, or by classes, conditionally or absolutely, and this without modification or regulation by Congress." *Ex parte Grossman*, 267 U.S. 87, 120 (1925) (emphasis added).

The pardon power, however, is not without limitations. For example, a presidential pardon generally must be accepted to be effective. *See Burdick v. United States*, 236 U.S. 79, 94 (1915); *but see Biddle v. Perovich*, 274 U.S. 480, 486-87 (1927) (finding, where defendant sought his release upon the grounds that he had not accepted the commutation of his death sentence to life imprisonment, that "the public welfare, not his consent, determines what shall be done"). "Once accepted, a full and

absolute pardon 'releases the wrongdoer from punishment and
restores the offender's civil rights without qualification.'"
*United States v. Arpaio*, No. 16-cr-1012, 2017 WL 4839072, at *1
(D. Ariz. Oct. 19, 2017) (quoting *Absolute Pardon*, Black's Law
Dictionary (10th ed. 2014)).

On the other hand, a pardon does not necessarily render
"innocent" a defendant of any alleged violation of the law.
Indeed, the Supreme Court has recognized that the acceptance of
a pardon implies a "confession" of guilt. *See Burdick*, 236 U.S.
at 94 ("[A pardon] carries an imputation of guilt; acceptance a
confession of it."); *see also United States v. Schaffer*, 240
F.3d 35, 38 (D.C. Cir. 2001) ("[A]cceptance of a pardon may
imply a confession of guilt." (citing *In re North*, 62 F.3d 1434,
1437 (D.C. Cir. 1994)). As Chief Justice Marshall wrote, "[a]
pardon is an act of grace, proceeding from the power intrusted
with the execution of the laws, which exempts the individual on
whom it is bestowed, from the punishment the law inflicts *for a
crime he has committed*." *United States v. Wilson*, 32 U.S. 150,
150 (1833) (emphasis added). In other words, "a pardon does not
blot out guilt or expunge a judgment of conviction." *In re
North*, 62 F.3d at 1437. Furthermore, a pardon cannot "erase a
judgment of conviction, or its underlying legal and factual
findings." *Arpaio*, 2017 WL 4839072, at *1 (citing *United States
v. Crowell*, 374 F.3d 790, 794 (9th Cir. 2004)); *but see*

*Schaffer*, 240 F.3d at 38 (vacating "all opinions, judgments, and verdicts of this court and the District Court" where "[f]inality was never reached on the *legal question* of [the defendant's] guilt" (emphasis added)).

Here, the scope of the pardon is extraordinarily broad – it applies not only to the false statements offense to which Mr. Flynn twice pled guilty in this case, but also purports to apply to "any and all possible offenses" that he might be charged with in the future in relation to this case and Special Counsel Mueller's investigation. Ex. 1 to Consent Mot. Dismiss, ECF No. 308-1 at 1. However, the Court need only consider the pardon insofar as it applies to the offense to which Mr. Flynn twice pled guilty in this case. Mr. Flynn has accepted President Trump's "full and unconditional pardon." *See* Consent Mot. Dismiss, ECF No. 308 at 2. The history of the Constitution, its structure, and the Supreme Court's interpretation of the pardon power make clear that President Trump's decision to pardon Mr. Flynn is a political decision, not a legal one. Because the law recognizes the President's political power to pardon, the appropriate course is to dismiss this case as moot. However, the pardon "does not, standing alone, render [Mr. Flynn] innocent of the alleged violation" of 18 U.S.C. § 1001(a)(2). *Schaffer*, 240 F.3d at 38. Accordingly, in view of the Supreme Court's expansive view of the presidential pardon power, the Court

grants the consent motion to dismiss this case as moot. *See, e.g.*, *id.*

## III. Conclusion

For the reasons stated above, the Court **DENIES AS MOOT** the government's motion to dismiss pursuant to Rule 48(a), ECF No. 198; and **GRANTS** the government's consent motion, ECF No. 308, based on the presidential pardon and **DISMISSES** this case **AS MOOT.** An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **December 8, 2020**

43